# EXHIBIT 35

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   1        DR NO.: 2000 01797849        8

REPORT DATE: 20001010   TIME: 0702

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

PROSECUTION DESIRED: YES

LOCATION: 002155 E LIBERTY LANE                 BEAT: 0435   GRID: JD32

REPORTING OFFICER[S]: DENNIS OLSON                 2979      UNIT: C81

  PREMISES: APARTMENT                                  OCCUPIED:

OFFENSE INVOLVED:  [DOMESTIC VIOLENCE]

PHOTOGRAPHS TAKEN: YES    BY: A3328

SCENE PROCESSED FOR LATENTS: YES     BY: A3328

LATENTS SUBMITTED TO CRIME LAB: YES

                  ***   PROPERTY/EVIDENCE   ***

  RECOVERY LOCATION: 002155 E LIBERTY AV
          DATE: 100900                    SEARCH WARRANT INVOLVED: YES

0001  PKG 000 CODE:IE   UK00
       ITEM: *MISC       BRAND:        MODEL:              COLOR:
       SIZE:             QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: FORK-BLOODSTAINED-
LIVING ROOM FLOOR

0002  PKG 000 CODE:IE   UK00
       ITEM: PCLOTHE     BRAND:        MODEL:          COLOR: BRO
       SIZE:             QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: BLOODSTAINED BELT
LIVING ROOM FLOOR

0003  PKG 000 CODE:IE   UK00
       ITEM: HKNIFE      BRAND:        MODEL:          COLOR:
       SIZE:             QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: BLOODSTAINED KNIFE
LIVING ROOM FLOOR

0004  PKG 000 CODE:IE   UK00
       ITEM: PCLOTHE     BRAND:        MODEL:          COLOR: WHI
       SIZE:             QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: BLOODSTAINED GIRLS PANTS
LIVING FLOOR FLOOR

0005  PKG 000 CODE:IE   UK00
       ITEM: *MISC       BRAND:        MODEL:          COLOR:

SIZE:             QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: BROKEN BLOODSTAINED SEAT OF STOOL (LARGER SECTION)
LIVING ROOM FLOOR

0006  PKG 000 CODE:IE    UK00
      ITEM: *MISC        BRAND:           MODEL:              COLOR:
      SIZE:             QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: LEG PORTION OF BLOODSTAINED STOOL (BROKEN)
LIVING ROOM FLOOR

0007  PKG 000 CODE:IE    UK00
      ITEM: *MISC        BRAND:           MODEL:              COLOR:
      SIZE:             QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: SMALLER PORTION OF BLOODSTAINED SEAT OF STOOL
LIVING ROOM FLOOR

0008  PKG 000 CODE:IE    UK00
      ITEM: PCLOTHE      BRAND:           MODEL:              COLOR: RED WHI
      SIZE:             QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: BLOODSTAINED BLANKET
LIVING ROOM FLOOR

0009  PKG 000 CODE:IE    UK00
      ITEM: *MISC        BRAND:           MODEL:              COLOR: TAN
      SIZE:             QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: BLOODSTAINED PLASTIC GARBAGE CAN AND LID
LIVING ROOM FLOOR

0010  PKG 000 CODE:IE    UK00
      ITEM: *MISC        BRAND:           MODEL:              COLOR:
      SIZE:             QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: BLOODSTAINED SECTION OF STOOL BRACE
LIVING ROOM FLOOR

0011  PKG 000 CODE:IE    UK00
      ITEM: FSPECIM      BRAND:           MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
LIVING ROOM CARPET FLOOR

0012  PKG 000 CODE:IE    UK00
      ITEM: FSPECIM      BRAND:           MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
LIVING ROOM CARPET FLOOR

0013  PKG 000 CODE:IE    UK00
      ITEM: FSPECIM      BRAND:           MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
LIVING ROOM CARPET FLOOR

0013A PKG 000 CODE:IE    UK00
      ITEM: *MISC        BRAND:           MODEL:              COLOR:

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   3          DR NO.: 2000 01797849          8

```
          DESCRIPTION: BLOODSTAINED CARPET
NORTH OF BLOODSTAINED CARPET #13

0014  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF VOMIT
LIVING ROOM CARPET FLOOR

0015  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED WHITE NAPKIN
LIVING ROOM FLOOR

0016  PKG 000 CODE:IE   UK00
      ITEM: FLAMP      BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
LIVING ROOM FLOOR

0017  PKG 000 CODE:IE   UK00
      ITEM: PCLOTHE    BRAND:          MODEL:              COLOR: GRN
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: VICTIM'S SHORTS (WEARING AT TIME OF DEATH)

0018  PKG 000 CODE:IE   UK00
      ITEM: FLAMP      BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
LIVING ROOM FLOOR

0019  PKG 000 CODE:IE   UK00
      ITEM: PCLOTHE    BRAND:          MODEL:              COLOR: WHI
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED PILLOW CASE
SEAT OF GREEN CHAIR

0020  PKG 000 CODE:IE   UK00
      ITEM: FLAMP      BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
LIVING ROOM FLOOR

0021  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
      DESCRIPTION: HAIR FROM VICTIM'S LEFT HAND

0022  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
      DESCRIPTION: HAIR FROM RIGHT HAND OF VICTIM
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   4       DR NO.: 2000 01797849        8

0023  PKG 000 CODE:IE   UK00
      ITEM: YDOOR      BRAND:         MODEL:           COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: BLOODSTAINED DOOR HANDLE
INTERIOR OF FRONT DOOR

0024  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
OUTSIDE FRONT DOOR

0024A PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: CONTROL SAMPLE-OUTSIDE FRONT DOOR

0025  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
LOWER DEAD BOLT LOCK OF FRONT DOOR

0026  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
UPPER DEAD BOLT OF FRONT DOOR

0027  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
INTERIOR OF FRONT DOOR

0027A PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: CONTROL SAMPLE-INTERIOR FRONT DOOR

0028  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
INTERIOR OF FRONT DOOR

0029  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
OUTSIDE WALL BY FRONT DOOR

0030  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM    BRAND:         MODEL:           COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-HAIR BARRETT AND PLASTIC BAG
CONTAINED POPCORN-POPCORN DISPOSED OF PRIOR TO IMPOUNDING

0031  PKG 000 CODE:IE   UK00

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   5          DR NO.: 2000 01797849          8

ITEM: FCLOTHE    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: THROW RUG-BLOODSTAINED

0031A PKG 000 CODE:IE    UK00
ITEM: *MISC    BRAND:          MODEL:          COLOR:
DESCRIPTION: BLOODSTAINED CARPET NORTH OF ITEM #31.

0032  PKG 000 CODE:IE    UK00
ITEM: FCOUCH    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: NORTH SIDE CUSHION COVER ON EAST SIDE COUCH
BLOODSTAINED

0033  PKG 000 CODE:IE    UK00
ITEM: FCOUCH    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: SOUTH SIDE CUSHION COVER FROM EAST COUCH-BLOOD
STAINED

0034  PKG 000 CODE:IE    UK00
ITEM: FPILLOW    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: FLOWERED COLORED PILLOW-BLOODSTAINED FROM EAST
COUCH

0035  PKG 000 CODE:IE    UK00
ITEM: FPILLOW    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: FLOWERED PILLOW FROM COUCH AGAINST EAST WALL-
BLOODSTAINED

0036  PKG 000 CODE:IE    UK00
ITEM: FPILLOW    BRAND:          MODEL:          COLOR: TAN
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: BLOODSTAINED ARM COVER FROM NORTH ARM OF COUCH
AGAINST EAST WALL

0037  PKG 000 CODE:IE    UK00
ITEM: FCOUCH    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: FRONT DUST COVER NORTH SIDE OF COUCH AGAINST
EAST WALL-BLOODSTAINED

0038  PKG 000 CODE:IE    UK00
ITEM: FCOUCH    BRAND:          MODEL:          COLOR:
SIZE:          QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: FRONT DUST COVER ON SOUTH SIDE OF COUCH AGAINST
EAST WALL-BLOODSTAINED

0039  PKG 000 CODE:IE    UK00

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NO.   6        DR NO.: 2000 01797849        8

```
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
EAST LIVING ROOM WALL

0040  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
EAST LIVING ROOM WALL

0040A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-EAST LIVING ROOM WALL

0041  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
EAST LIVING ROOM WALL

0041A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-EAST LIVING ROOM WALL

0042  PKG 000 CODE:IE   UK00
        ITEM: FCOUCH    BRAND:           MODEL:              COLOR:
        SIZE:              QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: SEAT CUSHION FROM CHAIR AGAINST SOUTH WALL
BLOODSTAINED

0043  PKG 000 CODE:IE   UK00
        ITEM: FPILLOW   BRAND:           MODEL:              COLOR:
        SIZE:              QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: FLOWERED PILLOW FROM CHAIR AGAINST SOUTH WALL
BLOODSTAINED

0044  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
SOUTH LIVING ROOM WALL

0044A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-SOUTH LIVING ROOM WALL

0045  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
SOUTH LIVING ROOM WALL

0046  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM   BRAND:           MODEL:              COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NO.    7        DR NO.: 2000 01797849        8

WEST LIVING ROOM WALL

0046A PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: CONTROL SAMPLE-WEST LIVING ROOM WALL

0047  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
WEST LIVING ROOM WALL

0048  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
SOUTH LIVING ROOM WALL

0049  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
T.V. STAND

0050  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
SOUTH LIVING ROOM WALL

0050A PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: CONTROL SAMPLE-SOUTH LIVING ROOM WALL

0051  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
WEST LIVING ROOM WALL

0051A PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: CONTROL SAMPLE-WEST LIVING ROOM WALL

0052  PKG 000 CODE:IE    UK00
      ITEM: *MISC    BRAND:            MODEL:            COLOR:
      SIZE:            QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: FRAMED PICTURE BLOODSTAINED AGAINST WEST WALL

0053  PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
NORTH LIVING ROOM WALL

0053A PKG 000 CODE:IE    UK00
      ITEM: PSPECIM    BRAND:            MODEL:            COLOR:

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   8        DR NO.: 2000 01797849         8


        DESCRIPTION: CONTROL SAMPLE-NORTH LIVING ROOM WALL

0054  PKG 000 CODE:IE    UK00
        ITEM: PSPECIM    BRAND:          MODEL:            COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
CERAMIC TILE FLOOR BY FRONT DOOR


0054A PKG 000 CODE:IE    UK00
        ITEM: PSPECIM    BRAND:          MODEL:            COLOR:
        DESCRIPTION: CONTROL SAMPLE-CERAMIC FLOOR


0055  PKG 000 CODE:IE    UK00
        ITEM: PJEWELR    BRAND:          MODEL:            COLOR: YEL
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: WEDDING RING WITH CLEAR STONE AND GREEN STONES
KITCHEN COUNTER


0056  PKG 000 CODE:IE    UK00
        ITEM: *MISC      BRAND:          MODEL:            COLOR:
        DESCRIPTION: PRESCRIPTION BOTTLES-KITCHEN COUNTER
1-CHLORPROMAZINE 25 MG, QNTY-40 AND 36 IN VIAL DATED 8-24-00
1-DEXAMETHASONE 4 MG, QNTY-20 AND 32 IN VIAL DATED 8-1-00
1-PROCHLORPERAZINE 10 MG, QNTY-60 AND 51 IN VIAL DATED 7-11-00
VICTIM'S NAME ON BOTTLES


0057  PKG 000 CODE:IE    UK00
        ITEM: OTELEPH    BRAND:          MODEL:            COLOR:
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: BROKEN CELL PHONE
KITCHEN COUNTER


0058  PKG 000 CODE:IE    UK00
        ITEM: *MISC      BRAND:          MODEL:            COLOR:
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: PRESCRIPTION BOX-KITCHEN COUNTER
ZOFRAN 8 MG, QNTY-9 AND 3 IN BOX DATED 8-22-00
VICTIM'S NAME ON PRESCRIPTION


0059  PKG 000 CODE:IE    UK00
        ITEM: PCLOTHE    BRAND:          MODEL:            COLOR: GRN WHI
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: DAMP TOWEL
KITCHEN FLOOR


0059A PKG 000 CODE:IE    UK00
        ITEM: PCLOTHE    BRAND:          MODEL:            COLOR: WHI
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: MULTI COLOR DAMP TOWEL
KITCHEN FLOOR


0059B PKG 000 CODE:IE    UK00

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   9          DR NO.: 2000 01797849          8

```
       ITEM: PCLOTHE    BRAND:          MODEL:              COLOR: GRN PNK
       SIZE:            QUANTITY: 0001  SERIAL NO.:
       DESCRIPTION: DAMP TOWEL
KITCHEN FLOOR

0060   PKG 000 CODE:IE   UK00
       ITEM: OTELEPH    BRAND:          MODEL:              COLOR:
       SIZE:            QUANTITY: 0002  SERIAL NO.:
       DESCRIPTION: CUT CELL PHONE CORD
KITCHEN FLOOR

0061   PKG 000 CODE:IE   UK00
       ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
       DESCRIPTION: SAMPLE OF BLOODSTAIN
NORTH SIDE OF KITCHEN COUNTER

0061A  PKG 000 CODE:IE   UK00
       ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
       DESCRIPTION: CONTROL SAMPLE-KITCHEN COUNTER

0062   PKG 000 CODE:IE   UK00
       ITEM: *MISC      BRAND:          MODEL:              COLOR:
       SIZE:            QUANTITY: 0001  SERIAL NO.:
       DESCRIPTION: BROKEN PICTURE AND FRAME
KITCHEN FLOOR

0063   PKG 000 CODE:IE   UK00
       ITEM: *MISC      BRAND:          MODEL:              COLOR:
       SIZE:            QUANTITY: 0001  SERIAL NO.:
       DESCRIPTION: BROKEN FLOWER POT
KITCHEN FLOOR

0064   PKG 000 CODE:IE   UK00
       ITEM: *MISC      BRAND:          MODEL:              COLOR:
       SIZE:            QUANTITY: 0001  SERIAL NO.:
       DESCRIPTION: BLOODSTAINED SILVER WARE DRAWER

0065   PKG 000 CODE:IE   UK00
       ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
       DESCRIPTION: SAMPLE OF BLOODSTAIN
KITCHEN FLOOR

0065A  PKG 000 CODE:IE   UK00
       ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
       DESCRIPTION: CONTROL SAMPLE-KITCHEN FLOOR

0066   PKG 000 CODE:IE   UK00
       ITEM: PSPECIM    BRAND:          MODEL:              COLOR:
       DESCRIPTION: SAMPLE OF BLOODSTAIN
KITCHEN FLOOR
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  10          DR NO.: 2000 01797849          8

0067  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-MANILLA FOLDER
DINING ROOM FLOOR

0068  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
DINING ROOM FLOOR

0069  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
DINING ROOM FLOOR

0070  PKG 000 CODE:IE   UK00
      ITEM: EKEY      BRAND:         MODEL:            COLOR:
      DESCRIPTION: SET OF CAR KEYS WITH ALARM
DINING ROOM FLOOR

0071  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-FREEZER DOOR

0071A PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      DESCRIPTION: CONTROL SAMPLE-REFRIDGRATOR DOOR

0072  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-FREEZER DOOR

0073  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-DOOR HANDLE OF REFRIDGERATOR

0074  PKG 000 CODE:IE   UK00
      ITEM: EKEY      BRAND:         MODEL:            COLOR:
      DESCRIPTION: SET OF KEYS WITH ALARM FROM WALL HOOK
SOUTH KITCHEN WALL

0075  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
DINING ROOM TABLE

0076  PKG 000 CODE:IE   UK00
      ITEM: PSPECIM   BRAND:         MODEL:            COLOR:

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  11          DR NO.: 2000 01/97849          8

            DESCRIPTION: SAMPLE OF BLOODSTAIN-CHILDREN'S CHAIR
DINING ROOM

0076A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: CONTROL SAMPLE-PLASTIC CHILDREN'S CHAIR

0077  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
NORTH WALL OF DINING ROOM WALL

0077A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: CONTROL SAMPLE-NORTH WALL OF DINING ROOM WALL

0078  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN
NORTH WALL OF DINING ROOM WALL

0079  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN-
NORTH WALL OF DINING ROOM WALL

0080  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN-
NORTH WALL OF DINING ROOM WALL-MIRROR

0080A PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: CONTROL SAMPLE-MIRROR

0081  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN-
NORTH WALL OF DINING ROOM WALL-MIRROR

0082  PKG 000 CODE:IE   UK00
        ITEM: PSPECIM    BRAND:          MODEL:          COLOR:
        DESCRIPTION: SAMPLE OF BLOODSTAIN-
NORTH WALL OF DINING ROOM WALL-MIRROR

0083  PKG 000 CODE:IE   UK00
        ITEM: *MISC      BRAND:          MODEL:          COLOR:
        SIZE:            QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: STOOL FROM DINING ROOM

0084  PKG 000 CODE:IE   UK00

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NO. 12          DR NO.: 2000 01797849          8

ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-NORTH WALL OF HALLWAY

0084A PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: CONTROL SAMPLE-NORTH HALLWAY WALL

0085  PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0085A PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: CONTROL SAMPLE-CEILING

0086  PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0087  PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0088  PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING FAN

0088A PKG 000 CODE:IE    UK00
ITEM: PSPECIM    BRAND:           MODEL:           COLOR:
DESCRIPTION: CONTROL SAMPLE-CEILING FAN

0089  PKG 000 CODE:IE    UK00
ITEM: PCLOTHE    BRAND:           MODEL:           COLOR: BLK
SIZE:            QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: PAIR OF BLOODSTAINED LADIES SHOES
HALLWAY FLOOR

0090  PKG 000 CODE:IE    UK00
ITEM: EKEY       BRAND:           MODEL:           COLOR:
DESCRIPTION: SET OF KEYS TO BUICK WITH ALARM
BATHROOM COUNTER

0091  PKG 000 CODE:IE    UK00
ITEM: PCLOTHE    BRAND:           MODEL:           COLOR: BLU WHI
SIZE:            QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: PLAID SHORTS-BATHROOM CLOSET

0092  PKG 000 CODE:IE    UK00
ITEM: PCLOTHE    BRAND:           MODEL:           COLOR: RED GRN
SIZE:            QUANTITY: 0001    SERIAL NO.:
DESCRIPTION: PLAID SHORTS-BATHROOM CLOSET

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  13          DR NO.: 2000 01797849          8

0093  PKG 000 CODE:IE    UK00
      ITEM: IPHOTO     BRAND:          MODEL:              COLOR:
      DESCRIPTION: STACK OF 35 MM PHOTOS OF SUSPECT AND FRIENDS
TOP OF DRESSER IN BEDROOM

0094  PKG 000 CODE:IE    UK00
      ITEM: PCLOTHE    BRAND:          MODEL:          COLOR: BLU WHI
      SIZE:            QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: CHECKERED SHORTS-UNDER SOUTH END OF BED

0095  PKG 000 CODE:IE    UK00
      ITEM: PCLOTHE    BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: MULTI COLORED FLOWERED SHORTS-NORTH OF BED

0096  PKG 000 CODE:IE    UK00
      ITEM: YDOCUME    BRAND:          MODEL:              COLOR:
      SIZE:            QUANTITY: 0001    SERIAL NO.:
      DESCRIPTION: LETTER AND COURT DOCUMENTS REFERENCE LAWSUIT

              ****   CRIME AGAINST PERSON M.O.   ****

  VICTIM - V-01       M.O. FOR SUSPECT - AP-01
SUSPECT-
       PRIMARY FORCE/MEANS OF ATTACK: KNIFE/CUTTING OBJECT
                               CLUB/CLUB TYPE OBJECT
     INFLICTED/ACTIONS:
         CUT/STABBED VICTIM


  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:      2777913

                           END OF REPORT          DR NO: 2000 01797849    0

```
                    PHOENIX POLICE DEPARTMENT REPORT

     SUPPLEMENT          PAGE NUMBER:   1     DR NUMBER: 2000 01797849    13


REPORT DATE: 20001011   TIME: 0918

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE               BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: KATHI GALBARI                4107    UNIT: C33
                      SALLIE DILLIAN               4689

PREMISES: APARTMENT                               OCCUPIED:

OFFENSE INVOLVED:  BIAS -

               ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 002155 E LIBERTY  #132
          DATE: 101000               SEARCH WARRANT INVOLVED: YES

0001  PKG 000 CODE:EI   AP01
           ITEM: *MISC   BRAND:       MODEL:         COLOR:
      DESCRIPTION: 2-YELLOW ENVELOPS WITH E-MAILS CONCERNING THE SHIP
      MENT OF CHEMICAL, AIRBORNE SHIPPING LABEL AND TRACKING # FOR SHIPMENT TO
      AP WENDI ANDRIANO USING AKA OF ANNE NEWTON. SHIPMENT OF SODIUM AZID SHIP
      PED TO AZTEC CREATIONS/ANNE NEWTON, 2442 S. 24TH ST. PHOENIX ON 9/28/00.
      TRACKING #6802739090
      FOUND IN WENDI ANDRIANO'S OFFICE AT APT RENTAL OFFICE WHERE SHE WORKED

0002  PKG 000 CODE:EI   AP01
           ITEM: IPHOTO  BRAND:       MODEL:         COLOR:
      DESCRIPTION: DEVELOPED COLOR PHOTOGRAPHS OF THE FAMILY
      ON THE KITCHEN COUNTER

0003  PKG 000 CODE:EI   AP01
           ITEM: IPHOTO  BRAND:       MODEL:         COLOR:
      DESCRIPTION: DEVELOPED PHOTOGRAPHS OF THE FAMILY
      ON THE KITCHEN COUNTER

0004  PKG 000 CODE:CI   AP01
           ITEM: CMISC   BRAND:       MODEL:         COLOR:
      DESCRIPTION: PLASTIC BAGGIE CONTAINING 3-KODAK MAX FLASH
      CAMERAS AND 5-ROLLS OF UNDEVELOPED FILM
      FOUND ON THE KITCHEN COUNTER

0005  PKG 000 CODE:EI   AP01
           ITEM: *MISC   BRAND:       MODEL:         COLOR:
      DESCRIPTION: DOCUMENTS FROM ALMA JENNINGS HAUGHT, CLERK OF
      COURTS, P.O. BOX 2730, FLORENCE, AZ.  85232
      FOUND ON THE KITCHEN COUNTER

0006  PKG 000 CODE:EI   AP01
           ITEM: *MISC   BRAND:       MODEL:         COLOR:

  2000 01797849    13                              Continued.
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  2      DR NUMBER: 2000 01797849     13

DESCRIPTION: NOTES WITH PHONE NUMBERS, NAMES AND ADDRESSES
ON THEM
FOUND ON THE KITCHEN COUNTER

0007  PKG 000 CODE:EI    AP01
           ITEM: *MISC   BRAND:       MODEL:          COLOR:
DESCRIPTION: PAMPHLET-GUIDE TO PROPER NUTRITION FOR THE
PATIENT UNDERGOING CANCER THERAPY
FOUND ON THE KITCHEN COUNTER

0008  PKG 000 CODE:EI    AP01
           ITEM: *MISC   BRAND:       MODEL:          COLOR:
 SIZE:          QUANTITY: 0032   SERIAL NO.:
DESCRIPTION: DOCUMENTS-SAN RIVA AT THE FOOTHILLS (PAPERS) FOR
NOTICE OF INTENT TO TERMINATE RENTAL AGREEMENT FOR NON-PAYMENT OF RENT
(32 PAGES) INDICATING A DIFFERENT TENANT ON EACH PAGE
FOUND ON THE KITCHEN TABLE

0009  PKG 000 CODE:EI    AP01
           ITEM: *MISC   BRAND:       MODEL:          COLOR:
DESCRIPTION: CLINICAL HEMATOLOGY BUSINESS CARD INDICATING
APPOINTMENT TIMES
FOUND ON THE KITCHEN COUNTER

0010  PKG 000 CODE:EI    AP01
           ITEM: *MISC   BRAND:       MODEL:          COLOR:
 SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: PLASTIC MEASURING SPOON 1/2 TSP.
FOUND ON THE KITCHEN COUNTER

0011  PKG 000 CODE:EI    AP01
           ITEM: *MISC   BRAND:       MODEL:          COLOR:
 SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: STENO PAD INDICATING THE "BRANTS CO." AT
817-336-3030 (AN INSURANCE COMPANY)
FOUND IN AP'S OFFICE AT APARTMENT MANAGERS RENTAL OFFICE

0012  PKG 000 CODE:EI    AP01
           ITEM: YFOOD   BRAND:       MODEL:          COLOR:
DESCRIPTION: SAMPLE OF GATORADE LEMON-LIME FLAVOR (POWDER)
FROM CONTAINER
FOUND IN THE KITCHEN CUPBOARD

0013  PKG 000 CODE:EI    AP01
           ITEM: YFOOD   BRAND:       MODEL:          COLOR:
DESCRIPTION: SAMPLE OF POPPED CORN
FROM TUPPERWARE STYLE DISH ON THE LIVING ROOM CHAIR BY HALLWAY

0014  PKG 000 CODE:EI    AP01
           ITEM: YFOOD   BRAND:       MODEL:          COLOR:
DESCRIPTION: SAMPLE OF LOWRY SEASON SALT

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3      DR NUMBER: 2000 01797849    13


FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0015  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: PLASTIC MEASURING SPOON
      FOUND ON THE KITCHEN COUNTER

0016  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: PLASTIC MEASURING SPOON
      FOUND IN KITCHEN DRAWER NEXT TO REFRIGERATOR

0017  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF WATER
      TAKEN FROM "SAN RIVA" PLASTIC WATER BOTTLE ON THE KITCHEN COUNTER

0018  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF "SCHWEPPES" GINGERALE
      TAKEN FROM ORIGINAL GREEN ALUMINUM CAN ON KITCHEN COUNTER

0019  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF FOOD SCRAPPINGS
      TAKEN FROM A BAKING PAN ON THE KITCHEN STOVE

0020  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF BUTTERY TOFFEE
      TAKEN FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0021  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF BUTTERY SALT
      TAKEN FROM ORIGINAL CONTAINER ON THE KITCHEN COUNTER

0022  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN LIQUID
      TAKEN FROM INSIDE A LARGE PLASTIC "INSIGHT.COM BOWL" DRINKING CUP ON
      KITCHEN COUNTER

0023  PKG 000 CODE:EI   AP01
              ITEM: DCPU   BRAND:        MODEL:              COLOR:
      SIZE:            QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: COMPUTER "COMPAQ PRESARIO" LAP TOP
      FCC# CNTTA1-24639-TTE
      TAKEN FROM THE MASTER BEDROOM

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  4      DR NUMBER: 2000 01797849    13

0024  PKG 000 CODE:EI   AP01
             ITEM: HDISH   BRAND:        MODEL:            COLOR:
       DESCRIPTION: LARGE PLASTIC "INSIGHT.COM BOWL" DRINKING CUP
       *(RELATED TO ITEM #22 LIQUID)
       TAKEN FROM THE KITCHEN COUNTER

0025  PKG 000 CODE:EI   AP01
             ITEM: YFOOD   BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF LIQUID FROM TALL DRINKING GLASS
       *(RELATED TO ITEM #26)
       TAKEN FROM THE KITCHEN COUNTER

0026  PKG 000 CODE:EI   AP01
             ITEM: HDISH   BRAND:        MODEL:            COLOR:
        SIZE:          QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: TALL DRINKING GLASS
       *(RELATED TO ITEM #25 LIQUID)
       TAKEN FROM THE KITCHEN SINK

0027  PKG 000 CODE:EI   AP01
             ITEM: YFOOD   BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
       TAKEN FROM PYREX DISH ON KITCHEN COUNTER

0028  PKG 000 CODE:EI   AP01
             ITEM: YFOOD   BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
       TAKEN FROM ANOTHER PYREX DISH ON THE KITCHEN COUNTER

0029  PKG 000 CODE:EI   AP01
             ITEM: YFOOD   BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF CLEAR LIQUID
       TAKEN FROM A PLASTIC "DASANI" BOTTLE ON KITCHEN COUNTER

0030  PKG 000 CODE:EI   AP01
             ITEM: YFOOD   BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
       TAKEN FROM A KETTLE ON THE KITCHEN STOVE

0031  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
        SIZE:          QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: PLASTIC SEA WORLD PAIL
       TAKEN FROM THE KITCHEN COUNTER

0032  PKG 000 CODE:EI   AP01
             ITEM: HDISH   BRAND:        MODEL:            COLOR:
        SIZE:          QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: DIRTY CASSEROLE DISH
       TAKEN FROM THE KITCHEN COUNTER

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NUMBER:   5      DR NUMBER: 2000 01797849    13


0033  PKG 000 CODE:EI   AP01
            ITEM: HDISH   BRAND:       MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: DIRTY BLUE PLASTIC DRINKING CUP
      TAKEN FROM THE KITCHEN COUNTER

0034  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
      MILK)
      TAKEN FROM TUPPERWARE STYLE CONTAINER ON THE KITCHEN COUNTER

0035  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
      MILK)
      TAKEN FROM A DISH ON THE KITCHEN COUNTER

0036  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF MUS-L BLAST 2000+ BODY BUILDING
      FORMULA (POWDER)
      FROM ORIGINAL CONTAINER FROM KITCHEN CUPBOARD RIGHT SIDE OF KITCHEN SINK
      (UPPER CABINET)

0037  PKG 000 CODE:EI   AP01
            ITEM: HDISH   BRAND:       MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: DIRTY PINK TUPPERWARE BOWL
      *(RELATED TO ITEM #38 CAPSULES)
      LOWER CUPBOARD NEXT TO REFRIGERATOR PUSHED ALL THE WAY TO THE BACK

0037A PKG 000 CODE:EI   AP01
            ITEM: YMEDICI BRAND:       MODEL:            COLOR:
      DESCRIPTION: UNKNOWN TYPE OF CAPSULES
      *(FROM ITEM #37 THE PINK BOWL)
      SAME AS ITEM #37

0038  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM SOUP BOWL ON KITCHEN COUNTER

0039  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A SOUP BOWL ON THE KITCHEN COUNTER

0040  PKG 000 CODE:EI   AP01
            ITEM: HDISH   BRAND:       MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  6     DR NUMBER: 2000 01797849    13

DESCRIPTION: EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
TAKEN FROM THE KITCHEN COUNTER

0041  PKG 000 CODE:EI   AP01
          ITEM: HDISH   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
      TAKEN FROM THE KITCHEN COUNTER

0042  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF FRYS PREMIUM COFFEE
      FROM ORIGINAL CONTAINER IN UPPER CUPBOARD NEXT TO REFRIGERATOR

0043  PKG 000 CODE:EI   AP01
          ITEM: HDISH   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: DIRTY GLASS BOWL WITH A FLORAL DESIGN
      TAKEN FROM THE KITCHEN COUNTER

0044  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF NUTS
      TAKEN FROM ORIG. CONTAINER IN UPPER KITCHEN CUPBOARD TO THE RIGHT OF SINK

0045  PKG 000 CODE:EI   AP01
          ITEM: HDISH   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: PLASTIC CUP WITH FLORAL DESIGN
      TAKEN FROM THE KITCHEN COUNTER

0046  PKG 000 CODE:EI   AP01
          ITEM: HDISH   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: PLASTIC TUPPERWARE STYLE BOWL
      TAKEN FROM THE KITCHEN COUNTER

0047  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF SALT
      TAKEN FROM ORIGINAL "HAIN" BRAND CONTAINER/UPPER CUPBOARD RIGHT OF SINK

0048  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF PEPPER
      TAKEN FROM SHAKER IN UPPER CABINET LEFT OF STOVE

0049  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF SALT
      TAKEN FROM SHAKER IN UPPER CABINET LEFT OF STOVE

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   7      DR NUMBER: 2000 01797849    13


0050  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:              COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: YELLOW DISHWASHING GLOVE
      TAKEN FROM THE KITCHEN COUNTER NEXT TO THE SINK

0051  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF ONION SALT
      TAKEN FROM ORIGINAL CONTAINER IN UPPER CABINET LEFT OF STOVE

0052  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF GARLIC SALT
      TAKEN FROM ORIGINAL CONTAINER IN UPPER CABINET LEFT OF STOVE

0053  PKG 000 CODE:EI   AP01
            ITEM: HDISH   BRAND:        MODEL:              COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: DIRTY WHITE PLASTIC SPOON
      TAKEN FROM KITCHEN COUNTER

0054  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF GATORADE
      TAKEN FROM THE REFRIGERATOR

0055  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE POTATO
      SALAD)
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0056  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0057  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0058  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0059  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM

```
                   PHOENIX POLICE DEPARTMENT REPORT

   SUPPLEMENT            PAGE NUMBER:   8     DR NUMBER: 2000 01797849    13


      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0060  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0061  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION:  SAMPLE OF WATER
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0062  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN LIQUID
      FROM A CONTAINER IN THE REFRIGERATOR

0063  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN YELLOW LIQUID
      FROM A CONTAINER IN THE REFRIGERATOR

0064  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF MILK
      TAKEN FROM ORIGINAL CONTAINER IN THE REFRIGERATOR

0065  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF "BRAGG LIQUID AMINOS"
      TAKEN FROM ORIGINAL CONTAINER INSIDE THE REFRIGERATOR

0066  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF ALMONDS
      TAKEN FROM A PLASTIC BAGGIE IN THE PANTRY OF KITCHEN

0067  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF HONEY
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0068  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF QUAKER MEDIUM BARLEY
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0069  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF COOKING OIL
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN


   2000 01797849    13                                  Continued.
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  9     DR NUMBER: 2000 01797849    13


0070  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF MULLED WINE & CIDER SPICE TEA
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0071  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF CEREAL
      FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0072  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF CHIPS
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0073  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF FLOUR
      TAKEN FROM GLASS CANISTER IN PANTRY OF KITCHEN

0074  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF VINEGAR
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0075  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF CRUNCHY CORN BRAN
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0076  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
      TAKEN FROM PACKAGE LYING ON THE KITCHEN FLOOR

0077  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF HONEY BUNCHES OF OATS
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0078  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF WHOLE WHEAT & HONEY
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0079  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF APPLE CINNAMON CHEERIOS
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0080  PKG 000 CODE:EI   AP01

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  10      DR NUMBER: 2000 01797849    13


            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF RICE
   TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0081  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF WHEAT FLOUR
   TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0082  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF "JOULE GOLD WEAVER, THE FABRIC OF LIFE"
   FABRIC CLEANER
   TAKEN FROM ORIGINAL CONTAINER UNDERNEATH THE SINK

0083  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF SUAVE SHAMPOO
   TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0084  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF HOT POT LIQUID POTPOURRI
   TAKEN FROM ORIGINAL BOTTLE FROM UNDERNEATH THE KITCHEN SINK

0085  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
   TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085A PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
   TAKEN FROM ORIGINAL CONTAINER IN PANTY OF KITCHEN

0085B PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
   TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085C PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
   TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085D PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:       MODEL:            COLOR:
   DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
   TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085E PKG 000 CODE:EI   AP01

 2000 01797849    13                                    Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  11     DR NUMBER: 2000 01797849     13

```
                ITEM: YFOOD  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
       TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0086  PKG 000 CODE:EI   AP01
                ITEM: YMEDICI BRAND:        MODEL:            COLOR:
       DESCRIPTION: BAG 1=MISC. CAPSULES OF MEDICATION, BAG 2=MISC.
       LIQUID MEDICINES AND A HANDWRITTEN CHART TO DISPENSE MEDICATIONS
       FROM INSIDE THE CUPBOARD TO THE RIGHT OF KITCHEN SINK

0087  PKG 000 CODE:EI   AP01
                ITEM: YMEDICI BRAND:        MODEL:            COLOR:
       DESCRIPTION: VARIETY OF OVER-THE-COUNTER LIQUID MEDICATIONS
       TAKEN FROM THE LEFT CUPBOARD ABOVE THE KITCHEN STOVE

0088  PKG 000 CODE:EI   AP01
                ITEM: YFOOD  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
       TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0089  PKG 000 CODE:EI   AP01
                ITEM: YFOOD  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF FISH CRACKERS
       TAKEN FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0090  PKG 000 CODE:EI   AP01
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF LIME AWAY CLEANER
       FROM ORIGINAL CONTAINER UNDERNEATH THE KITCHEN SINK

0091  PKG 000 CODE:EI   AP01
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF "OVITROL FLEA SPRAY"
       TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0092  PKG 000 CODE:EI   AP01
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF SWIMWEAR CLEANER
       TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0093  PKG 000 CODE:EI   AP01
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF "AMERICAN FARE KITCHEN CLEANER"
       TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0094  PKG 000 CODE:EI   AP01
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF RESOLVE SPOT/STAIN CLEANER
       TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0095  PKG 000 CODE:EI   AP01
```

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT           PAGE NUMBER: 12      DR NUMBER: 2000 01797849    13


              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: SAMPLE OF CASCADE DISHWASHING LIQUID
        FROM ORIGINAL CONTAINER UNDERNEATH THE KITCHEN SINK

0096  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: SAMPLE OF UNKNOWN SUBSTANCE
        UNLABELED CONTAINER UNDERNEATH KITCHEN SINK

0097  PKG 000 CODE:EI   AP01
              ITEM: YFOOD   BRAND:      MODEL:           COLOR:
        DESCRIPTION: SAMPLE OF WATER
        TAKEN FROM 5-GALLON PLASTIC JUG OF WATER IN THE CLOSET AT THE FRONT DOOR
        OF THE APARTMENT

0098  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: ELDERBERRY HERBAL SUPPLEMENTS
        TAKEN FROM THE LIVING ROOM CLOSET AT THE FRONT DOOR OF THE APARTMENT

0099  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: HANDWRITTEN LETTER TO PAT FROM WENDI
        FOUND IN THE LIVING ROOM CLOSET ON THE TOP SHELF

0100  PKG 000 CODE:EI   AP01
              ITEM: ACZG    BRAND:      MODEL:           COLOR:
        SIZE:         QUANTITY: 0001   SERIAL NO.: 00000
        DESCRIPTION: COLT 32 CAL. SEMI AUTOMATIC PISTOL IN A BROWN
        CASE **WEAPON HAS SERIAL NUMBER FILED OFF**
        FOUND ON SHELF IN MASTER BEDROOM CLOSET

0101  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        SIZE:         QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: BIRTHDAY CARD TO WENDI FROM JOE
        FOUND IN MASTER BEDROOM CLOSET ON TOP SHELF

0102  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: BROWN GLASS BOTTLE CONTAINING A LIQUID AND A
        DROPPER
        FOUND IN THE MASTER BEDROOM CLOSET ON SHELF

0103  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:      MODEL:           COLOR:
        DESCRIPTION: CHECK BOOK TO WYNDSTAR ENTERPRISES FROM B OF A
        BANK ACCOUNT #235390260
        FOUND IN THE MASTER BEDROOM CLOSET ON SHELF

0104  PKG 000 CODE:EI   AP01

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT           PAGE NUMBER:  13      DR NUMBER: 2000 01797849    13


              ITEM: *MISC   BRAND:        MODEL:            COLOR:
     DESCRIPTION: BOX OF LATEX RUBBER GLOVES, ABOUT 3/4 EMPTY
     FOUND UNDERNEATH THE SINK IN THE MASTER BATHROOM

0105  PKG 000 CODE:EI   AP01
              ITEM: RVTAPE  BRAND:        MODEL:            COLOR:
     SIZE:            QUANTITY: 0005   SERIAL NO.:
     DESCRIPTION: 8MM VIDEO TAPES
     (5 TAPES AND 1 EMPTY PLASTIC CONTAINER)
     FOUND IN THE MASTER BEDROOM CLOSET

0106  PKG 000 CODE:EI   AP01
              ITEM: IAIRTIC BRAND:        MODEL:            COLOR:
     DESCRIPTION: NORTHWEST AIRLINE TICKET STUBS FROM PHX TO MEM
     DATED SEPT. 22, 2000
     FOUND IN THE MASTER BEDROOM CLOSET

0107  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:            COLOR:
     DESCRIPTION: TELEPHONE BILL (THIS ADDRESS/OCCUPANTS)
     FOUND UNDERNEATH THE BED IN MASTER BEDROOM

0108  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:            COLOR:
     DESCRIPTION: TELEPHONE DAY MINDER
     FOUND IN THE TOP DRAWER OF NIGHTSTAND OF MASTER BEDROOM (S/E CORNER)

0109  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:            COLOR:
     DESCRIPTION: "VAX PURE AUSTRALIAN MEDICINAL OIL
     FOUND ON TOP OF NIGHTSTAND IN MASTER BEDROOM (S/E CORNER)

0110  PKG 000 CODE:EI   AP01
              ITEM: YMEDICI BRAND:        MODEL:            COLOR:
     DESCRIPTION: PACKAGE OF BENADRYL TABLETS
     FOUND ON THE NIGHTSTAND IN MASTER BEDROOM (S/E CORNER)

0111  PKG 000 CODE:EI   AP01
              ITEM: YMEDICI BRAND:        MODEL:            COLOR:
     DESCRIPTION: PLASTIC ZIPLOCK BAG CONTAINING MISC OVER-THE-
     COUNTER MEDICATION
     ON TOP OF THE CHEST OF DRAWERS ALONG THE NORTH WALL OF MASTER BEDROOM

0112  PKG 000 CODE:EI   AP01
              ITEM: *MISC   BRAND:        MODEL:            COLOR:
     SIZE:         QUANTITY: 0001   SERIAL NO.:
     DESCRIPTION: PLASTIC MEASURING SPOON
     FOUND ON THE FLOOR ALONG THE NORTH WALL OF THE MASTER BEDROOM

0113  PKG 000 CODE:EI   AP01
              ITEM: PWALLET BRAND:        MODEL:            COLOR:

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  14      DR NUMBER: 2000 01797849    13

       SIZE:            QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: BROWN WALLET WITH MISCELLANEOUS PAPERS AND ID TO
       THE VICTIM JOE D. ANDRIANO, DOB 8/18/67
       FOUND ON THE MIRRORED DRESSER IN MASTER BEDROOM (WEST WALL)

0114  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       DESCRIPTION: LARGE FLORAL PERSONAL PHONE BOOK
       FOUND UNDER THE BED IN MASTER BEDROOM (SOUTH SIDE)

0115  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       DESCRIPTION: MISC INTERNET GENERATED PAPERS DEALING WITH
       TUMOR VACCINES
       FOUND ON THE MIRRORED DRESSER IN MASTER BEDROOM ALONG WEST WALL

0116  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       SIZE:            QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: LATEX GLOVE
       FOUND ON THE FLOOR UNDER THE FOOT OF THE BED IN MASTER BEDROOM

0117  PKG 000 CODE:EI   AP01
             ITEM: YMEDICI BRAND:        MODEL:            COLOR:
       SIZE:            QUANTITY: 0001   SERIAL NO.:
       DESCRIPTION: BOTTLE OF PEPTO BISMOL
       FOUND ON THE MIRRORED DRESSER ALONG WEST WALL OF MASTER BEDROOM

0118  PKG 000 CODE:EI   AP01
             ITEM: HDISH   BRAND:        MODEL:            COLOR:
       DESCRIPTION: DIRTY PLASTIC PITCHER
       FOUND ON THE KITCHEN COUNTER

0119  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       DESCRIPTION: RESUME FOR WENDI E. ANDRIANO
       FOUND IN THE MASTER BEDROOM

0120  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       DESCRIPTION: MISC COLOR PHOTOGRAPHS AND A RECEIPT TO THE
       APACHE LAKE MARINA & RESORT
       FOUND ON A DESK IN THE CHILDRENS ROOM ALONG THE WEST WALL

0121  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:            COLOR:
       DESCRIPTION: CELLULAR PHONE BILLS FROM VERIZON WIRELESS TO JOE
       ANDRIANO (ACCT# 1001-6749181/ACCT NAME: JEANETTE ANDRIANO)
       FOUND ON THE 2ND SHELF OF THE DESK IN THE CHILDRENS ROOM ALONG WEST WALL

0122  PKG 000 CODE:EI   AP01

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  15     DR NUMBER: 2000 01797849    13

          ITEM: *MISC   BRAND:       MODEL:          COLOR:
DESCRIPTION: WELLS FARGO BANK STATEMENTS
FOUND ON THE TOP SHELF OF DESK IN NICHOLAS' ROOM ALONG THE WEST WALL

0123  PKG 000 CODE:EI   AP01
          ITEM: *MISC   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0002   SERIAL NO.:
DESCRIPTION: ROLO DEXES WITH PHONE NUMBERS
IN TOP DRAWER OF DESK IN NICHOLAS' ROOM ALONG WEST WALL

0124  PKG 000 CODE:EI   AP01
          ITEM: *MISC   BRAND:       MODEL:          COLOR:
DESCRIPTION: LETTER FROM ATTORNEYS ROUSH, MCCRACKEN,
GUERRERO & MILLER TO JOSEPH AND WENDI ANDRIANO DATED 8/30/00
ON TOP OF DESK IN NICHOLAS' ROOM ALONG THE WEST WALL

0125  PKG 000 CODE:EI   AP01
          ITEM: IPHOTO  BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: LARGE FAMILY PHOTOGRAPH OF VICTIM'S FAMILY
FOUND IN THE MASTER BEDROOM

0126  PKG 000 CODE:EI   AP01
          ITEM: YBOOK   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: MOSBY MEDICAL ENCYCLOPEDIA
FOUND IN THE MASTER BEDROOM NEAR NORTH NIGHTSTAND

0127  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
DESCRIPTION: SAMPLE OF POPCORN
FOUND ON THE FLOOR NEXT TO THE SOUTH NIGHTSTAND IN MASTER BEDROOM

0128  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:
DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
FOUND ON THE SOUTH NIGHTSTAND IN THE MASTER BEDROOM

0129  PKG 000 CODE:EI   AP01
          ITEM: IPHOTO  BRAND:       MODEL:          COLOR:
DESCRIPTION: COLOR PHOTOGRAPHS OF THE VICTIM'S CHILDREN
FOUND IN A PLASTIC BOX UNDERNEATH THE BED IN MASTER BEDROOM

0130  PKG 000 CODE:EI   AP01
          ITEM: *MISC   BRAND:       MODEL:          COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: SPA OIL
ON NIGHTSTAND IN MASTER BEDROOM, NORTH SIDE

0131  PKG 000 CODE:EI   AP01
          ITEM: YFOOD   BRAND:       MODEL:          COLOR:

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER: 16      DR NUMBER: 2000 01797849     13

DESCRIPTION: SAMPLE OF PISTACHIOS
FOUND IN A CUP IN THE MASTER BEDROOM NEAR THE BED

0132  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: BLUE ENVELOP AND PIECE OF PAPER WITH NAMES ON IT
FOUND IN THE MASTER BEDROOM AMONG PHOTOGRAPHS UNDER THE BED

0133  PKG 000 CODE:EI   AP01
            ITEM: FLIGHT  BRAND:        MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: NIGHTSTAND LAMP
FROM THE SOUTH NIGHTSTAND IN THE MASTER BEDROOM

0134  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:           COLOR:
DESCRIPTION: SAMPLE OF WATER
FROM A 1-GALLON JUG IN THE MASTER BEDROOM (NORTH- EAST CORNER)

0135  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: BOTTLE OF RETREAT AROMATHEAPY OIL
FOUND ON THE NIGHTSTAND IN THE MASTER BEDROOM, SOUTH SIDE

0136  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
DESCRIPTION: BROKEN PIECE OF LAMP
FOUND IN THE LIVING ROOM CLOSET NEAR THE FRONT DOOR

0137  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: AN ASSORTMENT OF SOAPS, LOTIONS AND GENERAL
GROOMING PRODUCTS
FROM THE MASTER BATHROOM

0138  PKG 000 CODE:KI   UK01
            ITEM: ACZG    BRAND: RUGER  MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.: 189-54802
      OAN:                          VALUE:     $500.00
DESCRIPTION: STURM RUGER & COMPANY 7.62 X 39 MM RIFLE WITH
ATTACHED BUSHNELL SPORTVIEW SCOPE
FOUND INSIDE 1990 VAN, AZ. MMY-987 REGISTERED TO JOE ANDRIANO

0139  PKG 000 CODE:KI   UK01
            ITEM: ACZG    BRAND: RUGER  MODEL:           COLOR:
      SIZE: 10/22    QUANTITY: 0001   SERIAL NO.: 242-08009
      OAN:                          VALUE:     $235.00
DESCRIPTION: RUGER MODEL 10/22 CARBINE 22 CAL. LR WITH
ATTACHED ARMSPORT SCOPE

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  17      DR NUMBER: 2000 01797849     13


   FOUND INSIDE 1990 VAN AZ. MMY-987 REGISTERED TO JOE ANDRIANO

0140  PKG 000 CODE:KI    UK01
              ITEM: ACZG    BRAND: NORINC MODEL: MAK-90       COLOR:
      SIZE:           QUANTITY: 0001   SERIAL NO.: 9375199
      OAN:                             VALUE:      $175.00
      DESCRIPTION: NORINCO MAK-90 SPORTER RIFLE CAL 7.62 X 39MM
      IN TWO-TONE BROWN CASE
      FOUND IN 1990 VAN AZ. MMY-987 REGISTERED TO JOE ANDRIANO

                 ****  NARRATIVE  ****
   SERIAL NUMBER: 4107

   SUPPLEMENT IS CREATED TO GENERATE AN INVOICE FOR IMPOUNDING PURPOSES.
   ITEMS SEIZED ON 10/10/00 FROM 2155 E. LIBERTY, APT #132.


   VICTIM RECEIVED RIGHTS INFORMATION:  NO        MAIL-IN SUPPLEMENT:

INVOICES:    2778372   2778373   2778374

   DR ENTERED BY : 4107    DR FINALIZED BY : 4689

                    END OF REPORT         DR NO: 2000 01797849    013

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NO.   1        DR NO.: 2000 01797849    20

REPORT DATE: 20001011    TIME: 1337

TYPE OF REPORT:  HOMICIDE                        OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0435   GRID: JD32

REPORTING OFFICER[S]: CLIFTON JEWELL             3526     UNIT: C33
                      PAUL HILL                  3727

**** NARRATIVE ****

SERIAL NUMBER: 3526

SEARCH WARRANT #:CR00-04726SW

DATE/TIME OF ENTRY:              10-10-00, 1629 HRS.
DATE/TIME OF EXIT:              10-10-00, 1810 HRS.

LOCATIONS SEARCHED:             LOCATION #1:    STORAGE SHED MARKED #323.
                                              · STORAGE SHED MARKED #315.

=============================================================================

ON 10-10-00 AT 1500 HRS., I ATTENDED A BRIEFING CONDUCTED BY SGT. SMALLMAN
#3142 AND DET. LUCERO #4913 IN THE HOMICIDE UNIT CONFERENCE ROOM REGARDING
THE SERVING OF SEARCH WARRANTS AT 2155 E. LIBERTY LN.  AFTER THE BRIEFING
DROVE TO 2155 E. LIBERTY LN.  THERE I WAS DIRECTED TO SERVE A SEARCH
WARRANT ON THE TWO STORAGE UNITS THAT HAD BEEN UNDER THE CONTROL OF AP1
WENDI ANDRIANO.  THE STORAGE UNITS WERE MARKED #323 AND #315.

DET. HILL #3727 AND I BEGAN WITH STORAGE UNIT #323 AT 1629 HRS.  THIS
STORAGE UNIT CONTAINED MISC. TOOLS, CLOTHING AND TOYS AND WE FOUND NOTHING
OF EVIDENTIARY VALUE INSIDE.  WE SECURED THIS STORAGE UNIT AT 1640 HRS.

WE THEN BEGAN A SEARCH OF STORAGE UNIT #315 AT 1645 HRS.  ALSO PRESENT WAS
SGT. SMALLMAN.  THIS UNIT CONTAINED BOXES OF MISC. PERSONAL PROPERTY, TOYS
AND BOXES OF PAPERWORK.  I LOCATED A CARDBOARD BOX NEAR THE CENTER OF THE
UNIT WHICH CONTAINED THE FOLLOWING ITEMS THAT WERE SIEZED:

ITEM #1:  LIFE INSURANCE POLICY FOR WENDI OCHOA
ITEM #2:  MASSMUTUAL LIFE INSURANCE RECEIPT OF PAYMENT ON A POLICY FOR
          JOSEPH ANDRIANO.
ITEM #3:  IRS DOCUMENT TO JOSEPH AND WENDI ANDRIANO DATED 1996.
ITEM #4:  LETTER FROM "WENDI" TO DONNA OCHOA WHICH CONTAINED A NEWSPAPER
          CLIPPING ABOUT A MALPRACTICE SUIT.
ITEM #5:  A BANK ONE DOCUMENT TO COYOTE ENTERPRISES.
ITEM #6:  A BANK OF AMERICA BANK STATEMENT AND CHECK #1161 FOR THE ACCOUNT
          OF WYNDSTAR ENTERPRISES.
ITEM #7:  MISC. MEDICAL DOCUMENTS FOR JOSEPH ANDRIANO FROM DIFFERENT
          FACILITIES.

ITEM #8 WAS FOUND ALONG THE NORTH WALL OF THE STORAGE UNIT AND IS

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   2          DR NO.: 2000 01797849     20


    CRIBED AS CARDBOARD SHIPPING CONTAINER CONTAINING A BROWN GLASS BOTTLE
..TH A WHITE POWDERY SUBSTANCE.  THE BOTTLE WAS MARKED "SODIUM AZIDE".
ALSO IN THE BOX WAS AT LEAST ONE LATEX GLOVE AND A SPOON.  DUE TO THE
POSSIBLE HAZARD FROM THE CHEMICAL IN THE BOX, THE CONTENTS WERE NOT
DISTURBED.  ALONG WITH THE SHIPPING CARTON WAS A SILVER COLORED,
FOIL TYPE WRAPPER.  THESE ITEMS WERE SUBSEQUENTLY TRANSPORTED TO 620 W.
WASHINGTON ST. AND SECURED IN A TEMPORARY EVIDENCE LOCKER UNTIL THE PROPER
METHOD OF PERMANENT IMPOUND COULD BE DETERMINED.  WE SECURED FROM THIS
STORAGE UNIT AT 1820 HRS.

COPIES OF THE SEARCH WARRANT AND AN INVENTORY OF THE PROPERTY TAKEN WERE
LEFT AT THE COMPLEX.


VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:

                        END OF REPORT          DR NO: 2000 01797849     020

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   1          DR NO.: 2000 01797849      32

REPORT DATE: 20001013     TIME: 0514

TYPE OF REPORT: HOMICIDE                                OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                    BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: THOMAS KULESA                3550     UNIT: C33

```
================================================================
=                                                              =
=      ***   REQUEST FOR SCIENTIFIC ANALYSIS   ***             =
=                                                              =
================================================================
```

CURRENT DR IS: 2000 01797849    032    BIOLOGICAL EVID (BLOOD,SEMEN,TISSUE): N
NAM: ANDRIANO          WENDI      ELIZABETH
NAM:                                        OFF:HOMICIDE
LOCATION: 002155   E   LIBERTY              LA              JAILED:Y
OFCR REQ OF ANALYSIS:KULESA, THOMAS         DATE OCC:100800 TIME:0338
(LAST,FIRST,MIDDLE) FIRM NAME USE BUS.      DATE REQ:101300 TIME:0515
VIC: ANDRIANO          JOSEPH        D        DUI RELATED:N
BUS:

MARIJUANA:  DRUGS:   BLOOD ALC:   BREATH ALC:   OTHER: Y PER INVOICE: N

INVOICE     ITEM # SFX   TYPE          INVOICE     ITEM #  SFX    TYPE

0002777913   0014        PSPECIM       0002777913   0031         PCLOTHE

BLOOD DRAWN BY:                        1.DATE/TIME DRAW:000000 / 0000
LOC OF DRAWING:                        2.DATE/TIME DRAW:000000 / 0000

                        ****  NARRATIVE  ****

SERIAL NUMBER: 3550


                ****  CAUTION - CAUTION - CAUTION  ****

        ****  POSSIBLE PRESENCE OF SODIUM AZIDE OR SIMILAR CHEMICAL  ****

PLEASE EXAMINE THESE TWO ITEMS FOR THE PRESENCE OF SODIUM AZIDE OR ANY
OTHER SIMILAR CHEMICALS. ALSO CHECK THE ITEMS FOR ANY FOREIGN SUBSTANCES.
BOTH ITEMS ARE BELIEVED TO CONTAIN VOMIT FROM THE VICTIM. ITEM # 14 IS A
SWABBED SAMPLE OF ONE OF THE POOLS CONTAINED IN ITEM # 31. ITEM # 31 IS A
LARGE PORTION OF THE THROW RUG THAT THE VICTIM WAS LAYING ON. THERE
APPEARS TO BE VOMIT AND BLOOD ON THIS ITEM.


ITEMS ALSO NEED TO BE PRESERVED FOR POSSIBLE FUTURE ANALYSIS.


2000 01797849     32                                        Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   2          DR NO.: 2000 0179/849      32

VICTIM RECEIVED RIGHTS INFORMATION:   NO          MAIL-IN SUPPLEMENT:

INVOICES:

END OF REPORT          DR NO: 2000 01/97849

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT           PAGE NO.    1          DR NO.: 2000 0179/849      67

REPORT DATE: 20001011    TIME: 1104

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0435   GRID: JD32

REPORTING OFFICER(S): ELIZABETH CIOTO            A3143     UNIT: C23

**** NARRATIVE ****

SERIAL NUMBER: A3143

ORIGINATING DR: 200001797849 018  LIMS: 00-21123 Report 11

THE FOLLOWING INFORMATION IS A SUMMARY OF THE LABORATORY EXAMINATION
RESULTS. CONTACT THE LABORATORY SERVICES BUREAU FOR THE OFFICIAL REPORT.

-- RESULTS OF SCIENTIFIC ANALYSIS --

SECTION : Serology Screening   ANALYST: Elizabeth Cioto(A3143)

A portion of the blood in the tube marked "Andriano, Joseph" (item
2778214-0001)  was preserved and retained in laboratory freezer storage.

Evidence Disposition:

At the conclusion of analysis, item 2778214-0001 was released to the
Property Management Bureau.

At the conclusion of analysis, item 2778214-0001.1 was retained in the
laboratory section.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:

END OF REPORT          DR NO: 2000 0179/849

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   1          DR NO.: 2000 01797849     82

EPORT DATE: 20001020   TIME: 0926

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                    BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: DENNIS OLSON                2979     UNIT: C81

                        ****  NARRATIVE  ****

SERIAL NUMBER: 2979

                    CRIME SCENE
                    AND
                    BLOODSTAIN INVESTIGATION
                    <<<<<<<<<<<>>>>>>>>>>>

TRAINING:      140 HOURS OF BLOODSTAIN INTERPRETATION AND PATTERN
               IDENTIFICATION FROM JUNE 1988 UNTIL PRESENT.

               INSTRUCTORS INCLUDED CRIMINALIST JUDITH BUNKER, RETIRED
               DEPUTY CHIEF ROD ENGLERT, CRIMINALIST TED YESHION,
               CRIMINALIST HENRY LEE, AND RETIRED DETECTIVE MITCH REA.

               INSTRUCTION INCLUDED SLIDES, PHOTOGRAPHS, LECTURE,
               EXPERIMENTS, HANDS ON TRAINING, AND CASE HISTORY.

               I HAVE INSTRUCTED SEVERAL CLASSES ON DEATH
               INVESTIGATIONS AND CRIME SCENE RECONSTRUCTION, WHICH
               INCLUDED BASIC BLOOD PATTERNS INVESTIGATIONS, AND
               ASSISTED ROD ENGLERT SEVERAL TIMES IN THE INSTRUCTION
               OF ADVANCED BLOOD PATTERN INVESTIGATIONS.

               TWENTY FOUR HOURS OF INSTRUCTION ON PRESUMPTIVE BLOOD
               TESTING AND LUMINOL TESTING.

               TESTIFIED AT LEAST 21 TIMES IN SUPERIOR COURT AS AN
               EXPERT IN BLOODSTAIN INTERPRETATION AND PATTERNS.

PROFESSIONAL ORGANIZATIONS:

     1) ARIZONA HOMICIDE INVESTIGATORS ASSOCIATION (A.H.I.A.)

        A) MEMBER SINCE 1988

     2) INTERNATIONAL ASSOCIATION OF BLOODSTAIN PATTERN ANALYSTS
        (I.A.B.P.A.)

        A) MEMBER SINCE 1995

     3) ASSOCIATION FOR CRIME SCENE RECONSTRUCTION (A.C.S.R.)

2000 01797849    82                              Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.    2          DR NO.: 2000 01797349     82

A) MEMBER SINCE 1997

                    **   MORE NARRATIVE CONTINUED ON NEXT PAGE.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   2          DR NO.: 2000 01797849    82

**** NARRATIVE ****

PHENOLPHTHALEIN TEST:   THE FOLLOWING IS A SUMMARY OF THE TESTING
PROTOCOL AND A LISTING OF THE CHEMICAL REAGENTS INVOLVED:

          PHENOLPHTHALEIN ZINC

          ETHANOL

          3% SOLUTION OF HYDROGEN PEROXIDE

          KNOWN SAMPLE OF BLOOD

          STERILE FILTER PAPER OR SWABS

          PHENOLPHTHALEIN REAGENT, ALSO REFERRED TO AS
          KASTLE-MEYER REAGENT, IS A CHEMICAL REAGENT
          UTILIZED IN A TWO PART PRESUMPTIVE TEST FOR THE
          PRESENCE OF BLOOD.  THE PHENOLPHTHALEIN TEST
          ALSO UTILIZES ETHANOL AND A 3% HYDROGEN PEROXIDE
          SOLUTION.  THE USE OF THIS TWO PART TEST
          ELIMINATES FALSE POSITIVE REACTIONS CAUSED BY
          THE PRESENCE OF CHEMICAL OXIDIZERS.

PHENOLPHTHALEIN TEST IS SPECIFIC TO BLOOD (ID PRESENCE OF POSSIBLE BLOOD)

     1) THE PHENOLPHTHALEIN TEST WORKS ON THE
        PRINCIPLE OF AN OXIDATION-REDUCTION REACTION.

        A) CHEMISTS REDUCE (OXIDATION REDUCTION
           REACTION) PHENOLPHTHALEIN BY SEPARATING
           HYDROGEN PEROXIDE AND OXYGEN TO MAKE THE
           CHEMICAL COLORLESS.  THE ORIGINAL COLOR IS
           PINK.

        B) PHENOLPHTHALEIN IS DROPPED ON THE
           BLOODSTAIN AND THERE SHOULD BE NO
           REACTION.

        C) HYDROGEN PEROXIDE IS DROPPED ON SAME
           BLOODSTAIN AND THE HEMOGLOBIN OF THE
           BLOOD (ENZYMES) CAUSES A BREAKDOWN OF
           THE HYDROGEN PEROXIDE, SEPARATING THE
           OXYGEN FROM THE HYDROGEN PEROXIDE.

        D) THE OXYGEN IS TRANSFERRED TO THE
           PHENOLPHTHALEIN REAGENT CAUSING IT TO BE
           OXIDIZED (BACK TO ORIGINAL COLOR) FORMING
           THE PINK COLOR.

        **   MORE NARRATIVE CONTINUED ON NEXT PAGE.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   4          DR NO.: 2000 01797849      82

**** NARRATIVE ****

PROCEDURE:

1) TEST A KNOWN SAMPLE OF BLOOD TO VERIFY REAGENTS ARE WORKING PROPERLY.

2) TEST FILTER PAPERS/SWABS TO MAKE SURE NO REACTION TO CHEMICALS.

3) MOISTEN SWAB OR FILTER PAPER WITH ETHANOL.

4) TOUCH QUESTIONED AREA WITH SWAB OR FILTER PAPER.

5) MOISTEN SWAB OR FILTER PAPER WITH PHENOLPHTHALEIN REAGENT.

6) THERE SHOULD BE NO COLOR CHANGE, IF THERE IS, THIS WOULD BE CONSIDERED A FALSE POSITIVE.

7) MOISTEN SWAB OR FILTER PAPER WITH HYDROGEN PEROXIDE.

8) IF BLOOD IS PRESENT, THERE WILL BE AN IMMEDIATE COLOR CHANGE OF AN INTENSE PINK/RED COLOR.

** MORE NARRATIVE CONTINUED ON NEXT PAGE.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT         PAGE NO.   5      DR NO.: 2000 01797849      82

\*\*\*\*   NARRATIVE   \*\*\*\*

BLOODSTAIN TERMINOLOGY

ANGLE OF IMPACT:          THE INTERNAL ANGLE AT WHICH BLOOD STRIKES A
                         TARGET.

ARTERIAL GUSHING:        CHARACTERISTIC PATTERNS RESULTING FROM BLOOD
                         EXITING UNDER PRESSURE FROM A BREACHED ARTERY.

BLOODSTAIN:              BLOOD THAT HAS COME IN CONTACT WITH A SURFACE.

CAST OFF PATTERN:        BLOOD THAT IS PROJECTED ONTO A SURFACE FROM OTHER
                         THAN AN IMPACT SOURCE.  THIS BLOODSTAIN PATTERN IS
                         CREATED WHEN BLOOD IS THROWN OFF A BLOODY OBJECT
                         IN MOTION.

DIRECTIONALITY:          RELATING TO OR INDICATING THE DIRECTION OF A DROP
                         OF BLOOD TRAVELED IN SPACE FROM ITS POINT OF
                         ORIGIN.  THE SPINE POINTS IN DIRECTION BLOOD WAS
                         TRAVELING PRIOR TO IMPACTING THE SURFACE.

DRIP PATTERN:            BLOOD THAT DRIPS INTO BLOOD RESULTING IN
                         CHARACTERISTIC, USUALLY ROUND SATELLITE SPATTERS.

IRATED PATTERN:          PROJECTED BLOOD BLOW OUT THE MOUTH, NOSE OR
                         COMBINATION OF BOTH.  IT WILL PRODUCE BLOODSTAINS
                         THAT APPEAR TO BE MEDIUM VELOCITY AND OCCASIONALLY
                         HIGH VELOCITY.  THE VICTIM'S FACE MUST REFLECT THE
                         PRESENCE OF BLOOD IN THE MOUTH AND/OR NOSE.  AIR
                         BUBBLES MAY BE PRESENT IN THE BLOODSTAINS.

FORWARD SPATTER:         BLOOD THAT TRAVELS IN THE SAME DIRECTION AS THE
                         FORCE THAT CAUSED THE SPATTER.

HIGH VELOCITY
IMPACT SPATTER:          BLOODSTAIN PATTERNS CHARACTERIZED BY A MIST LIKE
                         APPEARANCE THAT IS CAUSED BY A HIGH VELOCITY
                         FORCE.  THIS SPATTER TRAVELS ONLY A SHORT DISTANCE
                         IN FLIGHT.  THE SPEED OF H.V.I.S. IS CONSIDERED TO
                         BE APPROXIMATELY 100 FEET PER SECOND OR GREATER.

IMPACT SITE:             USUALLY THE AREA WHICH RECEIVES SOME SORT OF BLOW
                         OR GUNSHOT OR THE AREA ON THE SURFACE OF A TARGET
                         WHICH IS STRUCK BY BLOOD IN MOTION.

LOW VELOCITY
IMPACT SPATTER:          BLOODSTAIN PATTERN CHARACTERIZED BY SIZE, THAT IS

2000 01797849     82                                    Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   6          DR NO.: 2000 01797849        82

                          CAUSED BY A LOW VELOCITY FORCE (GRAVITY).  THE
                          SPEED OF L.V.I.S. IS CONSIDERED TO BE
                          APPROXIMATELY 5 FEET PER SECOND OR LESS.

MEDIUM VELOCITY
IMPACT SPATTER:           BLOODSTAIN PATTERN CHARACTERIZED BY SPOT SIZE,
                          THAT IS CAUSED BY A MEDIUM VELOCITY FORCE.   THE
                          SPEED OF M.V.I.S. IS CONSIDERED TO BE
                          APPROXIMATELY 25 FEET PER SECOND.

PARENT DROP:              A DROP OF BLOOD FROM WHICH A WAVE CAST OFF, OR
                          SATELLITE SPATTER ORIGINATES.

POINT OF
CONVERGENCE:              A POINT TO WHICH A BLOODSTAIN PATTERN CAN BE
                          PROJECTED.   THIS POINT IS DETERMINED BY TRACING
                          WELL DEFINED BLOOD DROPS WITHIN THE PATTERN BACK
                          TO A COMMON POINT OR SOURCE.

POINT OF ORIGIN:          THE LOCATION FROM WHICH THE BLOOD THAT PRODUCED
                          A BLOODSTAIN ORIGINATED.   THIS IS DETERMINED BY
                          PROJECTING ANGLES OF INCIDENCE OF WELL DEFINED
                          BLOOD DROPS BACK TO AN AXIS CONSTRUCTED THROUGH
                          THE POINT OF CONVERGENCE.

PROJECTED BLOOD
PATTERN:                  A PATTERN CREATED WHEN A FORCE, OTHER THAN A LOW
                          VELOCITY IMPACT, ACTS UPON A QUANTITY OF BLOOD OF
                          MORE THAN APPROXIMATELY 1.0 ML.

SATELLITE SPATTER:        SMALL DROPLETS OF BLOOD THAT ARE PROJECTED AROUND
                          OR BESIDE THE DROP OF BLOOD UPON IMPACT WITH A
                          SURFACE.   A WAVE CAST OFF IS ALSO CONSIDERED
                          SATELLITE SPATTER.

SECONDARY SPLASHING
OR RICOCHET:              LARGE VOLUMES OF BLOOD, WHEN IMPACTING A SURFACE
                          MAY DEFLECT OFF FROM THE INITIAL TARGET TO ANOTHE
                          TARGET.

SMUDGE:                   A BLOODSTAIN THAT HAS BEEN DISTORTED TO A DEGREE
                          THAT ITS HISTORY CANNOT NORMALLY BE IDENTIFIED.

SPINE:                    THE POINTED EDGE CHARACTERISTICS THAT RADIATE
                          AWAY FROM THE CENTER OF A BLOOD DROP.   IF SPINES
                          OCCUR, THEIR FORMATION DEPENDS UPON IMPACT
                          VELOCITY AND SURFACE TEXTURE.

SPLASH:                   A REACTION CREATED WHEN A LOW VELOCITY IMPACT
                          ACTS UPON ON A BLOOD QUANTITY OF MORE THAN
                          APPROXIMATELY 1.0 ML.

 2000 01797849    82                                        Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   7          DR NO.: 2000 01797349     82

WIPE OR SMEAR:          THE TRANSFER OF BLOOD ONTO A SURFACE NOT ALREADY
                        CONTAMINATED WITH BLOOD.  ONE EDGE IS USUALLY
                        FEATHERED.

TARGET:                 A SURFACE ONTO WHICH BLOOD HAS BEEN DEPOSITED.

TERMINAL VELOCITY:      THE GREATEST SPEED TO WHICH A FREE FALLING DROP
                        OF BLOOD CAN ACCELERATE IN AIR-25.1 FEET PER
                        SECOND.

TRANSFER PATTERN:       A CONTACT BLOODSTAIN CREATED WHEN A WET, BLOODY
                        SURFACE COMES IN CONTACT WITH A SECOND SURFACE.
                        A RECOGNIZABLE IMAGE OR AT LEAST A PORTION OF THE
                        ORIGINAL SURFACE MAY OR MAY NOT BE TRANSFERRED
                        TO THE SECOND SURFACE.

WAVE CAST OFF:          A SMALL BLOOD DROPLET THAT ORIGINATES FROM A
                        PARENT DROP OF BLOOD DUE TO THE WAVE LIKE ACTION
                        OF THE LIQUID IN CONJUNCTION WITH STRIKING A
                        SURFACE AT AN ANGLE OTHER THAN NINETY DEGREES.

WIPE:                   BLOODSTAIN PATTERN CREATED WHEN AN OBJECT MOVES
                        THROUGH AN EXISTING BLOODSTAIN REMOVING BLOOD
                        FROM THE ORIGINAL STAIN AND ALTERING THAT
                        STAIN'S APPEARANCE.

          **   MORE NARRATIVE CONTINUED ON NEXT PAGE.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   8          DR. NO.: 2000 01797849     82

**** NARRATIVE ****

CHARACTERISTICS OF BLOOD, TARGET SURFACE AND SURFACE TENSION
*******************************************************************

1)    GRAVITY WILL PULL THE BLOOD TO THE GROUND AFTER IT LEAVES THE BODY

2)    BLOOD IS HELD TOGETHER BY "SURFACE TENSION"

3)    GRAVITATIONAL ATTRACTION FOR THE BLOOD DROP MUST EXCEED SURFACE
      TENSION

4)    THE SURFACE TENSION MUST BE OVERCOME BY ENERGY TO SPATTER

5)    TYPICAL BLOOD DROP IS APPROXIMATELY .05 ML.

6)    THE HEIGHT OF BLOOD DROP FALLING DOES NOT ALTER/CHANGE PATTERN

7)    THE TERMINAL VELOCITY OF A TYPICAL BLOOD DROP IS APPROXIMATELY
      25.1 FEET PER SECOND

8)    THE SURFACE FALLS HAS AN EFFECT UPON THE EXTENT IT SPATTERS

9)    THE HARDER AND LESS POROUS THE SURFACE, THE LESS SPATTER

10)   THE SOFTER AND MORE POROUS THE SURFACE, THE MORE SPATTER

                    ** MORE NARRATIVE CONTINUED ON NEXT PAGE.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   9          DR NO.: 2000 01797849      82

**** NARRATIVE ****

ON 10/8/00 AT 1010 HOURS, DETECTIVE KULESA AND MYSELF BEGAN THE SCENE
INVESTIGATION AT 2155 EAST LIBERTY LANE.  IT WAS PREVIOUSLY DECIDED THAT
DETECTIVE KULESA WOULD CONDUCT THE INVESTIGATION OF THE TWO BATHROOMS AND
THE THREE BEDROOMS OF THE APARTMENT, ALONG WITH THE HALLWAY.  I WAS TO
CONDUCT THE INVESTIGATION OF THE LIVING ROOM, DINING ROOM AND KITCHEN
AREA.

THE FRONT DOOR LEADS INTO THE LIVING ROOM AREA.  THE DOOR OPENS INWARD AND
TO THE NORTH.   THERE IS A SMALL CLOSET THAT IS LOCATED DIRECTLY SOUTH OF
THE FRONT DOOR.   THE ENTRY WAY TO THE APARTMENT IS TILED, WITH THE LIVING
ROOM CARPETED.   THE LIVING ROOM IS LOCATED ON THE SOUTH SIDE OF THE
APARTMENT, AND THE KITCHEN AND DINING ROOM ARE LOCATED ON THE NORTH SIDE.

I OBSERVED THE VICTIM'S BODY LAYING IN THE LIVING ROOM, WITH THE HEAD
POINTED TOWARDS THE SOUTH/EAST AND HIS FEET POINTED TOWARDS NORTH/WEST.
HE WAS LAYING ON HIS BACK, WITH HIS ARMS OUTSTRETCHED FROM HIS BODY.  THE
VICTIM'S HEAD WAS BLOODY AND TILTED TO THE WEST.  THERE WAS A STRONG
CONCENTRATION OF BLOOD ON THE EAST SIDE OF HIS BODY, ON THE FLOOR.

THERE WERE A FEW BLOOD POOLS ABOVE HIS HEAD ON THE CARPET, AND THERE WERE
A NUMBER OF ITEMS LAYING ON THE FLOOR THAT WERE BLOODSTAINED.  I OBSERVED
A BELT AND A LARGE KNIFE THAT WERE BLOODSTAINED, LAYING ON THE FLOOR, EAST
OF THE VICTIM'S BODY.

THERE WAS A TRASH CAN ON THE WEST SIDE OF HIS BODY, THAT WAS TIPPED OVER
WAS BLOODSTAINED.

I OBSERVED BLOODSTAINS ON THE EAST WALL, SOUTH WALL AND WEST WALL OF THE
LIVING ROOM.   THERE WERE BLOODSTAINS ON THE WEST WALL OF THE CLOSET, WHICH
WAS BESIDE THE FRONT DOOR.   I ALSO OBSERVED SOME BLOODSTAINS ON THE NORTH
WALL OF THE LIVING ROOM AND ON THE TILED FLOOR.

I OBSERVED BLOODSTAINS ON THE CEILING FAN AND ON THE CEILING, IN THE
LIVING ROOM AND DINING ROOM.

I BRIEFLY EXAMINED THE DINING ROOM, WHICH WAS LOCATED NORTH OF THE LIVING
ROOM AND EAST OF THE KITCHEN.   THERE WAS A WOODEN TABLE WITH FOUR CHAIRS
AROUND IT.   THE FIFTH CHAIR WAS LAYING ON ITS SIDE AT THE ENTRANCE TO THE
HALLWAY.   THERE WERE BLOODSTAINS ON PAPER ON TOP OF THE TABLE, THE NORTH
WALL AND ON A MIRROR ON THE NORTH WALL.

THERE WERE SOME PAPERS LAYING ON THE CARPETED FLOOR, ON THE WEST SIDE OF
THE TABLE, THAT WERE BLOODSTAINED.

I BRIEFLY EXAMINED THE KITCHEN NEXT.   THE KITCHEN IS LOCATED IN THE
NORTH/WEST CORNER OF THE APARTMENT.   THERE IS A COUNTER TOP THAT SEPARATES
THE DINING ROOM AND THE KITCHEN.   THERE WAS MEDICATION AND A CELLULAR

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  10          DR NO.: 2000 01797849     82

NE ON TOP OF THE COUNTER TOP, ALONG WITH SOME BLOODSTAINS.

THE KITCHEN FLOOR WAS MADE OUT OF TILE AND I OBSERVED A BROKEN PICTURE WITH A FLOWER POT ON TOP OF IT, IN THE CENTER OF THE FLOOR.  THERE WERE SOME BLOODSTAINS ON THE FLOOR, ON THE REFRIGERATOR AND ON THE SILVERWARE DIVIDER IN A DRAWER, AGAINST THE NORTH SIDE OF THE KITCHEN.

I ALSO OBSERVED A CELLULAR PHONE TELEPHONE CORD, THAT WAS CUT IN HALF, LAYING ON THE KITCHEN FLOOR.

I NOTICED THAT THE LIGHTS IN THE HALLWAY WERE ON AND THE NIGHT LIGHT ABOVE THE STOVE IN THE KITCHEN WAS ON.  I DID NOT NOTICE ANY OTHER LIGHTS ON IN THE LIVING ROOM OR DINING ROOM.

BEFORE I STARTED MY INVESTIGATION, DETECTIVE KULESA LOCATED SOME DARK COLORED SPOTS IN THE HALLWAY.  HE WANTED ME TO CHECK THE SPOTS WITH THE PHENOPHALIN CHEMICALS, TO SEE IF THEY WERE BLOOD OR NOT.  I CHECKED THE SPOTS WITH THE PHENOPHALIN, HOWEVER, IT WAS NEGATIVE FOR BLOOD.

I EXAMINED THE LIVING ROOM.  THE LIVING ROOM MEASURED AT APPROXIMATELY 17 FEET NORTH/SOUTH AND 15 FEET 3 INCHES EAST/WEST.  THE EAST WALL OF THE LIVING ROOM, STARTING AT THE NORTH END, HAD A GREEN LAZY BOY CHAIR FACING NORTH/WEST, WITH A BLOODSTAINED PILLOW ON TOP OF IT.  THE CHAIR WAS 3 FEET WIDE AND 3 FEET LONG WITH THE SEAT 1 FOOT 6 INCHES HIGH.  THERE WAS ALSO A BLOODY PIECE OF AN OBJECT, THAT WE LATER DETERMINED TO BE PART OF A LAMP.

BEHIND THE GREEN LAZY BOY CHAIR, WAS A SMALL TABLE THAT CONTAINED A GREEN P°°, MISCELLANEOUS PAPERS ON THE FLOOR AND LADY'S SHOES.  SOME OF THE .RS WERE BLOODSTAINED AND THERE WAS ANOTHER OBJECT THAT WAS BLOODSTAINED, THAT I LATER DETERMINED BELONGED TO A LAMP. THE BASE OF THE PHONE WAS LAYING ON THE FLOOR APPARENTLY KNOCKED OVER FROM THE TABLE.

THE COUCH EXTENDED FROM THE TABLE SOUTH, TO THE DOOR THAT LEADS ONTO THE PATIO.  THE COUCH WAS FULL SIZED AND HAD BLOODSTAINS ON TOP OF THE CUSHIONS AND ON THE DUST COVER IN FRONT OF THE COUCH.  THE COUCH WAS MEASURED AT 7 FEET 6 INCHES LONG, 3 FEET 6 INCHES WIDE AND THE SEAT 1 FOOT 6 INCHES HIGH.  THERE WERE BLOODSTAINS ON THE WALL ABOVE THE COUCH AND BEHIND THE GREEN LAZY BOY CHAIR.

THERE WAS A DOOR ON THE EAST WALL OF THE LIVING ROOM BY THE SOUTH WALL THAT LEADS OUT ONTO THE BACK PATIO.  THE DOOR OPENS INWARD AND TO THE SOUTH, THAT HAD MINI BLINDS COVERING THE WINDOWS.  THE DOOR WAS LOCKED AND CLOSED.  THERE WERE BLOODSTAINS ON THE MINI BLINDS AND ON THE DOOR.

THERE WAS A WINDOW THAT WAS ON THE SOUTH WALL OF THE LIVING ROOM WITH VERTICAL MINI BLINDS, THAT WERE CLOSED.  THERE WAS AN OVERSIZED CHAIR WITH AN OTTOMAN, ON THE WEST SIDE AGAINST THE SOUTH WALL.  THERE WERE BLOODSTAINS ON TOP OF THE CHAIR.  THE CHAIR MEASURED AT 4 FEET LONG, 3 FEET WIDE AND THE SEAT 1 FOOT 6 INCHES HIGH.  THE OTTOMAN WAS MEASURED AT 2' SQUARE AND 1'6" HIGH.

2000 01797849     82                                    Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  11          DR NO.: 2000 01797849     82

SOUTH/WEST CORNER OF THE LIVING ROOM HAD A WEDDING DISPLAY THAT WAS
BROKEN AND LAYING ON THE FLOOR.  THIS CONSISTED OF DOLLS, WEDDING ITEMS
AND BROKEN GLASS. THERE WAS A BLOOD OR TWO LOCATED ON TOP OF THE BROKEN
GLASS.

THERE IS A TV, STEREO AND ENTERTAINMENT CENTER AGAINST THE WEST WALL OF
THE LIVING ROOM.  THE ENTERTAINMENT CENTER MEASURED 2 FOOT 6 INCHES LONG 2
FOOT WIDE AND 5 FEET HIGH.    THE TV WAS OFF AND THERE WERE BLOODSTAINS ON
THE TV SCREEN AND ON THE ENTERTAINMENT CENTER, NEAR THE FLOOR.  THERE WERE
BLOODSTAINS ON THE WEST WALL, SOUTH OF THE ENTERTAINMENT CENTER.  THERE
WAS A SPEAKER IN THE SOUTH/WEST CORNER OF THE LIVING ROOM AND A SPEAKER AT
THE NORTH/WEST CORNER.  THERE WAS AN ARTIFICIAL PLANT THAT WAS KNOCKED
OVER, LAYING ON THE FLOOR IN FRONT OF THE ENTERTAINMENT CENTER.

THE CLOSET IS LOCATED BETWEEN THE FRONT DOOR AND THE ENTERTAINMENT CENTER.
THE CLOSET MEASURED 3 FEET LONG AND 2 FOOT 2 INCHES WIDE.  THERE WERE
BLOODSTAINS ON THE SOUTH SIDE OF THE CLOSET AND ON THE WEST SIDE OF THE
LIVING ROOM WALL.  THERE WAS A 21 INCH TALL PLASTIC GARBAGE CAN THAT WAS
LAYING ON TOP OF A BACK PACK, JUST SOUTH OF THE FRONT DOOR.  THERE WERE
BLOODSTAINS ON THE GARBAGE CAN.

I NOTICED THAT ON TOP OF THE COUCH AGAINST THE EAST WALL THERE WAS A
REMOTE CONTROL CHANGER LAYING ON THE SOUTH ARM OF THE COUCH.  THERE WAS A
SMALL BOWL OF POPCORN THAT WAS ON THE SEAT OF THE SOUTHERN PORTION OF THE
COUCH. I NOTICED ON THE FLOOR IN FRONT OF THE COUCH, WAS A PINKISH COLORED
STAIN, WHICH I TESTED WITH THE PHENOPHALIN CHEMICALS AND IT WAS NEGATIVE
FOR BLOOD.

FLOOR OF THE LIVING ROOM WAS CARPETED WITH A LARGE AREA RUG, OVER THE
CARPET.  THE VICTIM WAS LAYING, ON HIS BACK, WITH HIS HEAD TO THE
SOUTH/EAST AND THE FEET TO THE NORTH/WEST.  THE RIGHT HAND WAS EXTENDED
HORIZONTALLY, AWAY FROM HIS BODY AND THE LEFT HAND WAS BENT AT THE ELBOW,
EXTENDED AWAY FROM THE BODY.  THE HEAD WAS TILTED TO THE WEST.

HE WAS WEARING GREEN SHORTS WITH NO SHIRT, SHOES OR SOCKS.  THE FEET WERE
CROSSED, WITH THE LEFT FOOT OVER THE RIGHT.  THERE WAS A BLANKET WADDED UP
NEXT TO THE LEFT SIDE OF HIS NECK AND THERE WERE TWO FIRE DEPARTMENT
PATCHES ON HIS CHEST.

THERE WAS A BROKEN PORTION OF THE SEAT OF A STOOL, LAYING ON THE FLOOR
ABOVE HIS HEAD, ON TOP OF A LARGE BLOOD POOL.  THERE WAS A LARGE KITCHEN
KNIFE LAYING ON THE RIGHT SIDE OF HIS BODY, WITH THE KNIFE EDGE POINTING
TOWARDS THE BODY AND THE HANDLE AWAY.  THE BOTTOM PORTION OF THE KNIFE
BLADE WAS BLOOD SOAKED AND THERE WAS A BROWN AND BLACK BELT, LAYING ON TOP
OF THE KNIFE.  THERE WAS A LARGE BLOODSTAIN ON THE RIGHT SIDE OF HIS BODY,
WITH THE OTHER PORTION OF THE BROKEN STOOL SEAT, LAYING ON TOP OF THIS
BLOOD POOL.  THE BROKEN BOTTOM PORTION OF THE STOOL IS LAYING ON TOP OF
THIS SEAT TO THE RIGHT SIDE OF THE VICTIM'S BODY.  THERE WAS ALSO A
BLOODSTAINED FORK LAYING ON THE FLOOR, NORTH OF THE KNIFE.

THE HEAD OF THE BODY IS TURNED TO THE WEST AND THERE IS A LARGE

2000 01797849    82                              Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  12          DR NO.: 2000 01797849      82

'CENTRATION OF BLOOD ON THE RIGHT SIDE OF HIS FACE, BELOW HIS EAR.
...ERE IS ALSO A BLOODSTAIN ON TOP OF HIS HEAD, THAT IS RUNNING FROM THE
BACK OF HIS HEAD FORWARD, TO HIS FOREHEAD.  I NOTICED THERE WAS HARDLY ANY
BLOOD ON HIS CHEST, PANTS, LEGS AND FEET.  ALL THE BLOOD IS CONCENTRATED
AROUND THE UPPER SHOULDERS, NECK, HEAD AREA AND ARMS.  THE BLOOD ON THE
RIGHT AND LEFT HAND WAS ON THE OUTSIDE AND INSIDE OF THE HANDS.  THERE WAS
BLOOD TRAVELING DOWN THE RIGHT SIDE OF HIS HEAD TO THE NECK THEN TO THE
BACK.

I OBSERVED A VOID AREA ON THE TOP SIDE OF HIS RIGHT BICEP, WHICH IS BY THE
LARGE BLOOD POOL ON THE RIGHT SIDE OF HIS BODY.  I ALSO NOTICED THERE WAS
HAIR IN BOTH OF HIS HANDS.

I EXAMINED THE DINING ROOM NEXT.  THE DINING ROOM IS 8 FEET 10 INCHES
NORTH/SOUTH AND 9 FEET EAST/WEST.  STARTING AT THE NORTH WALL AT THE WEST
END, THERE IS A STANDARD HIGH CHAIR FOR A BABY AND THEN A SMALL TABLE AND
CHAIR SET FOR A BABY.  ON THE BACK SIDE OF THE GREEN CHAIR WAS A
BLOODSTAIN.  THERE IS A MIRROR ON THE NORTH WALL THAT HAS BLOODSTAINS ON
THE MIRROR AND ON THE WALL.  THEY APPEARED TO BE GOING IN A DOWN
DIRECTION.

THERE IS A PICTURE HANGING ON THE EAST WALL OF THE DINING ROOM AND THERE
IS A TABLE AND CHAIR SET, LOCATED IN THE MIDDLE OF THE DINING ROOM.  THERE
IS ONE CHAIR AT THE NORTH END, TWO CHAIRS ON THE EAST SIDE AND ONE CHAIR
ON THE WEST SIDE OF THE TABLE.  THE OTHER MATCHING CHAIR IS LAYING ON ITS
BACK AT THE ENTRANCE TO THE HALLWAY, WITH THE LEGS FACING EAST.  THE TABLE
MEASURED 5'6" LONG, 3'6" WIDE AND 2'4" HIGH.

RE IS A WOODEN STOOL LOCATED IN THE NORTH/EAST CORNER OF THE DINING
ROOM, WHICH MATCHES THE BROKEN STOOL THAT IS LAYING IN THE LIVING ROOM.

ON TOP OF THE DINING ROOM WOODEN TABLE, THERE ARE MISCELLANEOUS PAPERS, A
CASE OF SNAPPLE, TWO PAPER BACK BOOKS AND OTHER MISCELLANEOUS ITEMS.
THERE WAS ALSO DRIED FLOWER RESIDUE ON THE SOUTHWEST CORNER OF THE TABLE.
THERE WAS A MAP OF THE COMPLEX LAYING ON TOP OF THE TABLE THAT WAS
BLOODSTAINED.

THE FLOOR OF THE DINING ROOM WAS CARPETED AND THERE WERE MISCELLANEOUS
PAPERS, CAR KEYS, SUNGLASSES, LOTION AND BOTTLED WATER LAYING ON THE FLOOR
BETWEEN THE TABLE AND THE KITCHEN COUNTER.  SOME OF THE PAPERS ON THE
FLOOR WERE BLOODSTAINED.  I WAS UNSURE IF THIS WAS KNOCKED FROM THE TABLE
OR THE KITCHEN COUNTER.

I EXAMINED THE KITCHEN NEXT.  THE KITCHEN MEASURED AT 10 FEET 2 INCHES
NORTH/SOUTH AND 10 FEET EAST/WEST.  THERE IS A COUNTER TOP THAT STARTS ON
THE NORTH WALL, BY THE REFRIGERATOR, THAT RUNS WEST, ALONG THE NORTH WALL,
THEN SOUTH ALONG THE WEST WALL, EAST ALONG THE SOUTH WALL AND BACK NORTH
FOR ABOUT FOUR FEET.  THE COUNTER TOP IS 3 FEET HIGH.  THE EAST COUNTER
TOP IS 3 FEET WIDE WITH THE NORTH, WEST AND SOUTH COUNTER TOPS BEING
APPROXIMATELY 2 1/2 FEET WIDE.

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  13          DR NO.: 2000 01797849      82

Σ REFRIGERATOR IS ALONG THE NORTH WALL EAST OF THE COUNTER TOP, AND A
ALL CLOSET IS EAST OF THE REFRIGERATOR.  THE FLOOR OF THE KITCHEN IS
MADE OF LINOLEUM.  THERE IS AN OPEN FRUIT CUP PACKAGE ON TOP OF THE
COUNTER TOP, ALONG WITH A BROKEN CELLULAR PHONE.

THERE ARE SEVERAL PRESCRIPTION BOTTLES ON THE COUNTER, BELONGING TO THE
VICTIM.  THERE IS A BLOODSTAIN ON THE NORTH END OF THE COUNTER TOP.  THE
STOVE IS AGAINST THE SOUTH WALL OF THE KITCHEN AND THERE WAS A COOKIE
SHEET AND A POT OF FOOD ON TOP OF THE STOVE.  THE STOVE WAS TURNED OFF.

THE DOUBLE SINK IS AGAINST THE WEST WALL OF THE KITCHEN, BELOW A WINDOW.
THERE WAS AN EMPTY GLASS IN THE SINK.  THE NORTH SIDE TOP CABINET DOOR WAS
OPEN AND THERE WERE SAME TYPE GLASSES IN THE CABINET.  THERE WAS A
DISHWASHER NORTH OF THE SINK.  THE NORTH WALL HAD AN OPEN DRAWER, WHICH
CONTAINED A SILVERWARE DIVIDER INSIDE, THAT WAS BLOODSTAINED.  THE
REFRIGERATOR WAS LOCATED EAST OF THE COUNTER TOP, WHICH HAD BLOODSTAINS ON
THE FRONT OF THE REFRIGERATOR AND ON THE SIDE.

THE FLOOR OF THE KITCHEN IN FRONT OF THE REFRIGERATOR HAD BLOODSTAINS
ALONG WITH A CELLULAR PHONE CORD, THAT APPEARED TO BE CUT.  ALSO ON THE
FLOOR WAS A BROKEN PICTURE IN A FRAME WITH A BROKEN FLOWER POT ON TOP OF
THE PICTURE.  THE PICTURE WAS A PORTRAIT OF THE VICTIM AND HIS FAMILY.

I ALSO NOTICED SEVERAL DAMP RAGS LAYING ON THE SOUTH/EAST CORNER OF THE
FLOOR BY THE COUNTER TOPS.

THE INTERIOR OF THE REFRIGERATOR WAS EXAMINED.  THERE WERE MISCELLANEOUS
ITEMS IN THE FREEZER AND IN THE REFRIGERATOR.  THE CABINET DOORS WERE
OPENED AND EXAMINED.  THEY CONTAINED MISC. ITEMS OF COOKWARE, DINNERWARE
AND COOKING SUPPLIES.

AFTER ALL THE OBSERVATIONS, I BEGAN THE SCENE INVESTIGATION OF THE ITEMS
AROUND THE BODY.  I LOCATED ITEMS #1 THROUGH #14, WHICH WERE BLOODSTAINED
ITEMS AND BLOODSTAINS AROUND THE BODY.

I PLACED NUMBERED PLACARDS BY THE EVIDENCE WITH ALL THE NUMBERS FACING
NORTH.  I USED THE SOUTH/EAST CORNER OF THE LIVING AS A REFERENCE POINT
FOR THE MEASUREMENTS.

ITEM #1 IS A SILVER COLORED DINNER FORK LAYING ON THE CARPET, NORTH OF THE
BODY.  THE HANDLE WAS BLOODSTAINED AND WAS MEASURED AT 12 FEET 9 INCHES
NORTH AND 6 FEET WEST OF THE REFERENCE POINT.

ITEM #2 IS A BROWN AND BLACK MEN'S BELT THAT WAS LOCATED ON TOP OF THE
KNIFE, WHICH WOULD BE TO THE RIGHT SIDE OF THE BODY.  THE BELT WAS
BLOODSTAINED BY THE BUCKLE AND THE END OF THE BELT.  THE BELT WAS MEASURED
AT 12 FEET NORTH AND 6 FEET 6 INCHES WEST OF THE REFERENCE POINT.  THE
BELT WAS ALSO LAYING ON TOP OF THE BLOOD POOL.  THE BELT MEASURED AT 35
INCHES LONG.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  14          DR NO.: 2000 01797849      82

M #3 IS A BLACK HANDLED KITCHEN KNIFE THAT WAS LAYING ON THE FLOOR TO
THE RIGHT SIDE OF THE VICTIM'S BODY.  THE BLADE WAS POINTING TOWARDS THE
VICTIM AND THE HANDLE AWAY.  THE SHARP EDGE OF THE KNIFE HAD A HIGH
CONCENTRATION OF BLOOD.  THE KNIFE MEASURED 13 INCHES LONG, WITH THE BLADE
BEING 9 INCHES LONG.  THERE WERE BLOODSTAINS ON THE HANDLE OF THE KNIFE.
THE KNIFE WAS MEASURED 12 FEET NORTH AND 6 FEET 6 INCHES WEST OF THE
REFERENCE POINT.  I TURNED THE KNIFE OVER AND AGAIN THERE WAS A HEAVY
CONCENTRATION OF BLOOD ON THE SHARP EDGE OF THE KNIFE.

ITEM #4 IS A PAIR OF WHITE CHILDREN'S PANTS THAT WERE BLOODSTAINED.  THE
PANTS WERE LOCATED ON THE LEFT SIDE OF THE VICTIM'S BODY AND MEASURED AT
10 FEET 8 INCHES NORTH AND 10 FEET WEST OF THE REFERENCE POINT.  THERE
WERE SMALL MEDIUM VELOCITY IMPACT SPATTER STAINS ON TOP OF THE PANTS.

ITEM #5 IS THE LARGER BROKEN SECTION OF THE STOOL SEAT THAT WAS FOUND ON
THE FLOOR TO THE RIGHT SIDE OF THE VICTIM'S BODY.  THE STOOL IS LAYING
WITH THE BOTTOM SIDE OF THE STOOL FACING UPWARD.  THERE WAS A HEAVY
CONCENTRATION OF BLOOD ON THE STOOL SEAT.  THE STOOL SEAT WAS MEASURED AT
12 FEET NORTH AND 5 FEET 2 INCHES WEST AND WAS LAYING UNDER ITEM #6, WHICH
IS A BROKEN SECTION OF THE STOOL.  THE TOP PORTION OF THE STOOL WAS LAYING
FACE DOWN AND WHEN TURNED OVER, THERE WAS VERY LITTLE BLOOD ON THE STOOL
SEAT.  THERE WAS A VOID SECTION UNDERNEATH THE STOOL, ON THE CARPET, WHICH
INDICATED THAT THE SEAT WAS ON THE FLOOR PRIOR TO THE BLOOD BEING SHED ON
TOP.

ITEM #6 IS THE LEG SECTION OF THE STOOL THAT WAS LAYING ON ITS SIDE, WITH
THE TOP PORTION FACING SOUTH AND THE BOTTOM PORTION FACING NORTH.  ONE OF
   LEGS WAS LAYING OVER THE TOP OF THE BROKEN SEAT PORTION OF THE STOOL.
 M #6 WAS MEASURED AT 12 FEET NORTH AND 5 FEET 2 INCHES WEST.  THE
BOTTOM PORTION OF THE LEG SECTION OF THE STOOL HAD ARTERIAL GUSHING
TRAVELING IN A NORTH/EAST DIRECTION.  THE TOP PORTION OF THE LEGS HAD
BLOODSTAINED TRANSFER PATTERNS ON IT.

AFTER PHOTOGRAPHING THE LEG PORTION IN PLACE, I STOOD THE SECTION STOOL UP
AND TOOK PHOTOGRAPHS ON ALL FOUR SIDES.  THERE WAS A WOODEN BRACE MISSING
WHICH WAS LATER MARKED ITEM #10.

ITEM #7 IS A SMALLER SECTION OF THE STOOL SEAT THAT WAS LOCATED ON TOP OF
A BLOOD POOL, SOUTH OF THE VICTIM'S HEAD.  THE TOP PORTION OF THE SEAT HAD
A FEW DROPS OF BLOOD ON TOP.  THE STOOL SEAT WAS MEASURED 8 FEET 4 INCHES
NORTH AND 6 FEET 6 INCHES WEST OF THE REFERENCE POINT.  AFTER THE SEAT WAS
MEASURED, I EXAMINED THE UNDER SIDE.  THE UNDER SIDE OF THE SEAT WAS
HEAVILY BLOODSTAINED FROM THE BLOOD POOL IT WAS LAYING IN.  IT APPEARS
THAT WAS PLACED ON THE FLOOR, AFTER THE BLOOD POOL WAS CREATED ON THE
FLOOR.

ITEM #8 IS A RED AND WHITE BLANKET THAT WAS LAYING ON THE FLOOR ON THE
LEFT SIDE OF THE VICTIM'S NECK.  THE BLANKET WAS MEASURED AT 9 FEET NORTH
AND 7 FEET 6 INCHES WEST OF THE REFERENCE POINT.  THE BLANKET HAD VERY
LITTLE BLOOD TRANSFER PATTERNS ON THE BLANKET.  THIS BLANKET WAS USED BY
THE VICTIM'S WIFE TO STOP THE BLEEDING ON THE VICTIM'S NECK, HOWEVER, DUE

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NO.  15          DR NO.: 2000 01797849      82

THE LACK OF BLOOD ON THE BLANKET, IT APPEARS THAT THE VICTIM HAD ALREADY DIED AND THERE WAS NO BLOOD LOSS FROM THE WOUND AND THE NECK, AT THE TIME THE BLANKET WAS PLACED IN THAT LOCATION.

ITEM #9 IS A TAN PLASTIC KITCHEN GARBAGE CAN THAT WAS LOCATED TO THE WEST OF THE VICTIM'S BODY, AGAINST THE WALL.  THE GARBAGE CAN WAS MEASURED AT 13 FEET NORTH AND 11 FEET WEST OF THE REFERENCE POINT.  THE CAN WAS MEASURED AT 21 INCHES HIGH AND IT WAS LEANING BACKWARD ON TOP OF A BACK PACK.  THE ONLY BLOODSTAINS I SAW ON THE TAN GARBAGE CAN WAS ON THE BACK SIDE AND LEFT SIDE.

THERE IS A COMBINATION IF MEDIUM VELOCITY IMPACT SPATTER AND CAST OFF PATTERN ON THE GARBAGE CAN.  THE CAST OFF PATTERN IS TRAVELING FROM FRONT TO BACK AND SLIGHTLY UPWARD.  IF THE CAN WAS LAYING TIPPED OVER ON THE BACK PACK, THIS WOULD INDICATE THAT THE PATTERN WAS IN A DOWNWARD DIRECTION.

ITEM #10 IS A DOWEL PORTION OF THE BROKEN STOOL, LOCATED NORTH OF THE VICTIM'S BODY, ON THE CARPET.  THE DOWEL WAS BLOODSTAINED AND IT WAS MEASURED AT 17 FEET NORTH AND 5 FEET 4 INCHES WEST OF THE REFERENCE POINT.

ITEM #11 IS A BLOOD POOL THAT WAS LOCATED ABOVE THE VICTIM'S HEAD.  THE BLOOD POOL WAS MEASURED AT 7 FEET 9 INCHES NORTH AND 6 FEET 10 INCHES WEST.  ITEM #7 WAS LAYING ON TOP OF THIS BLOOD POOL.  THE BLOOD POOL POSSIBLY CAME FROM THE TOP OF THE VICTIM'S HEAD INJURIES.  I NOTICED THERE WERE SEVERAL LARGE LACERATIONS ON TOP OF THE VICTIM'S HEAD.  IT DOES NOT APPEAR THAT HIS NECK WAS CUT AT THIS POINT, DUE TO THE FACT THERE IS NO ARTERIAL GUSHING PRESENT IN THIS AREA.

IT SHOULD BE NOTED THAT LATER IN THE INVESTIGATION, AFTER ALL THE EVIDENCE WAS COLLECTED OFF THE RUG, I CUT THIS SECTION OF THE CARPET OUT.  I NOTICED THE CARPET UNDERNEATH THE AREA RUG WAS ALSO HEAVILY BLOODSTAINED AND IT WAS MARKED 11A.

ITEM #12 IS THE BLOOD POOL AND ARTERIAL GUSHING FROM THE VICTIM'S NECK.  THE BLOOD POOL IS MEASURED AT 11 FEET 6 INCHES NORTH AND 6 FEET WEST OF THE REFERENCE POINT.  THE BLOOD POOL WAS LOCATED ON THE EAST SIDE OF THE VICTIM'S NECK.  THE VICTIM'S RIGHT ARM WAS LAYING HORIZONTALLY ACROSS THE TOP OF THIS BLOOD POOL, WITH A VOID AREA ON HIS BICEP.

ITEMS #2 AND #3 WAS LAYING ON TOP OF THE BLOOD POOL.  THESE ITEMS APPEARED TO BE PLACED OVER THE TOP OF THE BLOOD POOL.  IF YOU ROLL THE VICTIM TO HIS RIGHT SIDE, PLACING HIS FACE IN THE VOID AREA, THIS WOULD BE CONSISTENT OF THE BLOOD DRAINING FROM THE VICTIM'S NECK AND MOUTH AREA, WITH ARTERIAL GUSHING TRAVELING IN A NORTH/EAST DIRECTION.

IT SHOULD BE NOTED THAT AFTER ALL THE EVIDENCE WAS REMOVED FROM THE CARPET, I FOUND THAT THE CARPET UNDERNEATH THE AREA RUG WAS BLOODSTAINED ALSO.  THIS WAS MARKED 12A.

ITEM #13 IS A BLOODSTAIN THAT IS CLASSIFIED AS ARTERIAL GUSHING.  THIS

2000 01797849      82                                    Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  16          DR NO.: 2000 01797849      82

VELS NORTH/EAST FROM THE VICTIM'S INJURY TO THE NECK.  THE ARTERIAL
GUSHING WAS MEASURED AT APPROXIMATELY 3 FEET IN LENGTH.

ITEM #14 IS A POOL OF VOMIT THAT WAS LOCATED SOUTH OF THE VICTIM'S HEAD.
THE VOMIT POOL WAS MEASURED 10 FEET NORTH AND 7 FEET WEST OF THE REFERENCE
POINT.

THE VOMIT POOL WAS JUST NORTH OF THE BLOOD POOL MARKED ITEM #11.  THIS
WOULD INDICATE THAT THE VICTIM WAS EITHER VOMITING PRIOR TO, DURING OR
AFTER HIS INJURIES TO THE TOP OF HIS HEAD, AT THIS LOCATION.

THE HEAVY BLOOD FLOW THAT WAS MARKED ITEM #12 AND THE ARTERIAL GUSHING
THAT WAS MARKED ITEM #13 AND #13A, ALONG WITH THE VOID AREA ON TOP OF THE
VICTIM'S RIGHT BICEP, AND THE LOCATION OF THE VICTIM'S INJURY TO THE LEFT
SIDE OF HIS NECK, WOULD INDICATE THAT THE VICTIM WAS LAYING ON THE FLOOR
FACING EAST WHEN HIS NECK WAS CUT WITH THE KNIFE CAUSING THE ARTERIAL
GUSHING ON THE FLOOR.  THIS WOULD ALSO INDICATE THAT THE VICTIM WAS
ALREADY DOWN WHEN THE INJURY OCCURRED.

I FOUND ITEMS #15 AND #16 ON THE FLOOR, BETWEEN THE GREEN CHAIR AND THE
COUCH, AGAINST THE EAST WALL IN THE LIVING ROOM.

ITEM #15 IS A WHITE NAPKIN THAT HAD A CAST OFF PATTERN OF BLOOD ON THE
NAPKIN.  THIS NAPKIN WAS MEASURED 11 FEET 3 INCHES NORTH AND 2 FEET WEST
OF THE REFERENCE POINT.  THE CAST OFF PATTERN ON THE NAPKIN WAS IN AN EAST
DIRECTION.  I EXAMINED THE BOTTOM PORTION OF THE NAPKIN AND IT WAS
BLOODSTAINED.

ITEM #16 IS A BLOODSTAINED OBJECT THAT WAS LOCATED NEXT TO THE NAPKIN.
THIS ITEM WAS MEASURED AT 11 FEET 5 INCHES NORTH AND 2 FEET 6 INCHES WEST
OF THE REFERENCE POINT.  I LATER DETERMINED THAT THIS OBJECT WAS THE
BROKEN PIECE OF A TABLE LAMP THAT WAS TAKEN FROM THE SOUTH/EAST BEDROOM OF
THE APARTMENT.  THERE WERE BLOODSTAINS ON THE OUTSIDE OF THE LAMP PIECE
AND MEDIUM VELOCITY IMPACT SPATTER ON THE INSIDE OF THE LAMP PIECE.

ITEM #17 IS A PAIR OF GREEN MEN'S SHORTS THAT THE VICTIM WAS WEARING.  THE
SHORTS HAD A BLUE AND BLACK BELT ALSO.  I NOTICED THERE WAS A SMALL
PORTION TO THE REAR OF THE PANTS AT THE BELT LINE, THAT WAS BLOODSTAINED.
I DID NOT SEE ANY BLOOD SPATTER ON THE FRONT OR SIDES OF THE SHORTS.  THE
SHORTS WERE MEASURED AT 11 FEET 6 INCHES NORTH AND 9 FEET WEST OF THE
REFERENCE POINT.

ITEMS #18 AND #19 ARE EVIDENCE I FOUND LAYING ON TOP OF THE GREEN CHAIR,
AGAINST THE EAST WALL OF THE LIVING ROOM.

ITEM #18 IS A PIECE OF THE BROKEN LAMP THAT WAS MEASURED 14 FEET NORTH 1
FOOT 6 INCHES WEST AND 1 FOOT 6 INCHES HIGH.  THE BROKEN LAMP PIECE WAS
BLOODSTAINED ON BOTH SIDES.

ITEM #19 IS A WHITE PILLOW CASE AND PILLOW THAT WAS BLOODSTAINED, LAYING
ON TOP OF THE GREEN CHAIR.  THE BLOODSTAINED PORTION OF THE PILLOW WAS

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO. 17          DR NO.: 2000 01797849     82

ING THE BACK OF THE CHAIR.  THE PILLOW APPEARED TO HAVE A TRANSFER PATTERN OF BLOOD ON THE BOTTOM SIDE OF THE PILLOW WITH A HEAVY CONCENTRATION OF BLOOD LOCATED AT THE EDGE OF THE PILLOW.  THERE WAS POSSIBLE EX PIRATED BLOOD LOCATED ON TOP OF THE PILLOW, TRAVELING AWAY FROM THE HIGH CONCENTRATION OF BLOOD ON THE SIDE OF THE PILLOW.  THE PILLOW CASE WAS REMOVED FROM THE PILLOW AND IMPOUNDED.  THE PILLOW CASE WAS MEASURED AT 13 FEET NORTH, 3 FEET 1 INCH WEST AND 1 FOOT 8 INCHES HIGH FROM THE REFERENCE POINT.

ITEM #20 IS ANOTHER BROKEN PIECE OF THE LAMP THAT WAS FOUND LAYING ON THE FLOOR AT THE FOOT OF THE GREEN CHAIR.  THE BROKEN PIECE OF LAMP APPEARED TO BE BLOODSTAINED ON THE OUTSIDE OF THE PIECE ONLY.  THE BROKEN LAMP PIECE WAS MEASURED AT 13 FEET 10 INCHES NORTH AND 3 FEET 6 INCHES WEST OF THE REFERENCE POINT.

I THEN PLACED ITEMS #16, #18 AND #20 ON A CLEAN PIECE OF CLOTH AND HAD PHOTOGRAPHS TAKEN, SHOWING THEIR RELATIONSHIP TO EACH OTHER.

I CHECKED THE VICTIM'S HANDS AND NOTICED THERE WERE HAIR IN THE LEFT HAND, WHICH WAS MARKED ITEM #21 AND HAIR ON THE RIGHT HAND, WHICH WAS MARKED ITEM #22.  ITEM #21 WAS MEASURED AT 9 FEET NORTH AND 9 FEET 6 INCHES WEST. ITEM #22 WAS MEASURED AT 11 FEET NORTH AND 5 FEET WEST OF THE REFERENCE POINT.  THE VICTIM WAS BALD AND THE HAIR IS POSSIBLY THE VICTIM'S WIFE'S.

ITEMS #23 THROUGH #28, ARE BLOODSTAINS THAT WAS ON THE FRONT DOOR OF THE APARTMENT.

#23 IS THE INSIDE BLOODSTAINED DOOR HANDLE OF THE FRONT DOOR.

ITEM #24 IS A FINGER SMEAR PATTERN IN BLOOD ON THE OUTSIDE OF THE FRONT DOOR, THAT MEASURED AT ABOUT 3 FEET 9 INCHES HIGH.  THIS FINGER SMEAR WOULD BE LOCATED JUST ABOVE THE DEADBOLT LOCK.

ITEMS #25, #26, #27 AND #28 ARE FINGER SMEAR PATTERNS ON THE INTERIOR OF THE DOOR, BY THE DEADBOLT LOCKS.

ITEM #29 IS A BLOODSTAIN ON THE EXTERIOR WALL BY THE FRONT DOOR, MEASURED AT 3 FEET 7 INCHES HIGH.  THERE IS NO DISTINCTIVE PATTERN, OTHER THAN BEING A SMEAR PATTERN ON THE WALL.

ITEM #30 IS A PLASTIC BAG AND LADY'S BARRETTE THAT WERE BLOODSTAINED. THESE ITEMS WERE LAYING ON THE FLOOR TO THE EAST OF THE VICTIM'S BODY. THE PLASTIC BAG MEASURED 12 FEET NORTH AND 2 FEET 6 INCHES WEST OF THE REFERENCE POINT.  THE BLOODSTAIN ON THE BAG APPEARED TO BE MEDIUM VELOCITY IMPACT SPATTER.

AT THIS POINT OF THE INVESTIGATION, WE MEASURED, PHOTOGRAPHED AND COLLECTED ALL THE EVIDENCE.  I EXAMINED THE BODY A LITTLE BIT CLOSER AT THIS POINT OF THE INVESTIGATION.

2000 01797849     82                                    Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  18          DR NO.: 2000 01797849     82

LEFT SIDE OF THE VICTIM'S NECK APPEARED TO HAVE A KNIFE WOUND THAT RA
FROM THE FRONT OF HIS THROAT TO THE REAR.   THERE WAS NO BLOOD DRAINAGE
FROM THIS WOUND AT THIS TIME.   IT APPEARS THAT HE HAD STOPPED BLEEDING BY
THE TIME THAT THE VICTIM WAS ROLLED TO HIS BACK AND THE BLANKET PLACED UP
TO HIS WOUND.   THERE WERE SEVERAL WOUNDS TO THE BACK OF HIS HEAD AND THE
BLOOD DIRECTION WAS UP OVER THE TOP OF THE HEAD AND DOWN HIS FOREHEAD.
THERE APPEARED TO BE BLOOD HIS NOSTRILS AND IN HIS MOUTH.

WE REMOVED THE HAIR FROM HIS HANDS AND THEN BAGGED HIS HANDS FOR EVIDENCE.
THE VICTIM WAS ROLLED OVER TO HIS LEFT SIDE AND I OBSERVED THERE WAS A
VOID AREA UNDER HIS BACK.   THE BLOOD POOL MARKED ITEM #12 HAD SEEPED UNDER
THE BODY, DUE TO THE CONTOUR OF THE RUG.

THE ARTERIAL GUSHING BEGAN IN THE BLOOD POOL #12, AND CONTINUED NORTH/EAST
FOR ABOUT 6 FEET.   THE BROKEN PORTION OF THE STOOL SEAT, ITEM #5, WAS
LAYING UNDER THE ARTERIAL GUSHING IN THE BLOOD POOL.   THERE WAS A VOID
AREA ON TOP OF THE SEAT WHERE HIS HAND APPARENTLY HAD BEEN, DURING THE
BLOOD SHED.

IT APPEARS THE VICTIM WAS LAYING ON HIS RIGHT SIDE FACING EAST, WHEN HIS
NECK WAS CUT, CAUSING THE ARTERY TO MAKE THE ARTERIAL SPURT PATTERN IN A
NORTH/EAST DIRECTION.   IT APPEARS THE VICTIM WAS ALREADY DOWN IN THIS
POSITION WHEN HE WAS CUT BY THE KNIFE.

THE GREEN SHORTS, ITEM #17, WAS REMOVED FROM THE BODY, WITH THE PERMISSION
OF DR. KEEN, WHO IS THE MEDICAL EXAMINER.   THE MEDICAL EXAMINER'S OFFICE
RESPONDED AND PLACED THE VICTIM IN A BODY BAG, WHICH WAS SEALED WITH SEAL
59117.   THE BODY WAS THEN REMOVED TO THEIR OFFICE FOR FUTURE
MINATION.

ONCE THE BODY WAS REMOVED, I HAD SOME ADDITIONAL 35MM PHOTOGRAPHS TAKEN OF
THE RUG, WITHOUT THE BODY.   I THEN OUTLINED THE AREA OF THE RUG AND CUT IT
OUT, MARKING IT ITEM #31.   THE ARTERIAL SPURT PATTERN CONTINUED FROM THE
AREA RUG ONTO THE CARPET OF THE LIVING ROOM.   I CUT THIS SECTION OUT ALSO
AND MARKED IT #13A, WHICH WOULD CORRESPOND WITH THE ARTERIAL GUSHING
PATTERN #13.

ONCE THE RUG WAS CUT AND REMOVED, I NOTICED THAT THE BLOOD HAD SEEPED
THROUGH ONTO THE CARPET OF THE LIVING ROOM.   I MARKED THE AREA UNDER ITEM
#11 AS #11A, ON THE CARPET.   I CUT THIS SECTION OUT ALSO AND RETAINED IT
AS EVIDENCE.

I NOTICED THE AREA UNDER ITEM #12 WAS ALSO BLOOD SOAKED AND I MARKED THIS
AREA #12A, WHICH I CUT OUT AND RETAINED AS EVIDENCE.   I NOTICED THAT ONCE
THIS WAS REMOVED, THERE WERE BLOODSTAINS ON THE MAT UNDER THE CARPET.

I HAD EVIDENCE TECHNICIAN ROSA MORAN USE "LCV" ON THE BLOODY FINGERPRINTS
AND SMEARS ON THE FRONT DOOR TO ENHANCE THE FINGERPRINTS.   EVIDENCE TECH
MORAN ADVISED THAT SHE WAS UNABLE TO OBTAIN FINGERPRINTS.

ITEMS #32 THROUGH #38 ARE BLOODSTAINED CUSHIONS, PILLOWS AND DUST SKIRT,

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.  19          DR NO.: 2000 01797849     82

THE COUCH AGAINST THE EAST WALL OF THE LIVING ROOM.

ITEM #32 IS THE CUSHION ON THE NORTH SIDE OF THE COUCH.  THERE IS CAST OFF
BLOOD PATTERN ON TOP OF THE CUSHION, THAT IS TRAVELING IN AN EAST
DIRECTION AND MEDIUM VELOCITY IMPACT SPATTER ON THE FRONT SIDE OF THE
CUSHION.

ITEM #33 IS THE SEAT CUSHION ON THE SOUTHERN PORTION OF THE COUCH, WHICH
HAS CAST OFF BLOODSTAIN PATTERNS ON TOP OF THE CUSHION, TRAVELING IN AN
EAST DIRECTION AND MEDIUM VELOCITY IMPACT SPATTER ON THE FRONT SIDE OF THE
CUSHION.

ITEM #34 IS A FLOWERED PILLOW, WHICH IS ON THE NORTH SIDE OF THE COUCH.
THE PILLOW HAD CAST OFF BLOODSTAINS ON THE TOP SIDE OF THE PILLOW.  THE
PILLOWS MEASURED 9 FEET 6 INCHES NORTH, 3 FEET WEST AND 2 FEET HIGH, FROM
THE REFERENCE POINT.

ITEM #35 IS A FLOWERED PILLOW THAT WAS BEHIND BY ITEM #34.  THE TOP SIDE
OF THE PILLOW ALSO HAD CAST OFF BLOOD PATTERNS, WHICH WAS MEASURED 10 FEET
NORTH, 3 FEET WEST AND 2 FEET HIGH FROM THE REFERENCE POINT.

ITEM #36 IS THE ARM COVER TO THE NORTH ARM OF THE COUCH.  THE FRONT
PORTION OF THE ARM COVER HAD MEDIUM VELOCITY IMPACT SPATTER ON IT, AS DID
THE FRONT PART OF THE COUCH.  THIS MEASURED 11 FEET NORTH, 3 FEET WEST AND
2 FEET 7 INCHES HIGH.

ITEM #37 IS THE DUST SKIRT ON THE FRONT OF THE COUCH, ON THE NORTH SIDE,
   CH WAS BLOODSTAINED.  THIS WAS CONSISTENT OF THE MEDIUM VELOCITY IMPACT
 .TTER.  THIS WAS MEASURED 9 FEET NORTH AND 3 FEET 6 INCHES WEST OF THE
REFERENCE POINT.

ITEM #38 IS A DUST SKIRT ON THE FRONT OF THE COUCH ON THE SOUTH SIDE,
WHICH WAS BLOODSTAINED AND MEASURED AT 5 FEET NORTH AND 3 FEET 6 INCHES
WEST.  THIS WAS CONSISTENT OF HAVING MEDIUM VELOCITY IMPACT SPATTER ON THE
FRONT.

THE MEDIUM VELOCITY IMPACT SPATTER ON THE DUST SKIRT WAS RELATED TO THE
MEDIUM VELOCITY IMPACT SPATTER THAT WAS ON THE FRONT OF THE SEAT CUSHIONS.
THE MEDIUM VELOCITY IMPACT SPATTER TRAVELED FROM THE FLOOR UP TO THE
APPROXIMATELY 1 FOOT 6 INCHES HIGH.  THE MEDIUM VELOCITY IMPACT SPATTER ON
THE FRONT OF THE COUCH WOULD BE CONSISTENT OF THE POINT OF IMPACT OF THE
BLOOD SOURCE, AT A LOW LEVEL TO THE FLOOR.

THE COVERS TO THE PILLOWS, SEAT CUSHION AND DUST SKIRT WAS REMOVED FROM
THE COUCH AS EVIDENCE.  THE MEASUREMENTS OF THESE ITEMS WERE TO THE MIDDLE
OF THE ITEM.

THE SEAT CUSHIONS WERE REMOVED FROM THE COUCH AND THE COUCH MOVED AWAY
FROM THE WALL FOR ANY ADDITIONAL EVIDENCE, WITH NEGATIVE RESULTS.

I LOCATED ITEM #39, WHICH IS A BLOODSTAIN ON THE EAST WALL, ABOVE THE

2000 01797849     82                                       Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          ·   PAGE NO.  20          DR NO.: 2000 01797849     82

CH.   THIS WAS CONSISTENT OF BEING PART OF A CAST OFF PATTERN AND
MEASURED 8 FEET 10 INCHES NORTH AND 3 FEET HIGH, FROM THE REFERENCE POINT.

ITEM #40 IS A BLOODSTAIN LOCATED ON THE EAST WALL OF THE LIVING ROOM,
NORTH OF THE COUCH.   THIS WAS CONSISTENT OF BEING A CAST OFF PATTERN AND
THE DIRECTIONALITY WAS DOWN AND TO THE NORTH.   THE BLOODSTAIN MEASURED AT
13 FEET 9 INCHES NORTH AND 11 INCHES HIGH.

ITEM #41 IS A BLOODSTAIN PATTERN ON THE SOUTH WALL OF THE LIVING ROOM,
EAST OF THE OVERSIZED CHAIR.   THE DIRECTIONALITY OF THE CAST OFF PATTERN
WAS DOWN AND TO THE EAST.   THE PATTERN MEASURED AT 4 INCHES TO 3 FEET WEST
AND 4 FEET TO 6 INCHES HIGH.   THE LARGEST BLOODSTAIN WAS COLLECTED AS
EVIDENCE AND SEVERAL OF THE OTHER BLOODSTAINS WERE TESTED WITH THE
PHENOPHALIN CHEMICALS WITH POSITIVE RESULTS FOR INDICATION OF BLOOD.

THERE WAS ALSO CAST OFF PATTERN IN BLOOD ON THE MINI BLINDS ON THE DOOR
AGAINST THE EAST WALL OF THE LIVING ROOM.   THE DIRECTIONALITY WAS DOWN AND
TO THE SOUTH.   THE BLOODSTAINS ON THE MINI BLINDS TESTED POSITIVE FOR THE
INDICATION OF BLOOD, WITH THE PHENOPHALIN CHEMICALS.

I EXAMINED THE OVERSIZED CHAIR AGAINST THE SOUTH WALL, UNDER THE WINDOW.
THE TOP OF THE COUCH AND THE PILLOW LEANING AGAINST THE BACK OF THE CHAIR
HAD BLOODSTAINS ON THEM.

THE FRONT OF THE CUSHION, ITEM #42, HAD MEDIUM VELOCITY IMPACT SPATTER ON
IT AND THE TOP OF THE CUSHION AND THE PILLOW HAD CAST OFF BLOODSTAIN
PATTERNS.

. . 1 #42 MEASURED 2 FEET NORTH, 5 FEET WEST AND 1 FOOT 8 INCHES HIGH.

ITEM #43, WHICH WAS THE PILLOW, WAS MEASURED 2 FEET NORTH, 5 FEET WEST AND
2 FEET HIGH.   THESE ITEMS WERE MEASURED TO THE MIDDLE OF THE ITEM.

I REMOVED THE CUSHION FROM THE CHAIR AND MOVED THE CHAIR AWAY FROM THE
WALL AND THERE WERE NO ITEMS OF EVIDENCE LOCATED.   I REMOVED THE CASE FRO
THE PILLOW AND THE CASE FROM THE CUSHION, AND IMPOUNDED THEM AS EVIDENCE.

THE OTTOMAN WAS CHECKED AND THERE WAS MEDIUM VELOCITY IMPACT BLOODSTAINS
ON THE FRONT OF THE CUSHION.   I REMOVED THE OTTOMAN, TO CHECK FOR
EVIDENCE, WITH NEGATIVE RESULTS.

ITEM #44 IS A BLOODSTAIN LOCATED ON THE SOUTH WALL ON THE WEST SIDE OF THE
WINDOW.   THE DIRECTIONALITY OF THE CAST OFF PATTERN WAS DOWN AND TO THE
WEST.   THE BLOODSTAIN MEASURED 12 FEET 4 INCHES WEST AND 2 FEET 7 INCHES
HIGH.

ITEM #45 IS ANOTHER BLOODSTAIN THAT WAS LOCATED ON THE SOUTH WALL, WEST OF
THE WINDOW.   THIS CAST OFF PATTERN WAS MEASURED AT 13 FEET NORTH, 9 INCHES
WEST AND 2 FEET 2 INCHES HIGH.   THE DIRECTIONALITY WAS DOWN AND TO THE
WEST.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT    ·    PAGE NO.  21         DR NO.: 2000 01797849    82

M #46 IS A BLOODSTAIN LOCATED ON THE WEST WALL OF THE LIVING ROOM,
MEASURED AT 1 FOOT NORTH, 15 FEET 3 INCHES WEST AND 6 FEET 6 INCHES HIGH.
THE DIRECTIONALITY OF THE CAST OFF PATTERN WAS HORIZONTALLY IN A SOUTH
DIRECTION.

ITEM #47 IS LOCATED ON THE WEST WALL BELOW ITEM #46.  IT WAS CONSISTENT
WITH BEING A CAST OFF PATTERN IN A DOWN AND SOUTH DIRECTION.  THE
BLOODSTAIN WAS MEASURED AT 1 FOOT 8 INCHES NORTH, 15 FEET 3 INCHES WEST
AND 1 FOOT 6 INCHES HIGH FROM THE REFERENCE POINT.

ITEM #48 IS A BLOODSTAIN ON THE SOUTH LIVING ROOM WALL BY THE BASEBOARD.
THIS WAS CONSISTENT WITH BEING A CAST OFF PATTERN IN A DOWN DIRECTION.
THE BLOODSTAIN MEASURED AT 13 FEET 3 INCHES WEST AND 1 INCH HIGH.

ITEM #49 IS A BLOODSTAIN ON THE BOTTOM OF THE TV STAND, AGAINST THE WEST
LIVING ROOM WALL.  THIS WAS CONSISTENT WITH BEING A CAST OFF PATTERN IN A
DOWN DIRECTION.  THE BLOODSTAIN WAS MEASURED 6 FEET 1 INCH NORTH, 13 FEET
5 INCHES WEST AND 5 INCHES HIGH.  THERE WERE OTHER BLOODSTAINS ON THE FACE
OF THE TV THAT WAS GOING IN A DOWN DIRECTION, DIRECTLY ABOVE ITEM #49.

THE BLOODSTAINS WERE TESTED WITH PHENOPHALIN CHEMICALS AND THEY TESTED
POSITIVE FOR THE INDICATION OF BLOOD.

ITEM #50 IS LOCATED ON THE NORTH WALL OF THE LIVING ROOM, WHICH WOULD BE
THE SOUTH SIDE OF THE CLOSET, BY THE FRONT DOOR.  THE BLOODSTAINS ARE
CONSISTENT WITH BEING CAST OFF PATTERNS AND TRAVELING IN A DOWN AND WEST
DIRECTION.  THE BLOODSTAIN WAS MEASURED AT 10 FEET 2 INCHES NORTH, 12 FEET
INCHES TO 14 FEET WEST AND 4 FEET 2 INCHES HIGH OF THE REFERENCE POINT.

THE LARGEST BLOODSTAIN WAS COLLECTED AS EVIDENCE AND THE OTHERS WERE
TESTED WITH THE PHENOPHALIN CHEMICALS, WHICH WAS POSITIVE FOR THE
INDICATION OF BLOOD.

ITEM #51 IS A BLOODSTAIN ON THE WEST WALL OF THE LIVING ROOM, SOUTH OF TH
FRONT DOOR.  THIS APPEARED TO BE A CAST OFF PATTERN IN A DOWN DIRECTION.
THE BLOODSTAIN MEASURED 10 FEET 3 INCHES NORTH, 12 FEET 3 INCHES WEST AND
5 FEET 1 INCH HIGH.

ITEM #52 IS A FRAMED PICTURE LOCATED ON THE WEST LIVING ROOM WALL, SOUTH
OF THE FRONT DOOR.  THE PICTURE HAD CAST OFF PATTERN, WHICH MEASURED 10
FEET 6 INCHES NORTH, 12 FEET 3 INCHES WEST AND 4 FEET 5 INCHES HIGH, FROM
THE REFERENCE POINT.  THE DIRECTIONALITY WAS DOWN AND TO THE NORTH.

THERE WERE OTHER CAST OFF BLOOD PATTERNS ON THE WALL, BELOW THE PICTURE,
WHICH WAS TESTED WITH THE PHENOPHALIN CHEMICALS AND TESTED POSITIVE FOR
THE INDICATION OF BLOOD.

ITEM #53 IS A SAMPLE OF BLOODSTAINS FROM THE NORTH WALL, IN THE LIVING
ROOM, EAST OF THE FRONT DOOR.  THE BLOODSTAINS WERE A CAST OFF PATTERN IN
A DOWN AND WEST DIRECTION.  THEY WERE MEASURED AT 17 FEET 3 INCHES NORTH,

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT       ·   PAGE NO.  22       DR NO.: 2000 01797849    82

FEET 8 INCHES WEST AND 5 FEET 7 INCHES HIGH.

THE LARGER STAINS WERE COLLECTED AS EVIDENCE AND THE SMALLER ONES WERE
TESTED WITH THE PHENOPHALIN CHEMICALS, WHICH REACTED POSITIVE FOR THE
INDICATION OF BLOOD.

ITEM #54 ARE BLOODSTAINS ON THE TILED FLOOR AT THE BASE OF THE NORTH
LIVING ROOM WALL.  THEY ALSO WERE CONSISTENT OF BEING A CAST OFF PATTERN
AND TRAVELING IN A NORTH/WEST DIRECTION.  THEY WERE MEASURED AT 16 FEET TO
17 FEET 3 INCHES NORTH AND 12 FEET 2 INCHES TO 13 FEET 2 INCHES WEST, OF
THE REFERENCE POINT.

THE LARGER BLOODSTAINS WERE COLLECTED AS EVIDENCE AND THE SMALLER ONES
WERE TESTED WITH THE PHENOPHALIN CHEMICALS, WHICH REACTED POSITIVE TO THE
INDICATION OF BLOOD.

BASED ON THE INFORMATION THAT I PRESENTLY HAVE, THAT THE SUSPECT IS NOT
INJURED AND THERE WAS NO ONE ELSE INSIDE THE APARTMENT AT THE TIME THE
HOMICIDE, THE CAST OFF AND IMPACT BLOOD PATTERNS, ARE ALL CONSISTENT OF
COMING FROM THE VICTIM.  MOST OF THE MEDIUM VELOCITY IMPACT SPATTER IS ON
THE LOWER PORTION OF THE FURNITURE, WHICH WOULD INDICATE THAT THE SOURCE
OF IMPACT IS NEAR THE FLOOR LEVEL OF THE APARTMENT.

THE CAST OFF PATTERN INDICATE THAT THE VICTIM WAS BEATEN AT ABOUT THE SAME
LOCATION WHERE HE WAS FOUND IN THE LIVING ROOM, NEAR THE FLOOR LEVEL.
SOME OF THE CAST OFF PATTERN WOULD BE CONSISTENT OF FORWARD MOTION OF THE
OBJECT AND OTHER CAST OFF PATTERNS WOULD BE CONSISTENT OF BLOOD BEING
"NG OFF AN OBJECT IN A BACKWARD MOTION.

I BEGAN TO EXAMINE THE KITCHEN AND DINING ROOM NEXT.

I USED THE NORTH/WEST CORNER OF THE KITCHEN FOR MEASUREMENTS.  ITEMS #55
THROUGH #58 WERE LOCATED ON TOP OF THE COUNTER, ALONG THE EAST SIDE OF THE
KITCHEN.

ITEM #55 IS A LADY'S WEDDING RING, THAT WAS MEASURED 8 FEET 10 INCHES
SOUTH, 8 FEET 1 INCH EAST AND 3 FEET HIGH.

ITEM #56 WERE THE VICTIM'S PRESCRIPTION BOTTLES, THAT WERE FOUND ON TOP OF
THE KITCHEN COUNTER.  THEY WERE MEASURED AT 5 FEET 10 INCHES SOUTH, 9 FEET
9 INCHES EAST AND 3 FEET HIGH.

DETECTIVE KULESA HAD DOCUMENTED THE NAME OF THE DOCTORS, THE NAME OF THE
VICTIM, THE AMOUNT OF THE PRESCRIPTION AND HOW MANY TABLETS THAT WERE LEFT
IN EACH BOTTLE.  SEE HIS SUPPLEMENT FOR DETAILS.

ITEM #57 IS A QUALCOM CELLULAR PHONE FOUND ON TOP OF THE KITCHEN COUNTER.
THIS MEASURED AT 5 FEET 7 INCHES SOUTH, 8 FEET EAST AND 3 FEET HIGH.  THE
PHONE APPEARED TO BE BROKEN.

ITEM #58 IS A PRESCRIPTION BOX OF ZOFRAN, IN THE NAME OF THE VICTIM.  THE

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT    .   PAGE NO.  23       DR NO.: 2000 01797849    82

CRIPTION BOX WAS FOUND ON TOP OF THE KITCHEN COUNTER AND IT WAS
..SURED AT 7 FEET 6 INCHES SOUTH, 8 FEET EAST AND 8 FEET HIGH.

ITEM #59 WAS THREE DAMP TOWELS THAT WERE FOUND WADDED UP IN THE SOUTH/EAST
CORNER OF THE KITCHEN.  THEY WERE MEASURED AT 7 FEET 8 INCHES SOUTH, 7
FEET 4 INCHES EAST.

ITEM #60 IS A CELLULAR PHONE CORD THAT WAS CUT IN HALF, LAYING ON THE
KITCHEN FLOOR.  THE CORD WAS MEASURED AT 4 FEET 6 INCHES SOUTH AND 5 FEET
4 INCHES EAST.  THE CORD WAS FOUND TO BELONG TO THE QUALCOM TELEPHONE.

ITEM #61 IS A BLOODSTAIN THAT IS ON TOP OF THE KITCHEN COUNTER AT THE
NORTH END.  THE FINGER SMEARS MEASURED 5 FEET 4 INCHES SOUTH, 10 FEET EAST
AND 3 FEET HIGH.

ITEMS #62 AND #63 WERE LOCATED ON THE KITCHEN FLOOR.  ITEM #62 WAS A
FRAMED PHOTOGRAPH OF THE VICTIM AND HIS FAMILY, LYING FACE UP ON THE
FLOOR.  THE GLASS WAS BROKEN AND THERE WAS A BROKEN FLOWER POT LAYING ON
TOP OF THE FRAMED PICTURE.  THEY MEASURED AT 5 FEET 10 INCHES SOUTH AND 4
FEET EAST.

ITEM #64 IS A WOODEN SILVERWARE DRAWER, LOCATED AT THE NORTH END OF THE
KITCHEN, THAT WAS BLOODSTAINED.  THIS MEASURED AT 3 FEET SOUTH, 3 FEET 6
INCHES EAST AND 2 FEET 9 INCHES HIGH.  THE SILVERWARE DRAWER HAD FINGER
SMEARS IN BLOOD ON THE DRAWER.

ITEM #67 ARE BLOODSTAINS ON THE KITCHEN FLOOR THAT WAS MEASURED AT 3 FEET
S INCHES SOUTH AND 6 FEET EAST.  THEY APPEAR TO BE A SMEAR PATTERN.

ITEM #66 ARE BLOOD DROPS ON THE KITCHEN FLOOR.  THEY WERE MEASURED AT 2
FEET 10 INCHES SOUTH AND 7 FEET EAST.

I CHECKED THE DINING ROOM FLOOR NEXT, AND USED THE SOUTH/EAST CORNER OF
THE LIVING ROOM FOR MEASUREMENTS OF THESE ITEMS.

THERE WAS A PILE OF MISCELLANEOUS PAPERS, WATER BOTTLES, SUNGLASSES,
LOTION BOTTLE, KEYS AND A CIGARETTE LIGHTER, LYING ON THE FLOOR.  I WAS
UNSURE IF THIS WAS ORIGINALLY LOCATED ON THE KITCHEN COUNTER OR THE TABLE,
BUT IT APPEARED TO BE KNOCKED OFF, ONTO THE FLOOR.

ITEM #67 IS A MANILLA FOLDER THAT HAD BLOOD DROPS ON TOP OF IT.  THIS WAS
MEASURED AT 21 FEET 6 INCHES NORTH AND 6 FEET WEST.

ITEM #68 IS A WHITE PIECE OF PAPER THAT HAD BLOOD DROPS ON TOP OF IT.
THIS WAS PARTIALLY UNDER ITEM #67.  THIS MEASURED AT 21 FEET NORTH AND 5
FEET 4 INCHES WEST.

ITEM #69 IS A PIECE OF NOTEBOOK PAPER THAT HAD A BLOODY FINGER SMEAR ON
IT.  THIS MEASURED 20 FEET NORTH AND 5 FEET 4 INCHES WEST.

THERE WAS A SET OF CAR KEYS WITH AN ALARM ON THE FLOOR, SOUTH OF THESE

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT      .      PAGE NO.   24        DR NO.: 2000 01797849      82

'MS.   THE KEYS WERE MEASURED AT 19 FEET 2 INCHES NORTH AND 5 FEET 4
...CHES WEST.

I RETURNED TO THE KITCHEN AND CHECKED THE REFRIGERATOR.   I OBSERVED SOME
BLOODSTAINS ON THE REFRIGERATOR.

ITEM #71 IS LOCATED ON THE EAST SIDE OF THE REFRIGERATOR AND APPEARS TO BE
FINGER SMEARS.   THEY WERE MEASURED 2 FEET 7 INCHES SOUTH, 7 FEET EAST AND
3 FEET 9 INCHES HIGH, FROM THE REFERENCE POINT.

ITEM #72 IS LOCATED ON THE FRONT OF THE REFRIGERATOR AND APPEARS TO BE
FINGER SMEARS.   THE FINGER SMEARS START ON THE FREEZER AND TRAVEL DOWNWARD
ONTO THE REFRIGERATOR DOOR.   THEY MEASURED 2 FEET 7 INCHES SOUTH, 5 FEET
EAST AND 3 FEET 8 INCHES HIGH.

ITEM #73 ARE FINGER SMEARS ON THE DOOR HANDLE OF THE REFRIGERATOR.   THEY
MEASURED 2 FEET 9 INCHES SOUTH, 4 FEET 8 INCHES EAST AND 3 FEET HIGH.

ITEM #74 IS A SET OF KEYS WITH AN ALARM, ON A HOOK, ON THE SOUTH WALL OF
THE KITCHEN.   THEY WERE MEASURED 10 FEET 3 INCHES SOUTH, 7 FEET 5 INCHES
EAST AND 3 FEET 10 INCHES HIGH.

I CHECKED THE DINING ROOM AREA NEXT FOR EVIDENCE.   I USED THE SOUTH/EAST
CORNER OF THE LIVING ROOM AS A REFERENCE POINT FOR THE MEASUREMENTS.

I LOCATED A MAP OF THE COMPLEX LYING ON TOP OF THE KITCHEN TABLE, THAT HAD
A BLOOD DROP ON IT.   THIS WAS MEASURED AT 23 FEET 6 INCHES NORTH, 1 FOOT
' 3T AND 2 FEET 4 INCHES HIGH.   THE BLOOD DROP WAS POSSIBLY FROM CAST OFF.

ITEM #76 IS A BLOODSTAIN THAT WAS ON THE BACK OF THE GREEN CHILD'S CHAIR
LOCATED IN THE NORTH/EAST CORNER OF THE DINING ROOM.   THIS WAS A CAST OFF
PATTERN AND THE DIRECTIONALITY WAS DOWNWARD.   THE BLOODSTAIN WAS MEASURED
AT 24 FEET 9 INCHES NORTH, 4 FEET 3 INCHES WEST AND 10 INCHES HIGH.

ITEMS #77 THROUGH #82 ARE BLOODSTAINS FROM THE NORTH DINING ROOM WALL AND
MIRROR.   THEY ALL APPEAR TO BE CAST OFF PATTERN AND IN A DOWN DIRECTION.

ITEM #77 IS A BLOODSTAIN THAT WAS LOCATED AT 27 FEET 6 INCHES NORTH, 3
FEET 1 INCHES WEST AND 2 FEET 8 INCHES HIGH.

ITEM #78 IS A BLOODSTAIN THAT WAS LOCATED AT 27 FEET 6 INCHES NORTH, 3
FEET WEST AND 2 FEET HIGH.

ITEM #79 IS A BLOODSTAIN THAT WAS LOCATED AT 27 FEET 6 INCHES NORTH, 2
FEET 8 INCHES WEST AND 2 FEET HIGH.

ITEM #80 IS A BLOODSTAIN ON THE MIRROR, LOCATED AT 27 FEET 6 INCHES NORTH,
2 FEET 4 INCHES WEST AND 5 FEET 8 INCHES HIGH.

ITEM #81 IS A BLOODSTAIN ON THE MIRROR, LOCATED AT 27 FEET 6 INCHES NORTH,
1 FOOT 6 INCHES WEST AND 5 FEET 6 INCHES HIGH.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT      ·      PAGE NO.  25        DR NO.: 2000 01797849      82

ITEM #82 IS A BLOODSTAIN LOCATED ON THE MIRROR AT 27 FEET 6 INCHES NORTH, 1 FOOT WEST AND 2 FEET 6 INCHES HIGH.

ITEM #83 IS A STOOL THAT WAS LOCATED IN THE NORTH/EAST CORNER OF THE DINING ROOM, AT 27 FEET NORTH AND 6 INCHES WEST.

I CHECKED THE EAST DINING ROOM WALL FOR ANY EVIDENCE, WITH NEGATIVE RESULTS.  I DID LOCATE ITEM #84, WHICH IS A BLOODSTAIN ON THE NORTH HALLWAY WALL, AT THE ENTRANCE, INTO THE DINING ROOM.  THIS MEASURED AT 19 FEET 2 INCHES NORTH, 2 FEET EAST AND 4 FEET 5 INCHES HIGH.  THIS WAS A CAST OFF PATTERN, TRAVELING IN AN EAST DIRECTION.

I CHECKED THE CEILING OF THE LIVING ROOM AND DINING ROOM NEXT.

I LOCATED A CAST OFF PATTERN ON THE CEILING, TRAVELING FROM THE CEILING FAN NORTH TO THE DINING ROOM.

ITEM #85 IS LOCATED AT 13 FEET 6 INCHES NORTH, 5 FEET WEST AND 9 FEET HIGH.

ITEM #86 IS A BLOODSTAIN LOCATED AT 18 FEET 4 INCHES NORTH, 5 FEET WEST AND 9 FEET HIGH.

ITEM #87 IS A BLOODSTAIN LOCATED AT 8 FEET NORTH, 8 FEET 6 INCHES WEST AND 9 FEET HIGH.

ITEM #88 IS A BLOODSTAIN LOCATED ON THE CEILING FAN BLADE, LOCATED AT 7 FEET NORTH, 9 FEET WEST AND 8 FEET HIGH.

ITEMS #89 THROUGH #95 WERE LOCATED AND COLLECTED BY DETECTIVE KULESA. THEY WERE LOCATED IN OTHER ROOMS OF THE APARTMENT.  SEE HIS SUPPLEMENT FOR DETAILS.

I LOCATED ITEM #96, WHICH WAS LEGAL DOCUMENTS FOUND ON THE FLOOR OF THE LIVING ROOM.  THE LEGAL DOCUMENTS WERE FROM ATTORNEY JEFFREY MILLER, ADDRESSED TO JOSEPH AND WENDY ANDRIANO, DATED AUGUST 14, 2000.  THIS WAS REFERENCE A MEDICAL MALPRACTICE CLAIM, MADE BY THE VICTIM AGAINST DOCTORS AND MEDICAL CENTERS, THAT TREATED THE VICTIM.

IT SHOULD BE NOTED THAT ALL THE BLOOD EVIDENCE ON THE WALLS WERE CUT OUT WITH A SCALPEL.  THE BLADE OF THE SCALPEL WAS CLEANED WITH ALCOHOL AND WATER AFTER EACH COLLECTION PROCESS.

THE BLOODSTAINS THAT WERE LOCATED ON THE TILED FLOOR, KITCHEN FLOOR AND REFRIGERATOR WERE COLLECTED WITH A DAMP Q-TIP.

ALL THE EVIDENCE WAS EVENTUALLY IMPOUNDED AND SUBMITTED TO THE CRIME LAB FOR ANALYSIS.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT    ·    PAGE NO.  26        DR NO.: 2000 01797849    82


ᴉNVESTIGATION CONTINUING


11/9/00 - 1005 - A3649SAF


   VICTIM RECEIVED RIGHTS INFORMATION:   NO            MAIL-IN SUPPLEMENT:
INVOICES:

                        END OF REPORT            DR NO: 2000 01797849    082

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NO.   1        DR NO.: 2000 01797849    94

REPORT DATE: 20001028   TIME: 0823

TYPE OF REPORT:  HOMICIDE                            OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                 BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: JOHN KNELL                    A3492    UNIT: C23

                    ****  NARRATIVE  ****
   SERIAL NUMBER: A3492

ORIGINATING DR: 200001797849 074  LIMS: 00-21123 REPORT 14

THE FOLLOWING INFORMATION IS A SUMMARY OF THE LABORATORY EXAMINATION
RESULTS. CONTACT THE LABORATORY SERVICES BUREAU FOR THE OFFICIAL REPORT.

                -- RESULTS OF SCIENTIFIC ANALYSIS --

SECTION : TRACE ANALYSIS    ANALYST: JOHN KNELL(A3492)

THE WEIGHT OF THE CONTENTS OF THE BROWN BOTTLE (ITEM #2787725-0010) FOUND
IN THE BOX (ITEM 2780436-0008) WAS 426 GRAMS.  THE CONTENTS OF THE BOTTLE
WERE REMOVED AND REPACKAGED AS ITEM #2787725-0007.  A PORTION OF THE
MATERIAL WAS SAMPLED FOR ANALYSIS (ITEM 2787725-0007.1).
THE WEIGHT OF THE CONTENTS OF THE ROUND PLASTIC CONTAINER (ITEM
#2787725-0006) FOUND IN THE BROWN BOX (ITEM #2780436-0008) WAS 52.1 GRAMS.
   THE CONTENTS OF THE PLASTIC CONTAINER WERE REMOVED AND REPACKAGED AS ITE
I  2787725-0008.  A PORTION OF THE MATERIAL WAS SAMPLED FOR ANALYSIS (ITEM
2  7725-0008.1)
THE WEIGHT OF THE MATERIAL ON THE BUBBLE WRAP (ITEM #2787725-0002) FOUND
IN THE BROWN BOX (ITEM #2780436-0008) WAS 1.1 GRAMS.  THE MATERIAL WAS
REMOVED AND REPACKAGED AS ITEM #2787725-0009.
THE TOTAL WEIGHT OF THE MATERIAL FROM THE BROWN BOTTLE, THE ROUND PLASTIC
CONTAINER, AND ON THE BUBBLE WRAP WAS 479.2 GRAMS.
WHITE POWDER RESIDUE WAS FOUND ON THE PLASTIC FORK (ITEM #2780436-0011).
WHITE POWDER RESIDUE WAS FOUND IN THE SMALL PLASTIC BOWL (ITEM
#2780436-0013).


EVIDENCE DISPOSITION:

AT THE CONCLUSION OF ANALYSIS, ITEM 2787725-0007, 2787725-0008 AND
2787725-0009 WERE RELEASED TO THE PROPERTY MANAGEMENT BUREAU.

AT THE CONCLUSION OF ANALYSIS, ITEM 2780436-0008, 2780436-0011,
2780436-0013, 2787725-0002, 2787725-0006, 2787725-0007.1, 2787725-0008.1,
2787725-0009 AND 2787725-0010 WERE RETAINED IN THE LABORATORY SECTION.


   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

   2000 01797849    94                                      Continued.

Case 2:16-cv-01159-SRB   Document 45-18   Filed 12/04/17   Page 64 of 180

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT     ·    PAGE NO.    2          DR NO.: 2000 01797849      94

OICES:

END OF REPORT          DR NO: 2000 01797849      094

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   1          DR NO.: 2000 01797849   134

REPORT DATE: 20010111   TIME: 1327

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE 132            BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: DAVE LUCERO                  4913     UNIT: C33

                  ***   PROPERTY/EVIDENCE   ***

  RECOVERY LOCATION: 000620 W WASHINGTON ST
            DATE: 000000                SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI    AP01
      ITEM: *MISC     BRAND:          MODEL:          COLOR:
      SIZE:           QUANTITY: 0001  SERIAL NO.:
      DESCRIPTION: REPORT FROM WEST COAST ANALYTICAL SERVICE, INC.

                  ****   NARRATIVE   ****

  SERIAL NUMBER: 4913

SAMPLES: 1) UNKNOWN FOOD
            INVOICE #2778372
            ITEM #27, SAMPLE OF UNKNOWN FOOD ITEM TAKEN FROM PYREX DISH ON
                  KITCHEN COUNTER
            TESTED NEGATIVE FOR THE PRESENCE OF SODIUM AZIDE

         2) UNKNOWN FOOD
            INVOICE #2778372
            ITEM # 28, SAMPLE OF UNKNOWN FOOD ITEM TAKEN FROM ANOTHER
                  PYREX DISH ON THE KITCHEN COUNTER
            TESTED NEGATIVE FOR THE PRESENCE OF SODIUM AZIDE

         3) UNKNOWN FOOD
            INVOICE #2778372
            ITEM #30, SAMPLE OF UNKNOWN FOOD ITEM TAKEN FROM A KETTLE ON
                  THE KITCHEN STOVE
            TESTED POSITIVE FOR THE PRESENCE OF SODIUM AZIDE

         4) UNKNOWN TYPE OF CAPSULES
            INVOICE #2778372
            ITEM #37A, UNKNOWN TYPE OF CAPSULES (FROM ITEM #37 THE PINK
                  BOWL)
             TESTED NEGATIVE FOR THE PRESENCE OF SODIUM AZIDE

         5) UNKNOWN FOOD
            INVOICE #2778372
            ITEM  #38, SAMPLE OF UNKNOWN FOOD ITEM TAKEN FROM A SOUP BOWL
                  ON THE KITCHEN COUNTER
            TESTED POSITIVE FOR THE PRESENCE OF SODIUM AZIDE

Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   2          DR NO.: 2000 01797849   134

6) UNKNOWN FOOD
   INVOICE #2778372
   ITEM #39, SAMPLE OF UNKNOWN FOOD ITEM TAKEN FROM A SOUP BOWL
             ON THE KITCHEN COUNTER
   TESTED POSITIVE FOR THE PRESENCE OF SODIUM AZIDE

=============================================================================

ON 111600, THE PHOENIX POLICE CRIME LAB MAILED THE ABOVE LISTED FOOD
SAMPLES TAKEN FROM THE ANDRIANO'S APARTMENT TO THE WEST COAST ANALYTICAL
SERVICES, INC VIA FEDERAL EXPRESS. WEST COAST ANALYTICAL SERVICES TESTED
THE ITEMS FOR THE PRESENCE OF SODIUM AZIDE. FOOD ITEMS NUMBERS 30, 38 AND
39 TESTED POSITIVE FOR THE PRESENCE OF SODIUM AZIDE. ITEMS 27, 28 AND 37A
TESTED NEGATIVE FOR THE PRESENCE OF SODIUM AZIDE. REFER TO WEST COAST
ANALYTICAL SERVICES REPORT FOR FURTHER INFORMATION.

INVESTIGATION CONTINUING.

 VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:    2809487

                       END OF REPORT          DR NO: 2000 01797849   134

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.    1        DR NO.: 2000 01797849   154

REPORT DATE: 20010301    TIME: 0858

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: DAVE LUCERO                    4913    UNIT: C33

                    ***   PROPERTY/EVIDENCE   ***

  RECOVERY LOCATION: 000620 W WASHINGTON ST
              DATE: 030101                  SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM. SAMPLE REMOVED FROM
INVOICE 2778372 ITEM 27.

0002  PKG 002 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM. THIS SAMPLE WAS
 ʾMOVED FROM INVOICE 2778372 ITEM 28.

0003  PKG 003 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM. THIS SAMPLE WAS
REMOVED FROM INVOICE 2778372 ITEM 30.

0004  PKG 004 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: UNKNOWN TYPE OF CAPSULES. THIS ITEM WAS REMOVED
FROM INVOICE 2778372 ITEM 37A.

0005  PKG 005 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM. THIS SAMPLE WAS
◄ REMOVED FROM INVOICE 2778372 ITME 38.

0006  PKG 006 CODE:EI   AP01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM. THIS SAMPLE WAS
REMOVED FROM INVOICE 2778372 ITEM 39.

 )07  PKG 007 CODE:EI   V 01
      ITEM: *MISC    BRAND:          MODEL:           COLOR:

  2000 01797849   154                                  Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   2          DR NO.: 2000 01797849   154


        SIZE:              QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: SAMPLE OF VOMIT FROM LIVING ROOM FLOOR CARPET.
REMOVED FROM INVOICE 2777913 ITEM 14.

◄ 0008  PKG 008 CODE:EI   AP01
        ITEM: *MISC     BRAND:          MODEL:          COLOR:
        SIZE:              QUANTITY: 0001   SERIAL NO.:
        DESCRIPTION: SODIUM AZIDE. REMOVED FROM INVOICE 278725 ITEM
7.

                    ****  NARRATIVE  ****
    SERIAL NUMBER: 4913

THE ABOVE LISTED EVIDENCE AS WELL AS THE EVIDENCE ON INVOICE 2827790
ITEM 1, ARE SAMPLE RETURNED TO THE PHOENIX POLICE DEPARTMENT BY THE WEST
COAST LAB AFTER TESTING.
THE EVIDENCE WAS RETAINED BY THE PHOENIX POLICE CRIME LAB UNTIL TURNED
OVER TO THIS DETECTIVE FOR IMPOUNDING.


    VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2827787

                    END OF REPORT          DR NO: 2000 01797849   154

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NO.   1          DR NO.: 2000 01797849   155

REPORT DATE: 20010301    TIME: 0916

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0435  GRID: JD32

REPORTING OFFICER[S]: DAVE LUCERO                   4913     UNIT: C33

                    ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000620 W WASHINGTON ST
          DATE: 030101              SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI    AP01
      ITEM: *MISC     BRAND:       MODEL:              COLOR:
      SIZE:          QUANTITY: 0001   SERIAL NO.:
      DESCRIPTION: SODIUM AZIDE. REMOVED FROM INVOICE 2787725 ITEM
8.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:    2827790

                    END OF REPORT        DR NO: 2000 01797849    15

# EXHIBIT 36

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development



Philip E. Keen, M.D.
Chief Medical Examiner

Dorothy O'Connell
Administrator

# OFFICE OF THE MEDICAL EXAMINER
## 120 S. 6th Avenue
## Phoenix, AZ  85003

### FACSIMILE TRANSMITTAL

Telephone: (602)506-3322                    Fax:  (602)506-1546

Date: _Dec. 18, 2000_

To: _Susie Grant_

Company: _County Attorney's Office_

Department: _Major Crimes_

Fax Telephone Number: _(602) 506-7950_

From: _Norman Wade_

Department: _Laboratory_

Direct Telephone Number: _(602) 506-8697_

NUMBER OF PAGES, NOT INCLUDING THIS ONE: _1_

Comments: _Latest results on Andriano case._
_√/c——_

602-506+1546

NO.030   P02

12/13/00   12:44

Dec-14-00  9:13AM;

Page 2/2

: By: West Coast Analytical Service;   5629485850;

Client:   COUNTY OF MARICOPA
Job no.:   50185

Azide by Ion Chromatography

IC Method

Column:              Dionex AS10 with AG10 guard
Eluent:              180 mM NaOH, 0.9 mL/min
Injection Volume:    300 Microliters
Detection:           Suppressed Conductivity

The blood sample (Andriano, Joe 00-3022) was extracted at 1 mL to
20 mL 100 mM NaOH, with 10 min sonication.

| Sample ID | Azide Parts Per Million (mg/L) | Detection Limit |
|---|---|---|
| Andriano, Joe 00-3022 | 2 * | 2 |
| Method Blank | ND | 2 |

* There is a peak in the sample with the same retention time as
azide.  The suppressed conductivity detection cannot make an
absolute peak identity determination.  WCAS has no data on peaks
that might coelute with azide in pooled donor blood samples.

Date Analyzed:   12-08-00

Matrix Spike/Matrix Spike Duplicate Recovery Summary

Sample: Andriano, Joe 00-3022: Blood (pre-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec MS | MSD Result | %Rec MSD | RPD |
|---|---|---|---|---|---|---|---|
| Azide, mg/L | 2 | 40 | 45 | 108 | 48 | 115 | 6 |
| QC Guidelines ** | | | | 80 - 120 | | | 20 |

** No limits have been determined for this matrix

000002

art By: West Coast Analytical Service;   5629485850;   Dec-5-00 10:31AM;   Page 1/3

## WEST COAST ANALYTICAL SERVICE, INC.

Analytical Chemists

9840 Alburtis Avenue    Santa Fe Springs, CA 90570

562-948-2225   Fax 562-948-5850

http://www.wcaslab.com

---

### FAX REPORT

---

Date:       Tuesday, December 05, 2000

Fax No:     602.495.0169

Company:    City of Phoenix

Location:   Phoenix

Attn:       Mahesh Patel

---

REFERENCE:   Data - WCAS job number 49955

Here is the data that you requested. Please give me a call if you have any questions.

From: Doria Lillig                    Time: $10:30$ AM Faxed pages: 3

*West Coast Analytical Service, Inc. is not responsible for fax transmission errors. Unless otherwise noted, this data is preliminary and has not had final quality control review.*

000003

Client:   CITY OF PHOENIX
Job no.:   49955

Azide by Ion Chromatography

IC Method

Column:            Dionex AS10 with AG10 guard
Eluent:            180 mM NaOH, 0.9 mL/min
Injection Volume:  300 Microliters
Detection:         Suppressed Conductivity

| Sample ID | Azide Parts Per Million (mg/kg) | Detection Limit |
|-----------|--------------------------------|-----------------|
| #27 | ND | 1 |
| #28 | ND | 20 |
| — #30 | 25 | 20 |
| #37A | ND | 100 |
| #38 | 22 | 20 |
| #39 | 11 | 8 |
| Method Blank | ND | 1 |

| Sample ID | Azide Total µg | Detection Limit |
|-----------|----------------|-----------------|
| #14   (SWAB) | ND | 2 |
| Method Blank | ND | 2 |

| Sample ID | Azide Percent | Percent as Sodium Azide |
|-----------|---------------|-------------------------|
| #7.1 | 71.2 | 110 |

This sample had to be diluted by a dilution factor of 200000 for
analysis.

Dates Analyzed:   11-21-00 to 11-27-00

Matrix Spike/Matrix Spike Duplicate Recovery Summary

Sample: Batch QC (pre-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS | MSD Result | %Rec* MSD | RPD |
|---------|--------|--------|--------|-----|--------|-----|-----|
| Azide | 3.8 | 40.0 | 15.9 | 30 | 17.4 | 34 | 9 |

Sample:#7.1

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec MS |
|---------|--------|--------|--------|-----|
| Azide | 71.2 | 200 | 277 | 103 |

QC Guidelines:                                          90-110

Sample:#30 (post-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---------|--------|--------|--------|-----|
| Azide | 25.0 | 400 | 461 | 109 |

Sample:#37A (post-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---------|--------|--------|--------|-----|
| Azide | ND | 2130 | 2310 | 108 |

Sample:#38 (post-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---------|--------|--------|--------|-----|
| Azide | 22 | 400 | 498 | 119 |

Sample:#39 (post-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---------|--------|--------|--------|-----|
| Azide | 11.0 | 160 | 173 | 101 |

* QC limits have not been determined in this  matrix.

PRINTED ON - DATE: 10/27/00  TIME: 1055  PAGE:  5

IMPOUND PROPERTY INVOICE

.   OICE NO:    2773372     TYPE: EVIDENCE    DR NUMBER: 2000 01797849   13
CLAIM:    INVOICE DATE: 10/11/00 TIME:       BOOKING NO:   282050  FELONY: Y


TEM
NO. PKG CODE OWNER   TYPE   BRAND   MODEL      COLORS CAL/SZ QUANT.
     TAKEN FROM TUPPERWARE STYLE CONTAINER ON THE KITCHEN COUNTER

  35  3 E   AP 1  YFOOD
ERIAL NO:                        OAN:                    VALUE:
ESCR:  SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
     MILK)
     TAKEN FROM A DISH ON THE KITCHEN COUNTER

  36  2 E   AP 1  YFOOD
ERIAL NO:                        OAN:                    VALUE:
ESCR:  SAMPLE OF MUS-L BLAST 2000+ BODY BUILDING
     FORMULA (POWDER)
     FROM ORIGINAL CONTAINER FROM KITCHEN CUPBOARD RIGHT SIDE OF KITCHEN SINK
     (UPPER CABINET)

  37  7 E   AP 1  HDISH                                    1
ERIAL NO:                        OAN:                    VALUE:
ESCR:  DIRTY PINK TUPPERWARE BOWL
     *(RELATED TO ITEM #38 CAPSULES)
     LOWER CUPBOARD NEXT TO REFRIGERATOR PUSHED ALL THE WAY TO THE BACK

   A  8 E   AP 1  YMEDICI
E. AL NO:                        OAN:                    VALUE:
ESCR:  UNKNOWN TYPE OF CAPSULES
     *(FROM ITEM #37 THE PINK BOWL)
     SAME AS ITEM #37

  38  3 E   AP 1  YFOOD
ERIAL NO:                        OAN:                    VALUE:
ESCR:  SAMPLE OF UNKNOWN FOOD ITEM
     TAKEN FROM SOUP BOWL ON KITCHEN COUNTER

  39  3 E   AP 1  YFOOD
ERIAL NO:                        OAN:                    VALUE:
ESCR:  SAMPLE OF UNKNOWN FOOD ITEM
     TAKEN FROM A SOUP BOWL ON THE KITCHEN COUNTER

  40  6 E   AP 1  HDISH                                    1
ERIAL NO:                        OAN:                    VALUE:
ESCR:  EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
     TAKEN FROM THE KITCHEN COUNTER

  41  6 E   AP 1  HDISH                                    1
ERIAL NO:                        OAN:                    VALUE:
ESCR:  EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
     TAKEN FROM THE KITCHEN COUNTER

  42  3 E   AP 1  YFOOD
ERIAL NO:                        OAN:                    VALUE:
  R:  SAMPLE OF FRYS PREMIUM COFFEE

```
                    PRINTED ON - DATE: 10/27/00  TIME: 1055   PAGE:    4

                    IMPOUND PROPERTY INVOICE

.. VOICE NO:    2773372      TYPE: EVIDENCE      DR NUMBER: 2000 01797849    13
CLAIM:    INVOICE DATE: 10/11/00 TIME:      BOOKING NO:    282060  FELONY: Y


.TEM
.NO. PKG CODE OWNER   TYPE   BRAND    MODEL      COLORS CAL/SZ QUANT.
         *(RELATED TO ITEM #26)
         TAKEN FROM THE KITCHEN COUNTER

  26   6 E    AP 1  HDISH                                        1
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  TALL DRINKING GLASS
         *(RELATED TO ITEM #25 LIQUID)
         TAKEN FROM THE KITCHEN SINK

  27   3 E    AP 1  YFOOD
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  SAMPLE OF UNKNOWN FOOD ITEM
         TAKEN FROM PYREX DISH ON KITCHEN COUNTER

  28   3 E    AP 1  YFOOD
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  SAMPLE OF UNKNOWN FOOD ITEM
         TAKEN FROM ANOTHER PYREX DISH ON THE KITCHEN COUNTER

  29   4 E    AP 1  YFOOD
F  R:                           OAN:                     VALUE:
         TAKEN FROM A PLASTIC "DASANI" BOTTLE ON KITCHEN COUNTER

  30   4 E    AP 1  YFOOD
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  SAMPLE OF UNKNOWN FOOD ITEM
         TAKEN FROM A KETTLE ON THE KITCHEN STOVE

  31   0 E    AP 1  *MISC                                        1
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  PLASTIC SEA WORLD PAIL
         TAKEN FROM THE KITCHEN COUNTER

  32   5 E    AP 1  HDISH                                        1
.ERIAL NO:                      OAN:                     VALUE:
.ESCR:  DIRTY CASSEROLE DISH
         TAKEN FROM THE KITCHEN COUNTER

  33   7 E    AP 1  HDISH                                        1
.RIAL NO:                       OAN:                     VALUE:
.SCR:  DIRTY BLUE PLASTIC DRINKING CUP
         TAKEN FROM THE KITCHEN COUNTER

  34   3 E    AP 1  YFOOD
.RIAL NO:                       OAN:                     VALUE:
.SCR:  SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
         MILK)
```

602-506-1546

11/29/20      13:42                                                         NO.844      P9:



Philip E. Keen, M.D.                                                     Dorothy O'Connell
Chief Medical Examiner                                                  Administrator

# OFFICE OF THE MEDICAL EXAMINER
120 S. 6th Avenue
Phoenix, AZ  85003

## FACSIMILE TRANSMITTAL

Telephone: (602)506-3322                          Fax:  (602)506-1546

Date: _Nov. 29, 2000_

To: _Susie Grant_

Company: _Maricopa County Attorney's Office_

Department: _Major Crimes_

Fax Telephone Number: _(602) 506 - 7950_

From: _Norman A. Wade_

Department: _LAB_

Direct Telephone Number: _(602) 506 - 8677_

NUMBER OF PAGES, NOT INCLUDING THIS ONE: _1_

Comments: _Attached please find the
results of our contract lab's analysis
of the gastric contents of our case
on Joseph Andriano. Regards,
Norman_

NO.044   P02

11/29/00      13:42                                        Nov-28-00 12:48PM;         Page 2/2

int By: West Coast Analytical Service;   5629485850;

Client:    COUNTY OF MARICOPA
Job no.:   49853

Azide by Ion Chromatography

TO Method

Column:            Dionex AS10 with AG10 guard
Eluent:            180 mM NaOH, 0.9 mL/min
Injection Volume:  300 Microliters
Detection:         Suppressed Conductivity

| Sample ID | Azide Parts Per Million (mg/L) | Detection Limit |
|---|---|---|
| Andriano, Joseph Gastric | 3.8 | 2 |
| Method Blank | ND | 2 |

Dates Analyzed:   11-21-00 to 11-27-00

Matrix Spike/Matrix Spike Duplicate Recovery Summary

Sample: Andriano, Joseph: Gastric (pre-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec MS | MSD Result | %Rec* MSD | RPD |
|---|---|---|---|---|---|---|---|
| Azide | 3.8 | 40.0 | 15.9 | 30 | 17.4 | 34 | 9 |

Sample: Batch QC

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---|---|---|---|---|
| Azide | 71.2 | 200 | 277 | 103 |

QC Guidelines:                                    90-110

Sample: Batch QC (post-extraction spike)

| Analyte | Sample Result | Amount Spiked | MS Result | %Rec* MS |
|---|---|---|---|---|
| Azide | 11.0 | 160 | 173 | 101 |

* QC limits have not been determined in this matrix.

000009

# EXHIBIT 37

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development





**Critical Reviews in Environmental Science and Technology**

ISSN: 1064-3389 (Print) 1547-6537 (Online) Journal homepage: http://www.tandfonline.com/loi/best20

# Environmental Fate of Sodium Azide Derived from Automobile Airbags

Eric A. Betterton

**To cite this article:** Eric A. Betterton (2003) Environmental Fate of Sodium Azide Derived from Automobile Airbags, Critical Reviews in Environmental Science and Technology, 33:4, 423-458, DOI: 10.1080/10643380390245002

**To link to this article:** http://dx.doi.org/10.1080/10643380390245002

Published online: 03 Jun 2010.

Submit your article to this journal ⤤

Article views: 144

View related articles ⤤

Citing articles: 28 View citing articles ⤤

Full Terms & Conditions of access and use can be found at
http://www.tandfonline.com/action/journalInformation?journalCode=best20

Download by: [University of Arizona]    **Date:** 01 March 2017, At: 11:19

*Critical Reviews in Environmental Science and Technology,* 33:423–458, 2003
Copyright © Taylor & Francis Inc.
ISSN: 1064-3389
DOI: 10.1080/10643380390245002

# Environmental Fate of Sodium Azide Derived from Automobile Airbags

*Eric A. Betterton**

Department of Atmospheric Sciences, University of Arizona,
Tucson, AZ 85721-0081

* Corresponding author. Betterton@atmo.Arizona.edu

**ABSTRACT:** The environmental fate of sodium azide ($NaN_3$) is of considerable interest given the recent surge in production to satisfy demand for automobile air bag inflators, where it serves as the principal active ingredient. Since the mid-1990s, demand for sodium azide has exceeded 5 million kg per year and most passenger vehicles sold in the United States now contain approximately 300 g ($\approx 0.7$ lb) of sodium azide. This has greatly increased the potential for accidental environmental releases and for human exposure to this highly toxic, broad-spectrum biocide. It can be argued that a new environmental threat has developed because not only are millions of kilograms of sodium azide now transported to and processed at air bag inflator factories, but also this substance is now widely distributed throughout the developed world in automobiles. Even if sodium azide were to be replaced by a more benign propellant in the future, the problem of safely disposing of large quantities of azide will remain as the vehicle fleet ages and is retired to scrap yards and shredders. Unfortunately, the environmental fate of sodium azide is unknown so it is difficult to effectively manage releases. The problem is compounded by the fact that aqueous sodium azide is readily hydrolyzed to yield hydrazoic acid ($HN_3$), a volatile substance that partitions strongly to the gas phase.

**KEY WORDS:** air bag; sodium azide; hydrazoic acid; azide; inflator; environmental fate.

## INTRODUCTION

Sodium azide has long been used by industry in relatively small amounts to prepare heavy metal azides for use in explosives detonators. Small quantities of this highly toxic substance are also used in the preparation of biocides, in laboratory preservatives, as a radical scavenger, in the formulation of getters in electric discharge tubes, in anti-corrosion solutions and to inflate airline safety chutes.[1–5]

However, production recently surged to meet the new demand for automobile airbag inflators. The United States National Highway Traffic Administration (NHTSA) mandated that new passenger vehicles sold in the United States would be equipped with a driver-side air bag by 1994 and that vans and light trucks would be similarly equipped by 1995. Passenger-side air bags would be introduced by 1996. Consequently, sodium azide demand exceeded 5 million kg in the U.S. by 1995 and has rapidly grown as more new vehicles are

fitted with driver-side and passenger-side airbags.[6] An inflator module typically contains a number of compressed disks or pellets of $\approx$60% w/w $NaN_3$, blended with other ingredients, and packed into a sealed metal canister.[7,8] Each driver-side inflator contains approximately 50–80 g $NaN_3$, while the larger passenger-side inflator contains approximately 250 g.[9] The actual amounts depend on the specific inflator. The smooth, rapid thermal decomposition characteristics, the high specific nitrogen content (65 mole%), and the long shelf life make sodium azide an attractive propellant material.[9,10]

Upon impact, an electromechanical trigger fires an initiator squib that causes the $NaN_3$ to thermally decompose yielding the $N_2$ gas that inflates the air bag momentarily.[8]

$$NaN_3 \rightarrow Na + 3/2N_2 \quad \Delta G = -93.76 \text{ kJ/mol}$$

The metallic sodium byproduct, which could cause burns, is scavenged by additives such as iron oxide or copper oxide. Other additives such as potassium nitrate, perchlorate and silica, may also be present.[7,8]

Sodium azide is produced commercially by reaction of elemental sodium with anhydrous ammonia to yield sodium amide, which is subsequently reacted with nitrous oxide at elevated temperature and pressure to give sodium azide.[11]

$$Na + NH_3 \rightarrow NaNH_2 + H_2$$

$$NaNH_2 + N_2O \rightarrow NaN_3 + H_2O$$

The final product is a white crystalline solid. Total capacity in the U.S. exceeds $9 \times 10^6$ kg $y^{-1}$ ($20 \times 10^6$ lb $y^{-1}$).

Annually, 10–11 million vehicles are retired to scrap yards.[12] In the absence of regulations mandating the recycling or destruction of inflators, this could amount to an annual delivery rate of approximately $3 \times 10^6$ kg $NaN_3$ to the scrap yards, assuming that the average vehicle contains 300 g $NaN_3$. Some inflators are removed and stockpiled, some are safely disposed of, but others might be crushed or shredded under poorly controlled conditions. Some shredders are run wet (a water spray is used to reduce fugitive dust emissions) while others are run dry. Thus azide could potentially be found in aqueous run off and/or in dry atmospheric aerosols. There are over 200 automobile shredding installations in the United States, each of which could potentially be an azide source.

Significant releases associated with the transport and processing of azide have already occurred. For example, the town of Mona, UT, near Salt Lake City, was briefly interrupted in 1996 after a truckload of sodium azide overturned on the nearby I-15 and caught fire.[13] The highway was literally set alight and was shut down for 2 days. Eventually, the contaminated area was excavated and transported to a hazardous landfill. More recently, a manufacturer of air bag inflators in Arizona was penalized for the illegal disposal of azide-containing waste.

Thus, the problem of significant azide releases to the environment is not a hypothetical one. Even if $NaN_3$ is eventually replaced with a more benign propellant,[14] the azide disposal problem will remain for decades because the nation's vehicle fleet already carries millions of kilograms that must be properly disposed of or recycled in the future.

Azide is readily protonated in the aqueous environment to yield volatile hydrazoic acid ($HN_3$) that can then pose an airborne hazard.[9,11,15] The high solubility of sodium azide implies that spills could potentially migrate into sewers, streams, lakes and groundwater systems. Little is known about the environmental chemistry of azide and therefore it is

impossible to confidently predict the fate of this hazardous material. The purpose of this review is to examine relevant physical and chemical characteristics of sodium azide and hydrazoic acid with a view to estimating the rate and extent of some possible natural degradation reactions. This paper leans heavily on the following reviews and articles, which should be consulted for more details: the chemistry of inorganic azides;[5,11,16–19] solid state and physical properties;[20] metal-coordinated azides;[21] organic chemistry;[5,22] Schmidt reaction;[23–26] toxicology and biochemistry;[27,28] and storage and disposal.[2] It is perhaps noteworthy that in 1980, a US EPA review of the environmental chemistry of sodium azide amounted to just two sentences.[29] Much new information has become available during the intervening two decades.

Azide has fascinated chemists for many years. For example, it was Linus Pauling who first determined the crystal structure of sodium azide in 1925, reporting that the azide ion was linear and not cyclic,[30] and it is worth recalling the opening sentence of Audrieth's review, published nearly 70 years ago: "From whatever point of view hydrazoic acid be considered, it is bound to excite and stimulate curiosity, if not wonderment and amazement."[16]

## TOXICITY

The toxicity and mechanism of biological activity of sodium azide has been reviewed in detail.[27,28,31] Toxicity data have been summarized and are readily available on the Internet, e.g., at the EPA Integrated Risk Information System (IRIS) and at the Hazardous Substance Data Bank (HSDB, accessible through TOXNET). Sodium azide is a broad-spectrum biocide showing bactericidal, fungicidal, insecticidal, and nematocidal activity. Its conjugate acid, hydrazoic acid, shows similar toxicity. For example, the ceiling threshold limit value (TLV) of $NaN_3$ is 0.29 mg m$^{-3}$ (as sodium azide) while that of $HN_3$ is 0.11 ppmv (as hydrazoic acid vapor).[32,33] Exposure to as little as 0.5 to 7 $\mu$g $HN_3$ L$^{-1}$ is reported to result in marked symptoms, which may be delayed for a day.[4] At least one toxicity measure ranks azide as more toxic than cyanide. The reference dose for chronic oral exposure (RfD) is $4 \times 10^{-3}$ mg kg$^{-1}$ day$^{-1}$ for sodium azide but $4 \times 10^{-2}$ mg kg$^{-1}$ day$^{-1}$ for sodium cyanide.

Azide is a potent biocide that is often compared to other poisons such as cyanide and sulfide, yet its mechanism of action remains unclear.[28,34] Despite the widely held belief that it acts, like cyanide, by inhibition of cytochrome $c$ oxidase, azide may in fact act as a NO mimic or it may be converted to NO $in$ $vivo$.[31]

Azide is a potent hypotensive agent in humans.[28,35] The minimal hypotensive dose is 0.2–0.4 $\mu$g kg$^{-1}$.[32] Clinical symptoms are dose dependent. Exposure to trace amounts can cause the eyes to become blood shot while ingestion or inhalation of one milligram can lead to a rapid drop in blood pressure, pounding headaches and difficulty in breathing. As little as 50 mg $NaN_3$ taken by mouth can induce hypotension, tachycardia and collapse within 5 minutes.[33] An adult who accidentally swallowed 150 mg aqueous $NaN_3$ experienced "breathlessness and tachycardia," followed by "nausea, vomiting, diarrhea, lydipsia, ECG changes and leukocytosis." Complete recovery took 10 days. In another case, ingestion of "several grams" led to death in 40 minutes.[33] Cases of human poisoning have been summarized.[28]

Besides acute effects, azide exposure may also result in chronic effects. Workers who were exposed to sodium azide dust while offloading cargo were diagnosed with reactive

425

airway dysfunction. Certain respiratory symptoms remained for at least two years after exposure.[36]

Fortunately, azide appears to be only marginally mutagenic in mammalian cells. It does not appear to be a human teratogen or carcinogen, but it should be noted that the human carcinogenic potential has not yet been fully evaluated. It has been suggested that azide is non-carcinogenic only because certain $uvr^+$ cells are able to efficiently repair azide-induced damage, in which case azide may well turn out to be carcinogenic in organisms that are deficient in their ability to repair the azide-induced damage.[37] Demyelation of nerves has been observed in chronic large doses, and DNA inhibition in human fibroblasts occurs at $50$ mg $L^{-1}$.

Sodium azide is known to have toxic effects on many other species besides humans. For example, studies conducted on monkeys, rats and guinea pigs showed evidence for the cumulative toxicity of azide.[28] The $LD_{50}$ for mice (*intra pineal* administration) is $\approx 37$ mg $kg^{-1}$.[28,35] It is a powerful mutagen in many plants, bacteria and yeasts,[9] and it has been employed as a positive control in Ames assays. Aquatic toxicity has also been established: the median tolerance limit (TLm) for bluegill is $1.5$ ppm day$^{-1}$ in fresh water, for example. It is widely used in laboratories to control algal growth in water baths. It was experimentally applied to agricultural fields in the past to study its potential as a soil fumigant against insects, microorganisms and weeds. A 15% granular formulation was marketed under the trade name "Smite."[38]

Kleinhofs and coworkers have shown that azide is metabolized in barley and bacteria to yield a stable mutagenic metabolite, L-azidoalanine ($N_3CH_2CH(NH_2)COOH$), which is synthesized from $O$-acetylserine and azide, catalyzed by the enzyme $O$-acetylserine (thiol)-lyase.[39–52] It is noteworthy that the metabolite is a highly specific mutagen. The same enzyme also catalyzes the reaction of sulfide and cyanide with $O$-acetylserine, but neither of the products, L-cysteine and cyanoalanine, respectively, are mutagenic. Azide substitutes for sulfide, the natural substrate, in this reaction. The inability of mammalian cells to convert azide into L-azidoalanine may explain the lack of azide mutagenicity and perhaps carcinogenicity in mammals.[50] Animal cells use L-methionine rather than sulfide to synthesize L-cysteine, and thus lack the $O$-acetylserine (thiol)-lyase that is essential in the synthesis of L-azidoalanine.


## AIR BAG EFFLUENT

Inflation of an automobile air bag causes the release of a mixture of gases and aerosols, sometimes including azide, into the passenger compartment. Each gram of $NaN_3$ generates $0.56$ L nitrogen at NTP (25°C, 1 atm). Thus a driver's side inflator would yield approximately 28–45 L $N_2$ (NTP) while a passenger's side inflator would yield $\approx 140$ L (NTP) upon deployment. The reported concentrations of trace constituents vary widely, depending mainly on where (test chamber or automobile; front seat or rear seat) and when the sample was taken, the duration of time-weighted averaging (TWA), and whether the test involved deployment of the driver-side, passenger-side, or both air bags. The results of the most comprehensive studies are summarized in Table 1. In another study, azide was detected in the >0.3 $\mu$m diameter aerosol collected after certain inflators were deployed in a test chamber but the airborne concentrations were not reported.[53]

**TABLE 1.** Summary of some trace components found in the effluent of deployed automobile air bags

| Effluent | Concentration | Notes | Reference |
|---|---|---|---|
| Gas phase | | | |
| CO | 174–370 ppm | $TWA_{20}$ | 178 |
| | 2–264 ppm | $TWA_{20}$ | 54 |
| | <5.0–60.3 ppm | | 179 |
| $NO_X$ | 11–15 ppm | $TWA_{20}$ | 178 |
| NO | 0.1–8 ppm | $TWA_{20}$ | 178 |
| $SO_2$ | 5–10 ppm | $TWA_{20}$ | 178 |
| $H_2$ | 100–408 ppm | | 179 |
| $H_2S$ | <1.0–0.45 ppm | | 179 |
| $NH_3$ | 0.15–7.3 ppm | $TWA_{20}$ | 54 |
| HC | 5.7–538 ppm | Methane, ethane, acetylene, trace higher aliphatics | 54 |
| BTEX | 0.3–6.4 ppm | Benzene, toluene, ethylbenzene, xylene | 54 |
| Benzene | <0.1–0.45 ppm | | 179 |
| Aerosol phase | | | |
| $N_3^-$ | 41–200 $\mu g\,m^{-3}$ | | 178 |
| | 2.0–2.8 $\mu g\,m^{-3}$ | | 179 |
| $NO_3^-$ | 5 $\mu g\,m^{-3}$ | | 178 |
| | 230–720 $\mu g\,m^{-3}$ | | 179 |
| $NO_2^-$ | 16–32 $\mu g\,m^{-3}$ | | 178 |
| | <100–327 $\mu g\,m^{-3}$ | | 179 |
| $Cl^-$ | 220-39 $\mu g\,m^{-3}$ | | 178 |
| $SO_4^{2-}$ | 22–41 $\mu g\,m^{-3}$ | | 178 |
| | <100–140 $\mu g\,m^{-3}$ | | 179 |
| Acetate | 2050–3700 $\mu g\,m^{-3}$ | | 179 |
| Pb | <40–43 $\mu g\,m^{-3}$ | | 179 |
| Na | 4730–29800 $\mu g\,m^{-3}$ | Including NaOH | 179 |
| K | <100–123 $\mu g\,m^{-3}$ | | 179 |
| Cu | <6.1–7.7 $\mu g\,m^{-3}$ | | 179 |
| Total inhalable particles | 136–684 $mg\,m^{-3}$ | $TWA_{10}$-$TWA_{25}$ | 178 |
| Total particles | 21.9–92.2 $mg\,m^{-3}$ | | 179 |
| Total respirable particles | 133–673 $mg\,m^{-3}$ | $TWA_{10}$-$TWA_{25}$ | 178 |
| | 21.9–86.2 $mg\,m^{-3}$ | | 179 |
| Alkalinity (NaOH equiv.) | 83–220 $mg\,m^{-3}$ | | 178 |

Some aerosol originates from the lubricant on the bag itself (e.g., talcum powder or cornstarch) and some originates from combustion products, which may include sodium oxide/hydroxide, sodium carbonate/bicarbonate, silicates, metal oxides, and residual sodium azide. Total particulate concentrations measured in test vehicles ranged from 116 mg m$^{-3}$ (driver's side airbags only) to 148 mg m$^{-3}$ for vehicles with dual airbag systems (20-minute TWA).[54] The majority of particles had an aerodynamic diameter of $\approx 1$ $\mu$m (range $= 0.61$ to 2.32 $\mu$m diameter, geometric standard deviation $= 2.5$ $\mu$m diameter). The peak concentration is reached within 5 minutes, under certain conditions. In another study, the air bag aerosol effluent showed a bimodal mass distribution with maxima at 0.4 $\mu$m and 3 $\mu$m aerodynamic diameter.[55]

The highly respirable aerosol is also highly soluble. It is reported that 90% of the aerosol appears to be an alkaline (pH 10) mixture of sodium and potassium carbonates and bicarbonates.[55] The mechanism of induction of asthmatic attacks due to exposure to these aerosols has been studied.[55]

## EXPLOSIVE PROPERTIES

Sodium azide is not generally regarded as a detonatable explosive but it is an excellent propellant. Sodium azide burns (deflagrates) slower than the speed of sound in the bulk solid and therefore decomposition cannot be initiated by a high-speed shockwave, i.e., it does not explode. It decomposes smoothly to its elements when heated above $\approx 300°$C.[1-5] Much has been written about the explosive properties of other azides, particularly hydrazoic acid, $Ba(N_3)_2$, and heavy metal azides such as $Pb(N_3)_2$ and $Cu(N_3)_2$, which are extremely shock sensitive.[3,4,20,56] Indeed, mixtures containing lead azide are popular primary explosives.[3,4] The accumulation of azide in laboratory apparatus and drains, where it can react with lead or copper-containing fixtures, has caused explosions when routine maintenance work has been attempted.[27,57] Hydrazoic acid is described as a mobile, pungent liquid. Not only is the pure liquid highly explosive, but so are aqueous solutions when the concentration exceeds 17–20%.[4,11,58] In fact, a serious explosion involving hydrazoic acid led Curtius to abandon his pioneering work on this substance in the late 19th century.[59] A few years later in the United States, Dennis and Isham also reported violent explosions when working with anhydrous $HN_3$.[60] Hydrazoic acid vapor is supposedly non-explosive if its concentration remains below 15%.[11] At low pressure (30–200 mm Hg), hydrazoic acid vapor undergoes thermal decomposition with a half-life of 12 minutes at 330°C.[4,21]

## BONDING AND STRUCTURE

On the basis of bond lengths and bond angles, azides may be categorized as ionic or covalent. Sodium azide is an ionic solid that crystallizes as a body-centered rhombohedron in which the azide group is linear and symmetrical with a nitrogen-nitrogen bond length of 1.15 Å (Figure 1).[20,61-63] The symmetry is lost in covalent azides $XN_3$, including hydrazoic acid, where the nitrogen—X bond angle is 112° while the nitrogen—nitrogen bond lengths become 1.24 Å (HN—$N_2$) and 1.13 Å ($HN_2$—N).[64] The percent ionic character of the $X$-$N_3$ bond ranges from approximately 75% for $NaN_3$ and other "ionic" azides to approximately

(a)                                              (b)



**FIGURE 1.** The body-centered rhombohedral crystal structure of NaN$_3$. The hexagonal cell has a $= 5.481$Å and $\alpha = 38°43'$ and the unit cell contains 1 molecule. N—N $= 1.15$Å, Na—N $= 2.48$Å. The space group is R-3 m and the structure is layered (1b). Each azide (black) makes three close contacts (ionic bonds) to sodium (gray) on each end.[30,182]

25% for HN$_3$ and other "covalent" azides. The azide ion approximates a 5.1Å long $\times$ 3.5Å diameter cylinder.[61]

$$\overset{2-}{N}-\overset{+}{N}\equiv N \leftrightarrow \overset{-}{N}=\overset{+}{N}=\overset{-}{N} \leftrightarrow \overset{+}{N}\equiv \overset{2-}{N}-N$$
$$\text{I} \qquad\qquad \text{II} \qquad\qquad \text{III}$$

The N—N bonds display considerable double-bond character, i.e., form II dominates. The average oxidation number is $-1/3$ but the oxidation number of each N atom in the various canonical structures can vary from $+1$ to $-2$. Thus, azide can be oxidized (e.g., to N$_2$), or it can be reduced (e.g., to NH$_3$). A molecular orbital approach results in a configuration of $(1\sigma_g)^2(1\sigma_u)^2(2\sigma_u)^2(2\sigma_g)^2(1\pi_u)^4(1\pi_g)^4$ for azide in which the four highest energy electrons are found in non-bonding orbitals.[61]

NaN$_3$ has a density of 1.846 and is highly soluble in water (Table 2). The azide ion is regarded as a pseudo-halide and its salts display the expected solubility patterns.[19] For example, NaN$_3$ is water-soluble but AgN$_3$ is not.

## ELECTRONIC AND INFRARED SPECTRA

The electronic spectra of aqueous N$_3^-$, aqueous HN$_3$, gaseous HN$_3$, and other azides have been studied in detail.[65–68] The electronic spectrum of aqueous N$_3^-$ is somewhat featureless. It shows a maximum at $\approx$190 nm ($\varepsilon_{190} \approx 10^4$ M$^{-1}$ cm$^{-1}$) with a weak shoulder at $\approx$240 nm ($\varepsilon_{240} \approx 4 \times 10^2$ M$^{-1}$ cm$^{-1}$). The high-energy band is assigned to a $^1\Delta_u^- \leftarrow ^1\Sigma_g^+$ transition while the low-energy band is assigned to a "forbidden" $^1\Sigma_u^- \leftarrow ^1\Sigma_g^+$ transition. An ion-solvent electron transfer (charge transfer to solvent, CTTS) band may underlie the high-energy band. At 300 nm, where the ground-level solar spectral irradiance becomes

**TABLE 2.** Selected physicochemical properties of sodium azide and hydrazoic acid (adapted from[16,180,181])

|  | Sodium Azide | Hydrazoic Acid |
|---|---|---|
| Formula | $NaN_3$ | $HN_3$ |
| Molecular weight | 65.00099 | 43.0281 |
| N-content (mole %) | 64.6 | 97.7 |
| Appearance | White, crystalline powder | Mobile, pungent liquid |
| Boiling point (°C) | — | 37 |
| Melting point (°C) | Decomposes $\approx$275–330 | −80 |
| $pK_a$ (25°C; $\mu = 0$) | — | 4.65 |
| Water solubility (20°C) | 41 g/100 mL | Infinite |
| Density | 1.846 | 1.09 |
| Stability | Propellant (non-explosive) | Extremely sensitive explosive |
| $\Delta H_f^\circ$ (kJ mol$^{-1}$) | 21.71 (crystalline) | 294.1 (g); 260.08 (aq., undissociated) |
| $\Delta G_f^\circ$ (kJ mol$^{-1}$) | 93.81 (crystalline) | 328.1 (g); 321.8 (aq., undissociated) |
| S° (J mol$^{-1}$ K$^{-1}$) | 96.86 (crystalline) | 238.97 (g); 146.0 (aq., undissociated) |

insignificant, i.e., where it cuts off, the aqueous azide ion is only a very weak chromophore ($\varepsilon_{300} \approx 3 \times 10^{-2}$ M$^{-1}$ cm$^{-1}$).

By contrast, aqueous $HN_3$ shows a maximum at $\approx$200 nm ($\varepsilon_{200} = 6.7 \times 10^2$ M$^{-1}$ cm$^{-1}$) with a pronounced shoulder at $\approx$260 nm ($\varepsilon_{260} = 4 \times 10^1$ M$^{-1}$ cm$^{-1}$). Aqueous $HN_3$ absorbs significantly at wavelengths longer than the solar cut off, e.g., $\varepsilon_{300} \approx 6$ M$^{-1}$ cm$^{-1}$, implying that in aqueous solution the acid could be subject to direct solar photolysis while the conjugate base may not.

The electronic spectrum of gaseous $HN_3$ is very similar to that of aqueous $HN_3$, except that the shoulder is less intense ($\varepsilon_{260} \approx 2 \times 10^1$ M$^{-1}$ cm$^{-1}$) and shows some fine structure.

Infra-red bands for $NaN_3$ are found at 2128 cm$^{-1}$ (asymmetric stretch), 1358 cm$^{-1}$ (symmetric stretch) and 639 cm$^{-1}$ (bending). Detailed assignments have been made.[63]

The electronic and infrared spectra of other metal-azide complexes have also been described.[68]

## HENRY'S LAW

The Henry's law constant, $K_H$, in dilute aqueous solution was recently determined.[69]

$$K_H = [HN_3]/P_{HN3} = 12.0 \text{ M atm}^{-1}(25°C; \mu = 0.02 \text{ M}; \Delta H = -31 \pm 1 \text{ kJ mol}^{-1})$$

Here, $\mu$ = ionic strength. This is in good agreement with two earlier studies conducted at higher ionic strengths. D'Orazio and Wood[70] reported $K_H$ = 12.2–12.4 M atm$^{-1}$, $\mu$ = 0.10–1.65; while Templeton and King[71] reported $K_H$ = 12.1, $\mu$ = 0.1–11 M. Apparently, $K_H$ is not strongly dependent on ionic strength. Wilhem et al.[72] parameterized the temperature dependence.

The relatively small value of $K_H$ implies that partitioning of $HN_3$ to the atmosphere could be significant and that both gas- and aqueous-phase environmental degradation routes

should be considered. For example, 98 mole% of the total azide in a typical cloudy atmosphere (cloud liquid water = 1 g m$^{-3}$ air; pH 6.5) would partition to the gas phase. Similarly, in an enclosed workspace, as little a 6.5 ppm (m/v) NaN$_3$ in the aqueous phase (pH 6.5) would result in a gas phase concentration that exceeds the threshold limit value.[69]

## ACID-BASE PROPERTIES

Hydrazoic acid is mildly acidic, comparable to acetic acid.[15] It can only be further protonated under strongly acidic conditions.[73,74]

$$HN_3 \overset{K_a}{\rightleftharpoons} N_3^- + H^+ \quad pK_a = 4.65; 25°C; \Delta H = -15.1 \, kJ \, mol^{-1}; \mu = 0$$

$$H_2N_3^+ \overset{K_{a1+}}{\rightleftharpoons} HN_3^+ H^+ \quad pK_{a1+} = -5.4 \, to \, -7.19; 25°C$$

$$H_3N_3^{2+} \overset{K_{a2+}}{\rightleftharpoons} H^+ + H_2N_3^+ \quad pK_{a2+} = -9.6 \, to \, -10.2; 25°C$$

The reported values for $pK_{a1+}$ and $pK_{a2+}$ vary widely, depending on the method used to determine them.[74]

Dilute aqueous hydrazoic acid is stable, even upon boiling,[4] and unbuffered, aqueous sodium azide ($\approx$7%) is stable for several months when stored in sealed containers.[67] However, hydrazoic acid slowly decomposes in concentrated mineral acids.[61]

$$HN_3 + HNO_3 \rightarrow N_2 + 2NO + H_2O$$

$$HN_3 + H_2O \overset{H_2SO_4}{\longrightarrow} N_2 + NH_2OH$$

$$HN_3 + 1/3HCl \rightarrow 4/3N_2 + 1/3NH_4Cl$$

For example, in warm, concentrated sulfuric acid (73.8–98.7% w/w; 60°C), hydrazoic acid decomposes according to the following mechanism.[74]

$$HN_3 + H^+ \overset{K_{a1+}}{\rightleftharpoons} H_2N_3^+ + H^+ \overset{K_{a2+}}{\rightleftharpoons} H_3N_3^{2+}$$

$$H_2N_3^+ \rightarrow products$$

The effective rate constant, $k_{eff}$, is related to the intrinsic rate constant, k, through $k_{eff} = kA$, where,

$$A = (K_{a1+}/h_0 + h_+/K_{a2+} + 1)^{-1}$$

Here, $h_0$ and $h_+$ are the acidity functions for a neutral and a singly-charged cation, respectively.

Agibalov et al.[74] speculate that neutral HN$_3$ may also decompose in more dilute sulfuric acid but they note that the reaction is much slower than in concentrated acid.

Coordination of HN$_3$ to a transition metal can dramatically increase its acidity.[75]

$$[(H_2O)_5CrN_3H]^{3+} \overset{K_a}{\rightleftharpoons} [(H_2O)_5CrN_3]^{2+} + H^+ \quad pK_a = -3.4; 30°C$$

$$[(NH_3)_5CoN_3H]^{3+} \overset{K_a}{\rightleftharpoons} [(NH_3)_5CoN_3]^{2+} + H^+ \quad pK_a = -2.8$$

The increased acidity is only partly due to the charge on the complex because while anionic $[(CN)_5CoN_3H]^{2-}$ does not show such a marked effect ($pK_a = 0.7; 40°C, \mu = 1 \, M$) it is still much more acidic than HN$_3$.[76,77]

## GENERAL AZIDE DECOMPOSITION ROUTES

It has been pointed out previously that in general, the initial decomposition pathway depends on whether the azide is "ionic" or "covalent."[61,78] Hydrazoic acid, a covalent azide, decomposes by breaking the weakest N—N bond, i.e., $HN$—$N_2$, to yield $N_2$ and the imine radical, $HN^\bullet$, in an excited state.[17,18]

$$HN_3 \rightarrow HN^\bullet + N_2 \quad \Delta H = 138 \pm 8 \, kJ \, mol^{-1}$$

Fission of the H—N bond is "allowed" but requires a greater energy input.

$$HN_3 \rightarrow H^\bullet + N_3^\bullet \quad \Delta H = 355 \pm 13 \, kJ \, mol^{-1}$$

The imine radical ultimately yields ammonia, diimine (HNNH), hydroxylamine or nitrous acid, depending on the availability of oxygen and water.

By contrast, decomposition of ionic $N_3^-$ appears to proceed via the $N_3^\bullet$, radical. The radical–radical recombination reaction is highly exothermic and is thought to be the most significant route for further decomposition.

$$2N_3^\bullet \rightarrow 3N_2 \quad \Delta H = -879 \pm 25 \, kJ \, mol^{-1}$$

Decomposition by the "allowed" dissociation of $N_3^\bullet$ into excited $N^\bullet$ and $N_2$ requires a large energy input ($\Delta H = 260 \, kJ \, mol^{-1}$) and therefore probably plays only a minor role.

It is thought that the detonation of ionic azides, e.g., $Pb(N_3)_2$ and $Ag(N_3)_2$, is initiated by $N_3^\bullet$ formation through localized heating, shock (including ultrasonic and impact), friction, intense light, ionizing radiation, or electric current.

## PHOTOCHEMISTRY

### Solid Phase

In the solid phase, UV-photolysis promotes an electron to the conduction band leaving $N_3^\bullet$ holes, which may play a role in light-initiated decomposition to metal and $N_2$.[56] $N_3^\bullet$ is produced by a two-step process involving the thermal decomposition (q) of the excited anion, $N_3^{-*}$.[4]

$$N_3^- + h\upsilon \rightarrow N_3^{-*}$$
$$N_3^{-*} + q \rightleftharpoons N_3^\bullet + e^-$$

Although $NaN_3$ is reportedly decomposed upon exposure to light of wavelengths <405 nm it is impossible to estimate the rate of reaction in sun light using the published information.[79] This is unlikely to be a significant natural degradation route because the quantum yield (for $KN_3$) is only 0.001 using the full output of a high-pressure mercury arc lamp (90% intensity at 254 nm), reflecting the ease of the radical — $e^-$ recombination.[80]

### Gas Phase

The UV photolysis of hydrazoic acid (both gaseous and aqueous) has been the subject of many detailed experimental and theoretical studies, nearly all of which have employed

wavelengths $\ll 300$ nm, and are thus not directly applicable to the problem of estimating the rate of solar photolysis.[65,81-88] Also, the gas-phase studies are normally conducted in the absence of air and at low total pressures, and therefore possible atmospheric photooxidation routes and chain mechanisms may have been overlooked. From the perspective of estimating environmental persistence, perhaps the most applicable work is that of Kodama[85] who studied the photolysis of gaseous $HN_3$ at 313 nm. However, it should be noted that most of these experiments were performed at high concentrations of $HN_3$ ($6.6 \times 10^4$ ppmv) in an inert atmosphere of Xe, which varied from $\approx 0$ to 0.8 atm. Kodama proposed a detailed, fourteen-step, reaction mechanism:

(R1)    $HN_3 + h\nu \rightarrow N_2 + NH$

(R2)    $HN_3 + NH \rightarrow N_2 + N_2H_2^*$

(R3)    $HN_3 + NH \rightarrow 2N_2 + 2H$

(R4)    $HN_3 + NH \rightarrow N_3 + NH_2$

(R5)    $HN_3 + H \rightarrow H_2 + N_3$

(R6)    $HN_3 + H \rightarrow NH_2 + N_2$

(R7)    $N_2H_2^* \rightarrow N_2H_2^{**}$

(R8)    $HN_3 + N_2H_2^* \rightarrow N_2 + H_2 + HN_3$

(R9)    $HN_3 + N_2H_2^* \rightarrow NH_3 + 2N_2$

(R10)   $HN_3 + N_2H_2^{**} \rightarrow NH_3 + 2N_2$

(R11)   $HN_3 + NH_2 \rightarrow NH_3 + N_3$

(R12)   $HN_3 + NH_3 \rightarrow NH_4N_3$

(R13)   $HN_3 + N_3 \rightarrow HN_3 \cdot N_3$

(R14)   $2HN_3 \cdot N_3 \rightarrow 3N_2 + 2HN_3$

The major reaction products were $N_2$, $H_2$ and $NH_4N_3$, a white powder. The first step (R1) generates the imine radical, NH, in its excited singlet state, which then is lost primarily through reactions involving consumption of additional $HN_3$. A chain reaction ensues in which R2 ($\approx 82\%$) and R3 ($\approx 18\%$) dominate. Kodama reported a quantum yield for $N_2$ production, $\Phi_{N_2}$, of 4.85 ($\lambda = 313$ nm). In earlier studies, Beckman[82,83] reported $\Phi_{HN_3} = 3.6$ ($\lambda = 190$ nm or 254 nm).

As mentioned above, these laboratory experiments were conducted with much higher partial pressures of $HN_3$ than would be expected in the troposphere and so this $HN_3$ consuming chain reaction would probably not operate in the atmosphere. The net result would be $\Phi_{HN_3} \leq 1$ for direct photolysis at low $HN_3$ (although this remains to be shown).


## Aqueous Phase

Photolysis of aqueous $HN_3$ at 214 nm or 254 nm obeys the following stoichiometry with a quantum yield of $1.00 \pm 0.05$ for all N-containing species.[65]

$$HN_3 + H_2O \xrightarrow{h\nu} N_2 + NH_2OH$$

Ammonia, $N_2H_4$, $NO_X$ and $H_2$ were not detected.

433

Like the gas-phase reaction, it is thought to proceed via excited imine radical.

$$NH^\bullet + H_2O \rightarrow NH_2OH$$

By contrast, photolysis of aqueous $NaN_3$ at approximately 230 nm yields the azide radical $N_3^\bullet$ by electron transfer to water. Photolysis of $N_3^-$ (aq) at 229 nm and 254 nm differs from $HN_3$ (aq) in that ground state $(3\Sigma^-)$ NH is initially produced, instead of excited singlet state $(^1\Delta)$ NH.[65] Photolysis in the n–$\pi*$ band (e.g., 254 nm) does not lead to photoionization whereas photolysis in the charge-transfer-to-solvent (CTTS) band (<230 nm) yields $N_3^\bullet$ and $e^-$ (aq). $\Phi_{N2}$ increased from 0.3 to 0.6 as the azide concentration was raised from $10^{-3}$ M to 0.2 M (pH 7.7, borate buffer, air-free). $\Phi_{NH2OH}$ decreased from 0.3 to 0.18. The stoichiometry of the reaction is:

$$N_3^- + 2H_2O + h\nu \rightarrow NH_2OH + N_2 + OH^-.$$

At 214 nm, $\Phi_{N3-} \approx 0.31$.

The onset of the $N_3^-$ CTTS band occurs at $\approx$235nm. Excited $N_3^-*$ (n, $\pi*$) reacts with water at longer wavelengths, since it is not a dissociating state. Within the CTTS however, $NH_3$ is generated which results when $e^-$ (aq) reacts with $NH_2OH$. The following mechanism was proposed for CTTS photolysis of $N_3^-$ (aq):

$$N_3^- + h\nu \rightarrow N_3^-*$$
$$N_3^-* + H_2O \rightarrow N_2 + NH^\bullet + OH^-$$
$$N_3^-* \rightarrow N_3^\bullet + e^-(aq)$$
$$NH^\bullet + H_2O \rightarrow NH_2OH$$
$$NH_2OH + e^-(aq) \rightarrow NH_2^\bullet + OH^-$$
$$NH_2OH + NH_2^\bullet \rightarrow NH_3 + NHOH$$
$$N_3^\bullet + NH_2OH \rightarrow N_3^- + H^+ + NHOH$$
$$2NHOH \rightarrow N_2 + 2H_2O$$

In the absence of buffers, the pH of photolyzed $N_3^-$ solution can rise substantially.[89,90] At low $[N_3^-]$, e.g., $10^{-3}$ M, $\Phi_{N3-} = \Phi_{N2} = \Phi_{NH2OH}$.

Photolysis of a metal-coordinated azide, $[Co(NH_3)_5N_3]^{2+}$, at 252.7 nm yields $Co^{2+}$, $N_2$, $NH_4^+$ and probably $[Co(NH_3)_4(H_2O)N_3]^{2+}$.[91] Radiolabeling experiments demonstrate that $N_3^-$ is the source of $N_2$. Quantum yields, based on $Co^{2+}$ products, varied from 0.16 to 0.82, depending on experimental conditions. Evidence was found for the production of the neutral $N_3^\bullet$ radical in the first step, followed by radical–radical combination and disproportionation.

$$2N_3^\bullet \rightarrow 3N_2$$

## Solar Photolysis

Since the solar spectrum at the earth's surface "cuts out" below $\approx$300 nm, there is practically no overlap with the $N_3^-$ (aq) spectrum and thus direct photolysis of the aqueous anion is unlikely to be important. However, the small overlap of the solar irradiance with the $HN_3$ spectrum does afford the possibility of solar photolysis of this species in both the gas and aqueous phases. For example, using solar spectral data for a zenith angle of 0° we

estimate the first-order solar photolysis rate constant of gaseous $HN_3$, $j_{HN3}$, to be $\approx 4 \times 10^{-6}$ s$^{-1}$, assuming a primary quantum yield of unity.[92]

$$HN_3(g) + h\nu \xrightarrow{j_{HN3}} \text{products}$$

This corresponds to a half-life of 52 hrs. It should be noted that the quantum yield for this reaction under tropospheric conditions is not known.

Photolysis in a polluted atmosphere is likely to be complicated by reaction of HN$^\bullet$ with hydrocarbons. For example, photolysis of $HN_3$ in the presence of ethane yields a wide range of C-N products including primary amine salts of hydrazoic acid, $CH_3NH_2 \cdot HN_3$, $C_2H_5NH_2 \cdot HN_3$ as well as nitriles ($CH_3CN$) and azides ($CH_3N_3$).[86] Photolysis in the presence of ethene yields both insertion and addition products including $CH_3CN$, $CH_3N_3$ and $C_2H_5N_3$.[87] Also, the quantum yield of $N_2$ is reduced.

## REDOX CHEMISTRY

Hydrazoic acid is one of the most powerful *reductants* known (when the product is $N_2$) yet it is kinetically inert towards many common oxidizing agents.[16]

$$3N_2(g) + 2H^+ + 2e^- = 2HN_3(aq) \quad -3.10 \text{ V}$$
$$3N_2(g) + 2H^+ + 2e^- = 2HN_3(g) \quad -3.40 \text{ V}$$
$$3N_2(g) + 2e^- = 2N_3^-(aq) \quad -3.40 \text{ V}$$

Here, all potentials are with respect to the standard hydrogen electrode at 25°C.[93]

Despite the favorable thermodynamics, azide is not able to reduce certain powerful oxidizing agents. Dissolved oxygen, hydrogen peroxide, peroxymonosulfate ($HSO_5^-$), Fe(III), perchlorate and iodate are all kinetically inert, showing no appreciable affect on neutral or mildly acidic $NaN_3$ solutions. By contrast, azide is able to reduce the 1-electron oxidant Ce(IV) quantitatively thereby affording the basis for a useful titrimetric method of analysis.

*Oxidation* by aqueous hydrazoic acid is thought to proceed through the formation of triazene intermediate ($H_3N_3$), which subsequently decomposes to yield hydrazine ($N_2H_4$) and/or $NH_3$ and $N_2$.

$$HN_3 \xrightarrow{e^-} H_3N_3 \xrightarrow{e^-} H_2NNH_2 \xrightarrow{e^-} NH_3$$

Positive half-reactions can be written when $HN_3$ acts as an oxidant, and the product is $NH_4^+$.

$$HN_3(aq) + 3H^+ + 2e^- = NH_4^+ + N_2(g) \quad 1.96 \text{ V}$$
$$HN_3(aq) + 11H^+ + 8e^- = 3NH_4^+ (aq) \quad 0.695 \text{ V}$$

Half-reaction potentials for other N-containing reduction products such as $N_2H_4$ can also be calculated.[61]

$$N_3^- + 7H_2O + 6e^- = N_2H_4 + NH_3 + 7OH^- \quad + 0.62 \text{ V}$$

Oxidation of hydrogen, in the presence of colloidal Pd, yields $NH_3$ and $N_2H_4$ but oxidation of Cr(II), Sn(II), $HSO_3^-$ and $Cu_2O$ yield only $NH_3$ and $N_2$. Oxidation of sodium amalgam, sulfide and Fe(II) hydroxide also yield small quantities of hydrazine. Ti(II) and Cr(IV) produce stoichiometric amounts of $NH_3$ (1:1, $NH_3$:$N_3^-$).[5]

Like nitric acid, $HN_3$ is able to oxidize $H_2S$.[16]

$$HN_3 + H_2S \rightarrow S + N_2 + NH_3$$

It should be noted that the electrochemical potential for formation of the azidyl radical is easily accessible in biological systems.[94]

$$N_3^\bullet + e^- = N_3^- \quad 1.33\ V$$

Also, azide has been used as a singlet-oxygen and hydroxyl radical scavenger.[95]

## Hydroxyl Radical

The rate of reaction of $HN_3$ (g) with $HO^\bullet$ (g) has recently been reported.[96] The second order rate constant is $1.3 \times 10^{-12}$ $cm^3$ $molecule^{-1}s^{-1}$ at room temperature. Assuming that tropospheric $HO^\bullet$ (g) $= 10^6$ molecule $cm^{-3}$, the lifetime of $HN_3$ (g) would be approximately 9 days. This is too short for hemispheric scale transport but it is long enough for $HN_3$ to be locally dispersed and mixed over scales of hundreds of kilometers. The reaction probably proceeds via abstraction of $H^\bullet$ to yield $N_3^\bullet$, followed by subsequent reaction with oxygen to yield $NO_X$.

$$HN_3 + HO^\bullet \rightarrow H_2O + N_3^\bullet \quad k = 1.3 \times 10^{-12}\ cm^3\ molecule^{-1}\ s^{-1}$$

However, two other possible pathways are also thermodynamically favorable.

$$HN_3 + HO^\bullet \rightarrow HONH$$
$$HN_3 + HO^\bullet \rightarrow NO + N_2 + H_2$$

Hydroxyl radical ($HO^\bullet$) reacts rapidly with aqueous azide[97] suggesting that this oxidant, possibly generated by Fenton type chemistry, could afford a degradation pathway in the aquatic environment.

$$HO^\bullet + N_3^- \rightarrow N_3^\bullet + HO^- \quad k = 1.1 \times 10^{10}\ M^{-1}\ s^{-1};\ pH\ 9$$

Hydrometeors and surface waters are known to support Fenton reactions involving dissolved iron and $H_2O_2$.[98]

The steady state bulk concentration of $OH^\bullet$ (aq) in pristine cloud water has been estimated as approximately $4 \times 10^{-13}$ $M$[99] in which case the lifetime of azide would be just 4 minutes for this sink, assuming that no other competing $OH^\bullet$ sinks exist.

## Oxygen, Hydrogen Peroxide, Peroxymonosulfate

Aqueous, unbuffered $NaN_3$ is unaffected by $O_2$ or $H_2O_2$, even at millimolar concentration levels over periods of months. The negative results indicate the possible existence of kinetic, rather than thermodynamic, barriers because the reactions are thermodynamically feasible.

$$NaN_3 + 1/2O_2 + 1/2H_2O \rightarrow N_2 + 1/2N_2O + NaOH \quad \Delta G^0 = -342.29\ kJ/mol$$
$$NaN_3 + 1/2H_2O_2 \rightarrow N_2 + 1/2N_2O + NaOH \quad \Delta G^0 = -393.81\ kJ/mol$$

**436**

Several groups have found that azide is stable in the presence of $H_2O_2$.[100−102] For example, 1 mM $NaN_3$ in the presence of 1 mM $H_2O_2$ (unbuffered, pH $\approx$7; dark; room temperature) shows no detectable loss of $N_3^-$ over a period of several months. However, the slow decomposition of the $H_2O_2$ itself could in turn lead to some oxidation of $N_3^-$ to $N_2$, via the hydroxyl radical.[102]

We have found that the thermodynamically potent oxidant, peroxymonosulfate ($HSO_5^-$) has no effect on aqueous sodium azide over periods of months (unbuffered, pH $\approx$7; dark; room temperature).

Kinetic barriers can sometimes be overcome by introducing catalysts or promoters, some of which may occur naturally in the environment. For example, iron and manganese oxides, which are both common soil components, are well known autoxidation catalysts. This is discussed below.

## Ozone

The rate of oxidation of $HN_3$ by ozone in the gas phase does not appear to have been reported, although Ongstad et al.[103] mention that there was no reaction observed over a period of minutes in their experimental system containing $10^{15}$ molecule $cm^{-3}$ $O_3$ and $3 \times 10^{15}$ to $1 \times 10^{16}$ molecule $cm^{-3}$ $HN_3$.[103]

Under alkaline conditions, ozone oxidizes azide via a complicated mechanism to yield nitrite, nitrous oxide and peroxynitrite ion ($ONOO^-$).[104] There is some evidence that an orange colored intermediate may be the hypoazidite ion, $N_3O^-$, analogous to hypochlorite.[105]

$$N_3^- + O_3 \rightarrow N_3O^- \rightarrow NO_2^- + N_2$$

The reaction is interesting because azide, a pseudohalide, catalyzes the reduction of aqueous ozone (chain length $\approx$30). The reaction is first order in both azide and ozone.

$$-\frac{d[N_3^-]_T}{dt} = k[N_3^-]_T[O_3]$$

The reaction with $N_3^-$ is much more rapid ($k_{N3-} = 2.5 \times 10^6$ $M^{-1}$ $s^{-1}$; 25°C) than with $HN_3$ ($k_{HN3} = <4 \times 10^2$ $M^{-1}$ $s^{-1}$; 3°C).[105,106] So it is possible that ozone could be a sink for aqueous azide, despite low ambient concentrations. Hydrometeors in Henry's law equilibrium with polluted urban air (100 ppbv $O_3$) could contain approximately $10^{-9}$ M $O_3$. The lifetime of azide with respect to dissolved ozone could then be as short as 4 minutes under these conditions, assuming no mass transfer limitations. Azide would have to compete with other ozone sinks in natural systems so this simplistic calculation probably represents a lower limit.

## Halogens

All the halogen azides, $XN_3$ (X = F, Cl, Br, I) are known.[16,19,61,107] They are unstable compounds in which the $X-N_3$ bond strength increases in the order I < Br < Cl < F. Only $F-N_3$ shows a bond polarity of $F\delta^- -N\delta^+$. The other halogen azides show the opposite polarity, suggesting that the $N_3$ moiety is more electronegative than Cl, Br, and I.

Fluorine azide is just one of a number of products resulting from the action of elemental fluorine on gaseous hydrazoic acid (diluted in nitrogen).

$$2F_2 + 4HN_3 \rightarrow FN_3 + N_2 + NH_4F$$

Chlorine azide $ClN_3$ is prepared from hypochlorite and $HN_3$ in acidic solution, and is extracted into carbon tetrachloride.

$$HOCl + HN_3 \rightarrow ClN_3 + H_2O$$

The halogen azides are hydrolyzed in alkaline solution to return free azide so the final product distribution resulting from the chlorination of aqueous azide would be highly dependent on pH.

$$XN_3 + 2OH^- \rightarrow N_3^- + XO^- + H_2O$$

$BrN_3$ and $IN_3$ are stable only at temperatures below 0°C, and are therefore unlikely to found in the environment.

Iodine forms a weak complex with $N_3^-$ ($K = 11.4 \, M^{-1}$).[90] Pure $I_2$ has no further effect on neutral aqueous azide, but it does oxidize $N_3^-$ to $N_2$ in the presence of a wide variety of sulfur-containing catalysts such as thiosulfate, sulfide, azidodithio carbonates and carbon disulfide. This catalytic reaction has been extensively studied and forms the basis for the quantitative determination of azide or S-catalyst.[5,108]

$$2N_3^- + I_2 \xrightarrow{\text{catalyst}} 3N_2 + 2I^-$$

Bromine undergoes a similar S-catalyzed reaction.[5]


## Nitrous Acid and Nitrite

Oxidation by $HNO_2$ is rapid and quantitative and offers a convenient method for destroying excess azide in the laboratory.

$$HNO_2 + HN_3 \rightarrow N_2 + N_2O + H_2O$$

However, as will be seen later, this reaction is unlikely to be a significant sink for azide in natural systems.

Stedman studied the reaction in detail.[109−111] In acidic solution (pH $\leq \approx 2.5$), azide is oxidized via two pathways, both involving protonated nitrous acid, $H_2NO_2^+$ (the nitrous acidium ion), and nitrosyl azide, $N_3NO$.

Path 1

$$H_2NO_2^+ + NO_2^- \xrightarrow{k_1} N_2O_3 + H_2O$$
$$N_2O_3 + N_3^- \rightarrow N_3NO + NO_2^-$$
$$N_3NO \rightarrow N_2 + N_2O$$

Path 2

$$H_2NO_2^+ + HN_3 \xrightarrow{k_2} N_3NO + H_3O^+$$
$$N_3NO \rightarrow N_2 + N_2O$$

438

Thus Path 1, involving $N_3^-$, is similar to Path 2, involving $HN_3$, except that the former is preceded by the rate-determining formation of dinitrogen trioxide.

Path 3, involving nucleophilic attack of $N_3^-$ on $H_2NO_2^+$ only becomes apparent under conditions where $N_3^- \gg NO_2^-$ because although these ions are of approximately the same nucleophilicity, the lower p$K_a$ of $HNO_2$ (3.30) compared to $HN_3$ (4.65) ensures that under equal concentration conditions $NO_2^-$ is present at higher concentration whenever $\approx 1.3 \leq$ pH $\leq \approx 2.7$.

$$\text{Path 3}$$
$$H_2NO_2^+ + N_3^- \xrightarrow{k_3} N_3NO + H_2O$$
$$N_3NO \rightarrow N_2 + N_2O$$

On the other hand, at pH $\leq \approx 1.3$, Path 2 dominates and consequently Path 3 is not experimentally observable under these conditions.

Where $N_3^- \gg NO_2^-$ and pH = 4.5–5.5 the rate law is:

$$\nu = k_3[H^+][HNO_2][N_3^-] \quad k_3 = 2.5 \times 10^3 M^{-2}s^{-1}$$

The rate law for Path 1 is:

$$\nu = \frac{k_3}{K_a[HNO_2]}[H^+][HNO_2][NO_2^-] \quad k_1 = 8 \times 10^1 M^{-1}s^{-1}$$

while the rate law for Path 2 is:

$$\nu = k_2[H^+][HNO_2] \quad k_2 = 3.37 \times 10^1 M^{-2}s^{-1}$$

where $k_2 = k_1/K_{aHNO2}$.

Assuming that rainwater nitrite $\leq 10^{-6}$ M (pH 5), the lifetime for $N_3^-$ is estimated to be $\geq 2.5$ years for oxidation by N(III), using the rate constants given above. However, it should be noted that other nucleophiles such as acetate, $Cl^-$, $Br^-$ and $SCN^-$ can also compete for $H_2NO_2^+$ to form the corresponding nitrosyls, XNO, and thereby catalyze the reaction.[109–111]

## Metals and Metal Ions

$HN_3$ often behaves as an oxidizing acid, like nitric acid, and is thereby reduced. Normally, $H_2$ is not evolved. Instead, metals such as Mn, Zn, Fe, Ni and Cu reduce hydrazoic acid in acid solution to $NH_3$ and $N_2$, with variable quantities of hydrazine.

$$Mn + 3HN_3 \rightarrow Mn(N_3)_2 + NH_3 + N_2$$

In the case of Zn, an insoluble double salt of hydrazine, $ZnSO_4.(N_2H_4)_2.H_2SO_4$, precipitates while the reaction with Cu appears to occur in two steps yielding both cuprous and cupric salts.[2,5]

$$2Cu + 3HN_3 \rightarrow Cu(N_3) + NH_3 + N_2$$
$$Cu(N_3) + 1/2O_2 + H_2O \rightarrow Cu(N_3)_2 \cdot Cu(OH)_2$$

Apparently, Al is the only metal that leads to hydrogen evolution. Here, the metal-containing product is a nitride.[4]

$$2HN_3 + 6Al \rightarrow 6AlN + H_2$$

A mixture of hydrazoic acid and hydrochloric acid is capable of dissolving noble metals such as platinum (cf. $HNO_3$ in *aqua regia*).[16,19]

$$2HN_3 + 4HCl + Pt \rightarrow 2N_2 + 2NH_3 + PtCl_4$$

Although the following reaction is thermodynamically favorable it does not occur spontaneously.[112]

$$Fe^{3+} + N_3^- \rightarrow Fe^{2+} + 3/2N_2 \quad \triangle G = -402 \text{ kJ mol}^{-1}$$

By contrast, the analogous reductions by $I^-$ and $SCN^-$ have free energies of only –22.6 kJ $mol^{-1}$ and 0 kJ $mol^{-1}$, respectively, yet they proceed spontaneously. This is probably due to the high energy of the required $(N_3)_2$ intermediate compared to $I_2$, for example.[113]

$HN_3$ is also reduced by $Fe(OH)_2$ to $NH_3$.[113]

In acid solution manganese dioxide and permanganate are increasingly more vigorous oxidants. Permanganate yields nitrogen and oxygen.[4]

Ce(IV) quantitatively converts azide to molecular nitrogen and can therefore be used in volumetric analysis.[5]

$$2Ce(IV) + 2HN_3 \rightarrow 2Ce(III) + 3N_2 + 2H^+$$

## Electrochemistry

While hydrazoic acid is apparently resistant to electrochemical oxidation,[114] the azide ion can be electrochemically oxidized or reduced in neutral aqueous solution.[114–118] At potentials $< -0.9V$ vs. $Hg/Hg_2SO_4$, azide is reduced at a platinum electrode to form $N_2$, $N_2H_4$ and possibly $NH_3$.[114] The products of electrooxidation appear to depend on the existence of electrode surface oxides. For example, azide is irreversibly oxidized to $N_2$, NO, $NO_2$ and $N_2O$ at both Pt ($>0.3V$ vs. $Hg/Hg_2SO_4$) and Au ($>0.5V$ vs. $Hg/Hg_2SO_4$) anodes, because metal oxides are present at these potentials. By contrast, oxidation at a glassy carbon or diamond thin film anode, where oxides are absent, yields mainly $N_2$.[116,119] Oxidation at a gold electrode is further complicated by the formation of gold azide complexes.[115]

Oxidation proceeds via an EC(dim) mechanism (i.e., electron transfer, chemical reaction, dimerization) in which one-electron oxidation yields the $N_3^{\bullet}$ neutral radical that then dimerizes and decomposes to $N_2$ or reacts with surface oxides to yield various oxides of nitrogen.[120] Cyclic voltammetry at a pyrolytic graphite anode shows a peak at $+1.0$ V vs. SCE.

Polarography of the azide ion and azide metal complexes has been reported.[19,121,122]

## COORDINATION CHEMISTRY

Azide lies between $I^-$ and $F^-$ in the spectrochemical series and has found considerable use in transition metal chemistry.[123] Azide is sometimes classified as a "hard" ligand and therefore it is expected to form stable complexes with "hard" metal ions such as $Fe^{3+}$. However, it also forms reasonably stable complexes with "borderline" metals ($Cu^{2+}$) and "soft" metals ($Ag^+$, $Hg^{2+}$), perhaps because azide is a $\pi$-donor and the metal-N bond is partly covalent. Although azide is known to form bridged complexes,[21] the end-on coordinated

440

**TABLE 3.** Selected stability constants for mono-azido complexes and solubility products of certain monovalent and divalent metal complexes, where $K_1 = [M-N_3]/[M][N_3^-]$; and $K_{sp} = [M][N_3^-]^n/[M-(N_3)_n]_{solid}$. Adapted from Smith and Martell[15]

| Metal | Equilibrium | log K (25°C; $\mu = 0$) | $\Delta H$ (kJ mol$^{-1}$) | $\Delta S$ (J mol$^{-1}$K$^{-1}$) |
|---|---|---|---|---|
| $H^+$ | $K_1$ | $4.65 \pm 0.02$ | $-15.1$ | 38 |
| $Ag^+$ | $K_1$ | $2.49\,(\mu = 4)$ | | |
| | $K_{sp}$ | $-8.56 \pm 0.02$ | 69.9 | 84 |
| $Cu^+$ | $K_{sp}$ | $-8.31$ | | |
| $Cu^{2+}$ | $K_1$ | $2.86$ | | |
| $Cd^{2+}$ | $K_1$ | $1.61\,(\mu = 3)$ | $-5.0\,(\mu = 3)$ | $13\,(\mu = 3)$ |
| $Co^{2+}$ | $K_1$ | $0.74 \pm 0.02\,(\mu = 1)$ | | |
| $Fe^{3+}$ | $K_1$ | $5.26$ | $-13.0\,(\mu = 1)$ | $42\,(\mu = 1)$ |
| $Hg_2^{2+}$ | $K_{sp}$ | $-9.15$ | 125 | 243 |
| $Hg^{2+}$ | $K_1$ | $7.80$ | $-30.5\,(\mu = 1)$ | $33\,(\mu = 1)$ |
| $Mn^{2+}$ | $K_1$ | $0.61 \pm 0.03\,(\mu = 1)$ | | |
| $Ni^{2+}$ | $K_1$ | $0.86 \pm 0.02\,(\mu = 1)$ | $-0.8\,(\mu = 1)$ | $13\,(\mu = 1)$ |
| $Pd^{2+}$ | $K_{sp}$ | $-8.57 \pm 0.03$ | 66.5 | 59 |

complexes have received most attention. Selected stability constants and solubility products are summarized in Table 3.

Figure 2 shows the speciation of seven metals, each modeled independently at a total concentration of $10^{-4}$ molal, as a function of pH in a closed system containing $10^{-2}$ molal $N_{3\ T}^-$. Because of the lack of data only mononuclear, mono-azo complexes have been considered, and precipitation was not "allowed" in the model, MINTEQA2. The system quickly becomes supersaturated with respect to a number of oxide/hydroxide minerals as the pH increases, including hematite (pH 1.6), cupric ferrite (pH 3.0); tenorite (pH 6.4); $Cu(OH)_2$ (pH 7.0); and $Cd(OH)_2$ (pH 9.2). The system also becomes supersaturated with respect to $AgN_3(s)$ (pH 2.1). This is probably true of other metallo-azides too but the solubility products do not appear to have been reported.

Ag(I), Cu(II), Fe(III) and Hg(II) all show significant azide complex formation under these conditions. Ag and Cu reach a maximum of $\approx 65\%$ formation at pH $\geq \approx 5.5$. $Cu-N_3^+$ formation rapidly drops at higher pH where $OH^-$ effectively competes for the metal. $Fe-N_3^{2+}$ is most stable at pH 2.8 because of competition by $OH^-$ for Fe(III) at higher pH and competition by $H^+$ for $N_3^-$ at lower pH. Hg(II) is present exclusively as $Hg-N_3^+$ over the entire pH range, which suggests that azide could mobilize mercury. However, this simple system contains no $Cl^-$, which is expected to effectively compete with azide (log $K_{Cl} = 13.6$), depending on concentration; and possible precipitation of Hg(II) azide complexes has not been considered.

The three remaining metals (Cd, Mn, Ni) all form weak azide complexes even at the optimum pH (note the scale on the secondary y-axis). Cd reaches $\approx 13\%$ formation at pH $\approx 6-9$, while Mn and Ni reach just $\approx 1-2\%$. Thus while the potential for metal-azide complexation in water and moist soils indeed exists, strong competition from other ligands



**FIGURE 2.** Metal-azide speciation modeled in a closed system using MINTEQA2. Each metal was modeled independently and only mononuclear, mono-azo complexes were considered in this highly simplified system, which quickly becomes supersaturated with respect to a number of hydr(oxides) and azides as the pH rises above $\approx 2$. Solids were not "permitted" to precipitate in the model and all unknown reaction enthalpies were arbitrarily set at $-10$ kJ mol$^{-1}$ ($10^{-4}$ molal metal (total); $10^{-2}$ molal azide (total); ionic strength, $\mu = 0.1$ molal; 25°C).

such as OH$^-$ and Cl$^-$, and precipitation reactions may prevent it, depending on the prevailing conditions.

The coordination chemistry of Co(III) and Cr(III) complexes has been extensively studied[71,76,77,124–126] but the respective mono-azido stability constants, $K_1 = [M-N_3]/[M][N_3^-]$, do not appear to have been reported.

Fe(III) apparently yields a series of complexes Fe(N$_3$)$_n^{3-n}$ ($n \leq 5$), where coordinated water is omitted for simplicity.[127] The crystal structure of high-spin $d^5$ Fe(N$_3$)$_5^{2-}$ reveals a trigonal bipyramidal structure.[128] The mono-azido complex has been well studied but the remaining complexes ($n = 2$–4) have received little attention. The [Fe(H$_2$O)$_5$N$_3$]$^{2+}$ complex is intensely red colored ($\varepsilon_{460} = 3.68 \times 10^3$ M$^{-1}$ cm$^{-1}$).[129] The stability constant of the FeN$_3^{2+}$ complex has been determined in acidic solution (0.05 to 8.23 M HNO$_3$).[129]

$$K = \frac{[FeN_3^{2+}][H^+]}{[Fe^{3+}][HN_3]} = 1.71 (25°C; \ \mu = 0; \ \Delta H = (8.4 \pm 0.4) \text{ kJ mol}^{-1})$$

Using a value of p$K_a$ (HN$_3$) = 4.55, Wallace and Dukes[129] were then able to calculate the value of the following equilibrium constant:

$$K = \frac{[FeN_3^{2+}]}{[Fe^{3+}][N_3^-]} = 6.1 \times 10^4 \text{ M}^{-1}$$

442

This is close to the value of $6.7 \times 10^4$ ($20°C$; $\mu = 0$ M) reported by Bunn et al.,[112] but who used $pK_a$ ($HN_3$) = 4.68 for the calculation.

The kinetics of formation of $FeN_3^{2+}$ has also been studied at low pH.[130] The results were interpreted in terms of reaction of $HN_3$ with $Fe^{3+}$ or $FeOH^{2+}$.

$$Fe^{3+} + HN_3 \underset{k_{1d}}{\overset{k_{1f}}{\rightleftharpoons}} FeN_3^{2+} + H^+$$

$$FeOH^{2+} + HN_3 \underset{k_{2d}}{\overset{k_{2f}}{\rightleftharpoons}} FeN_3^{2+} + H_2O$$

The observed pseudo-first-order rate constant, $k_{obsd}$, increased with acid concentration. At $0.1$ M $HClO_4$, $k_{obsd} = 19.5$ s$^{-1}$ (i.e., $t_{1/2} = 36$ ms; $\mu = 1.0$ M; $25°C$; Fe(III) $= 9.8–14.8$ mF; $N_3^- = 2.6–9.6$ mF). The rate law is:

$$\upsilon = \frac{d[FeN_3^{2+}]}{dt} = (k_{2f}K_{aFe} + k_{1f}[H^+]) \frac{[Fe^{3+}][HN_3]}{[H^+]} - (k_{2d} + k_{1d}[H^+])[FeN_3^{2+}]$$

where $k_{1f} = 4.0 \pm 1.0$ F$^{-1}$ s$^{-1}$ and $k_{2f} = (6.8 \pm 0.5) \times 10^3$ F$^{-1}$ s$^{-1}$ ($25°C$, $\mu = 1$M), and where $K_{aFe} = [FeOH^{2+}][H^+]/[Fe^{3+}]$.

Fe(III)$–N_3$ complexes are intensely red-colored indicating that ligand-to-metal charge transfer is possible and that electron transfer (oxidation) could be promoted by sunlight. The catalytic cycle could be completed by the re-oxidation of Fe(II) to Fe(III) by oxygen. This system appears to be a possible environmental sink since the oxidant ($O_2$), catalyst (Fe (hydr)oxide), and promoter (sunlight) are all abundant in natural systems. Electron transfer could occur from coordinated $N_3^-$ through the metal to coordinated oxygen in a ternary $O_2$-Fe(III)-$N_3$ complex.

$$O_2 - Fe(III) - N_3^- \overset{h\nu}{\rightarrow} {}^-O_2 - Fe(III) - N_3 \rightarrow products$$

A potentially significant problem with this hypothesized degradation pathway is that azide will be displaced by hydroxide at neutral-to-alkaline pH, which will thus lower the equilibrium concentration of the required Fe(III)-$N_3$ complex (Figure 2).

It is possible that azide could also coordinate to other transition metals found in water and surface soils and thereby become subject to similar heterogeneous photopromoted oxidation reactions.

Also of potential importance to soil chemistry, azide has been used as a bridging ligand to facilitate the redox exchange reaction between $Fe^{2+}$ and $Fe^{3+}$ via the binuclear complex Fe(III)—$N_3$—Fe(II).[112]

It should be noted that besides forming purely inorganic Fe-azide complexes, azide is also known in organometallic complexes including metalloenzymes (see later) and 1,2-bis(dimethylphosphino)ethane complexes.[131]

The six-coordinate $[Co(NH_3)_5N_3]^{2+}$ and $[Co(CN)_5N_3]^{3-}$ complexes are well-known.[126,132] The first is readily prepared by air oxidation of ammoniacal $Co^{2+}$ in the presence of $N_3^-$. Coordinated azide in $[Co(NH_3)_5N_3]^{2+}$ is oxidized by $HNO_2$ to yield the important 5-coordinate $[Co(NH_3)_5]^{3+}$ intermediate as well as $N_2$ and $N_2O$.

Haim and Taube[124] studied the oxidation of $NaN_3$ bound to Co(III) (in pentammine complexes) by nitrous acid:

$$[Co(NH_3)_5N_3]^{2+} + HNO_2 + H^+ \rightarrow [Co(NH_3)_5H_2O]^{3+} + N_2 + N_2O$$

**443**

They postulated the formation of a nitrosyl azide intermediate, which undergoes a subsequent rapid decomposition reaction.

$$[Co(NH_3)_5N_3]^{2+} + NO^+ \rightarrow [Co(NH_3)_5N_3NO]^{3+} \rightarrow [Co(NH_3)_5OH_2]^{3+} + N_2 + N_2O$$

The rate law for decomposition of the Co(III)-azide complex is:

$$\nu = 9.3 \times 10^4 [Co(NH_3)_5N_3]^{2+}[HNO_2][H^+] \quad M\ min^{-1} \quad (25°C, \mu = 0.5\ M)$$

This is even slower than the metal-free N(III) system described above. Thus, it is unlikely that either free or metal-complexed azide will be rapidly oxidized by environmentally realistic concentrations of nitrous acid.

$[Co(CN)_5N_3]^{3-}$ is prepared from $[Co(NH_3)_5N_3]^{2+}$ by an inner-sphere redox reaction with $Co^{2+}$ in the presence of excess cyanide:

$$[Co(NH_3)_5N_3]^{2+} + [Co(CN)_5]^{3-} \rightarrow [Co(NH_3)_5]^{2+} + [Co(CN)_5N_3]^{3-}$$

In acid solution, $[Co(CN)_5N_3]^{3-}$ undergoes hydrolysis, liberating $HN_3$.[125,126,130]

$$[Co(CN)_5N_3^-]^{3-} + H^+ \overset{K}{\rightleftharpoons} [Co(CN)_5N_3^H]^{2-} \overset{k}{\rightarrow} [Co(CN)_5]^{2-} + HN_3$$

Here, $K = 4.67\ M^{-1}$ and $k = 3.46 \times 10^{-3}\ s^{-1}$ (40°C).

## ORGANIC CHEMISTRY

It is difficult to predict the organic chemistry of azide in the environment because much of the literature describes reactions that occur under extreme conditions (e.g., concentrated sulfuric acid) or in organic solvents, where azide behaves as a stronger nucleophile than in protic solvents.[133] Azide is a reasonably strong kinetic nucleophile (when ranked on the basis of Swain's or Edwards' nucleophilicity scales) and so it is not surprising that the organic chemistry of azide has proven to be a fertile field of research. It has been extensively reviewed.[5,22] Only those reactions that are most likely to be of significance in the environment are highlighted here. Further work may show that other reactions may need to be considered in the future.

First we discuss the free acid, $HN_3$, then the anion. Hydrazoic acid reacts with a variety of carbonyl compounds in the presence of a strong acid catalyst. This is known as the Schmidt reaction. For example, carboxylic acids yield amines, ketones yield amides and aldehydes yield nitriles and formamides.

$$RCOOH + HN_3 \overset{H^+}{\rightarrow} RNCO \overset{H_2O}{\rightarrow} RNH_2 + CO_2$$
$$RCOR' + HN_3 \overset{H^+}{\rightarrow} RCONHR' + RNHCOR'$$
$$RCHO + HN_3 \overset{H^+}{\rightarrow} RCN + RNHCHO$$

Schmidt originally proposed that the first step was the acid-catalyzed production of highly reactive imine radical, $^\bullet NH$. Since then, the mechanism of reaction has been the subject of much work and several reviews.[23,24,26,74,134] It is now apparent that protonated species such as $RCOOH_2^{2+}$ and $N_3H_2^+$ play important roles, which explains the need for the strong acid catalyst. Most laboratory studies are conducted in the presence of concentrated sulfuric acid in order to obtain an appreciable rate of reaction. The rate of reaction asymptotically

444

approaches zero as the $H_2SO_4$ concentration falls below approximately 55% (w/w) in the case of benzaldehyde, for example.

Reaction of hydrazoic acid with a variety of substituted benzoic acids is first-order with respect to each reactant, and therefore second-order overall. The first-order rate constant for $HN_3$ loss is $4.74 \times 10^{-4}$ min$^{-1}$ (40°C; 95.8% w/w $H_2SO_4$).[135] This corresponds to a half-life of 24 h under these conditions.

In contrast to many other carbonyls, quinones, which are widely distributed in plant material, add hydrazoic acid under mild conditions. For example, addition of excess $HN_3$ to 1,4-napthoquinone leads to 2-azido-1,4-napthoquinone in 97% yield (pH 4, 0°C, air, MeOH/$H_2O$ (70/30 v/v), 1 h).[136] In the absence of air, the chemically reduced amino derivative is obtained, i.e., 2-amino-1,4-napthoquinone. Benzoquinones are similarly reactive. This could provide a sink for azide in organically rich environments.



Besides their effect on carbonyls, acid catalysts can also promote the addition of $HN_3$ across the double bond of alkenes.

$$CH_3CH = CH_2 + HN_3 \xrightarrow{150°C, H_3PO_4} CH_3CH(N_3)CH_3$$

The presence of conjugated electron withdrawing groups facilitates the addition reaction. Thus, $\alpha$- carbonyl and -carboxyl olefins are more reactive than simple olefins.

$$CH_2 = CHCHO + HN_3 \rightarrow N_3CH_2CH_2CHO$$

Given the extreme conditions necessary to catalyze the Schmidt reaction and the addition reaction, they are unlikely to represent an important environmental sink for azide unless the specific acid catalyst can be replaced by one or more general acid catalysts, including metal ions or acid surfaces such as silica and alumina.[137]

Nucleophilic substitution involving a wide range of leaving groups is a general method for synthesizing aliphatic, aromatic, and heterocyclic azides.[133] Chloro-, bromo-, and iodo- derivatives are often used as the substrate but $p$-toluenesulfonato-, sulfato-, nitrato- and nitro-substituted organics are also suitable leaving groups. The presence of electron-withdrawing substituents on the carbon further facilitates the reaction.

Alcohols and unsaturated hydrocarbons react with $HN_3$ to yield alkyl azides, R—$N_3$, which subsequently rearrange. Many other functional groups including nitrites, oximes, amides, amidoximes, lactams, hydroxamic chlorides, isocyanides, cyanamide, cyanogens and dichloroketones react with hydrazoic acid to yield tetrazoles or substituted tetrazoles.[5,24] While an acid catalyst is not required in every case, most of these functional groups are present in the environment at very low concentrations and so may not represent significant azide sinks.

The azide anion is capable of reacting with organic compounds under mild conditions.[5] For example, it participates in a wide variety of halide substitution reactions in saturated alkyl halides, heterocyclic halides and $\alpha$–halothioethers.

$$CH_3SCH_2Cl + N_3^- \rightarrow CH_3SCH_2N_3 + Cl^-$$

Depending on the nature of the organo group, the initial products may undergo further reaction.

Azide reacts with epoxides at neutral pH to yield azido alcohols.[5,133]

$$RCH(O)CH_2 + N_3^- \rightarrow RCHOHCH_2N_3$$

Transition metal catalyzed reactions of azide with organic radicals can lead to the formation of organic mono- and di-azides in the presence of olefins because the azide radical is a good electrophile.[138] For example, the t-butoxy radical reacts with Fe-coordinated azide yielding the azido radical, which then attacks the coordinated ethylene.

$$(CH_3)_3CO^\bullet + FeN_3^{2+} \rightarrow N_3^\bullet + Fe^{3+} + (CH_3)_3CO^-$$
$$N_3^\bullet + C_6H_5CH = CH_2 \rightarrow C_6H_5 C^\bullet HCH_2N_3$$
$$C_6H_5 C^\bullet HCH_2N_3 + FeN_3^{2+} \rightarrow C_6H_5CHN_3CH_2N_3 + Fe^{2+}$$

The formation of azido-organics can also be triggered by Fenton chemistry because hydroxyl radical is a much stronger electrophile than azide radical, which is displaced from the coordination shell.[138] Thus this potential pathway could be of some significance in the environment.

$$H_2O_2 + Fe^{2+} \rightarrow HO^\bullet + HO^- + Fe^{3+}$$
$$HO^\bullet + FeN_3^{2+} \rightarrow FeOH^{2+} + N_3^\bullet$$
$$N_3^\bullet + C = C \rightarrow N_3C - C^\bullet$$
$$N_3C - C^\bullet + FeN_3^{2+} \rightarrow N_3C - CN_3 + Fe^{2+}$$

## BIOCHEMISTRY

Azide is known to be a broad-spectrum biocide yet despite years of research much remains to be learned about the details of its biological activity.[28,31] It is often assumed that the biological action of azide, a potent general metabolic inhibitor, is due largely to its ability to bind strongly to the transition metals contained in metalloenzymes, including cytochrome c oxidase, catalase, and superoxide dismutases, among others. However, azide toxicity may also result from its biotransformation to nitric oxide (NO) or its ability to mimic NO.[28]

In addition to its effects on bacterial respiration, azide interferes with DNA and RNA synthesis and inhibits protein export in *Escherichia coli*.[139] As mentioned above, azide is exceptional in that it is highly mutagenic in bacteria and plants but non-mutagenic (or only very weakly so) in animals, possibly because animal cells are incapable of generating the proximal mutagen L-azidoalanine.

The possibility of bacterial resistance to azide inhibition was described fifty years ago although the mechanism by which resistance is conferred remains unknown.[140] Mutations within the *secA* gene locus, which is essential for protein export across the cytoplasmic membrane, rendered certain *E. coli* strains more resistant to azide.[141] Standard selection procedures can yield a variety of azide-resistant mutants in a number of disparate bacteria including *Salmonella typhimusium*, *E. coli*, *Klebsiella pneumoniae*, *Bacillus subtilis* and *Staphylococcus aureus*.[142] In this case, azide resistance was related to production of an extracellular azide-inactivating substance (AIS), which was thought to be high molecular

weight (12–14 k daltons) and nonenzymatic. Beyond that, nothing is known about AIS structure, production or mechanism of interaction with azide.

Another, more direct indication of biodegradability of azide is its *reduction* by bacterial nitrogenase which is able to accomplish the 6-electron reduction of hydrazoic acid to hydrazine and ultimately to ammonia.[143]

Although it is used as a positive control in the Ames test its mechanism of mutagenicity is unclear. Azide is used as a model compound in the Salmonella assay where the effect appears to be due to the azide moiety itself, even when included in azido-hexoses, alcohols and glycerols.

No work appears to have been done on the rate of assimilation of azide by plants, although it has been considered in the context of using plant assays to detect environmental mutagens.[34]

The coordination of azide to the oxidized forms of metals in heme proteins and other metalloenzymes and proteins has been reviewed[31] The x-ray crystal structure, thermodynamics and kinetics of binding to metmyoglobin and methemoglobin have been reported.[144–147] The equilibrium constant for binding to methemoglobin is $6.25 \times 10^4$ $M^{-1}$.[147] Azide binds only weakly to cytochrome P450 ($K = 5 M^{-1}$) and therefore is not an effective inhibitor of this enzyme. Interestingly, it is able to inhibit $H_2O_2$ disproportionation by binding to catalase but separately prepared $H_2O_2$-catalase intermediates are able to oxidize $N_3^-$ to $N_2$.

$HN_3$ coordinates rapidly to horseradish peroxidase and to chloroperoxidase in a concerted mechanism in which the proton is transferred to a distal base. In the case of chloroperoxidase, $k = 7.6 \times 10^7 (M^{-1} s^{-1})/(1 + K_a/[H^+])$, where $K_a$ is the acid dissociation constant of $HN_3$.[148] The reaction with cytochrome bo is similar.[149] $HN_3$ ($3.8 \times 10^5 M^{-1} s^{-1}$) coordinates to metmyoglobin two orders of magnitude faster than does $N_3^-$ ($4.7 \times 10^3 M^{-1} s^{-1}$).[150] The rates of dissociation are $18 s^{-1}$ and $0.16 s^{-1}$, respectively. The kinetics and mechanism of the reaction of azide with aquacobalamin (vitamin $B_{12a}$) has been reported.[151]

Azide is a competitive inhibitor of several superoxide dismutases (SOD). For example, 50% inhibition is observed in Fe-SOD at 4 mM $N_3^-$, in Mn-SOD at 20 mM and in Cu/Zn-SOD at 32 mM.[152]

When administered at a toxic level to sewage sludge, azide induced methane thiol ($CH_3SH$) production implying that it also has bactericidal properties under reducing conditions. One consequence of this is that azide spills that find their way to sewage treatment plants could result in objectionable odors.[153]

## BEHAVIOR ON SOILS

Very little is known about the fate and transport of azide in soils. For example, only one preliminary soil column experiment has been reported[154] and it is not known how or at what rate azide is processed by microorganisms in soils and water or how vegetation may affect the residence time of azide. However, some clues may be gleaned from agricultural researchers who have tested azide in the field to control soil pests and to minimize nitrification of ammonia applied as a fertilizer, amongst other work.

Surprisingly, when applied at a rate of 134.5 kg $NaN_3$ $ha^{-1}$ bacterial populations in test beds at first rapidly increased by more than an order of magnitude over controls and then declined to normal levels over a period of 3 months.[38] Although the weed population declined

in the azide-treated plots no permanent effects on bacterial populations or soil enzymatic activities were observed. Azide was described as quite mobile and readily leachable in most soils. The reason for the initial increase in soil bacteria was not explained but could have been due to selective elimination of competitors by the azide or perhaps to metabolism of azide itself or an oxidation product, e.g., nitrite or nitrate.

Elsewhere, anhydrous ammonia containing 6% $KN_3$ was evaluated as a nitrification inhibitor when applied at a rate of 90 kg N ha$^{-1}$. Leaching of the 15-cm deep retention zone by irrigation or heavy rainfall rendered the azide completely ineffective. Otherwise, under relatively dry conditions, nitrification was significantly reduced for at least 6 months.[155] The recommended application rate for rice cultivation is 2.7–3.6 kg ha$^{-1}$, and at this level the persistence is reported to be 7–10 days but when applied at 44.8–134.4 kg ha$^{-1}$ sodium azide may persist for 3–5 weeks.[156] These results and others imply that the fate of azide in soils is dependent on soil moisture. In the case of dry soils it should survive for more than 6 months but under wet conditions it could be rapidly and almost quantitatively lost.

The "dissipation" of sodium azide from soil has been studied by a number of researchers.[38,157–159] In general, the rate of dissipation is more rapid from acidic than from alkaline soils and appears to be positively correlated with soil moisture and relative humidity.[160–162] However, the mechanism of dissipation is not clear. It is possible that azide is chemically transformed in the soil but a major pathway may also be simple conversion to hydrazoic acid, followed by volatilization. This would result in the transfer of azide to the gas phase but not to its net destruction. In an interesting paper Bradbury et al.[159] suggest that organo-azide compounds may be formed in the soil, and that they may subsequently decompose via a Curtius rearrangement to nitrogen and the isocyanate (which finally undergoes hydrolysis to $CO_2$).

$$RCON_3 \rightarrow RNCO + N_2$$

Neither the nature of the target organo compounds nor the formation mechanisms are explicitly described. For the reasons discussed above, it is unlikely the Schmidt reaction plays a role unless a general acid- or surface-catalyzed pathway exists. Quinones could conceivably be reactive.

According to one study,[163] manganese oxides do not appear to react with aqueous $NaN_3$ at 100 mg L$^{-1}$ but other work[164] reports an increase in extractable manganese after treatment with $NaN_3$, applied at a rate of 0.2 g kg$^{-1}$ soil. This treatment also decreased the extractable iron in one soil sample, and significantly increased the pH of two soils, which were poorly buffered. The cation exchange capacity was not altered.

Only one preliminary soil column study has been reported[154] and so it is not possible to estimate the transport properties of azide with any degree of confidence. These experiments, using a saturated column of desert soil (Gilman loam), showed that azide may behave as a conservative tracer in alkaline sandy soils (retardation factor ≈1.0, Peclet number ≈40, dispersion coefficient ≈3 × 10$^{-4}$ cm$^2$ s$^{-1}$, soil/water distribution coefficient, $K_d$, ≤ ≈1 mL g$^{-1}$). If these preliminary data are confirmed then the implication is that azide could travel long distances in such soils and eventually migrate to subsurface aquifers. However, it should be noted that this was alkaline soil with a low organic content. Azide may behave differently on low-pH, high-organic soils.

Recently it was reported that the release of colloidal particles as water flows through saturated soil columns can be dramatically affected by the nature (and concentration) of electrolyte anions.[165] Azide is notable in this regard because when present at 20 mM it

"suppresses" particle release more effectively than any other anion tested: $N_3^-$ < phthalate < $Cl^-$ ≪ malonate (the mass of particles released being evaluated after elution of one pore volume).

The adsorption of azide onto a strong base anion exchange resin has been studied. Three adsorption isotherms were evaluated and breakthrough curves were modeled.[166]

## CHEMICAL ANALYSIS

Colorimetry was one of the earliest methods used to determine azide.[167,168] If necessary, azide can first be separated from a sample by distillation of $HN_3$ from an acidified aliquot, and then collected in ferric nitrate solution where the red ferric azide complex is formed.

Spectrophotometric determination at 460 nm yields a linear Beer's law plot from 10 to 80 mg $N_3^-$ $L^{-1}$. The color is stable for >1 h if $HN_3$ losses are prevented. Cyanates and thiocyanates interfere. Sulfite, thiosulfate and sulfide interference are avoided by prior oxidation using $H_2O_2$, under alkaline conditions.[168]

Colorimetry has been used to determine azide in beverages.[169] The detection limit was 0.5 mM. Cyanide interfered with the analysis.

Azide can also be determined indirectly by oxidation of $HN_3$, released upon acidification, into $N_2$ over a Cu/CuO catalyst heated to 670°C. Volumetric determination of the collected $N_2$ completes the analysis.[170] Individual lead azide samples (3–5 mg) have been analyzed this way.

Alternatively, in a well-known redox titration, azide can be oxidized quantitatively to $N_2$ by reaction with excess Ce(IV), which is then back-titrated.[5]

Oxidation of azide by Ce(IV) followed by gas chromatography with thermal conductivity detection of the resulting nitrogen has been used to determine 5–120 $\mu$g $N_3^-$. Cyanide (≤1500 $\mu$g), sulfite (≤80 $\mu$g), sulfide (≤50 $\mu$g), thiosulfate (≤40 $\mu$g) and thiocyanate (≤20 $\mu$g) did not interfere with the determination of 25 $\mu$g $N_3^-$. Nor did Fe(III), Cu(II), or Pb(II) interfere when present at 1000 $\mu$g.

In another gas chromatographic method, used for analysis of blood and urine samples, azide is converted to its pentafluorobenzyl derivative by a simple halide substitution reaction with pentafluorobenzyl bromide and detected by negative ion chemical ionization mass spectrometry.[171] The detection limit (3 × S/N) is 0.5 $\mu$M.

Gas chromatography with thermal conductivity detection has been used to directly determine hydrazoic acid.[172] Response was nearly linear over the range 1.5 to 40 mg $HN_3$ and the detection limit was reported as 1.5 mg $HN_3$. The authors note that flame ionization detection is insensitive to $HN_3$ and that nitrogen selective detectors are problematic.

Ion chromatography (IC) is perhaps most commonly used to determine azide in aqueous solution. OSHA has published a procedure for the analysis of airborne azides using IC with UV detection (210 nm).[173] The detection limit is 11.6 $\mu$g $NaN_3$ $L^{-1}$. This method is based on a NIOSH method that employs conductivity detection. With care, ion chromatography is able to separate acetate, $Cl^-$, $NO_2^-$, $SO_4^{2-}$ and phosphate. However, separation of $NO_3^-$ and $Br^-$, which tend to co-elute with azide, requires careful selection of the column and eluant.[53,173] Nitrate interference can also be eliminated by using amperometric detection as opposed to conductivity.[117] By selecting an electrode potential that is sufficiently positive

449

to oxidize $N_3^-$ but not $NO_3^-$, e.g., 1.20 V vs. SCE, an azide detection limit of <0.03 $\mu$M can be achieved.

IC has been used to determine azide in beverages after stripping $HN_3$ from acidified samples. The detection limit was 0.05 $\mu$g mL$^{-1}$ with conductivity detection.[174]

High-pressure liquid chromatography with UV detection (210 nm) has also been used to determine hydrazoic acid in air.[175] The limit of detection was 265 $\mu$g $HN_3$ L$^{-1}$ solution.

Azide can be determined electrochemically.[117] Differential pulse voltammetry offers a linear dynamic range that spans four orders of magnitude with a limit of detection of 0.23 $\mu$M.

Flow injection analysis with amperometric detection has a linear dynamic range of five orders of magnitude with a detection limit of 3.7 nM.[117]

The application of capillary electrophoresis to the analysis of soil extracts containing azide has proven problematic, although azide could be detected down to at least 4 mg kg$^{-1}$.[161,162]

Sodium azide has been determined in an organic matrix at 20 ppm (w/w) using reversed-phase liquid chromatography.[176]

The use of the S-catalyzed oxidation of azide by iodine was mentioned previously as a method for the determination of azide.[5]

The determination of organo-azides has been reviewed in detail.[177]


## ACKNOWLEDGMENTS

It is a pleasure to acknowledge the contributions of the following colleagues and students: Brian Barbaris, Gabe Aldaz, Jill Robinson, David Craig, Amy Patel, and Angelita Denny for their contributions in the laboratory; Michael Carducci, for generating the crystal structures; Gina Wasson and Cynthia Malbrough for their assistance in preparing the manuscript; Dianna Love and Joe Lowry, for hosting my sabbatical leave at the EPA NEIC; and the EPA NEIC scientists and staff, particularly the library staff for tracking down obscure references.


## REFERENCES

1. Fair, H.D. and Walker, R.F., *Energetic Materials* Plenum, New York, 1977.
2. Pollock, B.D., Fisco, W.J., Kramer, H., and Forsyth, A.C., Handling, storability, and destruction of azides, in *Energetic Materials*, Fan, H.D. Plenum, New York, 1977.
3. Akhavan, J., *The Chemistry of Explosives* Royal Society of Chemistry, Cambridge, 1998.
4. Urbanski, T., *Chemistry and Technology of Explosives* Pergamon, Oxford, 1967.
5. Mason, K.G., Nitrogen. Hydrogen azide, in *Mellor's Comprehensive Treatise on Inorganic and Theoretical Chemistry* Wiley, New York, 1967, pp. 1–68.
6. Fatah, H., Sodium azide dumping?, in *Chemical Week* 1996, pp. 45.
7. Madlung, A., The chemistry behind the air bag—high tech in first-year chemistry, *J. Chem. Educ.* 73 (4), 347–8, 1996.
8. Resh, R.E., Working knowledge. Air bags., *Sci. Am.* 274 (6), 116, 1996.

9. Hitt, J.M., Automobile airbag industry toxic exposures, in *Hazardous materials toxicology: Clinical principles of environmental health*, Sullivan Jr., J.B. and Kreiger, G. R. Williams & Wilkins, Baltimore, 1992.

10. Edwards, W.R., A primer on inflatable restraints, in *Bag and Belt*, Cologne, 1990.

11. Jobelius, H.H. and Scharff, H.-D., Hydrazoic acid and azides, in *Encyclopedia of industrial chemistry*, 5th ed., Gerhartz, W., Yamamoto, Y. S., Campbell, F. T., Pfefferkorn, R., Rounsaville, J.F., and Ullmann, F. VCH, Weinheim, Federal Republic of Germany, 1985, pp. 193–7.

12. Anonymous, Green cars. End-of-life vehicle mangement, environmental defense, 2002.

13. Anonymous, For the Record. Road opened, in *Salt Lake Tribune* Salt Lake City, 1996.

14. Tabani, Y. and Labib, M.E., Modeling of an air bag inflater based on combustion of methane-oxygen mixture, *Combust. Sci. Technol.* 151, 73–103, 2000.

15. Smith, R.M. and Martell, A.E., *Critical Stability Constants* Plenum, New York, 1989.

16. Audrieth, L.F., Hydrazoic acid and its inorganic deriviatives, *Chem. Rev.* 15, 169–224, 1934.

17. Evans, B.L. and Yoffe, A.D., Structure and Stability of Inorganic Azides. 2. Some Physical and Optical Properties, and the Fast Decomposition of Solid Monovalent Inorganic Azides, *Proc. Roy. Soc. Lond. Ser. A* 250 (1262), 346–66, 1959.

18. Evans, B.L., Yoffe, A.D., and Gray, P., Physics and chemistry of the inorganic azides, *Chem. Rev.* 59 (4), 515–68, 1959.

19. Golub, A.M., Kohler, H., and Skopenko, V., Chemistry of pseudohalides, in *Topics in Inorganic Chemistry and General Chemistry*, Clark, R.J.H. Elsevier, Amsterdam, 1986.

20. Gray, P., Chemistry of the inorganic azides, *Quart. Rev.* 17 (4), 441–73, 1963.

21. Dori, Z. and Ziolo, R.F., Chemistry of coordinated azides, *Chem. Rev.* 73 (3), 247–54, 1973.

22. Patai, S., *Chemistry of the Azido Group* Interscience, London, 1971.

23. Shirokova, N.P., Smirnova, T.I., Koldobskii, G.I., Ostrovskii, V.A., and Gidaspov, B.V., Mechanism of Schmidt Reaction.15. Basicity and kinetics of $DN_3$ decomposition in $D_2O$-$D_2SO_4$ System, *Zhurnal Org. Khimii* 11 (9), 1805–8, 1975.

24. Wolf, H., The Schmidt Reaction, in *Organic Reactions* 1946, pp. 307–37.

25. Koldobskii, G.I., Smirnova, T.I., and Gidaspov, B.V., Mechanism of Schmidt Reaction.19. Determination of limiting stage of reaction of substituted benzoic-acids with hydrazoic acid, *Zhurnal Org. Khimii* 13 (5), 1026–30, 1977.

26. Koldobskii, G.I., Ostrovskii, V.A., and Gidaspov, B.V., Schmidt Reaction with aldehydes and carboxylic-acids, *Uspekhi Khimii* 47 (11), 2044–64, 1978.

27. Kleinhofs, A., Owais, W.M., and Nilan, R.A., Azide, *Mut. Res.* 55 (3–4), 165–95, 1978.

28. Smith, R.P. and Wilcox, D.E., Toxicology of selected nitric oxide-donating xenobiotics, with particular reference to azide, *Crit. Rev. Toxicol.* 24 (4), 355–77, 1994.

29. EPA, U.S., Report No. EPA 560/11-80-011, 1980.

30. Hendricks, S.B. and Pauling, L., The crystal structures of sodium and potassium azides and potassium cyanate and the nature of the azide group, *J. Am. Chem. Soc.* 47, 2904–20, 1925.

31. Smith, R.P., Louis, C.A., Kruszyna, R., and Kruszyna, H., Acute neurotoxicity of sodium-azide and nitric-oxide, *Fundam. Appl. Toxicol.* 17 (1), 120–7, 1991.

32. Anonymous, Hazardous substance database, 2002.

33. Trochimowicz, H.J., Heterocyclic and miscellaneous nitrogen compounds, in *Patty's Industrial Hygiene and Toxicology*, 4 ed., Clayton, G.D. and Clayton, F.E. Wiley, New York, 1994, p. 3285.

34. Grant, W.F. and Salamone, M.F., Comparative mutagenicity of chemicals selected for test in the international program on chemical-safety collaborative study on plant systems for the detection of environmental mutagens, *Mutat. Res.-Fundam. Mol. Mech. Mutagen.* 310 (2), 187–209, 1994.

35. Gosselin, R.E., Smith, R.P., Hodge, H.C., and Braddock, J.E., *Clinical Toxicology of Commercial Products*, 5 ed. Williams & Wilkins, Baltimore, 1984.

36. Weiss, J.S., Reactive airway dysfunction syndrome due to sodium azide inhalation, *Int. Arch. Occup. Environ. Health* 68, 469–71, 1996.

37. Kleinhofs, A. and Smith, J.A., Effect of excision repair on azide-induced mutagenesis, *Mut. Res.* 41 (2–3), 233–9, 1976.

38. Kelley, W.D. and Rodriguezkabana, R., Effects of sodium-azide and methyl-bromide on soil bacterial—populations, enzymic activities and other biological variables, *Pestic. Sci.* 10 (3), 207–15, 1979.

39. Owais, W.M., Zarowitz, M.A., Gunovich, R.A., Hodgdon, A.L., Kleinhofs, A., and Nilan, R.A., Mutagenic in vivo metabolite of sodium azide, *Mut. Res.* 53 (3), 355–8, 1978.

40. Owais, W.M., Nilan, R.A., and Kleinhofs, A., Mutagenic in vivo metabolite of sodium azide, *Genetics* 88 (4), S74–5, 1978.

41. Owais, W.M., Kleinhofs, A., and Nilan, R.A., In vivo conversion of sodium-azide to a stable mutagenic metabolite in salmonella-typhimurium, *Mut. Res.* 68 (1), 15–22, 1979.

42. Owais, W.M., Nilan, R.A., and Kleinhofs, A., In vivo conversion of sodium-azide to a mutagenic metabolite, *Genetics* 91 (4), S92–3, 1979.

43. Owais, W.M., Kleinhofs, A., and Nilan, R.A., In vitro synthesis of a mutagenic azide metabolite by cell-free bacterial extracts, *Mut. Res.* 84 (2), 239–46, 1981.

44. Owais, W.M., Kleinhofs, A., and Nilan, R.A., Effects of L-cysteine and O-Acetyl-L-Serine in the synthesis and mutagenicity of azide metabolite, *Mut. Res.* 80, 99–104, 1981.

45. Owais, W.M., Kleinhofs, A., Ronald, R.C., and Nilan, R.A., Isolation of an azide mutagenic metabolite in salmonella-typhimurium, *Mut. Res.* 91 (3), 155–61, 1981.

46. Owais, W.M., Kleinhofs, A., and Nilan, R.A., The mutagenic azide metabolite is azidoalanine, *Abstr. Pap. Am. Chem. Soc.* 184 (SEP), 58, 1982.

47. Owais, W.M., Rosichan, J.L., Ronald, R.C., Kleinhofs, A., and Nilan, R.A., A mutagenic metabolite synthesized by salmonella-typhimurium grown in the presence of azide is azidoalanine, *Mut. Res.* 118 (4), 229–39, 1983.

48. Owais, W.M., Kleinhofs, A., Ronald, R.C., and Nilan, R.A., The mutagenic azide metabolite is azidoalanine, *Environ. Mutagen.* 5 (3), 448, 1983.

49. Owais, W.M., Kleinhofs, A., and Nilan, R.A., The mutagenic properties of azide metabolite and other related compounds, *Environ. Mutagen.* 6 (3), 383–4, 1984.

50. Owais, W.M., Ronald, R.C., Kleinhofs, A., and Nilan, R.A., Synthesis and mutagenicity of the 2 stereoisomers of an azide metabolite (azidoalanine), *Mut. Res.* 175 (3), 121–6, 1986.

51. Owais, W.M., Ronald, R.C., Kleinhofs, A., and Nilan, R.A., Mutagenicity of D-isomers and L-isomers of azidoalanine (azide metabolite), Abst. 210, 18th Ann. Mtg Environ Mutagen. Soc., *Environ. Mutagen.* 9, 81, 1987.

52. Owais, W.M. and Kleinhofs, A., Metabolic-activation of the mutagen azide in biological-systems, *Mut. Res.* 197 (2), 313–23, 1988.

53. Westwood, L.C. and Stokes, E.L., Determination of azide in environmental samples by ion chromatography, in *Ion Chromatographic Analysis of Environmental Pollutants*, Mulik, J.D. and Sawicki, E. Ann Arbor Science, Ann Arbor, 1977, pp. 141–56.

54. Schreck, R.M., Rouhana, S.W., Santrock, J., Darcy, J.B., Wooley, R.G., Bender, H., Terzo, T.S., Desaele, K.H., Webb, S.R., Salva, D.B., and Moreau, M.C., Physical and chemical characterization of airbag effluents, *J. Trauma-Injury Inf. Crit. Care* 38 (4), 528–32, 1995.

55. Gross, K.B., Koets, M.H., Darcy, J.B., Chan, T.L., Wooley, R.G., and Basha, M.A., Mechanism of induction of asthmatic attacks initiated by the inhalation of particles generated by airbag system deployment, *J. Trauma-Injury Inf. Crit. Care* 38 (4), 521–7, 1995.

56. Verneker, V.R., Photodecomposition of solid metal azides, *J. Phys. Chem.* 72 (5), 1733, 1968.

57. Laluna, F.J., Wright, R.E., and Heim, W.J., Explosive hazard of blood diluents containing sodium azide, *N. Engl. J. Med.* 301 (7), 382–3, 1979.

58. Lambert, M., Meyer, E., and Deleenheer, A., Cyanide and sodium azide intoxication, *Ann. Emerg. Med.* 26 (3), 392, 1995.

59. Curtius, T.C. and Radenhausen, R.R., Zur Kenntniss der Stickstoffwasserstoffsaure, *J. Prakt. Chem.* 43, 207, 1891.

452

60. Dennis, L.M.D. and Isham, H.I., Hydronitric acid. VI, *J. Am. Chem. Soc.* 29, 216, 1907.

61. Jones, K., Hydrogen azide and azides, in *Comprehensive inorganic chemistry.*, 1st ed., Bailar, J. C. and Trotman-Dickenson, A. F. Pergamon Press, Oxford, 1973.

62. Pauling, L., *Nature of the chemical bond. The chemical bond; a brief introduction to modern structural chemistry*, Cornell University Press, Ithaca, N.Y., 1967.

63. Treinin, A., General and theoretical aspects, in *Chemistry of the Azido Group*, Patai, S. Interscience, London, 1971, pp. 1–34.

64. Jorgensen, W.L. and Salem, L., *The Organic Chemist's Book of Orbitals*, Academic Press, New York, 1973.

65. Shapira, D. and Treinin, A., Photolysis of hydrazoic acid in aqueous solution, *J. Phys. Chem.* 77 (10), 1195–8, 1973.

66. Burak, I. and Treinin, A., Spectrum of $N_3^-$ in solution, *J. Chem. Phys.* 39 (1), 189–96, 1963.

67. McDonald, J.R., Rabalais, J.W., and McGlynn, S.P., Electronic spectra of azide ion, hydrazoic acid, and azido molecules, *J. Chem. Phys.* 52 (3), 1332, 1970.

68. Beck, W., Fehlhamm, Wp, Pollmann, P., Schuiere. E. and Feldl, K., Darstellung Ir-Und Elektronenspektren Von Azido- Metallkomplexen, *Chem. Ber.-Recl.* 100 (7), 2335, 1967.

69. Betterton, E.A. and Robinson, J.L., Henry's law coefficient of hydrazoic acid, *J. Air Waste Manage. Assoc.* 47 (11), 1216–9, 1997.

70. D'Orazio, L.A. and Wood, R.H., The thermodynamics of the solution of polar gases in water; the heat, free energy and entropy of solution of hydrazoic acid, *J. Phys. Chem.* 67, 1435–8, 1963.

71. Templeton, J.C. and King, E.L., Kinetic and equilibrium studies on azidochromium(III) ion in concentrated perchloric acid, *J. Am. Chem. Soc.* 93 (26), 7160–6, 1971.

72. Wilhelm, E., Battino, R., and Wilcock, R.J., Low-pressure solubility of gases in liquid water, *Chem. Rev.* 77, 219–62, 1977.

73. Bak, T.A. and Praestgaard, E.L., The base strength of hydrazoic acid, *Acta Chem. Scand.* 11 (5), 901–2, 1957.

74. Agibalov, N.D., Ostrovsk, V.A., Koldobsk, G.I., and Enin, A.S., Mechanism of Schmidt Reaction. 9. Basicity and decomposition kinetics of hydrazoic acid in aqueous solutions of sulfuric acid, *Zhurnal Org. Khimii* 9 (8), 1580–5, 1973.

75. Staples, P.J., Acid-catalysed hydrolysis of azidopentammine complexes of chromium(3) cobalt(3) and rhodium(3), *J. Chem. Soc., A* (11), 2731–3, 1968.

76. Haim, A. and Wilmarth, W.K., Pentacyano complexes of cobalt(III). 1. Kinetics and mechanism of substitution of water in $Co(CN)_5OH_2^-$ by azide and thiocyanate ions and by $O^{18}$-enriched water, *Inorg. Chem.* 1 (3), 573, 1962.

77. Haim, A. and Wilmarth, W.K., Pentacyano complexes of cobalt(III). 2. Competition of thiocyanate ion and water for transient intermediate generated in acid-catalyzed aquation of $Co(CN)_5^{3-3}$, *Inorg. Chem.* 1 (3), 583–, 1962.

78. Yoffe, A.D., in *Developments in Inorganic Nitrogen Chemistry*, Colburn, C. B. Elsivier, Amsterdam, 1966, pp. 72–149.

79. Muller and Brous, The decomposition of azide by controlled electron bombardment and by ultraviolet light, *J. Chem. Phys.* 1, 482, 1933.

80. Jacobs, P.W.M. and Tompkins, F.C., The photolysis of solid potassium azide, *Proc. Roy. Soc. Lond. Ser. A* 215 (1121), 254–65, 1952.

81. Reiser, A. and Wagner, H.M., Photchemistry of the azido group, in *Chemistry of the Azido Group*, Patai, S. Interscience, London, 1971, pp. 441–501.

82. Beckman, A.O. and Dickinson, R.G., The products of the photochemical decomposition of hydrogen azide, *J. Am. Chem. Soc.* 50, 1870, 1928.

83. Beckman, A.O. and Dickinson, R.G., Quantum yield in the photochemical decomposition of hydrazoic acid, *J. Am. Chem. Soc.* 52, 124, 1930.

**453**

84. Piper, L.G., Krech, R.H., and Taylor, R.L., The UV photolysis of hydrazoic acid, *J. Chem. Phys.* 73 (2), 791–800, 1980.

85. Kodama, S., Reactions of NH Radicals. 1. Photolysis of $HN_3$ vapor at 313 nm, *Bull. Chem. Soc. Jpn.* 56 (8), 2348–54, 1983.

86. Kodama, S., Reactions of NH Radicals. 2. Photolysis of $HN_3$ in the presence of $C_2H_6$ at 313 nm, *Bull. Chem. Soc. Jpn.* 56 (8), 2355–62, 1983.

87. Kodama, S., Reactions of NH Radicals. 3. Photolysis of $HN_3$ in the presence of $C_2H_4$ at 313 nm, *Bull. Chem. Soc. Jpn.* 56 (8), 2363–70, 1983.

88. Fang, W.-H., Photodissociation of $HN_3$ at 248 nm and longer wavelength: A CASSCF study, *J. Phys. Chem., A* 104, 4045–50, 2000.

89. Burak, I. and Treinin, A., Photochemistry of $N_3^-$ in aqueous solution at 254 nm, *J. Am. Chem. Soc.* 87 (18), 4031, 1965.

90. Burak, I., Shapira, D., and Treinin, A., Photochemistry of $N_3^-$ in aqueous solution at 2288 and 2139 A, *J. Phys. Chem.* 74 (3), 568–74, 1970.

91. Endicott, J.F., Hoffman, M.Z., and Beres, L.S., The 2537-$A^0$ photochemistry of azido-ammine complexes of cobalt(III) in aqueous solution: products, stoichiometry and quantum yields, *J. Phys. Chem.* 74 (5), 1021–9, 1970.

92. Seinfeld, J.H., *Atmospheric Chemistry and Physics of Air Pollution* Wiley, New York, 1986.

93. Maloy, J.T., Nitrogen, phosphorus, arsenic, antimony, and bismuth, in *Standard Potentials in Aqueous Solution*, Bard, A.J., Parsons, R., andJordan, J. Marcel Dekker, New York, 1985, pp. 127–39.

94. Ram, M.S. and Stunbury, D.M., Electron-transfer reactions involving the azidyl radical, *J. Phys. Chem.* 90, 3691, 1986.

95. Haag, W.R. and Mill, T., Rate constants for interaction of singlet oxygen (1Dg) with azide ion in water, *Photochem. Photobiol.* 45, 317–21, 1987.

96. Hack, W. and Jordan, R., Reaction rates of the reactions of OH(X-2 $\pi$) with NH(a(1)$\Delta$) and $HN_3$((X)), *Chem. Phys. Lett.* 306 (3–4), 111–6, 1999.

97. Farhataziz and Ross, A.B., *Selected specific rates constants of reactions of transients from water in aqueous solution III. Hydroxyl radical and prehydroxyl radical and their radical ions.* U.S. Department of Commerce, Notre Dame, 1977.

98. Finlayson-Pitts, B.J. and Pitts Jr, J.N., *Atmospheric Chemistry* Wiley-Interscience, New York, 1986.

99. Jacob, D.J., Chemistry of OH in remote clouds and its role in the production of formic acid and peroxymonosulfate, *J. Geophys. Res.* 91 (D9), 9807–26, 1986.

100. Reigger, H.E., *J. Am. Chem. Soc.* 33, 1569, 1911.

101. Turrentine, Behavior of certain hydrazine salts on decomposition by heat, *J. Am. Chem. Soc.* 37, 1105, 1915.

102. Hofman-Bang, N., Oxidation of azide ions by hydrogen peroxide, *Acta Chem. Scand.* 18 (5), 1300, 1964.

103. Ongstad, A.P., Coombe, R.D., Neumann, D.K., and Stech, D.J., Photochemistry of $O_3$ $HN_3$ mixtures, *J. Phys. Chem.* 93 (2), 549–52, 1989.

104. Pryor, W.A., Cueto, R., Jin, X., Koppenol, W.H., Nguschwemlein, M., Squadrito, G. L., Uppu, P. L., and Uppu, R. M., A practical method for preparing peroxynitrite solutions of low ionic-strength and free of hydrogen-peroxide, *Free Radic. Biol. Med.* 18 (1), 75–83, 1995.

105. Betterton, E.A. and Craig, D., Kinetics and mechanism of the reaction of azide with ozone in aqueous solution, *J. Air Waste Manage. Assoc.* 49 (11), 1347–54, 1999.

106. Hoigne, J., Bader, H., Haag, W.R., and Staehelin, J., Rate constants of reactions of ozone with organic and inorganic compounds in water. 3. Inorganic compounds and radicals, *Water Res.* 19 (8), 993–1004, 1985.

107. Otto, M., Lotz, S.D., and Frenking, G., Quantum mechanical ab initio studies of the structures and stabilities of halogen azides $XN_3$ (X = F, Cl, Br, I), *Inorg. Chem.* 31, 3647–55, 1992.

108. Tuovinen, O.H., Lapple, W.J., and Mair, D.M., Analytical note—Catalytic effects of sulfur and other compounds in the azide-iodine test, *J. Am. Water Work Assoc.* 73 (2), 126, 1981.

109. Stedman, G., Mechanism of the azide-nitrite reaction. Part I, *J. Chem. Soc,* 2943–29, 1959.

110. Stedman, G., Mechansim of the azide-nitrite reaction. Part II, *J. Chem. Soc,* 2949–54, 1959.

111. Stedman, G., Mechansim of the azide-nitrite reaction. Part IV., *J. Chem. Soc,* 1702–9, 1960.

112. Bunn, D., Dainton, F.S., and Duckworth, S., Redox exchange between ferrous ions and $Fen_2^{3+}$ in aqueous solution, *Farad. Soc. Trans.* 57 (8), 1131, 1961.

113. Morgan, G.T. and Cooke, J. H., Benzenesulfonyl derivatives of o-aminoazo compounds. Preliminary note, *Chem. Soc. Proc.* 30, 349, 1914.

114. Dalmia, A., Wasmus, S., Savinell, R.F., and Liu, C.C., Electrochemical-behavior of sodium-azide at Pt and Au electrodes in sodium-sulfate electrolyte, *J. Electrochem. Soc.* 142 (11), 3735–40, 1995.

115. Dalmia, A., Savinell, R.F., and Liu, C.C., The anodic behavior of azide ions on gold and platinum electrodes in neutral electrolyte, *J. Electrochem. Soc.* 143 (6), 1827–33, 1996.

116. Dalmia, A., Wasmus, S., Savinell, R.F., and Liu, C.C., The anodic behavior of azide ions at carbon electrodes in neutral electrolyte, *J. Electrochem. Soc.* 143 (2), 556–60, 1996.

117. Xu, J.S. and Swain, G.M., Voltammetric and amperometric investigations of azide oxidation at the basal plane of highly oriented pyrolytic graphite, *Anal. Chem.* 71 (20), 4603–8, 1999.

118. Miyama, H., Nosaka, Y., and Fukushima, T., Electrochemical-behavior of azide ions on platinum-electrodes, *J. Electrochem. Soc.* 133 (2), 336–8, 1986.

119. Xu, J.Z. and Swain, G.M., Oxidation of azide anion at boron-doped diamond thin-film electrodes, *Anal. Chem.* 70 (8), 1502–10, 1998.

120. Amadelli, R., Maldotti, A., Bartocci, C., and Carassiti, V., Esr spin-trapping investigation of azide oxidation on CdS and ZnO suspensions, *J. Phys. Chem.* 93 (17), 6448–53, 1989.

121. Banerjea, D. and Singh, I.P., Association of metal ions with azide: polarographic study, *J. Indian Chem. Soc.* 39, 353–5, 1962.

122. Haul, R. and Scholz, E., Polarographic study of the azide ion, *Naturwissenschaften* 32, 294–5, 1944.

123. Basolo, F. and Pearson, R. G., *Mechanisms of Inorganic Reactions* Wiley, New York, 1967.

124. Haim, A. and Taube, H., Formation of $Co(NH_3)_5^{x+2}$ Complexes by reaction of $Co(NH_3)_5^{n3+2}$ with $HNO_2$ in presence of various anions—Mechanism of substitution reactions of pentaamminecobalt(III) complexes, *Inorg. Chem.* 2 (6), 1199–203, 1963.

125. Barca, R., Ellis, J., Tsao, M.S., and Wilmarth, W.K., Pentacyano complexes of cobalt(3). 4. Kinetics and mechanism of substitution of water in $Co(CN)_5OH_2^{2-}$ by pyridine ammonia hydrazine and hydrazinium ion, *Inorg. Chem.* 6 (2), 243, 1967.

126. Abouelwafa, M.H.M., Burnett, M.G., and McCullagh, J.F., The relative nucleophilic efficiency of water and the thiocyanate ion in the acid-catalyzed substitution of azidopentacyanocobaltate(III), *J. Chem. Soc.-Dalton Trans.* (10), 2083–9, 1986.

127. Ricca, B., Sulla reazione dell'ione ferrico con gli ioni azotirico solfocianico ed acetico, *Gaz. Chim. Ital.* 75, 71–7, 1945.

128. Drummond, J. and Wood, J.S., The structure of a five-coordinate complex of iron: the penta-azidoiron(III) ion, $Fe(N_3)_5^{2-}$, *Chem. Commun.*, 1373, 1969.

**455**

129. Wallace, R.M. and Dukes, E.K., Spectrophotometric study of reaction between ferric ion and hydrazoic acid, *J. Phys. Chem.* 65 (11), 2094, 1961.

130. Seewald, D. and Sutin, N., Kinetics of formation of monoazide complex of iron(III), *Inorg. Chem.* 2 (3), 643–5, 1963.

131. Field, L.D., George, A.V., Pike, S.R., Buys, I.E., and Hambley, T.W., Synthesis and reactions of azido complexes of iron, *Polyhedron* 14 (20–21), 3133–7, 1995.

132. Dinapoli, J., Hall, A.H., Drake, R., and Rumack, B.H., Cyanide and arsenic poisoning by intravenous (IV) injection, *Vet. Human Toxicol.* 30 (4), 360, 1988.

133. Biffin, M.E.C., Miller, J., and Paul, D.B., Introduction of the azido group, in *Chemistry of the Azido Group*, Patai, S. Interscience, London, 1971, pp. 57–190.

134. Banthorpe, D.V., Rearrangements involving azido groups, in *Chemistry of the Azido Group*, Patai, S. Interscience, London, 1971, pp. 405–16.

135. Hillman, M.E.D., Kinetics and mechansim of the reaction of hydrazoic acid with substituted benzoic acids, *Diss. Abstr.* 19, 2763, 1959.

136. Couladouros, E.A., Plyta, Z.F., and Haroutounian, S.A., Efficient synthesis of aminonaptho-quinones and azidohydroquinones: mechanistic considerations of the reaction of hydrazoic acid with quinones. An overview., *J. Org. Chem.* 62, 6–10, 1997.

137. Breton, G.W., Daus, K.A., and Kropp, P.J., Surface-mediated reactions. 2. Addition of hydrazoic acid to alkenes, *J. Org. Chem.* 57, 6646–9, 1992.

138. Minisci, F. and Galli, R., Influence of the electrophilic character on the reactivity of free radicals in solution reactivity of alkoxy, hydroxy, alkyl and azido radicals in presence of olefins, *Tetrahedron Lett.* (12), 533–8, 1962.

139. Fortin, Y., Phoenix, P., and Drapeau, G.R., Mutations confering resistance to azide in Escherichia coli occur primarily in the secA gene, *J. Bacteriol.* 172, 6607–10, 1990.

140. Lederberg, J., The selection of genetic recombinations with bacterial growth inhibitors, *J. Bacteriol.* 59, 211–5, 1950.

141. Oliver, D.B., Cabelli, R.J., Dolan, K.M., and Jaroski, G.P., Azide-resistant mutants of Escherichia coli alter the SecA protein, an azide-sensitive component of the protein export machinery, *Proc. Nat. Acad. Sci., USA* 87, 8227–31, 1990.

142. Banic, S., Production of sodium azide inactivating substance by resistant mutants of Salmonella typhimurium and other bacteria, *J. Chemother.* 8 (6), 432–7, 1996.

143. Robinson, J.F., Burgess, B.K., Corbin, J.L., and Dilworth, M. J., Nitrogenase reactivity: azide reduction, *Biochemistry* 24, 273, 1985.

144. Stryer, L., Kendrew, J.C., and Watson, H.C., The mode of attachment of the azide ion to sperm whale metmyoglobin, *J. Molec. Biol.* 8, 96, 1964.

145. Deathearage, J.F., Obendorf, S.K., and Moffat, K., Structure of azide methemoglobin, *J. Molec. Biol.* 134, 419, 1979.

146. Beetlestone, J.G. and Irvine, D.H., Reactivity differences between haemoglobins. VII. The efect of ionic strength on the affinity of methaemoglobins A and C for azide ion. A test of the dielectric cavity model for methaemoglobins, *J. Chem. Soc*, 951, 1968.

147. Gibson, Q.H., Parkhurst, L.J., and Geraci, G., The reaction of methemoglobin with some ligands, *Biol. Chem.* 244, 4668, 1969.

148. Holzwarth, J.F., Meyer, F., Pickard, M., and Dunford, H.B., Mechanism of azide binding to chloroperoxidase and horesradish peroxidase: use of and iodine laser temperature-jump apparatus, *Biochemistry* 27, 6628–33, 1988.

149. Little, R.H., Cheesman, M.R., Thomson, A.J., and Watmough, N.J., Cytochrome bo from escherichia coli: binding of azide to CuB, *Biochemistry* 35, 13780–7, 1996.

150. Lin, J., Merryweather, J., Vitello, L. B., and Erman, J. E., Metmyoglobin/azide: The effect of heme-linked ionizations on the rate of complex formation, *Arch. Biochem. Biophys.* 362, 148–58, 1999.

151. Marques, H.M., Breet, E.L.J., and Prinsloo, F.F., Kinetics of reaction of aquacobalamin with azide ion and hydrazoic acid: pH profile and activation parameters, *J. Chem. Soc.-Dalton Trans.* (11), 2941–4, 1991.

152. Misra, H.P. and Fridovich, I., Inhibition of superoxide dismutases by azide, *Arch. Biochem. Biophys.* 189, 317, 1978.

153. Zitomer, D.H. and Speece, R.E., Methanethiol in nonacclimated sewage-sludge after addition of chloroform and other toxicants, *Environ. Sci. Technol.* 29 (3), 762–8, 1995.

154. Betterton, E.A., Environmental fate of sodium azide derived from automobile airbags, *Abstr. Pap. Am. Chem. Soc.* 219, 9ENVR, 2000.

155. Cochran, V.L., Papendic, R.I., and Woody, W. M., Effectiveness of 2 nitrification inhibitors for anhydrous ammonia under irrigated and dryland conditions, *Agron. J.* 65 (4), 649–53, 1973.

156. Beste, C.E., *Herbicide Handbook of the Weed Science Society of America* 5 ed. Weed Science Society of America, Champaign, IL, 1983.

157. Ketchersid, M.L. and Merkle, M.G., Dissipation and phytotoxicity of sodium azide in soil, *Weed Sci.* 24 (3), 312–5, 1976.

158. Parochet, J.V. and Warren, G.F., Behavior of potassium azide in soil, *Weed Sci.* 18 (5), 555, 1970.

159. Bradbury, F.R., Campbell, A., Suckling, C.W., Jameson, H.R., and Peacock, F.C., The nematicidal properties of azides, *Ann. Appl. Biol.* 45 (2), 241–50, 1957.

160. Helling, C.S. and Thompson, S.M., Azide and ethylenethiourea mobility in soils, *Soil Sci. Soc. Am. J.* 38 (1), 80–5, 1974.

161. Guymon, E.P., Sodium azide breakdown in soil. Final report to Automotive Occupant Restraints Council: Safety Health and Environment Committee, Weber State University, Ogden, UT, 1997.

162. Guymon, G.R., *Decomposition of sodium azide in soil*, M.S. Thesis, Utah State University, 1998.

163. Sparrow, L.A. and Uren, N.C., Oxidation and reduction of Mn in acidic soils—Effect of temperature and soil pH, *Soil Biol. Biochem.* 19 (2), 143–8, 1987.

164. Wolf, D.C., Dao, T.H., Scott, H.D., and Lavy, T.L., Influence of sterilization methods on selected soil microbiological, physical, and chemical-properties, *J. Environ. Qual.* 18 (1), 39–44, 1989.

165. Grolimund, D., Barmettler, K., and Borkovec, M., Release and transport of colloidal particles in natural porous media 2. Experimental results and effects of ligands, *Water Resources Res.* 37 (3), 571–82, 2001.

166. Lin, S.H. and Huang, C.P., Adsorption of hydrazoic acid from aqueous solution by macroreticular resin, *J. Hazard. Mater.* 84, 217–28, 2001.

167. Roberson, C.E. and Austin, C.M., Colorimetric estimation of milligram quantities of inorganic azides, *Anal. Chem.* 29 (5), 854–5, 1957.

168. Anton, A., Dodd, J.G., and Harvey, A.E., Spectrophotometric determination of azide with ferric perchlorate, *Anal. Chem.* 32 (9), 1209–10, 1960.

169. Tsuge, K., Kataoka, M., and Seto, Y., Rapid determination of cyanide and azide in beverages by microdiffusion spectrophotometric method, *J. Anal. Toxicol* 25, 228–36, 2001.

170. Blais, M., Microdetermination of nitrogen and lead in lead azide, *Microchem. J.* 7, 464–72, 1963.

171. Kage, S., Kudo, K., and Ikeda, N., Determination of azide in blood and urine by gas chromatography-mass spectrometry, *J. Anal. Toxicol* 24, 429–32, 2000.

172. Zehner, J.M. and Simonaitis, R.A., Gas chromatographic determination of hydrazoic acid, *J. Chrom. Sci.* 14, 493–4, 1976.

173. OSHA, Sodium azide and hydrazoic acid in workplace atmospheres. ID-211, OSHA Salt Lake Technical Center, Salt Lake City, 1992.

174. Oshima, H., Ueno, E., Saito, I., and Matsumoto, H., Determination of sodium azide in beverages by ion chromatography, *J. AOAC Intl.* 83, 1410–4, 2000.

175. Puskar, M.A., Fergon, S.M., and Hecker, L.H., A short-term solid sorbent determination of hydrazoic acid in air, *Amer. Ind. Hygiene Assoc. J.* 52 (1), 14–9, 1991.
176. Bereznitski, Y., LoBrutto, R., and Grinberg, N., Trace analysis of sodium azide in an organic matrix, *Journal of Liquid Chromatography and Related Technologies* 24, 2111–20, 2001.
177. Gurst, J.E., Characterization and determination of organic azides, in *Chemistry of the Azido Group*, Patai, S. Interscience, London, 1971, pp. 191.
178. Wheatley, A.D., Sadhra, S., and Beach, J.R., Exposure to toxic gas and particle phase pollutants evolved during deployment of airbags in vehicles, *Indoor Built Environ.* 6 (3), 134–9, 1997.
179. Anonymous, Driver air bag technical data sheet, Morton International, Inc., Ogden, 1990, pp. 1.
180. Dean, J.A., *Lange's Handbook of Chemistry*, 14th ed. McGraw-Hill, New York, 1992.
181. Budavari, S., O'Neil, M.J., Smith, A., and Heckelman, P.E., *The Merck Index*, 11th ed. Merck, Rathway, NJ, 1989.
182. Carducci, M., Personal communication, Tucson, 2000.

# *Sodium Nitrite in Processed Meat and Poultry Meats: A Review of Curing and Examining the Risk/Benefit of Its Use*

*by*
*Jeffrey J. Sindelar and Andrew L. Milkowski*
*University of Wisconsin*

AMSA White Paper Series
Number 3
November, 2011



**American Meat Science Association**

AMERICAN MEAT SCIENCE ASSOCIATION
WHITE PAPER SERIES

NUMBER 3                                                    NOVEMBER, 2011

# Sodium Nitrite in Processed Meat and Poultry Meats: A Review of Curing and Examining the Risk/Benefit of Its Use

*Jeffrey J. Sindelar and Andrew L. Milkowski*

## Introduction

Meat and poultry curing is one of the oldest forms of food preservation still in use today. Before the advent of refrigeration, fish and meat were preserved by methods found effective to control spoilage after animal harvest and to extend food supplies during times of scarcity. Although lost in antiquity, the curing process for meats is believed to have derived from preservation methods with salt as early as 3,000 B.C. (Romans et al., 2001). Over time, the realization that salt contaminated with saltpeter (potassium nitrate) was responsible for curing, would unknowingly provide the basis for the beginnings of unraveling the mystery of curing.

With the development of refrigeration and food packaging technologies, the original purpose of curing highly perishable foods for preservation purposes has been widely replaced with creating convenience and variety for consumers (Pegg, 2004). The meat and poultry industry has greatly benefited from the use of sodium nitrite by allowing for the production of products with improved food safety and an extended shelf-life with excellent storage stability (Pegg and Shahidi, 2000). In fact, many of today's processed meat products that are most enjoyed by consumers contain sodium nitrite. Sodium nitrite allows for the existence of meat and poultry products with unique colors, textures, and flavors which cannot be recreated by any other ingredient (Sebranek, 1979).

The use of sodium nitrite for curing, however, has not been without controversy. Due to a strong debate in the 1970s surrounding certain nitroso compounds with potential to yield carcinogenic nitrosamines, the use of nitrite for curing was nearly banned (Cassens, 1990, 1997a). As a result, several steps were taken by both industry and government to significantly reduce the risk of nitrosamine formation and alleviate potential human health concerns. Since that time, health concerns involving risks related to cancer and leukemia, believed to be directly related to the consumption of nitrite cured meat and poultry products, have periodically resurfaced. Each of these occurrences has been addressed scientifically reassuring the public of the safety of nitrite usage in cured meats.

Research conducted since the mid-1980s has suggested that nitrite is a significant molecule important for human health. New scientific discoveries are now providing a better understanding of the profound and important roles nitrite plays in normal body functions. Dietary nitrates from vegetable consumption, for example, have been shown to serve as significant sources for the endogenous production of nitrite and nitric oxide in the human body. As a product of enzymatic synthesis in humans, nitric oxide controls blood pressure, immune response, wound repair, and neurological functions (Hunault et al., 2009). Recent research has clearly shown that nitric oxide can be produced directly from nitrite and is involved in controlling blood flow in cardiac muscle and potentially other tissues (Bryan et al., 2007; Bryan and Hord, 2010). Further, the normal production of nitric oxide and nitrite may prevent various types of cardiovascular disease including hypertension, atherosclerosis, and stroke (Bryan et al., 2007; Hunault et al., 2009).

**Authors:** *Jeffery J. Sindelar and Andrew L. Milkowski, University of Wisconsin, Department of Animal Sciences, Meat Science and Muscle Biology Laboratory, 1805 Linden Drive, Madison, WI 53706, USA jsindelar@wisc.edu*

**Reviewers:** *AMSA Scientific Information Committee, Mark Kreul, Chair*

*This project was funded in part by a grant from the American Meat Science Association Educational Foundation*

*http://www.meatscience.org/SodiumNitriteReview.aspx*

*© 2011 American Meat Science Association. All rights reserved*

# Product-Related Benefits of Curing with Nitrite

Nitrite is considered an essential curing ingredient responsible for 'fixing' the characteristic color associated with cured meats, creating a unique flavor profile that is distinguishable from products not containing nitrite, providing control of the oxidation of lipids, and serving as an effective antimicrobial by itself or synergistically with other ingredients (Sebranek and Fox, 1985; Townsend and Olson, 1987; Pegg, 2004). Nitrate, also considered a curing ingredient, is only effective in the same manner as nitrite if first reduced to nitrite. This reduction can be accomplished by either naturally present bacteria on the meat or by the addition of bacteria possessing nitrate reductase activity (Gray et al., 1981; Sebranek and Bacus, 2007). Although used very little today, nitrate is still included in products, such as dry sausages and dry-cured hams, where an extended maturing process necessitates a long term reservoir of nitrite. More recently, nitrate reduction is a common mode of action for indirect curing of "Natural" and "Organic" processed meats made specifically to simulate the typical curing process. For the remainder of this review, we will consider nitrite (and not nitrate) the true curing ingredient.

Tracing back to the origins of curing, the exact discovery of saltpeter (potassium nitrate) may never be known but is generally accepted to be associated with the inadvertent contamination of salt used for the sole purpose of meat preservation centuries ago. As the use of preservation practices resulting in meat with a 'fixed' red color and a unique flavor increased, the practice of treating meat with salt, saltpeter, and smoke became more commonplace (Pegg and Shahidi, 2000). Late in the 19th century and early in the 20th century, classical discoveries about meat curing were made by pioneering scientists E. Polenske, J. Haldane, K. Kisskalt, R. Hoagland, and K. B. Lehman. These scientists were able to create the foundational understanding of curing ingredients in that nitrite, and not nitrate, was responsible for meat curing (Cassens, 1990).

From the time of discovering nitrate and nitrite, maximizing the benefits these unique ingredients offer while adding them at sufficient levels to still achieve the functional benefits of adding them to meat and poultry products have both changed and stayed the same over time. Upon the discovery of curing compounds, sausage and cured meat products that were once heavily spiced and cured for preservation reasons were slowly being refined to meet flavor characteristics that were deemed desirable by consumers (Cerveny, 1980). Unknowingly, these compounds allowed for the emergence of early ready-to-eat type meat products. By using significantly less salt and/or other preservation methods due to the introduction and incorporation of nitrate or nitrite, meat and poultry products began to move from a state of unsatisfactory quality and poor shelf-life to improved quality and longer shelf life. As meat curing has evolved, it has changed from an inexact art to a sophisticated science. Decades of research have been performed to better understand the quality and safety improvement observations that were made centuries ago. Due to the complexity of curing and curing related reactions, this research continues today. Nitrite is considered a fascinating, remarkable, irreplaceable, and yet not clearly understood ingredient which imparts distinctive properties common to all, and yet only, cured meat products. Also of interest are the clear benefits of using nitrite from both a microbiological as well as a qualitative standpoint.

## Quality Impact from Curing

**Color.** The fixation of a desirable red color, shaded pink, is the most obvious effect from nitrite addition and is often considered an extremely important attribute for consumer acceptance (Cornforth and Jayasingh, 2004). Interestingly, very little nitrite is needed to induce a cured color. It has been reported that as little as 2 to 14 parts per million (ppm), depending on species, is necessary to induce a cured color. However, significantly higher levels are required to prevent rapid fading and non-uniform curing while also maintaining cured color throughout an extended shelf life (Sebranek and Bacus, 2007). Investigating the consumer acceptance of hams manufactured with varying levels of nitrite (0, 25, 75, and 125 ppm), DuBose et al. (1981) reported that no significant ($P > 0.05$) differences existed for color among the 25, 75, and 125 ppm nitrite containing samples while all were found different ($P < 0.05$) than the sample containing 0 ppm nitrite. A similar study conducted by Hustad et al. (1973) reported the only differences found between wieners having varying levels of nitrite (0, 50, 100, 150, 200, and 300 ppm) were when comparisons were made to the 0 ppm added nitrite treatment. Sebranek et al. (1977) investigating the consumer acceptance of frankfurters cured with varying levels (0, 26, 52, and 156 ppm) of nitrite found frankfurters containing 156 ppm nitrite to be more acceptable ($P < 0.05$) for color, flavor, and overall acceptability than all other nitrite concentrations. The researchers concluded that nitrite concentration was of critical importance for consumer acceptance of products possessing cured meat characteristics. The aforementioned research are examples of the extensive research studies that supported that minimum levels between 25 and 50 ppm of nitrite were likely sufficient for acceptable cured meat color in most meat and poultry products. However, higher levels would be necessary to achieve and maintain acceptable cured meat color, especially during a long product shelf-life period.

When nitrite is added to meat systems, it reacts with or binds to a number of chemical components such as protein (Cassens, 1997b). Much of the nitrite added during the product manufacturing is either depleted through a series of reactions or physically lost during certain manufacturing steps. Typically, between 10 and 20 percent of the originally added nitrite normally remains after the manufacturing process and those levels

continue to decline during storage (Pérez-Rodríguez et al., 1996; Cassens, 1997b). These levels of nitrite, referred to as residual nitrite, slowly decline over the storage life of cured meat products until they are often nondetectable (Skjelkvåle and Tjaberg, 1974; Eakes and Blumer, 1975; Honikel, 2004). To maintain a cured meat color throughout extended shelf-life, it is generally accepted that a small amount (10–15 ppm) of residual nitrite is needed to serve as a reservoir for the re-generation of cured meat pigment lost from oxidation and light-induced fading (Houser et al., 2005). Color chemistry has been one of the most studied and well understood aspects of nitrite usage and a number of investigations exploring detailed cured meat color chemistry reactions have been reviewed owing to the depth of our current understanding (Sebranek and Fox, 1985; Townsend and Olson, 1987; Pegg and Shahidi, 2000; Sebranek, 2009). The complexity of these reactions, however, underscores what is still not yet known about nitrite chemistry. Many factors contribute to the impressive complexity of this pale yellow crystalline substance. It is well accepted that the production of nitric oxide from nitrite is a required step for cured color. The highly reactive ion, nitrite, itself does not fix the pigment causing cured meat color. Rather, it forms nitrosylating agents by several different mechanisms which then have the ability to transfer nitric oxide that subsequently reacts with myoglobin to produce cured meat color. Further, several significant factors affect the many nitrite curing reactions including meat system pH, the amount of reductants present, temperature, and time (Sebranek, 2009).

*Flavor.* Cured meat flavor associated with nitrite was first described by Brooks et al. (1940) comparing pork cured in brines containing different levels of nitrate and nitrite. The role nitrite has on meat flavor is a complex stimulus involving properties such as aroma/odor, texture, taste, and temperature (Gray et al., 1981). Nitrite chemistry and the associated reactions likely play a role in imparting the unique flavor resulting from the addition of nitrite; however, the specific compounds involved have eluded scientists and are still not yet known. Cured meat flavor continues to be one of the least understood aspects of nitrite curing and can be described as 'at best obscure' (MacDonald et al., 1980b). Although clear differences exist between the cured and uncured versions of the same product (e.g., cured ham vs. fresh ham), little is known about what, specifically, is responsible for these differences. A proposed reason for cured flavor differences between products containing nitrite and those without is due to the nitrite-related suppression of oxidation products; thus controlling rancid flavor compound development (Shahidi, 1998). However, other commonly used antioxidants do not show this same effect. A comparison of salami with and without nitrite by Skjelkvåle and Tjaberg (1974) reported no sensory differences existed between nitrite and non-nitrite containing fermented sausages until after 3 months of storage when the nitrite containing sausage was scored

higher. This research supports the fat oxidation impact of nitrite on cured flavor. Noel et al. (1990), investigating the flavor of cured vs. uncured fermented dry sausages, also found a significant flavor improvement when nitrite was included in the product formulation. Although the reason for the flavor differences was not understood, the authors concluded their results illustrated the extremely important role sodium nitrite plays for specific flavor notes found in cured meats.

In sensory studies, consumer panelists were able to differentiate between samples manufactured with different levels of nitrite (10 or 20 vs. 156 or 200 ppm) (Gray et al., 1981). Examining the importance of nitrite for the development of cured ham aroma and flavor, MacDonald et al. (1980b) found a greater ($P < 0.05$) cured meat flavor in ham containing nitrite compared to ham only containing salt. In addition, nitrite levels as low as 50 ppm was found to be sufficient to induce meat flavor differences as identified by consumer sensory evaluations. Acceptable cured flavor development at lower levels was supported in work by Brown et al. (1974) who found that flavor scores from consumer sensory panelists were not different ($P > 0.05$) between samples containing 91 or 182 ppm of nitrite. Noel et al. (1990), concluded nitrite plays an extremely important role in the development of specific flavor notes as supported by sensory analysis. Cho and Bratzler (1970) demonstrated that cured flavor could be distinguished ($P < 0.05$) in pork longissimus dorsi containing nitrite over those without nitrite using a consumer triangle sensory test. Dethmers and Rock (1975) stated the addition of nitrite above 50 ppm in thuringer sausage reduced off-flavor development and improved the flavor quality, whereas treatments with no added nitrite were considered to be the most rancid and had the poorest flavor quality ($P < 0.05$). Investigating the role of nitrite addition in ham, Froehlich et al. (1983) reported a significant ($P < 0.05$) improvement in trained sensory cured meat flavor intensity scores as ingoing nitrite levels increased from 0, 50, and 100 ppm.

As illustrated, much research has been conducted to better understand the impact that nitrite has on the unique flavor development and characteristics of cured meats. While it is relatively easy to determine consumer acceptance between products with no, extremely low, and normal amounts of nitrite for cooked ham from pork (Froehlich et al., 1983), the chemical identity of cured flavor still remains unknown. Several studies have investigated flavor compounds that may be unique to cured meats with limited success (Ramarathnam et al., 1991a,b, 1993a,b; Shahidi, 1998; Olesen et al., 2004). Through this extensive work, hundreds of compounds have been thus far identified including hydrocarbons, alcohols, ketones, furans, pyrazines, and sulfur- and nitrogen containing heterocycles. Pegg and Shahidi (2000) identified an astonishing 135 volatile compounds in nitrite-cured ham. Although a few of these compounds

may play a role in cured flavor, no definitive confirmation of this currently exists.

Sensory research suggests that cured flavor is not solely a result of retarding lipid oxidation but a combination of a complex cured aroma and flavor in cooperation with a lack of rancid flavors. It is thus possible that a combined effect from the suppression of lipid oxidation by nitrite and the development of nitrite-related flavor, through yet unknown reactions, is responsible for the development of cured meat flavor. If nitrite does form volatile flavor compounds, this premise would suggest an unknown mechanism of nitrite or nitric oxide reactions may exist.

**Lipid Oxidation.** One of the most noteworthy properties of nitrite is its ability to effectively delay the development of oxidative rancidity. This prevention occurs even in the presence of salt, which is a strong oxidant. Lipid oxidation is considered to be a major reason for the deterioration of quality in meat and poultry products which often results in the development of rancidity and subsequent warmed over flavors (Yun et al., 1987; Vasavada and Cornforth, 2005). The rate and degree of lipid oxidation is related to the levels of unsaturated fats present as well as temperature, time, oxygen exposure, the removal of oxygen, and the addition of antioxidants and/or reducing agents (Shahidi, 1998).

The antioxidant effect of nitrite is likely due to the same mechanisms responsible for cured color development involving reactions with heme proteins and metal ions, chelating of free radicals by nitric oxide, and the formation of nitriso- and nitrosyl compounds having antioxidant properties (Sebranek, 2009). The antioxidant effect of nitrite has been well documented (Townsend and Olson, 1987; Pearson and Gillett, 1996; Pegg and Shahidi, 2000; Honikel, 2004). Nitrite has been shown to inhibit warmed over flavor development at relatively low levels. Sato and Hegarty (1971) reported significant inhibition of warmed over flavor development at a 50 ppm nitrite level with complete inhibition at a 220 ppm level. Investigating the effect of nitrite on lipid oxidation in various muscle systems, Morrissey and Tichivangana (1985) reported as little as 20 ppm nitrite was sufficient to significantly ($P < 0.01$) inhibit oxidation of lipid in fish, chicken, pork, and beef systems. These researchers also reported that 50 ppm ingoing nitrite provided a significant ($P < 0.001$) reduction whereas a 200 ppm ingoing level caused a 12-fold reduction in thiobarbituric acid (TBA) values for chicken, pork, and beef suggesting complete inhibition occurred. Fooladi et al. (1979) reported a protective effect against warmed over flavor in cooked, nitrite containing (156 ppm) beef, pork, and chicken compared to samples not containing nitrite. MacDonald et al. (1980a) studied the antioxidant behavior of different levels of nitrite (50, 200, and 500 ppm), butylated hydroxytoluene (BHT) and citric acid, and showed a significant reduction in TBA values when treated with any level of nitrite when compared to a non-nitrite treatment. Of particular interest was the observation that neither BHT nor citric acid was as effective in controlling lipid oxidation when compared to the lowest concentration (50 ppm) of ingoing nitrite. In studying the feasibility of replacing nitrite with sorbate in mortadella, Al-Shuibi and Al-Abdullah (2002) also showed that antioxidant effect of nitrite is present at low levels (40 ppm). Because nitrite is highly effective as an antioxidant, the United States Department of Agriculture (USDA), prohibits the use of synthetic antioxidants in a majority of products already containing nitrite. One exception to this ruling is for dry and semidry sausages when long, slow drying conditions during product manufacture would necessitate additional fat oxidation protection.

### Safety Impact from Curing

Another important function of nitrite is the role it plays as a bacteriostatic and bacteriocidal agent. Although not well understand, nitrite has been shown to have varying degrees of effectiveness on either preventing or controlling the growth of certain bacteria. A recent risk-benefit review of nitrite included a discussion of the antibacterial benefits of nitrite in cured meat products (Milkowski et al., 2010). Generally considered to be more effective against gram-positive bacteria, nitrite has been shown to contribute in controlling growth of pathogenic bacteria. Bauermann (1979) concluded in a study comparing the coliform levels in poultry products with and without nitrite that sodium nitrite does provide improved bacterial shelf-life. Bang et al. (2007) also reported a nitrite-coliform control phenomenon when nitrite was present. Buchanan and Solberg (1972) found a bacteriostatic action of nitrite on *Staphylococcus aureus* and suggested their results provided evidence that *S. aureus* may be effectively controlled with 200 ppm of nitrite. However, other researchers have reported conflicting results as Bayne and Michener (1975) reported no effect on the control of *Staphylococcus*, *Salmonella*, or naturally occurring spoilage bacteria present in frankfurters whether or not nitrite was included.

The inhibitory mechanism which results in the effects nitrite has on some bacteria likely differs among bacterial species (Tompkin, 2005). For example, nitrite is not generally considered to be effective for controlling gram-negative enteric pathogens such as *Salmonella* and *Escherichia coli* (Tompkin, 2005). Even though the specific inhibitory mechanisms of nitrite are not well known, its effectiveness as an antimicrobial is dependent on several factors including residual nitrite level, pH, salt concentration, reductants present, iron content, and others (Tompkin, 2005). As an example, nitrite inhibits bacteria more effectively at low pH (Roberts, 1975; Allaker et al., 2001). Further, the means of antimicrobial action of nitrite is likely attributed to reactions associated with the generation of nitric oxide or nitrous acid. The tolerance of nitric oxide by bacteria varies from acting as a metabolite for some to being toxic for others (Møller and Skibsted, 2002). The presence of nitrous acid has also been suggested to contribute to the antibacterial impact

of nitrite. Therefore, it is likely that nitrite reactions related to the development of cured meat color are related to and important for the antimicrobial properties attributed to nitrite

Before 2000, *Clostridium botulinum* was the most widely recognized bacteria associated with the antimicrobial impact from nitrite addition. The properties of curing with nitrite that also make it an effective antibotulinal compound are dependent on interactions of nitrite with several other factors. Those factors include salt, pH, heat treatment, spore level, ingoing nitrite level during manufacture, and residual nitrite levels in the meat (Roberts and Gibson, 1986). The nature of the competing flora, available iron in the product, and other present additives such as ascorbate, erythorbate, phosphate are other additional factors (Roberts and Gibson, 1986). The antibotulinal effects of nitrite on *C. botulinum* in thermally processed meat product systems takes place at two different stages in the life cycle of the microorganism. The first *C. botulinum* controlling effect of nitrite is the inhibition of vegetative cells emerging from surviving spores. The second controlling effect is preventing cell division in any vegetative cells that do emerge from surviving spores (Pierson and Smooth, 1982).

Less nitrite is needed to provide for color development than to control bacteria (Roberts, 1975). The main portion of nitrite added to cured meats is for *C. botulinum* control whereas only a small portion (roughly 25 ppm or less) is needed for color development (Sofos et al., 1979a). However, as nitrite levels increase, control of *C. botulinum* growth and toxin production also increases (Sofos et al., 1979a). The level of ingoing nitrite is believed to have more impact than the residual level during storage in providing inhibitory control of *C. botulinum* which suggests the formation of antibacterial compounds as a result of nitrite related reactions may be significant (Hustad et al., 1973).

Over the last 20 years, a greater appreciation for the contribution nitrite has in protecting from other food-borne pathogens has developed. Models developed to predict bacterial growth of pathogens such as *Listeria monocytogenes*, show improved effectiveness of antimicrobials like sodium lactate and sodium diacetate in the presence of nitrite (Schlyter et al., 1993; Duffy et al., 1994; Buchanan et al., 1997; McClure et al., 1997; Seman et al., 2002; Gill and Holley, 2003; Legan et al., 2004; USDA, 2006) These estimations predict that growth rates of pathogens such as *L. monocytogenes, E. coli* O157:H7, *S. aureus*, and *Bacillus cereus* are reduced in the presence of nitrite at levels used in cured meat and poultry products (Milkowski et al., 2010).

The complete understanding of the chemistry of nitrite related to cured meat color and flavor, retarding of fat oxidation, and antimicrobial action still remains elusive. After decades of research, only a partial understanding of the mechanisms related to the unique nitrite-related properties exist. It is clear that this highly reactive compound, having the capacity to act as an oxidizing,

reducing, or nitrosating agent and with the ability of being converted to a number of active compounds including nitric oxide, nitrous acid and nitrate, is an important and yet irreplaceable ingredient.

## Nitrate and Nitrite Use in Foods

The use of nitrites to preserve and cure meats evolved centuries ago (Cassens, 1995). Before the discovery of refrigeration, fish and meat were preserved by methods effective for controlling spoilage well past animal harvesting and immediate consumption or to also extend food supplies for a significant period of time. Drying to decrease water activity, smoking, salting, marinating, or pickling foods were commonly used methods of preservation (Pegg and Shahidi, 2000). Modern day curing technologies can still be directly related to early salting procedures.

The exact historical origin of meat curing is unknown but is believed to have been discovered by accident. It is understood and well accepted that impurities in natural salt led to the discovery of modern day meat curing (Pierson and Smooth, 1982; Townsend and Olson, 1987; Pearson and Gillett, 1996). The history of meat processing refers to several accounts of the contamination of salt with saltpeter (potassium nitrate) resulting in a stable red color in the meat (Cassens, 1990). It is unclear whether the saltpeter-cured characteristics were deemed desirable before the 10th century, but during and after the 10th century, the Romans were intentionally adding saltpeter to meat to obtain the desired red color and distinctive flavor. It was not until the 19th century that several scientific investigations to better understand the curing process were prompted by a discovery that pure salt (sodium chloride) did not produce a "cured color" (Pierson and Smooth, 1982).

In the early 1900s, the benefits of meat curing were recognized by the meat industry resulting in broader use of the practice. But with increased use, unsatisfactory and irregular curing was commonplace and was likely associated with the use of both nitrite and nitrate together. Recognizing the potential of "unfit" or unwholesome foods being produced if excessively high levels of nitrate and/or nitrite were used, the USDA Bureau of Animal Industry swiftly facilitated a series of experiments to better understand the formulation level/safety relationship (Binkerd and Kolari, 1975). From these experiments, the following conclusions were made:

1) From one-fourth to 1 oz. of sodium nitrite is sufficient to fix the color in 100 lb, the exact quantity depending on the meat to be cured and process to be employed;

2) Meats cured with sodium nitrite need contain no more nitrites than meats cured with nitrates, and are free from the unconverted nitrates regularly present in nitrate-cured meats;

3) "A shortening of the customary curing period may be obtained by the use of nitrite."

Early US regulatory discussion on the use of nitrate from saltpeter can be found in the regulation 18 Bureau of Animal Industry Order 218. With these conclusions, the first USDA regulations defining the regulatory allowance for nitrate and nitrite use in meat products were established in 1925 permitting no more than 200 ppm ingoing levels of nitrate, nitrite, or combinations thereof. Further research and findings regarding a better understanding of the curing capacity of nitrate, the early concern about nitrosamine formation, and the impact of reductants and acidulants, or so called "cure accelerators" resulted in a re-clarification of curing regulations in 1970 that still exist today (Cassens, 1990). Table 1 illustrates the maximum ingoing allowable limits for various curing agents and curing methods for cured meat products.

The exception to the general limits for curing ingredients is bacon as immersion cured and massaged/pumped bacon (skin off) must have an ingoing level of 120 ppm nitrite while dry-cured is limited to 200 ppm nitrite. Nitrate is not permitted in bacon so that actual concentrations of nitrite can be controlled more precisely. Further, bacon is required to also have either 550 ppm ingoing sodium erythorbate or sodium ascorbate, regardless of curing method, to inhibit the potential for nitrosamine formation during frying (USDA, 2009).

The change from nitrate to nitrite use by the meat industry was not a fast one (Binkerd and Kolari, 1975). In 1930, over 54% of packers were using nitrate compared to only 17% using nitrite. A survey of nitrate and nitrite levels in 1936 reported samples obtained at retail outlets contained an average of 3 to 86 ppm nitrite but alarmingly levels of 160 to 3,900 ppm nitrate. In 1937, a similar survey reported an average of 16 to 102 ppm nitrite and 210 to 3,000 ppm nitrate. From the period of 1970 to 1974, a marked decline in the amount of nitrate being used by the meat industry was found and likely due to the following:

1) A better understanding of meat curing and meat curing chemistry;

2) Advances in meat processing including the use of cure accelerators such as sodium or potassium ascorbate and erythorbate, or their acid form;

3) Regulatory changes for curing ingredients an processing including no longer allowing the use of nitrate in bacon; and

4) A growing consumer concern about the potential negative impacts of consuming nitrite/nitrate containing meat products underlined by the discovery of possible nitrosamine formation.

Detected in certain products where high heat greater than 130°C is employed, such as during the frying of bacon, specific nitrosamines, such as nitrosopyrrolidine, formation can occur. Nitrosamine formation was first identified in 1971 and has periodically resurfaced as a potentially significant risk to human health. The formation of nitrosamines can take place only under special conditions where secondary amines are present, nitrite is available to react, and necessary pH and temperatures exist. If significant levels of residual nitrite are present in products where high heat (>130°C) cooking methods are used, the ability for nitrosamine formation does exist.

Because of this fact and the growing concerns and controversy over nitrite usage, a series of proposed regulations were submitted, reviewed and acted upon in the interest of avoiding a complete ban on nitrite. Proposed nitrite regulations in 1975, centered on nitrosamine formation in bacon and resulted in the reduction of ingoing nitrite in bacon from 200 ppm to 125 ppm and a mandatory ingoing addition of 550 ppm sodium ascorbate or erythorbate. Additional petitions to this proposed rule resulted in a 1978 published final rule requiring the use of 120 ppm ingoing nitrite (or equivalent potassium nitrite of 148), 550 ppm ingoing sodium ascorbate or erythorbate, and the banning of nitrate addition during bacon processing. The rule also included the establishment of a nitrosamine monitoring and regulatory control program. Within one year of the newly developed monitoring program and with the cooperation of industry and government, nearly all bacon manufactured was confirmed free of nitrosamines. Today, a thorough scientific understanding of nitrosamine formation, specific regulatory control, and more stringent plant production practices have essentially eliminated all nitrosamine concerns in meat and poultry products.

## Concerns Associated with Nitrate and Nitrite

Nitrate and nitrite has been a topic of debate for several decades now. Reviewing the history and timeline of the "nitrite dilemma" reveals a long, controversial, heated, and confusion filled period of time. A critical report in the long-lasting nitrite debate was a 1970 paper by Lijinsky and Epstein (1970) titled "Nitrosamines as Environmental Carcinogens" published in *Nature*, which showed that nitrosamines were potent and specific carcinogenic

**Table 1.** Maximum ingoing allowable levels for curing ingredients in meat and poultry in the United States[1]

| Curing agent | Curing method | | | |
| --- | --- | --- | --- | --- |
| | Immersion cured (ppm) | Massaged or pumped (ppm) | Comminuted (ppm) | Dry cured (ppm) |
| Sodium nitrite | 200 | 200 | 156 | 625 |
| Potassium nitrite | 200 | 200 | 156 | 625 |
| Sodium nitrate | 700 | 700 | 1,718 | 2,187 |
| Potassium nitrate | 700 | 700 | 1,718 | 2,187 |

[1]Limits are based on total formulation/brine weight for immersion cured, massaged, or pumped and green weight for comminuted or dry cured products (USDA, 1995).

compounds. Further, the authors concluded the most appropriate means to address the problem was to eliminate one or the other nitrosamine precursors (nitrite and secondary amines). Since all cured meats were viewed as containing both precursors, consumption of cured meat was considered a potential public health hazard. Then, in 1978, news began to leak out to the press about a study nearing completion, with findings suggesting that nitrite, itself, was a carcinogen. The study conducted by Dr. Paul Newberne from the Massachusetts Institute of Technology (MIT), investigating cancer contraction of the lymphatic system in rats, became the centerpiece of heated debates including the USDA, FDA (Food and Drug Administration), media, the meat industry, scientists, and many others (Newberne, 1979). Ultimately, a number of discrepancies found in the study would bring into question the validity of the findings ultimately deemphasizing some of the more sensitive accusations. A specially formed National Academy of Sciences (NAS) committee was created to comprehensively review the available literature including consultations with many experts and organizations. This extensive review resulted in two reports by NAS entitled "The Health Effects of Nitrate, Nitrite, and N-Nitroso Compounds" and "Alternatives to the Current Use of Nitrite in Foods" issued in 1981 and 1982, respectively (NAS, 1981, 1982). Because of these two exhaustive reports, the concerns of nitrite usage were addressed resulting in significant diffusion of the heightened debate and ultimately avoiding a total ban on nitrite as a food additive.

The 1982 National Academy of Sciences report also called for a more thorough evaluation of nitrite in cancer bioassays and thus it was nominated by FDA for study in the National Toxicology Program (NTP). This study was completed in the 1990s and the results were peer reviewed by a panel at a meeting held on May 18, 2000. The review panel concluded that there was no evidence for nitrite induced carcinogenicity in any major tissues of male and female rats and male mice. There was only equivocal evidence for carcinogenicity in the forestomach of female mice (NTP, 2001). This "gold standard" of cancer bioassays was, at the time, the definitive statement of safety for nitrite as an ingredient.

In 1998, the state of California proposed classification of nitrite as a developmental and reproductive toxicant (DART) under their "Proposition 65" law (Safe Drinking Water and Toxic Enforcement Act). In the process, the California Office of Environmental Health Hazard Assessment (OEHHA) staff produced a Hazard Identification Document to support the proposal (Campbell, 2000). The consequence of listing nitrite as DART would have resulted in a requirement to place warning labels on all cured meat products. However, at a public hearing on June 2, 2000, the state's review committee of independent technical experts voted eight to one against this listing. A California Appeals court ruling in 2009 affirmed federal labeling regulation as preempt any potential California

requirements for Federally inspected meat products. That decision was appealed to the California Supreme Court, which declined to hear the case thereby ending the matter in favor of Federal preemption. The NTP and Proposition 65 reviews of nitrite safety in the context of nitrite benefits have been summarized by Archer (2002).

In 2006, another review of the carcinogenicity of nitrite and nitrate was conducted by a working group convened by the International Agency for Research on Cancer (IARC); a part of the United Nations sponsored World Health Organization headquartered in Lyon, France (WHO, 2006a,b), and the results of this review were published in a summary monograph in 2010 (IARC, 2010). During an eight day period in the summer of 2006 the working group composed of epidemiologists, toxicologists, and cancer researchers reviewed the literature and made a decision based on IARC guidelines on classifying nitrate and nitrite for their potential as human carcinogens. Their final conclusion was as follows:

> Ingested nitrate or nitrite under conditions that result in endogenous nitrosation is *probably carcinogenic to humans* (Group 2A) (Grosse et al., 2006).

When carefully examined, this conclusion is very narrow in scope. Under certain conditions, ingested amines and amides can be nitrosated to form carcinogenic nitrosamines and nitrosamides. However, one must question the practical application to any type of public policy or regulatory activity. Because nitrite is also readily formed via metabolism and in saliva, swallowing one's own saliva in combination with any food could be considered a potentially carcinogenic event. Thus, the biological common sense of this classification is open to question (Milkowski et al., 2010).

Despite the published conclusions of the NAS, NTP and Proposition 65 reviews, concerns regarding the safety of nitrate and nitrite use still periodically emerge including those of chemical toxicity, formation of carcinogens, and reproductive and developmental toxicity. In the 1990s, for example, a series of epidemiological studies reported consumption of cured meats was related to brain cancer and childhood leukemia (Peters et al., 1994; Preston-Martin and Lijinsky, 1994; Sarasua and Savitz, 1994; Preston-Martin et al., 1996). As information involving sensitive topics surrounding human health surfaces, media normally and commonly formulate opinionated pieces, often with incomplete explanations of scientific merit. One such example of this was a Washington Post news piece by Maugh (1994) who reported that "Children who eat more than 12 hot dogs per month have nine times the normal risk of development leukemia" and was based on the epidemiological paper "Processed meats and risk of childhood leukemia" written by Peters et al. (1994). Also in 2008, an epidemiological study concluded that "excessive risk" for colorectal cancer exists, attributed to several proposed pathways related to consumption of processed meats (Santarelli et al., 2008). Many epidemiologists

who report associations regarding cured, processed meat and poultry consumption and health risks do not recognize or consider the new findings, knowledge, and understanding surrounding nitrite as a natural metabolite in physiology and its benefits to food safety. The growing number of studies incorporating epidemiological studies have allowed for more interpretation, and at times extrapolation, by media and consumer groups allowing for growing confusion and inaccurate interpretation of the science.

The relationship between diet and cancer continues to be studied by researchers and headlined in the media. Several reports have asserted that red meat and/or processed meat consumption have been associated with higher rates of certain types of cancer. A 2007 report from the World Cancer Research Fund (WCRF), a confederation of cancer research and treatment advocacy groups including the American Institute for Cancer Research (AICR), represented a major global initiative to link diet to cancer (WCRF, 2007). This WCRF report—*Food, Nutrition, Physical Activity and the Prevention of Cancer: a Global Perspective*—was released in November 2007. The report included 10 broad recommendations for cancer prevention regarding diet, lifestyle, and exercise. Specifically, the report made a recommendation to limit red meat consumption to no more than 18 oz (cooked) per week and eliminate processed meat consumption entirely. A subsequent February 2009 Policy Report was issued to seek international public policy changes to promote their opinions on how dietary changes could reduce cancer incidence (WCRF, 2007). The conclusions and recommendations made by WCRF were largely based on weak epidemiological associations and have been challenged by researchers both associated and independent of the meat and poultry industry (Boyle et al., 2008; Truswell, 2009; Alexander and Cushing, 2009; Alexander et al., 2009, 2010a,b; Ferguson, 2010; Huffman and Bryan, 2010; Navia et al., 2010). Numerous factual errors in the WCRF analysis of meat consumption and cancer risk have been acknowledged, however, the organization has maintained that their recommendations are unchanged. The intense debate will continue.

## Biology of Nitric Oxides

### Nitrite and Nitrate as Part of the Nitrogen Oxide Metabolic Cycle

One of the basic approaches in the study of the biochemical and metabolic properties of nitrite in the 1970s and 1980s was to measure consumption and excretion of nitrite and nitrate. The results produced an anomaly. Excretion always seemed to exceed consumption (Tannenbaum et al., 1979; Green et al., 1981a,b). This anomaly implied that synthesis of these compounds was occurring in the body and led to a search for the pathways. In 1987, nitric oxide was identified as the transient factor that caused smooth muscle relaxation (Ignarro et al.,

1987; Ignarro, 1999). It was determined that synthesis of nitric oxide occurred from the amino acid arginine as a substrate and that nitric oxide was metabolized into nitrite and nitrate for excretion as a biological control mechanism (Buga et al.,1989; Gold et al., 1989a,b). Since the late 1980s there has been an explosion of research surrounding the biological functions of nitric oxide.

Nitric oxide is a profoundly active molecule, being involved in control of smooth muscle relaxation, neurotransmission, wound healing, immune response, and a host of other biological functions. In 1998, the Nobel Prize for medicine was awarded to researchers for their efforts in the discovery of the basic functions and synthetic pathways of nitric oxide (Smith, 1998). Typical endogenous nitric oxide is produced at about 1 milligram per kilogram of body weight per day in humans (Tricker, 1997). Being a very reactive molecule, it is quickly bound to heme and oxidized to nitrite and nitrate. The nitrate is circulated in the blood and can be excreted in the urine, sweat, or saliva of the individual. A number of reports have suggested that entero-salivary recirculation of nitrogen oxides serves as a biological adaptation to protect mammals from ingestion of pathogens (Dykhuizen et al., 1996, 1998; Duncan et al., 1997), Additionally, emerging evidence indicates that nitrite itself has a biological function as a signaling molecule independent of nitric oxide (Feelisch et al., 2002; Bryan et al., 2005). Curiously, this function involves nitrosyl and s-nitroso heme species—the very same compounds involved meat curing reactions and the subsequent production of cured meat pigments. Blood pressure control may indeed have circulating nitrite as a component based on studies that show deoxyhemoglobin will reduce nitrite to nitric oxide and cause circulatory vasodilation (Cosby et al., 2003). Deoxymyoglobin has also been shown to act as a nitrite reductase, producing nitric oxide, which participates in regulation of mitochondrial respiration (Shiva et al., 2007). Further, German researchers have proposed classifying nitrite as a "pro-drug" based on its many newly identified physiological functions (Suschek et al., 2006).

At a 2005 symposium at the US National Institutes of Health, researchers highlighted advances in the understanding of nitrite biochemistry, physiology, and therapeutics (Gladwin et al., 2005). The summary from this conference (Gladwin et al., 2005) suggested the following as important areas for continued research:

- "The contribution of NO-dependent and NO-independent signaling in cellular processes regulated by nitrite.

- The mechanisms of cytoprotection afforded by nitrite after ischemia-reperfusion, and the role of endogenous nitrite and diet in modulating these events.

- The role of myoglobin and other heme proteins, xanthine oxidoreductase, and other enzyme

systems in the 'physiological' reduction of nitrite to NO in different tissues at different pH or oxygen gradients.

• The potential role for the nitrite-hemoglobin reaction in regulating vascular homeostasis, signaling and hypoxic vasodilation, and the study of potential intermediates in these reactions and mechanisms of NO export from the red cell."

Figure 1 summarizes the interrelationships of nitric oxide, nitrite, and nitrate. Clearly, nitrite is a metabolite and is naturally made in significant quantities. Exogenous nitrite ingestion is small, by comparison, being at a typical residual level of approximately 10 ppm in commercial cured processed meats (Cassens, 1997a,b; Kilic et al., 2001; Keeton et al., 2009).

Given the complex biology of nitrogen oxides, involving endogenous synthesis, metabolic conversions and recycling via the entero-salivary pathway, estimates of total human exposure are difficult to make. Often they have focused on diet or water as exogenous sources while ignoring the latter. These potential sources for error have been more recently addressed in a few publications. Hord et al. (2009) summarized dietary intake estimates of nitrite and nitrate for the "DASH" (dietary approaches to stop hypertension) diet that included two scenarios for vegetables and fruit consumption. They indicated that a high nitrate intake from these sources could result in as much as 5 mg nitrite ingestion via recycling in the saliva and reduction of nitrate to nitrite by oral bacterial. An overall summary of this exposure was developed by Milkowski (2011) and is shown in Table 2.

## Medical Uses of Nitrogen Oxides

Since the discovery of nitric oxide, numerous therapeutic uses of targeted delivery of nitric oxide in specific tissues have been identified. Newborn infants, both full term and



The human nitrogen cycle. Dietary nitrate is rapidly absorbed into the bloodstream, where it mixes with endogenous nitrate from the NOS/NO pathway. A large portion of nitrate is taken up by the salivary glands, secreted with saliva and reduced to nitrite by symbiotic bacteria in the oral cavity. Salivary-derived nitrite is further reduced to NO and other biologically active nitrogen oxides in the acidic stomach. Remaining nitrite is rapidly absorbed and accumulates in tissues, where it serves to regulate cellular functions via reduction to NO or possibly by direct reactions with protein and lipids. NO and nitrite are ultimately oxidized to nitrate, which again enters the enterosalivary circulation or is excreted in urine.

**Figure 1. The human nitrogen cycle. Reprinted by permission from Macmillan Publishers Ltd: Nature Chemical Biology. M. T. Gladwin, A. N. Schechter, D. B. Kim-Shapiro, R. P. Patel, N. Hogg, S. Shiva, R. O. Cannon, M. Kelm, D. A. Wink, M. G. Espey, E. H. Oldfield, R. M. Pluta, B. A. Freeman, J. R. Lancaster, M. Feelisch, and J. O. Lundberg. 2005. The emerging biology of the nitrite anion. Nat. Chem. Biol. 1:308–314, copyright 2005.**

**Table 2.** Ranges of nitrate, nitrite and nitric oxide exposure form diet, endogenous synthesis and recycling for adult humans expressed as milligrams per day

| Source | Nitrate (mg/kg NO$_3^-$) | Nitrite (mg/kg NO$_2^-$) | Nitric oxide (mg/kg NO) |
|---|---|---|---|
| Diet (excluding cured processed meat)[1] | 50–220 | 0–0.7 | — |
| From 75 g/day cured processed meat intake[2] | 1.5–6 | 0.05–0.6 | — |
| Water[3] | 0–132 | 0–10 | — |
| Saliva[4] | >30–1,000 | 5.2–8.6 | — |
| Endogenous synthesis[5] | — | — | 70 |

[1]Based on IARC Table 1.8 (IARC, 2010).
[2]Based on Keeton et al. (2009) average values and intake described in White (1975).
[3]Based on none present to US EPA maximum allowed contaminant level f or water of 44 ppm and 2.7 L water consumption/day.
[4]Based on data from White (1975) and Hord et al. (2009) and includes both recycling of diet derived nitrate via the enterosalivary route and that from endogenous NO.
[5]Based on 1 mg/kg per day endogenous synthesis for 70 kg adults (Tricker, 1997).

premature, with a variety of pulmonary problems are now treated with nitric oxide gas to relieve respiratory distress (Kinsella and Abman, 2005; Lonnqvist and Jonsson, 2005; Sehgal et al., 2005). Heart medications utilize the delivery of nitric oxide to dilate smooth muscles and improve oxygenation of heart tissue. The long utilized cardiac drug, nitroglycerin, is a nitric oxide delivery vehicle (Clermont et al., 2003; Buch et al., 2004). Nitrite itself has been demonstrated to protect against reperfusion injury in cardiac ischemia (Bryan et al., 2007, 2008; Garg and Bryan, 2009).

Another particularly active area of research involves skin. Psoriasis, acne, and other skin disorders are being treated with nitrite and nitric oxide delivery drugs (Weller et al., 1997, 1998, 2001; Schwentker et al., 2002; Weller, 2003; Seabra et al., 2004). The response of skin tissue to UV light and wound healing are beneficially affected by nitric oxide and nitrite. (Childress and Stechmiller, 2002; Suschek et al., 2003, 2005, 2006; Luo and Chen, 2005; Broughton et al., 2006).

Although it is not widely realized, potassium nitrate is used in many toothpaste formulations. Toothpaste designed for sensitive teeth is formulated with up to five percent potassium nitrate (Manochehr-Pour et al., 1984; Silverman, 1985; Cohen et al., 1994; Orchardson and Gillam, 2000; Poulsen et al., 2001; Tzanova et al., 2005; Wara-aswapati et al., 2005). These products can be purchased at any drugstore.

## A World Without Meat Curing

Curing agents, namely nitrite, provide a number of important and unique cured meat characteristics already discussed. Each important function of nitrite has is

deemed beneficial by different entities (e.g., consumers or manufacturers) and for specific reasons. The color fixing and flavor development properties are considered desirable by consumers and thus manufacturers of cured meats have a great interest in using nitrite as an ingredient for both quality-related and economic reasons. An extended storage time due to the protection of lipids from oxidation can be viewed as a benefit to both manufacturers and consumers as both parties receive quality and economic benefit if product degradation is decreased. A long storage shelf-life provides manufacturers with greater flexibility in warehousing, distribution, and retail display times. A product formulated to maintain quality and safety longer in a consumer's home is considered an important benefit to the consumer and the manufacturer. A cured product with the potential of a longer refrigerated quality shelf life, even after package opening, can allow for maintaining certain quality attributes beyond that of uncured versions and result in less urgency for customers to use or consume the product before it "goes bad."

Since nitrite is an ingredient that has been shown to be an effective antimicrobial with bacteriostatic activity, its usage is clearly a benefit to both industry and consumers. With the relentless approach to ensuring the safety of meat and poultry products, nitrite (in addition to Good Manufacturing Practices and well established intervention strategies) is a powerful tool that the meat and poultry industries can use judiciously to help ensure, on a daily basis, the safest products are reaching their consumers. Although the level of nitrite needed for providing maximum effectiveness against many pathogens is still debated, a great deal of evidence supports that nitrite has an effect on many different bacteria in a variety of different processed meat products. The effect of nitrite in the control of *C. botulinum* is indisputable and well documented serving as a compelling and important reason for widespread meat and poultry industry use. Although rarely considered a concern by consumers, botulism has been completely controlled by nitrite use in cured meat products.

A world without meat curing would present some extraordinary challenges and concerns to both industry and consumers alike. The immediate ramifications would likely be a significant increase in finished product cost, a considerable increase of consumer dissatisfaction, and an increased challenge to control microbial growth. The long-term consequence would be many steps backwards on the already scientifically supported knowledge base surrounding the improved safety, quality, and health effects of nitrite. Throughout the past several decades, substitution of nitrite with alternative ingredients has been extensively studied but has been unsuccessful in identifying a comparable ingredient replacement.

The difficult challenge has been to identify an ingredient that would provide the same product characteristics of nitrite without representing a health hazard. Indeed, much research has identified ingredients such as sorbic acid (Sofos et al., 1979b), short-chain alkynoic and

alkenoic acids and esters (Huhtanen et al., 1985), various organic acids (Miller et al., 1993), and cooked, cured-meat pigment (Shahidi and Pegg, 1992). Several of the aforementioned ingredients have been found only limited effectiveness. Although single ingredient alternatives are usually effective for only replacing one of the important characteristics of nitrite, full replacement has not been successful through numerous scientific investigations, even with combinations of ingredients. In fact, to date, no ingredient has ever been identified that effectively reproduces all the important properties of stabilizing color, producing flavor, preventing fat oxidation, changing texture, and acting as a preservative as effectively as nitrite.

The substantiating importance of meat and poultry curing can be demonstrated by the widespread interest in "natural curing" of natural or organic meat products. Although natural and organic labeling standards ban the addition of any synthetic chemical, including nitrite and nitrate, the importance of curing by the industry coupled with the quality demands from consumers has fostered the development of creative, new, and novel technologies where curing from an indirect approach is commonplace in these categories of products. Because of the high regard for the important properties of cured meats, a majority of natural and organic processed meat products labeled "uncured" are actually quite the opposite. As a result, "naturally cured" products, because of indirect nitrite inclusion, have again provided consumers with variety, convenience, and satisfaction while giving manufacturers improved quality, shelf-life and safety.

## Summary

Curing with nitrite has been used, essentially, for thousands of years to produce safe and nutritious products and to effectively preserve meat. Since the controversies about the safety of nitrite that started in the mid-20th century, much has been learned about nitrite and heme chemistry and the overall metabolism of nitrogen oxides in humans. Curing practices in the meat and poultry industries have been adjusted using the knowledge obtained about nitrosamine risks. The ongoing research focused on the metabolism of nitric oxide, nitrite, and nitrate appears to reaffirm the safety and benefits of current curing practices. The challenge to meat scientists is two-fold. First, is to continually broaden their understanding of curing in the context of human physiology and metabolism of nitrite and to keep current on the medical literature in this area. The second is to effectively educate a broad community of public health scientists, nutritionists, and the general public about the fundamental role of nitrite in biology in order to address their unfounded fears and concerns about adverse health effects from consuming cured meat and poultry products.

## References

Al-Shuibi, A. M., and B. M. Al-Abdullah. 2002. Substitution of nitrite by sorbate and the effect on properties of mortadella. Meat Sci. 62:473–478.

Alexander, D. D., and C. A. Cushing. 2009. Quantitative assessment of red meat or processed meat consumption and kidney cancer. Cancer Detect. Prev. 32:340–351.

Alexander, D. D., C. A. Cushing, K. A. Lowe, B. Sceurman, and M. A. Roberts. 2009. Meta-analysis of animal fat or animal protein intake and colorectal cancer. Am. J. Clin. Nutr. 89:1402–1409.

Alexander, D. D., A. J. Miller, C. A. Cushing, and K. A. Lowe. 2010a. Processed Meat and Colorectal Cancer: A Quantitative Review of Prospective Epidemiologic Studies. Technical report for National Cattlemen's Beef Association. Accessed Apr. 5, 2010. http://www.beefresearch.org/CMDocs/BeefResearch/Nutrition%20Research/NCBA%20Cancer%20Report%20100r%20Web.pdf.

Alexander, D. D., L. M. Morimoto, P. J. Mink, and K. A. Lowe. 2010b. Summary and meta-analysis of prospective studies of animal fat intake and breast cancer. Nutr. Res. Rev. 25:1–11.

Allaker, R. P., L. S. Silva Mendez, J. M. Hardie, and N. Benjamin. 2001. Antimicrobial effect of acidified nitrite on periodontal bacteria. Oral Microbiol. Immunol. 16:253–256.

Archer, D. L. 2002. Evidence that ingested nitrate and nitrite are beneficial to health. J. Food Prot. 65:872–875.

Bang, W., D. J. Hanson, and M. A. Drake. 2007. Effect of salt and sodium nitrite on growth and enterotoxin production of *Staphylococcus aureus* during the production of air-dried fresh pork sausage. J. Food Prot. 71:191–195.

Bauermann, J. F. 1979. Processing of poultry products with and without sodium nitrite. Food Technol. 33:42–43.

Bayne, H. G., and H. D. Michener. 1975. Growth of *Staphylococcus* and *Salmonella* on frankfurters with and without sodium nitrite. Appl. Microbiol. 30:844–849.

Binkerd, E. F., and O. E. Kolari. 1975. The history and use of nitrate and nitrite in the curing of meat. Food Cosmet. Toxicol. 13:655–661.

Boyle, P., P. Boffetta, and P. Autier. 2008. Diet, nutrition and cancer: Public, media and scientific confusion. Ann. Oncol. 19:1665–1667.

Brooks, J., R. B. Haines, T. Moran, and J. Pace. 1940. The function of nitrate, nitrite and bacteria in the curing of bacon and hams. Great Britain Food Investigation Board, Special Report, 49-59.

Broughton, G., J. E. Janis, and C. E. Attinger. 2006. The basic science of wound healing. Plast. Reconstr. Surg. 117:12S–34S.

Brown, C. L., H. B. Hedrick, and M. E. Bailey. 1974. Characteristics of cured hams as influenced by levels of sodium nitrite and sodium ascorbate. J. Food Sci. 39:977–979.

Bryan, N. S., J. W. Calvert, J. W. Elrod, S. Gundewar, S. Y. Ji, and D. J. Lefer. 2007. Effects of dietary nitrite and nitrate on myocardial ischemia/reperfusion injury. Proc. Natl. Acad. Sci. USA 104:19144–19149.

Bryan, N. S., J. W. Calvert, S. Gundewar, and D. J. Lefer. 2008. Dietary nitrite restores NO homeostasis and is cardioprotective in endothelial nitric oxide synthase-deficient mice. Free Radic. Biol. Med. 45:468–474.

Bryan, N. S., B. O. Fernandez, S. M. Bauer, M. F. Garcia-Saura, A. B. Milsom, T. Rassaf, R. E. Maloney, A. Bharti, J. Rodriguez, and M. Feelisch. 2005. Nitrite is a signaling molecule and regulator of gene expression in mammalian tissues. Nat. Chem. Biol. 1:290–297.

Bryan, N. S., and N. G. Hord. 2010. Dietary nitrates and nitrites: The physiological context for potential health benefits. In Food, Nutrition and the Nitric Oxide Pathway: Biochemistry and Bioactivity. N. S. Bryan, ed. DESTech Publications Inc., Lancaster PA.

Buch, A. N., S. Chowdhary, J. H. Coote, and J. N. Townend. 2004. Effects of nitroglycerin treatment on cardiac autonomic control in heart failure. Clin. Auton. Res. 14:9–14.

Buchanan, R. L., M. H. Golden, and J. G. Phillips. 1997. Expanded models for the non-thermal inactivation of *Listeria monocytogenes*. J. Appl. Microbiol. 82:567–577.

Buchanan, R. L., and M. Solberg. 1972. Interaction of sodium nitrate,

oxygen and pH on growth of *Staphylococcus aureus*. J. Food Sci. 37:81–85.

Buga, G. M., M. E. Gold, K. S. Wood, G. Chaudhuri, and L. J. Ignarro. 1989. Endothelium-derived nitric oxide relaxes nonvascular smooth muscle. Eur. J. Pharmacol. 161:61–72.

Campbell, M. 2000. Evidence on Developmental and Reproductive Toxicity of Sodium Nitrite: Draft Hazard Identification Document. California Environmental Protection Agency, Sacramento.

Cassens, R. G. 1990. Nitrite-Cured Meat. Food and Nutrition Press Inc., Trumbull, CT. pp. 3–36.

Cassens, R. G. 1995. Use of sodium nitrite in cured meats today. Food Technol. 49:72–80, 115.

Cassens, R. G. 1997a. Composition and safety of cured meats in the USA. Food Chem. 59:561–566.

Cassens, R. G. 1997b. Residual nitrite in cured meat. Food Technol. 51:53–55.

Cerveny, J. G. 1980. Effects of changes in the production and marketing of cured meats on the risk of botulism. Food Technol. 34:240–243.

Childress, B. B., and J. K. Stechmiller. 2002. Role of nitric oxide in wound healing. Biol. Res. Nurs. 4:5–15.

Cho, I. C., and L. J. Bratzler. 1970. Effect of sodium nitrite on flavor of cured pork. J. Food Sci. 35:668–670.

Clermont, G., S. Lecour, C. Vergely, M. Zeller, C. Perrin, V. Maupoil, O. Bouchot, and L. Rochette. 2003. Direct demonstration of nitric oxide formation in organs of rabbits treated by transdermal glyceryl trinitrate using an in vivo spin trapping technique. Fundam. Clin. Pharmacol. 17:709–715.

Cohen, S., T. Schiff, J. McCool, A. Volpe, and M. E. Petrone. 1994. Anticalculus efficacy of a dentifrice containing potassium nitrate, soluble pyrophosphate, PVM/MA copolymer, and sodium fluoride in a silica base: A twelve-week clinical study. J. Clin. Dent. 5(Spec. No.):93–96.

Cornforth, D. P., and P. Jayasingh. 2004. Colour and pigment. In Encyclopedia of Meat Sciences. W. K. Jensen, C. Devine, and M. Dikeman, ed. Elsevier Ltd., Oxford, UK.

Cosby, K., K. S. Partovi, J. H. Crawford, R. P. Patel, C. Reiter, S. Martyr, B. K. Yang, M. A. Waclawiw, G. Zalos, X. Xu, K. T. Huang, H. Shields, D. B. Kim-Shapiro, A. Schechter, R. O. Cannon, and M. T. Gladwin. 2003. Nitrite reduction to nitric oxide by deoxyhemoglobin vasodilates the human circulation. Nat. Med. 9:1498–1505.

Dethmers, A. E., and H. Rock. 1975. Effect of added sodium nitrite and sodium nitrate on sensory quality and nitrosamine formation in thuringer sausage. J. Food Sci. 40:491–495.

DuBose, C. N., A. V. Cardello, and O. Maller. 1981. Factors affecting the acceptability of low-nitrite smoked, cured ham. J. Food Sci. 46:461–463.

Duffy, L. L., P. B. Vanderlinde, and F. H. Grau. 1994. Growth of *Listeria monocytogenes* on vacuum-packed cooked meats: Effects of pH, aw, nitrite and ascorbate. Int. J. Food Microbiol. 23:377–390.

Duncan, C., H. Li, R. Dykhuizen, R. Frazer, P. Johnston, G. MacKnight, L. Smith, K. Lamza, H. McKenzie, L. Batt, D. Kelly, M. Golden, N. C. Benjamin, and C. Leifert. 1997. Protection against oral and gastrointestinal diseases: Importance of dietary nitrate intake, oral nitrate reduction and enterosalivary nitrate circulation. Comp. Biochem. Physiol. Part A. Physiol. 118:939–948.

Dykhuizen, R. S., R. Fraser, C. Duncan, C. C. Smith, M. Golden, N. Benjamin, and C. Leifert. 1996. Antimicrobial effect of acidified nitrite on gut pathogens: Importance of dietary nitrate in host defense. Antimicrob. Agents Chemother. 40:1422–1425.

Dykhuizen, R. S., R. Fraser, M. McKenzie, M. Golden, C. Leifert, and N. Benjamin. 1998. *Helicobacter pylori* is killed by nitrite under acidic conditions. Gut 42:334–337.

Eakes, B. D., and T. N. Blumer. 1975. Effect of various levels of potassium nitrate and sodium nitrite on color and flavor of cured loins and country-style hams. J. Food Sci. 40:977–980.

Feelisch, M., T. Rassaf, S. Mnaimneh, N. Singh, N. S. Bryan, D. Jourd'Heuil, and M. Kelm. 2002. Concomitant S-, N-, and heme-nitros(yl)ation in biological tissues and fluids: Implications for the fate of NO in vivo. FASEB J. 16:1775–1785.

Ferguson, L. R. 2010. Meat and cancer. Meat Sci. 84:308–313.

Fooladi, M. H., A. M. Pearson, T. H. Coleman, and R. A. Merkel. 1979. The role of nitrite in preventing development of warmed-over flavor. Food Chem. 4:283–292.

Froehlich, D. A., E. A. Gullett, and W. R. Usborne. 1983. Effect of nitrite and salt on the color, flavor and overall acceptability of ham. J. Food Sci. 48:152–154, 171.

Garg, H. K., and N. S. Bryan. 2009. Dietary sources of nitrite as a modulator of ischemia/reperfusion injury. Kidney Int. 75:1140–1144.

Gill, A. O., and R. A. Holley. 2003. Interactive inhibition of meat spoilage and pathogenic bacteria by lysozyme, nisin and EDTA in the presence of nitrite and sodium chloride at 24 degrees C. Int. J. Food Microbiol. 80:251–259.

Gladwin, M. T., A. N. Schechter, D. B. Kim-Shapiro, R. P. Patel, N. Hogg, S. Shiva, R. O. Cannon 3rd, M. Kelm, D. A. Wink, M. G. Espey, E. H. Oldfield, R. N. Pluta, B. A. Freeman, J. R. Lancaster Jr., M. Feelisch, and J. O. Lundberg. 2005. The emerging biology of the nitrite anion. Nat. Chem. Biol. 1:308–314.

Gold, M. E., P. A. Bush, and L. J. Ignarro. 1989a. Depletion of arterial L-arginine causes reversible tolerance to endothelium-dependent relaxation. Biochem. Biophys. Res. Commun. 164:714–721.

Gold, M. E., K. S. Wood, G. M. Buga, R. E. Byrns, and L. J. Ignarro. 1989b. L-arginine causes whereas L-argininosuccinic acid inhibits endothelium-dependent vascular smooth muscle relaxation. Biochem. Biophys. Res. Commun. 161:536–543.

Gray, J. I., B. Macdonald, A. M. Pearson, and I. D. Morton. 1981. Role of nitrite in cured meat flavor: A review. J. Food Prot. 44:302–312.

Green, L. C., K. R. D. Luzuriaga, D. A. Wagner, W. Rand, N. Istfan, V. R. Young, and S. R. Tannenbaum. 1981a. Nitrate biosynthesis in man. Proc. Natl. Acad. Sci. USA 78:7764–7768.

Green, L. C., S. R. Tannenbaum, and P. Goldman. 1981b. Nitrate synthesis in the germfree and conventional rat. Science 212:56–58.

Grosse, Y., R. Baan, K. Straif, B. Secretan, F. El Ghissassi, V. Cogliano, on behalf of the WHO International Agency for Research on Cancer Monograph Working Group. 2006. Carcinogenicity of nitrate, nitrite, and cyanobacterial peptide toxins. Original Text. Lancet Oncol. 7:628–629.

Honikel, K. O. 2004. Curing agents. Pages 195–201 in Encyclopedia of Meat Sciences. W. K. Jensen, C. Devine, and M. Dikeman, ed. Elsevier, Oxford, UK.

Hord, N. G., Y. Tang, and N. S. Bryan. 2009. Food sources of nitrates and nitrites: The physiologic context for potential health benefits. Am. J. Clin. Nutr. 90:1–10.

Houser, T. A., J. G. Sebranek, W. Núñez Maisonet, J. C. Cordray, B. R. Wiegand, D. U. Ahn, and E. J. Lee. 2005. The effects of irradiation at 1.6 kGy on quality characteristics of commercially produced ham and pork frankfurters over extended storage. J. Food Sci. 70:262–266.

Huffman, R., and N. S. Bryan. 2010. Nitrite and nitrate in the meat industry. In Food, Nutrition and the Nitric Oxide Pathway: Biochemistry and Bioactivity. N. S. Bryan, ed. DESTech Publications Inc., Lancaster PA.

Huhtanen, C. N., H. Trenchard, and L. Milness-McCaffrey. 1985. Inhibition of *Clostridium botulinum* in comminuted bacon by short-chain alkynoic and alkenoic acids and esters. J. Food Prot. 48:570–573.

Hunault, C. C., A. G. van Velzena, A. Sips, R. C. Schothorst, and J. Meulenbelt. 2009. Bioavailability of sodium nitrite from an aqueous solution in healthy adults. Toxicol. Lett. 190:48–53.

Hustad, G. O., J. H. Cerveny, H. Trenk, R. H. Deibel, D. A. Kautter, T. Fazio, R. W. Johnston, and O. E. Kolari. 1973. Effect of sodium nitrite and sodium nitrate on botulinal toxin production and nitrosamine formation in wieners. Appl. Microbiol. 26:22–26.

IARC (International Agency for Research on Cancer). 2010. Ingested Nitrate and Nitrite, and Cyanobacterial Peptide Toxins. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans, Lyon, France.

Ignarro, L. J. 1999. Nitric oxide: A unique endogenous signaling molecule in vascular biology. Biosci. Rep. 19:51–71.

Ignarro, L. J., R. E. Byrns, G. M. Buga, and K. S. Wood. 1987. Endothelium-

derived relaxing factor from pulmonary artery and vein possesses pharmacologic and chemical properties identical to those of nitric oxide radical. Circ. Res. 61:866–879.

Keeton, J. T., W. N. Osburn, M. D. Hardin, N. S. Bryan, and M. T. Longnecker. 2009. A National Survey of the Nitrite/Nitrate Concentrations in Cured Meat Products and Non-Meat Foods Available at Retail. American Meat Institute Foundation Report. Accessed Mar. 2, 2010. http://www.amif.org/ht/a/GetDocumentAction/i/52741.

Kilic, B., R. G. Cassens, and L. L. Borchert. 2001. Influence of turkey meat on residual nitrite in cured meat products. J. Food Prot. 64:235–239.

Kinsella, J. P., and S. H. Abman. 2005. Inhaled nitric oxide therapy in children. Paediatr. Respir. Rev. 6:190–198.

Legan, J. D., D. L. Seman, A. L. Milkowski, J. A. Hirschey, and M. H. Vandeven. 2004. Modeling the growth boundary of *Listeria monocytogenes* in ready-to-eat cooked meat products as a function of the product salt, moisture, potassium lactate, and sodium diacetate concentrations. J. Food Prot. 67:2195–2204.

Lijinsky, W., and S. S. Epstein. 1970. Nitrosamines are environmental carcinogens. Nature 225:21–23.

Lonnqvist, P. A., and B. Jonsson. 2005. Premature infants benefit from inhaled nitric oxide, too. Not only full-term infants with severe hypoxic respiratory failure. Lakartidningen 102:3880–3882.

Luo, J. D., and A. F. Chen. 2005. Nitric oxide: A newly discovered function on wound healing. Acta Pharmacol. Sin. 26:259–264.

MacDonald, B., J. I. Gray, and L. N. Gibbins. 1980a. Role of nitrite in cured meat flavor: Antioxidant role of nitrite. J. Food Sci. 45:893–897.

MacDonald, B., J. I. Gray, D. W. Stanley, and W. R. Usborne. 1980b. Role of nitrite in cured meat flavor: Sensory analysis. J. Food Sci. 45:885–904.

Manochehr-Pour, M., M. Bhat, and N. Bissada. 1984. Clinical evaluation of two potassium nitrate toothpastes for the treatment of dental hypersensitivity. Periodontal Case Rep. 6:25–30.

Maugh, T. H. 1994. Study links hot dogs, cancer. Washington Post, June 3.

McClure, P. J., A. L. Beaumont, J. P. Sutherland, and T. A. Roberts. 1997. Predictive modelling of growth of *Listeria monocytogenes*: The effects on growth of NaCl, pH, storage temperature and NaNO₂. Int. J. Food Microbiol. 34:221–232.

Milkowski, A., H. G. Garg, J. S. Coughlin, and N. S. Bryan. 2010. Nutritional epidemiology in the context of nitric oxide biology: A risk–benefit evaluation for dietary nitrite and nitrate. Nitric Oxide 22:110–119.

Milkowski, A. L. 2011. Sources of exposure to nitrogen oxides. Pages 49–65 in Nitrite and Nitrate in Human Health and Disease. N. S. Bryan and J. Loscalzo, ed. Humana Press, New York, NY.

Miller, A. J., J. E. Call, and R. C. Whiting. 1993. Comparison of organic salts for *Clostridium botulinum* control in uncured turkey product. J. Food Prot. 56:958–962.

Møller, J. K. S., and L. H. Skibsted. 2002. Nitric oxide and myoglobins. Chem. Rev. 102:1167–1178.

Morrissey, P. A., and J. Z. Tichivangana. 1985. The antioxidant activities of nitrite and nitrosylmyoglobin in cooked meats. Meat Sci. 14:175–190.

NAS (National Academy of Sciences). 1981. The Health Effects of Nitrate, Nitrite and N-Nitroso Compounds. Natl. Acad. Press, Washington, DC.

NAS (National Academy of Sciences). 1982. Alternatives to the Current Use of Nitrite in Foods. Natl. Acad. Press, Washington, DC.

Navia, J. L., T. Byers, D. Djordjevic, E. Hentges, J. King, D. Klurfeld, C. Llewellyn, J. Milner, D. Skrypec, and D. Weed. 2010. Integrating the totality of food and nutrition evidence for public health decision making and communication. Crit. Rev. Food Sci. Nutr. 50(Suppl.):1–8.

Newberne, P. M. 1979. Nitrite promotes lymphoma incidence in rats. Science 204:1079–1081.

Noel, P., E. Briand, and J. P. Dumont. 1990. Role of nitrite in flavour

development in uncooked cured meat products: sensory assessment. Meat Sci. 28:1–8.

NTP (National Toxicology Program). 2001. Toxicology and carcinogenesis studies of sodium nitrite (CAS NO. 7632-00-0) in F344/N rats and B6C3F1 mice (drinking water studies). NIH Publication No. 01-3954. Natl. Toxicol. Program Tech. Rep. Ser. 495:7–273.

Olesen, P. T., A. S. Meyer, and L. H. Stahnke. 2004. Generation of flavour compounds in fermented sausages—The influence of curing ingredients, *Staphylococcus* starter culture and ripening time. Meat Sci. 66:675–687.

Orchardson, R., and D. G. Gillam. 2000. The efficacy of potassium salts as agents for treating dentin hypersensitivity. J. Orofac. Pain 14:9–19.

Pearson, A. M., and T. A. Gillett. 1996. Processed Meats. 3rd ed. Chapman and Hall, New York, NY. pp. 53–77.

Pegg, R. B., and F. Shahidi. 2000. Nitrite Curing of Meat. The N-Nitrosamine Problem and Nitrite Alternatives. Food and Nutrition Press Inc., Trumbull, CT.

Pegg, R. B. 2004. Curing. In Encyclopedia of Meat Sciences. W. K. Jensen, C. Devine, and M. Dikeman, ed. Elsevier Ltd., Oxford, UK.

Pérez-Rodríguez, M. L., N. Bosch-Bosch, and M. García-Mata. 1996. Monitoring nitrite and nitrate residues in frankfurters during processing and storage. Meat Sci. 44:65–73.

Peters, J. M., S. Preston-Martin, S. J. London, J. D. Bowman, J. D. Buckley, and D. C. Thomas. 1994. Processed meats and risk of childhood leukemia (California, USA). Cancer Causes Control 5:195–202.

Pierson, M. D., and L. A. Smooth. 1982. Nitrite, nitrite alternatives, and the control of *Clostridium botulinum* in cured meats. CRC Crit. Rev. Food Sci. Nutr. 17:141–187.

Poulsen, S., M. Errboe, O. Hovgaard, and H. W. Worthington. 2001. Potassium nitrate toothpaste for dentine hypersensitivity. Cochrane Database Syst. Rev. CD001476.

Preston-Martin, S., and W. Lijinsky. 1994. Cured meats and childhood cancer (Letters to the Editor). Cancer Causes Control 5:484–485.

Preston-Martin, S., J. M. Pogoda, B. A. Mueller, E. A. Holly, W. Lijinsky, and R. L. Davis. 1996. Maternal consumption of cured meats and vitamins in relation to pediatric brain tumors. Cancer Epidemiol. Biomarkers Prev. 5:599–605.

Ramarathnam, N., L. J. Rubin, and L. L. Diosady. 1991a. Studies on meat flavor. 1. Qualitative and quantitative differences in uncured and cured pork. J. Agric. Food Chem. 39:344–350.

Ramarathnam, N., L. J. Rubin, and L. L. Diosady. 1991b. Studies on meat flavor. 2. A quantitative investigation of the volatile carbonyls and hydrocarbons in uncured and cured beef and chicken. J. Agric. Food Chem. 39:1839–1847.

Ramarathnam, N., L. J. Rubin, and L. L. Diosady. 1993a. Studies on meat flavor. 3. A novel method for trapping volatile components from uncured and cured pork. J. Agric. Food Chem. 41:933–938.

Ramarathnam, N., L. J. Rubin, and L. L. Diosady. 1993b. Studies on meat flavor. 4. Fractionation, characterization, and quantitation of volatiles from uncured and cured beef and chicken. J. Agric. Food Chem. 41:939–945.

Roberts, T. A. 1975. The microbial role of nitrite and nitrate. J. Sci. Food Agric. 26:1755–1760.

Roberts, T. A., and A. M. Gibson. 1986. Chemical methods for controlling *Clostridium botulinum* in processed meats. Food Technol. 40:163–171., 176.

Romans, J. R., W. J. Costello, C. W. Carlson, M. L. Greaser, and K. W. Jones. 2001. The Meat We Eat. 14th ed. Interstate Publ., Danville, IL. pp. 779–887.

Santarelli, R. L., F. Pierre, and D. E. Corpet. 2008. Processed meat and colorectal cancer: A review of epidemiologic and experimental evidence. Nutr. Cancer 60:131–144.

Sarasua, S., and D. A. Savitz. 1994. Cured and broiled meat consumption in relation to childhood cancer: Denver, Colorado (United States). Cancer Causes Control 5:141–148.

Sato, K., and G. R. Hegarty. 1971. Warmed-over flavor in cooked meats. J. Food Sci. 36:1098–1102.

Schlyter, J. H., K. A. Glass, J. Loeffelholz, A. J. Degnan, and J. B. Luchansky. 1993. The effects of diacetate with nitrite, lactate,



or pediocin on the viability of *Listeria monocytogenes* in turkey slurries. Int. J. Food Microbiol. 19:271–281.

Schwentker, A., Y. Vodovotz, R. Weller, and T. R. Billiar. 2002. Nitric oxide and wound repair: Role of cytokines? Nitric Oxide 7:1–10.

Seabra, A. B., A. Fitzpatrick, J. Paul, M. G. De Oliveira, and R. Weller. 2004. Topically applied S-nitrosothiol-containing hydrogels as experimental and pharmacological nitric oxide donors in human skin. Br. J. Dermatol. 151:977–983.

Sebranek, J. G. 1979. Advances in the technology of nitrite use and consideration of alternatives. Food Technol. 33:58–62., 93.

Sebranek, J. G. 2009. Basic curing ingredients. Pages 1–24 in Ingredients in Meat Products. R. Tarte, ed. Springer Science+Business Media LLC, New York, NY.

Sebranek, J. G., and J. N. Bacus. 2007. Cured meat products without direct addition of nitrate or nitrite: What are the issues? Meat Sci. 77:136–147.

Sebranek, J. G., and J. B. Fox. 1985. A review of nitrite and chloride chemistry: Interactions and implications for cured meats. J. Sci. Food Agric. 36:1169–1182.

Sebranek, J. G., B. G. Schroder, R. E. Rust, and D. G. Topel. 1977. Influence of sodium erythorbate on color development, flavor and overall acceptability of frankfurters cured with reduced levels of sodium nitrite. J. Food Sci. 42:1120–1121.

Sehgal, A., I. Callander, J. Stack, T. Momsen, and K. Sterling-Levis. 2005. Experience with inhaled nitric oxide therapy in hypoxic respiratory failure of the newborn. Indian J. Chest Dis. Allied Sci. 47:245–249.

Seman, D. L., A. C. Borger, J. D. Meyer, P. A. Hall, and A. L. Milkowski. 2002. Modeling the growth of *Listeria monocytogenes* in cured ready-to-eat processed meat products by manipulation of sodium chloride, sodium diacetate, potassium lactate, and product moisture content. J. Food Prot. 65:651–658.

Shahidi, F. 1998. Flavor of Meat, Meat Products and Seafoods. 2nd ed. Blackie Academic and Professional, London, UK. pp. 290–317.

Shahidi, F., and R. B. Pegg. 1992. Nitrite-free meat curing systems: Update and review. Food Chem. 43:185–191.

Shiva, S., Z. Huang, R. Grubina, J. Sun, L. A. Ringwood, P. H. MacArthur, X. Xu, E. Murphy, V. M. Darley-Usmar, and M. T. Gladwin. 2007. Deoxymyoglobin is a nitrite reductase that generates nitric oxide and regulates mitochondrial respiration. Circ. Res. 100:654–661.

Silverman, G. 1985. The sensitivity-reducing effect of brushing with a potassium nitrate-sodium monofluorophosphate dentifrice. Compend. Contin. Educ. Dent. 6:131–133., 136.

Skjelkvåle, R., and T. B. Tjaberg. 1974. Comparison of salami sausage produced with and without addition of sodium nitrite and sodium nitrate. J. Food Sci. 39:520–524.

Smith, O. 1998. Nobel Prize for NO research. Nat. Med. 4:1215.

Sofos, J. N., F. F. Busta, and C. E. Allen. 1979a. Botulism control by nitrite and sorbate in cured meats: A review. J. Food Prot. 42:739–770.

Sofos, J. N., F. F. Busta, K. Bhothipaksa, and C. E. Allen. 1979b. Sodium nitrite and sorbic acid effects on *Clostridium botulinum* toxin formation in chicken frankfurter-type emulsions. J. Food Sci. 44:668–672, 675.

Suschek, C. V., A. Paunel, and V. Kolb-Bachofen. 2005. Nonenzymatic nitric oxide formation during UVA irradiation of human skin: Experimental setups and ways to measure. Methods Enzymol. 396:568–578.

Suschek, C. V., T. Schewe, H. Sies, and K. D. Kroncke. 2006. Nitrite, a naturally occurring precursor of nitric oxide that acts like a 'prodrug.' Biol. Chem. 387:499–506.

Suschek, C. V., P. Schroeder, O. Aust, H. Sies, C. Mahotka, M. Horstjann, H. Ganser, M. Murtz, P. Hering, O. Schnorr, K. D. Kroncke, and V. Kolb-Bachofen. 2003. The presence of nitrite during UVA irradiation protects from apoptosis. FASEB J. 17:2342–2344.

Tannenbaum, S. R., J. P. Witter, S. J. Gatley, and E. Balish. 1979. Nitrate and nitrite: Origin in humans. Science 205:1332, 1334–1337.

Tompkin, R. B. 2005. Nitrite. In Antimicrobials in Food. 3rd ed. P. M. Davidson, J. N. Sofos, and A. L. Branen, ed. CRC Press, Taylor and Frances Group, Boca Raton, FL.

Townsend, W. E., and D. G. Olson. 1987. Cured meats and cured meat products processing. Pages 193–216, 431–456 in The Science of Meat and Meat By Products. 3rd ed. J. F. Price and B. S. Schweigert, ed. Food and Nutrition Press Inc., Westport, CT.

Tricker, A. R. 1997. N-nitroso compounds and man: sources of exposure, endogenous formation and occurrence in body fluids. Eur. J. Cancer Prev. 6:226–268.

Truswell, A. S. 2009. Problems with red meat in the WCRF2. Am. J. Clin. Nutr. 89:1–2.

Tzanova, S., Z. Ivanova, and S. Velinova. 2005. Clinical evaluation of dentinal hypersensitivity treatment with 5% potassium nitrate dentifrice. Folia Med. (Plovdiv) 47:65–69.

USDA. 1995. Processing Inspectors' Calculations Handbook (FSIS Directive 7620.3). Accessed Dec. 19, 2009. http://www.fsis.usda.gov/OPPDE/rdad/FSISDirectives/7620-3.pdf.

USDA. 2006. Pathogen Modeling Program (PMP) Version 7. Accessed Apr. 1, 2010. http://ars.usda.gov/Services/docs.htm?docid=6761.

USDA. 2009. United States Code of Federal Regulations. Title 9 Animals and Animal Products Chapter III: Food Safety and Inspection Service. Department of Agriculture. Sections 319.2 Products and nitrates and nitrites; 424.21 Curing Agents; 424.22(b) Use of nitrite and sodium ascorbate or sodium erythorbate (isoascorbate) in bacon.

Vasavada, M. N., and D. P. Cornforth. 2005. Evaluation of milk mineral antioxidant activity in meat balls and nitrite-cured sausage. J. Food Sci. 70:250–253.

Wara-aswapati, N., D. Krongnawakul, D. Jiraviboon, S. Adulyanon, N. Karimbux, and W. Pitiphat. 2005. The effect of a new toothpaste containing potassium nitrate and triclosan on gingival health, plaque formation and dentine hypersensitivity. J. Clin. Periodontol. 32:53–58.

WCRF (World Cancer Research Fund). 2007. Food, Nutrition, Physical Activity, and the Prevention of Cancer. American Institute for Cancer Research, Washington, DC. Accessed Apr. 15, 2011. http://preventcancer.aicr.org/site/PageServer?pagename=research_science_expert_report.

Weller, R. 2003. Nitric oxide donors and the skin: Useful therapeutic agents? Clin. Sci. (Lond.) 105:533–535.

Weller, R., R. Dykhuizen, C. Leifert, and A. Ormerod. 1997. Nitric oxide release accounts for the reduced incidence of cutaneous infections in psoriasis. J. Am. Acad. Dermatol. 36:281–282.

Weller, R., A. D. Ormerod, R. P. Hobson, and N. J. Benjamin. 1998. A randomized trial of acidified nitrite cream in the treatment of tinea pedis. J. Am. Acad. Dermatol. 38:559–563.

Weller, R., R. J. Price, A. D. Ormerod, N. J. Benjamin, and C. Leifert. 2001. Antimicrobial effect of acidified nitrite on dermatophyte fungi, Candida and bacterial skin pathogens. J. Appl. Microbiol. 90:648–652.

White, J. W., Jr. 1975. Relative significance of dietary sources of nitrate and nitrite. J. Agric. Food Chem. 23:886–891.

WHO (World Health Organization). 2006a. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Preamble to the IARC Monographs (amended January 2006). Accessed Apr. 1, 2010. http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

WHO (World Health Organization). 2006b. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Vol. 94: Ingested nitrates and nitrites, and cyanobacterial peptide toxins. List of Participants. Accessed Apr. 1, 2010. http://monographs.iarc.fr/ENG/Meetings/vol94-participants.pdf.

Yun, J., F. Shahidi, L. J. Rubin, and L. L. Diosady. 1987. Oxidative stability and flavor acceptability of nitrite-free meat curing systems. Can. Inst. Food Sci. Technol. 40:246–251.

*The American Meat Science Association fosters community and professional development among individuals who create and apply science to efficiently provide safe and high quality meat. AMSA's over 1,500 members worldwide are the primary source for science-based information on meat processing and technology.*



This project was funded in part by a grant from the American Meat Science Association Educational Foundation

## The American Meat Science Association

PO Box 2187, Champaign, Illinois 61825 USA
(217) 356-5370, e-mail: information@meatscience.org
www.meatscience.org

T D
890
N37
1977
v.2

# ION
## CHROMATOGRAPHIC ANALYSIS
## OF ENVIRONMENTAL POLLUTANTS

### VOLUME 2

Edited by

## J. D. MULIK

## EUGENE SAWICKI



ANN ARBOR SCIENCE
PUBLISHERS INC
P.O. BOX 1425 • ANN ARBOR, MICH. 48106

MAY 23 1982

13

# DETERMINATION OF AZIDE IN ENVIRONMENTAL
# SAMPLES BY ION CHROMATOGRAPHY

L. C. Westwood and E. L. Stokes

Ford Motor Company
Scientific Research Laboratory
Dearborn, Michigan

## ABSTRACT

The need for a rapid interference-free direct measurement of
azide at the parts-per-million (ppm) level in complex matrices be-
came apparent during a recent evaluation of sodium azide-base gas
generators for air bag inflator systems in automobiles. Colorimetric
and other conventional methods for detecting azide are not suit-
able for accurate determination of microquantities of azide. This
chapter presents a method using ion chromatography (IC) as the
most efficient approach for the direct determination of sodium
azide in inflator effluents.

A Dionex Model 14 Ion Chromatograph was used with a Varian
A-25 recorder and a Spectra-Physics System I Computing Integrator
for quantifying the signals. Azide-base air bag inflators were deployed
in a 100-ft$^3$ chamber and particulate samples were collected on
filters, leached with distilled deionized water and analyzed on the IC
using a $NaOH/Na_2CO_3$ eluent. The relative standard deviation (RSD)
of the technique was found to be 2.0%. Optimum conditions (*e.g.,*
instrument settings, column dimensions, eluent formulation, etc.)
are given for best resolution and quantitative determination of sodium
azide. Solutions to problems of would-be interferences (*e.g.,* nitrate/
nitrite ions, phosphate ions and adipic acid) are provided. Chromat-
ograms of air bag inflator effluent samples are discussed in detail.

## INTRODUCTION

The need for a rapid interference-free direct measurement of azide ions at the parts-per-million level in complex matrices became apparent during a recent evaluation of sodium azide-base gas generators for air bag inflator systems in automobiles.[1] In sodium azide-base gas generators, sodium azide reacts with an oxidizing agent to generate nitrogen as the gas which fills the air bag. A good deal of concern has focused on the amount of (1) unreacted sodium azide in inflator effluents upon deployment, (2) unreacted sodium azide remaining in the inflator canister after deployment, and (3) unreacted sodium azide disseminated into the surrounding environment during shredding and other car-scrapping operations.[2]

Because the concentration of sodium azide present in inflator effluents is at the ppm level and exists in relatively complex matrices, a sensitive and accurate method for determining azide is required. The two most commonly used colorimetric methods for detecting microquantities of azide ions are:

1. determination of azide as the ferric azide complex[3] at pH 2.4;
2. addition of a known excess of oxidant such as ceric ammonium nitrate[4] or nitrous acid[5] with subsequent colorimetric determination of the excess oxidant.

The net reaction for the determination of the azide ion as the ferric ion complex is $Fe^{3+} + HN_3 \rightleftharpoons FeN_3^{2+} + H^+$, which suggests that at high hydrogen concentrations, the reaction proceeds only to a small extent. The ferric azide method appears to be precise only when applied to pure azide solutions. The presence of species which absorb at the same wavelength (460 nm) or exert a redox action make the analysis of samples (containing microquantities of azide) by the ferric azide complex technique very uncertain.

The indirect colorimetric method for determining azide, involving the decrease in absorption on known excess volumes of oxidant added to azide solutions, is also unreliable because of the possibility of interference from other reducing agents which may be present. Determination of azide as hydrazoic acid at levels of $10^{-7}$ $M$ by gas chromatography[4,6] has also been reported. This technique, however, requires a relatively involved pretreatment step. Another method[7] involves a Kjeldahl technique which reduces the azide ion to ammonia followed by colorimetric determination of ammonia. A major disadvantage of this latter method is that the technique is not specific for azide since other N-containing species could produce ammonia. In addition, the sensitivity is reduced since only one-third of a mole of ammonia is produced for each mole of hydrazoic

acid formed. For the most part, all the above methods involve laborious and time-consuming sample pretreatment techniques for separation and preconcentration that may not always be successful.

This paper presents a method using IC as the most efficient approach for the direct determination of microquantities of sodium azide in complex matrices. IC, a new ion-exchange liquid chromatographic technique with conductimetric detection, was developed by H. Small, T. Stevens and W. Bauman[8] of the Dow Chemical Corporation. The application of IC to a number of environmental studies is described in a recent review.[9] The instrumentation involved a pumping system, an eluent, an injection valve, an ion-exchange separator column for separation of ions, an ion-exchange suppressor column for conversion of the eluent to a nonconductive form and a conductivity cell for detection of the separated ions.

## EXPERIMENTAL

Instrumentation used was a Dionex Model 14 Ion Exchange Chromato graph with a Varian A-25 recorder and a Spectra-Physics System I Computing Integrator for quantifying the signals. Analytical-grade reagents and distilled-deionized water were used to prepare eluents, regenerants and standard solutions. Stock solutions containing 1000 mg of anion per liter were prepared from the sodium salts of azide, acetate, chloride, nitrite, nitrate and sulfate ions (most of which were found to be present in air bag inflator effluents). From the stock solutions, varying concentrations of each anion were prepared both individually and as a mixture. The selection of concentrations for each anion in the standards was based on the capability of each anion to give a significant signal at a given concentration and on estimated concentrations of each anion in the inflat particulates. Standard solutions of phosphate, bromide and adipic acid ions were also prepared since these anions were found to be capable of interfering with accurate azide detection.

Air bag inflators, using azide-based generators, were deployed in a 100-ft³ chamber.[1] A high-volume quartz-fiber filter apparatus was placed on the chamber floor under the inflator and was connected to a pump by a hose through the chamber wall. The high-volume filter allowed the collection of all particulates of particle diameters greater than 0.3 $\mu$ with an efficiency over 99.97%.

Particles collected on the high-volume filter were dissolved in distilled-deionized water and the resulting sample solutions were filtered and analyzed by IC.

One of the major advantages of IC is its simplicity. On a regenerated and well-rinsed column, 4-5 min are required to establish a steady

baseline with eluent flowing at 184 ml/hr (40% pump capacity). The sample loop of the IC injection system is rinsed and filled with sample or standard solution; the loop contents are then swept into the system. After the last peak appears on the recorder and the signal returns to the baseline, the integrator prints out the retention time and area of each peak. The concentration of each constituent in the sample is determined by referencing peak area to that of the standards. The time required for analysis of each sample is approximately 15 min.

## RESULTS AND DISCUSSION

After running the mixed standards, a chromatograph of excellent resolution was obtained, as illustrated in Figure 13.1. However, the chromatographs of our first attempts to determine azide in inflator effluent samples by IC did not afford the resolution obtained with the standards. As shown in Figure 13.2, the azide peak was difficult to distinguish.

In IC, variables, such as eluent constituency, eluent concentration, column dimensions, number of separator columns present, and presence or absence of precolumns, can effect resolution considerably. We first empirically determined the most probable interfering anions and then altered the variables while monitoring their effect(s) on resolution in the presence and absence of interfering ions.

Based on knowledge of initial constituents in the various vendors' inflators before deployment and on Inductively Coupled Argon Plasma Atomic Emission Spectroscopy (ICP-AES) data of deployed inflator particulate effluent, as well as many discussions with other investigators of azide in inflator effluents, we determined that the most probable interferences would be phosphate, bromide, nitrate and adipic acid.

Several eluent formulations, given in Table 13.1, were investigated to determine which afforded best resolution and detection of azide in air bag inflator samples. A pure solution of each anion by itself was run in order to determine the correct identification of each anion. Then mixed standards, spiked with one anion at a time, were run. Finally, each sample was run, both with and without azide spiking. Effects of the possible interfering anions (e.g., phosphate, bromide, nitrate and adipic acid) were investigated by adding 10-25 ppm to each sample, under a variety of instrument operating conditions.

We discovered that the presence of phosphate ions elevated the azide level above the actual concentration of azide present, due to the phosphate peak being superimposed on the azide peak, and that the presence of bromide resulted in a double peak. Using a trial-and-error approach, samples and standards were run repeatedly in the several eluent



CONDITIONS:

ELUENT: 0.002 M Na OH/0.0024 M Na$_2$ CO$_3$
FLOW RATE: 138 ML/HR
PRECOLUMN: 3mm x 250mm
SEPARATOR COLUMN: 3mm x 500
SUPPRESSOR COLUMN: 3mm x 500
SAMPLE VOLUME: 100 ul
SENSITIVITY SETTING: 3$\mu$ mho

**FIGURE 13.1 Chromatographs of mixed standards.**

formulations both by themselves and in the presence of phosphate ions and bromide ions. Table 13.2 tabulates the results obtained using Eluent No. 1 (considered the "poorest resolver") and Eluent No. 4 (considered the "best resolver," relatively). By using Eluent No. 4 (a more alkaline eluent) and a precolumn of 3 mm x 250 mm, the retention time of the phosphate peak is longer (as compared to its retention time in Eluent No. 1) and the occurrence of the phosphate peak is shifted such that



ELUANT: 0.003 M Na HCO₃ /0.0024 M Na₂CO₃
FLOW RATE: 184 ML/HR
SEPARATOR COLUMN: 3 mm x 500 mm
SUPPRESSOR COLUMN: 6 mm x 250 mm
SAMPLE VOLUME: 100 ul
SENSITIVITY SETTING: 3μ mho

**FIGURE 13.2** Chromatograph of early work before determining optimum conditions.

phosphate is eluted after the sulfate peak. Figures 13.3 and 13.4 and Table 13.3 illustrate this phenomenon.

The presence of bromide ions in the sample posed a problem that was not easily resolved. As seen in Figure 13.5, the retention time of bromide remains extremely close to that of azide, irrespective of eluent used. In addition, when the concentration of azide is small, it is not readily discernable from bromide. When azide is present in concentrations

**TABLE 13.1** Eluent Formulations Evaluated for the Detection of Anions in Air Bag Inflator Effluents

| Eluent 1: | 0.003 $M$ NaHCO₃ |
| | 0.0024 $M$ Na₂CO₃ |
| Eluent 2: | 0.0018 $M$ NaOH |
| | 0.0019 $M$ Na₂CO₃ |
| Eluent 3: | 0.0028 $M$ NaOH |
| | 0.0027 $M$ Na₂CO₃ |
| Eluent 4: | 0.002 $M$ NaOH |
| | 0.0024 $M$ Na₂CO₃ |

**TABLE 13.2** Azide Concentration [N₃⁻] ppm

| | Sample No. | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| E1[a] | 4.9 | 24.0 | 6.4 | 10.7 |
| E4[b] | 2.8 | 26.4 | 6.6 | 10.6 |
| E1+[N₃⁻][c]* | 3.2 | 22.6 | 5.1 | 13.1 |
| E4+[N₃⁻][d]* | 3.4 | 28.6 | 6.2 | 12.4 |
| E1+[N₃⁻]+[PO₄³⁻][e]* | 10.6 | 36.2 | 13.7 | 23.4 |
| E4+[N₃⁻]+[PO₄³⁻][f]* | 2.2 | 25.5 | 5.9 | 12.8 |
| E1+[N₃⁻]+[PO₄³⁻]+[Br⁻][g]* | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ |
| E4+[N₃⁻]+[PO₄³⁻]+[Br⁻][h]* | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ | Unable to resolve due to presence of Br⁻ |

[a] Air bag samples run in eluent 1 [0.003 $M$ NaHCO₃, 0.0024 $M$ Na₂CO₃].
[b] Air bag samples run in eluent 4 [0.002 $M$ NaOH, 0.0024 $M$ Na₂CO₃].
[c] Air bag samples with 10 ppm N₃⁻ added run in eluent 1.
[d] Air bag samples with 10 ppm N₃⁻ added run in eluent 4.
[e] Air bag samples with 10 ppm N₃⁻ and 10 ppm PO₄ added run in eluent 1.
[f] Air bag samples with 10 ppm N₃⁻ and 10 ppm PO₄ added run in eluent 4.
[g] Air bag samples with 10 ppm N₃⁻, 10 ppm PO₄⁻ and 10 ppm Br⁻ added run in eluent 1.
[h] Air bag samples with 10 ppm N₃⁻, 10 ppm PO₄⁻ and 10 ppm Br⁻ added run in eluent 4.
*Value given is net N₃⁻ value or actual N₃⁻ minus added azide.



FIGURE 13.3 Separation of azide from phosphate; $N_3^-$ alone; $PO_4^{3-}$ alone; $N_3^-$ and $PO_4^{3-}$ together all in E-4.

CONDITIONS:
ELUANT: 0.002 M NaOH/0.0024M $Na_2CO_3$
FLOW RATE: 184 ml/hr
PRECOLUMN: 3mm x 250mm
SEPERATOR COLUMN: 3mm x 500mm
SUPPRESSOR COLUMN: 6mm x 250mm
SAMPLE VOLUME: 100 ul
SENSITIVITY SETTING: 10u mho
AMT. $PO_4^{3-}$ ADDED: 25ppm

FIGURE 13.4 (a) Ten ppm standard mixture; (b) Sample spiked with $PO_4^{3-}$ in E-4.

of 10 ppm or greater, it is discernible from bromide but the resolution is poor resulting in marked uncertainty for analytical quantitation of azide concentration. An effort was made to circumvent the problem with bromide by using a longer ion exchange separator column. But this endeavor proved futile. Fortunately, bromide is not indigenous to air bag inflators. Nevertheless, research work to clearly resolve the azide peak from that of bromide continues in our laboratory.

Resolution of azide in the presence of nitrate was found to be poor, especially when a freshly regenerated 6 mm x 250 mm ion exchange suppressor column was used. As may be seen in Figure 13.6, although the azide peak was discernible, it was fused to the nitrate peak. As the 6 mm x 250 mm suppressor column depleted, resolution of the azide peak from the nitrate peak was improved. When a suppressor column of smaller diameter and greater length (3 mm x 500 mm) was used,

150 ION CHROMATOGRAPHIC ANALYSIS OF POLLUTANTS

Table 13.3 Retention Times of Anions[a]

| Anion | Retention Time (min) | |
|---|---|---|
| | Standards | Samples |
| Acetate | 2.12 | 2.02 |
| Chloride | 2.60 | 2.42 |
| Nitrite | 3.07 | — |
| Azide | 5.40 | 5.27 |
| Nitrate | 6.66 | 6.52 |
| Sulfate | 9.42 | 9.35 |
| Phosphate | 15.00 | 15.07[b] |
| Azide in presence of bromide | 6.46 | 6.36 |
| Bromide | 7.61 | 7.56 |

[a]Eluent: 0.002 $M$ NaOH/0.0024 $M$ Na$_2$CO$_3$.
   Flowrate: 184 ml/hr
   Precolumn: 3 mm × 250 mm
   Separator column: 3 mm × 500 mm
   Suppressor column: 3 mm × 500 mm
   Sample volume: 100 $\mu$l
   Sensitivity: 10 $\mu$mhos
[b]Sample spiked with 25 ppm phosphate.

resolution of the azide peak was excellent from the beginning of the freshly regenerated suppressor column to depletion, as is depicted in Figure 13.7. Poor resolution of azide, initially experienced using the larger diameter/shorter suppressor column, may be attributed to diffusion of the azide band after conversion to hydrazoic acid. When the suppressor column is partially depleted, the hydrazoic acid band has less surface area to cover while traveling down the column and, therefore, diffusion is minimized and good resolution achieved. By using a longer column of smaller diameter, the same results are achieved as in the partially depleted larger column. The smaller column does require more frequent regeneration, however.

When adipic acid was added to either standards or samples, a shift in the retention time of the azide peak, as well as an increase in peak height and area, was observed. Attempts were made to resolve this problem by adding, in tandem, another separator column (3 mm × 500 mm). This effort proved futile in that the presence of adipic acid still shifted the azide peak and superimposed on it; an overall doubling of retention time was observed, as shown in Figure 13.8. However, adipic acid may be removed as an interfering agent by methylating the sample. The use of diazomethane allows a method for methylating adipic acid.[10] Fortunately,

AZIDE DETERMINATION



CONDITIONS:
ELUENT: 0.002 M NaOH/0.0024 M Na$_2$CO$_3$
FLOW RATE: 184 ml/hr
PRECOLUMN: 3mm × 250mm
SEPARATOR COLUMN: 3mm × 500mm
SUPPRESSOR COLUMN: 6mm × 250mm
SAMPLE VOLUME: 100 ul
SENSITIVITY SETTING: 3 u mho

FIGURE 13.5 Br$^-$ and N$_3^-$ (unresolvable).

adipic acid is not present in inflator effluents although some attempts were made to use it as a neutralizing agent in early designs.

The calibration curve for this technique is given in Figure 13.9. Concentration of azide present is plotted as a function of peak area. As may be seen, the curve is linear over a concentration range of 0.10 $\mu$g/ml to 10 $\mu$g/ml. The correlation coefficient was found to be 0.9992, the slope =132.779 and the y-intercept = -10.0294.

Optimum instrument conditions determined for the analysis of azide in air bag inflator effluent by IC were found to be:

| | |
|---|---|
| Precolumn Dimensions: | 3 mm × 250 mm |
| Separator Column Dimensions: | 3 mm × 500 mm |
| Suppressor Column Dimensions: | 3 mm × 500 mm |
| Eluent: | 0.002 $M$ NaOH/0.0024 $M$ Na$_2$CO$_3$ |
| Flowrate: | 184 ml/hr |
| Sensitivity: | 10 $\mu$mhos |



**FIGURE 13.6** Chromatograph of $N_3^-$ fused to $NO_3^-$ in both standard and sample.



**FIGURE 13.7** Separation of $N_3^-$ from $NO_3^-$.

The relative standard deviation (RSD) for this technique, based on ten consecutive injections of mixed standard, was found to be 1.5%; the RSD, based on ten consecutive injections of sample, was found to be 2.5%.

## SUMMARY AND CONCLUSIONS

Sodium azide in air bag inflator effluent can be rapidly and accurately detected quantitatively by ion chromatography. While instrument sensitivity, eluent flowrate, eluent pH and column dimensions are major factors in achieving good results, the method is reliable and accurate for micro-quantities of azide. It allows for azide detection in a multi-ion matrix with no need for preseparation or preconcentration of sample. The presence of bromide ion interferes with good resolution but, fortunately, bromide ions are not indigenous to air bag inflator effluents. Adipic acid,

an interfering agent, could be circumvented by methylation, but adipic acid is not usually present in air bag effluent. Research continues to resolve the bromide interference problem. An RSD of 2.5% was empirically determined for this technique.



FIGURE 13.8 Adipic acid problem still present even when two separator columns are used.

CONDITIONS
ELUANT: 0.002 M NaOH/0.0024 M Na$_2$CO$_3$
FLOW RATE: 138 ml/HR
PRECOLUMN: 3mm x 250mm
SEPARATOR COLUMN (1): 3mm x 500mm
SEPARATOR COLUMN (2): 3mm x 500mm
SUPPRESSOR COLUMN: 3mm x 500m
SAMPLE VOLUME: 100 ul
SENSITIVITY SETTING: 10u mho

100 ppm ADIPIC ACID

10 ppm N$_3$

10ppm EACH OF N$_3$ & ADIPIC ACID



CORR. COEF. = 0.9992
SLOPE       = 132.779
Y- INTERCEPT = -10.0294

AREA

ppm. of N$_3^-$

FIGURE 13.9 Azide calibration curve.

## ACKNOWLEDGMENTS

Thanks are extended to Dr. B. M. Joshi for his valuable input and assistance and to Ms. R. Hall, Ms. L. M. Skewes and Mr. Y. T. Lu for their technical support and contributions.

## REFERENCES

1.  Joshi, B. M., and E. L. Stokes. "Sampling and Analyzing Techniqu for Air Bag Inflator Effluents." To be published.
2.  "Sodium Azide Investigation Program Report," Thiokol/Wasatch D Division, Brigham City, UT for Ford Motor Company, P.O. No. 47 594035-GM. Publications No. 78203 (May 26, 1978).
3.  Roberson, C. E., and C. M. Austin. "Colorimetric Estimation of Milligram Quantities of Inorganic Azides," *Anal. Chem.* 29:854 (1957).
4.  Fair, H. D., and R. F. Waler (eds.) *Energetic Materials*2: Technolo of the Inorganic Azides* (New York: Plenum Publishing Corporatior 1977).
5.  Sutherland, J., and H. Kramer. *J. Phys. Chem.* 71:4161 (1967).
6.  Blais, M. *Microchem. J.* 7:464 (1963).
7.  Pepkowitz, L. P. *Anal. Chem.* 24:400 (1952).
8.  Small, H., T. S. Stevens and W. C. Bauman. *Anal. Chem.* 47:1801 (1975).

9.   Rich, W. E., and R. A. Wetzel. "Ion Chromatographic Analysis of Trace Ions in Environmental Samples," in *Monitoring of Toxic Substances*, D. Schuetzle, Ed., American Chemical Society Symposium Series (Washington, D.C.: ACS, 1979).

10.   Aldrich Chemical Company, Inc. Milwaukee, WI. "Diazald Kit" Cat. No. Z10,025-0.

# COLLECTION OF FORMIC ACID VAPOR AND ANALYSIS BY ION CHROMATOGRAPHY

D. L. Haynes

SRI International
Menlo Park, California

## ABSTRACT

A method of collection and analysis for formic acid vapor in the workplace atmosphere is presented. In this method, air is drawn by a personal sampling pump through a glass tube packed with Chromosorb 103.* The formic acid is trapped on the Chromosorb 103 and is desorbed with deionized water. The analysis is performed on an ion chromatograph. The detection limit is 80 $\mu g/m^3$.

Tubes containing 50 mg of Chromosorb 103 have a collection efficiency of 100% for a sample size of at least 60 liters of an atmosphere containing 22 $mg/m^3$ formic acid and 85% relative humidity. Recoveries of 101 ± 2% were obtained from spiked samples over the concentration range investigated. The overall precision and accuracy of the sampling and analytical method was tested by sampling test atmospheres of known formic acid concentration. The coefficient of variation of samples taken at three levels was 7.3%. Collected samples were stable on Chromosorb 103 for at least seven days.

## INTRODUCTION

Formic acid is used by a number of industries in the production of formate esters, as an acidifying and reducing agent, and as a fumigant. It is known to cause damage to the skin, eye and mucosal surfaces. The Occupational Safety and Health Administration (OSHA) has set the level of exposure not to exceed 9 $mg/m^3$ of formic acid in air, based on an 8-hr time-weighted average.[1] The method described herein for collection

*Registered trademark of Johns Manville Corp., Denver, CO.

# EXHIBIT 38

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



# NATIONAL INSTITUTE OF JUSTICE
# FIVE THINGS
## ABOUT DETERRENCE



## Deter would-be criminals by using scientific evidence about human behavior and perceptions about the costs, risks and rewards of crime.

### 1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.

Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.

### 2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.

Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on prison as an ineffective deterrent.

### 3. Police deter crime by increasing the perception that criminals will be caught and punished.

The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught. Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective. A criminal's behavior is more likely to be influenced by seeing a police officer with handcuffs and a radio than by a new law increasing penalties.

### 4. Increasing the severity of punishment does little to deter crime.

Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes.

More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.

See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on the severity of punishment.

### 5. There is no proof that the death penalty deters criminals.

According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

Source: Daniel S. Nagin, "Deterrence in the Twenty-First Century," in *Crime and Justice: A Review of Research*, vol. 42: Crime and Justice in America: 1975-2025, ed. Michael Tonry, Chicago: University of Chicago Press, 2013.[1]

The content on this page is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.

Findings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Understanding the Relationship Between Sentencing and Deterrence

*In his 2013 essay, "Deterrence in the Twenty-First Century," Daniel S. Nagin succinctly summarized the current state of theory and empirical knowledge about deterrence. The information in this publication is drawn from Nagin's essay with additional context provided by NIJ and is presented here to help those who make policies and laws that are based on science.*

NIJ's "Five Things About Deterrence" summarizes a large body of research related to deterrence of crime into five points. Two of the five things relate to the impact of sentencing on deterrence — "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime" and "Increasing the severity of punishment does little to deter crime." Those are simple assertions, but the issues of punishment and deterrence are far more complex. This addendum to the original "Five Things" provides additional context and evidence regarding those two statements.

It is important to note that while the assertion in the original "Five Things" focused only on the impact of sentencing on deterring the commission of future crimes, a prison sentence serves two primary purposes: punishment and incapacitation. Those two purposes combined are a linchpin of United States sentencing policy, and those who oversee sentencing or are involved in the development of sentencing policy should always keep that in mind.

## Deterrence and Incapacitation

**There is an important distinction between deterrence and incapacitation. Individuals behind bars cannot commit additional crime in the community — this is incapacitation. Before someone commits a crime, he or she may fear *incarceration* and thus refrain from committing future crimes — this is incarceration as *deterrence*.**

### "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."

Prison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes.

Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect.

A very small fraction of individuals who commit crimes — about 2 to 5 percent — are responsible for 50 percent or more of crimes.[2] Locking up these individuals when they are young and early in their criminal careers could be an effective strategy to preventing crime *if* we could identify who they are. The problem is: we can't. We have tried to identify the young people most likely to commit crimes in the future, but the science shows we can't do it effectively.

It is important to recognize that many of these individuals who offend at higher rates may already be incarcerated because they put themselves at risk of apprehension so much more frequently than individuals who offend at lower rates.

### "Increasing the severity of punishment does little to deter crime."

To clarify the relationship between the severity of punishment and the deterrence of future crimes, you need to understand:

- The lack of any "chastening" effect from prison sentences,
- That prisons may exacerbate recidivism,
- The different impacts of the *certainty* versus the severity of punishment on deterrence, and
- That individuals grow out of criminal activity as they age.

*More severe punishments do not "chasten" individuals convicted of crimes.*

Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the "chastening" effect, thereby making individuals convicted of an offense less likely to commit crimes in the future. In fact, scientists have found no evidence for the chastening effect.

*Prisons may exacerbate recidivism.*

Research has found evidence that prison can exacerbate, not reduce, recidivism. Prisons themselves may be schools for learning to commit crimes. In 2009, Nagin, Cullen and Jonson published a review of evidence on the effect of imprisonment on reoffending.[3] The review included a sizable number of studies, including data from outside the U.S. The researchers concluded:

"… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Certainty has a greater impact on deterrence than severity of punishment.*

*Severity* refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect. In addition, the crime prevention benefit falls short of the social and economic costs.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that *certainty* plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*A person's age is a powerful factor in deterring crime.*

Even those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age. The data show a steep decline at about age 35.[4] A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation. But that incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age.

---

1. "Five Things About Deterrence" is available at https://ncjrs.gov/pdffiles1/nij/247350.pdf.
2. Mulvey, Edward P., *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders,* Juvenile Justice Fact Sheet, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, March 2011, NCJ 230971. Available at https://www.ncjrs.gov/pdffiles1/ojjdp/230971.pdf.

3. Nagin, Daniel S., Francis T. Cullen and Cheryl Lero Johnson, "Imprisonment and Reoffending," *Crime and Justice: A Review of Research,* vol. 38, ed. Michael Tonry, Chicago: University of Chicago Press, 2009: 115-200.
4. Sampson, Robert. J., John H. Laub and E.P. Eggleston, "On the Robustness and Validity of Groups," *Journal of Quantitative Criminology* 20 (1) (2004): 37-42.

**National Institute of Justice** • Strengthen Science • Advance Justice

**NIJ**.GOV

# EXHIBIT 39

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

LAW AND JUSTICE

AT THE NATIONAL RESEARCH COUNCIL
www.nationalacademies.org/claj

REPORT BRIEF • APRIL 2012

# Deterrence and the Death Penalty



Many studies over the past few decades have sought to determine whether the death penalty has any deterrent effect on homicide rates. Researchers have reached widely varying, even contradictory, conclusions. Some studies have concluded that the threat of capital punishment deters murders, saving large numbers of lives; other studies have concluded that executions actually increase homicides; still others, that executions have no effect on murder rates. Commentary among researchers, advocates, and policymakers on the scientific validity of the findings has sometimes been acrimonious.

Against this backdrop, the National Research Council was asked to assess whether the available evidence provides a scientific basis for answering questions of if and how the death penalty affects homicide rates. The committee examined studies that have been conducted on deterrence and the death penalty since the 1976 Supreme Court decision in *Gregg vs. Georgia*, which ended a four-year moratorium on executions.

It is important to make clear what the committee's study did not examine. Deterrence is only one of many considerations relevant to deciding whether the death penalty is good public policy. Not all supporters of capital punishment base their argument on

## THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

National Academy of Sciences • National Academy of Engineering • Institute of Medicine • National Research Council

deterrent effects, and not all opponents would be affected by persuasive evidence of such effects. The case for capital punishment is sometimes based on arguments that the death penalty is the only appropriate response to especially heinous crimes; the case against it is sometimes based on claims that the sanctity of human life precludes state-sanctioned killings. Other considerations include whether capital punishment can be administered in a nondiscriminatory way, whether the risk of mistakenly executing an innocent person is acceptably small, and the cost of administering the death penalty in comparison with other punishments.

The committee was not charged with considering these issues, nor with rendering an overall judgment on whether capital punishment is good public policy. It was tasked only with assessing the scientific quality of the evidence on whether capital punishment deters homicides and recommending ways to improve the quality of future research.

## CONCLUSION AND RECOMMENDATION

**The committee concludes that research to date is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, these studies should not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Claims that research demonstrates that capital punishment decreases or increases the homicide rate or has no effect on it should not influence policy judgments about capital punishment.**

All of the studies on the possible effects of capital punishment on homicide rates suffer from three fundamental flaws, which make

> ### USE OF THE DEATH PENALTY
>
> From 1973 to 2009, 8,115 people were sentenced to death in the United States; 1,188 of them — about 15 percent of those sentenced — had been executed by the end of 2009. Since 2005, the number of executions has remained stable at about 50 per year. As of 2009, 35 states allow the death penalty.

them uninformative as a basis for policy consideration:

*The studies do not factor in the effects of noncapital punishments that may also be imposed.* The relevant question about deterrence is whether the death penalty is more or less effective as a deterrent than other penalties, such as a life sentence without the possibility of parole. None of the existing studies considers the other potential punishments that states impose or their potential effects on homicide rates. Any effect that these noncapital punishments have on homicide rates may contaminate the estimated effects — in either direction — of capital punishment.

*The studies use incomplete or implausible models of potential murderers' perceptions of and response to the use of capital punishment.* Much of the research assumes that potential murderers respond to the objective risk of execution. But determining the objective risk poses great complexities even for a well-informed researcher, let alone a potential murderer. For example, only 15 percent of people who have been sentenced to death since 1976 have actually been executed, and a large fraction of death sentences are reversed. None of the studies used a measure of risk that plausibly corresponds to the objec-

tive risk of execution, and conclusions about any deterrent effect are very sensitive to the measure of risk used. The committee is also skeptical that potential murderers can possibly estimate the objective risk, whatever it is; there is good reason to believe that potential murderers' perceived risk deviates from the objective risk. Thus, there is no basis for judging which, if any, of the studies' estimates might be informative about the effect of the death penalty on homicide rates.

*Estimates of the effect of capital punishment are based on statistical models that make assumptions that are not credible.* For example, a common assumption is that the effect of capital punishment on homicide rates is the same across states and years. As a consequence of such implausible assumptions, the estimated effects themselves lack credibility.

The committee does not construe its conclusion that the existing studies are uninformative as favoring one side or the other in the long-standing debate about deterrence and the death penalty.

## NEXT STEPS FOR RESEARCH

The committee offers several recommendations for addressing the shortcomings in the research on capital punishment, including:

- collecting the data required for a more complete consideration of both the capital and noncapital punishments for murder;

- conducting studies on how potential murderers perceive the punishments that are applied in murder cases; and

- use of methods that make more credible assumptions to identify or bound the effect of capital punishment on homicides.

The committee does not expect that ad-

vances in data on systems of punishment and in knowledge of risk perceptions will come quickly or easily. However, data collection on the noncapital part of punishment systems need not be entirely complete to be useful; and even if research on perceptions of risk of capital punishment cannot resolve all major issues, making even some progress would provide valuable information for policy makers.

Ultimately, the success of the research may depend on the specific question addressed. Questions of interest include:

- If or how the legal status of the death penalty affects homicide rates;

- If or how the intensity of use of the death penalty — both in terms of sentencing and actual executions — affects homicide rates; and

- If or how executions affect homicide rates in the short run.

Some of these questions may be informed by research that the committee recommends.

Moreover, the recommended research will likely improve knowledge on the effects of noncapital punishments on crimes not subject to capital punishment. Developing more scientific knowledge about these effects is particularly important. Although capital punishment is a highly contentious public policy issue, policies on prison sanctions and, more broadly, the administration of justice are important components of the nation's response to crime. Thus, even if the recommended research is not ultimately successful in answering the question of capital punishment's effects on homicide, advancing knowledge on the crime-prevention effects of other punishments and the criminal justice system can make major contributions to important policy issues.

## COMMITTEE ON DETERRENCE AND THE DEATH PENALTY

**DANIEL S. NAGIN** *(Chair)*, H. John Heinz III College, Carnegie Mellon University;
**KERWIN K. CHARLES**, Harris School of Public Policy Studies, The University of Chicago;
**PHILIP J. COOK**, Sanford School of Public Policy, Duke University; **STEVEN N. DURLAUF**,
Department of Economics, University of Wisconsin-Madison; **AMELIA M. HAVILAND**,
H. John Heinz III College, Carnegie Mellon University; **GERARD E. LYNCH**, U.S. Court
of Appeals for the Second Circuit **CHARLES F. MANSKI**, Department of Economics,
Northwestern University; **JAMES Q. WILSON**, School of Public Policy, Pepperdine
University, and Clough Center for the Study of Constitutional Democracy, Boston College;
**JANE L. ROSS**, *Study Director;* **JOHN V. PEPPER**, *Consultant*

FOR MORE INFORMATION…This brief was prepared by the Committee on Law and Justice of the Division of Behavioral and Social Sciences and Education based on the report *Deterrence and the Death Penalty*, which was overseen by the Committee on Law and Justice. The study was sponsored by the National Institute of Justice, the Tides Foundation, and the Proteus Action League. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the authors and do not reflect those of the sponsoring organizations. Copies of the report are available from the National Academies Press, 500 Fifth Street, N.W., Washington, DC 20001; (800) 624-6242; http://www.nap.edu.

## THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The nation turns to the National Academies—National Academy of Sciences, National Academy of Engineering, Institute of Medicine, and National Research Council— for independent, objective advice on issues that affect people's lives worldwide.
**www.national-academies.org**

# EXHIBIT 40

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development



# Smart on Crime:
## Reconsidering the Death Penalty
## in a Time of Economic Crisis

**National Poll of Police Chiefs Puts Capital Punishment
at Bottom of Law Enforcement Priorities**

A Report from the Death Penalty Information Center

# Smart on Crime:
## Reconsidering the Death Penalty in a Time of Economic Crisis

**National Poll of Police Chiefs Puts Capital Punishment
at Bottom of Law Enforcement Priorities**

A Report from the Death Penalty Information Center
by Richard C. Dieter, Executive Director

Washington, DC
October 2009

*www.deathpenaltyinfo.org*

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

# Table of Contents

Executive Summary     6

Introduction     8

The Views of Law Enforcement – Police Chiefs Poll     9

The Crisis Facing State Criminal Justice Systems     12

How much does the death penalty cost?     14

Can the Costs of the Death Penalty Be Reduced?     18

Why Does the Death Penalty Cost So Much?     20

What is Society Receiving in Return?     22

Conclusion     23

References     24

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

# Executive Summary

"Smart on Crime" is a new report from the Death Penalty Information Center that explores the prospect of saving states hundreds of millions of dollars by ending the death penalty. The report also serves to release a national poll of police chiefs in which they rank the death penalty at the bottom of their priorities for achieving a safer society.

The death penalty in the U.S. is an enormously expensive and wasteful program with no clear benefits. All of the studies on the cost of capital punishment conclude it is much more expensive than a system with life sentences as the maximum penalty. In a time of painful budget cutbacks, states are pouring money into a system that results in a declining number of death sentences and executions that are almost exclusively carried out in just one area of the country. As many states face further deficits, it is an appropriate time to consider whether maintaining the costly death penalty system is being smart on crime.

The nation's police chiefs rank the death penalty last in their priorities for effective crime reduction. The officers do not believe the death penalty acts as a deterrent to murder, and they rate it as one of most inefficient uses of taxpayer dollars in fighting crime. Criminologists concur that the death penalty does not effectively reduce the number of murders.

Around the country, death sentences have declined 60% since 2000 and executions have declined almost as much. Yet maintaining a system with 3,300 people on death row and supporting new prosecutions for death sentences that likely will never be carried out is becoming increasingly expensive and harder to justify. The money spent to preserve this failing system could be directed to effective programs that make society safer.

California is spending an estimated $137 million per year on the death penalty and has not had an execution in three and a half years. Florida is spending approximately $51 million per year on the death penalty, amounting to a cost of $24 million for each execution it carries out. A recent study in Maryland found that the bill for the death penalty over a twenty-year period that produced five executions will be $186 million. Other states like New York and New Jersey spent well over $100 million on a system that produced no executions. Both recently abandoned the practice. This kind of wasteful expenditure makes little sense. The death penalty may serve some politicians as a rhetorical scare tactic, but it is not a wise use of scarce criminal justice funding.

In 2009, eleven state legislatures considered bills to end capital punishment and its high costs were part of these debates. New Mexico abolished the death penalty and the Connecticut legislature passed an abolition bill before the governor vetoed it. One house of the legislatures in Montana and Colorado voted to end the death penalty, and the Colorado bill would have directed the cost savings to solving cold cases. As the economic crisis continues, the trend of states reexamining the death penalty in light of its costs is expected to continue.

The report that follows analyzes the costs of the death penalty as measured in various state studies. It examines why the death penalty is so expensive and why it may be impossible to cut those costs without endangering fundamental rights. The report looks closely at the opinions of law enforcement experts and finds little support for continuing to spend enormous sums on an ineffective program when so many other areas of need are being short changed. Many states are looking at the death penalty in a new light because of the economic crisis, realizing that being smart on crime means investing in programs that really work.

# Smart on Crime:
## Reconsidering the Death Penalty in a Time of Economic Crisis

**National Poll of Police Chiefs Puts Capital Punishment
at Bottom of Law Enforcement Priorities**



*[W]e must move beyond the narrow parameters that have constrained our nation's debate about criminal justice policy over the last several decades. There is no doubt that we must be "tough on crime." But we must also commit ourselves to being "smart on crime."*

**-Attorney General Eric Holder[1]**



*Give a law enforcement professional like me that $250 million, and I'll show you how to reduce crime. The death penalty isn't anywhere on my list.*

**-Police Chief James Abbott,
West Orange, NJ[2]**

photo by John Goodwin



*Local jurisdictions are likely to lose a significant amount of state funding this year because of the severe financial crisis. This funding helps cities and counties provide essential services in the areas of public safety, emergency services, and health and children's services. Without it, our communities will no doubt suffer dire consequences.*

*At the same time, we continue to waste hundreds of millions on the state's dysfunctional death penalty. If we replaced the death penalty with a sentence of permanent imprisonment, the state would save more than $125 million each year. We haven't had an execution in California for three years. Are we any less safe as a result? I don't think so.*

**-Police Chief Ray Samuels (ret.), Newark, CA[3]**

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

# Introduction

For many states the impact of the economic recession is likely to be felt for years to come.  The unemployment rate may surpass 10%, and 2009 will probably be worse than 2008 in state income and in demands for services.[4] Most states are facing new budget shortfalls in the coming fiscal year, and further cuts in state spending are inevitable.[5]

Not surprisingly, the criminal justice system is feeling the consequences of this downturn along with other sectors of the economy.  Police departments are cutting back, state employees are being furloughed, trials are being delayed as courts and public defenders run out of money, and prisoners are being released early.  The justice system was already overburdened—now it is being pushed to the breaking point.

In every sector of the economy governments are trying to eliminate wasteful programs while preserving essential services.  This report examines one reasonable step that could save hundreds of millions of dollars in the criminal justice system: **end the enormously expensive and wasteful death penalty that is draining state budgets.** Every cost study in the U.S. shows that the death penalty is far more expensive than a system where the maximum penalty is life in prison.  The following evidence shows that many in the law enforcement community believe that replacing the death penalty with life without parole would actually advance the fundamental goals of the criminal justice system.  The report also explains why the death penalty is so expensive and estimates the costs to the nation for retaining it.

The judgment that the death penalty is the last place that scarce criminal justice dollars should go is supported by a growing number of law enforcement officials and backed by **a national poll of police chiefs** that is being released in this report. The poll reveals that the death penalty is at the bottom of the chiefs' list when it comes to wise spending to fight crime.

The problem is not simply the high cost of capital punishment in a time of economic crisis.  Indeed, some states like New York and New Jersey took action to end the financial drain caused by the death penalty even before the current downturn.

The death penalty has been a bloated government program for many decades.  The death penalty is not just expensive, it is wasteful.  In most places the money is being spent even as the core measures of the system—death sentences and executions—have declined precipitously.[6]  It is as if a car manufacturer was keeping all of its factories and showrooms open even though it was producing only a handful of cars that hardly anyone was buying.

This is an appropriate time to examine the death penalty as a pragmatic issue—to ask, Is it working?  Is it functioning as envisioned, and is it benefiting society? Whether any societal gain is derived from the death penalty will be discussed more below.  But even at the most basic level of executions the death penalty is dysfunctional. In most states there were no executions last year and none on the horizon.  Almost all recent executions have been in just one region of the country—the south—and most of those have been in one state—Texas.[7]  The death penalty without executions is a very expensive form of life without parole.



photo by John Goodwin

*I no longer believe that you can fix the death penalty. I learned that the death penalty throws millions of dollars down the drain--money that I could be putting directly to work fighting crime every day--while dragging victims' families through a long and torturous process that only exacerbates their pain. . . Give a law enforcement professional like me that $250 million, and I'll show you how to reduce crime. The death penalty isn't anywhere on my list.[i]*

**-Police Chief James Abbott (NJ)**

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## The Views of Law Enforcement

Police Chief James Abbott of West Orange, New Jersey, quoted above, served on a legislative commission that reviewed that state's death penalty. The commission eventually overwhelmingly recommended abolition of the death penalty. Chief Abbott is part of a growing number of law enforcement officials who have concluded that there are much smarter ways to reduce crime than wasting money on the death penalty. A newly released **national poll of police chiefs** shows a high degree of skepticism about the death penalty and a strong desire to spend limited funds more productively elsewhere.

## Police Chiefs Poll

The poll was commissioned by the Death Penalty Information Center and conducted by R.T. Strategies of Washington, D.C., surveying a national sample of 500 randomly selected police chiefs in the United States.[8]

The police chiefs had the opportunity to identify what they believe is most effective in fighting crime. As leaders in law enforcement, they were asked where the death penalty fit in their priorities. The poll found:

• When asked to name one area as "most important for reducing violent crime," greater use of the death penalty ranked **last** among the police chiefs, with only 1% listing it as the best way to reduce violence. Instead, increasing the number of police officers, reducing drug abuse, and creating a better economy and more jobs all ranked much higher than the death penalty.[9]

• The death penalty was considered the **least efficient** use of taxpayers' money. Police chiefs ranked expanded training for police officers, community policing, programs to control drug and alcohol abuse, and neighborhood watch programs as more cost-effective ways to use taxpayers' money.[10]



What Interferes with Effective Law Enforcement?

| | Percent |
|---|---|
| Lack of law enforcement resources | 20 |
| Drug/Alcohol Abuse | 20 |
| Family problems/child abuse | 14 |
| Lack of programs for mentally ill | 12 |
| Crowded courts | 7 |
| Ineffective prosecution | 6 |
| Too many guns | 5 |
| Gangs | 3 |
| Insufficient use of the death penalty | 2 |

Percent Ranking Item as One of Top Two or Three

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS



### Police Chiefs' Views

Percent Finding Statement Accurate/Innaccurate

- Politicians support the death penalty as a symbolic way to show they are tough on crime — Accurate 69, Innaccurate 24
- Death penalty cases are hard to close and take up a lot of police time. — Accurate 61, Innaccurate 32
- Debates about the death penalty distract Congress and state legislatures from focusing on real solutions to crime problems. — Accurate 50, Innaccurate 42
- The death penalty significantly reduces the number of homicides — Accurate 37, Innaccurate 48
- The death penalty is one of the most important law enforcement tools — Accurate 31, Innaccurate 66
- Murderers think about the range of possible punishments before committing homicides — Accurate 24, Innaccurate 69

• The police chiefs did not believe that criminals generally consider the consequences of their actions when engaged in violence.  Fifty-seven percent (57%) said the death penalty does little to prevent violent crimes because **perpetrators rarely consider the consequences** when engaged in violence.[11]

• Although the police chiefs did not oppose the death penalty in principle, **less than half** (47%) supported it compared to a sentence of life imprisonment without parole combined with mandatory restitution by the defendant to the victim.[12]

• Barely a quarter of the police chiefs polled believed expanding the death penalty, which they viewed as slow and cumbersome, would alleviate crime.[13]

• Of various statements about the death penalty, the one with which the police chiefs most identified was:  **"Philosophically, I support the death penalty, but I don't think it is an effective law enforcement tool in practice."**

The police chiefs rejected any suggestion that insufficient use of the death penalty interfered with their work. When asked about obstacles to effective law enforcement, the police chiefs ranked insufficient use of the death penalty last in a list of nine issues, with only 2% saying it was one of their top concerns.[15] Even in the south, only 3% of the police chiefs chose greater use of the death penalty as one of their top priorities.  Instead, chiefs throughout the country identified lack of law enforcement resources, drug and alcohol abuse, family problems, and the lack of secure treatment for the mentally ill as their top problems.

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

The primary purpose of the criminal justice system is to make society safer.  All aspects of this system—apprehending offenders, trials, and punishment—have costs.  Cutbacks in any part of the criminal justice system can potentially result in a less safe society.  Choices have to be made.  The death penalty is the most expensive part of the system on a per-offender basis.  Millions are spent seeking to achieve a single death sentence that, even if imposed is unlikely to be carried out.  Thus money that the police desperately need for more effective law enforcement is wasted on the death penalty. It should be high on the list of programs to cut.



## Police Chiefs Agree Death Penalty Does Not Work as a Deterrent

"The death penalty does little to prevent violent crimes because perpetrators rarely consider the consequences when engaged in violence."

Disagree

4%

39%

Agree

57%

■ Strongly or Somewhat Disagree

■ Strongly or Somewhat Agree

☐ Not sure



*The reality is that the death penalty is not, and never has been, a deterrent. Prison safety depends on proper staffing, equipment, resources and training. Certainly the money spent on trying to put someone to death for over 20 years could find better use in addressing those practical needs of our correctional system. . . [T]he best way to protect our correctional professionals is to recognize the need for a well-trained staff, for the commitment of adequate resources to operate the institutions safely, and for innovative management incentives that serve to reduce the opportunity for prison violence.[ii]*

**- John Connor, Chief Special Prosecutor in Montana for 21 years, prosecuting five prison-homicide cases**

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## Police Reject Deterrence Theory

A significant reason why police chiefs do not favor use of the death penalty is that they do not believe it deters murders. Only 37% of those polled believed the death penalty significantly reduces the number of homicides.[16] Fifty-seven percent (57%) agreed: "The death penalty does little to prevent violent crimes because perpetrators rarely consider the consequences when engaged in violence."[17]  Only 24% of the respondents believe murderers think about the range of possible punishments before committing homicides.[18]



*With California facing its most severe fiscal crisis in recent memory -- with draconian cuts about to be imposed from Sacramento that will affect every resident of the state -- it would be crazy not to consider the fact that it will add as much as $1 billion over the next five years simply to keep the death penalty on the books.* [iii]

**- Former California Attorney General
   John Van de Kamp**

## Criminologists Concur

The leading criminologists in the country agree with the police chiefs about deterrence.  A recent survey showed that 88% of the country's top criminologists do not believe the death penalty acts as a deterrent to homicide.[19]

Eighty-seven percent (87%) believe abolition of the death penalty would have no significant effect on murder rates.  The authors concluded:

Our survey indicates that the vast majority of the world's top criminologists believe that the empirical research has revealed the deterrence hypothesis for a myth … [T]he consensus among criminologists is that the death penalty does not add any significant deterrent effect above that of long-term imprisonment.[20]

Over many years, deterrence studies have been inconclusive, with most experts concluding that the relative rarity of executions and their concentration in a few states renders national conclusions about a deterrent effect to the death penalty unreliable.[21]  If the goal is to deter homicides, the police chiefs have pointed to many ways of achieving it far more effectively than the death penalty.

## The Crisis Facing
## State Criminal Justice Systems

On the state and federal level, efforts are being made to eliminate government programs that do not work and to address deficits through layoffs, shorter hours for governmental services, and higher fees.  But so far the death penalty has largely escaped the budgetary scalpel.  Capital punishment uses enormous resources on a few cases, with little to show for it.  This was the principal reason Colorado's legislature came within one vote this year of passing a bill to abolish the death penalty and use the money saved to deal with unsolved cases, as victims' families had requested.[22]

The same states that are spending millions of dollars on the death penalty are facing severe cutbacks in other justice areas.  Courts are open less, trials are delayed, and even police are being furloughed.

• In Florida, the courts have lost 10% of their funding, with another cut expected, as home foreclosures accelerated.[23]

• Philadelphia is leaving 200 police positions unfilled.[24]

• Police in Atlanta had a 10% pay cut through a furlough of 4 hours per week, even as the region experienced an increase in crime.[25]

• In New Hampshire, civil and criminal jury trials were halted for a month to save money; in one county, 77 criminal trials were delayed for up to six months.[26]

• Public defenders in Kentucky, Tennessee, and Florida are overburdened with caseloads of 400 felonies a year, even though national standards set a limit of 150.[27]

• Legal service organizations that provide help to indigent clients in civil matters depend on income from interest rates that are tied to the Federal Reserve's benchmark interest rate.  When that rate fell nearly to zero, many legal service organizations were forced to cut staff 20%, just when their services were most needed.[28]

• The legal service agency in East Texas where thousands of people lost their homes in Hurricane Ike in 2008 experienced a budget drop from $16 million to $4 million.[29]

• A recent poll by the Police Executive Research Forum found that 39% of responding police departments said their operating budgets were being cut because of the economy, and 43% said the faltering economy had affected their ability to deliver services.[30]

Clearly, eliminating the death penalty cannot solve all of these problems, but the savings would be significant.  Where studies have been done, the excess expenditures *per year* for the death penalty typically are close to $10 million per state.[31]  If a new police officer (or teacher, or ambulance driver) is paid $40,000 per year, this death penalty money could be used to fund 250 additional workers in each state to secure a better community.



*[W]hat of the tremendous cost of pursuing capital punishment? . . . [If] we were to replace the death penalty with life without parole, that $22.4 million could pay for 500 additional police officers or provide drug treatment for 10,000 of our addicted neighbors. Unlike the death penalty, these are investments that save lives and prevent violent crime. If we knew we could spare a member of our family from becoming a victim of violent crime by making this policy change, would we do it?[iv]*

**-Governor Martin O'Malley of Maryland**

## Costs Affect Capital Cases

The costs of capital punishment have forced some states into a crisis in administering the death penalty itself:

• In New Mexico, the state Supreme Court held that more resources had to be made available for indigent defendants facing capital punishment. The legislature declined and adjourned for the year. A trial judge then ruled that the state could not pursue the death penalty in a particular case.  The attorney general's office concurred, halting the capital prosecution.[32] The state abolished the death penalty in 2009, with costs as a factor.[33]

• In Georgia, pursuing the death penalty in the Brian Nichols' case cost the state over $2 million in defense costs, and probably more for the prosecution. It resulted in a verdict of life imprisonment.  There was no question of Nichols' guilt, but *seeking* the death penalty proved enormously expensive.  The case has resulted in a crisis in indigent funding across the state.  The head of the death penalty unit of the public defender's office resigned because his office could no longer fairly represent its clients.  Many cases have ground to a halt.[34]

• In Florida, a budget crisis has led to a cut in funds for state prosecutors.  Some prosecutors will be cutting back on use of the death penalty and perhaps other prosecutions. Florida State Attorney

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

Harry Shorstein recently explained how available funds affect the administration of justice: "There will be cases that can't be tried. . . . We are strained to the breaking point. . . . Instead of seeking the death penalty, maybe we'll seek something else."[35]

In 2009, eleven state legislatures (Colorado, Connecticut, Illinois, Kansas, Maryland, Montana, Nebraska, New Hampshire, New Mexico, Texas, and Washington) considered bills to abolish the death penalty. In many of the debates, cost was an important issue. New Mexico abolished the death penalty. Connecticut voted to abolish it, but the bill was vetoed by the governor. In Colorado and Montana, the abolition bill passed one house of the legislature before being defeated. With the economic crisis continuing, it is likely other states will address this issue.

## How much does the death penalty cost?

There are many ways to approach the question of how much the death penalty costs. One could calculate the cost of each individual step in a death penalty case, such as the investigation, the trial, and the appeals, though this approach focuses only on the distinct minority of cases that go through the whole system. Another approach would be to measure the extra cost to the state of arriving at one death sentence or one execution, a cost that must include the many potential death penalty cases that failed to produce such a result. Finally, one could assess the total extra costs to the state for maintaining the death penalty system instead of a system in which life in prison was the maximum sentence, on a yearly or multi-year basis. In recent years, studies have been conducted not just to determine the bottom line in dollars and cents for this system, but as a way of evaluating whether the death penalty is justified in comparison to other pressing state needs.

There is no national figure for the cost of the death penalty. Every state study is dependent on that state's laws, pay scales, and the extent to which it uses the death penalty. Studies have been conducted by research organizations, public defender offices,

legislative committees, and the media. Researchers have employed different approaches, using different assumptions. However, all of the studies conclude that the death penalty system is far more expensive than an alternative system in which the maximum sentence is life in prison.

The high costs to the state per execution reflect the following reality: For a single death penalty trial, the state may pay $1 million more than for a non-death penalty trial.[36] But only one in every three capital trials may result in a death sentence,[37] so the true cost of that death sentence is $3 million. Further down the road, only one in ten of the death sentences handed down may result in an execution.[38] Hence, the cost to the state to reach that one execution is $30 million. Sums like these are causing officials to rethink the wisdom of such expenditures.

Although arriving at the actual cost of the death penalty in a state is complicated, in some states $30 million per execution is a very conservative estimate:

• In 2008, the California Commission on the Fair Administration of Justice released an exhaustive report on the state's capital punishment system, concluding that it was "dysfunctional" and "broken." The report found that the state was spending $137 million per year on the death penalty. The Commission estimated a comparable system that sentenced the same inmates to a maximum punishment of life without parole would cost only $11.5 million per year.[39] Since the number of executions in California has averaged less than one every two years since the death penalty was reinstated in 1977, the cost *for each execution* is over $250 million. The state has also indicated it needs another $400 million to construct a new death row.

• In New York and New Jersey, the high costs of capital punishment were one factor in those states' recent decisions to abandon the death penalty. New York spent about $170 million over 9 years and had no executions.[40] New Jersey spent $253 million over a 25-year period and also had no executions.[41] In such states the cost per execution obviously cannot be calculated, but even assuming they eventually

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## Death Penalty Costs Increasing

reached one execution every other year, and continued the annual expenditures indicated in their studies, the cost per execution would be in the $20-to-$40 million range.

• In Maryland, where a legislative commission recently recommended abolishing the death penalty, a comprehensive cost study by the Urban Institute estimated the extra costs to taxpayers for death penalty cases prosecuted between 1978 and 1999 to be $186 million.[42] Based on the 5 executions carried out in the state, this translates to a cost of $37 million per execuion.

It is important to emphasize the high costs per execution do not mean that executions themselves are expensive, or that pursuing one execution will cost tens of millions of dollars. Rather, these costs reflect the reality that most capital prosecutions never result in a death sentence, and most death sentences do not result in an execution. The extra expenses begin mounting as soon as counsel are appointed in a potential death penalty case.



*I worked in corrections for 30 years. . . I came to believe that the death penalty should be replaced with life without the possibility of parole. I didn't reach that conclusion because I'm soft on crime. My No. 1 concern is public safety. I wish the public knew how much the death penalty affects their wallets.*

*California spends an additional $117 million each year pursuing the execution of those on death row. Just housing inmates on death row costs an additional $90,000 per prisoner per year above what it would cost to house them with the general prison population.[v]*

**-Jeanne Woodford, former Warden of San Quentin**

Moreover, the costs per execution are rising. In 1988, the *Miami Herald* estimated that the costs of the death penalty in Florida were $3.2 million per execution, based on the costs and rate of executions at that time.[43] But today there are more people on death row, fewer executions per year, and higher overall costs, all contributing to a significantly higher cost per execution. A recent estimate by the *Palm Beach Post* found a much higher cost per execution: Florida now spends $51 million a year over what it would spend to punish all first-degree murderers with life in prison without parole. Based on the 44 executions Florida carried out from 1976 to 2000, that amounts to a cost of $24 million for each execution, a significant rise from earlier projections.[44]



[T]he death penalty is inefficient and extravagantly expensive. . . . Spending scarce public resources on after-school programs, mental health care, drug and alcohol treatment, education, more crime labs and new technologies, or on hiring more police officers, would truly help create safer communities.[vi]

**-Norm Stamper, 35-Year-Veteran Police Officer; Chief of Police (ret.), Seattle**

A similar increase appears in California. In 1988, the *Sacramento Bee* found that the death penalty cost California $90 million annually beyond the ordinary expenses of the justice system, of which $78 million was incurred at the trial level.[45] But the costs have increased sharply since then. According to the *Los Angeles Times* in 2005, maintaining the death penalty system now costs taxpayers more than $114 million a year beyond the cost of simply keeping the convicts locked up for life. This figure does not count the millions more spent on court costs to prosecute capital cases. The *Times* concluded that Californians and federal taxpayers are paying more than **$250 million for *each* execution.**[46]

It is also telling to examine the costs of specific features of the death penalty system, as revealed through state and federal studies:

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

• In Maryland, the 106 cases in which a death sentence was sought but **not** imposed will cost the state $71 million. This extra cost is solely due to the fact that the death penalty was pursued, even though the ultimate outcome was a life or long-term prison sentence.[47]

• The average cost for the **defense** at trial in a federal death case is $620,932, about 8 times that of a non-capital federal murder case.[48]

• In Kansas, the **trial costs** for death cases were about 16 times greater than for non-death cases ($508,000 for death case; $32,000 for non-death case).  The appeal costs for death cases were 21 times greater.[49]

• In California, the cost of confining one inmate to death row is $90,000 per year more than the cost of incarcerating the same inmate in a maximum-security prison.  Death row inmates require higher security, often in single cells, where meals and other essentials are brought to them daily.  This is a very inefficient means of confinement.  With California's current death row population of 670, that amounts to over $60 million annually.[50]  And a new death row is being planned, at a cost of about $400,000 per inmate.

> *It's hard to imagine that any of the 89 Kansas lawmakers who voted in 1994 to revive the death penalty for the "the worst of the worst" criminals anticipated it would still be unused come 2007. Each year sends more men to Kansas' death row, nine in all currently, but the legal challenges to their sentences continue at a glacial pace. Then there is the cost to taxpayers, averaging $1.2 million each by one tally. At some point, given the legal problems and the lack of executions, a death penalty stops making sense for Kansas.[vii]*
>
> **-Editorial, (Kansas) Wichita Eagle**

# Opportunity Costs

Generally, offices involved in the prosecution or defense of criminal cases expand or contract according to the work that must be done.  The extra time required by death penalty cases typically has caused the size and budgets of such offices to increase, but not every cost associated with the death penalty appears as a line item in the state budget.  Prosecutors, who are not paid by the hour, have been reluctant to divulge the time and related expenses reflecting their part in capital cases.  Judges and public defenders are usually salaried employees who will be paid the same amount whether assigned to death penalty cases or other work.  But it would be misguided not to include the extra time that pursuing the death penalty takes compared to cases prosecuted without the death penalty in calculating costs.

If it takes 1,000 hours of state-salaried work to arrive at a death sentence and only 100 hours to have the same person sentenced to life without parole, the 900 hours difference is a state asset.  If the death penalty is eliminated, the county or the state can decide whether to direct those employee-hours to other work that had been left undone, or choose to keep fewer employees.  There is a financial dimension to all aspects of death penalty cases, and proper cost studies take these "opportunity costs" into account.[51]

# The Effect of Plea Bargaining

One asserted refutation that has been offered to the high cost of the death penalty is that the threat of this punishment produces financial savings because defendants are more likely to accept plea bargains, thus avoiding the cost of a trial.[52] However, whatever savings are produced through this ethically questionable practice are overwhelmed by the costs of preparing for a death penalty prosecution even if it never goes to trial.

Some of the most thorough cost analyses conducted over the past 15 years specifically address plea bargaining as an area that could affect the costs of the death penalty, including those in North Carolina,[53] Indiana,[54] Kansas,[55] and California,[56] though

some considered it too speculative to measure. These studies nevertheless concluded that the death penalty added significantly to the costs of the criminal justice system.

The dubiousness of any savings from this practice is underscored by a federal death penalty cost study.  The Judicial Conference of United States concluded that the average cost of representation in federal death penalty cases *that resulted in plea bargains* was $192,333.  The average cost of representation in cases that were eligible for the death penalty but in which the death penalty was not sought was only $55,772.[57]  This indicates that *seeking* the death penalty raises costs, even when the case results in a plea bargain.  It would be far cheaper to pursue murder cases if the death penalty were never on the table, even taking some non-capital cases to trial, than to threaten the use of the death penalty to induce a plea bargain because the legal costs of preparing for a death penalty case far exceed the costs of a non-death penalty trial.

Moreover, data from some states refute the notion that the death penalty increases the incentive to plea bargain. Prosecutors in New Jersey said that abolition of the death penalty there in 2007 has made no difference in their ability to secure guilty pleas.[58] In Alaska, where plea bargaining was abolished in 1975, a study by the National Institute of Justice found that since the end of plea bargaining, "guilty pleas continued to flow in at nearly undiminished rates. Most defendants pled guilty even when the state offered them nothing in exchange for their cooperation."[59]

In addition, the practice of charging the death penalty for the purpose of obtaining plea bargains is an unethical and unconstitutional interference with a defendant's Sixth Amendment right to trial. It risks convicting innocent defendants who plead guilty solely to avoid the possibility of a death sentence—which has occurred on numerous occasions.[60]

*During my career, which includes 10-plus years as a certified crime scene technician, I have experienced countless violent crime scenes where the perpetrators inflicted horrific injury, pain and suffering on their victims. Of the accused murderers my fellow officers and I have brought to justice, I do not believe any of them was deterred in the least by Nebraska's death penalty.*

*One facet of the issue that is rarely mentioned is the economic cost of capital punishment . . . [these] cases are the most expensive cases by far. . . with a cost as high as $7 million. . . . Removing the death penalty variable from the justice equation should reduce the overall cost.[viii]*

**-Jim Davidsaver, 20-Year Police Veteran,
   Lincoln, Nebraska**

## Approximating the National Costs

As noted above, it is not possible to say precisely how much the death penalty costs the nation as a whole.  Many states have not even attempted an evaluation of their costs.  Of the states where reliable estimates are available, the differing methodologies used, assumptions made, and applicable statutes make generalizations difficult.  The cost per execution, for example, is dependent on the number of executions a state has carried out.  Cost estimates of $20-$37 million per execution tend to come from states (such as Maryland) that have a fair number of trials, but relatively few executions.  A conservative approach would be to use the North Carolina study, which measured actual costs from cases in a state that is sixth in the country in carrying out executions.  Their estimate of $2.16 million per execution is probably very understated because the study was conducted in 1993 and costs have increased considerably since then.

Assuming that North Carolina's cost-per-execution is a representative figure, and using the 1,150 executions that have occurred nationally since the death penalty was reinstated in 1976, the country has spent about $2.5 billion beyond the costs that would have been incurred if life in prison was the most severe penalty.  (This cost includes cases in which the death penalty was sought—making them more expensive—but no execution occurred.)

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

If recent costs per execution measured in Florida and Maryland are representative of the true costs around the country, then the total bill for the death penalty is likely to be as much as ten times as high, or $25 billion.

Another approach to this same question is to use the extra costs *per death sentence* as the measure for the cost of the nation's death penalty.  Again, the North Carolina study may be representative, although conservative.  The extra costs attributable to each death sentence were about $300,000.  Since 1973, there have been about 7,500 death sentences in the country.  Hence, the total net costs for the death penalty have been $2.25 billion, very close to the figure computed from the execution data.  Again, data from more recent studies indicate a higher cost per death sentence, implying a much higher national bill for having the death penalty.

## Can the Costs of the Death Penalty Be Reduced?

An understandable reaction to the high costs of the death penalty is to ask whether there are ways it could be made less expensive, such as by 1) curtailing the appeals process, or 2) limiting trial expenses.  However, the first interferes with a critical part of the death penalty process and could result in the execution of innocent defendants, and the second could end up costing more than the current system.

Although the appeals process is a tempting target for critics, it actually does not constitute most of the death penalty's costs.  In the cost study conducted by Duke University, trial costs in North Carolina made up over 4 times the appeals costs for each death sentence imposed.[61]  But cutting back on appeals presents another, more serious problem.

Since 1973, 138 people have been exonerated and freed from death row.[62]  In many of these cases, the appeals process was critical in overturning an unfair conviction and allowing a new trial at which the defendant was acquitted.  In other cases, even the appeals failed to find evidence of

innocence or a constitutional flaw in the process that led to conviction, but the process at least allowed for the passage of time, during which exonerating DNA evidence was discovered and tested, or the person actually responsible for the crime was identified.  The average time between sentencing and exoneration was 9.8 years.  If the appeals process were truncated there might not have been time for the mistakes to be found or new evidence to emerge.  Most of the innocent people who were sentenced to death would have been executed before they could demonstrate their conviction was a mistake.

The same can be said for attempts to shortchange the defense in capital trials.  Good lawyers who are given adequate resources often can uncover the evidence that leads to the acquittal of an innocent defendant.

Good representation and thorough appeals are also necessary for guilty clients.  It is impossible to know before the process has run its course who is guilty and who is innocent.  In addition, the death penalty is supposed to be given to only the worst offenders.  Qualified defense lawyers are needed to ensure that juries have all the information they need to make an informed sentencing decision.  In 2003 the American Bar Association issued new guidelines for the appointment and performance of defense counsel in capital cases.[63]  These guidelines were intended to establish a national standard of practice, and courts that ignore them risk reversal at a later time.

From a cost perspective, the reasons for providing a full defense are also compelling.  In recent years the U.S. Supreme Court has overturned several death penalty cases because of inadequate representation.[64]  The thrust of these decisions is that death penalty cases require defense attorneys to investigate every aspect of their client's history in order to prepare an adequate defense on penalty as well as guilt.  This implies states should hire experienced attorneys who know how to conduct such investigations, and give them the resources to carry them out.  If not, the case may have to be done over, requiring all the expenses of a death penalty trial a second time. Cost studies of the death penalty

indicate that 70% of the expenses occur at the trial level. Two trials greatly increase the cost of the death penalty, especially when the passage of time makes re-trial more difficult. If a new conviction or sentence is handed down, a second appeals process must also be conducted.

 ***Families of Homicide Victims and Missing Persons*** *believes the death penalty—as it is practiced in Colorado—is a waste of taxpayers money. It is no deterrent to those who contemplate murder. We propose to eliminate the death penalty and use those funds to investigate our unsolved murders. The most effective deterrent is the certainty of apprehension. Too many people are getting away with murder.*[ix]

-**Mission Statement, FOHVAMP  2009**

## Using the Death Penalty Less

Could states reduce the cost of the death penalty by seeking death sentences less frequently? Fewer trials and appeals, and fewer people on death row, would reduce the overall costs of the death penalty. However, in almost all states the decision whether to seek the death penalty is not centralized but is made by the District Attorney of each county. These prosecutors typically have wide discretion on whether to seek the death penalty. Although it is possible to write more restrictive capital punishment statutes, the tendency has been for states to *expand* their laws to make more crimes eligible for the death penalty.[65] If the murder of a police officer makes a defendant death-eligible, the high-profile murder of a fire fighter or teacher may well result in those crimes becoming death-eligible as well. Once enacted, such expansions are hard to rescind.

Nevertheless, even without changes in the law restricting the types of murder eligible for the death penalty, death sentences have dropped dramatically since 2000. In the 1990s, the annual number of death sentences averaged close to 300, but in recent years the number is down to 115, a 62%

drop. Skeptical juries concerned about innocence[66] and the availability of life without parole sentences have played a part in this decline. The rising costs of the death penalty have caused some prosecutors not to seek the death penalty or to accept plea bargains.[67] The current economic climate could accelerate this trend.

Ironically, a death penalty that is rarely used raises its own concerns. Are the few people chosen for execution really the worst of the worst, or was their sentence just the unfortunate product of ineffective representation or their crime being committed in a high-death penalty county? Do the rationales of deterrence and retribution make sense in a system where only a tiny fraction of eligible criminals in only a few states receive the ultimate punishment?

An article in the *Wall Street Journal* noted that in states where counties are chiefly responsible for prosecuting capital cases, the expenses can put an extraordinary burden on local budgets comparable to that caused by a natural disaster.[68] Katherine Baicker of Dartmouth concluded that capital cases have a "large negative shock" on county budgets, often requiring an increase in taxes. She estimated the extra expenses for counties to be $1.6 billion over a 15-year period.[69]

The net effect of this burden on counties is a widely disparate and highly arbitrary use of the death penalty. "Rich" counties that can afford the high costs of the death penalty may seek this punishment often, while poorer counties may never seek it, settling for life sentences instead. In some areas, this geographical disparity can have racial effects as well, depending on the geographical location of racial minorities within the state. Some counties have approached the brink of bankruptcy because of one death penalty case that had to be repeated two or three times.[70]

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## Why Does the Death Penalty Cost So Much?

The principal reason why the death penalty is so expensive can be summed up in one phrase: "death is different."[71]  Whenever the government seeks to execute a human being, the legal system is required by a long line of U.S. Supreme Court precedent, buttressed by American Bar Association guidelines, to apply a more methodical and reliable process.  The older, less guided form of capital punishment was struck down as unconstitutional in 1972.[72]

The stakes in death penalty cases have always put more burdens on the state compared to other parts of the criminal justice system.  Long before states were required to appoint counsel for indigent defendants in ordinary criminal cases, the appointment of counsel was deemed essential in death penalty cases.[73]  Congress required the assignment of two attorneys "learned in the law" in federal capital cases as far back as the First Congress in 1790.[74]

The exposure of so many mistakes in death penalty cases in recent years has shown that the ideal of "heightened due process" in capital cases has often been ignored.  It has become clear that a shoddy, less expensive death penalty risks innocent lives.  It can also make the punishment of death depend on whether a state is willing to provide adequate representation. The choice today is between a very expensive death penalty and one that risks falling below constitutional standards.

Costs alone may not carry the day in deciding the future of an institution as entrenched as capital punishment.  The costs of the death penalty must be compared to other ways of achieving a safer community.  The money saved by giving up the death penalty is desperately needed elsewhere: for hiring and training police, solving more crimes, improving forensic labs and timely DNA testing, and crime prevention.

## Stages of a Capital Case

Every stage of a capital case is more time-consuming and expensive than in a typical criminal case.  If the defendant is found guilty of a capital crime, an entire separate trial is required, with new witnesses and new evidence, in which the jury must decide whether the penalty should be death or life imprisonment without the possibility of parole.  Two attorneys are often appointed for the defense, so that issues of guilt and sentencing can be separately explored.  The prosecution has to respond with equal or greater resources since they have the burden of proof.

## Experts Needed

Experts are needed to examine the forensic evidence and to explore the mental health of the defendant.  For every expert on one side, the other side needs a rebuttal.  In a thoroughly defended case, mitigating and aggravating evidence is compiled and examined.  Mitigation experts must probe aspects of the defendant's life from birth to the present.  Relatives, co-workers, supervisors, teachers, and doctors are interviewed.  The state matches this testimony with evidence of aggravating factors and expert testimony denigrating the defendant's past.

The mental health of the defendant at the time of the crime may become a major issue, with psychiatrists called to testify.  If a defendant is mentally retarded, he cannot receive the death penalty, though that determination alone can result in considerable expense.  If at any time he was mentally ill, that will be a mitigating factor to be presented to the jury.  Most of the preparation for this presentation must be done in advance, whether or not a sentencing trial actually turns out to be necessary.  (Of course, in states that are not so thorough, the costs will come later when verdicts are overturned and trials have to be done over.)

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## Jury Selection

Jury selection in a capital case can take weeks or even months.[75]  Each person's position on the death penalty is explored in detail by the judge, the prosecutor and defense attorney.  Such questioning about the eventual punishment of the defendant would not be allowed in a non-death penalty case, and it makes jury selection take much longer in capital cases.  Potential jurors must be carefully questioned about their willingness to vote for the death penalty or life imprisonment; any prospective juror who cannot fairly consider both sentencing alternatives is excluded from serving.

Jurors may also be struck for no stated reason.  Although race and gender are improper considerations in selecting a jury, they are statistically related to people's views on the death penalty.  Hence, jury selection can involve lengthy disputes about whether a particular juror was struck legitimately because of her doubts about the death penalty or unfairly because of her race.  With regard to costs, the end result is that jury selection costs much more in capital cases because it takes much longer.

## Appeals

Death penalty trials often conclude with no death sentence.  The defendant may be acquitted or sentenced to prison. However, the process of getting to that point is much more expensive because the case was prosecuted as a capital case.  If a death sentence is imposed, there are mandatory appeals.  Unlike in ordinary criminal cases where the main focus of an appeal is the conviction, capital defendants are entitled to full review of their death sentence as well.  A reversal can mean a new sentencing trial with another jury, more witnesses, and another chance that no death sentence will be imposed.  Additional appeals may look at constitutional challenges, such as the effectiveness of defense counsel or the withholding of any evidence that should have been turned over before trial.  The entire appeal process can take 15 or 20 years before an execution.  The average time between sentencing and execution in 2007 was 12.7 years, the longest of any year since the death penalty was reinstated.[76] In 2006, over 400 inmates around the country had been on death row

for 20 years or more, with some cases going back to 1974. Despite the length of this process, however, it is the pre-trial and trial costs that make up the majority of death penalty expenses, not the appeal.

## Time on Death Row

The time that inmates spend on death row also adds to the costs of the death penalty because of the extra security required compared to normal prisons.  In California, a legislative commission concluded that it costs the state an *extra* $90,000 for each death row inmate per year compared to the costs of the same inmate housed in general population.  With over 670 inmates on death row, that amounts to an additional yearly cost of $60 million solely attributable to the death penalty.[77]

## Expensive Life Sentences

It is important to note that all of these expenses are incurred in the many death penalty cases that never result in an execution. Sentences or convictions can be reversed, defendants may die of natural causes or suicide, governors occasionally grant clemency, and entire statutes can be overturned by the courts.  This often means that a life sentence is the end result, but only after a very expensive death penalty process.  According to one comprehensive study, 68% of death penalty cases are reversed at some point in the appeals process.  When these cases are retried without the defect that led to the reversal, 82% result in a sentence of life or less.[78]

This is an extremely wasteful process.  The most prevalent cause for reversal on appeal is the inadequacy of the trial counsel.  Frequently, this is the result of courts trying to cut costs by short-changing due process.  States that appoint inexperienced lawyers at low fees, or which deny the experts and resources necessary for thorough representation, may end up paying for two trials, with the second one resulting in a life sentence.  In most cases a life sentence could have been obtained at the outset of the case for a fraction of the cost.  It is the *pursuit* of the death penalty that is so expensive.

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

The higher costs of the death penalty process—lengthy trials, complicated appeals with many reversals, the higher security of death row—are unavoidable and likely to increase.  Death sentences and executions may continue to decline.  The longer the death penalty is retained, the higher the bill will be for nebulous results.  At the same time, programs with proven track records in reducing crime and improving society will go unfunded.

## What is Society Receiving in Return?

Costs are only part of a cost-benefit analysis. If the death penalty has no clear and measurable benefits, then its high costs are even less defensible. As discussed above, neither police chiefs, nor criminologists, nor the American public believe that the death penalty serves as a better deterrent to murder than a sentence of life in prison.

The retribution that is imposed in the tiny fraction of cases that result in an execution compared to the number of murders renders this purpose meaningless as well. In reality, executions are rare and depend more on factors such as geography, a state's spending on capital defense, and other arbitrary factors than on the severity of the offense.

Since the death penalty was reinstated in 1976, 41 of the 50 states have had either no executions or an average of less than 1 execution per year.[79]  Of the remaining 9 states, only 5 have averaged more than 2 executions per year and only 1 (Texas) averaged more than 3.  By contrast, the average number of murders in the U.S. per year during this time was approximately 19,000.[80]  Abstract justifications for the death penalty such as retribution and deterrence, which have been widely criticized on other grounds, have little meaning when a punishment is used so rarely and unpredictably.

# Conclusion

It is doubtful in today's economic climate that any legislature would introduce the death penalty if faced with the reality that each execution would cost taxpayers $25 million, or that the state might spend more than $100 million over several years and produce few or no executions.  Surely there are more pressing needs deserving funding, such as retaining police officers, rebuilding roads and bridges, creating jobs, providing health care for children, and keeping libraries open.  Yet that is precisely the dilemma that many states with the death penalty now face.

Referring to the costs of the death penalty often evokes a response that money is irrelevant when it comes to justice and a safer society. But the death penalty is not essential to those goals, as the 15 states in the U.S. and the growing majority of countries in the world without the death penalty have demonstrated.  Even states with the death penalty rarely use it.  Justice can be achieved far more reliably and equitably without the death penalty.  There are more efficient ways of making society safer.

*By pursuing life without parole sentences instead of death, resources now spent on the death penalty prosecutions and appeals could be used to investigate unsolved homicides, modernize crime labs, and expand effective violence prevention programs.[81]*

**-Letter signed by 30 law enforcement officials to the California Commission on the Fair Administration of Justice**

The economic crisis that began in 2008 continues, and its impact on states will be felt for years to come.  There is no reason the death penalty should be immune from reconsideration, along with other wasteful, expensive programs that no longer make sense.  The promised benefits from the death penalty have not materialized.  Deterrence is not credible; vengeance in the name of a few victims in a handful of states is both divisive and debilitating.  If more states choose to end the death penalty, it will hardly be missed, and the economic savings will be significant.  The positive programs that can be funded once this economic burden is lifted will be readily apparent. Such an approach would be smart on crime.

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

## REFERENCES

[1]. E. Holder, Speech at the American Bar Association Convention, Aug. 3, 2009; available at U.S. Dept. of Justice http://www.usdoj.gov/ag/speeches/2009/ag-speech-090803.htm.

[2]. J. Abbott, "Less money, more pain and injustice," Fort Worth Star-Telegram, January 20, 2008 (op-ed).

[3]. R. Samuels, "Capital Punishment is a costly mistake," Contra Costa Times, Dec. 19, 2008 (op-ed).

[4]. See, e.g., A. Goodnough, "States Turning to Last Resorts in Budget Crisis," N.Y. Times, June 22, 2009, at A1.

[5]. See, e.g., E. McNichol & I. Law, "State Budget Troubles Worsen," Center on Budget and Policy Priorities, Feb. 10, 2009.

[6]. Death sentences have declined 60% since 2000.  Executions have also declined.  The number of people executed in 2008 was the lowest in 14 years.  See Death Penalty Information Center [DPIC], "The Death Penalty in 2008: Year End Report," http://www.deathpenaltyinfo.org/2008YearEnd.pdf.

[7]. See id. (95% of executions in 2008 were in the South).

[8]. RT Strategies, "Omnibus Poll and The Law Enforcement Leadership Poll," Oct. 29-Nov. 14, 2008 [hereinafter, Police Poll].  The margin of error for the poll was ±5.1 percent.

[9]. Police Poll, question 3.

[10]. Id. at question 4.

[11]. Id. at question 6c.

[12]. Id. at question 7c.

[13]. Id. at questions 4 and 8.

[14]. Id. at question 9.

[15]. Id. at question 2.

[16]. Id. at question 8.

[17]. Id. at question 6.

[18]. Id. at question 8.

[19]. M. Radelet & T. Lacock, "Do Executions Lower Homicide Rates? The Views of Leading Criminologists," 99 Journal of Criminal Law and Criminology 489 (2009).

[20]. Id. at 504.

[21]. See, e.g., J. Donohue & J. Wolfers, "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791, 843 (2005) ("Aggregating over all of our estimates, it is entirely unclear even whether the preponderance of evidence suggests that the death penalty causes more or less murder.").

[22]. K. Johnson, "Death Penalty Repeal Fails in Colorado," N.Y. Times, May 5, 2009.

[23]. S. Karnowski, "Poor economy hits courts, hurts programs for poor," Associated Press, Jan. 23, 2009 (Google-hosted news).

[24]. C. Johnson, "Double Blow for Police: Less Cash, More Crime," Washington Post, Feb. 8, 2009, at A3.

[25]. Id.

[26]. T. Baldas, "Cost-cutting hits courts," National Law Journal, Feb. 16, 2009.

[27]. See Karnowski, note 23 above.

[28]. E. Eckholm, "Interest Rate Drop Has Dire Results for Legal Aid," N.Y. Times, Jan. 19, 2009.

[29]. Id.

[30]. K. Bohn, "Police face cuts as economy falters," CNN.com, Oct. 23, 2008.

[31]. See discussion below in text, pp. 12-14.

[32]. Scott Sandlin, "Death Penalty Out in Guard Killing," Albuquerque Journal, April 4, 2008.

[33]. See D. Baker, "NM Gov Reconsiders Death Penalty," Associated Press, February 16, 2009.  The governor signed the bill abolishing the death penalty on March 18, 2009.

[34]. Shannon McCaffrey, "Georgia Senate slashes money for public defenders," Macon Telegraph, February 20, 2008; see also N.Y. Times, September 7, 2007.

[35]. Jacksonville Daily Record, September 13, 2007.

[36]. In one of the most recent cost studies, The Urban Institute estimated the additional cost of a death penalty trial in Maryland to be $1.9 million.  J.  Roman et al., "The Cost of the Death Penalty in Maryland," The Urban Institute (March 2008), at 2.

[37]. In the Maryland study, 56 death sentences were handed down out of 162 cases in which the death penalty was sought.  Id. at 3. This does not even account for the many cases in which the death penalty was originally sought, incurring many additional expenses, but then settle without a trial or death sentence being imposed.

[38]. Of the 56 death sentences in Maryland, five have resulted in executions.

[39]. See California Commission on the Fair Administration of Justice, http://www.ccfaj.org/rr-dp-official.html, June 30, 2008 [hereinafter California Commission].

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

40. See, e.g., D. Wise, "Capital Punishment Proves to Be Expensive," New York Law Journal, April 30, 2002, at p.1; see also "Costly Price of Capital Punishment—Case Shows Effort Expended Before the State takes a Life," Albany Times-Union, Sept. 22, 2003 (over $160 million spent in 7 years); N.Y. Times, Feb. 28, 2005 (citing costs of $170 million).

41. See Newsday, Nov. 21, 2005.

42. See J. McMenamin, "Death penalty costs Md. more than life term," Baltimore Sun, March 6, 2008. The study included projected future costs since many of the cases prosecuted during that time are still not complete and are incurring additional expenditures.

43. D. Von Drehle, "Bottom Line: Life in Prison One-sixth as Expensive," Miami Herald, July 10, 1988, at 12A.

44. S. V. Date, "The High Price of Killing Killers," Palm Beach Post, Jan. 4, 2000, at 1A.

45. S. Maganini, "Closing Death Row Would Save State $90 Million a Year," Sacramento Bee, March 28, 1988, at 1.

46. Los Angeles Times, March 6, 2005 (California has now had 13 executions).

47. J. McMenamin, see note 42 above.

48. Office of Defender Services of the Administrative Office of the U.S. Courts, "Update on Cost, Quality, and Availability of Defense Representation in Federal Death Penalty Cases," June 2008; prepared by Jon Gould and Lisa Greenman.

49. Performance Audit Report: Costs Incurred for Death Penalty Cases: A K-GOAL Audit of the Department of Corrections, Kansas (2003).

50. California Commission, see note 39 above, at 70.

51. See, e.g., P. Cook, "The Costs of Processing Murder Cases in North Carolina," Duke University (May 1993). This is one of the most comprehensive cost studies conducted in the country. It included the costs of the extra time spent by prosecutors, judges, and other personnel on death penalty cases and concluded that the death penalty costs North Carolina $2.16 million per execution over the costs of a non-death penalty system imposing a maximum sentence of imprisonment for life.

52. See, e.g., K. Scheidegger, "The Death Penalty and Plea Bargaining to Life Sentences," Working paper 09-01, at 13, Criminal Justice Legal Foundation (Feb. 2009) ("repeal of the death penalty would likely result in fewer pleas to life or long sentences, requiring that prosecutors either take more cases to trial at a substantial financial cost or accept bargains to lesser sentences at a substantial cost to public safety.").

53. See P. Cook, note 51 above.

54. Indiana Criminal Law Study Commission, January 10, 2002.

55. See note 49 above.

56. See California Commission, note 39 above.

57. See, "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," Judicial Conference of the United States (May 1998). The prosecution costs in death cases were 67% higher than the defense costs, even before including the investigative costs of law enforcement agencies.

58. R. Lardini, "A year later, state assesses justice without death penalty," New Jersey Star Ledger, December 15, 2008.

59. R. Fine, "Plea Bargaining: An Unnecessary Evil," in Criminal Justice?, Robert Bidinotto, ed. Irving-on-Hudson: Foundation for Economic Education, 1996; cited in "Plea Bargaining: Economic Costs and Benefits," undergraduate paper for The Economics of the Law, Washington University in St. Louis, December 5, 1996; www.dianahsieh.com/undergrad/pb.html.

60. See, e.g., P. Hammel, "Pardons granted to five in murder they didn't commit," Omaha World-Herald, January 27, 2009. The defendants who were pardoned had confessed to the crime to escape the threat of the death penalty. "We were all scared of it. They were all threatening us with it," said James Dean, one of the five who was exonerated. Ada Joann Taylor, another defendant, said, "They told me they wanted to make me the first female on death row." Id.

61. See P. Cook, note 51 above, at p. 97, table 9.1.

62. See DPIC, http://www.deathpenaltyinfo.org/innocence-and-death-penalty (visited Aug. 11, 2009).

63. "ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 Hofstra Law Review 913 (2003) (revised edit.).

64. See, e.g., Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 545 U.S. 374 (2005).

65. See J. Krichmeier, "Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme," 6 William & Mary Bill of Rights Journal 345, 397 (1998).

66. See R. Dieter, "A Crisis of Confidence: Americans' Doubts About the Death Penalty," DPIC (2007).

67. See, e.g., T. Coyne, "Indiana Executions at slowest pace in 15 years," Chicago Tribune, June 14, 2009 (citing prosecutors' hesitations due to the high costs of the death penalty).

68. R. Gold, "Counties Struggle with High Cost of Prosecuting Death-Penalty Cases," Wall St. Journal, Jan. 9, 2002.

69. K. Baicker, "The Budgetary Repercussions of Capital Convictions," National Bureau of Economic Research, Working Paper 8382, July 2001.

70. See generally, R. Dieter, "Millions Misspent: What Politicians Don't Say About the High Costs of the Death Penalty," (revised edit., 1994) (available from DPIC).

RECONSIDERING THE DEATH PENALTY IN A TIME OF ECONOMIC CRISIS

[71]. See Gregg v. Georgia, 428 U.S. 153, 188 (1976) ("penalty of death is different in kind from any other punishment").

[72]. See Furman v. Georgia, 408 U.S. 238 (1972).

[73]. Powell v. Alabama, 287 U.S. 45 (1932) (Scottsboro boys' case).

[74]. 1 Stat. 118-19, sec. 29 (1790).

[75]. See, e.g., B. Miller, "D.C. Case Has Court Struggling for a Jury," Washington Post, April 29, 2001, at C1 (after 5 weeks of jury selection in a capital case, jury was still not complete).

[76]. U.S. Dept. of Justice, Bureau of Justice Statistics, "Capital Punishment, 2007 – Statistical Tables," at Table 11 (available at http://www.ojp.usdoj.gov/bjs/pub/html/cp/2007/cp07st.htm).

[77]. California Commission, see note 39 above, at 70.

[78]. See J. Liebman, et al., Capital Attrition: Error Rates in Capital Cases, 1973-1995, 78 Texas Law Review 1839 (2000).  The author notes that in an additional 7% of the cases there is not even a conviction after retrial.

[79]. See DPIC, http://www.deathpenaltyinfo.org/executions-united-states, (June 2009).

[80]. See U.S. Dept. of Justice, FBI Yearly Uniform Crime Reports, http://www.fbi.gov/ucr/ucr.htm (2009).

[81]. See Death Penalty Focus Press Release at http://www.deathpenalty.org/article.php?id=212 (March 27, 2008).

## REFERENCES FOR BOXES

i. J. Abbott, "Less money, more pain and injustice," Fort Worth Star-Telegram, January 20, 2008 (op-ed).

ii. J. Connor, "Death Penalty drains justice system resources," Billings Gazette, March 22, 2009 (op-ed).

iii. J. Van de Kamp, "California can't afford the death penalty," Los Angeles Times, June 10, 2009 (op-ed).

iv. M. O'Malley, "Why I Oppose the Death Penalty," Washington Post, February 21, 2007 (op-ed).

v. J. Woodford, "Death Row Realism," Los Angeles Times, October 2, 2008) (op-ed).

vi. N. Stamper, "Death penalty wastes money, while failing to reduce crime," Mercury News, Nov. 19, 2007 (op-ed).

vii. Editorial, Wichita Eagle, Sept. 13, 2007.

viii. J. Davidsaver, (Lincoln) Journal-Star, Mar. 25, 2007 (op-ed).

ix. Families of Homicide Victims and Missing Persons, http://www.unresolvedhomicides.org/about.html (2009).



The Death Penalty Information Center (DPIC) is a non-profit organization serving the media and the public with analysis and information on issues concerning capital punishment.  The Center provides in-depth reports, issues press releases, conducts briefings for journalists, and serves as a resource to those working on this issue.  The Center is funded through the generosity of individual donors and foundations, including the Roderick MacArthur Foundation, the Open Society Institute, and the European Union. The contents of this document are the sole responsibility of DPIC and can under no circumstances be regarded as reflecting the position of the European Union or other donors.

www.deathpenaltyinfo.org.