# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| IIIIIIIIIIII | Evidentiary Hearing Exhibits |
| 2 | Report from George W. Woods, Jr., M.D., Dated February 14, 2012 |
| 2.001 | Appendix A to the Expert Report of George W. Woods, Jr., M.D. |
| 2.002 | Appendix B- Overview of the Biopsychosocial and Psychiatric History of Wendi Andriano |
| 2.003 | Curriculum Vitae of George W. Woods, Jr., M.D. |
| 2.004 | Appendix D- Qualifications, Expert Witness Experience and Compensation Rate |
| 3 PART 1 | Expert Report of James Hopper, Ph.D. |

# EXHIBIT IIIIIIIIIII
# PART 1

Exhibit No.:   2

Case No.: CR2000-096032

For Identification:

**DEFENDANT**
01/31/2014
_____

In Evidence: *Stipulated*
*2/3/2014*
_____

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841533

**GWW** GEORGE  W.  WOODS, JR., M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Atlanta

Stephan Nickels, Esq.
Foley and Lardner, LLP
Madison, Wisconsin

       Re: Wendi Elizabeth Andriano

Mr. Nickels,

       In accordance with your request to provide the government with a summary and outline of my testimony, I submit the following report. The purpose of this report is to outline my expert opinion regarding whether Ms. Andriano had any mental defects or impairments at the time of the crime and/or throughout her lifetime.

**MATERIALS RELIED UPON**

       The data or other information considered by me in forming opinions in this case are listed in **Appendix A**, attached. The substance of my opinions as expressed in this report can be summarized in a PowerPoint should you desire one as an Exhibit for court proceedings.

       In order to complete my neuropsychiatric examination, I interviewed Wendi on 11/23/2010, 1/18/2011, and 4/26/2011.  I also interviewed her mother, Ms. Donna Ochoa, on 4/27/2011. I reviewed Wendi's academic history, employment history, and medical/mental health history.

       In addition, I reviewed Wendi's paternal and maternal family history, including available medical, school, and prison records and declarations from persons who knew Wendi,

1

including Donna Ochoa, Alejo Ochoa, Shelby Wayne Robertson, family members, church members, pastors, classmates from Wendi's elementary and high school years, and persons who knew Wendi as an adult. The social history of Ms. Andriano created as a part of this report is attached as **Appendix B** and incorporated herein. Much of the comprehensive social history information is summarized in the report of James Hopper, Ph.D., which supplements this report as to the matters contained therein.

I reviewed the police investigation, including Wendi's interrogation, trial transcripts and jail and prison records.

A complete list of records reviewed is included in Appendix A.

## QUALIFICATIONS, EXPERT WITNESS EXPERIENCE, AND COMPENSATION RATE IN THIS CASE

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as **Appendix C**. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

My qualifications, background, experience and expert witness experience are set out in full and attached as **Appendix D** and incorporated herein.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

2

## SUMMARY OF FINDINGS

In combination with a familial history of mental illness and a multi-generational history of trauma and abuse, while growing up, Wendi was subjected to emotional and physical neglect, sexual abuse, beatings, isolation, extreme poverty, cultish indoctrinations, exploitation, extraordinarily traumatic events, and marginalization. As a result, Wendi developed neurocognitive deficits, environmental impairments, and psychiatric illnesses, including: (1) bipolar disorder; (2) complex posttraumatic stress disorder; (3) dependent personality disorder; (4) cognitive disorder not otherwise specified; and (5) caregiver burden.

These illnesses are co-morbid in Wendi, with their effects and symptoms intensified in combination and in aggregate. The amalgam of Wendi's neurological impairments and psychiatric illnesses, combined with her social, religious, familial and cultural upbringing, resulted in significantly impaired judgment, extremely limited ability to recognize, understand, and appreciate context in the world around her, and a limited and circumscribed ability to respond self-protectively. These deficits were and are most pronounced in times of extreme stress and novel circumstances.

Wendi's mother, biological father, and adoptive father exhibited symptoms of mental illnesses, addictions, and impairments that were severely damaging to Wendi at every developmental stage from infancy to young adult.[1] Mental illness, alcoholism, drug addiction and cognitive impairments are common in varying presentations and combinations within Wendi's family, extended family, and the insular, isolated communities in which she grew up.[2]

---

[1] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of Donna Ochoa; Tabs 10, 12, 16, 24, 27, 30, 32, 36.

[2] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of

Family and community members report a range of symptoms and behaviors including psychotic episodes, depression, mania, suicidal tendencies and attempts, delusional disorders, polysubstance abuse, and many others.[3] These symptoms and behaviors impacted the Ochoa family's daily life and basic functioning, compromised caregiving and parenting, continued unchecked due to a lack of education and awareness among their sufferers, and, for Wendi's caregivers, were never ameliorated by medical or psychiatric treatment until after she was incarcerated, and then only to a limited extent, primarily through medication.[4] While Wendi was growing up, these symptoms and behaviors were intensified by long periods of extreme isolation, poverty, and transience.[5]

Wendi's neurological and cognitive impairments that resulted from her multigenerational and transgenerational[6] family history of mental illness, abuse, trauma, and addiction, as well as the psychological, emotional, physical and sexual abuse, and isolation to which Wendi was subjected for her entire childhood. These impairments manifested themselves more severely after Wendi met and married Joe Andriano in a succession of poor choices that ever more deeply embroiled her in a pattern of alternating dependence and self-sacrificing caregiving.

---

Donna Ochoa; Medical and Mental Health Records of Nadine Bednorz, Clark Bednorz, Jr., Kathy Worsham, LaVerne Ann Worsham, Tabs 10-14, 16, 18, 24, 27, 30, 32-35.

[3] Ibid.

[4] Mental Health Record of Donna Ochoa, Tabs 24, 27.

[5] Address History of Donna Ochoa, Social Security Earnings Records of Shelby Robertson, Arizona Social Services Records; Tabs 24, 27, 36, Tab 10 at ¶ 37, Tab 35, at ¶ 6.

[6] As used in this declaration, "multigenerational" means across multiple generations of ancestors and descendants, while "transgenerational" means across multiple individuals of various parentage within the same generation.

By reviewing the trial court proceedings,[7] including testimony presented by Wendi and witnesses, I determined that the nature, severity, and ramifications of Wendi's mental illness, of her family's extensive history of mental illness, and the consequences of the extreme trauma, abuse, and neglect that she survived, were not presented to the jury. The evidence, arguments, and inferences that *were* presented to the jury failed to represent Wendi's biopsychosocial history and her mental state prior to and during the time of the offense for which she was sentenced to death. Further, Wendi's mental state after she was arrested and during the time she was incarcerated in the Maricopa County Jail prior to her sentencing was also mischaracterized and misdiagnosed.

This report is divided into two sections: (1) Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano and (2) Forensic Analysis and Formulation of How Wendi Andriano's Mental Disorders Impacted her Behavior in Relation to the Offense, which supports and contributes to my diagnoses. For a complete social history of Wendi Andriano, please see the full report of James Hopper, Ph.D.

1. **Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano**

Wendi Elizabeth Andriano suffers from multiple mental disorders that were present before the offense for which she has been charged and convicted.

a. **Clinical Findings**

*First*, Wendi suffers from Bipolar Disorder, a prevalent disorder within her maternal extended family. Many individuals, including Wendi's mother, Donna; maternal aunt, Nadine; grandmother, Ann; and multiple cousins have been diagnosed, treated, or have exhibited symptoms for bipolar disorder.

---

[7] See Appendix A.

5

Wendi manifested symptoms of bipolar disorder during the months prior to her husband's death, including hypersexuality, impaired judgment, depression, irritability, increased alcohol use, impaired contextual understanding, and poor mental flexibility.  She was treated with medications used in the treatment of bipolar depression for years after her arrest and incarceration.

*Second*, Wendi suffered from Complex Post-Traumatic Stress Disorder ("PTSD"), resulting from ongoing sexual coercing by her father and neglect by her mother. Symptoms of affective dysregulation, anger, dissociation, affective numbing, avoidance, acquiescence, and hyperreactivity mark much of Wendi's life, particularly during her marriage to Joe Andriano. Wendi also meets the criteria for Type I PTSD. She suffered from irritability, rumination, hypervigilance, and hopelessness.

*Third*, Wendi meets the criteria of Dependent Personality Disorder. She was pathologically subservient in relationships, unable to tolerate the loss of relationships, and became emotionally impaired when unable to discern her role in intimate relationships. Her personality structure was formed by the ongoing sexual coercion and neglect of her father and mother during her formative years.

*Fourth*, Myla Young, PhD, documented cognitive deficits in processing speed and understanding social context, as well as impaired decision making. Dr. Young's neuropsychological findings support the diagnosis of Cognitive Disorder Not Otherwise Specified (Cognitive Disorder NOS).

*Fifth*, Wendi suffered from Caregiver Burden, the tremendous emotional strain imposed upon those who take care of the terminally ill. Wendi was the financial, emotional, psychological, and day-to-day functional caregiver for not only her dying husband, but her

children as well, in the years leading up to Joe's death. The clinical literature documents the destruction of resiliency that caregiver burden can cause, especially in the face of an emotionally fragile person like Wendi.

Symptoms of each of these disorders include stealing money from her employer, lying on employment applications, becoming sexually provocative, creating false documents in the presence of employees and others, drinking to excess, extreme and spontaneous anger. Each of these symptoms could have been identified at the time of trial by a comprehensive social, medical, and psychiatric history. Many of these symptoms were identified and treated after she was incarcerated.

All were in play at the time of the offense, a synergy of trauma, cognitive deficits, and mood defects, impairing her ability to conform her behavior to the requirements of the law. Below is a discussion of Wendi Andriano's mental status examination and diagnostic impressions, followed by a more detailed description of each of the five symptom complexes and their role in Wendi Andriano's mental state before, during, and after the offense for which she has been tried, convicted, and sentenced to death.

b.   **Mental Status Examination and Diagnostic Impressions of Wendi Elizabeth Andriano**

Wendi Andriano is a white female who looked younger than her stated age. She was regularly dressed in orange prison garb during my evaluations. She was oriented to person, place, date, and circumstances. Her movements were fluid. She used and gestured with her hands a great deal.

Wendi denied perceptual disorders such as hallucinations, illusions, and delusions. She did display occasional thinking which bordered on magical thinking, as well as

significant denial. This thinking was specifically around her current adjustment to prison, and is discussed below.

Wendi dissociated on several occasions. Wendi appeared to look away, and did not respond. There were no indications of epileptiform disorder, such as her looking only in one direction or motor involvement. Her dissociation was related to discussions of traumatic events, both in her family, during her marriage, and at the time of the offense.

The first instance was during our first discussion about the sexual coercion by her stepfather, Alejo Ochoa. She dissociated when she was told about sexually provocative photographs taken of her by her father, as reported by Brandon Ochoa and Cynthia Schaider,[8] and when she was shown a picture of herself taken by Alejo ("Lightning Photo"). (*See* Tabs72 – 74.)

When told about the photos described by Cynthia Schaider, Wendi did not recall them having been taken, and did not recall ever having seen them. When I showed her the Lightning Photo, taken when she was a teen, Wendi had no independent recollection of this photo prior to her father giving it to her a couple of years ago. Wendi did remember going to the mountains during a thunderstorm with her father so he could take pictures of her. She also then recalled going to a motel room for the purpose of taking other photographs, but Wendi did not recall the actual taking of these pictures. When questioned further about the photographs, Wendi reported that she did not recall ever seeing them.

Wendi's speech was normal in volume and fluid. She was articulate.

Wendi's insight was impaired. She saw herself currently in the best circumstances of her life, and felt she had learned more on Death Row than she could have experienced in the

---

[8] Tab 34, at ¶7: Tab 26, at ¶ 18.

outside world. There was some insight, however, in that Wendi had some recognition of her dependency needs and acquiescence prior to her incarceration, and felt that she has overcome some of these symptoms.

Wendi's judgment remains impaired by her profound trauma and dependency needs, which continue to guide much of her behavior. This impaired judgment was evident during her early incarceration, and her constant desire to please significantly impairs clear thinking.

Wendi described situations in her early jail experiences when she was very gullible. Although she claimed to have become less gullible, her judgment remained impaired during our conversations. Her insight into herself and her trauma history remained impaired over the period of my evaluations. Her understanding of her mental disorders was just beginning to develop. This is particularly true about her early traumatic experiences such as her family's traveling and her mother's early neglect. As part of beginning to cope with the history of her father's sexual coercing and molestation, she has withdrawn from him to an extent.

Neurovegetative signs included sleep disruption, anhedonia (loss of pleasure), and cognitive confusion. She described periods when she would stay in bed for days. These periods would be accompanied by heaviness in her limbs, as though it were difficult to move. She also described periods of not sleeping, without any associated tiredness. Problems with sleep have occurred since childhood.

Wendi denied changes in appetite. She has decreased activity, consistent with her mood disorder, as well as her incarceration. There is no agitation, pain, or alterations in consciousness.

9

She said that aside from the pain of losing her children, coming to prison has been the best thing that had ever happened to her. She said that she has been able to "find herself" while in prison, and had grown in ways that had not been possible for her when she was a child or during her marriage.

Wendi resisted my suggestion that being incarcerated and on Death Row, awaiting her execution, by definition could not be "the best time" in her life. She presented significant denial of her circumstances, consistent with the mood elevation of bipolar disorder.

Her thought processes displayed circumstantiality, the filling in of extraneous details, and flight of ideas, moving from one idea to another without a logical flow, as if the ideas were going from trapeze to trapeze. When under stress, her ability to follow instructions was impaired. This was also captured in Dr. Young's neuropsychological interview.

When she attempted to discuss traumatic events, Wendi's thought processes were often disrupted by dissociative experiences. She would stop talking, often taking a moment or two to respond. She was able to renew the conversation at the point of departure, which is consistent with dissociation, and also consistent with her inability to recall emotionally conflicted circumstances that had nothing in common with the time of the offense, other than the quality of stress Wendi was experiencing.

Wendi's mood was generally apprehensive and anxious. She displayed anticipatory anxiety which persisted throughout my evaluations of her, but which abated somewhat over the course of my time with her. She was always physically tense. Wendi's mood was also labile, ranging from extreme sadness to near euphoria. Wendi's mood was fragile. She described her process for attempting to keep herself together emotionally and not becoming suicidal after discussions of the trauma she experienced in her personal history. Her current

10

process for keeping herself together after these visits consisted of going to her cell, isolating herself and not talking with anyone, and reading until she fell asleep. This process reminded her of going into the closet when she was a child.

While generally apprehensive, Wendi's affect was often extremely—and inappropriately—bright. Her affective range was extremely wide in spite of her anxiety.

In addition to being inappropriately bright in general, given her position on Death Row, Wendi's affect was often inappropriately bright compared to the specific content of our conversations. She smiled when talking about her father buying her a negligee or taking her into pornography shops when she was a teen.

Wendi exhibited strong dependency needs. It was obviously very, very important to her to be both liked and correct in the responses she provided to any questions. When I did not reassure her that any given response from her was acceptable or any given answer was correct, she became anxious and ruminative, going over the issue again and again.

Wendi's thought content reflected significant denial and thought repression. Her belief that Death Row was the best circumstances she has ever had is both grandiose and reflects pathological denial. However, it is also a barometer for the impact of her previous life, an impact that was not truly understood at the time of trial for its significant pathology. She denied experiencing homicidal and suicidal ideation at the time of my interviews with her.

### c.   Clinical and Diagnostic Conclusions

Wendi was born into a family that suffered from mood disorders, alcohol abuse, sexual abuse, and violence. She suffered for years from sexual coercion and molestation at the hands of her stepfather, causing both trauma and dependency.

Wendi has demonstrated a broad range of co-morbid, interrelated symptoms and clinical disorders, resulting from trauma and abuse, from the familial mental illness as shown in

11

her personal history, and from her multigenerational and transgenerational family history. What follows is a discussion of Wendi's symptoms that are the most relevant contributing factors in Wendi being arrested, charged, convicted and sentenced. These symptoms were not investigated or presented to the jury at any time during her trial, or offered as mitigating factors in her defense or sentencing.

Wendi's clinically identifiable disorders include: (1) Bipolar Disorder, (2) Complex PTSD, (3) Dependent Personality Disorder, and (4) Cognitive Disorder NOS. Additionally, Wendi suffers from the well-documented strain of providing for someone with chronic, in this case terminal, illness. This overwhelming condition is documented in the medical literature as Caregiver Burden.

The Diagnostic and Statistical Manual-Fourth Edition, Text Revised (DSM-IVTR), is the current classification system used in American psychiatry to increase interrater reliability, meaning a set of criteria for each disorder that is felt by treating clinicians to reflect the most common symptoms of a disorder. The DSM-IVTR notes that its use in forensic settings must be taken cautiously. This caveat is especially true, since the DSM-IVTR is over 15 years old, and DSM-V is rapidly approaching, which has shown significant evolution in the diagnoses of Wendi's disorders.

i.    **Wendi Elizabeth Andriano Suffers from Bipolar Disorder**

(1)    **Diagnostic Criteria of Bipolar Disorder**

Bipolar disorder is a disruption of mood. The DSM-IVTR criteria for Bipolar disorder are:

Table 14.6-7. DSM-IVTR Criteria for Manic Episode

- A distinct period of abnormally and persistently elevated, expansive, or irritable mood, lasting at least 1 week (or any duration if hospitalization is necessary).

12

- During the period of mood disturbance, three (or more) of the following symptoms have persisted (four if the mood is only irritable) and have been present to a significant degree:

  o   inflated self-esteem or grandiosity

  o   decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

  o   more talkative than usual or pressure to keep talking

  o   flight of ideas or subjective experience that thoughts are racing

  o   distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

  o   increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

  o   excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments)

- The symptoms do not meet criteria for a mixed episode.

- The mood disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.

- The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, or other treatment) or a general medical condition (e.g., hyperthyroidism).

Note: Manic-like episodes that are clearly caused by somatic antidepressant treatment (e.g., medication, electroconvulsive therapy, light therapy) should not count toward a diagnosis of bipolar I disorder.

   (2) **Evidence of Wendi Elizabeth Andriano Having Bipolar Disorder**

Wendi's family is what is known as an "affectively laden family," meaning there are multiple generations of symptoms and diagnoses of mood disorder. Wendi's father, Skip

13

Robertson, was a hypersexual alcoholic. Chemical dependency has a high co-morbidity with bipolar disorder, meaning the two disorders occur together frequently.[9]

Donna Ochoa, Wendi's mother, has had bouts of psychotic depression since she was a child, the latest occurring during Wendi's incarceration. She has a history of hypersexuality, impaired judgment, and currently displays flight of ideas and inappropriate affect. She describes both flight of ideas and inappropriate affect as family traits that have been commented upon over the years.

Donna's oldest half-sister, Nadine, was diagnosed with bipolar disorder and treated with Lithium and other anti-manic drugs for much of her adult life. She functioned successfully as a nurse for many years.

Donna's younger half-sister, Kathie, has also been diagnosed with mood disorders, and has a long-term history of chemical dependency.

Wendi manifested symptoms of depression early in life. On one missionary trip to Mexico while a teenager, Wendi spent several weeks in bed, for no apparent reason.

Wendi was diagnosed with depressive symptoms by the Casa Grande Counseling Services. She was treated, ineffectively, with antidepressants that caused her "increased anxiety," consistent with the manic switch which may be induced in persons suffering from the depressive phase of bipolar disorder.[10]

---

[9] Brady, K. T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[10] Ghaemi, S. N., Rosenquist, K. J., Ko, J. Y., Baldassano, C. F., Kontos, N. J. & Baldessarini, R. J. (2004). Antidepressant treatment in bipolar versus unipolar depression. *American Journal of Psychiatry, 161*(1), 163-165.

Wendi has also complained of "panic attacks," episodes of increased anxiety and energy that do not meet the criteria for true panic disorders. Panic-like attacks are found in bipolar disorder.[11]

The clinical literature clearly identifies a strong relationship between traumatic stress and the manifestation of bipolar disorder.[12]

Wendi's behavior prior to her offense reflects ongoing manic behavior. She had significant irritable mood and mood lability. She increased her alcohol intake, in response to her overwhelming mood disruption.

Wendi also manifested hypersexuality and an increase in goal-directed activity. She became involved in two sexual relationships (one at the apartment complex she managed). Both of these relationships were known to her employees. Wendi also created false business licenses on the business computer in plain sight of her employees.

An excessive involvement in activities with a high potential for negative consequences was also seen during this extraordinarily stressful period, coupled with the other symptoms of her mood disorder.

These symptoms—including irritable mood, impaired judgment, chemical dependency, denial, and impaired decision making[13]—continued for an extended period, and did not only occur during her alcohol use, meeting the criteria for bipolar disorder.

---

[11] MacKinnon, D. F., Zandi, P. P., Cooper, J., Potash, J. B., Simpson, S. G., Gershon, E., Nurnberger, J., Reich, T., & DePaulo, J. R. (2002). Comorbid bipolar disorder and panic disorder in families with a high prevalence of bipolar disorder. *American Journal of Psychiatry, 159*(1), 30-35.

[13] Kim, E.Y., D.J. Miklowitz, A. Biuckians, K. Mullen. (2006). Life stress and the course of early onset bipolar disorder. *Journal of Affective Disorders, 99*(1-3), 37-44.

Wendi's acute mood disorder symptoms, although always apparent, became increasingly obvious during the period surrounding the offense, and extended for years after.

### ii. Wendi Elizabeth Andriano Suffers from Post-Traumatic Stress Disorder (PTSD)

#### (1) Diagnostic Criteria of PTSD

Wendi suffers from Type II, or complex, post-traumatic stress disorder. Complex PTSD is characterized by ongoing, chronic exposure to one or more traumatic stressors, as opposed to Type I PTSD, which is characterized by exposure to a singular traumatic incident. Complex PTSD differs in significant ways from the single-incident version. Below are criteria for Complex Trauma:

Alterations in:

- Regulation of affect and impulses
- Attention or consciousness
- Self-perception
- Relations to others
- Body functioning and integrity (somatization)
- Systems of meaning[14]

Complex PTSD is a diagnosis that does not appear in the DSM-IVTR, although it was actively studied and the subsequent body of literature has supported an independent diagnosis. The symptoms noted above "result[] from lasting traumatic experiences in which the

---

[13] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[14] Roth, S., Newman, E., Pelcovitz, D., van der Kolk, B., & Mandel, F. S. (1997). Complex PTSD in victims exposed to sexual and physical abuse: Results from the DSM-IV field trial for posttraumatic stress disorder. *Journal of Traumatic Stress, 10*, 539-556.

victim felt-or was-captive and unable to escape."[15]  Wendi's experienced two chronic stressors that would create symptoms of complex PTSD. The first is her upbringing, particularly the ongoing sexual coercing of her stepfather and neglect of her mother. The second chronic stressor is her caregiver burden in taking care of her dying husband and just-born children.

(2)     **Evidence of Wendi Elizabeth Andriano Having Complex PTSD**

Numbing of affect is common in both Complex Trauma and Type I PTSD. The emotional numbing, the self-protective shell, limits emotional connectedness. Wendi has had both an external shell, her closet as a child, and an internal shell, her overwhelming numbing and dissociation.

Wendi also suffers from many of the motor symptoms of traumatic stress. She constantly scans the environment and the person, looking to pick up cues. She is hyperreactive and easily overwhelmed in stressful situations, even when those situations are artificial testing circumstances.

The core symptoms of Wendi's traumatic presentation are avoidance, affective numbing, acquiescence, and dissociation. She has pathological avoidance and denial, and these symptoms, coupled with her active dissociation, impaired her judgment at the time of the offense and continue to do so.

Wendi displays a number of symptoms that are related to or arise from affective dysregulation, including: generally poor coping skills; an inability to recognize her own needs, emotionally and otherwise; and an inability to effectively weigh, deliberate, and formulate options for choices she might make, particularly in circumstances of high stress.  All of these are

---

[15] Tab 3, at p. 22.

17

expected clinical symptoms resulting from the trauma and abuse Wendi suffered while growing up.

Wendi exhibits patterns of extreme acquiescence, which means a constant, overriding inability to stand up to or overcome the emotional control of others in intimate relationships. The functional result of this in Wendi's life has been that she has given in to the demands, needs, requirements, and control of others from childhood to the present. Her pattern of acquiescence is the clinically expected and logical result of the sexual coercion, abuse, and molestation, and the other complex and compounded abuse and trauma that Wendi suffered beginning in infancy or very early childhood and throughout her childhood and adolescence. This degree of acquiescence requires the unhinging or disconnecting of emotions to actions, which results in the emotional dysregulation of PTSD.

Wendi's acquiescence to her stepfather's sexual coercion over years set the stage for her difficulty making effective judgments in response to events in the world around her, particularly for novel, stressful, and difficult events, and her inability to protect herself in those circumstances. The patterns of acquiescence that Wendi demonstrated as a young adult and adult in her relationship with Joe are also consistent with dependent personality disorder.

Throughout her life, Wendi has displayed a lack of self-identity, meaning acquiescence to the needs of others to such an extent that she reforms herself in the image others wanted for her, rather than maintaining a consistent identity.

Wendi exhibits affective dysregulation, which means an inability to accurately modulate her emotional reactivity, both in failing to register a self-protective emotional response in situations in which a normal person would do so, a result of years of sexual coercion and molestation; and in overreacting emotionally in situations in which a normal person would be

able to respond appropriately.  During times of stress, Wendi's capacity to rely on the normal emotional processes that are necessary for effective decision-making is limited.

Affective dysregulation generally arises from poor or nonexistent modeling of appropriate coping mechanisms by parents. Wendi's affective dysregulation is the clinically expected and logical result of the traumatic stress and the neglect she suffered from her mother, biological father, and adoptive father. The denial by Alejo and Donna of Alejo's ongoing coercion and sexual molestation of Wendi while she was growing up illustrates the poor insight and coping skills demonstrated by Wendi's parents, and highlights the poor insight and coping skills that were modeled for Wendi.

In addition to failing to model appropriate behaviors and coping mechanisms, Wendi's parents actively modeled inappropriate behavior.

The extensive abuse and trauma that Wendi experienced growing up are seen in the degree to which Wendi has normalized violence and abuse. Wendi describes events which objectively are extreme and traumatic, as being "normal" and "not unusual" compared to the chronic violence she suffered growing up.  She states that even though losing her children has been incredibly difficult, coming to prison as an inmate on Death Row is the best thing that has ever happened to her. "Normalization" of violence and trauma is part of the typical numbing seen in cases of chronic traumatic stress, and, in Wendi, contributes to her emotional disconnect and affect.

Finally, because the trauma  is ongoing, neglect can be as damaging as direct trauma. We see this in Wendi's case, with the neglect of Donna Ochoa, Wendi's mother, who, due to her own mental illness, could not marshal the emotional responsibility to protect her daughter from ongoing sexual coercion and intimidation by Wendi's step father, Alejo Ochoa.

### iii.  Wendi Andriano Suffers from Cognitive Disorder NOS

#### (1)  Diagnostic Criteria for Cognitive Disorder NOS

The DSM-IVTR describes Cognitive Disorder NOS as:

**Cognitive Disorder Not Otherwise Specified**

This category is for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section and that are not better classified as Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or Amnestic Disorder Not Otherwise Specified. For cognitive dysfunction due to a specific or unknown substance, the specific Substance-Related Disorder Not Otherwise Specified category should be used.

Mild neurocognitive disorder: impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment, accompanied by objective evidence of a systemic general medical condition or central nervous system dysfunction (see Appendix B in DSM-IV-TR for suggested research criteria).

#### (2)  Evidence of Wendi Elizabeth Andriano Having Cognitive Disorder NOS

Dr. Young identified areas of cognitive impairment in Wendi's brain functioning. Wendi did well on much of the neuropsychological testing. However, there were areas of cognitive dysfunction that relate directly to her mood and trauma symptoms.

Decision making, particularly under stressful circumstances, was tested on the Iowa Gambling Task. Wendi's ability to develop problem-solving strategies is impaired, when those problem-solving strategies are made under novel, stressful or new conditions.

Dr. Young also found cognitive deficits in Wendi's processing speed, the speed with which she is able to understand, synthesize, and respond effectively. Her understanding of

the big picture, as identified by her difficulty with the Reyes Complex Figure instrument, is also impaired.

Wendi's behavior during testing was acquiescent, in the extreme. Dr. Young reported Wendi regularly asked for direction, and became stressed when Dr. Young could not, as part of the testing protocol, provide Wendi feedback on her performance. Her test taking behavior was consistent with the difficulties attending and focusing evident through much of her adult life, especially after her marriage. These problems attending are more consistent with mood disruption than disorders of attention.

Wendi therefore meets the criteria for Cognitive Disorder, Not Otherwise Specified.

### iv.   Wendi Elizabeth Andriano Suffers from Dependent Personality Disorder

#### (1)   Diagnostic Criteria for Dependant Personality Disorder

Dependent personality disorder is characterized by pervasive psychological dependence upon and acquiescence to other people, to the loss of the sufferer's own identity. Diagnostic criteria for 301.6 Dependent Personality Disorder include:

- A pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

  - o   has difficulty making everyday decisions without an excessive amount of advice and reassurance from others

  - o   needs others to assume responsibility for most major areas of his or her life

  - o   has difficulty expressing disagreement with others because of fear of loss of support or approval. Note: Do not include realistic fears of retribution

21

o       has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)

o       goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant

o       feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself

o       urgently seeks another relationship as a source of care and support when a close relationship ends

o       is unrealistically preoccupied with fears of being left to take care of himself or herself

**(2)     Evidence of Wendi Elizabeth Andriano Having Dependent Personality Disorder**

Wendi's presentations for this disorder, beginning in childhood, include abnormal efforts to please others, extreme obedience and acquiescence, impaired self-control within relationships, lack of self-confidence, naiveté, gullibility, and willingness to accept mistreatment. For people suffering from dependent personality disorder, the desire to please others is forefront in their minds and a significant amount of time and of energy is expended trying to achieve this goal. Disagreeing with others may be so unbearable that they will go to great lengths to win people over. The sufferer is prone to being taken advantage of as they consistently place others' needs and desires before their own and will abdicate their own safety and well-being for that of others.

People with dependent personality disorder often experience pathological anger when their dependency needs are thwarted. Malmquist discusses the seemingly paradoxical phenomena:

> Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such

22

destructive relationships, reveals a limited perspective and narrow focus to their existence....[I]t is a prominent awareness of the limitations existing in the degrees of freedom they have in their lives....They have a sense of being caught in the grips of powerful forces with which they cannot deal.[16]

v.   **Wendi Elizabeth Andriano Suffered From Caregiver Burden**

(1)   **Manifestations of Caregiver Burden**

Caregiver burden is a well-documented stressor, with a set of severe manifestations that magnify underlying preexisting psychiatric conditions.[17] Caregiver stress was initially studied in connection with care for those suffering from Alzheimer's disease and severe mental illnesses like schizophrenia. Only in the last two decades has the literature on caregiver stress in chronic medical illnesses and terminal conditions like cancer been extensively reviewed. As noted in this recent research:

A cancer diagnosis has a significant impact on the patient and the spouse caregiver. Patients are confronted with a life-threatening diagnosis and a difficult treatment regimen, while their partners are often required to fulfill the demanding role of a spouse caregiver. These difficulties are amplified during the terminal phase of cancer when patients experience more disease-related factors. Individuals with cancer are at an increased risk for persistent depressive symptoms when compared with the general population. Feelings of hopelessness are also common in patients approaching end-stage cancer. A general feeling of hopelessness may reflect end-of-life despair, or in extreme cases, may develop into a desire for hastened death or suicidal ideation, loss of dignity, and intimate dependency. A reported 15–50% of adult cancer patients and their spouses present with clinically significant psychological distress,

---

[16]Malmquist, C. (1996). Dependent Personality Disorders and Killing. In *Homicide: A Psychiatric Perspective (157-159).* Washington, DC: American Psychiatric Press.

[17] Biegel, D. E., Milligan, S. E., Putnam, P. L., &Song, L. Y. (1994). Predictors of burden among lower socioeconomic status caregivers of persons with chronic mental illness. *Community Mental Health Journal, 30*(5), 473-494; Caregiver Burden Assessment, Erie County Department of Senior Services, Caregiver Resource Center, 95 Franklin St., Rm. 1301, Buffalo, NY 14202

including depression and hopelessness, and this increases as death approaches.

The majority of studies report that patients and their spouse caregivers have similar levels of distress over time, consistent with the view that common factors impact both partners, and affect the entire family system.[18]

Sales et al. describe the objective as well as the subjective burdens of caregiving, listed below:

1) Objective burden

    a) Direct tasks of care

        i) Helping patient with ADLs

        ii) Supervising the patient

    b) Indirect tasks

        i) Dealing with emotional needs of patient

        ii) Encouraging the patient

        iii) Effects of caregiving on other aspects of life

        iv) Family interaction

        v) Family routine

        vi) Leisure

        vii) Work/employment

---

[18]McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care*, *19*, 1539-1548 (internal citations omitted).

24

        viii)    Mental health

        ix)    Physical health

        x)    Social network

        xi)    Others outside household

        xii)    Children

        xiii)    Financial consequences

2)    Subjective burden

    a)    Personal reactions to caregiving Distress

    b)    Stigma

    c)    Worrying

    d)    Shame

    e)    Guilt[19]

**(2)    Evidence of Wendi Elizabeth Andriano Having Caregiver Burden**

Wendi's symptoms of mental disorder were amplified by the strains of her caregiving. She, almost singlehandedly, was responsible for each of the objective burdens described by Sales.

It was Wendi who was primarily responsible, particularly in the last few months, of taking care of her husband's daily care. As Joe became increasingly despondent and withdrawn, refusing to share his plight with others, it was Wendi who became his main emotional outlet, bearing the brunt of his despair, anger, and fear of death.

Jeffrey B. Miller, Joe and Wendi's malpractice attorney, worked with the couple during the 2000 period. He discusses, in his declaration of August 8, 2011, how a distraught

---

[19] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41 (internal citations omitted).

Wendi called him, concerned about the suicidal urges Joe was having. Mr. Miller talked with

Joe, who acknowledged suicidal ideation.

> In the months prior to Joe's October 2000 death, I received two or
> three distressed phone calls from Wendi relating to her
> observations of Joe. In each of these phone calls, Wendi stated that
> she was feeling very concerned and frightened for Joe.  Wendi said
> that she had perceived Joe becoming more depressed, and that he
> had recently expressed a desire to die and an intent to take his own
> life. Wendi told me that she was worried that Joe would hurt
> himself, and asked me to speak with him regarding his mental state
> and recommend a counselor for Joe. Wendi also asked me to
> remind Joe that, from a legal perspective, he would be hurting his
> family by committing suicide because the malpractice claim would
> be dismissed.

> I subsequently spoke with Joe regarding these concerns. I told Joe
> that his family was concerned about his mental state and worried
> that he was contemplating suicide. Joe acknowledged these
> concerns and did not deny that they were accurate. Joe said he
> understood that the malpractice claim would not continue if he
> died from something other than cancer, and told me not to worry. I
> recommended a counselor to Joe, but I do not know if Joe
> ultimately received treatment from that counselor.[20]

Wendi was the primary financial provider, working her full time job and, at times,

being forced to leave her work to change her children's diapers or attend to both her husband's

and her children's needs. Wendi was also responsible for family interaction, which became

increasingly tense as the needs of the children and the needs of her dying husband complicated

her ability to satisfy these often contradictory circumstances.

Wendi's leisure activities reflected the stress of her caregiving and amplified her

mood and trauma symptoms. She drank heavily, became involved in sexual behavior, and

became isolated from her family and any true support system she might have had. Rather than

---

[20] Tab 19, at ¶¶ 4-5.

reflecting a lack of caring, these behaviors, actually symptoms of her acute mental illness, clearly illustrate how impaired Wendi had become, and illustrates what little resiliency she had was undermined by the extraordinarily stressful strain of her attempt to provide care to her husband and children.[21]

Sales describes the effects of caregiver strain on other aspects of the caregiver's life as perhaps the most difficult impact of the illness on the caregiver.[22]

Wendi's psychiatric symptoms from her bipolar disorder, dependent personality disorder, and complex trauma were magnified by the stress and novel circumstances of her role during most of her marriage, that of caregiver. Although Wendi had been placed in the role of soother and pacifier during her childhood and adolescence in her sexual interactions with her stepfather, but it was not until her marriage to Joe and his terminal diagnosis that she found herself as a caregiver.

Within a very short time, Wendi experienced an additional stressor, watching her husband become ill, with repeated failures to correctly diagnose cancer. There is extensive documentation of Wendi's multiple interventions to save her husband's life, as well as to care for her children that were born during this tumultuous period.

The overwhelming emotional burden of Wendi's attempts to live, grow, understand, empathize, support, and resolve were never recognized nor presented at her trial. The

---

[21] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12* (Suppl. 1), 33–41.

[22] "In some ways, the impact of caregiving on other central life roles may be its most pervasive and pernicious consequence. The degree to which caregiving demands truncate or create conflict in other role sectors may vary, but most researchers attempt to measure the broad range of impact commonly felt. These include changes in family interactions, family routines, leisure, work, social network involvement, contacts with others outside the household, as well as the financial consequences of illness. These role ramifications are most commonly viewed as additional objective consequences of caregiving, although Braithwaite places them in the subjective burden category." Sales, *supra*, at 37 (internal citations omitted).

27

interaction between her re-traumatization through her role as caregiver for her husband and children, and her emerging symptoms of affective dysregulation, impaired judgment, anger, affective numbing, and slowed realization of her circumstances is the foundation for her inability, due to mental disorder and environmental trauma, to conform her behavior to the law. The behaviors seen in the months before her husband's death were fueled by the destruction of all resiliency and support Wendi had known in her life.

    d.    **Conclusion of Clinical and Diagnostic Findings and Mental Status Examination**

Wendi suffers from multiple mental disorders. She suffers from bipolar disorder, and clearly comes from an affectively laden family, with her father, sister, and mother manifesting symptoms of alcoholism, hypersexuality, impaired judgment, mood swings, chemical dependency, psychosis, suicidality, and depression.

Wendi suffers from complex PTSD, with at least two sources of chronic trauma. The first is the ongoing sexual coercing and abuse by her step-father, which led to her acquiescence, anger, affective numbing, hyperreactivity, and emotional dysregulation. She also underwent the extreme, ongoing trauma of her caregiver strain, while attempting to find ways to help her husband, raise her children, and maintain her family.

Wendi has cognitive impairments that slow down her ability to effectively size up and respond to social situations. In spite of the structure of prison, her cognitive deficit continues to this day.

She also suffers from a longstanding dependent personality disorder, created and coerced by the sexual abuse of her stepfather and neglect and abuse of her mother. Dependent personality disorder has been well documented as a source of anger and self destructive behavior.

Each of these disorders was acute during the months before her husband's death. Symptoms of each disorder were synergistic, creating a maelstrom of instability and emotional disruption. This was the mental state Wendi was suffering from at the time of her husband's death, and for some time afterwards, as captured in jail and prison medical records.

It is against this emotional and cognitive backdrop that her behavior at the time of the offense must be considered, and her behavior examined forensically.

2. **Forensic Analysis and Formulation:  How Wendi Andriano's Mental Disorders Impacted Her Behavior in Relation to the Offense**

This section includes my forensic analysis of Wendi's history, specifically from the time she met Joseph Andriano ("Joe") on March 17, 1992 until Joe's death on October 8, 2000, and her incarceration following Joe's death from 2000 to the present. This section analyzes how Wendi's mental disorders impacted her behavior in relation to the offense.

In this formulation and analysis, when I describe statements in the present verb tense, such as "Wendi states" or "Donna describes," this indicates that I received the information directly from the person involved during firsthand evaluations conducted during 2010 and 2011. Other statements come from the trial transcripts, declarations, or other sources identified in Appendix A.

a. **Adulthood from Meeting Joe to the Night of the Offense**

i. **The Beginning of Wendi and Joe's Relationship**

Wendi was twenty-one years old when she met Joe on March 17, 1992, at Dell's Pizza in Casa Grande, Arizona.[23]  While Wendi maintained steady, regular employment, Joe was having a hard time earning money as a welder and found himself without a place to live. Within weeks of meeting Joe, Wendi (the caregiver and unable to turn anyone away) offered to let Joe

---

[23] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011.

sleep on the couch in her apartment. As underscored by Dr. Hopper, Wendi was coerced from

her childhood to feel safe and loved when she was taking care of others, especially during times

when they were angry and abusive:

> If someone is angry – whether that anger is caused by her, directed
> at her for no good reason, or directed elsewhere and has nothing to
> do with her – Wendi feels *driven* to make that person feel better,
> because she believes, "then they will like me." If someone likes
> her and is nice to her, Wendi strives to be even nicer to them and to
> take care fo them, because this is the only way she knows to avoid
> them getting angry at her or abandoning her. . . . In short, the very
> ways she attempts to avoid negelect and abuse in adult
> relationships leave her feeling neglected and used.[24]

In the year prior to meeting Joe, Wendi's relationship ended with Shawn King,

her childhood sweetheart. Shawn broke up with Wendi in the fall of 1991 and he punctuated the

breakup by smashing the windows of Wendi's car.[25] In the year prior to Joe moving into

Wendi's apartment, Wendi's paternal cousin, Barbara Mitchell stayed most nights at Wendi's

apartment with her. Barbara was still in high school at the time and largely resided with Wendi

for about ten months. It was just around this time that Wendi met Joe.  One of the defining

symptoms of people suffering from dependent personality disorder is the intolerance of being

alone. When they are alone they feel helpless and uncomfortable. As soon as a relationship has

ended, or even before, they will desperately seek out a new one. Joe Andriano came into

Wendi's life at a time when she was most vulnerable to the discomfort and  helplessness that she

otherwise faced in being alone.

Shortly after Joe began staying with Wendi, he moved in permanently and they

officially became a couple. During 1992, the year that Wendi and Joe met, Wendi earned over

---

[24] Tab 4, at ¶ 548.

[25] Tab 15.

$15,000 and received her apartment at Quail Gardens as part of her compensation package. Joe, on the other hand, had reported income of just over $2,200. The economic disparity in the earnings between Joe and Wendi continued throughout their relationship and into their marriage with Wendi providing the main financial support.[26] Only one time in their history together did Joe earn more than Wendi and that was in the time frame just after their first child, Nicholas, was born. Wendi's parents provided additional financial support so Wendi could stay home with her infant child.

Joe's inability to provide financial or emotional support for the family reinforced Wendi's self-deprecating behavior and enabled her dependent personality. Wendi's early relationship with Joe was characterized by her acquiescence, the result of both her trauma history and the conditioning she received from the earliest moments of her life to abdicate herself to men in positions of authority while being unprotected by the women in her family.[27] When Wendi first met Joe, he was unlike any of the young men she had previously been acquainted with. He was from a different social group in Casa Grande and compared to Wendi, was much more adept

---

[26] Tab 69 (Social Security Earnings Statements of Wendi and Joe Andriano: 1993 – Wendi - $19,128; Joe - $3,404; 1994 – Wendi - $22,447; Joe - $0; 1995 – Wendi - $24,234; Joe - $0; 1996 – Wendi - $6,648; Joe - $0; 1997 – Wendi - $0; Joe - $5,576; 1998 – Wendi - $17,064; Joe - $11,529; 1999 – Wendi - $31,943; Joe - $0; 2000 – Wendi - $38,682; Joe - $0).

[27] Tab 27, Tab 34 at ¶¶ 8-9, 15, 25 ("Wendi grew up in a male-dominated environment. Tom King frequently preached that a woman's place was in submission to her husband. He often said that women should quit their jobs and stay at home. He was sexist. There were certain roles that men and women were expected to fulfill, and this was embedded in the culture of the church. According to Tom, if a girl wore a bathing suit and a boy got aroused it was the girl's fault. As parents, we were encouraged by the pastor to use corporal punishment on our children. This was presented as the Biblical way to raise children. Wendi had domineering daddy and grew up in a church with a domineering pastor. . . . Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation. . . . Discipline at that school centered around scolding, humiliation, corporal punishment, extreme work punishment, and social isolation.").

31

at navigating the social circles of young adults in the small town of Casa Grande.[28]   Unlike the

Ochoa family, who lived on the periphery of social acceptance and flew far under the radar in

their desire to remain religiously segregated and isolated,[29] the Andriano family was part of the

landholding farming class in Casa Grande, an influential segment of the population that

possessed social status and clout in the community of Casa Grande.

       Given her history of being coerced and acquiescent behavior, her relatively

newfound social freedom beyond the boundaries of the church, and her natural curiosity, Wendi

found Joe's attention desirable. Wendi was "surprised" that Joe "loved me."[30] Although Wendi

reports that she "did not want a rigid, religious man who controlled my life," and that her

decision to date Joe was based, in part, on the fact that he was not part of the church,[31] she

discovered over time that Joe and her stepfather, Alejo were similar in terms of their requirement

for her caregiving.[32]

       Wendi allowed Joe to move in without a defined commitment or clear agreement

between them about their status as a romantically partnered couple, or any real understanding of

---

[28] In 1990, Casa Grande had a population of 19,954 residents in an area covering 48.2 square miles, making it an extremely low-density population. http://www.census.gov/epcd/www/92profiles/county/04021.TXT

[29] Tab 27, Tab 34, at ¶¶ 3-4 ("Wendi's parents, Donna and Alejo, had nothing, meaning they were always very poor. They told me that before I knew them, they were part of a street ministry in Northern California. They followed another strong-willed, 'turn or burn' pastor there. It was a different time; the Jesus-freak movement was in full swing: It consisted of born again hippies who traveled around spreading 'Jesus power.' This was in the mid-1970s. Donna and Alejo told me that while they were in the ministry, Wendi panhandled for them. They lived out of a bus and walked the streets preaching and handing out tracts. . . . When we began going to the church in 1980, Donna and Alejo lived in a rental house on the south side of the tracks in Casa Grande. It was a low-income area. Later, Donna, Alejo and Wendi moved to a house in another housing project called 'Hopi Hills,' or 'Indian Hills,' or something like that.")

[30] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on November 23, 2010.

[31] Ibid.

[32] Ibid.

32

the direction in which the relationship was headed. After Joe moved in, Wendi quickly allowed Joe to take a position of increasing control over her. Initially, Wendi was attracted to Joe because she could take care of him and because he was a connection to life outside of the church.[33] Wendi persevered in acquiescing to Joe, and expressed her pathological dependence by allowing him a progressively greater position of control over her. Joe began to dictate how she dressed, and he required her to wear her hair in a different style and color than she had ever used before, specifically blond and short, much different than her naturally brown and historically long hair.[34] Wendi soon started disengaging with her friends and they felt unwelcome in her apartment. As noted by Barbara Mitchell in her interview with Sharon Murphy prior to trial, "Joe isolated Wendi making it very difficult for her to retain her previous relationships."[35] Wendi's interactions were limited to Joe's crowd, even though many of the women in that group rejected her. Even this early in their relationship, Wendi was unable to stand up to Joe and went along with these changes.[36]

   Wendi's behavior in her relationship with Joe mirrored, in many ways, the compliant behavior required of her in her relationship with her father and with the adults at 91st Psalm and Harvest Church and School. In both the home and at school, Wendi was coerced to behave in compliance under the threat of severe punishment. She was also required to dress in certain ways. Photographs of Wendi early in life depict her as a miniature version of Donna, with matching hairstyles and outfits. Donna was dying Wendi's hair to match her own by the time

---

[33] Tab 26, at ¶21.

[34] Interview with Donna Ochoa by Woods, G.; Interview with Barbara Mitchell by Sharon Murphy on May 20, 2003.

[35] Interview with Barbara Mitchell by Murphy S. on May 20, 2003.

[36] Interview by Woods, G. on May 26, 2011.

Wendi was nine to eleven years old. Alejo preferred Wendi to dress provocatively, and began buying her age-inappropriate attire before she had even reached her teens.[37]

Wendi reports that passion was not a part of her relationship with Joe. She appreciated his laughter and his initial attentiveness to her as opposed to being in love with him. She describes her sexual relationship with Joe during their entire relationship as not satisfying, which is consistent with how she describes all of her sexual encounters throughout her life. She felt that if her partner wanted sex, it was her responsibility to have sex, without considering at all her own feelings, preferences, or concerns about sexuality and having sex with that partner[38]—the automatic behavior created through traumatic sexual coercion and molestation during childhood and adolescence. "Wendi and Joe had a very structured romantic life . . . It was so regimented and controlled. Wendi told me that she wanted her relationship with Joe to be more affectionate and intimate. She told me that Joe refused to kiss her at all."[39]

Despite Wendi's yearning for affection, she was unable to enjoy a fully developed sexual relationship and instead repeated the learned sexual behaviors of submission in her marriage with Joe. Wendi's relationship with her father mirrors this acquiescence without intimacy, the basis of a dependent personality disorder in many cases. Donna describes Wendi and Alejo going into adults-only novelty stores, triple-X pornography stores, and making special family trips to Frederick's of Hollywood, a store with primarily extremely revealing clothing. Even though both Wendi and Donna were conflicted by this behavior, Alejo's intimidation and coercion "normalized" this behavior for Wendi.

---

[37] Tab 27.

[38] Interview by Woods, G. on November 23, 2010; Interview with Barbara Mitchell by Murphy, S. on May 20, 2003.

[39] Tab 31, at ¶11.

### ii.   Wendi and Joe Get Married

Wendi's mother and father, with whom Wendi maintained regular contact and who lived close by, were uncertain enough of her interest in and passion for Joe that, as late as Wendi's wedding day, they asked her if the marriage to Joe was really what she wanted, and assured her that she could say "no" to the marriage. Despite their relationship being emotionally disconnected, Wendi married Joe on January 22, 1994. By the time they were married, Wendi had left her employment at Quail Gardens. In May of 1993, she started working at the Casa Grande Regional Medical Center in the accounting department.[40] Wendi and Joe had each moved into the homes of their respective parents prior to their marriage.[41] In deciding to marry Joe, Wendi manifested symptoms of her dependent personality disorder: her inability to recognize her own needs, her inability to recognize options in making decisions, her lack of coping skills, and lack of self-identity in her relationship with Joe.

Donna Ochoa documented difficulties beginning very early between Joe and Wendi. Donna recalls Joe calling Wendi a "fucking bitch," and other instances when Wendi called her parents after sequestering herself in the bedroom, after Joe had become angry and physically intimidating. Wendi felt that the traumatic events occurring between her and Joe were "normal" and "not unusual" compared to the chronic violence she suffered growing up.[42] Wendi's actions and choices from the time she met Joe in 1992 until his death in 2000 demonstrate affective dysregulation, numbing of her own affect responses, her sense of

---

[40] Tabs 69, 69.B. (Employment and Social Security Earnings Records of Wendi Andriano).

[41] Interview by Woods, G on April 26, 2011.

[42] Interview by Woods, G. on April 26, 2011.

helplessness, and her increasing inability to respond normally or appropriately to stressful, difficult situations.  These are all symptoms of her PTSD.

Wendi states that, "The first part of the marriage was within the bounds of acceptability. I had grown up with an angry father. For the first six months, we lived in a rented townhouse then we moved to Andriano farm property." After that, Joe was "yelling and yelling and yelling and breaking things . . . I did not leave. In the morning, I got up and we did not talk about it." Wendi states that she had and still has no way to determine how to behave or what to do absent demands or requests from others. In characterizing her general behavior, she states, "I need to know what you want from me. If I don't, I don't know how to function or what to do."[43]

The experience of prolonged and severe trauma, particularly trauma that occurs early in the life cycle, as experienced by Wendi, can lead to complex clinical pictures that include disturbances of regulation of affective arousal, an impaired capacity for cognitive integration of experience (as in dissociation), and impairment in the capacity to differentiate relevant from irrelevant information.  Research shows that people who suffer from PTSD are prone to suffer from problems with affect regulation, decision making, difficulty modulating anger, chronic self-destructive and suicidal behaviors, impulsive and risk-taking behaviors, and difficulty modulating sexual involvement.  Like findings are found in child development literature: as many as 80% of abused infants and children develop disorganized/disoriented attachment patterns. These are associated with an inability to utilize caregivers for soothing and with the emergence of pathological self-regulatory behaviors such as, in Wendi's case, hiding in the closet, obsessive caregiving and later, heavy alcohol consumption. A substantial body of

---

[43] Mental Status evaluation of Wendi Andriano by Woods G., M.D., January 18, 2011.

research has shown that early and prolonged trauma in childhood affects the capacity to regulate the intensity of affective responses.[44]

Yet, it was more than Wendi's traumatic environment alone that affected Wendi's responses to stress. Myla Young, PhD's neuropsychological testing documents Wendi's cognitive deficits, specifically her difficulties organizing and processing her thoughts in stressful circumstances.

Dr. Young describes a number of cognitive impairments, including Wendi's inability to effectively attend, and to recall verbal information. The cognitive deficits that most directly impact Wendi's ability to weigh and deliberate, to make good decisions, were her executive functions. Dr. Young describes these executive functions as "an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed

---

[44] Walker, E. A., Katon, W. J., Neraas, K., Jemelka, R. P., & Massoth, D. (1992). Dissociation in women with chronic pelvic pain. *American Journal of Psychiatry, 149*(4), 534-537;

Saxe, G.N., Chinman, G., Berkowtiz, R., Hall, K., Lieberg, G., Schwartz, J., & van der Kolk B. A. (1994). Somatization in patients with dissociative disorders. *American Journal of Psychiatry, 151*(9), 1329-1334;

Cole, P. & Putnam, F. W. (1992). Effect of incest on self and social functioning: A developmental psychopathology perspective. *Journal of Consulting and Clinical Psychology, 60*(2), 174-184;

Adams-Tucker, C. ( 1982). Proximate effects of sexual abuse: A report on 28 children. *American Journal of Psychiatry, 139*(10), 825-837;

Browne, A. & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. *Psychology Bulletin, 99*(1), 66-77;

Green, A. H. (1983). Dimensions of psychological trauma in abused children. *American Journal of Psychiatry, 22*(3), 231-237;

Pynoos, R. S. & Nader, K. (1988). Children who witness the sexual assaults of their mothers. *Journal of the American Academy of Child and Adolescent Psychiatry, 27*(5), 567-572.

actions. Executive functioning also is the ability to problem solve, and include abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions."[45]

Wendi did well on some executive functioning tests, reflecting a lack of malingering as well as illustrating intact areas of brain functioning. But Dr Young also found that "…her abilities were predominantly impaired."[46] Her cognitive abilities were specifically impaired in those areas that "…required rapid processing of information, flexible thinking, decision making, and/or inhibition…the ability to stop responding to the immediate physical environment…in order to think, consider and plan alternative ways of solving a problem and respond according to the situation."[47]

### iii.   Joe Gets Sick

Once they were married, Wendi and Joe moved to "the shop," a structure located on the Andrianos' farm.  It was a small workshop that had been converted for habitation. Joe had learned windshield repair and hoped to make a go of having his own business, "Joe's Windshield Repair."  Joe's sister and brother-in-law co-signed for a loan to start the business. Business did not go well for Joe and the young couple faced ongoing financial difficulties.

Within several months of their marriage, Joe noticed a lump on his neck and his neck pathology was discovered.  In September 1994 he underwent the first of his surgeries, an outpatient surgery to remove what the doctor noted to be s a benign tumor. Doctors told Wendi

---

[45] Tab 5, at p. 11.

[46] Tab 5, at p. 12.

[47] Tab 5, at p. 13.

and Joe that his tumors were not malignant. Wendi reports that she and Joe were obviously relieved to learn that Joe's condition wasn't expected to be serious.[48]

After marrying Joe, in June of 1994, Wendi returned to Central Arizona College where she continued to take classes until June of 1995. She also enrolled at the University of Phoenix in April of 1995 to commence business classes.  Even though Joe was minimally ill during this initial period of medical evaluation, he, nevertheless, was not supportive of Wendi's efforts to continue her education or secure more stable employment.  Wendi reports that Joe ridiculed her attempts to continue her education and did not see value in it. Wendi acquiesced to Joe's preferences, and ultimately stopped going to school. The pervasiveness of Wendi's dependency needs is apparent in how completely she allowed Joe to control her life, from her appearance to her professional future, from what she ate to whom she befriended.[49]

Within six months of Joe's first surgery in September of 1994, he experienced pain in his neck in the area of the surgery as the result of another lump forming. Wendi reports that, by early 1995, Joe's neck was painful and swollen. Together, Wendi and Joe pursued further medical treatment for Joe. The second surgery, also an outpatient surgery, was performed at the University Medical Center in Tucson, Arizona in August 1995. Joe was required to spend a night in a hotel, but, again, the couple did not yet understand the terminal nature of Joe's illness and the enormity of the effect it would have on their lives. They were again reassured that the tumor removed was benign.

---

[48] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011

[49] Ibid.

Despite Wendi's income from the hospital and monetary assistance from Donna, Joe and Wendi were unable to manage the glass business or their finances well enough to stay afloat financially as Joe continued to deteriorate physically and emotionally.

### iv.    Pressure on Wendi Increases as Joe Worsens

With mounting financial pressures, and Wendi desperate to provide the care and support for her young family, she took money from her employer. In January 1996, Wendi's doctor placed her on a medical leave of absence during which time Wendi acknowledged that she took $2,000 from her employer, an uncharacteristic act considering her lack of criminal history prior to her experiencing such extreme stress levels about her family's circumstances. The manifestation of trauma and mood symptoms like impaired judgment, impulsivity, numbing of affect, and depression speaks to the increased pressures of Wendi's caregiver burden as well.[50] Wendi's increasing caregiver pressures exposed her vulnerabilities that result from her history of trauma, dependent personality disorder, and bipolar disorder.

In connection with the theft, Wendi was referred for counseling and psychological treatment and was seen at Casa Grande Valley Counseling Service, Inc. ("CGVCSI"). Treatment notes from CGVCSI indicate that Wendi's day-to-day functioning was impaired. She was not sleeping, was unable to focus, and felt unsupported by her husband. It was recommended that she receive anti-depressant medication to "help her sleep better and cope with the stresses she is

---

[50] McClean, L.M., Walton, T., Matthew, A., & Jones, J. M. *Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress.* 19 SUPPORT CANCER CARE, 1539-1548 (2001) ("The diagnosis of cancer has profound consequences for both patients and their family members, and its progression brings further challenges for couples that include imposed changes in responsibilities and the threat of mortality. Distress, including depression and hopelessness, is very common in both partners when facing a diagnosis of metastatic cancer . . . Spouses who are less satisfied with the marital relationship may experience more caregiving burden. Caregiver burden refers to both objective caregiving, including care-related tasks and time involved in caregiving, as well as subjective caregiving, including the caregiver's experience and feelings about their role as caregiver.") (internal citations omitted).

facing at work and at home."[51] Her therapist notes that, "Wendi appears to be very depressed and very angry at her husband although she has not reported this to him." Wendi was overwhelmed, depressed, and becoming increasingly isolated.[52]

Although Wendi received anti-depressant medication, her therapist noted that Wendi "has had a bad reaction to [the anti-depressants], so plans to recontact her doctor." The therapist also advised Wendi to seek credit-counseling services, but by March of 1996, Wendi reported that she had not followed through with that recommendation because "her husband does not want them to lose their credit cards."

There is a note by Wendi's therapist, Beverly Nichols, MFT, from March 6, 1996. Wendi was taking anti-depressants but reported that "she's having *more* difficulties sleeping." Antidepressants are well known to induce manic episodes, called the "manic switch," in patients that are bipolar, rather than unipolar and merely depressed.[53]

The manic switch is a chemically-induced elevation of mood, most often caused by antidepressants. Bipolar disorder is a chronic, enduring, severe, and often crippling illness that, as we see in Wendi's case, exerts a crushing toll on the individual and the family. Women with bipolar disorder present most commonly with depressive moods, particularly in the early stages of the disorder. Depression appears most commonly before manic symptoms in bipolar disorder, and appears more frequently in women.

---

[51] Tab 46 (Medical Records of Wendi Andriano – Casa Grande Valley Counseling Service Inc., March 1, 1996).

[52] *Ibid.*

[53] Boerlin, H.L., Gitlin, M. J., Zoellner, L. A., & Hammen, C. L. (1998). Bipolar Depression and Antidepressants induced mania: A naturalistic study. *Journal of Clinical Psychiatry, 59*(7), 374-379.

In early 1996, Wendi lost her job at the Medical Center. Joe Wendi tried to keep Joe's Windshield Repair going and Wendi began seeking employment. Meanwhile, Joe began working at a boat shop owned by friends. The money Joe made working there, however, appears to have been used to support his boating hobby and no additional income entered into the family home. Social Security Earnings Reports verify the grave state of financial affairs with Wendi earning just over $6600 in tax year 1996 and Joe with no reported earnings. When Wendi lost her job, she and Joe lost their medical insurance.

By late September 1996, Wendi was pregnant with no way to afford medical care. Her mother, Donna assisted in paying for prenatal care. Joe took out another loan, for $10,000, and purchased another speedboat.

Joe experienced more pain and swelling and had a third surgery with no postoperative care recommended in February 1997. The pathology report again noted "benign pleomorphic adenoma."[54]

In 1997, Wendi continued to scramble to earn enough money to provide for her now growing family. It must be remembered that, in addition to her medically ill husband, Wendi and Joe had a child (and she would soon be pregnant with another) at a time of great emotional and financial insecurity.

Wendi became involved in an at-home marketing program in attempt to earn extra money. In the initial phases of this endeavor, she wrote to Pat Hyduk, a woman associated with the marketing program, "I need to get $5,000 in one week or the bank is repossessing my car, my

---

[54] Medical Records of Joseph Andriano – Mayo Clinic Revised Report of August 18, 1998

phone will be shut off and God knows what else. I am really desperate. Is there something you can do to help me? I [sic] going insane."[55]

This cry for help, to an almost complete stranger, is more than the desperate cry from someone who is just angry. Wendi was overwhelmed, and unable to function effectively. Her own life was unraveling, her husband was seriously ill, she was having to care for her children, and she was beginning to experience symptoms of mental illness to greater and greater degrees.

Joe's glass repair business was hampered by local competition and poor financial management skills. After recovering from his surgery in February 1997, he was never able to regain his footing in the business. Wendi considered leaving Joe in early 1997, and asked her parents for money to move. However, after Joe's surgery, because of his clearly failing health, Wendi was emotionally unable to leave him. She borrowed money from her parents for basic items, such as food.

Nicholas was born on .Redacted    Wendi and Joe were deeply in debt, and Donna and Alejo bought most of Nicholas's clothes, diapers, and furniture.

When Joe was offered the opportunity to purchase an already established business, Accu-Glass, a successful company that Joe had once worked for, Wendi and Joe thought that might be a good option. Already deeply in debt, Wendi and Joe had no independent financial resources or credit to secure conventional business financing to purchase Accu-Glass.

Wendi wanted—and needed—Joe to succeed. She sought help from her father, Alejo, which led to Jerry Robles, an old friend. Jerry had cash from his various enterprises. According to Alejo, Donna, and Wendi, Jerry Robles became partners with Wendi and Joe.

---

[55] Letter from Wendi Andriano to Pat Hyduk , c. 1997 .

Jerry put up $85,000 in cash and retained 51% ownership. The remainder of the purchase price of Accu-Glass—an additional $100,000—was to be paid to the sellers, over a five-year period.

Wendi began working with Joe at Accu-Glass, handling the accounting and office functions. They were not effective business people, and Joe once again began experiencing pain and swelling in his neck in September 1997. Jerry Robles was not receiving revenues from Accu-Glass, and, amid turmoil with him regarding the business's financial condition, Wendi and Joe signed the business over to Robles. The high hopes Wendi held for Joe and a successful business venture collapsed. The young couple continued to depend on others for financial support.

In March 1998, Wendi obtained a job at the Courtyard Apartments in Casa Grande. She noted on her application that she had completed a bachelor's degree, even though she had not completed her education. She secured a good compensation package, which included health insurance and a free apartment. Wendi was pregnant again.

In July 1998, with the birth of their second child, Ashlee just two months away, Joe was diagnosed with cancer and a report from the Armed Forces Institute of Pathology confirmed that all of the tumors dating back to the first mass removed in September of 1994 were, indeed, malignant cancers.[56]

Joe had his fourth surgery in the summer of 1998. Shortly thereafter, on Redacted Ashlee was born. Joe was becoming increasingly depressed, isolated, bitter, and withdrawn. Wendi was the sole financial provider for the family. Because Joe was sick, Wendi had no choice but to return to work right after Ashlee was born. Joe was unable to care for the children so they were in left in the care of a neighbor at the apartment complex. Wendi

---

[56] Medical Records of Joseph Andriano – Armed Forces Institute of Pathology Report dated August 12, 1998.

returned to the apartment at lunch to feed Joe through a feeding tube that had been inserted after the surgery. Alejo came over three times a day to change his bandage.

Overwhelming financial pressures, the increasing pressures of her marriage, and the continuing illness of her husband began to weigh heavily on Wendi, undermining her resiliency and exposing her fragile homeostasis. Holding on by acquiescing no longer worked to keep the effects of Wendi's mood dysregulation and poor coping skills—coupled with the impaired judgment and impulsivity of her mood disorder—from completely disintegrating her ability to rise above her dependence.  She had long since abandoned school and had eliminated all social contacts other than with Joe's friends. Her life became dedicated to Joe, her children, and their support and needs.

As noted by Gia Palicki who provided day care for Nicholas and Ashlee in the year before Joe died:

> Wendi and Joe told me that Joe's job was the kids, and Wendi's job was work, but really Joe spent his time doing whatever he wanted. Wendi was responsible for taking care of all the bills as long as Joe made sure that the children were dropped off for daycare. He loved to go boating, and that's what he spent most of his time doing. Wendi encouraged that hobby, and she was glad to have me care for her children so that Joe was free to go have fun. This arrangement was mutually agreed between Wendi and Joe. This was how their family worked.[57]

Though Wendi may have encouraged Joe to "go have fun" after his diagnosis, her tacit permission for Joe to avoid responsibility further worsened Wendi's emotional state.  As noted by one study addressing issues related to caregiver burden, female caregivers' level of

---

[57] Tab 31, at ¶3.

marital distress increases as the male patient avoidance subscale score increases, such that the more avoidant the male patients are, the more the female caretakers' marital distress increases.[58]

Wendi became even more committed to helping Joe recover. She researched and found a Christian-based alternative naturopathic facility, Health Quarters Ministries in Colorado Springs, Colorado.[59] Joe's family and friends held a benefit dinner to raise money so Joe could go to Health Quarters. The program was based on nutrition. Upon his return, Wendi attempted to support a radical change in the way the young couple ate. She worked during the day and then cared for her children and Joe in the evenings, attempting to follow a strict vegetarian nutritional program that incorporated the use of vitamins, supplements, and fresh juice extracts. Despite Wendi's good intentions, encouragement and support, Joe was unable to maintain the diet and soon returned to his former eating habits.

> ### v.   Wendi's Symptoms Worsen as Joe's Physical and Mental Condition Deteriorates

On the heels of Joe's diagnoses, Wendi was informed that she was losing her job at Courtyard. For the Andriano family, not only did this mean the loss of income but the loss of their home and health insurance. Wendi once again scrambled to find employment. She obtained a well-paying job at an upscale apartment complex, the Meridian at the Biltmore, in Scottsdale.

---

[58] McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548.

[59] According to its Web site, "The mission of Health Quarters is to help facilitate both physical and spiritual health in the lives of God's people. We focus on building better health by presenting nutritional choices and the principles of nutrition through body cleansing and the rebuilding of the immune system. We firmly believe that illness and disease are caused by toxicity, stress, an inefficient digestive system, biochemical imbalances, mal-absorption of vital nutrients in the body, etc. We also believe that the human body has been designed by God for self-healing of degenerative conditions, given the right dietary and lifestyle changes."
https://www.healthquarters.org/index.php?option=com_content&view=article&id=43&Itemid=2

However, housing was not provided. Joe and Wendi returned to live at the Andriano farm property. Wendi worked full days, leaving at six-thirty or seven in the morning and returning home to Casa Grande late at about seven or eight in the evening after a long commute.  Joe transported the kids to the babysitter and picked them up each day that Wendi worked.

Wendi's emotional leak was gradual, but unrelenting. She was crumbling under the stress of her marriage and Joe's ever growing discontent at living with his parents. When Joe and Wendi learned of a new apartment complex—San Riva—being opened in the Ahwatukee Foothills in south Phoenix, Wendi applied. She went through three interviews and obtained yet another position at an even higher scale. She received not only an excellent salary and benefits, including health insurance, but a three bedroom, two bath apartment. The young family moved to San Riva in November 1999.

When Wendi started working at San Riva, she initially worked double shifts every day to try and catch up on her family's expenses. Once their health insurance took effect, Joe returned to have a CT Scan of his lungs. In the ten months since the last scan, the tumors had doubled and the prognosis was poor. Joe was, literally, suffocating to death.

During the year leading up to Joe's death, the caregiver burden Wendi experienced and the weight Wendi bore crushed her.  As noted by Gia Palicki, Wendi and Joe's babysitter:

> When I met Joe, he was a free spirit, but towards the end he was
> not that way anymore. His attitude completely changed. Joe
> changed drastically over the year that I knew him. In the
> beginning, things were so different. He was all about the kids,
> having fun, and being happy. As the illness progressed, Wendi
> became the sole caregiver for the children. She also was the only
> one working. It got so that Joe was always pissed off, and he was
> hardly ever at home. Eventually he was almost never around at all

and I hardly saw him anymore. I even started picking the kids up in the morning instead of Joe dropping them off if Wendi couldn't.[60]

Wendi's dependence, her need to not be alone and maintain a dependent relationship, was turned upside down. She could not get praise. Her financial, emotional, physical, and familial life was deteriorating in front of her eyes.

In addition, symptoms of Wendi's bipolar disorder began to further disrupt her ability to modulate her affect and behavior. She started to drink more.[61] She then became involved in a romantic relationship with Rick Freeland, a resident at San Riva, and spoke openly to her employees and tenants about the affair. An open affair with someone in her apartment complex, while she continues as manager, is a manifestation of both dysregulation and bipolar disorders. In Wendi's case, her condition was compounded by her dependent personality. When Rick met Joe and Rick said he could not continue the relationship, Wendi fell apart, consistent with the symptoms seen in dependent personality disorder. Gia Palicki observed:

> If it is true that Wendi had an affair, I can understand that. She was afraid to be alone. She did not know anyone different than Joe, and towards the end he was not very affectionate with her, which is about all she would have asked for from him. He was dying, and later on he was always angry even though she was doing everything she could to make his remaining time as comfortable and happy as possible. She was young, and her relationship with Joe was cold physically. If she had an affair, it was not because she did not love Joe.[62]

Then what were her affairs? The very symptoms of trauma and dependence, acquiescence, aiming to please, denial, emotional dyscontrol, and numbing of affect that had

---

[60] Tab 31, at ¶18.

[61] Testimony of Wendi Andriano, October 27, 2004

[62] Tab 31, at ¶21.

driven and shaped Wendi's life were undermined. She was increasingly unable to maintain the facade of normality, of possible triumph, and she was feeling to blame. Traumatic stress, real life caregiver burden, and mood disorder began to undermine Wendi's identity as the pleaser and fixer she had been coerced to be. Her affairs, her drinking, and her impaired judgment were the products of her emerging bipolar disorder, symptoms augmented by her longstanding trauma and pathological dependency.[63]

The burden of giving care added to the weight of always trying to keep up. As Joe became increasingly sick, the weight of caring not only for her husband, but her two children, eviscerated Wendi's ability to make reasoned choices.

Wendi suffers co-morbid disorders, disorders that occur in combination or at the same time. Among all mental disorders, alcohol and substance use is highest in people suffering from bipolar disorder and PTSD.[64] Alcohol is the most common "self-medication" used by people suffering from bipolar and PTSD disorders and PTSD is highly correlated with substance abuse. In one study, 24% of persons with PTSD also suffered from alcohol abuse.[65]

---

[63] Malmquist (1996), *supra*, p.159 ("A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level as not possible without this other person, no matter what the price . . . .").

[64] Brady, K.T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[65] Mills, K.L., Teesson, M., Ross, J., & Peters, L. *Trauma, PTSD, and Substance Use Disorders: Findings from the Australian National Survey of Mental Health and Well-Being.* 163(4) AMERICAN JOURNAL OF PSYCHIATRY, 652-658 (2006).

When a person with bipolar disorder is subjected to stress, mood symptoms of mania or depression may become increasingly prevalent. Since alcohol is both a stimulant at low levels and a depressant at higher levels, it serves to anesthetize both poles, while also causing impaired cognitive functioning. The combination of trauma and mood symptoms in co-morbid disorders creates atypical and more severe behavior than would be seen in a given disorder alone. Wendi's co-morbid disorders were intensified by the trauma of her husband's terminal illness, and unleashed her mood symptoms. As discussed, Wendi' symptoms were openly displayed and rarely covered.

Wendi's underlying dependency needs, present since childhood and fostered by her father's coercion, kept her teetering toward the pathological anger seen in dependent personality when those needs are thwarted.

Wendi describes conversations with Joe about his unwillingness to continue to live given his terminal condition and his fear of dying via suffocation, as had been predicted due to the proliferation of the cancer in his lungs. In fact, Wendi reports that Joe did not want anyone to know about his desire to end his life, as his minimization to Jeffrey Miller illustrates.

As a result, Wendi investigated, on her *office computer*, lethal drugs, used primarily for suicide. Wendi reports conversations with Shawn King about types of drugs and places to buy these drugs online.[66] Under the best of circumstances, Wendi's investigation into lethal substances reflects impaired judgment. She had little knowledge of these compounds, and her only computer was at her desk at work in an office shared by other people.

Wendi frequently talked with co-workers about the tremendous pressure she was under, and they saw it. Her family recognized the loss of emotional control and attempted to take

---

[66] Interview of Wendi Andriano by George Woods, MD at ASP Perryville, January 26, 2011.

care of the children, pay for medical care, or provide Joe with outlets like paying for him to spend time on his boat.

### vi.   Wendi Becomes More Erratic

As Wendi's stress increased, her behavior became more erratic. Her relative openness at work, particularly about her relationship with Joe, her affairs, her use of the office computer, and her investigation into lethal drugs and substances in a location where she could easily be seen doing so reflects Wendi's impaired decision making and ability to understand context as seen in people suffering from bipolar disorder.[67] As a 2001 study noted:

> This is possibly the first study to have directly compared decision-making performance in manic and depressed patients. The results showed manic and depressed patients' to be impaired on a computerized decision-making task. While the most general indicators of performance showed similarities between these two groups, close examination of the individual components of the task revealed distinct patterns of impairment: although both manic and depressed patients demonstrated similarly delayed deliberation times and altered betting strategies, impairments in the quality of decisions were confined to manic patients.[68]

An impaired mental flexibility to effectively understand social context and make good decisions is reflected in Wendi's open research into lethal drugs and substances on her office computer and in the fact that others' open awareness of Joe's condition might lead them to discern the purpose of her research. This decision making impairment is also captured in Dr. Young's testing.

---

[67] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[68] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

Cognitive dysfunction is common in bipolar disorder.[69] Problems with attention and focus, leading to a slower processing of events and circumstances, have been found in persons suffering from bipolar disorder, regardless of mental status and mood state. So, a person with bipolar disorder, even in a euthymic (stable) state, may still manifest symptoms of cognitive impairment.

In the period leading up to Joe's death, Wendi was acutely symptomatic. Symptoms consistent with bipolar disorder began to manifest. The most prominent were her expansive mood, distractibility, increased psychomotor activity, impaired judgment, and willingness to engage in activities with a high risk for problematic endings.

Wendi became inappropriately involved with fellow workers in a way that was historically uncharacteristic for her. Once married to Joe, she limited her social contacts to his friends and activities related to boating and events at the lake. Even though she was responsible for various social events at Quail Gardens and the Courtyard Apartments, she did not become personally involved with the residents and staff. At San Riva, Wendi became a part of the San Riva community. To some degree this may have served as a supportive measure for her, but, in fact, her involvement was inappropriate, showed little ability to judge her role, either as wife or manager, and was much more consistent with mental disease.

Wendi worked at San Riva. She was the boss. Nevertheless, she socialized with co-workers and renters at San Riva. She used her only computer at her office at San Riva, often in plain view of other employees and renters. She had affairs with tenants. She went to parties and barbeques at San Riva, and drank more and more.

---

[69] Martínez-Arán, A., Eduard, V., Reinares, M., Colom, F., Torrent, C., Sánchez-Moreno, J., Benabarre, A...& Salamero, M. *Cognitive Function Across Manic or Hypomanic, Depressed, and Euthymic States in Bipolar Disorder.* 161(2) AMERICAN JOURNAL OF PSYCHIATRY, 262-270 (2004).

Deficits in understanding social circumstances, and the impaired ability to respond appropriately to social circumstances are hallmarks of children and adults with bipolar disorder.[70]

Dr. Young's findings are consistent with the social history and Wendi's behavior. Dr. Young found Wendi has difficulty with decision-making, particularly with decisions that were novel and stressful. Wendi's Iowa Gambling Task demonstrated poor strategies for decision making.

Dr. Young also found that Wendi's ability to process novel information is slowed. Both Wendi and Donna describe this difficulty with understanding context and responding to it in multiple ways. Wendi described developing relationships early in her prison years that indicate decision-making that was impaired beyond mere naiveté.

We see the correlation between Dr. Young's findings of slow processing speed, and Wendi's own impaired judgment, particularly under tremendous stress, stress that had become much greater than the "normal" stress of violence and anger she had grown up with.

Wendi became involved with two men (one of whom, Rick Freeland, a tenant at the apartment complex she managed). Consistent with the need to be loved, Wendi described herself in her testimony as falling in love with Freeland within months. When they separated, she

---

[70] "Children and adults with bipolar disorder perform differently from comparison subjects and individuals with other disorders on social-cognitive measures, particularly facial expression processing tasks. Symptomatic adults with bipolar disorder also have difficulty using contextual cues to infer others' mental states. Less research has focused on expressive aspects of social cognition; clinical observation of youths with pediatric bipolar disorder, however, suggests that language pragmatics (i.e., appropriate social use of verbal/nonverbal language) may be problematic. This pattern of aberrant social-cognitive skill suggests dysfunction in neural structures thought to mediate social, emotional, and possibly pragmatic linguistic processing. These structures include the ventrolateral and medial prefrontal cortices and the amygdala, which exhibit structural and/or functional anomalies in bipolar disorder." McClure et al. (2005). *Deficits in Social Cognition and Response Flexibility in Pediatric Bipolar Disorder* (internal citations omitted).

was overwhelmed, feeling as though she had lost a close friend, someone she could talk with, an interaction of classic symptoms of bipolar disorder and dependent personality disorder.

Wendi was the manager of the San Riva apartments. She not only lived there, with her husband and children, but San Riva was her place of business. She manifested multiple behaviors that portended increasing mental illness, as she continued to work there. These symptoms of elevated mood, poor judgment, impaired impulse control, increased alcohol intake, and increased sexuality, were temporally and causally related to the onset of her extreme level of traumatic stress and subsequent manifestation of bipolar symptoms. There was a change in Wendi.

The extreme stress rent the fabric of Wendi's fragile mental state, already bombarded by affective dysregulation, self-medication, impaired cognitive tools, and defective judgment. Many of the symptoms that were previously subclinical, meaning less obvious, were amplified by Wendi's loss of control, and the destruction of all that she knew, and as a result of the need to keep herself, her children, and her dying husband going.

It is unclear whether Joe participated in a suicide decision, although he had clearly entertained suicide and talked with his malpractice lawyer about his suicidal ideation. Wendi, however, on her office computer, created a false business license, using the address of her actual business office. She found a company that sold lethal compounds. She brought those compounds to her office.

Wendi's competent facade was just that, a facade that quickly crumbled in the face of coercion by her dad, the vulnerabilities of her own mental illnesses, the neglect of her mother, and, now, the extraordinary burdens of caregiving she faced. From childhood, she was isolated from others, unable to effectively socialize, and subject to peer pressure. The series of

behaviors prior to the night of the offense captures the range and severity of the mental illnesses Wendi was suffering from, especially when under tremendous stress before the current offense, at the time of the offense, and while being treated in jail after the offense.

### vii.    Wendi's Symptoms on the Night of the Offense

Chris Hashisaki's testimony gives some insight into Wendi's mental symptoms and mental state at the time of the offense. When asked, during cross examination, if Wendi was creating fictitious business licenses on the job, in plain view of other employees, Ms. Hashisaki said "Yes."[71] Ms. Hashisaki acknowledged seeing the package in Wendi's office. When asked by Mr. Martinez to describe Wendi's mental state at the time of the offense, Ms. Hashisaki describes Wendi as "confused."[72]

Ms. Hashisaki made it clear that Wendi was overwhelmed by Joe's illness, not just Wendi and Joe's relationship.[73]

When the emergency medical technicians came the first time, Wendi said her husband was dying and did not want any services. They asked her if she had a DNR (Do not

---

[71] Hashisaki testimony, Page 48 ("Q: In the office set up there, she openly was in the process of creating fictitious business license, correct? A: Yes. Q: You observed that? A: Yes. Q: She made no effort to hide that fact from you in doing it, correct? A: To point. Q: Right. And then when you inquired of it, she basically said it's none of your business, leave me alone? A: Correct. Q: But she did it at time during business hours, correct? A: She did yes. Q: When you were witness to it? A: Yes.").

[72] Hashisaki testimony, Page 11 ("Q: How would you describe her demeanor? A: Confused. Q: And did she have telephone in her hand? A: She did.").

[73] Hashisaki testimony, Page 40 ("Q: The marriage had some problems? A.  They were having trouble with his illness, yes. Q: Beyond the illness, they were having other problems? A: Such as what? Q: Such as -- don't know how else to describe it.  Difficulty between man and wife in husband and wife kind of relationship? A: She expressed difficulty in the relationship, yes. Q: And she attributed those problems to the conduct of Mr. Andriano correct? A:  More so towards his illness. Q: Illness was one of the problems, but there were other items that were causing marital discord between these two individuals, correct? A: That don't know of. Q: Are you telling me that she never suggested that she was having problems with Mr. Andriano? A: No I'm not suggesting that.  I'm suggesting that it was more so due to the illness. . .").

resuscitate) order.[74] Wendi's executive functioning, her impaired sequencing and understanding of specific social context, had fallen apart. She was suddenly surrounded by people she had called without knowing what to do, the very antithesis of planning, if that were the case.

Again, the emotional disconnect grounded in trauma was documented. Wendi's range of emotions and the quality of the symptoms at play included traumatic dissociation, where she lost and was unable to recollect much of the time during the incident. Wendi's dissociation has a strong foundation in the trauma and neglect of her childhood. As noted above and in the Hopper report, Wendi's father coerced her sexually for many years during her childhood and early adolescence. There are at least two incidents of Wendi being photographed by her father, once in a motel, in sexually-provocative poses and see-through nightgowns. Wendi does not recall either of the photographs, although she does recall going to each place these photographs were taken, and recalls reluctantly agreeing to let Alejo Ochoa, her father, take these pictures.

Wendi's dissociation underlies much of what we know about the actual offense. Studies consistently report a high degree of dissociation in patients who suffer from pathological forms of affective dysregulation as discussed above.[75] Indeed, Wendi was experiencing pronounced symptoms of her mental illness during the period leading up to Joe's death, and the

---

[74] Hashisaki testimony, Page 37 ("A: She walked past the fire department and myself and stood by the front door and explained that she did not want any service, that her husband was dying and this was not the way that he wanted to go, and that she would like us to leave. Q: And what did the fire department people do? A: The fire department said that if you're refusing treatment that was something they understood. They asked her if he had a 'DNR'. She asked them what a 'DNR' was and they said 'DNR' was 'do not resuscitate.'").

[75] Lewis, D. O. (1992). From abuse to violence: Psychophysiological consequences of maltreatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 31*(3), 383-391;

van der Kolk, B. A., Perry, J. C., & Herman, J. L. (1991). Childhood origins of self-destructive behavior. *American Journal of Psychiatry, 148*(12), 1665-1671;

Terr, L. (1991). Childhood traumas: An outline and overview. *American Journal of Psychiatry, 148*, 10-20.

night of the offense involved the convergence of severe symptoms of each of Wendi's disorders, which, because of their co-morbid nature, would have fed off each other to exponentially worsen their collective severity.  The manifestations of her psychiatric disorders, including dissociation, likely played a substantial role in the events that caused Joe's death. A person in Wendi's state would have been unable to control and manage her emotions and responses to the events as they unfolded.  Moreover, those disorders in conjunction – and particularly dependent personality disorder when the sufferer's dependency needs are thwarted in the profound manner at issue here – likely would have substantially impaired Wendi's ability to accurately judge how to "help" her terminally ill husband, who was the focus of Wendi's pathological dependence needs. Her ability to judge whether her behavior was right was marred by her multiple mental and cognitive symptoms.

Wendi's post-arrest therapy sessions with private counselor Kandy Rohde provide our best glimpse into her mental state.

> She felt angry and hit him twice with a chair. She believes she continued to hit him with the chair but her recollection is that she watched herself do that.  [A classic description of dissociation.] The next memory is of Wendi sitting on the ground next to Joe's body. She thinks she had her hand on him and she knew he was dead. She said they were in the middle of a pool of blood. She got up to wash her face and glasses because they were so bloody she could not see. She said that she does not know how much time passed or what happened. She did not hear the paramedics. The children did not wake up. Chris did not return. She called her parents and her father told her to call the police. She did. Her most chilling memory is that of Joe asking her to help him as she hit him with the chair. In her head she said that she was helping him. She said that she felt relief when she found him dead. She was glad her old life was over.[76]

---

[76] Tab 45 (Kandy Rohde Notes dated February 23, 2001).

Consistent with her multiple, interrelated, co-morbid disorders, Wendi describes dissociative symptoms at the time of here greatest stress. Her loss of time, emotional numbing, hyper-reactivity, and anger are all part and parcel of her traumatic disorder. Augmenting her traumatic response, however, is her Dependent Personality Disorder, created from the long term sexual coercion that led to both acquiescence and the anger that comes from overwhelming stress.

Dr. Carl Malmquist describes how individuals with dependent personality disorders are often led to violence.[77] This was certainly the case with Wendi. Her history with men, starting with her sexual coercion by Alejo Ochoa, her stepfather, to her affair with Rick Freeland and subsequent one-night stand with Travis Black, had always been one of dependence. In the impending death of Joe Andriano, Wendi was suffering from emotional abuse, dissociation, affective numbing, anger, hyper reactivity, and the foreshortened sense of the future one sees in complex trauma. She had already become unhinged, displaying manic symptoms of increased drinking, incredibly poor judgment, and sexual dalliances. The multiplicity and interplay of symptoms eroded what little ability she had shown in the past, to maintain cohesive functioning.

Symptoms of dependent personality disorder, acquiescence, difficulty being alone, and extreme neediness, permeated the early years of Wendi's and Joe's marriage. With the introduction of Joe's terminal illness, Wendi began to show new, acute trauma symptoms like numbing of affect, hyper reactivity, anger, irritability, and avoidance. These symptoms are common in caregivers, particularly those who have few resources for support.

---

[77] Malmquist, C. (1996). Dependent personality disorders and killing, in *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

Pearlin has investigated the role implications of life stressors, including family illness. He suggests that concepts such as role captivity, which is viewed as being placed in a role involuntarily and unwillingly, and role overload, help us to understand many dilemmas of caregiving. He also acknowledges the impact of caregivers' coping and social support resources on their ability to deal with caregiving demands.[78]

Wendi reported many symptoms of traumatic stress when describing the night of the offense to counselor Kandy Rohde. She described affective numbing, dissociation, and the overreaction seen when trauma, both acute and chronic, impairs the ability to modulate feelings and behaviors.

Tragically, the dependent underpinnings of her façade were also crushed, and her ability to conform her behavior was thwarted.[79] Wendi's mental disorders and the role they played in the deterioration of her mental state were never examined before or during her trial. A thorough social history would have pointed out the multigenerational history of mental illness. A social history would have also chronicled the sexual coercion of her stepfather and neglect of her mother which led to a lack of coping skills, acquiescence, and lack of appropriate affective control and response.

---

[78] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41.

[79] "A question arises as to why a DPD (Dependent Personality Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level." Malmquist, C. (1996). Dependent personality disorders and killing. In, *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

In addition, research has consistently demonstrated a connection between affective dysregulation and experiences of early childhood neglect, trauma and attachment failure. Without adequate regulation of the infant's distress states, the nervous system and affect-regulating brain structures fail to respond optimally. Affective dysregulation is a core symptom of post-traumatic stress disorder. Methods to increase self-regulation are crucial to the effectiveness of any treatment for these problems. Traditional therapeutic modalities that address distorted cognitions or focus on emotional expression, attempt to address affect regulation but fail to modify its underlying basis in the nervous system.  When Wendi sought and first received psychological treatment in 1996, no historical information was provided to the therapist and there was no treatment recommended to appropriately approach affect dysregulation as a caregiver stress and trauma symptom, and address the underlying causes of Wendi's dysregulation.

The significance of Wendi's affective dysregulation, dissociation, numbing of affect, and other symptoms of PTSD can only be determined by a careful investigation of the total context of a patient's life, and the totality of the patient's functioning. In Wendi's case, the substantiation of many of Wendi's symptoms of bipolar disorder, cognitive dysfunction, dependent personality, and complex trauma rest upon a social history that was not sought nor found by her trial attorneys.

The lack of this social history prevented mental health specialists from understanding the multiple disorders in play as well as the environmental pressures of caregiver burden.

b.   **Post Offense Treatment for Mental Illness**

After Wendi was arrested and charged with Joe's murder, jail mental-health practitioners recognized Wendi's mood disorder, trauma, and personality symptoms. She began

to complain of problems sleeping early in her incarceration. Within weeks of her incarceration, she was placed on Prozac, Remeron, and Trazadone; all three antidepressants. Remeron and Trazadone are particularly sedative, and are used to aid in sleep.

On November 3, 2000, Dr. Garcia-Bunel reported that Wendi was extremely depressed, and that she had been depressed for over a year. This year corresponds to Wendi's most illogical, mood-driven acts.

Within months, her medication was changed to Remeron solely. Wendi's attorneys advised her not to talk with Dr. Garcia-Bunel, and those visits were discontinued.

Wendi was first placed on Seroquel, an atypical antipsychotic commonly used in bipolar depression, in April 2002. She was started on 100mg. at night. Seroquel is also highly sedative and an excellent sleep aid in persons that have a psychotic disorder or bipolar disorder.

By November 2002, Wendi was described as still having ongoing insomnia. Dr. Vickie Ayers increased Wendi's Seroquel to 200mg at night. Dr. Ayers also prescribed Ativan, an anti-anxiety agent, and Elavil, a very sedating antidepressant. Over the next months, Wendi was consistently prescribed Seroquel, the atypical antipsychotic, and Elavil, the sedating antidepressant. There is an important clinical question of whether Wendi was actually switched into hypomania by the Elavil. She certainly continued to manifest anxiety and problems sleeping, symptoms that could have been compounded by the very treatment she is receiving.

Vincent Stuart, MD, saw Wendi on October 23, 2003. He felt that she was anxious due to the upcoming trial and, in addition to her Seroquel, he increased her Ativan to a total of 4mg per day.[80]

---

[80] MCCHSD Progress Notes, October 23, 2003.

On November 27, 2003, in spite of treatment with antidepressants and medications for her bipolar depression, Wendi attempted suicide. She cut her left wrist, and was taken to the Durango Psych. Unit. D. Anderson, the evaluating nurse, described Wendi's thoughts as "irrational" and felt she was minimizing her attempt.[81] Wendi was placed in four-point restraints.

By the afternoon of November 28th, Wendi was logical. She had been reduced to two-point restraints. K. Hoffert, MD, made the diagnosis of "Adjustment Disorder with mixed features," and continued her medications.

Wendi's discharge criteria, developed on November 29, 2003, were that she not be a danger to herself or others, and that she develop a 25% increase in coping skills.[82] Wendi's pathological dependency needs appear at her most vulnerable times, as Counselor L. King recognized.

King evaluated Wendi on November 29, 2003. King determined that Wendi should remain on the Psychiatric Unit, where she stayed for two more years, through her trial, an extremely unusual occurrence for someone not grossly psychotic. It speaks to Wendi's mental fragility during this period, the result of multiple, overlapping psychiatric symptoms.

King believed that Wendi's need for stabilization justified her stay on the Durango Psych. Unit. Wendi's instability had, as Wendi said, started long before her incarceration. The treatment she needed came too late.

---

[81] Progress notes, MCCHSD, November 27, 2003.

[82] Progress note, MCCHSD, September 29, 2003.

Date: February 14, 2012

George W. Woods, Jr., M.D.

## APPENDIX A TO THE EXPERT REPORT OF DR. GEORGE W. WOODS

### Materials reviewed by Dr. George W. Woods

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report and Appendix of James W. Hopper, Ph.D.

- The Expert Report of Myla Young, Ph.D.

Exhibit No.: **2.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*

*2/3/2014*

**Clerk of Superior Court**

By: _____L. MOONEY_____
(Deputy Clerk)

1002841554

### APPENDIX A TO THE EXPERT REPORT OF DR. GEORGE W. WOODS

#### Materials reviewed by Dr. George W. Woods

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report and Appendix of James W. Hopper, Ph.D.

- The Expert Report of Myla Young, Ph.D.

Exhibit No.: **2.002**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By:_____ L. MOONEY _____
(Deputy Clerk)

1002841535

## APPENDIX B

### Overview of the Biopsychosocial and Psychiatric History of
### Wendi Elizabeth Andriano and Her Family

1.   **Importance of Family Social History and Mental Illness**

Wendi's immediate and extended family members, including her parents, maternal aunt and cousins, and maternal grandmother, all exhibit a history of mental illness. Particularly notable are symptoms consistent with bipolar disorder, major and psychotic depression, attention deficit disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Medical records describe, and family members report, an array of psychiatric symptoms displayed by various family members, including bipolar episodes, depression, mania, suicidal tendencies, suicide attempts, psychosis, obsessive compulsive disorder, and substance abuse.[1] These symptoms interfered with the family's day-to-day functioning, seriously compromised their parenting and care giving abilities, and were rarely ameliorated by any medical or psychiatric treatment.

Wendi's family's multigenerational history is pivotal in determining the genetic and familial components of her mental disorders. Wendi was vulnerable to mood disorders, which were rampant in her family. The incidence of inheriting mood disorders is increased four-fold in the children of persons with bipolar or depressive disorders.[2]

Wendi's maternal grandfather exhibited symptoms of bipolar disorder, including hypersexuality, chemical dependency, irritability, and impaired functioning. We also see Wendi's aunt, Nadine, diagnosed with bipolar disorder. Her mother, Donna Ochoa, has suffered from psychotic breaks on at least four occasions.

During Wendi's earliest years, she was exposed to the extreme neglect, drug use and violence of her parents. Skip Robertson, himself an abused, depressed, traumatized man; surrounded his daughters with his family, rife with childhood sexual abuse. Donna, due to her own limitations and demons, did nothing to protect her child. Wendi manifested inappropriate sexual mannerisms as early as four years of age.

Wendi was sexually traumatized at the hands of her stepfather, Alejo Ochoa. She was also subjected to an authoritarian, cult-like environment for many of her most formative years. These "religious" environments fostered corporal child abuse, and turned a blind eye to child sexual abuse.

---

[1] *See generally* Tabs 18, 27-28, 32.

[2] Schulze, T.G., Hedeker, D, Zandi, P., Rietschel, M. & McMahon, F.J. (2006).  What is Familial about Familial Bipolar Disorder.  Archives of General Psychiatry, 63 (Dec.).

This genetic/familial/environmental vulnerability to mental illness resulted in Wendi suffering from the seeds of multiple mental disorders.

## 2.   Maternal Biopsychosocial History: Clinical Symptoms and Diagnoses

### a.   Maternal Family Biosocial History

Maternal family declarations and medical, military, and pharmacological records reveal and support a multigenerational and transgenerational history of bipolar disorder, clinical depression, migraine headaches, cognitive disorders, attention deficit hyperactivity disorder ("ADHD"), and alcoholism. Many occurrences of these conditions went untreated. With few exceptions, in the instances up to and including Wendi's generation when treatment was sought and obtained, this was usually done late in the lives of the family members affected, often in middle age.  As a result, during the parents' years of child-rearing and care giving, children were subjected to abuse and neglect resulting from alcohol and drug abuse, psychosis, outbursts and emotional absence due to mania and mood shifts, anxiety, and the despondency of depression. Children across multiple generations of Wendi's maternal family lacked care giving, nurturing, safety, parental attention and guidance, and appropriate modeling. Situational events resulting from these conditions often derailed successful childhood development and the achievement of normal developmental milestones.

Wendi's maternal great-grandfather (her mother's paternal grandfather), Henry Mason Worsham, Sr., was "a big drinker and an alcoholic" who "drank away" his farm.[3] Wendi's mother's paternal grandmother, Mary Elizabeth Fortner, put up with Henry Worsham, Sr.'s lifelong drinking just as Wendi's maternal grandmother, Laverne Ann Tilley (Ann), put up with Henry Worsham, Jr.'s, lifelong drinking.[4]

Wendi's maternal great-grandparents (her mother's maternal grandparents) were Sanford Tilley and Ina Rebecca Roberts. Family stories reveal the severe bipolar symptoms suffered by Ina, including having migraines her whole life[5] and severe, rapid mood changes.

---

[3] Tab 27, at ¶ 4.

[4] Tab 27, at ¶ 5.

[5] Tab 27, at ¶ 406.

2

Ina tried to kill herself on at least one occasion. In a separate incident, when Ina was hospitalized for migraines later in life, she died at the hospital in what her husband at the time considered a successful suicide attempt.[6]

Thyroid disorder is frequently seen and co-morbid in people suffering from depression and bipolar disorder and other mental illness. Wendi's maternal grandmother, Ann, had a lifelong history of thyroid disorder,[7] and later in life was regularly prescribed anxiolytics in the form of Librium and Ativan and was also prescribed Haldol, used to treat psychotic disorders.[8]

Wendi's maternal grandfather (Donna's father), Henry Mason Worsham, Jr. ("Hank") was "the black sheep of his family because he stayed in the Navy and never settled down like the rest of his family."[9] Hank was a lifelong alcoholic, so severe in his alcoholism that he spent most of his money on alcohol, drank regularly for the entire time Donna was growing up, and he continued drinking until the end of his life.[10] Hank lost great potential for a successful career and life because of his drinking:

> [Donna and her parents] moved to Tucson around the time
> [Donna] was finishing third grade or during the summer
> before [she] started 4th grade. In Tucson [Hank] worked as a
> recruiter for the Navy. He should have been an officer by
> then, but he often drank and got into fights, which resulted in
> his being demoted all the time. Most of the fights he got into
> were bar fights with other military people while he was
> drunk, like when Army and Navy men were in the same bar.
> He ended up spending time in the brig on a Navy ship more
> than once.

After Donna and her parents moved to Tucson when Donna was about nine years old, Hank prepared Donna to drink alcohol:

> My dad took me around to bars while I was growing up. That
> was how we spent time together after we moved to Tucson. I

---

[6] Tab 27, at ¶ 407.

[7] Health History of LaVerne Ann Worsham; Medical and Pharmacy records of Laverne Ann Worsham.

[8] Medical and Pharmacy records of Laverne Ann Worsham.

[9] Military and Address History of Nadine A. Zens; Address history by LaVerne A. Worsham.

[10] Tab 27, at ¶ 29; Tab 18, at ¶ 14; Medical and Military Records of Nadine A. Zens.

spent a lot of my youth in bars in downtown Tucson. I sat in
the bars and drank Shirley Temples, a nonalcoholic drink
made of 7up, grenadine syrup, and cherries, while my dad
was drinking alcohol. If I was really lucky I got a cherry
coke, but usually drank a Shirley Temple because the name
sounded like a drink for grownups. How pathetic is that:
preparing a child to drink alcohol by taking her around to bars
and giving her an adult-sounding cocktail when she's not
even a teen yet.[11]

Donna started drinking alcohol regularly with her dad when she was fifteen years old.[12]

     Hank was unfaithful to Ann and reared a family with another woman,
Virgie, while remaining married to Ann.[13] Hank and Ann were unable to either separate
or resolve their problems. They subjected each other and Donna to years of violence,
vicious fighting, abuse, and neglect. For the first year or two of Hank's affair with Virgie,
Ann "dragged" the twelve-or-thirteen-year-old Donna along with her on Sundays while
she went around to hotels looking for Hank. Sometimes Ann brought a gun with her, and
on one occasion, while Donna waited in the car, Ann entered the hotel room where Hank
and Virgie were staying and fired the gun at Virgie, attempting to kill her, then provided
no explanation of what had occurred to Donna, leaving Donna wondering whether or not
her mom had killed her dad.[14] When Hank came home around midnight after drinking
and carousing with waitresses, there was regularly screaming and fighting between Hank
and Ann and "they fought so hard that they broke windows." The pre-teen and early-teen
Donna became so afraid and anxious that she began keeping a butcher knife by her bed to
protect herself from her parents.[15] The problems between her parents escalated over
time[16] until in 8th or 9th grade Donna had a psychotic depressive break that included
periods of uncontrollable crying and mental absence.[17]

---

[11] Tab 27, at ¶ 30.

[12] Tab 27, at ¶ 83.

[13] Tab 27, at ¶ 49; Tab 18, at ¶ 14.

[14] Tab 27, at ¶ 35.

[15] Tab 27, at ¶¶ 37-38.

[16] Tab 27, at ¶ 38.

[17] Tab 27, at ¶ 48.

Ann "became suddenly furious at times, and had rapid mood swings."[18] Ann abruptly ended conversations on the phone. She "just suddenly had to stop talking and get off the phone." Now Donna does the same thing. She stops family members in the middle of conversations and hangs up because she "reach[es] a point where I'm just done talking and the idea of continuing to talk is intolerable."[19]

Donna is aware of a diagnosed history of bipolar disorder within her family.[20] Medical records for Wendi's mother, Donna Ochoa, reveal a history of depression, and in 2001, she was referred for a psychiatric consultation in which she was diagnosed as suffering from severe depression and anxiety disorder.[21] Donna's history of severe trauma, abuse, and neglect is manifested in an array of severe clinical symptoms and disorders that in some cases have extreme presentations in Donna's history, including bipolar disorder, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. *See* "Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa" and "Donna Elizabeth Ochoa: Clinical Symptoms and Diagnostic Conclusions," below in this appendix, for detailed treatment and discussion of Donna's trauma and mental health history.

Wendi's maternal aunt, Kathie E. Worsham, child of Donna's father, Hank, with his second wife, has a significant mental health history.[22]

Wendi's maternal aunt, Nadine Ann Bednorz nee Zens, first child of Ann, had a significant mental health history. Nadine was diagnosed with both clinical depression and bipolar disorder,[23] and struggled with depression while her children grew up.[24] Nadine suffered from migraines[25] for which she received medical and pharmaceutical treatment for most of her life. She was treated with Phenobarbital from the time she was twelve or thirteen years old until she was seventeen, after which the

---

[18] Tab 27, at ¶ 405.

[19] Tab 27, at ¶ 404.

[20] Tab 27, at ¶ 406.

[21] Donna Ochoa Medical Records.

[22] Criminal History and ADOC Records of Kathie Worsham; Tab 27, at ¶¶ 50-61; Tab 26.

[23] Medical Records of Nadine Bednorz; Tab 18, at ¶ 3; Tab 27, at ¶ 406.

[24] Tab 18, at ¶ 3.

[25] Medical Records of Nadine Bednorz; Tab 27, at ¶ 406; Tab 18, at ¶ 3.

headaches subsided until she was twenty-five years old.  Thereafter she was prescribed Fioronal, to which she became addicted and was admitted for detoxification at the age of about fifty-nine. [26]

Nadine's medical records from 2001 and 2002 report a familial history of headaches, depression and bipolar disorder.  She was hospitalized three times between 2001 and 2005 for treatment for headaches, depression and bipolar disorder.[27]

Wendi's maternal cousins, including the children and grandchildren of Nadine, and Kathie's son, Brandon, who later became Wendi's adoptive brother, also have significant mental health and alcohol/substance histories. Wendi's maternal cousin, Clark Bednorz, Jr., son of Nadine, who is about a year younger than Wendi,[28] received an Individualized Education Plan ("IEP") in elementary school as a result of being diagnosed with attention-deficit disorder (now characterized in the literature as a type of ADHD).[29] He had mental-health issues as a child and received neuropsychiatric treatment for his behavioral and adjustment difficulties. [30]

Clark's condition has not improved over his lifetime.[31]  Nadine was afraid of him because of his "violent rages."[32] He drank and got into trouble for drinking.[33] As an adult and through the present-day, Clark "literally begins living on the street suddenly if he doesn't take his medication regularly."[34]

Nadine's daughter, Margie (Wendi's maternal cousin), suffers from migraines and has been diagnosed with bipolar disorder.[35] Margie has extreme mood swings so extreme that even Nadine was afraid of her:[36]

---

[26] Medical Records of Nadine Bednorz

[27] Medical Records of Nadine Bednorz

[28] Tab 27, at ¶ 414.

[29] Medical and Scholastic records of Clark Bednorz, Jr.

[30] Medical and Scholastic records of Clark Bednorz, Jr.; Tab 27, at ¶ 414.

[31] Tab 18, at ¶¶ 4-10.

[32] Tab 27, at ¶ 414.

[33] Tab 18, at ¶ 6.

[34] Tab 27, at ¶ 415.

[35] Tab 27, at ¶ 406.

> At times [Margie] can be the happiest person you could ever
> expect to meet and at other times, vicious and violent. She
> goes from fits of screaming and cursing to being nice and
> docile. She goes into the screaming fits suddenly, and can
> transition back to being happy and as calm as can be as
> though nothing happened within an hour. When that happens,
> family members are often standing around shocked, and
> Margie doesn't seem to think it's a big deal. She and her
> husband Jeff have been physically abusive toward each other.
> Nadine gave Margie thousands of dollars over the years to
> encourage her to leave him but still she has not left him
> though as far as I know the abuse and violence continues.[37]

Margie has four children: Brett, born 1991; Kayla, born 1993; Tyler, Born
2002; and Logan, born 2010. All of Margie's children except Logan, an infant, have been
prescribed psychiatric medications "for mental health and behavioral issues" from the
time they were small children, before they started grade school.[38] Margie states:

> My son Brett and my daughter Kayla have both been
> diagnosed with ADHD. My son Tyler is autistic, has a mood
> disorder, and also has ADHD. He has a lot of anger problems.
> Brett was eleven years old when my dad passed away. They
> were very close and Brett was extremely affected by his
> grandfather's death. Even though he was only eleven years
> old, I was unable to get him to go to school. Eventually, I had
> to put him on antidepressant medication, but he didn't take it
> for very long. Kayla is currently taking Concerta, for her
> ADHD. Tyler takes Adderall, Tenex, Risperdal, and
> Depakote.  Because I've had trouble dealing with Tyler's
> problems, and with my mom's passing, I currently take
> Prozac.[39]

Alcoholism is common among individuals in Wendi's extended family,
including her maternal grandfather, Henry Worsham, Jr., great-grandfather, Henry
Worsham, Sr., and many others:

---

[36] Tab 27, at ¶ 413.

[37] Tab 27, at ¶ 413.

[38] Tab 18, at ¶ 13; Tab 27, at ¶ 416.

[39] Tab 18, at ¶ 13.

7

Many people in Wendi's extended family, both blood relatives and relatives by marriage, are or have been alcoholics, including Wendi's biological father, Skip, for much of his life; [Wendi's mother, Donna] for a couple of periods from the time [she] was a teenager until [she] was in [her] mid-twenties; Alejo, before he turned twenty or twenty-one; my dad and my paternal grandfather; all of Skip's brothers; my half-sister, Nadine, when she was younger and while she was in the service; Nadine's son, Clark, and her grandson, Brett; the husband of Nadine's daughter Marjorie, whose name is "Jeff;" my half-brother, Stevie; my half-sister, Kathie; my stepbrother, Adolfo; my mother's brother, Delmar; my mother's first husband, Theodore Zens; my father's second wife, Virginia, when she was younger; many of the men in my dad's extended family; Alejo's father, Alejo, Sr., who was a rowdy drinker until he was about sixty-five years old; Alejo's mother, Natalie; Wendi's paternal cousin, Natalie; and many other members of Alejo's extended family, including his aunts, uncles, and cousins.[40]

Wendi's life must be viewed through the legacy of her family. Prominent symptoms of impaired sexuality, chemical dependency, psychosis, and mood disruption are the foundations of Wendi's affectively laden family. Her mother, Donna, inherited many of these symptoms, and, as we now see, passed them on to Wendi.

**b.**    Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa Relevant to the Clinical Diagnosis and Forensic Formulation.

I will not reiterate the full biopsychosocial history of Donna Ochoa, due to the extensive documentation provided by Dr. Hopper's report, but will summarize certain particularly relevant portions here.

Early childhood years are critical for developing a person's capacity for developing and maintaining healthy relationships as an adult. The ability to bond and empathize are typically reinforced by parents during these years. During this time Donna moved frequently and was a loner. Her parents' tumultuous and violent marital history shows their limited capacities for bonding and empathy, and her father's absence and mother's neglect show that Donna received little positive parental reinforcement as a child to establish the foundation needed for adult relationship skills. Donna's rheumatic fever and subsequent hospitalizations reinforced her isolationist tendencies. Medical

---

[40] Tab 28, at ¶ 96.

illness in children is a significant cause of traumatic stressors, one that is not often considered when looking at personality and mood disorders in adults that have suffered significant medical afflictions as children.

While growing up and as an adult, Donna was coerced to please her father. Until she was at least six or seven years old, she took showers with her father, and he continued to surprise her while she showered by dumping cold water on her until she was twelve years old and in the 6th grade.[41] This is the earliest incident of self-reported, inappropriate sexual and sex-related behavior by men Donna was close to with underage girls. Inappropriate sex-related behavior and sexual abuse of underage girls by men who were close to Donna and close to Wendi is consistently evident throughout both of their lives.[42]

Donna's childhood friend in Tucson, Alice McGuffee and her sisters were sexually abused by the Robertson brothers, the brothers of Donna's future husband, Wendi's biological father, Skip Robertson.[43]

Donna was "completely oblivious to the sexual abuse going on in [the McGuffee] family" and she "thought that the McGuffees had the perfect happy family" while growing up as Alice's best friend,[44] beginning a life-long pattern of Donna not noticing or comprehending sexual abuse occurring around her or in her household:

> [I, Donna] was an only child, severely neglected by parents who had no affection for each other, and I had no clue and no way to understand or even notice the sexual abuse that was happening in Alice's family, despite the fact that I witnessed things that as an adult in retrospect I recognize as being inappropriate. I actually always thought that the McGuffees had the perfect happy family, the kind of family I always wanted, because it was a big family with siblings, lots of activities and things going on, and everyone involved in each other's lives.
>
> If I had known then what I know now as an adult, and if I had had the adult skills and perceptions that I have today, I would

---

[41] Tab 27, at ¶ 18.

[42] *See generally* Tabs 12, 27-28, 30, 32.

[43] Tab 27, at ¶ 27; Tab 28, at ¶¶ 8, 13; Tab 30; Tab 17; Tab 32, at ¶3.

[44] Tab 28, at ¶ 14.

have recognized things that were going on in Alice's family as being odd, and in retrospect I can see some incidents as definitely being weird, mild things such as inappropriate grasping or touching of the McGuffee girls by the Robertson brothers while I was around and the girls had their clothes on, but at the time I didn't know that any of it was wrong or even unusual. I had nothing healthy in my own family to compare it with, and no context in my own life to recognize that anything was occurring other than the happy, normal family life that I thought the McGuffees had.[45]

Donna's mother, Laverne Ann Tilley ("Ann"), ignored Donna and neglected her severely while Donna was growing up.[46] At times Ann lashed out and slapped or smacked Donna for no reason other than that Donna was nearby and Ann was angry.[47] Donna's food and survival needs were met, but the relationship between Donna and her mom was sterile and distant; there was "no emotional connection with [my mom], no hugging, no cuddling, no warmth, no affection, no bond."[48]

As described in depth above, Donna's father, Hank, drank so much that he spent most of his money on alcohol for the entire time Donna was growing up, and he continued drinking until the end of his life.[49] The primary way Donna spent time with her father, from the time she was about nine years old, in 4th grade, until she was thirteen or fourteen years old, was in bars—where Hank drank alcohol and she drank nonalcoholic drinks.[50] Hank thus prepared Donna to drink alcohol while she was still a child, and she started drinking alcohol regularly with her dad when she was fifteen years old.[51]

As described above, Donna's father had marital affairs with many women while Donna was growing up.[52] Shortly after the affair began between Hank and Virgie,

---

[45] Tab 28, at ¶ 14.

[46] Tab 27, at ¶¶ 44–46, 304; Tab 28, at ¶ 14.

[47] Tab 27, at ¶ 44.

[48] Tab 27, at ¶ 46, Tab 32, at ¶ 31.

[49] Tab 27, at ¶ 29.

[50] Tab 27, at ¶ 30.

[51] Tab 27, at ¶ 83.

[52] Tab 27, at ¶ 33.

while Donna was in 6th or 7th grade, she "didn't want to be Donna anymore, so I decided to change my name to 'Beth,'" and she "went around for a summer telling everyone that I was 'Beth.'"[53] This indicates intense emotional conflict in the pre-teen and early teen Donna.

The stress and fighting between Donna's parents worsened further over time.[54] Ann continued to ignore Donna, and never talked with Donna about anything important, "especially not the difficulties between her and my dad." Ann never admitted to Donna that there was a problem between her and Hank,[55] and despite the intense fighting late at night, Donna and her parents pretended that nothing was wrong. They never talked about the fighting, and during the day acted like things were okay.[56]

Donna "never wanted to do anything to make my dad mad at me."[57] She did things that she knew he would not approve of, but when he found out about them and told her to stop, she stopped: "Whatever my dad told me to do, I did."[58]

A family history of substance abuse, childhood abuse, and isolation are all clearly evident in Donna's childhood, and all strongly support a diagnosis of bipolar disorder in Donna and Wendi.

Two or three years after her parents' severe marital problems began, when Donna was in 8th or 9th grade, she "took it until I couldn't take it anymore," then lost it and "had the breakdown,"[59] the first of at least four psychotic breaks that she has suffered throughout her life. She was unable to stop crying, and then could not respond when people talked to her. She "stayed home from school and everything else" for a week or two.[60]

Donna had a period of hypersexuality beginning in her senior year in high school and continuing after she graduated, while she went to college for a semester, and

---

[53] Tab 27, at ¶ 43.

[54] Tab 27, at ¶ 38.

[55] Tab 27, at ¶ 45.

[56] Tab 27, at ¶ 38.

[57] Tab 27, at ¶ 72.

[58] Tab 27, at ¶¶ 76–77.

[59] Tab 27, at ¶ 48.

[60] Tab 27, at ¶ 48.

then met Wendi's biological father, Skip.[61] She was "fresh meat for the partying crowd and the guys who were older than [she] was,"[62] and she went to bars with "partiers and bad boys" who were in their twenties when she was seventeen.[63] Her first sexual intercourse occurred when she was underage with a man who was twenty-three or twenty-four years old.[64]

Donna's periods of hypersexuality and alcohol abuse in late adolescence and early adulthood are typical prodromal symptoms of bipolar disorder. Donna drank so much while attending college, "during the whole semester," that she almost got kicked out of school.[65]

Donna got together with Wendi's biological father, Skip Robertson, in late 1967, when she returned home for Christmas break after her first semester of college. Skip had just returned from Vietnam.[66] She saw him for the first time since high school at a party at which Skip and his brothers started drinking early and stayed drunk all evening.[67] Donna was eighteen years old at the time.[68] Donna and Skip had sex over Christmas break. Donna thought she was pregnant, so she and Skip got married.[69] Skip and Donna were married in February, 1968.[70]

Donna's history of severe trauma, abuse, and neglect is manifested in an array of clinical symptoms and disorders, including bipolar, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. The clinical literature recognizes the

---

[61] Tab 27, at ¶ 179.

[62] Tab 27, at ¶ 78.

[63] Tab 27, at ¶ 77.

[64] Tab 27, at ¶ 179.

[65] Tab 27, at ¶ 85.

[66] Tab 27, at ¶ 90; Tab 32, at ¶ 17.

[67] Tab 27, at ¶ 90.

[68] Tab 27, at ¶ 92; Tab 32, at ¶ 17.

[69] Tab 27, at ¶ 93.

[70] Tab 27, at ¶ 96; Tab 32, at ¶ 24.

impact trauma can have in the manifestation of mood symptoms, not only depression but mania as well.[71]

When faced with the severe trauma of her childhood, Donna began to dissociate as a survival mechanism.[72] Her parents subjected her to intense fighting, screaming, and even murderous violence[73] and reinforced her dissociation by avoiding all discussion of what occurred, encouraging "pretending" that things were normal and nothing was wrong.[74] As a teen, the only way she was able to enjoy sex was to dissociate from it and pretend it was not happening.[75] Throughout the time she was married to Skip, Donna's response to years of Skip's extreme alcoholism, drug use, affairs with other women, absence, extreme verbal abuse, and other forms of abuse was to "choke it down somehow, look the other way, pretend it isn't a problem, and all will be fine, or at least that's what I tell myself."[76]

When she had the choice, Donna preferred uppers to alcohol.[77] This predilection is consistent with treating the depressed phase of bipolar disorder. Clinical literature supports gender differences in the presentation of bipolar disorder. One gender difference is the greater amount of depression bipolar women typically experience than bipolar men during a lifetime.

Throughout her life, Donna has adopted the lifestyle, ways, clothing, and attitudes of others in order to fit in, "almost like [she] was a chameleon." All her life she has gone along with whatever group or person she has been with, whether with partiers in high school, Skip and his family, with hippies, with church and ministry groups, or around Joe Andriano after he and Wendi were married. She changes her appearance and behavior in order to be liked and accepted. She avoided development of a cohesive identity and throughout her life "never wanted to make a decision" about who and what she was.[78] Donna has had periods of excessive drug and alcohol abuse beginning when

---

[71] Nolen et al. (2004). Correlates of 1-Year Prospective Outcome in Bipolar Disorder: Results From the Stanley Foundation Bipolar Network. *American Journal of Psychiatry.*

[72] Tab 27, at ¶ 46.

[73] Tab 27, at ¶¶ 34–35, 37–38.

[74] Tab 27, at ¶ 38.

[75] Tab 27, at ¶ 73.

[76] Tab 27, at ¶ 121.

[77] Tab 27, at ¶ 107.

[78] Tab 27, at ¶ 98.

13

she was a teenager, two periods in particular in her late teens and early-to-mid-twenties.[79] These periods of alcohol use coincided with equivalent periods of hypersexuality.[80]

Donna has experienced at least four psychotic depressive breaks during her life: in childhood after the ugliness and fighting between her parents became too much,[81] a few days after Wendi was born when she found that her dog had disappeared while Donna was at the hospital giving birth,[82] late in the marriage with Skip when trying to leave him when Wendi was two or three years old,[83] and after Wendi was arrested in connection with the current matter.[84] When she experiences these breaks, she becomes emotionally labile or cries uncontrollably for a day or two, "usually lasts a day," then shuts down and is completely dissociated for a day or longer, unable to feed herself, recognize when others are around her, or respond to communications.[85] In Donna's words, "My brain completely stops processing . . . I'm completely gone for a couple of days. I don't even have facial expressions. You can't even really talk to me because I'm not there."[86]

Throughout her adulthood, as a result of her trauma history, Donna demonstrated a capacity for extremely poor judgment and poor decision making, as with marrying Skip,[87] her difficulty and inability to leave Skip despite extreme problems,[88] the illogic of becoming pregnant with Wendi to try to solve severe marital problems with Skip despite Skip's alcoholism, absence, affairs, and abuse,[89] and the numerous poor choices Donna made in regard to Wendi's upbringing, as detailed in the report of James

---

[79] Tab 27, at ¶¶ 31, 81–89, 106–107.

[80] Tab 27, at ¶¶ 74, 76–78, 87.

[81] Tab 27, at ¶¶ 48, 143.

[82] Tab 27, at ¶¶ 142–144.

[83] Tab 27, at ¶ 143.

[84] Tab 27, at ¶ 143.

[85] Tab 27, at ¶¶ 48, 143.

[86] Tab 27, at ¶ 143.

[87] Tab 27, at ¶¶ 83, 92-93.

[88] Tab 27, at ¶¶ 103, 109-110, 112-14.

[89] Tab 27, at ¶¶ 115-16, 120, 123.

Hopper, Ph.D.  Over the course of her adulthood, Donna's cumulative bad judgment and decision making provides a remarkable narrative of suffering and mental disorder.

    3.      Paternal Biopsychosocial History: Clinical Symptoms and Diagnoses

Wendi's biological father, Shelby Wayne "Skip" Robertson, was born April 11, 1948, to Boyd Gravely "BG" Robertson and Flora Pearl Harrison, in Fort Stockton, Texas.[90] Skip was the youngest of eight siblings.[91]

Skip was sexually abused by his brother, Buck, who was almost sixteen years his senior when Skip was eight or nine years old.[92]

Skip attempted suicide at age fifteen or sixteen by overdosing on pills that his brothers took to stay awake and go to sleep while trucking. Skip served in the Marine Corp in Vietnam beginning in 1966.[93] After five or six months in Vietnam, he "was numb."[94]

It was hard for Skip to return from Vietnam and be called a "baby killer."[95] The first few months after he returned were especially bad.[96] Skip was "[always] mental, meaning crazy," in the time period after he returned to Vietnam and during his marriage to Donna. He had "bad nightmares," four to five nights per week, where he thrashed around and called out to people.[97] On one occasion, when lying in bed with Donna, he threw her out of bed because he believed he was under attack. Another time he woke up to find himself on top of her on the floor after she threw her arm across his chest in bed while they were sleeping and he responded as though he were being attacked. Donna woke him up many times from a nightmare because he was "hollering to get down."[98]

---

[90] Tab 32, at ¶ 4.

[91] Tab 27, at ¶ 67;  Tab 32, at ¶ 4.

[92] Tab 32, at ¶ 15.

[93] Tab 27, at ¶ 91.

[94] Tab 32, at ¶ 20.

[95] Tab 32, at ¶ 20.

[96] Tab 32, at ¶ 21.

[97] Tab 27, at ¶¶ 101, 110; Tab 32, at ¶ 21.

[98] Tab 32, at ¶ 21.

Skip was very jumpy and easily startled. "[A]ny kind of loud noises or sudden surprises set him off." Skip stayed away from 4th of July celebrations and could watch fireworks only from afar because the loud noise was too much for him.[99] There were several incidents when Skip hit the ground in response to a loud noise.[100] To waken Skip safely, Donna had to crouch at the end of the bed and touch his toes, because he came out of his dreams swinging his fists hard enough to hurt her.

Skip drank steadily and was drunk for much of the time while he and Donna were married, both before and after Wendi was born. He did not "just have a couple of beers or go out and get buzzed, he always drank to get really drunk." Skip remained in Wendi's life until he and Donna were divorced.[101] He saw her only a few times after he and Donna were divorced, until Wendi was six years old.[102]

Skip has had "really bad" depression at times throughout his life, and in addition to the attempted suicide as a teenager, he had had other difficult depressive periods and has thought about committing suicide "every once in a while."[103] In 1987 he had another difficult period while driving trucks with his brother, Tommie. Skip did not attempt suicide directly, but "drank a lot to drown [his] sorrows."

In 1990, Skip married his third wife, Crystal Overpeck. Not long after marrying Crystal, Skip became very depressed.

Skip's brother, Tommie, was arrested for taking photos of Julie, Skip's stepdaughter, including a Polaroid with Tommie holding his penis in front of Julie's face. Julie's brother, James, found the pictures in the sleeper compartment of Tommie's truck, and showed them to his mother. When the pictures were discovered, Skip told Tommie he had to leave. Tommie was arrested a few months later in Tucson, in late 1992.[104]

Skip was also arrested in November, 1992, and went to prison in 1993 after pleading guilty to charges of molesting his stepdaughter.[105] Prior to going to prison, and

---

[99] Tab 32, at ¶ 42.

[100] Tab 27, at ¶ 102.

[101] Tab 28, at ¶¶ 35, 37.

[102] Tab 28, at ¶ 39; Tab 32, at ¶¶ 1, 33.

[103] Tab 32, at ¶¶ 11, 13, 63.

[104] Tab 32, at ¶¶ 65,67; Probation Report – State of Arizona v. Shelby Wayne Robertson.

[105] Tab 32, at ¶ 67.

for three years while he was in prison, Skip went to counseling, which has made it easier for him to talk about difficult things that the rest of his family never discussed.[106] He learned in counseling that he has post-traumatic stress disorder. While in prison, if someone slapped shower shoes together, the sudden noise made him jump.[107]

Skip served out his entire seventeen-year sentence until 2010.  While incarcerated, Skip learned a lot, including how to recognize when he is depressed, and that he has "to do things" to bring himself out of it.[108]

From the time Wendi was five or six years old, Skip had no contact whatsoever with her, and until 2009 he was unaware that she was on death row.[109] When he signed his declaration in June 2011, Skip still experienced PTSD symptoms. If he watches war movies, he has nightmares and wakes up "hollering and screaming." He has to be careful what he watches on TV because PBS documentaries or even an advertisement can set him off.[110]

Based on the above, Skip meets the diagnosis of Post-Traumatic Stress Disorder.

---

[106] Tab 32, at ¶¶ 12, 60.

[107] Tab 32, at ¶ 22.

[108] Tab 32, at ¶ 71.

[109] Tab 32, at ¶¶ 1, 33.

[110] Tab 32, at ¶ 22.

Exhibit No.: 2.003

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*

*2/3/2014*

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841536

## CURRICULUM VITAE

**George W. Woods, Jr., M.D.**

**4200 Park Boulevard, #545**
**Oakland, California 94602**

**57 Executive Park South, #360**
**Atlanta, Georgia 30326**
**United States of America**

EDUCATION

1981-1982:  American Psychiatric Association/National Institute of Mental Health
Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981:  Residency- Psychiatric - Pacific Medical Center
San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978: Internship—Medical/Surgical, Highland Hospital
Oakland, California

1977:  MD, University of Utah
Salt Lake City, Utah

1969:  BA, Westminster College
Salt Lake City, Utah

LICENSES & CERTIFICATIONS

2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004: Fellow: American Psychiatric Association

1992:  Certified by the American Board of Psychiatry and Neurology

1979:  Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

1

2011: San Francisco Police Department Crisis Intervention Training (CIT): Suicide Assessment, Mood disorders, thought disorders, and personality disorders.

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981: Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California


INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania


ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

3

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

CLINICAL LECTURES

2011: Mood and Thought Disorders in Crisis Intervention: San Francisco County Sheriff's Crisis Intervention Training, San Francisco, California.

2011: Fetal Alcohol Spectrum Disorders and the Criminal Justice System, National Press Club, Washington, DC.

2011: The Epidemiology of Medicalization of Prisoners in the United States, International Academy of Law and Mental Health, Berlin, Germany

2011: Intellectual Disability and Fetal Alcohol Spectrum Disorder: International Academy of Law and Mental Health, Berlin, Germany

4

2011: Neuronal Plasticity: **Cognitive Skills Retraining for students with acquired brain injuries or learning disabilities**. College of Alameda, Alameda, California

2011: "The Neurobiology of Trauma In Children: Lessons About Early Childhood; Families First, Atlanta, Georgia

2010: From the Plantations/Asylums to the Prisons: The Relationship between Humiliation, Stigma, Economics and Correctional Care for the Mentally Ill: 2010 Workshop on Transforming Humiliation and Violent Conflict*□representing the□16th Annual Human DHS Conference□and the Seventh Workshop on Humiliation and Violent Conflict□□ Columbia University, Teachers College, New York

2010: Applying the Institute of Medicine Quality Chasm Framework to Improving Health Care for Mental and Substance Use Conditions; Morehouse School of Medicine, Department of Psychiatry, Journal Club

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009: Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007: Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine,

Atlanta, Georgia

2006: Moderator & Respondent (Representing Morehouse School of Medicine) Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003: Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

American Association for Intellectual and Developmental Disabilities

CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California
(Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association,
Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York
University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of
Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy,

8

University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Greenspan, Switzky, Woods: *Intelligence Involves Risk-Awareness and Intellectual Disability Involves Risk-Unawareness: Implications of a Theory of Common Sense*, Journal on Intellectual & Developmental Disability, 2011, in press.

Woods, Greenspan, Agharkar: *Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders:* American Academy of Psychiatry and the Law, 2011, in press.

Bradford, Fresh, Woods: Not all patients are alike: *Ethnopsychopharmacology of Bipolar Disorder in African Americans.* Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

FORENSIC PROFESSIONAL LECTURES

2010:  The Trial of Hamlet, Morrison and Foerster, LLP, Law College, San Diego, California

2009:  Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University

of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999: Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist?  Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996: Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995: Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995: Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

11

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention

PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995. (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

12

Anatomy of a Trial: 1994 (Available for the California State Bar).

PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health

PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2011: Forefront Behavioral Telecare, LLC: Director of Clinical Research

2009-2010:  Forefront Behavioral Telecare, LLC: Chief Medical Officer

2009: AgeServe  Communications, LLC: Director of Research/Director of Government Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:    In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II- Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

13

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006).  Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters:  Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College.  (pp. 99-116).  New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000).  Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.

14

**APPENDIX D**

**Qualifications, Expert Witness Experience, and Compensation Rate in this Case**

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as Exhibit B. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

I am a Fellow of the American Psychiatric Association, as well as a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am currently Secretary General of the International Academy of Law and Mental Health.

I am on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York. I teach Clinical Aspects of Forensic Psychiatry and Geriatric Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry.

I was on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento. I was on the faculty of the University of Washington, Bothell campus, where I have taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California Medical Center.

I received a Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992. My fellowship was in Geriatric Psychopharmacology.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm. The neuropsychiatric

assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline.

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders and dysmorphology (the study of structural abnormalities often related to developmental disorders). The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and transcendent of both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology practice in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status is undertaken.

My early medical training focused on internal medicine as well as psychiatry. My internship at Alameda County Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital (Now California Pacific Presbyterian Hospital), in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United Farmworkers of America. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had neurological impairments, significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

4818-2253-8254.1

The focus of my American Psychiatric Association/National Institute of Mental Health (APA/NIMH) Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges.

First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population, yet is directly relevant to non-geriatric populations who may be ill or incapacitated in other ways. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated. Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required. I still conduct home visits with many of my clinical patients, due to their impairments.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, which is a long term psychiatric facility dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations. During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital is one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many psychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these psychiatric drugs are not utilized for their primary psychiatric indication. For example, anti- psychotics, anti-depressants, and anti-

3

seizure medications may be effective in diabetic limb and phantom pain. Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention.

During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California. Sleep disorders, the evaluation of disorders in the architecture of sleep is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Substance abuse is also often related to impairment of normal sleep patterns.

From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic. We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance. From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients with what are called co-occurring disorders. Co-occurring disorders defined persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to

4

neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, neurologists, and hospital pharmacologists on all patients in the Intensive Care Unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological instruments, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI, 2, and RF), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

In the last 10 years, my clinical practice has focused on developmental disorders like Fetal Alcohol Spectrum Disorder and Intellectual Disabilities. I assess and treat patients with psychiatric manifestations of brain impairment, typically congenital, infectious, or acquired brain injury.

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry.  I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse College of Medicine, Department of Psychiatry in Atlanta, Georgia.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

5

I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that, even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

6

Exhibit No.:  **2.004**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*

*2/3/2014*

**Clerk of Superior Court**

By: _____ L. MOONEY _____

(Deputy Clerk)

1002841537

**APPENDIX D**

**Qualifications, Expert Witness Experience, and Compensation Rate in this Case**

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as Exhibit B. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

I am a Fellow of the American Psychiatric Association, as well as a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am currently Secretary General of the International Academy of Law and Mental Health.

I am on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York. I teach Clinical Aspects of Forensic Psychiatry and Geriatric Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry.

I was on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento. I was on the faculty of the University of Washington, Bothell campus, where I have taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California Medical Center.

I received a Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992. My fellowship was in Geriatric Psychopharmacology.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm. The neuropsychiatric

assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline.

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders and dysmorphology (the study of structural abnormalities often related to developmental disorders). The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and transcendent of both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology practice in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status is undertaken.

My early medical training focused on internal medicine as well as psychiatry. My internship at Alameda County Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital (Now California Pacific Presbyterian Hospital), in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United Farmworkers of America. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had neurological impairments, significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

2

The focus of my American Psychiatric Association/National Institute of Mental Health (APA/NIMH) Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges.

First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population, yet is directly relevant to non-geriatric populations who may be ill or incapacitated in other ways. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated. Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required. I still conduct home visits with many of my clinical patients, due to their impairments.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, which is a long term psychiatric facility dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations. During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital is one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many psychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these psychiatric drugs are not utilized for their primary psychiatric indication. For example, anti-psychotics, anti-depressants, and anti-

3

seizure medications may be effective in diabetic limb and phantom pain. Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention.

During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California. Sleep disorders, the evaluation of disorders in the architecture of sleep is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Substance abuse is also often related to impairment of normal sleep patterns.

From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic. We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance. From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients with what are called co-occurring disorders. Co-occurring disorders defined persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to

4

neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, neurologists, and hospital pharmacologists on all patients in the Intensive Care Unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological instruments, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI, 2, and RF), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

In the last 10 years, my clinical practice has focused on developmental disorders like Fetal Alcohol Spectrum Disorder and Intellectual Disabilities. I assess and treat patients with psychiatric manifestations of brain impairment, typically congenital, infectious, or acquired brain injury.

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry. I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse College of Medicine, Department of Psychiatry in Atlanta, Georgia.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

5

4818-2253-8254.1

I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that, even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

6

Exhibit No.: **3**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: _Stipulated_
_2/3/2014_

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841538

## EXPERT REPORT OF JAMES HOPPER, Ph.D.

### I.    QUALIFICATIONS

I am a clinical psychologist licensed to practice in the Commonwealth of

Massachusetts.  In 1997, I earned a Doctoral degree (Ph.D.) in clinical psychology from

the University of Massachusetts at Boston. Most of my research and clinical work over

the past 20 years has focused on the long-term effects of childhood abuse.

From 1997 to 1999, I completed a post-doctoral psychology fellowship at the

Trauma Center of HRI Hospital, in Brookline, Massachusetts, an internationally

recognized clinic affiliated with Boston University School of Medicine.  I was also the

Assistant Director of Research at the Trauma Center during the same period.  In these

capacities, I received training in and provided intensive psychotherapy for severely

traumatized clients and co-designed and managed several research projects on traumatic

memory characteristics and psychological and biological treatments of Posttraumatic

Stress Disorder (PTSD).

I have conducted research at Harvard Medical School, Boston University School

of Medicine and the University of Western Ontario on various aspects of psychological

trauma and PTSD, including characteristics of traumatic memories, emotional and

behavioral effects of child abuse, brain bases of emotion regulation problems in

psychological trauma, and psychological and pharmacological treatments for PTSD

caused by child abuse trauma.  I have conducted assessments and provided therapy to

adults suffering from the effects of childhood neglect and abuse in several different

outpatient settings, including hospital clinics, college counseling and mental health

centers, and private practice. Since 2003 I have also worked as an independent consultant

in clinical and forensic psychology, including as an expert witness on psychological

trauma and its effects for eight capital cases.

From 1995 to 2000 I was an adjunct instructor with the Department of

Psychology at the University of Massachusetts at Boston, where I taught undergraduate

courses in personality theory, abnormal psychology, and psychological trauma.  From

2000 to the present I have given numerous invited teaching presentations, on topics

including the diagnosis, clinical phenomenology and treatment of PTSD; the long-term

effects of childhood abuse, including sexual abuse; the biology of trauma and PTSD; and

the implications of research on traumatic memory characteristics and the biology of

PTSD for various lines of work, including psychotherapy and police crime investigations.

In addition, I have given talks at numerous conferences of professional psychological and

psychiatric associations, as well as to the United States military.

I have authored or co-authored sixteen papers published in peer reviewed

journals, on various aspects of psychological trauma and PTSD, including perpetration

outcomes in adults with histories of child abuse, characteristics of traumatic memories,

and neurobiological aspects of PTSD and reactions to trauma-related stimuli.

In 2007 I was a founding board member of 1in6, Inc., a non-profit organization

serving men with histories of child sexual abuse, and from 2008 through 2011 I was a

1in6 Advisory Board member and paid consultant writing the content for 1in6.org, the

most comprehensive website in the world on the issue.

From 2006 to 2011, I was an Instructor of Psychology in the Department of

Psychiatry of Harvard Medical School. In July of 2001 my appointment with Harvard

Medical School became Clinical Instructor of Psychology and I began my current

position as psychological trauma consultant for the Outpatient Addictions Service of the

Cambridge Health Alliance.

A copy of my curriculum vitae is attached to this report as Exhibit A.

## II.   SCOPE OF ASSIGNMENT

I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically

traumatic aspects of Ms. Andriano's development from birth to age eighteen.  Of

particular focus were (1) experiences of neglect, abuse and other potentially traumatic

mistreatment by her parents and other adults, and (2) harmful effects of such traumatic

experiences and relationships on her mental health and ways of relating to others.

## III.   MATERIALS REVIEWED

I conducted numerous interviews and reviewed thousands of pages of

documents. My interviews included six visits with Wendi, totaling 52 hours, and

one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;

- Wendi's biological father, Shelby Robertson;

- Wendi's adoptive father, Alejo Ochoa;

- Martha England, an adult member of Ms. Andriano's church when
  Wendi was a child and adolescent; and

- Jeri Lynn Cunningham, a childhood friend who reports being sexually
  abused by Alejo Ochoa while Wendi laid next to her in bed

My document review included a copy of Ms. Andriano's videotaped

interrogation by detectives shortly after she was arrested, a transcript of that

interrogation, hundreds of pages of trial testimony and numerous affidavits

obtained by counsel and others throughout the course of Ms. Andriano's post-

conviction relief proceedings, including affidavits from Wendi's direct family,

several friends and acquaintances, and many extended family members. A complete list of the documents I reviewed is attached as Exhibit B.

## IV.    CONCLUSIONS

Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

## V.    EVIDENCE AND ANALYSIS

The following is a summary of the evidence and analysis which support my conclusions. Given the large volume of information and the complexity of this matter, I am providing this summary to highlight the most significant traumatic experiences and relationships that shaped Wendi's childhood development and adult life.  A full presentation of the evidence and my analysis is attached as an appendix to this report, and I will refer to that appendix as I summarize the evidence and analysis below.

### A.    Wendi Andriano's Neglect and Abuse by Her Parents and Other Adults

The most important people in Wendi's life were themselves severely damaged individuals incapable of providing the caring and nurturing necessary for normal human development. Wendi's mother, biological father and adopted father all suffered neglect and abuse in their own childhoods and repeated that pattern with Wendi. When not being

4

neglected or abused by one of her parents, Wendi was turned over to other adults who likewise subjected Wendi to extremely harmful environments.

The neglect and abuse falls into five categories: (1) neglect by Wendi's mother; (2) physical abuse, including Wendi being "beaten into submission;" (3) emotional abuse by Wendi's adoptive father; (4) sexual abuse by her adoptive father and others; and (5) traumatizing relationship patterns. Each category is addressed below.

### 1. Neglect by her Mother.

Wendi's mother, Donna Ochoa, emotionally neglected her from birth until she left home at age 18. Donna often handed Wendi off to others, including emotionally, physically and sexually abusive men, starting with her first husband, Skip Robertson. Looking back on various phases and traumatic events of Wendi's childhood, Donna repeatedly comments on not knowing and not even wanting to know where Wendi was, who she was with, or whether she was being abused. And when it came to the most abusive relationship of Wendi's life, with Donna's second husband Alejo Ochoa, Donna was *relieved* to have Wendi be the one to deal with Alejo's anger and sexual perversion.

Donna was herself severely neglected by both of her parents. Donna reports that while her mother made sure she was fed and clothed, "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." Donna's father was usually absent – either working, drinking, or with other women and his parallel family. When he did give her attention, he took her to bars (beginning at age 10) or went drinking with Donna and her teenage friends. Donna also reports being told that her father took showers with her until she was six or seven years old, suggesting he may have sexually abused her, although she does not have access to those memories. (Appendix, Section III.B.)

5

The neglect Donna experienced was particularly devastating, and rendered her unable to cope with the traumatic experiences of her childhood or to effectively parent Wendi. Donna's parents had brutal fights with screaming, breaking glass, and physical assaults. A particular low point occurred when Donna's mother brought her along when searching for her father (with other women) in local hotels, and Donna heard her mother fire a gun at him and believed he may have been killed. Throughout all of this Donna's parents never helped Donna deal with the emotional effects on her or expressed any concern about her wellbeing. Donna responded by pretending not to notice and acting like everything was OK – just as she would when Wendi was in harm's way and being abused.

The following are representative samples of the ways in which Donna neglected Wendi. A full discussion of Donna's neglect can be found throughout the appendix to this report, particularly in sections IV and VIII.

Immediately after Wendi's birth, Donna made no effort to visit her in the hospital nursery, and "did not bond with Wendi at all." Donna was more worried about her dog, which had gone missing while she was in the hospital, and "couldn't attend to Wendi at all," including to breast feed her. After bringing Wendi home, Donna went into depression and "completely shut down," unable to feed herself, get on her feet, or communicate. After that, nursing was the *only* way that Donna cared for her baby. She otherwise avoided her, and was unable to sooth her colicky baby even when she tried. Almost every night for the first several months of her life, infant Wendi was left to cry in her room for hours, with no contact from her parents.

Decades of research have shown that infant brain development depends as much on emotional nurturance as physical care. Maternal neglect is known to exert substantial deleterious effects on developing infants' brains. Experiences like those of Wendi's infancy can have lasting effects on neurotransmitter systems, on circuits involved in attachment to parents, emotion and mood, as well as other brain systems, through a variety of mechanisms including altered gene expression.

Donna did not merely neglect her daughter's emotional needs. She remembers feeling, from the beginning, "I didn't know what to do with Wendi... and I didn't interact with her... My mom had the patience to sit and rock her, but I was like 'No way.'" Donna often handed Wendi over to others, including men likely to abuse her.  Her neglect always occurred in the context of triangular relationships, in which Donna's attitude and actions as a mother can be summed up: "I can't handle her. I don't want her. YOU take her."

Until Wendi was four, Donna often handed Wendi over to Wendi's biological father, Skip Robertson. Skip's childhood was also full of neglect and abuse.  His family produced at least five sons who sexually abused young girls, with Skip and one brother ultimately serving long sentences for abusing Skip's step-daughter. (Appendix, Section III.A.) Skip imposed harsh discipline on Wendi, including potty training her by 10 months of age with punishments and threats. (Appendix, Section IV.) Donna made no attempt to protect her. At Robertson family gatherings, the women cooked, the men got drunk, and Donna had no idea where Wendi was or who she was with, which put Wendi at risk of sexual abuse by Skip's brothers and father, who was notorious among Robertson family women as a "dirty old man." (*Id.*)

When Wendi was four years old, day care workers reported that Wendi was initiating unusual and concerning sexual interactions with other children. Donna made no attempt to get Wendi help. Soon thereafter, Donna let Wendi wander the dangerous neighborhood around the drug and alcohol clinic where she worked. She let Wendi spend time alone with the director of the clinic, even after discovering evidence that he had sexually abused girls.

Donna divorced Skip when Wendi was four years old. Donna then became sexually involved with Alejo Ochoa, an extremely limited and disturbed man with a history of sexual abuse by family members and neighbors, as well as emotional neglect and emotional and physical abuse by both parents. (Appendix, Section V.) From the start Alejo was more interested in Wendi than Donna, and soon he was sleeping in the same bed with them. (Appendix, Section VI.) Then Wendi began wetting the bed for the first time in her life. Donna did not want to know, or even to think about whether Alejo was sexually abusing Wendi. Within months Donna married Alejo, and he took primary responsibility for parenting Wendi. For the next 13 years, Donna mostly withdrew, looked away and tried not to notice as Wendi was emotionally, physically and sexually abused by Alejo. (Appendix Sections VI-VIII.)

## 2.    Physical Abuse.

Donna's abdication of her parenting duties was not limited to neglect; it included physical abuse as well. Starting when she was a toddler and lasting into her teens, Wendi was regularly subjected to physical beatings by her mother. She was also beaten by her biological and adoptive fathers and authority figures in two religious cults who taught that God wants children beaten into submission. The beatings were not just for bad behavior, but for failure to instantly and automatically obey. The children were even

beaten for displaying a "bad attitude," that is, insufficient submissiveness as expressed by facial expression, body language or tone of voice.

Skip proudly reported a time Wendi stopped crying after he beat her. As a toddler Wendi was regularly beaten by Donna and Skip, with their hand or a wooden spoon. Donna recalls beating Wendi for not coming immediately when called. (Appendix, Section IV.) When Alejo assumed the primary parental role, he applied the same "beat into submission" philosophy until Wendi was around 13 years old. (Appendix, Sections VI-VIII.)

Donna and Alejo joined a traveling religious cult when Wendi was 7, in which the leaders gave God's imprimatur to their philosophy of beating children into submission. (Appendix, Section VII.) When Wendi was nine, her family left the traveling cult and joined a stationary one, in which attempts to beat children into total submission were even more extreme. Wendi attended a school controlled by the cult, where children were constantly beaten for any infraction, including having a bad attitude. (Appendix, Section VIII.) An audio recording captures the cult's leader saying things like, "You beat 'em 'til they cry, and you keep on beatin' 'til they cry softly," because if they cry loudly, "it's rebellion, and you gotta get 'em until their spirit is broken" (emphasis in spoken language). By then Wendi had learned to obey and put on a façade of obedience. Rarely beaten outside of her home, she normalized the violence to which children around her were continually subjected.

A complete discussion of the physical abuse suffered by Wendi is included in Sections IV and VI to VIII of the appendix to this report.

### 3.    Emotional Abuse by her Adoptive Father.

Alejo Ochoa entered Wendi's life when she was four and a half years old. He immediately became Wendi's primary caretaker. Alejo was a damaged, limited and confused man, with a history of emotional abuse that included sadistic and sexual elements as well as emotional neglect, physical and sexual abuse. He began emotionally abusing Wendi almost immediately. This abuse escalated over the years. By the time Wendi was about 10 years old, Alejo was routinely teasing and attempting to degrade and humiliate her, primarily in sexualized ways.

For example, Alejo proudly recalls forcing Wendi, when she was four years old, to clean crayon from a door for an hour and a half straight – despite her not having known that coloring on the door was forbidden (i.e., she didn't even know she had done anything wrong) and despite her crying the entire time. He told this story as an example of her innocence and his allegedly effective parenting. (Appendix, Section VI.)

Donna reports that Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence. He did so "ruthlessly," despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." He pounced on naïve or "clueless" comments she made by saying she was "another dumb blond." (Appendix, Section VIII.)  A parent in the community recalls that Alejo "was real harsh with Wendi and frequently humiliated her in front of everyone, just screamed at her. Wendi reminded me of a whipped pup."

When Wendi was about 10 years old, Alejo's verbal abuse became predominantly sexual in nature. He tried to embarrass and shame her about sexual issues, including commercials for feminine products. If Wendi or Donna protested, Alejo denied their experiences and reality itself, insisting that Wendi *liked* what he was doing.

10

A full discussion of Alejo's emotional abuse of Wendi is included in Sections VI to VIII of the appendix to this report.

### 4.    Sexual Abuse by Her Adoptive Father and Others.

There is evidence that Wendi was sexually abused from infancy through age nine and strong evidence that such abuse occurred from ages 9 to 18. It was during this latter time that Alejo sexualized Wendi in an incestuous relationship that included buying and dressing her in lingerie, making her look at pornographic and "adult" paraphernalia with him, and making her scratch and rub his legs and head for hours while both Wendi and Alejo were barely dressed and with Alejo doing things like putting his head in Wendi's crotch and exposing his genitals. The following is a summary of the evidence that Wendi was sexually abused; a full discussion is included in Sections IV and VI to VIII of the appendix to this report.

The evidence that Wendi was sexually abused before age nine is indirect but suggestive. Given Donna's well-established and acknowledged neglect and that Skip, his brothers and father are well-known child sexual abusers, it is likely Wendi was sexually abused during numerous Robertson family cookouts, parties and camping trips when she was one to four years old. During these events Donna left Wendi unsupervised with drunken men who were known sexual abusers of young girls. (Appendix, Section IV.) Wendi exhibited typical sexual abuse-reactive behaviors at day care when she was four years old.

Donna let Wendi wander alone in a dangerous neighborhood where she worked at a clinic frequented by drug addicts and criminals, and left Wendi alone with the clinic's boss, despite Donna's knowledge of his prior sexual abuse of girls. Around the same