# TABLE OF CONTENTS (INTERACTIVE)

| IIIIIIIIIIII | Evidentiary Hearing Exhibits |
|---|---|
| 4 PART 3 | Appendix to the Expert Report of James W. Hopper, Ph.D. |
| 4.001 | Curriculum Vitae of James W. Hopper, Ph.D. |
| 4.002 | Exhibit B to the Expert report of James W. Hopper |
| 5 | Confidential Neuropsychological Testing of Wendi Elizabeth Andriano from Myla H. Young, Ph.D., dated 7-11-11 |
| 5.001 | Confidential Neuropsychological Evaluation Test Scores from Myla H. Young, Ph.D., dated 7-11-11 |
| 6.001 | Letter Dated March 28, 2001 from the Forensic Services Unit RE: Competency Screening Evaluation of Wendi Andriano |
| 6.002 | Email from Dan Patterson to Patrick Linderman, dated 12-20-01 |
| 6.003 | Evaluation Report of Richard J. Rosengard, D.O., dated 8-27-02 |
| 6.004 | Email from Daniel Patterson to Michelle Arvanitas, dated 2-14-02 |
| 6.005 | Psychological Report of Michael B. Bayless, Ph.D., dated 8-4-04 |

# EXHIBIT IIIIIIIIII
# PART 4

Alejo (with Donna's acquiescence and even relief) imposed on Wendi, with progressively greater intensity when she was nine to thirteen years old.

482. As addressed above, Jeri Lynn Cunningham has reported being sexually touched by Alejo as a child, from ages eleven to thirteen. When I first asked Wendi about what Jeri Lynn had reported, I did so only implicitly, and without revealing Jeri Lynn's identity, by asking Wendi if she had any memories of Alejo ever being in bed with her and a friend. Wendi replied that she has no memory of her father ever being in her bed at night. She continued, "I remember him wrestling around with us a lot" on the "bed, couch, and floor," just as Donna and Alejo had reported, then said, "But sleeping in the bed, no." When finally told, at the end of the interview, exactly what Jeri Lynn reported, Wendi responded, "What disturbs me is that, in my logical mind, I know Jeri Lynn wouldn't lie or make something like that up, but I can't link it to anything in my mind."

483. Finally, in our last interview, I reviewed with Wendi many of the recollections of her mother's covering those years when she was nine to thirteen years old (as well as ages fourteen to eighteen, covered below). These included Donna's reports, reviewed above, of Alejo buying Wendi lingerie and other inappropriate sexy clothing, of Wendi having an entire drawer full of lingerie by the time she was thirteen, and of Alejo routinely forcing Wendi to look at things in the adults-only section of Spencer's gifts. Wendi had three main responses to this information – all three common responses among adult women who were subjected to repeated sexual abuse in an incestuous family where the mother, as Donna had, essentially handed her daughter over to the perpetrator. First, Wendi said that she genuinely did not remember those things. Second, she said that, despite not remembering herself, she had no trouble believing that those things had

218

happened – given what she has always known, what she has recently been able to admit, and what she has recently learned about Alejo; and given that her mother is, like Jeri Lynn, not the kind of person to make up such things, especially not in such detail. Third, Wendi expressed both amazement and intense anger that her mother had actually known, and thus been complicit in, so much more of Alejo's sexual abuse than Wendi had ever realized or could have imagined.

484. **Wendi ages fourteen to eighteen: Observations of adults and children in community.** When Wendi was fourteen, Donna began working full-time at Ak-Chin farms. As Donna herself reports, covered below, this precipitated her final withdrawal from Wendi and Alejo and left Wendi even more vulnerable to Alejo's sexual exploitation and abuse. At the same time, after turning fourteen Wendi increasingly thought and acted like a teenager – though certainly not a normal one given her continued immersion in the cult community and her incestuous relationship with Alejo. Nonetheless, Wendi tried to achieve some freedom and power, in the church and school systems and her relationship with Alejo.

485. Several witnesses' recollections of Wendi during this time include positive qualities and behaviors that had always distinguished her as a child at the cult's church and school. For example, Stephen Shaider recalls entrusting Wendi to babysitting his young daughter Bree, who liked Wendi a lot, and how Stephen and his wife Cindy always felt their daughter was safe with Wendi. (Tab 35, at ¶ 18.) Mr. Shaider also remembers Wendi as a teenager who was "not afraid to work" to make money and did household chores for his family as well (Tab 35, at ¶ 19.) The school principals, Mark

and Nancy Keating, continued to have positive views of Wendi as a student and athlete, as described above, as did other children like Jeri Lynn and Jasper Neace.

486. Once Wendi reaches fourteen, however, there are more reports of great concern about her well-being, particularly that she was being sexually abused by Alejo. But it was not so simple, and the available evidence indicates that as Wendi progressed beyond age thirteen she simultaneously gained power and freedom *and* lost them. Furthermore, the gains were partly "benefits" of her losses.

487. This requires some explaining. By all reports, as Donna withdrew even further while working full-time at Ak-Chin farms, Wendi *lost* by being used by Alejo for intimacy and sexual gratification. At the same time, Wendi *gained* freedom and power, in two ways. First, like all teenagers, her cognitive development during that time provided more capacities to negotiate, and at times turn to her advantage, the church/school/cult system and her pathological relationship with Alejo. Second, being Alejo's partner, even in a very subordinate role, meant that Wendi could get things *she* wanted from him by withholding or providing what *he* wanted from her, which was access to her attention, her affection, and most of all, her *body* – which Alejo was obsessed with looking at, dressing in sexy lingerie and clothing, touching, and being touched by in prolonged "touching on" sessions. In summary, like many children caught in a sexually abusive intimate relationship with an adult and no hope of anyone helping them escape it – especially an incestuous relationship with one parent while the other looks away and feels relief – Wendi learned to "make the best of it," though certainly at a high cost. Let us now consider the recollections of several witnesses from outside the family that support this assessment of Wendi's main predicament from ages fourteen to eighteen.

220

488.  As addressed above, even before Wendi reached age fourteen, Mark and Nancy Keating and Jeri Lynn Cunningham had all observed that Wendi's relationship with Alejo was "not a father-daughter" one (they even used that same phrase).  Nancy calls it "more of a teasing relationship," Mark refers to "things about Alejo's dynamic with Wendi that did not sit right" with him, including a "weird" and disturbing kiss he witnessed, and Jeri Lynn called the relationship "flirty." (Tab 14, at ¶ 7; Tab 13, at ¶ 6; Tab 12, at ¶ 14.) In addition, both Nancy and Jeri Lynn repeatedly witnessed Wendi, as an older teenager, exerting some power over Alejo. Nancy Keating recalls:

"A couple of times when Wendi was a teenager, I observed Alejo trying to get Wendi to pull weeds or do some kind of manual labor on the church grounds. Like a typical teenager, Wendi rolled her eyes or expressed a desire not to do what was asked of her. Instead of telling Wendi not to talk back, Alejo did something very strange with Wendi. He *begged* her to do what was asked of her, sometimes in exchange for something else. He said, 'Please, Wendi. Please…' I cannot recall what he offered her in exchange for performing her required tasks, but it was as if Wendi was his little princess and he needed to entice her to get her to do what he wanted." (Tab 14, at ¶ 9, italics in original.)

Given what is known about how Wendi often spent hours "touching on" Alejo while dressed in skimpy and sexy clothes in their home, and how when Wendi was younger Alejo would, from a position of power, only drive Wendi and Jeri Lynn to the desert if they wore their nightgowns and scratched his head and legs, it is inconceivable that Wendi did not eventually learn to turn the tables. It is inconceivable that Wendi did not sometimes, especially in their home rather than a public place like the church grounds,

221

make Alejo beg to be granted the titillating and sexually gratifying experiences of Wendi's body with which he was so obsessed and addicted.

489.  As Wendi's close friend who spent lots of time with Wendi and Alejo, including at their home for sleepovers, Jeri Lynn was well positioned to see Wendi's increasing assertion of power in her relationship with Alejo: "Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from him. Wendi switched between calling Alejo 'dad' and 'Alejo.'" (Tab 12, at ¶ 14.) Jeri Lynn observed these behaviors throughout her relationship with Wendi. She saw Wendi use sexually-charged flirting to get things she wanted from Alejo up until she and Wendi lost connection, when they were both about sixteen years old (three years after Jeri Lynn's family had followed Cal Lorts to Tempe).

490.  Lonnie Carlin reports witnessing an older teenage Wendi demonstrate – graphically and publicly – her ability to manipulate Alejo by sexually stimulating him. Lonnie is the fellow student who says that, when they were ten or eleven and children visited her house, Wendi frequently wore lingerie that she said Alejo had bought and wanted her to wear to "look her best." As noted previously, and consistent with his mother's report that he is "too traumatized" to talk with her about his time in the cult (Tab 10, at ¶ 25), Lonnie spoke to investigators but did not sign a declaration.  He told the investigator of the following disturbing interaction between Wendi and Alejo, which he says that he and other children witnessed "a lot" at school when Wendi was fourteen or fifteen. "Wendi sat on Alejo's lap, wiggled back and forth, and commented aloud that it 'made him get hard.'" Lonnie said that Alejo would just look away, sometimes pushed Wendi off, and seemed "embarrassed" when this happened. However, Lonnie made it

clear that he "did not get the impression at all that Alejo thought it was bad that his step-daughter was grinding on his crotch. He just did not want other children to know."

491.  It is important to recognize however, that the ability to embarrass Alejo, by doing in public the kinds of things that he trained her to do in private, does not constitute real power. Rather, Wendi was reenacting an abusive interaction into which she had been manipulated and coerced into repeatedly engaging at least since she was nine or ten years old. Indeed, most witnesses do not report seeing Wendi take what might be perceived as an active and assertive role in Alejo's incestuous abuse during these years. They simply recall evidence of Alejo's ongoing sexual abuse of Wendi, and mostly in terms of Wendi as a victim whose sexual exploitation was recognized but never stopped by a community of beaten-down cult members.

492.  Looking back on Wendi's teenage years overall, Constance Boys reports, "I recall that when Wendi was a teenager, something in her changed. Something just wasn't right. I recall my daughter, Sarah, telling me that Wendi had shown Sarah some negligees and lingerie that her father had bought for her.  Sarah said, 'Isn't that weird?'" (Tab 10, at ¶ 24.) Ms. Boys also recalls, "For years there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember who specifically knew what, but I do remember it was generally discussed." (Tab 10, at ¶ 7.) Ms. Boys goes on to report one rumor she had heard, that Wendi told Mark Keating Alejo was sexually abusing her, and Mark told Tom King, who refused to believe it. (Tab 10, at ¶ 7.) However, Mark Keating says only that Wendi appeared about to disclose to him sexual abuse by Alejo but was cut short (by Alejo entering the room), and does not say he spoke to Tom King about the issue. (Tab 13, at ¶ 7.) Whether or not

223

Wendi disclosed sexual abuse by Alejo to any adults in the church, Ms. Boys'
recollections (and those of others, covered above and below) do indicate a general
awareness and concern in the community that it was happening.

493.  Ms. Boys then focuses on how, aside from getting "the cutest clothes and
shoes," Wendi lost power and freedom in those final years of living at home and
attending the church and school, from about ages sixteen to eighteen:

> "Those last couple of years, it was as if Wendi came to the realization that she
> just couldn't fight it. She completely gave in, and became 'Daddy's little girl'
> and was always hanging on her father. She always seemed like a free-thinking
> little girl before that, and suddenly she was a model student. She became quiet
> and withdrawn.  I remember that she had the cutest clothes and shoes — all that
> her dad had purchased for her. He just lavished her with things like that. Of
> course, everyone at the church said, 'Praise God, Wendi finally learned.' They
> said that she had finally 'repented' and had 'got her life right with God,' but I
> feel that they had finally broken her. She had no one to turn to…. I believe she
> must have realized that no one was going to help her, and she finally gave in
> to it — she just threw in the towel, so to speak." (Tab 10, at ¶ 24.)

494.  Mark Keating recalls once seeing Wendi dressed in a "Playboy Bunny workout
outfit" in the Casa Grande fitness center. He continues, "She was just a teenager. Wendi
said that Alejo bought [it] for her. I did not think it was right for her to be walking around
in an outfit like that, but since it appeared that her parents were aware of how Wendi was
dressed and even encouraged it, there was not much I could do." (Tab 13, at ¶ 8.) Both
Nancy and Mark Keating recall how, when Wendi was a junior in high school, Alejo and

Donna pulled her from the swim team because she was losing weight and her breasts were becoming smaller. Nancy recalls, "It was another thing about Wendi and her parents that made me suspect that something was terribly wrong at home." (Tab 13, at ¶ 4; Tab 14, at ¶ 12.)

495.  Cynthia Schaider, a parent at the time, recalls that Alejo showed her a series of photographs he took of Wendi when she was fifteen or sixteen years old. Alejo was into modeling, and the pictures were "part of his portfolio, examples of 'modeling shots.'" (Tab 34, at ¶ 7.) Ms Schaider continues:

> "They were part of his portfolio, examples of 'modeling shots.' In the
> pictures, Wendi was dressed in lingerie, a white teddy, and posing in the
> desert. I always took issue with that. I felt it was inappropriate for a stepfather
> to take his beautiful, curvy daughter out into the desert in her underwear and
> take sexy photographs of her. It was unseemly to me, but it was not my place
> to comment on the behavior of one of the pastors of the church." (Tab 34, at
> ¶ 7.)

496.  One of those photographs has been preserved and is shown below. Although this particular image shows Wendi's body in silhouette, it is clear that she is scantily clad. Alejo admits to having taken the picture, even expresses pride in having done so: "I enjoy long exposure photography and like taking pictures in the desert electrical storms. I photographed Wendi and was able to capture lightning from an electric storm about fifty miles away…" (Tab 24, at ¶ 165.)



497. A number of adult witnesses recall seeing and hearing evidence that Alejo was sexually abusing of Wendi, yet feeling powerless to do anything about it. Ms. Schaider explains the subservience and isolation of cult members that let Alejo abuse Wendi with impunity and left Wendi to her own devices. "We lived in a culture where we were expected to obey. At the church, we were taught that bad things would befall us if we didn't 'toe the line.' As a result, no one discussed negative aspects of their lives. It kept us isolated from one another." Ms. Schaider continues, describing her later realization that cult members experienced a false sense of family in which "none of us really knew each other," "everyone ran around pretending life was wonderful," and many "lived a double life." Community members were also taught that, should they speak negatively of

226

their pastors, including Alejo, "the 'wrath of God' would come upon us." (Tab 34, at ¶¶ 30, 31.)

498.  As mentioned above, Jasper Neace was abruptly expelled from the school when he was seventeen or eighteen (and Wendi was fourteen or fifteen), after confronting Alejo and Tom King about Alejo's possession of pornographic magazine and his sexual harassment and abuse of Wendi and other children in the community.

> "Wendi brought the cover of a pornographic magazine to school and told me that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in my locker, and then I told the pastor, Tom King, that I needed to talk to him about something important. My intention was to tell Tom King about the magazine. All the other kids were too afraid to say anything. I wanted Alejo to face the consequences for all the damage he was doing. I was angry about what I saw to be extreme hypocrisy. I was in trouble for buying a motorcycle, and my mother got kicked out for getting married, but Alejo faced no consequences for his sexual behavior with children, for whooping on kids, and for looking at dirty magazines. Tom King called me into his office and asked me what I had to say. I told Tom King about the magazine, but Alejo was right there and he flatly denied it." (Tab 23, at ¶ 51.)

499.  Jasper reports that Tom then asked him, "Are you sure you have the magazine? I'd like to see it." The three of them went to the locker, and it was gone. When they returned to the office, Jasper recalls, Tom and Alejo "looked so smug," which provoked a long-suppressed rage in Jasper, who proceeded to point his finger at Tom and say, "I've always wanted to tell you this: Fuck you, Tom." As Jasper remembers it, Tom then

threatened to call the police and "started rattling off scriptures and said that he was rebuking me in the name of Jesus and…turning me over to the devil." A physical altercation followed, and Jasper ran out the door. Looking back on the explosive confrontation that resulted in his expulsion from the school and community, Jasper recalls, "I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity." (Tab 23, at ¶ 51.)

500.  Mark Keating remembers learning at the time of Jasper's confrontation with Alejo and Tom about the pornography magazine. (Tab 13, at ¶ 5.) So does Constance Boys, who, as noted above, reports that "many people went to Tom about Alejo's behavior, and Tom refused to believe it." (Tab 10, at ¶ 23.)  Ms. Boys reports details of the incident that she heard at the time, including that it was not "*Playboy* or something like that – it was really hardcore porn," and that Alejo made up a story of having found the magazines, picked them up so the children would not see them and taken them home, then forgotten about them. (Tab 10, at ¶ 16.)

501.  The available evidence indicates only one time that Alejo was confronted over his sexual abuse of Wendi, privately by George Carlin, father of Lonnie Carlin. George recalls that, at about the same time his wife and daughter told him of inappropriate sexual comments Alejo had made to them, "I was concerned that Alejo had been sexually molesting Wendi." Mr. Carlin called Alejo on the phone, told him why he was calling, and asked Alejo to meet him at the church to discuss it further.  They spoke outside of the church, and Mr. Carlin recalls, at the beginning, "Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually." As reported above, Mr. Carlin remembers that Alejo then asked

what he should do, and whether he should resign from the church. Mr. Carlin told the sexually obsessive, compulsive and addictive Alejo to simply "ask for forgiveness and stop his inappropriate behavior."

502.  Finally, Mark and Nancy Keating report an incident that took place not long before they left the school in 1988, when Wendi was seventeen or eighteen years old, in which Wendi appears to have decided to disclose to them Alejo's sexual abuse – only to be thwarted by a sudden and unexpected appearance by Alejo.  Mark remembers that Wendi approached them "on the heels of a sermon that a guest-minister named Kevin McNulty made about sexual sins and sexual abuse." He and Nancy were alone in a small classroom at the time.

> "Wendi came in and said, 'Can I talk to you?' She looked very anxious and
> concerned. Just as Wendi prepared to tell us what was heavy on her heart,
> Alejo walked in. Within the classroom was a closet and Wendi backed right
> into it, very affected by Alejo's presence. Wendi never did tell us what was on
> her mind. It seemed to be related to the porno Alejo was accused of bringing
> by JC Neace.  I was afraid it had something to do with sexual abuse, having
> observed Alejo's inappropriate behavior and strange dynamic with Wendi."
> (Tab 13, at ¶ 7.)

503.  Nancy Keating's account of the incident is almost identical, including her strong belief that Wendi had planned to disclose that Alejo was sexually abusing her:

> "Wendi came in and said she had something she wanted to tell us, but she
> could not get much out. She was very nervous and swallowing a lot. Alejo
> came into the room just as Wendi was about to reveal whatever it was she

wanted to talk to us about, and she just shut down. Her eyes got really big.
She looked like she had been caught saying something bad. I think Alejo's
presence scared Wendi. I thought at the time that maybe she was going to tell
us that she was being molested." (Tab 14, at ¶ 10.)

504.   Soon thereafter, Mark and Nancy Keating decided to leave the school, as well as
the cult community and Casa Grande altogether, after learning that Tom "did not do
much" when his own niece was sexually abused by his friend (see above; Tab 14, at
¶ 11). Mark recalls, "Before I left Harvest, I pulled Wendi into my office because I
needed to tell her something. I told Wendi that if something was going on with her at
home, if there was anything that was going wrong in her life, she needed to find someone
she trusted to share it with. That person did not need to be me, necessarily. I just wanted
Wendi to know that if something was not okay with her, there was help." (Tab 13, at ¶ 9.)
It may be that Mr. Keating was, without intending to, giving Wendi a mixed message.
The evidence suggests that she had *already* attempted to tell him such a thing, and had
*already* indicated that she trusted him and his wife enough to do so. Wendi had only been
stopped by Alejo's unexpected entrance into the room. Sadly, most adults who suspect
sexual abuse of children do not know how to respond appropriately. Whatever exactly
transpired in that conversation between Wendi and Mark Keating, all of the evidence
indicates that by then Wendi had concluded, correctly, that there was no one she could
trust to save her from Alejo's sexual abuse. Indeed, the only adults she had hoped might
be able to help were themselves jumping ship – escaping the cult community where such
sexual abuse occurred, and leaving her behind.

505.  **Wendi ages fourteen to eighteen: Recollections of Donna and Alejo.** As
noted previously, when Donna started working full-time at Ak-Chin Farm in late 1984,
when Wendi had recently turned fourteen, it was Donna's final big withdrawal, both
physically and emotionally, from both Wendi and Alejo. Donna recalls, "Beginning in
1984 after I was working full-time outside the church, Alejo and Wendi had dinner
together more often than Alejo and I had dinner together or the three of us [did] for the
rest of the time Wendi was growing up." As quoted above, and worth repeating here,
about each of her progressively greater withdrawals, including this one, Donna said: "It
was easier for me to let Wendi spend so much time with Alejo because I got to ignore
him, avoid the unpleasantness of being around him and his anger, and go into my room
and read." (Tab 27, at ¶ 248.)

506.  As discussed above, what Donna most wanted to escape were Alejo's constant
pushing for sex (that she did not want, before her hysterectomies and especially after
them), and his constant anger over her sexual rejection, which Alejo says caused "ninety
percent" of their arguments – until, by all indications, he gave up on Donna and sought
sexual gratification primarily from Wendi and her friends. And as discussed above, what
Donna did – most of all in her final turning away when Wendi was fourteen years old –
with actions that spoke much louder than words, was say to Wendi, "I can't handle his
constant sexualizing and anger. YOU take him," and to Alejo, "I can't handle your
constant sexualizing and anger. You take HER." It was a classic incestuous family
pattern, and it reached a peaked when Wendi was fourteen to eighteen years old.

507.  Most Donna's and Alejo's recollections of these years are the same as when
Wendi was ten to thirteen. As Donna reports, consistent with other witnesses, Alejo

continued his verbal abuse of Wendi, especially verbal sexual abuse; his demands that Wendi scratch and rub his head and legs, sometimes for hours each night, often with his head by her genitals, with each of them dressed in less and less clothing during this "touching on" ritual; his buying Wendi lingerie and other skimpy and sexy clothing; his insistence that Wendi and her friends who slept over wear their nightgowns and "snuggle" and "wrestle" with him; his pulling Wendi into the adults-only section of Spencer's gifts and forcing her to look at sexually explicit greeting cards, games, toys and other paraphernalia. Yet Donna also recalls escalations and new twists on many of these sexually exploitive and abusive behaviors after Wendi turned fourteen and how, facing further abandonment by Donna and increased pressure from Alejo, Wendi resigned herself to the role of Alejo's intimate partner.

508. Donna reports that Alejo verbally abused and "degraded" Wendi throughout her childhood and adolescence, and that these attacks dramatically escalated when Wendi became a pre-teen. As described above, at that point – and just as his aunts, uncles and parents had done when he became a pre-teen – Alejo became especially relentless and cruel with his sexualized teasing of Wendi, and this form of sexual abuse continued until Wendi left home after high school. (Tab 27, at ¶¶ 256-57.)  Added to the mix during Wendi's teenage years, Donna recalls, was the way Alejo would jump on any "clueless" comment by Wendi and use it against her, often telling her she was "another dumb blond" or having "another blonde moment." (Tab 28, ¶ 89) In short, Donna recalls Alejo unleashing a steady stream of emotional abuse against Wendi, with a new form added but most of it still sexualized, throughout these years.

509. Furthermore, Donna reports that Alejo's targeted, predominantly sexualized verbal abuse of Wendi occurred against a backdrop of Alejo's constant yelling at Donna and Wendi. Donna recalls, "To me, it felt like he was continually yelling at us, almost every day. For all those years he was – and he continues to the present – extremely explosive in his anger. I never know what will set him off…. There's just no warning, then suddenly he's extremely upset, yelling, and even literally screaming." (Tab 27, at ¶ 291) Donna also recalls that Wendi eventually became inured and numbed to Alejo's abusive verbal outbursts. "When Alejo was on his tirades throughout her teens, Wendi told me, 'It's going to be okay, Mom. He'll come back eventually and things will be okay." (Tab 27, at ¶ 294.) Donna then notes that Wendi was "always the middle person, trying to make things better for me and Alejo." (Tab 27, at ¶ 294.) In these situations, as both Donna and Wendi recall, that meant not only verbally reassuring Donna when Alejo had stormed off after a tirade and gone for a drive, but hours of rubbing and scratching Alejo's legs and head – "babying" and "touching on" him, often while scantily dressed – once he returned home again.

510. With respect to Alejo's physical abuse of Wendi, Donna reports, "After about age thirteen, Wendi didn't need swatting very often, only once or twice year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.) Alejo too recalls that "Wendi got fewer swats as she got older." He says beatings were replaced by "pulling weeds or having to do extra chores or being grounded," because he eventually "did not want to be associated with the kind of pain that was inflicted by paddling children." (Tab 24, at ¶ 127.) Thus Donna's comments appear to accurately reflect a decreasing frequency of physical

233

beatings. However, her comment that Wendi "completely gave in," like the views of women in the community who perceived Wendi as wholly beaten down and defeated during her teenage years, is an oversimplification. As we have seen, others recall Wendi being "flirty" with Alejo to get things she wanted, and at times even reducing Alejo to begging her. Alejo himself acknowledges, "When Wendi became a teenager, she started relating to me in many of the ways Donna did.  She told me what shirts to wear and what ties went with them. If I grumbled at something Donna made for dinner, Wendi might retort by telling me, 'Just eat it – there is nothing wrong with it.'" (Tab 24, at ¶ 116.)

511.  Donna's recollections of Alejo's sexual abuse of Wendi during this time are of it becoming even more pervasive and intense, and of her responding by pulling away even more, often in denial and sometimes in disgust.  For example, Donna recalls, "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about." (Tab 27, at ¶ 269.)  She remembers how, when Alejo showed Wendi things in the adults-only section of Spencer's, "I always gave him a disgusted look and took off to look at something else." (Tab 27, at ¶ 272.) Donna recalls that, in general, "I was working and paying so little attention to what was going on with Wendi that they could have shopped five days a week and I wouldn't have known about it," and "I didn't care to know where they went or what they did while they were shopping without me." (Tab 27, at ¶¶ 265, 275  Such responses of withdrawal and abandonment only provided Alejo with more opportunities to focus his sexual obsessions, compulsions and perversions onto Wendi and to seek sexual gratification from her.

512.  However, when the three of them went on family vacations, Donna could not avoid learning of Alejo's escalating abuses during these years. Donna recalls,

"As Wendi got older, by age fourteen and at ages fifteen, sixteen, and older, Alejo took Wendi into hardcore, triple-X, adult porno stores and sex stores. It was actually more like Alejo dragged Wendi into the hardcore porn stores.... She said she didn't want to go, but he insisted. It was just like earlier on with Spencer's.... He said, 'We'll just go in for a minute,' but then they spent longer than a minute, actually fifteen to twenty minutes or even more." (Tab 27, at ¶ 280.)

Donna then explains, "The shopping at hardcore porn stores came into my awareness mostly on vacations because I'd be with them while they were shopping.... I wasn't really invited when Alejo and Wendi shopped at home." (Tab 27, at ¶ 281.) Thus Donna went into these stores with Alejo and Wendi "only occasionally, about once or twice per year," and even then, she only "hung around by the entrance and never went past the front section where the clothes and less hardcore items are." Donna then describes how different the experience always was for Wendi -- and that just how different, she preferred not to know:

"Alejo always took Wendi right into the main part of the store where the triple-x and hardcore sex magazines, videos, toys, and other hardcore items were displayed and sold. I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." (Tab 27, at ¶ 281.)

513.  And so, once again, Donna sacrificed Wendi to such abuse in order to spare herself from dealing with Alejo's sexual perversion. Donna now frankly acknowledges this is true: "I let Wendi be the one who looked at the hardcore porn stuff in those shops

with Alejo instead of having me be the one who had to deal with it." (Tab 27, at ¶ 282.)

Finally, she explains that Alejo got away with bringing Wendi into those shops because

Wendi, "with her hair and makeup done," looked older than the young teenager she

actually was. (Tab 27, at ¶ 282.)

514.   Looking back on all of this, Donna reflects on how it was that she could have

stood by and let her own daughter be so sexually exploited and abused by Alejo:

> "While Wendi was growing up I lived by the old adage, 'What you don't
>
> know isn't going to hurt you,' and while I knew Alejo was shopping with
>
> Wendi for explicit, adults-only items by the time she was ten years old and
>
> taking her into hardcore porn stores by the time she was fourteen years old…,
>
> I didn't see myself as being able to do anything about it and I never let myself
>
> aware that it might be a problem. Alejo was the head of our household and
>
> one of the main tenants of our religion was that as the head of the household
>
> he set the rules and it was our place to obey the rules, so that's what we did."
>
> (Tab 27, at ¶ 283.)

515.   While these reflections certainly ring true, Donna here leaves out another factor

that she elsewhere acknowledges: Thanks to her own profound limitations, both

psychological and moral, resulting largely from her own mother's neglect of her and

other major childhood traumas, she was *motivated* to hand Wendi over to Alejo, a man

himself terribly limited and damaged from a childhood of neglect and abuse, especially

sexual abuse, so that Wendi and not she would be the primary object of Alejo's sexual

obsessions, compulsions and perversions. Indeed, as we have seen, Donna was *relieved* to

do so.

516. **Wendi's memories of ages fourteen to eighteen.** As reported above, I assessed Wendi's memory for most of the incidents of physical and sexual abuse – or strong evidence of sexual abuse – reported by witnesses in the community and by her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse; in those interviews I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

517. Wendi confirmed her mother's report that she was seldom physically beaten during this period. When Wendi recalled being made to pull weeds as punishment at school, she said this was because "they realized it was hopeless to just keep spanking me." She also recalled not minding pulling weeds, especially if Alejo wasn't angry at her for whatever had gotten her in trouble at school. Indeed, Wendi said that she often enjoyed pulling weeds with Alejo more than being in school. Asked why she was punished at school during those years, she said, "Me not listening, not doing what I was supposed to." She added that "Tom King's scripture for me," which he was always saying to her, in a tone of judgment and condemnation, was "rebellion is as the sin of witchcraft" (1 Samuel 15:23). She also remembers Tom often saying her rebellion would "send you to hell."

518. When told that one witness had said she seemed to lose her will to rebel at some point, Wendi responded that she had "*always* felt rebellious," from childhood through adulthood, including at work. Of course, growing up in a family and community where children were supposed to automatically, instantly and mindlessly obey their parents and other adults, and to believe whatever church/cult leaders say (no matter how crazy, brutal

or hateful), any child would feel rebellious, but especially one who did not completely give up on some independence of thought and action. Wendi added that she also always felt that she "deserved the bad things that happened" to her, and that she believed she deserved them *because* she was rebellious. Again, this is totally consistent with the messages she got in the traveling cult and the 91st Psalm/Harvest church/cult. Wendi did remember that she "put up the façade" of total obedience and submission in high school, but Tom and other adults at the church/cult continued to say she "didn't have the spirit of meekness" (i.e., the meekness Tom King depicted in his sermon, of the children he had beaten into submission). Wendi also remembers how, when she was on swim team and saw kids from Casa Grande Union High School, she thought, "I want that," by which she meant a life with some fun and freedom from the church/cult and her father.

519. Most of Wendi's memories – and lack thereof – of sexually exploitive and abusive behavior by Alejo are addressed above, because Alejo's behavior and other's observations of it were fairly consistent throughout Wendi's time in Casa Grande from ages nine to eighteen. As reported above, Wendi discussed Alejo's constant sexual comments and innuendos; his watching sexually explicit movies with her and her friends; his open invitation to her and her friends to ask him questions about sex and his visible excitement whenever they did. It was this constant sexualizing of her and everything around them that Wendi recalls vividly and now finds extremely disturbing. She became very upset and cried when commenting that Alejo should have "protected" that sexual part of her, not "used" it, and that he had "ruined" sex for her.

520. Also as described above, Wendi remembers "babying" Alejo by scratching his legs and head, sometimes for hours at a time. She recalls that Alejo often wore no

underwear when she did this, that his robe was often open, exposing his genitals, and for

that reason she hated to scratch his legs and whenever possible only scratched his head.

521.  Wendi also remembered Alejo looking in her bedroom window when friends

did sleepovers, which was almost every weekend with Laura for a year or two. At the

time he said and she believed that he was only interested in playfully trying to scare her

and her friends, but looking back now she believes he may have been trying to see them

naked. Indeed, she remembered an incident where Alejo hid behind her water bed as she

and a friend changed into their nightgowns, and how upset she was to discover he had

been there all along.

522.  Wendi remembered Alejo taking photographs of her in lingerie when she was

age sixteen or seventeen years old. These were apparently the same photographs seen and

found so disturbing by Cynthia Schaider, as described above. Wendi was able to recall

some details of one lingerie photography incident, which was very unusual for her:

> "I remember going out of town, checking into a hotel room... I remember
>
> sitting on top of the bed, and him pulling things out of a bag for me to wear,
>
> and me freaking out about it. I have absolutely no memory of taking the actual
>
> pictures and all that.... It had taken so long for him to get me to agree, more
>
> than a week at least.... I remember [he said] that it was a money issue [i.e., he
>
> could not afford to pay a model]. I do remember that I seriously didn't want
>
> to.... It's almost like you're embarrassed to do it but you're obligated to do
>
> it."

523.  Wendi's final comment there, about feeling "obligated" to do what Alejo

pressured, cajoled and demanded of her, is consistent with Donna's reports (above) of

239

Alejo forcing Wendi too look at sexual materials and toys at Spencer's Gifts, which Wendi also remembers.  Only when asked about Alejo taking photographs of her in the desert, including with lightning from an electrical storm in the background, did Wendi say she recalled that experience. She did not remember any details of posing and being photographed. However, in contrast to the lingerie photo shoot in the hotel room, Wendi said, "I don't remember thinking, 'I don't want to do this.'"

524.  Similarly, Wendi only spoke of the Spencer's Gifts experiences when asked about them.  She referred to these experiences as "the sexual gag stuff," and said she had remembered them on her own but had not thought Alejo's behavior was significant or "a big deal." Wendi said that on her own she had also remembered going into Fredericks of Hollywood with Alejo, which she again had not seen significant. But as noted above, Wendi said she did *not* recall ever buying any lingerie there (or anywhere else), or having any lingerie at home when she was a child or teenager.

525.  Indeed, when asked about having lingerie at home, and told that more than one witness had reported seeing her dressed in lingerie at home, with one reporting that she had said her father bought it and liked her to wear it so she could "look her best," Wendi said she had no memories. Appearing genuinely surprised and baffled, she added, "I don't know, because I don't own any lingerie, only flannel pajamas."

526.  There were several other reported recollections by her mother and other witnesses of incidents and evidence during this fourteen to eighteen year old period, detailed above, that Wendi was asked about in our interviews and explicitly stated that she could not remember, not even as a vague feeling. For example, she had no memory of giving Jasper Neace a pornography magazine (or magazine cover) that belonged to Alejo

240

– as was not only reported by Jasper, but remembered by Mark Keating and Constance Boys as something they had heard about at the time, either directly from Jasper or from someone else in the community.  (I did not ask Wendi about Mark and Nancy Keating's recollections of her approaching them to tell them something of clearly great emotional significance to her, which they believed was sexual abuse by Alejo, only to be cut short by Alejo's sudden appearance. I did not receive the Keatings' declarations until after the interviews focused on potential memories of sexual abuse, and did not inquire about that story during our final interview in August of 2011.)

527.  Finally, and further illustrating the incestuous family dynamic repeatedly explained above, in our final interview Wendi commented that she had "always assumed [her mother] didn't know things, and to find out she did" was very disturbing.  I then asked what specifically had Wendi always assumed her mother did not know. Wendi could not name anything in particular, but said, "I thought that my mother had the same memory that I did," by which she meant the kind of memory that did not allow knowing one's most painful and hurtful experiences, and that she was amazed that her mother actually remembered so many details. From these reflections Wendi returned, once again, to the feelings of anger and hurt that all children of incestuous families feel about the non-abusing parent having abandoned them and allowed the abuse to go on.

## IX.    WENDI ENDS CHILDHOOD WITH MAJOR, BRAIN-BASED DEFICITS IN EMOTIONAL, COGNITIVE, AND RELATIONSHIP FUNCTIONING

528.  The analysis below is based on my experience and knowledge as a researcher and therapist who has for twenty years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence

directly available to me (i.e., my interviews with Wendi, her parents and other witnesses;

thousands of pages of documents; and media files); it also relies on findings by the two

other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist

George Woods, M.D.

529.  From birth until age eighteen, Wendi Andriano experienced a great deal of

neglect and abuse. This included severe emotional neglect by her mother and biological

father; physical abuse in which pain was used to compel complete and automatic

obedience by her mother, biological father, adoptive father and other adults in her

communities; emotional abuse by her biological father, adoptive father and adults in the

91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including

her biological father and his father and brothers, her mother's boss at an alcohol and drug

services center, and definite sexual abuse by her adoptive father.

530.. In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability

to bipolar disorder. By adolescence she suffered from manic and depressive symptoms.

Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut

down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

531.  Wendi's history of childhood neglect and trauma, combined with her biological

vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a

severely traumatized and damaged person – which she remains to this day.  The damage

includes brain-based deficits in cognitive functioning; psychiatric illnesses and

symptoms; problems regulating emotions; and posttraumatic patterns of relating to

others.

532. **Brain-based deficits in cognitive functioning.** The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

533. Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at p.9.) On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (Tab 5, at p.9, italics in original.) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (Tab 5, at p.10.)

534. Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at p.10.) On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again thirty minutes later and then distinguish between accurate and inaccurate portions, Wendi's thirty-minute delayed recall and her ability to distinguish accurate and inaccurate portions thirty minutes later were moderately to severely impaired. (Tab 5, at p.10.) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (Tab 5, at p.11.)

535. Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at p.11.) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (Tab 5, at pp.11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired."

(Tab 5, at p.12.)  In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (Tab 5, at p.12.) Inhibition is ability "to stop responding to the immediate physical environment... in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (Tab 5, at p.13.)

536.  In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with caregivers,* and are particularly vulnerable to damage by neglectful and abusive relationships.

537. **Psychiatric disorders and symptoms.**  As assessed and reported by Dr. Woods, Wendi Andriano suffers from several psychiatric disorders. Specifically, Wendi

meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

538.   Bipolar disorder runs in Wendi's maternal family, including her mother Donna and her aunt Nadine. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness.  Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

539.   As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

540.   As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at

all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

541.   Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape.  The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

542.   For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long

247

before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

543.  Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

544.  As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age eighteen, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her

248

husband's life, contributed to her actions and role in Joe's death. Those pathological

relationship patterns are addressed below.

545. **Deficits in emotional functioning.**  Psychiatric diagnoses and symptoms

cannot capture the complexity of unique human beings, or the myriad potential effects of

chronic and severe childhood neglect and abuse. For example, while the diagnosis of

complex PTSD includes problems with emotion regulation, Wendi's problems with

emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has

major, long-standing deficits in the following areas: emotional awareness, including

awareness of the bodily correlates of emotions; when she is aware of unwanted emotions,

tolerating them without becoming immediately overwhelmed; modulating the intensity of

her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions

into words and sharing them with other people in order to calm herself and connect with

others, understand the situations and interactions that give rise to emotions, and come up

with constructive solutions. Importantly, emotion regulation problems are based in the

dysfunction of multiple interwoven brain circuitries – including the circuitries that

underlie Wendi's memory and executive functioning deficits and her bipolar and

dissociative symptoms. All of those circuitries are known to be damaged by childhood

neglect and abuse, especially when the neglect and abuse are severe and chronic and

perpetrated by parents.

546. **Trauma-based ways of relating to others.**  The neglect and abuse to which

Wendi's parents and many other adults subjected her, and some key relationship patterns

in which their neglect and abuse was embedded, are summarized above. As a result of

those traumatic childhood relationships, Wendi habitually relates to others in specific

ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

547.  As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want*. As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

548.  All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me."  If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she

250

attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

549.  These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

## X.    CONCLUSIONS

550.  Wendi Andriano lived a childhood characterized by substantial neglect and abuse -- emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

551.  As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing -- as she has -- deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

Date: _____          _____
                                       James W. Hopper, Ph.D.

# CURRICULUM VITAE

| | |
|---|---|
| **Date Prepared:** | February 3, 2012 |
| **Name:** | James W. Hopper, Ph.D. |
| **Office Address:** | 9 Henderson Street<br>Arlington, MA  02474 |
| **Work Phone:** | 617-821-3197 |
| **Work Email:** | jim.hopper10@gmail.com     **Work Fax:** 888-316-2125 |
| **Place of Birth:** | Mountain View, California |

**Education:**

| 1988 | B.A. | History | University of Rochester |
| 1997 | Ph.D. | Clinical Psychology | University of Massachusetts Boston |

**Postdoctoral Training**

| 1997-1999 | Fellow, The Trauma Center & Boston University School of Medicine |
| 2003-2006 | Fellow, Behavioral Psychopharmacology Research Laboratory<br>McLean Hospital & Harvard Medical School, |

**Faculty Academic Appointments**

| 1995-2000 | Adjunct Instructor, Department of Psychology<br>University of Massachusetts Boston |
| 1997-2003 | Research Associate, Department of Psychiatry<br>Boston University School of Medicine (BUSM) |
| 2001- | Adjunct Instructor, Department of Psychiatry<br>Faculty of Medicine and Dentistry, University of Western Ontario |
| 2006-2011 | Instructor in Psychology, Department of Psychiatry, Harvard Medical School |
| 2011- | Clinical Instructor in Psychology, Department of Psychiatry, Harvard Medical School |

**Appointments at Hospitals/Affiliated Institutions**

**Past**

| 1992-1993 | Half-time Predoctoral Psychology Intern, Counseling Center<br>The New England Conservatory of Music, Boston, MA |
| 1993-1994 | Half-time Predoctoral Psychology Intern, Outpatient Psychiatry Department The Cambridge Hospital |
| 1994-1995 | Psychology Testing Fellow, Outpatient Psychiatry Department<br>The Cambridge Hospital |
| 1996-1997 | Predoctoral Intern, University Health Services Mental Health Division<br>University of Massachusetts Amherst |
| 1997-1999 | Fellow, The Trauma Center & HRI Hospital, Brookline, MA |
| 1997-1999 | Assistant Director of Research, The Trauma Center & HRI Hospital |
| 2008-2010 | Research Associate, Department of Psychiatry, Massachusetts General Hospital |

**2011**       Workshop, "Neuroscience, Mindfulness, and Yoga for Transforming Trauma and Addiction: An Introduction," with Dana Moore, 22nd Annual International Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA.

### International

**2007**       Plenary, "Ecological Momentary Assessment in Substance Abuse Research." NIDA International Forum, Technological Innovations to Build International Research Capacity, Quebec City, Canada.

**2008**       Lecture, "Reconditioning Traumatized Minds and Brains: Parallels Between Neuroscience and Buddhism." Bi-annual conference in "Brain, Mind and Body: Trauma, Neurobiology, and the Healing Relationship," School of Medicine and Dentistry, University of Western Ontario, London, Ontario.

## Report of Clinical Activities

### Current Licensure

2000-          Clinical Psychologist, Massachusetts License 7763-PR

### Practice Activities

Psychotherapy   Arlington, Massachusetts
I have a small consulting practice focused on helping people identify treatment options for complex posttraumatic effects of child abuse.

### Forensic Activities

Expert Witness   Since 2003 I have conducted psychological and psychosocial history assessments on people accused or convicted of crimes. I have focused on evidence of trauma-related mitigation, especially sexual and physical abuse, to be considered during sentencing at trial and upon appeal. Since 2009 I have conducted evaluations of plaintiffs in civil suits involving "recovered memories."

## Report of Scholarship

### Peer Reviewed Publications

1. Lisak D, **Hopper J**, Song P. Factors in the cycle of violence: Gender rigidity and emotional constriction. J Trauma Stress 1996;9:721-743.

2. Lisak D, Conklin A, **Hopper J**, Miller P, Altschuler L, Smith B. The Abuse-Perpetration Inventory: Development of an assessment instrument for research on the cycle of violence. Family Viol Sexual Assault Bull 2000;16:21-30.

3. **Hopper JW**, van der Kolk BA. Retrieving, assessing, and classifying traumatic memories. J Aggression, Maltreatment, Trauma 2001;4:33-71.

4. Osterman JE, **Hopper J**, Heran WJ, Keane TM, van der Kolk BA. Awareness under anesthesia and the development of posttraumatic stress disorder. Gen Hosp Psychiatry 2001;4:198-204.

5. van der Kolk BA, **Hopper JW**, Osterman JE. Exploring the nature of traumatic memory. J Aggression, Maltreatment, Trauma 2001;4:9-31.

6. Lanius RA, Williamson PC, **Hopper JW**, Boksman K, Densmore M, Gupta MA, Neufeld RWJ, Gati JS, Menon R. Recall of emotional states in posttraumatic stress disorder: An fMRI investigation. Biol Psychiatry 2003;53:204-210.

7.  Lanius RA, **Hopper JW**, Menon RS. Individual differences in a husband and wife who developed PTSD after a motor vehicle accident: A functional MRI case study. Am J Psychiat 2003;160:667-669.

8.  Sack M, **Hopper JW**, Lamprecht F. Low respiratory sinus arrhythmia and prolonged psychophysiological arousal in PTSD: Heart rate dynamics and individual differences in arousal regulation. Biol Psychiatry 2004;55:284-290.

9.  **Hopper JW**, Karlsgodt KH, Adler CM, Macklin EA, Lukas SE, Elman I. Effects of acute cortisol and cocaine administration on attention, recall and recognition task performance in individuals with cocaine dependence. Hum Psychopharmacol 2004;19:1-6.

10. **Hopper JW**, Spinazzola J, Simpson WB, van der Kolk BA. Preliminary evidence for parasympathetic influence on basal heart rate in posttraumatic stress disorder. J Psychosom Res 2006;60:83-90.

11. **Hopper JW**, Su Z, Looby AR, Ryan ET, Penetar DM, Palmer CM, Lukas SE. Incidence and patterns of polydrug use and craving for ecstasy in regular ecstasy users: An ecological momentary assessment study. Drug Alcohol Depend 2006;85:221-235.

12. van der Kolk BA, Spinazzola J, Blaustein M, **Hopper J**, Hopper E, Korn D, Simpson W. A randomized clinical trial of EMDR, fluoxetine and pill placebo in the treatment of PTSD: Treatment effects and long-term maintenance. J Clin Psychiatry 2007;68:37-46.

13. **Hopper JW**, Frewen PA, Sack M, Lanius RA, van der Kolk BA. The Responses to Script-Driven Imagery Scale (RSDI): Assessment of state posttraumatic symptoms for psychobiological and treatment research. J Psychopathol Behav Assess 2007;20:249-268.

14. **Hopper JW**, Frewen PA, van der Kolk BA, Lanius RA. Neural correlates of reexperiencing, avoidance, and dissociation in PTSD: Symptom dimensions and emotion dysregulation in responses to script-driven trauma imagery. J Trauma Stress 2007;22:713-725.

15. Frewen PA, Lanius RA, Dozois DJA, Neufeld RWJ, Pain C, **Hopper JW,** Densmore M, Steven TK. Clinical and neural correlates of alexithymia in PTSD. J Abnorm Psychol 2008;117:171-181.

16. **Hopper JW**, Pitman RK, Zhaohui S, Heyman GM, Lasko NB, Macklin LM, Orr SP, Lukas SE, Elman IE. Probing reward function in posttraumatic stress disorder: Expectancy and satisfaction with monetary gains and losses. J Psychiatr Res 2008;42:802-807.

Exhibit No.:   **4.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By:_____ L. MOONEY

(Deputy Clerk)

1002841540

Exhibit No.: **4.002**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**

**01/31/2014**

In Evidence: *Stipulated 2/3/2014*

**Clerk of Superior Court**

By: _____ L. MOONEY

(Deputy Clerk)

1002841541

## EXHIBIT B TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D.

### Materials reviewed by James W. Hopper Ph.D.

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report of Dr. George W. Woods.

- The Expert Report of Myla Young, Ph.D.

# CURRICULUM VITAE

**George W. Woods, Jr., M.D.**

**4200 Park Boulevard, #545**
**Oakland, California 94602**

**57 Executive Park South, #360**
**Atlanta, Georgia 30326**
**United States of America**

EDUCATION

1981-1982: American Psychiatric Association/National Institute of Mental Health
Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981: Residency- Psychiatric - Pacific Medical Center
San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978: Internship—Medical/Surgical, Highland Hospital
Oakland, California

1977: MD, University of Utah
Salt Lake City, Utah

1969: BA, Westminster College
Salt Lake City, Utah

LICENSES & CERTIFICATIONS

2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004: Fellow: American Psychiatric Association

1992: Certified by the American Board of Psychiatry and Neurology

1979: Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

1

2011: San Francisco Police Department Crisis Intervention Training (CIT): Suicide Assessment, Mood disorders, thought disorders, and personality disorders.

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

2

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981: Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California


INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania


ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

3

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

## FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

## CLINICAL LECTURES

2011: Mood and Thought Disorders in Crisis Intervention: San Francisco County Sheriff's Crisis Intervention Training, San Francisco, California.

2011: Fetal Alcohol Spectrum Disorders and the Criminal Justice System, National Press Club, Washington, DC.

2011: The Epidemiology of Medicalization of Prisoners in the United States, International Academy of Law and Mental Health, Berlin, Germany

2011: Intellectual Disability and Fetal Alcohol Spectrum Disorder: International Academy of Law and Mental Health, Berlin, Germany

2011: Neuronal Plasticity: **Cognitive Skills Retraining for students with acquired brain injuries or learning disabilities**. College of Alameda, Alameda, California

2011: "The Neurobiology of Trauma In Children: Lessons About Early Childhood; Families First, Atlanta, Georgia

2010: From the Plantations/Asylums to the Prisons: The Relationship between Humiliation, Stigma, Economics and Correctional Care for the Mentally Ill: 2010 Workshop on Transforming Humiliation and Violent Conflict*□representing the□16th Annual Human DHS Conference□and the Seventh Workshop on Humiliation and Violent Conflict□□ Columbia University, Teachers College, New York

2010: Applying the Institute of Medicine Quality Chasm Framework to Improving Health Care for Mental and Substance Use Conditions; Morehouse School of Medicine, Department of Psychiatry, Journal Club

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009: Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007: Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine,

Atlanta, Georgia

2006: Moderator & Respondent (Representing Morehouse School of Medicine)
Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of
Law and Health, Health Law Institute

2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo
Chekundo Mental Hospital, Zanzibar, Tanzania

2003: Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference,
International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma:
Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute,
Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and
Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly,
Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras
College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing
Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors
Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference,
Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health,
Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International
Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment:
Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

7

American Association for Intellectual and Developmental Disabilities

CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California (Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association, Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy,

8

University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Greenspan, Switzky, Woods: *Intelligence Involves Risk-Awareness and Intellectual Disability Involves Risk-Unawareness: Implications of a Theory of Common Sense*, Journal on Intellectual & Developmental Disability, 2011, in press.

Woods, Greenspan, Agharkar: *Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders:* American Academy of Psychiatry and the Law, 2011, in press.

Bradford, Fresh, Woods: Not all patients are alike: *Ethnopsychopharmacology of Bipolar Disorder in African Americans*. Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

FORENSIC PROFESSIONAL LECTURES

2010:   The Trial of Hamlet, Morrison and Foerster, LLP, Law College, San Diego, California

2009:  Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of  Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University

of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999: Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist?  Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996:  Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995: Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995:  Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention


PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995.  (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

Anatomy of a Trial: 1994 (Available for the California State Bar).

PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health

PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2011: Forefront Behavioral Telecare, LLC: Director of Clinical Research

2009-2010:  Forefront Behavioral Telecare, LLC: Chief Medical Officer

2009: AgeServe Communications, LLC: Director of Research/Director of Government Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:     In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II-Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

13

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006).  Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters:  Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College.  (pp. 99-116).  New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000).  Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.

Exhibit No.:  **5**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:

*Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By:_____
L. MOONEY
(Deputy Clerk)

1002841542

**MYLA H. YOUNG, Ph.D., ABN**
Diplomate – American Board of Professional Neuropsychology
PSY 11916

July 11, 2011

CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING

In response to your request, following is a report of neuropsychological and psychological testing for Wendi Andriano. Information includes a description of neuropsychological and psychological tests administered, information about those tests, neuroanatomical descriptions of brain functioning and results of her neuropsychological testing.

Name: Wendi Elizabeth Andriano
Date of Birth: 08/24/70
Dates of Evaluation: 12/06/10; 12/07/10; 2/15/11; and 2/16/11
Education: 14 estimated
Ethnicity: White
Handedness: R
Date of Report: 04/21/11

Wendi Andriano was seen for neuropsychological evaluation on 12/06; 12/07; 12/08/2010 and on 2/15 and 2/16/ 2011 for a total of 25 hours of evaluation. The evaluation was completed in a private contact room at Arizona State Prison, Perryville, Arizona. She was not restrained, there were no interruptions, the room was reasonably quiet, she was provided lunch and frequent breaks with food, and she was not directly viewed by any other individuals, including custody staff. Limitations to her confidentiality were explained, understood and agreed upon. Third party observers were not present.

Information Relied Upon:

Transcripts of testimony by Wendi Andriano – 2004
Consultations with legal and medical professionals associated with her legal defense

Review of records associated with her developmental, educational, work, social, medical, psychiatric, criminal, prison and jail records.

1

<u>Procedures Completed</u>:

The following neuropsychological tests were administered to Wendi Andriano:

Effort on Neuropsychological Testing
       15 Item Test
       Test of Malingering Memory (TOMM)
       Green Word Memory Test
       Structured Inventory of Malingered Symptomatology (SIMS)
       California Verbal Learning Test Forced Choice (CVLT-II)
       Rorschach Bolder Validity Index

Intellectual Functioning
       Wechsler Adult Intelligence Scale-IV

Neuropsychological Functioning
       Sensory and Motor Coordination
              Smell Identification Test (SIT)
              Klove-Reitan Sensory Perception Examination
              Grooved Pegboard
              Finger Tapping Test

       Attention and Concentration
              Conners' Continuous Performance Test (CPT)
              Paced Auditory Serial Attention Test (PASAT)
              Visual Search and Attention Test (VSAT)
              Conners' Adult ADHD Rating Scales (CAARS-Self Report)
              Seashore Rhythm Test
              Sensory Perception Test

       Memory and Learning
              California Verbal Learning Test (CVLT II)
                     Trial Learning
                     Interference Learning
                     Short Delay-Free
                     Short Delay-Cued
                     Long Delay-Free
                     Long Delay-Cued
                     Recognition
                     Forced Choice

              Wechsler Memory Scale (WMS-IV)
                     Auditory Memory Subtests
                     Visual Memory Subtests
                     Working Memory Subtests
                     Immediate Memory
                     Delayed Memory

Rey Complex Figure Test (REY)
    Immediate Recall
    Delayed Recall
    Recognition

Tactual Performance Test
    Memory Trial
    Location Trial

Secondary Language
    Wechsler Individual Achievement Test (WIAT II)
        Word Recognition
        Reading Comprehension
        Pseudoword Decoding
        Numerical Operations
        Math Reasoning

Visual Perception
    Rey Complex Figure Test Copy Trial
    WAIS-IV Perceptual Organization Scales
    WAIS-IV Processing Speed Scales

Executive Functioning
    Executive Functioning Test
        Trail Making Tests
        Verbal Fluency Tests
        Design Fluency Tests
        Color-Word Interference Tests
        Sorting Tests
        Twenty Questions
        Tower Test
        Motor Speed

Wisconsin Card Sorting Test
Category Test
Iowa Gambling Test (IGI)
Comprehensive Affect Testing System (CATS)

Behavior Rating Scale – Self Report (BRIEF-A)

Halstead-Reitan Neuropsychological Battery
    Reitan-Klove Sensory-Perceptual Examination
    Finger Tapping Test (FTT)
    Tactile Form Recognition
    Trail Making A and B
    Tactual Performance Test (TPT)
    Seashore Rhythm Test
    Speech Sounds Perception Test

3

Category Test

Emotional Testing:
Rorschach Test
Dissociative Experience Scale (DES)
Multi-score Depression Inventory (MDI)
Detailed Assessment of Posttraumatic Stress (DAPS)

Interview – Wendi Andriano:

Accommodations for testing were private, in an environmentally comfortable place, uninterrupted, and not directly observed by other viewers.  She was advised, understood, and signed consent to complete this evaluation.  Interviews with Wendi Andriano were limited to only that information that was needed to understand her brain and psychiatric functioning.  She was not asked to provide information about her early developmental history and possibility of childhood victimization.  I am aware that Wendi Andriano has had unusual childhood experiences which included being raised in a Fundamental Christian ministry/church and having minimal interaction with the general community.  Most of her education was provided by a school program within the ministry church.  The group moved and relocated frequently.  She was at times homeless.

Interviews with Wendi were conducted on December 6, 7, and 8 2010 and on 2/15/11 and 2/16, 2011.  Although she reported previously being prescribed antidepressants (Seroquel;Zoloft;Elavil) as well as Ativan, she had not been taking any psychotropic medications at this time.  She indicated that she had not used alcohol and/drug in close proximity to testing.

She reported that she did not have a prior major medical disability and did not have any medical problem at the time of evaluation.  She indicated that she was not currently receiving psychiatric treatment.  She reported that she had received some counseling in 1996 and had previously received therapy while in jail.

She reported that she had never used or abused drugs or smoked tobacco.  She reported a history of limited adult alcohol use.  Her first drink of alcohol was when she was 18 years old.  She reported that since 2000 she had used alcohol with friends, with alcohol use characterized as drinking wine coolers.  She used alcohol most when was 21 years old, using alcohol at least once a week and overusing alcohol on some limited occasions.  She indicated that she was not smoking tobacco at the time of the evaluation and had never smoked.

When she was 13 years old she was involved in a moving vehicle accident (MVA).  Documented information describing this MVA was not currently available.  She, however, reported repeated head injuries throughout her childhood ("I have a lot of traumas in my life.  As a kid life was hard, real hard.").  She described also having repeated head injuries throughout her marriage.  She was not sure whether or not she experienced loss of consciousness, but indicated that "would see stars" and be "blank."   When her head was hit particularly hard, she would "just go to sleep".

Other than the conviction for which she was given the death penalty, to my knowledge she does not have prior criminal offenses.  She reported that she had received three disciplinary reports

4

while in prison—two for "using make up" and one for having tobacco on her food tray. She reported that she did not put the tobacco on the food tray because she had never had tobacco while in prison. It is her belief that the tobacco was placed on her food tray by a cafeteria worker or another inmate.

Reports indicate that her childhood was unusual. She reportedly did not have contact with her biological father after she was 5 years old. She was adopted by Alejo Ochoa when she was 5-6 years old. His occupation is described as construction, but primarily as "ministry activities" where he is described as "fundamental Christian." Elements of early childhood abuse are not fully described. *Although details not known to me, it is reported that she was sexually abused as a "very small child,"* before three years of age. As indicated, her early childhood was unusual, and would be considered abusive. Although family life as a Christian family is not considered "abusive," elements in her family life would be considered abusive. Her family was described as "fundamentally Christian." Her adoptive father is described as a "street minister" and part of a traveling ministry. They reported lived predominantly in a trailer, moving frequently. Her education was provided exclusively in a Christian school which apparently had somewhat limited typical educational experience, with biblical topics incorporated into educational subjects that were taught.

She was reportedly not allowed to dance or listen to "secular music." Her social activities were strictly limited. Her friends were permitted only to children of other Christian preachers, and her social interactions were permitted to be associated only with other individuals who were known to be Christian. Her first heterosexual date was when she was 18 years old, and that date was chaperoned by her parent(s).

Her discipline at home was described by her parents as atypical. She reportedly was "spanked with a wooden paddle," the severity of which is not known to me. Consequence of discipline was, however, described as being of such severity that she reportedly occasionally ran away from home with friends to avoid punishment. *Another incidence is described as her father yelling at her, grabbing her by the shoulders and shaking her and telling her to "get out of sight."* No further information about disciplinary procedures is known to me.

Wendi Andriano was married to the victim in this offense, Joe Andriano, in 1994. Her father reportedly disapproved of her relationship with him and at one point had refused to speak to her for at least one year because of the relationship. She and her husband initially lived with his parents. They have two children, Nicolas who was born in 1997 and Ashley who was born in 1998. Their marriage is described as often troublesome, with descriptions of frequent arguments, threats of harm to her, being hit on several occasions, and incidences of retreating to the bathroom and locking the door. On one occasion her husband is described as becoming so angered that he banged on the bathroom door until the door was broken and had to be replaced. She described being hit several times by him and on another occasion being squeezed "until it was hard to breathe."

In 1994 Joe Andriano was diagnosed with a "lump" in his neck which was surgically removed and diagnosed as benign. In 1995 and again in 1997 a lesion was again diagnosed, surgically removed and described as benign. In 1998, when a lesion again appeared and was again surgically removed, the lesion was identified as positive for cancer. He received extensive surgery, followed by radiation and chemotherapy and he sought what is described as "holistic"

5

treatment . While hospitalized he is described as uncooperative and aggressive with nursing staff, with at least one incidence of throwing a medical chart at nursing staff. Following hospitalization he is described as experiencing severe nausea, hair loss, anger and depression. In testimony, Wendi Andriano indicated that "he blamed me for God not healing him."

In 2000 he reportedly talked about suicide, sought cyanide but purchased sodium azide rather than cyanide. She testified that he believed that this method of suicide would be quick and painless. These actions were either quick or painless but resulted in more severe symptoms which left him "sick and scared." She testified that they then participated in "assisted suicide."

Brain Functioning and Neuropsychological Assessment

Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is currently supported and relied upon by contemporary neuroscientists in understanding brain function (Bear, Connors & Paradiso, 2001).

Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to main ain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and prefrontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

 In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a specific and predictable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and prefrontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

Neuroscientists have known for many years that the prefrontal cortex and networks of connections to and from the prefrontal cortex are the last brain region to mature, undergoing

6

profound brain growth and change through adolescence and into young adulthood. It has been well established that the region of the brain that is undergoing the greatest maturation, is also the brain region that is most vulnerable to damage. Development and maturation of the prefrontal cortex is most vulnerable to damage during adolescence. As the prefrontal cortex develops and matures, the individual's abilities for executive functioning also mature. Prenatal neurodevelopmental abnormality and brain insult(s) as a child interfere with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

Neuroscientists are also now aware of the consequences to brain development of childhood abuse and/or neglect. It is believed that when a child experiences persistent abuse or lives in a highly anxiety producing environment the brain noradrenic system is over stimulated leaving the child in a state of increased norepinetrine and dopamine production resulting in damage particularly to the prefrontal, temporal, hippocampus, amygdala, cerebellum and neuropathways throughout the brain results. If that abuse continues from childhood into adulthood, the brain damage continues with consequence of attention deficit, executive functioning deficiency, memory impairment, emotional dysfunction and psychiatric disorder, particularly depression and acute anxiety disorders (Teicher, 2002; Van der Kolk, 2003).

Neuroscientists are also aware of the consequences of brain damage associated with persistent fear or anxiety that is initiated during childhood and continues in adulthood but continues into adulthood. Prefrontal, temporal cortex, limbic system, hippocampus, amygdala, cerebellum, and neuropathways among these brain regions as previously described continue. Additionally, diminished right-left hemisphere integration in exchange between the right and left brain hemispheres across the corpus callosum and structured damage to the cerebellum, particularly the cerebellar vermis, and integration of information from the cerebellum to other brain region intensify. Abnormality of neurotransmitters, particularly norepinephrine and dopamine, as well as electrical activity particularly from the cerebellar vermis though pathways through the cortex continue and are demonstrated in individuals who experience one of several psychiatric disorders, including depression disorders and acute anxiety disorders.

As a result, degeneration and smaller brain structural size, neuropathway immaturity, abnormal neurotransmitter production, abnormal neural activity particularly electrical stimulation of neuron movement, and impaired postsynaptic receptors have been found in several psychiatric disorders, and particularly in depression and overwhelming anxiety disorders. Prefrontal, temporal, hippocampus, amygdala, cerebellum, neuropathway and abnormal communication of information across the corpus callosum have been shown.

Results of Neuropsychological Evaluation:

Wendi Andriano's performance on neuropsychological testing is summarized in the following sections of this report. A detailed description of her abilities on neuropsychological testing is described in greater detail in an addendum to this report.

   *Attitude Towards and Effort on Testing:* Wendi's attitude towards and effort on neuropsychological testing was evaluated using tests specifically developed to assess her effort on testing and possible attempt to manipulate her testing ability, or to malinger. These tests included 15 Item Test, *Test of Malingering (TOMM), California Verbal Learning Test (CVLT*

7

II) Forced Choice, Green Word Memory Test, Bolder Index of the Rorschach Test, and Structured Inventory of Malingered Symptoms (SIMS). Wendi Andriano's responses to all these tests of effort and potential manipulation indicate that she was cooperating with testing, was putting forth an appropriate level of effort on testing, and was not attempting to "fake" or "malinger" her test performance.

Wendi's attitude towards and effort on neuropsychological testing was also consistently evaluated through my observations of her abilities throughout the testing, through patterns of her abilities on individual neuropsychological tests. This is achieved through assessment of the consistency both *within and across her neuropsychological testing, and through* evaluation of patterns of abilities on neuropsychological tests that are known to be associated with specific neurological disorders. All indications are that Wendi Andriano was cooperating with testing, was putting forth substantial effort to complete all neuropsychological tests, and was not attempting to malinger or to manipulate the testing results. Wendi's abilities as described in this evaluation are considered a valid assessment of her functioning.

*Intellectual Functioning:* Wendi Andriano's general mental ability was evaluated using the Wechsler Adult Intelligence Scale (WAIS-IV). Her abilities on the WAIS-IV place her general mental ability in the Average Range of intellectual functioning (Full Scale =104, 61st %ile; 95% Confidence = 100 - 108). Her verbal abilities that require reasoning, comprehension and conceptualization using verbal information was in the High Average range (VCI =110, 75th %ile Confidence =104 – 115). Her nonverbal reasoning and visual-perceptual organization were in the High Average range (PRI ≈ 115, 84th %ile Confidence = 108 – 120). Her simultaneous and sequential processing of information, attention and concentration was substantially lower but within the Average range (WMI = 102, 55th %ile Confidence = 95 - 109 ). Her speed of mental processing and visual-perceptual skills were, however, significantly lower and in the Borderline Range (PSI = 76, 5th %ile Confidence = 70 – 87).

*Sensory Perception:* Wendi's sensory perception was evaluated using the Smell Identification Test (SIT) and bilateral primary and secondary sensory perception. On the SIT she had four errors (26th %ile) indicating Normosia to Mild Microsmia. Although she did not experience impairment on primary tactile, auditory or visual perception, her secondary sensory perception was significantly impaired with impairment in the moderate range. This pattern of impairment implicates reasonable normality of the primary sensory perception strip, but significant impairment when more complex information has to be integrated among the sensory strip and other brain regions. Prefrontal cortex, orbitofrontal pathway and frontal-subcortical pathway impairments are primarily indicated.

*Motor Coordination:* Wendi's motor coordination was evaluated using the Grooved Pegboard Test and Finger Tapping Test. On the Grooved Pegboard Test she had mild dominant (right) impairment and mild-moderate non-dominant (left) impairment (Grooved Pegboard Right = 56, SS -1; Left = 84 -1.5; Finger Tapping Right =36.7, SS -2; Left 33, SS-2).

Sustained fine motor ability is primarily mediated by the posterior motor region of the prefrontal cortex, in coordination with other brain regions. Her abilities on these tests of motor coordination indicate overall impairment within the motor strip, prefrontal cortex, orbitofrontal pathway, frontal-subcortical pathways, and corpus callosum.

8

*Attention and Concentration:*  Wendi's attention and concentration was evaluated using the Conners' Continuous Performance Test (CPT), Paced Auditory Serial Attention Test. (PASAT), Visual Perception Test  (VSPT), Seashore Rhythm Test and Sensory Perception Test. With the exception of the quick and simple VSPT and simple Sensory Perception Test, her abilities on all other measures of attention and concentration were significantly impaired.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated.

Her ability on the VSPT and Sensory Perception Test was within the average range (VSP = 95th %ile; Sensory Perception Test = Average Range).  Her abilities on the more complex CPT and PSAT, however, were significantly impaired.

On the CPT her performance demonstrated significantly impaired attention and concentration with an equal chance that her attention and concentration is like that of individuals who experience Attention Deficit Hyperactivity Disorder and attention disorder associated with other Neurological Disorder(s).  Her reaction times were slowed and inconsistent.  Her ability to change her response time as the time of the target stimuli changed was significantly impaired. When the target stimuli slowed, her abilities were most impaired.  She also was impaired in her ability to sustain her attention to the test, with her abilities becoming more impaired the longer the test progressed.  Poor performance indicates potential attention problems with several significantly elevated and impaired attention measures.  Co-existing, poor performance indicates potential neurological deficit(s) other than attention problems, with several neurological measures also significantly elevated and like those of individuals who experience a neurological disorder.

The PASAT requires the individual to listen to numbers paired together and remember the last number heard, adding the number last heard to the number previously heard.  There are four separate trials.  The numbers do not change, but each successive trial presents the information more rapidly.  Of all tests of attention, her abilities on the PASAT were the most impaired, with classification of ability persistently in the inferior range.  Her impairment ranged from mild to severe.  Observing her attempt to complete this test was uncomfortable to observe.  She was obviously expending extraordinary effort to be successful on the test.  She simply was not able to accomplish the task.  She was unable to successfully remember and manipulate simple numbers from the time the test was initiated and until the test was completed.  Her abilities throughout this test were severely impaired, but became more impaired as the test progressed.

Both the CPT and PASAT are complex tests of attention and the VSAT is a simple test of attention requiring less than one minute to complete.  As the tests of attention became more complex, her abilities became more impaired.

In addition to completing tests which were directly administered, she independently responded to the Connors' CAARS.  This is a self-report test in which the individual is asked to respond to thirty questions describing behaviors or problems that are experienced by adults.  Their responses are then compared to the responses of individuals who have known attention deficit disorders and those who do not experience attention deficits.   Each question is ranked on a scale of 0 to 3, with 0 = Not at All  and  3 = Very Much, Very Frequently.   Wendi's responses to this

self-report measure were significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Attention is process that allows awareness of a part or aspect of the environment and allows selective responsiveness to one class of stimuli while simultaneously being able to filter out or ignore information which is not essential or simply confusing to understanding a situation or environment. Attention is not a single ability, but rather includes multiple aspects including arousal, perception, divided attention, selective attention, sustaining attention and shifting attention. The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning indicate impairment of these brain regions and structures.

*Memory and Learning:* Wendi's memory and learning of verbal and visual information were evaluated using the California Verbal Learning Test (CVLT-II), Rey Complex Figure Test (Rey), Wechsler Memory Scale IV (WMS-IV), Tactual Performance Test Memory and Location trials. Her abilities on the WMS-IV and Rey memory trials were in the average range.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated. Her abilities on the WMS-IV and on the Rey immediate memory were in the average range. Her abilities on all other measures of memory and learning were, however, mild – moderately impaired.

The CVLT-II requires the individual to learn verbal information that is repeated several times, recall that same information both immediately and again after a 30 minute delay, and recognize information when a choice of information is provided. The CVLT-II also has one subtest that was developed specifically to identify individuals who are attempting to manipulate their testing abilities or are *not providing sufficient effort to complete neuropsychological testing to the best* of their ability. This CVLT-II subtest has been demonstrated to identify with 96% the accuracy those individuals who were not putting forth appropriate effort and/or were attempting to manipulate their abilities (Millis, Putnam, Adams & Ricker, 1995).

On CVLT-II, her ability to learn information after the information had be repeated five items was significantly impaired. Her ability to learn information the first time the information was heard was mild-moderately impaired (Trial 1 = SS-1.5). Her ability to learn new information was mild-moderately impaired. She had a significant error, remembering information that had never been presented (Intrusion = SS -1). There were a significant number of instances when she remembered information that had never been presented (Intrusion Errors = SS -1). On the Wechsler Memory Scale IV (WMS-IV) her abilities were within the average range.

The Rey Complex Figure Test requires the individual to copy a complex figure; recall the figure they had just copied after a one minute delay; recall the figure again after a 30 minute delay; and distinguish between accurate and inaccurate portions of the figure after a 30 minute delay. Her ability to recall the information immediately was in the average range (Immediate Recall = T = 50, 50th %ile ). Her ability on all other measures was moderately – severely impaired (Total Recognition T = 33, 4th %ile; Recognition True Positive 2-5[th] %ile; Recognition False Negative 2-5[th] %ile). It is noteworthy that memory errors occurred even after requiring significantly

longer to copy the figure, which should have enhanced the probability of recalling the information (Copy = 7 minutes 3 seconds <1st%ile).

Memory and learning are primarily mediated by the brain's neocortex (thalamo-limbic system, hippocampus, amygdala, basal ganglia), the brain's mesocortex (temporal and prefrontal cortices), and all brain connecting systems (frontal-subcortical, hippocampal, orbitofrontal) connections to and from these brain structures. Memory and learning are also strongly impacted by the brain's ability to transfer information across the corpus callosum to and from the right and left brain hemispheres as well as transfer of information from the cerebellum vertex to the prefrontal cortex. *Her disabilities across these tasks of memory and learning indicate impairment within all of these brain structures and pathways).*

*Language*:  Wend's secondary language was evaluated using the Wechsler Individual Achievement Test (WIAT II) Word Reading, Reading Comprehension, Pseudoword Decoding, Numerical Operations and Math Reasoning subtests. Although her Pseudoword Decoding and Math Reasoning abilities were in the mild range of impairment, her abilities on other WIAT-II subtests were in the average range.   For her, primary parietal and occipital brain structures are strengths for her and within the average range.  Connecting region between these structures, particularly the angular gyrus region is significantly impaired.

*Visual-Perceptual*:  Wendi's visual perception was primarily evaluated using the copy trial of the Rey Complex Figure Test (Rey) and the WAIS-IV Perceptual Organization and Processing Speed Indices.  The Rey is a test evaluating the individual's ability to copy a complex design while the figure can be seen.  The WAIS-IV Perceptual Organization Index is a measure of the ability to analyze and synthesize abstract visual stimuli and the WIAS-IV Processing Speed Index is a measure of sort-term visual memory, cognitive flexibility, visual discrimination, psychomotor speed, speed of mental operation, attention and concentration.

The *Rey Complex Figure Copy* trial requires the individual to copy a figure while viewing the stimulus.  Her ability to copy this figure was within the average range.  It is noteworthy, however, that it required significantly more time for her to complete this task.  Whereas most individuals required less than five minutes to copy the figure, she required 7 minutes 20 seconds (<1st %ile) to complete this task. As previously demonstrated on the WIAT II her visual-perception is brain strength. When required to coordinate information from these brain structures to the prefrontal cortex, however, her ability is severely impaired.

*Executive Functioning*:  Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions.

Executive functioning is mediated by the brain prefrontal cortex, but also requires interconnection among the prefrontal cortex and other cortical and subcortical regions of the brain, comprising a prefrontal *system*.  As previously described, the developmental course of executive functioning is sequential and prolonged, beginning as a child, continuing through adulthood, and with the greatest maturation occurring during adolescence (12 – 18 years of age). Adequate and mature prefrontal cortex development is required for just about every aspect of

adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions.

The prefrontal cortex is the largest brain structure in the human brain, comprising 20–25% of total brain tissue. The prefrontal cortex is divided into four regions—motor, mesial, dorsolateral and orbitofrontal. Each of these pre-frontal cortex regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration of motor coordination and sensory perception. The mesial region primarily regulates emotion, motivation, drive, and the ability to monitor actions. The dorsolateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize memory, and—in combination with the mesial region—the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional liability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a primary interactive role with the limbic system, assessing and altering emotion.

Wendi Andriano's executive functioning was evaluated using subtests of the Executive Functioning Test (EFT), Wisconsin Card Sorting Test (WCST), Comprehensive Affect Testing System (CATS) and Iowa Gambling Test (IGT). The Executive Functioning Test is a series of tests which systematically evaluate functioning of each region of the prefrontal cortex as well as connecting systems to and from the prefrontal cortex and all other brain regions. The Wisconsin Card Sorting Test is one of the oldest tests of prefrontal cortex functioning, and requires the individual to develop a rule, consistently apply that rule, and respond to information provided by the test by flexibly changing their thinking and actions as signaled by the test. The Comprehensive Affect Testing System (CATS) is one of the newest tests of executive functioning (2003), and systematically evaluates the prefrontal cortex, temporal cortex (including extended limbic system), and connection between these brain regions. The Iowa Gambling Test (IGT) evaluates the individual's ability to think ahead, plan, organize, and weight the consequences making decisions.

Although she he was successfully able to complete some EFT subtests, her abilities were predominantly impaired. On the 25 EFT Primary Measures, her abilities were significantly impaired on 72% of EFT measures. On WCST, her abilities were significantly impaired on 88% of the measures. Her abilities on all CAT Subtests (Affect Recognition; Prosody Recognition; Emotional Recognition) were significantly impaired. On the IGT her ability to think about the task was within the average range. Any IGT measures which required decision making, however, were significantly impaired (Deck A Decision Making = 2-5th %ile; Deck D Decision Making – 11 – 16th %ile).

Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired, within these tests, those executive functioning tests which required rapid processing of information, flexible thinking, decision making, and/or inhibition were the most severely impaired. The ability to rapidly process information allows the individual to face a new or different situation, take in information that is relevant to that situation while ignoring information which is not relevant to that situation, and put that thinking into actions. Flexible thinking is a "hallmark" of executive functioning and is the ability to abandon a previous response to generate a new response when demands of the situation require a change. It is also the ability to move freely from one situation to another, one aspect of a problem to another, make transitions to new

12

thinking and actions, and consequently to effectively solve problems. Inhibition is the inability to stop responding to the immediate physical environment (what is happening at this moment and not beyond) in order to think, consider and plan alternate ways of solving a problem and responding accordingly to that situation. Inhibition also is the inability to disengage involvement in the immediate in order to organize, plan, problem solve and act in ways that are appropriate to the situation. Executive functioning is mediated by the prefrontal cortex. These particular executive functioning abilities are predominantly mediated by dorsolateral and orbitofrontal prefrontal cortex regions, as well as pathways among the prefrontal cortex and all other brain structures, particularly the hippocampus, temporal, limbic amygdala, and cerebellum.

Wendi had a range of abilities across measures of executive functioning, indicating a pattern of brain normalcy and abnormality. Her abilities across measures of executive range ranged from within average range to severely impaired, depending on which brain region within the prefrontal cortex was required to complete the specific test. In the interest of some brevity, Wendi's abilities on all of these measures of executive functioning are described in detail in the addendum to this report. If further information is needed, please advise me.


Psychological Functioning:
Wendi Andriano's emotional functioning was evaluated using the Rorschach Test, Dissociative Experience Scale (DES), Multi-score Depression Inventory (MDI) and Detailed Assessment of Posttraumatic Stress (DAPS). Her responses to each of these tests indicate that she was not attempting to exaggerate her feelings and was providing a valid description of her emotional experience.

On the Rorschach Test her responses are like those of individuals who have experienced mild depression for much of their lives. Her Rorschach responses suggest that she is pervasively introverted. She would expend much effort looking inside her own feelings and attempting to understand them without the help of others. Unfortunately for Wendi, when she looks inside herself she experiences much pain and negative feelings about herself. Her responses are like those of individuals who have limited emotional resources, are extremely emotionally vulnerable and consequently are emotionally dependent. Her responses are like those of individuals who have experienced themselves as "damaged," and take a passive role in their interactions with others. They are individuals who attempt to avoid emotion because they have some awareness of their emotional vulnerability. Overall, her responses are like those of individuals who have been diagnosed with Dysthymia or Mood Disorder. The possibility of Bipolar Disorder would not be ruled out.

On the Dissociative Association Scale (DAS) Wendi acknowledged several experiences consistent with the experience of dissociation. Of particular note, she acknowledged some out of ordinary experiences of listening to someone talk and suddenly realizing that she did not hear part or all of what was said; of someone approaching her that she does not know and the individual calls her by name or insists that they have met previously. She acknowledged having no memory of some important event in her life (for example a wedding or graduation). Of particular concern she indicated that she had experienced times when she was not sure whether things that she remembered had really happened or whether she just dreamed them; that sometimes when she is alone she talks out loud to herself; and that she had experienced hearing voices inside her head that tell her to do things or comment on things that she is doing.

13

On the Multiscore Depression Inventory (MDI) Wendi acknowledged extreme fatigue, overwhelming feelings of pessimism and hopelessness, extreme feelings of guilt and that she experiences overwhelming feelings of sadness.  Overall, her responses to the MDI would satisfy the diagnosis of a Mood Disorder.

On the Detailed Assessment of Posttraumatic Stress (DAPS) she described her life as having experienced multiple situations of fearfulness and  overwhelming anxiety  dating back to childhood and continuing into adulthood.  She described herself as frequently bothered by intrusive recollections of her experiences, as having upsetting memories, dreams and flashbacks of the experiences, and as regularly being bothered by intrusive recollections of these experiences of fear.  She indicates that she has a tendency to withdraw or "shut down", particularly when  her experience is of recalling  her fear.  Overall, her responses to the DAPS would satisfy the diagnosis of PTSD or of Acute Anxiety Disorder.

Summary
Wendi Andriano's abilities across neuropsychological tests are like those of individuals who experience serious neurological and psychiatric disorders.  From a neuropsychological perspective, early childhood mistreatment and early childhood fear and anxiety are likely brain impairment consequences of Cognitive Disorder.  From a psychiatric perspective these same factors of serious early childhood mistreatment, fear and anxiety, as well as continuing experiences of fear and anxiety into adulthood are likely psychiatric consequences of Depression Disorder and/or Anxiety Disorder.

Disabilities in thinking, reasoning, planning, making decisions, anticipating consequences of plans and actions, maintaining impulse control, attending and concentrating, remembering important information, recognizing emotional problem, seeking help for emotional problems, and consistently communicating information in accurate and meaningful ways would need to be considered.

*Myla H. Young*

Myla H. Young, Ph.D., ABN

Clinical Neuropsychology
Office:                                          Mailing:
1475 North Broadway, Suite 335      1630 North Main Street #357
Walnut Creek, CA 94596               Walnut Creek, CA 94596
(925)  952-4350

14

**MYLA H. YOUNG, Ph.D., ABN**
Diplomate -- American Board of Professional Neuropsychology
PSY 11916

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALAUTION

TEST SCORES

Name:  Wendi Elizabeth Andriano
Date of Birth:  08/26/70
Date of Evaluation:  12/06/10; 12/07/10; 12/08/10; 02/15/11; 02/16/11
Age at Time of Evaluation:  40 years
Education:  14 years estimated
Handedness:  Right
Date of Report:  07/11/11

**Attitude towards Evaluation**

| Test | Score | Qualitative Description |
|---|---|---|
| 15 Item Test | 15/15 | Valid Protocol |
| Test of Malingering Memory | 49/50 | Valid Protocol |
| CVLT II Forced Choice | 100% | Valid Protocol |
| Green Word Memory Test | 98/98/98/100 | Valid Protocol |
| Bolder Index | 0 | Valid Protocol |
| Structured Inventory of Malingered Symptoms | 5 | Valid Protocol |

**Wechsler Adult Scale of Intelligence (WAIS IV)**

| Scale | Sum of Scaled Scores | Index Score | 95% Confidence | %ile | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension | 36 | 110 | 104-115 | 75 | High Average |
| Perceptual Reasoning | 38 | 115 | 108-120 | 84 | High Average |
| Working Memory | 21 | 102 | 95-109 | 55 | Average |
| Processing Speed | 11 | 76 | 70-87 | 5 | Borderline |
| Full Scale | 106 | 104 | 100-108 | 61 | Average |

| Verbal Comprehension | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Similarities | 32 | 14 | 91 |
| Vocabulary | 39 | 10 | 50 |
| Information | 18 | 12 | 75 |
| Comprehension | 34 | 17 | 99 |
| (Con't) | | | |

1

**WAIS IV (Con't)**

| Perceptual Reasoning | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Block Design | 62 | 16 | 98 |
| Matrix Reasoning | 18 | 10 | 50 |
| Visual Puzzles | 18 | 12 | 75 |
| Figure Weights | 18 | 12 | 75 |
| Picture Completion | 10 | 7 | 16 |

| Working Memory | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Digit Span | 31 | 11 | 63 |
| Arithmetic | 15 | 10 | 50 |
| Letter-Number Seq | 20 | 10 | 50 |

| Processing Speed | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Symbol Search | 20 | 5 | 5 |
| Coding | 49 | 6 | 9 |
| Cancellation | 26 | 6 | 9 |

**Wechsler Individual Achievement Test (WIAT-II)**

| Subtest | Standard Score | Composite Score | 95% Confid. Index | %ile |
|---|---|---|---|---|
| Reading | | | | |
|   Word Reading | 115 | | 109-121 | 84 |
|   Comprehension | 128 | | 122-134 | 97 |
|   Pseudoword Decoding | 109 | | 104-114 | 73 |
|    Composite | 352 | 130 | 126-134 | 98 |
| Mathematics | | | | |
|   Numerical Reasoning | 118 | | 110-126 | 88 |
|   Math Reasoning | 107 | | 100-114 | 68 |
|    Composite | 225 | 112 | 106-118 | 79 |
| | | | | |

**Smell Identification Test**

| Errors | %ile | Qualitative Description |
|---|---|---|
| 4 | 26 | Normosia |

**Grooved Pegboard Test**

| Measure | Raw Score | Mean/SD – Comparison Group | Standard Score | Qualitative Description |
|---|---|---|---|---|
| Dominant | 56 | X=63;SD=7.4 | -1 | Mild Impairment |
| Non-Dominant | 84 | X=70.8; SD=8.9 | -1.5 | Mild-Moderate Impairment |

2

**Finger Tapping Test**

|  | Mean Number Taps | Mean/SD-Comparison Group Mean | Standard Score | Qualitative Description |
|---|---|---|---|---|
| Dominant –R | 36.7 | 47.0/5.6 | -2 | Moderate Impairment |
| Non-Dominant | 33 | 43.5/5.2 | -2 | Moderate Impairment |

**Conners' Continuous Performance Test (CPT)**

**Inattention**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Below Average |
| Hit RT Std. Error | 59.05 | Mild Impairment |
| Variability | 59.35 | Mild Impairment |
| Detectability | 16.37 | Average |
| Hit RT ISI Change | 60.74 | Mild Impairment |
| Hit SE ISI Change | 77.24 | Severe Impairment |

**Impulsivity**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Average |
| Perseverations | 45.91 | Average |
| Commissions | 31.63 | Average |

**Vigilance**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Hit RT Block Change | 35.50 | Average |
| Hit SE Block Change | 40.26 | Average |

**Paced Auditory Serial Addition Test (PASAT)**

| Pacing | Total Correct | SS | % | Classification |
|---|---|---|---|---|
| 2.4 | 28 | -2 | 46.6 | Inferior |
| 2.0 | 30 | -2 | 50.0 | Inferior |
| 1.6 | 7 | >-3 | >11.6 | Inferior |
| 1.2 | 2 | >-3 | .03 | Inferior |

3

**California Verbal Learning Test (CVLT-II)**

| Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
| Trial 1 | 5 | -1.5 | Mild-Moderate Impairment |
| Trail 5 | 16 | 1 | Average |
| Trial B | 4 | -1.5 | Mild-Moderate Impairment |
| Short Delay-Free | 15.0 | 1 | Average |
| Short Delay-Cued | 15.0 | 1 | Average |
| Long Delay-Free | 15.0 | 1 | Average |
| Long Delay-Cued | 15.0 | .05 | Borderline |
| Recognition | 16.0 | 0 | Average |
| Intrusions | 0 | -1 | Mild Impairment |
| Forced Choice | | 100% | Valid Protocol |

**Wechsler Memory Scale (WMS-IV)**

| Index | Sum of SS | Index Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Auditory Memory | 51 | AMI 117 | 87 | High Average |
| Visual Memory | 42 | VMI 103 | 58 | Average |
| Visual Working Memory | 20 | VWMI 100 | 50 | Average |
| Immediate Memory | 42 | IMI 103 | 58 | Average |
| Delayed Memory | 51 | DMI 119 | 90 | High Average |

**Rey Complex Figure Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Copy | 35 | | >16 | Average |
| Immediate Recall | 21.5 | 50 | 50 | Average |
| Delayed Recall | 21 | 49 | 46 | Mild Impairment |
| Recognition | 18 | 33 | 4 | Moderate Impairment |
| Time to Copy | 7'3" | | <1 | Exceeds Normal Time |
| Recognition True Positive | 6 | | 2-5 | Moderate Impairment |
| Recognition False Positive | 0 | | >16 | Average |
| Recognition True Negative | 12 | | >16 | Average |
| Recognition False Negative | 6 | | 2-5 | Moderate Impairment |

**Executive Functioning Test (EFT)**

| Measure | Raw Score | Scaled Score | Qualitative Description |
|---|---|---|---|
| **Verbal Fluency Tests** | | | |
| Letter Fluency | 27 | 6 | Mild Impairment |
| Category Fluency | 39 | 10 | Average |
| Category Switching | 16 | 12 | Average |
| Category Switching Accuracy | 8 | 6 | Mild Impairment |
| (Con't) | | | |

4

| Executive Functioning Test (Con't)<br>Measure | Raw Score | Scaled Score | Qualitative Description |
|---|---|---|---|
| **Trail Making Tests** | | | |
| Visual Scanning | 25 | 9 | Average |
| Number Sequencing | 42 | 8 | Borderline Impairment |
| Letter Sequencing | 41 | 8 | Borderline Impairment |
| Number-Letter Switching | 86 | 9 | Average |
| **Design Fluency** | | | |
| Filled | 10 | 10 | Average |
| Empty | 12 | 11 | Average |
| Switching | 6 | 9 | Average |
| **Color-Word Interference** | | | |
| Color | 41 | 4 | Moderate Impairment |
| Word | 32 | 4 | Moderate Impairment |
| Inhibition | 70 | 7 | Mild Impairment |
| Inhibition-Switching | 74 | 8 | Borderline Impairment |
| **Sorting Test** | | | |
| Confirmed Sorts | 8 | 9 | Average |
| Description | 30 | 9 | Average |
| Recognition | 36 | 10 | Average |
| **Twenty Questions** | | | |
| Abstraction | 25 | 9 | Average |
| Questions Asked | 20 | 13 | Average |
| Achievement | 19 | 15 | Average |
| **Tower Test** | | | |
| Achievement | 18 | 11 | Average |
| Rule Violations | 1 | 44%ile | Average |

**Wisconsin Card Sorting Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Total Correct | 56 | | | |
| Total Errors | 8 | 53 | 61 | Average |
| Perseverative Responses | 4 | 49 | 45 | Average |
| Persevertive Errors | 4 | 49 | 47 | Average |
| Nonperseverative Errors | 4 | 51 | 53 | Average |
| Conceptual Level | 53 | 51 | 55 | Average |
| Categories Completed | 5 | | >16 | |
| Trials to Complete | 11 | | >16 | |
| Failure to Maintain Set | 0 | | | |
| Learning to Learn | 0.19 | | >16 | |

5

**Short Category Test**

| Test | Raw Error | T Score | %ile | Qualitative Description |
|------|-----------|---------|------|-------------------------|
| Total Errors | 48 | 41 | 18 | Low Average |

**Iowa Gambling Test**

| Score | Raw Score | % | Classification |
|-------|-----------|---|----------------|
| A' | 21 | 2-5 | Moderate Impairment |
| B' | 30 | >16 | Average |
| C' | 26 | >16 | Average |
| D' | 23 | 11-16 | Average |

6

Exhibit No.:  **5.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:

*Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841543

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA
### Forensic Services Unit

March 28, 2001

The Honorable Daniel A. Barker
Maricopa County Superior Court
222 East Javelina Avenue
Mesa, AZ 85210-6201

RE:   Wendi Elizabeth Andriano
      Competency Screening Evaluation
      CR# 2000-096032

Dear Judge Barker:

This is in reference to the above-named individual.  On March 9, 2001 your court ordered the Forensic Services Unit to evaluate the competency of Ms. Andriano.  I had an opportunity of visiting with the defendant for this evaluation on March 21, 2001.  At that time the defendant was housed within the general population of the Estrella Jail Facility, which is under the jurisdiction of the Maricopa County Sheriff.  When I saw the defendant for this evaluation in the Medical Dispensary of that unit, I informed her of the nature of our conversation and the fact it would not be privileged.  I also told the defendant the information she provided could not be used against her in further proceedings unless she were to enter a plea of Guilty Except Insane.  She understood the reason for the evaluation and agreed to continue.  Prior to completing my report I reviewed:

1)    The Court's order;
2)    Defense counsel's Motion;
3)    A copy of a letter from counselor, Ms. Rohde;
4)    A copy of the grand jury transcripts.

I appreciate having received the information I did in a timely fashion.  I also had an opportunity of discussing the case at length with Dr. Leonardo Garcia-Bunuel.  Dr. Garcia-Bunuel is a psychiatrist with Correctional Health Services.

Ms. Andriano is a 30-year-old widowed Caucasian female who is the mother of two preschool children.  When seen, she was dressed in routine jailhouse garb and had


EXHIBIT
A

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 2

good hygiene. She was fully alert and oriented to her name, the date, our location, and the reason for my evaluation. The defendant's thought processes were goal-directed and intact throughout our conversation. There was no evidence she was suffering from perceptual disturbances, such as auditory or visual hallucinations. She adamantly denied having such experiences. The defendant denied being on any psychiatric medications at the present time. Her affect was generally appropriate, but at times she seemed quite depressed and was tearful. She denied any previous history of psychiatric hospitalizations. She denied any known family history of psychiatric hospitalizations. Apparently her family history is significantly positive for two paternal cousins having successfully suicided. The defendant denies abuse of alcohol or other illicit substances. Apparently Ms. Andriano was reared in Pinal County, where her parents presently reside. She has worked in Phoenix for a number of years, and was working in the field of property management when arrested. Her cognitive abilities are quite likely consistent with that of the general population. She maintains she attended classes at the University of Phoenix in "business management." I would estimate her I.Q. as being within the average range. Her abilities to abstract and conceptualize, as tested by having her interpret relatively common sayings/proverbs, were intact. Her memory seemed to be grossly intact for both recent and remote events. She did complain of having some lacunae in her memory. She was able to remember three out of three unrelated items after a few minutes of intervening conversation. She was neither suicidal nor homicidal at the time of my evaluation. She maintains that she is religious and is a non-denominational Christian.

Ms. Andriano is very well aware of being charged with First Degree Murder. She also understands the adversarial nature of the proceedings she is facing. She realizes that she has certain Constitutional rights, and that if she is to enter a plea of Guilty, she will waive those rights. She was able to talk in a coherent fashion about her various rights, including her right not to testify, as well as her right to call witnesses on her own behalf and confront the witnesses against her in a court of law. She was able to independently identify her attorney. She maintains she has a lot of respect and confidence in Mr. Delozier, Jr. The defendant maintains she has not been offered a plea agreement in the charges she is facing.

In summary, I do not believe that grounds exist to further question the competency of Ms. Andriano. It would be my opinion, within a reasonable degree of psychiatric certainty, that she has a factual, as well as a rational understanding of the proceedings she is facing. I also would opine that she can effectively assist her attorney in her defense. Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine. Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense. Certainly

009179

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 3

there is something quite bizarre about what allegedly occurred. If Ms. Rhode is
accurate in her diagnostic assessment, then the criminal culpability of the defendant
and her state of mind at the time of the alleged offense should be evaluated
independently, outside the scope of a Rule 11 evaluation.

If the Court has any further questions regarding my opinions, I will remain available. (I
would also note that apparently previous Defense counsel instructed Ms. Andriano not
to talk to Dr. Garcia-Bunuel. I think this is a mistake, as I believe Dr. Garcia-Bunuel is
trying to treat the defendant for what he believes is a Depressive Disorder. If such
treatment is indicated, I would hope that Defense counsel would be supportive of his
client receiving the necessary treatment from Dr. Garcia-Bunuel, who is a respected,
ethical, and competent psychiatrist.)

Respectfully,

Jack Potts, M.D.
Chief, Forensic Services Unit

009180

Exhibit No.:  **6.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By:  L. MOONEY
     (Deputy Clerk)

1002841545

**Patrick Linderman - PDX**

| | |
|---|---|
| **From:** | Daniel Patterson - PDX |
| **Sent:** | Thursday, December 20, 2001 12:01 PM |
| **To:** | Patrick Linderman - PDX |
| **Subject:** | RE: referrals |

Pat- the two clients are Albert Redacted and Wendi Andriano- both are death penalty cases- Patty Moncada has been asked to provide you with complete sets of discovery- both clients should be examined by mental health professionals- not because I believe they suffer from mental illness but as death penalty cases, a mental health exam can provide a source for mitigation- be glad to give you a synopsis of their respective cases at your convenience- just come see me- Thanks- Dan P.

-----Original Message-----
**From:**  Patrick Linderman - PDX
**Sent:**  Wednesday, December 19, 2001 9:15 AM
**To:**  Daniel Patterson - PDX; Patricia Moncada - PDX; Irene Esqueda - PDX
**Subject:**  referrals

Hi Dan,

I received word recently that I am assigned as the Client Services Coordinator to two of your cases. I am unclear exactly which cases, but I believe that they are Carrion and someone named Wendy something. I would love to get together with you to gain some clarification and direction. I will also probably speak with Patty since it appears that she is the person also assigned to this case. I am sure that I can get the DRs and other important papers from her. All those legal assistants are always very organized. (Wish some of that would rub off on me) It is my understanding that our office has had these cases for some time, so I may need to jump right in and see what I can do to help.

Patrick Linderman

EXHIBIT
B

007684

Exhibit No.:  **6.002**

Case No.:  **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:  Defendant
2/7/14

## Clerk of Superior Court

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841546

# Richard J. Rosengard, D.O.

Mailing Address:   5501 N. 7th Ave., PMB # 219              Diplomate, American Board of Psychiatry and Neurology
                   Phoenix, Arizona 85013-1755             Diplomate of the American Board of Forensic Medicine
                   (602) 843-0035 • FAX (602) 843-8963     Diplomate, American Board of Forensic Examiners



August 27, 2002


Dan Patterson, Deputy Public Defender
Office of the Public Defender
Southeast Facility
1750 South Mesa Drive, Suite 150
Mesa, Arizona  85210-6211                              **Fax Number 506-2865**


RE:   State of Arizona v. Wendi Elizabeth Andriano
CR#:  2000-096032
DATE OF EVALUATION: June 23, 2002
DATE OF DICTATION: August 25, 2002
EVALUATION LOCATION: Estrella Jail

**IDENTIFICATION:**  Wendi Andriano was seen on a referral from the Office of the Public
Defender and chief trial deputy, Larry Grant and presented as a 31-year-old, Caucasian female who
prior to her detention in the Estrella Jail, where she had been since October of 2000, had been
employed as a property manager.  She was married and resided with her spouse and two children.

**INFORMANT:**  The Defendant understood the extent and limitation of this evaluation and
consented for me to release information herewith obtained, knowing full well that I was not
establishing a physician/patient relationship with her.  She also signed a Release of Information
indicating that I could review the records in the Estrella Jail Clinic.  Those records indicated that
she had been on Seroquel 100 mg h.s. and that previously Remeron, trazodone, and Prozac had been
used and discontinued.  A note from November 3, 2000, indicated that the psychiatrist felt that she
was labile.

I reviewed a cover letter written by Patricia Moncada, who was a legal assistant to Daniel Patterson,
Deputy Public Defender, listing the reports which were reviewed and included a Phoenix Police
Department narrative report, transcripts from 911 calls from the Phoenix Fire Department and
Phoenix Police Department, medical records regarding the victim from Dr. Kellogg, and the medical
examiner's report regarding the victim.  The supplemental Phoenix Police Department Report
reviewing the 911 call, showed how the Defendant had apparently admitted that her husband was
stabbed, indicating that she possibly had done it and that she and her husband were fighting to the
point of him strangling her.  She denied doing the action purposefully and appeared to be upset by
the situation.  She indicated that her husband went into rages.  She went on to indicate that she had
previously hit her husband over the head, and his rage simmered down and then started once again.
She indicated that she sent away the paramedics because she did not want to get her husband in
trouble.  She indicated that her husband had episodes of rage and personality changes, secondary
to the chemotherapy that he was going through.  She indicated that her husband had wrapped a cell

007544

EXHIBIT

C

Aug-28-02   12:55pm   From-Arizona Community Psychiatric          602-843-7054          T-736   P.003/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 2
RE:   State of Arizona v. Wendi Elizabeth Andriano                     August 27, 2002

phone cord around her throat, and she grabbed a knife in order to cut that cord; thereafter, they wrestled around.

There was contact between Patricia Moncada and my office, indicating the charge against the Defendant who indicated that she did not recall what had happened and was not involved with drugs or alcohol. She reported that she had called the paramedics one to two hours earlier but sent them away and then called the police thereafter. The victim apparently had a lot of outstanding business loans. He also had terminal cancer with less than a year survival rate, according to the medical examiner. She was seen to have superficial scrapes with a fake nail ripped off and redness around her neck.

**PRESENTING SITUATION ACCORDING TO THE DEFENDANT:**  The Defendant indicated that she had not pleaded as of yet and knew that she was charged with first degree murder. She indicated that she read the police report accusation synopsis, as well as a newspaper where it was alleged that she had slit her husband's throat and had given him poison over a period of time. She indicated, though, that her husband had been on chemotherapy and was no longer working. She indicates that he took sodium azide and an overdose of pills and wanted to kill himself. She indicates that her husband got mad when a friend, Chris, was called and vacillated about what he wanted to do. She indicates that in March of 2000, she had an affair, predominantly for companionship but did consummate the relationship sexually. She felt that her husband sensed what was going on and asked her about that, and she answered honestly. He got angry and had a physical fight with her regarding that on the night that the incident happened. The next thing that the Defendant recalled was sitting on the living room floor with her husband. Thereafter, she called her parents and told her father and then called the police. She indicated that she could not recall calling the paramedics earlier. She also admitted to making calls to buy sodium azide a few weeks prior to the incident. Her husband wanted that. At first, he apparently wanted cyanide; and then the Defendant had convinced a friend to assist in getting the sodium azide. She indicated that her husband had suicidal thoughts in the past and went through therapy but did not want to go through therapy again. He did have some family therapy in 1997 and 1998. Apparently, therapy was set up but her husband did not want to go.

**STRESSORS:**  The Defendant indicated that her husband's cancer had been getting worse, since they found out about it in March of 2000. He had adeno cystic carcinoma since 1994, and was diagnosed in 1996 or 1997. The Defendant was obviously now going through legal repercussions of her alleged behavior and going through continued remorse and grief regarding the death of her husband. Her husband had been going through chemotherapy, and they had two young children. She worked, as her husband no longer did or could work.

**MOOD DISORDER SYMPTOMS:**  The Defendant was depressed for six to seven months prior to coming into detention. While in detention, she was doing better with the level of depression, as

007545

Aug-28-02   12:55pm   From-Arizona Community Psychiatric          602-843-7054        T-736   P.004/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                        Page 3
RE:    State of Arizona v. Wendi Elizabeth Andriano                             August 27, 2002

there was relief from some of the stressors that existed previously. Nevertheless, the symptoms still
included: insomnia and feeling depressed, helpless, and anhedonic. She had lost weight and had
a reduced appetite with crying episodes. In the past, she felt particularly helpless, as she could not
help her husband, particularly when he got irritable in the last few months of his life.

The Defendant denied symptoms that would be consistent with manic episodes but did admit to
panic attacks since childhood. These happened at night on attempts to go to sleep and occurred less
than a few times a year. During these episodes, she would have an increase in heart rate, dyspnea,
dizziness, lightheadedness, shakes, sweats, and like a lump in her throat. She would have
gastrointestinal upset, a fear of dying and losing control, and a sense of impending doom. She
indicated that it was like having a heart attack. She also had symptoms of anxiety but would hide
these feelings and focus in on somebody else when she had them.

The Defendant denied any history of suicidal attempts or homicidal ideation, intent, or actions. She
had thoughts of hurting herself when she first came into detention for a few months but indicated
that they were "Not serious."

OTHER PSYCHIATRIC CONDITIONS: The Defendant denied symptoms consistent with
phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders.
She denied having paranoia or hallucinations that were auditory or visual.

The Defendant indicated that her mother and therapist say that her biological grandfather sexually
abused her when she under the age of 3; although, she could not recall that and had no dreams or
flashbacks. She had difficulties in trusting others sexually but was able to enjoy herself with the
exception of intercourse, and she did not like that. She got easily upset in dealing with others who
were in abusive relationships; and with the aid of therapy, she felt that she was in an abusive
relationship with her husband. She was particularly upset in finding out about and dealing with
children that were sexually abused.

SUBSTANCE ABUSE HISTORY: The Defendant denied use of cocaine, speed, cannabis, IV
drugs, heroin, PCP, LSD, inhalants, or alcohol.

PAST PSYCHIATRIC HISTORY: The Defendant had no history of acting out in violence,
treatment with psychiatric medications, or placement in a psychiatric facility. She went for three
to four appointments in 1996, to an EAP therapist but did not enjoy that therapy, indicating that they
had blamed her husband and told her to leave him. In the year 2000, her husband's doctor gave her
medication for anxiety and sleep; but she could not recall, the name of the medication and it was
used for two to three months. She was out of that medication, I believe, for a week prior to being
detained.

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                  Page 4
RE:   State of Arizona v. Wendi Elizabeth Andriano                    August 27, 2002

**FAMILY PSYCHIATRIC HISTORY:** The Defendant's father and grandfather abused alcohol and there was no familial history of suicides, psychiatric illnesses, or drug abuse.

**PAST PERSONAL HISTORY:** The Defendant was born in Groom, Texas, and raised in Arizona and California. She indicated that her childhood was "Different," as her mother and stepfather were married when she was 4 years old. They travelled around on bus, being involved in a street ministry. Until the age of 10, she was raised at home; and from 10 and on, she was in a private school. She did well in school but indicated that she did get in trouble as she was "Being really hardheaded," even to the point of getting expelled. She could not recall what she did to merit that expulsion. She always got honors in her grades. She was the only child from her biological father who lived with her for a few years; and thereafter, her stepfather lived with her. She saw her biological father when she was 8 years old and did not really know him. She indicated that she had no involvement with the military or the law, except for some speeding tickets. In the last two years of high school, she did junior college work, as well; and after high school, she went to Mexico, doing missionary work for seven to eight months. Thereafter, she worked for a few months answering phones but apparently had a temper and quit. Then, she worked in property management as a leasing agent for a couple of years and ended that work to be an AP clerk accountant at Casa Grande Regional Hospital. She left that job after less than four years to go into property management. While she had been working at Casa Grande Regional Hospital, she attended college and indicates that she is two classes shy of a BA degree. She met her husband in March of 1992, and they were married in January of 1994. They have two children who are now being cared for by their paternal aunt. She indicated that she had no relationships with other people and that her relationship with her husband was difficult as he yelled at her daily. That is why she sought out the company of another man for moral support. She indicated that, at that time, she got into alcohol, as well; but she ended the relationship with that other man prior to the incident at hand.

**PAST MEDICAL HISTORY:** The Defendant denied any history of allergies to medications, surgeries, seizures, fractures, head traumas, or other major medical problems. She denied any use of tobacco. She used alcohol with peers, approximately four to five drinks at a time, drinking that every other week in the year 2000, and a lot less prior to that time. She had been on Seroquel at the time of the evaluation, 100 mg h.s. and had been on that for a couple of months. That was used to help sleep. She indicated that her bunkmate took that medication. She had tried other medications prior to the use of Seroquel, as I indicated above under informant.

**OBJECTIVE MENTAL STATUS EXAMINATION:** The Defendant appeared clean in jail garb and was well-groomed. She wore glasses and was less than average in her build. She appeared her stated age with a normal degree of alertness, posture, and gait. Her eye contact was good, and her attention span was satisfactory. Her motor level was normal, and she appeared good and cooperative as a historian. Her speech was normal. Her affect was labile, tearful, and sad; although,

007547

Aug-28-02   12:56pm   From-Arizona Community Psychiatric          602-843-7054          T-736   P 006/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                                 Page 5
RE:   State of Arizona v. Wendi Elizabeth Andriano                              August 27, 2002

she was able to smile a few times. She denied and showed no psychotic thought processes. She denied suicidal or homicidal ideation or intent. She indicated that her mood was "Fine." She was friendly, trustful, and cordial in her interpersonal style and fair in her insight and judgement. She was oriented to her own name, the day of the week, month, and year and knew the street and address of the jail and the city, county, and state where it was located. She knew that the date was somewhere in the twenties but did not know the exact date. Immediately, she was able to repeat three out of three items that I asked her to repeat; and after five minutes, she was able to recall one of them. She knew the name of the current and previous president of the United States and felt that she did not know the one prior to Clinton but indicated that prior to Clinton was possibly Reagan. She was able to do serial sevens accurately to 72 from 100 and accurately multiply six times eight and nine times seven. She was able to spell the word "world" backwards and abstractly interpret a proverb of moderate difficulty. She was thought to have an IQ that was above average.

**DIAGNOSTIC IMPRESSION:**

| | | |
|---|---|---|
| AXIS I: | (a) | Major affective disorder, depression. |
| | (b) | Probable posttraumatic stress disorder. |
| | (c) | Panic disorder. |
| AXIS II: | None. | |
| AXIS III: | None. | |
| AXIS IV: | Stressors: 1) dealing with her husband's cancer that was getting worse; 2) dealing with the legal repercussions, as well as personal repercussions, of the loss of her husband; 3) currently being a single parent. | |
| AXIS V: | Current GAF: 62. Highest GAF in last 12 months: 70. | |

**SUMMARY, OPINIONS, AND RECOMMENDATIONS:** The Defendant was going through a considerable amount of stress in dealing with not only the eventual loss of her husband at a very early age and being the sole parent of her two young children but dealing with the slow and painful demise of her husband, while her husband was becoming inappropriately irritable and mistreating her emotionally and physically. She had seen a deterioration in their relationship; and apparently, she had killed him. Perhaps no one will know exactly what occurred in the incident; and several potentials exist, including the potential that she was defending herself to some extent. Questions could arise as to how somebody who had a sound mind prior to and after the event could now have blocked what had occurred, specifically at that juncture; and the issue of amnesia for the subject appears all too convenient. I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it. An individual who goes through a traumatic event

Aug-28-02   12:56pm   From-Arizona Comunity Psychiatric          602-843-7054          T-736   P.007/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 6
RE:    State of Arizona v. Wendi Elizabeth Andriano                    August 27, 2002

will often forget that extreme situation, because an individual is unable to deal with the thoughts
on an emotional basis. This occurs in both children and adults who have been physically or sexually
attacked and more than explains the Defendant's response, particularly in light of the fact that she
had a past history, apparently, of being abused and symptoms consistent with posttraumatic stress
disorder. That situation and the emotional responses that she has had from that situation make it
more likely that she would have had such an amnestic response to her apparent actions. That is true
whether her actions were a matter of self-defense or whether they were purposeful attacks in the
heat of a momentary aggressive outburst. The former appears more probable and the latter less
probable, based on the Defendant's statements currently and to the emergency crew that she dealt
with.

The Defendant certainly should receive appropriate therapeutic treatment, which would include
individual therapy and a strong consideration of an antidepressant, which could be beneficial both
for her depression and traits of posttraumatic stress disorder.

Should there be further questions regarding this Defendant or my report, I would be happy to answer
them at your earliest convenience.

Respectfully submitted,


Richard J. Rosengard, D.O.
RJR/mw/TMHT


007549

Exhibit No.:  **6.003**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**

**01/31/2014**

In Evidence: Stipulated

2/3/2014

**Clerk of Superior Court**

By: _____L. MOONEY_____

(Deputy Clerk)

1002841547

**Michelle Arvanitas - PDX**

| | |
|---|---|
| From: | Daniel Patterson - PDX |
| Sent: | Thursday, February 14, 2002 3:04 PM |
| To: | Michelle Arvanitas - PDX |
| Subject: | RE: Andriano |

Thank you- Michelle- Dan P.

-----Original Message-----
From: Michelle Arvanitas - PDX
Sent: Wednesday, February 13, 2002 3:04 PM
To: Daniel Patterson - PDX
Subject: Andriano

Hey Dan P.

I spoke with Dave Delozier this morning. He heard through Donna's sister in Texas (Nadine Bednorz) that Wendi called someone right after the accident by the name of Easy (probably a nickname). Supposedly she called this person prior to calling her father, Police or cousin. Dave heard that Mathew Ocker is on the state's witness list. Do you have an updated list that might verify this story? Easy worked at SESCO gas. That is the same place that Mathew Ocker worked at the time. Sherry Ocker mentioned to Nadine Bednorz that Mathew Bednorz was subpoenaed. (Hope you are following this explanation). Nadine has not mentioned this to Donna.

I also spoke with Kandy Rohde-Wendi's counselor.
Wendi was diagnosed with Three things according to Kandy.

1) Depersonalization Disorder (300.6) is persistent or recurrent episodes of depersonalization characterized by a feeling of detachment or estrangement from one's self.
She does not let the "bad stuff in". She ignores any bad feeling.

2) Disassociative Amnesia. (300.12) is an inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by normal forgetfulness.

3) Physical, Sexual or Neglect of a child. V61.21

Kandy mentioned that Wendi avoided conflict or confrontation by doing everything Joe said.
Wendi's biological grandfather may have molested her as a child. Supposedly, her biol. father is in prison for molestation.
After Joe took the pill (poison) and didn't die he begin to panic. She wanted to take him to the hospital and put her purse in her car. He kept changing his mind-wanting to go to the hospital, then not wanting to go. He wanted her to call 911. He was really upset, she was trying to calm him down. He pushed her on the infidelity issue, wanted to know before he died. She felt he deserved to know. She finally admits and is surprised at how enraged he became. This is what escalated the fight . She recalls what made him angry and that Chris came and waited outside. Her standing in the kitchen and him coming after her with the phone cord. She remembers shiny knife on counter. She wakes up-so much blood. Rinses off glasses in order to see. Surprised to see scene-confused. appears to have materialized out of nowhere. Remembers calling parents. She recalls sitting outside waiting-snapshots. Recalls jail. Kandy mentions that she appears calm for being in jail the first time. Remembers thinking what can I do to fix this-she fixed everything for everybody. Heard 1st degree murder still thinking how she can fix-not in tune with severity of what happened. This is Kandy's chat in a nutshell. Looking forward to our meeting with Shawn and atty.

EXHIBIT D      019106

Exhibit No.:   **6.004**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:

 *Defendant*
*2/7/14*

**Clerk of Superior Court**

By:            L. MOONEY
            (Deputy Clerk)

1002841548

Exhibit No.:  **6.005**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:  *Stipulation*
*2/3/2014*

## Clerk of Superior Court

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841549



MICHAEL B. BAYLESS & ASSOCIATES
3620 NORTH THIRD STREET
PHOENIX, ARIZONA 85012
PHONE: 602-230-7373
FAX: 602-230-5105

MICHAEL B. BAYLESS, PH.D.
LETICIA AMICK, PH.D.
CRISTY LOPEZ, PH.D.

August 4, 2004

## PSYCHOLOGICAL REPORT
## RE: WENDY ANDRIANO

**Reason for Referral:**
Wendy Andriano entered a plea of not guilty to first-degree murder. She is currently charged with the murder of her husband, Joe Andriano. According to the police reports Joe Andriano's death occurred on or about October 8, 2000. The purpose of this evaluation is to exam Wendy Andriano's intellect, personality, and overall emotional stability.

**Observations:**
Wendy Andriano is a relatively short, thinly-built 33-year-old female of Caucasian descent. At the time of the interview, Ms. Andriano was wearing jail attire and her hygiene appeared to be good. She was in relatively good mood and was very open and cooperative with this examiner. Her affect was normal to content. She did not exhibit any abnormal motor activity or mannerisms. She denied having any tattoos or identifying physical marks. She was alert, exhibited good eye contact, and maintained satisfactory attention span. Her thoughts and communications were coherent and seemed to follow logical sequence. There were no obvious deficits in her short or long-term memory.

**Consent to Evaluation:**
Wendy Andriano signed Bayless and Associates 's Forensic Consent Form indicating she read and understood the purpose of the evaluation and limits of confidentiality. She was aware that information from this evaluation would be reported to the court and may be disseminated to interested parties. Ms. Andriano consented to the evaluation and voluntarily answered all questions.

**Documents Reviewed:**
1. Photographs of the crime scene
2. Phoenix Police Department departmental Reports
3. Autopsy Report
4. Sharon B. Murphy, Ph.D. Report and Domestic Violence Data



EXHIBIT
E

Andriano
Page 2

**Procedures:**
1. The Shipley Institute of Living Scale.
2. The Williamson Sentence Completion Test.
3. The Minnesota Multiphasic Personality Inventory – II.
4. Clinical interview.

**Background:**
Wendy Andriano was born Groom, Texas and is an only child. Wendy did not know her biological father. Her mother remarried when she was approximately four years of age to Alejo Ochoa. Her stepfather raised her as his own daughter and was basically the only father she has ever known. Her father worked as an assistant pastor and managed a tortilla factory and restaurant. Her mother is a human resource person and both of her parents are described as being workaholics. However, she also states that they were very caring, outgoing, and very loving. Her father was the main disciplinarian in the family. She reports that she has always had a very loving and open relationship with her parents. She was raised as a Christian and states as a young girl she participated in a lot of church activities. When asked whether or not she had ever been physically or sexually abused, she reported that she was sexually abused by her biological father and her grandfather. She believes that she was less than two years of age and can barely remember what happened. She states that she remembers parts but not all of the things that happened. Noteworthy, her biological father is in prison for child molestation. Wendy has a vague memory of the molestation and states she can only remember it when she is dreaming.

Although she states that she was happy as a young girl, she did have a number of anxiety-related problems. During her childhood she was a sleepwalker, experienced night terrors, bed wet, and suffered from separation anxiety from her mother. Noteworthy, she continues to have night terrors to this day.

As a teenager, Wendy enjoyed music, playing the piano, and swimming. She went to a very small high school, such that there were only 15 kids in her high school class. She got along quite well with her peer group. The most significant event that happened to her during her teenage years was her participation in the church social group. She did not date during her high school years.

**Education:**
Wendy graduated from high school with honors and reports that she has always been a very good student and really enjoyed her education. She went to a small Christian school and reports that everyone was best friends. She has also completed approximately three years of college.

**Employment:**
Wendy's last job was working as a property manager for the San Riva apartments. She worked there from September 1999 through October 8, 2000. She earned approximately $32,000 a year. Before she was arrested, her goals were to work in real estate but now she simply wants to have her children back and go back to having a normal life. Noteworthy, after Wendy was arrested for the murder of her husband it was learned that there were some financial irregularities at the apartment complex. It was found that in apartment #229, a man had been allowed to live rent free without documentation in that apartment. There was also a full audit being done due to irregularities which had come to light. On a previous job, Wendy stole approximately $18,000 from her employer. She reported that she stole the money because her husband had created so much debt that she had to do something. She felt overwhelmed by the debt and felt responsible for the family's happiness. Consequently, she was forced to steal $18,000.

Andriano
Page 3

**Relationships:**
Wendy has been married once and has two children. She was married from 1994 to 2000. Wendy's deceased husband had cancer and the last year of her marriage was very hard. She admitted to having an extra-marital affair during her last year of marriage, When asked about her affair, she reported that she had an affair with Rick Freeman. She met Rick at the apartment complex and they became friends. He was aware that her husband had cancer and he had told her that his fiancé had recently died. On one evening she went to Rockin' Rodeo, which is a local bar, with Rick and as they were coming home he kissed her. She stated that after they had kissed their relationship deepened and it became sexual. Noteworthy, Wendy reported to this examiner that she did not enjoy having sex and actually sex was quite painful for her. When asked about this, she stated "you can't just kiss on someone and not have sex with them, that's teasing". He was comforting me and as a trade I had sex with him". She reports she had sex with Rick Freeman five or six times. She claims he was quite gentle and although it wasn't painful for her, it was very uncomfortable. She stated "I don't know why my brain just clicks off. A lot of it is I was scared and thinking what do I do, how do I act. Joe was dying; life was going to be different".

**Psychological History:**
Wendy reports that she was treated by Candy Rhode in May once a week for three years. She denies receiving any other inpatient or outpatient treatment. This examiner did not receive copies of those records to review. Currently, while incarcerated, Wendy is taking Ativan, Zoloft and Seroquel. When asked if she had anyone in her family who had a history of mental illness or substance abuse, she reported her grandfather was an alcoholic and her aunt had a drug problem. She denies having a bad temper and states when she gets angry she would typically cry. She stated "I always see the best in people. Anger is a sin. I practice forgiveness and love".

Wendy denies having a frequent headaches, backaches, stomachaches, dizziness, heart palpitations, and fatigue. When she is under a great deal of stress she sometimes has difficulty sleeping and she used to have frequent nightmares. She reports her appetite is normal and she has not experienced any weight loss or weight gain.

Wendy denies experiencing hallucinations and/or delusions. She admitted that at times she does become depressed and has had suicidal ideations and one suicidal attempt. After being served papers about severing her parental rights she intentionally cut her arm. Further, she reported that she has a lot of fear and basic dislike of sexual intercourse due to it causing her pain.

Wendy is in relatively good physical condition and has not had any major operations or serious illnesses. She denies any neurological injuries.

**Alcohol/Drug Use:**
Wendy reported that she began drinking alcohol when she was 21 years of age. She typically drinks wine coolers and rarely if ever becomes intoxicated. She reports that she has been intoxicated maybe three or four times in her entire life. She denies using any illicit drugs. She does not drink coffee nor does she smoke cigarettes.

**Arrest Record:**
Wendy does not have a juvenile arrest record. She reports that this is the first time she has ever been arrested or charged with a crime. As noted earlier, Wendy is currently charged with first-degree murder. When asked how she is handling incarceration, she reported "I have adjusted. Either you sink or swim".

Andriano
Page 4

**Defendant Statements:**

In 1994 Wendy married Joe Andriano. They were married in Casa Grande, Arizona. Initially, there was some conflict over their church and beliefs but that quickly resolved and their marriage was basically okay. After the marriage, Wendy reported that she and her husband Joe both felt as if they had changed and they did not have to any longer "put on any airs". Through their marriage they learned who they both were and everything was fine. Wendy initially hung out with Joe and his friends and eventually lost touch with her own friends. Joe was working as a welder but quit that and went into his own business, auto glass replacement. They got a loan and started Joe's Windshield Repair. In the process of obtaining a new business, Wendy and Joe moved to her parent's farm and basically renovated the old shack and lived there until March of 1998. She reported she had her first child in the old farmhouse. Approximately seven months into the marriage it was discovered that Joe had a tumor, which supposedly the doctor removed successfully. However, in 1996 it came back, which started to wreck havoc in their lives. They both were upset and under a lot of stress. Joe was not a very good businessman and spent most of his money on pleasurable activities. As a result, Wendy felt as though she had to put money back into the business from her job and eventually became overwhelmed by debt. She stated, "I felt responsible for my family's happiness". As a result, Wendy over a period of four year's, stole approximately $18,000 from her employer. She was fired from her job.

When Wendy first met Joe, he was dating this very wealthy girl and would say to her quite often that if he had stayed with his rich girlfriend his life would not be as miserable as it is today. Wendy reported this really hurt and here she was working full-time, stealing money from her company, attempting to go to school, making dinner, cooking, doing the clothes, and everything else around the house but that was not good enough. She stated, "What could I do, how could I make him happy".

At this point during the marriage, she was only around members of Joe's family. She felt isolated, alone and decided to go back to church. She tried to teach Joe how to love and forgive but was not very successful. Wendy was pregnant with her first child and Joe was not working. At this point, she was taking care of the baby, working and her parents were also helping do almost everything. Then she found out that she was pregnant again and that was just totally overwhelming. In October 1997 she decided that she was going to leave Joe because she did not want her son to grow up like this. She went to Jerry, the man who had loaned them the money for the business, and he gave her $2,000 and told her that if she wanted to leave, for her to leave. Noteworthy, Wendy did not leave Joe and instead reported that she actually gave the $2,000 to Joe. She reported that she wrote Joe a letter telling him that she was going to leave and later that evening he came in, in the middle of the night, and had apparently found the letter. He was angry and was screaming at her "what does this mean". She stated by the time it was all done he was begging her to stay and for some reason he was able to talk her into not leaving. Joe had a way with words and also she was very much afraid of his temper. She stated she remembers the first time she asked Joe about living on the farm, just that she thought they were living there so that they could save money to buy a house. She stated Joe became extremely angry, grabbed her and shook her, which made her very much afraid. Previously Joe told her about catching his ex-girlfriend sleeping with another man and he became so upset that he had to move to California to keep him from hurting the guy with whom his girlfriend was having an affair. She believes one of the reasons Joe told this story was so that she would be afraid of him.

Wendy reported that she really was not angry with Joe and actually always felt bad for him. Joe, in her mind, was angry at the world because of his cancer. Wendy stated, "It was the worse thing you could go through. You expect it when you are old, not when you are young". Wendy also reported that Joe would feel very bad when he had his episodes of anger. The cancer was overwhelming and basically consumed him. She told this examiner it was Joe who asked her to order the poisons because he wanted to take it and end it all.

Andriano
Page 5

Police Interviews:

In witness interviews conducted by the Phoenix Police Department, Chris Hashisaki reported that Wendy had asked both Eric Vallente and James Yost to pose as Joe so she could a life insurance policy on Joe. She believed that they both were offered $50,000 to do this. Chris is also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

Shannon Sweeney was also interviewed by the police and is one of Wendy's friends. Shannon and Wendy would often go to bars and hang out. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he had not become ill. Shannon believed that Joe was very possessive of Wendy. On one night, Shannon reported they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot.

Shannon was also aware that Wendy had an affair with Rick Freeman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end and became very persistent. Rick described this to Shannon as Wendy refusing to leave him alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer she threatened to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this. Later, Wendy also had a one night affair with a young man by the name of Travis whom she met at Rockin' Rodeo Bar.

Noteworthy, Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incident in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently, Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose at Joe. As to the poison ordered over the Internet, Wendy used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to. The poison Wendy ordered has the effect of mimicking a heart attack in its victim. Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

Ray Ortega, who was part of the management team that managed San Riva Apartments, found out that a man was living apartment 229 rent-free. Additionally, on October 10, 2000 Ray found in Wendy's office while he was cleaning the office, an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janice Lord and advised her of what William found. Ray, along with Janice, confronted Wendy about this. Wendy did not deny looking up this information but stated that she was helping a friend with a college report.

Eric Vaillent is a friend of Rick Freeman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also

Andriano
Page 6

observed Wendy at nightclubs drinking excessively and would flirt and kiss on guys she knew at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any of the domestic violence or any situation in which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can buy poisons. Wendy told this examiner that it was Joe's idea to buy poison.

Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20,000,000. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated he got upset with Wendy and called her a money hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed Wendy did not really care for Joe any longer and she told him that she no longer had sex with Joe. This is quite interesting considering the fact that Wendy told this examiner that Joe demanded sex with her on a daily basis.

Rick Freeman admitted that he used to date Wendy and when he found out she was married he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Ted Bennett, who is a neighbor at the San Riva Apartments, reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him how much money they expected to be awarded. Ted reported that Joe did not appear to have given up or want to die and in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments Ted had never been aware of any rodent problems that would require poison.

Debra Lewis was employed as a housekeeper for the San Riva Apartment complex. She is aware that Wendy and Joe were having some problems and was aware that Joe was questioning Wendy about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe's continued checking up on her and Wendy also complained to Debra in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Debra was unaware of any alligations of domestic violence between Wendy and Joe. She describes Joe as being a real pussy cat. Debra often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Debra stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore. She described Wendy as acting as if she was not married.

Travis Black is a young man that Wendy met at a night club called the Rockin' Rodeo. She met Travis on September 27, 2000 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations Wendy told Travis that her husband had died of cancer.

On August 28, 2000 Wendy contacted Amica Life Insurance Company in reference to purchasing a life insurance policy on her husband Joe. Wendy talked to Carolyn Statalano and told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes she stated this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Also, on the application for a life insurance policy, the policy asks if Joe had cancer to which Wendy entered "no" on the application.

Andriano
Page 7

Based on the above-mentioned interviews, it appears clear that Wendy in more than one situation had a tendency to be less than truthful. She has the ability to be manipulative and attempted to encourage others to get involved in fraudulent schemes to collect money from an insurance company. Additionally, for a woman who did not enjoy sex, she clearly was sexually aggressive with one of her male boyfriends and on one occasion met a man at a bar one night and took him home and had sex with him. She seemed to become somewhat obsessed with Rick and seemed to have extreme difficulty accepting the fact that he no longer wanted to date her. Additionally, Wendy told this examiner that Joe asked her to buy the poison. Yet in her overall quest to buy the poison, she attempted to hide her identity, have the poison mailed to a business address, and seemed to want to hide her connection to the poison.

**Intellectual Functioning:**
Wendy Andriano's performance on the Shipley Institute of Living Scale yielded a total IQ score of 110 which places her in the above-average range of intellectual functioning. Ms. Andriano was oriented to reality and had a capacity to appreciate the difference between right and wrong. At the time of the testing her memory, judgment, and decision making ability were intact. Although she was mildly anxious during the testing her test scores appear to be an accurate representation of her abilities. She did not report nor did the test data indicate the presence of neurological impairment.

Wendy Andriano's performance on the Minnesota Multiphasic Personality Inventory yielded a valid and interpretable profile. Her scores on the Validity Scales indicate that she tends to be defensive, lack insight, and be slightly more conforming and moralistic than usual. Typically, these individuals have a tendency to repress or deny problems and unfavorable traits. She is prone to minimize and disregard problems with herself. Self-insight and self-understanding are usually lacking. She is very concerned about how she is perceived by others and typically views emotional problems as weaknesses.

Ms. Andriano's performance on the Clinical Scales reveals an individual who has a very mild level of emotional distress that is characterized by a general dissatisfaction with life rather than by any specific mood. She is so unaware of this dissatisfaction that she can say that she is happy most of the time and very seldom has "spells" of the "blues". Yet she frequently worries about something. She will use indirect means of expressing her anger.

Ms. Andriano sees herself as quite capable and able to make decisions easily. Her memory and concentration skills are good. She does not analyze her or others feelings and behavior. She daydreams very little. She believes that it is safe to trust others and that they are willing to help. She is very direct and comfortable in stating her opinions to others.

Although she is concerned about her health, she does not report any specific symptoms other than dizzy spells. Individuals with similar scores report that they do not wake up fresh and rested most mornings. They typically have behavioral problems in school and are likely to have been in trouble with the law. Although she may abuse substances, she is unlikely to have suicidal ideation. Typically individuals with similar profiles have a very poor prognosis. This is due to their problems being more characterological and not readily amenable to change. She is experiencing minimal emotional distress and has little concern about her behavior, limiting her motivation for treatment.

Noteworthy, clients with this profile tend to be defensive, and unwilling to acknowledge psychological problems even when they are readily apparent to others. They report little psychological emotional distress and describe themselves as less depressed and anxious than do most psychiatric patients. Behavioral problems are more likely to occur in this code type than in any other code type that includes Scale 3. Further, clients of this profile are characterized by poorly controlled anger and hostility that it is expressed in cyclic fashion. Often these clients are eventually incarcerated for their violent acts.

Andriano
Page 8

Typically, these clients are quiet, withdrawn individuals, and their sudden outbursts come as a surprise to others. They display poor judgment under stress, but their emotional or violent outbursts may be only minimally related to external stress or provocation. The cyclic pattern of violent outbursts with intermittent periods of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change.

Ms. Andriano's performance on the Williamson Sentence Completion Test substantiates the findings noted above. Again we see an individual who has very little anxiety and who tends to be very superficial in her overall responses. This examiner finds this to be somewhat surprising considering what Ms. Andriano is being charged with and the fact that she is in jail. She tends to have very strict rules in which she expects herself and others to live up to. Further, she has a strong need to be needed and desperately wants to be seen in the eyes of others as being worthy. She has a rather naïve viewpoint of life such as she wants/desires a perfect existence. When she cannot get all her needs met she tends to feel guilty and has a tendency to externalize blame onto others for her own shortcomings. Her primary defense mechanism is denial.

Summary:
Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a fictitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

Andriano
Page 9

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The examiner notes that this is understandable considering Ms. Andriano's behavior and general response toward her husband. During this time period in which Ms. Andriano's husband was very suspicious of her behavior, she was, in fact, having an affair. As a matter of fact, she admits to having actually two affairs. This examiner finds this is quite interesting in light of the fact that Ms. Andriano reports that she did not enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on the night of the offense she and her husband were engaged in a physical fight. She alleged that he had attempted to choke her with a telephone cord and had earlier pushed her into the dresser and onto her bed. He also pushed her into their wedding display case, shattering it, grabbed her in a bear hug and they both were wrestling around in the house. As her husband began to reach for a belt to hit her, she was able to wiggle away from him, grab the barstool and hit him on the back of his head. Apparently Joe was knocked unconscious and was severely injured. She gave him a pillow and blanket. She called Chris and told her Joe was having a heart attack. While she was waiting for Chris to come, she covered the blood on the carpet with a towel. Chris came over and told Wendy to call 911. Wendy told the 911 operator Joe was having a heart attack. The Fire Department came and Wendy sent them away. She also told Chris to go home. When she returned to the apartment and Joe was standing up. At this time he wrapped the charging cord from his cell phone around her neck and as they struggled and moved toward the kitchen she grabbed a knife and cut the cord from around her neck. She reported that the next thing she remembers was struggling with her husband in the living room. She still had the knife in her hand and the next thing she knew she had blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim the she was a victim of domestic violence.

Diagnosis:
Axis I:      Depressive disorder NOS.
Axis II:     Personality disorder NOS with antisocial and borderline traits.
Axis III:    None.
Axis IV:     Marital conflict, financial problems.
Axis V:      GAF = 65.

Michael B. Bayless, Ph.D.
Clinical and Forensic Psychologist

## NOTES
### RE: WENDY ANDRIANO

Note 1: In the interview with Leslie Herb Duncan, AKA Herb, Chris reported that Wendy had asked both Eric Vallante and James Yost to pose as Joe so she get a life insurance policy on Joe. She believed that they both would offered $50,000 to do this. Chris was also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

Note 2: Interview with Shannon Sweeney. Shannon Sweeney was a friend of Wendy's and would often go to bars and hang out with Wendy. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he not become ill. Shannon believed that Joe was very possessive of Wendy. On one incident, Shannon reported that they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot. Shannon was also worried that Wendy had an affair with Rick Friedman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end it and became very persistent. Rick described this to Shannon as Wendy refusing to leave him alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer, she would threaten to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this.

Later Wendy also began dating a day by the name of Travis whom she met at a rock rodeo bar. Noteworthy is that Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incidents in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose as Joe. As to the poison ordered over the Internet, Wendy had used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to.

Note 3: Interview with Ray Ortega. Ray Ortega is part of the management team that managed San Riva Apartments which Wendy Andriano was a manager. It was found out that in Apartment #229 a man had been allowed to live rent-free without documentation in that apartment. Noteworthy, there was a full audit being done due to irregularities which had come to light after Wendy's arrest.

Note 4: Interview: Eric Vaillent. Eric was a friend of Rick Friedman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also observed Wendy at nightclubs in which she would often drink excessively and would flirt and kiss on guys she met at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any domestic violence or any situation which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can

Notes
Wendy Andriano
Page 2

buy poisons. Wendy told this examiner that it was Joe's idea to buy poison. Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20 million dollars. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated that he got upset with Wendy and called her a money-hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed that Wendy did not really care for Joe any longer and she had told him that she no longer had sex with Joe. This was quite interesting in the fact that Wendy told this examiner that Joe demanded sex from her on a daily basis.

Note 5: Interview: Rick Friedman. Rick admitted that he used to date Wendy and when he found out she was married, he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Note 6: Witness: Ted Bennett. Ted reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him about how much money they expected to be awarded. Ted reported that Joe did not appear to have given up and wanted to die and, in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments, Ted had never been aware of any rodent problems that would require poison.

Note 7: Interview: Deborah Lewis. Deborah Lewis was employed as a housekeeper for the San Riva Apartment complex. She was aware that Wendy and Joe were having some problems in the fact that Joe was questioning her about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe continually checking up on her and Wendy also complained to Deborah in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Deborah was unaware of any allegations of domestic violence between Wendy and Joe. She described Joe as being a real pussycat. Deborah often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Deborah stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore and that he was not here anymore. She described Wendy as acting as if she was not married.

Note 8: Witness: Travis Black. Travis is a young man that Wendy met at a nightclub called the Rocking Rodeo. She met Travis on 09/27/00 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then they went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations, Wendy told Travis that her husband had died of cancer.

Note 9: Witness: Ray Ortega. Ray on 10/10/00 found in Wendy's office while he was cleaning the office an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janis Lord and advised her of what William found. Ray along with Janis confronted Wendy about this. Wendy did not deny looking up this information but stated she was helping a friend with a college report. Noteworthy, Ray is unaware of the apartment complex having a rodent problem.

Notes
Wendy Andriano
Page 3

Note 10:  Witness:  Carolyn Catalano at Amica Life Insurance Company.  Apparently Wendy contacted Amica Life Insurance Company on 08/28/00 in reference to purchasing a life insurance policy on her husband Joe.  On 09/22/00 Carolyn called Wendy on the phone.  Wendy told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix.  In Carolyn's notes, she stated that this was a strange conversation.  Noteworthy, no actual policy was ever taken out by Wendy. Noteworthy, on the application for life insurance policy, the policy asked if Joseph had cancer to which Wendy entered no on the application.  Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

_____
Michael Brad Bayless, Ph.D.
Forensic and Clinical Psychologist

## INTERVIEW FORMAT

NAME & DOE: *Wendi Andriano*

REFERRAL INFORMATION: *1st degree Murder*

*Had not Guilty / —*

*Date of Death / 10-8-00 Called 911 – Reported*

*Husband Dead – Intellect, Personally, Emotional stab.*

## BEHAVIORAL OBSERVATIONS

AGE: *33*　　　　　　　　　RACE: *Cauc.*

DOB: *8/26/70*　　　　　　 HYGIENE/ATTIRE: *OK / nothing else*

HEIGHT: *5' 4"*　　　　　　 MOOD: *OK, Emot.*

WEIGHT: *110*　　　　　　　AFFECT: *NO.*

PHYSICAL IDIOSYNCRASIES: *No*

EXAM ATTITUDE....cooperative, pleasant, did not mind personal inquiry, inquisitive, overly anxious, complaining, indifferent, resistant, defensive, too revealing

TEST-TAKING ATTITUDE....needed reassurance, easily frustrated, impulsive, grew tired, worked slowly, gave good effort, perfectionistic, organized, persistent, inconsistent

SENSORIUM....alert, hypervigilant, confused, sleepy, stuporous

EYE CONTACT....good, avoided, appeared distracted

ATTENTION SPAN....poor, satisfactory, distractible

MOTOR LEVEL....normal, hyperactive, hypoactive, psychomotor retardation

POSTURE....normal, relaxed, slumped, rigid, leaning to side

MANNERISMS....none, tics, EPS, tardive dyskinesia, fidgety, rocking, leg shaking

SPEECH....normal, rapid/slow, loud/soft, excessive detail/impoverished, stuttered, mumbled, slurred, pressured, lisp

LANGUAGE ABILITIES....monolingual/bilingual...speaking/reading/writing fluency

THINKING....incoherent, loose, circumstantial, tangential, concrete, logical, linear

MEMORY....grossly intact, confused, superficial/poor historian, contradictions, perseverated

PERSONALITY TRAITS....shy, gregarious, sense of humor, frank, bizarre, suspicious, hostile, manipulative, help-seeking, complaining, immature, narcissistic, argumentative

THOUGHT CONTENT: _____

JUDGMENT/INSIGHT: _____

SUICIDAL/HOMICIDAL IDEATION: _____

**BACKGROUND**

PLACE OF BIRTH & RELOCATIONS: *Grove, Texas*

BIRTH ORDER/# OF SIBLINGS: *Only Child -*

BIRTH/DEVELOPMENTAL PROBLEMS: *StepDad.*

*3rd DAD.*

PARENTS' NAMES & AGES: *Alejo, Donna Ochoa*

DIVORCE/DEATH (TIME/CAUSE): *Raised her Since Age 4*

REMARRIAGES:

PARENTS' OCCUPATIONS: *Artist Instr @ Mamas a Teller*

*Jockey @ Walmart - Mom - Human Resource Person*

PARENTS' PERSONALITIES: *Both Stable, Very Cozy yet*

*Quiet - Loving - Mom - Same - Retd. Hard -*

HOME ATMOSPHERE/DISCIPLINE: *Very Detailed - Perfectionist*

*DAD - Spank Grounded -*

RELATIONSHIP WITH PARENTS: *Good - Stresses -*

RELATIONSHIP WITH SIBLINGS/FRIENDS: *N/A*

RELIGION (CHILD/CURRENT): *Christian*

SIGNIFICANT CHILDHOOD EVENTS (ABUSE): *Yes - Dad Father*

*9 Grand father - I I under - More But Not Mie -*

EARLY CHILDHOOD.. (happy) poor health, nail biting, stuttering, thumb sucking, sleepwalking, (night terrors) bed wetting, (separation anxiety) fears, rituals, hyperactivity

*Age 9.   Still   9-10yrs   now   EAZIER.* (Music), Piano, Swim Team -

TEEN HOBBIES/INTERESTS:

PEER GROUP (GANGS): *Very Small - 15 Kids in H.S. Class.*

SIGNIFICANT TEEN EVENTS: *- Church Social Group -*

**EDUCATION**

HIGHEST GRADE COMPLETED: *15 yrs -*   GED?:

SPECIAL ED/HELD BACK:

GENERAL ATTITUDE/GRADES: *H.S. A Honors -*

BEHAVIOR PROBLEMS: *No -*   / Popular -

PEER RELATIONS (TEASING↔): *No* /

COLLEGE/TRADE SCHOOL:

*Christian School - Very Small*

*- 80 Class Best Friends -*