# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| IIIIIIIIIIIII | Evidentiary Hearing Exhibits |
| 54 PART 2 | Motion for Order to Assist Mitigation Investigation and Proposed Order, dated 11-19-04 |
| 56 | Email from Donna Ochoa to Delozier, dated 2-12-01 |
| 57 | Email from Donna Ochoa to Arvanitas, dated 2-26-03 |
| 61 | Letter from Delozier to Alejo and Donna Ochoa, dated 12-14-00 |
| 63 | Email from Michelle Arvanitas to Delozier, dated 8-5-02 |
| 64 | Email from Patricia Rubio to Patterson, dated 10-16-00 |
| 65 | Report of Autopsy of Joseph D. Andriano, dated 10-11-00 |
| 65.001 | Phoenix Fire Department Incident History Report, dated 10-16-00 |
| 68 | Andriano-Poverty/Income Chart with Wendi's Age |
| 68.001 | Itemized Statement of Earnings |
| 68.002 | Itemized Statement of Earning |
| 73 | Photographs |
| 74 | Photographs |
| 76 PART 1 | American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Revised Edition February 2003 |

# EXHIBIT IIIIIIIIIII
# PART 9

123 S.Ct. 2527, 2537 (2003) (The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are "well-defined norms."). *See also* Ariz.R.Crim.P. 6.8(b)(1)(iii).

Defense counsel must conduct "thorough and independent" investigations relating to issues of both guilt and penalty. ABA GUIDELINE 10.7. Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. *Commentary to* ABA GUIDELINE 10.7. Mitigation investigations must include "efforts to discover *all reasonably available* mitigating evidence and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." Commentary to ABA GUIDELINE 10.11. Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

4

011813

PCR000300

Copy of the foregoing mailed/
delivered this ___ day of November, 2004, to:

THE HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
Maricopa County Attorney's Office
301 W. Jefferson, 8th Floor
Phoenix, AZ  85003

G. DAVID DELOZIER
Attorney At Law
4016 East Forest Pleasant Place
Cave Creek, AZ  85331

By: _____
     DANIEL B. PATTERSON
     Deputy Public Defender

6

011815

PCR000302

FROM : G. David DeLozier,P.C.        PHONE NO. : 502 867 5894          Feb. 12 2001 08:19AM P1

Page 1 of 1

*Andriano*

| | |
|---|---|
| Subj: | early years |
| Date: | 2/12/01 7:32:05 AM US Mountain Standard Time |
| From: | grandmaochoa@hotmail.com (Donna Ochoa) |
| To: | GDDeLozier@aol.com |
| File: | earlyyea.zip (11507 bytes) DL Time (28800 bps): < 1 minute |

I've done a short early history on Wendi. If more is needed, please ask
Kandy what sort of details she'd like. I have pictures, too.

I added a little to Joe/Wendi's history re: trip to Vegas this past May.
After he grabbed Wendi, Joe grabbed the luggage and started just throwing it
in the back of the Yukon. Didn't care where or how hard, he was angry.

I've attached other concerns re police. Will be done with rest of interviews
in couple days. We do not have Wendi's interviews on paper, do you? I'm
trying real hard not to be anal and realize these are summaries and not
transcribed notes.

We received your faxes.

Praise God and have a blessed day! We pray for all of you daily.

Alejo & Donna

Get your FREE download of MSN Explorer at http://explorer.msn.com

------------------ Headers ------------------
Return-Path: <grandmaochoa@hotmail.com>
Received: from rly-xb05.mx.aol.com (rly-xb05.mail.aol.com [172.20.105.106]) by air-xb04.mail.aol.com
(v77_r1.21) with ESMTP; Mon, 12 Feb 2001 09:32:05 -0500
Received: from hotmail.com (f289.law11.hotmail.com [64.4.16.164]) by rly-xb05.mx.aol.com (v77_r1.21) with
ESMTP; Mon, 12 Feb 2001 09:29:25 -0500
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
   Mon, 12 Feb 2001 06:29:25 -0800
Received: from 208.165.25.80 by lw11fd.law11.hotmail.msn.com with HTTP;   Mon, 12 Feb 2001 14:29:25
GMT
X-Originating-IP: [208.165.25.80]
From: "Donna Ochoa" <grandmaochoa@hotmail.com>
To: GDDeLozier@aol.com
Subject: early years
Date: Mon, 12 Feb 2001 07:29:25 -0700
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="----=_NextPart_000_6caf_46fc_52f1"
Message-ID: <F289yi67EKRuYDlrjbu00009a87@hotmail.com>
X-OriginalArrivalTime: 12 Feb 2001 14:29:25.0335 (UTC) FILETIME=[32EDAE70:01C09500]

Monday, February 12, 2001      America Online: GDDeLozier

008349

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 12 2001 08:19AM P2

ANDRIANO

**Wendi's early years:**

I (Donna) was married at 18 years of age, I had lived in Tucson, AZ from age 8. My dad was in the Navy, he worked as a recruiter then retired and became a restaurant owner. I was in the Flowing Wells district all my school years. My father was an alcoholic and my mom was really a good person (though I preferred my dad at the time). They fought all the time. I went with a boy through high school, then broke up when I when he went to college (1 year ahead of me). married Skip (Shelby Robertson), in Feb. 1968. N He had returned from Viet Nam on Dec. 24, 1967. He was my best friend's step uncle. Her father had died in a mining accident when we were 9 and her mother remarried Buck Robertson, Skip's older brother when we were in Jr. Hi I never dated him in school or even thought much of him (he was the kind that was always getting into trouble, skipped school, had sleeves rolled up with cigs in them). The fall of 1967, I was in college. Right before Christmas break I broke up with my boyfriend at school. Christmas eve when Skip returned to Tucson, I was drunk and when he made a pass at me, I caught it. We dated the whole time he was home on leave. Seemed to have changed. By February that year we were married and I moved to San Clemente, CA to be with him.

We had okay marriage until he got out of service (spring of 1969) and we came back to Arizona. His brothers all drove trucks and he had promised he wouldn't. He went to trade school, but didn't finish and then started driving long distance trucks, too. Things got worse, but we had promised each other we wouldn't ever get a divorce because everyone (the families) thought we couldn't make it together. Being stubborn, we were going to show them. The fall of 1969, I got fed up with the drinking and never having any money. He would never have any left after a haul, it all went to expenses. Being young and naïve I believed it. I took off and went to Tucson and stayed with a girlfriend. Skip came looking for me and said if I wanted, we could live in Tucson and he'd try to find another job. We moved, I worked at a Title company and proceeded to get pregnant. I was so tired of his father, the father was really old (60's) and the brothers all mooched of his other. (Six brothers, two sisters) (family was from Austin, Texas - all drunks and partying cowboys) Wendi was due in August 1970. In June 1970, Skip came home and said he had a job in Groom, Texas and that we were moving. I quit my job, packed and we took off. Six months pregnant in a small mustang was a trip. Got there and he had a job at a small truck stop (really a gas station) in Groom (pop. 600, maybe) on Route 66, about 40 miles east of Amarillo. I was miserable and would sit in the car for hours playing the 8 track by Charley Pride about "going back to Phoenix, Arizona." That is where Wendi was born on Redacted          I started having contraction in July, my mother came out the end of July to help. My husband was running around with some older lady and I had no clue, I just knew he didn't come home much, even before mom came out. We lived in a big farm house and my mom was staying in the attic which had a separate entrance (she was working in a restaurant there) Wendi was born on a Wednesday and we stayed in hospital till Saturday morning. She was the only baby in the hospital (in Groom, for surrounding communities) and was spoiled by the nurses. She was 7 pounds 11 ounces and 21 inches long. No hair and black eyes. She was beautiful. Was an easy delivery, the doctor almost didn't make it back to catch her.

On Labor Day, we had snow and Skip decided we needed to move back to Arizona (later found out that the girl he'd been messing around with was pregnant and he didn't want to be named the father). Mom, Skip and I moved into a house in Phoenix (mom usually paid the rent) and I started working at another Stewart Title. We moved houses a couple times and landed in one around 35th Ave. south of McDowell. Mom was working at Garcia's on 35th and had her own place. I was working at US Life Title at that time. Skip was still running around, driving trucks.

Wendi was a really good baby. She had colic in Texas and mom and I would take turns rocking her. I nursed her for 4 months then she went on the bottle. She was a chunk, she started baby cereal at 2 ½ months. The money that I made went to paying bills and food. I

008350

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 857 5894          Feb. 12 2001 08:20AM P3

never expected any from Skip. But by this time he would come home and tell me I was gaining weight, or that I wasn't raising Wendi right, etc. I was afraid of him when he drank because he would start swinging, especially if he was thinking about Nam. The first few years we were married I would have to wake him up by touching his feet, because he would come up swinging. He wanted to go to the cowboy bars whenever he was home (I didn't grow up on that, I had liked rock and roll) and I just wanted to please him. [Sounds like history repeated itself - I have just never really faced it before). I felt like I couldn't leave him because I wouldn't be able to make it on my own. He talked down to me so much that I had no self esteem. (didn't know that expression back then) I had always been an 'A' student in school, took college prep classes, had looked forward to doing great things. Had wanted to be a pharmacist and was sharp enough to have done it. Wendi was taken care of by my mom for a while. Wendi would go to a baby-sitter. Skip was the one that had Wendi potty trained by 11 months. He had babysat for his older brothers and sisters all his life, He was good with her those first two years, I think.

We moved to Tempe early 1972. I transferred to the Tempe office of USLife Title. I worked as an Escrow secretary then as the Assistant Escrow Officer. Down the street was a day care center where I took Wendi. She learned dance, French, etc. A Montessori school believe. Occasionally I would go on a weekend run to LA with Skip and his sister-in-laws would watch Wendi. She was a really loving child, loved to hug and cuddle.

During those first years, Wendi was around my mom and me mostly. Skip was not home very often. He drove what was called 'garbage' trucks. They hauled anything and everything. He and his brothers did lots of pills and booze.

In May 1971, Skip was arrested in Ohio for robbery. He had parked his rig, went to a bar. Got drunk and pilled up. He walked into a residence and stole money and was going through the house when the owner woke up chased him out with a baseball bat. Skip flagged down a car, which was a police officer and was busted. My mother paid his way out and the fees. ($5000) In 1972 he destroyed government property with his truck and mom paid that one too ($3000). My mom helped support us many times throughout our 8 years fiasco.

This part is hard. Sometime in 1972 rumors were flying through the family that the grandpa (Skip's dad) was touching the granddaughters inappropriately. (All different ages, from 1 to 14.) Of course, the brothers all said they were crazy, their dad wouldn't do that (macho rednecks from Texas) and the kids were lying. To this day I still do not know how much if true and how much wasn't. And I know that I didn't want to believe it as Wendi had been around the grandpa numerous times. And I have thought of it through the years, and have been scared about it. One of Skip's older brothers had been in prison twice and another one once.

One of the girls in my office was dating the director of Terros (drug program in Phoenix). She talked me into going to counseling there because of my marriage. It was definitely on the rocks. Skip hadn't changed and I was starting to get stronger. I started going over there and went through counseling (Gestalt, I'm OK, You're OK type stuff). Started volunteering at the Terros House. Emergency phone lines for druggies, clinic, ambulance service. I started taking classes at Phoenix College to become and psychologist to help other people. I also took EMT classes and received my EMT II certification. At the time you could not be rated any higher that that, only firefighters could go on to be a paramedic. I worked on the Terros ambulance whenever they needed me. Eventually I quit my job at USLife and went to work for CODAC (Community Organization for Drug and Alcohol Corporation) in the accounting department. I kept records and was learning to write grants. CODAC was the umbrella organization for lots of different substance abuse programs. Right next door to the CODAC office was part of Terros. At this location the handled addicts. It was a place for detox and also for handing out methadone. At times I would take Wendi there with me and the ones that had detoxed would talk to her, etc. Lots of the women had children of their own (usually hookers) and they loved seeing her. It was almost therapy for them. They wanted to be able to see their own children when they were straight like they were seeing Wendi. She was _never_ alone with any of them.

008351

PCR000307

She was such an outgoing child, I always watched over her very closely. She especially loved old people, we'd go to the parks and she'd head straight for them. She has continued that love for them through out her entire life. She's always been very patient with the elderly and the young children. Young children have always gravitated to her. She treats them like little people.

Towards the end of 1973 I began telling Skip I wanted out, I wanted a divorce. Her would cry and promise to do better, stop drinking, etc. Never happened and I was still a sucker Figured be hard to find another husband as I had a child. Sometimes our thought processes are so screwed. Finally, in March of 1974 I told him no more. I was leaving. He tried to talk me out of it but this time he knew I was serious and would do it. (strange, we were driving from Phoenix to Maricopa where I was taking him to meet his brother with a load of cattle) I still did have a hard time standing up for myself and he finally said, won't you think about getting back together in a year or two? Like a chicken I said okay. Prior to this I had started dating a real estate agent I had met at work several years before. We had dated a few times, and I realized I wasn't such a loser. That there were people out there that thought I was worth something. We had a good relationship. No abuse (Skip would get rough with me, he hit me once but not again. He would try to hurt me when we had sex. Or he would just cut me down verbally.)

After the divorce was final in May 1974, I continued working at CODAC. Wendi would go to a nursery downtown that was attended by other whit collar worker's children. It was a good school, I do not recall the name. That summer my mom and I moved in with each other so we both took care of Wendi. My mother loved Wendi like she was her own. I remember getting jealous a few times when Wendi would call her 'mom.' But mom was a good stable influence on Wendi. At Christmas that year, Wendi and I went with a young man I was seeing (he had just returned from Thailand being in the Peace Corp) to his family's home in Flagstaff. It was great. In January I went to work at Casa Grande for PADAC (Pinal Alcohol and Drug Abuse Corporation). I had met the director that fall at a Convention in Scottsdale and had been doing grant work for him on the side. When he got money available to hire me he did so and I moved to Casa Grande. I met my husband, Alejo prior to moving. Alejo was on the Board of Directors for PADAC and had met me and had to approve my hire.

The facility I worked at was downtown Casa Grande. Around the corner was a used furniture store run by one of the old-timers in town (Stoney-his last name). Very nice man, retired, etc. Wendi would be down there with me sometimes. She would sneak out the door and stand there asking people for money. She was so cute they gave it to her. A couple times she wandered over to Stoney's. He'd be sitting on his rocking chair and he'd keep an eye on her. If she looked like she was going to go anywhere else, he'd walk her back to the center. Normally she was at the day care, this would be on the weekends.

Alejo and I were married 6/6/75. We all moved out of our apartment when the lease ran out and moved into mom's house. We were having a house built and only stayed there a couple months. We had dogs, which Wendi always loved. She has felt she was missing something If she didn't have a dog. The one she grew up with (Toby), she would sit and hold him and tell him all her problems.

Wendi and Alejo loved each other from the start. When we were dating, he tell her something to do and she'd look at him with her hands on her hips and say, "You can't tell me what to do, you're not MY boss." He'd just laugh and say okay, but wouldn't you like to do this? She'd do it, feeling like she had won the contest.

From the time she was small I wanted her to be independent. Able to ask for things by herself. I didn't want her to be like me. Afraid to confront anyone. In some area she did turn out like that. She's bold enough to go after what she wanted in the area of school. In areas where she wasn't connected personally with someone. But she wouldn't stand up for her rights. She always tried to make other people happy.

008352

FROM : G. David DeLozier,P.C.       PHONE NO. : 602 867 5894       Feb. 12 2001 08:22AM P5

She went to kindergarten and first grade in Casa Grande. After that she was home schooled until December 1979. We were in the ministry beginning June 1977 and traveled with an evangelistic group. There were 4 married couples, she was the only child. Her use of the English language really grew at that time with being around adults. She sang with the group and did solos while she played the guitar. When we came back to Casa Grande in November 1979, it took her awhile to get used to kids around all the time.

Even when she was small, if someone wanted something of hers, she gave it to them. She did that all through her childhood. When she got her first credit card, she let her friends use it and didn't complain when they didn't pay it. If you needed her dress, it was yours. She gave total strangers money. She had been taught that "give and it shall be given to you." She was always a giver. She was and is a 'care-taker.' When my mother was in the nursing home in South Dakota in 1988 - 1991, Wendi would go back there and hang out at the home. The elderly loved her and she had no problem being around them. It takes a special person to do that. I personally couldn't.

Wendi was even tempered as a child, she loved animals and was always trying to bring puppies and kittens home. We had our share of goldfish, too. She played well with other kids and she shared well.

She wasn't the kind to let you sleep in late on the weekend. She'd get up early and come in my room and want to talk. I'd turn on the TV and cartoons and tell her to watch them. Five minutes later she was back. She wasn't addicted to the TV.

One of my favorite stories has always been this one: When she was around two years old we were driving over to Mesa on Broadway. She'd ask me a question, I'd answer, she'd say "Why?" I'd answer again, she'd reply, "Why?" Over and over, finally I told her that was enough, no more "Why's?" She looked at me and said, "I thought you wanted me to learn!?" Her vocabulary was very good for her age.

She walked at 10 months, was potty trained by 11 months, her first tooth didn't come in till she was 14 months and she had none to very little hair until she was over two years. She was definitely a 'precocious' child.

008353

PCR000309

Exhibit No.:  **56**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Defendant*
*2/4/2014*

**Clerk of Superior Court**

By: _____ L. MOONEY
(Deputy Clerk)

1002841621

**Michelle Arvanitas - PDX**

| | |
|---|---|
| From: | Donna Ochoa [grandmaochoa@hotmail.com] |
| Sent: | Wednesday, February 26, 2003 5:29 PM |
| To: | arvanitas@mail.maricopa.gov |
| Cc: | pattersond@mail.maricopa.gov; GDDeLozier@aol.com |
| Subject: | Andriano |

Michelle,
I don't remember if I gave you al of this information before.  This is
Wendi's biological father and his location:

Shelby Wayne Robertson
dob - 3/11/48
ADC Inmate No. 100374
ASPC - Eyman
State ID # - 09534466

It states the maximum term is 17/00/00

---

MSN 8 with e-mail virus protection service: 2 months FREE*
http://join.msn.com/?page=features/virus

1

062173

PCR000310

Exhibit No.:  **57**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Defendant*
*2/4/2014*

## Clerk of Superior Court

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841622

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

G. David DeLozier SBAZ #05237
*(Admitted in AZ, PA, TX & Federal Courts)*
Kathy M. O'Quinn SBLA #14195
*(Admitted in LA & Federal Courts)*

**Legal Assistants:**

*General:*
Ronald Ramirez
Kimberly Birdsong

*Planning & Zoning:*
Marlene J. Baker
Domestic Relations.
Tamara Martin

December 14, 2000

Mr. Alejo Ochoa
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222

Re: State v. Wendi E. Andriano

Dear Mr. and Mrs. Ochoa:

It was a pleasure to meet with you today, Mr. Ochoa. Thank you for driving that long distance to meet with me and provide the initial funds, $5,400.00, of the retainer.

As you know, your daughter's request came to me through mutual friends and we are willing to assist her for several reasons, including those friends. We have, however, significantly reduced our normal fees for this representation. However, that does not mean that your daughter will not receive all of the best efforts we are able to make on her behalf.

However, the one aspect that I believe that may be significantly beyond our abilities is that of forensic experts in various areas, most notably psychologists. Thus, I am very hopeful that Mr. Thikoll will advise me expeditiously of his intent in assisting with the case and what his plans are in especially this area of expert witnesses. It is my opinion, that without the use of experts, your daughter's defense is going to be extremely difficult. Thus, while attorney's fees are critical, and I am thankful for all you are doing to raise the funds for these fees, I want to be certain you are aware of these critical areas, as well. Of course, if Mr. Thikoll or you know of persons in these fields of expertise that will work with us on a reduced basis, that would also be helpful to know. But, the defense of the case needs immediate attention.

With that in mind, I have revised the representation agreement and have included two copies of it. I have executed both; please have your wife and you sign one of them and return to me. Please feel free to call with your questions and comments at any time. Again, thank you for driving up to meet with me today.

PCR000334

Mr. Alejo Ochoa
Mrs. Donna Ochoa
Re: State v. Wendi E. Andriano
December 14, 2000
Page 2.

Also, I look forward to those chips and tamales.  Best regards.

Very truly yours,

LAW OFFICES OF G. DAVID DELOZIER, P.C.

G. David DeLozier

enclosures

cc: Wendi E. Andriano

Exhibit No.: **61**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant
2/4/2014

**Clerk of Superior Court**

By: _____ L. MOONEY
(Deputy Clerk)

1002841632

**Michelle Arvanitas - PDX**

From:   Michelle Arvanitas - PDX
Sent:   Monday, August 05, 2002 2:59
To: ·   'GDDeLozler@aol.com'
Subject: RE: andriano

Dave,

Please direct all correspondence with Dan Patterson as he is the one who determines the  mailing list.
~Michelle

> -----Original Message-----
> From: GDDeLozier@aol.com [mailto:GDDeLozier@aol.com]
> Sent: Monday, August 05, 2002 12:58 PM
> To: Michelle Arvanitas - PDX
> Cc: dbpazlawyer@msn.com
> Subject: Re: andriano
>
> Michelle:
> Thanks for your return e-mail; however, I need to be on your regular mailing list to
> receive anything that is filed by your offices, any correspondence going to our
> client, any correspondence going to the prosecution, any filings made by the
> prosecution, etc.  I am "out of the loop".  We discussed this when you were here a
> couple of weeks ago, as you may recall.  Thanks.
>
> In a message dated 8/5/02 9:13:53 AM US Mountain Standard Time,
> arvanitas@mail.maricopa.gov writes:
>
>
> > Subj:RE: andriano
> > Date:8/5/02 9:13:53 AM US Mountain Standard Time
> > From:arvanitas@mail.maricopa.gov
> > To:GDDeLozier@aol.com
> > *Sent from the Internet*
> >
> >
> > Hi David,
> >
> > I understand your frustration.  I have spoken with Dan about sending you a copy of the last
> > motion.  I will speak with him again.  As far as I am aware there is not another second chair on the
> > case.  Maybe this email will help him understand your frustration.
> >
> > Michelle
> >
> > -----Original Message-----
> > From: GDDeLozier@aol.com [mailto:GDDeLozier@aol.com]
> > Sent: Friday, August 02, 2002 4:51 PM
> > To: Michelle Arvanitas - PDX
> > Cc: dbpazlawyer@msn.com
> > Subject: andriano

019718

8/5/02

PCR000337

Page 1 of 1

**Michelle Arvanitas - PDX**

**From:** GDDeLozier@aol.com
**Sent:** Friday, August 02, 2002 4:51 PM
**To:** Michelle Arvanitas - PDX
**Cc:** dbpazlawyer@msn.com
**Subject:** andriano

Michelle:

Donna Ochoa called me today around noon to advise that the scheduled hearing for 1:30 pm was postponed. I am glad I did not make a trip to Mesa!! Also, as we discussed when you were at my office, I am still not receiving any of the filings nor the previous ones filed. What do you suggest on how I might be able to keep informed on what is going on. I am working on keeping this from being frustrating. But, Dan made it very clear that I was second chair and that the PD's office was not going to put anyone else on the case. And, I am completely without knowledge of the case developments. Please advise. I am copying Dan, just in case he is unaware of these issues.

## G. David DeLozier
**LAW OFFICES OF G. DAVID DELOZIER, P.C.**
4016 E. Forest Pleasant Place
Cave Creek, AZ 85331
(480) 575-8660
Fax (480) 575-6661

*This transmission is confidential and may not be reproduced or retransmitted without the express written permission of the author. If you receive this transmission in error, please delete from your computer and notify the sender. Thank you.*

019570

5/10/2004

Exhibit No.:  **63**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant
2/10/2014

**Clerk of Superior Court**

By: _____ L. MOONEY
(Deputy Clerk)

1002841634

**Patricia Rubio - PDX**

From:              Patricia Rubio - PDX
Sent:              Thursday, October 23, 2003 10:27 AM
To:                Daniel Patterson - PDX
Subject:           State v. Andriano

Hi Dan.....

I met with DeLozier yesterday and went over the file. I will make copies of what he needs of the Original file. He states you only gave him one stack of papers yesterday which were the Defendant's Pleadings and not the State's Pleadings.

Since he was adamant about not having received ANYTHING since you took over the case, I showed a receipt for Discovery materials which were picked up by someone in his office back in May, which included all discovery in the binders. He said he would look for it in his office when he went back. He called me and said he could not find any of it. Soooooo ..I have to copy it for him ALL OVER AGAIN!!!! (Sorry just needed to vent)

Anyhow, just keeping you updated.

Thanks!

~ Patty

019008

PCR000339

Exhibit No.:  **64**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence:  *Defendant*

*2/11/2014*

## Clerk of Superior Court

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841635

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
120 S. 6th Avenue
Phoenix, Arizona 85003

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

## REPORT OF AUTOPSY

**DECEDENT:** Joseph D. Andriano

**CASE:** 00-03022

**DATE OF EXAMINATION:** 10/11/2000

**TIME:** 0710 Hours

**PERSONS PRESENT AT AUTOPSY**
Forensic Assistants: Garn Bailey
Michael Millette
Jarred Sanders

### PATHOLOGIC DIAGNOSES

I. Multiple blunt force injuries head and scalp.
   A. Superficial incised wounds scalp, posterior shoulders and both hands.
   B. Contusion dorsum right wrist.
   C. Deep incised wound left lateral neck.
   D. Subarachnoid hemorrhage left temporal lobe brain secondary to blunt force craniocerebral trauma.

II. Moderately well differentiated adenocarcinoma, kidney.

III. Widely metastatic adenocarcinoma involving lungs, mediastinal lymph nodes, periaortic lymph nodes and kidneys.

**CAUSE OF DEATH:** Multiple blunt force and incised injuries
**MANNER:** Homicide

PHILIP E. KEEN, MD
MEDICAL EXAMINER

009073

000445

PCR000340

JOSEPH D. ANDRIANO                                              00-03022

## CIRCUMSTANCES OF DEATH

This man was found deceased inside his residence the apparent victim of multiple blunt force head injuries and incised wounds. His wife had been in the residence with him and was reportedly tardy in response to emergency personnel arrival at the address. This man had a previous history of metastatic malignancy.

## EXTERNAL EXAMINATION

The unembalmed body arrives at the Medical Examiner's facility in a zippered body pouch secured by evidence seal #1059117. Delivered to the autopsy suite by Detective Lucero Badge #4913 of the Phoenix Police Department in a separate paper bag is a container of prescription medications issued to the decedent and a pair of green Tommy Hilfiger label shorts with a belt. There are irregular, dried, red-brown, apparent blood stains on the fabric.

The body arrives attired in a pair of brown striped boxer shorts. Brown paper bags encircle each hand. Electrocardiographic electrode pads are present beneath each clavicle.

The body is that of a slender, adult Caucasian man, 70 inches in length, weighing 156 pounds. Rigor mortis is complete. Livor mortis is purple, posterior, dependent and fixed. Scalp hair appears to be brown and the head is bald and possibly shaved. There are multiple traumatic injuries of the scalp to be subsequently described. Irides are light brown. Pupils are round, equal, symmetrical, 4 mm in diameter each. There are no scleral or conjunctival lesions. There are no lesions of external auditory canals or nares. There is a contusion over the bridge of the nose to be subsequently described. There is neither a beard nor moustache. Dentition is natural and in reasonably good state of repair with no acute oral mucosal lesions noted. Trachea is in the midline. There is a gaping incised wound of the left lateral neck to be subsequently described. Thorax is symmetrical with transverse diameter exceeding the anterior-posterior diameter. The abdomen is scaphoid with no palpable intra-abdominal masses or areas of significant skin scarring. Pubic hair appears shaved. External genitalia are those of an adult male with circumcised penis. Two small testes are palpable within the scrotal sac. Extremities are paired and symmetrical with what appears to be old subcutaneous hemorrhage and mild fibrosis in the left antecubital space. Posterior aspects of the torso are symmetrical. General appearance is compatible with a chronically ill man of the reported age of 33 years.

## EXTERNAL EVIDENCES OF TRAUMA

### Head and Neck:

There are areas of dried abrasion over the right cheek ranging up to 1-1/4 inches in greatest dimension. Inline with this area of abrasion is a second area of small abrasion 5/16 of an inch in greatest dimension on the infraorbital rib of the lateral extent of the

009074

000446

PCR000341

JOSEPH D. ANDRIANO                                           00-03022

right orbit and a linear area of abrasion of the right upper lid extending to the level of the brow.

There is a contusion over the mid-bridge of the nose ranging up to 1/2 inch in greatest dimension. The overlying skin surfaces are intact.

There is an apparent stabbing/incised wound of the right neck beneath the angle of the jaw paralleling approximately the inferior mandibular axis and extending into the skin and right sternocleidomastoid muscle ranging up to 1-1/4 inches in length with a V-shaped cutting surface oriented anteriorly.

There is a large gaping wound of the left neck extending posteriorly from the anterior border of the left sternocleidomastoid muscle forming a defect 3-3/4 inches x up to 2 inches in maximum width. On the anterior borders of this wound are a series of four superficial incised wounds ("hesitation marks"). This wound extends through the muscle and soft tissue structures of the left lateral neck, severs a branch of the left external carotid artery and at its greatest depth passes into the intervertebral space of C-4 – C-5 and produces a notch-like tool mark on the left lateral surface of the cervical spine. The wound does not penetrate the spinal canal.

There are two superficial linear oblique to horizontal incised wounds of the upper lateral left neck overlying the mastoid and inferior to the mastoid process on the left ranging up to 1-1/2 inches in greatest dimension.

Distributed over the occipital and parietal scalp and concentrated within an area of approximately 6 x 5 inches are a minimum of no less than twenty-three separate wounds. At least eight of these have features of superficial stabbing or incised wound and range from 1/4 to 1 inch in length and vary in axis from vertical to horizontal. Center most within this region of the scalp, however, are multiple large intersecting lacerations range up to 3 inches in greatest vertical dimension, up to 3 inches in greatest single horizontal dimension. The wound margins are abraded and irregular. There are bridging fibers across the depths of these wounds. They form two very prominent patterns of a V-shaped laceration over the right parietal scalp and the other is a double Y-shaped laceration in the midline posterior occipital prominence.

Just to the left of the sagittal plane in the left posterior parietal scalp is a 1-1/2 inch linear laceration with contusion and abrasion on the posterior aspect at an acute angle to the breach in the skin. Lateral to this is a 1-3/4 inch flattened omega-shaped laceration of the scalp.

There are two lacerations of the posterior surface of the left ear ranging up to 1-1/2 inches in greatest dimension.

There are two 1/4 inch superficial stabbing-style wounds of the posterior right lateral neck and a 5/8 inch horizontal superficial incised wound with lateral superficial abrasions all concentrated over the right trapezius insertions of the right posterior neck.

009075

000447

PCR000342

JOSEPH D. ANDRIANO                                    00-03022

There is a superficial linear apparently incised wound of the inferior surface of the mid-left mandible 1-1/4 inches in greatest dimension.

There is a superficial linear abrasion of the lateral left neck lying anterior to the sternocleidomastoid muscle and overlying the inferior portions of the left surface of the larynx.

**Posterior Shoulders:**

There are linear areas of abrasion of the posterior shoulders one over the left 1-1/4 inches in greatest dimension forming a tapering triangular shaped pattern with a vertex oriented medially.

There is a linear area of superficial laceration over the superior-posterior surface of the right shoulder 3/4 of an inch in greatest dimension.

Over the dorsum of the right shoulder is a small 3/8 inch linear superficial stabbing-style wound penetrating only to the level of the dermis.

Between this wound and the 3/4 inch linear abrasion is a linear wound 5/16 of an inch in greatest dimension extending to the level of the subcutaneous fat.

There are a series of four superficial linear mostly vertically oriented incised wounds of the skin of the upper back medial and superior to the scapula. These are 3/8, 1, 5/8, and 3/8 inch in length, respectively lateral to medial.

**Hands and Wrists:**

Over the dorsum of the right wrist on the radial aspect of this wrist is a 1-1/4 x 1 inch area of recent purple contusion with an intact overlying skin surface.

Over the dorsum of the right hand just distal to the wrist is a linear 1/2 inch superficial incised wound.

There are two superficial linear abrasions and/or lacerations of the dorsum of the left middle finger and the middle phalangeal segment and in the proximal phalangeal segment.

There are two incised defensive style wounds of the dorsum of the right hand. The first of these is 1/2 inch in length over the distal interphalangeal joint of the right ring finger. The second is V-shaped with two 1/2 inch arms over the middle interphalangeal joint of the right middle finger.

009076
000448

Page 4 of 8

PCR000343

JOSEPH D. ANDRIANO                                                    00-03022

## INTERNAL EVIDENCES OF TRAUMA

In addition to the hemorrhage on the soft tissue of the left lateral neck and the incised wound on the superficial branch of the left external carotid artery, there are intercranial evidences of trauma consisting of subarachnoid hemorrhage over the right temporal lobe of the brain. There are no grossly or radiographically demonstrable fractures of the skull.

## INTERNAL EXAMINATION

The body is opened by a standard Y-shaped thoracoabdominal incision. Subcutaneous adipose tissue ranges up to 2 cm in thickness at the level of the umbilicus. All viscera occupy their approximate appropriate anatomic relationships. There are multiple metastatic tumor nodules present in both lungs, in the mediastinal lymph nodes, in the cortical zones of both kidneys. A small quantity of serous fluid is present in each pleural space with no significant free fluid accumulation in any body cavities. Inferior margin of the liver extends 8 cm beyond the costal margin in the right midclavicular line. Diaphragmatic leaflets are at the level of the anterior 6th rib bilaterally. Internal viscera are somewhat pale.

## HEART

The 320-gm heart occupies its usual mediastinal site. The chambers are empty of fluid. There is a moderate quantity of epicardial fat present. Epicardial and endocardial surfaces are smooth and glistening. All major vessels arise in their appropriate anatomic relationships. Coronary arteries arise and are distributed in the usual fashion with no significant narrowing or occlusions. Step sections of myocardium reveal moist, uniform, rubbery, red-brown muscle with no localizing areas of softening, hemorrhage, or gross scarring. No abnormal communications exist between the cardiac chambers. The cardiac valves are normally formed with circumferences appropriate to the caliber of the cardiac chambers.

Upon removal of the heart, pulmonary arteries and veins, inferior vena cava and aorta are compressed and all returning blood flow to the pericardial sac is harvested for toxicologic or serologic testing purposes.

## GREAT VESSELS

The aorta is of normal caliber with smooth glistening endothelial surfaces. There is no aneurysmal dilation or dissection. There are no occlusions of major arterial branches. No systemic venous abnormalities or thrombi are identified.

## LUNGS

Weight: left 500 gm, right 540 gm. The lungs are similar. They are moderately well expanded, fluffy, and pink-tan with a few glistening pleural surfaces focally distorted by

009077
000449

PCR000344

JOSEPH D. ANDRIANO                                                    00-03022

subpleural and intraparenchymal masses.   These masses are firm and pale gray-white and yellow-white on cut surfaces with a few areas of central yellow necrosis. The tumor nodules range up to 4 cm maximum diameter.  The bronchi are patent with smooth mucosal surfaces. All of the nodules within the lungs appear to be metastatic disease. The perihilar lymph nodes are focally replaced by similar firm gray-white tumor.

## NECK ORGANS

There is hemorrhage in the soft tissue of the left lateral neck with incised injuries of the left sternocleidomastoid muscle, the thyroid artery branch of the carotid artery, superficial branches of the left external jugular vein, and penetration to the level of the cervical spine with separation of the lateral spinous ligaments.  The upper airway is patent.  There is no glottic or epiglottic edema.  There is no penetration of the trachea by the acute injuries. Thyroid and parathyroid glands are grossly not remarkable.

## THYMUS

Grossly not remarkable.

## SPLEEN

The 210-gm spleen occupies its usual anatomic site.  It is moderately congested but otherwise grossly not remarkable.

## LIVER

The 2000-gm, dome-shaped, red-brown liver occupies its usual anatomic site and is covered by a flat, smooth, glistening capsule. No metastatic disease is identified in the external or cut surfaces of the liver.  Intrahepatic and extrahepatic biliary ducts are patent and of normal caliber. The gallbladder is present, intact and contains orange-brown bile and no calculi.

## ADRENAL GLANDS

The adrenal glands are grossly not remarkable with no evidences of hemorrhage or metastatic tumor.

## PANCREAS

Grossly not remarkable. The duct system is patent. There are no mass lesions, areas of hemorrhage, fat necrosis or gross scarring.

## KIDNEYS

Weight: left 170 gm, right 150 gm. The kidneys are similar. The capsules strip with moderate ease from the cortical surfaces which are red-brown and focally have

009078
000450

PCR000345

JOSEPH D. ANDRIANO                                          00-03022

peripheral cortical nodules ranging up to 1.3 cm in greatest diameter. The larger of these tumor nodules have umbilication of the surfaces. There are no gross abnormalities of the renal pyramids or the of the calyceal system. The renal vessels are patent. The ureters are patent and of normal caliber bilaterally.

## PELVIC ORGANS

The urinary bladder contains 20 ml of cloudy yellow urine. Mucosal surfaces are gray-white, flat and glistening. Trigone is patent. The prostate and seminal vesicles are grossly not remarkable.

## GASTROINTESTINAL TRACT

There are no intrinsic lesions of the esophagus. The esophagus itself is empty. The mucosal surfaces are gray-tan and glistening. The cardioesophageal junction is well delineated. The gastric fundus contains approximately 30 ml of cloudy-tan liquid all of which was harvested. There is a solitary yellow-tan portion of solid material also included in the gastric contents. There no areas of ulceration, hemorrhage, erosion or even hyperemia of the gastric mucosa. There are no intrinsic mucosal or mural lesions of small bowel, colon, cecum, or rectum. Vermiform appendix is present.

## MUSCULOSKELETAL SYSTEM

Other than traumatic injuries noted above, the musculoskeletal system is grossly not remarkable.

## SKULL AND CRANIAL CONTENTS

The scalp is further reflected and the galea is removed from the outer surface of the calvarium in an effort to inspect the pericardial surfaces of the calvarium. No gross fracture lines are present. The calvarium is of normal to slightly increased thickness. The brain weighs 1450 gm. It is covered by delicate, thin, glistening leptomeninges. There is good preservation of cerebral symmetry throughout. Convolutional patterns are intact. There is a small amount of fresh hemorrhage covering the right temporal lobe over the anterior pole and superior middle and inferior lobules of the temporal lobes on the outer surfaces. No gross cortical contusions are noted beneath this hemorrhage. No other localizing lesions are identified on multiple coronal sections of cerebrum, cerebellum and brain stem. Ventricular system is symmetrical, nondilated and contains clear fluid. Pituitary is not remarkable. There are no hemorrhages or fractures of the osseous structures of the floor of the cranial vault.

## EVIDENTIARY MATERIALS

There are varying length, fine caliber hairs adherent to dried blood on the palmar surfaces and intertriginous surfaces of both hands and from the surface of the body. No other extraneous foreign material is identified. These trace items are inventoried

Page 7 of 8

009079
000451

PCR000346

JOSEPH D. ANDRIANO                                          00-03022

and released to the Phoenix Police Department. In addition, a purple-top tube of blood and the clothing are inventoried and released.

## TOXICOLOGY

Samples of blood, urine, vitreous humor, gastric contents, bile, liver, gastric mucosa and brain are harvested for toxicologic analysis.

PEK:plf
D:10/13/2000
T:10/31/2000

## MICROSCOPIC DESCRIPTIONS

Histologic sections confirm the presence of the subarachnoid hemorrhage of the left temporal lobe of the brain and further elucidate the character of the metastatic malignancy noted grossly. This tumor has a remarkably consistent gland-forming pattern in all of its sites consisting of pale amphiphilic mucinous secretions contained within variable tumor glands. The morphologic features of the tumor are more consistent with renal primary.

## FINAL SUMMARY

This man died of multiple blunt force and incised injuries.

The manner is homicide.

PEK:plf
F:11/28/2000

000452

PCR000347

**Maricopa County Office of the Medical Examiner**
120 South Sixth Avenue • Phoenix, AZ 85003 • (602) 506-3322



MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
**NOT FOR DUPLICATION**

sub Q bandg

Paper bag

Paper bag

* Green slits &
Br. Bell (PPD).

Broken stippled
Bayers

| | | | |
|---|---|---|---|
| Hair Color | Br. / Bald. | Eye Color | Light Brown |
| Teeth | Natural | Beard (Y/N) | No |
| Weight | 56 | Moustache (Y/N) | No |
| Height | 70 | Clothing | Yes |
| Rigor | full | | 009081 |
| Livor | Affixed | Seal No. | 1059/17 |

00-03022        10/08/2000
... RIANO, JOSEPH

PPD            DR: 01-79784
DOB: Redacted   SSN: Redacted

000453

000348

**Maricopa County Office of the Medical Examiner**
120 South Sixth Avenue – Phoenix, AZ 85003 - (602) 506-3322

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION




1¼" Abrasion
cheek



1¼"



④ Superficial
"hesitation"
incised wounds

3⅞" X ↑2"
gaping
Wound
D.K.W.

00-03022
ANDRIANO, JOSEPH          10/08/2000
PPO
DOB: Redacted          DR: 01-797849
SSN: Redacted



009082
000454



MARICOPA COUNTY, OFFICE
OF THE MEDICAL EXAMINER

CASE #

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

"U" shaped ½ & ½

½

1 ¼

—1¼ X 1" Contusion

009083
10/08/2000

00-03022
ANDRIANO, JOSEPH

000455

PPD
DOB: Redacted

DR: 01-
SSN: Redacted

900-021  10-88

MARICOPA COUNTY OFFICE OF THE MEDICAL EXAMINER

REPORT OF TOXICOLOGICAL EXAMINATION

Case Number:      00-03022
Decedent:         JOSEPH D. ANDRIANO
Date Submitted:   10/11/2000
Report Date:      12/27/2000

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

Specimens Collected:   VITREOUS, BILE, BLOT/FILTER PAPER, CARDIAC
BLOOD, URINE, GASTRIC, GASTRIC MUCOSA, LIVER, BRAIN

Medical Examiner:  PHILIP E. KEEN, MD

**RESULTS*:**

Vitreous:        None detected for ethanol, methanol, isopropanol and acetone

Cardiac Blood:   None detected for ethanol, methanol, isopropanol, acetone,
                 amphetamine, methamphetamine, phencyclidine, cocaine,
                 benzoylecgonine, methadone, morphine, codeine,
                 benzodiazepines, barbiturates, antihistamines, phenothiazines,
                 tricyclic antidepressants and sodium azide **

Bile:            None detected for amphetamine, methamphetamine,
                 phencyclidine, cocaine, methadone, codeine, antihistamines,
                 phenothiazines, and tricyclic antidepressants

Gastric:         Positive for
                     Sodium Azide 3.8 mg/L **
                 None detected for amphetamine, methamphetamine,
                 phencyclidine, cocaine, methadone, codeine, antihistamines,
                 phenothiazines, and tricyclic antidepressants

Urine:           None detected for amphetamine, methamphetamine,
                 phencyclidine, cocaine, methadone, codeine, antihistamines,
                 phenothiazines, and tricyclic antidepressants

*If results are not listed for any specimen(s), that/those specimen(s) is/are deemed to be on "HOLD"
**Assay performed by West Coast Analytical Service, Santa Fe Springs, CA.

Norman A. Wade
Laboratory Director

Agency:   PHOENIX PD
DR#       01-797849
By:rs
Tox. 1/2000
DAWN:

009084
PEKeen
12/27/0

000456

120 S. 5th Avenue • Phoenix, Arizona 85003 • (602) 506-3322 • (FAX) (602) 506-1546

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR PUBLICATION

MARICOPA COUNTY OFFICE OF THE MEDICAL EXAMINER
120 South Sixth Avenue
Phoenix, Arizona 85003
(602)506-3322

## AMENDMENT TO MEDICAL EXAMINER'S REPORT OF INVESTIGATION

DATE OF AMENDMENT: January 5, 2001

CASE #00-03022

NAME OF DECEASED: JOSEPH D. ANDRIANO
DATE OF DEATH: 10/08/2000

AGENCY PHOENIX PD
DR# 01-797849

ITEMS TO BE AMENDED:

MEANS:  BLUNT FORCE TRAUMA

PERSON AMENDING REPORT:  PHILIP E. KEEN, M.D.

SUPPLEMENTARY DEATH CERTIFICATE FILED (Y/N):  NO

_____
SIGNATURE

/ogm

015321
000443

PCR000352

# OFFICE OF THE MEDICAL EXAMINER

120 South Sixth Avenue
Phoenix, Arizona 85003
(602) 506-3322

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
**NOT FOR DUPLICATION**

Case #: 00-03022

## REPORT OF INVESTIGATION BY MEDICAL EXAMINER

| Name | Age | DOB | Sex |
|------|-----|-----|-----|
| JOSEPH D. ANDRIANO | 33 | 08/18/1967 | MALE |

| Race | Marital Status | Type of Death | Means |
|------|----------------|---------------|-------|
| CAUCASIAN | MARRIED | VIOLENT | FIREARMS |

| Address | City | State |
|---------|------|-------|
| 2155 E. LIBERTY LANE #132 | PHOENIX | AZ |

| Notification By | Agency | DR Number |
|-----------------|--------|-----------|
| LUCERO #4913 | PHOENIX PD | 01-797849 |

|  | Address | Town/City | Type of Premises | Date | Time |
|--|---------|-----------|------------------|------|------|
| Illness |  |  |  |  |  |
| Injured | 2155 E. LIBERTY LANE #132 | PHOENIX | RESIDENCE | 10/08/2000 | UNK |
| Death Pronounced | 2155 E. LIBERTY LANE #132 | PHOENIX | RESIDENCE | 10/08/2000 | 0345 |

Examination at the Maricopa County Office of the Medical Examiner:   Date: 10/11/2000      Time: 0710

### SEAL NUMBER# 1059117

Narrative Summary of Reported Circumstances Surrounding Death:

THIS MAN WAS FOUND DECEASED IN HIS RESIDENCE THE APPARENT VICTIM OF HEAD INJURIES AND INCISED WOUNDS.

Pursuant to section 11-594 Arizona Revised Statutes, I hereby certify that I took charge of the body described herein and that after making inquiries into the cause and manner of death and examination of the body it is my opinion that death occurred due to the cause(s) and in the manner stated.

Cause of Death:   MULTIPLE BLUNT FORCE AND INCISED INJURIES   Autopsy (Y/N): YES

Manner of Death: HOMICIDE

Toxicology:   YES

015322

PLF: 11/1/2000

PHILIP E. KEEN, MD, Medical Examiner

000444

PCR000353

Exhibit No.: **65**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: *Stipulated*
*2/3/2014*

**Clerk of Superior Court**

By: L. MOONEY
(Deputy Clerk)

1002841636

```
PRINVST                    FMS LIVE System                  Page    1
                       Phoenix Fire Department           10/16/2000
                        INCIDENT HISTORY REPORT
Incident #: 00-162335

--------------------------------------------------------------------------
  DISPATCHED INCIDENT
  Agcy PFD  Incident # 00-162335    Disp Date 10/08/2000 Time 02:25:53 DOW SUN
  City PHX Loc 2155 E LIBERTY LN, PHOENIX, AZ
  Map SE1102 Census      Fire Dist 5      Council Dist 6
  Lat: +33.294449  Lon: -112.035075 Desc              Phone
  CTG                              DescAPT 132           Phone 4806592630
  Nature: Initial DB    Final DB    Response: Initial ALS   Final ALS
  Supp Text
  Channel A8   Travel Code 3 Sub Zone 21970  Cancel Flag N
                   Date       Time      Elapsed
  Received       10/08/2000   02:24:58
  Entered        10/08/2000   02:25:46   00:00:48
  Dispatched     10/08/2000   02:25:53   00:00:07
  On Scene       10/08/2000   02:33:15   00:07:22
  Closed         10/08/2000   02:45:52   00:12:37

  UNIT TIMES
  Unit   Dispatch  Enroute   Onscene   Lv Scene  Arr Hosp  Hosp  Available
  E46    02:25:53  02:27:39  02:33:15                              02:45:43

  UNIT PERSONNEL
  Unit E46
  UID    Name                              Rank      Role
  KJ1153  KIERNAN, JAMES D                  FF
  MB1585  MCKINNON, BENJAMIN E              ENGP*56
  PR1605  PERROTT, RICHARD W                CPTP*56
  PA1300  PINEDA, ANGELICA                  FF

  INCIDENT HISTORY
  Time     Type    Oper ID  Misc
  02:25:46  ENTRY   NC2709      DS6
  02:25:46  ENTRY   NC2709      DS6
  02:25:47  CHANGE  NC2709      Alert: R???-> R
  02:25:47  CHANGE  NC2709      Alert: R???-> R
  02:25:49  SUGG    AVLSUG  DS2  E46+[01.7]
  02:25:49  SUGG    AVLSUG  DS2  E46+[01.7]
  02:25:53  DISP    GE3021  E46  [01.7] (ALS/ENG/MPW/BIC)  #KJ1153 KIERNAN, JAME
                                  S D #MB1585 MCKINNON, BENJAMIN E #PR1605 PERROTT,
                                  RICHARD W #PA1300 PINEDA, ANGELICA
  02:25:53  DWARN   SYSTEM       Dispatch warning, zone 4601!** CHANGE SITE TO S
                                  OUTH MTN ***
  02:25:53  DWARN   SYSTEM       Dispatch warning, zone 46011** CHANGE SITE TO S
                                  OUTH MTN ***
  02:25:53  DISP    GE3021  E46  [01.7] (ALS/ENG/MPW/BIC)  #KJ1153 KIERNAN, JAME
                                  S D #MB1585 MCKINNON, BENJAMIN E #PR1605 PERROTT,
                                  RICHARD W #PA1300 PINEDA, ANGELICA
  02:27:06  UPDATE  CJ4020  E46
  02:27:06  UPDATE  CJ4020  E46
  02:27:39  *ENROUT         E46  [01:46]
  02:27:39  *ENROUT         E46  [01:46]
  02:29:11  PTI     NC2709       AGE:33YO  SEX:M INFEC:NO PER CALLER
                                  CC:HX OF LUNG CANCER, SAYS HE IS EXTREMELY SOB TURNING
                                  BLUE BUT IS CONS. & TALKING, HAS ALSO VOMITTE D SAYS
                                  HE FEELS LIKE HE IS HAVING A HRT ATTACK IS TAKING CHEM
                                  OTHERAPHY
  02:29:11  PTI     NC2709       AGE:33YO  SEX:M INFEC:NO PER CALLER
                                  CC:HX OF LUNG CANCER, SAYS HE IS EXTREMELY SOB TURNING
                                  BLUE BUT IS CONS. & TALKING, HAS ALSO VOMITTE D SAYS
```

004034

ncident #: 00-162335

------------------------------------------------------------------------
                          HE FEELS LIKE HE IS HAVING A HRT ATTACK IS TAKING CHEM
                          OTHERAPHY
2:33:15  *ONSCNE          E46   [17:22]
2:33:15  *ONSCNE          E46   [17:22]
3:40:18  MISC   CJ4020    E46   ,ATT TO CONT RESD....THEY ARE REFUSING TO ANSWER
                              THE DOOR
2:40:18  MISC   CJ4020    E46   ,ATT TO CONT RESD....THEY ARE REFUSING TO ANSWER
                              THE DOOR
2:45:43  *AOR            E46
2:45:43  *AOR            E46
2:45:52  CLOSE  CJ4020
2:45:52  CLOSE  CJ4020
4:13:14  CROSS  FJ1735          #F00162360

004035

000049

Exhibit No.: **65.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Stipulated
2/3/2014

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841638

PCR000366

**Andriano - Poverty/Income Chart with Wendi's Age**

| Year | Age | Donna Ochoa | Alejo Ochoa | Totals | Federal Poverty Line[1] | Amount Below/Above Poverty Line | Percent Below Poverty Line |
|---|---|---|---|---|---|---|---|
| 1975 | 4 - 5 | $1,513.88 | $0.00 | $1,513.88 | $4,361.00 | -$2,847.12 | 65% |
| 1976 | 5 - 6 | $8.30 | $3,938.15 | $3946.45 | $4,613.00 | -$666.55 | 14% |
| 1977 | 6 - 7 | $0.00 | $2,937.41 | $2,937.41 | $4,910.00 | -$1,972.59 | 40% |
| 1978 | 7 - 8 | $5,191.00 | $1,883.66 | $5,074.66 | $5,284.00 | -$209.34 | 4% |
| 1979 | 8 - 9 | $0.00 | $1,923.13 | $1,923.13 | $5,879.00 | -$3,955.87 | 16% |
| 1980 | 9 - 10 | $1,348.00 | $7,357.63 | $8705.63 | $6,628.00 | +$2,077.63 | N/A |
| 1981 | 10 - 11 | $0.00 | $0.00 | $0.00 | $7,316.00 | -$7,316.00 | 100% |
| 1982 | 11 - 12 | $0.00 | $0.00 | $0.00 | $7,765.00 | -$7,765.00 | 100% |
| 1983 | 12 - 13 | $0.00 | $0.00 | $0.00 | $8,015.00 | -$8,015.00 | 100% |
| 1984 | 13 - 14 | $2,633.00 | $0.00 | $2,633.00 | $8,355.00 | -$5,722.00 | 68% |
| 1985 | 14 - 15 | $12,500.00 | $0.00 | $12,500.00 | $8,654.00 | +$3,846.00 | N/A |
| 1986 | 15 - 16 | $12,950.00 | $0.00 | $12,950.00 | $8,820.00 | +$4,130.00 | N/A |
| 1987 | 16 - 17 | $12,956.52 | $0.00 | $12,956.52 | $9,142.00 | +$3,814.52 | N/A |

[1] Source: http://www.census.gov/hhes/www/poverty/data/threshld/index.html

PCR000367

**Andriano - Poverty/Income Chart with Wendi's Age**

| Year | Age | Donna Ochoa | Alejo Ochoa | Totals | Federal Poverty Line[1] | Amount Below/Above Poverty Line | Percent Below Poverty Line |
|---|---|---|---|---|---|---|---|
| 1988 | 17 - 18 | $13,504.10 | $0.00 | $13,504.10 | $9,522.00 | +$3,982.10 | N/A |
| 1989 | 18 - 19 | $2,151.50 | $0.00 | $2,151.50 | $9,981.00 | -$7,829.50 | 78% |
| 1990 | 19 - 20 | $3,620.00 | $0.00 | $3,620.00 | $10,520.00 | -$6,900.00 | 66% |
| 1991 | 20 - 21 | $4,499.60 | $0.00 | $4,499.60 | $10,963.00 | -$6463.40 | 59% |
| 1992 | 21 - 22 | $8,254.00 | $1,927.35 | $10,181.35 | $11,293.00 | -$1,111.65 | 10% |
| 1993 | 22 - 23 | $0.00 | $0.00 | $0.00 | $11,631.00 | -$11,631.00 | 100% |
| 1994 | 23 - 24 | $176.00 | $0.00 | $176.00 | $11,923.00 | -$11,735.00 | 99% |
| 1995 | 24 - 25 | $0.00 | $0.00 | $0.00 | $12,267.00 | -$12,267.00 | 100% |

Exhibit No.:   **68**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant
2/4/2014

**Clerk of Superior Court**

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841664

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN Redacted            * * *



FROM:  SOCIAL SECURITY ADMINISTRATION
       OFFICE OF CENTRAL OPERATIONS
       300 N. GREENE STREET
       BALTIMORE, MARYLAND  21290-0300

CAPITOL CASE PROJECT                  NUMBER HOLDER NAME:
                                      ALEJO   OCHOA
19528 VENTURA BLVD
#520

TARZANA              CA  91356

PERIOD REQUESTED   JANUARY 1967  THRU  DECEMBER 2009

YEAR  JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC     TOTAL

EMPLOYER NUMBER:  86-0183480
ALEJO M OCHOA
OCHOAS TORTILLA FACTORY
112 N MARSHALL ST
CASA GRANDE AZ 85222-0000

1968        51.01                                        $51.01

SELF EMPLOYMENT


1974        -            -            -            -      $4,001.00
1978        -            -            -            -      $3,191.00
1995        -            -            -            -      $7,558.00

EMPLOYER NUMBER:  86-0281632
BARRY HOWARD GRIMMER
LIVING DESERT LANDSCAPING
851 PALM PARKE BLVD
CASA GRANDE AZ 85223-0000

1976     1,064.25       315.75                           $1,380.00

                          PAGE 001
```

CCP 002773

PCR000368

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *     FOR SSN Redacted          * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  75-0278040
FOXWORTH GALBRAITH LUMBER CO
PO BOX 799002
DALLAS  TX 75379-9002
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1976 | | | 853.76 | 1,704.39 | $2,558.15 |
| 1977 | 1,496.25 | 1,218.75 | | | $2,715.00 |

```
EMPLOYER NUMBER:  86-0283779
DANIEL LESTER MUNSTER
PO BOX 425
MILFORD  UT 84751-0000
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1977 | | 100.00 | | | $100.00 |

```
EMPLOYER NUMBER:  23-1994091
ADIA TEMPORARY SERVICES INC
PARTIME
PO BOX 2768
MENLO PARK CA 94026-2768
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1977 | | | | 122.41 | $122.41 |
| 1978 | - | - | - | - | $844.71 |

```
EMPLOYER NUMBER:  86-0189901
MANPOWER INC OF TUCSON
5301 N IRONWOOD RD
MILWAUKEE  WI 53217-4910
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1978 | - | - | - | - | $170.45 |

```
EMPLOYER NUMBER:  86-0319966
WYBE DE VRIES
3521 E SYLVANE
TUCSON  AZ 85713-0000
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1978 | - | - | - | - | $868.50 |

PAGE 002

CCP 002774

PCR000369

```
SSA-1826            ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *   FOR SSN Redacted        * * *


YEAR  JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC    TOTAL


EMPLOYER NUMBER:  86-0197899
JOHN A JACKSON
JACKSONS CONSTRUCTION
2965 W CARNAUBA
TUCSON  AZ 85705-0000

1979       -           -            -           -        $1,412.50


EMPLOYER NUMBER:  94-2161806
ADECCO
% ADIA SERVICES INC
175 BROADHOLLOW RD
MELVILLE  NY 11747-4902

1979       -           -            -           -          $56.88


EMPLOYER NUMBER:  95-2117125
MINUTE MAN INC
PO BOX 710
BELL  CA 90201-0000

1979       -           -            -           -         $105.75


EMPLOYER NUMBER:  95-2313401
TOYO LANDSCAPING COMPANY
764 N CYPRESS ST
ORANGE  CA 92867-6606

1979       -           -            -           -         $348.00
1980       -           -            -           -          $14.00


EMPLOYER NUMBER:  86-0310699
GALLO AND SGRIGNOLI INC
711 E COTTONWOOD LANE SUITE C
CASA GRANDE AZ 85222-2725

1980       -           -            -           -        $7,121.63

                            PAGE 003
```

CCP 002775

PCR000370

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN Redacted          * * *


YEAR  JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC     TOTAL


EMPLOYER NUMBER:  86-0393445
GALLO PROPERTY MANAGEMENT
 CORPORATION
711 E COTTONWOOD LN SUITE C
CASA GRANDE AZ 85222-2725

1980        -           -           -           -          $222.00

EMPLOYER NUMBER:  62-1167633
FEDERAL COMPRESS & WAREHOUSE CO INC
6060 PRIMACY PKWY STE 400
MEMPHIS  TN 38119-5704

1992        -           -           -           -        $1,927.35

EMPLOYER NUMBER:  86-0765813
OCHOAS TORTILLAS INC
% LUPE O GARCIA
502 W OCOTILLA ST
CASA GRANDE AZ 85222-2323


1996        -           -           -           -        $1,950.00
1997        -           -           -           -       $17,225.00
1998        -           -           -           -       $17,650.00
1999        -           -           -           -       $18,190.00
2000        -           -           -           -       $18,200.00
2001        -           -           -           -       $18,250.00
2002        -           -           -           -       $18,755.47
2003        -           -           -           -       $18,980.00
2004        -           -           -           -       $21,320.00
2005        -           -           -           -       $10,790.00

THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2008 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

                    PAGE 004 END
```

CCP 002776

PCR000371

Exhibit No.: **68.001**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**
_____

In Evidence: 

_____

## Clerk of Superior Court

By: _____ L. MOONEY _____
(Deputy Clerk)

1002841665

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *        FOR SSN Redacted          * * *


FROM:   SOCIAL SECURITY ADMINISTRATION
        OFFICE OF CENTRAL OPERATIONS
        300 N. GREENE STREET
        BALTIMORE, MARYLAND  21290-0300

CAPITAL CASE PROJECT                    NUMBER HOLDER NAME:
                                        DONNA    OCHOA
19528 VENTURA BLVD
#520

TARZANA             CA  91356-0000

PERIOD REQUESTED    JANUARY 1964  THRU  DECEMBER 2009

YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC      TOTAL

EMPLOYER NUMBER:  86-0199202
TUCSON YOUTH DEVELOPMENT INC
1901 N STONE AVE
TUCSON   AZ 85705-5642

1966         132.52       37.50     212.50       168.75       $551.27
1967         148.13      135.00                                $283.13

EMPLOYER NUMBER:  86-0148290
HORIZON CORPORATION 16838 E
 PALISADES BLVD
5847 SAN FELIPE 2600
HOUSTON   TX 77057-3000

1967                     140.00     819.44                    $959.44

EMPLOYER NUMBER:  95-2231259
IRA R LYON
MUTUAL READERS LEAGUE OF
 LOS ANGELES
5601 VIA DEL CALLADO
TORRANCE  CA 90505-0000

1968          4.73                                              $4.73

                          PAGE 001
```

PCR000372

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN Redacted            * * *
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  95-1581868
RAYMOND A TURNER
KEYSTONE READERS SERVICE
P O BOX 6348
SAN DIEGO CA 92106-0000
```

| 1968 | | | 26.25 | | $26.25 |
|------|---|---|-------|---|--------|

```
EMPLOYER NUMBER:  95-2494484
JERI S GUIDI LOU SCUDDER JR
COIFFURES DE LEON
2550 5TH AVE
SAN DIEGO CA 92103-0000
```

| 1968 | | | 325.00 | 940.00 | $1,265.00 |
|------|--------|--------|--------|--------|-----------|
| 1969 | 862.00 | 308.00 | | | $1,170.00 |

```
EMPLOYER NUMBER:  86-0213395
PARR OF ARIZONA
1009 N 3RD ST
PHOENIX  AZ 85004-0000
```

| 1969 | | 365.38 | 572.80 | | $938.18 |
|------|---|--------|--------|---|---------|

```
EMPLOYER NUMBER:  86-0075205
LAWYERS TITLE OF ARIZONA
5600 COX RD
GLEN ALLEN VA 23060-9266
```

| 1969 | | | | 791.54 | $791.54 |
|------|--------|--------|---|--------|-----------|
| 1970 | 937.50 | 415.00 | | | $1,352.50 |

```
EMPLOYER NUMBER:  86-0223200
STEWART TITLE & TRUST OF PHOENIX
244 W OSBORN RD
PHOENIX  AZ 85013-3910
```

| 1971 | 193.87 | 915.58 | 682.50 | | $1,791.95 |
|------|--------|--------|--------|---|-----------|

```
                        PAGE 002
```

```
SSA-1826                 ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *       FOR SSN Redacted            * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  86-0196814
ATI TITLE AGENCY OF ARIZONA INC
NORWEST MORTGAGE INC
4801 E WASHINGTON ST
PHOENIX  AZ 85034-2004
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1971 |             |             | 347.73      | 1,275.00  | $1,622.73 |
| 1972 | 1,275.00    | 1,275.00    | 1,325.00    | 1,425.00  | $5,300.00 |
| 1973 | 1,425.00    | 1,425.00    | 1,475.00    | 1,575.00  | $5,900.00 |
| 1974 | 1,675.00    | 1,725.00    | 1,738.87    |           | $5,138.87 |

```
EMPLOYER NUMBER:  86-0224913
COMCARE INC
1740 W ADAMS 4TH FLR
PHOENIX  AZ 85007-2602
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1974 |             |             |             | 1,581.17  | $1,581.17 |
| 1975 | 645.78      |             |             |           | $645.78 |
| 1976 |             | 8.30        |             |           | $8.30 |

```
EMPLOYER NUMBER:  86-0271185
PINAL COUNTY ALCOHOL & DRUG ABUSE
 COUNCIL
SERENITY HOUSE
102 N FLORENCE ST
CASA GRANDE AZ 85222-0000
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1975 |             | 868.10      |             |           | $868.10 |

```
SELF EMPLOYMENT
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|
| 1978 | -           | -           | -           | -         | $3,191.00 |
| 1980 | -           | -           | -           | -         | $1,348.00 |

```
                              PAGE 003
```

```
SSA-1826                 ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN Redacted          * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  86-0317255 A
AK-CHIN FARMS ENTERPRISE OF AK-CHIN
 INDIAN COMMUNITY
42507 W PETERS AND NALL RD
MARICOPA  AZ 85138-0000
```

| 1984 | - | - | - | - | $2,633.00 |
| 1986 | - | - | - | - | $12,950.00 |
| 1987 | - | - | - | - | $12,956.52 |
| 1989 | - | - | - | - | $1,335.50 |

```
EMPLOYER NUMBER:  86-0317255
AK-CHIN FARMS ENTERPRISE OF AK-CHIN
 INDIAN COMMUNITY
42507 W PETERS AND NALL RD
MARICOPA  AZ 85239-3940
```

| 1985 | - | - | - | - | $12,500.00 |
| 1988 | - | - | - | - | $13,504.10 |

```
EMPLOYER NUMBER:  13-0544597
AVON PRODUCTS INC
 ATTN TAX DEPARTMENT
ATT PAYROLL DEPT
1345 AVE OF THE AMERICAS
NEW YORK NY 10105-0000
```

| 1989 | - | - | - | - | $816.00 |
| 1990 | - | - | - | - | $3,620.00 |
| 1991 | - | - | - | - | $986.00 |

```
EMPLOYER NUMBER:  62-1167633
FEDERAL COMPRESS & WAREHOUSE CO INC
6060 PRIMACY PKWY STE 400
MEMPHIS  TN 38119-5704
```

| 1991 | - | - | - | - | $3,513.60 |
| 1992 | - | - | - | - | $8,254.00 |
| 1994 | - | - | - | - | $176.00 |

PAGE 004

PCR000375

```
SSA-1826                ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *       FOR SSN Redacted           * * *
```

| YEAR | JAN - MARCH | APRIL - JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|--------------|-------------|-----------|-------|

```
EMPLOYER NUMBER:  86-0173224
CHANDLER REGIONAL HOSPITAL
475 S DOBSON RD
CHANDLER  AZ 85224-5601
```

| 1996 | - | - | - | - | $724.20 |

```
EMPLOYER NUMBER:  86-0402200
PROFESSIONAL RESPIRATORY CARE
 SERVICES INC
3801 N 24TH ST
PHOENIX  AZ 85016-6512
```

| 1996 | - | - | - | - | $756.00 |

```
EMPLOYER NUMBER:  86-0779811
REGIONAL HEALTHCARE SERVICES
 CORPORATION
% ROBERT F THEILMANN
1800 E FLORENCE BLVD
CASA GRANDE AZ 85222-5303
```

| 1996 | - | - | - | - | $15,662.87 |
| 1997 | - | - | - | - | $25,685.53 |
| 1998 | - | - | - | - | $16,535.04 |

```
EMPLOYER NUMBER:  86-0919714
REGIONAL HEALTHCARE SERVICES
 CORPORATION
1800 E FLORENCE BLVD
CASA GRANDE AZ 85122-5303
```

| 1998 | - | - | - | - | $15,988.61 |
| 1999 | - | - | - | - | $32,525.39 |

```
EMPLOYER NUMBER:  86-0427850
CASA GRANDE REGIONAL MEDICAL CENTER
1800 E FLORENCE BLVD
CASA GRANDE AZ 85122-0000
```

| 2000 | - | - | - | - | $37,154.95 |

PCR000376

```
SSA-1826              ITEMIZED STATEMENT OF EARNINGS
VERSION 2009.001 * * *      FOR SSN  Redacted          * * *
```

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------------|
| 2001 | - | - | - | - | $39,949.03 |
| 2002 | - | - | - | - | $45,142.01 |
| 2003 | - | - | - | - | $45,379.13 |
| 2004 | - | - | - | - | $47,171.08 |
| 2005 | - | - | - | - | $51,501.09 |
| 2006 | - | - | - | - | $53,990.94 |
| 2007 | - | - | - | - | $57,075.10 |
| 2008 | - | - | - | - | $56,844.28 |
| 2009 | - | - | - | - | $59,231.98 |

THERE ARE NO OTHER EARNINGS RECORDED UNDER THIS SOCIAL SECURITY
NUMBER FOR THE PERIOD(S) REQUESTED.

EARNINGS FOR THE YEARS AFTER   2008 MAY NOT BE SHOWN, OR ONLY
PARTIALLY SHOWN, BECAUSE THEY MAY NOT YET BE ON OUR RECORDS.

PAGE 006 END

PCR000377

Exhibit No.:   **68.002**

Case No.:   **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant

2/4/2014

**Clerk of Superior Court**

By:   _____ L. MOONEY _____
(Deputy Clerk)

1002841666



Exhibit No.:  **73**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant
2/4/2014

**Clerk of Superior Court**

By: _____ L. MOONEY
(Deputy Clerk)

1002841673



Exhibit No.: **74**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**
**01/31/2014**

In Evidence: Defendant

2/4/2014

**Clerk of Superior Court**

By: _____ L. MOONEY
(Deputy Clerk)

1002841674

clemency-dispenser has historically found persuasive. As possible innocence is the most frequently cited reason for clemency,[354] if there is a possibility that the client is innocent, counsel should mobilize an especially detailed investigation to determine whether confidence in the client's guilt can be undermined. If doubts about the fairness of the judicial proceedings that produced the death sentence have led to clemency in other cases, counsel should consider whether particular instances of procedural unfairness can be set out as to the client's case.[355] If personal characteristics of the condemned, such as youth, mental illness,[356] spousal abuse, or cultural barriers, have proven helpful in past clemency proceedings, then counsel should discover and demonstrate examples of the client's similar characteristics to the extent possible.

In any event, the presentation should be as complete and persuasive as possible, utilizing all appropriate resources in support (e.g. relevant outside organizations, the trial judge, prominent citizens), and discussing explicitly why the clemency-dispenser should act favorably notwithstanding the repeated reaffirmation of the client's conviction and sentence by the judicial system. For example, counsel may be in a position to argue that the underlying claims were powerful ones but procedural technicalities barred the courts from addressing their merits.

As discussed in the text accompanying notes 63-64 *supra*, due process protections apply to clemency proceedings, and counsel should be alert to the possibility of developing the nascent existing law in this area.

---

[354] The Death Penalty Information Center reports that since 1976, of the 35 death row inmates who have been granted clemency for reasons other than the personal convictions of the governor in opposition to the death penalty, the possible innocence of the condemned inmate was provided as the reason for granting clemency in 16 cases (46%). *Available at* http://www.deathpenaltyinfo.org/clemency.html.

[355] For example, in 1999 the Governor of Arkansas commuted the death sentence of Bobby Ray Fretwell after receiving a letter from a juror at Fretwell's trial stating that he had been the lone holdout against the death penalty, but had relented for fear that he would be an outcast in the small community where the killing had occurred. *See Arkansas Governor Spares Killer's Life After Juror's Plea*, L.A. TIMES, Feb. 6, 1999, at A19. In the case of Charlie Brooks, who was executed in Texas in 1982, counsel enlisted the trial prosecutor to argue before the Board of Pardons and Paroles that it would be unfair to execute the client when his co-defendant was serving a term of years and the state did not know who the triggerman had been. *See* Robert Reinhold, *Groups Race to Prevent Texas Execution*, N.Y. Times, Dec. 6, 1982, at A16.

[356] In 2002, the Georgia Board of Pardons commuted the death sentence of Alexander Williams to life in prison without parole in large part due to Williams's profound mental illness. *See* Rhonda Cook, *Death penalty reduced to life*, ATLANTA J. & CONST., Feb. 26, 2002, at A1.

PCR000531

Exhibit No.:  **76**

Case No.: **CR2000-096032**

For Identification:

**DEFENDANT**

**01/31/2014**

In Evidence: Defendant

2/6/14

**Clerk of Superior Court**

By: _____ L. MOONEY

(Deputy Clerk)

||||| |||| ||||| |||||| ||||
1002841676

# American Bar Association
# Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases



## Revised Edition
## February 2003

PCR000396

*Copyright © 2003 American Bar Association*

All rights reserved. The materials herein may be reproduced, in whole or in part, provided that such use is for informational, non-commercial purposes only and any copy of the materials or portion thereof acknowledges original publication by the American Bar Association and includes the title of the publication, the name of the author, and the legend "Copyright 2003 American Bar Association. Reprinted by permission." Requests to reproduce materials in any other manner should be addressed to: Copyrights & Contracts Department, American Bar Association, 321 N. Clark St,, Chicago, IL 60610; Phone: 312-988-6102; FAX: 312-988-6030; E-mail: copyright@abanet.org.

*Library of Congress Control Number: 2003104861*
*ISBN 1-59031-236-8*

The commentary contained herein does not necessarily represent the official position of the American Bar Association. Only the text of the black-letter guidelines has been formally approved by the American Bar Association House of Delegates as official policy. The commentary, though unofficial, serves as a useful explanation of the black-letter guidelines.

Joint Project of the
American Bar Association
Standing Committee on Legal Aid and Indigent Defendants
Chicago, Illinois
www.abalegalservices.org

And the
American Bar Association
Special Committee on Death Penalty Representation
Washington, D.C.
www.abanet.org/deathpenalty

Printed in the United States of America

PCR000397

# ACKNOWLEDGEMENTS

The American Bar Association gratefully acknowledges the assistance of the members of the Advisory Committee and others who contributed valuable insight and expertise to this endeavor: Barry Alberts, private practitioner, Schiff Hardin & Waite, Chicago, Illinois (Representative from ABA Section of Litigation); Sylvia Bacon, Judge (Retired), Superior Court of the District of Columbia, Washington, D.C. (Representative from ABA Criminal Justice Section); Stephen B. Bright, Director, Southern Center for Human Rights, Atlanta, Georgia (Representative from National Association of Criminal Defense Lawyers); David I. Bruck, private practitioner, Columbia, South Carolina (Representative from Federal Death Penalty Resource Counsel); Mardi Crawford, Staff Attorney, New York State Defenders Association, Albany, New York; Lawrence J. Fox, private practitioner, Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania (Chair, ABA Special Committee on Death Penalty Representation); Stephen K. Harper, Co-coordinator, Capital Litigation Unit, Miami-Dade County Public Defender's Office, Miami, Florida (Representative from National Legal Aid and Defender Association); Randy Hertz, Professor of Law, New York University School of Law, New York, New York; Henderson Hill, private practitioner, Ferguson, Stein, Chambers, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, North Carolina (Representative from ABA Special Committee on Death Penalty Representation); Denise LeBoeuf, Director, Capital Post-Conviction Project of Louisiana, New Orleans, Louisiana; Norman Lefstein, Professor of Law and Dean Emeritus, Indiana University School of Law, Indianapolis, Indiana; Margaret Love, Of Counsel, Asbill Moffitt & Boss, Chartered, Washington, D.C.; Jill Miller, Forensic Social Worker, Madison, Wisconsin; L. Jonathan Ross, private practitioner, Wiggin & Nourie, P.A., Manchester, New Hampshire (Chair, ABA Standing Committee on Legal Aid and Indigent Defendants); Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Randolph Stone, Professor of Law, University of Chicago School of Law, Chicago, Illinois (Representative from ABA Standing Committee on Legal Aid and Indigent Defendants); Ronald J. Tabak, private practitioner, Skadden, Arps, Slate, Megher & Flom LLP, New York, New York (Representative from ABA Section of Individual Rights and Responsibilities); Scott Wallace, Director, Defender Legal Services, National Legal Aid and Defender Association, Washington, D.C.; and Denise Young, private practitioner, Tucson, Arizona (Representative from Habeas Assistance and Training Project).

The following ABA staff and ABA entities participated in this project: Terry Brooks; Rebecca Coffee; Shubhangi Deoras; Judith Gallant; Robin Maher; Melanie Mays; Elisabeth Semel; the Association of the Bar of the City of New York; Criminal Justice Section; the Special Committee on Death Penalty Representation; the Section of Individual Rights and Responsibilities; the Standing Committee on Legal Aid and Indigent Defendants; the Section of Litigation; and the Senior Lawyers Division.

Finally, the ABA thanks Raoul Schoenemann, Chris Spaulding, and Janice Bergmann, who served as consultants to this project, and expresses its special appreciation to the Reporter, Eric M. Freedman, Professor of Law, Hofstra University School of Law, Hempstead, New York.

PCR000398

# INTRODUCTION

This revised edition of the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* is the product of a two-year long drafting effort. In April 2001, the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation jointly sponsored the ABA Death Penalty Guidelines Revision Project to update the Guidelines, which were originally adopted by the ABA House of Delegates in 1989. An Advisory Committee of experts was recruited to review and identify necessary revisions, including representatives from the following ABA and outside entities: ABA Criminal Justice Section; ABA Section of Litigation; ABA Section on Individual Rights and Responsibilities; ABA Standing Committee on Legal Aid and Indigent Defendants; ABA Special Committee on Death Penalty Representation; National Association of Criminal Defense Lawyers; National Legal Aid and Defender Association; Federal Death Penalty Resource Counsel; Habeas Assistance and Training Counsel; and State Capital Defenders Association.

Expert capital litigators were retained as consultants to the ABA Death Penalty Guidelines Revision Project to incorporate the decisions of the Advisory Committee into preliminary drafts of revisions. Drafts were considered by Advisory Committee members during several day-long meetings in Washington, D.C. as well as follow-up discussions. The final working draft of the revisions was approved by the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation. The ABA House of Delegates approved the revised edition of the Guidelines on February 10, 2003.

The final product, this revised edition of the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, is the result of an extensive and conscientious drafting and review process by experts in the field of death penalty litigation. The revised edition provides comprehensive, up-to-date guidance for professionals who work in this specialized and demanding field and helps to ensure effective assistance of counsel for all persons charged with or convicted of capital crimes.

PCR000399

# TABLE OF CONTENTS

Guideline 1.1      Objective and Scope of Guidelines ................................................ 1

Guideline 2.1      Adoption and Implementation of a Plan to Provide High Quality Legal Representation in Death Penalty Cases ..................... 18

Guideline 3.1      Designation of a Responsible Agency .................................... 22

Guideline 4.1      The Defense Team and Supporting Services ............................ 28

Guideline 5.1      Qualifications of Defense Counsel ........................................ 35

Guideline 6.1      Workload ................................................................................ 38

Guideline 7.1      Monitoring; Removal ............................................................ 42

Guideline 8.1      Training................................................................................... 46

Guideline 9.1      Funding and Compensation .................................................. 49

Guideline 10.1     Establishment of Performance Standards ............................. 55

Guideline 10.2     Applicability of Performance Standards ............................... 58

Guideline 10.3     Obligations of Counsel Respecting Workload....................... 61

Guideline 10.4     The Defense Team .................................................................. 63

Guideline 10.5     Relationship with the Client.................................................. 68

Guideline 10.6     Additional Obligations of Counsel Representing a Foreign National ... 73

Guideline 10.7     Investigation ......................................................................... 76

Guideline 10.8     The Duty to Assert Legal Claims........................................... 86

Guideline 10.9.1   The Duty to Seek an Agreed-Upon Disposition.................... 91

Guideline 10.9.2   Entry of a Plea of Guilty........................................................ 97

Guideline 10.10.1  Trial Preparation Overall ..................................................... 99

Guideline 10.10.2  Voir Dire and Jury Selection................................................. 100

Guideline 10.11    The Defense Case Concerning Penalty................................... 104

Guideline 10.12    The Official Presentence Report............................................ 117

Guideline 10.13    The Duty to Facilitate the Work of Successor Counsel ......... 119

Guideline 10.14    Duties of Trial Counsel After Conviction ............................. 121

Guideline 10.15.1  Duties of Post-Conviction Counsel ...................................... 123

Guideline 10.15.2  Duties of Clemency Counsel.................................................. 130

PCR000400

## Guideline 1.1        Objective and Scope of Guidelines

A.      The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.

B.      These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings, and any connected litigation.

### *Definitional Notes*

Throughout these Guidelines:

1.      As in the first edition, "should" is used as a mandatory term.

2.      By "jurisdiction" is meant the government under whose legal authority the death sentence is to be imposed. Most commonly, this will be a state (as opposed to, *e.g.*, a county) or the federal government as a whole. The term also includes the military and any other relevant unit of government (*e.g.*, Commonwealth, Territory). Where a federal judicial district or circuit is meant, the Commentary will so state.

3.      The terms "counsel," "attorney," and "lawyer" apply to all attorneys, whether appointed, retained, acting *pro bono*, or employed by any defender organization (*e.g.*, federal or state public defenders offices, resource centers), who act on behalf of the defendant in a capital case. When modified by "private," these terms apply to both *pro bono* and retained attorneys.

4.      The term "custody" is used in the inclusive sense of *Hensley v. Municipal Court*, 411 U.S. 345, 350-51 (1973).

5.      The term "post-conviction" is a general one, including (a) all stages of direct appeal within the jurisdiction and certiorari (b) all stages of state collateral review proceedings (however denominated under state law) and certiorari, (c) all stages of federal collateral review proceedings, however denominated (ordinarily petitions for writs of habeas corpus or motions pursuant to 28 U.S.C. § 2255, but including all applications of similar purport, *e.g.*, for writ of error coram nobis), and including all applications for action by the Courts of Appeals or the United States Supreme Court (commonly certiorari, but also, *e.g.*, applications for original writs of habeas corpus, applications for certificates of probable cause), all applications for interlocutory relief (*e.g.*, stay of execution, appointment of counsel) in connection with any of the foregoing. If a particular subcategory of post-conviction proceeding is meant, the language of the relevant Guideline or Commentary will so state.

6.      The terms "defendant," "petitioner," "inmate," "accused" and "client" are used interchangeably.

PCR000401

7.      The terms "capital case" and "death penalty case" are used interchangeably.

8.      The terms "defender organization," "Independent Authority," and "Responsible Agency" are defined in Guideline 3.1 and accompanying Commentary

9.      The term "Legal Representation Plan" is defined in Guideline 2.1.

*History of Guideline*

The Commentary to the original edition of this Guideline stated that it was designed to express existing "practice norms and constitutional requirements." This thought has been moved to the black letter in order to emphasize that these Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases.

The first edition of this Guideline stated that the objective in providing counsel in death penalty cases should be to ensure the provision of "quality legal representation." The language has been amended to call for "high quality legal representation" to emphasize that, because of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case.

The Guidelines formerly covered only "defendants eligible for appointment of counsel." Their scope has been revised for this edition to cover "all persons facing the possible imposition or execution of a death sentence." The purpose of the change is to make clear that the obligations of these Guidelines are applicable in all capital cases, including those in which counsel is retained or providing representation on a *pro bono* basis. The definition of "counsel" reflects this change.

The use of the term "jurisdiction" as now defined has the effect of broadening the range of proceedings covered. In accordance with current ABA policy, the Guidelines now apply to military proceedings, whether by way of court martial, military commission or tribunal, or otherwise.

In accordance with the same policy, the words "from the moment the client is taken into custody" have been added to make explicit that these Guidelines also apply to circumstances in which an uncharged prisoner who might face the death penalty is denied access to counsel seeking to act on his or her behalf (*e.g.*, by the federal government invoking national security, or by state authorities exceeding constitutional limitations). This language replaces phraseology in the former Guidelines which made them applicable to "cases in which the death penalty is sought." The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically important. In addition to enabling counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable, effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty. Thus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible – well before the prosecution has actually determined that the death penalty will be sought.

These Guidelines, therefore, apply in any circumstance in which a detainee of the government may face a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be

PCR000402

sought. The case remains subject to these Guidelines until the imposition of the death penalty is no longer a legal possibility. In addition, as more fully described in the Commentary, these Guidelines also recognize that capital defense counsel may be required to pursue related litigation on the client's behalf outside the confines of the criminal prosecution itself.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.2(c) & cmt. ("Role of Defense Counsel in Capital Cases"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.1 (3d ed. 1992) ("Objective").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.2 cmt. (3d ed. 1992) ("Capital Cases").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.1 (3d ed. 1992) ("Initial Provision of Counsel").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.2 (3d ed. 1992) ("Duration of Representation").

ABA, House of Delegates Resolution 8C (adopted Feb. 5, 2002)

### Commentary

Introduction

In 1932, Mr. Justice Sutherland, writing for the United States Supreme Court in *Powell v. Alabama*, a death penalty case, acknowledged that a person facing criminal charges "requires the guiding hand of counsel at every step in the proceedings against him."[1]

More than seventy years later, death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases.[2]

The quality of counsel's "guiding hand" in modern capital cases is crucial to ensuring a reliable determination of guilt and the imposition of an appropriate sentence. Today, it is

---

[1]    Powell v. Alabama, 287 U.S. 45, 69 (1932).

[2]    *See* McFarland v. Scott, 512 U.S. 849, 855 (1994) (noting the uniqueness and complexity of death penalty jurisprudence); *see also* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299 (1983); Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 MERCER L. REV. 695 (1991); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. ILL. L. REV. 323 (1993).

PCR000403

universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the highly specialized legal knowledge that counsel must possess and in the advocacy skills he or she must master.  At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules.  Counsel must be able to develop strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

As one writer has explained:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution.  The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law.  In addition, defending a capital case is an intellectually rigorous enterprise, requiring command of the rules unique to capital litigation and constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law.[3]

Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make "extraordinary efforts on behalf of the accused."[4]  As discussed *infra* in the text accompanying notes 228-29, these efforts may need to include litigation or administrative advocacy outside the confines of the capital case itself (*e.g.*, pursuit of information through a state open records law,[5] administrative proceedings to obtain or correct a military record, a collateral attack to invalidate a predicate conviction,[6] litigation of a systemic challenge to the jury selection procedures of a jurisdiction or district,[7] or to a jurisdiction's clemency process).[8]

---

[3]     Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences*, 43 Buff. L. Rev. 329, 357-58 (1995) (footnote omitted).

[4]     *See* ABA Standards for Criminal Justice: Defense Function , Standard 4-1.2(c), *in* ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

[5]     *See, e.g.,* McCleskey v. Zant, 499 U.S. 467, 526  (1991)  (Marshall, J., dissenting) (involving successor federal habeas corpus petition based on documents released as a result of new interpretation of Georgia Open Records Act by Georgia Supreme Court).

[6]     For example, the defendant prevailed in Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (disallowing use of prior conviction used in aggravation) only after the same *pro bono* counsel successfully litigated People v. Johnson, 69 N.Y.2d 339, 342 (1987) (vacating that conviction). *See infra* text accompanying note 21.

[7]     *Cf.* Amadeo v. Zant, 486 U.S. 214, 219 (1988) (involving federal habeas corpus petitioner who succeeded on jury discrimination claim where factual predicate was discovered in independent litigation against the county).

[8]     *See infra* text accompanying notes 63-64.

PCR000404

Structure of the Guidelines

This Commentary provides a general overview of the areas in which counsel must be prepared to perform effectively and be given appropriate governmental support in doing so.  These areas are addressed more specifically in subsequent Guidelines and commentaries.  While there is some inevitable overlap, Guidelines 1.1–10.1 contain primarily principles and policies that should guide jurisdictions in creating a system for the delivery of defense services in capital cases, and Guidelines 10.2-10.15.2 contain primarily performance standards defining the duties of counsel handling those cases.

Representation at Trial

Trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including rehabilitation of venire members who initially state opposition to the death penalty and demonstration of bias on the part of prospective jurors who will automatically vote to impose the death penalty if the defendant is convicted on the capital charge.[9]  Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination.[10]

An attorney representing the accused in a death penalty case must fully investigate the relevant facts.  Because counsel faces what are effectively two different trials – one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death[11] – providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation.  Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty.[12]  Counsel must

---

[9]     *See infra* Guideline 10.10.2.

[10]    *See infra* text accompanying notes 88-97.

[11]    *See* Bullington v. Missouri, 451 U.S. 430, 438-446 (1981); Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., *Legislative Modification of Federal Habeas Corpus in Capital Cases*, 44 REC. ASS'N OF THE BAR OF CITY OF N.Y. 848, 854 (1989) [hereinafter *Legislative Modification*] ("[For a lawyer], taking such a case means making a commitment to the full legal and factual evaluation of two very different proceedings (guilt and sentencing) in circumstances where the client is likely to be the subject of intense public hostility, where the state has devoted maximum efforts to the prosecution, and where one must endure the draining emotional effects of one's personal responsibility for the outcome.")

[12]    *See infra* text accompanying notes 159-63; *see also* Williams v. Taylor, 529 U.S. 362, 395-396 (2000) (notwithstanding fact that trial counsel "competently handled the guilt phase of the trial," counsel's failure to begin to prepare for sentencing phase until a week before trial fell below professional standards, and counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *id.* at 415 (O'Connor, J., concurring) ("counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances" amounted to ineffective assistance of counsel); ABA STANDARDS FOR CRIMINAL JUSTICE: Standard 4-4.1(a), *in* ABA STANDARDS FOR CRIMINAL JUSTICE:

5

promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.[13]  Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence,[14] to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty.[15]  At the same time, counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress.[16]

With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime, and all evidence -- whether testimonial, forensic, or otherwise -- purporting to inculpate the client. To assume the accuracy of whatever information the client may initially offer or the prosecutor may choose or be compelled to disclose is to render ineffective assistance of counsel. The defense lawyer's obligation includes not only finding, interviewing, and scrutinizing the backgrounds of potential prosecution witnesses, but also searching for any other potential witnesses who might challenge the prosecution's version of events, and subjecting all forensic evidence to rigorous independent scrutiny. Further, notwithstanding the prosecution's burden of proof on the capital charge, defense counsel may need to investigate possible affirmative defenses -- ranging from absolute defenses to liability (*e.g.*, self-defense or insanity) to partial defenses that might bar a death sentence (*e.g.*, guilt of a lesser-included offense).  In addition to investigating the alleged offense, counsel must also thoroughly investigate all events surrounding the arrest, particularly if the prosecution intends to introduce evidence obtained pursuant to alleged waivers by the defendant (*e.g.*, inculpatory statements or items recovered in searches of the accused's home).

Moreover, trial counsel must coordinate and integrate the presentation during the guilt phase of the trial with the projected strategy for seeking a non-death sentence at the penalty phase.[17]

---

PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.")

[13]     *See infra* Guideline 10.4(C) and accompanying Commentary.

[14]     *See infra* Guidelines 10.9.1-2

[15]     *See, e.g.,* Atkins v. Virginia, 122 S. Ct. 2242 (2002) (mental retardation).

[16]     *See infra* Guideline 10.5 and accompanying Commentary.

[17]     *See infra* Guideline 10.10.1 and accompanying Commentary. *See also* Stephen B. Bright, *Developing Themes in Closing Argument and Elsewhere: Lessons from Capital Cases*, LITIG., Fall 2000, at 40; Lyon, *supra* note 2, at 708-11; Mary Ann Tally, *Integrating Theories for Capital Trials: Developing the Theory of Life*, THE CHAMPION, Nov. 1998, at 34.

PCR000406

At that phase, defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death.[18]

If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate – together with the defense investigator, a mitigation specialist, and other members of the defense team – the defendant's behavior and the circumstances of the conviction.[19] Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence,[20] and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights.[21]

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.[22]

Along with preparing to counter the prosecution's case for the death penalty, defense counsel must develop an affirmative case for sparing the defendant's life.[23] A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death.[24] This Eighth Amendment right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[25] Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) links

---

[18]    *See infra* Guideline 10.11 and accompanying Commentary.

[19]    *See infra* text accompanying note 298.

[20]    *See, e.g.*, Simmons v. South Carolina, 512 U.S. 154, 160-61 (1994); Gardner v. Florida, 430 U.S. 349, 362 (1977).

[21]    *See* Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Counsel's obligation to prevent the prosecution from using unconstitutionally obtained prior convictions in support of a death sentence may well require counsel to litigate collateral challenges to such prior convictions in the jurisdictions or Districts where those convictions were obtained. *See, e.g.*, Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 402-04 (2001).

[22]    *See infra* text accompanying notes 299-302.

[23]    *See infra* text accompanying notes 275-89.

[24]    *See* Eddings v. Oklahoma, 455 U.S. 104, 116 (1982); Lockett v. Ohio, 438 U.S. 586, 602-03 (1978) (plurality opinion).

[25]    Louis D. Bilionis & Richard A. Rosen, *Lawyers, Arbitrariness, and the Eighth Amendment*, 75 Tex. L. Rev. 1301, 1316-17 (1997) (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)).

PCR000407

the client's behavior to the evidence offered in mitigation.[26]

Finally, trial counsel, like counsel throughout the process, must raise every legal claim that may ultimately prove meritorious, lest default doctrines later bar its assertion. "[T]he courts have shown a remarkable lack of solicitude for prisoners – including ones executed as a result – whose attorneys through no fault of the prisoners were not sufficiently versed in the law . . . [to] consider the possibility that a claim long rejected by local, state, and federal courts might succeed in the future or in a higher court."[27]

The Commentary to the first edition of this Guideline noted that "many indigent capital defendants are not receiving the assistance of a lawyer sufficiently skilled in practice to render quality assistance," and supported the statement with numerous examples. The situation is no better today.[28] Indeed, problems with the quality of defense representation in death penalty cases

---

[26]    *See infra* Guideline 10.11 and accompanying Commentary.

[27]    JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 11.2(a), at 482 (4th ed. 2001). Thus, for example, within a single week in the spring of 2002, the Supreme Court rendered two major rulings favorable to capital defendants. *See* Atkins v. Virginia, 122 S. Ct. 2242, 2252 (2002) (holding that the Constitution bars execution of mentally retarded individuals); Ring v. Arizona, 122 S. Ct. 2248, 2443 (2002) (applying *Apprendi v. New Jersey*, 530 U.S. 466 (2000) to capital cases). In both cases, the Court squarely overruled governing precedent. *See* Penry v. Lynaugh, 492 U.S. 302, 340 (1989) (holding that the Constitution does not bar the execution of mentally retarded individuals); Walton v. Arizona, 497 U.S. 639, 679 (1990) (upholding same statute later invalidated in *Ring* against same challenge); Apprendi v. New Jersey, 530 U.S. 466, 497 (2000) (stating that *Walton* remained good law). It would have been appropriate (and indeed, some Justices might believe, required on pain of forfeiture) for capital counsel to assert these claims at every stage in the proceedings, even though they were then plainly at odds with the governing law. *See infra* Guideline 10.8 and accompanying Commentary.

One current example is the potential categorical unconstitutionality of the execution of juveniles. In light of a growing body of scientific evidence regarding the diminished culpability of juveniles, Eighth Amendment considerations, and international laws and treaties forbidding the execution for crimes committed while under the age of 18, four current Justices have suggested that the Court should absolutely bar the execution of such offenders. *See In re* Stanford, 123 S. Ct. 472 (2002). Counsel would be remiss not to assert the claim, notwithstanding that the Court has previously rejected it. *See* Stanford v. Kentucky, 492 U.S. 361 (1989). A similar example is discussed *infra* at note 350.

[28]    *See generally* James S. Liebman, *The Overproduction of Death*, 100 COLUM. L. REV. 2030, 2102-08 (2000); Spec. Comm. on Capital Representation & Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., *The Crisis in Capital Representation*, 51 REC. OF ASS'N OF THE BAR OF CITY OF N.Y. 169, 185-87 (1996) [hereinafter *Crisis in Capital Representation*]; Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835 (1994); Jeffrey L. Kirchmeier, *Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the Stickland Prejudice Requirement*, 75 NEB. L. REV. 425, 427-33 (1996); Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials*, 107 HARV. L. REV. 1923 (1994). *See also infra* at note 153.

---

8

have been so profound and pervasive that several Supreme Court Justices have openly expressed concern. Justice Ginsberg told a public audience that she had "yet to see a death case among the dozens coming to the Supreme Court on eve-of-execution stay applications in which the defendant was well represented at trial" and that "people who are well represented at trial do not get the death penalty."[29] Similarly, Justice O'Connor expressed concern that the system "may well be allowing some innocent defendants to be executed" and suggested that "[p]erhaps it's time to look at minimum standards for appointed counsel in death cases and adequate compensation for appointed counsel when they are used."[30] As Justice Breyer has said, "the inadequacy of representation in capital case" is "a fact that aggravates the other failings" of the death penalty system as a whole.[31]

In the past, post-conviction review has often been relied upon to identify and correct untrustworthy verdicts.[32] However, legal changes in the habeas corpus regime,[33] combined with

---

[29]    Anne Gearan, *Supreme Court Justice Supports Death Penalty Moratorium*, ASSOCIATED PRESS, Apr. 9, 2001.

[30]    Crystal Nix Hines, *Lack of Lawyers Hinders Appeals in Capital Cases*, N.Y. TIMES, July 5, 2001, at A1.

[31]    *See* Ring v. Arizona, 122 S. Ct. 2428, 2448 (2002) (Breyer, J., concurring). The "failings" to which Justice Breyer refers are many of the same ones that led the ABA to call for a moratorium on the imposition of the death penalty. *See* ABA, *Report Accompanying Recommendation 107*, *3 (Feb. 3, 1997) ("Today, administration of the death penalty, far from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency.").

[32]    *See* ERIC M. FREEDMAN, HABEAS CORPUS: RETHINKING THE GREAT WRIT OF LIBERTY 147-48 (2001) (listing numerous modern examples of injustices in capital cases redressed on federal habeas corpus); LIEBMAN & HERTZ, *supra* note 27, § 11.2(c) (same).

[33]    In 1996, Congress enacted the Anti-Terrorism and Effective Death Penalty Act (the AEDPA), which imposed substantial restrictions on the availability of federal habeas corpus for state prisoners. The AEDPA established strict deadlines for the filing of a federal habeas petition, limits on the scope of review of state court decisions, restrictions on the availability of evidentiary hearings to develop facts in support of constitutional claims, and placed stringent constraints on federal courts' consideration of additional applications for review by the petitioner. *See generally* 28 U.S.C. § 2244-2264. There is significant cause for concern that these provisions may "greatly diminish the reliability of the capital system's review process and of the capital verdicts that the system produces." James S. Liebman, *An "Effective Death Penalty"? AEDPA and Error Detection in Capital Cases*, 67 BROOK. L. REV. 411, 427 (2001). *See also* ABA Panel Discussion, *Dead Man Walking Without Due Process? A Discussion of the Anti-Terrorism and Effective Death Penalty Act of 1996*, 23 N.Y.U. REV. L. & SOC. CHANGE 163, 166-75 (1997); Marshall J. Hartman & Jeanette Nyden, *Habeas Corpus and The New Federalism After The Anti-Terrorism And Effective Death Penalty Act of 1996*, 30 J. MARSHALL L. REV. 337, 387 (1997); Larry W. Yackle, *A Primer on the New Habeas Corpus Statute*, 44 BUFF. L. REV. 381, 386-93 (1996). One reason for this concern is that portions of the legislation seemed to reduce the level of scrutiny that the federal courts could give to state capital convictions. *See* 28 U.S.C. § 2254 (d), (e) (providing that writ may not be granted unless state proceedings resulted in a decision that was "contrary to or involved an unreasonable application of clearly established Federal law," or "was based on an

---

PCR000409

the Congress' defunding of post-conviction defender organizations (PCDOs) in 1995,[34] make it less likely that such traditional "fail-safes" will continue to operate properly in the future. Under the standards set out by the Supreme Court for reviewing claims of ineffective assistance of counsel,[35] even seriously deficient performance all too rarely leads to reversal.[36] Hence, jurisdictions that continue to impose the death penalty must commit the substantial resources necessary to ensure effective representation at the trial stage.[37]  In mandating the provision of high quality legal representation at the trial level of a capital case, this Guideline recognizes the simple truth that any other course has weighty costs – to be paid in money and delay if cases are reversed at later stages or in injustice if they are not.

Post-conviction Review

Ensuring high quality legal representation in capital trials, however, does not diminish the need for equally effective representation on appeal, in state and federal post-conviction proceedings, and in applications for executive clemency.  Because each of those proceedings has a unique role to play in the capital process, because both legal and social norms commonly evolve

unreasonable determination of the facts").

[34]     *See Crisis in Capital Representation, supra* note 28, at 200-05 (presenting state-by-state analysis of impact of defunding of PCDOs);  Roscoe C. Howard, Jr., *The Defunding of the Post Conviction Defense Organizations as a Denial of the Right to Counsel*, 98 W. VA. L. REV. 863 (1996) (emphasizing the important role that the former PCDOs played in assuring fairness in habeas corpus review of capital convictions); *see also* Ronald J. Tabak, *Capital Punishment: Is There Any Habeas Left in This Corpus?*, 27 LOY. U. CHI. L.J. 523, 540-43 (1996).

[35]     *See* Strickland v. Washington, 466 U.S. 668 (1984).

[36]     *See* McFarland v. Scott, 512 U.S. 1256, 1259 (1994) (Blackmun, J., dissenting from denial of *certiorari*) ("Ten years after the articulation of [the *Strickland*] standard, practical experience establishes that the *Strickland* test, in application, has failed to protect a defendant's right to be represented by something more than 'a person who happens to be a lawyer.'") (*quoting* Strickland v. Washington, 466 U.S. 668, 685 (1984)); Adele Bernhard, *Take Courage: What the Courts Can Do to Improve the Delivery of Criminal Defense Services*, 63 U. PITT. L. REV. 293, 346 (2002) ("[A]ll who have seriously considered the subject agree that *Strickland* has not worked either to prevent miscarriages of justice or to improve attorney performance."); William S. Geimer, *A Decade of* Strickland*'s Tin Horn: Doctrinal and Practical Undermining of the Right to Counsel*, 4 WM. & MARY BILL RTS. J. 91, 94 (1995) ("*Strickland* has been roundly and properly criticized for fostering tolerance of abysmal lawyering"); *Legislative Modification, supra* note 11, at 862 n.28 (criticizing "the strong presumptions of attorney effectiveness mandated by *Strickland*" as applied to capital cases: "Whatever benefits counter-factual presumptions may have in other areas of the law, they are certainly out of place when a human life hangs in the balance.").

[37]     *See, e.g.*, REPORT OF THE GOVERNOR'S COMMISSION ON CAPITAL PUNISHMENT 177, 179 (Apr. 2002), *available at* http://www.doc.state.il.us/ccp/reports/commission-report (recommending that the Illinois legislature "significantly improve the resources available to the criminal justice system in order to permit the meaningful implementation of reforms in capital cases," including the full funding of the defense, which "should significantly improve the quality of defense representation of capital defendants").

PCR000410

over the course of a case, and because of "the general tendency of evidence of innocence to emerge only at a relatively late stage in capital proceedings,"[38] jurisdictions that retain capital punishment must provide representation in accordance with the standards of these Guidelines "at all stages of the case." (Subsection B)   Post-judgment proceedings demand a high degree of technical proficiency, and the skills essential to effective representation differ in significant ways from those necessary to success at trial.   In addition, death penalty cases at the post-conviction stage may be subject to rules that provide less time for preparation than is available in noncapital cases.[39]   Substantive pleadings may have to be prepared simultaneously with, or even be delayed for, pleadings to stay the client's execution.[40]   For post-judgment review to succeed as a safeguard against injustice, courts must appoint appropriately trained and experienced lawyers.

     A.    <u>Representation on Direct Appeal</u>

        The Constitution guarantees effective assistance of counsel on an appeal as of right.[41]   The "guiding hand of counsel" must lead the condemned client through direct review.   Appellate counsel must be intimately familiar with technical rules of issue preservation and presentation, as well as the substantive state, federal, and international law governing death penalty cases, including issues which are "percolating" in the lower courts but have not yet been authoritatively resolved by the Supreme Court.[42]   Counsel must also be capable of making complex strategic decisions that maximize the client's chances of ultimate success in the event that the direct appeal is resolved unfavorably.[43]

---

[38]    Eric M. Freedman, *Innocence, Federalism and the Capital Jury: Two Legislative Proposals for Evaluating Post-trial Evidence of Innocence in Death Penalty Cases*, 18 N.Y.U. REV. L. & SOC. CHANGE 315, 316 (1991).

[39]    Under the AEDPA, "special habeas corpus procedures" may apply to federal habeas corpus petitions in capital cases if a state's post-conviction procedures satisfy certain prerequisites. *See* 28 U.S.C. § 2263. Thus, the deadline for filing of a federal habeas corpus petition by capital prisoners in qualifying "opt-in" states is 180 days, *id.*, in contrast to the one-year limitations period that would otherwise apply. 28 U.S.C. § 2244(d)(1). In addition, the AEDPA's "opt-in" procedures accelerate the time for review of the case by the district court and the court of appeals, 28 U.S.C. § 2266(b)(1)(A), (c)(1)(A), and restrict a capital habeas corpus petitioner's ability to amend a petition after the state files its response. 28 U.S.C. § 2266(b)(3)(B). *See also* Michael Mello & Donna Duffy, *Suspending Justice: The Unconstitutionality of the Proposed Six-Month Time Limit on the Filing of Habeas Corpus Petitions by State Death Row Inmates*, 18 N.Y.U. REV. L. & SOC. CHANGE 451, 487-92 (1991) (discussing why a six-month limit does not provide an attorney with adequate time to prepare a habeas petition properly).

[40]    *See infra* text accompanying notes 331-36.

[41]    *See* Evitts v. Lucey, 469 U.S. 387, 395-96 (1985).

[42]    *See* Smith v. Murray, 477 U.S. 527, 536-37 (1986) (holding that appellate counsel in a Virginia capital case had waived a legal issue by not raising it at an earlier stage of appeal; the novelty of the issue in Virginia was no excuse because it had been raised, though unsuccessfully, in an intermediate appellate court of another state).

[43]    *See infra* Guideline 10.15.1 and accompanying Commentary.

---

PCR000411

B.   Collateral Review Proceedings

Habeas corpus and other procedures for seeking collateral relief are especially important in capital cases.[44]   Quality representation in both state and federal court is essential if erroneous convictions are to be corrected.[45]

1.   State Collateral Review Proceedings

Counsel's obligations in state collateral review proceedings are demanding.[46] Counsel must be prepared to thoroughly reinvestigate the entire case to ensure that the client was neither actually innocent nor convicted or sentenced to death in violation of either state or federal law. This means that counsel must obtain and read the entire record of the trial, including all transcripts and motions, as well as proceedings (such as bench conferences) that may have been recorded but not transcribed.  In many cases, the record is voluminous, often amounting to many thousands of pages.  Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, again scrutinizing them for what is missing as well as what is present.

[44]   *See* McFarland v. Scott, 512 U.S. 849, 855 (1994) ("[Q]uality legal representation is necessary in capital habeas corpus proceedings in light of 'the seriousness of the possible penalty and . . . the unique and complex nature of the litigation.'") (citation omitted); LIEBMAN & HERTZ, *supra* note 27, § 2.6.

[45]   A recent comprehensive study finds that of every 100 death sentences imposed, 47 are reversed at the state level, on direct appeal or collateral review.  An additional 21 are overturned on federal habeas corpus. *See* JAMES S. LIEBMAN, ET AL., A BROKEN SYSTEM: ERROR RATES IN CAPITAL CASES, 1973-1995, pt. I, app. A, at 5-6 (2000).  These statistics indicate the importance of providing qualified counsel for both state and federal proceedings.

[46]   Some states provide attorneys at public expense to death-sentenced prisoners seeking state post-conviction relief, but others do not. *See* Andrew Hammel, *Diabolical Federalism: A Functional Critique and Proposed Reconstruction of Death Penalty Federal Habeas*, 39 AM. CRIM. L. REV.  1, 83-99 (2002) (providing state-by-state list); Jennifer N. Ide, *The Case of Exzavious Lee Gibson: A Georgia Court's (Constitutional) Denial of a Federal Right*, 47 EMORY L.J. 1079, 1099-1110 (1998); Clive A. Stafford Smith & Remy Voisin Starns, *Folly By Fiat: Pretending that Death Row Inmates Can Represent Themselves in State Capital Postconviction Proceedings*, 45 LOY. L. REV. 55, 56 (1999). Moreover, even in those states that nominally do provide counsel for collateral review, chronic underfunding, lack of standards, and a dearth of qualified lawyers willing to accept appointment have resulted in a disturbingly large number of instances in which attorneys have failed to provide their clients meaningful assistance. *See, e.g.*, TEX. DEFENDER SERV., A STATE OF DENIAL: TEXAS JUSTICE AND THE DEATH PENALTY, ch. 7 (2002), *available at* http://www.texasdefender.org/study/study.html (reporting that a review of 103 post-conviction petitions filed by court-appointed counsel in Texas death penalty cases between 1995 and 2000 indicated that 25 percent of the petitions were 15 pages long or less, and that counsel offered no evidence outside the trial record in 40 percent of the cases reviewed).

These considerations suggest that counsel should continue to test the solidity of Marray v. Giarratano, 492 U.S. 1 (1989) (rejecting claim of constitutional right to counsel in state capital post-conviction proceedings).

PCR000412

Like trial counsel, counsel handling state collateral proceedings must undertake a thorough investigation into the facts surrounding all phases of the case. It is counsel's obligation to make an independent examination of all of the available evidence -- both that which the jury heard and that which it did not -- to determine whether the decision maker at trial made a fully informed resolution of the issues of both guilt and punishment.

Since the reinstatement of the death penalty in 1977, there have been more than 100 known wrongful convictions in capital cases in the United States.[47] As further described *infra* in the text accompanying notes 196-200, these resulted from a variety of causes, including the testimony of unreliable jailhouse informants,[48] the use of dubious or fraudulent forensic scientific methods,[49]

---

[47]    *See* DEATH PENALTY INFORMATION CENTER: *Innocence and the Death Penalty*, *available at* http://www.deathpenaltyinfor.org/innoc.html (last visited December 18, 2002) (stating that there are 102 people that have been wrongly convicted of capital crimes). *See generally* JIM DWYER ET AL., ACTUAL INNOCENCE: FIVE DAYS TO EXECUTION AND OTHER DISPATCHES FROM THE WRONGFULLY CONVICTED (2000); C. RONALD HUFF ET AL., CONVICTED BUT INNOCENT 63-82 (1996); NAT'L INST. OF JUSTICE, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996); Ken Armstrong & Steve Mills, "'Until I Can be Sure:' How the Threat of Executing the Innocent has Transformed the Death Penalty Debate," in BEYOND REPAIR? AMERICA'S DEATH PENALTY (Stephen P. Garvey, ed. 2003); Michael L. Radelet & Hugo Adam Bedau, "The Execution of the Innocent," *in* AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT AND FUTURE OF THE ULTIMATE PENAL SANCTION 223 (James Acker et al., eds. 1998)

[48]    *See* Dodd v. State, 993 P.2d 778 (Okla. Crim. App. 2000) (citing "insidious reliability problems" as basis for imposing major procedural restrictions on use of jailhouse informants); CONSTITUTION PROJECT, MANDATORY JUSTICE: EIGHTEEN REFORMS TO THE DEATH PENALTY, at 52 (2001) (A "category of evidence that has a particularly high chance of being an outright lie, exaggerated, or otherwise erroneous is the testimony of jailhouse informants. Their confinement provides evidence of their questionable character, motivates them to lie in order to improve the conditions of their confinement or even secure their release, and often affords access to information that can be used to manufacture credible testimony."). *See, e.g.*, Ted Rohrlich, *Jail House Informant Owns Up to Perjury in a Dozen Cases*, L.A. TIMES, Jan. 4, 1990, at A1 (detailing perjuries committed by Leslie White, an inmate at the Los Angeles County jail who demonstrated to authorities and reporters how he concocted false confessions, and noting confession of another informant, Stephen Jesse Cisneros, to perjury in five murder cases).

[49]    *See generally* Brief of Amici Curiae Five Innocent Former Death Row Inmates & Centurion Ministries, Schlup v. Delo, 513 U.S. 298 (1995) (No. 93-7901) (reviewing generally unscrupulous practices by investigators and prosecutors that can lead to false convictions); Paul Duggan, *Oklahoma Reviews 3,000 Convictions*, WASH. POST, May 9, 2001, at A2 (discussing Oklahoma review of 3,000 convictions based on work of Joyce Gilchrist, an Oklahoma City police chemist, who went far beyond what was scientifically knowable in conducting forensic investigations of local crime); Davidson Goldin, *Fifth Trooper Pleads Guilty in Scandal*, N.Y. TIMES, Apr. 8, 1995, at A29 (describing scandal in which New York state troopers transferred fingerprints of potential suspects to crime scenes to enhance their cases); Mark Hansen, *Out of the Blue*, 82 A.B.A. J. 50 (1996) (describing dentist, widely discredited by his peers, who claimed to be able to match bite marks to the teeth that made them); Adam Liptak, *2 States to Review Lab*

PCR000413

prosecutorial misconduct, and incompetence of defense counsel at trial.  Because state collateral proceedings may present the last opportunity to present new evidence to challenge the conviction, it is imperative that counsel conduct a searching inquiry to assess whether any mistake may have been made.

Reinvestigation of the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds.  Counsel must determine if the witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial.  Counsel must also assess all of the non-testimonial evidence and consider such issues as whether forensic testing must now be performed, either because some technology, such as DNA, was unavailable at the time of trial or because trial counsel failed to ensure that necessary testing took place.[50]

Counsel must conduct a similarly comprehensive reevaluation of the punishment phase to verify or undermine the accuracy of all evidence presented by the prosecution, and to determine whether the decisionmaker was properly informed of all relevant evidence,[51] able to give appropriate weight to that evidence,[52] and provided with a clear and legally accurate set of instructions for communicating its conclusion.[53]

### 2.  Federal Habeas Corpus

In addition to requiring counsel to undertake all the tasks just described in Section B(1), federal collateral proceedings present another set of obstacles – ones that highlight the importance of quality representation.  From 1973 to 1995, capital habeas corpus petitioners obtained relief at many times the rate of non-capital ones[54] and they should continue to do so in the future.  But

---

*Work of Expert Who Erred on ID*, N.Y. TIMES, Dec. 19, 2002, at A24 (Montana and Washington reviewing over 100 cases based on questionable forensic testimony of Arnold Melnikoff); Armando Villafranca, *Bradford Cites Lab Furor, Urges Freeze on Death Row*, HOUSTON CHRONICLE, March 7, 2003 (reporting legislative testimony of Houston Police Chief urging that no execution dates be set for seven Death Row inmates whose cases may have been affected by shoddy work of Houston police crime laboratory, which was found in a state audit to have had numerous shortcomings in preservation and testing of DNA evidence; *infra* note 198).

[50]     *See, e.g.*, Eric M. Freedman, *Earl Washington's Ordeal*, 29 HOFSTRA L. REV. 1089, 1098-99 (2001) (*pro bono* counsel on state post-conviction discovered exculpatory semen stain evidence, which "having been appropriately turned over by the government, lay unappreciated in the files of former defense counsel").

[51]     *See* Williams v. Taylor, 529 U.S. 362, 370-71 (2000) (granting habeas corpus relief to petitioner whose trial counsel failed to find and present mitigating evidence).

[52]     *See infra* Guideline 10.10.2 and accompanying Commentary.

[53]     For examples of death sentences overturned for failure to comply with this requirement, see Penry v. Johnson, 532 U.S. 782 (2001), McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), and Davis v. Mitchell, 2003 WL 222741 (6th Cir. Feb. 4, 2003).

[54]     *See* James S. Liebman, et al., *Capital Attrition: Error Rates in Capital Cases, 1973-1995*,

federal habeas corpus actions are governed by a complex set of procedural rules.[55] Counsel must master these thoroughly.[56] Moreover, restrictions on the availability of federal habeas relief for state prisoners imposed by the AEDPA will continue to raise numerous novel legal issues.

    C.    <u>Executive Clemency</u>

    Executive clemency plays a particularly important role in death penalty cases, as it "provides the [government] with a final, deliberative opportunity to reassess this irrevocable punishment."[57] Because post-judgment proceedings have traditionally provided very limited opportunity for review of questions of guilt or innocence, clemency is "the historic remedy for preventing miscarriages of justice where judicial process has been exhausted."[58] As the Supreme Court has recognized, "history is replete with examples of wrongfully convicted persons who have been pardoned in the wake of after-discovered evidence establishing their innocence."[59] Recent advances in the use of DNA technologies, combined with restrictions on the availability of post-conviction review, have elevated the important role that clemency has played as the "fail-safe" of the criminal justice system,[60] and increased the demands on counsel.[61] Moreover, wholly apart

---

78 TEX. L. REV. 1839, 1849 (2000) (federal habeas relief was granted in 40 percent of 599 cases between 1973 and 1995 in which the judgment remained intact after direct appeal and state post-conviction review). *Cf.* Eric M. Freedman, *Federal Habeas Corpus in Capital Cases, in* AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT AND FUTURE OF THE ULTIMATE PENAL SANCTION *supra* note 47, at 417, 427 ("By the most generous estimates, the rate in non-capital cases does not exceed 7%, and, if the appropriate statistical methodology is applied, the actual number is less than 1%.").

[55]    *See, e.g.,* Edwards v. Carpenter, 529 U.S. 446 (2000) (limits on asserting ineffective assistance of counsel as "cause" for procedural default); Schlup v. Delo, 513 U.S. 298 (1995) ("fundamental miscarriage of justice" exception to procedural default rule); Teague v. Lane, 489 U.S. 288 (1989) (non-retroactivity of "new rules" of constitutional procedure); Wainwright v. Sykes, 433 U.S. 72 (1977) (limiting review of constitutional claims due to procedural default). Indeed, on the website of the *New York Times*, its Supreme Court reporter, Linda Greenhouse, has described the Court's habeas jurisprudence as "so complex as to be almost theological" (posted July 6, 2001).

[56]    *See Legislative Modification, supra* note 11, at 854 ("The post-conviction handling of capital cases is a legal specialty requiring mastery of an intricate body of fast-changing substantive and procedural law.")

[57]    Daniel T. Kobil, *Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency*, 27 U. RICH. L. REV. 201, 214 (1993). *See infra* Guideline 10.15.2 and accompanying Commentary.

[58]    Herrera v. Collins, 506 U.S. 390, 411-12 (1993).

[59]    *Id.* at 415.

[60]    *See* Kathleen M . Ridolfi, *Not Just an Act of Mercy: The Demise of Post-Conviction Relief and a Rightful Claim to Clemency*, 24 N.Y.U. REV. L. & SOC. CHANGE 43, 68-77 (1998).

[61]    *See, e.g.,* Freedman, *supra* note 50, at 1100-03 (describing detailed oral and written

---

PCR000415

from questions of guilt or innocence, executive clemency has been granted in death penalty cases for a broad range of humanitarian reasons.[62] Recognizing these considerations, the Supreme Court has begun to apply due process protection to clemency proceedings.[63] Thus, in addition to assembling the most persuasive possible record for the decisionmaker, counsel must carefully examine the possibility of pressing legal claims asserting the right to a fuller and fairer process.[64]

The Imperative of a Systemic Approach

General statements of expectations about what lawyers should do will not themselves ensure high quality legal representation. Indeed, Guidelines confined to such statements would be ones "that palter with us in a double sense, that keep the word of promise to our ear, and break it to our hope."[65] Attorney error is often the result of systemic problems, not individual deficiency. [66] The provision of counsel for indigent capital defendants is too frequently made through *ad hoc* appointment, a system inimical to effective representation.[67] Although defender offices generally have the experience and dedication to provide high quality legal representation in capital cases, they are commonly overworked and inadequately funded. And private counsel often discover too late that they have taken on a task for which they are unqualified[68] or lack sufficient resources. The Guidelines that follow, therefore, not only detail the elements of quality representation, but mandate the systematic provision of resources to ensure that such representation is achieved in fact, whether counsel is individually assigned, employed by a defender office, or privately retained

---

presentations made to two Governors of Virginia by a six-lawyer team to secure DNA testing for death row inmate Earl Washington that resulted in his exoneration). *See also infra* Guideline 10.15.2 and accompanying Commentary

[62]   *See* Michael L. Radelet & Barbara A. Zsembik, *Executive Clemency in Post-Furman Cases*, 27 U. RICH. L. REV. 289, 297-99 (1993) (identifying 29 cases between 1972 and 1993 in which death-sentenced inmates had their death sentences commuted to terms of life imprisonment through executive clemency procedures).

[63]   *See* Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272 (1998); *see also* Ford v. Wainwright, 477 U.S. 399 (1986) (invalidating Florida procedure for determining whether inmate was mentally competent to be executed).

[64]   *See, e.g.,* Wilson v. United States Dist. Ct., 161 F.3d 1185 (9th Cir. 1998) (affirming District Court order directing new clemency proceeding on basis that prior one had violated due process).

[65]   WILLIAM SHAKESPEARE, MACBETH act 5, sc. 8.

[66]   *See* Goodpaster, *supra* note 2, at 356.

[67]   *See infra* Guideline 2.1(C) and accompanying Commentary.

[68]   *See, e.g.,* Washington v. Murray, 952 F.2d 1472 (4th Cir. 1991) (failure of retained counsel to appreciate exculpatory significance of scientific evidence produced by prosecution). *See generally* Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) (guarantee of Sixth Amendment applies equally whether counsel is retained or appointed).

PCR000416

with or without compensation.[69]

Conclusion

Unless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."[70]   Accordingly, any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines.[71]

---

[69]     *See infra* Guidelines 4.1 and 9.1 and accompanying Commentary.

[70]     Lockett v. Ohio, 438 U.S. 586, 605 (1978).

[71]     *Cf. Legislative Modification, supra* note 11, at 848 ("[F]or so long as the death penalty continues to exist in this country, capital inmates are entitled to procedures -- including ones for the provision of competent counsel -- that result in the full and fair review of their convictions and sentences.  Correlatively, any state which chooses to impose death sentences must accept the obligation of providing mechanisms for assuring that those sentences are legally and factually correct at the time of their execution.").

PCR000417

**Guideline 2.1**     **Adoption and Implementation of a Plan to Provide High Quality Legal Representation in Death Penalty Cases**

A.     Each jurisdiction should adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to be provided in accordance with these Guidelines (the "Legal Representation Plan").

B.     The Legal Representation Plan should set forth how the jurisdiction will conform to each of these Guidelines.

C.     All elements of the Legal Representation Plan should be structured to ensure that counsel defending death penalty cases are able to do so free from political influence and under conditions that enable them to provide zealous advocacy in accordance with professional standards.

*History of Guideline*

    The obligation to create a formal "Legal Representation Plan" for provision of representation in death penalty cases was contained in Guideline 3.1 of the original edition. Subsection B is new and is designed to make it easier for jurisdictions to determine the necessary contents of a Plan. Subsection C is drawn from several sections of the original edition.

*Related Standards*

    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.2 (3d ed. 1992) ("Systems for legal representation").

    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.3 (3d ed. 1992) ("Professional independence").

    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 (3d ed. 1992) ("Supporting services").

    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.5 (3d ed. 1992) ("Training and professional development").

    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.6 (3d ed. 1992) ("Funding").

    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

    ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 1 (2002) ("The public defense function, including the selection, funding and payment of defense counsel, is independent").

    NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDSARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.8 (1973) ("Selection of Public Defenders").

PCR000418

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.9 (1973) ("Performance of Public Defender Function").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.4 (1976) ("State Level Organization with Centralized Administration").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.10 (1976) ("The Defender Commission").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.11 (1976) ("Functions of the Defender Commission").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES Standard 2.18 (1976) (Administration of Defense System Funds").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.1 (1989) ("Establishment of a Legal Representation Plan").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES Standard II-1 (1984) ("Policy Board").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES Standard II-2 (1984) ("Members").

### Commentary

Each jurisdiction should take effective measures to formalize the process by which high quality legal representation will be provided in capital cases. This may be done by statute, court order, regulation or otherwise. The critical element is that the plan be judicially enforceable against the jurisdiction.[72] Experience shows, however, that a plan is most likely to succeed if it is embodied in a statute. That route maximizes judicial neutrality in passing on claims of non-compliance, and tends to result in greater transparency and access to public funds than do the other options.

---

[72]    *See, e.g.*, Spalding v. Dugger, 526 So. 2d 71, 72 (Fla. 1988) (holding that under statute creating office for post-conviction capital representation, "each defendant . . . is entitled, as a statutory right, to effective legal representation," and may enforce that right in post-conviction proceedings).

PCR000419

The Legal Representation Plan should provide standards and procedures that apply to capital cases on a jurisdiction-wide basis. National professional groups concerned with criminal justice issues have for decades advocated that defender services be organized on a statewide basis.[73] Specifically, the ABA Criminal Justice Standards endorse statewide organization "as the best means for service provision."[74] Jurisdiction-wide organization and funding can best ameliorate local disparities in resources and quality of representation, and insulate the administration of defense services from local political pressures.[75]

This last item is, of course, of critical concern. "It is essential that both full-time defenders and assigned counsel be fully independent, free to act on behalf of their clients as dictated by their best professional judgment. A system that does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can afford to retain."[76]

---

[73]    *See, e.g.*, NAT'L LEGAL AID & DEFENDER ASS'N, NATIONAL STUDY COMMISSION ON DEFENSE SERVICES, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES FINAL REPORT (1976) (calling for a statewide organization with a centralized administration to "ensure uniformity and equality of legal representation and supporting services and to guarantee professional independence for individual defenders"); Nat'l Conf. of Comm'rs on Unif. State Laws, *Prefatory Note* to UNIFORM LAW COMMISSIONER'S MODEL PUBLIC DEFENDER ACT, *in* HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 267-268 (1970) (approving recommendation of National Defenders Conference that every state establish a statewide public defender system "to assure better coordination and consistency of approach throughout the state, [provide] better consultation with the several branches of state government, [...] reduce the administrative burden on court personnel and provide more efficient and more experienced defense counsel services to needy persons accused of crime"); TASK FORCE ON THE ADMIN. OF JUSTICE, PRESIDENT'S COMM'N ON LAW ENFORCEMENT & ADMIN. OF JUSTICE, TASK FORCE REPORT: THE COURTS 52-53 (1967) (recommending that "each State should finance assigned counsel and defender systems on a regular and statewide basis").

[74]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES, Standard 5-1.2(c) and cmt. (3d ed. 1992, black letter approved 1990, commentary completed 1992).

[75]    Mississippi, for example, has recently moved from a county-based to a state-based system for the provision of capital defense services. *See* Julie Goodman, *Inmates on Death Row Given Last Hope*, CLARION-LEDGER (Jackson, Miss.), May 13, 2002, at B1 (discussing post-conviction defense office); Emily Wagster, *Capital Defense Job Filled; State Office to Provide Lawyers for Indigent*, SUN HERALD (Biloxi, Miss.), July 7, 2001, at A2 (discussing trial defense office). Similarly, California has adopted statewide qualifications for appointed trial counsel in capital cases effective January 1, 2003. *See* Cal. Rules of Ct., R. 4.117.

[76]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.3 cmt. (3d ed. 1992). *See also*, ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 1 and cmt. (2002) ("The public defense function, including the selection, funding, and payment of defense counsel, is independent.") ("The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel. To safeguard independence and to promote efficiency and quality of services, a non-partisan board should oversee defender, assigned counsel, or

PCR000420

Therefore, as Guideline 2.1(C) mandates, any acceptable Legal Representation Plan must assure that individual lawyers are not subject to formal or informal sanctions (*e.g.*, through the denial of future appointments, reductions in fee awards, or withholding of promotions in institutional offices) for engaging in effective representation.[77] The same principle applies to the overall architecture of the system. Thus, for example, the head of a public defender office must be subject to judicial supervision only in the same manner and to the same extent as a lawyer in private practice – and not be subject to institutional arrangements that might enable his or her re-appointment to be blocked by judges irked at the zealous advocacy conducted by his or her office.

Moreover, the system must be structured so as to assure that each client receives defense services "in accordance with professional standards." (Subsection C) For example, it is predictable that there will be conflicts of interest among various actors in the criminal justice system (e.g. co-defendants, co-operating witnesses), who may play different roles in different cases, and the plan must provide a mechanism to assure conflict-free representation.[78]

---

contract systems. Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense. The selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff.").

[77]   For example, under the North Carolina's Indigent Defense Services Act of 2000, a 13-member Indigent Defense Services Commission (consisting of ten members appointed by, but independent of, the state Bar, the Governor, the Chief Justice, and the legislature, and three members chosen collectively by those ten) appoints a Capital Defender who is responsible only to it. The Capital Defender supervises a staff of attorneys and also oversees the representation provided by a roster of private lawyers and public defenders who have been certified to provide representation in capital cases. *See* www.ncids.org (last visited March 7, 2003). *Cf. Retarding Due Process*, St. Petersburg Times, Apr. 22, 2002, at A10 (editorial criticizing Florida legislation permanently barring any appointed capital defense attorney seeking compensation in excess of fee schedule from another appointment).

[78]   For instance, although it may not violate the Sixth Amendment for defense counsel to have previously represented the victim, *see* Mickens v. Taylor, 122 S. Ct. 1237 (2002), it certainly violates ethical norms, *see* Brief of Legal Ethicists and the Stein Center for Law and Ethics as Amici Curiae in Support of Petitioner, Mickens v. Taylor, 122 S. Ct. 1237 (2002) (No. 00-9285) and would not be permitted by any acceptable plan for capital representation. *Cf. Ex parte* McCormick, 645 S.W.2d 801 (Tex. Crim. App. 1983) (en banc) (reversing two capital convictions because same counsel represented both co-defendants).

PCR000421

**Guideline 3.1**       **Designation of a Responsible Agency**

A.     The Legal Representation Plan should designate one or more agencies to be responsible, in accordance with the standards provided in these Guidelines for:

  1.     ensuring that each capital defendant in the jurisdiction receives high quality legal representation, and

  2.     performing all the duties listed in Subsection E (the "Responsible Agency").

B.     The Responsible Agency should be independent of the judiciary and it, and not the judiciary or elected officials, should select lawyers for specific cases.

C.     The Responsible Agency for each stage of the proceeding in a particular case should be one of the following:

  <u>Defender Organization</u>

  1.     A "defender organization," that is, either:

    a.     a jurisdiction-wide capital trial office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or

    b.     a jurisdiction-wide capital appellate and/or post-conviction defender office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or

  <u>Independent Authority</u>

  2.     An "Independent Authority," that is, an entity run by defense attorneys with demonstrated knowledge and expertise in capital representation.

D.     Conflict of Interest:

  1.     In any circumstance in which the performance by a defender organization of a duty listed in Subsection E would result in a conflict of interest, the relevant duty should be performed by the Independent Authority.  The jurisdiction should implement an effectual system to identify and resolve such conflicts.

  2.     When the Independent Authority is the Responsible Agency, attorneys who hold formal roles in the Independent Authority should be ineligible to represent defendants in capital cases within the jurisdiction during their term of service.

PCR000422

E.   The Responsible Agency should, in accordance with the provisions of these Guidelines, perform the following duties:

1.   recruit and certify attorneys as qualified to be appointed to represent defendants in death penalty cases;

2.   draft and periodically publish rosters of certified attorneys;

3.   draft and periodically publish certification standards and procedures by which attorneys are certified and assigned to particular cases;

4.   assign the attorneys who will represent the defendant at each stage of every case, except to the extent that the defendant has private attorneys;

5.   monitor the performance of all attorneys providing representation in capital proceedings;

6.   periodically review the roster of qualified attorneys and withdraw certification from any attorney who fails to provide high quality legal representation consistent with these Guidelines;

7.   conduct, sponsor, or approve specialized training programs for attorneys representing defendants in death penalty cases; and

8.   investigate and maintain records concerning complaints about the performance of attorneys providing representation in death penalty cases and take appropriate corrective action without delay.

## *History of Guideline*

The obligation of the Legal Representation Plan to designate a "Responsible Agency" for the appointment of counsel in death penalty cases was contained in Guideline 3.1 of the first edition. Subsection B makes it clear that the Responsible Agency should be an independent entity, and that lawyer selection should not be performed by the judiciary or elected officials. Subsection C is new and describes the acceptable kinds of Responsible Agencies. Subsection D is new and specifies the obligations of the Responsible Agency in the event of a conflict of interest. Lastly, part of subsection E is new and details the other duties of the Responsible Agency, including the duty to ensure that qualified attorneys are available to represent defendants in death penalty cases, the duty to promptly investigate complaints about the performance of attorneys, and the duty to take corrective action without delay.

## *Related Standards*

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.2 (3d ed. 1992) ("Systems for legal representation").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.3 (3d ed. 1992) ("Professional independence").

PCR000423

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.8 (1973) ("Selection of Public Defenders").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.10 (1976) ("The Defender Commission").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.11 (1976) ("Functions of the Defender Commission").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.12 (1976) ("Qualifications of the Defender Director and Conditions of Employment").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.13 (1976) ("The Governing Body For Assigned Counsel Programs").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Standard 2.18 (1976) ("Administration of Defense System Funds").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.1 (1989) ("Establishment of Legal Representation Plan").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.2.1 (1989) ("Creation of Board").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.2.2 (1989) ("Functions of Board").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-1 (1984) ("Purposes/ Policy Board").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-2 (1984) ("Members").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-3 (1984) ("Duties").

PCR000424

*Commentary*

As indicated in Guideline 2.1(C) and the accompanying Commentary, the Legal Representation Plan must ensure that the capital defense function remains free from political influence. One important mechanism for accomplishing this goal is granting the authority for training, assigning, and monitoring capital defense lawyers to one or more entities independent of the judiciary and wholly devoted to fostering high quality legal defense representation.

This Guideline, based on accumulated experience, contemplates two structures that jurisdictions might employ.

1.     In the first structure, the jurisdiction has created (a) a jurisdiction-wide capital trial organization, relying on staff attorneys, and, optionally, members of the private bar, and/or (b) a jurisdiction-wide capital appellate and/or post-conviction defender organization, relying on staff attorneys, and, optionally, members of the private bar.  (Collectively, "defender organizations").[79]

In this structure, the defender organizations may both provide representation and perform all the functions listed in Subsection E as appropriate to their portion of the system, with one key exception.  No defender organization may perform any function that would involve it in a conflict of interest, *e.g.*, monitoring its own performance under Guideline 7.1 (A), investigating or disposing of a complaint against such a lawyer pursuant to Guideline 7.1 (B) against one of its staff lawyers, or making the appointment of counsel in a situation in which there exists a professional conflict.  Thus, for example, if two defendants with antagonistic defenses were charged with a capital crime, the agency could assign itself to defend one of them but could play no role in the assignment of counsel to the other.  Similarly, a defender organization could not monitor the quality of its own performance (Subsection E (5)).

Accordingly, this structure also contemplates the existence of an "Independent Authority," which will at minimum deal with conflicts such as these.

2.     In the second structure, an "Independent Authority," an entity run by defense attorneys with demonstrated knowledge and expertise in the representation of persons facing the possible imposition or execution of a death sentence, performs all the functions listed in Subsection E but does not itself provide representation.

While serving the organization in a formal role, whether paid or unpaid (*e.g.*, officers, directors, staff members), attorneys should not be eligible for appointment to death penalty cases.

---

[79]     For example, in 1995, New York enacted a comprehensive legislative plan for a "capital defender office" (CDO) to provide representation and legal assistance in capital cases. NY. JUD. LAW § 35-b(3) (McKinney 2001).  The CDO is authorized to represent capital defendants and also to advise and assist other appointed counsel in such cases.  The office assists in determining qualification standards and presenting training programs for attorneys seeking to become certified to accept appointments.  Other states have similar programs for providing representation in post-conviction proceedings. *See, e.g.,* CAL. GOV'T CODE § 68661 (West Supp. 2002) (creating California Habeas Corpus Resource Center, which is authorized to provide representation and serve as a resource in state and federal post-conviction proceedings).

PCR000425

The idea is that attorneys should not be appointed by an entity in whose operations they are playing a material role. Thus, this provision does not extend to persons who are simply providing occasional advice to the entity.

The agency performing the function in the particular case, whether a defender organization or the Independent Authority, is referred to as "the Responsible Agency."

The Responsible Agency must assess the qualifications of attorneys who wish to represent capital defendants, conducting a meaningful review of each request for inclusion on the roster of qualified counsel in light of the criteria listed in Guideline 5.1. In order to make informed decisions on eligibility, the Responsible Agency should have sufficient flexibility to gather as much relevant information as possible to secure a fair picture of the applicant's ability and experience. The Responsible Agency should utilize whatever sources of information it deems appropriate, including in-court observations, writing samples, and information-gathering from the applicant, from judges before whom the applicant has appeared, and from attorneys, supervisors, and former clients who are familiar with the applicant's professional abilities. The performance standards established pursuant to Guidelines 10.1 *et seq.* should also be used to evaluate the prior performance in capital cases of attorneys seeking to establish eligibility for renewal placement on the roster of qualified counsel.

In assigning attorneys to capital cases, the overriding consideration must always be to provide high quality legal representation to the person facing a possible death sentence. Adherence to a "strict rotation" system for assigning counsel in the interest of fairness to attorneys should never take precedence over the interests of the capital defendant in receiving the best possible representation. Rather, in making assignments of counsel to a particular capital case, the Responsible Agency should give careful consideration to counsel's qualifications, skills, and experience; any aspects of the case that make assignment of a lawyer with specific qualifications or skills necessary or particularly appropriate (*e.g.*, counsel's ability to speak the client's native language); and the relative onerousness of prospective lawyers' existing caseloads. It is also appropriate to give consideration to maintaining continuity of counsel where the defendant has previously been represented by a qualified lawyer at an earlier stage of the proceedings, provided that (a) counsel is also deemed qualified to represent the client at the subsequent stage of the proceedings and (b) counsel's representation of the client at successive stages of the proceedings does not present a conflict of interest.[80] Given the extraordinary demands and pressures placed on counsel in a capital case,[81] the Responsible Agency should, in accordance with Guideline 4.1 (A)(1), ensure that at every stage of the proceedings the defendant is represented by counsel who are in a position to provide high quality legal representation. This may require the agency to furnish resources, in the form of additional counsel or otherwise,[82] to private counsel.[83]

---

[80]     Of course, any applicable statutory provisions, *e.g.*, 28 U.S.C. § 2261(d), must also be observed.

[81]     *See supra* Guideline 1.1 and accompanying Commentary.

[82]     *See infra* Guideline 4.1 and accompanying Commentary.

[83]     Specifically, the Responsible Agency should in every capital case determine whether retained or *pro bono* counsel meets the qualification standards set forth in Guideline 5.1 *infra* and, if not, provide as many additional qualified attorneys as are appropriate under the circumstances

PCR000426

The remaining elements of this Guideline reflect the longstanding view of the ABA that "jurisdictions that have the death penalty should establish and fund organizations to recruit, select, train, monitor, support, and assist attorneys involved at all stages of capital litigation and, if necessary, to participate in the trial of such cases."[84]  Several of these functions are described in greater detail in subsequent Guidelines.[85]  The common theme, however, is that the provision of consistently high quality legal representation requires that the duties given to the Responsible Agency by this Guideline be performed by an entity with the authority and resources to discharge them vigorously.

---

of the case.  In accordance with Guideline 4.1(B), the Responsible Agency must also assure that counsel have the necessary support services.

[84]  ABA Criminal Justice Section, Report to the House of Delegates (Feb. 1990), *reprinted in Toward a More Just and Effective System of Review in State Death Penalty Cases*, 40 AM. U. L. REV. 1, 9 (1990).

[85]  *See, e.g., infra* Guideline 7.1 (removal of attorneys from roster); Guideline 8.1 (training programs).

PCR000427

**Guideline 4.1        The Defense Team and Supporting Services**

A.    **The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.**

1.    **The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.**

2.    **The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.**

B.    **The Legal Representation Plan should provide for counsel to receive the assistance of all expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings. The Plan should specifically ensure provision of such services to private attorneys whose clients are financially unable to afford them.**

1.    **Counsel should have the right to have such services provided by persons independent of the government.**

2.    **Counsel should have the right to protect the confidentiality of communications with the persons providing such services to the same extent as would counsel paying such persons from private funds.**

*History of Guideline*

This Guideline is based on Guideline 8.1 of the original edition. In keeping the team approach described in the Commentary, Subsection A has been added to provide for the assembly of a "defense team." The first sentence of Subsection B is based on the original version of the Guideline and has been revised to emphasize that the purpose of providing adequate support services is to further the overall goal of providing "high quality legal representation," not merely "an adequate defense." The second sentence is taken from Standard 5-1.4 of the ABA Standards for Criminal Justice: Providing Defense Services. Subsections B (1) and B (2) are new and reflect the decision to include private attorneys in these Guidelines.

*Related Standards*

ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS Standard 7-1.1 (1989) ("Roles of Mental Health and Mental Retardation Professionals in the Criminal Process").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.4 (3d ed. 1992) ("Supporting services").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION Standard 3-2.4 ("Special Assistants, Investigative Resources, Experts"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1 ("Duty to

PCR000428

Investigate"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.14 (1973) ("Supporting Personnel and Facilities").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel).

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 2 (1970) ("Rights to Representation, Services, and Facilities").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 12 (1970) ("Personnel and Facilities").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-8 (1984) ("Support Staff and Forensic Experts").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-9 (1984) ("Investigators").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-10 (1984) ("Compensation").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES §3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES §3.4 (1976) ("Nonpersonnel Needs in Defender Offices").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.6 (1989) ("Support Services").

*Commentary*

Introduction

In a capital case reaffirming that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.[86]

---

[86]     Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

PCR000429

It is critically important, therefore, that each jurisdiction authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal, post-conviction and clemency, and to procure and effectively present the necessary expert witnesses and documentary evidence.[87]

The Team Approach to Capital Defense

National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate supporting services, including, "expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencing, and trained investigators to interview witnesses and to assemble demonstrative evidence."[88]

This need is particularly acute in death penalty cases. The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own.[89] Yet investigating a homicide is uniquely complex and often involves evidence of many different types. Analyzing and interpreting such evidence is impossible without consulting experts -- whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others.[90]

In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses.[91] Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings,

---

[87]   *See* ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 cmt. (3d ed. 1992).

[88]   *Id.*

[89]   *See* Subcommittee on Federal Death Penalty Cases Committee on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 24 (1998) [hereinafter *Federal Death Penalty Cases*] (discussing federal death penalty cases), *available at* http://www.uscourts.gov/dpenalty/1COVER.htm (reporting that "both the prosecution and the defense rely more extensively on experts in death penalty cases" than in other criminal cases).

[90]   *See e.g.,* Alec Wilkinson, *A Night at the Beat House,* THE NEW YORKER, Feb. 13, 1995, at 68 (discussing how counsel used an expert to show that victim was not killed in the prosecuting jurisdiction but dragged to the crime scene after her death; client eventually exonerated and released).

[91]   *See, e.g.,* Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation,* 35 SANTA CLARA L. REV. 547 (1995); Dorothy O. Lewis et al., *Psychiatric, neurological, and psychoeducational characteristics of 15 Death Row inmates in the United States,* 143:7 AM. J. PSYCHIATRY 838-45 (1986).

PCR000430

including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend *Miranda* warnings, and competency to waive constitutional rights.  The Constitution forbids the execution of persons with mental retardation,[92] making this a necessary area of inquiry in every case.  Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase.[93]  Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process.[94]  Counsel must compile extensive historical data, as well as obtaining a thorough physical and neurological examination.  Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.[95]

Counsel's own observations of the client's mental status, while necessary,[96] can hardly be expected to be sufficient to detect the array of conditions (*e.g.*, post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance.  Accordingly, Subsection A (2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs.  The demands of each case – and each stage of the same case – will differ.  Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories.  For example, it might well be appropriate for counsel to retain an expert familiar with the cultural context by which the defendant was shaped, or a professional researcher to track down elusive archival records.  While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole.[97]

---

[92]    *See* Atkins v. Virginia, 122 S. Ct. 2242 (2002).

[93]    *See* Goodpaster, *supra* note 2, at 323-24.

[94]    *See* John H. Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, THE ADVOCATE, Aug. 1995, *available at* http://www.dpa.state.ky.us/rwheeler/blume/blume.html.

[95]    *See* Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43-64 (1994).

[96]    *See infra* Guidelines 10.5 and 10.15.1(E)(2) and accompanying Commentary.

[97]    For example, in light of the constitutional prohibition on the execution of the mentally retarded, *see* Atkins v. Virginia, 122 S. Ct. 2242 (2002), significant resources spent at the pretrial phase in investigating and presenting the defendant's retardation status will be amply repaid in future cost savings since the most likely outcomes are (a) the case is taken off the capital track

PCR000431

Effective Assistance of Experts

Subsections B (1) and B (2) are aimed at insuring that the fact of public funding does not diminish the quality of the assistance that counsel is able to obtain from experts. Thus, unless counsel agrees otherwise, the defendant is entitled to experts independent of the government; the jurisdiction may not meet its obligations by relegating him to the state mental hospital or the state crime laboratory.[98] Similarly, doctrines of privilege, work product, and the like should protect the communications between counsel and the experts just as they would if the experts were being paid with private funds. Procedures for the auditing of public funds should be structured so as to preserve this confidentiality.

The Core Defense Team

In addition to employing the particular nonlegal resources that high quality legal representation requires in each individual case, the standard of practice demands that counsel have certain specific forms of assistance in every case. This Guideline accordingly requires that those resources be provided.[99]

     A.   The Investigator

The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings. Although some investigative tasks, such as assessing the credibility of key trial witnesses, appropriately lie within the domain of counsel, the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case. Moreover, the defense may need to call the person who conducted the interview as a trial witness.[100] As a result, an investigator should be part of the defense team at stage of a capital proceeding.

---

entirely, very possibly by agreement with the prosecution or (b) the issue is decided against the defendant, thus minimizing the likelihood of it being raised later. Similarly, it is not only expensive, but also extremely unjust for exculpatory evidence about which trial counsel should have learned from an expert to lie undiscovered until post-conviction proceedings many years later – years during which an innocent person is incarcerated. *See* Freedman, *supra* note 50, at 1094-95, 1098-99.

[98]     Of course, non-lawyer professionals on the staff of defender organizations are, even if on the public payroll, "independent of the government" for this purpose.

[99]     This Guideline contemplates that defense counsel will be primarily responsible for selection of the remaining members of the defense team. (Guideline 10.4 *infra* discusses in greater detail the division of this responsibility among the attorneys on the team.) The Responsible Agency should, however, be prepared to provide assistance in finding qualified individuals to fill these roles.

[100]     *See infra* Guideline 10.7 and accompanying Commentary.

PCR000432

B.    The Mitigation Specialist

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have.[101]  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.[102]  The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.[103]

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.[104]

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."[105]

---

[101]    *See* Dwight H. Sullivan et al., *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 CIV. RTS. L.J. 199, 206-11 (2002).

[102]    *See* Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, 18 N.Y.U. Rev Law & Soc. Change 245, 250 (1990/1991) (Many attorneys make no preparations whatsoever for the sentencing phase; because they believe that a lawyer should try to win rather than plan to lose, they "are devastated when the client is convicted and afterward just throw in the towel"); *See infra* Guideline 10.10.1 and accompanying Commentary; text accompanying notes 271-74.

[103]    *See* Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, Indigent Defense (NLADA July/Aug. 1999); TEXAS DEFENDER SERVICE CAPITAL TRIAL PROJECT, DEATH PENALTY MITIGATION MANUAL FOR TRIAL ATTORNEYS ch. 2 (2001) ("The Mitigation Specialist and the Team Approach") [hereinafter TEXAS DEATH PENALTY MITIGATION MANUAL].

[104]    *See infra* text accompanying note 178.

[105]    *See Federal Death Penalty Cases*, *supra* note 89, at 24.  Numerous death penalty

---

PCR000433

Counsel Not Compensated by Public Funds

Finally, in the relatively rare case in which a capital defendant retains counsel, jurisdictions must ensure that the defendant has access to necessary investigative and expert services if the defendant cannot afford them. "Inability to afford counsel necessarily means that a defendant is unable to afford essential supporting services, such as investigative assistance and expert witnesses. The converse does not follow, however. Just because a defendant is able to afford retained counsel does not mean that sufficient finances are available for essential services. . . . . Supporting services [should] be made available to the clients of retained counsel who are unable to afford the required assistance."[106] Of course, the same observations apply where counsel is serving *pro bono* or, although originally retained, has simply run out of money.

---

jurisdictions routinely authorize the payment of funds for mitigation experts pursuant to state statute, court rule, case law or defense motion, *e.g.,* South Carolina, S.C. Code Ann. § 16-3-26(c) and State v. Bailey, 424 S.E.2d 503, 507 (S.C.1992) ("In today's capital trial, the defendant is entitled to produce mitigation evidence concerning his childhood and family background in mitigation of his criminal conduct, so that the jury may impose life imprisonment as an alternative to the death sentence. In preparing this evidence, the attorney must employ investigators in the course of thoroughly researching the defendant's entire life."); Tennessee, Tenn. Code. Ann. § 40-14-207(b) and Tenn. S. Ct. R. 13, § 5; Illinois, 725 Ill. Comp. Stat. 124/10 (West 2002); Washington; Kentucky, Ky. Rev. Stat. Ann. § 31.31.110; New York; Colorado, New Jersey; and Georgia, Ga. Code Ann. § 17-12-90 et seq. In federal capital trials, mitigation experts are routinely appointed and compensated under 21 U.S.C. § 848(q).

[106]    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 cmt. (3d ed. 1992). *See also* Edward C. Monahan & James J. Clark, *Funds for Resources for Indigent Defendants Represented by Retained Counsel,* CHAMPION, Dec. 1996, at 16.

---

PCR000434

**Guideline 5.1**     Qualifications of Defense Counsel

A.     The Responsible Agency should develop and publish qualification standards for defense counsel in capital cases. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B.     In formulating qualification standards, the Responsible Agency should insure:

    1.     That every attorney representing a capital defendant has:

        a.     obtained a license or permission to practice in the jurisdiction;

        b.     demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and

        c.     satisfied the training requirements set forth in Guideline 8.1.

    2.     That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

        a.     substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

        b.     skill in the management and conduct of complex negotiations and litigation;

        c.     skill in legal research, analysis, and the drafting of litigation documents;

        d.     skill in oral advocacy;

        e.     skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

        f.     skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

        g.     skill in the investigation, preparation, and presentation of mitigating evidence; and

        h.     skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

PCR000435

### History of Guideline

This Guideline has been substantially reorganized for this edition. In the original edition, it emphasized quantitative measures of attorney experience – such as years of litigation experience and number of jury trials – as the basis for qualifying counsel to undertake representation in death penalty cases. In this revised edition, the inquiry focuses on counsel's ability to provide high quality legal representation.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.2 (3d ed. 1992) ("Eligibility to Serve").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.2 (1997) ("Education, Training, and Experience of Defense Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II.3 (1984) ("Duties").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.9 (1989) ("Standards for Performance of Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(b) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1.1 (1989) ("Qualifications of Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.15 (1976) ("Establishing the Assigned Counsel Panel").

### Commentary

Under Guideline 3.1, it is the duty of the Responsible Agency to provide capital defendants with attorneys who will give them high quality legal representation. This Guideline amplifies that duty. It is designed to be outcome-focused and to leave the Responsible Agency maximum flexibility. The Guideline sets forth the necessary qualifications for all attorneys (Subsection B (1)), and also requires that "the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation." (Subsection B (2)). The qualification standards set by the Responsible Agency must be such as to bring about this result.

This functional approach is new to this edition.

PCR000436

As described in the Commentary to Guideline 1.1, the abilities that death penalty defense counsel must possess in order to provide high quality legal representation differ from those required in any other area of law. Accordingly, quantitative measures of experience are not a sufficient basis to determine an attorney's qualifications for the task. An attorney with substantial prior experience in the representation of death penalty cases, but whose past performance does not represent the level of proficiency or commitment necessary for the adequate representation of a client in a capital case, should not be placed on the appointment roster.[107]

There are also attorneys who do not possess substantial prior experience yet who will provide high quality legal representation in death penalty cases.[108] Such attorneys may have specialized training and experience in the field (*e.g.*, as law professors), may previously have been prosecutors, or may have had substantial experience in civil practice.[109] These attorneys should receive appointments if the Responsible Agency is satisfied that the client will be provided with high quality legal representation by the defense team as a whole.

In order to make maximum use of the available resources in the legal community overall, the Responsible Agency needs to devise qualification standards that build upon the contribution that each lawyer can make to the defense team, while ensuring that the team is of such a size and aggregate level of experience as to be able to function effectively.

---

[107]     *See* Bright, *supra* note 28, at 1871 n.209 ("Standards for the appointment of counsel, which are defined in terms of number of years in practice and number of trials, do very little to improve the quality of representation since many of the worst lawyers are those who have long taken criminal appointments and would meet the qualifications").

[108]     Because, as the second sentence of Subsection A emphasizes, the overriding goal is to provide high quality legal representation to the client in the individual case, it may also be appropriate for the appointing authority to certify an attorney for a limited purpose, *e.g.*, to represent a particular client with whom he or she has a special relationship.

[109]     Superior post-conviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field but who did have a commitment to excellence. *See, e.g.*, Kelly Choi, *Against All Odds*, THE AMERICAN LAWYER, Dec. 2000, at 98; *Death-Row Rescue by Minnesota Life-Saving Lawyers*, STAR TRIBUNE, Jan. 5, 2001, at 18A.

---

PCR000437

### Guideline 6.1        Workload

**The Responsible Agency should implement effectual mechanisms to ensure that the workload of attorneys representing defendants in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these Guidelines.**

*History of Guideline*

The original edition of this Guideline stated that "attorneys accepting appointments pursuant to these Guidelines . . . should not accept appointment" if their workload would interfere with the provision of "quality representation or lead to the breach of professional obligations."

Although that admonition has been retained in Guideline 10.3, this Guideline, which in accordance with Guideline 1.1 applies to all defense counsel (not just appointed members of the private bar), has been added to make clear that it is the responsibility of the jurisdiction creating the system to establish mechanisms for controlling attorney workloads.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-5.3 (3d ed. 1992) ("Workload").

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.3 ("Delays; Punctuality; Workload") in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 5 (2002) ("Defense counsel's workload is controlled to permit the rendering of quality representation").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.12 (1973) ("Workload of Public Defenders").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.1 (1976) (Establishing Maximum Pending Workload Levels for Individual Attorneys").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.2 (1976) (Statistics and Record Keeping").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.3 (1976) (Elimination of Excessive Caseloads").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-12 (1984) (Case and Work Overload").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(c) (1989) ("Establishment and General Operation of

PCR000438

Assigned Counsel Roster").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.12 (1989) ("Workload of Attorneys").

*Commentary*

In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the extraordinary time and effort necessary to ensure effective and zealous representation in a capital case. As the ABA Defense Services Standards note:

> One of the single most important impediments to the furnishing of quality defense services for the poor is the presence of excessive caseloads. All too often in defender organizations, attorneys are asked to provide representation in too many cases. Unfortunately, not even the most able and industrious lawyers can provide quality representation when their workloads are unmanageable. Excessive workloads, moreover, lead to attorney frustration, disillusionment by clients, and weakening of the adversary system.[110]

A numerical set of caseload standards for appointed counsel, standing alone, would not ensure high quality legal representation. While national caseload standards should in no event be exceeded, the concept of "workload" (*i.e.*, caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement of counsel's ability to provide quality representation. In assessing appointed counsel's workload, the Responsible Agency must also consider whether counsel has adequate access to essential support staff such as investigators, mitigation specialists, paralegals, and legal secretaries. Counsel's workload, including legal cases and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline to undertake additional cases above such levels.[111]

In accordance with these principles, the Responsible Agency should assess the workload of eligible attorneys prior to appointment to ensure that counsel's workload will enable counsel to provide high quality legal representation. To assist in assessing workloads, some defender offices have established workload guidelines that are useful in determining whether the workload of a particular attorney is excessive. These guidelines may be consulted as one measure of appropriate workloads.[112]

---

[110]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-5.3 cmt. (3d ed. 1992). *See also* MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 2-30 (1997); MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.3 cmt. 1 (1997) ("A lawyer's workload should be controlled so that each matter can be handled adequately.").

[111]    *See infra* Guideline 10.3 and accompanying Commentary.

[112]    *See* NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guidelines 4.1, 5.1–5.3 (1976); NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.12 (1973). These standards all acknowledge the need to determine acceptable workloads, and all

PCR000439

Studies have consistently found that defending capital cases requires vastly more time and effort by counsel than noncapital matters. For example, a study of the California State Public Defender revealed that attorneys there spent, on average, four times as much time on capital representation as on cases with any other penalty, including those involving a maximum possible sentence of life imprisonment without parole.[113] In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889.[114]

Workloads for lawyers handling direct appeals should also be maintained at levels that are consistent with providing high quality legal representation. Like the responsibilities of counsel at trial, appellate work in a capital case is time-consuming and difficult. A capital trial record, which appellate counsel must review in full and with care, typically runs to thousands or even tens of thousands of pages -- even before, pursuant to Guideline 10.7 (B) (2), counsel investigates the possibility that the record may be incomplete. Once appellate counsel has reviewed the record, he or she must conduct especially wide-ranging legal research, canvassing both state and federal judicial opinions, before drafting the opening brief. Given the gravity of the punishment, the unsettled state of the law, and the insistence of the courts on rigorous default rules, it is incumbent upon appellate counsel to raise every potential ground of error that might result in a reversal of the defendant's conviction or punishment.[115] Further, counsel must aggressively examine the government's brief and research its legal assertions in order to prepare an adequate reply. Preparing for and presenting oral argument requires counsel to invest still more hours. In California, where the Office of the State Public Defender handled capital appeals in the California Supreme Court, a 1989 study concluded that attorneys handling such cases should be responsible for two to three briefs per year.[116]

---

acknowledge within the standards themselves or in commentary the myriad factors that must be considered in weighing workload. Only the National Advisory Commission sets forth suggested numerical maximums for caseloads; those numbers are provided with the caveat "that particular local conditions – such as travel time – may mean that lower limits are essential." The National Advisory Commission standard does not address death penalty workloads.

[113]    Richard J. Wilson & Robert L. Spangenberg, *State-Postconviction Representation of Defendants Sentenced to Death*, 72 JUDICATURE 331, 336-337 (1989) (collecting and reviewing studies).

[114]    *Federal Death Penalty Cases*, *supra* note 89, at 14. This figure was only for the number of hours expended through the end of trial court proceedings, and did not include any post-conviction representation.

[115]    *See supra* text accompanying notes 41-43. Moreover, counsel must continue to investigate the facts. *See infra* Guideline 10.7 (A).

[116]    NAT'L CTR. FOR STATE COURTS & SPANGENBERG GROUP, WORKLOAD AND PRODUCTIVITY STANDARDS: A REPORT TO THE OFFICE OF THE STATE PUBLIC DEFENDER 82-93 (1989).

---

PCR000440

Similarly, the workloads of counsel handling collateral proceedings must be carefully limited to allow for high quality legal representation. A 1998 survey of the time and expenses required in Florida capital post-conviction cases concluded that "the most experienced and qualified lawyers at Florida's post-conviction defender office, the Office of Capital Collateral Representation have estimated that, on average, over 3,300 lawyer hours are required to take a post-conviction death penalty case from the denial of certiorari by the United States Supreme Court following direct appeal to the denial of certiorari" through that state's post-conviction proceedings.[117]

It is the duty of the Responsible Agency to distribute assignments in light of each attorney's duty under the Rules of Professional Conduct to "provide competent representation to a client"[118], which requires "the legal knowledge, skill, thoroughness and preparation"[119] necessary for a complex and specialized area of the law. Thus, the Responsible Agency must monitor private counsel in accordance with Guideline 7.1, and provide them with additional assistance as necessary. And the Independent Authority must monitor the defender organizations of the jurisdiction and stand ready to supplement their resources with those of the private bar.

Regardless of the context, no system that involves burdening attorneys with more cases than they can reasonably handle can provide high quality legal representation. In the capital context, no such system is acceptable.

---

[117]   THE SPANGENBERG GROUP, AMENDED TIME AND EXPENSE ANALYSIS OF POST-CONVICTION CAPITAL CASES IN FLORIDA 16 (1998).

[118]   MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.1 (2002).

[119]   MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.1 CMT. 1 (2002); ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.2(d), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993). *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7(b) (1997). The comment to that Rule says that "a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently." MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. 6 (1997). *See also* NAT. LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION 1.3(a) (1995).

PCR000441

## Guideline 7.1        Monitoring; Removal

A.   The Responsible Agency should monitor the performance of all defense counsel to ensure that the client is receiving high quality legal representation. Where there is evidence that an attorney is not providing high quality legal representation, the Responsible Agency should take appropriate action to protect the interests of the attorney's current and potential clients.

B.   The Responsible Agency should establish and publicize a regular procedure for investigating and resolving any complaints made by judges, clients, attorneys, or others that defense counsel failed to provide high quality legal representation.

C.   The Responsible Agency should periodically review the rosters of attorneys who have been certified to accept appointments in capital cases to ensure that those attorneys remain capable of providing high quality legal representation. Where there is evidence that an attorney has failed to provide high quality legal representation, the attorney should not receive additional appointments and should be removed from the roster. Where there is evidence that a systemic defect in a defender office has caused the office to fail to provide high quality legal representation, the office should not receive additional appointments.

D.   Before taking final action making an attorney or a defender office ineligible to receive additional appointments, the Responsible Agency should provide written notice that such action is being contemplated, and give the attorney or defender office opportunity to respond in writing.

E.   An attorney or defender office sanctioned pursuant to this Guideline should be restored to the roster only in exceptional circumstances.

F.   The Responsible Agency should ensure that this Guideline is implemented consistently with Guideline 2.1(C), so that an attorney's zealous representation of a client cannot be cause for the imposition or threatened imposition of sanctions pursuant to this Guideline.

*History of Guideline*

In the original edition, this Guideline provided that an attorney should receive no additional capital appointments if counsel had "inexcusably ignored basic responsibilities of an effective lawyer, resulting in prejudice to the client's case." In this edition, the standard has been changed to prohibit future appointment where counsel "has failed to provide high quality legal representation." The change was made because the former language was considered insufficiently stringent. Subsection B is based on Commentary to the original edition of the Guideline. Subsections C–E are taken from Subsections A and C of the original edition of the Guideline. Subsection F is new and is intended to emphasize the importance of the principle enunciated in Guideline 2.1(C).

PCR000442

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases • February 2003*

**Related Standards**

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 (3d ed. 1992) ("Rotation of assignments and revision of roster").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.3 (3d ed. 1992) ("Removal").

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 10 (2002) ("Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.4 (1989) ("Supervision of Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.4.2 (1989) ("Monitoring").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5 (1989).

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.1 (1989) ("Penalties Less Thank Removal").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.2 (1989) ("Removal from Program Rosters").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.3 (1989) ("Reinstatement After Removal").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.4 (1976) ("Supervision and Evaluation of Defender System Personnel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.5 (1976) ("Monitoring and Evaluation of Assigned Counsel Program Personnel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III.16 (1984) ("Supervision and Evaluation").

PCR000443

*Commentary*

Consistent with its duty to ensure that high quality legal assistance is afforded to indigent capital defendants, the Responsible Agency should monitor the performance of all capital defense counsel, including defender offices. "Admittedly, this is not an easy task and there obviously are difficulties present in having third parties scrutinize the judgments of private counsel. On the other hand, the difficulty of the task should not be an excuse to do nothing."[120]

While the Responsible Agency should investigate and maintain records regarding any complaints made against assigned counsel by judges, clients and other attorneys,[121] an effective attorney-monitoring program in death penalty matters should go considerably beyond these activities. The performance of each assigned lawyer should be subject to systematic review based upon publicized standards and procedures.[122] Counsel should be removed from the roster when counsel has failed to represent a client consistently with these Guidelines.[123]

In fulfilling its monitoring function, the Responsible Agency should not attempt to micro-manage counsel's work;[124] most lawyering tasks may reasonably be performed in a variety of ways. In order to preserve the nature of the attorney-client relationship, counsel for the accused must have the freedom to represent their client as they deem professionally appropriate. Clients, moreover, should have the right to continue satisfactory relationships with lawyers in whom they have reposed their confidence and trust. Rather, the responsibility of the Responsible Agency is to ensure that, overall, the attorney is providing high quality legal representation. Where counsel fails to do so, whether because of a mental or physical impairment,[125] or for any other reason, the

---

[120]   ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 cmt. (3d ed. 1992).

[121]   *Id.*

[122]   *See infra* Guidelines 10.1 to 10.15.2.

[123]   The standard for denying additional appointments to death penalty lawyers should be more strictly applied than the standard for denying additional appointments in non-capital cases. In non-capital criminal cases, the standard provides that "where there is compelling evidence that an attorney *consistently* has ignored basic responsibilities, the attorney's name should be removed from the roster after notice and hearing, with the possibility of reinstatement after removal if adequate demonstration of remedial measures is shown." ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 cmt. (3d ed. 1992) (emphasis added). As these Guidelines make clear, low quality representation of a capital defendant may have irrevocable consequences. Accordingly, the Responsible Agency should not wait for an attorney to "consistently ignore basic responsibilities."

[124]   *See* ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.3 cmt. (3d ed. 1992).

[125]   It cannot always be safely assumed that counsel who has been determined to be qualified based on past performance will represent current or future clients satisfactorily. Circumstances can change. For example, the attorney may begin suffering from illness, chemical dependency or other handicap unknown to the appointing authority, the court or the client. *See* Kirshmeier, *supra* note 28, at, 455-60 (discussing cases in which defendants were represented by lawyers who were

---

PCR000444

Responsible Agency should intervene. This may occur on the Responsible Agency's own motion or as a result of a request by the defendant or the court.[126]

In keeping with the paramount objective of protecting the rights and interests of the defendant, Subsection E provides that the Responsible Agency should have a regularized procedure for investigating and resolving complaints of inadequate representation. The procedure should recognize that many people (*e.g.*, family members of the client, witnesses whom the attorney has interviewed or not interviewed) may be in a position to provide important information. The procedure should be publicized accordingly.

The Responsible Agency must monitor cases, and take appropriate action in the event of any substandard performance. If the jurisdiction has defender organizations, the Independent Authority monitoring them must review such problems with an eye towards rectifying both deficiencies on the part of individual staff lawyers and any structural flaws that those deficiencies may reveal. If inadequate training, office workload, or some other systemic problem has resulted in representation of lower quality than required by these Guidelines and the situation is not corrected, the Independent Authority should remove the office from the roster.

Because of the unique and irrevocable nature of the death penalty, counsel or offices that have been removed from the roster should be readmitted only upon exceptional assurances that no further dereliction of duty will occur. The Responsible Agency should not readmit counsel or the office to the roster unless it determines that the original removal was in error, or finds by clear and convincing evidence that the problem which led to the removal of counsel or the office has been identified and corrected. It may condition readmission on specific actions (*e.g.*, proof of reduction in workload, proof of additional training and/or experience, substance abuse counseling, or correction of systemic defects in an office).

---

intoxicated, abusing drugs, or mentally ill).

[126]    *See* ABA STANDARDS FOR CRIMINAL JUSTICE: SPECIAL FUNCTIONS OF THE JUDGE Standard 6-1.1(a) (2d ed. 1986) ("The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.").

---

PCR000445

## Guideline 8.1   Training

A.   The Legal Representation Plan should provide funds for the effective training, professional development, and continuing education of all members of the defense team.

B.   Attorneys seeking to qualify to receive appointments should be required to satisfactorily complete a comprehensive training program, approved by the Responsible Agency, in the defense of capital cases. Such a program should include, but not be limited to, presentations and training in the following areas:

  1.   relevant state, federal, and international law;

  2.   pleading and motion practice;

  3.   pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty;

  4.   jury selection;

  5.   trial preparation and presentation, including the use of experts;

  6.   ethical considerations particular to capital defense representation;

  7.   preservation of the record and of issues for post-conviction review;

  8.   counsel's relationship with the client and his family;

  9.   post-conviction litigation in state and federal courts;

  10.  the presentation and rebuttal of scientific evidence, and developments in mental health fields and other relevant areas of forensic and biological science;

  11.  the unique issues relating to the defense of those charged with committing capital offenses when under the age of 18.

C.   Attorneys seeking to remain on the roster or appointment roster should be required to attend and successfully complete, at least once every two years, a specialized training program approved by the Responsible Agency that focuses on the defense of death penalty cases.

D.   The Legal Representation Plan should insure that all non-attorneys wishing to be eligible to participate on defense teams receive continuing professional education appropriate to their areas of expertise.

PCR000446

*History of Guideline*

The importance of training was addressed in Guideline 9.1 of the original version of the Guidelines for lawyers seeking to receive appointments in capital cases. Subsections A and D have been added to this revised edition to emphasize that the Legal Representation Plan must provide for specialized training of all members of the defense team involved in the representation of capital defendants. Subsections B and C are based on the original edition of the Guideline. This revised edition of the Guideline has been amended to emphasize that qualified training programs must be "comprehensive" in scope. Thus the eleven areas of training set forth in Subsection B are new and are intended to indicate the broad range of topics that must be covered in order for an initial training program to meet minimum requirements. The requirement of participation in a continuing legal education program every two years is also a minimum; many capital defense counsel have discovered that they must attend training programs more frequently in order to provide effective legal representation.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.5 (3d ed. 1992) ("Training and Professional Development").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION Standard 3-2.6 (3d ed. 1993) ("Training Programs") in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 9 (2002) ("Defense counsel is provided with and required to attend continuing legal education").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.16 (1973) ("Training and Education of Defenders").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID & DEFENDER ASS'N, DEFENDER TRAINING & DEVELOPMENT STANDARDS (1997).

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES § III-17 (1984) ("Professional Development").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.7 (1976) (Training Staff Attorneys In A Defender System").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.8 (1976) (Training Assigned Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF

PCR000447

ASSIGNED COUNSEL SYSTEMS Standard 4.2 (1989) ("Orientation").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.3.1 (1989) ("Entry-Level Training").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.3.2 (1989) ("In-Service Training").

*Commentary*

As indicated in the Commentary to Guideline 1.1, providing high quality legal representation in capital cases requires unique skills. Accordingly, the standard of practice requires that counsel have received comprehensive specialized training before being considered qualified to undertake representation in a death penalty case.[127] Such training must not be confined to instruction in the substantive law and procedure applicable to legal representation of capital defendants, but must extend to related substantive areas of mitigation and forensic science. In addition, comprehensive training programs must include practical instruction in advocacy skills, as well as presentations by experienced practitioners.

Once an attorney has been deemed qualified to accept appointments in capital cases, the standard of practice requires counsel to regularly receive formal training in order to keep abreast of the field.[128] Continuing legal education, which is required by many state bars as a matter of course for all attorneys, is critically important to capital defense attorneys. As the Commentary to Guideline 1.1 indicates, they must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones.[129]

In recognition of the central role that ongoing training plays in the provision of effective capital defense representation, a number of professional organizations, including the National Association of Criminal Defense Lawyers, the National Legal Aid and Defender Association, the Habeas Assistance Project, the NAACP Legal Defense and Education Fund, Inc., the office of the Kentucky Public Advocate, and the Association of the Bar of the City of New York, have regularly devoted significant resources to providing educational programs of the quality contemplated by this Guideline.

---

[127]    *See, e.g.,* New York Capital Defender Office, *Minimum Standards for Lead Counsel and Associate Counsel in Capital Cases, available at* http://www.nycdo.org/35b/35b-std.html (requiring that applicants submit "a description of specialized training programs regularly attended, such as the NITA, the National Criminal Defense College, or bar association criminal justice programs" and specifying that "an attorney shall not be considered eligible to be appointed as lead counsel or associate counsel in a capital case unless the Capital Defender Office shall certify that the attorney satisfactorily has completed a basic capital training program prescribed by the Capital Defender Office").

[128]    As one authority has noted, capital defense counsel must exhibit "constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law." Vick, *supra* note 3, at 358.

[129]    *See supra* text accompanying note 27.

PCR000448