# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---:|---|
| JJJJJJJJJJJJ | Joint Motion to Correct the Record |
| Part 2 | Volume 1 |
| Part 1 | Volume 2 |

# EXHIBIT JJJJJJJJJJJJJ
# PART 2

left the traveling cult and become trapped in a stationary one, she had other children in her school and community. For Wendi, this meant taking her main survival strategy of caring for others and applying it in new ways, including balancing obedience to adults with caring for other kids. In her friendship with Jeri Lynn, this meant sharing knowledge and teaching skills that, for Wendi, had become second nature. Jeri Lynn tells a story of Wendi coaching her on how to act with an adult who was angry because Wendi and Jeri Lynn allegedly had been exhibiting "bad attitudes." Jeri Lynn recalls, "I was so terrified on the way to the office, I couldn't help but look upset. Wendi told me over and over again, 'You need to smile or we're going to get in trouble again for having a bad attitude.'" Jeri Lynn was still anxious but managed to smile, and they avoided a beating. (Tab 12, at ¶ 6.)

397. Other positive qualities of Wendi's were observed by adults, including Nancy and Mark Keating, principals who arrived when Wendi was twelve or thirteen and were liked and respected by the children. Upon arriving at the school in 1983, Nancy Keating was impressed with Wendi as "a lovely little girl" who was "always very put together" and a "very conscientious student." Wendi stood out as a student who "really pushed herself" and "wanted to make something of herself." (Tab 14, at ¶ 5.) Nancy also immediately noticed that Wendi and Alejo were together "most of the time" before and after the school day, with Wendi helping Alejo with the grounds keeping. She recalls too that neither Wendi nor Alejo spent much time with Donna, who was "more like a once-a-week church goer." (Tab 14, at ¶ 8.)

398. As with his wife, Mark Keating says that Wendi quickly "made a big impression" on him; she put in great effort on the swim team he and Nancy started, and

was "the fastest girl out there" in a swim time trial. (Tab 13, at ¶ 4.) Both Nancy and Mark also quickly perceived that Alejo and Wendi did not have a normal father-daughter relationship. It seemed too intimate, more like they were a couple. Nancy recalls, "There was something off about Alejo's relationship with Wendi. It was more of a teasing relationship, not a father-daughter relationship." She also noticed that while Alejo was proud of Wendi, it seemed she "needed to be perfect" around him. (Tab 14, at ¶ 7.) Mark reports "There were things about Alejo's dynamic with Wendi that did not sit right with me," and goes on to report an incident he witnessed one night: "I looked into the parking lot and I saw Wendi and Alejo. Wendi leaned into Alejo and they kissed on the mouth. Something was weird about it. It was not a father-daughter kiss.... This stuck out in my mind so much, I told Nancy about it." (Tab 13, at ¶ 6.) Exactly when this incident happened is not clear from his report, and he may not remember. As we shall see, both Nancy and Mark Keating report that eventually they became convinced Alejo was sexually abusing Wendi, and recall an incident where they felt certain Wendi was on the verge of disclosing such abuse to them (but was cut short by Alejo suddenly coming into the room). Those reports, however, appear to refer to times Wendi was older than thirteen, and thus are covered below.

399. Although she did not want to accept it at the time, Martha England was also presented with information that Alejo and Wendi were "close" in totally inappropriate, sexually abusive ways. And Mrs. England knew some of the context and contributing factors as well. She recalled that Donna had problems with an intra-uterine device when Wendi was about ten, and because church discouraged medical care it got worse and worse until Donna was in so much pain that she would retreat home to her bedroom. As

we shall see, Donna too describes pulling back from Wendi even more during this time, which included two surgeries, the first when Wendi was ten. Mrs. England also said that when Wendi was about ten years old, Wendi told Mrs. England's daughter, Suzy, that when she went home "her Daddy would have her put on her baby doll nighty and lay in bed with her."

400. Yet like almost everyone else, with the exceptions of Jasper Neace, who was only a child, and George Carlin, who only once attempted an ineffective private confrontation with Alejo, Mrs. England neither said nor did anything to protect Wendi. She recalled, "I didn't want to think something was bad," and that like her daughter's other reports of Alejo being "perverted," she did not want to believe it. Trying to make sense of her own response at the time, Mrs. England became pensive and said, "In your mind you cast things out... I knew Alejo loved me," then added, "I was so blinded and brainwashed by the church's teachings."                    REDACTED

401. Other children than Suzy England were seeing evidence of Alejo's sexual relationship with Wendi. One of them was Lonnie Carlin, George Carlin and Constance Boys' son who is Wendi's age, who ultimately did not feel comfortable going on the record with what he reported to an investigator. Still, the evidence warrants consideration here, and is consistent with Mrs. England's recollections of her daughter's reports as well as Donna's (detailed below). A Capital Case Project investigator was told by Lonnie Carlin that, when he visited Wendi's house when they were ten or eleven years old,

sometimes with other children present as well, "Wendi frequently dressed in revealing lingerie and showed it off to the other children." When Wendi was asked where she got the lingerie, she told Lonnie and the other children that Alejo "liked her to 'dress up' and that he wanted her to 'look her best.'" Lonnie recalls that Wendi "pranced around in thong panties and stockings."

402. Among the most explicit and extreme reported evidence that Alejo was sexually abusing Wendi during these years comes from Jasper Neace. As noted above, Jasper was three years older than Wendi but often spent time with her after school, where he did grounds work with Alejo. Jasper reports Wendi told him, when she was eleven or twelve years old, "that Alejo touched her in a sexual way," and that "[s]he was really upset and she was crying about it." (Tab 23, at ¶ 42.) Jasper also recalls "being under the impression that Alejo wanted to have sex with Wendi, and lists a variety of comments he says Wendi made to him and behaviors he says he witnessed, all of which led him to that conclusion:

> "She told me things on several occasions that led me to believe that. Often, they were just little remarks. She said that her dad was disgusting. She said that her dad licked her neck. She said that her dad put his tongue on her and rubbed her upper leg…. She often screwed up her face in disgust when Alejo was nearby. I got the impression that she was afraid to be alone with him, that she was scared of what he might do…. She immediately changed when he walked in the room. I recall that she always crossed her legs and kept her dress pulled down as far as it would go. She sat there real quiet, and you could just feel the tension. She never wanted to sit too close to him, and when she

got in the car with him, I recall that she'd get in the back seat. She never sat

next to him in the front." (Tab 23, at ¶ 42.)

403. Thus Jasper reports witnessing myriad evidence that Wendi was disturbed and

repulsed by Alejo, and afraid that Alejo might, at any moment, inflict upon her mind and

body his sexual obsessions, compulsions and perversions – of which everyone in the

community was by then well aware, thanks to Alejo's frequent and often public sexually

inappropriate and harassing comments, jokes, and gestures. Looking back with bitterness,

Jasper comments, "It seemed that no one had the guts to flat out tell on Alejo and what he

was up to with her. It was hard being a kid in that situation because the adults had all the

power." (Tab 23, at ¶ 42.) Jasper Neace was ultimately expelled from the school, under

circumstances (that he and another witness report) included telling Tom King that Alejo

possessed hard-core pornographic magazines and getting into a physical altercation with

Tom and Alejo.

404. Like Mark and Nancy Keating, Jeri Lynn Cunningham reports evidence that is

consistent with most other witnesses' reports. Jeri Lynn recalls that "Wendi and Alejo

had a different kind of relationship – it wasn't a father-daughter relationship." Jeri

Lynn's comment casts light on a dynamic of incestuous father-daughter relationships in

which the sexual abuse does not involve violence but is part of a "coupling" imposed on

the child – not only by the pedophilic father, but by the neglectful mother who withdraws

from both daughter and husband. The details of how this dynamic unfolded in Wendi's

family are provided below, in Donna and Alejo's accounts of these years of Wendi's life.

Here the focus is what adults and children in the community witnessed, including the

Keatings and Jeri Lynn. As the latter recalls, "Looking back now, I would call their

relationship 'flirty.' Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from him. Wendi switched between calling Alejo 'dad' and 'Alejo.'" (Tab 12, at ¶ 14.)

405. Finally, another consequence for the social development of children caught in incestuous relationships is captured by the recollections of Shawn King, son of cult leader Tom King. Shawn was Wendi's age and became very close to her during these years, ultimately becoming her boyfriend when they were sixteen or seventeen. In his deposition by Wendi's attorneys, Shawn describes Wendi when he first met her, when she was eight or nine years old, as "very energetic and outgoing" and "happy as a general rule." (Tab 15, at p.11.) He then goes on to say, "But there was always a bit of perhaps question in that from my – I don't know. From my perspective, you know, like a little bit underneath it maybe." (Tab 15, at p.11.) Asked to clarify, Shawn replied, "She was just very – she was very – I don't know how else to say it. She was kind of devious in things. So I always knew she had a kind of a plan underneath what she was doing." Shawn then went on to describe how Wendi would often get away with things that other kids didn't, like pinching other kids, which was a "big thing at one time" among the kids at the school. "[S]he was just good at that on the sly kind of thing." (Tab 15, at p.12.) Shawn's memories are consistent with those of Jeri Lynn, who remembers Wendi coaching her on how to smile and display the attitude that adults wanted to see in order to avoid being beaten. Yet in Shawn's comments are also echoes of his father Tom King's voice, and his fathers' perceptions of "defiance" – along with "rebellion," "sin" and "evil" – whenever a child pursues needs or wishes that fail to perfectly align with *controlling adults'* needs,

wishes and demands. Most important here, however, is that Shawn's observations, shorn

of judgmental and condemning connotations, reflects one of Wendi's main strategies for

coping in a cult community and an incestuous family.

406. **Wendi ages nine to thirteen: Close friend sexually abused by Alejo.**

Wendi's friend        REDACTED        was sexually abused by Alejo from ages eleven to

thirteen, but never told anyone, including her parents, until questioned by an investigator

on this case. REDACTED remembers being afraid of what her father would do to Alejo if he

found out, and fearing that if she told she would never see her friend again. (Tab 12, at

¶ 19.) I also spoke directly with REDACTED , in her home, where she recounted the same

details of Alejo sexually abusing her as he lay between Wendi and her in Wendi's bed.

As a researcher who has studied memories of child sexual abuse, and as a therapist who

has worked with many clients with histories of child sexual abuse, it is my opinion that

REDACTED was a completely honest and credible, although (understandably) self-

conscious and reticent, reporter of events she had experienced.

407. Before detailing her account of sexual abuse by Alejo in Wendi's bed, it is

helpful to review and quote from her reports of other sexualized behaviors that Alejo

engaged in toward her and Wendi. One incident occurred when Wendi and REDACTED

were twelve years old in 1982, and REDACTED accompanied Wendi, Alejo and Donna on a

trip to California. They camped at the beach and used outdoor showers. One day Wendi

and REDACTED were taking showers in their bathing suits, feeling freezing cold, when

"Alejo pulled out his camera and took a bunch of pictures of us as we showered. He

laughed and made fun of us until Wendi said, 'Stop, dad!'" In a pattern that appears over

and over, the girls felt violated and angry, but "Alejo thought it was so funny." REDACTED

notes that this is one of only two memories she has of the entire trip (the other was of

Wendi buying her a trinket at Sea World, which she has always kept because Wendi's act

of kindness meant a lot to her). (Tab 12, at ¶ 8.) At least in partial corroboration of this

story, in Donna's "Treasured Memories" booklet that she gave Wendi for high school

graduation, the entry for the phrase beginning, "Remember when we went" reads "to

California in 1982 and REDACTED also went. Taking showers out in front of everyone."

(Treasured Memories booklet, Obtained by Capital Case Project.)

408.  Another incident occurred when Wendi and REDACTED wanted Alejo to take

them into the desert at night to tell scary stories. Alejo promised to drive them out into

the desert, but only if they first did what he wanted:

> "Alejo laid on the couch and forced Wendi and me to rub his feet and rub his
>
> head until he fell asleep. As we did this, Alejo laid his head in my crotch,
>
> facing my crotch. It felt so wrong. I wanted so badly to lift his head off me
>
> and get out from underneath him, but his head was heavy and I was afraid he
>
> would wake up. I sometimes wondered if Alejo was actually sleeping or if he
>
> was just pretending so he could keep his head in my crotch. It went on for a
>
> long time until Wendi 'woke up' Alejo and asked him to hold up his end of
>
> the bargain and drive us out to the desert." (Tab 12, at ¶ 16.)

409.  There were many other occasions involving drives to the desert and Alejo

demanding the girls provide him with some sexualized gratification. REDACTED recalls,

"Alejo drove us out into the desert, about ten minutes away, under the condition that we

wear our nightgowns. Wearing my nightgown at Alejo's request made me feel

uncomfortable and I knew something wasn't right about it." (Tab 12, at ¶ 17.) We have

already heard of Lonnie Carlin's memory of Wendi "prancing" around her house in

lingerie Alejo bought for her, and of Martha England hearing through her daughter of

Wendi curled up in her nightgown with Alejo at night. Below we will read Donna's

account of Alejo buying Wendi a whole drawer full of lingerie and other highly revealing

and sexualized clothing by the time she was thirteen, as well as Alejo cajoling Wendi into

posing in lingerie for him to photograph. What is important here is that REDACTED reports

*numerous* occasions, repeated over two to three years, where Alejo coerced Wendi and

her friend into wearing nightgowns for no other reason than to satisfy him.

410. Where was Wendi's mother while all of this was going on? As REDACTED

reports, "I remember so clearly that Donna went to sleep early every night. The reason I

remember this so distinctly is because Alejo's mannerisms and actions changed as soon

as Donna went to sleep, when it was just the three of us: Alejo, Wendi, and me." (Tab 12,

at ¶ 15.)

411. REDACTED continues, "From the time I was about eleven years old until I was

approximately thirteen years old, Alejo molested me. He also sexually molested Wendy."

(Tab 12, at ¶ 15.) REDACTED provides details of a frequent experience of sexual abuse by

Alejo:

> "When I spent the night at Wendi's, Wendi and I slept in her bed in her
>
> bedroom. Alejo came into the bedroom late at night and laid in bed between
>
> us. While he laid between us, Alejo touched me sexually by putting his hands
>
> on my breasts. I moved his hands away from my breasts over and over again
>
> as I drifted in and out of sleep, but his hands always wound up there again.
>
> Alejo's behavior made me feel sick and uncomfortable. Alejo laid down

between us throughout what seemed like the duration of the night and into the early morning. I don't recall Donna ever waking up to see where Alejo was or what he was doing." (Tab 12, at ¶ 18.)

412. When REDACTED was about thirteen years old, Alejo's middle-of-the-night fondling ended. She had no idea why at the time, nor does she now. (Tab 12, at ¶ 20.) REDACTED says that she never told anyone about this until contacted by investigators retained by Wendi's defense team. She says she thought about telling her parents, but was afraid of what her father would do to Alejo. She was also afraid that she would never see Wendi again. (Tab 12, at ¶ 19.) These are common responses of sexually abused children. In REDACTED words, "It sounds silly saying so now, but that's the way the mind of a child works." Another common response REDACTED had to Alejo's sexual abuse: "Wendi and I never discussed what Alejo did to us. We just didn't." (Tab 12, at ¶ 19.) In my interview with her, REDACTED acknowledged that she never saw Alejo touching Wendi's breasts, but she always assumed this was the case, because "she didn't seem surprised that he was in the bed. It seemed like a normal thing for her." As we shall see, Wendi recalls that she had sleepovers with REDACTED, but reports no memory of Alejo ever being in bed with them.

413. **Wendi ages nine to thirteen: Recollections of Donna and Alejo.** Donna's memories of Wendi and of Wendi's relationships with her and Alejo during this time are consistent with Donna's long-standing pattern of neglecting Wendi and handing her over to others. Donna was not paying attention to Wendi or particularly concerned about what Alejo was doing with her. However, Donna could not help but become aware of – although she attempted to ignore and forget – disturbing evidence of Alejo sexually exploiting and abusing Wendi. As for Alejo's memories, at least those he is willing to

share, they are superficial but nonetheless consistent with the classic incestuous relationship to which he subjected Wendi during this time and until she left home.

414. Both Donna and Alejo report that Wendi was subjected to physical beatings in the home during this time, about once a month and sometimes more often. They agree that Alejo was the disciplinarian who administered most beatings, and that the beatings decreased in frequency from when she was nine years old until after she was thirteen, when Wendi seldom "needed" them and Alejo was less enthusiastic about beating her. (Tab 27, at ¶¶ 239, 240; Tab 24, at ¶¶ 85, 126, 127.) Also when Wendi was around thirteen, Alejo introduced the punishment of pulling weeds for hours on the church and school grounds, which Wendi sometimes had to do at school. (Tab 24, at ¶ 128.) Looking back on the beatings, and echoing Tom King's sermon on beating children into submission, Donna says, "You have to spank them hard enough that they're not just angry; it has to go beyond that so you break them. They have to stop being angry and learn to obey." (Tab 27, at ¶ 237.) Donna reports that, by the end of this period of Wendi's life (i.e., after she turned thirteen), "Wendi didn't need swatting very often, only once or twice a year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.)

415. Over this same period, Wendi was being reduced to submission in another way: an incestuous relationship with Alejo. Not surprisingly, Donna provides the most details. Yet Alejo's recollections are consistent with the main elements of Donna's, and many of his statements reveal the incestuous nature of his relationship with Wendi.

416. A first example is Donna's account of how, beginning when they moved to back to Casa Grande, Alejo routinely insisted that Donna and Wendi rub his head, back and

legs -- and how Donna was relieved to have Wendi take on responsibility for this unwanted task. Donna's first account of this behavior, immediately below, is consistent with REDACTED story of Alejo making her and Wendi rub his head and legs. (Her second account, presented later, is consistent with REDACTED account of Alejo putting his face in her crotch.) According to Donna:

> "Once we were back in Casa Grande after the traveling ministry, every evening, Alejo sat on the floor and wanted Wendi or me to rub his head, back and legs. Being at home was almost like being in a harem with Wendi and I pampering Alejo, with him in control. The main focus of everyone's attention was to soothe him and respond to his every little need.... After a while, maybe after the first months or a year back in Casa Grande.... when Wendi was nine years old, she took over almost all of the work rubbing Alejo. It was a relief to have Wendi rubbing Alejo so that I didn't have to do it." (Tab 27, at ¶ 255.)

417. One of Donna's entries in the "Treasured Memories" high school graduation present suggests that, at least at the beginning, it was not only Alejo who insisted on such behavior. That is, in the "Treasured Memories" booklet Donna completes the phrase "Remember when" with "dad & mom would whine so that you'd rub our backs or legs. Sometimes you'd fall asleep while you were rubbing Dad's legs and I come out and wake you both up." (Treasured Memories booklet, Obtained by Capital Case Project.) However, in his interview with me Alejo acknowledged that Wendi took over responsibility for pampering him as Donna increasingly withdrew from both of them, and that such an arrangement continued to be common until Wendi was in high school.

418. Indeed, in my interview with Alejo, when asked about ways Wendi used to "baby" him – a phrase he had used earlier in the interview and I had heard numerous times from Wendi – Alejo replied, "She or Laura would scratch my head. I think they did it to get me to fall asleep." Hearing this, I recalled Donna's account and Jeri Lynn's memory of Alejo having "forced" Wendi and her to rub his feet and head and how it "felt so wrong." After pausing as those words and images went through my head, I asked Alejo, "So it was their idea?" He responded that, yes, it was entirely their idea. Once again, Alejo's statement is deceptive, self-serving, and inconsistent with multiple other witnesses' declarations. Also notable: Alejo only mentioned that Wendi and Laura scratched his head, but not (as described by Donna, REDACTED and Wendi) his legs, which put the girls' heads and faces closer to his genitals.

419. Nor does Alejo mention, as REDACTED, Donna and Wendi have independently reported, the way he would put his head between Wendi's and her friends' legs so that his face was inches away from their genitals. Below is Donna's more detailed recollection of this perverse and sexually abusive ritual. Based on REDACTED recollection and Wendi's as well, Donna's account appears accurate with respect to how the participants' bodies were clothed and positioned, and what they were doing.

> "From age ten or eleven onward, until she left to go out on her own as an
> adult, almost every night, weekdays and weekends, as long as Alejo was home
> which he was most of the time, Wendi spent a couple of hours rubbing Alejo's
> head, back, and legs. While she rubbed him Alejo was partly dressed. When
> this first started, he had his shirt off. After a while he just wore shorts, and
> then it got so he was stripped down to his briefs all the time while Wendi

rubbed him for a couple of hours each night. What Wendi wore while she rubbed Alejo varied. During the warm weather she wore little pajama shorts and a pajama top like she wore at the sleepovers with Jeri Lynn and Laura, or she put on one of Alejo's T-shirts with just her underwear on underneath.... By the time she was eleven or twelve years old, sexy underwear was the only kind of underwear Wendi owned.... Alejo really liked to have his head in Wendi's lap while she rubbed him beginning when she was nine years old and throughout her teens. At the time we called it being in the position of Wendi 'ministering to him,' although there was no religious aspect to it. Another way we described it was Wendi touching or 'touching on' Alejo. He was constantly saying to Wendi in a kind of whiny way, 'Just touch me,' or 'Why don't you just touch on me.'" (Tab 27, at ¶¶ 276-77.)

420.  Both Donna and Alejo describe several elements of the process by which Donna increasingly withdrew from both Alejo and Wendi and Alejo increasingly made Wendi meet what he experienced as his emotional and sexual needs.  In the literature on sex offenders, what Alejo did to Wendi, including the progression of less and less clothing worn by each of them during the "touching on" ritual, is known as "grooming." This refers to a process whereby a pedophile gradually and progressively manipulates a child into increasingly intrusive sexual acts. As we can see from Donna's account, in incestuous families like theirs much of the grooming can happen right before the eyes of the neglectful and withdrawn parent.

421.  Another key factor in this process, although a background one, was that neither Donna nor Alejo had any friends or emotionally significant relationships with other

adults. Donna recalls, "We never had any activities or dates with other adults or adult couples, and never had other adults, not even people from the church, into our home to have a meal, spend the evening together, or have an activity." (Tab 27, at ¶ 252.) Alejo says "There were not a lot of things I did with other adults and did not have many adult friendships. I have been very guarded from being hurt too many times in the past." After friendships with two other couples during their first year in the church/cult, which ended when Cal and Barry Lots left, Alejo reports that he "never really had any other adult connections." (Tab 24, at ¶ 93.)

422. In Donna's case, she responded to her childhood of neglect and trauma, and then to her marriages with deeply disturbed men, as well as the bipolar disorder from which she suffered, by withdrawing from all non-work relationships and retreating into her own private world of reading books or sleeping. At one point Donna says that Alejo "broke up" her and Wendi, though as we have seen, from day one Donna had minimal interest in having a relationship with Wendi. Alejo, in contrast, like many sexually obsessed and pedophilic men, upon failing to get his emotional needs met (or at least substituted for) through sexual relationships with adult women, attempted to fulfill those needs via intimate and sexualized relationships with children. Children who were less likely to hurt him, and more likely to gratify him, because he could use his adult authority and power to control them. And so, in a classic pattern of many families plagued by incest, the more Donna withdrew the more Alejo turned to Wendi and coerced her into meeting his emotional and sexual needs.

423. Donna recalls, "Beginning when she was ten or eleven, Wendi cooked for Alejo and they ate meals together and spent evenings together without me." (Tab 27, at ¶ 248.)

Confirming Donna's recollections, Alejo notes, "Wendi and I spent a lot of time together. There were many evenings that Wendi and I spent together without Donna because Donna went to sleep so early." (Tab 24, at ¶ 86.) Also, Alejo and Wendi's nighttime routines typically took place after they had already, as other witnessed have reported (see above), spent much of the afternoon together on the church/school grounds.

424. Donna's and Alejo's written declarations provide a great deal of detail on this incestuous family constellation, only some of which can be addressed here, and most only with a brief mention. A few quick examples: Alejo says he was not just Wendi's father, but her "friend" and "buddy." (Tab 24, at ¶¶ 92-93.) Donna recalls how, on long drives for family vacations, Alejo and Wendi sat in the front seats together, "like they were the married couple and I sat in back, usually sleeping most of the way." (Tab 27, at ¶ 250) Alejo reports, "I often kept Wendi from home on Mondays while Donna was working just for Wendi to have a chance to hang out or for us to go shopping." (Tab 24, at ¶ 85.)

425. Summing up the situation, Donna says that by age eleven, Wendi "was more partnered with Alejo than I was, almost like she was his spouse," and that "the only social life Alejo had outside of church activities was with Wendi and her girlfriends," including sleepovers with Jeri Lynn and Laura Kelly, when Donna was either not home or "in another room reading or asleep." (Tab 27, at ¶¶ 247, 252.)

426. Before getting into some details of Alejo's sexual abuse of Wendi, it is helpful to revisit the centrality of sex in Alejo's world. He does not admit his constant and compulsive sexual comments to women and girls, the ways he loved to lick his finger and rub it against their ears, his repeated fondling of REDACTED breasts in Wendi's bed, nor a

190

variety of other abusive behaviors described by Donna below. But Alejo does reveal the
obsessive sexuality that consumed him and that he imposed on others, including Wendi,
during the time covered here, when she was nine to thirteen years old. For example, Alejo
describes speaking in tongues during these early years of 91st Psalm: "the spirit would
come" in an "amazing experience" that "feels like a rush of cocaine onset... a momentum
that starts slow and builds... like a good orgasm." (Tab 24, at ¶ 107.) Another example:
What happened when Alejo took off a day each month from his church and school duties
to "go into meditation." He says he would "pray and get close to God," and from whom
he would receive revelations:

> "Many times after these days in isolation, I came back knowing things about
> Wendi or Donna that they never told me. Here's a cute one – I found at that
> there were certain things Donna wanted me to do in bed and I did them and
> there were explosions. She never told me and when I did them, she asked me
> how I knew that was what she wanted. Sex is from God and I can recall
> praying for revelations of how to please Donna better in the bedroom." (Tab
> 24, at ¶ 111.)

427.  In short, when Alejo experiences himself as connecting to "spirit" or God,
whether while speaking in tongues or "meditating," it is *sex* that tends to come up and
dominate his experience. And if Alejo indeed believes that God also revealed to him
things about Wendi (not just Donna) that she had "never told" him, then it's safe to infer
that many of those alleged "revelations" were sexual too: Perhaps about the kinds of
lingerie Wendi "wanted." Or about how Wendi "wanted" to wear that lingerie to, as
Lonnie Carlin recalls her saying, "look her best" for Alejo. Of course it's the opposite:

Lonnie Carlin says Wendi told him that *Alejo* wanted those things; <sup>REDACTED</sup> says Alejo "forced" her and Wendi to wear nightgowns as a condition of taking them into the desert. But in the deluded mind of Alejo Ochoa, it was Wendi who secretly wanted these things, and God who sometimes let him know.

428. Alejo also acknowledges that his obsession with sex, and his frustration at not getting as much sex as he wanted from Donna, was *the* main source the anger he almost constantly directed at Donna and Wendi during these years. As Alejo recalls, "Donna had two surgeries. The first was a partial hysterectomy and the second a complete hysterectomy. After the first surgery, I did not touch her sexually much until she was healed. After the second surgery, she became really cold toward me and I became more and more frustrated." (Tab 24, at ¶ 120.) Even before the surgeries, when Donna was feeling "more discomfort," Alejo says he "always" wanted more sex than she did. He then describes how he responded to this predicament:

"As a result, I was often frustrated. My frustration led to me losing control and yelling at Donna. Typically, Donna and Wendi retreated to another room and I often left and went out to cool off. What I had a hard time dealing with was that over time in our relationship, Donna refused to do things with me sexually that she previously seemed to enjoy. I tried different things to get her interested in me again but it just did not happen." (Tab 24, at ¶ 121.)

429. Alejo goes on to describe how his sexual frustration and resulting extreme anger were at times daily features of the household. He says Donna "would always have an excuse" for not wanting to be sexual with him, that it "would start in the morning with her refusing me and then it built and built all day and I spent the day hoping she would

change her mind until I was ready to explode." He started by "slamming doors to let them

know I was mad." Such angry behavior "only made things worse and turned [Donna] off"

to him sexually, which meant she "clammed up," which only made him more angry.

Alejo says that Wendi – who repeatedly witnessed this cycle of his angry attacks, her

mother's withdrawal, and Alejo's increasing anger until he "exploded" in screaming

rages – "took it hard and did not like it when I exploded." (Tab 24, at ¶ 123.) Alejo also

reports that Wendi often witnessed him and Donna "avoiding each other" for days after

he had exploded. (Tab 24, at ¶ 124.) In contrast to Donna, Alejo says, Wendi "always

forgave me when I apologized and hugged me after blow ups." (Tab 24, at ¶ 123.)

    430.  Based on Donna's account of these events, which is consistent with Alejo's

albeit from her perspective, we can see that Wendi accepted Alejo's apologies largely

because Donna was withdrawing not only from Alejo but from Wendi too – and even

more than she had before. Donna remembers that Alejo would become even angrier when

all three of them were together, "so Wendi and I put all our energy into trying to make

him feel better, which ruined the experience of whatever we were trying to do together,

so we got used to interacting with Alejo individually." (Tab 27, at ¶ 251.) Yet Wendi

remembers these times, when she and Donna placated Alejo after his enraged outbursts,

as the only times she felt connected or aligned with her mother rather than Alejo, albeit

briefly and in the shared unhappiness of placating him. Either way, as is clear from

Donna's other recollections, what happened was that Donna withdrew even more from

both Alejo and Wendi, not that both she and Wendi "got used to" spending time alone

with Alejo.

431. This meant Wendi was stuck with Alejo as the only parent and the only family member to whom she could turn for any emotional connection or companionship. Donna recalls the time of her surgeries, and her even greater withdrawal from Wendi when she began working full-time when Wendi was fourteen (covered below): "It was easier for me to let Wendi spend so much time with Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room to read." At the time, however, Donna rationalized her actions and Wendi's predicament – as Alejo always did – as what Wendi *wanted*: "I told myself that was what Wendi wanted, but most of what she did with Alejo was actually to pamper him and make him feel better." (Tab 27, at ¶ 248.)

432. It is a classic incestuous family dynamic: An immature, emotionally damaged, severely limited, sexually obsessive and compulsive (step- or adoptive-) father becomes increasingly frustrated by the attempts of his equally (though differently) damaged and limited wife to resist his sexual advances and generally avoid contact with him; and both parents increasingly convince themselves, in their own self-serving and self-deluding ways, that their daughter *wants* to replace her mother as her father's intimate partner. The daughter, already long neglected and abused thanks to her parents' inabilities (even under the best of circumstances) to love and nurture her, and always desperate for whatever attention and affection she can get within the family, resigns herself to conforming to her parents' pathological wants and wishes. She further subverts her own wants and needs to theirs, and submits to her father's progressively more intrusive sexual abuse, with devastating short- and long-term consequences.

433.  Beginning when Wendi was nine or ten years old, Donna *did* witness Alejo engaging in plenty of sexualizing and sexually abusive behaviors with Wendi.  She saw the nighttime "touching on" ritual between scantily clad Alejo and Wendi.  She was along on outings when Alejo took Wendi shopping for lingerie and other revealing clothing.  Donna saw and heard Alejo routinely subject Wendi to verbal sexual abuse, just as Alejo's aunts, uncles and parents had done to him beginning when he was the same age.  Donna watched Alejo pull Wendi into pornographic sections of stores, and into whole stores devoted to pornography and "adult" paraphernalia.

434.  Let us begin with the Donna' recollections of how Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence; how he did so "ruthlessly," keeping at Wendi despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." (Tab 27, at ¶ 257.)  Donna recalls, "Beginning when Wendi was a pre-teen, Alejo especially degraded her when she said something clueless, which she did fairly regularly." (Tab 28, ¶ 89.) Donna remembers getting frustrated and angered at the way Alejo "degraded her constantly," and how when Donna told him to stop and leave Wendi alone, he retorted, "No, she likes it." (Tab 27, at ¶ 257.)

435.  Beginning when Wendi was about ten years old, Alejo's verbal abuse became predominantly sexual in nature; he "picked at her constantly about sexual topics and feminine hygiene." For example, Alejo relished teasing Wendi when commercials for products like Tampax appeared on TV, asking her questions like, "What are those? Do you need those? What do you use those for?"  Donna recalls how Alejo constantly attempted to "embarrass and shame" Wendi in these ways. And whenever Wendi or

Donna protested, Alejo insisted that Wendi *liked* – and thus by implication, *wanted* – to be subjected to such shaming, degrading and humiliating verbal sexual abuse. (Tab 27, at ¶ 256.) (Nor did it help that, consistent with the incestuous family dynamic articulated above, Donna never felt comfortable talking with Wendi about sexual or reproductive issues, and even sent Wendi to Alejo when she had her first menses; Donna admits this, but also attempts to deny responsibility and blame it entirely on Alejo. (Tab 27, at ¶ 285.)).

436. Another sexually abusive behavior that Alejo started when Wendi was around ten years old was taking her into the "adult" section of Spencer's Gifts, a store found in most suburban malls. As Donna recalls and remains true today, Spencer's sells "everything from blow up dolls and other sex toys to gadgets like black lights and lava lamps." They visited the store regularly, "maybe once per month," and Donna liked to look at some of the "cute things" in the store. Alejo "always wanted to take Wendi in [the adult section] to see what was new." (Tab 27, at ¶ 271.) When they went in the store, Donna and Wendi "tried to look at the less explicit and cuter things, but he always called us over to look at the adults-only sex stuff.... He loved looking at the sexually themed and explicit greeting cards" (like those he has sent to Wendi in prison, shown above). She continues:

> "Wendi and I always came to look when he called us over. I always gave him
> a disgusted look and took off to look at something else. When Alejo told
> Wendi, 'Look at this!' at first Wendi said, 'Dad!' not wanting to look at the
> stuff, but once Alejo got started she didn't have a choice. He replied, 'Look at
> this. Don't be that way,' and early on, maybe for the first two or three visits,

she said, 'I don't want to,' until he ordered her, 'Look at it,' so she gave in
and did look at it. After the first few visits, she knew she had to look and
didn't argue anymore." (Tab 27, at ¶ 272.)

437. Donna then describes what Alejo did once he had coerced his ten year old
adopted daughter, without her mother stopping him or making any effort to protect her,
into complete submission to this form of sexual abuse. "Wendi looked at a lot of the
sexually explicit adults-only items and spent a lot of time with Alejo in the adult section
at Spencer's from the time she was ten years old onward. She spent as much time as
Alejo wanted looking at whatever he wanted." This included "everything from adult
magazines and cards to board games where the point of playing the game is answering
questions about personal sexual preferences, experiences, and practices..." (Tab 27, at
¶ 273.)

438. On the trips to the mall, Donna could see what was going on. But as Alejo
himself acknowledges, he spent a lot of time going shopping with Wendi alone, including
taking her out of school to do so. (Tab 24, at ¶ 85.) Donna recalls, "By age twelve or
thirteen, when Wendi and Alejo went shopping together, they went to lots of different
places, and did so fairly regularly, most of it without me." How did Donna think and feel
about this at the time? "I didn't care to know where they went or what they did while
they were shopping without me." (Tab 27, at ¶ 275.)

439. Many of Alejo's shopping trips with Wendi were about buying her lingerie and
other clothing that Alejo found sexy and exciting on his young daughter. Donna recalls,
"The clothes Alejo bought for Wendi starting when she was about ten or eleven years old
often surprised me because they were a lot tighter, shorter, and provocative than anything

I ever bought for her." Some were "not things she could wear around anyone we knew, much less to church activities or the church," and many were "too sexy and inappropriate for her to where anywhere other than when she was at home with Alejo or when the three of us went on trips to California." (Tab 27, at ¶ 262.) She is referring here to the "revealing lingerie," including "thongs and panties," that Lonnie Carlin remembers Wendi frequently dressing in when other children visited her home when she about ten or eleven years old – which Lonnie remembers Wendi saying Alejo "liked her to 'dress up'" in so she would "look her best."

440. Not surprisingly, Alejo reports taking Wendi clothes shopping but does not reveal what he bought and pretends he was merely giving Wendi what *she* wanted: "I took her clothes shopping. Wendi preferred to go with me because I agreed to what she wanted to buy and did not mind buying things for her." (Tab 24, at ¶ 85.) Donna recalls that whenever she wanted to take Wendi clothes shopping Alejo made excuses for why she could not, and before long she gave up on trying. (Tab 27, at ¶ 264.)

441. Donna also notes the complete contradiction between what Alejo said and did in his role as youth pastor at the church, where he "preached against that kind of inappropriate behavior," and what he did with Wendi at home. (Tab 27, at ¶ 263.) When Wendi's church friends spent the night for sleepovers, Alejo had them dress in such clothing too. Donna remembers, "while I was sleeping or reading, the girls were often in little baby-doll pajamas that included little shorts and sleeveless or spaghetti-strap tops that were loose and open and didn't cover very much when the girls moved around." (Tab 27, at ¶ 263.)

442. Looking back, Donna recalls, "By the time she was twelve or thirteen [and until she left home], Wendi had at least a dresser-drawer, maybe more, full of little frilly bras and lacy, frilly, sexy underwear." Alejo bought Wendi "tiny little shorts, and little halter-top-type T-shirts," and "lots of little sexy outfits" and "lots of high heels." (Tab 27, at ¶ 266.) These were not things that Donna would wear, and she recalls taking back lingerie whenever Alejo bought it for her, to exchange for something more comfortable. She also remembers that when Wendi was twelve to fourteen, Alejo bought her "lacy, silky, or satin garter belts, the corset kind of underwear that comes in separate pieces where the panties or bottoms hook or snap to nylons so there's a sexy gap at the top of the thighs around the panties." Remarkably, Donna continues, "I specifically remember him buying those for Wendi, including the nylons," and then delivers an another stark admission of her neglect and abandonment of Wendi to Alejo's sexual predations: "I had no idea why Alejo was buying Wendi underwear like that when she was a pre-teen and early teen, and didn't think about it." (Tab 27, at ¶ 267.)

443. Despite Donna's willful ignorance of Alejo's motives, her efforts to look the other way, and her unwillingness to admit what was going on, she remembers even more such detailed stories, too many to include here. But two more should not be omitted. They end this section on Donna's and Alejo's recollections of the period when Wendi was nine to thirteen years old.

444. The first are Donna's memories of witnessing Alejo taking Wendi into lingerie stores, including Victoria's Secret and Frederick's of Hollywood. Donna recalls, "We all knew when we went into those stores that the purpose of being there was to buy sexy underwear and sexy little outfits for Wendi." (Tab 27, at ¶ 270.) Alejo even planned a trip

to the original Frederick's of Hollywood. "Alejo specifically and specially wanted to take Wendi into that store," and "a big part of why we made that trip to California was so Alejo could take Wendi shopping for underwear in the main or original Frederick's of Hollywood store." (Tab 27, at ¶ 270.)

445.   Finally, Donna reports many details on how Alejo behaved with Wendi and her friends when they had sleepovers, including not only, as noted above, the skimpy clothes the children wore, but also how Alejo would "cuddle" and "wrestle" with the girls in physically intimate and overpowering ways, such as pinning them to the ground and refusing to get off despite their protests. (Tab 27, at ¶ 278.) These reports of Donna's are consistent with  REDACTED   reports – of forced wearing of nightgowns, forced rubbing of Alejo's head and legs, and Alejo putting his head and face in her crotch. When it comes to Alejo's memories of these sleepovers and the young girls involved, as would be expected, they are simultaneously superficial and disturbingly revealing. Consider, for example: "I had a very close relationship with REDACTED  and she slept over at our house many times. She was a very obedient and a good kid. She did anything I said..." (Tab 24, at ¶ 98.)

446.   Let us sum up what we have learned from Donna's and Alejo's recollections of this time, from when Wendi was nine years old and the family joined the 91st Psalm church/cult community, until she reached age fourteen and began to act more like a teenager.   Both Donna and Alejo agree that by age thirteen or fourteen Wendi seldom "needed to be swatted" because, at least for a time, she obeyed nearly all rules of their home, school and church. But when had Wendi reached age thirteen her submission, indeed her sacrifice, entailed much more than that.   Just as Donna had been relieved to

hand Wendi over to Alejo when they first met, when Wendi was nine Donna was relieved to hand over "all the work of rubbing Alejo's head, back and legs," and Donna was even more relieved, after her hysterectomy surgeries when Wendi was ten and eleven, to hand Alejo completely over to Wendi and saddle her with the responsibility of satisfying Alejo's needs for emotional intimacy and sexual pleasure. In short, Donna's relationship with Wendi and Alejo went from "I can't handle her. I don't want her. YOU take her," to "I can't handle his constant sexualizing and anger. YOU take him," and "I can't handle your constant sexualizing and anger. You take HER."

447. **Wendi ages nine to thirteen: Wendi's memories.** As discussed above, Wendi suffers from severe autobiographical memory deficits. Compared to normal healthy adults, she has few specific autobiographical memories, particularly of unpleasant experiences. Instead, she tends to have "over-general" memories that are more like summaries or overviews of types of experiences; even those are typically incomplete and have few visual images. When Wendi does remember experiences of neglect or abuse, she tends to say she "feels" that something happened. Because I conducted several interviews with Wendi, it was possible to acquire a number of general and specific memories that are consistent with reports of witnesses from outside the family and recollections shared by Donna and Alejo.

448. Also as discussed previously, and as is common for adults sexually abused by a parent, the causes of Wendi's memory deficits include motivational ones. In our very first interview, before I had asked for any childhood memories, two of the first things Wendi said were, "I feel like memory is really vulnerable to suggestion," and "I don't want it [her memory] to turn into a monster." That is, she was afraid of have false or distorted

memories, and of hurting anyone. At the same time, Wendi suspected there were memories of abuse by Alejo that she could not recall, because she then began crying and said, "I get so worked up every time we talk about my Dad. I don't have a memory, but I know something's wrong," and then cried some more. In one of our last interviews, after Wendi had managed to access and report memories of her father repeatedly making sexual comments to her, but not memories of him buying or making her wear lingerie, Wendi said, "I feel like I'm betraying people, and I feel like that's why my dad isn't coming to see me, because he feels like I'm betraying him." She also said, as she had several times before, that she has no memories of her father touching her sexually, and "If I was to remember something, I feel like I'd be so disloyal."

449. Importantly, this does *not* mean that Wendi was consciously and deliberately withholding memories that she had in fact retrieved into awareness during our interviews. It just means that, like many adults sexually abused by a parent who continues to have a significant place in their lives, Wendi had some very good reasons for not wanting to remember. Such motivations can operate automatically, and outside of awareness, to prevent abuse memories from being retrieved into awareness. Indeed, in these cases, remembering any such abuse experiences, even the mildest and most "borderline" behaviors, requires working against automatic and deeply ingrained habits of not doing so. Also, as discussed previously, all of the evidence suggests that the severe emotional neglect, emotional and physical abuse, as well as sexual abuse, prevented Wendi from developing a healthy, integrated sense of self. Instead, she suffers from significant pathological "dissociation," in which different categories and realms of experience – including memories associated with them – are disconnected from each other. When this

is the case, thoughts, feelings, perceptions and memories associated with sexual abuse are

disconnected from normal everyday awareness and the sense of self with which one

identifies. To clarify, Wendi does not suffer from Dissociative Identity Disorder,

formerly known as "Multiple Personality Disorder," which is the most extreme form of

dissociative pathology. But she does suffer from significant dissociative pathology, as has

just been described, which contributes to her difficulties accessing memories of sexual

abuse in usual waking states of consciousness.

450. Consistent with these formulations, Wendi herself said, in one of our final

interviews, "One of the things I've realized in this process is that I have to *make* myself

remember because it's not in my nature to." She then added, "My thoughts don't go

there, and when they do go there it tends to be on a meaningless detail and to go round

and round," such that she does not fully access the memory. Here Wendi is describing

common and well-known memory processes in many adults who have experienced

chronic and pervasive childhood neglect and abuse.

451. In this section on Wendi's memories covering ages nine to thirteen, most of the

focus is on incestuous family dynamics and what Wendi can remember of Alejo's sexual

abuse, which is but a fraction of what other witnesses and victims, as well as Donna and

Alejo, have reported. Less space is devoted to Wendi's memories of her church and

school experiences and Alejo's emotional and physical abuse of her. Wendi reported a

few specific and many general memories of the 91st Psalm/Harvest church and school

environments, including isolation, humiliation, beatings and general harsh domination of

children by adults with power in that community. Those memories were either consistent

with the memories of witnesses provided above, or contained other details that shed light

on her relationship with Alejo. Similarly, Wendi's memories of Alejo physically beating her provide insight into their relationship.

452. I assessed Wendi's memory for most of the incidents of physical and sexual abuse (and strong evidence of sexual abuse) reported by witnesses in the community and her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse. In those interviews, as in all of my interviews, I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

453. With respect to the church/cult community, Wendi recalls surreptitiously listening, sometimes with Shawn King, to conversations of Cal, Tom, Alejo and others in the main office. From as early as she can remember, Wendi says she "always knew" Alejo's background, that is, "that he was not from the church," because he told her stories of doing drugs, being a "drug mule," etc. But hearing Alejo talk to other adults about such experiences, and in the church office, was an entirely new experience. Wendi remembers being surprised and fascinated by how they spoke of their past substance abuse and related exploits as the most fun and most exciting experiences of their lives. She remembers the excitement of hearing the adults' gossip. "That's how we would learn about who was giving how much money [to the church], who was cheating on who." Wendi was struck, more generally, by the glaring contradiction between church/cult leaders' public statements and personas and what they said and did privately, and by their rank hypocrisy. For example, she remembers that "Grown-ups always said 'love everyone,' but they'd talk mean about other people."

454. Although Tom King and other adults' physical brutality toward children was consistent with their church's teachings, Alejo's compulsive sexual harassment of girls and women was widely recognized as against church principles, even if Tom ignored and denied it. But when it came to Alejo's behavior at home, like her mother Wendi could see that the contradiction and hypocrisy were nearly total. Wendi recalls, "My father had two sets of behaviors." On the one hand, "the public presentation was all these strict rules, but I knew a different side that didn't apply these rules to us at home." She remembers that her father "preached not to watch TV but loved Miami Vice," and eventually let her watch it too. She recalls that, before too long, "I was always aware of those silent rules.... What was allowed and what wasn't, with whoever I was around.... Even within the church, there were lax people, and I knew and made adjustments."

455. In short, Wendi recalls continually being confronted, in her community and at home, with massive contradictions, hypocrisy and moral confusion in the adults who were supposed – and claimed – to be instilling morality in her and the other children. And she remembers doing her best to navigate the unwritten rules and adapt herself, chameleon-like, to the demands of different people and situations.

456. Looking back on the sleepovers with her friends, Wendi remembers Alejo being "just a lot more liberal than my mom, and letting me and my friends watch movies with sex and nudity. At the time he was the fun dad in this strict community." She does not remember experiencing discomfort while watching those movies with her father and her friends. Indeed, it was not until years later, in the prison where she is now, that she finally "realized it wasn't appropriate," and only when she "talked to other women about their dads."

457. With respect to Alejo's regular physical beatings of her, Wendi had few specific but several general memories of what it was like to be on the receiving end of the abusive "discipline" preached and practiced by Tom King and her father. She recalls feeling the (completely natural and healthy) resistance that any child would experience when a parent attempts to impose, though violence, absolute and unquestioning obedience and submission (which, as explained above, actually thwarts the development of age-appropriate capacities for self-regulation and internalization of rules and values). "He'd get stubborn, and I would too.... He could spank me and it's supposed to break you down and make you sorry, but I'd still hold my opinion... I'd clench my jaw... It could be fifteen swats [without her giving in] and then he'd storm off." Other times she pretended to submit. She also remembers that Alejo often beat her with obvious anger while denying he felt any.

458. Sometimes Wendi cried and gave in because she sincerely "didn't want to be a disappointment" to her parents. She knew, having heard it so often at church and school, "they wanted 'true repentance.'" At times she sincerely tried to give it to them, even when she knew the punishment was unfair. Wendi also remembers how, when she was left crying after a beating, she had to stay alone in her room, with no one to comfort her. "I wanted to go cry to them but I couldn't... it felt horrible... As long as you were crying and upset, you had to stay in your room... So you had to pretend it was OK, be extra-smiley, extra-cheerful." At that moment, remembering herself as a hurt and confused young girl pretending everything was fine and even (as Jeri Lynn gratefully remembered Wendi teaching her) turning up the fake happiness, Wendi broke down and cried.

459. As we can see from the sampling of memories above, the regular beatings from Alejo involved all kinds of painful emotions and relationship dynamics. Thanks to the craziness of the 91st Psalm/Harvest cult, unlike many physically abused children, Wendi's experiences were additionally freighted with extremes of condemnation and attributions of "evil" upon any perceived rebellion against adults' authority and power (recall Tom King's sermon). Like most abused children, though, Wendi had no one to help her safely acknowledge and feel, let alone make sense of, the confusing and contradictory emotions and relationship dynamics – emotions of fear, sadness, shame, and anger; dynamics of domination, submission, resistance, dishonesty, hypocrisy, and isolation. Given her temperament and personality, Wendi blocked all that out as best she could, and pretended everything was OK. She acted "extra-smiley" and "extra-cheerful." She focused on taking care of others – especially Alejo but also other children. And like most abused children, who want more than anything to be loved and happy, Wendi did her best to do well in school and have fun with her friends.

460. As Alejo himself has reported, and consistent with Donna's recollections, his most common (non-sexual) abusive behaviors in the home were yelling and screaming at Donna and Wendi. Recall Alejo's accounts of feeling, from when Wendi was ten years old, sexually rejected and frustrated by Donna pretty much every day, and of responding to that frustration with building anger that led to explosions of rage at Wendi and Donna. Wendi remembers that Alejo "had a very short fuse" and that it was "scary" and upsetting when he screamed at her. Wendi also remembers that her mother never attempted to comfort her, and when recalling this added, "In fact, it was our job to help him calm down." She also remembers working with her mother to calm a raging Alejo as the only

times she felt at all close to her mother. Otherwise, Wendi recalls, "It was me and my Dad together and my Mom over there."

461.  Wendi also remembers – as does her mother, who admits to increasingly abandoning Wendi to Alejo during these years – that it was increasingly Wendi's job alone to pacify Alejo, especially after an explosive outburst had passed. Wendi recalls that Alejo would often rage at her and her mother, abruptly storm out of the house and go for a ride in the car, and then come back expecting and demanding to be, as Wendi put it, "babied." When Wendi accessed these memories in our interview, she continued, with a look and tone of amazement: "I spent *so much time* babying him." She recalled, "He'd lie on the couch and I'd rub his legs…. I remember my mother doing it a few times. But she didn't want to. She'd say, 'Wendi, you do it.'" Wendi's memories her are consistent with those of her mother and Alejo, and with Donna handing Wendi to Alejo and pushing Alejo toward Wendi while she retreated into working, reading and sleeping.

462.  Reflecting further on her mother's perspective at the time, Wendi remembered, "She was displeased with him. She was the responsible one [working and bringing in the money]. She didn't want to be catering to him." Reflecting on the lessons she herself absorbed from years of repeating, on nearly a daily basis, this cycle of Alejo getting angry, screaming and yelling, then requiring literally hours of "babying," Wendi said: "If I get you angry, you care, and I can soothe you." (Indeed, even from Donna's account alone it is clear that Wendi would have experienced Donna as not caring enough to get angry or feeling much of anything toward her.)  Furthermore, it was not just a matter of soothing Alejo after he got angry, but attending to his needs and wishes so preemptively and subserviently that he might not get angry in the first place. Wendi reflected, "You get

put in the position of helping him not be mad any more, creating an environment where he won't get mad." In addition, even when Alejo was ostensibly paying attention to her, or doing things for her – whether it was shopping, playing with her and her friends, watching TV together – it was really about *him* and getting *his* needs met, which mostly meant his needs for sexual stimulation and gratification. As Wendi once succinctly put it, a common experience growing up was "getting attention but feeling ignored."

463.  These repeated experiences, Wendi recognizes now, gave rise to patterns of relating to others that have manifested throughout her life, in all of her relationships, large and small, including in prison to this day. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

464.  These are not uncommon patterns of relating in people who have suffered chronic childhood neglect and abuse that included being forced to sacrifice their own needs and wants to those of their abuser.

465.  Several times in our interview, consistent with the primarily associative nature of human memory recall, talking about "babying" Alejo elicited unwanted memories of

what Wendi now recognizes were his sexually inappropriate behaviors. (Wendi never used the phrase "sexual abuse" to describe any of Alejo's behaviors toward her, though many certainly were.) It is to those sexually abusive experiences – at least those that Wendi can remember, and to the extent she can, that we turn now.

466.  After talking about "babying" Alejo, Wendi continued: "I hated scratching his legs… My father would never wear underwear… sometimes you could see his penis." She then recalled how she tried to avoid seeing his genitals: "I could usually end up scratching his head." Asked if Alejo ever had an erection, she replied, "Oh my goodness! I don't recall…." Her comment reveals several things: How she simultaneously submitted to Alejo's demands to do things he found sexually gratifying and attempted to minimize her awareness of the sex involved; how she has blocked herself from remembering the most disturbing and conspicuous sexual aspects of these experiences; and how she hopes others might remember and save her from having to "betray" her father.

467.  Wendi then added that she remembers Alejo walking around the house with his robe open, and how "you'd have to look the other way" not to see his genitals. She also recalled that whenever she complained to her mother, the response was inevitably something like, "Well, that's your father." Similarly, when asked about her earliest memory of something "sexual" with father, Wendi recalled how, when they lived in the house of Cedar St. (from ages nine to eleven), although Alejo had his own bathroom and she and her mother had theirs, Alejo often came in when she was talking a shower. "I remember screeching, 'What are you doing in here?!' and him being like, 'What's wrong with you? The shower curtain is closed.'" She continued, "I even have a memory of telling my mother, complaining about my father coming into the bathroom when I was in

the shower, and her saying, 'Well, you know your father.' I can hear her saying that to me. And she's just saying it in passing, continuing to do what she was doing and just brushing me off."

468. As described above, in the section on Donna's and Alejo's recollections of this time, there were several factors that contributed to the incestuous family dynamics and Wendi's increasing subjection to Alejo's sexual abuse. These include Donna and Alejo's social isolation; Donna pulling away from Alejo, both emotionally and sexually; Alejo's sexual frustration and anger; Donna pushing Wendi, explicitly to sooth and prevent Alejo's anger, and implicitly to tend to Alejo's sexual wishes; Donna avoiding being in Alejo and Wendi's presence to avoid witnessing his sexual abuse and, when such avoidance was not possible, looking the other way. Although Donna did not report having minimized and dismissed Alejo's behavior when confronted with Wendi's complaints, Wendi's memories of such "brushing off" are consistent with Donna's many other acknowledged behaviors that contributed to the incestuous family dynamic and sexual abuse.

469. Wendi also recalled her parents' social isolation after Cal left the church, and how this, when combined with her mother's withdrawal from her and Alejo, left him "starved for affection," which it became her job to provide. Referring to her mother's withdrawal during this time, Wendi said, "I feel like Mom would come home from work, go into her bedroom to eat and read," and that she and Alejo would eat in the living room and spend the rest of the night together, including hours after her mother fell sleep early.

470. Another big contributor to the incestuous dynamic and abuse: Donna did not want to hear from Wendi anything upsetting or anything about sex. Wendi recalled

learning early on not to tell her mother anything potentially upsetting, because "she couldn't deal with it." Whenever she did tell her mother something that was "too much for her," Donna would "disappear into her room." Wendi remembers once asking her mother about dating, "and she just wouldn't answer. Then I'd have to go to my father and I'd get more than I wanted, probably too much information." When Wendi had her first period, she was shocked and went to her mother, who responded not by explaining anything but by telling Alejo to go to the store to get pads and tampons. "She seemed very embarrassed, very uncomfortable, like she said, 'Alejo, you tell her.'" In another interview Wendi recalled, "Everything I know about sex I learned from my dad. My mom was too embarrassed to talk about anything." She then continued, "And now, everything sexual I talk about is linked back to him, and that's what I freak out about, because it gets so twisted in my head. I don't mean to be dramatic, but I feel like if I sit down to write a letter in a romantic way [to her pen-pal boyfriend], he's that shadow in the room."

471. In the interview specifically focused on eliciting memories of sexually inappropriate or abusive behaviors by Alejo, conducted in April of 2011 according to strict procedures to avoid leading questions and anything that could lead to false or distorted memories, Wendi was able to access several memories of Alejo being sexually inappropriate. Importantly, she recalled none of the more serious incidents reported by others, such as her wearing lingerie around the house, Alejo in bed with her and RED ACT ED , or being in the adults-only section of Spencer's gifts. This was even the case when, at the end of the interview, those witness reports were explicitly communicated to her. Nor did Wendi ever remember an incident involving undeniably sexual contact, although

she did recall – as did Donna and Alejo – how Alejo would "wrestle" with her, Jeri Lynn and Laura when they wore their nightgowns during sleepovers at her house.

472. After the memory of Alejo coming into the bathroom as she showered (and her mother dismissing her complaints), the next memory to surface was of there always being a Frederick's of Hollywood catalog behind the couch. Wendi spontaneously associated to this memory, of which neither I nor the investigators had heard at that point. Wendi said, "In the living room behind the couch he would keep Frederick's of Hollywood catalogs – it's lingerie, more risqué." She then laughed nervously and added, "There seemed to always be one there.... I remember showing          REDACTED          ." After reporting that memory, Wendi continued:

> "I have to go where my mind's taking me. I remember my parents buying me
> two pairs of pajamas, one with footies and one not, one blue and one cream,
> one loose and one tight. I remember being uncomfortable in the tight one, and
> my father really wanting me to wear the tight one, trying to convince me, and
> I always felt really uncomfortable.... [Alejo's] comments and compliments
> were supposed to make me want to wear it more, but I remember in the back
> of my head, it was too revealing, too much.... I was just starting to wear
> training bras, and with the tight pajamas every little thing was showing."

Wendi remembers expressing her discomfort to her father, and him telling her, although she cannot remember the specific words, that her concerns were "not valid, not a worry, not an issue, or whatever you want to call it."

473. This memory parallels one Wendi had reported in an earlier interview – a memory that had also emerged spontaneously, following her recollection of Donna

213

sending her to Alejo when she had her first period. It was of being out shopping with Alejo and him buying a bathing suit that she did not want. Wendi wanted a yellow one and he wanted her to get a white see-through one that felt physically uncomfortable on her body. Wendi made her dislike of the revealing suit perfectly clear, but Alejo insisted on buying both. When they got home and Donna asked why they had bought the see-through one, Alejo replied, "We couldn't decide."

474. In the later interview, Wendi went on to remember how, in general, her father often bought and pressured her to wear clothing that was physically uncomfortable and revealing. However, she reported no memory of wearing lingerie – even at the end of the interview, after being explicitly asked about this, and after being told a childhood friend had reported that she frequently wore lingerie at home in front of other children and said that Alejo liked her to "dress up" and wanted her to "look her best." Indeed, when told of those reports Wendi said, "My reaction to that is: Go away, that's ridiculous. I can't even relate to that." (At that point Donna had not yet reported all the lingerie that Alejo had bought Wendi, the trips to Frederick's of Hollywood, etc.)

475. The next memory to emerge in that interview, again spontaneously and without specific prompting: "Did he or my mom ever tell you how he always called me 'BBW'?" After the investigator present and I replied that no, they had not, Wendi explained that BBW stands for "baggy butt Wendi." She continued, "No matter what I was wearing he would say that. Even everyone at the church knew." Asked what she understood the phrase to mean, she replied, "I didn't know, but it just made me cry." Wendi then said "BBW" was a name Alejo constantly called her. She also spoke, as Donna has and is described above, of Alejo's "Constant sexual teasing – ten times a day." Consistent with

a classic dynamic in incestuous families, in which the perpetrator tells the victim and others that she actually *likes* and *wants* his abuse, and when that tactic fails, claims he is doing nothing wrong and the problem is with them, Wendi commented, "I remember my father always telling my mother and me that we were uptight. Even now I wonder, was it me or him? It was always so hard to know because he denied everything and blamed us." Indicative of how Alejo had brainwashed Wendi and she had come to identify with a humiliating nickname that made her cry when she was a pre-teen and teenager, when Wendi created an email address to communicate with Shawn King in the summer of 2000, it was "Wendi.bbw@usa.net."

476. Asked about a comment she had made during a prior interview, about things she "considered telling Kandy" (her therapist while jailed before trial) but never did, Wendi responded, "I didn't really have specific things, but I felt like the topic we were going down I should bring up my dad, but I guess I just wasn't ready to do all that." She continued, "My hesitation, part of my hesitation, I don't have a specific event. It's more emotions and feelings and things that seem to be over the line... everything with sexual overtones on it, always." This was at the beginning of the second of three days of interviews specifically focused on eliciting potential memories of sexually inappropriate or abusive behavior by Alejo. Wendi continued by saying that during the interview on the prior day, and that night in her cell, after having searched her memory, "I can't think of any times my father touched me."

477. However, Wendi then said that for years she has suffered from nightmares in which her father is having sex with her. She reported having to tell her pen-pal boyfriend to stop putting any sexual references in his letters to her, because it was causing dreams

of sex with her father. Asked about the dreams, Wendi replied, "I was trying to find one, but I can't – can't even pull up the details. I don't usually have those dreams because I know how to limit what I watch on TV, what I read. I had to put my friend on hold 'til I get through this [appeal process]. So I know how to make it stop." Asked later in that interview for a sexual dream image or "movie" she can remember, Wendi again said she had no details, and "Most of the stuff that I can see in my head right now is being freaked out and angry when waking up, and being desperate to get that out of my head."

478.   The memories that were most clear and numerous, and evoked the strongest emotions and most tears from Wendi, were memories of how Alejo constantly forced his sexual obsessions, compulsions and perversions on her through things he said. As explained above, Wendi could not talk to her mother about sex. Also, Tom King and the church/cult community strictly forbid healthy teaching or conversations about human sexuality, and any talk of teenagers and sex was framed in terms of sin, evil and temptation, and laced with condemnation and threats. When it came to getting their questions answered, Wendi and her friends were stuck with Alejo – and he took full advantage of his self-appointed role. Wendi remembered how, when she and a friend would bring up a sexual topic to Alejo, "it was like, 'I'm your buddy and let's talk about sex.'" Saying this Wendi portrayed the eager excitement in his voice, and I commented on that. Wendi responded, "Yes, absolutely," and spoke of the "excitement in his eyes" at such times. Indeed, she added, she can think of nothing else about which Alejo ever expressed such excitement.

479.   Asked how often those sexual conversations happened, and how often Alejo initiated them, Wendi replied, "That's just his nature. It comes out in everything.

216

Watching a movie, reading a book, something someone would say... Someone would say, "Let's go play with the balls today, and he'd be smirking." She continued, "Whatever could be taken in a sexual way, he made sure that awareness was there, so everything was always about sex." Asked what she meant with the balls example, she responded, "He'd say, 'Oh, you're going to go play with the *balls*,' so no one could escape the awareness of his sexual perspective." Consistent with the reports of several witnesses, detailed above, Wendi recalled Alejo doing this constantly, around not just adults and teenagers but children of all ages. Asked how she used to respond to such comments, Wendi said, "It's always been like when someone tells a joke that's not funny and you laugh anyway. With this it was always like that. I tried to pacify him."

480. In the midst of sharing these memories, Wendi expressed anger and hurt, which she rarely did in our interviews. At one point she said, with searing clarity: "He should have *protected* that part of me, not *used* it. It was not for him to use. He should have protected me." Indeed, like all adults who sexually abuse children, and parents most of all, Alejo terribly betrayed her.

481. Another summarizing comment of Wendi's on the effects Alejo's constant sexualizing had on her, which reduced her to tears: "I feel like my dad, because he freely talked about sex my whole life, he's ruined sex for me. Whenever I was interested in a guy, I would think of my dad and feel disgusting." Recovering from crying, Wendi then reflected on how, if somebody was to confront Alejo with what he had done, "He'd say he wasn't doing anything wrong, it was normal. But it wasn't. It got everything mixed up in my head." These are classic dynamics and effects of the incestuous relationship that

Alejo (with Donna's acquiescence and even relief) imposed on Wendi, with progressively greater intensity when she was nine to thirteen years old.

482. As addressed above,  REDACTED  has reported being sexually touched by Alejo as a child, from ages eleven to thirteen. When I first asked Wendi about what REDACTED had reported, I did so only implicitly, and without revealing  REDACTED identity, by asking Wendi if she had any memories of Alejo ever being in bed with her and a friend. Wendi replied that she has no memory of her father ever being in her bed at night. She continued, "I remember him wrestling around with us a lot" on the "bed, couch, and floor," just as Donna and Alejo had reported, then said, "But sleeping in the bed, no." When finally told, at the end of the interview, exactly what REDACTED reported, Wendi responded, "What disturbs me is that, in my logical mind, I know REDACTED wouldn't lie or make something like that up, but I can't link it to anything in my mind."

483. Finally, in our last interview, I reviewed with Wendi many of the recollections of her mother's covering those years when she was nine to thirteen years old (as well as ages fourteen to eighteen, covered below). These included Donna's reports, reviewed above, of Alejo buying Wendi lingerie and other inappropriate sexy clothing, of Wendi having an entire drawer full of lingerie by the time she was thirteen, and of Alejo routinely forcing Wendi to look at things in the adults-only section of Spencer's gifts. Wendi had three main responses to this information – all three common responses among adult women who were subjected to repeated sexual abuse in an incestuous family where the mother, as Donna had, essentially handed her daughter over to the perpetrator. First, Wendi said that she genuinely did not remember those things. Second, she said that, despite not remembering herself, she had no trouble believing that those things had

218

happened – given what she has always known, what she has recently been able to admit, and what she has recently learned about Alejo; and given that her mother is, like $^{RED}_{ACT}$
$_{ED}$
, not the kind of person to make up such things, especially not in such detail. Third, Wendi expressed both amazement and intense anger that her mother had actually known, and thus been complicit in, so much more of Alejo's sexual abuse than Wendi had ever realized or could have imagined.

484. **Wendi ages fourteen to eighteen: Observations of adults and children in community.** When Wendi was fourteen, Donna began working full-time at Ak-Chin farms. As Donna herself reports, covered below, this precipitated her final withdrawal from Wendi and Alejo and left Wendi even more vulnerable to Alejo's sexual exploitation and abuse. At the same time, after turning fourteen Wendi increasingly thought and acted like a teenager – though certainly not a normal one given her continued immersion in the cult community and her incestuous relationship with Alejo. Nonetheless, Wendi tried to achieve some freedom and power, in the church and school systems and her relationship with Alejo.

485. Several witnesses' recollections of Wendi during this time include positive qualities and behaviors that had always distinguished her as a child at the cult's church and school. For example, Stephen Shaider recalls entrusting Wendi to babysitting his young daughter Bree, who liked Wendi a lot, and how Stephen and his wife Cindy always felt their daughter was safe with Wendi. (Tab 35, at ¶ 18.) Mr. Shaider also remembers Wendi as a teenager who was "not afraid to work" to make money and did household chores for his family as well (Tab 35, at ¶ 19.) The school principals, Mark

and Nancy Keating, continued to have positive views of Wendi as a student and athlete, as described above, as did other children like Jeri Lynn and Jasper Neace.

486. Once Wendi reaches fourteen, however, there are more reports of great concern about her well-being, particularly that she was being sexually abused by Alejo. But it was not so simple, and the available evidence indicates that as Wendi progressed beyond age thirteen she simultaneously gained power and freedom *and* lost them. Furthermore, the gains were partly "benefits" of her losses.

487. This requires some explaining. By all reports, as Donna withdrew even further while working full-time at Ak-Chin farms, Wendi *lost* by being used by Alejo for intimacy and sexual gratification. At the same time, Wendi *gained* freedom and power, in two ways. First, like all teenagers, her cognitive development during that time provided more capacities to negotiate, and at times turn to her advantage, the church/school/cult system and her pathological relationship with Alejo. Second, being Alejo's partner, even in a very subordinate role, meant that Wendi could get things *she* wanted from him by withholding or providing what *he* wanted from her, which was access to her attention, her affection, and most of all, her *body* – which Alejo was obsessed with looking at, dressing in sexy lingerie and clothing, touching, and being touched by in prolonged "touching on" sessions. In summary, like many children caught in a sexually abusive intimate relationship with an adult and no hope of anyone helping them escape it – especially an incestuous relationship with one parent while the other looks away and feels relief – Wendi learned to "make the best of it," though certainly at a high cost. Let us now consider the recollections of several witnesses from outside the family that support this assessment of Wendi's main predicament from ages fourteen to eighteen.

488. As addressed above, even before Wendi reached age fourteen, Mark and Nancy Keating and Jeri Lynn Cunningham had all observed that Wendi's relationship with Alejo was "not a father-daughter" one (they even used that same phrase). Nancy calls it "more of a teasing relationship," Mark refers to "things about Alejo's dynamic with Wendi that did not sit right" with him, including a "weird" and disturbing kiss he witnessed, and Jeri Lynn called the relationship "flirty." (Tab 14, at ¶ 7; Tab 13, at ¶ 6; Tab 12, at ¶ 14.) In addition, both Nancy and Jeri Lynn repeatedly witnessed Wendi, as an older teenager, exerting some power over Alejo. Nancy Keating recalls:

"A couple of times when Wendi was a teenager, I observed Alejo trying to get Wendi to pull weeds or do some kind of manual labor on the church grounds. Like a typical teenager, Wendi rolled her eyes or expressed a desire not to do what was asked of her. Instead of telling Wendi not to talk back, Alejo did something very strange with Wendi. He *begged* her to do what was asked of her, sometimes in exchange for something else. He said, 'Please, Wendi. Please…' I cannot recall what he offered her in exchange for performing her required tasks, but it was as if Wendi was his little princess and he needed to entice her to get her to do what he wanted." (Tab 14, at ¶ 9, italics in original.)

Given what is known about how Wendi often spent hours "touching on" Alejo while dressed in skimpy and sexy clothes in their home, and how when Wendi was younger Alejo would, from a position of power, only drive Wendi and REDACTED to the desert if they wore their nightgowns and scratched his head and legs, it is inconceivable that Wendi did not eventually learn to turn the tables. It is inconceivable that Wendi did not sometimes, especially in their home rather than a public place like the church grounds,

make Alejo beg to be granted the titillating and sexually gratifying experiences of Wendi's body with which he was so obsessed and addicted.

489. As Wendi's close friend who spent lots of time with Wendi and Alejo, including at their home for sleepovers, Jeri Lynn was well positioned to see Wendi's increasing assertion of power in her relationship with Alejo: "Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from him. Wendi switched between calling Alejo 'dad' and 'Alejo.'" (Tab 12, at ¶ 14.) Jeri Lynn observed these behaviors throughout her relationship with Wendi. She saw Wendi use sexually-charged flirting to get things she wanted from Alejo up until she and Wendi lost connection, when they were both about sixteen years old (three years after REDACTED family had followed Cal Lorts to Tempe).

490. Lonnie Carlin reports witnessing an older teenage Wendi demonstrate – graphically and publicly – her ability to manipulate Alejo by sexually stimulating him. Lonnie is the fellow student who says that, when they were ten or eleven and children visited her house, Wendi frequently wore lingerie that she said Alejo had bought and wanted her to wear to "look her best." As noted previously, and consistent with his mother's report that he is "too traumatized" to talk with her about his time in the cult (Tab 10, at ¶ 25), Lonnie spoke to investigators but did not sign a declaration. He told the investigator of the following disturbing interaction between Wendi and Alejo, which he says that he and other children witnessed "a lot" at school when Wendi was fourteen or fifteen. "Wendi sat on Alejo's lap, wiggled back and forth, and commented aloud that it 'made him get hard.'" Lonnie said that Alejo would just look away, sometimes pushed Wendi off, and seemed "embarrassed" when this happened. However, Lonnie made it

clear that he "did not get the impression at all that Alejo thought it was bad that his step-daughter was grinding on his crotch. He just did not want other children to know."

491.  It is important to recognize however, that the ability to embarrass Alejo, by doing in public the kinds of things that he trained her to do in private, does not constitute real power. Rather, Wendi was reenacting an abusive interaction into which she had been manipulated and coerced into repeatedly engaging at least since she was nine or ten years old. Indeed, most witnesses do not report seeing Wendi take what might be perceived as an active and assertive role in Alejo's incestuous abuse during these years. They simply recall evidence of Alejo's ongoing sexual abuse of Wendi, and mostly in terms of Wendi as a victim whose sexual exploitation was recognized but never stopped by a community of beaten-down cult members.

492.  Looking back on Wendi's teenage years overall, Constance Boys reports, "I recall that when Wendi was a teenager, something in her changed. Something just wasn't right. I recall my daughter, Sarah, telling me that Wendi had shown Sarah some negligees and lingerie that her father had bought for her. Sarah said, 'Isn't that weird?'" (Tab 10, at ¶ 24.) Ms. Boys also recalls, "For years there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember who specifically knew what, but I do remember it was generally discussed." (Tab 10, at ¶ 7.) Ms. Boys goes on to report one rumor she had heard, that Wendi told Mark Keating Alejo was sexually abusing her, and Mark told Tom King, who refused to believe it. (Tab 10, at ¶ 7.) However, Mark Keating says only that Wendi appeared about to disclose to him sexual abuse by Alejo but was cut short (by Alejo entering the room), and does not say he spoke to Tom King about the issue. (Tab 13, at ¶ 7.) Whether or not

Wendi disclosed sexual abuse by Alejo to any adults in the church, Ms. Boys'
recollections (and those of others, covered above and below) do indicate a general
awareness and concern in the community that it was happening.

493. Ms. Boys then focuses on how, aside from getting "the cutest clothes and
shoes," Wendi lost power and freedom in those final years of living at home and
attending the church and school, from about ages sixteen to eighteen:

"Those last couple of years, it was as if Wendi came to the realization that she
just couldn't fight it. She completely gave in, and became 'Daddy's little girl'
and was always hanging on her father. She always seemed like a free-thinking
little girl before that, and suddenly she was a model student. She became quiet
and withdrawn. I remember that she had the cutest clothes and shoes – all that
her dad had purchased for her. He just lavished her with things like that. Of
course, everyone at the church said, 'Praise God, Wendi finally learned.' They
said that she had finally 'repented' and had 'got her life right with God,' but I
feel that they had finally broken her. She had no one to turn to…. I believe she
must have realized that no one was going to help her, and she finally gave in
to it – she just threw in the towel, so to speak." (Tab 10, at ¶ 24.)

494. Mark Keating recalls once seeing Wendi dressed in a "Playboy Bunny workout
outfit" in the Casa Grande fitness center. He continues, "She was just a teenager. Wendi
said that Alejo bought [it] for her. I did not think it was right for her to be walking around
in an outfit like that, but since it appeared that her parents were aware of how Wendi was
dressed and even encouraged it, there was not much I could do." (Tab 13, at ¶ 8.) Both
Nancy and Mark Keating recall how, when Wendi was a junior in high school, Alejo and

Donna pulled her from the swim team because she was losing weight and her breasts were becoming smaller. Nancy recalls, "It was another thing about Wendi and her parents that made me suspect that something was terribly wrong at home." (Tab 13, at ¶ 4; Tab 14, at ¶ 12.)

495. Cynthia Schaider, a parent at the time, recalls that Alejo showed her a series of photographs he took of Wendi when she was fifteen or sixteen years old. Alejo was into modeling, and the pictures were "part of his portfolio, examples of 'modeling shots.'" (Tab 34, at ¶ 7.) Ms Schaider continues:

> "They were part of his portfolio, examples of 'modeling shots.' In the pictures, Wendi was dressed in lingerie, a white teddy, and posing in the desert. I always took issue with that. I felt it was inappropriate for a stepfather to take his beautiful, curvy daughter out into the desert in her underwear and take sexy photographs of her. It was unseemly to me, but it was not my place to comment on the behavior of one of the pastors of the church." (Tab 34, at ¶ 7.)

496. One of those photographs has been preserved and is shown below. Although this particular image shows Wendi's body in silhouette, it is clear that she is scantily clad. Alejo admits to having taken the picture, even expresses pride in having done so: "I enjoy long exposure photography and like taking pictures in the desert electrical storms. I photographed Wendi and was able to capture lightning from an electric storm about fifty miles away…" (Tab 24, at ¶ 165.)

REDACTED

497.   A number of adult witnesses recall seeing and hearing evidence that Alejo was

sexually abusing of Wendi, yet feeling powerless to do anything about it. Ms. Schaider

explains the subservience and isolation of cult members that let Alejo abuse Wendi with

impunity and left Wendi to her own devices. "We lived in a culture where we were

expected to obey. At the church, we were taught that bad things would befall us if we

didn't 'toe the line.' As a result, no one discussed negative aspects of their lives. It kept

us isolated from one another." Ms. Schaider continues, describing her later realization

that cult members experienced a false sense of family in which "none of us really knew

each other," "everyone ran around pretending life was wonderful," and many "lived a

double life." Community members were also taught that, should they speak negatively of

their pastors, including Alejo, "the 'wrath of God' would come upon us." (Tab 34, at ¶¶ 30, 31.)

498. As mentioned above, Jasper Neace was abruptly expelled from the school when he was seventeen or eighteen (and Wendi was fourteen or fifteen), after confronting Alejo and Tom King about Alejo's possession of pornographic magazine and his sexual harassment and abuse of Wendi and other children in the community.

> "Wendi brought the cover of a pornographic magazine to school and told me
> that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in
> my locker, and then I told the pastor, Tom King, that I needed to talk to him
> about something important. My intention was to tell Tom King about the
> magazine. All the other kids were too afraid to say anything. I wanted Alejo to
> face the consequences for all the damage he was doing. I was angry about
> what I saw to be extreme hypocrisy. I was in trouble for buying a motorcycle,
> and my mother got kicked out for getting married, but Alejo faced no
> consequences for his sexual behavior with children, for whooping on kids, and
> for looking at dirty magazines. Tom King called me into his office and asked
> me what I had to say. I told Tom King about the magazine, but Alejo was
> right there and he flatly denied it." (Tab 23, at ¶ 51.)

499. Jasper reports that Tom then asked him, "Are you sure you have the magazine? I'd like to see it." The three of them went to the locker, and it was gone. When they returned to the office, Jasper recalls, Tom and Alejo "looked so smug," which provoked a long-suppressed rage in Jasper, who proceeded to point his finger at Tom and say, "I've always wanted to tell you this: Fuck you, Tom." As Jasper remembers it, Tom then

threatened to call the police and "started rattling off scriptures and said that he was rebuking me in the name of Jesus and…turning me over to the devil." A physical altercation followed, and Jasper ran out the door. Looking back on the explosive confrontation that resulted in his expulsion from the school and community, Jasper recalls, "I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity." (Tab 23, at ¶ 51.)

500.   Mark Keating remembers learning at the time of Jasper's confrontation with Alejo and Tom about the pornography magazine. (Tab 13, at ¶ 5.) So does Constance Boys, who, as noted above, reports that "many people went to Tom about Alejo's behavior, and Tom refused to believe it." (Tab 10, at ¶ 23.)  Ms. Boys reports details of the incident that she heard at the time, including that it was not "*Playboy* or something like that – it was really hardcore porn," and that Alejo made up a story of having found the magazines, picked them up so the children would not see them and taken them home, then forgotten about them. (Tab 10, at ¶ 16.)

501.   The available evidence indicates only one time that Alejo was confronted over his sexual abuse of Wendi, privately by George Carlin, father of Lonnie Carlin. George recalls that, at about the same time his wife and daughter told him of inappropriate sexual comments Alejo had made to them, "I was concerned that Alejo had been sexually molesting Wendi." Mr. Carlin called Alejo on the phone, told him why he was calling, and asked Alejo to meet him at the church to discuss it further.  They spoke outside of the church, and Mr. Carlin recalls, at the beginning, "Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually." As reported above, Mr. Carlin remembers that Alejo then asked

what he should do, and whether he should resign from the church. Mr. Carlin told the sexually obsessive, compulsive and addictive Alejo to simply "ask for forgiveness and stop his inappropriate behavior."

502. Finally, Mark and Nancy Keating report an incident that took place not long before they left the school in 1988, when Wendi was seventeen or eighteen years old, in which Wendi appears to have decided to disclose to them Alejo's sexual abuse – only to be thwarted by a sudden and unexpected appearance by Alejo. Mark remembers that Wendi approached them "on the heels of a sermon that a guest-minister named Kevin McNulty made about sexual sins and sexual abuse." He and Nancy were alone in a small classroom at the time.

> "Wendi came in and said, 'Can I talk to you?' She looked very anxious and concerned. Just as Wendi prepared to tell us what was heavy on her heart, Alejo walked in. Within the classroom was a closet and Wendi backed right into it, very affected by Alejo's presence. Wendi never did tell us what was on her mind. It seemed to be related to the porno Alejo was accused of bringing by JC Neace. I was afraid it had something to do with sexual abuse, having observed Alejo's inappropriate behavior and strange dynamic with Wendi."
>
> (Tab 13, at ¶ 7.)

503. Nancy Keating's account of the incident is almost identical, including her strong belief that Wendi had planned to disclose that Alejo was sexually abusing her:

> "Wendi came in and said she had something she wanted to tell us, but she could not get much out. She was very nervous and swallowing a lot. Alejo came into the room just as Wendi was about to reveal whatever it was she

wanted to talk to us about, and she just shut down. Her eyes got really big. She looked like she had been caught saying something bad. I think Alejo's presence scared Wendi. I thought at the time that maybe she was going to tell us that she was being molested." (Tab 14, at ¶ 10.)

504. Soon thereafter, Mark and Nancy Keating decided to leave the school, as well as the cult community and Casa Grande altogether, after learning that Tom "did not do much" when REDACTED was sexually abused by his friend (see above; Tab 14, at ¶ 11). Mark recalls, "Before I left Harvest, I pulled Wendi into my office because I needed to tell her something. I told Wendi that if something was going on with her at home, if there was anything that was going wrong in her life, she needed to find someone she trusted to share it with. That person did not need to be me, necessarily. I just wanted Wendi to know that if something was not okay with her, there was help." (Tab 13, at ¶ 9.) It may be that Mr. Keating was, without intending to, giving Wendi a mixed message. The evidence suggests that she had *already* attempted to tell him such a thing, and had *already* indicated that she trusted him and his wife enough to do so. Wendi had only been stopped by Alejo's unexpected entrance into the room. Sadly, most adults who suspect sexual abuse of children do not know how to respond appropriately. Whatever exactly transpired in that conversation between Wendi and Mark Keating, all of the evidence indicates that by then Wendi had concluded, correctly, that there was no one she could trust to save her from Alejo's sexual abuse. Indeed, the only adults she had hoped might be able to help were themselves jumping ship – escaping the cult community where such sexual abuse occurred, and leaving her behind.

505. **Wendi ages fourteen to eighteen: Recollections of Donna and Alejo.** As noted previously, when Donna started working full-time at Ak-Chin Farm in late 1984, when Wendi had recently turned fourteen, it was Donna's final big withdrawal, both physically and emotionally, from both Wendi and Alejo. Donna recalls, "Beginning in 1984 after I was working full-time outside the church, Alejo and Wendi had dinner together more often than Alejo and I had dinner together or the three of us [did] for the rest of the time Wendi was growing up." As quoted above, and worth repeating here, about each of her progressively greater withdrawals, including this one, Donna said: "It was easier for me to let Wendi spend so much time with Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room and read." (Tab 27, at ¶ 248.)

506. As discussed above, what Donna most wanted to escape were Alejo's constant pushing for sex (that she did not want, before her hysterectomies and especially after them), and his constant anger over her sexual rejection, which Alejo says caused "ninety percent" of their arguments – until, by all indications, he gave up on Donna and sought sexual gratification primarily from Wendi and her friends. And as discussed above, what Donna did – most of all in her final turning away when Wendi was fourteen years old – with actions that spoke much louder than words, was say to Wendi, "I can't handle his constant sexualizing and anger. YOU take him," and to Alejo, "I can't handle your constant sexualizing and anger. You take HER." It was a classic incestuous family pattern, and it reached a peaked when Wendi was fourteen to eighteen years old.

507. Most Donna's and Alejo's recollections of these years are the same as when Wendi was ten to thirteen. As Donna reports, consistent with other witnesses, Alejo

continued his verbal abuse of Wendi, especially verbal sexual abuse; his demands that Wendi scratch and rub his head and legs, sometimes for hours each night, often with his head by her genitals, with each of them dressed in less and less clothing during this "touching on" ritual; his buying Wendi lingerie and other skimpy and sexy clothing; his insistence that Wendi and her friends who slept over wear their nightgowns and "snuggle" and "wrestle" with him; his pulling Wendi into the adults-only section of Spencer's gifts and forcing her to look at sexually explicit greeting cards, games, toys and other paraphernalia. Yet Donna also recalls escalations and new twists on many of these sexually exploitive and abusive behaviors after Wendi turned fourteen and how, facing further abandonment by Donna and increased pressure from Alejo, Wendi resigned herself to the role of Alejo's intimate partner.

508.  Donna reports that Alejo verbally abused and "degraded" Wendi throughout her childhood and adolescence, and that these attacks dramatically escalated when Wendi became a pre-teen. As described above, at that point – and just as his aunts, uncles and parents had done when he became a pre-teen – Alejo became especially relentless and cruel with his sexualized teasing of Wendi, and this form of sexual abuse continued until Wendi left home after high school. (Tab 27, at ¶¶ 256-57.)  Added to the mix during Wendi's teenage years, Donna recalls, was the way Alejo would jump on any "clueless" comment by Wendi and use it against her, often telling her she was "another dumb blond" or having "another blonde moment." (Tab 28, ¶ 89) In short, Donna recalls Alejo unleashing a steady stream of emotional abuse against Wendi, with a new form added but most of it still sexualized, throughout these years.

509. Furthermore, Donna reports that Alejo's targeted, predominantly sexualized verbal abuse of Wendi occurred against a backdrop of Alejo's constant yelling at Donna and Wendi. Donna recalls, "To me, it felt like he was continually yelling at us, almost every day. For all those years he was – and he continues to the present – extremely explosive in his anger. I never know what will set him off.... There's just no warning, then suddenly he's extremely upset, yelling, and even literally screaming." (Tab 27, at ¶ 291) Donna also recalls that Wendi eventually became inured and numbed to Alejo's abusive verbal outbursts. "When Alejo was on his tirades throughout her teens, Wendi told me, 'It's going to be okay, Mom. He'll come back eventually and things will be okay." (Tab 27, at ¶ 294.) Donna then notes that Wendi was "always the middle person, trying to make things better for me and Alejo." (Tab 27, at ¶ 294.) In these situations, as both Donna and Wendi recall, that meant not only verbally reassuring Donna when Alejo had stormed off after a tirade and gone for a drive, but hours of rubbing and scratching Alejo's legs and head – "babying" and "touching on" him, often while scantily dressed – once he returned home again.

510. With respect to Alejo's physical abuse of Wendi, Donna reports, "After about age thirteen, Wendi didn't need swatting very often, only once or twice year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.) Alejo too recalls that "Wendi got fewer swats as she got older." He says beatings were replaced by "pulling weeds or having to do extra chores or being grounded," because he eventually "did not want to be associated with the kind of pain that was inflicted by paddling children." (Tab 24, at ¶ 127.) Thus Donna's comments appear to accurately reflect a decreasing frequency of physical

233

beatings. However, her comment that Wendi "completely gave in," like the views of women in the community who perceived Wendi as wholly beaten down and defeated during her teenage years, is an oversimplification. As we have seen, others recall Wendi being "flirty" with Alejo to get things she wanted, and at times even reducing Alejo to begging her. Alejo himself acknowledges, "When Wendi became a teenager, she started relating to me in many of the ways Donna did. She told me what shirts to wear and what ties went with them. If I grumbled at something Donna made for dinner, Wendi might retort by telling me, 'Just eat it – there is nothing wrong with it.'" (Tab 24, at ¶ 116.)

511. Donna's recollections of Alejo's sexual abuse of Wendi during this time are of it becoming even more pervasive and intense, and of her responding by pulling away even more, often in denial and sometimes in disgust. For example, Donna recalls, "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about." (Tab 27, at ¶ 269.) She remembers how, when Alejo showed Wendi things in the adults-only section of Spencer's, "I always gave him a disgusted look and took off to look at something else." (Tab 27, at ¶ 272.) Donna recalls that, in general, "I was working and paying so little attention to what was going on with Wendi that they could have shopped five days a week and I wouldn't have known about it," and "I didn't care to know where they went or what they did while they were shopping without me." (Tab 27, at ¶¶ 265, 275  Such responses of withdrawal and abandonment only provided Alejo with more opportunities to focus his sexual obsessions, compulsions and perversions onto Wendi and to seek sexual gratification from her.

512. However, when the three of them went on family vacations, Donna could not avoid learning of Alejo's escalating abuses during these years. Donna recalls,

"As Wendi got older, by age fourteen and at ages fifteen, sixteen, and older, Alejo took Wendi into hardcore, triple-X, adult porno stores and sex stores. It was actually more like Alejo dragged Wendi into the hardcore porn stores.... She said she didn't want to go, but he insisted. It was just like earlier on with Spencer's.... He said, 'We'll just go in for a minute,' but then they spent longer than a minute, actually fifteen to twenty minutes or even more." (Tab 27, at ¶ 280.)

Donna then explains, "The shopping at hardcore porn stores came into my awareness mostly on vacations because I'd be with them while they were shopping.... I wasn't really invited when Alejo and Wendi shopped at home." (Tab 27, at ¶ 281.) Thus Donna went into these stores with Alejo and Wendi "only occasionally, about once or twice per year," and even then, she only "hung around by the entrance and never went past the front section where the clothes and less hardcore items are." Donna then describes how different the experience always was for Wendi – and that just how different, she preferred not to know:

"Alejo always took Wendi right into the main part of the store where the triple-x and hardcore sex magazines, videos, toys, and other hardcore items were displayed and sold. I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." (Tab 27, at ¶ 281.)

513. And so, once again, Donna sacrificed Wendi to such abuse in order to spare herself from dealing with Alejo's sexual perversion. Donna now frankly acknowledges this is true: "I let Wendi be the one who looked at the hardcore porn stuff in those shops

235

with Alejo instead of having me be the one who had to deal with it." (Tab 27, at ¶ 282.)

Finally, she explains that Alejo got away with bringing Wendi into those shops because

Wendi, "with her hair and makeup done," looked older than the young teenager she

actually was. (Tab 27, at ¶ 282.)

514. Looking back on all of this, Donna reflects on how it was that she could have

stood by and let her own daughter be so sexually exploited and abused by Alejo:

> "While Wendi was growing up I lived by the old adage, 'What you don't
>
> know isn't going to hurt you,' and while I knew Alejo was shopping with
>
> Wendi for explicit, adults-only items by the time she was ten years old and
>
> taking her into hardcore porn stores by the time she was fourteen years old...,
>
> I didn't see myself as being able to do anything about it and I never let myself
>
> aware that it might be a problem. Alejo was the head of our household and
>
> one of the main tenants of our religion was that as the head of the household
>
> he set the rules and it was our place to obey the rules, so that's what we did."
>
> (Tab 27, at ¶ 283.)

515. While these reflections certainly ring true, Donna here leaves out another factor

that she elsewhere acknowledges: Thanks to her own profound limitations, both

psychological and moral, resulting largely from her own mother's neglect of her and

other major childhood traumas, she was *motivated* to hand Wendi over to Alejo, a man

himself terribly limited and damaged from a childhood of neglect and abuse, especially

sexual abuse, so that Wendi and not she would be the primary object of Alejo's sexual

obsessions, compulsions and perversions. Indeed, as we have seen, Donna was *relieved* to

do so.

516. **Wendi's memories of ages fourteen to eighteen.** As reported above, I assessed Wendi's memory for most of the incidents of physical and sexual abuse – or strong evidence of sexual abuse – reported by witnesses in the community and by her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse; in those interviews I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

517. Wendi confirmed her mother's report that she was seldom physically beaten during this period. When Wendi recalled being made to pull weeds as punishment at school, she said this was because "they realized it was hopeless to just keep spanking me." She also recalled not minding pulling weeds, especially if Alejo wasn't angry at her for whatever had gotten her in trouble at school. Indeed, Wendi said that she often enjoyed pulling weeds with Alejo more than being in school. Asked why she was punished at school during those years, she said, "Me not listening, not doing what I was supposed to." She added that "Tom King's scripture for me," which he was always saying to her, in a tone of judgment and condemnation, was "rebellion is as the sin of witchcraft" (1 Samuel 15:23). She also remembers Tom often saying her rebellion would "send you to hell."

518. When told that one witness had said she seemed to lose her will to rebel at some point, Wendi responded that she had "*always* felt rebellious," from childhood through adulthood, including at work. Of course, growing up in a family and community where children were supposed to automatically, instantly and mindlessly obey their parents and other adults, and to believe whatever church/cult leaders say (no matter how crazy, brutal

or hateful), any child would feel rebellious, but especially one who did not completely give up on some independence of thought and action. Wendi added that she also always felt that she "deserved the bad things that happened" to her, and that she believed she deserved them *because* she was rebellious. Again, this is totally consistent with the messages she got in the traveling cult and the 91st Psalm/Harvest church/cult. Wendi did remember that she "put up the façade" of total obedience and submission in high school, but Tom and other adults at the church/cult continued to say she "didn't have the spirit of meekness" (i.e., the meekness Tom King depicted in his sermon, of the children he had beaten into submission). Wendi also remembers how, when she was on swim team and saw kids from Casa Grande Union High School, she thought, "I want that," by which she meant a life with some fun and freedom from the church/cult and her father.

519. Most of Wendi's memories – and lack thereof – of sexually exploitive and abusive behavior by Alejo are addressed above, because Alejo's behavior and other's observations of it were fairly consistent throughout Wendi's time in Casa Grande from ages nine to eighteen. As reported above, Wendi discussed Alejo's constant sexual comments and innuendos; his watching sexually explicit movies with her and her friends; his open invitation to her and her friends to ask him questions about sex and his visible excitement whenever they did. It was this constant sexualizing of her and everything around them that Wendi recalls vividly and now finds extremely disturbing. She became very upset and cried when commenting that Alejo should have "protected" that sexual part of her, not "used" it, and that he had "ruined" sex for her.

520. Also as described above, Wendi remembers "babying" Alejo by scratching his legs and head, sometimes for hours at a time. She recalls that Alejo often wore no

underwear when she did this, that his robe was often open, exposing his genitals, and for that reason she hated to scratch his legs and whenever possible only scratched his head.

521. Wendi also remembered Alejo looking in her bedroom window when friends did sleepovers, which was almost every weekend with $\frac{\text{REDAC}}{\text{TED}}$ for a year or two. At the time he said and she believed that he was only interested in playfully trying to scare her and her friends, but looking back now she believes he may have been trying to see them naked. Indeed, she remembered an incident where Alejo hid behind her water bed as she and a friend changed into their nightgowns, and how upset she was to discover he had been there all along.

522. Wendi remembered Alejo taking photographs of her in lingerie when she was age sixteen or seventeen years old. These were apparently the same photographs seen and found so disturbing by Cynthia Schaider, as described above. Wendi was able to recall some details of one lingerie photography incident, which was very unusual for her:

"I remember going out of town, checking into a hotel room… I remember sitting on top of the bed, and him pulling things out of a bag for me to wear, and me freaking out about it. I have absolutely no memory of taking the actual pictures and all that…. It had taken so long for him to get me to agree, more than a week at least…. I remember [he said] that it was a money issue [i.e., he could not afford to pay a model]. I do remember that I seriously didn't want to…. It's almost like you're embarrassed to do it but you're obligated to do it."

523. Wendi's final comment there, about feeling "obligated" to do what Alejo pressured, cajoled and demanded of her, is consistent with Donna's reports (above) of

Alejo forcing Wendi too look at sexual materials and toys at Spencer's Gifts, which

Wendi also remembers. Only when asked about Alejo taking photographs of her in the

desert, including with lightning from an electrical storm in the background, did Wendi

say she recalled that experience. She did not remember any details of posing and being

photographed. However, in contrast to the lingerie photo shoot in the hotel room, Wendi

said, "I don't remember thinking, 'I don't want to do this.'"

524.  Similarly, Wendi only spoke of the Spencer's Gifts experiences when asked

about them. She referred to these experiences as "the sexual gag stuff," and said she had

remembered them on her own but had not thought Alejo's behavior was significant or "a

big deal." Wendi said that on her own she had also remembered going into Fredericks of

Hollywood with Alejo, which she again had not seen as significant. But as noted above,

Wendi said she did *not* recall ever buying any lingerie there (or anywhere else), or having

any lingerie at home when she was a child or teenager.

525.  Indeed, when asked about having lingerie at home, and told that more than one

witness had reported seeing her dressed in lingerie at home, with one reporting that she

had said her father bought it and liked her to wear it so she could "look her best," Wendi

said she had no memories. Appearing genuinely surprised and baffled, she added, "I

don't know, because I don't own any lingerie, only flannel pajamas."

526.  There were several other reported recollections by her mother and other

witnesses of incidents and evidence during this fourteen to eighteen year old period,

detailed above, that Wendi was asked about in our interviews and explicitly stated that

she could not remember, not even as a vague feeling. For example, she had no memory of

giving Jasper Neace a pornography magazine (or magazine cover) that belonged to Alejo

– as was not only reported by Jasper, but remembered by Mark Keating and Constance Boys as something they had heard about at the time, either directly from Jasper or from someone else in the community. (I did not ask Wendi about Mark and Nancy Keating's recollections of her approaching them to tell them something of clearly great emotional significance to her, which they believed was sexual abuse by Alejo, only to be cut short by Alejo's sudden appearance. I did not receive the Keatings' declarations until after the interviews focused on potential memories of sexual abuse, and did not inquire about that story during our final interview in August of 2011.)

527. Finally, and further illustrating the incestuous family dynamic repeatedly explained above, in our final interview Wendi commented that she had "always assumed [her mother] didn't know things, and to find out she did" was very disturbing. I then asked what specifically had Wendi always assumed her mother did not know. Wendi could not name anything in particular, but said, "I thought that my mother had the same memory that I did," by which she meant the kind of memory that did not allow knowing one's most painful and hurtful experiences, and that she was amazed that her mother actually remembered so many details. From these reflections Wendi returned, once again, to the feelings of anger and hurt that all children of incestuous families feel about the non-abusing parent having abandoned them and allowed the abuse to go on.

## IX.    WENDI ENDS CHILDHOOD WITH MAJOR, BRAIN-BASED DEFICITS IN EMOTIONAL, COGNITIVE, AND RELATIONSHIP FUNCTIONING

528. The analysis below is based on my experience and knowledge as a researcher and therapist who has for twenty years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence

directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

529.   From birth until age eighteen, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

530.   In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

531.   Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day.  The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

532. **Brain-based deficits in cognitive functioning.** The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

533. Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at p.9.) On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (Tab 5, at p.9, italics in original.) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (Tab 5, at p.10.)

534. Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at p.10.) On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again thirty minutes later and then distinguish between accurate and inaccurate portions, Wendi's thirty-minute delayed recall and her ability to distinguish accurate and inaccurate portions thirty minutes later were moderately to severely impaired. (Tab 5, at p.10.) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (Tab 5, at p.11.)

535. Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at p.11.) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (Tab 5, at pp.11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired."

(Tab 5, at p.12.) In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (Tab 5, at p.12.) Inhibition is ability "to stop responding to the immediate physical environment... in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (Tab 5, at p.13.)

536. In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with caregivers,* and are particularly vulnerable to damage by neglectful and abusive relationships.

537. **Psychiatric disorders and symptoms.** As assessed and reported by Dr. Woods, Wendi Andriano suffers from several psychiatric disorders. Specifically, Wendi

meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

538. Bipolar disorder runs in Wendi's maternal family, including        REDACTED

. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

539. As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

540. As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at

all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

541. Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape. The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

542. For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long

before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

543. Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

544. As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age eighteen, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her

husband's life, contributed to her actions and role in Joe's death. Those pathological

relationship patterns are addressed below.

545. **Deficits in emotional functioning.** Psychiatric diagnoses and symptoms

cannot capture the complexity of unique human beings, or the myriad potential effects of

chronic and severe childhood neglect and abuse. For example, while the diagnosis of

complex PTSD includes problems with emotion regulation, Wendi's problems with

emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has

major, long-standing deficits in the following areas: emotional awareness, including

awareness of the bodily correlates of emotions; when she is aware of unwanted emotions,

tolerating them without becoming immediately overwhelmed; modulating the intensity of

her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions

into words and sharing them with other people in order to calm herself and connect with

others, understand the situations and interactions that give rise to emotions, and come up

with constructive solutions. Importantly, emotion regulation problems are based in the

dysfunction of multiple interwoven brain circuitries – including the circuitries that

underlie Wendi's memory and executive functioning deficits and her bipolar and

dissociative symptoms. All of those circuitries are known to be damaged by childhood

neglect and abuse, especially when the neglect and abuse are severe and chronic and

perpetrated by parents.

546. **Trauma-based ways of relating to others.** The neglect and abuse to which

Wendi's parents and many other adults subjected her, and some key relationship patterns

in which their neglect and abuse was embedded, are summarized above. As a result of

those traumatic childhood relationships, Wendi habitually relates to others in specific

ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

547. As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want.* As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

548. All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she

attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

549. These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

## X.    CONCLUSIONS

550. Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

551. As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

Date: _February 14, 2012_

James W. Hopper, Ph.D.

252

**CURRICULUM VITAE**

**Date Prepared**:   February 3, 2012

**Name:**   James W. Hopper, Ph.D.

**Office Address:**   9 Henderson Street
Arlington, MA  02474

**Work Phone:**   617-821-3197

**Work Email:**   jim.hopper10@gmail.com          **Work Fax:**  888-316-2125

**Place of Birth:**   Mountain View, California

## Education:

| 1988 | B.A. | History | University of Rochester |
| 1997 | Ph.D. | Clinical Psychology | University of Massachusetts Boston |

## Postdoctoral Training

1997-1999   Fellow, The Trauma Center & Boston University School of Medicine

2003-2006   Fellow, Behavioral Psychopharmacology Research Laboratory
McLean Hospital & Harvard Medical School,

## Faculty Academic Appointments

1995-2000   Adjunct Instructor, Department of Psychology
University of Massachusetts Boston

1997-2003   Research Associate, Department of Psychiatry
Boston University School of Medicine (BUSM)

2001-   Adjunct Instructor, Department of Psychiatry
Faculty of Medicine and Dentistry, University of Western Ontario

2006-2011   Instructor in Psychology, Department of Psychiatry, Harvard Medical School

2011-   Clinical Instructor in Psychology, Department of Psychiatry, Harvard Medical
School

## Appointments at Hospitals/Affiliated Institutions

### Past

1992-1993   Half-time Predoctoral Psychology Intern, Counseling Center
The New England Conservatory of Music, Boston, MA

1993-1994   Half-time Predoctoral Psychology Intern, Outpatient Psychiatry Department The
Cambridge Hospital

1994-1995   Psychology Testing Fellow, Outpatient Psychiatry Department
The Cambridge Hospital

1996-1997   Predoctoral Intern, University Health Services Mental Health Division
University of Massachusetts Amherst

1997-1999   Fellow, The Trauma Center & HRI Hospital, Brookline, MA

1997-1999   Assistant Director of Research, The Trauma Center & HRI Hospital

2008-2010   Research Associate, Department of Psychiatry, Massachusetts General Hospital

2010-2011   Research Associate, Department of Psychiatry, McLean Hospital

**Current**

2010-   Clinical Instructor, Outpatient Addictions Service, Cambridge Health Alliance

## Other Professional Positions

| | | |
|---|---|---|
| 2007 | Board of Directors | 1in6, Inc. |
| 2008-2012 | Advisory Board | 1in6, Inc. |
| 2009-2010 | Leadership Council | Transforming Trauma Initiative, Garrison Inst. |
| 2010- | Board of Directors | Stop It Now |

## Committee Services

### National

| | | |
|---|---|---|
| 2004 | Member, Publications Review Committee | International Society for Traumatic Stress Studies |
| 2005-2006 | Member, Website Committee | International Society for Traumatic Stress Studies |

## Professional Societies

| | |
|---|---|
| 1991-2009 | Member, American Psychological Association |
| 1996- | Member, International Society for Traumatic Stress Studies |
| 1997- | Member, National Organization on Male Sexual Victimization |
| 1999-2009 | Member, Society for Psychophysiological Research |

## Editorial Activities

| | | |
|---|---|---|
| 2005- | Ad hoc reviewer | Journal of Traumatic Stress |
| 2005- | Ad hoc reviewer | Psychological Bulletin |
| 2007- | Ad hoc reviewer | Drug and Alcohol Dependence |
| 2008- | Ad hoc reviewer | Biological Psychology |
| 2008- | Ad hoc reviewer | Journal of Psychiatric Research |

## Honors and Prizes

| | | |
|---|---|---|
| 1986 | Donald Park's "Dexter Perkins Prize" in History, | University of Rochester |
| 1994 | "Book Award" for Excellence on the Comprehensive Exam | University of Massachusetts Boston |
| 2004-2005 | Livingston Fellowship | Department of Psychiatry, Harvard Medical School |

## Report of Invited Teaching and Presentations

### Local

Undergraduate Courses, Department of Psychology, University of Massachusetts Boston

| | |
|---|---|
| **1994** | Personality Theory, Course Director/Instructor |
| **1995** | Personality Theory, Course Director/Instructor |
| **1995** | Personality Theory, Course Director/Instructor |
| **1995** | Abnormal Psychology, Course Director/Instructor |
| **1996** | Personality Theory, Course Director/Instructor |

| **1996** | Personality Theory, Course Director/Instructor |
| **1998** | Psychological Trauma, Course Director/Instructor |
| **1998** | Psychological Trauma, Course Director/Instructor |
| **1999** | Psychological Trauma, Course Director/Instructor |
| **2000** | Psychological Trauma, Course Director/Instructor |
| **2002** | Psychological Trauma, Course Director/Instructor |

Presentations

**2000**     Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Core Seminar for the Certificate Program in Traumatic Stress Studies of The Trauma Center, Brookline, MA.

**2000**     Lecture, "Frameworks for Connecting the Biology of Trauma to Clinical Practice," opening presentation of a one-day public workshop, "Integrative and Eclectic Approaches to Psychological Trauma," Provincetown, MA.

**2001**     Lecture, "Clinical Implications of Traumatic Memory Research: Phenomenology, Symptoms, and Biology," Public Lecture Series, The Trauma Center, Brookline, MA.

**2001**     Lecture, "Posttraumatic Stress Disorder: Diagnosis, Clinical Phenomenology and Treatment," Pfizer-sponsored Clinician Education Series, Beth Israel Hospital, Brookline, MA.

**2001**     Lecture, "Psychological Trauma and Biology," New England Region Public Lecture Series, Ben Gurion University, Public Library, Newton, MA.

**2002**     Lecture, "A Perspective on the Brain and Trauma," Public Lecture Series, The Trauma Center, Brookline, MA.

**2003**     Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Postdoctoral Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA.

**2004**     Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Postdoctoral Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA.

**2005**     Lecture, "Psychobiological Measures and Methodologies in Psychological Trauma Research," Postdoctoral Research Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA.

**2006**     Lecture, "Marijuana Intoxication and 'Cognitive Disinhibition' – An Integrative Model and Clinical Implications," Neurophysiology Seminar Series, Center for Sleep & Cognition, Beth Israel Deaconess Medical Center & Harvard Medical School, Boston, MA.

**2006**     One-day workshop, "Transforming Trauma with Mindfulness and Lovingkindness: Psychological Practices and Brain Processes," with Drs. Deborah Rozelle and Elizabeth Call, The Trauma Center & Boston University School of Medicine, Brookline, MA.

**Regional**

**2005**     Lecture, "Child Abuse-related PTSD, Self-Regulation Deficits and Substance Use in Women." Substance Abuse Seminar Series, Department of Psychiatry, Yale University School of Medicine, New Haven, Connecticut.

**2008**     One-day workshop, "Trauma and PTSD: Implications for Getting Accurate Victim Testimony." Annual Sexual Assault Investigative Training for law enforcement officers and prosecutors in the Upper Connecticut River Valley of

2011

New Hampshire and Vermont, co-hosted by WISE and the Lebanon Police Department, Lebanon, New Hampshire.

**2008**    Lecture, "Successes and Innovations in Treating Trauma: EMDR and Mindfulness." For mental health professionals in the Upper Connecticut River Valley of New Hampshire and Vermont, hosted by WISE, Lebanon, New Hampshire.

**2009**    Lecture, "The Marijuana High and How It Works: Cognitive and Brain Processes," Neurobiology Lecture Series, Worchester State College, Worchester, Massachusetts.

**2009**    Lecture and case conference, "Trauma and Affect Regulation: The Embodied Self, Aversion and Reward," Training Seminar, University Health Services mental Health Division, University of Massachusetts Amherst.

### National

**2002**    Lecture, "Clinical Implications of Psychophysiology and Neuroimaging and Findings in PTSD," 13th Annual International Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA.

**2004**    Two-day workshop, "Child Abuse and Problems with Self-Regulation: Research and Treatment." Department of Counseling, Idaho State University, Pocatello, Idaho.

**2004**    Lecture, "Neurobiology of Trauma," 15th Annual Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA.

**2005**    Lecture, "Clinical Implications of Neuroscience Research for the Treatment of Traumatized Adults," 16th Annual Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA.

**2006**    Plenary, "Male Sexual Assault Victims: Special Issues." Sexual Assault Response Coordinator Conference, United States Department of Defense Sexual Assault Prevention and Response Office, St. Louis, Missouri.

**2006**    Plenary, Dr. Frank Giesber Lecture, "From Posttraumatic Aversion and Addiction to Healing and Love: Brain Processes and Disciplined Practices to Recondition Them." Annual Krost Symposium, Texas Lutheran University, Seguin, Texas.

**2008**    Lecture, "The Neurobiology of Trauma," Michigan Victims Assistance Academy, United States Office for Victims of Crime Training and Technical Assistance Center, Ann Arbor, Michigan.

**2009**    Plenary, "Male Victims of Sexual Assault: Emotion, Masculinity, and Values." 2nd Annual United States Army Sexual Harassment/Assault Prevention Summit, Arlington, Virginia.

**2009**    Panel presentation, "Outcome: Neurobiological Perspectives." Neurobiology panel of the Transforming Trauma Leaders Forum, Garrison Institute, Garrison, New York.

**2010**    Workshop (90 minutes), "Discovering Evidence of Trauma / Interviewing for Complex Trauma," with Danalynn Recer, JD, Capital Case Defense Seminar, sponsored by California Attorneys for Criminal Justice and California Public Defenders Association, Monterey, California

**2011**    Plenary, "Psychological and Biological Effects of Sexual Assault." 4th Annual United States Army Sexual Harassment/Assault Prevention and Response (SHARP) Summit, Arlington, Virginia.

**2011**    Workshop, "Neuroscience, Mindfulness, and Yoga for Transforming Trauma and Addiction: An Introduction," with Dana Moore, 22nd Annual International Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA.

### International

**2007**    Plenary, "Ecological Momentary Assessment in Substance Abuse Research." NIDA International Forum, Technological Innovations to Build International Research Capacity, Quebec City, Canada.

**2008**    Lecture, "Reconditioning Traumatized Minds and Brains: Parallels Between Neuroscience and Buddhism." Bi-annual conference in "Brain, Mind and Body: Trauma, Neurobiology, and the Healing Relationship," School of Medicine and Dentistry, University of Western Ontario, London, Ontario.

## Report of Clinical Activities

### Current Licensure

2000-    Clinical Psychologist, Massachusetts License 7763-PR

### Practice Activities

Psychotherapy    Arlington, Massachusetts
I have a small consulting practice focused on helping people identify treatment options for complex posttraumatic effects of child abuse.

### Forensic Activities

Expert Witness    Since 2003 I have conducted psychological and psychosocial history assessments on people accused or convicted of crimes. I have focused on evidence of trauma-related mitigation, especially sexual and physical abuse, to be considered during sentencing at trial and upon appeal. Since 2009 I have conducted evaluations of plaintiffs in civil suits involving "recovered memories."

## Report of Scholarship

### Peer Reviewed Publications

1.    Lisak D, **Hopper J**, Song P. Factors in the cycle of violence: Gender rigidity and emotional constriction. J Trauma Stress 1996;9:721-743.

2.    Lisak D, Conklin A, **Hopper J**, Miller P, Altschuler L, Smith B. The Abuse-Perpetration Inventory: Development of an assessment instrument for research on the cycle of violence. Family Viol Sexual Assault Bull 2000;16:21-30.

3.    **Hopper JW**, van der Kolk BA. Retrieving, assessing, and classifying traumatic memories. J Aggression, Maltreatment, Trauma 2001;4:33-71.

4.    Osterman JE, **Hopper J**, Heran WJ, Keane TM, van der Kolk BA. Awareness under anesthesia and the development of posttraumatic stress disorder. Gen Hosp Psychiatry 2001;4:198-204.

5.    van der Kolk BA, **Hopper JW**, Osterman JE. Exploring the nature of traumatic memory. J Aggression, Maltreatment, Trauma 2001;4:9-31.

6.    Lanius RA, Williamson PC, **Hopper JW**, Boksman K, Densmore M, Gupta MA, Neufeld RWJ, Gati JS, Menon R. Recall of emotional states in posttraumatic stress disorder: An fMRI investigation. Biol Psychiatry 2003;53:204-210.

7.   Lanius RA, **Hopper JW**, Menon RS. Individual differences in a husband and wife who developed PTSD after a motor vehicle accident: A functional MRI case study. Am J Psychiat 2003;160:667-669.

8.   Sack M, **Hopper JW**, Lamprecht F. Low respiratory sinus arrhythmia and prolonged psychophysiological arousal in PTSD: Heart rate dynamics and individual differences in arousal regulation. Biol Psychiatry 2004;55:284-290.

9.   **Hopper JW**, Karlsgodt KH, Adler CM, Macklin EA, Lukas SE, Elman I. Effects of acute cortisol and cocaine administration on attention, recall and recognition task performance in individuals with cocaine dependence. Hum Psychopharmacol 2004;19:1-6.

10.  **Hopper JW**, Spinazzola J, Simpson WB, van der Kolk BA. Preliminary evidence for parasympathetic influence on basal heart rate in posttraumatic stress disorder. J Psychosom Res 2006;60:83-90.

11.  **Hopper JW**, Su Z, Looby AR, Ryan ET, Penetar DM, Palmer CM, Lukas SE. Incidence and patterns of polydrug use and craving for ecstasy in regular ecstasy users: An ecological momentary assessment study. Drug Alcohol Depend 2006;85:221-235.

12.  van der Kolk BA, Spinazzola J, Blaustein M, **Hopper J**, Hopper E, Korn D, Simpson W. A randomized clinical trial of EMDR, fluoxetine and pill placebo in the treatment of PTSD: Treatment effects and long-term maintenance. J Clin Psychiatry 2007;68:37-46.

13.  **Hopper JW**, Frewen PA, Sack M, Lanius RA, van der Kolk BA. The Responses to Script-Driven Imagery Scale (RSDI): Assessment of state posttraumatic symptoms for psychobiological and treatment research. J Psychopathol Behav Assess 2007;20:249-268.

14.  **Hopper JW**, Frewen PA, van der Kolk BA, Lanius RA. Neural correlates of reexperiencing, avoidance, and dissociation in PTSD: Symptom dimensions and emotion dysregulation in responses to script-driven trauma imagery. J Trauma Stress 2007;22:713-725.

15.  Frewen PA, Lanius RA, Dozois DJA, Neufeld RWJ, Pain C, **Hopper JW**, Densmore M, Steven TK. Clinical and neural correlates of alexithymia in PTSD. J Abnorm Psychol 2008;117:171-181.

16.  **Hopper JW**, Pitman RK, Zhaohui S, Heyman GM, Lasko NB, Macklin LM, Orr SP, Lukas SE, Elman IE. Probing reward function in posttraumatic stress disorder: Expectancy and satisfaction with monetary gains and losses. J Psychiatr Res 2008;42:802-807.

**EXHIBIT B TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D.**

### Materials reviewed by James W. Hopper Ph.D.

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report of Dr. George W. Woods.

- The Expert Report of Myla Young, Ph.D.

# Exhibit 5

**MYLA H. YOUNG, Ph.D., ABN**
**Diplomate – American Board of Professional Neuropsychology**
**PSY 11916**

July 11, 2011

CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING

In response to your request, following is a report of neuropsychological and psychological testing for Wendi Andriano. Information includes a description of neuropsychological and psychological tests administered, information about those tests, neuroanatomical descriptions of brain functioning and results of her neuropsychological testing.

Name: Wendi Elizabeth Andriano
Date of Birth: 08/24/70
Dates of Evaluation: 12/06/10; 12/07/10; 2/15/11; and 2/16/11
Education: 14 estimated
Ethnicity: White
Handedness: R
Date of Report: 04/21/11

Wendi Andriano was seen for neuropsychological evaluation on 12/06; 12/07; 12/08/2010 and on 2/15 and 2/16/ 2011 for a total of 25 hours of evaluation. The evaluation was completed in a private contact room at Arizona State Prison, Perryville, Arizona. She was not restrained, there were no interruptions, the room was reasonably quiet, she was provided lunch and frequent breaks with food, and she was not directly viewed by any other individuals, including custody staff. Limitations to her confidentiality were explained, understood and agreed upon. Third party observers were not present.

Information Relied Upon:

Transcripts of testimony by Wendi Andriano – 2004
Consultations with legal and medical professionals associated with her legal defense

Review of records associated with her developmental, educational, work, social, medical, psychiatric, criminal, prison and jail records.

1

Procedures Completed:

The following neuropsychological tests were administered to Wendi Andriano:

Effort on Neuropsychological Testing
      15 Item Test
      Test of Malingering Memory (TOMM)
      Green Word Memory Test
      Structured Inventory of Malingered Symptomatology (SIMS)
      California Verbal Learning Test Forced Choice (CVLT-II)
      Rorschach Bolder Validity Index

Intellectual Functioning
      Wechsler Adult Intelligence Scale-IV

Neuropsychological Functioning
      Sensory and Motor Coordination
            Smell Identification Test (SIT)
            Klove-Reitan Sensory Perception Examination
            Grooved Pegboard
            Finger Tapping Test

      Attention and Concentration
            Conners' Continuous Performance Test (CPT)
            Paced Auditory Serial Attention Test (PASAT)
            Visual Search and Attention Test (VSAT)
            Conners' Adult ADHD Rating Scales (CAARS-Self Report)
            Seashore Rhythm Test
            Sensory Perception Test

      Memory and Learning
            California Verbal Learning Test (CVLT II)
                 Trial Learning
                 Interference Learning
                 Short Delay-Free
                 Short Delay-Cued
                 Long Delay-Free
                 Long Delay-Cued
                 Recognition
                 Forced Choice

            Wechsler Memory Scale (WMS-IV)
                 Auditory Memory Subtests
                 Visual Memory Subtests
                 Working Memory Subtests
                 Immediate Memory
                 Delayed Memory

2

Rey Complex Figure Test (REY)
    Immediate Recall
    Delayed Recall
    Recognition

Tactual Performance Test
    Memory Trial
    Location Trial

Secondary Language
    Wechsler Individual Achievement Test (WIAT II)
        Word Recognition
        Reading Comprehension
        Pseudoword Decoding
        Numerical Operations
        Math Reasoning

Visual Perception
    Rey Complex Figure Test Copy Trial
    WAIS-IV Perceptual Organization Scales
    WAIS-IV Processing Speed Scales

Executive Functioning
    Executive Functioning Test
        Trail Making Tests
        Verbal Fluency Tests
        Design Fluency Tests
        Color-Word Interference Tests
        Sorting Tests
        Twenty Questions
        Tower Test
        Motor Speed

Wisconsin Card Sorting Test
Category Test
Iowa Gambling Test (IGI)
Comprehensive Affect Testing System (CATS)

Behavior Rating Scale – Self Report (BRIEF-A)

Halstead-Reitan Neuropsychological Battery
    Reitan-Klove Sensory-Perceptual Examination
    Finger Tapping Test (FTT)
    Tactile Form Recognition
    Trail Making A and B
    Tactual Performance Test (TPT)
    Seashore Rhythm Test
    Speech Sounds Perception Test

Category Test

Emotional Testing:
Rorschach Test
Dissociative Experience Scale (DES)
Multi-score Depression Inventory (MDI)
Detailed Assessment of Posttraumatic Stress (DAPS)

Interview – Wendi Andriano:

Accommodations for testing were private, in an environmentally comfortable place, uninterrupted, and not directly observed by other viewers. She was advised, understood, and signed consent to complete this evaluation. Interviews with Wendi Andriano were limited to only that information that was needed to understand her brain and psychiatric functioning. She was not asked to provide information about her early developmental history and possibility of childhood victimization. I am aware that Wendi Andriano has had unusual childhood experiences which included being raised in a Fundamental Christian ministry/church and having minimal interaction with the general community. Most of her education was provided by a school program within the ministry church. The group moved and relocated frequently. She was at times homeless.

Interviews with Wendi were conducted on December 6, 7, and 8 2010 and on 2/15/11 and 2/16, 2011. Although she reported previously being prescribed antidepressants (Seroquel;Zoloft;Elavil) as well as Ativan, she had not been taking any psychotropic medications at this time. She indicated that she had not used alcohol and/drug in close proximity to testing.

She reported that she did not have a prior major medical disability and did not have any medical problem at the time of evaluation. She indicated that she was not currently receiving psychiatric treatment. She reported that she had received some counseling in 1996 and had previously received therapy while in jail.

She reported that she had never used or abused drugs or smoked tobacco. She reported a history of limited adult alcohol use. Her first drink of alcohol was when she was 18 years old. She reported that since 2000 she had used alcohol with friends, with alcohol use characterized as drinking wine coolers. She used alcohol most when was 21 years old, using alcohol at least once a week and overusing alcohol on some limited occasions. She indicated that she was not smoking tobacco at the time of the evaluation and had never smoked.

When she was 13 years old she was involved in a moving vehicle accident (MVA). Documented information describing this MVA was not currently available. She, however, reported repeated head injuries throughout her childhood ("I have a lot of traumas in my life. As a kid life was hard, real hard."). She described also having repeated head injuries throughout her marriage. She was not sure whether or not she experienced loss of consciousness, but indicated that "would see stars" and be "blank." When her head was hit particularly hard, she would "just go to sleep".

Other than the conviction for which she was given the death penalty, to my knowledge she does not have prior criminal offenses. She reported that she had received three disciplinary reports

while in prison—two for "using make up" and one for having tobacco on her food tray. She reported that she did not put the tobacco on the food tray because she had never had tobacco while in prison. It is her belief that the tobacco was placed on her food tray by a cafeteria worker or another inmate.

Reports indicate that her childhood was unusual. She reportedly did not have contact with her biological father after she was 5 years old. She was adopted by Alejo Ochoa when she was 5-6 years old. His occupation is described as construction, but primarily as "ministry activities" where he is described as "fundamental Christian." Elements of early childhood abuse are not fully described. Although details not known to me, it is reported that she was sexually abused as a "very small child," before three years of age. As indicated, her early childhood was unusual, and would be considered abusive. Although family life as a Christian family is not considered "abusive," elements in her family life would be considered abusive. Her family was described as "fundamentally Christian." Her adoptive father is described as a "street minister" and part of a traveling ministry. They reported lived predominantly in a trailer, moving frequently. Her education was provided exclusively in a Christian school which apparently had somewhat limited typical educational experience, with biblical topics incorporated into educational subjects that were taught.

She was reportedly not allowed to dance or listen to "secular music." Her social activities were strictly limited. Her friends were permitted only to children of other Christian preachers, and her social interactions were permitted to be associated only with other individuals who were known to be Christian. Her first heterosexual date was when she was 18 years old, and that date was chaperoned by her parent(s).

Her discipline at home was described by her parents as atypical. She reportedly was "spanked with a wooden paddle," the severity of which is not known to me. Consequence of discipline was, however, described as being of such severity that she reportedly occasionally ran away from home with friends to avoid punishment. Another incidence is described as her father yelling at her, grabbing her by the shoulders and shaking her and telling her to "get out of sight." No further information about disciplinary procedures is known to me.

Wendi Andriano was married to the victim in this offense, Joe Andriano, in 1994. Her father reportedly disapproved of her relationship with him and at one point had refused to speak to her for at least one year because of the relationship. She and her husband initially lived with his parents. They have two children, Nicolas who was born in 1997 and Ashley who was born in 1998. Their marriage is described as often troublesome, with descriptions of frequent arguments, threats of harm to her, being hit on several occasions, and incidences of retreating to the bathroom and locking the door. On one occasion her husband is described as becoming so angered that he banged on the bathroom door until the door was broken and had to be replaced. She described being hit several times by him and on another occasion being squeezed "until it was hard to breathe."

In 1994 Joe Andriano was diagnosed with a "lump" in his neck which was surgically removed and diagnosed as benign. In 1995 and again in 1997 a lesion was again diagnosed, surgically removed and described as benign. In 1998, when a lesion again appeared and was again surgically removed, the lesion was identified as positive for cancer. He received extensive surgery, followed by radiation and chemotherapy and he sought what is described as "holistic"

treatment . While hospitalized he is described as uncooperative and aggressive with nursing staff, with at least one incidence of throwing a medical chart at nursing staff. Following hospitalization he is described as experiencing severe nausea, hair loss, anger and depression. In testimony, Wendi Andriano indicated that "he blamed me for God not healing him."

In 2000 he reportedly talked about suicide, sought cyanide but purchased sodium azide rather than cyanide. She testified that he believed that this method of suicide would be quick and painless. These actions were either quick or painless but resulted in more severe symptoms which left him "sick and scared." She testified that they then participated in "assisted suicide."

## Brain Functioning and Neuropsychological Assessment

Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is currently supported and relied upon by contemporary neuroscientists in understanding brain function (Bear, Connors & Paradiso, 2001).

Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to main ain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and prefrontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

 In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a specific and predictable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and prefrontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

Neuroscientists have known for many years that the prefrontal cortex and networks of connections to and from the prefrontal cortex are the last brain region to mature, undergoing

6

profound brain growth and change through adolescence and into young adulthood. It has been well established that the region of the brain that is undergoing the greatest maturation, is also the brain region that is most vulnerable to damage. Development and maturation of the prefrontal cortex is most vulnerable to damage during adolescence. As the prefrontal cortex develops and matures, the individual's abilities for executive functioning also mature. Prenatal neurodevelopmental abnormality and brain insult(s) as a child interfere with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

Neuroscientists are also now aware of the consequences to brain development of childhood abuse and/or neglect. It is believed that when a child experiences persistent abuse or lives in a highly anxiety producing environment the brain noradrenic system is over stimulated leaving the child in a state of increased norepinehrine and dopamine production resulting in damage particularly to the prefrontal, temporal, hippocampus, amygdala, cerebellum and neuropathways throughout the brain results. If that abuse continues from childhood into adulthood, the brain damage continues with consequence of attention deficit, executive functioning deficiency, memory impairment, emotional dysfunction and psychiatric disorder, particularly depression and acute anxiety disorders (Teicher, 2002; Van der Kolk, 2003).

Neuroscientists are also aware of the consequences of brain damage associated with persistent fear or anxiety that is initiated during childhood and continues in adulthood but continues into adulthood. Prefrontal, temporal cortex, limbic system, hippocampus, amygdala, cerebellum, and neuropathways among these brain regions as previously described continue. Additionally, diminished right-left hemisphere integration in exchange between the right and left brain hemispheres across the corpus callosum and structured damage to the cerebellum, particularly the cerebellar vermis, and integration of information from the cerebellum to other brain region intensify. Abnormality of neurotransmitters, particularly norepinephrine and dopamine, as well as electrical activity particularly from the cerebellar vermis though pathways through the cortex continue and are demonstrated in individuals who experience one of several psychiatric disorders, including depression disorders and acute anxiety disorders.

As a result, degeneration and smaller brain structural size, neuropathway immaturity, abnormal neurotransmitter production, abnormal neural activity particularly electrical stimulation of neuron movement, and impaired postsynaptic receptors have been found in several psychiatric disorders, and particularly in depression and overwhelming anxiety disorders. Prefrontal, temporal, hippocampus, amygdala, cerebellum, neuropathway and abnormal communication of information across the corpus callosum have been shown.

Results of Neuropsychological Evaluation:

Wendi Andriano's performance on neuropsychological testing is summarized in the following sections of this report. A detailed description of her abilities on neuropsychological testing is described in greater detail in an addendum to this report.

Attitude Towards and Effort on Testing: Wendi's attitude towards and effort on neuropsychological testing was evaluated using tests specifically developed to assess her effort on testing and possible attempt to manipulate her testing ability, or to malinger. These tests included 15 Item Test, Test of Malingering (TOMM), California Verbal Learning Test (CVLT

II) Forced Choice, Green Word Memory Test, Bolder Index of the Rorschach Test, and Structured Inventory of Malingered Symptoms (SIMS). Wendi Andriano's responses to all these tests of effort and potential manipulation indicate that she was cooperating with testing, was putting forth an appropriate level of effort on testing, and was not attempting to "fake" or "malinger" her test performance.

Wendi's attitude towards and effort on neuropsychological testing was also consistently evaluated through my observations of her abilities throughout the testing, through patterns of her abilities on individual neuropsychological tests. This is achieved through assessment of the consistency both *within and across her neuropsychological testing, and through* evaluation of patterns of abilities on neuropsychological tests that are known to be associated with specific neurological disorders. All indications are that Wendi Andriano was cooperating with testing, was putting forth substantial effort to complete all neuropsychological tests, and was not attempting to malinger or to manipulate the testing results. Wendi's abilities as described in this evaluation are considered a valid assessment of her functioning.

*Intellectual Functioning:*  Wendi Andriano's general mental ability was evaluated using the Wechsler Adult Intelligence Scale (WAIS-IV).  Her abilities on the WAIS-IV place her general mental ability in the Average Range of intellectual functioning (Full Scale =104, 61st %ile; 95% Confidence = 100 - 108).  Her verbal abilities that require reasoning, comprehension and conceptualization using verbal information was in the High Average range (VCI =110, 75th %ile Confidence =104 – 115).  Her nonverbal reasoning and visual-perceptual organization were in the High Average range (*PRI = 115, 84th %ile Confidence = 108 – 120*).  Her simultaneous and sequential processing of information, attention and concentration was substantially lower but within the Average range (WMI = 102, 55th %ile Confidence = 95 - 109 ).  Her speed of mental processing and visual-perceptual skills were, however, significantly lower and in the Borderline Range (PSI = 76, 5th %ile  Confidence = 70 – 87).

*Sensory Perception:*  Wendi's sensory perception was evaluated using the Smell Identification Test (SIT) and bilateral primary and secondary sensory perception.  On the SIT she had four errors (26th %ile) indicating Normosia to Mild Microsmia.  Although she did not experience impairment on primary tactile, auditory or visual perception, her secondary sensory perception was significantly impaired with impairment in the moderate range.  This pattern of impairment implicates reasonable normality of the primary sensory perception strip, but significant impairment when more complex information has to be integrated among the sensory strip and other brain regions. Prefrontal cortex, orbitofrontal pathway and frontal-subcortical pathway impairments are primarily indicated.

*Motor Coordination:*  Wendi's motor coordination was evaluated using the Grooved Pegboard Test and Finger Tapping Test.  On the Grooved Pegboard Test she had mild dominant (right) impairment and  mild-moderate non-dominant (left) impairment (Grooved Pegboard Right = 56, SS -1; Left = 84 -1.5; Finger Tapping *Right* =36.7, SS -2; Left 33, SS-2).

Sustained fine motor ability is primarily mediated by the posterior motor region of the prefrontal cortex, in coordination with other brain regions. Her abilities on these tests of motor coordination indicate overall impairment within the motor strip, prefrontal cortex, orbitofrontal pathway, frontal-subcortical pathways, and corpus callosum.

*Attention and Concentration:*   Wendi's attention and concentration was evaluated using the Conners' Continuous Performance Test (CPT), Paced Auditory Serial Attention Test. (PASAT), Visual Perception Test  (VSPT), Seashore Rhythm Test and Sensory Perception Test. With the exception of the quick and simple VSPT and simple Sensory Perception Test, her abilities on all other measures of attention and concentration were significantly impaired.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated.

Her ability on the VSPT and Sensory Perception Test was within the average range (VSP = 95th %ile; Sensory Perception Test = Average Range). Her abilities on the more complex CPT and PSAT, however, were significantly impaired.

On the CPT her performance demonstrated significantly impaired attention and concentration with an equal chance that her attention and concentration is like that of individuals who experience Attention Deficit Hyperactivity Disorder and attention disorder associated with other Neurological Disorder(s). Her reaction times were slowed and inconsistent. Her ability to change her response time as the time of the target stimuli changed was significantly impaired. When the target stimuli slowed, her abilities were most impaired. She also was impaired in her ability to sustain her attention to the test, with her abilities becoming more impaired the longer the test progressed. Poor performance indicates potential attention problems with several significantly elevated and impaired attention measures. Co-existing, poor performance indicates potential neurological deficit(s) other than attention problems, with several neurological measures also significantly elevated and like those of individuals who experience a neurological disorder.

The PASAT requires the individual to listen to numbers paired together and remember the last number heard, adding the number last heard to the number previously heard. There are four separate trials. The numbers do not change, but each successive trial presents the information more rapidly.   Of all tests of attention, her abilities on the PASAT were the most impaired, with classification of ability persistently in the inferior range. Her impairment ranged from mild to severe. Observing her attempt to complete this test was uncomfortable to observe. She was obviously expending extraordinary effort to be successful on the test. She simply was not able to accomplish the task. She was unable to successfully remember and manipulate simple numbers from the time the test was initiated and until the test was completed. Her abilities throughout this test were severely impaired, but became more impaired as the test progressed.

Both the CPT and PASAT are complex tests of attention and the VSAT is a simple test of attention requiring less than one minute to complete. As the tests of attention became more complex, her abilities became more impaired.

In addition to completing tests which were directly administered, she independently responded to the Connors' CAARS.  This is a self-report test in which the individual is asked to respond to thirty questions describing behaviors or problems that are experienced by adults. Their responses are then compared to the responses of individuals who have known attention deficit disorders and those who do not experience attention deficits.   Each question is ranked on a scale of 0 to 3, with 0 = Not at All  and  3 = Very Much, Very Frequently.   Wendi's responses to this

self-report measure were significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Attention is process that allows awareness of a part or aspect of the environment and allows selective responsiveness to one class of stimuli while simultaneously being able to filter out or ignore information which is not essential or simply confusing to understanding a situation or environment. Attention is not a single ability, but rather includes multiple aspects including arousal, perception, divided attention, selective attention, sustaining attention and shifting attention. The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning indicate impairment of these brain regions and structures.

*Memory and Learning:* Wendi's memory and learning of verbal and visual information were evaluated using the California Verbal Learning Test (CVLT-II), Rey Complex Figure Test (Rey), Wechsler Memory Scale IV (WMS-IV), Tactual Performance Test Memory and Location trials. Her abilities on the WMS-IV and Rey memory trials were in the average range.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated. Her abilities on the WMS-IV and on the Rey immediate memory were in the average range. Her abilities on all other measures of memory and learning were, however, mild – moderately impaired.

The CVLT-II requires the individual to learn verbal information that is repeated several times, recall that same information both immediately and again after a 30 minute delay, and recognize information when a choice of information is provided. The CVLT-II also has one subtest that was developed specifically to identify individuals who are attempting to manipulate their testing abilities or are not providing sufficient effort to complete neuropsychological testing to the best of their ability. This CVLT-II subtest has been demonstrated to identify with 96% the accuracy those individuals who were not putting forth appropriate effort and/or were attempting to manipulate their abilities (Millis, Putnam, Adams & Ricker, 1995).

On CVLT-II, her ability to learn information after the information had be repeated five items was significantly impaired. Her ability to learn information the first time the information was heard was mild-moderately impaired (Trial 1 = SS-1.5). Her ability to learn new information was mild-moderately impaired. She had a significant error, remembering information that had never been presented (Intrusion = SS -1). There were a significant number of instances when she remembered information that had never been presented (Intrusion Errors = SS -1). On the Wechsler Memory Scale IV (WMS-IV) her abilities were within the average range.

The Rey Complex Figure Test requires the individual to copy a complex figure; recall the figure they had just copied after a one minute delay; recall the figure again after a 30 minute delay; and distinguish between accurate and inaccurate portions of the figure after a 30 minute delay. Her ability to recall the information immediately was in the average range (Immediate Recall = T = 50, 50th %ile). Her ability on all other measures was moderately – severely impaired (Total Recognition T = 33, 4th %ile; Recognition True Positive 2-5th %ile; Recognition False Negative 2-5th %ile). It is noteworthy that memory errors occurred even after requiring significantly

10

longer to copy the figure, which should have enhanced the probability of recalling the information (Copy = 7 minutes 3 seconds <1st%ile).

Memory and learning are primarily mediated by the brain's neocortex (thalamo-limbic system, hippocampus, amygdala, basal ganglia), the brain's mesocortex (temporal and prefrontal cortices), and all brain connecting systems (frontal-subcortical, hippocampal, orbitofrontal) connections to and from these brain structures. Memory and learning are also strongly impacted by the brain's ability to transfer information across the corpus callosum to and from the right and left brain hemispheres as well as transfer of information from the cerebellum vertex to the prefrontal cortex. Her disabilities across these tasks of memory and learning indicate impairment within all of these brain structures and pathways).

*Language*: Wend's secondary language was evaluated using the Wechsler Individual Achievement Test (WIAT II) Word Reading, Reading Comprehension, Pseudoword Decoding, Numerical Operations and Math Reasoning subtests. Although her Pseudoword Decoding and Math Reasoning abilities were in the mild range of impairment, her abilities on other WIAT-II subtests were in the average range. For her, primary parietal and occipital brain structures are strengths for her and within the average range. Connecting region between these structures, particularly the angular gyrus region is significantly impaired.

*Visual-Perceptual*: Wendi's visual perception was primarily evaluated using the copy trial of the Rey Complex Figure Test (Rey) and the WAIS-IV Perceptual Organization and Processing Speed Indices. The Rey is a test evaluating the individual's ability to copy a complex design while the figure can be seen. The WAIS-IV Perceptual Organization Index is a measure of the ability to analyze and synthesize abstract visual stimuli and the WIAS-IV Processing Speed Index is a measure of sort-term visual memory, cognitive flexibility, visual discrimination, psychomotor speed, speed of mental operation, attention and concentration.

The Rey Complex Figure Copy trial requires the individual to copy a figure while viewing the stimulus. Her ability to copy this figure was within the average range. It is noteworthy, however, that it required significantly more time for her to complete this task. Whereas most individuals required less than five minutes to copy the figure, she required 7 minutes 20 seconds (<1st %ile) to complete this task. As previously demonstrated on the WIAT II her visual-perception is brain strength. When required to coordinate information from these brain structures to the prefrontal cortex, however, her ability is severely impaired.

*Executive Functioning*: Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions.

Executive functioning is mediated by the brain prefrontal cortex, but also requires interconnection among the prefrontal cortex and other cortical and subcortical regions of the brain, comprising a prefrontal *system*. As previously described, the developmental course of executive functioning is sequential and prolonged, beginning as a child, continuing through adulthood, and with the greatest maturation occurring during adolescence (12 – 18 years of age). Adequate and mature prefrontal cortex development is required for just about every aspect of

11

adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions.

The prefrontal cortex is the largest brain structure in the human brain, comprising 20-25% of total brain tissue.  The prefrontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal.  Each of these pre-frontal cortex regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning.  For example, the motor region primarily regulates motor coordination and integration of motor coordination and sensory perception.   The mesial region primarily regulates emotion, *motivation, drive, and the ability to monitor actions*.  *The dorsolateral region* primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize memory, and—in combination with the mesial region—the ability to monitor and change actions.  The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional liability, olfaction, disinhibition, and control of actions.  The orbitofrontal region also plays a primary interactive role with the limbic system, assessing and altering emotion.

Wendi Andriano's executive functioning was evaluated using subtests of the Executive Functioning Test (EFT), Wisconsin Card Sorting Test (WCST), Comprehensive Affect Testing System (CATS) and Iowa Gambling Test (IGT).  The Executive Functioning Test is a series of tests which systematically evaluate functioning of each region of the prefrontal cortex as well as connecting systems to and from the prefrontal cortex and all other brain regions.  The Wisconsin Card Sorting Test is one of the oldest tests of prefrontal cortex functioning, and requires the individual to develop a rule, consistently apply that rule, and respond to information provided by the test by flexibly changing their thinking and actions as signaled by the test.   The Comprehensive Affect Testing System (CATS) is one of the newest tests of executive functioning (2003), and systematically evaluates the prefrontal cortex, temporal cortex (including extended limbic system), and connection between these brain regions.  The Iowa Gambling Test (IGT) evaluates the *individual's ability to think ahead, plan, organize, and weight the* consequences making decisions.

Although she he was successfully able to complete some EFT subtests, her abilities were predominantly impaired.   On the 25 EFT Primary Measures, her abilities were significantly impaired on 72% of EFT measures.  On WCST, her abilities were significantly impaired on 88% of the measures.  Her abilities on all *CAT Subtests (Affect Recognition; Prosody Recognition; Emotional Recognition)* were significantly impaired.  On the IGT her ability to think about the task was within the average range.  Any IGT measures which required decision making, however, were significantly impaired (Deck A Decision Making = 2-5[th] %ile; Deck D Decision Making – 11 – 16th %ile).

Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired, within these tests, those executive functioning tests which required rapid processing of information, flexible thinking, decision making, and/or inhibition were the most severely impaired.   The ability to rapidly process information allows the individual to face a new or different situation, take in information that is relevant to that situation while ignoring information which is not relevant to that situation, and put that thinking into actions.  Flexible thinking is a "hallmark" of executive functioning and is the ability to abandon a previous response to generate a new response when demands of the situation require a change.  It is also the ability to move freely from one situation to another, one aspect of a problem to another, make transitions to new

thinking and actions, and consequently to effectively solve problems. Inhibition is the inability to stop responding to the immediate physical environment (what is happening at this moment and not beyond) in order to think, consider and plan alternate ways of solving a problem and responding accordingly to that situation. Inhibition also is the inability to disengage involvement in the immediate in order to organize, plan, problem solve and act in ways that are appropriate to the situation. Executive functioning is mediated by the prefrontal cortex. These particular executive functioning abilities are predominantly mediated by dorsolateral and orbitofrontal prefrontal cortex regions, as well as pathways among the prefrontal cortex and all other brain structures, particularly the hippocampus, temporal, limbic amygdala, and cerebellum.

Wendi had a range of abilities across measures of executive functioning, indicating a pattern of brain normalcy and abnormality. Her abilities across measures of executive range ranged from within average range to severely impaired, depending on which brain region within the prefrontal cortex was required to complete the specific test. In the interest of some brevity, Wendi's abilities on all of these measures of executive functioning are described in detail in the addendum to this report. If further information is needed, please advise me.

Psychological Functioning:
Wendi Andriano's emotional functioning was evaluated using the Rorschach Test, Dissociative Experience Scale (DES), Multi-score Depression Inventory (MDI) and Detailed Assessment of Posttraumatic Stress (DAPS). Her responses to each of these tests indicate that she was not attempting to exaggerate her feelings and was providing a valid description of her emotional experience.

On the Rorschach Test her responses are like those of individuals who have experienced mild depression for much of their lives. Her Rorschach responses suggest that she is pervasively introverted. She would expend much effort looking inside her own feelings and attempting to understand them without the help of others. Unfortunately for Wendi, when she looks inside herself she experiences much pain and negative feelings about herself. Her responses are like those of individuals who have limited emotional resources, are extremely emotionally vulnerable and consequently are emotionally dependent. Her responses are like those of individuals who have experienced themselves as "damaged," and take a passive role in their interactions with others. They are individuals who attempt to avoid emotion because they have some awareness of their emotional vulnerability. Overall, her responses are like those of individuals who have been diagnosed with Dysthymia or Mood Disorder. The possibility of Bipolar Disorder would not be ruled out.

On the Dissociative Association Scale (DAS) Wendi acknowledged several experiences consistent with the experience of dissociation. Of particular note, she acknowledged some out of ordinary experiences of listening to someone talk and suddenly realizing that she did not hear part or all of what was said; of someone approaching her that she does not know and the individual calls her by name or insists that they have met previously. She acknowledged having no memory of some important event in her life (for example a wedding or graduation). Of particular concern she indicated that she had experienced times when she was not sure whether things that she remembered had really happened or whether she just dreamed them; that sometimes when she is alone she talks out loud to herself; and that she had experienced hearing voices inside her head that tell her to do things or comment on things that she is doing.

13

On the Multiscore Depression Inventory (MDI) Wendi acknowledged extreme fatigue, overwhelming feelings of pessimism and hopelessness, extreme feelings of guilt and that she experiences overwhelming feelings of sadness. Overall, her responses to the MDI would satisfy the diagnosis of a Mood Disorder.

On the Detailed Assessment of Posttraumatic Stress (DAPS) she described her life as having experienced multiple situations of fearfulness and overwhelming anxiety dating back to childhood and continuing into adulthood. She described herself as frequently bothered by intrusive recollections of her experiences, as having upsetting memories, dreams and flashbacks of the experiences, and as regularly being bothered by intrusive recollections of these experiences of fear. She indicates that she has a tendency to withdraw or "shut down", particularly when her experience is of recalling her fear. Overall, her responses to the DAPS would satisfy the diagnosis of PTSD or of Acute Anxiety Disorder.

Summary
Wendi Andriano's abilities across neuropsychological tests are like those of individuals who experience serious neurological and psychiatric disorders. From a neuropsychological perspective, early childhood mistreatment and early childhood fear and anxiety are likely brain impairment consequences of Cognitive Disorder. From a psychiatric perspective these same factors of serious early childhood mistreatment, fear and anxiety, as well as continuing experiences of fear and anxiety into adulthood are likely psychiatric consequences of Depression Disorder and/or Anxiety Disorder.

Disabilities in thinking, reasoning, planning, making decisions, anticipating consequences of plans and actions, maintaining impulse control, attending and concentrating, remembering important information, recognizing emotional problem, seeking help for emotional problems, and consistently communicating information in accurate and meaningful ways would need to be considered.

*Myla H. Young, Ph.D., ABN*

Clinical Neuropsychology
Office:
1475 North Broadway, Suite 335
Walnut Creek, CA 94596
(925) 952-4350

Mailing:
1630 North Main Street #357
Walnut Creek, CA 94596

14

**MYLA H. YOUNG, Ph.D., ABN**
**Diplomate – American Board of Professional Neuropsychology**
**PSY 11916**

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALAUTION

TEST SCORES

Name:   Wendi Elizabeth Andriano
Date of Birth:   08/26/70
Date of Evaluation:   12/06/10; 12/07/10; 12/08/10;  02/15/11;  02/16/11
Age at Time of Evaluation:  40 years
Education:   14 years estimated
Handedness:   Right
Date of Report:   07/11/11

**Attitude towards Evaluation**

| Test | Score | Qualitative Description |
|------|-------|------------------------|
| 15 Item Test | 15/15 | Valid Protocol |
| Test of Malingering Memory | 49/50 | Valid Protocol |
| CVLT II Forced Choice | 100% | Valid Protocol |
| Green Word Memory Test | 98/98/98/100 | Valid Protocol |
| Bolder Index | 0 | Valid Protocol |
| Structured Inventory of Malingered Symptoms | 5 | Valid Protocol |

**Wechsler Adult Scale of Intelligence (WAIS IV)**

| Scale | Sum of Scaled Scores | Index Score | 95% Confidence | %ile | Qualitative Description |
|-------|---------------------|-------------|----------------|------|------------------------|
| Verbal Comprehension | 36 | 110 | 104-115 | 75 | High Average |
| Perceptual Reasoning | 38 | 115 | 108-120 | 84 | High Average |
| Working Memory | 21 | 102 | 95-109 | 55 | Average |
| Processing Speed | 11 | 76 | 70-87 | 5 | Borderline |
| Full Scale | 106 | 104 | 100-108 | 61 | Average |

| Verbal Comprehension | Raw Score | Scaled Score | %ile |
|---------------------|-----------|--------------|------|
| Similarities | 32 | 14 | 91 |
| Vocabulary | 39 | 10 | 50 |
| Information | 18 | 12 | 75 |
| Comprehension | 34 | 17 | 99 |
| (Con't) | | | |

1

| WAIS IV (Con't) Perceptual Reasoning | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Block Design | 62 | 16 | 98 |
| Matrix Reasoning | 18 | 10 | 50 |
| Visual Puzzles | 18 | 12 | 75 |
| Figure Weights | 18 | 12 | 75 |
| Picture Completion | 10 | 7 | 16 |

| Working Memory | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Digit Span | 31 | 11 | 63 |
| Arithmetic | 15 | 10 | 50 |
| Letter-Number Seq | 20 | 10 | 50 |

| Processing Speed | Raw Score | Scaled Score | %ile |
|---|---|---|---|
| Symbol Search | 20 | 5 | 5 |
| Coding | 49 | 6 | 9 |
| Cancellation | 26 | 6 | 9 |

**Wechsler Individual Achievement Test (WIAT-II)**

| Subtest | Standard Score | Composite Score | 95% Confid. Index | %ile |
|---|---|---|---|---|
| Reading | | | | |
|    Word Reading | 115 | | 109-121 | 84 |
|    Comprehension | 128 | | 122-134 | 97 |
|    Pseudoword Decoding | 109 | | 104-114 | 73 |
|    Composite | 352 | 130 | 126-134 | 98 |
| | | | | |
| Mathematics | | | | |
|    Numerical Reasoning | 118 | | 110-126 | 88 |
|    Math Reasoning | 107 | | 100-114 | 68 |
|    Composite | 225 | 112 | 106-118 | 79 |
| | | | | |
| | | | | |

**Smell Identification Test**

| Errors | %ile | Qualitative Description |
|---|---|---|
| 4 | 26 | Normosia |

**Grooved Pegboard Test**

| Measure | Raw Score | Mean/SD – Comparison Group | Standard Score | Qualitative Description |
|---|---|---|---|---|
| Dominant | 56 | X=63;SD=7.4 | -1 | Mild Impairment |
| Non-Dominant | 84 | X=70.8; SD=8.9 | -1.5 | Mild-Moderate Impairment |

**Finger Tapping Test**

|  | Mean Number Taps | Mean/SD-Comparison Group Mean | Standard Score | Qualitative Description |
|---|---|---|---|---|
|  |  |  |  |  |
| Dominant –R | 36.7 | 47.0/5.6 | -2 | Moderate Impairment |
| Non-Dominant | 33 | 43.5/5.2 | -2 | Moderate Impairment |

**Conners' Continuous Performance Test (CPT)**

**Inattention**

| Measure | T Score | Qualitative Description |
|---|---|---|
|  |  |  |
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Below Average |
| Hit RT Std. Error | 59.05 | Mild Impairment |
| Variability | 59.35 | Mild Impairment |
| Detectability | 16.37 | Average |
| Hit RT ISI Change | 60.74 | Mild Impairment |
| Hit SE ISI Change | 77.24 | Severe Impairment |

**Impulsivity**

| Measure | T Score | Qualitative Description |
|---|---|---|
|  |  |  |
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Average |
| Perseverations | 45.91 | Average |
| Commissions | 31.63 | Average |

**Vigilance**

| Measure | T Score | Qualitative Description |
|---|---|---|
|  |  |  |
| Hit RT Block Change | 35.50 | Average |
| Hit SE Block Change | 40.26 | Average |

**Paced Auditory Serial Addition Test (PASAT)**

| Pacing | Total Correct | SS | % | Classification |
|---|---|---|---|---|
|  |  |  |  |  |
| 2.4 | 28 | -2 | 46.6 | Inferior |
| 2.0 | 30 | -2 | 50.0 | Inferior |
| 1.6 | 7 | >-3 | >11.6 | Inferior |
| 1.2 | 2 | >-3 | .03 | Inferior |

3

**California Verbal Learning Test (CVLT-II)**

| Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
| | | | |
| Trial 1 | 5 | -1.5 | Mild-Moderate Impairment |
| Trail 5 | 16 | 1 | Average |
| Trial B | 4 | -1.5 | Mild-Moderate Impairment |
| Short Delay-Free | 15.0 | 1 | Average |
| Short Delay-Cued | 15.0 | 1 | Average |
| Long Delay-Free | 15.0 | 1 | Average |
| Long Delay-Cued | 15.0 | .05 | Borderline |
| Recognition | 16.0 | 0 | Average |
| Intrusions | 0 | -1 | Mild Impairment |
| Forced Choice | | 100% | Valid Protocol |

**Wechsler Memory Scale (WMS-IV)**

| Index | Sum of SS | Index Score | %ile | Qualitative Description |
|---|---|---|---|---|
| | | | | |
| Auditory Memory | 51 | AMI 117 | 87 | High Average |
| Visual Memory | 42 | VMI 103 | 58 | Average |
| Visual Working Memory | 20 | VWMI 100 | 50 | Average |
| Immediate Memory | 42 | IMI 103 | 58 | Average |
| Delayed Memory | 51 | DMI 119 | 90 | High Average |

**Rey Complex Figure Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| | | | | |
| Copy | 35 | | >16 | Average |
| Immediate Recall | 21.5 | 50 | 50 | Average |
| Delayed Recall | 21 | 49 | 46 | Mild Impairment |
| Recognition | 18 | 33 | 4 | Moderate Impairment |
| Time to Copy | 7'3" | | <1 | Exceeds Normal Time |
| Recognition True Positive | 6 | | 2-5 | Moderate Impairment |
| Recognition False Positive | 0 | | >16 | Average |
| Recognition True Negative | 12 | | >16 | Average |
| Recognition False Negative | 6 | | 2-5 | Moderate Impairment |

**Executive Functioning Test (EFT)**

| Measure | Raw Score | Scaled Score | Qualitative Description |
|---|---|---|---|
| | | | |
| **Verbal Fluency Tests** | | | |
| Letter Fluency | 27 | 6 | Mild Impairment |
| Category Fluency | 39 | 10 | Average |
| Category Switching | 16 | 12 | Average |
| Category Switching Accuracy | 8 | 6 | Mild Impairment |
| | | | |
| (Con't) | | | |

4

| Executive Functioning Test (Con't) Measure | Raw Score | Scaled Score | Qualitative Description |
|---|---|---|---|
| **Trail Making Tests** | | | |
| Visual Scanning | 25 | 9 | Average |
| Number Sequencing | 42 | 8 | Borderline Impairment |
| Letter Sequencing | 41 | 8 | Borderline Impairment |
| Number-Letter Switching | 86 | 9 | Average |
| | | | |
| **Design Fluency** | | | |
| Filled | 10 | 10 | Average |
| Empty | 12 | 11 | Average |
| Switching | 6 | 9 | Average |
| | | | |
| **Color-Word Interference** | | | |
| Color | 41 | 4 | Moderate Impairment |
| Word | 32 | 4 | Moderate Impairment |
| Inhibition | 70 | 7 | Mild Impairment |
| Inhibition-Switching | 74 | 8 | Borderline Impairment |
| | | | |
| **Sorting Test** | | | |
| Confirmed Sorts | 8 | 9 | Average |
| Description | 30 | 9 | Average |
| Recognition | 36 | 10 | Average |
| | | | |
| **Twenty Questions** | | | |
| Abstraction | 25 | 9 | Average |
| Questions Asked | 20 | 13 | Average |
| Achievement | 19 | 15 | Average |
| | | | |
| **Tower Test** | | | |
| Achievement | 18 | 11 | Average |
| Rule Violations | 1 | 44%ile | Average |

**Wisconsin Card Sorting Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Total Correct | 56 | | | |
| Total Errors | 8 | 53 | 61 | Average |
| Perseverative Responses | 4 | 49 | 45 | Average |
| Persevertive Errors | 4 | 49 | 47 | Average |
| Nonperseverative Errors | 4 | 51 | 53 | Average |
| Conceptual Level | 53 | 51 | 55 | Average |
| Categories Completed | 5 | | >16 | |
| Trials to Complete | 11 | | >16 | |
| Failure to Maintain Set | 0 | | | |
| Learning to Learn | 0.19 | | >16 | |

5

**Short Category Test**

| Test | Raw Error | T Score | %ile | Qualitative Description |
|------|-----------|---------|------|-------------------------|
| Total Errors | 48 | 41 | 18 | Low Average |

**Iowa Gambling Test**

| Score | Raw Score | % | Classification |
|-------|-----------|---|----------------|
| A' | 21 | 2-5 | Moderate Impairment |
| B' | 30 | >16 | Average |
| C' | 26 | >16 | Average |
| D' | 23 | 11-16 | Average |

6

Exhibit 6

1

2

3

4

5

6                        SUPERIOR COURT OF ARIZONA

7                           COUNTY OF MARICOPA

8

9 State of Arizona,                       )

                                    )

10                    Respondent,    )    No. CR2000-096032-A

                                    )

11      vs.                           )    **AFFIDAVIT OF**

12                                   )    **DANIEL PATTERSON**

13 Wendi Elizabeth Andriano,       )

                                    )    (Assigned to the Hon. Douglas Rayes)

14                    Petitioner.     )

                                    )

15                                       )

16

17 STATE OF ARIZONA         )

                               )    SS.

18 COUNTY OF MARICOPA     )

19            DANIEL PATTERSON, being first duly sworn upon oath deposes and states:

20

21      1.      I represented Wendi Andriano during her trial for first-degree murder in connection

22 with the death of her husband, Joseph Andriano. I have personal knowledge of the facts stated

23 herein.

24

25                                   **OVERVIEW**

26      2.      I commenced employment with the Public Defender's Office on July 23, 2001,

27 after leaving private practice. Wendi's case was one of eight death penalty cases I assumed on

28

MADI_2575620.1

1   that date from former Deputy Public Defender Gerald Gavin, seven of which (including Wendi's)

2   were pending trial and one of which was awaiting sentencing.  Wendi's case was the second-

3   newest of my caseload at that time (determined by date of the offense), and two of the cases were

4   set to go to trial in early 2002.

5

6       3.      In addition, I was subsequently assigned a very high-profile case in September

7   2001 (*State v. Roque*) in which I defended a man accused of committing an ethnically motivated

8   murder immediately following the September 11, 2001 terrorist attacks.  The *Roque* case required

9   substantial attention and went to trial in the fall of 2003, before Wendi's trial.  As a result, my

10  personal involvement in Wendi's representation was limited until early 2003, just before we had a

11  trial date set in her case.  When Wendi's trial was continued to accommodate the *Roque* trial, my

12  involvement in her case was again limited throughout the remainder of 2003.

13

14

15      4.      Prior to my assignment, Ms. Andriano was successively represented by other

16  attorneys in the Public Defender's Office, including Attorneys Bethanne Klopp-Bryant and Gerald

17  Gavin, who represented her in 2000, and Attorney Wesley Peterson, who represented her in early

18  2001.  As reflected in the docket in her case, there was some back-and-forth regarding whether

19  she would be represented by private counsel (initially Attorney Leon Thikoll, then Attorney

20  Thikoll and Attorney David DeLozier, and by March 2001 solely Attorney DeLozier) or the

21  Public Defender's Office, and there was a dispute raised in court between the Public Defender's

22  Office and Attorney DeLozier regarding payments of funds.  Ms. Andriano was primarily

23  represented by private counsel for several months between December 2000 and June 2001.  By

24  the time the case came to me, it was my understanding that the Public Defender's Office would

25  take the lead role and Attorney DeLozier would serve as co-counsel pursuant to *Knapp v. Hardy*,

26  111 Ariz. 107, 523 P.2d 1308 (1974).

27

28                                              2

1    5.    Prior to Wendi's case, I had no experience working with counsel retained pursuant

2  to *Knapp* in any felony case. Wendi's case is the first and only capital case I have defended with

3  *Knapp* counsel.

4

5    6.    From July 2001 until Wendi's sentence, I was the only attorney from the Public

6  Defender's Office assigned to Wendi's case, and the only attorney from that office who worked

7  on the case. I did not request or receive substantive assistance on the case from any attorney other

8  than Attorney DeLozier.

9

10    **RELATIONSHIP WITH CO-COUNSEL**

11    7.    As noted above, I represented Wendi in conjunction with her *Knapp* counsel,

12  Attorney David DeLozier.

13

14    8.    I first met with Attorney DeLozier at the Public Defender's Office on September

15  20, 2001, shortly after I was assigned the case. From our conversation and outside knowledge, I

16  recognized that Attorney DeLozier had no experience or training in death penalty cases, and that I

17  could not rely upon him for substantial assistance on issues relating to capital jurisprudence.

18

19    9.    Attorney DeLozier and I did not have regularly-scheduled meetings to discuss

20  Wendi's case. My communications with Attorney DeLozier were initially infrequent, but became

21  more common after the conclusion of the *Roque* trial discussed above.

22

23    10.    I was responsible for the majority of Wendi's case. I believed that it was necessary

24  for me to assume responsibility for the majority of the work on Wendi's case because I had the

25  relevant death penalty experience. I assigned specific tasks to Attorney DeLozier and did most of

26  the pre-trial work on Wendi's case myself.

27

28

3

11.     Among the tasks assumed by Attorney DeLozier was the primary responsibility for meeting with Ms. Andriano to prepare for trial. I was aware that Attorney DeLozier met with her frequently while she was awaiting trial, but I did not discuss the content of those meetings with him.

12.     It was not until I suggested that Attorney DeLozier perform Wendi's direct examination at trial, approximately four months before trial began in August 2004, that Wendi informed me that she and Attorney DeLozier had not discussed the details of her case during their meetings. Rather, Attorney DeLozier and Wendi had mainly discussed faith and religion. In accordance with Wendi's wishes, I performed Wendi's examination at trial.

13.     Several weeks into Wendi's trial, I began to notice that Attorney DeLozier was becoming increasingly thin and weak. I learned from Wendi that Attorney DeLozier was fasting during the trial for spiritual purposes. He told me that he was not consuming any food during this time, although he did drink fruit juice.

14.     An attorney at Attorney DeLozier's law firm was murdered during Wendi's trial on Sunday, October 17, 2000. I contacted the Court and requested two days of recess in light of the effect of this tragedy on Attorney DeLozier. The court reconvened on Wednesday, October 20, and Attorney DeLozier conducted direct examination of a witness that day. During the middle of the prosecutor's cross-examination of that witness, I observed that Attorney DeLozier appeared to be in a daze and not focused on the proceedings; he was not following the questioning or the witness's testimony, and he did not respond to my inquiry at counsel table concerning his condition. I was forced to interrupt the Court to ask to adjourn the trial for the day.

4

MADI_2575620.1

## MY INVESTIGATION

15.    My personal involvement in the pre-trial investigation of Wendi's case consisted primarily of inspecting and assessing the State's evidence and interviewing the individuals on the State's witness list. This was time-consuming because the witness list, with supplements, listed roughly 100 individuals. The interviews were conducted in the presence of counsel from the County Attorney, usually at his office.

16.    I interviewed 10-20 individuals associated with law enforcement or the fire department on six days in May 2002, another dozen or so associated with law enforcement, Wendi's apartment complex, or Wendi's attempts to obtain life insurance on six days in October 2002, and another 25-35 witnesses on various dates from December 2003 through April 2004. I did not conduct any follow-up interviews with any of these witnesses prior to trial.

17.    Prior to trial, I did not personally investigate or conduct interviews of mitigation-related fact witnesses, except for Wendi and her immediate family. I relied on others—including the mitigation specialist assigned to the case, Scott Mac Leod—to locate and interview potential witnesses not identified by the State who could be relevant to Wendi's defense.

## MITIGATION INVESTIGATION AND THE *RING* DECISION

18.    I had defended several death penalty cases prior to Wendi's trial, but I had only tried one death penalty case (*Roque*) since the Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002).

19.    In my opinion, *Ring* made a dramatic difference in how death penalty cases are prepared and tried in Arizona. Before *Ring*, a judge was responsible for deciding whether a defendant found guilty of murder would be sentenced to death. Presenting a mitigation case

5

MADI_2575620.1

1   typically consisted of preparing a presentation about the positive aspects of the defendant's life

2   and about life circumstances that helped to explain the defendant's actions. After *Ring*, the fact-

3   finding necessary to the sentencing decision was made by a jury. Presenting a mitigation case to a

4   jury under the post-*Ring* standards required a much more extensive investigation into the

5   defendant's life history because a jury is less capable of considering proportionality, a factor that I

6

7   routinely relied upon in making sentencing arguments to judges.

8        20.    Further, the amount of time between the guilt and sentencing phases was

9   eliminated post-*Ring*. Prior to *Ring*, defense counsel often was allowed more than a year

10  following a guilty verdict to investigate and prepare a mitigation case. It was my practice to wait

11  until after a defendant received a guilty verdict before focusing on the mitigation case. Following

12  *Ring*, the sentencing phase began shortly after the guilt phase, requiring that defense counsel

13  begin to prepare the mitigation case much earlier. If I were to try Wendi's case today, with the

14  experience I now have in death-penalty cases post-*Ring*, I would have been more active in the

15  development of her mitigation case than I was.

16

17  21.    I assigned most of the research and preparation of the mitigation case to Scott Mac

18  Leod, a mitigation specialist in our office who took over Wendi's case after a previous mitigation

19  specialist, Patrick Linderman, left the office in early 2004. I gave limited direction to Mr.

20  Linderman and Mr. Mac Leod as to developing themes and theories of mitigation. I do not recall

21  giving Mr. Mac Leod any specific direction and largely left the development of the mitigation

22  case to the discretion of Mr. Mac Leod and Attorney DeLozier, who had the primary relationship

23  with Wendi and her family.

26

27

28

6

MADI_2575620.1

1   22.   I assigned Attorney DeLozier to take the lead in presenting the mitigation case.

2   The theme of the mitigation case, as I understood it, was that Wendi was a good person, mother,

3   and inmate, and an abused spouse, and therefore did not deserve the death penalty.

4

5   **LACK OF MENTAL HEALTH AND SOCIAL HISTORY INVESTIGATION**

6   23.   Attached as Exhibit A is a true and correct copy of a competency assessment made

7   by Dr. Jack Potts in March 2001, which was available to me once I assumed the role of lead

8   counsel in the case.

9

10   24.   Attached as Exhibit B is a true and correct copy of an email I sent to Patrick

11   Linderman, a former employee of the Public Defender's Office, on December 20, 2001.

12

13   25.   Attached as Exhibit C is a true and correct copy of an a competency assessment

14   performed by Dr. Richard Rosengard in August 2002, which was made available to me at that

15   time. I understand that Dr. Rosengard's report was obtained in response to my email in Exhibit B.

16

17   26.   I was aware that Wendi had been independently meeting with Kandi Rohde, while

18   Wendi was in pre-trial incarceration. Attached as Exhibit D is a true and correct copy of an email

19   I received from Michelle Arvanitas, an investigator with the Public Defender's Office assigned to

20   work on the Andriano matter, on February 14, 2002.

21

22   27.   Attached as Exhibit E is a true and correct copy of an August 4, 2004 report by Dr.

23   Michael Bayless, which was provided to me prior to Wendi's trial.

24

25   28.   I was aware that Wendi attempted suicide while incarcerated and was placed in a

26   psychiatric facility during her trial.

27

28   7

MADI_8575620.1

29.    I was also aware that Wendi was prescribed and took multiple psychoactive medications while incarceration.  I was not aware of the specific medications she was taking.

30.    My investigation into Wendi's mental health and her personal and family mental health history was limited to the email attached as Exhibit B and the report prepared by Dr. Rosengard as Exhibit C.  There was no strategic reason why I did not investigate further into Wendi's mental health and her personal and family mental health history, or engage an additional psychiatrist or neuropsychologist to evaluate Wendi's mental health.  Based on the information then known to me, I did not believe that there was a viable mitigation theme based on Wendi's mental health.

31.    I was aware that Wendi's biological father was in prison for sexual molestation of another child, and I inquired of Wendi and her mother as to whether he had molested Wendi as well.  Neither confirmed abuse by Wendi's biological father.  Other than this inquiry, I did not investigate whether Wendi had suffered childhood abuse or trauma.  There was no strategic reason why I did not do so.

32.    I did not conduct any interviews of individuals that knew Wendi from her childhood school or church that may have had information relevant to Wendi's mitigation case except for speaking with Shawn King in the presence of his lawyer, and I did not direct Scott Mac Leod or Attorney DeLozier to do so.  There was no strategic reason why I did not do so.

33.    Scott Mac Leod did not recommend or assist in engaging any experts.  The information that Mr. Mac Leod presented to me focused on Wendi's good upbringing and character and her good behavior in jail.

8

MADl_8575620.1

## ADDITIONAL DETAIL

34.   I provided several boxes containing true and correct copies of documents from my file relating to Wendi's case to her post-conviction relief counsel. All materials provided (except for post-trial materials) were available to me at or before the time of Wendi's trial.

DATED this / day of June, 2011.



Daniel Patterson

Subscribed and sworn to before me
this /4 day of June, 2011.

Notary Public, State of Arizona
My Commission: April 20 2015

OFFICIAL SEAL
ELIA HUBRICH
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires April 20, 2015

9

MADI_2575620.1

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA
### Forensic Services Unit

March 28, 2001

The Honorable Daniel A. Barker
Maricopa County Superior Court
222 East Javelina Avenue
Mesa, AZ 85210-6201

RE:  **Wendi Elizabeth Andriano**
     **Competency Screening Evaluation**
     **CR# 2000-096032**

Dear Judge Barker:

This is in reference to the above-named individual.  On March 9, 2001 your court
ordered the Forensic Services Unit to evaluate the competency of Ms. Andriano.  I had
an opportunity of visiting with the defendant for this evaluation on March 21, 2001.  At
that time the defendant was housed within the general population of the Estrella Jail
Facility, which is under the jurisdiction of the Maricopa County Sheriff.  When I saw the
defendant for this evaluation in the Medical Dispensary of that unit, I informed her of the
nature of our conversation and the fact it would not be privileged.  I also told the
defendant the information she provided could not be used against her in further
proceedings unless she were to enter a plea of Guilty Except Insane.  She understood
the reason for the evaluation and agreed to continue.  Prior to completing my report I
reviewed:

    1)    The Court's order;
    2)    Defense counsel's Motion;
    3)    A copy of a letter from counselor, Ms. Rohde;
    4)    A copy of the grand jury transcripts.

I appreciate having received the information I did in a timely fashion.  I also had an
opportunity of discussing the case at length with Dr. Leonardo Garcia-Bunuel.  Dr.
Garcia-Bunuel is a psychiatrist with Correctional Health Services.

Ms. Andriano is a 30-year-old widowed Caucasian female who is the mother of two
preschool children.  When seen, she was dressed in routine jailhouse garb and had

009178

**EXHIBIT**
**A**

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 2

good hygiene. She was fully alert and oriented to her name, the date, our location, and the reason for my evaluation. The defendant's thought processes were goal-directed and intact throughout our conversation. There was no evidence she was suffering from perceptual disturbances, such as auditory or visual hallucinations. She adamantly denied having such experiences. The defendant denied being on any psychiatric medications at the present time. Her affect was generally appropriate, but at times she seemed quite depressed and was tearful. She denied any previous history of psychiatric hospitalizations. She denied any known family history of psychiatric hospitalizations. Apparently her family history is significantly positive for two paternal cousins having successfully suicided. The defendant denies abuse of alcohol or other illicit substances. Apparently Ms. Andriano was reared in Pinal County, where her parents presently reside. She has worked in Phoenix for a number of years, and was working in the field of property management when arrested. Her cognitive abilities are quite likely consistent with that of the general population. She maintains she attended classes at the University of Phoenix in "business management." I would estimate her I.Q. as being within the average range. Her abilities to abstract and conceptualize, as tested by having her interpret relatively common sayings/proverbs, were intact. Her memory seemed to be grossly intact for both recent and remote events. She did complain of having some lacunae in her memory. She was able to remember three out of three unrelated items after a few minutes of intervening conversation. She was neither suicidal nor homicidal at the time of my evaluation. She maintains that she is religious and is a non-denominational Christian.

Ms. Andriano is very well aware of being charged with First Degree Murder. She also understands the adversarial nature of the proceedings she is facing. She realizes that she has certain Constitutional rights, and that if she is to enter a plea of Guilty, she will waive those rights. She was able to talk in a coherent fashion about her various rights, including her right not to testify, as well as her right to call witnesses on her own behalf and confront the witnesses against her in a court of law. She was able to independently identify her attorney. She maintains she has a lot of respect and confidence in Mr. Deiozier, Jr. The defendant maintains she has not been offered a plea agreement in the charges she is facing.

In summary, I do not believe that grounds exist to further question the competency of Ms. Andriano. It would be my opinion, within a reasonable degree of psychiatric certainty, that she has a factual, as well as a rational understanding of the proceedings she is facing. I also would opine that she can effectively assist her attorney in her defense. Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine. Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense. Certainly

009179

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 3

there is something quite bizarre about what allegedly occurred.   If Ms. Rhode is
accurate in her diagnostic assessment, then the criminal culpability of the defendant
and her state of mind at the time of the alleged offense should be evaluated
independently, outside the scope of a Rule 11 evaluation.

If the Court has any further questions regarding my opinions, I will remain available.  (I
would also note that apparently previous Defense counsel instructed Ms. Andriano not
to talk to Dr. Garcia-Bunuel.  I think this is a mistake, as I believe Dr. Garcia-Bunuel is
trying to treat the defendant for what he believes is a Depressive Disorder.  If such
treatment is indicated, I would hope that Defense counsel would be supportive of his
client receiving the necessary treatment from Dr. Garcia-Bunuel, who is a respected,
ethical, and competent psychiatrist.)

Respectfully,

Jack Potts, M.D.
Chief, Forensic Services Unit

009180

## Patrick Linderman - PDX

**From:**      Daniel Patterson - PDX
**Sent:**      Thursday, December 20, 2001 12:01 PM
**To:**      Patrick Linderman - PDX
**Subject:**      RE: referrals

Pat- the two clients are REDACTED   and Wendi Andriano- both are death penalty cases- Patty Moncada has been asked to provide you with complete sets of discovery- both clients should be examined by mental health professionals- not because I believe they suffer from mental illness but as death penalty cases, a mental health exam can provide a source for mitigation- be glad to give you a synopsis of their respective cases at your convenience- just come see me- Thanks- Dan P.

    -----Original Message-----
    **From:**     Patrick Linderman - PDX
    **Sent:**     Wednesday, December 19, 2001 9:15 AM
    **To:**     Daniel Patterson - PDX; Patricia Moncada - PDX; Irene Esqueda - PDX
    **Subject:**     referrals

    Hi Dan,

    I received word recently that I am assigned as the Client Services Coordinator to two of your cases. I am unclear exactly which cases, but I believe that they are REDA  and someone named Wendy something. I would love to get together with you to gain some clarification and direction. I will also probably speak with Patty since it appears that she is the person also assigned to this case. I am sure that I can get the DRs and other important papers from her. All those legal assistants are always very organized. (Wish some of that would rub off on me) It is my understanding that our office has had these cases for some time, so I may need to jump right in and see what I can do to help.

    Patrick Linderman

1



EXHIBIT
B

007684

Aug-28-02   12:55pm   From-Arizona Community Psychiatric        602-843-7054        T-736   P.002/007   F-401

# Richard J. Rosengard, D.O.

Mailing Address:   5501 N. 7th Ave., PMB # 219
Phoenix, Arizona 85013-1755
(602) 843-0035 • FAX (602) 843-8963

Diplomate, American Board of Psychiatry and Neurology
Diplomate of the American Board of Forensic Medicine
Diplomate, American Board of Forensic Examiners



August 27, 2002

Dan Patterson, Deputy Public Defender
Office of the Public Defender
Southeast Facility
1750 South Mesa Drive, Suite 150
Mesa, Arizona  85210-6211                                    **Fax Number 506-2865**

RE:     State of Arizona v. Wendi Elizabeth Andriano
CR#:   2000-096032
DATE OF EVALUATION: June 23, 2002
DATE OF DICTATION: August 25, 2002
EVALUATION LOCATION: Estrella Jail

**IDENTIFICATION:** Wendi Andriano was seen on a referral from the Office of the Public Defender and chief trial deputy, Larry Grant and presented as a 31-year-old, Caucasian female who prior to her detention in the Estrella Jail, where she had been since October of 2000, had been employed as a property manager. She was married and resided with her spouse and two children.

**INFORMANT:** The Defendant understood the extent and limitation of this evaluation and consented for me to release information herewith obtained, knowing full well that I was not establishing a physician/patient relationship with her. She also signed a Release of Information indicating that I could review the records in the Estrella Jail Clinic. Those records indicated that she had been on Seroquel 100 mg h.s. and that previously Remeron, trazodone, and Prozac had been used and discontinued. A note from November 3, 2000, indicated that the psychiatrist felt that she was labile.

I reviewed a cover letter written by Patricia Moncada, who was a legal assistant to Daniel Patterson, Deputy Public Defender, listing the reports which were reviewed and included a Phoenix Police Department narrative report, transcripts from 911 calls from the Phoenix Fire Department and Phoenix Police Department, medical records regarding the victim from Dr. Kellogg, and the medical examiner's report regarding the victim. The supplemental Phoenix Police Department Report reviewing the 911 call, showed how the Defendant had apparently admitted that her husband was stabbed, indicating that she possibly had done it and that she and her husband were fighting to the point of him strangling her. She denied doing the action purposefully and appeared to be upset by the situation. She indicated that her husband went into rages. She went on to indicate that she had previously hit her husband over the head, and his rage simmered down and then started once again. She indicated that she sent away the paramedics because she did not want to get her husband in trouble. She indicated that her husband had episodes of rage and personality changes, secondary to the chemotherapy that he was going through. She indicated that her husband had wrapped a cell



EXHIBIT
C

007544

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 2
RE:    State of Arizona v. Wendi Elizabeth Andriano                          August 27, 2002

phone cord around her throat, and she grabbed a knife in order to cut that cord; thereafter, they
wrestled around.

There was contact between Patricia Moncada and my office, indicating the charge against the
Defendant who indicated that she did not recall what had happened and was not involved with drugs
or alcohol. She reported that she had called the paramedics one to two hours earlier but sent them
away and then called the police thereafter. The victim apparently had a lot of outstanding business
loans. He also had terminal cancer with less than a year survival rate, according to the medical
examiner. She was seen to have superficial scrapes with a fake nail ripped off and redness around
her neck.

**PRESENTING SITUATION ACCORDING TO THE DEFENDANT:** The Defendant indicated
that she had not pleaded as of yet and knew that she was charged with first degree murder. She
indicated that she read the police report accusation synopsis, as well as a newspaper where it was
alleged that she had slit her husband's throat and had given him poison over a period of time. She
indicated, though, that her husband had been on chemotherapy and was no longer working. She
indicates that he took sodium azide and an overdose of pills and wanted to kill himself. She
indicates that her husband got mad when a friend, Chris, was called and vacillated about what he
wanted to do. She indicates that in March of 2000, she had an affair, predominantly for
companionship but did consummate the relationship sexually. She felt that her husband sensed what
was going on and asked her about that, and she answered honestly. He got angry and had a physical
fight with her regarding that on the night that the incident happened. The next thing that the
Defendant recalled was sitting on the living room floor with her husband. Thereafter, she called her
parents and told her father and then called the police. She indicated that she could not recall calling
the paramedics earlier. She also admitted to making calls to buy sodium azide a few weeks prior
to the incident. Her husband wanted that. At first, he apparently wanted cyanide; and then the
Defendant had convinced a friend to assist in getting the sodium azide. She indicated that her
husband had suicidal thoughts in the past and went through therapy but did not want to go through
therapy again. He did have some family therapy in 1997 and 1998. Apparently, therapy was set up
but her husband did not want to go.

**STRESSORS:** The Defendant indicated that her husband's cancer had been getting worse, since
they found out about it in March of 2000. He had had adeno cystic carcinoma since 1994, and was
diagnosed in 1996 or 1997. The Defendant was obviously now going through legal repercussions
of her alleged behavior and going through continued remorse and grief regarding the death of her
husband. Her husband had been going through chemotherapy, and they had two young children.
She worked, as her husband no longer did or could work.

**MOOD DISORDER SYMPTOMS:** The Defendant was depressed for six to seven months prior
to coming into detention. While in detention, she was doing better with the level of depression, as

007545

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                          Page 3
RE:    State of Arizona v. Wendi Elizabeth Andriano              August 27, 2002

there was relief from some of the stressors that existed previously. Nevertheless, the symptoms still included: insomnia and feeling depressed, helpless, and anhedonic. She had lost weight and had a reduced appetite with crying episodes. In the past, she felt particularly helpless, as she could not help her husband, particularly when he got irritable in the last few months of his life.

The Defendant denied symptoms that would be consistent with manic episodes but did admit to panic attacks since childhood. These happened at night on attempts to go to sleep and occurred less than a few times a year. During these episodes, she would have an increase in heart rate, dyspnea, dizziness, lightheadedness, shakes, sweats, and like a lump in her throat. She would have gastrointestinal upset, a fear of dying and losing control, and a sense of impending doom. She indicated that it was like having a heart attack. She also had symptoms of anxiety but would hide these feelings and focus in on somebody else when she had them.

The Defendant denied any history of suicidal attempts or homicidal ideation, intent, or actions. She had thoughts of hurting herself when she first came into detention for a few months but indicated that they were "Not serious."

**OTHER PSYCHIATRIC CONDITIONS:** The Defendant denied symptoms consistent with phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders. She denied having paranoia or hallucinations that were auditory or visual.

The Defendant indicated that her mother and therapist say that her biological grandfather sexually abused her when she under the age of 3; although, she could not recall that and had no dreams or flashbacks. She had difficulties in trusting others sexually but was able to enjoy herself with the exception of intercourse, and she did not like that. She got easily upset in dealing with others who were in abusive relationships; and with the aid of therapy, she felt that she was in an abusive relationship with her husband. She was particularly upset in finding out about and dealing with children that were sexually abused.

**SUBSTANCE ABUSE HISTORY:** The Defendant denied use of cocaine, speed, cannabis, IV drugs, heroin, PCP, LSD, inhalants, or alcohol.

**PAST PSYCHIATRIC HISTORY:** The Defendant had no history of acting out in violence, treatment with psychiatric medications, or placement in a psychiatric facility. She went for three to four appointments in 1996, to an EAP therapist but did not enjoy that therapy, indicating that they had blamed her husband and told her to leave him. In the year 2000, her husband's doctor gave her medication for anxiety and sleep; but she could not recall, the name of the medication and it was used for two to three months. She was out of that medication, I believe, for a week prior to being detained.

007546

Aug-28-02   12:56pm   From-Arizona Community Psychiatric          602-843-7054          T-736   P.005/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender
RE:    State of Arizona v. Wendi Elizabeth Andriano

**FAMILY PSYCHIATRIC HISTORY:** The Defendant's father and grandfather abused alcohol and there was no familial history of suicides, psychiatric illnesses, or drug abuse.

**PAST PERSONAL HISTORY:** The Defendant was born in Groom, Texas, and raised in Arizona and California. She indicated that her childhood was "Different," as her mother and stepfather were married when she was 4 years old. They travelled around on bus, being involved in a street ministry. Until the age of 10, she was raised at home; and from 10 and on, she was in a private school. She did well in school but indicated that she did get in trouble as she was "Being really hardheaded," even to the point of getting expelled. She could not recall what she did to merit that expulsion. She always got honors in her grades. She was the only child from her biological father who lived with her for a few years; and thereafter, her stepfather lived with her. She saw her biological father when she was 8 years old and did not really know him. She indicated that she had no involvement with the military or the law, except for some speeding tickets. In the last two years of high school, she did junior college work, as well; and after high school, she went to Mexico, doing missionary work for seven to eight months. Thereafter, she worked for a few months answering phones but apparently had a temper and quit. Then, she worked in property management as a leasing agent for a couple of years and ended that work to be an AP clerk accountant at Casa Grande Regional Hospital. She left that job after less than four years to go into property management. While she had been working at Casa Grande Regional Hospital, she attended college and indicates that she is two classes shy of a BA degree. She met her husband in March of 1992, and they were married in January of 1994. They have two children who are now being cared for by their paternal aunt. She indicated that she had no relationships with other people and that her relationship with her husband was difficult as he yelled at her daily. That is why she sought out the company of another man for moral support. She indicated that, at that time, she got into alcohol, as well; but she ended the relationship with that other man prior to the incident at hand.

**PAST MEDICAL HISTORY:** The Defendant denied any history of allergies to medications, surgeries, seizures, fractures, head traumas, or other major medical problems. She denied any use of tobacco. She used alcohol with peers, approximately four to five drinks at a time, drinking that every other week in the year 2000, and a lot less prior to that time. She had been on Seroquel at the time of the evaluation, 100 mg h.s. and had been on that for a couple of months. That was used to help sleep. She indicated that her bunkmate took that medication. She had tried other medications prior to the use of Seroquel, as I indicated above under informant.

**OBJECTIVE MENTAL STATUS EXAMINATION:** The Defendant appeared clean in jail garb and was well-groomed. She wore glasses and was less than average in her build. She appeared her stated age with a normal degree of alertness, posture, and gait. Her eye contact was good, and her attention span was satisfactory. Her motor level was normal, and she appeared good and cooperative as a historian. Her speech was normal. Her affect was labile, tearful, and sad; although,

007547

Aug-28-02   12:56pm   From-Arizona Community Psychiatric        602-843-7054        T-736   P 006/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 5
RE:    State of Arizona v. Wendi Elizabeth Andriano                     August 27, 2002

she was able to smile a few times.  She denied and showed no psychotic thought processes.  She
denied suicidal or homicidal ideation or intent.  She indicated that her mood was "Fine."  She was
friendly, trustful, and cordial in her interpersonal style and fair in her insight and judgement.  She
was oriented to her own name, the day of the week, month, and year and knew the street and address
of the jail and the city, county, and state where it was located.  She knew that the date was
somewhere in the twenties but did not know the exact date.  Immediately, she was able to repeat
three out of three items that I asked her to repeat; and after five minutes, she was able to recall one
of them.  She knew the name of the current and previous president of the United States and felt that
she did not know the one prior to Clinton but indicated that prior to Clinton was possibly Reagan.
She was able to do serial sevens accurately to 72 from 100 and accurately multiply six times eight
and nine times seven.  She was able to spell the word "world" backwards and abstractly interpret
a proverb of moderate difficulty.  She was thought to have an IQ that was above average.

**DIAGNOSTIC IMPRESSION:**

| | |
|---|---|
| AXIS I: | (a) Major affective disorder, depression. |
| | (b) Probable posttraumatic stress disorder. |
| | (c) Panic disorder. |
| AXIS II: | None. |
| AXIS III: | None. |
| AXIS IV: | Stressors: 1) dealing with her husband's cancer that was getting worse; 2) dealing with the legal repercussions, as well as personal repercussions, of the loss of her husband; 3) currently being a single parent. |
| AXIS V: | Current GAF: 62.  Highest GAF in last 12 months: 70. |

**SUMMARY, OPINIONS, AND RECOMMENDATIONS:** The Defendant was going through
a considerable amount of stress in dealing with not only the eventual loss of her husband at a very
early age and being the sole parent of her two young children but dealing with the slow and painful
demise of her husband, while her husband was becoming inappropriately irritable and mistreating
her emotionally and physically.  She had seen a deterioration in their relationship; and apparently,
she had killed him.  Perhaps no one will know exactly what occurred in the incident; and several
potentials exist, including the potential that she was defending herself to some extent.  Questions
could arise as to how somebody who had a sound mind prior to and after the event could now have
blocked what had occurred, specifically at that juncture; and the issue of amnesia for the subject
appears all too convenient.  I do not believe that there is any evidence that would conclude that what
had occurred was premeditated; and certainly, the actions were regretted from the very beginning,
as witnessed by the Defendant's response when answering questions posed to her when she called
the emergency numbers.  Because of what she saw, she surmised that she actually had killed her
husband and admitted to feeling badly about it.  An individual who goes through a traumatic event

007548

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                        Page 6
RE:    State of Arizona v. Wendi Elizabeth Andriano                August 27, 2002

will often forget that extreme situation, because an individual is unable to deal with the thoughts on an emotional basis. This occurs in both children and adults who have been physically or sexually attacked and more than explains the Defendant's response, particularly in light of the fact that she had a past history, apparently, of being abused and symptoms consistent with posttraumatic stress disorder. That situation and the emotional responses that she has had from that situation make it more likely that she would have had such an amnestic response to her apparent actions. That is true whether her actions were a matter of self-defense or whether they were purposeful attacks in the heat of a momentary aggressive outburst. The former appears more probable and the latter less probable, based on the Defendant's statements currently and to the emergency crew that she dealt with.

The Defendant certainly should receive appropriate therapeutic treatment, which would include individual therapy and a strong consideration of an antidepressant, which could be beneficial both for her depression and traits of posttraumatic stress disorder.

Should there be further questions regarding this Defendant or my report, I would be happy to answer them at your earliest convenience.

Respectfully submitted,

Richard J. Rosengard, D.O.
RJR/mw/TMHT

007549

## Michelle Arvanitas - PDX

| | |
|---|---|
| From: | Daniel Patterson - PDX |
| Sent: | Thursday, February 14, 2002 3:04 PM |
| To: | Michelle Arvanitas - PDX |
| Subject: | RE: Andriano |

Thank you- Michelle- Dan P.

-----Original Message-----
| | |
|---|---|
| From: | Michelle Arvanitas - PDX |
| Sent: | Wednesday, February 13, 2002 3:04 PM |
| To: | Daniel Patterson - PDX |
| Subject: | Andriano |

Hey Dan P.

I spoke with Dave Delozier this morning. He heard through Donna's sister in Texas (Nadine Bednorz) that Wendi called someone right after the accident by the name of Easy (probably a nickname). Supposedly she called this person prior to calling her father, Police or cousin. Dave heard that Mathew Ocker is on the state's witness list. Do you have an updated list that might verify this story? Easy worked at SESCO gas. That is the same place that Mathew Ocker worked at the time. Sherry Ocker mentioned to Nadine Bednorz that Mathew Bednorz was subpoenaed. (Hope you are following this explanation). Nadine has not mentioned this to Donna.

I also spoke with Kandy Rohde-Wendi's counselor.
Wendi was diagnosed with Three things according to Kandy.

1) Depersonalization Disorder (300.6) is persistent or recurrent episodes

of depersonalization characterized by a feeling of detachment or

estrangement from one's self.
She does not let the "bad stuff in". She ignores any bad feeling.

2) Disassociative Amnesia. (300.12) is an inability to recall important

personal information, usually of a traumatic or stressful nature,

that is too extensive to be explained by normal forgetfulness.

3) Physical, Sexual or Neglect of a child. V61.21

Kandy mentioned that Wendi avoided conflict or confrontation by doing everything Joe said.
Wendi's biological grandfather may have molested her as a child. Supposedly, her biol. father is in prison for molestation.
After Joe took the pill (poison) and didn't die he begin to panic. She wanted to take him to the hospital and put her purse in her car. He kept changing his mind-wanting to go to the hospital, then not wanting to go. He wanted her to call 911. He was really upset, she was trying to calm him down. He pushed her on the infidelity issue, wanted to know before he died. She felt he deserved to know. She finally admits and is surprised at how enraged he became. This is what escalated the fight . She recalls what made him angry and that Chris came and waited outside. Her standing in the kitchen and him coming after her with the phone cord. She remembers shiny knife on counter. She wakes up-so much blood. Rinses off glasses in order to see. Surprised to see scene-confused. appears to have materialized out of nowhere. Remembers calling parents. She recalls sitting outside waiting-snapshots. Recalls jail. Kandy mentions that she appears calm for being in jail the first time. Remembers thinking what can I do to fix this-she fixed everything for everybody. Heard 1st degree murder still thinking how she can fix-not in tune with severity of what happened. This is Kandy's chat in a nutshell. Looking forward to our meeting with Shawn and atty.

1



019106



MICHAEL B. BAYLESS & ASSOCIATES
3620 NORTH THIRD STREET
PHOENIX, ARIZONA 85012
PHONE: 602-230-7373
FAX: 602-230-5105

MICHAEL B. BAYLESS, PH.D.
LETICIA AMICK, PH.D.
CRISTY LOPEZ, PH.D.

August 4, 2004

## PSYCHOLOGICAL REPORT
## RE: WENDY ANDRIANO

**Reason for Referral:**
Wendy Andriano entered a plea of not guilty to first-degree murder. She is currently charged with the murder of her husband, Joe Andriano. According to the police reports Joe Andriano's death occurred on or about October 8, 2000. The purpose of this evaluation is to exam Wendy Andriano's intellect, personality, and overall emotional stability.

**Observations:**
Wendy Andriano is a relatively short, thinly-built 33-year-old female of Caucasian descent. At the time of the interview, Ms. Andriano was wearing jail attire and her hygiene appeared to be good. She was in relatively good mood and was very open and cooperative with this examiner. Her affect was normal to content. She did not exhibit any abnormal motor activity or mannerisms. She denied having any tattoos or identifying physical marks. She was alert, exhibited good eye contact, and maintained satisfactory attention span. Her thoughts and communications were coherent and seemed to follow logical sequence. There were no obvious deficits in her short or long-term memory.

**Consent to Evaluation:**
Wendy Andriano signed Bayless and Associates's Forensic Consent Form indicating she read and understood the purpose of the evaluation and limits of confidentiality. She was aware that information from this evaluation would be reported to the court and may be disseminated to interested parties. Ms. Andriano consented to the evaluation and voluntarily answered all questions.

**Documents Reviewed:**
1. Photographs of the crime scene
2. Phoenix Police Department departmental Reports
3. Autopsy Report
4. Sharon B. Murphy, Ph.D. Report and Domestic Violence Data



EXHIBIT
E

Andriano
Page 2

**Procedures:**
1. The Shipley Institute of Living Scale.
2. The Williamson Sentence Completion Test.
3. The Minnesota Multiphasic Personality Inventory – II.
4. Clinical interview.

**Background:**
Wendy Andriano was born Groom, Texas and is an only child. Wendy did not know her biological father. Her mother remarried when she was approximately four years of age to Alejo Ochoa. Her stepfather raised her as his own daughter and was basically the only father she has ever known. Her father worked as an assistant pastor and managed a tortilla factory and restaurant. Her mother is a human resource person and both of her parents are described as being workaholics. However, she also states that they were very caring, outgoing, and very loving. Her father was the main disciplinarian in the family. She reports that she has always had a very loving and open relationship with her parents. She was raised as a Christian and states as a young girl she participated in a lot of church activities. When asked whether or not she had ever been physically or sexually abused, she reported that she was sexually abused by her biological father and her grandfather. She believes that she was less than two years of age and can barely remember what happened. She states that she remembers parts but not all of the things that happened. Noteworthy, her biological father is in prison for child molestation. Wendy has a vague memory of the molestation and states she can only remember it when she is dreaming.

Although she states that she was happy as a young girl, she did have a number of anxiety-related problems. During her childhood she was a sleepwalker, experienced night terrors, bed wet, and suffered from separation anxiety from her mother. Noteworthy, she continues to have night terrors to this day.

As a teenager, Wendy enjoyed music, playing the piano, and swimming. She went to a very small high school, such that there were only 15 kids in her high school class. She got along quite well with her peer group. The most significant event that happened to her during her teenage years was her participation in the church social group. She did not date during her high school years.

**Education:**
Wendy graduated from high school with honors and reports that she has always been a very good student and really enjoyed her education. She went to a small Christian school and reports that everyone was best friends. She has also completed approximately three years of college.

**Employment:**
Wendy's last job was working as a property manager for the San Riva apartments. She worked there from September 1999 through October 8, 2000. She earned approximately $32,000 a year. Before she was arrested, her goals were to work in real estate but now she simply wants to have her children back and go back to having a normal life. Noteworthy, after Wendy was arrested for the murder of her husband it was learned that there were some financial irregularities at the apartment complex. It was found that in apartment #229, a man had been allowed to live rent free without documentation in that apartment. There was also a full audit being done due to irregularities which had come to light. On a previous job, Wendy stole approximately $18,000 from her employer. She reported that she stole the money because her husband had created so much debt that she had to do something. She felt overwhelmed by the debt and felt responsible for the family's happiness. Consequently, she was forced to steal $18,000.

Andriano
Page 3

**Relationships:**
Wendy has been married once and has two children. She was married from 1994 to 2000. Wendy's deceased husband had cancer and the last year of her marriage was very hard. She admitted to having an extra-marital affair during her last year of marriage. When asked about her affair, she reported that she had an affair with Rick Freeman. She met Rick at the apartment complex and they became friends. He was aware that her husband had cancer and he had told her that his fiancé had recently died. On one evening she went to Rockin' Rodeo, which is a local bar, with Rick and as they were coming home he kissed her. She stated that after they had kissed their relationship deepened and it became sexual. Noteworthy, Wendy reported to this examiner that she did not enjoy having sex and actually sex was quite painful for her. When asked about this, she stated "you can't just kiss on someone and not have sex with them, that's teasing". He was comforting me and as a trade I had sex with him". She reports she had sex with Rick Freeman five or six times. She claims he was quite gentle and although it wasn't painful for her, it was very uncomfortable. She stated "I don't know why my brain just clicks off. A lot of it is I was scared and thinking what do I do, how do I act. Joe was dying; life was going to be different".

**Psychological History:**
Wendy reports that she was treated by Candy Rhode in May once a week for three years. She denies receiving any other inpatient or outpatient treatment. This examiner did not receive copies of those records to review. Currently, while incarcerated, Wendy is taking Ativan, Zoloft and Seroquel. When asked if she had anyone in her family who had a history of mental illness or substance abuse, she reported her grandfather was an alcoholic and her aunt had a drug problem. She denies having a bad temper and states when she gets angry she would typically cry. She stated "I always see the best in people. Anger is a sin. I practice forgiveness and love".

Wendy denies having a frequent headaches, backaches, stomachaches, dizziness, heart palpitations, and fatigue. When she is under a great deal of stress she sometimes has difficulty sleeping and she used to have frequent nightmares. She reports her appetite is normal and she has not experienced any weight loss or weight gain.

Wendy denies experiencing hallucinations and/or delusions. She admitted that at times she does become depressed and has had suicidal ideations and one suicidal attempt. After being served papers about severing her parental rights she intentionally cut her arm. Further, she reported that she has a lot of fear and basic dislike of sexual intercourse due to it causing her pain.

Wendy is in relatively good physical condition and has not had any major operations or serious illnesses. She denies any neurological injuries.

**Alcohol/Drug Use:**
Wendy reported that she began drinking alcohol when she was 21 years of age. She typically drinks wine coolers and rarely if ever becomes intoxicated. She reports that she has been intoxicated maybe three or four times in her entire life. She denies using any illicit drugs. She does not drink coffee nor does she smoke cigarettes.

**Arrest Record:**
Wendy does not have a juvenile arrest record. She reports that this is the first time she has ever been arrested or charged with a crime. As noted earlier, Wendy is currently charged with first-degree murder. When asked how she is handling incarceration, she reported "I have adjusted. Either you sink or swim".

Andriano
Page 4

**Defendant Statements:**
In 1994 Wendy married Joe Andriano. They were married in Casa Grande, Arizona. Initially, there was some conflict over their church and beliefs but that quickly resolved and their marriage was basically okay. After the marriage, Wendy reported that she and her husband Joe both felt as if they had changed and they did not have to any longer "put on any airs". Through their marriage they learned who they both were and everything was fine. Wendy initially hung out with Joe and his friends and eventually lost touch with her own friends. Joe was working as a welder but quit that and went into his own business, auto glass replacement. They got a loan and started Joe's Windshield Repair. In the process of obtaining a new business, Wendy and Joe moved to her parent's farm and basically renovated the old shack and lived there until March of 1998. She reported she had her first child in the old farmhouse. Approximately seven months into the marriage it was discovered that Joe had a tumor, which supposedly the doctor removed successfully. However, in 1996 it came back, which started to wreck havoc in their lives. They both were upset and under a lot of stress. Joe was not a very good businessman and spent most of his money on pleasurable activities. As a result, Wendy felt as though she had to put money back into the business from her job and eventually became overwhelmed by debt. She stated, "I felt responsible for my family's happiness", As a result, Wendy over a period of four year's, stole approximately $18,000 from her employer. She was fired from her job.

When Wendy first met Joe, he was dating this very wealthy girl and would say to her quite often that if he had stayed with his girlfriend his life would not be as miserable as it is today. Wendy reported this really hurt and here she was working full-time, stealing money from her company, attempting to go to school, making dinner, cooking, doing the clothes, and everything else around the house but that was not good enough. She stated, "What could I do, how could I make him happy".

At this point during the marriage, she was only around members of Joe's family. She felt isolated, alone and decided to go back to church. She tried to teach Joe how to love and forgive but was not very successful. Wendy was pregnant with her first child and Joe was not working. At this point, she was taking care of the baby, working and her parents were also helping do almost everything. Then she found out that she was pregnant again and that was just totally overwhelming. In October 1997 she decided that she was going to leave Joe because she did not want her son to grow up like this. She went to Jerry, the man who had loaned them the money for the business, and he gave her $2,000 and told her that if she wanted to leave, for her to leave. Noteworthy, Wendy did not leave Joe and instead reported that she actually gave the $2,000 to Joe. She reported that she wrote Joe a letter telling him that she was going to leave and later that evening he came in, in the middle of the night, and had apparently found the letter. He was angry and was screaming at her "what does this mean". She stated by the time it was all done he was begging her to stay and for some reason he was able to talk her into not leaving. Joe had a way with words and also she was very much afraid of his temper. She stated she remembers the first time she asked Joe about living on the farm, just that she thought they were living there so that they could save money to buy a house. She stated Joe became extremely angry, grabbed her and shook her, which made her very much afraid. Previously Joe told her about catching his ex-girlfriend sleeping with another man and he became so upset that he had to move to California to keep him from hurting the guy with whom his girlfriend was having an affair. She believes one of the reasons Joe told this story was so that she would be afraid of him.

Wendy reported that she really was not angry with Joe and actually always felt bad for him. Joe, in her mind, was angry at the world because of his cancer. Wendy stated, "It was the worse thing you could go through. You expect it when you are old, not when you are young". Wendy also reported that Joe would feel very bad when he had his episodes of anger. The cancer was overwhelming and basically consumed him. She told this examiner it was Joe who asked her to order the poisons because he wanted to take it and end it all.

Andriano
Page 5

**Police Interviews:**
In witness interviews conducted by the Phoenix Police Department, Chris Hashisaki reported that Wendy
had asked both Eric Vallante and James Yost to pose as Joe so she could a life insurance policy on Joe.
She believed that they both were offered $50,000 to do this. Chris is also aware of an incident in which
Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer.
Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time
as having no observable injuries.

Shannon Sweeney was also interviewed by the police and is one of Wendy's friends. Shannon and
Wendy would often go to bars and hang out. Wendy apparently told Shannon that she had been having
problems with Joe for a long time and would have left him if he had not become ill. Shannon believed
that Joe was very possessive of Wendy. On one night, Shannon reported they took Wendy out for her
birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's
cellular phone and a glass bottle across the parking lot.

Shannon was also aware that Wendy had an affair with Rick Freeman. Apparently Wendy did not tell
Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not
want to end and became very persistent. Rick described this to Shannon as Wendy refusing to leave him
alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric
at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to
follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone.
When he would not answer, she began banging on his door and when he would not answer she threatened
to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this. Later, Wendy also
had a one night affair with a young man by the name of Travis whom she met at Rockin' Rodeo Bar.

Noteworthy, Wendy told Shannon about Joe screaming and would often break things. Wendy never told
her about any incident in which Joe touched her. Shannon had never observed any injuries on Wendy.
Apparently, Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost
and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon
that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no
way the insurance company would find out about him posing as Joe. She also told Eric that Joe would
most likely die of a heart attack due to his condition and treatment and that this would not be investigated.
He also told Shannon that Wendy offered him $50,000 to pose at Joe. As to the poison ordered over the
Internet, Wendy used a fictitious business license in order to order the poison. Noteworthy, Wendy gave
an address to a company that she had no connection to. The poison Wendy ordered has the effect of
mimicking a heart attack in its victim. Noteworthy, Wendy ordered poison from the website under the
name of Anne Newton.

Ray Ortega, who was part of the management team that managed San Riva Apartments, found out that a
man was living apartment 229 rent-free. Additionally, on October 10, 2000 Ray found in Wendy's office
while he was cleaning the office, an envelope under Wendy's desk. Ray observed a pieced-together
certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information
on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William
told him that while working on the office computer, he discovered where somebody had looked up a
website containing information on cyanide as well as a point of reference site. Ray contacted Janice Lord
and advised her of what William found. Ray, along with Janice, confronted Wendy about this. Wendy
did not deny looking up this information but stated that she was helping a friend with a college report.

Eric Vaillent is a friend of Rick Freeman who was dating Wendy. He reported that Wendy would often
pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and
kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also

Andriano
Page 6

observed Wendy at nightclubs drinking excessively and would flirt and kiss on guys she knew at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any of the domestic violence or any situation in which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can buy poisons. Wendy told this examiner that it was Joe's idea to buy poison.

Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20,000,000. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated he got upset with Wendy and called her a money hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed Wendy did not really care for Joe any longer and she told him that she no longer had sex with Joe. This is quite interesting considering the fact that Wendy told this examiner that Joe demanded sex with her on a daily basis.

Rick Freeman admitted that he used to date Wendy and when he found out she was married he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Ted Bennett, who is a neighbor at the San Riva Apartments, reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him how much money they expected to be awarded. Ted reported that Joe did not appear to have given up or want to die and in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments Ted had never been aware of any rodent problems that would require poison.

Debra Lewis was employed as a housekeeper for the San Riva Apartment complex. She is aware that Wendy and Joe were having some problems and was aware that Joe was questioning Wendy about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe's continued checking up on her and Wendy also complained to Debra in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Debra was unaware of any alligations of domestic violence between Wendy and Joe. She describes Joe as being a real pussy cat. Debra often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Debra stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore. She described Wendy as acting as if she was not married.

Travis Black is a young man that Wendy met at a night club called the Rockin' Rodeo. She met Travis on September 27, 2000 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations Wendy told Travis that her husband had died of cancer.

On August 28, 2000 Wendy contacted Amica Life Insurance Company in reference to purchasing a life insurance policy on her husband Joe. Wendy talked to Carolyn Statalano and told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes she stated this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Also, on the application for a life insurance policy, the policy asks if Joe had cancer to which Wendy entered "no" on the application.

Andriano
Page 7

Based on the above-mentioned interviews, it appears clear that Wendy in more than one situation had a tendency to be less than truthful. She has the ability to be manipulative and attempted to encourage others to get involved in fraudulent schemes to collect money from an insurance company. Additionally, for a woman who did not enjoy sex, she clearly was sexually aggressive with one of her male boyfriends and on one occasion met a man at a bar one night and took him home and had sex with him. She seemed to become somewhat obsessed with Rick and seemed to have extreme difficulty accepting the fact that he no longer wanted to date her. Additionally, Wendy told this examiner that Joe asked her to buy the poison. Yet in her overall quest to buy the poison, she attempted to hide her identity, have the poison mailed to a business address, and seemed to want to hide her connection to the poison.

**Intellectual Functioning:**
Wendy Andriano's performance on the Shipley Institute of Living Scale yielded a total IQ score of 110 which places her in the above-average range of intellectual functioning. Ms. Andriano was oriented to reality and had a capacity to appreciate the difference between right and wrong. At the time of the testing her memory, judgment, and decision making ability were intact. Although she was mildly anxious during the testing her test scores appear to be an accurate representation of her abilities. She did not report nor did the test data indicate the presence of neurological impairment.

Wendy Andriano's performance on the Minnesota Multiphasic Personality Inventory yielded a valid and interpretable profile. Her scores on the Validity Scales indicate that she tends to be defensive, lack insight, and be slightly more conforming and moralistic than usual. Typically, these individuals have a tendency to repress or deny problems and unfavorable traits. She is prone to minimize and disregard problems with herself. Self-insight and self-understanding are usually lacking. She is very concerned about how she is perceived by others and typically views emotional problems as weaknesses.

Ms. Andriano's performance on the Clinical Scales reveals an individual who has a very mild level of emotional distress that is characterized by a general dissatisfaction with life rather than by any specific mood. She is so unaware of this dissatisfaction that she can say that she is happy most of the time and very seldom has "spells" of the "blues". Yet she frequently worries about something. She will use indirect means of expressing her anger.

Ms. Andriano sees herself as quite capable and able to make decisions easily. Her memory and concentration skills are good. She does not analyze her or others feelings and behavior. She daydreams very little. She believes that it is safe to trust others and that they are willing to help. She is very direct and comfortable in stating her opinions to others.

Although she is concerned about her health, she does not report any specific symptoms other than dizzy spells. Individuals with similar scores report that they do not wake up fresh and rested most mornings. They typically have behavioral problems in school and are likely to have been in trouble with the law. Although she may abuse substances, she is unlikely to have suicidal ideation. Typically individuals with similar profiles have a very poor prognosis. This is due to their problems being more characterological and not readily amenable to change. She is experiencing minimal emotional distress and has little concern about her behavior, limiting her motivation for treatment.

Noteworthy, clients with this profile tend to be defensive, and unwilling to acknowledge psychological problems even when they are readily apparent to others. They report little psychological emotional distress and describe themselves as less depressed and anxious than do most psychiatric patients. Behavioral problems are more likely to occur in this code type than in any other code type that includes Scale 3. Further, clients of this profile are characterized by poorly controlled anger and hostility that it is expressed in cyclic fashion. Often these clients are eventually incarcerated for their violent acts.

Typically, these clients are quiet, withdrawn individuals, and their sudden outbursts come as a surprise to others. They display poor judgment under stress, but their emotional or violent outbursts may be only minimally related to external stress or provocation. The cyclic pattern of violent outbursts with intermittent periods of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change.

Ms. Andriano's performance on the Williamson Sentence Completion Test substantiates the findings noted above. Again we see an individual who has very little anxiety and who tends to be very superficial in her overall responses. This examiner finds this to be somewhat surprising considering what Ms. Andriano is being charged with and the fact that she is in jail. She tends to have very strict rules in which she expects herself and others to live up to. Further, she has a strong need to be needed and desperately wants to be seen in the eyes of others as being worthy. She has a rather naïve viewpoint of life such as she wants/desires a perfect existence. When she cannot get all her needs met she tends to feel guilty and has a tendency to externalize blame onto others for her own shortcomings. Her primary defense mechanism is denial.

**Summary:**
Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a fictitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

Andriano
Page 9

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The examiner notes that this is understandable considering Ms. Andriano's behavior and general response toward her husband. During this time period in which Ms. Andriano's husband was very suspicious of her behavior, she was, in fact, having an affair. As a matter of fact, she admits to having actually two affairs. This examiner finds this is quite interesting in light of the fact that Ms. Andriano reports that she did not enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on the night of the offense she and her husband were engaged in a physical fight. She alleged that he had attempted to choke her with a telephone cord and had earlier pushed her into the dresser and onto her bed. He also pushed her into their wedding display case, shattering it, grabbed her in a bear hug and they both were wrestling around in the house. As her husband began to reach for a belt to hit her, she was able to wiggle away from him, grab the barstool and hit him on the back of his head. Apparently Joe was knocked unconscious and was severely injured. She gave him a pillow and blanket. She called Chris and told her Joe was having a heart attack. While she was waiting for Chris to come, she covered the blood on the carpet with a towel. Chris came over and told Wendy to call 911. Wendy told the 911 operator Joe was having a heart attack. The Fire Department came and Wendy sent them away. She also told Chris to go home. When she returned to the apartment and Joe was standing up. At this time he wrapped the charging cord from his cell phone around her neck and as they struggled and moved toward the kitchen she grabbed a knife and cut the cord from around her neck. She reported that the next thing she remembers was struggling with her husband in the living room. She still had the knife in her hand and the next thing she knew she had blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim the she was a victim of domestic violence.

Diagnosis:
Axis I:      Depressive disorder NOS.
Axis II:     Personality disorder NOS with antisocial and borderline traits.
Axis III:    None.
Axis IV:     Marital conflict, financial problems.
Axis V:      GAF = 65.

---

Michael B. Bayless, Ph.D.
Clinical and Forensic Psychologist

## NOTES
### RE: WENDY ANDRIANO

**Note 1:** In the interview with Leslie Herb Duncan, AKA Herb, Chris reported that Wendy had asked both Eric Vallante and James Yost to pose as Joe so she get a life insurance policy on Joe. She believed that they both would offered $50,000 to do this. Chris was also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

**Note 2:** Interview with Shannon Sweeney. Shannon Sweeney was a friend of Wendy's and would often go to bars and hang out with Wendy. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he not become ill. Shannon believed that Joe was very possessive of Wendy. On one incident, Shannon reported that they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot. Shannon was also worried that Wendy had an affair with Rick Friedman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end it and became very persistent. Rick described this to Shannon as Wendy refusing to leave him alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer, she would threaten to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this.

Later Wendy also began dating a day by the name of Travis whom she met at a rock rodeo bar. Noteworthy is that Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incidents in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose as Joe. As to the poison ordered over the Internet, Wendy had used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to.

**Note 3:** Interview with Ray Ortega. Ray Ortega is part of the management team that managed San Riva Apartments which Wendy Andriano was a manager. It was found out that in Apartment #229 a man had been allowed to live rent-free without documentation in that apartment. Noteworthy, there was a full audit being done due to irregularities which had come to light after Wendy's arrest.

**Note 4:** Interview: Eric Vaillent. Eric was a friend of Rick Friedman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also observed Wendy at nightclubs in which she would often drink excessively and would flirt and kiss on guys she met at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any domestic violence or any situation which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can

Notes
Wendy Andriano
Page 2

buy poisons. Wendy told this examiner that it was Joe's idea to buy poison. Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20 million dollars. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated that he got upset with Wendy and called her a money-hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed that Wendy did not really care for Joe any longer and she had told him that she no longer had sex with Joe. This was quite interesting in the fact that Wendy told this examiner that Joe demanded sex from her on a daily basis.

Note 5: Interview: Rick Friedman. Rick admitted that he used to date Wendy and when he found out she was married, he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Note 6: Witness: Ted Bennett. Ted reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him about how much money they expected to be awarded. Ted reported that Joe did not appear to have given up and wanted to die and, in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments, Ted had never been aware of any rodent problems that would require poison.

Note 7: Interview: Deborah Lewis. Deborah Lewis was employed as a housekeeper for the San Riva Apartment complex. She was aware that Wendy and Joe were having some problems in the fact that Joe was questioning her about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe continually checking up on her and Wendy also complained to Deborah in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Deborah was unaware of any allegations of domestic violence between Wendy and Joe. She described Joe as being a real pussycat. Deborah often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Deborah stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore and that he was not here anymore. She described Wendy as acting as if she was not married.

Note 8: Witness: Travis Black. Travis is a young man that Wendy met at a nightclub called the Rocking Rodeo. She met Travis on 09/27/00 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then they went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations, Wendy told Travis that her husband had died of cancer.

Note 9: Witness: Ray Ortega. Ray on 10/10/00 found in Wendy's office while he was cleaning the office an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janis Lord and advised her of what William found. Ray along with Janis confronted Wendy about this. Wendy did not deny looking up this information but stated she was helping a friend with a college report. Noteworthy, Ray is unaware of the apartment complex having a rodent problem.

Notes
Wendy Andriano
Page 3

**Note 10:** Witness: Carolyn Catalano at Amica Life Insurance Company. Apparently Wendy contacted Amica Life Insurance Company on 08/28/00 in reference to purchasing a life insurance policy on her husband Joe. On 09/22/00 Carolyn called Wendy on the phone. Wendy told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes, she stated that this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Noteworthy, on the application for life insurance policy, the policy asked if Joseph had cancer to which Wendy entered no on the application. Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

_____

**Michael Brad Bayless, Ph.D.**
**Forensic and Clinical Psychologist**

## INTERVIEW FORMAT

NAME & DOE: _Wendi Andriano_

REFERRAL INFORMATION: _1st degree Murder_
_Head dot Guilty_
_Date of Death / 10-8-00 Called 911 - Reported_
_Husband Dead - Intellect, personality, Emotional status._

## BEHAVIORAL OBSERVATIONS

AGE: _33_

DOB: _8/26/70_

HEIGHT: _5'4"_

WEIGHT: _110_

RACE: _Cauc._

HYGIENE/ATTIRE: _Fair / Higher / Glass_

MOOD: _OK, = good_

AFFECT: _No_

PHYSICAL IDIOSYNCRASIES: _No_

EXAM ATTITUDE....cooperative,  pleasant,  did not mind personal inquiry,  inquisitive, overly anxious,  complaining,  indifferent,  resistant,  defensive,  too revealing

TEST-TAKING ATTITUDE....needed reassurance,  easily frustrated,  impulsive,  grew tired, worked slowly,  gave good effort,  perfectionistic,  organized,  persistent,  inconsistent

SENSORIUM....alert,  hypervigilant,  confused,  sleepy,  stuporous

EYE CONTACT....good,  avoided,  appeared distracted

ATTENTION SPAN....poor,  satisfactory,  distractible

MOTOR LEVEL....normal,  hyperactive,  hypoactive,  psychomotor retardation

POSTURE....normal,  relaxed,  slumped,  rigid,  leaning to side

MANNERISMS....none,  tics,  EPS,  tardive dyskinesia,  fidgety,  rocking,  leg shaking

SPEECH....normal,  rapid/slow,  loud/soft,  excessive detail/impoverished,  stuttered, mumbled,  slurred,  pressured,  lisp

LANGUAGE ABILITIES....monolingual/bilingual....speaking/reading/writing fluency

THINKING....incoherent,  loose,  circumstantial,  tangential,  concrete,  logical,  linear

MEMORY....grossly intact,  confused,  superficial/poor historian,  contradictions,  perseverated

PERSONALITY TRAITS....shy,  gregarious,  sense of humor,  frank,  bizarre,  suspicious, hostile,  manipulative,  help-seeking,  complaining,  immature,  narcissistic,  argumentative

THOUGHT CONTENT: _____

JUDGMENT/INSIGHT: _____

SUICIDAL/HOMICIDAL IDEATION: _____

## BACKGROUND

PLACE OF BIRTH & RELOCATIONS: *Groom, Texas*

BIRTH ORDER/# OF SIBLINGS: *Only Child -*

BIRTH/DEVELOPMENTAL PROBLEMS: *StepDAD.*

PARENTS' NAMES & AGES: *Alejo, Donna Ochoa*
DIVORCE/DEATH (TIME/CAUSE): *Raised her Since Age 4*
REMARRIAGES:

PARENTS' OCCUPATIONS: *Assist Mngr @ Manage a Tortilla factory & distrent - Mom - Human Resource Person*

PARENTS' PERSONALITIES: *Dad stoic very easy get Going - loving - Mom - same - Stressed -*

HOME ATMOSPHERE/DISCIPLINE: *Very Detailed - perfectionist DAD - SPANK Grounded -*

RELATIONSHIP WITH PARENTS: *Bad - Stressed -*

RELATIONSHIP WITH SIBLINGS/FRIENDS: *N/A*

RELIGION (CHILD/CURRENT): *Christian*

SIGNIFICANT CHILDHOOD EVENTS (ABUSE): *Yes - Not Father ? Unde - Mroks Best Not ...*

EARLY CHILDHOOD.. (happy) poor health, nail biting, stuttering, thumb sucking, (sleepwalking), (night terrors), (bed wetting), (separation anxiety), fears, rituals, hyperactivity
*2 Age 9.   Still   6-9-10 mrs   mom   episods.*

TEEN HOBBIES/INTERESTS: (Music), Piano, Swim Team -

PEER GROUP (GANGS): *Very Small - 15 kids in HS class.*
SIGNIFICANT TEEN EVENTS: *- Church Social Group -*

## EDUCATION

HIGHEST GRADE COMPLETED: *15 yrs -*   GED?:

SPECIAL ED/HELD BACK:
GENERAL ATTITUDE/GRADES: *HS. @ Honors -*

BEHAVIOR PROBLEMS: *No -   Popular -*

PEER RELATIONS (TEASING↔): *No -*
COLLEGE/TRADE SCHOOL:

*Christian School - Very Small*
*- EO was Best friends -*

(margin notes, left side:)
*3rd MD*
*1K.*
*HM*
*☐*
*TBA*
*work.*
*lat her prior child molestation que during the westgotion only in new york*

## EMPLOYMENT

**FIELD OF WORK:** _Manager - San Labs APM_

**CURRENT/LAST JOB TITLE & DATES:** _Sept 99 to Oct 8, 2000   Property Mgmt_

**SATISFIED/REASON FOR LEAVING:** _____

**EARNINGS VS. COSTS:** _$32,000_

**JOB HISTORY (FIRST, LONGEST, DATES & REASONS FOR LEAVING):** _____

**HX OF SSI/SSD/WKMAN'S COMP:** _____

**HX OF GRIEVANCE/HARASSMENT:** _____

**AMBITION/GOALS:** _Rt Now - Want my Children Back_
_Before - wanted to wk in Real Estate_

**MILITARY BRANCH :** _____

**DURATION OF SERVICE:** _No_

**TYPE OF DISCHARGE & RANK:** _____

**SPECIAL AWARDS/DISCIPLINARY ACTIONS:** _____

## RELATIONSHIPS

**NUMBER OF MARRIAGES:** _1_

**NAME, AGE, OCCUPATION, PERSONALITY OF CURRENT PARTNER:**
_Joe Williams - 94-2000_

**HX & STATUS OF CURRENT RELATIONSHIP:** _Deceased -_
_Husband had cancer - last yr. of marriage was hard -_

**OTHER MARRIAGES/SIGNIFICANT RELATIONSHIPS:** _Had a sexual_
_rel. - eight months affair_

**DOMESTIC VIOLENCE:** _____

**GENDER/AGES OF CHILDREN:** _2   Ages - Boy Girl   6 - 5 yrs_

**DESCRIPTION OF CHILDREN (SPECIAL PROBLEMS?):** _____

**RELATIONSHIP WITH CHILDREN:** _____

**MISCARRIAGES/ABORTIONS:** _____

## (RELATIONSHIPS CONTINUED)

**AGE/CIRCUMSTANCES OF FIRST EXPOSURE TO DATING & SEX:** _____

_____

**ATTITUDE ABOUT SEX:** _____

**HX OF SEXUAL FUNCTIONING (OVERALL/CURRENT):** _____

_____

## PSYCHOLOGICAL HISTORY

**INPATIENT FACILITY & DOCTOR:**                    **DATES/LENGTH:**

**OUTPATIENT PRACTITIONERS:**          **DATES/FREQUENCY:**
*Candy Rhode, MA.*                         *1X w/k for 3yrs -*

**HX OF COT?:** _____

**OUTCOME OF TX (PSYCHOTROPICS/DIAGNOSES):** _-_ ____

**TX COMPLIANCE/BENEFIT:** _____

**CURRENT MEDICATION(RX, NON-RX, HERBS):** *Ativan 1mg* · *Dr. Belogia*
*25. mg. Zoloft      100 mg. Seroquel 5* / *Dr. Perry*

**CURRENT COMPLIANCE (LAST DOSAGE):** _____     *WrH*

**FAMILY HISTORY OF ABUSE/MENTAL ILLNESS/SUBSTANCE USE:**
*G.F. Alcoholic; Aunt (mom's sister) bing*

**TEMPER/ANGER (DTO: EASILY AGITATED, LOSE CONTROL):** _____
*No - Cry -*

*always see the best in people.*
*Anger is a sin - forgive*
*& love ·*

## PSYCHOSOMATIC SYMPTOMS

**HEADACHES:** *no*       **DIZZINESS:** *no*
**BACKACHES:**            **PALPITATIONS:**
**STOMACH/GI SX:**        **FATIGUE:**
**ALLERGIES:**            **NUMBNESS:**

**SLEEP DISTURBANCES:** *S.I. — Stress / also Nightmares.*

**CHANGES IN APPETITE:** *NC*

## PSYCHOPATHOLOGICAL SYMPTOMS

**HALLUCINATIONS:** *No*

**DELUSIONS:** *No*
**PARANOIA:**
**GRANDIOSITY:** *No*

**DEPRESSION:** *Yes — S.I. — / S.A.*

*Cut my arm inside*

**DTS:**
**MANIA:** *none — Since being in*

**PANIC/AGORAPHOBIA:** *Jail. After being*
**PHOBIAS:**
**OBSESSIONS/COMPULSIONS:** *Sensed papers about,*
**PTSD:**
**GAD:** *Seeming mental d.*

**SEXUAL DYSFUNCTIONS:** *Fear n abstile of Intercourse.*
**PARAPHILIAS:**
**GENDER ID:** *Female*

**ANOREXIA:**
**BULIMIA/ BINGE:** *No*

**INTERMITTENT/EXPLOSIVE:**
**PYRO/KLEPTO/TRICHO/GAMBLING:**
**DISSOCIATION/UNREALITY:**

**PERSONALITY D/O (STRENGTHS/WEAKNESSES):**

*Started Embezz. From Job. )) Fired
Stole $18000 in 4 yrs — )) From Job.*

## MEDICAL AND NEUROLOGICAL

**CURRENT GENERAL HEALTH:** _WNS_ —
**HEALTH HX (ILLNESSES, OPERATIONS, ACCIDENTS):** _____

**HX OF NEUROLOGICAL INJURIES/PROBLEMS:** _no_

**COGNITIVE FUNCTIONING/MEMORY:** _____

**OTHER UNTREATED PAIN/COMPLAINTS:** _no_

### SUBSTANCE USE

**AGE STARTED ALCOHOL:** _21_
**USUAL TYPE OF ALCOHOL:** _Wine Coolers_
**AVERAGE, PEAK, LONGEST WITHOUT:**
_Intox 3 to 4 X's in life_ —
**ROUTINE:**
**EFFECTS (INTOX, BLACKOUTS, SOC/OCC FUNCTION, TOL/WITHD):** _____

**CURRENT USE (LAST 30 DAYS):** _____

**AGE STARTED DRUGS:** _no_
**TYPES OF DRUGS:** _____

**AVERAGE, PEAK, LONGEST WITHOUT:** _____

**ROUTINE/PARAPHERNALIA:** _____

**EFFECTS (BLACKOUTS, SOC/OCC FUNCTION, TOL/WITHD):** _____

**CURRENT USE (LAST 30 DAYS):** _____

**CAFFEINE INTAKE:** _no_
**CIGARETTE USE:** _no_
**OVERALL DRUG OF CHOICE:** _alcohol_
**TREATMENT:** _no_

## CRIMINAL/LEGAL

**JUVENILE ARRESTS:**      **DATE:**      **DISPOSITION:**

*No*

**ADULT ARRESTS:**      **DATE:**      **DISPOSITION:**

*1st Time*

**WEAPONS (TRAINING, BELIEFS, OWN?):** *No — children has guns & knives*

**FAMILY HX OF CRIMINAL BEHAVIOR:** *Bio father in prison for molestation*

**FUNCTIONING IN JAIL:** *I Adjusted — Either Sink a swim —*

**LITIGATION HISTORY:**

## CURRENT FUNCTIONING

**LIVING SITUATION/OTHERS IN HOME:** *Jail*

**DAILY ROUTINE:**

**CURRENT INTERESTS (FREE TIME):**

**CURRENT PEER & SUPPORT GROUPS:**

**STRESSES (LEGAL/FINANCIAL PROBLEMS):**

**STATEMENTS**

Married Joe (Age 26) Wendi (23) 1994
Married in Casa Grande -
Religious conflict over Church -
Initially marriage was OK - marriage
was diff - both felt we changed -
we didn't have to put on "airs"
pretend who we were - it was fine
for me - use to hang out c his friends
lost touch c mine - He had a
Corner Chg - was welding - then
Auto Re. placement (Glass) - got a
loan - Started Joe's windshield Repair
Rented a House - moved to the farm
to a shack - old store, we living
lived there until March 98 -
had my 1st child in there -
[illegible] months in marriage - He had [illegible]
got [illegible] fired - then [illegible] came back - 1996
1994 - Got a good [illegible] manager - He spent
the money on pleasure things - then I
had to put money in the business from
my job - overwhelmed by Debt -
Felt Responsible for our happiness, "what
more can I do" - Stole $18,000

**RULE 11/26.5**

UNDERSTANDS CHARGES: *[handwritten text]*

UNDERSTANDS PLEAS (G/NG): *[handwritten text]*

UNDERSTANDS COURT ROLES: *[handwritten text]*

*[handwritten text]*

ABILITY TO HELP LAWYER: *[handwritten text]*

UNDERSTANDS CONSTITUTIONAL RIGHTS: *[handwritten text]*

UNDERSTANDS WAIVER OF RIGHTS WITH GUILTY PLEA: _____

COMPETENCE TO STAND TRIAL: _____

COMPETENCE RELATED TO MEDS?: _____

AMENABILITY TO TREATMENT: _____

DANGER TO COMMUNITY: _____

(IF REQUESTED) MENTAL STATUS AT OFFENSE: _____

# MMPI-2™ Minnesota Multiphasic Personality Inventory-2™

Name Wendi Andriano

## Harris-Lingoes and Si Subscales Score Record

Excerpted from the MMPI-2™ (Minnesota Multiphasic Personality Inventory-2™) Manual for Administration, Scoring, and Interpretation, Revised Edition. Copyright © 2001 The Regents of the University of Minnesota. All rights reserved.
Distributed exclusively under license from the University of Minnesota by NCS PEARSON, INC., P.O. Box 1416, Minneapolis, MN 55440   800-627-7271   http://assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

FEMALE



| Raw Score | D₁ | D₂ | D₃ | D₄ | D₅ | Hy₁ | Hy₂ | Hy₃ | Hy₄ | Hy₅ | Pd₁ | Pd₂ | Pd₃ | Pd₄ | Pd₅ | Pa₁ | Pa₂ | Pa₃ | Sc₁ | Sc₂ | Sc₃ | Sc₄ | Sc₅ | Sc₆ | Ma₁ | Ma₂ | Ma₃ | Ma₄ | Si₁ | Si₂ | Si₃ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score | 14 | 1 | 5 | 4 | 3 | 6 | 9 | 5 | 2 | 7 | 2 | 2 | 4 | 5 | 4 | 2 | 3 | 7 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 4 | 4 | 2 | | | |
| T Score | 16 | 57 | 63 | 57 | 58 | 61 | 99 | 59 | 45 | 77 | 50 | 46 | 52 | 54 | 53 | 51 | 53 | 60 | 39 | 40 | 46 | 44 | 46 | 45 | 54 | 55 | 56 | 43 | | | |

ABCD-2001

NCS Assessments

Product Number
24006

# MMPI-2™  Minnesota Multiphasic Personality Inventory-2™

## Profile for Validity and Clinical Scales

Excerpted from the MMPI-2™ (Minnesota Multiphasic Personality Inventory-2™) Manual for Administration, Scoring, and Interpretation, Revised Edition. Copyright © 2001 The Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS PEARSON, INC., P.O. Box 1416, Minneapolis, MN 55440  800-627-7271  http://www.assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

Name  Wendi Andriano

Address _____

Occupation _____  Date Tested _____

Education _____  Age ____  Marital Status _____

Referred by _____

MMPI-2 Code _____

Scorer's Initials _____

**FEMALE**

Raw Score:  6  9  5  ___  6  21  7  30  32  21  37  14  11  5  18  20

7 Raw Score  0

K to be Added  11      8      21  21  4

A B C D 2001

Raw Score with K  18      29      32  26  22



Product Number
24001

# MMPI-2™ Minnesota Multiphasic Personality Inventory-2™

**Profile for Supplementary Scales**

Copyright © 1986 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved. Copyright © 1942, 1943 (renewed 1970), 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved. Distributed exclusively by National Computer Systems, Inc., P.O. Box 1416, Minneapolis, MN 55440. 800-627-7271 www.ncs.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS logo is a registered trademark of National Computer Systems, Inc.

Name _____
Address _____
Occupation _____  Date Tested __/__/__
Education ____ Age ____ Marital Status _____
Referred By _____
Scorer's Initials _____



**LEGEND**

| | |
|---|---|
| A | Anxiety |
| R | Repression |
| Es | Ego Strength |
| MAC-R | MacAndrew Alc. |
| AAS | Addiction Admiss |
| APS | Addiction Potenti |
| MDS | Marital Distress |
| O-H | Overcon. Host. |
| Do | Dominance |
| Re | Social Responsibility |
| Mt | College Maladjustment |
| GM | Gender Role-Masculine |
| GF | Gender Role-Feminine |
| PK | Post Trauma-Keane |
| PS | Post Trauma-Schlenger |
| Si1 | Shyness/Self Consciousness |
| Si2 | Social Avoidance |
| Si3 | Alienation – Self and Others |
| Fb | Back F |
| VRIN | Variable Resp. Incon. |
| TRIN | True Resp. Incon. |

FEMALE

| | Raw Score | |
|---|---|---|
| A | 13 | 52 |
| R | 21 | 62 |
| Es | 34 | 49 |
| MAC-R | 24 | 56 |
| AAS | 4 | 61 |
| APS | 25 | 55 |
| MDS | 4 | 57 |
| O-H | 15 | 55 |
| Do | 13 | 39 |
| Re | 21 | 50 |
| Mt | 16 | 55 |
| GM | 21 | 37 |
| GF | 36 | 48 |
| PK | 12 | 55 |
| PS | 7 | 45 |
| Si1 | 1 | 38 |
| Si2 | 0 | 38 |
| Si3 | 3 | 44 |
| Fb | 2 | 50 |
| VRIN | 6 | 54 |
| TRIN | 9 | 60 |

BC DEF



Product Number
24004

# MMPI-2™ Minnesota Multiphasic Personality Inventory-2™



The VRIN scale consists of 49 pairs of specially selected items. The members of each VRIN item pair have either similar or opposite content; each pair is scored for the occurrence of an inconsistency in responses to the two items. The scale score is the total number of times item pairs are answered inconsistently. (Refer to the *MMPI-2 Manual for Administration, Scoring, and Interpretation* for directions on interpreting scores.)

**Directions for scoring:**

1. Transfer responses to the item pairs from the answer sheet to the recording grid on the right by blackening in the appropriate circle:
   Example:  If response to item 6 was false    6   ⓉⒺ

2. Place the scoring template VRIN-1 over the grid; in the blank provided in the third column, enter a "+" (plus sign) for each item pair in which both template boxes show a blackened response.
   Example:  The response 3 ●Ⓕ    39 ●Ⓕ  would receive a "+" because both boxes of the scoring template show a blackened response.

3. Do the same for scoring template VRIN-2.

4. Total the +'s and record the total score.

| | | | | |
|---|---|---|---|---|
| 3 Ⓣ● | | 39 ●Ⓕ | | |
| 6 ●Ⓕ | | 90 ●Ⓕ | | |
| 9 ●Ⓕ | | 56 Ⓣ● | | |
| 29 Ⓣ● | | 59 Ⓣ● | | |
| 31 Ⓣ● | | 299 Ⓣ● | | |
| 32 Ⓣ● | | 316 Ⓣ● | | |
| 40 Ⓣ● | | 176 Ⓣ● | | |
| 48 Ⓣ● | | 265 Ⓣ● | | |
| 48 Ⓣ● | | 184 ●Ⓕ | | |
| 49 ●Ⓕ | | 280 Ⓣ● | | |
| 73 ●Ⓕ | | 377 ●Ⓕ | | |
| 81 ●Ⓕ | | 284 Ⓣ● | + |
| 83 ●Ⓕ | | 288 Ⓣ● | | |
| 84 ●Ⓕ | | 105 Ⓣ● | + |
| 86 ●Ⓕ | | 369 ●Ⓕ | | |
| 95 ●Ⓕ | | 388 Ⓣ● | | |
| 99 Ⓣ● | | 138 Ⓣ● | | |
| 103 Ⓣ● | | 344 Ⓣ● | | |
| 110 Ⓣ● | | 374 Ⓣ● | | |
| 119 Ⓣ● | | 430 Ⓣ● | | |
| 125 Ⓣ● | | 195 Ⓣ● | | |
| 135 Ⓣ● | | 482 Ⓣ● | − |
| 136 Ⓣ● | | 507 Ⓣ● | | |
| 152 ●Ⓕ | | 464 Ⓣ● | | |
| 161 Ⓣ● | | 185 Ⓣ● | | |
| 165 ●Ⓕ | | 565 Ⓣ● | | |
| 166 ●Ⓕ | | 268 ⓉⒺ | + |
| 167 Ⓣ● | | 243 Ⓣ● | | |
| 186 ●Ⓕ | | 415 ●Ⓕ | | |
| 199 Ⓣ● | | 467 Ⓣ● | | |
| 226 Ⓣ● | | 267 Ⓣ● | | |
| 259 Ⓣ● | | 333 Ⓣ● | | |
| 262 ●Ⓕ | | 275 Ⓣ● | | |
| 290 ●Ⓕ | | 556 ●Ⓕ | | |
| 339 Ⓣ● | | 394 ●Ⓕ | | |
| 348 Ⓣ● | | 515 Ⓣ● | | |
| 350 ●Ⓕ | | 521 Ⓣ● | | |
| 353 ●Ⓕ | | 370 ●Ⓕ | | |
| 364 Ⓣ● | | 554 Ⓣ● | | |
| 369 ●Ⓕ | | 421 Ⓣ● | | |
| 372 ●Ⓕ | | 405 ●Ⓕ | | |
| 380 Ⓣ● | | 562 ●Ⓕ | | |
| 395 Ⓣ● | | 435 Ⓣ● | | |
| 398 Ⓣ● | | 403 ●Ⓕ | − |
| 411 Ⓣ● | | 485 ●Ⓕ | | |
| 472 Ⓣ● | | 533 Ⓣ● | | |
| 491 ●Ⓕ | | 509 ●Ⓕ | − |
| 506 Ⓣ● | | 520 Ⓣ● | | |
| 513 Ⓣ● | | 542 Ⓣ● | | |

VRIN Total   10

Form for use with the MMPI-2 test as published and copyrighted by the Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS Pearson, Inc., P.O. Box 1416, Minneapolis, MN 55440.
800-627-7271  http://assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

Product Number
24007



# MMPI-2

**Minnesota Multiphasic
Personality Inventory-2™**

The TRIN scale consists of 20 pairs of items that are opposite in content. If a subject responds inconsistently by answering True to both items of certain pairs, one point is added to the TRIN score; if the subject re-sponds inconsistently by answering False to certain item pairs, one point is sub-tracted. (Refer to the *MMPI-2 Manual for Administration, Scoring, and Interpretation* for directions on interpreting scores.)

**Directions for scoring:**

1. Transfer responses to the item pairs from the answer sheet to the recording grid on the right by blackening in the appropriate circle:
   Example: If response to item 3 was false    3  ① ●

2. Place the scoring template TRIN-1 over the grid; in the blank provided in the third column, enter a "+" (plus sign) for each item pair in which both template boxes show a blackened response.
   Example: The response  3 ● ⑤    39 ● ⑤  would receive a "+" because both template boxes show a blackened response.

3. Count the number of "+"s and enter the TRIN-1 total.

4. Place the TRIN-2 scoring template over the grid; in the blank provided in the third column, enter a "-" (minus sign) for each item pair in which both template boxes show a blackened response.

5. Count the number of "-"s and enter the TRIN-2 total.

6. Subtract the TRIN-2 total from the TRIN-1 total and enter the result.

7. Add 9 points to obtain the TRIN total.
   Example:  TRIN-1 total     2
            TRIN-2 total    −1
                             1
                            +9
            TRIN Total     10

| | | |
|---|---|---|
| 3 ① ● | 39 ● ⑦ | |
| 9 ● ⑦ | 56 ① ● | |
| 12 ① ● | 166 ● ⑦ | |
| 40 ① ● | 176 ① ● | |
| 48 ① ● | 184 ● ⑦ | |
| 63 ① ● | 127 ● ⑦ | |
| 65 ① ● | 95 ● ⑦ | |
| 73 ● ⑦ | 239 ① ● | |
| 83 ● ⑦ | 266 ① ● | |
| 99 ① ● | 314 ● ⑦ | |
| 125 ① ● | 195 ① ● | |
| 140 ① ● | 198 ● ⑦ | |
| 152 ① ● | 484 ① ● | |
| 165 ● ⑦ | 565 ① ● | |
| 209 ● ⑦ | 351 ● ⑦ | |
| 262 ● ⑦ | 275 ① ● | |
| 265 ① ● | 360 ● ⑦ | |
| 359 ● ⑦ | 367 ① ● | |
| 377 ● ⑦ | 534 ① ● | |
| 555 ● ⑦ | 560 ● ⑦ | + |

TRIN-1      1

− TRIN-2    1

-           0

           +9

TRIN TOTAL  9

Form for use with the MMPI-2 test as published and copyrighted by the Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS Pearson, Inc., P.O. Box 1416, Minneapolis, MN 55440.
800-627-7271  http://assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

A B C D 2000



Product Number
24007

# MMPI-2™ Minnesota Multiphasic Personality Inventory-2™

**Profile for Content Scales**

Excerpted from the MMPI-2™ (Minnesota Multiphasic Personality Inventory-2™) Manual for Administration, Scoring, and Interpretation, Revised Edition. Copyright © 2001 The Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS PEARSON, INC., P.O. Box 1416, Minneapolis, MN 55440   800-627-7271   http://www.assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

Name **Wendi Andriano**
Address
Occupation _____   Date Tested _____
Education _____ Age ____   Marital Status _____
Referred by
MMPI-2 Code

Scorer's Initials



**FEMALE**

|       | ANX | FRS | OBS | DEP | HEA | BIZ | ANG | CYN | ASP | TPA | LSE | SOD | FAM | WRK | TRT |
|-------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Raw Score | 15 | 7 | 6 | 7 | 4 | 3 | 0 | 7 | 8 | 5 | 9 | 3 | 3 | 10 | 7 |
|       | 69 | 51 | 50 | 54 | 46 | 56 | 32 | 47 | 54 | 43 | 57 | 41 | 42 | 52 | 55 |

A B C D 2001


NCS assessments™

Product Number
24002

## Part II

Instructions: Complete the following by filling in either a number or a letter for each dash ( _____ ). Do the items in order, but don't spend too much time on any one item.

EXAMPLE: A B C D _E_

(1) 1 2 3 4 5 _6_

(2) white black   short long   down _u_ _p_

(3) AB . BC   CD   D _E_

(4) Z Y X W V U _T_

(5) 1 2 3 2 1   2 3 4 3 2   3 4 5 4 3   4 5 6 _6_ _2_

(6) NE/SW   SE/NW   E/W   N/ _S_

(7) escape   scape   cape _a_ _p_ _e_

(8) oh ho   rat tar   mood ___ _a_ _a_ ___

(9) A Z B Y C X D _W_

(10) tot tot   bard drab   537 _7_ _3_ _5_

(11) mist is   wasp as   pint in   tone _a_ _a_

(12) 57326   73265   32657   26573 _6_ _5_ _7_ _3_ _2_

(13) knit in   spud up   both to   stay _a_ _t_

(14) Scotland   landscape   scapegoat _g_ _o_ _a_ _t_ ee

(15) surgeon 1734567   snore 17635   rogue _1_ _5_ _3_ _7_ _6_

(16) tam tan   rib rid   rat raw   hip _b_ _i_ _t_

(17) tar pitch throw   saloon bar rod   fee tip end   plank _t_ _a_ _b_ _l_ _e_ meals

(18) 3124   82   73   154   46   13 _42_

(19) lag leg   pen pin   big bog   rob _r_ _u_ _b_

(20) two w   four r   one o   three _t_

_IQ~110_

| Summary Scores | | | |
|---|---|---|---|
| V: Raw _32_ T_____ | A: Raw _20_ T_____ | Total: Ra_68_ T_____ | |
| CQ: _____ | AQ: _____ | Est. IQ: _____ | |

Exhibit 7

1
2
3
4
5
6
7
8

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

9 State of Arizona,                          )
                                            )
10                        Respondent,        )    No. CR2000-096032-A
                                            )
11        vs.                               )    **DECLARATION OF**
                                            )    **G. DAVID DELOZIER**
12                                          )
   Wendi Elizabeth Andriano,                )
13                                          )    (Assigned to the Hon. Douglas Rayes)
                          Petitioner.        )
14                                          )
                                            )
15 _____)

16

17    1.    I served as counsel to Wendi Andriano during her first degree murder trial in

18 connection with the death of her husband, Joseph Andriano.

19

20    2.    Prior to Wendi's case, I had never tried a death penalty case. I had some

21 criminal defense experience starting in the mid-1990s, including some felony cases. I also

22 played a secondary role in a couple second-degree murder cases in the late 1990s, similar

23 to the role I ultimately assumed in Wendi's case. I had never worked on a criminal matter

24 comparable to the magnitude of Wendi's case.

25

26    3.    The Public Defender's Office initially represented Wendi along with *Knapp*

27 counsel Leon Thikoll. I assumed representation of Wendi's case on December 2, 2000,

28

MADI_2575622.1

1   after speaking with Pastor Andrew Cunningham, a friend of the Ochoas. For several

2   months in early 2001, I had sole representation of Wendi, taking over for both Attorney

3   Thikoll and the Public Defender's Office. The Public Defender's Office resumed the lead

4

5   role in the case in mid-2001, when it became clear that the cost and expense of the case

6   would be prohibitive for Wendi and her family to pursue with privately retained counsel.

7

8       4.      Prior to the Public Defender's resumption of representation in mid-2001, I

9   sought the appointment of experts and was actively involved in the preparation of the case.

10

11      5.      My active involvement in the case ceased when the Public Defender's Office

12  resumed primary responsibility for the case in mid-2001. Dan Patterson was the attorney

13  assigned to Wendi's case from the Public Defender's Office, and from our first meeting in

14  September 2001 forward, I understand that my role was to be passive—providing

15  assistance on discrete tasks when requested by Attorney Patterson—rather than taking the

16

17  lead on any aspects of the pre-trial preparation or investigation. From that time forward, I

18  did not assume responsibility for any tasks related to Wendi's case unless Attorney

19  Patterson asked for my assistance. Because I viewed my role in the case as limited to

20

21  tasks that Attorney Patterson assigned me, I did not continue to pursue my own

22  investigation of the case after Attorney Patterson's appointment.

23

24      6.      Attorney Patterson rarely requested my assistance in Wendi's case. He only

25  met with me a few times total between our first meeting in 2001 until Wendi's trial in

26  August 2004, and he rarely communicated with me by phone. Attorney Patterson

27  frequently failed to return my calls and correspondence when I attempted to contact him

28                                               2

MADI_2575622.1

about Wendi's case. Attorney Patterson did not inform me which witnesses he wanted me to examine until after the trial was underway.

7.     As a result, I worked on very limited, discrete tasks in the months leading up to the trial. My billing records indicate that I spent a total of 36.35 hours working on the case during a seven-month time period (December 2003 through June 2004) prior to trial.

8.     I communicated with Wendi regularly during the time leading up to trial. These meetings were primarily to discuss topics unrelated to her case, such as family and our belief in God. I viewed my role with Wendi as a combination of an attorney and a spiritual counselor. One of the primary goals of my meetings with Wendi was to provide psychological and religious support. Because I was not routinely kept "in the loop" on case strategy and progress by Attorney Patterson, I generally did not communicate with her regarding matters relating to the substance of her case.

9.     I fasted during Wendi's trial to provide spiritual insight. I went 70 days without eating any solid food, although I did consume fruit juices during this time.

10.     An attorney that worked in my law firm, Justin Blair, was murdered during Wendi's trial. I was devastated by this loss and found it very difficult to focus on Wendi's case after this happened. I believe that this loss also greatly affected my concentration and performance during the trial. Additionally, Mr. Blair's death was disruptive because Mr. Blair had assisted me with Wendi's case, both by performing legal research and helping me prepare for direct examination of the defense witnesses.

3

MADI_2575622.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11.    On at least one day during the trial (October 20, 2004), I felt weak to the extent that I began trailing off toward the end of my direct examination of William Joe Collier, a witness who testified regarding sodium azide, and realized that I was unable to follow along during the prosecutor's cross-examination of Mr. Collier. Midway through the cross-examination, Attorney Patterson recognized that I was feeling ill and asked the Court to adjourn early.

12.    Attorney Patterson requested that I be the principal lawyer involved in preparing and presenting Wendi's mitigation case in the spring of 2004. Attorney Patterson did not participate in preparing or presenting the mitigation case until after the verdict.

13.    I met with some of Wendi's friends and family to research the mitigation case and then narrated a Power Point prepared by Scott Mac Leod with photographs of Wendi during the mitigation case. I initially requested that Donna Ochoa, Wendi's mother, write the script for the Power Point. Donna recommended that a family friend, Cindy Schaider, write the script, which I later read during the Power Point.

14.    I only met with Scott Mac Leod, the mitigation specialist from the Public Defender's Office, a few times before Wendi's trial and had minimal contact by phone. When I did see him, he appeared tired and preoccupied. Other than Scott's preparing the slides for the Power Point presentation I narrated, we did not coordinate on the mitigation portion of the case.

4

15.     I was aware of information while preparing for trial that suggested that

Wendi had mental health problems and a history of childhood sexual abuse.  For example,

I communicated with Kandi Rohde, a mental-health counselor who treated Wendi during

her pre-trial incarceration.  Wendi authorized Ms. Rohde to communicate to me

information disclosed during her counseling sessions, and Ms. Rohde frequently contacted

me regarding her concerns about Wendi's mental health.  On February 19, 2001, Ms.

Rohde sent me a letter urging that I pursue a psychiatric consultation for Wendi.  Ms.

Rohde's February 19, 2001 letter is attached as Exhibit A.  Ms. Rohde's letter indicated

that Wendi displayed symptoms of a personality disorder and emphasized that Wendi's

mother had reported that Wendi was sexually abused by her paternal grandfather.  *See* Ms.

Rohde's February 19, 2001 letter at p. 1.

16.     Ms. Rohde also sent me a letter on March 12, 2001, which is attached as

Exhibit B.  In her letter, Ms. Rohde reported that she believed Wendi had been sexually

molested by her paternal grandfather as a child and that Wendi suffered from

depersonalization disorder, dissociative amnesia, and a personality disorder and asked that

I seek a psychological examination of Wendi.  *See* Ms. Rohde's March 12, 2001 letter at p.

1-2.

17.     On several occasions, Ms. Rohde sent me her notes from the counseling

sessions, including sessions held on September 29, 2003 and October 2, 2003.  Ms.

Rohde's notes from the sessions are attached as Exhibit C.  These sessions occurred

shortly after Wendi attempted suicide, requiring emergency medical treatment and

5

MADI_2575622.1

1    placement in a psychiatric facility.  Ms. Rohde's notes from these counseling sessions

2    detailed Wendi's psychiatric symptoms of anxiety and distress.  *Id.*

3

4        18.    Dr. Jack Potts conducted a competency evaluation of Wendi in March of

5    2001.  Dr. Potts' competency report, which I received prior to Wendi's trial, is attached as

6    <u>Exhibit D</u>.  Dr. Potts' report noted Wendi's depression and memory problems, urging that

7

8    Wendi's mental health be independently evaluated.  *See* Dr. Potts' Report, p. 2-3.

9        19.    I was not aware that Dr. Richard Rosengard had performed an additional

10   competency evaluation of Wendi in August of 2002.

11

12       20.    Dr. Michael Bayless conducted a psychological evaluation of Wendi for the

13   prosecution and issued a report dated August 4, 2004, which I received prior to Wendi's

14

15   trial.  Dr. Bayless's report is attached as <u>Exhibit E</u>.  In his report, Dr. Bayless diagnosed

16   Wendi with depressive disorder and personality disorder with antisocial and borderline

17   traits.  *See* Dr. Bayless's Report, p. 9.  Dr. Bayless also noted that Wendi reported a

18   history of childhood sexual abuse by her paternal grandfather and biological father, and

19

20   that Wendi's biological father was currently in prison for child molestation of his step-

21   daughter.  *Id.* at 2.

22

23       21.    I was generally aware that Wendi was taking psychoactive medications prior

24   to and during trial.  I did not monitor her medications.

25

26       22.    I was also aware of Wendi's grueling schedule during the trial.  Each day

27   during her trial, Wendi was required to wake up at 1:00 a.m. to prepare to be transported to

28                                          6

MADI_2575622.1

1   Madison Jail, where she was held from 2:20-7:30 a.m. in a holding cell.  At 7:30 a.m.,

2   Wendi was transported to Mesa Courthouse.  Wendi reported difficulty getting adequate

3
    sleep and exhaustion during her trial.  Wendi was also provided only two meals each day
4
5   during her trial – one at 3:00 a.m. and one at 6:30 p.m.  Wendi reported hunger during her

6   trial.  A handwritten note by Wendi from during her trial detailing her daily schedule is

7   attached as Exhibit F.  A letter from Wendi's healthcare providers during her incarceration

8
    at Durango Jail, expressing concern regarding her lack of adequate meals, is attached as
9
10  Exhibit G.

11
12  23.     I did not investigate Wendi's personal and family history of mental health

13  problems or engage a psychiatrist or neuropsychologist to evaluate Wendi's mental health.

14  I sent copies of some of Kandy Rohde's notes regarding Wendi's mental health to

15  Attorney Patterson, but he did not ask me to follow up.  I know of no strategic reason for

16
    not investigating Wendi's personal and family history of mental health problems.
17

18  24.     I did not investigate Wendi's history of possible childhood abuse.  I know of

19
    no strategic reason for not investigating childhood abuse of Wendi.
20

21  25.     I provided several boxes containing true and correct copies of documents

22
    from my file relating to Wendi's case to her post-conviction relief counsel.  All materials
23
24  provided (except for post-trial materials) were available to me at or before the time of

25  Wendi's trial.

26
27  26.     I declare under penalty of perjury that the foregoing is true and correct.

28                                              7

MADI_2575622.1

1    DATED this 7th day of June, 2011.

2

3    _____
     David DeLozier
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

MADI_2575622.1

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 21 2001 12:47PM P2

Feb-21-01 07:28A                                          310 836 0695          P.01

H. Kandy Rohde, CPC
5507 East Shea Blvd.
Scottsdale AZ 85254
(480) 443-9313

Law Offices of G.David DeLozier
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

February 19, 2001

Dear Mr. DeLozier,

I have been meeting with Wendi Andriano, and I recommend that a psychiatrist be called in to examine her. I believe that her willingness to give up her will to others is a symptom of some kind of personality disorder. I also suspect that her defense system includes dissociation. Her mother's reference to possible abuse by Wendi's paternal grandfather could be the origin of that dissociation. The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional.

It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist. Ideally I would like to have him or her administer personality tests and perhaps interview Wendi under hypnosis. I would also hope she could be evaluated for medication.

Please let me know if this is possible and if I can confer with the professional she chooses. Thank you.

Sincerely,

H.Kandy Rohde, CPC

EXHIBIT

A

H.Kandy Rohde
Certified Professional Counselor
5507 East Shea Blvd.
Scottsdale AZ 85254
(480) 443-9313

Law Offices of G.David DeLozier
4016 East Forest Pleasant Place
Cave Creek AZ 85331

March 12, 2001

Dear Mr. DeLozier,

I have been meeting with Wendi Andriano since January 9, 2001. I have
seen her for eight sessions of counseling totaling thirteen and one half hours. I suspect that
she was molested by her natural father and/or grandfather when she was less than four
years old. She seems to have begun dissociating as a defense beginning as a very young
child and continuing until today. She told me that she has no trouble remembering events
in her life, even stressful events, yet when I asked her about her childhood, her marriage
and her imprisonment she was unable to recall large sections of her history. After I
brought that to her attention, she spoke to her mother who said that Wendi habitually
"forgot" anything that was unpleasant. She said that, as a child, Wendi would go sit in a
large closet to disappear from anything that she found stressful. Wendi said that she
found life easier if she "didn't think about things are upsetting." Wendi reports being
content in jail and says that she does not worry about the ultimate possibilities that
threaten her. Wendi describes the weeks prior to Joe's death as a time in which she felt
detached from her own feelings. She said she could see herself and questioned her lack
of feeling, but still had no feelings.

In addition to my belief that she is the victim of sexual molestation and that she
suffers from Depersonalization Disorder as well as Dissociative Amnesia, I believe she
exhibits the symptoms of the Cluster C Personality Disorders. She seems to have
desperately needed the relationship with Joe, and she was willing to give up her friends,
freedom and individual choice to be with him. She was preoccupied with complying
with his requirements and drove herself to exhaustion meeting his demands. She would
take on every task to keep him from becoming frustrated and angry. She would sacrifice
her identity and social life to fit in with his expectations. She has a deep fear of
confrontation and she spent her life keeping him from yelling at her. She believed that if
she always complied with his wishes, he would be nice to her. She rationalized this by
saying to herself that his expectations were reasonable and that she deserved his anger
when she did not meet his expectaions.

I believe she was the victim of emotional abuse as well as some physical abuse
during her marriage. I think she was able to cope by dissociating and rationalizing. She

007110



EXHIBIT
B

became more and more isolated from her friends and family to please him and because she was ashamed and wanted to paint the best possible picture of her marriage.

I think Wendi suffers from serious psychological disorders and am anxious to have examined by another professional for a second opinion. If I can be of assistance to that person, please let me know. I intend to continue seeing Wendi. Our goals are to help her learn to establish and enforce boundaries so that she can live a life defined by her standards rather than giving herself up to others.

Sincerely,

H. Kandy Rohde, CPC

007111

Sep 30 03 05:14p
4803680704
P.1

*To David*
*From Kandy*

CONFIDENTIAL

giving herself up another is codependency and as long as she was asking Robin for the things that Wendi needs it is not that. She said that she had been in a spiteful adolescent drama with Robin and acknowledged that it was a power struggle. This seems appropriate for Wendi because the struggle for power is conscious and she does not feel guilty trying to get something for herself even when Robin calls her selfish. Wendi cried and said it had been very unpleasant. I urged her to speak frankly with Robin, not to give herself up and not to get even if she feels like Robin is engaging in a power play. I asked to call me if there is any physical violence because I believe it is mandatory that Wendi not befriend anyone who might abuse her physically. She agreed. She asked me to return in a week.

September 24, 2003 12:30-1:30

Met with Wendi in contact booth. She said that she had asked David to help Laurie Warren her former roommate and she was worried that Laurie had not met him this morning. Wendi said that Laurie had said that she would help Wendi in exchange. It seems that Wendi is trusting people unworthy of her trust. I asked if she were prepared to be disappointed and she cried. I suggested that she be aware of the differences between the jail culture and the outside culture. She said that she still knew how she was and would be able to return to a less threatening dramatic world. Will speak to Dave. Wendi said that Dr. Garcia has still not returned. I am concerned that she needs to see him to cut the ativan down from the 4 mg she is now taking.

September 29, 2003 6:15 pm -8:15 pm

Received a call from David that Wendi was in the psych ward at Durango after a suicide attempt. Met with Wendi face to face in psych ward. She was very thin and pale. Her

UUU364



◄◄03680704                        P.2

hands were cold. She cried on and off, but generally seemed possessed. She said that she had reached her breaking point with Robin and her clique who were manipulating and threatening her. She said that she had begun to feel anxious aand upset Wednesday night. She said that Baby was in the next pod and she had been talking to her through the glass. She said that Robin had become angry and possessive. Wendi said that she could not ignore Robin anymore. She said that she asked the guards to get her out. She asked to be transferred to the pod that Baby was in. The guard agreed to put Wendi in voluntary lock down until an evaluator could come and see if it would be safe to drop the "keep away" from Baby. Wendi said that by the third day she feared that she would be left in lock up indefinitely. She said that she was terrified of an extended stay there because of the emotional strain of the last time she had been in solitary. The last time she was in for 10 days and the guards threatened her with 90 days if she ever went back again. It seemed at the time that the indeterminate sentence along with the lack of a valid reason for isolating her made her feel out of control of her own life. Wendi tries to find ways of coping that allow her to feel that there is some order to her life. She seems to become anxious when she perceives chaos. Wendi asked a guard whom she trusted to check her file and see when the evaluator was coming. The guard found out that Wendi was in involuntary lock down and no evaluator was scheduled. Wendi said that the confirmation of her worst fear set off an extreme sense of anxiety. She said that she felt trapped and could think of no way to manage her anxiety. She said that she tried listening to Christian music and praying, but that when the commercial came on she could no longer distract herself. She said that she calmly wanted to die. She said that she intentionally cut the vein at the fold of her elbow. She said that she had looked at pictures of her children and had written a

letter and had not cried. She said that she felt peace about escaping the angst. Wendi said that she watched the blood seep out and puddle calmly thinking that she wondered how long it would take. She said that she passed out at some point and woke up with bright lights in her eyes. She said that she was given blood and fluids in the hospital and was sent back on the bus to Estrella jail. She said that she had cut herself Saturday (late afternoon?) and had been in jail that night. Wendi said that she slipped in and out of consciousness on the bus. She said that they took her back to Durango to the psych hospital. At the hospital she was questioned by a nurse (?). The nurse spoke abusively to Wendi and insisted that Wendi stop blaming others for her suicide attempt. She put Wendi into a black molded restraint chair at about 5 a.m. Sunday. Wendi said that she had urinated on herself while she was unconscious. She said that she was cold and weak. She said that the woman left her in the restraints for 6 hours during which she would return and ask Wendi to admit responsibility. Wendi said that she could not move at all in the chair. She said that her body was held in a painful posture as she waited without knowing if and when the treatment would end. She said that she got no water or food and she felt weak, frightened and angry. She said that she tried to reason with the woman, but that she would not listen to Wendi's explanation. Wendi said that at 11 a.m. she was taken out of the restraint chair and was put in four point restraint on a cot. She said that this was also painful and that she could not sleep. She said that a doctor came out to see her and remove two of the restraints so that she could move enough to sleep. Wendi said that she tried to tell the hospital staff that she was not suicidal and that this was an impulsive act. She said that she felt like she was treated like a trouble maker rather than someone in distress.

066366

I spoke to the nurse on duty and the social worker (Laura). The nurse said that Wendi's medical records were at Estella not Durango. I asked if they were aware of the fact that Wendi had been prescribed 4 mg of ativan. They said that she was on 1mg twice a day. Wendi told me that they had cut her ativan from 4 mg to 2 mg on Wednesday. That was the day she began feeling unable to handle the anxiety. It seems that she would have been feeling rebound anxiety from the cut in her ativan which could reasonably have made it impossible to cope with the social stress of the pressure from Robin and her crowd as well as the fear of indefinite involuntary lock down. Laura assured me that Dr. Garcia was back and would handle Wendi's case at Estrella. Wendi said that she was cold and had asked for an extra blanket, but that they did not have her records authoriz ng another blanket. I asked the nurse and she said that she would write the request. She also said that Wendi was getting 2 prenatal vitamins as well as 2 mg of ativan and a seroquel for sleep. I am concerned that Wendi's weight is very low and she needs food water and rest to regain her health. Wendi said that she no longer wanted to die and would not do anything to hurt herself.

000307

Oct 03 03 11:19a          ADRIANO          *603680704          p.1

To: DAVID
FROM: KANDY          CONFIDENTIAL

Wendi Adriano October 2, 2003 3:30 – 4:45pm

Met with Wendi at Durango psych unit. She looked puffy and pale when I arrived and said that she had taken seroquel. She said that she had asked the doctors about it and they said that it was from the blood loss. By the end of the session she seemed less swollen. Wendi detailed the time line of the suicide attempt:

She cut her arm about 5 pm Saturday. She was aware of the second shift of guards when and they leave at 11 pm. She was aware of the third shift of guards who come on at 11 pm. She knows that she was in county hospital for some period of time, but she does not know how long. She knows that she told them that she was well enough to be transported back to jail. She remembers being on the bus to Estrella and that she was very cold. The third shift was on when she returned to Estrella. They go off at 5 am. Wendi recalls that she was put in the chair at Estrella at about 5:30 am. She said that she had no food or water since breakfast Saturday. She was locked in the chair until noon. The nurse scolded her several times telling her that she needed to be punished for what she did so she would not do it again. (Therapeutically, this is inappropriate because driving a suicidal person deeper into despair is more likely to increase suicidality.) Wendi said that she told the nurse that this was inhumane. Wendi said that she was shivering and her nails were blue. Wendi was taken out of the chair at noon and was told to stand up to get on the bus. She was too weak to stand and a guard (Branson) gave her bread. She ate the bread and was still too weak and he offered milk. Wendi said that she still couldn't stand and was in and out of consciousness. They were trying to chain her to another girl when Wendi fell. She said that she saw the milk on the floor. She said that the guards dragged her up the steps onto the bus. She was wet and couldn't lift her head. She said the transportation guards were saying "hurry and Stand" and she kept saying she couldn't and that she was going to pass out. She said that she was wet and too weak to lift her head so she only looked at the ground. Wendi slept on the bus and felt someone poke his finger into her chest to wake her. She said that they pulled her by the arm off the bus and put her into a wheel chair. When she got to D2 at Durango she got to change her wet clothes. She was four pointed on a cot. Wendi told the nurse what had happened and she got a doctor to look at Wendi. He allowed the restraints to be partially removed (two point) saying

Wendi said that the protocol for a suicide attempt is 6 hours in the chair if the attempt is more drama than suicide. Wendi's blood loss seems to have serious enough that this should have been viewed as a medical emergency as much as a psychiatric one. Punishing suicide attempts seems cruel and counterproductive at any rate.

At this visit Wendi expressed optimism about the trial and the attention she getting f.om the defense. She said that she finally believes the end is in sight. She said that she has adjusted to the current dose of ativan. I encouraged her to talk to Dr. Garcia about slowing weaning it down some more. She said that she is resting and reading and feels better, but is still extremely weak.

000368

# Andriano Trial Schedule

**1:00 AM**  Wake up, dress, wait for MCSO transportation

**2:00 AM**  Pickup by MCSO staff, transport to Madison Jail

**2:20 AM –
7:30 AM**  Housed in a holding cell; given one sack lunch; holding cell only has cold metal beds.

**7:30 AM**  Pickup by MCSO staff, transport to Mesa Courthouse

**8:00**  Housed in a holding cell until court time.

**8:30 AM –
5:00 pm**  Alternate between holding cell and court room; No food available.

**5:30 pm**  Pickup by MCSO staff, return to Durango Jail

**6:30 pm –
1:00 AM**  Dinner is served. Sleep for 5.5 hours; wake up and start routine again.

Please Note that food is supplied to inmate by MCSO at 3:00 AM and 6:30 pm. Due to the rigorous schedule, this is not sufficient food to allow the inmate to participate competently in her trial. Inmate has access to food through a jail commissary; however, MCSO rules prohibit her from bringing food to court. An exception to the rules, ordered by your Honor, would solve our

009192

EXHIBIT
F

dilemma. Permission to bring breakfast, lunch, and a snack would serve to meet her needs.

Secondly, Inmate Andrano will only have 5.5 hours to sleep. After arriving at Madison, there are four more hours which could be used for sleeping. Allowing the inmate to bring one blanket would ensure her ability to sleep while waiting in the holding cells. Due to the longevity of the trial, the inmate requires sufficient sleep to avoid physical exhaustion and ultimately mental breakdown.

From:                                                        09/01/2004 15:26 #032 P.002



**Maricopa County
Health Services
Department**

David DeLozier, Esq.                                    September 1, 2004
Scottsdale, Arizona

Re: Wendi Andriano
    Booking #A631830

Dear Mr. DeLozier:

As Ms. Andriano's main Healthcare Providers in the Durango Jail, we are concerned
about Ms. Andriano's ability to maintain her physical and mental health throughout the
current period of what appears will be a lengthy and grueling trial. As you might be
aware, because of transportation realities and the logistics of getting Ms. Andriano to and
from the Courthouse, she is subjected to very lengthy periods away from the jail for
several days per week. While she can be fed before leaving and after returning, there is a
lengthy period during the day when she has no access to food. We are requesting that
you assist in arranging permission from the the Mesa Police department for Ms. Andriano
to carry with her on her person three or four food items per day for consumption during
the middle of the day.

Thank you for your assistance in this matter.

Sincerely,

Gerald M. Perry, Psy.D.
Licensed Psychologist

Pamela Drapeau, M.D.
Psychiatrist

Cc: Patient's chart

**EXHIBIT
G1**

3225 West Durango Avenue • D2 • Phoenix, Arizona 85009 • (502) 256-1959

# Exhibit 8

1   Di COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
    Suite 1200
2   Phoenix, Arizona  85004
    (602) 224-0999
    Scott M. Bennett, State Bar No. 022350
3
    FOLEY & LARDNER LLP
    150 E. Gilman Street
4   Madison, WI 53703
    Telephone:  (608) 257-5035
    Fax:        (608) 258-4258
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels, Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*

    *Attorneys for Petitioner*
7   Wendi Andriano

8                   SUPERIOR COURT OF ARIZONA
9                      COUNTY OF MARICOPA

10

11   State of Arizona,                    )
                                          )
12                        Respondent,     )   No. CR2000-096032-A
                                          )
13       vs.                              )
                                          )   **AFFIDAVIT OF SCOTT A.**
14                                        )   **MAC LEOD**
     Wendi Elizabeth Andriano,            )
15                                        )   (Assigned to the Hon. Douglas Rayes)
                                          )
16                        Petitioner.     )
                                          )
17                                        )

18

19   STATE OF ARIZONA          )
                               )    SS.
20   COUNTY OF MARICOPA        )

21

22       SCOTT A. MAC LEOD, being first duly sworn upon oath deposes and states:

         1.      I an adult resident of Maricopa County.  I was employed as
23
     mitigation specialist for the Maricopa County Office of the Public Defender from August
24
     2001 to January 2007, and I served as the mitigation specialist assigned to the defense
25
     team for Wendi Andriano from April 2004 through her sentencing in December 2004.  I
26
     have personal knowledge of the matters stated herein.
27

28
MADI_2583195.1

### PROFESSIONAL BACKGROUND

2.    I joined the Office of the Public Defender in August 2001 as a trial group mitigation specialist. The job of a mitigation specialist is to investigate and compile information relating to the client's background and to present that information to the Court as a basis for a particular sentence the implementation of pre- and post-sentencing plans.

3.    Prior to my work at the Public Defender's Office, I served for two-and-a-half years as a probation officer for Maricopa County. It was common for probation officers to transfer to mitigation specialists; at the time, there were roughly ten mitigation specialists at the Office of the Public Defender, and about half of them were former probation officers.

4.    My educational background was in political science and criminal justice. I did not have any degrees or educational background in social work, sociology, psychology, or other behavioral sciences.

5.    I do not recall any formal, introductory training or programs specific to the mitigation specialist position when I started. As I recall, the training was on-the-job, which may have included some job shadowing of an more senior mitigation specialist.

6.    As a trial group mitigation specialist, I handled mitigation work for standard (non-capital) felonies. When I was assigned a case, I would typically review the police report and other documents, interview the client several times, interview his or her family members, and prepare a report for the attorney to present to the Court. The report would advocate for a particular sentence that usually consisted of a combination of prison and rehabilitative programs or services for the client's reintegration into society.

2

MADI_2583195.1

1    7.    As a trial group mitigation specialist, I handled roughly 10 to 15 cases

2    at one time. None of my cases involved jury sentencing, and very few went to trial. For

3    those that did go to trial, there was typically a one- or two-month period after the verdict

4    before sentencing by the Court.

5

6    8.    Until my work on Wendi Andriano's case, I had never served as a

7    mitigation specialist in a capital case. I had also never worked as a mitigation specialist

8    for a case involving jury sentencing.

9

10   9.    I applied for and became a capital case mitigation specialist in June

11   2004, roughly two months after I was assigned as the mitigation specialist for Wendi

12   Andriano's capital murder case. I do not recall receiving any additional training specific

13   to the role of mitigation in capital cases versus standard felony cases.

14

15   10.    There were some differences in the emphasis of my job duties when I

16   became a capital mitigation specialist. Namely, I did not have to write a report advocating

17   a specific sentence to the Court (because there was jury sentencing), and it seemed like the

18   investigation of the client's background was more intensive. Overall, however, I did not

19   view my role as a mitigation specialist any differently; there is nothing that I would not

20   have done in standard felony cases that I would otherwise do in capital cases.

21

22   11.    Whether as a trial group mitigation specialist or a capital case

23   mitigation specialist, I took my direction from the lawyers on a particular case. In my

24   view, they were the ones holding the law license, and I deferred to their judgment in all

25   matters relating to mitigation. Generally speaking, the lawyers told me what they wanted

26   in terms of mitigation evidence, and I would investigate accordingly. I believe I had

27

28

3

1    authority to pursue other avenues that counsel had not directed me down, but I would

2    normally raise those potential avenues with the attorneys and receive a go-ahead from

3    them prior to pursuing those areas of investigation on my own.

4

5        12.    I am familiar with the Supreme Court decision in *Ring v. Arizona*,

6    536 U.S. 584 (2002), and I do not recall any changes office-wide or for me personally in

7    my role as a mitigation specialist following that decision.  I did not change my approach to

8    mitigation investigation in Ms. Andriano's case as a result of the *Ring* decision.  Because I

9

10   viewed the lawyers as responsible for setting overall mitigation strategy and coordination

11   with the other phases of the case, any changes based on *Ring* would have come in the form

12   of different directions and deadlines from them; I would not on my own implement any

13

14   changes in my overall approach in response to the fact that sentencing was handled by a

15   jury rather than a judge.

16       13.    The mitigation specialist position is a 40-hour per week job, and I

17   typically worked 40 hours per week.  I do not specifically recall working overtime; if I

18   had, I am fairly certain that I would not have been paid overtime for the extra work.

19

20                    **INVOLVEMENT IN WENDI ANDRIANO'S CASE**

21       14.    As noted above, I was assigned to work as the mitigation specialist on

22   Wendi Andriano's case in April 2004, while I was still a trial group mitigation specialist.

23       15.    I do not recall whether my remaining workload was reduced in

24   response to this assignment.  I believe I was winding up my remaining standard felony

25

26   cases shortly after becoming a capital case mitigation specialist.  At that time, I also took

27   on a few other capital cases besides Ms. Andriano's case.

28                                              4

16. My recollection of the work that I did on this case is limited. I remember meeting with Ms. Andriano, as well as her mother and stepfather. I looked through pictures and other documents relating to Ms. Andriano's childhood and prepared a slide show depicting her positive achievements and impact. I also attended the trial. I know that I talked to other people and did more work, but I cannot recall who else I interviewed, how many other people I interviewed, or what other investigation or work I did relating to the case.

17. I do not recall "scrambling" or rushing to conduct the mitigation investigation in the four months between the time I began working on the case (in April 2004) and the beginning of Ms. Andriano's trial (in August of 2004).

18. I recall efforts to use the slide show and photographs to describe Ms. Andriano's life, but I do not recall preparing any written, comprehensive life history reports or any documented psycho-social history of Ms. Andriano.

19. I do not recall investigating any trauma experienced by Ms. Andriano other than domestic violence by Joe Andriano, nor do I recall investigating or analyzing the effect of any early trauma on Ms. Andriano's development.

20. I do not recall identifying or investigating any childhood abuse of Ms. Andriano.

21. I do not recall recommending the retention of any experts in the case, or assisting in identifying appropriate experts.

22. I do not recall providing any social history information to any experts in the case.

5

23.    The themes for mitigation were provided to me by Dan Patterson; mitigation strategy was always his call, as far as I was concerned. Those themes included the contention that Ms. Andriano was a victim of domestic violence by her late husband, and that she had a good upbringing and character. I do not recall working with counsel to include additional themes or facts based on my investigation.

24.    I do not recall investigating any possible explanations for Ms. Andriano's affairs and other seemingly out-of-character actions in the months leading up to the death of her husband, other than domestic violence.

25.    I recall that the defense team had some sense that Ms. Andriano's childhood church/parochial school had what some might consider to be strange teachings, but I did not investigate further because no one on the case asked me to do so.

26.    As a mitigation specialist you always screen for mental health issues, but I do not recall identifying or investigating any potential issues relating to Ms. Andriano's mental health.

DATED this ___ day of ~~February~~ *March*, 2011.



Scott A. Mac Leod

Subscribed and sworn to before me
this /⁵ day of February, 2011.

_____
Notary Public, State of Arizona.
My Commission: Oct 14, 2013

OFFICIAL SEAL
ROSA RAMIREZ
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 14, 2013

6

MADI_2583195.1

# Exhibit 9

FEB 1 6 2012

1
2
3
4
5
6          SUPERIOR COURT OF ARIZONA
7              COUNTY OF MARICOPA
8
9   State of Arizona,                    )
10                  Respondent,          )   No. CR2000-096032-A
11                                        )
    vs.                                   )   **DECLARATION OF**
12                                        )   **WENDI ANDRIANO**
    Wendi Elizabeth Andriano,             )
13                                        )
14                  Petitioner.           )
                                          )
15                                        )
16
17          WENDI ANDRIANO, declares as follows:

18                      **OVERVIEW**

19          1.      I retained Attorney David DeLozier to represent me in 2000. I also retained

20   Attorney Leon Thikoll in 2000, but Attorney Thikoll was not involved with my case after

21   March 2001.

22

23          2.      Attorney Daniel Patterson was assigned by the Public Defenders' Office to

24   represent me in July 2001. Several other attorneys from the Public Defenders' Office

25   were briefly involved in my case before Attorney Patterson was assigned.

26
27
28
4826-5108-5196.2

3.　　Mitigation expert Scott Mac Leod was assigned by the Public Defenders' Office to my case in 2004, after the mitigation expert previously assigned to my case, Patrick Linderman, left the Public Defenders' Office.

4.　　I recall meeting with both Attorneys Patterson and DeLozier together once in 2003. I do not recall meeting with Attorneys Patterson and DeLozier together at any other time until 2004, when I met with them together several times both shortly before trial began and during trial.

5.　　I do not recall meeting with Attorney Patterson, Attorney DeLozier, and Mr. Mac Leod together until shortly before my trial began.

## ATTORNEY DAVID DELOZIER

6.　　A childhood friend, Jeri Lynn Cunningham, referred me to Attorney David DeLozier because her husband knew Attorney DeLozier from serving on a church board with him. I agreed to meet with Attorney DeLozier at the prison to discuss the possibility of him serving as my defense attorney. Although I was aware that Attorney DeLozier had no experience defending a death penalty case, I agreed to hire him after he told me that God had sent him to help me. I believed that God wanted me to hire Attorney DeLozier to serve as my defense attorney.

7.　　I met frequently with Attorney DeLozier during the four years leading up to my trial, but these meetings rarely involved any discussion about my case. Attorney

2

4826-5168-5198.2

1    DeLozier spent most of our meetings discussing God and religion with me. Attorney

2    DeLozier typically brought a Bible to our meetings, which we used for Bible study.

3

4        8.      Attorney DeLozier told me that he believed that God was assisting in my

5    defense case and would not allow me to be sentenced to death. Attorney DeLozier told me

6    that God was involved in many aspects of my case, from small details such as making sure

7    that he was able to find a parking space at the jail to more significant decisions involving

8

9    legal strategy.

10

11       9.      A few months before my trial began, Attorney Patterson informed me that he

12   planned to have Attorney DeLozier perform my direct examination at trial. I told Attorney

13   Patterson that I did not believe that Attorney DeLozier knew enough about my case to be

14   able to perform my direct examination because we had not discussed the details of my

15

16   case during my meetings with him over the last four years. When Attorney Patterson

17   heard this, he told me he would perform my direct examination.

18

19       10.     Prior to trial, Attorney DeLozier told me that he planned to fast during the

20   duration of my trial to seek God's favor and to give him a better spiritual connection with

21   God and to make him more receptive to hearing God's instructions about how to defend

22   my case. During trial, Attorney DeLozier told me that he was not consuming any food and

23

24   was only drinking water and juices. Attorney DeLozier appeared tired and weak

25   throughout my trial, as if he were in a state of prayer during my trial. Attorney DeLozier

26   appeared to lose a significant amount of weight. Attorney DeLozier told me that he had

27   lost so much weight that he had to buy a new suit because his old suits did not fit him.

28

3

1    11.    An attorney with Attorney DeLozier's law firm was murdered during my

2    trial. Attorney DeLozier appeared very upset about this loss, and appeared to have

3    difficulty focusing on my trial after his death. At one point, Attorney Patterson had to

4

5    request that the judge adjourn the trial for the day because Attorney DeLozier was so upset

6    about his associate's death that he was unable to concentrate on or participate in my trial.

7

8                          **ATTORNEY DANIEL PATTERSON**

9    12.    In July 2001, Attorney Patterson was assigned by the Public Defenders'

10

11   Office to represent me. At the time he was assigned to my case, he was responsible for

12   several other death penalty cases. Shortly after beginning on my case, he was also

13   assigned to represent the defendant in *State v. Roque*. Attorney Patterson told me that the

14   *Roque* case would be very demanding of his time and attention. Therefore, he said that I

15

16   was "second in line" and that he would not be able to put much time in on my case until

17   *Roque* was resolved.

18

19   13.    Attorney Patterson only met with me a few times each year until 2004, when

20   he appeared to increase his attention to my case in preparation for my trial. During 2004,

21   Attorney Patterson met with me much more frequently than he had during 2001-2003 –

22   often several times in one month. These meetings were typically less than an hour long.

23

24   14.    Attorney Patterson spent a few hours on one day preparing me for my

25   testimony during the guilt phase. This occurred after my trial had started. Attorney

26

27

28                                         4

4826-5168-5196.2

1 DeLozier did not attend this meeting and was not involved with preparing me for my

2 testimony.

3

4     15.     The day before I gave my allocution, Attorney Patterson told me that I

5 would need to prepare a statement to read to the jury. Attorney Patterson told me that the

6 purpose of this statement was to ask the jury to have mercy on me and not sentence me to

7

8 death. I wrote part of my allocution when I returned to my jail cell that evening, and

9 completed the rest of it while in transit to the courthouse and while waiting in a holding

10 cell at the courthouse. I showed the statement I had written to Attorney Patterson, who

11 read it and said it was "fine." Attorneys Patterson and DeLozier did not provide any

12 suggestions or changes to my allocution and did not have me practice giving my

13

14 allocution.

15

16 ### MITIGATION SPECIALIST SCOTT MAC LEOD

17     16.     When I first met with Scott Mac Leod, he asked me to tell him my "life

18 story." I provided a ten-minute summary of my life. I do not recall him asking many

19 follow-up questions about my life story.

20

21     17.     When I met with Mr. Mac Leod, we talked more about gossip regarding the

22 Public Defenders' Office and his plans to go to law school than we discussed my case.

23

24     18.     Mr. Mac Leod told me that the purpose of the mitigation phase was to

25 convince the jury that I was a good person that did not deserve the death penalty. Most of

26 my meetings with Mr. Mac Leod revolved around identifying photographs and topics for a

27

28

4826-6468-5196.2

1      Power Point presentation that he prepared for the mitigation phase. Mr. Mac Leod told me

2      that the purpose of the presentation was to show the jury evidence of the good things that I

3

4      have done during my life.

5          19.     During my trial, Mr. Mac Leod expressed frustration to me about how

6

7      Attorneys Patterson and DeLozier were handling my trial. He did not identify specifically

8      how he believed Attorneys Patterson and DeLozier were providing me with inadequate

9      representation, but stated that he wished he could go to law school because then "all of this

10      stuff would not be happening."

11

12                       **MITIGATION INVESTIGATION**

13          20.     Attorney Patterson asked me about my health history. In response to this

14      question, I told him that I had been prescribed medication for insomnia and anxiety by

15

16      Joe's oncologist prior to Joe's death. I told Attorney Patterson that Joe's oncologist

17      suggested this prescription because he noticed that I was frequently stressed and tearful

18      during Joe's appointments. Attorney Patterson told me that he would seek these medical

19      records, although I do not know whether he ever did this. I also told Attorney Patterson

20

21      that I saw a counselor in 1996 because of stress and problems at work. Attorneys

22      Patterson and DeLozier and Mr. Mac Leod did not ask me any additional questions about

23      the circumstances surrounding the prescription or counseling I received or about my

24      physical or mental health history. I would have been willing to provide additional

25

26      information if requested.

27

28

4826-5168-5196.2

21. Attorneys DeLozier and Patterson and Mr. Mac Leod did not ask me to provide any information about the physical or mental health history of my family. I would have been willing to provide this information if requested.

22. Attorneys DeLozier and Patterson and Mr. Mac Leod did not ask me to provide any information about the backgrounds or childhoods of my mother, father, stepfather, or other family members. I would have been willing to provide this information if requested.

**TRIAL SCHEDULE**

23. As a result of my transportation schedule during my trial, I felt extremely tired throughout my trial and had difficulty remaining awake and focused while in court or when meeting with my attorneys. During my trial, I was typically woken up at 1:00 a.m. each day to get ready for transportation to Madison Jail from Durango Jail. At 2:00 a.m., I was transported to Madison Jail. At 3:00 a.m., I was given a sack lunch for the day, which was for both my breakfast and lunch. I remained in a holding cell until approximately 7:30 a.m., when I was transported to Mesa Courthouse to attend trial. I returned to Durango Jail around 5:30 p.m. each day. Dinner was served at 6:30 p.m., after which I would try to sleep as much as possible until I was woken up to be transported back to a holding cell in Madison Jail at 1:00 a.m. Although my scheduled varied somewhat throughout my trial, I consistently felt too tired to participate in my representation and trial.

7

1     24.    The sack lunch I was provided at 3:00 a.m. each morning was not enough

2 food for both breakfast and lunch. I was not allowed to eat any food other than that

3 provided by the prison and was not given any additional food during the day beyond what

4

5 was in the sack lunch I received at 3:00 a.m. As a result, I frequently had difficulty

6 focusing on and participating in my trial and meetings with my attorneys because I was

7 hungry. During trial, I informed Attorneys Patterson and DeLozier that I was consistently

8 tired from lack of sleep and hungry because of insufficient food.

9

10     25.    I declare under penalty of perjury that the foregoing is true and correct.

11

12

13 DATED this 13 day of February , 2012.

14

15 Wendi Andriano

16

17

18

19

20

21

22

23

24

25

26

27

28                         8

4826-5168-5196.2

# Exhibit 10

**DECLARATION OF CONSTANCE BOYS**

I, Constance Boys, declare as follows:

1.      My name is Constance Boys. Everyone calls me "Connie." I was born on May 31, 1952 in Oklahoma City, Oklahoma. My family moved to Phoenix, Arizona when I was four years old. My son, Lonnie, was born in Phoenix, Arizona in May of 1970. I married George Carlin in 1973 in Phoenix, Arizona, and shortly thereafter we moved to Casa Grande, Arizona. I have two daughters with George: Sarah, who was born in 1974, and Rachel, who was born in 1976. George also adopted my son, Lonnie. I first met Wendi Ochoa in the late 1970s when her family began attending our church.

2.      In about 1976, my then-husband George and I began attending a small church in Casa Grande, Arizona, called "91st Psalm Ministries." The pastor, Calvin "Cal" Lorts, and his wife, Barbara "Barb" Lorts, were friends of ours – we knew them before they went to Bible school. At that time, the church was brand new – there wasn't even a building yet, and services were held in Cal and Barb's house. George and I, along with a few other families, helped Cal and Barb build the church. We actually laid cement and built walls and that sort of thing.

3.      In 1977, Cal opened a school at the church called "91st Psalm Christian School." I enrolled Lonnie in that school the same year. When Sarah and Rachel were school-aged, they began attending school there as well. Over the years, I also volunteered at the church school two or three days a week. I worked in the nursery and I taught

Initials

kindergarten. I am not certain of the date, but at some point, Wendi Ochoa and her parents, Donna and Alejo Ochoa, began attending 91st Psalm.

4.      Sometime in the mid 1980s, Cal Lorts left the school. He went to start another school up in Phoenix. At that time, the associate pastor, Tom King, took over the church and school. He renamed the church "Harvest Family Church," and the school became "Harvest Christian Academy." We remained at the church, and I remained at the school as a part-time volunteer.

5.      When Cal Lorts first left, the church was different, but not dramatically so. Over the next couple of years, it got progressively worse. In the beginning, Tom's sermons were pretty typical, but they became so harsh over time. The church became very cultish, though it didn't start that way. Everything became so warped.

6.      I remember that Tom King frequently preached that children should be spanked. He encouraged us to spank our children often. I got the distinct impression that he didn't care how old they were – he even spanked teenagers. Nearly every transgression warranted a spanking in Tom King's mind. He quoted scriptures about it, such as, "Foolishness is born in the heart of a child and the rod of correction will drive it far from him." I recall specifically that he quoted scriptures that said that if we spanked our children, they would not die.

7.      Wendi's step-father, Alejo, was the youth pastor at the church. I believe that he held that position before Cal left and that he continued on in that capacity when Tom took over. I think that he was a pervert and I think that everyone else thought so


Initials

too. For years, there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember specifically who knew what, but I do remember that it was generally discussed. I recall hearing that Wendi had told the principal, Mark Keating, and that Mark had gone to Tom about it. When this came out, Wendi wasn't believed. In fact, she was punished for saying it. At that school, corporal punishment was delivered frequently, and it seemed to me that Wendi received a lot of punishment. Wendi was physically punished for saying those things about her father. I recall that, Alejo and Tom King kicked Wendi out of school frequently. During that time, Wendi was put to work doing manual labor on the school and church grounds. The church consisted of a large, ten-acre compound. She was outside chopping weeds all day in the hot sun, instead of attending class. No one was allowed to speak to her. This occurred when Wendi was a teenager or preteen, but I do not recall exactly how old she was.

8.     Alejo constantly made comments and jokes of a sexual nature around children as well as adults. He was inappropriate. I remember that many of the children, when they entered the pubescent stage, complained that Alejo was making sexually inappropriate comments to them. I recall firsthand that he spoke that way to myself and to Cyndee Justus. I recall telling him time and again, "That's not funny, Alejo." He always responded the same way, with something like, "You have a dirty mind Connie, you're the one taking it there." There was always a sexual undercurrent to the things Alejo said. I remember that on one occasion, he said something to me about my breasts,


Initials

and I said, "What makes you think you can say that to me?" We had words over it, and I was pretty mad. But when I mentioned his behavior to other people, they customarily responded, "Oh, that's just Alejo." Everyone knew how Alejo was, but no one seemed to care. Tom King and the church leaders did absolutely nothing about it except punish children if they complained.

9.      I do remember that on one occasion I spoke to my then-husband, George, about Alejo's behavior and George took him aside and told him that he didn't appreciate it. George told me that Alejo apologized, but I was not there so I don't know exactly what transpired between them.

10.      Members of the church were scared of Alejo, especially the children. I believe that, in part, this was because you never knew how he was going to be. Sometimes he was so happy-go-lucky and such a goof-off, and other times he got in these black moods. It was as if there was a dark cloud over him. One minute, he was joking around and having fun, and he actually could be quite funny, and the next moment he was dark and moody and anyone around him was afraid to say or do anything.

11.      I recall that my daughter, Sarah, complained to me about Alejo. She told me that she and her best friend, Lisa Daugherty, were eating popsicles when Alejo made a sexual comment to them. I don't recall exactly what he said, but he made a reference to oral sex. Lisa and Sarah were about fourteen or fifteen years old at that time. I talked to my husband, George, about it and he confronted Alejo. Alejo denied it, and George

Initials

and I went to Tom King. Tom said, "If that was true, God would have told me." That's when I realized just how crazy Tom was.

12.     I recall hearing the things that Wendi said about Alejo, and I wondered if there was truth to them. When it happened to my own kid, however, it was a different story. I went to the pastor several times to complain about Alejo's behavior, but he had Alejo's back and covered for him so nothing ever happened to Alejo.

13.     While attending the church, I was good friends with the church secretary, Lola Archuleta. I took her daughter, Frances, home with me every day and kept her until Lola got off of work. Frances was a part of my family. I recall being angry about the way that Tom and Alejo treated Frances. She was often disciplined in much the same way as Wendi. They had her outside all the time chopping weeds. I recall indicating to Lola on several occasions that I did not think it was right the way they were treating her daughter. I never came right out and said it because Lola was so tight with Tom and Alejo.

14.     Alejo was a very shady individual. I recall that he was constantly putting eye drops in his eyes and eating breath mints to hide his smoking. Wendi had told other kids that her father smoked marijuana, but everyone always covered for him. I knew that he was smoking – you could smell it on him.

15.     On one occasion, a teenage boy by the name of Jasper ("JC") Neace found some porn magazines that belonged to Alejo. They weren't just *Playboys* or anything like that – it was really hardcore porn. When JC found them, he went to Tom King about it. Tom King asked Alejo, and Alejo said that he was outside and found them by the trash

Initials

can. He said that he picked them up so the kids wouldn't see them, and brought them to his house, where he had forgotten about them. JC was kicked out of school shortly after that incident. I believed that he was kicked out for reporting this to Tom King, but Tom never just came out and said things like that. When Tom threw someone out of school, he customarily said that it was because they were "rebellious" or had a "bad attitude." He was pretty subtle about his reasons. After JC left the school, he became embittered. That happened to a lot of the kids at the school. They were so turned off by God and Church due to their experience at Harvest that they walked away from Christianity entirely. JC was not a bad kid, but he did a complete 180 when he left the school. He got involved in drugs and he's been in and out of prison for drugs and domestic violence ever since.

16.     Prior to that incident, JC had been really close with Alejo. JC's family was poor. His father didn't live at home, and his mother was trying to raise eight or nine kids on her own. They couldn't afford to pay the school fees, so Cal, and later, Tom, let them come to the school for free. JC worked around the school to help pay for the school fees. He was constantly around Alejo. I think that Alejo was kind of a father figure to him. I'm sure that it was hard for him to tell on Alejo, but he thought he was doing the right thing.

17.     My daughter, Sarah, and her best friend, Lisa Daugherty, were the "wild girls" at the school. They were funny kids. They had the big hair that was popular back then, and they wore a lot of make-up. They were always in trouble, not because they



Initials

were bad kids, but because everything was forbidden. They were just trying to have a normal childhood, but "normal" wasn't permissible in that environment. I recall that when Sarah was in eighth grade, she tried bringing some of her friends to the Church. One would think that Tom King would have been appreciative that she was bringing new people around, but instead, he became angry with her. He seemed very uncomfortable with having new people in his church. I remember that Tom King referred to my daughter, Sarah, and some other students at the school, as "worldly," because they participated in activities, and had friends, outside the church. In Tom's mind, this was a sin. I recall him saying that people who were not a part of our church were "of the world." Social activities that were not put on by the church were strongly discouraged.

18.    Sarah challenged everything. She knew what kind of person Alejo was, and she didn't stand for it. She constantly made him mad. I recall that he made her write a twenty-page report one time when she was fourteen or fifteen years old. She was always getting into trouble. I know that there were numerous occasions when Alejo made her write reports. I recall that Sarah was so defiant that when Alejo asked her to write a report she wrote the same sentence over and over again. I don't recall what the report was about, but whatever it was, Sarah just wrote, "This is a report about..." several times.

19.    Sarah was also kicked out of school for approximately three months. She was caught kissing a boy behind the oleander bushes on the church property when she



Initials

was thirteen or fourteen years old. She brought him to the church – he was not a student at Harvest.

20.     Tom King's sister-in-law, Cyndee Justus, the sister of Tom King's wife, Patricia, worked at the school. Her husband, Steve Justus was business partners with another man who also attended our church, Dick Herdegen. Dick Herdegen was also a friend of Tom King's. REDACTED

REDACTED

REDACTED

ᵣ Shortly

after that came out, I was in the office with Tom. I don't remember who else was there, but I heard Tom say something like, REDACTED

REDACTED

REDACTED

I

couldn't believe he said that.

21.  REDACTED

I

think there was a lot of guilt and anger there REDACTED

REDACTED                    . Cyndee and Steve eventually got a divorce, and though it may not have been entirely because of that, I know that it contributed. Dick Herdegen ended

Initials

REDACTED

up leaving the area.

REDACTED

22.     Casa Grande was a small town, and our church was a small community inside that small town. For that reason, when some scandal occurred, everyone knew.

REDACTED

23.     I recall that several years ago, I had a conversation with Cyndee. We sat down and we talked about the church and how crazy it all was. I'm not going to remember everyone now, but we counted thirteen families that left the school directly because of Alejo. Many people went to Tom about Alejo's behavior, and Tom refused to believe it. He completely rejected it. It sickens me to even think about it.

24.     I recall that, when Wendi was a teenager, something in her changed. Something just wasn't right. I recall my daughter, Sarah, telling me that Wendi had shown Sarah some negligees and lingerie that her father had bought for her. Sarah said, "Isn't that weird?" Those last couple years, it was as if Wendi came to the realization that she just couldn't fight it. She completely gave in, and became "Daddy's little girl" and was always hanging on her father. She always seemed like a free thinking little girl before that, and suddenly she was a model student. She became quiet and withdrawn. I remember that she had the cutest clothes and shoes – all that her dad had purchased for her. He just lavished her with things like that. Of course, everyone at the church said, "Praise God, Wendi finally learned." They said that she had finally "repented" and had "got her life right with God," but I feel that they had finally broken her. She had no one

Page 9 of 17

*CB*
Initials

to turn to. When she reported the abuse that she was experiencing at the hands of her father, she was punished – and punished harshly. I believe that she must have realized that no one was going to help her, and she finally gave in to it – she just threw in the towel, so to speak.

25.     I know that Wendi confided in my son, Lonnie, a lot. Lonnie, however, cannot even talk to me about Harvest – he is too traumatized. He is really bitter. He's forty years old, he's been out of the church for twenty-two years, and he still can't talk about the things he experienced there. To this day, I rarely speak to my son. We don't have a great relationship.

26.     I think my daughters did better than Lonnie because we eventually pulled them out. We sent them to Valley Christian School in Tempe. They got to experience a normal high school. They are both college graduates and are doing well. They seem to have done better than Lonnie.

27.     Lonnie went to Harvest until he was expelled at the end of his junior year of high school. The circumstances surrounding his expulsion are almost laughable to me now. Lonnie was having sex with his girlfriend at the time, another Harvest student by the name of Kim Ethington. He felt guilty about it, and he thought he could talk to Tom. When he did tell Tom, however, he was kicked out of school. I don't recall what started that whole thing, but I remember that there was a big blow-up at the school at that time, wherein Tom was questioning the kids about their relationships. I recall that another girl, Laura Bell, who was a very close friend of Wendi's, was also expelled from school because

Page 10 of 17

Initials

someone had reported to Tom that she was having sex with her boyfriend. For some reason, however, Kim Ethington was not expelled from school – she continued going. I don't know why that was. Lonnie was treated horribly and I feel so badly about it now.

28.     After Lonnie was expelled, we continued going to the church for a year or two, despite my objections. In the church, we were taught that women were to be subservient to men. Since that was so ingrained in me, I obeyed my husband. I wanted to leave the church, but I couldn't convince my husband to do so. I recall crying and begging my husband to leave. We fought over it. I prayed every night that God would release us from that place.

29.     My husband, George, ~~only~~ went to the church on Sundays <sup>services & Wed. CB</sup> – he didn't work there like I did. For this reason, he didn't see as much of what went on. He never really got it. I wanted to leave for years before we actually did, but I had a hard time convincing him. He didn't see things the way I did. I believe that the turning point for him was when he saw how our daughter, Sarah, was being treated.

30.     In addition to my husband's feelings about the church, I, personally, had a hard time leaving. We were so involved in the church. It was our social life. It had such power over us. We had a fear of being ostracized because we had seen that happen to other people, and, when we did decide to leave, we lost most of our friends. Each time a family left the church, Tom King insinuated to the other members of the congregation that the members who left were "bad people," and that we were not to talk to them. He never came right out and said this, but it was definitely implied. It took a lot for us to

CB
Initials

leave; we were so afraid to do it. I recall that when George finally went to talk to the pastor, I was praying that he would come out of there and say, "Okay, we're leaving." I still have the letter that Tom gave us, "releasing" us from the church. I can't throw it away, though I have tried to do it many times. I was so thrilled and the girls were so excited. The summer that we left was a joyous time.

31.     I remember that when Rachel and Sarah were teenagers – probably about fourteen or fifteen years old, I allowed them to walk to Kmart. It was only about three blocks from our house. Someone from the church saw them there without me, and reported it to Tom King. Tom called me in and questioned me about it. He said, "I've had a report your daughters were at Kmart without you." I couldn't believe it. That was my decision, not his – it had nothing to do with him. That's an example of how controlling he was about every little thing.

32.     I remember another girl at the school who was reprimanded when she was sixteen years old. She and some other teenagers got into trouble with Tom King. I don't recall what the infraction was, but I know that it was something minor. I think that they may have stayed out too late on one of their breaks or something like that. There were about fifteen kids involved. Tom King rounded them all up and spanked them. This one young girl probably hadn't been spanked since she was five or six – she was a good kid. I remember that her parents took her out of school because of that incident. It was all about control with Tom.

*CB*
Initials

33. I remember seeing a program on the Discovery Channel about Warren Jeffs. I recall thinking that there were many parallels between that religious cult and our own. It was definitely the same type of control.

34. When Lonnie was kicked out of school, he moved out of town. He enrolled in classes at Eastern Arizona College in Thatcher. When he came home to visit, however, my husband, George, made him come to church with us. Lonnie knew that those were the rules. Tom allowed him to come, but Lonnie was not to socialize with other teenagers. It must have been so hard for him. I think that he feels that we chose the church over him. He was so ostracized – he could not be seen talking to other kids. There is no doubt in my mind that this has hurt him.

35. George and I separated in 2001, and our divorce went through the following year. From what my kids tell me, he is an alcoholic now. The last couple years of my marriage, he started drinking a lot. When we left the church, we left Casa Grande altogether. We moved to Chandler. We visited a couple churches in Chandler, but George never wanted to go to church again.

36. I remember that Donna and Alejo adopted Wendi's little cousin, Brandon. We left the church before Brandon was old enough to start school, but I remember when they first got him. They were so strict on that little boy. I worked in the church nursery from time to time, so I had Brandon with me during some of the services. Many of the adults worked in the nursery and we took turns watching the kids. I remember that the punishment that Brandon received from Alejo was always so harsh. It seemed to me that

Page 13 of 17

Initials

he was beaten a lot. I recall that Alejo talked to him with such a harshness to his voice. Brandon always seemed nervous when Alejo was around. Brandon was a hyper little kid and Alejo yelled at him constantly. I can't remember any specifics because so much time has passed, but I do have impressions. I know that Brandon was definitely afraid of Alejo. There was more to it than just the fact that Alejo was the father figure.

37.     From 1983 until 1985, I was working for Ak-Chin tribal community in the finance department. I knew that Donna and Alejo had nothing – they were poor as church mice. Alejo was the children's church pastor, but he wasn't bringing in very much money – they were extremely poor. I felt sorry for them, and I helped Donna get a job at Ak-Chin. I knew Donna from church, but I didn't really know her that well. I recall riding to work with her in the mornings, and she constantly talked about how hard everything was and how broke she and Alejo were. At some point, Donna began embezzling from Ak-Chin. The manager of Ak-Chin Farms was a man named Donny England. His family was involved in the church as well. I went to Donny to tell him about Donna's theft several times, and he told me he would take care of it, but he never did.

38.     Donna had a PriceClub card through work. Once a week, she took a truck from the farm and drove to PriceClub. She used a personal check to pay for the items, and reimbursed herself when she got back. I could see her from the window when she returned from a shopping trip. She opened the trunk of her car and began moving things from the truck to her trunk. I knew what she was doing. At first it was maybe two or

Page 14 of 17

CB
Initials

three-hundred dollars per week, but eventually she was stealing about eight-hundred dollars per week. I recall that during that time, Donna and Alejo had a couple of parties for teens at their house. My son, Lonnie, came back from them and told me, "Donna and Alejo have all new furniture and appliances." Donna was making a little money from the farm as a bookkeeper, but it wasn't enough to account for all the new stuff they had. She also bought Alejo a new truck, expensive tools, and generators. He had many tools that most average, working people don't have.

39.    When I discovered that Donna was stealing from our place of employment, I repeatedly reported it to Donny England. When he did nothing about it, I decided to quit my job. I told the chairperson at that time, a woman named Leona Kaker, of my plans and she asked me to go to work in the fire department instead. At that time, the Ak-Chin fire department was brand new and it was built through a grant that I wrote when I was in the accounting department. There was a fire chief, but he was the only employee. I fell in love with the work and became a firefighter, which I continued to do for twenty-two years. I retired approximately two years ago.

40.    When Donna began stealing from our place of employment, I felt betrayed. I had a hard time with it because I was the one who had helped her get a job in the first place. I recall that on one occasion, Delia Carlyle, who was the tribal chairperson, wanted a membership at PriceClub. She was told that Donna, Martha England, who is the wife of Donny England, and Suzie England, who was Donny and Martha's daughter, were the only ones with memberships. This made her mad, because Martha and Suzie

CB
Initials

didn't even work there -- only Donny did. Delia was so mad that she went back and pulled all the records. She saw what was happening and she took them to a meeting with Tribal Counsel and their attorney. The tribal counsel got involved, but they didn't want to involve the feds or the state police. Sovereign immunity is huge in tribal communities and they didn't want anyone coming in. Donna confessed to everything. They allowed her to resign, but she had to sign something stating that she would pay back the thirty-thousand dollars she had embezzled over the years. Delia told me before I retired that Donna had not paid back a dime.

41.     I recall that Donna was caught stealing on a Wednesday. That night, we had church. When I arrived at church that evening, Tom King pulled me into his office and said, "Don't you dare tell anyone." It didn't seem to bother him in the slightest that Donna was a thief.

formerly Cyndee Justus
CB

42.     I sat down a couple years ago with Cyndee Jorgensen and we discussed the church. We both thought it was so strange how much sexual abuse was occurring at that school. REDACTED

REDACTED

On

one occasion, REDACTED

REDACTED

That settled things as far as Tom was concerned.

CB
Initials

43.     Sometimes I think about Wendi. I think about how hard things must have been for her. I have seen the impact that the Church had on my own children, and they were not as enmeshed in it as Wendi was. It was so much worse for her.

44.     Many of the statements I have made in this declaration are conclusions that I have drawn based on things that I witnessed at 91st Psalm and Harvest. Everything that I have said in this declaration is true to the best of my recollection, and is based on my own opinions. Because many of these things occurred a long time ago, I do not recall all the details. Until now, no one has talked to me before about Wendi or the church and school. If I had been asked to testify on Wendi's behalf, I would have done so. If I had been asked to provide the information contained in this declaration, I would have done so. In fact, if I had been contacted sooner, I likely would have recalled more information.

I have read the foregoing declaration consisting of seventeen (17) pages and forty-four (44) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this 9 day of November 2010 at Pinal County, Arizona.

_Constance Boys_
Constance Boys

Page 17 of 17

Initials

# Exhibit 11

## DECLARATION OF GEORGE CARLIN

I, George Carlin, declare as follows:

1.     I was born May 17, 1950 in Safford, Arizona.  In May of 1973, I married Connie Owin.  We later divorced in 2002.  Together, we have three children.  Lonnie was born May 10, 1970, Sarah was born February 26, 1974, and Rachel was born September 28, 1976.  Lonnie, who I adopted, is Connie's son from a previous relationship.  Sarah and Rachel are our biological children.  Around 1973 or 1974 we moved from Phoenix, Arizona to Casa Grande, Arizona.  In about 1975, my family began attending a church called 91st Psalm, headed by Pastor Cal Lorts.  While attending 91st Psalm, we met fellow church members Alejo Ochoa, his wife, Donna Ochoa, and their daughter, Wendi Ochoa.

2.     When we joined 91st Psalm, church membership was going strong.  At one point, the church had about two hundred attendees.  *Maybe More*  The teachings of the church at that time focused on proselytizing, bringing others into the church.  Pastor Cal Lorts was a very charismatic figure.  The congregation just loved him.  He had a very magnetic personality.  In the beginning, we met for worship services in a junior high school.  Shortly after joining, the congregation began constructing a church.  The majority of the men and some women used their various construction skills to make it all come together.  The church also had a school on its grounds.  Connie and I sent our kids to the school as did Donna and Alejo and many other families belonging to 91st Psalm.

3.     The main leaders at 91st Psalm were Pastor Cal Lorts, Pastor Tom King, and

Page 1 of 7

Initials

Alejo Ochoa. It was my understanding that Cal and Alejo knew each other previously from when they were younger, when they used to do drugs or sell drugs. I don't really know the whole story behind their drug dealing or use. In fact, many of the people who founded 91st Psalm came from a background of having previously battled drug or alcohol abuse. I believe Cal's brother, Barry Lorts, also came from that background. As the church got up and running, nothing about Alejo, Donna, or Wendi stood out to me. They were just kind of in the background at church. Alejo was involved in the youth ministry, Donna worked at the church school in some capacity, and Wendi was a quiet child.

4.     Around the early to mid-1980's there was a major shift in the church. Pastor Cal Lorts left 91st Psalm to start up a church in the Phoenix area. Cal turned over the pastorship to Tom King. At the time of Cal's departure, I thought the relationship between Pastor Cal and Pastor Tom was amicable. It was not until years later, in talking to other members of the congregation, that I was informed that Cal and Pastor Tom split off from one another on less-than-friendly terms.

5.     Under Pastor Tom King, the church was called "Harvest Family Church." It became something completely different under Pastor Tom's rule. Pastor Tom was very controlling. He was condemning–literally condemning. He had a number of rules that if broken, meant you were going to Hell. Just the way he looked at me and other members of the church, it was as if he had the ability to say "you're not living right," or "you're not doing right," just with his gaze. He was scary and the children were scared of him as well.

Initials

6.      To be honest, I can't recall what Pastor Tom specifically preached about from the pulpit. I snoozed through church some of the time. I went to church mostly because I felt like it was something I ought to do. I do recall, however, many of the church members becoming increasingly disillusioned by Pastor Tom's sermons. I recall someone saying, "What has gotten in to Pastor Tom?" referring to how extreme his sermons had become.

7.      Throughout the years at Harvest Family Church, Pastor Tom really emphasized how effective his parenting style was. When it came to disciplining children, Pastor Tom encouraged corporal punishment, which included spanking, swatting, and paddling. Pastor Tom sent the message "do it like I'm doing it, because my kids are perfect," which was a point of contention between myself and Pastor Tom. I never bought into that, though I'm sure many members of the church did. Pastor Tom had some of his congregation brainwashed. It reminded me of the cult leader Jim Jones, but on a smaller scale.

8.      I recall one time when my daughter Sarah was about thirteen or fourteen years-old, she brought some of her friends to the church. I'm sure Sarah thought this was the right thing to do, but Pastor Tom wasn't having any of it. Pastor Tom was quite upset and thought Sarah's friends were bad influences. In contrast to Pastor Cal, Pastor Tom was very closed-minded about outsiders. Instead of being pleased with Sarah's interest in bringing nonmembers to church, Tom thought her choice of friends reflected poorly on her. Sarah always had a mind of her own, though, and Pastor Tom didn't like that.

Initials

9.     It wasn't long after Pastor Tom's takeover that members of the congregation began leaving the church. I specifically remember the church school principals, Mark and Nancy Keating, leaving the church on bad terms with Pastor Tom. Mark and Nancy left around 1987. Pastor Tom was very critical of Mark and Nancy, who were great friends with me and my ex-wife, Connie. I think Pastor Tom was unhappy with Mark and Nancy because they were so popular amongst the congregation. People just loved them. Unlike Pastor Cal, Mark, and Nancy, Pastor Tom didn't have a charismatic quality to his personality. In my opinion, Pastor Tom was jealous of Mark and Nancy Keating, and that's why bad feelings developed and they left.

10.    During all of this, Alejo occupied a more prominent role at the school as an assistant pastor and youth minister. I was made aware by my then-wife, Connie, and my daughter, Sarah, who was a young teenager, that Alejo made sexually inappropriate comments to them. Because it was so long ago, I cannot recall specifically what he said to them, but it made me very angry. Around the same time I ~~also learned from my daughter, Sarah, that~~ *was concerned that* Alejo had been sexually molesting Wendi. I was so upset with Alejo's behavior, I called him up on the phone and arranged a meeting between us. When I spoke with Alejo, I told him the reason I was calling and I asked him to meet me at church to discuss it further. He agreed to come meet me. When I arrived at the church, Alejo was standing outside. He didn't want to meet inside the church, probably because he didn't want anyone else to find out about the subject of our meeting. At the beginning of our conversation,

Page 4 of 7

Initials

Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually. Alejo asked me, "What should I do? Should I resign from the church?" Looking back on it, I wish I would have just told him to resign, but instead I told him that he needed to ask for forgiveness and stop his inappropriate behavior.

11. There were other things about Alejo that just didn't seem right. I recall he had some inappropriate dealings with a former student from the church school, Ronnie *I heard they* Neace. I think Ronnie was about nineteen years-old at the time. Alejo apparently met up with him to buy drugs, such as marijuana.

12. I don't recall ever seeing Donna have a reaction to Alejo's inappropriate sexual behavior. I don't know for sure how aware she was of what was said about him at the church, though I don't see how she could have been totally oblivious to it. For the most part, to me Donna was just part of the backdrop at Harvest Family Church. The main thing that really stands out to me about Donna is that, for a time, she worked at Ak-Chin Farms with Connie. During Donna's employment with Ak-Chin, I noticed that Alejo had a bunch of brand new, expensive power tools. Donna and Alejo never had much money, so I wondered how they were able to afford such nice, fancy equipment. I later found out from Connie, my wife at the time, that Donna embezzled money from Ak-Chin Farms. I believe she lost her job because of that. This happened in the mid to late-1980's.

13. Shortly after Alejo made sexually inappropriate comments to Connie and

Initials

Sarah, I brought up Alejo's sexually inappropriate behavior to Pastor Tom. Pastor Tom just ignored it and criticized my family's child-rearing practices, which he believed were too permissive, instead of doing anything about Alejo. Subsequently, my son, Lonnie, was expelled from the church school for having sex with his girlfriend, Kimberly Ethington, who was also a member of the church school. By that point, I had had enough of Tom King. When Lonnie was in his last year of high school, Sarah was in her junior year of high school, and Rachel was about to start high school, my wife and I decided to pull our kids out of the church school and put them in a school in Tempe, Arizona. When I met with Pastor Tom and Alejo to discuss my issues with the church and school, Pastor Tom insulted my wife's parenting skills yet again and I just couldn't stand for that. I came close to getting into a physical altercation with Pastor Tom because he was so insulting to me, Connie, and my family. During the meeting, Alejo said nothing. I assume Alejo was so silent because he was terrified I would bring up his sexually inappropriate behavior again. Pastor Tom kicked my family out of the church. In fact, my wife, Connie, kept the severance letter he gave us.

14.     In the end, Pastor Tom's congregation whittled down to just a few members and that's where it stands today. He is so controlling, cold, and unforgiving, very few people have an interest in his teachings. The only person I can think of, aside from his immediate family, who has remained totally loyal to him, is the church secretary, Lola Archuleta. Lola is about the last person from the church that doesn't bad-mouth Pastor Tom. I don't know why she has remained so faithful to his church over the years, but I've often wondered if he

Page 6 of 7

Initials

has something on her. That's the only reason I can think of that she would have stayed with him. I don't get it.

15.     When I learned about Wendi's arrest and incarceration, I followed the news stories about it. They offered few details. In discussions with my family, we talked about the possibility that information about Alejo molesting Wendi would come out at trial. I never read anything about it, so I don't know whether or not it was ever revealed. If Alejo never came forward with that information, that wouldn't surprise me. If Donna never came forward with the information, I can't understand that. I believe that Donna knows about what Alejo *Allegedly* did to Wendi. Many people at the church knew about it.

16.     Until now, no one has ever contacted me about Wendi or my experiences at 91st Psalm and Harvest Family Church. If I had been questioned back in 2000 after Wendi was first arrested, I am sure my memory would have been clearer on details and specifics. If I had been asked to provide information about Wendi, her family, my family, the church and the school or to testify on Wendi's behalf, I would have done so. If I had been asked to testify to the information contained in this declaration, I would have done so.

I have read the foregoing declaration consisting of _7_ pages and _16_ paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that it is true and correct. Signed this _11_ day of November 2010 in Maricopa County, Arizona.

George Carlin
George Carlin

Page 7 of 7

# Exhibit 12

## DECLARATION OF JERI LYNN CUNNINGHAM

I, Jeri Lynn Cunningham, declare as follows:

1.      I was born May 20, 1970 in Phoenix, Arizona.  My parents are John and June Wilkirson.  I have one sibling, Wade Wilkirson, who was born December 22, 1971.  When I was about ten years-old, my family began attending 91st Psalm church and school in the town of Casa Grande, Arizona, where we lived.  91st Psalm was headed by Pastor Cal Lorts.  It was at 91st Psalm that I met Wendi Ochoa, who also attended the church and school.  Wendi and I were the same age.  Her parents, Donna and Alejo Ochoa, were also a part of the 91st Psalm church.

2.      I remember that Alejo had a couple of jobs at the 91st Psalm church and school.  Alejo worked in the children's ministry teaching what the church referred to as "devotions."  Devotions were classes that explained Bible scripture to children.  Alejo also taught children's church, which was a Sunday service offered to children while their parents attended regular Sunday services.  Children's church taught Christian concepts to children and included activities like puppet shows and other things that appealed to kids.

3.      When I began attending 91st Psalm church and school, Wendi and I struck up a friendship.  Wendi went out of her way to befriend me.  I was a very shy child and didn't have a lot of friends.  Wendi, on the other hand, was very popular and stood out amongst the crowd.  Wendi played piano and sang at church and school.  On her own time, she

Initials

helped her dad, Alejo, with the upkeep of the church and school grounds, hoeing weeds. We were so different. Soon after meeting, Wendi's mom, Donna, arranged for Wendi and I to play together at her house. Despite the differences in our personalities, Wendi and I bonded quickly and became inseparable. I began spending a lot of time at Wendi's house. Sometimes I spent the night there. We were best friends.

4.      I admired so many things about Wendi. She was compassionate and available to anybody who needed her, myself included. Before I met Wendi, I was quiet and withdrawn. After developing a strong bond with Wendi, it laid the foundation for me to develop new friendships with others. I was more self-confident with Wendi as my friend. She was so bubbly and fun, it made me want to be bubbly and fun too. I remember a time when a new girl came to the church school at 91st Psalm. I don't remember her name, but I remember that being new, she didn't have any friends. Just as Wendi had done with me, Wendi befriended that girl. When I saw them playing together, I couldn't help but feel a twinge of jealousy seeing someone else play with my best friend Wendi. Wendi intuitively picked up on my jealousy and explained, "Just because I'm her friend, doesn't mean I'm not your friend too. You're still my best friend." Wendi knew what to say and how to comfort me when I was upset. I always knew that Wendi was truly my friend and I never worried that she talked behind my back or talked bad about me because it was so apparent how fair and compassionate she was toward everyone.

Initials

5.      As I began to get to know Wendi and her family better, I noticed some things about Wendi's home life. Wendi's parents were on the strict side. They didn't seem overly-strict to me, but they were very involved in Wendi's life and there was a definite sense of what was acceptable and what was unacceptable in their home. Wendi had a number of chores that her parents told her to do on a regular basis, such as cleaning her room and doing the dishes. She wasn't permitted to listen to secular music, which Wendi and I sometimes listened to anyway. I recall one time when Wendi and I were verbally reprimanded by Donna for using words she thought were unsuitable. They weren't curse words or swear words—they were words like "gross." Sometimes Wendi told me, "I don't want to get the rod," which was an expression used to describe spanking or paddling, though I never saw Wendi "get the rod" while I visited her. I can also recall times when Wendi was grounded and we weren't permitted to see each other. During those times, we found ways to secretly communicate such as meeting in the bathroom at school. We told each other how much we missed playing together and looked forward to a time when we could resume our friendship again. The grounding probably lasted for about two weeks, though it felt like an eternity to us.

6.      In school, there were many rules. I recall Pastor Cal's wife, Barbara Lorts, was a respected figure at the 91st Psalm school. She was the kind of woman who seemed to have "eyes in the back of her head." We really couldn't get anything past her. One of the things that wasn't permitted at school was having a "bad attitude." On one occasion, Wendi and

Initials

I were called to the principal's office for having bad attitudes. I can't recall what it was we were doing that conveyed that we had a bad attitude. I imagine we must have been complaining or doing something that caught the attention of one of the school officials. I was so terrified on the way to the office, I couldn't help but look upset. Wendi told me over and over again, "You need to smile or we're going to get in trouble again for having a bad attitude." Though I was anxious about being in such big trouble, we were only talked to about our infraction. I can't recall whether or not it was explained what exactly Wendi and I had done wrong, but I was relieved that the punishment did not include being paddled. Though paddling was a common punishment for breaking the rules at 91st Psalm, I was never paddled in school.

7.      The way Wendi handled our trip to the school office by telling me to smile was very typical of Wendi. She knew how to talk and act like an adult. Even her mannerisms seemed very grown up to me. She made eye contact with the person she was speaking to and tipped her head during conversation. She was very polite and very well-mannered. In general, I always felt that Wendi was older and more mature than me even though I was technically several months older than her.

8.      In 1982, I went with Wendi and her parents, Donna and Alejo, on a family vacation to California. I know that Wendi and her parents were in California to see relatives, but I cannot recall who we saw or what their names were. There are a couple of things I *do* remember about that vacation that stand out in my mind. I remember that we all went to

Initials

the amusement park Sea World, in San Diego. I didn't have a lot of spending money with me, but Wendi had some of her own money which she used to buy me little trinkets. I distinctly remember her buying me a little flamingo toy from Sea World. I really liked flamingos. The gesture meant so much to me, I have kept it with me all these years. I still have it. I also remember me, Wendi, Donna, and Alejo camping at the beach in California. Wendi and I used the outdoor showers to wash off. We were both freezing, showering off in our bathing suits. Alejo pulled out his camera and took a bunch of pictures of us as we showered. He laughed and made fun of us until Wendi said, "Stop, dad!" Alejo thought it was so funny. During the family vacation to California, I didn't see Donna or Alejo interact a lot. I didn't see them argue, but I didn't see them be affectionate with each other, either.

9.      Around 1983 or 1984, Pastor Cal Lorts left 91st Psalm in Casa Grande to start up a new 91st Psalm in Tempe, Arizona. Pastor Cal turned the church in Casa Grande over to Pastor Tom King. Previous to Pastor Cal's departure, Pastor Tom directed the chapel classes at 91st Psalm. When Pastor Cal told the congregation that he was called to move to the Tempe location because it required his leadership, he was very gracious. After Pastor Cal's announcement, Pastor Tom stood up and said, "I'm glad he's leaving," and proceeded to tell the congregation that Pastor Cal's departure provided him with the freedom to do what the Lord called him to do. It was a very memorable statement.

10.      Pastor Cal was more involved in the church part of 91st Psalm and left school

Initials

matters to his wife, Barbara. In contrast, Pastor Tom took an active role as a disciplinarian at the 91st Psalm school in addition to his pastorship. One time, when Wendi and I were about twelve years-old, we got in trouble with Pastor Tom for chasing boys at school. When I say we were chasing boys, I mean that we were literally running after boys. Pastor Tom had a big problem with that and said, "Girls should not chase boys." I felt that Pastor Tom was implying that we were trying to get boyfriends, but we were just having some innocent fun.

11.     The transition between Pastor Cal starting up a new 91st Psalm in Tempe and Pastor Tom taking over the Casa Grande 91st Psalm location was gradual. I think it took about six months. During that time, I continued to go to the school in Casa Grande and went to services in Tempe. I recall that Wendi and Donna went to services in Tempe during that time, as did other members of the Casa Grande 91st Psalm church. When the transition was final, my family moved with Pastor Cal to his new location in Tempe, so I was not privy to the goings-ons at 91st Psalm in Casa Grande after Pastor Cal left. I know Pastor Tom changed the name from 91st Psalm to "Harvest Family Church." I remember overhearing adult conversations, probably between my parents and their friends, about Pastor Tom becoming power-hungry and that his church membership declined under his leadership.

12.     After my family stopped attending 91st Psalm in Casa Grande, I missed Wendi very much. I often called Wendi and asked, "Can I come out and see you?" From the time I was about thirteen years-old until I was about sixteen years-old, my parents or Wendi's

Initials

parents drove me from my house to Wendi's house. I spent the night at Wendi's house in Casa Grande on the occasional weekend and at other opportunities our parents approved of. Back then, Wendi's house was on the outskirts of Casa Grande. The house was in a regular neighborhood, but it was away from the center of town. At Wendi's house, she and I acted silly together and did the kinds of things you'd expect most young teenage girls to do. We talked and did each other's make-up. We had a lot of fun together.

13.      When I was over at Wendi's house, Alejo acted like a big kid, even though he was Wendi's dad. He played jokes on us. Sometimes he scared us by banging on the window outside. Alejo and Wendi played pranks on each other and on other people. Alejo seemed to encourage that kind of playful behavior in Wendi. I recall one time Wendi gave me some of her mom's chocolate laxatives as a joke. We all thought it was funny and Alejo kept asking me if I had any trouble going to the bathroom.

14.      When Alejo and Wendi interacted they had a different kind of relationship—it didn't seem like a father-daughter relationship. Looking back on it now, I would call their relationship "flirty." Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from Alejo. Wendi switched between calling Alejo "dad" and "Alejo."

15.      I remember so clearly that Donna went to sleep very early every night. The reason I remember this so distinctly is because Alejo's mannerisms and actions changed as soon as Donna went to sleep, when it was just the three of us: Alejo, Wendi, and me. REDACTED

Page 7 of 12

Initials

REDACTED

REDACTED    He $_{\text{ACT}}^{\text{RED}}$ sexually molested Wendi.

16.    I remember a time when Wendi and I wanted so badly for Alejo to take us into the desert behind Wendi's house, so we could tell each other scary stories in the dark.  In exchange for promising to drive us out to the desert, Alejo laid on the couch and forced Wendi to rub his feet and me to rub his head until he fell asleep.  As we did this, REDACTED
REDACTED

REDACTED                                                         It went on for what seemed to be a very long time until Wendi "woke up" Alejo and asked him to hold up his end of the bargain and drive us out to the desert.

17.    Wendi and I liked to go out into the desert and we went there many times when we were kids. Alejo drove us to the desert, about ten minutes away, under the condition that we wear our nightgowns.  I don't recall Alejo explaining why we had to change into our nightgowns.  Wearing my nightgown at Alejo's request made me feel uncomfortable and I knew something wasn't right about it.  When we got to the desert, we usually just sat in the car and told ghost stories.  There was one time when Wendi and I asked Alejo to leave us in the middle of the desert, thinking it would be a great adventure. We didn't expect him to actually leave, but he took off and left us there for about ten

Page 8 of 12

Initials

minutes before coming back.

18.     When I spent the night at Wendi's, Wendi and I slept in her bed in her bedroom. REDACTED

REDACTED

REDACTED                              Alejo's behavior made me feel sick and uncomfortable.

                                        REDACTED

REDACTED     . I don't recall Donna ever waking up to see where Alejo was or what he was

doing.

19.     Until now, I never told anyone about       REDACTED       . I thought about

telling my parents, but I was afraid of what my dad would do to       REDACTED       When

I was a young teenager, my mother was in the hospital at Casa Grande Regional Medical

Center for pleurisy. I recall my father telling me to stay at Wendi's house, since it was so

                                                      REDACTED

close to the hospital. I didn't want to stay there,

REDACTED     , but I didn't want to tell my father why, so I said, "It takes me too long to get

ready in the morning when I stay at the Ochoa house." My dad thought I was being

ridiculous, but he had no idea why I was so reluctant to stay there. Another reason I never

told anyone about what happened, is because I was afraid I would never see Wendi again.

It sounds so silly saying it now, but that's the way the mind of a child works. I really enjoyed

my friendship with Wendi and I thought that       REDACTED

Page 9 of 12

Initials

REDACTED , then I might not see Wendi ever again.  Wendi and I never discussed REDACTED
REDACTED
     We just didn't.

20.     When I was about thirteen years-old, REDACTED I don't know
why it stopped when it did, but I remember that there came a time when REDACTED
                REDACTED
                            Wendi and I remained friends
until we gradually drifted apart as adults.  The last time I saw Wendi before her arrest was
at the funeral of Brad King, who was the son of Pastor Tom.  Brad died in a plane crash.
The funeral was in 1994 and I was pregnant with my first child.  I talked with Wendi briefly.
She said, "I can't believe you're pregnant."  It was just small talk.

21.     About a month before Wendi's arrest in 2000, my mom gave me Wendi's
phone number.  Wendi came in to my mom's work to get some things printed off and gave
my mom her phone number and told her to pass it along to me.  I was really busy at the time
and I never made contact with Wendi.  A few weeks went by and I heard the news that
Wendi was arrested in connection with the death of her husband.  I was mad at myself for
not getting in touch with Wendi and I couldn't help but think about the possibility that Joe
might not be dead and Wendi might not be in jail if I'd been available to Wendi, as a
supportive friend.  It's just one of those things you can't help but wonder about.

Initials

22.     After I learned of Wendi's arrest, I got in touch with Donna and Alejo. I wanted to visit with Wendi. I was able to make arrangements to visit Wendi and did so.

23.     As a child, I wasn't aware of anyone knowing that                REDACTED                I assumed that no one at the church knew, because I couldn't imagine why they would allow him to be the youth minister at 91st Psalm and Family Harvest Church knowing that. I just assumed no one else knew except me, Wendi, and Alejo. I'm just beginning to face what happened to me and I wish I would have said something at the time it was going on or during Wendi's trial.

24.     During Wendi's trial, I read that Joe was abusive and Wendi did not seek refuge from his abuse or reach out for help. I did not know Joe, but if he was abusive, it makes sense to me that Wendi suffered in silence and covered up for her husband. Wendi has been covering up for others her whole life. During the course of our friendship, not once did Wendi talk about Alejo sexually molesting her. She covered up for him probably in the same way she covered up for Joe.

25.     If I could say anything to a jury of strangers considering Wendi's sentencing, I would say that Wendi is sweet and compassionate. The person described by the prosecution is not Wendi. I know Wendi as the kind of person who doesn't say mean things about others.   Wendi is a good person who was probably pushed over the edge by an accumulation of things that happened to Wendi growing up and in her marriage. It's just unbelievable to me that Wendi is actually on death row. She doesn't belong there.

Page 11 of 12

Initials

26.    Until now, no one has ever contacted me about Wendi. If I had been asked

to provide information about Wendi, her family, my family, the church and the school or to

testify on Wendi's behalf, I would have done so. If I had been asked to testify to the

information contained in this declaration, I would have done so.


I have read the foregoing declaration consisting of 12 pages and 26 paragraphs and it has
been read to me. I declare under penalty of perjury under the laws of the State of Arizona
and the United States of America that it is true and correct. Signed this 11 day of
November 2010 in Maricopa County, Arizona.

Jeri Lynn Cunningham

Initials

# Exhibit 13

DECLARATION OF MARK KEATING

I, Mark Keating, declare as follows:

1979 MK

1.      I was born August 24, 1956. I am a formal educator. In ~~1980~~, I graduated

from the University of North Carolina Chapel Hill with a B.A. in Radio, Television, and

Motion Picture. I furthered my education from 1981 to 1983, by attending Rhema Bible

MK TRAINING CENTER

~~College~~ in Oklahoma.   In 1991, I graduated with a Master's Degree from Regent

University in Virginia Beach, Virginia.   Currently, I work at Veritas Christian Academy as

Director of the Dialectic and Rhetoric School (Upper Division) and as Swim Coach and

Tennis Coach.   I have been an educator for 28 years and I have taught thousands of

students over the course of my professional career.                                      MK

School

2.      From 1983 to 1988, I was the principal at 91st Psalm Christian ~~Church~~ in

MK

Casa Grande, Arizona, alongside my wife, Nancy Keating. We were asked to come to 91st

met MK at  ME,           Training Center  MK

Psalm by Pastor Cal Lorts, who was someone I ~~knew from~~ Rhema Bible ~~College~~, in

Oklahoma. Soon after Nancy and I accepted the position at 91st Psalm, Pastor Cal decided

to leave his location in Casa Grande and start a new church up in the Phoenix area. We

remained at the school in Casa Grande and it was taken over by a new pastor named Tom

King. Tom King renamed the school Harvest Christian Academy.

Page 1 of 5

Initials

3.    I met Wendi Ochoa and her parents, Alejo and Donna Ochoa.  My first memory of seeing Wendi was when she came inside the church after pulling weeds with the King boys, Shawn and Brad.  Shawn and Brad are Pastor Tom's sons.  Wendi was about twelve years old.  Wendi was a student at 91ˢᵗ Psalm and Harvest.  Her father, Alejo, was the groundskeeper and ~~youth~~ children's MK pastor there.

4.    Wendi made a big impression on me when Nancy and I started up a swim team at Harvest.  Wendi participated in a swim time trial and she was the fastest girl out there.  She swam one-hundred meters.  Wendi stayed with the swim team until her ~~senior~~ Junior me year of high school.  Her parents pulled her out because she lost a lot of weight and her chest became flatter.  I thought it was abnormal for a parent to be concerned about the size of his or her child's breasts

5.    Wendi's father, Alejo, joked around a lot.  ~~A lot~~ Some MK of his jokes were not well-received at the church.  Alejo was addressed by a number of the fathers at 91ˢᵗ Psalm and Harvest about his sexual gestures made toward some of the adult women at the church, Cindee Justus and Connie Carlin, in particular.  Another time Alejo was accused by a student, Jasper 'JC' Neace, of having pornography.

6.    There were things about Alejo's dynamic with Wendi that did not sit right with me.  I used to live in an A-frame house on the church property with Nancy.  One night, I was standing on the balcony as I got ready for Wednesday night services.  I looked

Page 2 of 5

into the parking lot and I saw Wendi and Alejo. Wendi leaned into Alejo and they kissed on the mouth. Something was weird about it. It was not a father-daughter kiss. After the kiss, Wendi went in one direction and Alejo went in the other direction. This stuck out in my mind so much, I told Nancy about it.

7.     One time while Nancy and I were in a small classroom at the church, Wendi came in and said, "Can I talk to you?" She looked very anxious and concerned. Just as Wendi prepared to tell us what was heavy on her heart, Alejo walked in. Within the classroom was a closet and Wendi backed right up into it, very affected by Alejo's presence. Wendi never did tell us what was on her mind. I was afraid it had something to do with the sexual abuse, having observed Alejo's inappropriate behavior and strange dynamic with Wendi. When she came to talk to us, it was on the heels of a sermon that a guest-minister named Kevin McNulty made about sexual sins and sexual abuse.

8.     Another time, when I was at the tennis courts at the fitness center in Casa Grande, I saw Wendi there. To my surprise, she was wearing a Playboy Bunny costume. She was just a teenager. A guy at the fitness center made a lewd comment about Wendi and it upset me. Wendi said that Alejo bought Playboy Bunny costumes for her. I did not think it was right for her to be walking around in an outfit like that, but since it appeared that her parents were aware of how Wendi was dressed and even encouraged it, there was not much I could do.

Page 3 of 5

Initials

9.      Before I left Harvest, I pulled Wendi into my office because I needed to tell her something. I told Wendi that if something was going on with her at home, if there was anything that was going wrong in her life, she needed to find someone she trusted to share it with. That person did not need to be me, necessarily. I just wanted Wendi to know that if something was not okay with her, there was help.

10.     Within the church administration, with Pastor Tom as its head, things really deteriorated. He was friends with a man named Dick Herdegen who was a big financial contributor to the church. The money he got from Dick became a big part of Tom's pastorship. It all kind of unraveled when it was discovered that REDACTED
REDACTED
, was molested by Dick Herdegen.

11.     Tom's need for control got to a point where church members and students needed to go through him to find out whether or not they were right with God. I even found myself falling into that trap. One time, I was shopping for clothes and I thought about buying a pair of jeans and I found myself thinking, "What would Tom think of this?" The church was becoming more and more like a cult. I noticed that during this time, Tom really loved "baby Christians," meaning people who were new to Christianity and easier to convince of anything. More seasoned and thoughtful Christians who questioned Tom's authority were shunned by Tom.


Initials

12.     In 1988, Nancy and I resigned and were encouraged not to finish the school year there.  We packed up and left and went to Oklahoma, ~~to go to graduate school.~~

13.     After we left, we kept in touch with George Carlin, another church member. He kept us informed about Harvest and its members.  After we left, things just completely fell apart.  Marriages were broken and some of the students had a difficult time staying on the right path.  Some of the kids like JC Neace and Jamie Allen wound up in prison.  I heard that Shiloh Justus got into drugs as an adult.

14.     In 2000 or 2001, George called to tell me that Wendi had been arrested.  I could not believe it.  I remember Wendi as a very dedicated student, wanting to do so well in school.  I could not help but think that whatever was going on in her childhood home might have had something to do with how her life turned out.

15.     Until now, no one has come to speak with me about Wendi.  If they had, I would have said what I have said in this declaration.  If I had been asked to testify, I would have done so.

I have read the foregoing declaration consisting of five (5) pages and fifteen (15) paragraphs and it has been read to me.  I declare under penalty of perjury under the laws of the state of Virginia, Arizona, and the United States of America that it is true and correct.  Signed May 24, 2011 at Suffolk County, Virginia.

_____
Mark Keating

_____
Initials

# Exhibit 14

## DECLARATION OF NANCY KEATING

I, Nancy Keating, declare as follows:

1.     I was born December 7, 1959. In 1982, I earned a B.A. in Education with a concentration in Health and Physical Education from the University of North Carolina. In 1991, I completed my Masters Degree at Regent University, Virginia Beach, Virginia in the school of Education with endorsements in Reading and Learning Disabilities Specialist. Currently, I work at Veritas Christian Academy as Elementary Assistant, Department Head of Physical Education, Elementary Reading Teacher, and Head Cross Country Coach. I have been an educator for 29 years and have taught thousands of students.

2.     I met Wendi Ochoa (Andriano) and her parents, Alejo and Donna Ochoa in 1983 when I began working at 91st Psalm Christian School in Casa Grande, Arizona. I came to work at 91st Psalm through my husband, Mark Keating. Mark and I were invited to the church by its pastor, Cal Lorts. Because both Mark and I had backgrounds in formal education, Cal brought us into the school to step up the experience and quality of education. Shortly after we arrived, there was a change in pastorship from Pastor Cal to a new pastor named Tom King. Though we liked Pastor Cal and his wife, Barbara, very much, Mark and I prayed about it and decided to stay at 91st Psalm in Casa Grande instead of following Pastor Cal to his new church near Phoenix. From 1983 to 1988, Mark and I acted as school principals at 91st Psalm, later renamed Harvest Christian Academy by Pastor Tom.

NK
Initials

3.     When I first arrived at 91st Psalm, it did not take me long to realize that the culture there was very backwards. A big part of my educational platform is integrating sports and the spirit of athleticism into schools. So, I showed up to one of our first school events wearing Bermuda shorts and began participating in a game of basketball with the men, unaware of how foreign the concept of female athleticism was to the church community. Women at 91st Psalm wore long pants or skirts, even in the hot Arizona weather. They did not wear clothes that were appropriate for sports or physical activity.

4.     As educators, Mark and I encouraged students to look beyond the community of Casa Grande and to continue to be educated, to go to college, and to take pride in their education and sportsmanship. We wanted them to have goals. One of the ways in which we instilled these concepts was to incorporate sports into the curriculum. We started a swim team and a track team. We also hosted sporting events in the community, like Harvest Track Classic, and that helped Harvest shed their negative reputation within Casa Grande.

5.     Wendi was one of our students who really pushed herself. She was a lovely little girl; always very put together and a very conscientious student. I say this very humbly, but I believe she was inspired to take pride in herself because of the messages that Mark and I passed on to her and the rest of the students. She wanted to make something of herself. Wendi loved to sing and had a great competitive spirit. Wendi participated on our swim team for many years, until her senior year of high school.

Initials

*Children's Pastor*
NL

6.  Wendi's father, Alejo Ochoa, worked at the church as a groundskeeper and a ~~children's minister~~. Alejo was often side-tracked to perversion. He made perverted jokes in front of and to some of the adults, including Connie Carlin and Cindee Justus, both of whom were bothered by Alejo's behavior. Alejo just laughed to himself and found ways to talk about objects as if they were male genitalia. Before a school recital or performance, Alejo made such a joke about one of the microphones, in front of everyone. Sometimes he made gestures imitating intercourse. Alejo also made sexual jokes in front of Lola Archuleta, the church secretary. He upset a lot of people with his inappropriate behavior.

7.  Something was off about Alejo's relationship with Wendi. It was more of a teasing relationship, not so much a father-daughter relationship. Alejo did not seem protective of Wendi, as his daughter. Alejo *was* very proud of Wendi being his daughter. He praised her when she sang or participated in a swim competition. I felt that Wendi needed to be perfect around Alejo. I do not know if the word "perfectionist" quite describes Wendi's personality, but she always performed very well.

8.  Alejo was with Wendi most of the time. After school, she was out there on the church yard for a long time, helping Alejo with his grounds-keeping. They were together quite a bit. In contrast, I didn't see Alejo with his wife, Donna, too much. I didn't see Wendi with Donna much, either. Donna was someone who was more like a once-a-week church goer, whereas Alejo and Wendi were at the school most of the day.

NK
Initials

9.      A couple of times when Wendi was a teenager, I observed Alejo trying to get Wendi to pull the weeds or do some type of manual labor on the church grounds. Like a typical teenager, Wendi rolled her eyes or expressed a desire not to do what was asked of her. Instead of telling Wendi not to talk back, Alejo did something very strange with Wendi. He *begged* her to do what was asked of her, sometimes in exchange for something else. He said, "Please, Wendi. Please..." I cannot recall what he offered her in exchange for performing her required tasks, but it was as if Wendi was his little princess and he needed to entice her to get her to do what he wanted.

10.     A couple of years after Mark and I started working at 91st Psalm and Harvest, we were dealing with curriculum in a very small classroom at the school. Wendi came in and said she had something she wanted to tell us, but she could not get much out. She was very nervous and swallowing a lot. Alejo came into the room just as Wendi was about to reveal whatever it was she wanted to talk to us about, and she just shut down. Her eyes got really big. She looked like she had been caught saying something bad. I think Alejo's presence scared Wendi. I thought at the time that maybe she was going to tell us that she was being molested.

11.     This happened around the time that it was discovered that REDACTED REDACTED , was being molested by a man named Dick Herdegen, who was a huge financial contributor to the church and a good friend to Pastor Tom. Pastor Tom did not do much about REDACTED being molested.   When the news about REDACTED being molested broke at the church, it was shocking. After word spread, Dick took off up north never to be seen or heard from again.

Page 4 of 6

$\mathcal{N}\mathcal{K}$
Initials

When all of this came to light, I just knew that Mark and I could not start a family in Casa
Grande. Not in that environment. It was not healthy there.

12.     When Wendi was in her ~~senior~~ junior year of high school, Donna and Alejo pulled
Wendi from swim team. The reasoning behind this, according to Donna, was that Wendi lost
too much body fat and was losing her breasts. It was another thing about Wendi and her
parents that made me suspect that something was terribly wrong at home.

13.     Around the time that Wendi ended her participation with the swim team, Mark
and I left Harvest School.

14.     After Harvest, we moved to Oklahoma MK ~~and went to graduate school.~~

15.     Two of my Harvest students, Lisa Daugherty and Sarah Carlin, wanted to come
visit me and Mark after we moved to Oklahoma. They told me that Pastor Tom and the rest of
the administration gave them a really hard time for wanting to come visit us. Sarah's parents,
George and Connie Carlin, decided not let Sarah visit us because it jeopardized her position at
the school. Lisa and her sister, Kristin, *did* come visit us, but they told me that they were
ridiculed by the Harvest administration for doing so.

16.     Another Harvest student, Jamie Allen, also visited us in Oklahoma. Jamie brought
with him an eight year-old boy who also went to Harvest. I can't remember how old Jamie was,
but he was in his late teens. When they stayed with us, the little boy needed to take a bath and
Jamie was quick to pipe up and say that he could take care of it. A couple years later, Jamie was
arrested for child molestation and went to prison.

Page 5 of 6

NK
Initials

17.    I think about Harvest and I could write a book about all of the tragic stories that came out of that church.  Around 2000 or 2001, I heard from George Carlin that Wendi was arrested.  Though I could not imagine Wendi doing what she was accused of, I also thought about my suspicions that Wendi was molested while she was growing up.  Like many other students who attended Harvest, Wendi is *NK most likely a* by-product of that unhealthy environment at Harvest Christian Academy.

18.    No one in connection with Wendi's case ever contacted me before now.  If they had, I would have told them what I have said in this declaration.  If I had been asked to testify on Wendi's behalf, I would have done so, *under subpoena. NK*

I have read the foregoing declaration consisting of six (6) pages and eighteen (18) paragraphs and it has been read to me.  I declare under penalty of perjury under the laws of the state of Virginia, Arizona, and the United States of America that it is true and correct.  Signed May 24, 2011 at Suffolk County, Virginia.

*Nancy Keating*
Nancy Keating

*NK*
Initials

# Exhibit 15

SUPERIOR COURT OF ARIZONA

COUNTY OF MARICOPA


STATE OF ARIZONA,                )
                                 )
          Respondent,            )
                                 )
v.                               ) No.   CR2000-096032-A
                                 )
WENDI ELIZABETH                  )
ANDRIANO,                        )
                                 )
          Petitioner.            )
_____  )


DEPOSITION OF SHAWN KING

Phoenix, Arizona

July 11, 2011


Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

**Page 2**

```
 1
 2                    THE DEPOSITION OF SHAWN KING
 3  commenced at 1:47 p.m. on July 11, 2011, at
 4  Coppersmith Schermer & Brockelman,  2800 North
 5  Central Avenue, Phoenix, Arizona, before Cindy
 6  Mahoney, RPR, RMR, Arizona Certified Court
 7  Reporter No. 50680.
 8
 9      APPEARANCES:
10          For the Deponent:
             BROWN & LITTLE, P.L.C.
11          By:   Adrian W. Little, Esq.
                  950 West Elliot Road
12                Suite 107
                  Tempe, Arizona 85284
13                480-299-2093
14          For the Petitioner:
             FOLEY & LARDNER LLP
15          By:   Allen A. Arntsen, Esq.
                  150 East Gilman Street
16                Madison, Wisconsin 53703
                  608-257-5035
17          For the Respondent:
             OFFICE OF THE ATTORNEY GENERAL
18           STATE OF ARIZONA
             By:   Lacey Stover Gard, Esq.
19                 400 West Congress
                   Tucson, Arizona 85701
20                 520-628-6654
21
22
23
24
25
```

**Page 3**

```
 1
 2                   I N D E X
 3   WITNESS                               PAGE
 4   SHAWN KING
 5   Examination by Mr. Arntsen             4
 6   Examination by Ms. Gard               45
 7
                     (No exhibits)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

12:48:32-13:48:27

**Page 4**

1    SHAWN KING,

2  the witness herein, being first duly sworn,

3       was examined and testified as follows:

4                    EXAMINATION

5    Q BY MR. ARNTSEN:  Can you please state

6  your name.

7    A Shawn King.

8    Q Where do you live, Mr. King?

9    A 2102 North Hill, Mesa, Arizona.

10    Q Have you ever had your deposition

11  taken before?

12    A Yes.

13    Q Couple things.  If you don't

14  understand a question, let me know, and I'll

15  try to rephrase it.  Okay?

16    A Okay.  Yes.

17    Q Are there -- is there anything -- for

18  instance, are you on any medications today

19  that would interfere with your ability to

20  testify truthfully and completely?

21    A No.

22    Q And you understand that this

23  deposition is in connection with some

24  post-conviction proceedings relating to -- on

25  behalf of Wendi Andriano?  Do you understand

13:48:27-13:49:26

**Page 5**

1  that?

2    A Yes, I do.

3    Q Just to let you know, I'm

4  representing Ms. Andriano in these

5  post-conviction proceedings.

6       So that's sort of the context in

7  which this deposition is being taken.  Okay?

8    A All right.

9    Q And if I refer to Ms. Andriano as

10  Wendi Andriano, you'll know who I mean; right?

11    A Yes.

12    Q Even though it's my understanding

13  most of time you knew her, her name was Wendi

14  Ochoa; correct?

15    A Yes.

16    Q When did you first meet Wendi?

17    A I can't tell a specific year.  I

18  probably was eight years old.  So it would be

19  '79.

20    Q What was the context?

21    A We went to school at the same place.

22    Q How long did you go to school

23  together?

24    A From either 1981 until she graduated

25  in '88, I believe.

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

**13:49:28-13:50:30**  Page 6

1  Q  When did you graduate?
2  A  I graduated in 1990. She might have
3  graduated -- she was '89, I think.
4  Q  What was the name of the school?
5  A  91st Psalm originally, and then
6  Harvest Christian Academy it became. It was
7  the same school.
8  Q  Was that school affiliated with
9  church?
10  A  Yes.
11  Q  And what was the name -- was the name
12  of the church the same as the school?
13  A  Well, it was -- it was Harvest Family
14  Church and then 91st Psalm before that.
15  Q  Was your father the pastor of the
16  church?
17  A  My dad was the pastor of Harvest
18  Family Church. He was the associate pastor at
19  91st Psalm.
20  Q  And do you recall when it was that --
21  when did it -- did the church go from being
22  91st Psalm to Harvest Family Church?
23  A  I think it was -- I'm saying '82,
24  '83, somewhere in there, yeah.
25  Q  And again, that's when your father

---

**13:50:32-13:51:26**  Page 7

1  went from being the assistant pastor to
2  becoming the pastor?
3  A  Yes.
4  Q  And is the church still there?
5  A  Yes. Well, the one -- the building
6  that it was both 91st Psalm and Harvest, it
7  burned down. There was an arson in 2003. And
8  they're rebuilding something on the site now.
9  Q  They being the congregation?
10  A  Actually, yes. It's a -- my dad and
11  the congregation rebuilding it.
12  Q  Did you know Wendi's parents?
13  A  Yes.
14  Q  How did you know them?
15  A  Alejo Ochoa -- well, that's her
16  stepdad, I believe --
17  Q  Right.
18  A  -- was the -- was an associate pastor
19  at Harvest Family Church for sure, maybe at
20  91st Psalm. He might have been there at that
21  time. I don't know if he was pastor at that
22  point.
23  Q  Okay. And then --
24  A  He was definitely associated with it
25  though.

---

**13:51:30-13:52:45**  Page 8

1  Q  That's Alejo Ochoa?
2  A  Yes. And then Donna Ochoa, his wife,
3  Wendi's biological mother, I believe I knew
4  her through him, I guess, just through Alejo,
5  the fact that she would come with him
6  sometimes to be around the church or whatever
7  or the school.
8  Q  So I believe you indicated starting
9  when you were -- you met Wendi when you were
10  around eight or so?
11  A  Yeah.
12  Q  And did you -- was your -- were your
13  interactions with Wendi initially at the
14  school?
15  A  Yes.
16  Q  Any place other than at school?
17  A  Yeah. My recollection was only --
18  well, yeah, it was at school first for the
19  first -- I don't know -- couple years. And
20  then we were invited to various places, like
21  there would be a party, birthday party at --
22  well, there was an A-framed house on the
23  school and church grounds. It was a
24  parsonage, and they would have a party there.
25     So she would be at that and I would

---

**13:52:49-13:54:12**  Page 9

1  be at that. And then there was also -- they
2  would have another set of parties at Carlin --
3  Lonny Carlin, his house -- or his parents'
4  house, and I went there, and she would be
5  there. And I don't recall when I went to
6  their house. But it was when they lived -- to
7  Alejo and Donna's house. It wasn't until they
8  lived in Indian Hills, which was -- I don't
9  know. I don't have any idea when that was.
10  Q  Do you recall approximately how old
11  you were?
12  A  Well, yeah. Where did I live in -- I
13  would have lived in -- it would have been more
14  like 12, I think, whenever I started going --
15  or we would go there and -- and then just -- I
16  mean, it was always with -- usually -- well,
17  yeah, it was with my parents and other people
18  that I would go -- other friends and whatever.
19  Q  Were these events sort of sponsored
20  by the church or the school? Were they in
21  connection with that?
22  A  Not always. I mean, there would be
23  like -- they would just have a get-together
24  for whatever reason, party for something,
25  somebody's birthday. That wouldn't be the

---

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

13:54:15-13:55:18       Page 10

1 school or church having anything to do with
2 it.
3     Q Did you -- did you actually live
4 on -- was the school on the same property as
5 the church?
6     A Yes.
7     Q Okay.
8     A It used the same building.
9     Q Did you live on that property also?
10     A Not until '85 -- no, it was --
11 actually, it's not the church property that we
12 lived at. It was -- it was a -- like, the
13 church is a big parcel of 10 acres or
14 something or 15, 20 acres, but -- and then we
15 have -- my parents have another parcel beside
16 that.
17     Q Okay. Just adjacent?
18     A Yeah, yeah. It's like a quarter mile
19 away. So they built a -- I helped my dad
20 build a house that was done -- actually, I
21 think we moved in like '87 or '88. So we
22 didn't live there until then. Otherwise we
23 never lived in the parsonage. That was the
24 parsonage for the previous pastor before it
25 became Harvest Christian -- or Harvest Family

---

13:55:18-13:56:33       Page 11

1 Church.
2     Q What can you tell me about Wendi as a
3 child when you first met her?
4     A She was very -- she was a very, for
5 lack of a better word, I guess spry kind of
6 thing, very energetic and outgoing and not
7 very sporty. She didn't, like, play --
8 whenever we'd play dodge ball and stuff like
9 that, she didn't play much. She'd get
10 involved but not a lot.
11     But I mean, she was a -- she was
12 happy as a general rule. But there was always
13 a bit of perhaps question in that from my -- I
14 don't know. From my perspective, you know,
15 like a little bit underneath it maybe. That's
16 from my recollection now of how it was.
17     Q What do you mean by that little bit
18 underneath it, that thing that's different
19 from being happy?
20     A She was just very -- she was very --
21 I mean, I don't know how else to say it. She
22 was kind of devious in things. So I always
23 knew she had kind of a plan underneath what
24 she was doing.
25     Q Can you give me an example?

---

13:56:36-13:57:52       Page 12

1     A I'm trying to think. Well, she got
2 away with anything, like pinching, that was a
3 big thing I remember from one time whenever
4 people would be pinching each other and girls
5 were pinching guys. That was the big thing at
6 one time.
7     And all these other girls -- not all,
8 but a few would get in trouble. She never got
9 caught. She'd always be pinching me or my
10 brother or something like that. Never got
11 caught, even though I wouldn't try to get her
12 caught. But she was just very good at that on
13 the sly kind of thing.
14     Q About how old was she when this --
15     A This was early on, like eight. She's
16 my age, I think. Yeah, she's like six months
17 older than me.
18     And we didn't have grades. So we
19 were all with everybody all the time. It
20 wasn't a big school. I can't think of any
21 other kind of thing, but it did seem like she
22 had a -- a more -- like 12, as we got into
23 teenage years, she had control over other
24 girls.
25     Q Like what other girls?

---

13:57:55-13:58:58       Page 13

1     A Like, who am I trying to think of? I
2 can't remember. Gerri Lynn. I don't know.
3 That's one of the girls I'm thinking of.
4 That's just a name. I can't think of a
5 particular -- like, not bossing around, but
6 like her leadership or something, she's the --
7 the top dog kind of thing. That's just the
8 feeling I got.
9     I didn't know that for sure. But, of
10 course, I was always interested in her, in a
11 relationship with her from like probably 12 or
12 something.
13     Q Okay.
14     A And so --
15     Q And what -- so what do you mean by
16 you were interested in a relationship with her
17 from about 12?
18     A Well, it would be primarily, you
19 know, like romantic kind of relationship. I
20 just thought she would be my sweetheart kind
21 of thing. I was very naive at that point,
22 having not been raised on television or
23 anything.
24     And probably right about that time is
25 when I started watching TV, being allowed to

---

     

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

13:59:03-14:00:26                                    Page 14

1  watch TV. I mean, I watched sports, but I
2  couldn't watch commercials or anything. So --
3  and no movies. And so she was just the
4  epitome of real life -- or not -- yeah,
5  epitome of worldly, if you know what I'm
6  talking, you know.
7      Q  Would it be fair to say you had a
8  crush on her?
9      A  Yeah, definitely. From probably 12
10 years old or something like that.
11     Q  And for how long did this crush last?
12     A  It lasted until I was -- well, until
13 I guess it -- whenever we started going out at
14 16, 17, something like that, I mean, I still
15 had a crush. I mean, she was like in total
16 control of my life. Not -- I mean, yeah, she
17 could get me to do anything pretty much.
18     Q  Like what?
19     A  Well, because I didn't generally
20 disobey the rules of the school or whatever,
21 but if she wanted me to do something, I would
22 do it. And so she -- like, kissing and stuff
23 like that was not allowed and hand holding, so
24 we'd hold hands like at probably 16 or, you
25 know, I'd do that or she'd do that, and I'd do

---

14:01:51-14:03:12                                    Page 16

1  it was a general crush, jealousy I guess at
2  that time. It became a freak-out later. And
3  based on what she -- yeah, stuff I found out
4  later.
5      Q  What do you mean by that?
6      A  Well, I mean, whenever we went out
7  and -- whatever years those were, because I
8  think '91 is when it ended, so I would have
9  been 20. But before that time, I mean, we
10 were -- we got -- it was probably '88 that we
11 got sexually active to some degree.
12     And from that time until '91 or, you
13 know, until like mid '91, I assumed that we
14 were -- or I mean, I believed that we were
15 monogamous, you know, together exclusively.
16 And I find out from multitudes of people that
17 she had been with so many guys during my
18 tenure with her. And that just blew me away.
19     I  Caught her with a couple guys a
20 couple different times, and she talked me out
21 of it. She got me to believe -- like, I
22 walked back into her house and believed that
23 it was okay. So I -- somehow.
24     Then finally, that's whenever I did
25 the -- the breakup with her was finally in

---

14:00:27-14:01:48                                    Page 15

1  it even though I didn't want to or whatever.
2      Q  Hold hands?
3      A  Yeah. Well, that or kissing or
4  whatever. So it was kind of interesting. But
5  she always kind of -- it seemed to me like I
6  was the -- not the goody two-shoes. I wasn't
7  like that at all, but that I was the good part
8  of her, is what it seemed like to me. But
9  that's in retrospect. So I have no clue for
10 sure.
11     Q  Did you -- was -- was your friendship
12 a good one?
13     A  Yeah. I was always mistrustful,
14 though. I mean, not terribly so, but once I
15 found out, you know, later on I became freaked
16 out. But yeah, I did like her. I mean, we
17 talked about -- we had a good intellectual
18 connection. And I was always reading, and she
19 had read a lot of the same stuff. And we
20 seemed to connect well.
21     And we like -- she didn't really like
22 sports that much. So that was a problem for
23 me. Although she swam, but she didn't
24 really -- I was worried that she was trying to
25 look all sexy for everyone. And so, I mean,

---

14:03:15-14:04:42                                    Page 17

1  '91. I heard about a couple of different guys
2  and different -- different -- different guys
3  than the two I caught her with. And so that
4  was pretty -- yeah.
5      So then I mistrusted her completely.
6  But before that, I really thought -- I was
7  just naive and just thought all is well with
8  us.
9      Q  So over what period of time were you
10 and Wendi a couple?
11     A  Definitely ended in fall of '91. I
12 believe it started officially -- well, I know
13 it sexually started in -- it may have been
14 '87, late '87 because I was 17. My birthday
15 is in December. Before that we might have --
16 it might have been at the start of the school
17 year. So early -- mid '87.
18     Q  So when you say you caught Wendi with
19 a couple of guys, tell me what happened?
20     A  Okay. One time I -- well, the one
21 time I caught her for -- is that -- I mean, I
22 didn't actually see her in the act with
23 anyone. I didn't -- but she -- okay. She's
24 in her apartment. She got an apartment after
25 she got out of school, I think. So this was

---

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

1  '89, I believe, probably I caught -- or '90
2  maybe.
3       But I found her -- I went to her
4  apartment. And the door is locked, and I hear
5  some noises inside. So I start beating the
6  door down -- or, I mean, banging on the door a
7  ton, not breaking it. And then she finally
8  comes up and answers the door in like a
9  nightie kind of thing with nothing on.
10      Then I walk into the -- I come
11  running into the bedroom, and there's a guy
12  getting up with pretty much nothing on as
13  well. He's pulling up some boxers or
14  something.
15      And that's the one where I'm like --
16  I'm positive something was happening here.
17  And I'm going off on her. Then she -- or I
18  mean, I'm just, you know, crying and stuff.
19  Then she takes me over to the -- outside to
20  the porch. There's a little porch thing. It
21  was up a flight of stairs, I think. And she
22  talked me into thinking it's fine.
23      I don't know -- I mean, I was so
24  different back then, unaware I guess you'd
25  say. But I mean, I believed her somehow.

1      Q What did she tell you?
2      A That they were just resting. Why
3  they had no clothes on, I don't -- oh, they
4  had swum (sic). Or they had been swimming. I
5  don't know if that's a word, swum. Anyway,
6  yeah, and so they had to have their clothes
7  off. So I bought it.
8      Q And you indicated you caught her on
9  another occasion?
10     A Yes. Well, that was in a truck. She
11  was delivered back -- she was supposed to have
12  been at the apartment for us to meet, you
13  know, for one of our little dates or whatever
14  one night. She wasn't there.
15      And so I stayed there like for two
16  hours or something because there were other
17  friends that lived around there. So I was
18  talking to them or whatever. And she shows up
19  and -- or this truck shows up. There's this
20  guy sitting in the driver's seat, and she's
21  nowhere to be seen.
22      And then she gets out and she's --
23  then she suddenly gets out and her hair is all
24  disheveled and everything. Her dress is all
25  messed up. She's got her underwear pulling up

1  as she walks out.
2       So I was -- I just -- at that point I
3  assumed -- I didn't catch her in anything, but
4  it was soon after that that I broke up because
5  I was -- I became convinced that she had been
6  with -- because other people had told me --
7  other friends of hers or friends of ours had
8  told me that they had seen her at parties
9  doing stuff actually in the act. And so I
10  was.
11     Q You said friends of yours told you
12  that they had seen Wendi having sexual
13  intercourse at parties?
14     A Yeah, I believe -- yeah, definitely,
15  they had said -- like Kim -- I think Kim was
16  one.
17     Q Who?
18     A Kim Ethington. She used to live
19  close to -- that's not her name now, but I
20  know she's been married at least twice. But I
21  don't keep up with her really. Just hear
22  through other people.
23      Then I think -- I can't -- I can't
24  recall any -- I think Lonny Carlin may have
25  seen her once or more than once. And I don't

1  think -- yeah, I don't think, like, Lonny's
2  sister Sarah, I don't think she saw anything.
3      Q By the way, what were the names of
4  these guys that you caught Wendi with?
5      A God, I have no idea. I never knew.
6  Wait a second. One of the guys was Anthony.
7  Definitely there was an Anthony because I
8  hated that name from then on until like 10
9  years later. So got over it.
10     Q And again, what did Kim Ethington
11  tell you about Wendi?
12     A She was saying that she saw her
13  making out for sure at multiple parties. But
14  then she saw her at one sitting on a guy
15  essentially who was sitting on the couch, but
16  then she's sitting on the guy, and he's out of
17  his pants kind of thing. She's basically
18  having sex with him on the couch.
19     Q And do you recall what Lonny Carlin
20  told you?
21     A No. I mean, it was just something
22  about sex, I think. I don't know the
23  actual -- the specifics. I can't remember
24  any.
25     Q Did you and Wendi have a sexual

| 14:09:40-14:10:52 | Page 22 |
|---|---|

1 relationship?
2     A Yes, we did. But we never had -- we
3 never -- we never had anything but oral
4 intercourse because she was saving herself for
5 marriage like we were taught allegedly. And I
6 didn't know how to -- or I didn't know a thing
7 at that point.
8     Q And for how long a period before you
9 broke up were you and Wendi having oral sex?
10     A It was from '88 to '91. So we would
11 do that fairly frequently, I mean, like once
12 or twice a week. That's not too frequently.
13     Q When you're saying oral sex, you
14 performed oral sex on her and she performed
15 oral sex on you?
16     A Yeah.
17     Q So what was it that prompted the
18 breakup of your relationship?
19     A Well, it was that guy in the -- in
20 the truck or the thing in the truck, whatever
21 went on there. And because she didn't say --
22 she didn't explain anything. Or somehow she
23 explained it to a point where I was okay with
24 it for then, but then like three days later I
25 went -- she wasn't showing up at places

| 14:10:55-14:12:05 | Page 23 |
|---|---|

1 whenever we were supposed to go out or
2 whatever, and so I just got irritated and
3 decided that's it.
4     Q Tell me the -- what happened, the
5 circumstances of your and Wendi's breakup?
6     A Well, we -- there was the one --
7 yeah, it was the night that I -- I walked --
8 did I walk or ride the bike? I can't remember
9 exactly, but I went to her apartment complex.
10     She had just bought a new car. I
11 smashed the windows out of the car with a
12 rock, and I told her that's it.
13     Oh, yeah, and then -- and then I
14 don't know if it was before that -- I think it
15 was a time before that where I had given her a
16 ring of promise, and I took that off her
17 finger, bit it, and threw it down. But I
18 think that was before the breakup. That
19 didn't work. The breakup didn't take that
20 time. And so then I had to get it the next
21 time.
22     Whenever I broke the windows, that
23 definitely was it. And I don't think I said
24 anything to her after that. Just didn't -- we
25 just didn't talk.

| 14:12:07-14:13:44 | Page 24 |
|---|---|

1     Q That was in '91?
2     A Yeah.
3     Q Tell me what you recall about Wendi's
4 interactions with her parents, her mother and
5 her stepfather?
6     A I don't -- I mean, her mother -- she
7 got along well with people, with authority
8 figures because we looked at adults, you know,
9 as authority figures. It wasn't like they
10 were our friends or anything. But she was
11 more friendly with people than I was for sure.
12     And it seemed like she felt like her
13 mom was commanding, but not too bad. And
14 Alejo, I mean, just seemed more like chummy,
15 you know, like they were just --
16     Q What do you mean?
17     A -- friends. I mean, more friendly
18 than -- I mean, just like friend to friend
19 kind of thing, not -- I mean, it wasn't like
20 he was lording over her or anything but -- as
21 much as her mom would. But otherwise, I
22 didn't notice any major -- yeah, no big
23 differences from other friends that had
24 parents, you know.
25     Q How much interaction did you have

| 14:13:46-14:14:54 | Page 25 |
|---|---|

1 with Alejo, given that he was an assistant
2 pastor?
3     A We did a fair amount, I mean, like
4 working together on a -- because I would work
5 construction stuff with them around the church
6 with my dad and with the church and the house
7 and what have you. I would do work,
8 construction.
9     So he also worked construction. So I
10 would learn. And then he -- he would -- you
11 know, like we'd dig ditches and stuff like
12 that. So he was pretty -- he would be singing
13 spiritual type songs, you know, more of the --
14 he would just be fun, oh, Lord, would you buy
15 me a Mercedes-Benz or something like that. So
16 we'd sit there and sing. We had a good time
17 just joking and messing around and stuff.
18     And as I got older, I got into
19 computers. And so I went away from him,
20 veered away. And he was like -- started to
21 get into photography and stuff, so I didn't
22 have anything to do with him pretty much from
23 then on. So I mean, not intentionally. It
24 just happened, divergent paths.
25     Q Were there any problems between you

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

1 and Alejo?
2    A  Oh, no, none.
3    Q  Was the church -- was it sort of --
4 would you describe it as a sort of male
5 dominated culture, or would that not be right?
6    A  I don't -- I mean, I had most -- my
7 best relationships were with ladies, not like
8 the ladies -- not a ladies man or anything,
9 but I was able to connect best with women.
10 And I felt like I was guided by a certain set
11 of women in the church.
12       So I wouldn't say it's too male.
13 There's -- like, the Bible is pretty male
14 oriented, if you don't mind.  And -- and I
15 didn't necessarily agree with that.  But I
16 thought that there was enough -- my mom was
17 the music leader and all that, and there were
18 others that did teachings and devotional type
19 things and stuff.  So I thought that was all
20 right.
21    Q  Are you still a member of the church?
22    A  Not necessarily.  Actually, I did
23 just go back for the first time in eight --
24 seven, eight years.  I went back a couple
25 weeks ago.

1       I just had -- since my accident, I've
2 kind of grown in various ways and learned
3 to -- learned, you know, I go a different --
4 my spirituality is different now from theirs.
5 And it doesn't really work for me.
6       As long as it works for them, I'm
7 cool with it.  I was able to go and be cool
8 with what they did at their church and hang
9 out.  And it was good spiritual stuff for
10 them.  For me, it was somewhat spiritual but
11 not big time, not the kind of thing I want to
12 do every week.
13    Q  Did you have a sort of abrupt, you
14 know, split with your parents and the church
15 or anything like that?
16    A  No.  There was no -- I just -- it was
17 actually through counseling, through my
18 spiritual advisors in counseling type stuff
19 that I realized that my path is diverging from
20 theirs.  So I just told them.  And we've
21 remained in great connection, my parents and
22 I.
23    Q  You indicated you had an accident.
24       Can you just describe briefly what
25 the accident was?

1    A  In October of -- of 1999, I was
2 walking from a friend's house.  It was like 6
3 in the morning or 6:55, something like that.
4 But I was -- I was still under the influence
5 of alcohol.
6       And I walked across the street on a
7 red crosswalk light, and a truck hit me, 1950
8 Chevy pickup.  And I dented the hood with my
9 head.  So it caused traumatic brain injury.
10 And then, plus I flew across the street, flew
11 across five lanes and smacked my head on the
12 concrete.
13       So it caused brain traumatic -- both
14 traumatic brain injuries.  And then my legs
15 were essentially cut off, smashed up,
16 pulverized, my lower legs.  They were able to
17 put them back on, whatever.
18       So that was the big -- then I was
19 laid up for like a year, almost a year.  Well,
20 I couldn't hardly get out.  I couldn't roll a
21 wheelchair because my left side was --
22 prognosis was paralyzed for life on the left
23 side because of the right side head trauma.
24       I ended up being able to get action
25 eventually, but not during really 2000.  So

1 that was the extent.
2       My -- whenever you have traumatic
3 brain injury, apparently one grows up again,
4 and it can happen multiple times.  So I -- I
5 mean, I kept journals from the time about six
6 months into it -- no, three months.  Yeah, I
7 started keeping journals because my counselor,
8 like before the accident, told me to do that.
9 So I did it.
10       And I can see how I grew up
11 multiple -- you know, I would start like a
12 little kid and grow up again and again, you
13 know.  So it happened over a long period.
14       So my brain was not working well
15 during the first probably five years.  And
16 then seven years after the accident -- it was
17 in 2008, so that was nine years that I started
18 a neurocognitive rehabilitation program.  And
19 that has just done amazing things.  But
20 anyway.
21    Q  So a very extensive physical and sort
22 of mental and psychological, emotional
23 rehabilitation --
24    A  Yes.
25    Q  -- process?

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

1    A  Yeah, yeah. I've been in full effort
2  ever since the accident. Well, ever since I
3  got out of the coma.
4    Q  Did you stay in touch at all with
5  Wendi after you broke up?
6    A  No, definitely not with her. I would
7  hear about her from, like, my parents or from
8  friends that would say she's doing this. I
9  mean, she had -- she got married, had kids. I
10  heard about that. But I didn't see them or
11  anything.
12        It seemed like -- well, yeah, she
13  even came to church because I kept playing the
14  drums at my parents' church. I had always
15  played like from '95 -- or '85 through '99. I
16  played every Sunday pretty much, played drums
17  for the music ministry.
18        And for a while there she was coming
19  to church. And I would -- they had a
20  particular place where Alejo and Donna and her
21  would sit. And then I remember them sitting
22  there. But I was always completely distant
23  and aloof. I never went and saw them. I
24  would never go talk to them afterward. I
25  would just leave out another door. I didn't

1  like to talk to anybody.
2    Q  Was there -- do you recall her being
3  at the church with Joe or her kids?
4    A  I guess so. I mean, before -- like,
5  in '95, something like that, maybe before --
6  yeah. I don't remember when she married Joe.
7  You know, once she moved -- she moved, I
8  heard -- yeah, she definitely moved up to
9  somewhere in Phoenix, and she just quit coming
10  to church.
11        At one point Alejo was no longer a
12  pastor. So they quit coming. So then I don't
13  have any idea when that happened. Because I
14  was -- I was disconnected from the church
15  really, even though I keep coming every
16  Sunday. I was -- I didn't pay attention to --
17  my life was in Scottsdale and work and stuff
18  like that.
19    Q  Did you ever meet Joe?
20    A  I think I did before the accident,
21  yeah.
22    Q  Okay. Do you recall the
23  circumstances?
24    A  I didn't go to her wedding, did I? I
25  mean, I could have gone to her wedding if

1  somebody had dragged me along, or else he was
2  at church or something. I do think I
3  remember -- I'm not positive about this -- but
4  shaking his hand one time. And I definitely
5  never talked to him like as anybody. I mean,
6  I just said hi, and that was it as far as I
7  recall.
8    Q  As best you can -- did you ever talk
9  with Joe anytime other than that, whether it's
10  over the phone or in person?
11    A  Definitely not. No, I definitely
12  didn't. I mean, I barely knew him. I
13  wouldn't know him by sight at all now.
14    Q  Now, after Joe died, did you talk
15  with -- did the police come and interview you?
16    A  No.
17    Q  Did the prosecutor's office come and
18  interview you?
19    A  No.
20    Q  Did you -- do you recall talking with
21  anyone from the police department?
22    A  No.
23    Q  Do you recall talking with anyone
24  from the prosecutor's office?
25    A  No.

1    Q  Is there anything else you can recall
2  that kind of sticks in your mind about Wendi
3  growing up that kind of, you know, stands out
4  about her as, you know, someone you knew for a
5  dozen years or so?
6    A  Well, I mean, -- well, a primary
7  thing, from my perspective, was her
8  flirtatiousness. That, like, stands out in my
9  mind because of how she was with me and -- but
10  then I saw how she was with -- she was that
11  way with a lot of people, but not -- not more
12  than me.
13        It seemed like she was more directed
14  at me, you know. It seemed like she would be
15  more intense, if you will. Maybe that was
16  just my hope. But I just remember her being
17  very -- it was kind of -- I almost want to say
18  cheerfully flirtatious but not -- I don't
19  know. Bubbly -- no, not really. I don't know
20  how to describe it.
21        But it was a very -- I mean, at one
22  point I thought it was wholesome, very
23  wholesome, but obviously my -- based on future
24  events, my recollection is tainted, I'm sure.
25    Q  The future events being those you've

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

14:25:35-14:26:45                                    Page 34

1  talked about?
2      A  Yeah.
3      Q  Was she flirtatious with a lot of
4  people?
5      A  Yeah.  It seemed like most everybody
6  that she -- you know, she'd be -- she would be
7  flirtatious with girls, with guys.  She was
8  just very flirtatious.
9      Q  And just -- can you just elaborate a
10  little more as to the specific conduct that
11  you're -- you know, you're lumping within
12  flirtatious?
13      A  There's the -- there's a lot of
14  touching going on when she would talk to
15  the -- I mean, people do that, but -- and then
16  there would be like shoulder action, you know.
17  Just the way she would move would be kind of
18  sexy doing whatever.  Not -- you know, not
19  real -- but she would always, you know, like
20  throw her hips in like to my hip or whatever
21  and stuff like that at times.
22          And that was more with me than the
23  kids at school and stuff.  She wouldn't do it
24  because that was completely illegal from our
25  school rules and stuff.  But I would go to --

---

14:26:47-14:28:16                                    Page 35

1  I didn't really go to parties with her that
2  were outside of the school or outside of
3  people from the school.  And so I think she'd
4  do that with most other people.
5          And I would see her sometimes at a
6  pool party or something or a pool gathering
7  that they would have for the swim team.  I
8  would come at the end because my track coach
9  was married to the swim coach.
10          So anyway, I would see her kind of
11  being like that with other guys.  And I'd be
12  like -- I don't know.  At that time I just
13  wrote it off.
14      Q  Was she like that with adults too or
15  just kids?
16      A  Oh, yeah, it seemed like it.  But
17  less -- but she would, like, use -- I mean,
18  she -- my understanding and my recollection is
19  that she taught me the meaning of feminine
20  wiles, you know.  And she could use her charm
21  to get things from men especially.
22      Q  Can you give me some examples?
23      A  I'm trying to think of something.  If
24  she -- it wouldn't -- it definitely would not
25  work on my dad, but other -- like, I'm trying

---

14:28:20-14:29:30                                    Page 36

1  to think of a guy.
2          Like, there was this big guy, Jim
3  Nish, that would be telling her to do
4  something.  And she would just get all smiley
5  and, you know, flirtatious, batting the eye
6  kind of thing and wiggling around a little
7  bit.  And this was when she was 14, something
8  like that.  And then he would just back off,
9  just tell her, you know, okay, do whatever you
10  want.
11          And that was the -- that's what I
12  recall as far as dealing with adults.  With
13  women, she was more -- if I'm remembering
14  correctly, she was bristled a little bit more.
15  She wouldn't try too much flirtation with
16  certain women, at least that I saw.
17          With girls, she was kind of
18  flirtatious, with people her own age and
19  younger adults.
20      Q  Do you recall this flirtatious
21  behavior from when you met Wendi or did that
22  start at some point in time?  Did she change
23  at all?
24      A  Seems like early on -- it seems like
25  she grew in it, like, got better and better at

---

14:29:32-14:30:46                                    Page 37

1  it.  But it seemed like she was kind of -- I
2  would call it originally very outgoing, but I
3  don't know if I just grew up in my knowledge
4  and understanding or if she grew into it
5  and --
6      Q  Do you recall any -- generally, how
7  did Wendi dress when -- you know, again at the
8  school and that --
9      A  Well, at school we had uniforms,
10  so -- so she would always wear a uniform,
11  although she would kind of -- I mean, well,
12  after school, is the -- I mean, you had to
13  have it buttoned, I think.  Or I can't
14  remember what girls had.  I think it was to
15  the top.  Yeah, definitely.  We had to wear
16  ties, as guys.
17          And so she would -- but after school,
18  before leaving, like in the 10 minutes you're
19  waiting for your parents to come get you, she
20  would unbutton her thing further and show
21  whatever.
22          But then at parties and stuff or like
23  outside of school, she never -- I mean, until
24  she became -- because, yeah, in high school we
25  were allowed to dress ourselves -- or I mean,

---

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

**14:30:50-14:32:10**      Page 38

1  choose our clothes. But we had to follow a
2  dress code. And she would follow the dress
3  code, but her clothes would be tight usually.
4  And they definitely revealed her figure. And
5  most all the time, I believe -- or yeah, I'm
6  sure.
7       And then I mean, she didn't really do
8  too much crazy stuff like at -- at the pool,
9  you know. I mean, she'd be in a two-piece
10  bathing suit, but -- I don't know. She never
11  did, like, strip down or anything like that in
12  front of much people that I knew of.
13       And -- but I think it was more -- to
14  me it was always more her manner. Whatever
15  she was wearing, it just looked hot. And she
16  played it quite well to whoever was watching,
17  in my opinion, obviously. But that was a
18  tainted opinion back then.
19       Q It was a teenage boy's opinion?
20       A Right. And I know other guys thought
21  the same way that were my friends.
22       Q Have we covered everything you can
23  recall about Wendi being with other guys?
24       A Yeah. Everything I know as far as --
25  you're talking about during the -- during

---

**14:32:11-14:33:24**      Page 39

1  my -- you know, until '91?
2       Q Right.
3       A Yeah. That's -- yeah, that's as far
4  as I can recall.
5       Q Again, it's my understanding then
6  that from, you know, after '91 really until
7  after your accident, you had very little
8  contact with Wendi?
9       A Yeah, very little. Although -- yeah,
10  yeah.
11       Q Anything come to mind in terms of
12  either, you know, interaction with her or
13  knowing of her during that period?
14       A I do recall in '91 -- in '99, we
15  went -- before the accident, we went out to
16  dinner, I believe. Yeah, we had dinner. And
17  then I thought she had totally changed.
18       Q Tell me about that.
19       What led up to you and Wendi having
20  dinner?
21       A Well, I was moving to Chicago.
22       Q In '99?
23       A Yeah. In fact, three days after my
24  accident I had a one-way ticket to Chicago.
25  All my stuff -- I sold my house. All my stuff

---

**14:33:26-14:34:21**      Page 40

1  was on a truck to Chicago. It actually worked
2  out nicely when you're in a coma and all your
3  stuff gets rerouted to my parents' house, gets
4  stored at their place, and I move into my
5  parents' place after I come out of the
6  hospital. It's all good.
7       But beyond that, I was leaving, so
8  she thought -- I don't know what -- how -- I
9  mean it was -- she started it, the meeting.
10       Q How did she know how to get a hold of
11  you?
12       A Through my parents.
13       Q Okay.
14       A Because -- well, I came to church
15  every Sunday. She knew about it. They were
16  living somewhere else. They didn't come to
17  church anymore.
18       Q They being Wendi and Joe?
19       A Yes. Right. And their kids or
20  whatever. I don't think I ever even met the
21  kids. Yeah, I definitely have no
22  recollection. I don't even know when they
23  were born.
24       But she -- maybe I saw them at
25  church. I don't know. I definitely didn't

---

**14:34:23-14:35:33**      Page 41

1  meet them.
2       But I heard -- maybe I heard that she
3  had asked about me or something, so I
4  called -- I don't know. Somehow I got in
5  touch with her. We went to dinner one time.
6  And she just sounded so changed and, you know,
7  like she had grown up or whatever.
8       And, you know, the whole -- I think
9  Joe was sick. Yeah, he had been diagnosed
10  with cancer at that point. I don't remember
11  for sure. I don't know if she even brought up
12  Joe.
13       But I can't remember much of that
14  because my memory didn't come back well
15  late -- my early memory is okay. My late
16  memory is not great up to the accident.
17       Q Do you recall whose idea it was that
18  you guys have dinner?
19       A Yeah, that's what I'm not entirely
20  sure about. But I mean, I know that if I had
21  heard that she contacted me, that I would be
22  interested in -- or that she asked about me, I
23  would be interested in saying what's up, so
24  why not get together and do something.
25       Q And it was just the two of you?

---

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

| 14:35:33-14:36:44 | Page 42 |
|---|---|

1   A Yeah.
2   Q Do you remember where you went?
3   A Someplace downtown -- or not
4   downtown. Like 24th and Camelback. I can't
5   remember what it's called. I'm sure it was a
6   nice place.
7   Q Do you recall what you talked about?
8   A No. That's the thing. We talked
9   about just life. Not just -- but I'm sure we
10  talked about -- we talked about, you know,
11  well, the fact that I was going to Chicago and
12  my idea of life and her married life and, you
13  know, whatever. I might have said -- I mean,
14  I don't know. I don't want to conjecture.
15  Q No, I just want what you can recall.
16  A Okay. That would be it as far as
17  what I remember.
18  Q And you said she was changed. In
19  what way?
20  A That was just based on her
21  conversation about her kids. She actually
22  seemed genuinely interested, you know,
23  enthused about leading her kids into life, you
24  know. And I mean, I don't recall if she said
25  anything about Joe, but I think she talked

| 14:36:52-14:38:12 | Page 43 |
|---|---|

1   about being with him, you know, being more --
2   it just seemed like she was more adult or, you
3   know, than I recall from '99 for sure. She
4   wasn't all flirtatious or any stuff like that.
5   Yeah, it was interesting.
6   Q So I mean what -- I'm not trying to
7   put words in your mouth, but what I'm
8   gathering is, to the extent she talked about
9   her relationship with Joe, it seemed like a
10  positive thing?
11  A From what I can remember.
12  Q From what you can recall?
13  A Yeah, yeah. I don't remember any
14  negative. Although, I do remember feeling
15  like we might have been able to do something
16  that night had I made the move, but I didn't.
17  And I don't do that.
18      But I actually -- I mean, for
19  whatever reason, I remember thinking that. It
20  could have been hope. I don't know what it
21  would have been.
22  Q That was the first time you had spent
23  any significant amount of time with Wendi
24  since your breakup; correct?
25  A Oh, yeah, as far as -- yeah. I mean,

| 14:38:17-14:39:19 | Page 44 |
|---|---|

1   yeah, yeah. Alone, I mean, definitely for
2   sure.
3       MR. ARNTSEN: That's all I've got.
4   Thank you.
5           EXAMINATION
6   Q BY MS. GARD: Just a couple follow-up
7   questions.
8       You mentioned that you had been
9   deposed previously?
10  A Yes.
11  Q Was that in connection with this
12  case?
13  A Yes.
14  Q And I'm assuming since you didn't
15  talk to the prosecutors that that was some
16  sort of defense interview?
17  A Yeah.
18  Q I wanted to follow up about the
19  example that you gave about the man in the
20  truck.
21      And I want to see if you remember
22  more information about what exactly Wendi told
23  you, how she explained that?
24  A I can't -- I have no recollection
25  necessarily, no specific recollection. I know

| 14:39:24-14:40:21 | Page 45 |
|---|---|

1   that in situations that seemed strange to me,
2   she was always -- I'm just having fun. We're
3   just bouncing around doing, you know,
4   whatever. And I bought it. I was like okay.
5   Q So whatever she told you at that
6   point was something that you accepted?
7   A Yeah.
8   Q At least for the time being?
9   A Early on. I mean, even at that time,
10  and then I started thinking about it and heard
11  words from other people.
12  Q Would you say she had a very
13  convincing way about her, very persuasive?
14  A Oh, yeah.
15  Q You made a little -- you alluded a
16  little bit to some memory problems from your
17  accident?
18  A Yes.
19  Q But am I correct in understanding
20  that your earlier memories are pretty clear?
21  It's just closer in time to the accident that
22  you have trouble remembering?
23  A My early memories are better than my
24  later ones. I would just say -- I mean, I
25  don't know how great my earlier ones are. But

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

---

14:40:24-14:41:26                                    Page 46

1  they've been identified with, you know,
2  coinciding with other people's accounts and
3  things they do all right.
4      Q But the impressions that you've
5  shared today with Wendi, are those pretty
6  clear in your mind?
7      A I believe so, yes. They are clear to
8  me. I can't guarantee that they're right.
9      Q Okay.
10     A They're right for what I feel.
11     Q The dinner that you spoke about in
12 '99 with Wendi, you said that you thought that
13 you could have done something with her that
14 evening.
15     What did she do to give you that
16 impression? Do you recall?
17     A I don't know that she did much of
18 anything. I mean, it just seemed -- I mean,
19 she was a little bit flirty but yet more adult
20 and sophisticated, if you will, I thought
21 perhaps. But I just felt this vibe, I guess.
22     But at the time I was -- I had just
23 come off a big breakup and was with a fiancee.
24 I was the one that broke up, but I just
25 didn't -- I just wasn't about to make any kind

---

14:41:30-14:42:49                                    Page 47

1  of move. Plus I was scared. I mean --
2      Q What do you mean?
3      A I say scared, I was just -- you know,
4  I was like -- I was like a little kid still in
5  relationship with her. That's how I felt. I
6  just felt like the little boy that was all
7  into her at like 15 years old, not little
8  obviously, but the -- the crazy teenager and
9  whatever. My face all, you know, sheepishly
10 looking at her. I just felt like that, so I
11 wouldn't --
12     Q Okay. I'm sorry, I cut you off.
13     A I wouldn't have made a move because
14 of that.
15     Q Okay.
16     A So that's the reason.
17     Q How did you learn what had happened
18 to Joe?
19     A My parents. I think they woke me up
20 because I was living at my parents' house at
21 the time. They woke me up that morning,
22 whatever day it was, and told me that Joe was
23 dead or something and Wendi was arrested.
24 Alejo and Donna had gone to help or something
25 or do something.

---

14:42:51-14:44:12                                    Page 48

1      Q What was your reaction when you heard
2  that?
3      A Well, I was pretty -- I don't know.
4  I mean, I wasn't -- I mean, he was terminally
5  ill. And I don't know what else -- I mean,
6  but I was -- I was surprised that she would
7  have done that, but I couldn't -- I couldn't
8  believe it. But I heard that there was some
9  thought of defense or something like, her
10 defending herself. I don't know what.
11     MS. GARD: That's all I have.
12     MR. ARNTSEN: She'll type up the
13 transcript. You'll get a chance to read it
14 over and make sure that she got everything --
15     THE WITNESS: Okay.
16     MR. ARNTSEN: You'll have probably 30
17 days. That's what it is most places. Then if
18 there are mistakes, you can correct the
19 mistakes. Whether you want to do that or
20 whether you want to be done with this process
21 now --
22     THE WITNESS: I'll do it just to make
23 sure.
24
25

---

14:44:18                                             Page 49

1          (The deposition concluded at 2:45
2  p.m.)
3
4
5
6
7                    SHAWN KING
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

14:44:18                                                         Page 50

```
1
2   STATE OF ARIZONA    )
    COUNTY OF MARICOPA   )
3            BE IT KNOWN that the foregoing deposition
4   was taken by me pursuant to stipulation of counsel;
5   that I was then and there a Certified Court Reporter
6   in the State of Arizona, and by virtue thereof
7   authorized to administer an oath; that the witness
8   before testifying was duly sworn by me to testify to
9   the whole truth; pursuant to request, notification
10  was provided that the deposition is available for
11  review and signature; that the questions propounded
12  by counsel and the answers of the witness thereto
13  were taken down by me in shorthand and thereafter
14  transcribed into typewriting under my direction;
15  that the foregoing pages are a full, true and
16  accurate transcript of all the proceedings had upon
17  the taking of said deposition, all done to the best
18  of my skill and ability.
19            I FURTHER CERTIFY that I am in no way
20  related to nor employed by any parties hereto; nor
21  am I in any way interested in the outcome thereof.
22            Dated at Phoenix, Arizona, this _____ day
23  of July, 2011.
24
25                      CINDY MAHONEY, RMR, No. 50680
```

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

## 1

**10 (3)** 10:13:54:41   12.5;
21:14:08:43   7.5;
37:14:30:17   17.5
**12 (5)** 9:13:53:31   13.5;
12:13:57:40   21.5;
13:13:58:21   10.5,
13:58:34   16.5;
14:13:59:22   8.5
**14 (1)** 36:14:28:34   6.5
**15 (2)** 10:13:54:44   13.5;
47:14:41:43   6.5
**16 (2)** 14:13:59:37   13.5,
14:00:21   23.5
**17 (2)** 14:13:59:37   13.5;
17:14:04:01   13.5
**1950 (1)** 28:14:17:49   6.5
**1981 (1)** 5:13:49:18   23.5
**1990 (1)** 6:13:49:28   1.5
**1999 (1)** 28:14:17:31   25.5

## 2

**20 (2)** 10:13:54:44   13.5;
16:14:02:11   8.5
**2000 (1)** 28:14:18:45   24.5
**2003 (1)** 7:13:50:42   6.5
**2008 (1)** 29:14:19:41   16.5
**2102 (1)** 4:13:47:40   8.5
**24th (1)** 42:14:35:39   3.5

## 3

**30 (1)** 48:14:43:59   15.5

## 6

**6 (1)** 28:14:17:34   1.5
**6:55 (1)** 28:14:17:38   2.5

## 7

**79 (1)** 5:13:49:08   18.5

## 8

**82 (1)** 6:13:50:18   22.5
**83 (1)** 6:13:50:20   23.5
**85 (2)** 10:13:54:31   9.5;
30:14:20:50   14.5
**87 (4)** 10:13:55:03   20.5;
17:14:04:01   13.5,
14:04:01   13.5,
14:04:12   16.5
**88 (4)** 5:13:49:22   24.5;
10:13:55:03   20.5;
16:14:02:17   9.5;
22:14:10:09   9.5
**89 (2)** 6:13:49:31   2.5;
18:14:04:42   25.5

## 9

**90 (1)** 18:14:04:42   25.5
**91 (10)** 16:14:02:30   12.5,
14:02:24   11.5,
14:02:09   7.5;
17:14:03:12   25.5,
14:03:49   10.5;
22:14:10:09   9.5;
24:14:12:05   25.5;
39:14:32:44   13.5,
14:32:10   25.5,
14:32:19   5.5
**91st (6)** 6:13:50:07   18.5,
13:50:15   21.5,
13:49:55   13.5,
13:49:37   4.5;
7:13:50:39   5.5,
13:51:18   19.5
**95 (2)** 30:14:20:50   14.5;
31:14:21:46   4.5
**99 (5)** 30:14:20:50   14.5;
39:14:33:15   21.5,
14:32:44   13.5;
43:14:36:55   2.5;
46:14:40:44   11.5

## A

**ability (1)** 4:13:48:04   18.5
**able (5)** 26:14:15:24   8.5;
27:14:16:42   6.5;
28:14:18:18   15.5,
14:18:42   23.5;
43:14:37:23   14.5
**abrupt (1)**
27:14:16:58   12.5
**Academy (1)**
6:13:49:40   5.5
**accepted (1)**
45:14:39:32   5.5
**accident (13)**
27:14:16:24   25.5,
14:17:28   24.5,
14:17:24   22.5;
29:14:19:37   15.5,
14:19:17   7.5;
30:14:20:06   1.5;
31:14:22:34   19.5;
39:14:32:23   6.5,
14:32:50   14.5,
14:33:19   23.5;
41:14:35:08   15.5;
45:14:40:06   20.5,
14:40:00   16.5
**accounts (1)**
46:14:40:24   1.5
**acres (2)** 10:13:54:44   13.5,
13:54:41   12.5
**across (3)**
28:14:18:01   9.5,
14:18:04   10.5,
14:17:45   5.5
**act (2)** 17:14:04:30   21.5;
20:14:07:21   8.5
**action (2)**
28:14:18:42   23.5;
34:14:26:12   15.5
**active (1)** 16:14:02:22   10.5
**actual (1)** 21:14:09:33   22.5
**Actually (11)**
7:13:50:52   9.5;
10:13:54:33   10.5,
13:55:01   19.5,
13:54:16   2.5;
17:14:04:30   21.5;
20:14:07:21   8.5;
26:14:16:13   21.5;
27:14:17:07   16.5;
40:14:33:24   25.5;
42:14:36:27   20.5;
43:14:37:34   17.5
**adjacent (1)**
10:13:54:52   16.5
**adult (2)** 43:14:36:52   1.5;
46:14:41:01   18.5
**adults (4)** 24:14:12:32   7.5;
35:14:27:21   13.5;
36:14:29:10   18.5,
14:28:49   11.5
**advisors (1)**
27:14:17:11   17.5
**affiliated (1)**
6:13:49:44   7.5
**A-framed (1)**
8:13:52:37   21.5
**afterward (1)**
30:14:21:23   23.5
**again (7)** 6:13:50:25   24.5;
21:14:08:50   9.5;
29:14:18:58   2.5,
14:19:26   11.5,
14:19:26   11.5;
37:14:29:50   6.5;
39:14:32:16   4.5
**age (2)** 12:13:57:13   15.5;
36:14:29:07   17.5
**ago (1)** 26:14:16:22   24.5
**agree (1)** 26:14:15:45   14.5
**alcohol (1)**
28:14:17:43   4.5
**Alejo (10)** 7:13:51:08   14.5;
8:13:51:26   25.5,
13:51:38   3.5;
9:13:53:08   6.5;
24:14:12:57   13.5;
25:14:13:44   25.5;
26:14:14:54   25.5;
30:14:21:10   19.5;
31:14:22:04   10.5;
47:14:42:45   23.5
**allegedly (1)**
22:14:09:54   4.5
**allowed (3)**
13:13:58:55   24.5;

**alluded (1)**
45:14:39:54   14.5
**almost (2)**
28:14:18:24   18.5;
33:14:25:01   16.5
**Alone (1)** 44:14:38:12   25.5
**along (2)** 24:14:12:27   6.5;
32:14:22:49   25.5
**aloof (1)** 30:14:21:19   22.5
**Although (4)**
15:14:01:39   22.5;
37:14:30:01   10.5;
39:14:32:28   8.5;
43:14:37:20   13.5
**always (15)** 9:13:53:43   15.5,
13:54:02   21.5;
11:13:56:26   21.5,
13:55:56   11.5;
12:13:56:55   8.5;
13:13:58:16   9.5;
15:14:00:34   4.5,
14:01:25   17.5,
14:01:02   12.5;
30:14:20:48   13.5,
14:21:15   21.5;
34:14:26:23   18.5;
37:14:29:58   9.5;
38:14:31:28   13.5;
45:14:39:24   1.5
**amazing (1)**
29:14:19:51   18.5
**amount (2)**
25:14:13:48   2.5;
43:14:38:04   22.5
**Andriano (4)**
4:13:48:25   24.5;
5:13:48:40   8.5,
13:48:30   3.5,
13:48:51   9.5
**Anthony (2)**
21:14:08:38   5.5,
14:08:41   6.5
**anymore (1)**
40:14:34:00   16.5
**apartment (5)**
17:14:04:37   23.5,
14:04:37   23.5;
18:14:04:52   3.5;
19:14:06:18   11.5;
23:14:11:18   8.5
**apparently (1)**
29:14:18:58   2.5
**approximately (1)**
9:13:53:18   9.5
**Arizona (1)** 4:13:47:40   8.5
**ARNTSEN (4)**
4:12:48:32   4.5;
44:14:38:27   2.5;
48:14:43:50   11.5,
14:43:59   15.5
**around (8)** 8:13:51:44   5.5,

**14:00:10** 22.5;
37:14:30:04   24.5
**alluded (1)** *(continued above)*

**14:14:00:18** 22.5;
37:14:30:04   24.5
**13:51:56** 9.5;
13:13:58:03   4.5;
19:14:06:31   16.5;
25:14:13:54   4.5,
14:14:28   16.5;
36:14:28:32   5.5;
45:14:39:27   2.5
**arrested (1)**
47:14:42:40   22.5
**arson (1)** 7:13:50:42   6.5
**assistant (2)**
7:13:50:30   25.5;
25:14:13:44   25.5
**associate (2)**
6:13:50:03   17.5;
7:13:51:11   17.5
**associated (1)**
7:13:51:25   23.5
**assumed (2)**
16:14:02:30   12.5;
20:14:07:02   2.5
**assuming (1)**
44:14:38:40   13.5
**attention (1)**
31:14:22:21   15.5
**authority (2)**
24:14:12:37   8.5,
14:12:27   6.5
**away (5)** 10:13:54:57   18.5;
12:13:56:36   1.5;
16:14:02:49   17.5;
25:14:14:33   18.5,
14:14:38   19.5

## B

**back (9)** 16:14:03:00   21.5;
18:14:05:42   23.5;
19:14:06:16   10.5;
26:14:16:19   23.5,
14:16:15   22.5;
28:14:18:22   16.5;
36:14:28:37   7.5;
38:14:31:41   17.5;
41:14:34:57   13.5
**bad (1)** 24:14:12:49   12.5
**ball (1)** 11:13:55:46   7.5
**banging (1)**
18:14:04:56   5.5
**barely (1)** 32:14:23:16   11.5
**based (3)** 16:14:01:56   2.5;
33:14:25:23   22.5;
42:14:36:25   19.5
**basically (1)**
21:14:09:18   16.5
**bathing (1)**
38:14:31:17   9.5
**batting (1)** 36:14:28:29   4.5
**beating (1)**
18:14:04:54   4.5
**became (6)**
6:13:49:40   5.5;
10:13:55:14   24.5;

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

15:14:01:11   14.5;
16:14:01:51   1.5;
20:14:07:09   4.5;
37:14:30:37   23.5
**becoming (1)**
7:13:50:32   1.5
**bedroom (1)**
18:14:05:09   10.5
**behalf (1)** 4:13:48:25   24.5
**behavior (1)**
36:14:29:16   20.5
**beside (1)**
10:13:54:48   14.5
**best (3)** 26:14:15:24   8.5,
14:15:16   6.5;
32:14:23:07   7.5
**better (4)** 11:13:55:34   4.5;
36:14:29:27   24.5,
14:29:27   24.5;
45:14:40:10   22.5
**beyond (1)**
40:14:33:38   6.5
**Bible (1)** 26:14:15:36   12.5
**big (9)** 10:13:54:41   12.5;
12:13:56:46   4.5,
13:56:42   2.5,
13:57:26   19.5;
24:14:13:28   21.5;
27:14:16:56   10.5;
28:14:18:23   17.5;
36:14:28:20   1.5;
46:14:41:16   22.5
**bike (1)** 23:14:11:14   7.5
**biological (1)**
8:13:51:33   2.5
**birthday (3)**
8:13:52:32   20.5;
9:13:54:09   24.5;
17:14:04:01   13.5
**bit (8)** 11:13:56:14   16.5,
13:56:08   14.5,
13:56:00   12.5;
23:14:11:38   16.5;
36:14:28:54   13.5,
14:28:34   6.5;
45:14:39:57   15.5;
46:14:41:01   18.5
**blew (1)** 16:14:02:49   17.5
**born (1)** 40:14:34:15   22.5
**bossing (1)**
13:13:58:03   4.5
**both (2)** 7:13:50:39   5.5;
28:14:18:09   12.5
**bought (3)**
19:14:06:05   6.5;
23:14:11:22   9.5;
45:14:39:29   3.5
**bouncing (1)**
45:14:39:27   2.5
**boxers (1)**
18:14:05:15   12.5
**boy (1)** 47:14:41:41   5.5
**boy's (1)** 38:14:31:43   18.5

**brain (5)** 28:14:17:58   8.5,
14:18:09   12.5,
14:18:11   13.5;
29:14:19:30   13.5,
14:18:58   2.5
**breaking (1)**
18:14:04:59   6.5
**breakup (7)**
16:14:03:08   24.5;
22:14:10:31   17.5;
23:14:11:02   4.5,
14:11:42   17.5,
14:11:45   18.5;
43:14:38:06   23.5;
46:14:41:16   22.5
**briefly (1)** 27:14:17:27   23.5
**bristled (1)**
36:14:28:54   13.5
**broke (5)** 20:14:07:05   3.5;
22:14:10:05   8.5;
23:14:11:53   21.5;
30:14:20:17   4.5;
46:14:41:20   23.5
**brother (1)**
12:13:56:58   9.5
**brought (1)**
41:14:34:50   10.5
**Bubbly (1)**
33:14:25:10   18.5
**build (1)** 10:13:55:01   19.5
**building (2)**
7:13:50:37   4.5;
10:13:54:26   7.5
**built (1)** 10:13:54:57   18.5
**burned (1)** 7:13:50:42   6.5
**buttoned (1)**
37:14:30:06   12.5
**buy (1)** 25:14:14:20   13.5

### C

**call (1)** 37:14:29:32   1.5
**called (2)** 41:14:34:29   3.5;
42:14:35:43   4.5
**came (2)** 30:14:20:46   12.5;
40:14:33:53   13.5
**Camelback (1)**
42:14:35:39   3.5
**Can (16)** 4:12:48:32   4.5;
11:13:56:31   24.5,
13:55:18   1.5;
27:14:17:27   23.5;
29:14:19:21   9.5,
14:19:03   3.5;
32:14:23:07   7.5;
33:14:23:55   25.5;
34:14:25:50   8.5;
35:14:27:44   21.5;
38:14:31:53   21.5;
39:14:32:16   3.5;
42:14:36:15   14.5;
43:14:37:16   10.5,
14:37:17   11.5;

48:14:44:03   17.5
**cancer (1)** 41:14:34:47   9.5
**car (2)** 23:14:11:24   10.5,
14:11:22   9.5
**Carlin (4)** 9:13:52:54   2.5,
13:52:49   1.5;
20:14:08:10   23.5;
21:14:09:25   18.5
**case (4)** 44:14:38:40   11.5
**catch (1)** 20:14:07:02   2.5
**caught (10)**
12:13:57:04   11.5,
13:57:01   10.5,
13:56:55   8.5;
16:14:02:52   18.5;
17:14:04:26   20.5,
14:04:17   17.5,
14:03:20   2.5;
18:14:04:42   25.5;
19:14:06:07   7.5;
21:14:08:33   3.5
**caused (2)**
28:14:18:09   12.5,
14:17:58   8.5
**certain (2)**
26:14:15:28   9.5;
36:14:29:00   15.5
**chance (1)**
48:14:43:52   12.5
**change (1)**
36:14:29:20   21.5
**changed (3)**
39:14:33:00   16.5;
41:14:34:34   5.5;
42:14:36:20   17.5
**charm (1)** 35:14:27:36   19.5
**cheerfully (1)**
33:14:25:07   17.5
**Chevy (1)** 28:14:17:55   7.5
**Chicago (4)**
39:14:33:13   20.5,
14:33:19   23.5;
40:14:33:24   25.5;
42:14:36:03   10.5
**child (1)** 11:13:55:22   2.5
**choose (1)**
38:14:30:46   25.5
**Christian (2)**
6:13:49:40   5.5;
10:13:55:14   24.5
**chummy (1)**
24:14:12:57   13.5
**church (34)** 6:13:49:47   8.5,
13:49:50   11.5,
13:50:11   20.5,
13:49:55   13.5,
13:50:03   17.5,
13:50:15   21.5,
13:50:01   15.5;
7:13:51:13   18.5,
13:50:34   3.5;
8:13:52:40   22.5,
13:51:44   5.5;

9:13:53:55   19.5;
10:13:54:41   12.5,
13:54:23   4.5,
13:54:33   10.5,
13:54:12   25.5;
11:13:55:18   25.5;
25:14:13:56   5.5,
14:13:54   4.5;
26:14:14:56   2.5,
14:16:03   20.5,
14:15:31   10.5;
27:14:17:01   13.5,
14:16:46   7.5;
30:14:21:06   18.5,
14:20:48   13.5,
14:20:46   12.5;
31:14:22:17   13.5,
14:22:03   9.5,
14:21:35   2.5;
32:14:22:51   1.5;
40:14:34:00   16.5,
14:33:53   13.5,
14:34:19   24.5
**circumstances (2)**
23:14:11:02   4.5;
31:14:22:38   22.5
**clear (3)** 45:14:40:03   19.5;
46:14:40:32   6.5,
14:40:31   5.5
**close (1)** 20:14:07:52   18.5
**closer (1)** 45:14:40:06   20.5
**clothes (4)**
19:14:05:54   2.5,
14:06:00   5.5;
38:14:30:52   2.5,
14:30:46   25.5
**clue (1)** 15:14:00:48   8.5
**coach (2)** 35:14:27:04   7.5,
14:27:07   8.5
**code (2)** 38:14:30:52   2.5,
14:30:50   1.5
**coinciding (1)**
46:14:40:24   1.5
**coma (2)** 30:14:20:10   2.5;
40:14:33:26   1.5
**coming (4)**
30:14:21:02   17.5;
31:14:22:20   14.5,
14:22:01   8.5,
14:22:09   11.5
**commanding (1)**
24:14:12:49   12.5
**commercials (1)**
14:13:59:03   1.5
**completely (4)**
4:13:48:07   19.5;
17:14:03:29   4.5;
30:14:21:15   21.5;
34:14:26:38   23.5
**complex (1)**
23:14:11:18   8.5
**computers (1)**
25:14:14:33   18.5

**concrete (1)**
28:14:18:07   11.5
**conduct (1)**
34:14:25:53   9.5
**congregation (2)**
7:13:50:50   8.5,
13:50:56   10.5
**conjecture (1)**
42:14:36:13   13.5
**connect (2)**
15:14:01:32   19.5;
26:14:15:24   8.5
**connection (5)**
4:13:48:17   22.5;
9:13:53:59   20.5;
15:14:01:25   17.5;
27:14:17:20   20.5;
44:14:38:37   10.5
**construction (3)**
25:14:14:02   8.5,
14:14:02   7.5,
14:13:54   4.5
**contact (1)**
39:14:32:27   7.5
**contacted (1)**
41:14:35:21   20.5
**context (2)** 5:13:48:35   5.5,
13:49:09   19.5
**control (2)**
12:13:57:43   22.5;
14:13:59:47   15.5
**conversation (1)**
42:14:36:27   20.5
**convinced (1)**
20:14:07:09   4.5
**convincing (1)**
45:14:39:49   12.5
**cool (2)** 27:14:16:42   6.5,
14:16:42   6.5
**correctly (1)**
36:14:28:54   13.5
**couch (2)**
21:14:09:12   14.5,
14:09:22   17.5
**counseling (2)**
27:14:17:11   17.5,
14:17:07   16.5
**counselor (1)**
29:14:19:14   6.5
**Couple (9)**
4:13:47:48   12.5;
8:13:52:26   18.5;
16:14:02:55   19.5,
14:02:52   18.5;
17:14:04:20   18.5,
14:03:12   25.5,
14:03:45   9.5;
26:14:16:19   23.5;
44:14:38:31   5.5
**course (1)** 13:13:58:16   9.5
**covered (1)**
38:14:31:53   21.5
**crazy (2)** 38:14:31:09   7.5;

47:14:41:47   7.5
**crosswalk (1)**
  28:14:17:49   6.5
**crush (4)** 14:13:59:27   10.5,
  13:59:21   7.5,
  13:59:46   14.5;
  16:14:01:48   25.5
**crying (1)** 18:14:05:26   17.5
**culture (1)** 26:14:15:05   4.5
**cut (2)** 28:14:18:15   14.5;
  47:14:42:04   11.5

## D

**dad (5)** 6:13:50:01   16.5;
  7:13:50:52   9.5;
  10:13:54:57   18.5;
  25:14:13:56   5.5;
  35:14:28:11   24.5
**dates (1)** 19:14:06:21   12.5
**day (1)** 47:14:42:32   21.5
**days (3)** 22:14:10:47   23.5;
  39:14:33:16   22.5;
  48:14:44:00   16.5
**dead (1)** 47:14:42:40   22.5
**dealing (1)**
  36:14:28:49   11.5
**December (1)**
  17:14:04:06   14.5
**decided (1)**
  23:14:10:58   2.5
**defending (1)**
  48:14:43:27   9.5
**defense (2)**
  44:14:38:44   15.5;
  48:14:43:21   8.5
**definitely (17)**
  7:13:51:25   23.5;
  14:13:59:22   8.5;
  17:14:03:49   10.5;
  20:14:07:36   13.5;
  21:14:08:41   6.5;
  23:14:11:55   22.5;
  30:14:20:22   5.5;
  31:14:21:58   7.5;
  32:14:22:56   3.5,
  14:23:14   10.5,
  14:23:14   10.5;
  35:14:27:53   23.5;
  37:14:30:10   14.5;
  38:14:30:58   3.5;
  40:14:34:10   20.5,
  14:34:19   24.5;
  44:14:38:12   25.5
**degree (1)**
  16:14:02:22   10.5
**delivered (1)**
  19:14:06:16   10.5
**dented (1)** 28:14:17:55   7.5
**department (1)**
  32:14:23:48   20.5
**deposed (1)**
  44:14:38:36   8.5

**deposition (3)**
  4:13:47:44   9.5,
  13:48:17   22.5;
  5:13:48:38   6.5
**describe (3)**
  26:14:15:02   3.5;
  27:14:17:27   23.5;
  33:14:25:12   19.5
**devious (1)**
  11:13:56:26   21.5
**devotional (1)**
  26:14:15:55   17.5
**diagnosed (1)**
  41:14:34:45   8.5
**died (1)** 32:14:23:30   13.5
**differences (1)**
  24:14:13:35   22.5
**different (9)**
  11:13:56:16   17.5;
  16:14:02:55   19.5;
  17:14:03:15   1.5,
  14:03:15   1.5,
  14:03:15   1.5,
  14:03:12   25.5;
  18:14:05:42   23.5;
  27:14:16:35   3.5,
  14:16:33   2.5
**dig (1)** 25:14:14:09   10.5
**dinner (6)**
  39:14:33:12   19.5,
  14:32:55   15.5,
  14:32:55   15.5;
  41:14:35:14   17.5,
  14:34:31   4.5;
  46:14:40:41   10.5
**directed (1)**
  33:14:24:50   12.5
**disconnected (1)**
  31:14:22:17   13.5
**disheveled (1)**
  19:14:06:52   23.5
**disobey (1)**
  14:14:00:00   19.5
**distant (1)**
  30:14:21:15   21.5
**ditches (1)**
  25:14:14:09   10.5
**divergent (1)**
  25:14:14:49   23.5
**diverging (1)**
  27:14:17:14   18.5
**dodge (1)** 11:13:55:46   7.5
**dog (1)** 13:13:58:10   6.5
**dominated (1)**
  26:14:15:05   4.5
**done (5)** 10:13:55:01   19.5;
  29:14:19:51   18.5;
  46:14:40:50   12.5;
  48:14:44:07   19.5,
  14:43:13   6.5
**Donna (3)** 8:13:51:30   1.5;
  30:14:21:10   19.5;
  47:14:42:45   23.5

**Donna's (1)** 9:13:53:08   6.5
**door (5)** 18:14:05:02   7.5,
  14:04:56   5.5,
  14:04:52   3.5,
  14:04:56   5.5;
  30:14:21:26   24.5
**down (4)** 7:13:50:42   6.5;
  18:14:04:56   5.5;
  23:14:11:38   16.5;
  38:14:31:19   10.5
**downtown (2)**
  42:14:35:39   3.5,
  14:35:38   2.5
**dozen (1)** 33:14:24:27   4.5
**dragged (1)**
  32:14:22:49   25.5
**dress (5)** 19:14:06:52   23.5;
  37:14:30:44   24.5,
  14:29:50   6.5;
  38:14:30:50   1.5,
  14:30:50   1.5
**driver's (1)**
  19:14:06:41   19.5
**drums (2)**
  30:14:20:55   15.5,
  14:20:48   13.5
**duly (1)** 4:12:48:32   1.5
**during (6)**
  16:14:02:46   16.5;
  28:14:18:45   24.5;
  29:14:19:33   14.5;
  38:14:32:06   24.5,
  14:32:06   24.5;
  39:14:32:41   12.5

## E

**earlier (2)**
  45:14:40:16   24.5,
  14:40:03   19.5
**early (6)** 12:13:57:10   14.5;
  17:14:04:12   16.5;
  36:14:29:24   23.5;
  41:14:35:04   14.5;
  45:14:40:10   22.5,
  14:39:36   8.5
**effort (1)** 30:14:20:04   25.5
**eight (5)** 5:13:49:06   17.5;
  8:13:51:56   9.5;
  12:13:57:10   14.5;
  26:14:16:15   22.5,
  14:16:19   23.5
**either (2)** 5:13:49:18   23.5;
  39:14:32:39   11.5
**elaborate (1)**
  34:14:25:50   8.5
**else (5)** 11:13:56:24   20.5;
  32:14:22:49   25.5,
  33:14:23:55   25.5;
  40:14:33:57   15.5;
  48:14:43:06   4.5
**emotional (1)**
  29:14:19:59   21.5

**end (1)** 35:14:27:04   7.5
**ended (3)**
  16:14:02:09   7.5;
  17:14:03:49   10.5;
  28:14:18:42   23.5
**energetic (1)**
  11:13:55:37   5.5
**enough (1)**
  26:14:15:48   15.5
**enthused (1)**
  42:14:36:33   22.5
**entirely (1)**
  41:14:35:15   18.5
**epitome (2)**
  14:13:59:12   3.5,
  13:59:16   4.5
**especially (1)**
  35:14:27:41   20.5
**essentially (2)**
  21:14:09:12   14.5;
  28:14:18:15   14.5
**Ethington (2)**
  20:14:07:51   17.5;
  21:14:08:50   9.5
**Even (9)** 5:13:48:53   11.5;
  12:13:57:01   10.5;
  15:14:00:26   25.5;
  30:14:20:46   12.5;
  31:14:22:20   14.5;
  40:14:34:13   21.5,
  14:34:05   19.5;
  41:14:34:50   10.5;
  45:14:39:36   8.5
**evening (1)**
  46:14:40:52   13.5
**events (3)** 9:13:53:53   18.5;
  33:14:25:29   23.5,
  14:25:32   24.5
**eventually (1)**
  28:14:18:45   24.5
**everybody (2)**
  12:13:57:21   18.5;
  34:14:25:40   4.5
**everyone (1)**
  15:14:01:45   24.5
**exactly (2)**
  23:14:11:18   8.5;
  44:14:38:59   21.5
**EXAMINATION (2)**
  4:12:48:32   3.5;
  44:14:38:31   4.5
**examined (1)**
  4:12:48:32   2.5
**example (2)**
  11:13:56:31   24.5;
  44:14:38:51   18.5
**examples (1)**
  35:14:27:44   21.5
**exclusively (1)**
  16:14:02:38   14.5
**explain (1)**
  22:14:10:43   21.5
**explained (2)**

22:14:10:45   22.5;
  44:14:39:01   22.5
**extensive (1)**
  29:14:19:55   20.5
**extent (2)**
  29:14:18:52   25.5;
  43:14:37:10   7.5
**eye (1)** 36:14:28:29   4.5

## F

**face (1)** 47:14:41:55   8.5
**fact (3)** 8:13:51:41   4.5;
  39:14:33:16   22.5;
  42:14:36:03   10.5
**fair (2)** 14:13:59:20   6.5;
  25:14:13:48   2.5
**fairly (1)** 22:14:10:13   10.5
**fall (1)** 17:14:03:49   10.5
**Family (5)** 6:13:49:52   12.5,
  13:50:15   21.5,
  13:50:03   17.5;
  7:13:51:13   18.5;
  10:13:55:14   24.5
**far (6)** 32:14:23:02   5.5,
  36:14:28:49   11.5;
  38:14:32:03   23.5;
  39:14:32:12   2.5;
  42:14:36:18   15.5;
  43:14:38:09   24.5
**father (2)** 6:13:50:25   24.5,
  13:49:58   14.5
**feel (1)** 46:14:40:38   9.5
**feeling (2)**
  13:13:58:13   7.5;
  43:14:37:20   13.5
**felt (6)** 24:14:12:44   11.5;
  26:14:15:28   9.5;
  46:14:41:09   20.5;
  47:14:41:41   5.5,
  14:41:37   4.5,
  14:42:01   9.5
**feminine (1)**
  35:14:27:34   18.5
**few (1)** 12:13:56:52   7.5
**fiancee (1)**
  46:14:41:16   22.5
**figure (1)** 38:14:30:58   3.5
**figures (2)**
  24:14:12:32   7.5,
  14:12:37   8.5
**finally (3)**
  16:14:03:08   24.5,
  14:03:05   23.5;
  18:14:04:59   6.5
**find (1)** 16:14:02:42   15.5
**fine (1)** 18:14:05:38   21.5
**finger (1)** 23:14:11:38   16.5
**first (8)** 4:12:48:32   1.5;
  5:13:48:59   15.5;
  8:13:52:26   18.5,
  13:52:21   17.5;
  11:13:55:22   2.5;

Case 2:16-cv-01159-SRB   Document 52-1   Filed 12/27/17   Page 265 of 357

State of Arizona vs.                                                                              Shawn King
Andriano                                                                                        July 11, 2011

26:14:16:15  22.5;
29:14:19:33  14.5;
43:14:38:02  21.5

five (2) 28:14:18:04  10.5;
29:14:19:33  14.5

flew (2) 28:14:18:01  9.5,
14:18:01  9.5

flight (1) 18:14:05:35  20.5

flirtation (1)
36:14:28:58  14.5

flirtatious (9)
33:14:25:07  17.5;
34:14:25:46  6.5,
14:25:37  2.5,
14:25:58  11.5,
14:25:48  7.5;
36:14:29:07  17.5,
14:29:14  19.5,
14:28:29  4.5;
43:14:37:00  3.5

flirtatiousness (1)
33:14:24:36  7.5

flirty (1) 46:14:41:01  18.5

follow (3) 38:14:30:50  1.5,
14:30:46  25.5;
44:14:38:46  17.5

follows (1) 4:12:48:32  2.5

follow-up (1)
44:14:38:31  5.5

found (3)
15:14:01:11  14.5;
16:14:01:56  2.5;
18:14:04:48  2.5

freaked (1)
15:14:01:11  14.5

freak-out (1)
16:14:01:51  1.5

frequently (2)
22:14:10:13  10.5,
14:10:18  11.5

friend (2) 24:14:13:12  17.5,
14:13:12  17.5

friendly (2)
24:14:13:10  16.5,
14:12:40  10.5

friends (10) 9:13:53:51  17.5;
19:14:06:31  16.5;
20:14:07:16  6.5,
14:07:27  10.5,
14:07:16  6.5;
24:14:13:35  22.5,
14:12:39  9.5,
14:13:10  16.5;
30:14:20:31  7.5;
38:14:31:48  20.5

friend's (1)
28:14:17:34  1.5

friendship (1)
15:14:00:52  10.5

front (1) 38:14:31:22  11.5

full (1) 30:14:20:04  25.5

fun (2) 25:14:14:20  13.5;
45:14:39:24  1.5

further (1)
37:14:30:23  19.5

future (2) 33:14:25:32  24.5;
14:25:23  22.5

## G

GARD (2)
44:14:38:31  5.5;
48:14:43:31  10.5

gathering (1)
35:14:26:58  5.5;
43:14:37:10  7.5

gave (1) 44:14:38:51  18.5

general (2)
11:13:55:56  11.5;
16:14:01:48  25.5

generally (2)
14:13:59:59  18.5;
37:14:29:48  5.5

genuinely (1)
42:14:36:29  21.5

Gerri (1) 13:13:57:55  1.5

gets (4) 19:14:06:49  22.5,
14:06:46  21.5;
40:14:33:29  2.5,
14:33:29  2.5

get-together (1)
9:13:54:04  22.5

girls (8) 12:13:57:49  24.5,
13:57:49  23.5,
13:56:50  6.5,
13:56:43  3.5;
13:13:57:58  2.5;
34:14:25:46  6.5;
36:14:29:06  16.5;
37:14:30:08  13.5

given (2) 23:14:11:34  14.5;
25:14:13:44  25.5

God (1) 21:14:08:36  4.5

good (7) 12:13:57:04  11.5;
15:14:01:22  16.5,
14:00:56  11.5,
14:00:41  6.5;
25:14:14:25  15.5;
27:14:16:48  8.5;
40:14:33:37  5.5

goody (1) 15:14:00:37  5.5

grades (1)
12:13:57:18  17.5

graduate (1)
6:13:49:26  25.5

graduated (3)
5:13:49:18  23.5;
6:13:49:31  2.5,
13:49:28  1.5

great (3) 27:14:17:20  20.5;
41:14:35:08  15.5;
45:14:40:16  24.5

grew (4) 29:14:19:21  9.5;
36:14:29:27  24.5;
37:14:29:40  3.5,
14:29:37  2.5

grounds (1)
8:13:52:40  22.5

grow (1) 29:14:19:26  11.5

growing (1)
33:14:24:20  2.5

grown (2) 27:14:16:28  1.5;
41:14:34:37  6.5

grows (1) 29:14:18:58  2.5

guarantee (1)
46:14:40:34  7.5

guess (7) 8:13:51:38  3.5;
11:13:55:34  4.5;
14:13:59:33  12.5;
16:14:01:48  25.5;
18:14:05:42  23.5;
31:14:21:43  3.5;
46:14:41:09  20.5

guided (1) 26:14:15:28  9.5

guy (7) 18:14:05:09  10.5;
19:14:06:41  19.5;
21:14:09:14  15.5,
14:09:09  13.5;
22:14:10:34  18.5;
36:14:28:16  25.5,
14:28:20  1.5

guys (14) 12:13:56:46  4.5;
16:14:02:52  18.5,
14:02:46  16.5;
17:14:03:12  25.5,
14:04:20  18.5,
14:03:15  1.5;
21:14:08:38  5.5,
14:08:33  3.5;
34:14:25:46  6.5;
35:14:27:14  10.5;
37:14:30:12  15.5;
38:14:31:46  19.5,
14:31:58  22.5;
41:14:35:14  17.5

## H

hair (1) 19:14:06:49  22.5

hand (2) 14:14:00:18  22.5;
32:14:22:56  3.5

hands (2)
14:14:00:21  23.5;
15:14:00:27  1.5

hang (1) 27:14:16:46  7.5

happen (1)
29:14:19:03  3.5

happened (6)
17:14:04:20  18.5;
23:14:11:00  3.5;
25:14:14:49  23.5;
29:14:19:28  12.5;
31:14:22:14  12.5;
47:14:42:10  16.5

happening (1)
18:14:05:22  15.5

happy (2)
11:13:56:19  18.5,
13:55:56  11.5

hardly (1) 28:14:18:29  19.5

Harvest (8)
6:13:50:01  16.5,
13:49:52  12.5,
13:49:40  5.5,
13:50:15  21.5;
7:13:51:13  18.5,
13:50:39  5.5;
10:13:55:14  24.5,
13:55:14  24.5

hated (1) 8:13:48:43  7.5

head (3) 28:14:18:39  22.5,
14:18:04  10.5,
14:17:58  8.5

hear (3) 18:14:04:52  3.5;
20:14:08:00  20.5;
30:14:20:26  6.5

heard (9)
17:14:03:12  25.5;
30:14:20:36  9.5;
31:14:21:58  7.5;
41:14:34:23  1.5,
14:34:23  1.5,
14:35:21  20.5;
45:14:39:38  9.5;
48:14:42:49  25.5,
14:43:18  7.5

help (1) 47:14:42:45  23.5

helped (1)
10:13:54:57  18.5

herein (1) 4:12:48:32  1.5

herself (2)
22:14:09:49  3.5;
48:14:43:27  9.5

hi (1) 32:14:23:02  5.5

high (1) 37:14:30:37  23.5

Hill (1) 4:13:47:40  8.5

Hills (1) 9:13:53:11  7.5

hip (1) 34:14:26:25  19.5

hips (1) 34:14:26:25  19.5

hit (1) 28:14:17:49  6.5

hold (3) 14:14:00:21  23.5;
15:14:00:27  1.5;
40:14:33:48  9.5

holding (1)
14:14:00:18  22.5

hood (1) 28:14:17:55  7.5

hope (2) 33:14:24:57  15.5;
43:14:37:39  19.5

hospital (1)
40:14:33:37  5.5

hot (1) 38:14:31:31  14.5

hours (1) 19:14:06:28  15.5

house (2) 8:13:52:37  21.5;
9:13:52:57  3.5,
13:53:05  5.5,
13:53:08  6.5,
13:52:54  2.5;
10:13:55:01  19.5;
16:14:03:00  21.5;
25:14:13:56  5.5;
28:14:17:14  1.5;
39:14:33:22  24.5;

hardly (1) 28:14:18:29  19.5

40:14:33:29  2.5;
47:14:42:25  19.5

## I

idea (5) 9:13:53:16  8.5;
21:14:08:36  6.5;
31:14:22:14  12.5;
41:14:35:12  16.5;
42:14:36:05  11.5

identified (1)
46:14:40:21  25.5

ill (1) 48:14:43:06  4.5

illegal (1) 34:14:26:38  23.5

impression (1)
46:14:40:54  15.5

impressions (1)
46:14:40:27  3.5

Indian (1) 9:13:53:11  7.5

indicated (3)
8:13:51:51  7.5;
19:14:06:07  7.5;
27:14:17:24  22.5

influence (1)
28:14:17:41  3.5

information (1)
44:14:38:59  21.5

initially (1) 8:13:52:10  12.5

injuries (1)
28:14:18:11  13.5

injury (2) 28:14:17:58  8.5;
29:14:18:58  2.5

inside (1) 18:14:04:54  4.5

instance (1)
4:13:48:03  17.5

intellectual (1)
15:14:01:22  16.5

intense (1)
33:14:24:56  14.5

intentionally (1)
25:14:14:47  22.5

interaction (2)
24:14:13:41  24.5;
39:14:32:39  11.5

interactions (2)
8:13:52:10  12.5;
24:14:12:16  3.5

intercourse (2)
20:14:07:35  12.5;
22:14:09:49  3.5

interested (5)
13:13:58:31  15.5,
13:58:16  9.5;
41:14:35:26  22.5,
14:35:23  21.5;
42:14:36:29  21.5

interesting (2)
15:14:00:30  3.5;
43:14:37:04  4.5

interfere (1)
4:13:48:04  18.5

interview (3)
32:14:23:43  17.5,

14:23:36   14.5;
44:14:38:44   15.5
**into (12)** 12:13:57:40   21.5;
16:14:03:00   21.5;
18:14:05:38   21.5,
14:05:09   10.5,
14:05:08   9.5;
25:14:14:31   17.5,
14:14:42   20.5;
29:14:19:11   5.5;
37:14:29:40   3.5;
40:14:33:32   3.5;
42:14:36:33   22.5;
47:14:41:43   6.5
**invited (1)** 8:13:52:28   19.5
**involved (1)**
11:13:55:50   9.5
**irritated (1)**
23:14:10:55   1.5

## J

**jealousy (1)**
16:14:01:48   25.5
**Jim (1)** 36:14:28:20   1.5
**Joe (12)** 31:14:22:30   18.5,
14:21:49   5.5,
14:21:35   2.5;
32:14:23:30   13.5,
14:23:09   8.5;
40:14:34:00   17.5;
41:14:34:45   8.5,
14:34:54   11.5;
42:14:36:42   24.5;
43:14:37:12   8.5;
47:14:42:32   21.5,
14:42:13   17.5
**joking (1)** 25:14:14:28   16.5
**journals (2)**
29:14:19:14   6.5,
14:19:08   4.5

## K

**keep (2)** 20:14:08:00   20.5;
31:14:22:20   14.5
**keeping (1)**
29:14:19:14   6.5
**kept (2)** 29:14:19:08   4.5;
30:14:20:46   12.5
**kid (2)** 29:14:19:26   11.5;
47:14:41:34   3.5
**kids (8)** 30:14:20:33   8.5;
31:14:21:35   2.5;
34:14:26:36   22.5;
35:14:27:23   14.5;
40:14:34:10   20.5,
14:34:02   18.5;
42:14:36:33   22.5,
14:36:27   20.5
**Kim (4)** 20:14:07:51   17.5,
14:07:38   14.5,
14:07:38   14.5;

21:14:08:50   9.5
**kind (25)** 11:13:56:29   22.5,
13:56:26   21.5,
13:55:34   4.5;
12:13:57:32   20.5,
13:57:07   12.5;
13:13:58:38   18.5,
13:58:10   6.5,
13:58:42   19.5;
15:14:00:30   3.5,
14:00:34   4.5;
18:14:05:05   8.5;
21:14:09:18   16.5;
24:14:13:16   18.5;
27:14:16:56   10.5,
14:16:28   1.5;
33:14:25:01   16.5,
14:24:20   2.5,
14:24:16   1.5;
34:14:26:16   16.5;
35:14:27:11   9.5;
36:14:29:06   16.5,
14:28:32   5.5;
37:14:30:01   10.5,
14:29:30   25.5;
46:14:41:23   24.5
**King (3)** 4:13:47:39   7.5,
13:47:38   6.5,25.5
**kissing (2)**
14:14:00:07   21.5;
15:14:00:28   2.5
**knew (8)** 5:13:48:55   12.5;
8:13:51:33   2.5;
11:13:56:29   22.5;
21:14:08:36   4.5;
32:14:23:16   11.5;
33:14:24:23   3.5;
38:14:31:22   11.5;
40:14:33:54   14.5
**knowing (1)**
39:14:32:41   12.5
**knowledge (1)**
37:14:29:37   2.5

## L

**lack (1)** 11:13:55:34   4.5
**ladies (3)** 26:14:15:20   7.5,
14:15:16   6.5,
14:15:20   7.5
**laid (1)** 28:14:18:24   18.5
**lanes (1)** 28:14:18:04   10.5
**last (1)** 14:13:59:27   10.5
**lasted (1)** 14:13:59:30   11.5
**late (3)** 17:14:04:01   13.5;
41:14:35:04   14.5,
14:35:04   14.5
**later (6)** 15:14:01:11   14.5;
16:14:02:00   3.5,
14:01:51   1.5;
21:14:08:46   8.5;
22:14:10:47   23.5;
45:14:40:13   23.5

**leader (1)**
26:14:15:51   16.5
**leadership (1)**
13:13:58:07   5.5
**leading (1)**
42:14:36:33   22.5
**learn (2)** 25:14:14:05   9.5;
47:14:42:10   16.5
**learned (2)**
27:14:16:33   2.5,
14:16:28   1.5
**least (3)** 20:14:07:55   19.5;
36:14:29:00   15.5;
45:14:39:34   7.5
**leave (1)** 30:14:21:26   24.5
**leaving (2)**
37:14:30:17   17.5;
40:14:33:38   6.5
**led (1)** 39:14:33:10   18.5
**left (2)** 28:14:18:35   21.5,
14:18:32   20.5
**legs (2)** 28:14:18:18   15.5,
14:18:11   13.5
**less (1)** 35:14:27:28   16.5
**life (8)** 14:13:59:12   3.5,
13:59:47   15.5;
28:14:18:35   21.5;
31:14:22:25   16.5;
42:14:35:53   8.5,
14:36:05   11.5,
14:36:05   11.5,
14:36:33   22.5
**light (1)** 28:14:17:49   6.5
**little (16)** 11:13:56:14   16.5,
13:56:08   14.5;
18:14:05:32   19.5;
19:14:06:21   12.5;
29:14:19:26   11.5;
34:14:25:53   9.5;
36:14:28:54   13.5,
14:28:32   5.5;
39:14:32:28   8.5,
14:32:23   6.5;
45:14:39:57   15.5,
14:39:54   14.5;
46:14:41:01   18.5;
47:14:41:34   3.5,
14:41:43   6.5,
14:41:41   5.5
**live (6)** 4:13:47:39   7.5;
9:13:53:21   11.5;
10:13:55:05   21.5,
13:54:16   2.5,
13:54:27   8.5;
20:14:07:51   17.5
**lived (6)** 9:13:53:11   7.5,
13:53:05   5.5,
13:53:28   12.5;
10:13:54:36   11.5,
13:55:08   22.5;
19:14:06:31   16.5
**living (2)** 40:14:33:57   15.5;
47:14:42:25   19.5

**locked (1)** 18:14:04:52   3.5
**long (5)** 5:13:49:14   21.5;
14:13:59:27   10.5;
22:14:10:00   7.5;
27:14:16:40   5.5;
29:14:19:28   12.5
**longer (1)**
31:14:22:04   10.5
**Lonny (9)** 9:13:52:54   2.5;
20:14:08:10   23.5;
21:14:09:25   18.5
**Lonny's (1)**
21:14:08:24   25.5
**look (1)** 15:14:01:45   24.5
**looked (2)**
24:14:12:32   7.5;
38:14:31:31   14.5
**looking (1)**
47:14:42:01   9.5
**Lord (1)** 25:14:14:20   13.5
**lording (1)**
24:14:13:19   19.5
**lot (5)** 11:13:55:50   9.5;
15:14:01:28   18.5;
33:14:24:46   10.5;
34:14:26:00   12.5,
14:25:37   2.5
**lower (1)** 28:14:18:18   15.5
**lumping (1)**
34:14:25:56   10.5
**Lynn (1)** 13:13:57:55   1.5

## M

**major (1)** 24:14:13:28   21.5
**making (1)**
21:14:09:05   12.5
**male (3)** 26:14:15:02   3.5,
14:15:36   12.5,
14:15:33   11.5
**man (2)** 26:14:15:20   7.5;
44:14:38:51   18.5
**manner (1)**
38:14:31:28   13.5
**many (1)** 16:14:02:46   16.5
**marriage (1)**
22:14:09:54   4.5
**married (5)**
20:14:07:55   19.5;
30:14:20:33   8.5;
31:14:21:49   5.5;
35:14:27:07   8.5;
42:14:36:05   11.5
**may (2)** 17:14:03:59   12.5;
20:14:08:10   23.5
**maybe (7)** 7:13:51:13   18.5;
11:13:56:08   14.5;
18:14:04:47   1.5;
31:14:21:46   4.5;
33:14:24:56   14.5;
40:14:34:17   23.5;
41:14:34:23   1.5
**mean (67)** 5:13:48:51   9.5;

9:13:54:02   21.5,
13:53:43   15.5;
11:13:56:24   20.5,
13:56:14   16.5,
13:55:51   10.5;
13:13:58:27   14.5;
14:13:58:58   25.5,
13:59:47   15.5,
13:59:46   14.5,
13:59:37   13.5;
14:01:06   13.5,
14:01:45   24.5;
16:14:02:34   13.5,
14:02:11   8.5,
14:02:03   5.5,
14:02:00   4.5;
17:14:04:26   20.5;
18:14:05:46   24.5,
14:05:40   22.5,
14:05:26   17.5,
14:04:56   5.5;
21:14:09:29   20.5;
22:14:10:13   10.5;
24:14:13:07   15.5,
14:13:12   17.5,
14:13:16   18.5,
14:13:10   16.5,
14:12:57   13.5,
14:12:25   5.5;
25:14:14:47   22.5,
14:13:48   2.5;
26:14:15:12   5.5;
29:14:19:08   4.5;
30:14:20:33   8.5;
31:14:22:47   24.5,
14:21:43   3.5;
32:14:23:16   11.5,
14:22:58   4.5;
33:14:25:12   20.5,
14:24:30   5.5;
34:14:26:10   14.5;
35:14:27:28   16.5;
37:14:30:44   24.5,
14:30:30   22.5,
14:30:03   11.5,
14:30:01   10.5;
38:14:31:07   6.5,
14:31:13   8.5;
40:14:33:43   8.5;
41:14:35:17   19.5;
42:14:36:37   23.5,
14:36:09   12.5;
43:14:38:09   24.5,
14:37:34   17.5,
14:37:05   5.5;
44:14:38:12   25.5;
45:14:40:13   23.5,
14:39:36   8.5;
46:14:40:59   17.5,
14:40:59   17.5;
47:14:41:26   25.5,
14:41:30   1.5;

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

48:14:43:00  3.5,
14:43:00  3.5,
14:43:06  4.5
meaning (1)
  35:14:27:34  18.5
medications (1)
  4:13:48:03  17.5
meet (4) 5:13:48:59  15.5;
  19:14:06:18  11.5;
  31:14:22:30  18.5;
  41:14:34:21  25.5
meeting (1)
  40:14:33:43  8.5
member (1)
  26:14:16:03  20.5
memories (2)
  45:14:40:03  19.5,
  14:40:10  22.5
memory (4)
  41:14:35:04  14.5,
  14:34:57  13.5,
  14:35:08  15.5;
  45:14:39:57  15.5
men (1) 35:14:27:41  20.5
mental (1)
  29:14:19:59  21.5
mentioned (1)
  44:14:38:34  7.5
Mercedes-Benz (1)
  25:14:14:22  14.5
Mesa (1) 4:13:47:40  8.5
messed (1)
  19:14:06:55  24.5
messing (1)
  25:14:14:28  16.5
met (4) 8:13:51:53  8.5;
  11:13:55:22  2.5;
  36:14:29:16  20.5;
  40:14:34:05  19.5
mid (2) 16:14:02:30  12.5;
  17:14:04:12  16.5
might (6) 6:13:49:28  1.5;
  7:13:51:18  19.5;
  17:14:04:11  15.5,
  14:04:06  14.5;
  42:14:36:09  12.5;
  43:14:37:23  14.5
mile (1) 10:13:54:54  17.5
mind (5) 26:14:15:40  13.5;
  33:14:24:39  8.5,
  14:24:16  1.5;
  39:14:32:34  10.5;
  46:14:40:31  5.5
ministry (1)
  30:14:20:58  16.5
minutes (1)
  37:14:30:17  17.5
mistakes (2)
  48:14:44:05  18.5,
  14:44:03  17.5
mistrusted (1)
  17:14:03:29  4.5
mistrustful (1)

15:14:01:02  12.5
mom (3) 24:14:13:26  20.5,
  14:12:49  12.5;
  26:14:15:48  15.5
monogamous (1)
  16:14:02:38  14.5
months (3)
  12:13:57:13  15.5;
  29:14:19:11  5.5,
  14:19:11  5.5
more (20) 9:13:53:28  12.5;
  12:13:57:40  21.5;
  20:14:08:13  24.5;
  24:14:12:57  13.5,
  14:13:10  16.5,
  14:12:40  10.5;
  25:14:14:15  12.5;
  33:14:24:56  14.5,
  14:24:50  12.5,
  14:24:46  10.5;
  34:14:26:33  21.5,
  14:25:53  9.5;
  36:14:28:54  13.5,
  14:28:52  12.5;
  38:14:31:28  13.5,
  14:31:25  12.5;
  43:14:36:44  25.5,
  14:36:52  1.5;
  44:14:38:59  21.5;
  46:14:41:01  18.5
morning (2)
  28:14:17:38  2.5;
  47:14:42:28  20.5
most (6) 5:13:48:55  12.5;
  26:14:15:12  5.5;
  34:14:25:40  4.5;
  35:14:26:53  3.5;
  38:14:31:02  4.5;
  48:14:44:00  16.5
mother (3) 8:13:51:33  2.5;
  24:14:12:25  5.5,
  14:12:16  3.5
mouth (1) 43:14:37:08  6.5
move (5) 34:14:26:16  16.5;
  40:14:33:32  3.5,
  43:14:37:28  15.5;
  47:14:41:26  25.5,
  14:42:04  12.5
moved (4)
  10:13:55:03  20.5;
  31:14:21:58  7.5,
  14:21:55  6.5,
  14:21:55  6.5
movies (1)
  14:13:59:05  2.5
moving (1)
  39:14:33:13  20.5
much (13) 11:13:55:48  8.5;
  14:13:59:52  16.5;
  15:14:01:35  21.5;
  18:14:05:12  11.5;
  24:14:13:41  24.5,
  14:13:26  20.5;

25:14:14:44  21.5;
  30:14:20:55  15.5;
  36:14:28:58  14.5;
  38:14:31:22  11.5,
  14:31:09  7.5;
  41:14:34:56  12.5;
  46:14:40:57  16.5
multiple (3)
  21:14:09:05  12.5;
  29:14:19:24  10.5,
  14:19:03  3.5
multitudes (1)
  16:14:02:42  15.5
music (2)
  26:14:15:51  16.5;
  30:14:20:58  16.5

**N**

naive (2) 13:13:58:46  20.5;
  17:14:03:36  6.5
name (8) 4:13:47:37  5.5;
  5:13:48:55  12.5;
  6:13:49:47  10.5,
  13:49:47  10.5,
  13:49:34  3.5;
  13:13:58:00  3.5;
  20:14:07:52  18.5;
  21:14:08:43  7.5
names (1) 21:14:08:31  2.5
necessarily (3)
  26:14:16:13  21.5,
  14:15:45  14.5;
  44:14:39:16  24.5
negative (1)
  43:14:37:20  13.5
neurocognitive (1)
  29:14:19:47  17.5
new (1) 23:14:11:22  9.5
next (1) 23:14:11:47  19.5
nice (1) 42:14:35:46  5.5
nicely (1) 40:14:33:26  1.5
night (3) 19:14:06:23  13.5;
  23:14:11:11  6.5;
  43:14:37:28  15.5
nightie (1) 18:14:05:05  8.5
nine (1) 29:14:19:41  16.5
Nish (1) 36:14:28:24  2.5
noises (1) 18:14:04:54  4.5
none (1) 26:14:14:55  1.5
North (1) 4:13:47:40  8.5
notice (1) 24:14:13:28  21.5
nowhere (1)
  19:14:06:44  20.5

**O**

obviously (3)
  33:14:25:23  22.5;
  38:14:31:38  16.5;
  47:14:41:47  7.5
occasion (1)
  19:14:06:11  8.5

Ochoa (4) 5:13:48:57  13.5;
  7:13:51:08  14.5;
  8:13:51:30  1.5,
  13:51:26  25.5
October (1)
  28:14:17:31  25.5
off (8) 18:14:05:23  16.5;
  19:14:06:05  6.5;
  23:14:11:37  15.5;
  28:14:18:15  14.5;
  35:14:27:20  12.5;
  36:14:28:37  7.5;
  46:14:41:16  22.5;
  47:14:42:04  11.5
office (2) 32:14:23:52  23.5,
  14:23:40  16.5
officially (1)
  17:14:03:55  11.5
old (5) 5:13:49:06  17.5;
  9:13:53:18  9.5;
  12:13:57:08  13.5;
  14:13:59:25  9.5;
  47:14:41:43  6.5
older (2) 12:13:57:15  16.5;
  25:14:14:31  17.5
once (5) 15:14:01:06  13.5;
  20:14:08:13  24.5,
  14:08:13  24.5;
  22:14:10:13  10.5;
  31:14:21:55  6.5
one (20) 7:13:50:37  4.5;
  12:13:56:49  5.5,
  13:56:42  2.5;
  13:13:57:58  2.5;
  15:14:00:56  11.5;
  17:14:04:22  19.5,
  14:04:22  19.5;
  18:14:05:19  14.5;
  19:14:06:23  13.5,
  14:06:21  12.5;
  20:14:07:48  15.5;
  21:14:09:09  13.5,
  14:08:38  5.5;
  23:14:11:06  5.5;
  29:14:18:58  2.5;
  31:14:22:04  10.5;
  32:14:22:56  3.5;
  33:14:25:12  20.5;
  41:14:34:31  4.5;
  46:14:41:20  23.5
ones (2) 45:14:40:16  24.5,
  14:40:13  23.5
one-way (1)
  39:14:33:19  23.5
only (1) 8:13:52:19  16.5
opinion (3)
  38:14:31:43  18.5,
  14:31:41  17.5,
  14:31:38  16.5
oral (5) 22:14:10:26  14.5,
  14:10:23  13.5,
  14:10:20  12.5,
  14:10:05  8.5,

14:09:46  2.5
oriented (1)
  26:14:15:40  13.5
originally (2)
  6:13:49:37  4.5;
  37:14:29:32  1.5
others (1) 26:14:15:55  17.5
Otherwise (2)
  10:13:55:05  21.5;
  24:14:13:26  20.5
ours (1) 20:14:07:16  6.5
ourselves (1)
  37:14:30:44  24.5
out (24) 14:13:59:33  12.5;
  15:14:01:14  15.5,
  14:01:11  14.5;
  16:14:02:55  19.5,
  14:02:42  15.5,
  14:02:03  5.5,
  14:01:56  2.5;
  17:14:04:40  24.5;
  19:14:06:49  22.5,
  14:06:46  21.5;
  20:14:06:58  25.5;
  21:14:09:14  15.5,
  14:09:05  12.5;
  23:14:10:52  25.5,
  14:11:24  10.5;
  27:14:16:48  8.5;
  28:14:18:29  19.5;
  30:14:21:26  24.5,
  14:20:10  2.5;
  33:14:24:36  7.5,
  14:24:20  2.5;
  39:14:32:50  14.5;
  40:14:33:35  4.5,
  14:33:26  1.5
outgoing (2)
  11:13:55:37  5.5;
  37:14:29:32  1.5
outside (4)
  18:14:05:28  18.5;
  35:14:26:47  1.5,
  14:26:47  1.5;
  37:14:30:30  22.5
over (8) 12:13:57:43  22.5;
  17:14:03:43  8.5;
  18:14:05:28  18.5;
  21:14:08:46  8.5;
  24:14:13:19  19.5;
  29:14:19:28  12.5;
  32:14:23:13  9.5;
  48:14:43:54  13.5
own (1) 36:14:29:07  17.5

**P**

pants (1) 21:14:09:18  16.5
paralyzed (1)
  28:14:18:35  21.5
parcel (2)
  10:13:54:41  12.5,
  13:54:48  14.5

State of Arizona vs.
Andriano

Shawn King
July 11, 2011

parents (11)
   7:13:50:59   11.5;
   9:13:53:46   16.5;
   10:13:54:48   14.5;
   24:14:13:37   23.5,
   14:12:16   3.5;
   27:14:17:20   20.5,
   14:17:01   13.5;
   30:14:20:26   6.5;
   37:14:30:20   18.5;
   40:14:33:50   11.5;
   47:14:42:20   18.5
parents' (5)
   9:13:52:54   2.5;
   30:14:20:48   13.5;
   40:14:33:35   4.5,
   14:33:29   2.5;
   47:14:42:25   19.5
parsonage (3)
   8:13:52:42   23.5;
   10:13:55:10   23.5,
   13:55:08   22.5
part (1) 15:14:00:41   6.5
particular (2)
   13:13:58:03   4.5;
   30:14:21:10   19.5
parties (6) 9:13:52:49   1.5;
   20:14:07:35   12.5,
   14:07:18   7.5;
   21:14:09:05   12.5;
   35:14:26:45   25.5;
   37:14:30:28   21.5
party (5) 8:13:52:42   23.5,
   13:52:32   20.5,
   13:52:32   20.5;
   9:13:54:06   23.5;
   35:14:26:58   5.5
pastor (10) 6:13:50:03   17.5,
   13:50:01   16.5,
   13:49:58   14.5;
   7:13:51:21   20.5,
   13:51:11   17.5,
   13:50:32   1.5,
   13:50:30   25.5;
   10:13:55:10   23.5;
   25:14:13:46   1.5;
   31:14:22:09   11.5
path (1) 27:14:17:14   18.5
paths (1) 25:14:14:49   23.5
pay (1) 31:14:22:21   15.5
people (15)
   9:13:53:46   16.5;
   12:13:56:43   3.5;
   16:14:02:42   15.5;
   20:14:08:02   21.5,
   14:07:14   5.5;
   24:14:12:40   10.5,
   14:12:27   6.5;
   33:14:24:46   10.5;
   34:14:26:10   14.5,
   14:25:39   3.5;
   35:14:26:53   3.5,
   14:26:49   2.5;

36:14:29:07   17.5;
   38:14:31:22   11.5;
   45:14:39:42   10.5
people's (1)
   46:14:40:24   1.5
performed (2)
   22:14:10:23   13.5,
   14:10:23   13.5
perhaps (2)
   11:13:56:00   12.5;
   46:14:41:09   20.5
period (4)
   17:14:03:43   8.5;
   22:14:10:00   7.5;
   29:14:19:28   12.5;
   39:14:32:41   12.5
person (1) 32:14:23:13   9.5
perspective (2)
   11:13:56:07   13.5;
   33:14:24:34   6.5
persuasive (1)
   45:14:39:49   12.5
Phoenix (1)
   31:14:22:01   8.5
phone (1) 32:14:23:13   9.5
photography (1)
   25:14:14:42   20.5
physical (1)
   29:14:19:55   20.5
pickup (1) 28:14:17:55   7.5
pinching (4)
   12:13:56:55   8.5,
   13:56:46   4.5,
   13:56:43   3.5,
   13:56:36   1.5
place (6) 5:13:49:11   20.5;
   8:13:52:14   15.5;
   30:14:21:10   19.5;
   40:14:33:35   4.5,
   14:33:32   3.5;
   42:14:35:46   5.5
places (3) 8:13:52:28   19.5;
   22:14:10:50   24.5;
   48:14:44:00   16.5
plan (1) 11:13:56:29   22.5
play (3) 11:13:55:48   8.5,
   13:55:46   7.5,
   13:55:42   6.5
played (4)
   30:14:20:55   15.5,
   14:20:55   15.5,
   14:20:50   14.5;
   38:14:31:34   15.5
playing (1)
   30:14:20:46   12.5
please (1) 4:12:48:32   4.5
plus (2) 28:14:18:01   9.5;
   47:14:41:26   25.5
point (10) 7:13:51:23   21.5;
   13:13:58:46   20.5;
   20:14:07:00   1.5;
   22:14:10:45   22.5,
   14:09:59   6.5;

31:14:22:04   10.5;
   33:14:25:20   21.5;
   36:14:29:20   21.5;
   41:14:34:47   9.5;
   45:14:39:32   5.5
police (2)
   32:14:23:48   20.5,
   14:23:36   14.5
pool (3) 35:14:26:58   5.5,
   14:26:58   5.5;
   38:14:31:09   7.5
porch (4) 18:14:05:32   19.5,
   14:05:32   19.5
positive (3)
   18:14:05:22   15.5;
   32:14:22:53   2.5;
   43:14:37:14   9.5
post-conviction (2)
   4:13:48:20   23.5;
   5:13:48:33   4.5
pretty (10) 14:13:59:52   16.5;
   17:14:03:24   3.5;
   18:14:05:12   11.5;
   25:14:14:44   21.5,
   14:14:11   11.5;
   26:14:15:36   12.5;
   30:14:20:55   15.5;
   45:14:40:03   19.5;
   46:14:40:29   4.5;
   48:14:42:53   2.5
previous (1)
   10:13:55:10   23.5
previously (1)
   44:14:38:36   8.5
primarily (1)
   13:13:58:36   17.5
primary (1)
   33:14:24:30   5.5
probably (9)
   5:13:49:06   17.5;
   13:13:58:54   23.5,
   13:58:21   10.5;
   14:13:59:22   8.5,
   14:00:21   23.5;
   16:14:02:17   9.5;
   18:14:04:42   25.5;
   29:14:19:33   14.5;
   48:14:43:59   15.5
problem (1)
   15:14:01:35   21.5
problems (2)
   25:14:14:52   24.5;
   45:14:39:57   15.5
proceedings (2)
   4:13:48:20   23.5;
   5:13:48:33   4.5
process (2)
   29:14:20:03   24.5;
   48:14:44:07   19.5
prognosis (1)
   28:14:18:35   21.5
program (1)
   29:14:19:47   17.5

promise (1)
   23:14:11:37   15.5
prompted (2)
   22:14:10:28   16.5
property (3)
   10:13:54:20   3.5,
   13:54:33   10.5,
   13:54:27   8.5
prosecutors (1)
   44:14:38:42   14.5
prosecutor's (2)
   32:14:23:52   23.5,
   14:23:40   16.5
Psalm (6) 6:13:49:55   13.5,
   13:49:37   4.5,
   13:50:15   21.5,
   13:50:07   18.5;
   7:13:51:18   19.5,
   13:50:39   5.5
psychological (1)
   29:14:19:59   21.5
pulling (2)
   18:14:05:15   12.5;
   19:14:06:55   24.5
pulverized (1)
   28:14:18:18   15.5
put (2) 28:14:18:22   16.5;
   43:14:37:08   6.5

Q

quarter (1)
   10:13:54:54   17.5
quit (2) 31:14:22:09   11.5,
   14:22:01   8.5
quite (1) 38:14:31:34   15.5

R

raised (1) 13:13:58:50   21.5
reaction (1)
   48:14:42:49   25.5
read (2) 15:14:01:28   18.5;
   48:14:43:52   12.5
reading (1)
   15:14:01:25   17.5
real (2) 14:13:59:12   3.5;
   34:14:26:23   18.5
realized (1)
   27:14:17:14   18.5
really (11) 15:14:01:43   23.5,
   14:01:34   20.5,
   17:14:03:34   5.5;
   20:14:08:00   20.5;
   27:14:16:38   4.5;
   28:14:18:45   24.5;
   31:14:22:20   14.5;
   33:14:25:10   18.5;
   35:14:26:45   25.5;
   38:14:31:07   6.5;
   39:14:32:19   5.5
reason (3)
   9:13:54:06   23.5;

43:14:37:35   18.5;
   47:14:42:08   15.5
rebuilding (2)
   7:13:50:56   10.5,
   13:50:47   7.5
recall (25) 6:13:50:08   19.5;
   9:13:53:18   9.5,
   13:53:00   4.5;
   20:14:08:10   23.5;
   21:14:09:25   18.5;
   24:14:12:09   2.5;
   31:14:22:36   21.5,
   14:21:31   1.5;
   32:14:23:50   22.5,
   14:23:44   19.5,
   14:23:06   6.5;
   33:14:25:35   25.5;
   36:14:29:14   19.5,
   14:28:49   11.5;
   37:14:29:48   5.5;
   38:14:31:58   22.5;
   39:14:32:44   13.5,
   14:32:16   3.5;
   41:14:35:12   16.5;
   42:14:36:37   23.5,
   14:36:15   14.5,
   14:35:48   6.5;
   43:14:37:17   11.5,
   14:36:55   2.5;
   46:14:40:54   15.5
recollection (7)
   8:13:52:19   16.5;
   11:13:56:11   15.5;
   33:14:25:29   23.5;
   35:14:27:31   17.5;
   40:14:34:13   21.5;
   44:14:39:16   24.5,
   14:39:13   23.5
red (1) 28:14:17:49   6.5
refer (1) 5:13:48:40   8.5
rehabilitation (2)
   29:14:20:02   22.5,
   14:19:47   17.5
relating (1) 4:13:48:20   23.5
relationship (7)
   13:13:58:38   18.5,
   13:58:31   15.5,
   13:58:21   10.5;
   22:14:10:31   17.5,
   14:09:39   25.5;
   43:14:37:12   8.5;
   47:14:41:37   4.5
relationships (1)
   26:14:15:16   6.5
remained (1)
   27:14:17:20   20.5
remember (19)
   12:13:56:42   2.5;
   13:13:57:55   1.5;
   21:14:09:33   22.5;
   23:14:11:14   7.5;
   30:14:21:12   20.5;
   31:14:21:49   5.5;

32:14:22:53   2.5;
33:14:24:57  15.5;
37:14:30:08  13.5;
41:14:34:56  12.5,
14:34:47   9.5;
42:14:36:19  16.5,
14:35:43   4.5,
14:35:33   1.5;
43:14:37:35  18.5,
14:37:20  13.5,
14:37:18  12.5,
14:37:16  10.5;
44:14:38:57  20.5
remembering (3)
36:14:28:52  12.5;
45:14:40:08  21.5
rephrase (1)
4:13:47:53  14.5
representing (1)
5:13:48:30   3.5
rerouted (1)
40:14:33:29   2.5
resting (1) 19:14:05:50   1.5
retrospect (1)
15:14:00:48   8.5
revealed (1)
38:14:30:58   3.5
ride (1) 23:14:11:14   7.5
right (13) 5:13:48:51   9.5,
13:48:40   7.5;
7:13:51:09  16.5;
13:13:58:54  23.5;
26:14:16:02  19.5,
14:15:05   4.5;
28:14:18:39  22.5;
38:14:31:46  19.5;
39:14:32:11   1.5;
40:14:34:02  18.5;
46:14:40:38   9.5,
14:40:34   7.5,
14:40:26   2.5
ring (1) 23:14:11:37  15.5
rock (1) 23:14:11:26  11.5
roll (1) 28:14:18:29  19.5
romantic (1)
13:13:58:38  18.5
rule (1) 11:13:55:56  11.5
rules (2) 14:14:00:00  19.5;
34:14:26:40  24.5
running (1)
18:14:05:09  10.5

S

same (7) 5:13:49:11  20.5;
6:13:49:50  11.5,
13:49:43   6.5;
10:13:54:26   7.5,
13:54:20   3.5;
15:14:01:28  18.5;
38:14:31:48  20.5
Sarah (1) 21:14:08:26   1.5
saving (1) 22:14:09:49   3.5

saw (7) 21:14:09:09  13.5,
14:09:04  11.5,
14:08:26   1.5;
30:14:21:19  22.5;
33:14:24:44   9.5;
36:14:29:00  15.5;
40:14:34:17  23.5
saying (4) 6:13:50:18  22.5;
21:14:09:04  11.5;
22:14:10:20  12.5;
41:14:35:26  22.5
scared (2)
47:14:41:31   2.5,
14:41:26  25.5
school (28) 5:13:49:14  21.5,
13:49:11  20.5;
6:13:49:50  11.5,
13:49:44   7.5,
13:49:43   6.5,
13:49:34   3.5;
8:13:52:40  22.5,
13:52:21  17.5,
13:52:14  15.5,
13:52:13  13.5,
13:51:51   6.5;
9:13:53:55  19.5;
10:13:54:20   3.5,
13:54:12  25.5;
12:13:57:26  19.5;
17:14:04:40  24.5,
14:04:11  15.5;
34:14:26:40  24.5,
14:26:36  22.5;
35:14:26:49   2.5,
14:26:47   1.5;
37:14:30:37  23.5,
14:30:30  22.5,
14:30:15  16.5,
14:30:03  11.5,
14:29:55   8.5,
14:29:54   7.5
Scottsdale (1)
31:14:22:25  16.5
seat (1) 19:14:06:41  19.5
second (1)
21:14:08:38   5.5
seem (1) 12:13:57:32  20.5
seemed (16)
15:14:01:32  19.5,
14:00:46   7.5,
14:00:34   4.5;
24:14:12:57  13.5,
14:12:44  11.5;
30:14:20:41  11.5;
33:14:24:52  13.5,
14:24:50  12.5;
34:14:25:40   4.5;
35:14:27:24  15.5;
37:14:29:30  25.5;
42:14:36:29  21.5;
43:14:37:12   8.5,
14:36:52   1.5;

45:14:39:19  25.5;
46:14:40:59  17.5
seems (2)
36:14:29:24  23.5,
14:29:24  23.5
set (2) 9:13:52:49   1.5;
26:14:15:28   9.5
seven (2)
26:14:16:19  23.5;
29:14:19:37  15.5
sex (6) 21:14:09:30  21.5,
14:09:22  17.5;
22:14:10:26  14.5,
14:10:23  13.5,
14:10:20  12.5,
14:10:05   8.5
sexual (2)
20:14:07:31  11.5;
21:14:09:36  24.5
sexually (2)
16:14:02:22  10.5;
17:14:03:59  12.5
sexy (2) 15:14:01:45  24.5;
34:14:26:18  17.5
shaking (1)
32:14:22:56   3.5
shared (1) 46:14:40:29   4.5
Shawn (2) 4:13:47:38   6.5,
25.5
sheepishly (1)
47:14:41:55   8.5
shoulder (1)
34:14:26:12  15.5
show (1) 37:14:30:23  19.5
showing (1)
22:14:10:50  24.5
shows (2)
19:14:06:37  18.5,
14:06:33  17.5
sic (1) 19:14:05:56   3.5
sick (1) 41:14:34:45   8.5
side (3) 28:14:18:39  22.5,
14:18:39  22.5,
14:18:32  20.5
sight (1) 32:14:23:22  12.5
significant (1)
43:14:38:04  22.5
sing (1) 25:14:14:25  15.5
singing (1)
25:14:14:11  11.5
sister (1) 21:14:08:26   1.5
sit (2) 25:14:14:25  15.5;
30:14:21:12  20.5
site (1) 7:13:50:47   7.5
sitting (5)
19:14:06:41  19.5,
21:14:09:14  15.5,
14:09:12  14.5,
14:09:09  13.5;
30:14:21:12  20.5
situations (1)
45:14:39:19  25.5
six (2) 12:13:57:13  15.5;

29:14:19:08   4.5
sly (1) 12:13:57:07  12.5
smacked (1)
28:14:18:04  10.5
smashed (2)
23:14:11:24  10.5;
28:14:18:15  14.5
smiley (1) 36:14:28:26   3.5
sold (1) 39:14:33:22  24.5
somebody (1)
32:14:22:49  25.5
somebody's (1)
9:13:54:09  24.5
somehow (4)
16:14:03:02  22.5;
18:14:05:46  24.5;
22:14:10:43  21.5;
41:14:34:29   3.5
someone (1)
33:14:24:23   3.5
Someplace (1)
42:14:35:38   2.5
sometimes (2)
8:13:51:44   5.5;
35:14:26:56   4.5
somewhat (1)
27:14:16:53   9.5
somewhere (3)
6:13:50:20  23.5;
31:14:22:01   8.5;
40:14:33:57  15.5
songs (1) 25:14:14:15  12.5
soon (1) 20:14:07:05   3.5
sophisticated (1)
46:14:41:05  19.5
sorry (1) 47:14:42:04  11.5
sort (7) 5:13:48:35   5.5;
9:13:53:53  18.5;
26:14:15:02   3.5,
14:14:56   2.5;
27:14:16:58  12.5;
29:14:19:55  20.5;
44:14:38:44  15.5
sounded (1)
41:14:34:34   5.5
specific (3)
5:13:49:04  16.5;
34:14:25:53   9.5;
44:14:39:16  24.5
specifics (1)
21:14:09:33  22.5
spent (1) 43:14:38:02  21.5
spiritual (4)
25:14:14:15  12.5;
27:14:17:17  17.5,
14:16:53   9.5,
14:16:48   8.5
spirituality (1)
27:14:16:35   3.5
split (1) 27:14:17:01  13.5
spoke (1) 46:14:40:41  10.5
sponsored (1)
9:13:53:53  18.5

sports (2)
14:13:58:58  25.5;
15:14:01:35  21.5
sporty (1) 11:13:55:42   6.5
spry (1) 11:13:55:34   4.5
stairs (1) 18:14:05:35  20.5
stands (2)
33:14:24:36   7.5,
14:24:20   2.5
start (4) 17:14:04:11  15.5;
18:14:04:54   4.5;
29:14:19:24  10.5;
36:14:29:20  21.5
started (10) 9:13:53:31  13.5;
13:13:58:55  24.5;
14:13:59:33  12.5;
17:14:03:59  12.5,
14:03:55  11.5;
25:14:14:38  19.5;
29:14:19:41  16.5,
14:19:14   6.5;
40:14:33:43   8.5;
45:14:39:38   9.5
starting (1) 8:13:51:51   7.5
state (1) 4:12:48:32   4.5
stay (1) 30:14:20:13   3.5
stayed (1)
19:14:06:26  14.5
stepdad (1)
7:13:51:09  15.5
stepfather (1)
24:14:12:20   4.5
sticks (1) 33:14:24:16   1.5
still (5) 7:13:50:34   3.5;
14:13:59:37  13.5;
26:14:16:03  20.5;
28:14:17:41   3.5;
47:14:41:34   3.5
stored (1) 40:14:33:32   3.5
strange (1)
45:14:39:19  25.5
street (2) 28:14:18:01   9.5,
14:17:45   5.5
strip (1) 38:14:31:19  10.5
stuff (23) 11:13:55:46   7.5;
14:14:00:07  21.5;
15:14:01:28  18.5;
16:14:01:56   2.5;
18:14:05:26  17.5;
20:14:07:21   8.5;
25:14:14:42  20.5,
14:14:28  16.5,
14:14:09  10.5,
14:13:54   4.5;
26:14:16:00  18.5;
27:14:17:11  17.5,
14:16:48   8.5;
31:14:22:25  16.5;
34:14:26:40  24.5,
14:26:36  22.5,
14:26:30  20.5;
37:14:30:28  21.5;
38:14:31:09   7.5;

State of Arizona vs.
Andriano

<div style="text-align:right">Shawn King
July 11, 2011</div>

39:14:33:22  24.5,
14:33:22  24.5;
40:14:33:29   2.5;
43:14:37:00   3.5
**suddenly (1)**
19:14:06:49  22.5
**suit (1)** 38:14:31:17   9.5
**Sunday (3)**
30:14:20:55  15.5;
31:14:22:21  15.5;
40:14:33:54  14.5
**supposed (2)**
19:14:06:16  10.5;
23:14:10:52  25.5
**sure (15)** 7:13:51:13  18.5;
13:13:58:14   8.5;
15:14:00:51   9.5;
21:14:09:05  12.5;
24:14:12:40  10.5;
33:14:25:29  23.5;
38:14:31:05   5.5;
41:14:35:17  19.5,
14:34:50  10.5;
42:14:35:53   8.5,
14:35:43   4.5;
43:14:36:55   2.5;
44:14:38:17   1.5;
48:14:44:12  22.5,
14:43:54  13.5
**surprised (1)**
48:14:43:12   5.5
**swam (1)** 15:14:01:39  22.5
**sweetheart (1)**
13:13:58:42  19.5
**swim (2)** 35:14:27:07   8.5,
14:27:01   6.5
**swimming (1)**
19:14:05:56   3.5
**sworn (1)** 4:12:48:32   1.5
**swum (2)** 19:14:05:59   4.5,
14:05:56   3.5

## T

**tainted (2)**
33:14:25:29  23.5;
38:14:31:41  17.5
**talk (7)** 23:14:12:03  24.5;
30:14:21:23  23.5;
31:14:21:29  25.5;
32:14:23:30  13.5,
14:23:07   7.5;
34:14:26:06  13.5;
44:14:38:42  14.5
**talked (11)**
15:14:01:22  16.5;
16:14:02:55  19.5;
18:14:05:38  21.5;
32:14:22:58   4.5;
34:14:25:34  25.5;
42:14:36:42  24.5,
14:35:59   9.5,
14:35:59   9.5,

14:35:51   7.5,
14:35:48   6.5;
43:14:37:10   7.5
**talking (2)**
14:13:59:19   5.5;
19:14:06:33  17.5;
32:14:23:50  22.5,
14:23:44  19.5;
38:14:32:06  24.5
**taught (2)** 22:14:09:54   4.5;
35:14:27:34  18.5
**teachings (1)**
26:14:15:55  17.5
**team (1)** 35:14:27:01   6.5
**teenage (2)**
12:13:57:43  22.5;
38:14:31:43  18.5
**teenager (1)**
47:14:41:47   7.5
**television (1)**
13:13:58:50  21.5
**telling (1)** 36:14:28:24   2.5
**tenure (1)**
16:14:02:49  17.5
**terminally (1)**
48:14:43:00   3.5
**terms (1)** 39:14:32:34  10.5
**terribly (1)**
15:14:01:06  13.5
**testified (1)** 4:12:48:32  2.5
**testify (1)** 4:13:48:07  19.5
**theirs (2)** 27:14:17:18  19.5,
14:16:35   3.5
**thinking (4)**
13:13:57:58   2.5;
18:14:05:38  21.5;
43:14:37:35  18.5;
45:14:39:38   9.5
**though (6)**
5:13:48:53  11.5;
7:13:51:26  24.5;
12:13:57:01  10.5;
15:14:01:06  13.5,
14:00:26  25.5;
31:14:22:20  14.5
**thought (12)**
13:13:58:42  19.5;
17:14:03:36   6.5,
14:03:34   5.5;
26:14:16:00  18.5,
14:15:48  15.5;
33:14:25:20  21.5;
38:14:31:46  19.5;
39:14:33:00  16.5;
40:14:33:40   7.5;
46:14:41:05  19.5,
14:40:44  11.5;
48:14:43:21   8.5
**three (3)** 22:14:10:47  23.5;
29:14:19:11   5.5;
39:14:33:16  22.5
**threw (1)** 23:14:11:38  16.5
**throw (1)** 34:14:26:25  19.5

**ticket (1)** 39:14:33:19  23.5
**ties (1)** 37:14:30:12  15.5
**tight (1)** 38:14:30:52   2.5
**times (3)** 16:14:02:55  19.5;
29:14:19:03   3.5;
34:14:26:30  20.5
**today (2)** 4:13:48:03  17.5;
46:14:40:29   4.5
**together (4)**
5:13:49:15  22.5;
16:14:02:38  14.5;
25:14:13:50   3.5;
41:14:35:28  23.5
**told (10)** 20:14:07:27  10.5,
14:07:18   7.5,
14:07:14   5.5;
21:14:09:27  19.5;
23:14:11:26  11.5;
27:14:17:18  19.5;
29:14:19:17   7.5;
44:14:38:59  21.5;
45:14:39:31   4.5;
47:14:42:32  21.5
**ton (1)** 18:14:04:59   6.5
**took (1)** 23:14:11:37  15.5
**top (2)** 13:13:58:10   6.5;
37:14:30:10  14.5
**total (1)** 14:13:59:46  14.5
**totally (1)** 39:14:33:00  16.5
**touch (2)** 30:14:20:13   3.5;
41:14:34:31   4.5
**touching (1)**
34:14:26:06  13.5
**track (1)** 35:14:27:04   7.5
**transcript (1)**
48:14:43:52  12.5
**trauma (1)**
28:14:18:39  22.5
**traumatic (4)**
28:14:18:11  13.5,
14:18:09  12.5,
14:17:58   8.5;
29:14:18:55   1.5
**trouble (2)**
12:13:56:52   7.5;
45:14:40:08  21.5
**truck (7)** 19:14:06:37  18.5,
14:06:12   9.5;
22:14:10:38  19.5,
14:10:38  19.5;
28:14:17:49   6.5;
40:14:33:24  25.5;
44:14:38:56  19.5
**truthfully (1)**
4:13:48:07  19.5
**try (3)** 4:13:47:53  14.5;
12:13:57:01  10.5;
36:14:28:58  14.5
**trying (6)** 12:13:56:33  25.5;
13:13:57:52  25.5;
15:14:01:43  23.5;
35:14:28:11  24.5,
14:27:50  22.5;

43:14:37:05   5.5
**TV (2)** 13:13:58:55  24.5;
14:13:58:58  25.5
**twice (2)** 20:14:07:55  19.5;
22:14:10:18  11.5
**two (3)** 17:14:03:20   2.5;
19:14:06:26  14.5;
41:14:35:30  24.5
**two-piece (1)**
38:14:31:13   8.5
**two-shoes (1)**
15:14:00:37   5.5
**type (4)** 25:14:14:15  12.5;
26:14:15:55  17.5;
27:14:17:11  17.5;
48:14:43:50  11.5

## U

**unaware (1)**
18:14:05:42  23.5
**unbutton (1)**
37:14:30:23  19.5
**under (1)** 28:14:17:41   3.5
**underneath (3)**
11:13:56:29  22.5,
13:56:16  17.5,
13:56:08  14.5
**underwear (1)**
19:14:06:55  24.5
**uniform (1)**
37:14:29:58   9.5
**uniforms (1)**
37:14:29:55   8.5
**up (32)** 18:14:05:35  20.5,
14:05:15  12.5,
14:05:12  11.5,
14:05:02   7.5;
19:14:06:55  24.5,
14:06:55  24.5,
14:06:37  18.5,
14:06:33  17.5;
20:14:08:00  20.5,
14:07:05   3.5;
22:14:10:50  24.5,
14:10:05   8.5;
28:14:18:42  23.5,
14:18:24  18.5,
14:18:15  14.5;
29:14:19:26  11.5,
14:19:21   9.5,
14:18:58   2.5;
30:14:20:17   4.5;
31:14:21:58   7.5;
33:14:24:20   2.5;
37:14:29:37   2.5;
39:14:33:10  18.5;
41:14:34:37   6.5,
14:35:26  22.5,
14:35:08  15.5,
14:34:50  10.5;
44:14:38:46  17.5;
46:14:41:20  23.5;

47:14:42:28  20.5,
14:42:20  18.5;
48:14:43:50  11.5
**use (2)** 35:14:27:36  19.5,
14:27:28  16.5
**used (2)** 10:13:54:26   7.5;
20:14:07:51  17.5
**usually (2)**
9:13:53:43  15.5;
38:14:30:52   2.5

## V

**various (2)**
8:13:52:28  19.5;
27:14:16:28   1.5
**veered (1)**
25:14:14:38  19.5
**vibe (1)** 46:14:41:09  20.5

## W

**Wait (1)** 21:14:08:38   5.5
**waiting (1)**
37:14:30:20  18.5
**walk (2)** 26:14:16:08   9.5;
23:14:11:14   7.5
**walked (3)**
16:14:03:00  21.5;
23:14:11:11   6.5;
28:14:17:45   5.5
**walking (1)**
28:14:17:34   1.5
**walks (1)** 20:14:06:58  25.5
**watch (2)** 14:13:59:03   1.5,
13:58:58  25.5
**watched (1)**
14:13:58:58  25.5
**watching (2)**
13:13:58:55  24.5;
38:14:31:34  15.5
**way (6)** 21:14:08:31   2.5;
33:14:24:46  10.5;
34:14:26:16  16.5;
38:14:31:48  20.5;
42:14:36:24  18.5;
45:14:39:49  12.5
**ways (1)** 27:14:16:28   1.5
**wear (2)** 37:14:30:10  14.5,
14:29:58   9.5
**wearing (1)**
38:14:31:31  14.5
**wedding (2)**
31:14:22:47  24.5,
14:22:42  23.5
**week (2)** 22:14:10:18  11.5;
27:14:16:57  11.5
**weeks (1)**
26:14:16:22  24.5
**Wendi (27)** 4:13:48:25  24.5;
5:13:48:51   9.5,
13:48:59  15.5,
13:48:55  12.5;

State of Arizona vs.
Andriano

8:13:52:10  12.5,
13:51:53   8.5;
11:13:55:18   1.5;
17:14:04:17  17.5,
14:03:45   9.5;
20:14:07:31  11.5;
21:14:09:36  24.5,
14:08:53  10.5,
14:08:33   3.5;
22:14:10:05   8.5;
30:14:20:17   4.5;
33:14:24:16   1.5;
36:14:29:16  20.5;
37:14:29:50   6.5;
38:14:31:58  22.5;
39:14:33:10  18.5,
14:32:27   7.5;
40:14:34:00  17.5;
43:14:38:04  22.5;
44:14:38:59  21.5;
46:14:40:44  11.5,
14:40:29   4.5;
47:14:42:40  22.5
**Wendi's (4)**
    7:13:50:59  11.5;
    8:13:51:33   2.5;
    23:14:11:02   4.5;
    24:14:12:09   2.5
**what's (1)** 41:14:35:26  22.5
**wheelchair (1)**
    28:14:18:32  20.5
**whenever (9)**
    9:13:53:31  13.5;
    11:13:55:46   7.5;
    12:13:56:42   2.5;
    14:13:59:33  12.5;
    16:14:03:05  23.5,
    14:02:03   5.5;
    23:14:10:52  25.5,
    14:11:53  21.5;
    29:14:18:55   1.5
**whole (1)** 41:14:34:40   7.5
**wholesome (2)**
    33:14:25:23  22.5,
    14:25:20  21.5
**whose (1)**
    41:14:35:12  16.5
**wife (1)** 8:13:51:30   1.5
**wiggling (1)**
    36:14:28:32   5.5
**wiles (1)** 35:14:27:36  19.5
**windows (2)**
    23:14:11:53  21.5,
    14:11:24  10.5
**within (1)** 34:14:25:56  10.5
**witness (3)** 4:12:48:32   1.5;
    48:14:44:10  21.5,
    14:43:58  14.5
**woke (2)** 47:14:42:28  20.5,
    14:42:20  18.5
**women (4)**
    26:14:15:31  10.5,
    14:15:24   8.5;

36:14:29:00  15.5,
14:28:52  12.5
**word (2)** 11:13:55:34   4.5;
    19:14:05:59   4.5
**words (2)** 43:14:37:08   6.5;
    45:14:39:42  10.5
**work (6)** 23:14:11:45  18.5;
    25:14:13:58   6.5,
    14:13:50   3.5;
    27:14:16:38   4.5;
    31:14:22:25  16.5;
    35:14:28:11  24.5
**worked (2)**
    25:14:14:02   8.5;
    40:14:33:24  25.5
**working (2)**
    25:14:13:50   3.5;
    29:14:19:30  13.5
**works (1)** 27:14:16:40   5.5
**worldly (1)**
    14:13:59:16   4.5
**worried (1)**
    15:14:01:43  23.5
**wrote (1)** 35:14:27:20  12.5

## Y

**year (4)** 5:13:49:04  16.5;
    17:14:04:12  16.5;
    28:14:18:24  18.5,
    14:18:24  18.5
**years (12)** 5:13:49:06  17.5;
    8:13:52:26  18.5;
    12:13:57:43  22.5;
    14:13:59:25   9.5;
    16:14:02:06   6.5;
    21:14:08:46   8.5;
    26:14:16:19  23.5;
    29:14:19:41  16.5,
    14:19:37  15.5,
    14:19:33  14.5;
    33:14:24:27   4.5;
    47:14:41:43   6.5
**younger (1)**
    36:14:29:10  18.5

```
 1   STATE OF ARIZONA     )
     COUNTY OF MARICOPA    )
 2        Be it known that the foregoing deposition was

 3   taken by me pursuant to stipulation of counsel; that I

 4   was then and there a Certified Court Reporter in the

 5   State of Arizona, and by virtue thereof authorized to

 6   administer an oath; that the witness before testifying

 7   was duly sworn by me to testify to the whole truth;

 8   deposition review and signature was waived; that the

 9   questions propounded by counsel and the answers of the

10   witness thereto were taken down by me in shorthand and

11   thereafter transcribed into typewriting under my

12   direction; that the foregoing pages are a full, true,

13   and accurate transcript of all the proceedings had

14   upon the taking of said deposition, all done to the

15   best of my skill and ability.

16        I FURTHER CERTIFY that I am in no way related

17   to nor employed by any parties hereto; nor am I in any

18   way interested in the outcome thereof.

19        Dated at Phoenix, Arizona, this ___11th___ day of

20   ___July_____, 2011.

21

22        _____Cindy Mahoney_____
             CINDY MAHONEY, RMR, No. 50680
23

24

25
```

# Exhibit 16

## DECLARATION OF BARRY LORTS

I, Barry Lorts, declare as follows:

1.      I am the brother of Calvin Lorts, who is the former pastor of 91st Psalm Christian School in Casa Grande, Arizona. I was born to Bill and Dion Lorts in Kansas City, Missouri. I have four brothers and sisters: Calvin, Lonnie, Vicki, and Colleen. I have two children of my own: Matthew and Vanessa Lorts.

2.      I lived in Higginsville, Missouri for most of my childhood. I moved from Higginsville to Casa Grande with my parents in 1969 when I was fifteen years old. My father was an electrical superintendent with a company that built restaurants, and he followed his work to Casa Grande. When he finished the projects there, we stayed because we preferred the warm weather. My sisters were already married and out of the house, and my brother, Calvin was in the Marines at this time. Lonnie also stayed behind in Missouri, so it was just my parents and I that went to Casa Grande.

3.      I attended Casa Grande Union High School beginning in my freshman year. This is where I first met Wendi's Andriano's father, Alejo Ochoa. Alejo became a close friend of mine. We hung out together, and we were druggies. We did our share of acid and smoked marijuana. We also drank alcohol. We didn't get into much trouble though, and nobody really messed with us. We weren't violent and I don't recall getting into any fights. We were the "longhairs."

4.      When we were in high school, Alejo's parents owned a tortilla factory called "Ochoa's Tortillas." Alejo's job was to deliver the tortillas to various grocery stores

Page 1 of 5

Initials

around Casa Grande, and I often went with him.  I knew Alejo's mother, she was real nice and liked to cook for us, but I never met his father. I have no idea where his father was – Alejo didn't talk about him and I never asked.

5.    My brother, Calvin, served in Vietnam during his stint in the military. After he got out of the Marine Corps sometime in the early 1970s, he went to ministry school in Tulsa, Oklahoma.  When he completed ministry school, he went to a town called Mexico, Missouri and started a Christian school there. When I graduated from high school, I went up to Mexico to work with him. Calvin decided that he was going to go to Washington DC to start another school, and I told him that I would not go with him and that I was returning to Casa Grande. Calvin then decided to also return to Casa Grande.

6.    In about 1978, Calvin founded a church and school in Casa Grande called 91st Psalm.  He was the pastor of the school and church.  The curriculum used at 91st Psalm was called Accelerated Christian Education, or ACE.   Learning was mostly independent and the students were taught by completing PACE booklets, which were ordered from ACE. Each booklet had a test in the back, and each classroom had a monitor. When a student completed a PACE booklet, he or she handed it to the monitor who graded it.  The monitors weren't really teachers, they were there mostly to keep order in the classroom and to grade the tests, but they also answered questions that the students had about their work.  I think that the monitors were all volunteers.  I do not believe that the school had any paid employees at that time.

Page 2 of 5


Initials

7.    The school had different rules and standards than a public school. For one, it was more godly based and the bible was a focal point of the student's studies. In addition, corporal punishment was a common method of discipline at 91st Psalm, something that would not go over well in a public school. As I understand it, my brother, Calvin, administered the punishment. I believe that he used a paddle, though I am not sure. As far as I know, they didn't linger about it, and the punishment was delivered soon after the transgression took place.

8.    Calvin started a satellite church in Phoenix, also called 91st Psalm, sometime in the early 80s. He traveled back and forth between the two schools in the beginning, in order to get the new one off the ground. I took over as pastor at the 91st Psalm in Phoenix. Sometime in the mid-80s, I lost my way. I took my eyes off what I should have been paying attention to. Let's just say I got distracted by a female member of the congregation, and I left the Church altogether.

9.    Calvin left the 91st Psalm church and school in Casa Grande to take over for me at the church and school in Phoenix when I quit. The school in Casa Grande was turned over to Pastor Tom King. When Tom King took over the church in Casa Grande, it was renamed Harvest Family Church, and the school was renamed Harvest Christian Academy. I knew Tom King from 91st Psalm and he seemed like a nice guy, but I remember that he made me uneasy. There was a difference in how we saw things; he was more dogmatic and assertive than I was. I could be easily silenced if I did disagree, so we never really had words over it. Tom King constantly quoted scripture – he was very letter-of-the-law and conservative. I was a lot more liberal, but I didn't feel


Initials

that I knew enough to argue with him. Tom King's wife, Patricia King, also worked at the school and I remember that she was a really sweet lady. I heard that they lost one son, Brad, in a plane crash, and that another son, Shawn, was in a bad accident, which nearly killed him.

10.     My nieces, Kyre, Keather and Kaileen attended school at 91st Psalm and so did my children, Matthew and Vanessa. Kyre, Keather, and Kaileen are the daughters of my brother Calvin. Wendi also attended school there and she and Kyre were close friends. They are the same age. Kyre did not graduate from the school in Casa Grande, however. I believe that she graduated from the school in Phoenix.

11.     Wendi's parents, Donna and Alejo, worked at the 91st Psalm in Casa Grande. Alejo was the children's pastor and Donna worked in the office. They attended church every Sunday and the students seemed to like them. I lost contact with Donna and Alejo after I moved to Phoenix in the late 70s or early 80s. I have tried to call Alejo a few times since then, but he does not return my calls.

12.     Sometime after Wendi's arrest, probably about six or seven years ago, REDACTED REDACTED , confided in me that Alejo was sexually abusive to both Wendi and herself. REDACTED frequently spent the night at Wendi's home, and, according to REDACTED, Alejo molested her and Wendi on a regular basis. REDACTED did not go in to detail with me about the abuse and I didn't ask too many questions about it. She kept it quiet for a long time and as far as I know, I was the first person she told. She still had a lot of anger built up about it when she told me, and I think she just needed to get it off her chest. At that time, she was trying to work things out in her life and come to terms with it. I know that Kyre and

Page 4 of 5


Initials

Wendi spent a lot of time with two other girls, REDACTED , so it

is possible that Alejo was molesting them as well. I was very surprised to hear that this

had happened. Alejo never seemed like that kind of person to me. I am under the

impression that it took place after I moved to Phoenix. I don't know if Donna was aware

of what was going on in her home, but I believe that this may be the reason that Alejo

does not return my calls. Maybe he is afraid of what I will do. Who knows what he

thinks?

13.     The last time I saw Wendi, she was twelve or thirteen years old. I

remember that she was a really sweet little girl. When I heard about what happened with

her husband I was very surprised. It shocked everybody that knew her. It definitely

seemed out of character and it is so sad.

14.     Until now, no one has ever contacted me about Wendi or my experiences

with 91st Psalm and Harvest. If I had been asked to testify on Wendi's behalf and to what

I have said in this declaration, I would have done so.

I have read the foregoing declaration consisting of five (5) pages and fourteen (14)
paragraphs and it has been read to me. I declare under penalty of perjury under the laws
of the state of Arizona and the United States of America that it is true and correct.
Signed this _19_ day of August 2010 at Maricopa County, Arizona.

                                                            Barry Lotts

Page 5 of 5

# Exhibit 17

## DECLARATION OF KELSEY LEON MCGUFFEE, JR.

I, Kelsey Leon McGuffee, Jr., declare as follows:

1.     Most people call me "Lee." I was born to Kelsey Leon McGuffee, Sr. and Thelma Faye McGuffee on January 21, 1948 in Fittstown, Oklahoma. I have four younger sisters, who in birth order are: Alice, who was born on February 11, 1949; Charlotte, who was born on May 1, 1950; Bonnie, who now goes by "Deblen," who was born on November 9, 1951; and Debbie, who was born in about 1955. My family moved to Tucson Arizona when I was eight years old. I currently work for the Tucson Fire Department as an Emergency Vehicle Technician. My father passed away when I was twelve years old and a couple of years later, when I was about fourteen, my mother remarried to Burl Boyd "Buck" Robertson. Buck was the brother of Wendi's biological father, Shelby Wayne "Skip" Robertson. Buck later fathered a son, Wade, with my mother. Wade is my half-brother.

2.     I first met Wendi's mother, Donna, in about 1958, when I was ten years old and she was a year or two younger. She was friends with my sister Alice, and she was over at our house all the time because her dad was gone a lot. Donna and Alice were about the same age. They were inseparable. Donna frequently came over in the morning and had breakfast with our family, and then she hung around and spent the day with my sisters. Every once in a while, she had a slumber party with my sisters. She was in and out of the house, part of the gang. She was a like

Page 1 of 8

Initials

another sister to me. I think her dad was in the Navy and I don't know much about her mom. Donna was sociable and outgoing. She was never in trouble or anything like that.

3.      Wendi's father, Skip Robertson, on the other hand, was always in trouble, the whole time I knew him. He and I were about the same age so we were in the same grade in school. *I heard* He got into trouble for stealing, ditching school, and drinking. You name it, Skip was probably in trouble for it. Eventually, after Skip and his friends got caught stealing a vending machine from a filling station, Skip was forced by the court to choose between the Marine Corps and jail time. He chose the Marine Corps.

4.      After my mother married Buck, Buck moved into our house. Once he moved in, I never liked it at home. He was really overbearing and there was a lot of tension in the house. He criticized me non-stop. For example, when I was a kid, I liked to build model airplanes. I am a bit of a perfectionist so I would spend a lot of time on them, painting them and making them look nice. He always criticized me for this. He said things like, "Paint don't make it fly any better." That was the main reason that I later joined the Marines – to get out of there.

5.      Skip lived with us for about a year, up until the time he went into the military. We were about sixteen when he moved in. I shared a room with him, but I never liked him. We did not associate that much with each other, especially outside

Page 2 of 8

Initials

of the house. He hung out with what we called the "hoodlums" and I hung around with what people would refer to today as "jocks," the athletic types. Skip did drugs and drank quite a bit. He and his buddies huffed gasoline. During the time he lived with us, I saw Skip and his pals take the cap off of a motorcycle tank and breathe in the fumes.

6.    Buck and Skip's other brothers, Glen, AV, Jerry Don, and Bud, also stayed with us quite a bit, from the time that Buck moved in with us until I moved out of my mother's house at the age of nineteen. It seemed that one of them was always there at any given time. They were truckers, or at least most of them were, and when they came to town they stayed on our couch. They were constantly in and out of the house. I did not like any of them. I was teased all the time by the whole blessed group of them. They teased me for being too "straight-laced." They said that I was not daring and did not take chances because I did not like hanging around with them and I did not get drunk or go to bars with them. They were all very arrogant and boastful, and they all drank a lot. I spent most of my time trying to avoid the lot of them. When we went on fishing trips, I went off to fish by myself. When we went camping, I did my own thing.

7.    The term that I often heard used to describe my stepfather, Buck Robertson, was "Banty Rooster." He was short, only about 5'5" and he tried to make up for it by being the "big man." When he was driving trucks, if he ran into a group

Page 3 of 8

Initials

of people he knew at a truck stop restaurant, he'd buy everyone's meals even though he couldn't afford it. He always talked big and flirted with and came on to the waitresses. In fact, my mother met Buck while she was working as a waitress at the 84 truck stop café in Tucson.

8.     When my mother married Buck, Buck's mother was already dead and his father, Boyd, moved around constantly to live with all his kids. He stayed at our house quite a bit. He was a weird duck. He always talked strangely about women – he talked down about them. He said that they were playthings. One of the last times he stayed in our house my mother threw him out because he grabbed her butt.

9.     Boyd's attitude towards women was pretty much the standard with all the Robertson men. They were all older than me, Glen was the oldest next to Buck and was about fourteen years older, so he was about twenty-eight years old when my mother and Buck got married. Then Jerry, who was about nine years older than me, about twenty-three or so, then AV who was about seven years older than me, and was about twenty one, and Tommie Lee "Bud", who was about three or four years older and around seventeen or eighteen. I stopped going boating on the lake with them because all they talked about all the time was their conquests of women, by which they meant the women who they had had sex with. They described these "conquests" in graphic detail, even Buck who was married to my mom at the time.

Page 4 of 8

Initials

They mostly talked about waitresses that they slept with while they were on the road, or prostitutes that they visited while on the road in Louisiana.

10.     From the time my mother married Buck, I was always uncomfortable at home. If I got into trouble, Buck grounded me for long stretches. Skip on the other hand, did what he pleased. He was treated like a guest in the house and Buck and my mother pretty much let him do whatever he wanted. One time he was thrown in jail in Nogales, on the other side of the border in Mexico. Buck went down there and got him and brought him back and nothing was ever really said about it.

11.     When I was about eighteen years old there was a huge problem at home with                                    REDACTED                                    There was a big blow up and Buck and my mom beat REDACTED severely. REDACTED reported it and took them to court and, as a result,                    REDACTED          I saw REDACTED, the day after this occurred and she had a black eye and bruises all over her cheeks. She also had bruises on her arms. She looked terrible. I am still not clear on what exactly caused the fight, but after                    REDACTED          she stayed separate from our family for about fifteen years.

12.     Buck tried to beat me up on one occasion, when I was a senior in high school and about eighteen years old. I stayed out after curfew one day and was grounded for it. I kept going out even though I was not supposed to leave the house, and I kept getting grounded for longer and longer periods. Eventually, Buck told me

Page 5 of 8

Initials

that I was "too old to whoop," so he was going to take me outside to beat my ass. He smoked three packs of camel cigarettes a day, so I was able to hold him off until he got winded. He swung at me, but I held him at arm's distance until he got tired. My mom was there and saw the whole thing, but she never stood up for us when it came to Buck.

13. When I was about nineteen years old, I joined the Marine Corps to escape the environment at my house. I served in Vietnam for thirteen months, and returned in 1969. When I got back, I learned                REDACTED        that our stepfather and his brothers, including Skip, were all child molesters. At that point in time, I cut off most of my contact with the Robertsons. In fact, even today, I do not talk much to my mother and have not spoken with her in about a year. Likewise, I do not care very much for my half brother, Wade, because he is too much like his father.

14. According to            REDACTED          were all molested by the Robertsons. I am not sure if REDACTED was or not. I have never spoken to REDACTED or REDACTED about the molestation. The sexual abuse would have occurred during the time that Donna spent a lot of time at our house, but I never discussed this with Donna. After            REDACTED

a            REDACTED

REDACTED   During that time, she confirmed what REDACTED had told me. She said

Initials

that my stepfather and all his brothers molested her. In fact, she told me that when REDACTED she reported the sexual abuse, but Buck said she was lying and my mom backed him up. My mom always defended Buck. I feel that it was really unfair that my mother and Buck got away with what they did to REDACTED

15.    I do not know exactly when the sexual abuse started, because I was not aware that it was happening at the time, but I was under the impression that it reached its peak while I was over in Vietnam. REDACTED both told me that my mom knew what was going on and that they had told her that it was happening. My mom denied the whole thing. She pretty much let Buck do what he pleased. This sounds about right to me based on my own experiences with Buck and my mom, and knowing how they are. Several times I tried to talk to my mother about Buck's behavior and how he treated me and she acted the same way, just ignoring everything he did. On the inside, I think she believed it. She knew what was going on, but vocally she denied it.

16.    Skip eventually went to prison for child molestation. He was in for about seventeen years.

17.    I may have seen Skip once or twice after returning from Vietnam, but for the most part, I avoided him. When I learned that Skip and Donna got married, I was very surprised. Being that she spent so much time around REDACTED I thought that Donna probably knew that Skip was a child molester.

Page 7 of 8

Initials

18.    Since Donna was friends with <sup>REDACTED</sup> I still saw her from time to time after we became adults. Donna and<sup>REDACTED</sup> also hung around my first wife, Sharon. I saw Wendi a couple times when she was a child. I think she was probably about eight years old the last time I saw her.

19.    I still consider Donna a friend and we have communications from time to time. She has asked us to keep Wendi in our prayers, which we do.

20.    Until now, no one has come to speak to me about Wendi or my family history. If they had, I would have told them what I have said in this declaration. I would have answered whatever questions were asked. If I had been asked to testify on Wendi's behalf and to what I have said in this declaration, I would have done so.

I have read the foregoing declaration consisting of eight (8) pages and twenty (20) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this ___ day of September 2011 at Pima County, Arizona.

Kelsey Leon McGuffee

Page 8 of 8

Initials

# Exhibit 18

## DECLARATION OF MARJORIE MICEK

I, Marjorie Micek, declare as follows:

1.      I am the maternal first cousin of Wendi Andriano. I was born "Marjorie Bednorz" on July 24, 1973 in Jacksonville, Florida to Clark and Nadine Bednorz. I have one brother, Clark Bednorz, Jr. who was born in 1971 in Asmara, Ethiopia. My family moved to Victoria, Texas in 1979. My mother, Nadine Ann Bednorz nee Zens is the half-sister of Wendi's mother, Donna Ochoa nee Worsham. They have the same mother, Laverne Ann Tilley Zens Worsham. In 1991, I married Jeffrey Micek. Together, we have four children. In birth order they are: Brett, who was born on November 20, 1991; Kayla, who was born on November 16, 1993; Tyler, who was born on March 13, 2002; and Logan who was born on June 23, 2010. My mother died in December of 2008. My father died in June of 2003.

2.      I did not have that much contact with Wendi growing up since we lived in different states. I went out to Arizona a couple times with my family, and my brother, Clark, went out and stayed with Wendi, Donna and Alejo one time for a month or more. I always admired Wendi for her hard work and achievements in school. Also, from what I heard about her through my family, it seemed that she never got into trouble and she never did anything wrong. My mother always spoke very highly of her. I looked up to Wendi even though she lived a thousand miles away.

Page 1 of 8

Initials

3.     My mom and I were very close, but while I was growing up she struggled with          REDACTED                She was diagnosed with          REDACTED

REDACTED          When mom got mad, she flew into a rage. It was impossible to distract her from it; that's where all her focus was. That's all she could see in that moment. As she aged, my mother became a packrat. She kept old newspapers and outdated magazines. She had stacks of them all over her house and when I asked her why she did not toss them, she said that she was planning on reading them someday. My dad was also a packrat and, later in life, their house was very cluttered. He was a handyman, and when something broke, such as the food processor, he kept it, insisting that he was going to fix it. He never did and it just sat around the house. Their house was full of things like that, newspapers, magazines, and broken appliances. After my dad passed, my mom and I went through their things. My dad printed off and saved every email. They kept all of Clark's and my school records.

4.     My brother, Clark, was always different. He was diagnosed with     REDACTED
REDACTED                          but I think he must have had something else. I suspect that he is          REDACTED               My son, Tyler, is          REDACTED
REDACTED                          Tyler, like, Clark, has some anger issues. Clark never really had many friends growing up. He was a hermit, but he tried to impress people with material items, like his racing cars. He was always that way, but I think it got worse when he was in junior high and high school. He did not have a good sense of socially appropriate behavior and often said things that other children and people found

Page 2 of 8

*Initials*

offensive. Sometimes, so much so that they became aggressive with him. As kids, we just thought he was being obnoxious, but Clark just didn't communicate well with other people. He did not pick up on social cues.

5. Looking back on it, I don't think Clark should have been in mainstream school. He should have been in Special-Ed. He was held back and repeated kindergarten. He had such a hard time fitting in. He was always trying to impress other kids. He made weird noises, such as snorting like a pig. He also had strange habits. He grabbed locks of his hair and wrapped them around and around his finger for twenty or thirty minutes at a time. This frustrated my parents, and eventually they buzzed his head. It was the only way to get him to stop. He was also constantly trying to show off in front of other children. Overall, he was an odd character.

6. I do not think that Clark ever graduated from high school, but I think he got his GED. He went up to Waco to attend Texas State Technical College (TSTC). He got into trouble all the time up there, mostly for drinking, and eventually dropped out. Later, he went to Texas Vocational School, here in Victoria, for electronics. He finished and opened a computer shop, which my mom and dad provided the funding for. Clark married Johnda Harris in 1992 and they have two daughters together, Aireal and Allie. The marriage did not last long and Clark and Johnda divorced a few years after marrying.

7. In the summer of 2002, my brother Clark was living in Austin, Texas. My husband, Jeff, and our three children, and I drove up there to visit him. My son, Tyler,

Page 3 of 8


Initials

was a baby at the time, and Kayla and Brett were eight and ten, respectively. Clark had a semi-automatic rifle propped up against the wall by his front door. I asked him if he could please move it, since my kids were in the house and he responded with something like, "What if the Middle-Eastern people come?" He was paranoid and I think, delusional. In November or December of 2002, Clark stopped going into work. In January of 2003, he was real sick. He had nodules in his legs and he was getting frequent nosebleeds. I asked him why he didn't go to the doctor, and he told me that he never got his new insurance card from work. That is how I found out that he had not been at work for some time.

8.    In the spring of 2003, Clark was          REDACTED          He was high somewhere, I believe on crack cocaine or methamphetamine, and someone called the police at the store he was in. He was arrested, and when my dad bailed him out, he told my dad that he had seen little green Martians on the dashboard of his car. He was completely paranoid and delusional by this time, and his teeth were rotting out of his head. After that, he spent at least a month in          REDACTED          While he was there, his house was foreclosed on and my dad, my husband, Jeff, my kids, and I all drove up on Mother's Day weekend to clear his belongings from the house. It was a disaster. There was junk everywhere, a lot of it trash. There were papers, computer parts, clothes, and towels all over the place. I'm not sure what Clark was diagnosed with while  REDACTED REDACTED but I think it was          REDACTED          He was prescribed medication, but he refused to take it. Clark got out of the hospital in June of 2003, and my dad passed away a few


Initials

weeks later. Clark was angry that he did not inherit my dad's truck, even though my parents had previously purchased a car for him.

9.      In 2004, my brother, Clark, tried to burn my mother's house down, but only succeeded in setting fire to her shed. The night prior, my mom came to my house to spend the night. She had heard someone trying to break in to her house and she was convinced that it was Clark. She was scared of him, and she did not want to be at home alone. He had come by the house on other occasions, wanting things, and she never knew when he was going to show up. He was physically much stronger than my mom and he had a really bad temper. On several occasions, he put holes in the wall with his fist. That night, my mother slept at my house. The next morning she went to her car to find that there was ketchup all down the side of it. Brett and Kayla went with her back to her house, and, as they were pulling up, they saw writing from Clark all over the garage. My mother went inside to take a shower, and Brett went outside and saw smoke coming from the shed. Brett tried to put the fire out, but the shed burnt down. Later, they found a threatening letter that Clark had written to my mother stuck to the front door. They hadn't seen it when they arrived because they went in through the garage. Clark was angry because my mom refused to give him money and she had recently thrown him out of the house. He was charged with arson and "terroristic threat," but I believe those charges were dropped. He was held in the Victoria County Jail for several months, possibly even a year, on other charges.

Page 5 of 8

Initials

10. After Clark was released from the Victoria County Jail, he went by my mother's house. She gave him money for food and a bus ticket. That was the last time any of us saw him. About three or four years ago, a childhood friend of ours saw Clark somewhere in Victoria. Clark told him that he was working as a day laborer in Austin and staying in a motel. That was the last time I heard anything about him. I have no idea where Clark is now, but I think he is probably homeless. I do not even think that he knows that our mother passed away. I would like to know that he is okay, but I do not want him to know where I live because Clark is unpredictable. I do not think his REDACTED REDACTED and so I fear for myself, for my home, and for my family.

11. My mother moved to Arizona in 2006. She passed away, in Arizona, in December of 2008. Before her death, I had contact with Donna and her husband, Alejo, off and on. Since her death, I don't really talk to them anymore. Truth is, I was mad and resentful because I felt that they convinced my mom to move out to Arizona, where they live. About six weeks prior to my mother's death, they changed her will without my knowledge. I do not know what happened to my mom's money after she passed, but Donna insists that there was no money. I think that they took advantage of my mom. I was a little put out by all of that, and I tried to talk to them a couple of times, but they did not return my phone calls.

12. Donna and Alejo are more interested in talking to my daughter, Kayla, than they are in talking to me. Kayla went to Arizona to visit my mom in 2007 and again in 2008. Kayla told me that when she was there, she spent most of her time with Alejo,

Page 6 of 8

Initials

and that they joked and played around a lot. Donna was usually at work. Ever since Kayla came back from Arizona, Alejo and Kayla have been in frequent contact. They send text messages back and forth. They also talk on facebook. I asked Kayla what she talks to Alejo about, and she told me that they talk about different things. For example, if she is having trouble with her boyfriend, she will talk to Alejo rather than me. It weirded me out a little at first. I got the sense that Alejo was trying to replace Wendi with my daughter. I was also worried that Donna and Alejo were trying to put things in Kayla's head, to turn her against me. But Kayla is seventeen years old now, and has matured significantly. She has a keen sense for filtering information.

13.     My son Brett and my daughter Kayla have both been diagnosed with REDACTED   My son Tyler is                     REDACTED                     He has a lot of anger problems. Brett was eleven years old when my dad passed away. They were very close and Brett was extremely affected by his grandfather's death. Even though he was only eleven years old, I was unable to get him to go to school. Eventually, I had to
REDACTED

REDACTED   Because I've had trouble dealing with Tyler's problems, and with my mom's passing, I currently   REDACTED

14.     My mother never said much about her biological father. He passed away when she was six or seven years old. All I can recall my mom telling me about her stepfather, Hank, was that he was a drunk, that he was in the navy and was her recruiter,

Initials

and that my grandmother caught him "shacked up with a Mexican woman." That woman's name was "Virgie" and she is the mother of Donna's younger half-sister. My mother told me that my grandmother, Laverne Ann, never liked Alejo, because he was Mexican and Hank left my grandmother for a Mexican woman. My mother told me that every day, after work, she watched Hank ~~walk~~ drive right by their house and straight to the bar.

15.     Until now, no one has come to speak to me about Wendi or our shared family history. If they had, I would have told them what I have said in this declaration. I would have answered whatever questions were asked. If I had been asked to testify on Wendi's behalf and to what I have said in this declaration, I would have done so.

I have read the foregoing declaration consisting of eight (8) pages and fifteen (15) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this __1__ day of August 2011 at Victoria County, Texas.

_Marjorie Micek_
Marjorie Micek

Initials

# Exhibit 19

1
2
3
4
5
6              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
7
8
9   State of Arizona,                    )
                                         )
10                      Respondent,      )   No. CR2000-096032-A
                                         )
11        vs.                            )   **DECLARATION OF**
                                         )   **JEFFREY B. MILLER**
12  Wendi Elizabeth Andriano,            )
13                                       )   (Assigned to the Hon. Douglas Rayes)
                        Petitioner.      )
14                                       )
                                         )
15  _____     )
16
17        JEFFREY B. MILLER, declare as follows:
18        1.    I am a practicing attorney in Arizona and one of the founding partners
19  of Miller Weber Kory LLP.  From the fall of 1998 through October 2000, I represented
20  Joe and Wendi Andriano (the "Andrianos") in pursuing a malpractice claim against certain
21
22  medical providers, alleging that those providers unreasonably failed to properly diagnose
23  and treat Joe's cancer before it became terminal.  I have personal knowledge of the matters
24  stated herein.
25        2.    The Andrianos and I spoke from the outset of my representation
26
27  regarding the possibility that Joe's health could deteriorate and the malpractice claim
28  might not be decided before his cancer took his life.  I informed the Andrianos that if this

MADL_2747675.1

occurred, the claim would continue for the benefit of their family. I also explained the concept of causation to the Andrianos, and informed them that if Joe died of something other than the cancer, they would not have a viable claim for damages. The Andrianos told me that they understood and accepted these realities regarding their case.

3.    During the course of my representation, I spoke periodically with Joe and/or Wendi to request information, inquire as to Joe's health and any other concerns, and to update them regarding the status of my investigation of their claim.

4.    In the months prior to Joe's October 2000 death, I received two or three distressed phone calls from Wendi relating to her observations of Joe. In each of these phone calls, Wendi stated that she was feeling very concerned and frightened for Joe. Wendi said that she had perceived Joe becoming more depressed, and that he had recently expressed a desire to die and an intent to take his own life. Wendi told me that she was worried that Joe would hurt himself, and asked me to speak with him regarding his mental state and recommend a counselor for Joe. Wendi also asked me to remind Joe that, from a legal perspective, he would be hurting his family by committing suicide because the malpractice claim would be dismissed.

5.    I subsequently spoke with Joe regarding these concerns. I told Joe that his family was concerned about his mental state and worried that he was contemplating suicide. Joe acknowledged these concerns and did not deny that they were accurate. Joe said he understood that the malpractice claim would not continue if he died from something other than cancer, and told me not to worry. I recommended a counselor to Joe, but I do not know if Joe ultimately received treatment from that counselor.

2

MADI_2747675.1

6.     After learning of Joe's death, I sent a letter to Wendi advising her that the malpractice case should be dismissed.  A true and correct copy of that letter is attached as **EXHIBIT 1**.

7.     I was called to testify on September 29, 2004 as a witness for the State in Wendi's murder trial.  Given the facts I knew, I was surprised that the State sought to use my testimony in an effort to argue that Wendi killed Joe to somehow benefit from their malpractice claim; that simply could not have been the case, given that I had on multiple occasions explained to each of them that the malpractice claim would be dismissed if Joe died from something unrelated to the misdiagnosed cancer.  I was also surprised because lawyers for both the State and Wendi had interviewed me prior to trial, and I had informed them of Wendi's concern that Joe was suicidal in the months before his death. Her concerns seemed inconsistent with the State's theory that Wendi had formed an intent to kill Joe months before his death.

8.     During my testimony, Wendi's lawyer once attempted to ask me about my conversations with the Andrianos regarding Joe's mental state and Wendi's concerns. The State raised an objection, which was sustained, and Wendi's lawyer did not argue further or attempt to return to the subject. Had I been permitted to testify regarding those communications, I would have described them as set forth in this Declaration.

9.     I declare under penalty of perjury that the foregoing is true and correct.

DATED this _____ day of July, 2011.

3

1

2          Jeffrey B. Miller

3

4

5

6

7

8

9

10

11         SUBSCRIBED AND SWORN TO before me this 28th day of July, 2011.

12

13         Notary Public

14    08|11|11

15

16         BARBARA A. DEMARCHI

17         Notary Public - Arizona
           Maricopa County
           Expires 08/11/2011

18

19

20

21

22

23

24

25

26

27

28

*Roush, McCracken, Guerrero & Miller*

*Attorneys at Law*
*A Partnership of Professional Corporations*

*650 North Third Avenue*
*Phoenix, Arizona 85003*
*(602) 253-3554*
*FAX (602) 340-1896*
*rmg@rmglaw.com*

PETER A. GUERRERO, P.C.
ROBERT D. MCCRACKEN, P.C.                    ｜
CHARLES D. ROUSH, P.C.
JEFFREY B. MILLER, P.C.

*of counsel*
FRANK X. GORDON, JR.

October 10, 2000


**ATTORNEY/CLIENT PRIVILEGE MATERIAL**
**TO BE OPENED ONLY BY ADDRESSEE**

Wendi Andriano
1104 North Park
Casa Grande, Arizona 85222

        *Re: Andriano Medical Malpractice Claim*

Dear Wendi:

        I received your message and have also seen some of the
various media reports. I am sorry. I have no idea what happened
or why, and it is probably best that we not discuss it in case any
attorney hired to represent you with respect to criminal charges
has any need to call me as a witness. Everything which you, Joe
and I discussed is protected by the attorney-client privilege
unless and until such time as you waive it, but it is at least
possible that your criminal defense attorney may find it advisable
to waive that privilege if information about your civil litigation
explains in any way what occurred.

        With respect to that civil litigation, as you know from our
discussions when you were concerned about the possibility that Joe
might attempt suicide, Joe's death from something other than cancer
is a devastating blow to your case. Under the current
circumstances (regardless of the outcome of any criminal charges
against you), I believe pursuing the case is not an option. Any
claim Joe had for his personal injuries was extinguished at his
death, as was your derivative claim for loss of consortium. While
we knew that in the event Joe died from his cancer, there would be
a wrongful death claim for you, the children, as well as Joe's
parents, we were not yet to that point in time, and it would be
incumbent upon us to prove that Joe's death resulted from the
malpractice, which appears to be impossible. Obviously, if there
are facts of which I should be aware to evaluate the connection

October 10, 2000
Page 2

between his death and the malpractice, we may need to talk about
those, but I know you are aware from our discussions of the
difficulty of proving that connection when the cause of death is
not cancer.

There is at least in theory an action which exists for Joe's
Estate to recover medical bills incurred by the Estate for medical
treatment which Joe would not have had to have, but for the
negligence of the defendant doctors in failing to detect the cancer
sooner. In looking at the medical treatment of which I am aware,
it does not appear, however, that such bills are significant, given
that Joe would have had to have medical treatment for his cancer
whenever it was discovered that would likely not have been less
expensive than what was incurred here after the cancer was
discovered. I raise this issue because it is a claim which could
conceivably be made by whoever is the personal representative of
Joe's Estate. Under most circumstances, the likely personal
representative would be you as having priority as the surviving
spouse. You will know better than I whether such an appointment
would likely be contested by anyone else under the circumstances.
Further, if money was recovered by the Estate, it would be subject
to the claims of those to whom the Estate also owes money (health
care providers, persons who have loaned the family money to pay for
bills, etc.). Thus, while this claim exists in theory, as a
practical matter, it does not appear to be a claim worth pursuing,
although you have more information in this regard that I do. No
matter what, it is not a claim which our office has any desire to
pursue on behalf of anyone, because it would appear that the
proceeds would, at best, provide a very uncertain recovery on the
vast amount of time and expenses necessary to prove that portion of
the case.

There are a couple of ways of proceeding given the current
circumstances, but they all, in my view, ultimately lead to the
same place, which is dismissal of the current malpractice action.
The first, and easiest, is for you simply to give me authority to
dismiss the malpractice action in exchange for the defendant
doctors agreeing not to seek costs or attorneys' fees against you
or the Estate for having to defend the case thus far. This at
least provides the Estate with some protection in exchange for the
dismissal. While I could seek a dismissal "without prejudice"
(which means that the case could be refiled by someone else later),
I do not have a great deal of optimism that the defense attorneys
will agree to it. Rather, I would anticipate that the defense
attorneys would file motions for summary judgment which would have
a significant chance for success in getting the case dismissed and

October 10, 2000
Page 3

that would still leave the Estate open to attorneys' fees and costs.

Should you wish to substitute other lawyers for us in the event that you disagree and wish to pursue this matter further, or if you wish to pursue the action for unpaid medical bills as a "survival action" (an action which survives Joe's death), the last option would be for our law firm to move to withdraw and substitute counsel. If you disagree with the advice that is set forth in this letter, which is to dismiss the case in a manner which protects you from further claims against the Estate, then we will have to move to withdraw in any event, because we do not believe that pursuing the claim further makes financial or legal sense for either you or the law firm.

Our law firm has been a strong believer in this case and has supported that belief with thousands of dollars in costs and hundreds of hours in time. We sincerely hoped to be able to go forward on behalf of you and Joe to a successful recovery. Because I have no idea what happened, please do not misunderstand anything in this letter as being judgmental in any way. Unfortunately, we simply have to face the fact that what has occurred, in our view, for all practical purposes makes pursuit of this claim unreasonable and unlikely to be successful. I can only wish you and your family our condolences and our hopes under what must be incredibly difficult circumstances.

If you agree with the dismissal of this case with prejudice in exchange for an agreement not to seek fees or costs against you or the Estate, please sign a copy of this letter and return it to me at your earliest convenience. If you disagree or wish to discuss any of the other options further, please call or write me or let me know how I can discuss them with you and I will be pleased to do so.

Very truly yours,

Jeffrey B. Miller

JBM.wkg

_____

Wendi Andriano
I hereby authorize dismissal of this case with prejudice.

# Exhibit 20

1
2
3
4
5
6           SUPERIOR COURT OF ARIZONA
7              COUNTY OF MARICOPA
8
9   State of Arizona,                    )
                                         )
10                      Respondent,      )   No. CR2000-096032-A
                                         )
11      vs.                              )   **DECLARATION OF**
                                         )   **SHARON MURPHY**
12  Wendi Elizabeth Andriano,            )
                                         )
13                                       )   (Assigned to the Hon. Douglas Rayes)
                                         )
14                      Petitioner.      )
                                         )
15                                       )
16
17      SHARON MURPHY, declare as follows:

18      1.      I am an assistant professor at the University of New Hampshire

19  Department of Social Work, where I have served on the faculty since 2004. I previously

20  taught social work classes at Arizona State University, and testified as an expert witness

21
22  for the defense in the murder trial of Wendi Andriano. I have personal knowledge of the

23  matters stated below.

24      2.      In 2002, I was asked to serve as a expert witness for the defense in

25  Wendi's case by defense attorney Dan Patterson. My academic specialty is domestic

26
27  violence, and I was retained to assess whether and to what extent Wendi was a victim of

28  domestic violence by her late husband, Joe Andriano. I was not asked to explore any

1   sources of abuse other than Joe Andriano, and the defense attorneys did not present me

2   with any evidence of other abuse, such as childhood abuse. Therefore, my assessment and

3   testimony was almost entirely limited to evaluating Wendi as a victim of spousal abuse.

4

5       3.      I had previously testified as an expert on domestic violence, but

6   Wendi's case was and remains the only time I testified in a death-penalty case.

7       4.      From the outset, I was uncomfortable with the defense counsel's

8   theory of the case—namely, the total focus on Wendi as a victim of spousal abuse. Wendi

9   was a victim of emotional and sexual abuse by her late husband—which often produces

10  more disproportionate and unpredictable responses by the victim than the responses of

11  those who are victimized by the stereotypical "wife-beating" spouse—but there was not a

12  documented history of more conventional physical violence by her late husband. In my

13  experience, jurors have difficulty comprehending the mindset of a domestic violence

14

15  victim, and even more so when the domestic violence is in the form of sexual and

16  emotional abuse by a spouse rather than more obvious physical abuse evidenced by

17  bruises, cuts, and trips to the emergency room. In our first meeting, I communicated these

18  concerns to Dan Patterson.

19

20      5.      In my interviews with Wendi, she revealed certain information to me

21  that made me suspect that she had suffered childhood sexual abuse or other trauma. I did

22  not pursue this line of inquiry further with Wendi, because I recognized that it was an

23  emotionally charged area for her. Given Wendi's mental state at the time and my narrow

24  charge of evaluating her as a victim of spousal abuse, I did not believe it was appropriate

25  for me to probe into this subject more fully. I did, however, raise this issue with Dan

26

27

28

Patterson during a meeting with him and other members of the defense team and encouraged him to investigate further.

6.      I also met several times with Kandy Rohde, a certified counselor who met regularly with Wendi while Wendi was in pre-trial incarceration. Ms. Rohde confirmed to me that Wendi likely suffered childhood trauma.

7.      I have some training and qualifications in mental illness and recognized from our interviews that Wendi was likely suffering from depression and/or post-traumatic stress disorder, but I told Dan Patterson that I did not feel comfortable testifying as an expert on these issues in a death penalty case. I am aware that Kandy Rohde urged Dan Patterson before the trial to utilize a mental health expert in light of her observations of Wendi.

8.      Had defense counsel investigated the possibility of childhood trauma and sexual abuse and determined that such events occurred, it would have impacted my opinions and testimony regarding Wendi's relationship with her late husband. The effects of sexual abuse and trauma upon a person tend to be cumulative in nature, weighing down a victim over time. If the abuse by Wendi's late husband was a continuation of a much longer pattern of abuse by other men in Wendi's life since childhood, it likely would have made Wendi more susceptible to severe reactions or "lashing out" when subject to significant stress. It also would have impaired her ability to react to such stressors in ways that non-victims would consider to be rational.

9.     I had the opportunity to work with defense counsel prior to and during Wendi's trial, primarily Dan Patterson. I also attended portions of the trial and had the opportunity to observe the performance of both Dan Patterson and David DeLozier.

10.     David DeLozier appeared to be unprepared and unfit for a case of this magnitude, a perception that was reinforced throughout the trial. I raised my concerns with Dan Patterson, who acknowledged them but stated, "I can't do this case by myself."

11.     For his part, Dan Patterson appeared to be a far more experienced litigator, but he faded over the course of the trial. I knew that he had served as lead counsel in a very high profile death-penalty case immediately before turning his attention to Wendi's case, and he seemed to run out of steam as Wendi's trial wore on.

12.     I remember reaching this conclusion following Dan Patterson's cross-examination of the State's expert, Michael Bayless. At Dan's request, I had reviewed the report of Dr. Bayless regarding his evaluation of Wendi as a victim of domestic violence. I believed that Dr. Bayless lacked the credentials to testify as an expert regarding domestic violence and noted numerous conclusions and methods that were unsupportable according to the standard practices in the field. I communicated these points to Dan and, at his request, prepared a lengthy list of topics and questions for cross-examination of Dr. Bayless. Dan's cross-examination ignored many of the key areas; from at least that point of the case forward, it appeared to me that he had given up or was too exhausted to thoroughly rebut the State's evidence.

13.     I was especially struck by the superficiality and overall weakness of the mitigation case presented by the defense. From my interviews with Wendi, I knew her

to be a deep and multifaceted adult, who had suffered through significant hardship and stresses in her life. The mitigation case the defense presented failed to portray Wendi as a complex person, and in particular failed to provide information about Wendi as an adult. The defense lawyers called very few mitigation witnesses, and most of the character witnesses did not even know Wendi as an adult; most were just acquaintances of her parents who knew Wendi was she was growing up. I found the mitigation case as a whole to be cursory and shallow.

14.     Although I saw him at meetings, I did not work directly with mitigation specialist Scott Mac Leod in preparing the mitigation portion of the case. At one point before the trial, the late Melissa Kupfenberg (another mitigation specialist in the Public Defender's Office, who was not assigned to the case) confided in me that she believed Scott Mac Leod lacked the necessary work ethic and experience to be responsible for mitigation in this capital case. I recall a meeting at the Public Defender's Office in which Melissa volunteered to help with the mitigation investigation, but Dan Patterson declined her assistance.

15.     I declare under penalty of perjury that the foregoing declaration is true and correct.

DATED this 2nd day of September, 2011.

_Sharon Murphy_
Sharon Murphy

# Exhibit 21

## DECLARATION OF BRENDA NAGORE

I, Brenda Nagore, declare as follows:

1.     I was born "Brenda Ward" on September 17, 1957 in Charleston, West Virginia. I moved with my family to Tucson, Arizona when I was five years old, and I have lived there ever since. I married Frank Nagore on September 18, 1976 in Tucson, Arizona, the day after my nineteenth birthday. Together, we have three children, Colleen, Jennifer, and Jake. Jake passed away in June of 1998. Frank and I also adopted our granddaughter, Alexis, who is Jennifer's daughter.

2.     I first met Joe Andriano when he was approximately twenty-one years old. Frank and I spent a lot of time at Apache Lake, Arizona during that time, and Joe often hung out there with his friends. I was about ten years older than Joe and his friends but we had a common interest in boating, and my husband and I developed a close relationship with Joe. I never spent too much time talking to the other kids from Casa Grande, however. After the first few times we saw Joe at the lake, we began making arrangements to be there on the same weekends he was.

3.     Joe and his friends liked to party. At the lake, the guys all got drunk. They reminisced about the same old things all the time. They told wild stories about the dumb things they did – just typical drunken stories. I remember that, at the campsite, the guys liked to mess around with fire. I recall that on one occasion the guys tied one of Joe's friends to a tree and poured jet fuel in a ring around it. Then they set the jet fuel on fire so that Joe's friend couldn't escape. They were always pulling stupid pranks like that. I

Initials

remember that no one wanted to camp anywhere near us or the Casa Grande kids because we were all so obnoxious.

4.     The guys also went in the boats together, and raced them after they had been drinking. I never drank while at that lake because I acted as their babysitter. I usually stayed sober and drove Joe's boat with the women in it, while Joe and the guys rode in Frank's boat. A lot of the time, I spent the day at the campsite while the guys took the boats out on the lake and drank. I remember cooking and cleaning a lot. I stayed behind because I didn't want to be around a bunch of drunks. Frank and Joe and the other guys all got drunk and went across the lake as fast as they could. Depending on the boat, that could be anywhere from seventy to ninety miles per hour. Later, when my husband got more involved in professional boat races, he became concerned with safety and stopped doing things like that. With the pro drag boats, there were always rescue boats alongside in case there was an accident, and I think he realized how dangerous speed boating could be.

5.     I remember a couple of occasions when there were accidents at the lake because the guys were screwing around. I recall that on one occasion one of Joe's friends was on a Sea-Doo, and he kept weaving in front of Frank's boat. Frank told him to stop because he had trouble seeing him, and eventually Frank hit the Sea-Doo. I think that there was damage to it, but Joe's friend wasn't hurt. He threatened to sue, but my husband just said, "Go ahead, it was your fault, and we've all been drinking." Nothing ever came of that.

Page 2 of 10

*Bh*
Initials

6.     I remember that when he was younger and before he was diagnosed with cancer, that Joe was a fun, nice guy. We loved him very much. Over the years we knew Joe, he had different girlfriends that he brought with him to the lake. I remember that he had one girlfriend, Shelly, for a long time. All I really remember about Joe and Shelly's relationship is that they fought all the time. They were constantly bickering and they broke up quite often. I never really connected with Shelly or any of the other girls that Joe brought to the lake, but I remember that the first time he brought Wendi to the lake, I said to my husband, Frank, "Joe is going to marry her." Frank said, "How do you know?" And I said, "I just do." Sure enough, they got engaged shortly thereafter.

7.     When Joe and Wendi got married, my husband and I went to the wedding. I was also invited to the baby shower for their son, Nicholas, but I don't think that I went. We were very close with Wendi and Joe. I remember that they also came to the high school graduation of our daughter, Colleen, in 1995 or 1996. Colleen and Joe were good friends, and Colleen got along with Wendi well too.

8.     Wendi was a real sweetheart. She was always very thoughtful and stood up for everyone. She never wanted to hurt anyone's feelings, and she always tried to minimize any conflict. I remember that she was always very good with my kids. She was, and I believe still is, a very good person.

9.     Joe and his friends had all known each other since grade school. They came from a farming community and they were all close to each other. I believe that Wendi had grown up going to a private, Christian school, so she wasn't around them



Initials

during that time. Wendi never really fit in with Joe's friends because she was not like the other girls. They were all little wild girls, and they never sat down and talked with me the way that Wendi did. I don't want to say that they were trampy, exactly, but they were the kinds of girls that were always wearing little bikinis and falling down drunk. Wendi was not like that. She dressed very modestly. I know she did not wear string bikinis or anything like that – I remember her wearing a one-piece most of the time. She was a very innocent, naïve, and modest girl, and she just never fit in. It was a very close knit, cliquish group, and a lot of the other girls had wanted Joe to marry his previous girlfriend, Shelly, who was a little blonde-headed girl that they had also known for a long time. As a result, I think that, in the beginning, they didn't care too much for Wendi.

10.    I met many of Joe's friends. As I recall, it was Joe's friends who were at the lake, and Wendi hung out with Joe's crowd.

11.    I remember that Wendi drank a little, but I never saw her falling down drunk or passed out. She was very sweet and seemed very inexperienced in the kinds of activities that Joe and his friends were into like drinking and boating. She drank a little, and when she did, became a giggly girl. I think that Wendi was very naïve before she met Joe.

12.    In contrast, I saw Joe very drunk many, many times. Around us, he was usually a fun drunk, but he did like to drink. I never thought that he was an ugly or mean drunk, however. In those days he was just young and wanted to have a good time. He


Initials

always seemed to get drunker than my husband, Frank. Frank could really hold his liquor though.

13.     Joe's friends were rich kids. Their daddies bought them new trucks all the time and when they wanted a new boat, that was provided for them too. They were spoiled to say the least. I don't think that Joe was as spoiled as the rest of them. I remember Joe saying that his father was really mean and that Joe and his father did not get along real well. Joe said that his dad didn't give him anything, and his mom was not very loving. He just wasn't close with his parents. I remember that after Wendi and Joe had Nicholas, Wendi's parents always watched Nicholas when Joe and Wendi needed childcare because Joe's parents couldn't be bothered to do it.

14.     After Wendi and Joe had Nicholas, they occasionally brought him to the boat races. Wendi was very excited to be a mom, and was an excellent mother. She was a really loving, kind person. Joe was a good father too, but he was a typical guy in that he thought it was a woman's job to take care of the baby. Wendi was always the one watching their son, while Joe was free to party and piddle around with the boats.

15.     I recall that on one occasion we were at Saguaro Lake with Joe and Wendi. There was some obnoxious guy there who threw a beer bottle and hit me in the head with it. Joe and Frank were understandably angry, and they were going to beat him up, but Wendi talked them down from getting in a fight. She was always doing things like that.


Initials

16.     I remember that Wendi often brought her little brother, Brandon, who I believe was actually her cousin, to the lake and to the boat races with us. She was very protective of Brandon, and even though he was her cousin, she always introduced him as her brother. I remember that he was always pretty quiet and did what she told him to do. She never seemed to mind taking him anywhere.

17.     Wendi's parents, Donna and Alejo, also came to the lake with Joe and Wendi sometimes. I remember that Wendi's dad had long dark hair and that he was very religious. I believe that he was a minister of some sort, but he wasn't the kind of guy who pushed it on you. He was just a very Christian man. I remember Wendi's mother as a very nice lady.

18.     When Joe got sick, before he knew it was cancer, he came down to Tucson to have tests done at the University of Arizona. I remember that he had a lump on his lymph nodes. When he came down for the tests, he usually stayed at our house with us.

19.     I recall that on one occasion, we loaned Joe and Wendi money when they were having financial problems. I think we gave them a couple thousand dollars. They paid it all back as soon as they could. They were very honest, good people. I also remember that Joe sometimes came down and helped my husband and I. We were contractors, and Joe helped me wire a few houses.

20.     In June of 1998, my son, Jake, committed suicide. I recall seeing Wendi and Joe at his funeral. We were in mourning for a long time, and other people didn't know how to deal with it. It's hard to know what to say to someone when they've lost



Initials

their child. As a result, we lost contact with most of our friends, including Wendi and Joe. We still spoke to them occasionally, but it was not a daily interaction like it once was.

21.     After our son's death, I heard through the grapevine that Joe and Wendi were having some marital problems. I was in my own little world at that time though, and I didn't really care about anyone else. It was hard to care about other people's problems after what we'd been through.

22.     I recall that, shortly after Joe's death, Frank and I received a call from someone in Casa Grande who said that Wendi had killed Joe. I don't remember who it was that called, but I remember that we were doing a contracting job at the time. We were wiring a house out on Tangerine Road in Tucson. I remember being very shocked. Frank and I were unable to continue working and we took the rest of the day off and cried. We prayed.

23.     Frank and I went to Joe's funeral. I recall that we saw Wendi's parents there and we spoke to them a little. Joe's friends were mad that we were talking to Wendi's parents. Joe's friends were very bitter towards Wendi and they were angry that Wendi's parents showed up at the funeral.

24.     My husband, Frank, still talks to some of Joe's friends occasionally. I don't think that they discuss Joe for the most part, but I do know that they occasionally mention him and say that they miss him.

25.     I know that many of Joe's friends were angry with Wendi. I didn't feel that way, however. I know that there must have been something going on that caused her to



Initials

do what she did, if she even did it at all. Wendi may have made a mistake, but I'm not God, and I don't judge her. It was a terrible tragedy for everyone involved. After my son's death, I realized that you can't judge people based on one act. I can't pretend to know what happened between Wendi and Joe, but I do know that I still have so much love and trust for Wendi that, to this day, I would let her move into my house and be around my granddaughter.

26.     I recall hearing from some of our friends that Joe had become a different person after he was diagnosed with cancer. We knew people who'd seen him at the lake and they said that he just wasn't the same – that he was angry, mean, and violent. I recall specifically that a friend of ours said that he saw Joe at the lakes just before Joe's death. He said that Joe was changing from the cancer, he had become short tempered, and he was fighting with everyone around him.

27.     After Wendi's arrest, I called her mother, Donna a few times. I usually got the machine, but sometimes I spoke to her. I always felt so badly for her. She lost her son-in-law, her daughter, and her grandkids all in one night. I don't talk to Donna anymore. I don't think that she's doing too well, and she probably doesn't really want to talk to anyone. She does send me a Christmas card every year though.

28.     I remember that one of the boats Joe had was a boat that we sold to him. He still had it when he died, and his parents inherited it. After Joe's death, Joe's friend Brandon called to tell us that Joe's dad wanted to sell the boat. Brandon called to see if

Initials

we wanted to buy it. He knew we would want it back because it was a rare kind of boat. Joe's dad sold the boat back to my husband about five years ago.

29.     I remember that just before Wendi's trial, I called someone who was helping to defend her. I think that I got the number from Wendi's mother, Donna, or from Wendi. It was a very short conversation, no more than ten minutes. I don't recall who it was, but they didn't really ask me any questions. I did all the talking. I told them that Wendi was a perfect friend and a perfect person. I told them that I would be glad to testify as a character witness at Wendi's trial, but I never heard from them again. I was really surprised that they didn't contact me, because I would have been a very positive witness for Wendi.

30.     After she was arrested, I began writing to Wendi and I sent her some money. I remember that, despite the fact that she was incarcerated, Wendi's letters were always very uplifting and optimistic. She always knew how to make me feel better and she helped me through some hard times. We corresponded for a while, but then, on March 21, 2009, my husband, Frank, got into a boating accident in Lake Elsinore, California. He was in the hospital in Loma Linda for several weeks, and we thought he might die. After the accident, he was paralyzed from the chest down. Now, however, he is paralyzed from the waist down and he is beginning to get feeling back in his legs. About a month after my husband's accident, I wrote to Wendi to tell her that I may not be corresponding with her for a while because of what happened with Frank. I have not been in contact with her since that time.



Initials

31.     Other than the very brief conversation I had with someone working on Wendi's behalf previously which I initiated, I have not been contacted in connection with Wendi's case.   If I had been asked to provide the information contained in this declaration, I would have done so.   I would have provided any information that was asked of me.   If I had been asked to testify on Wendi's behalf and to what I have said in this declaration, I would have done so.

I have read the foregoing declaration consisting of ten (10) pages and thirty-one (31) paragraphs and it has been read to me.  I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this ___ day of November 2010 at Pima County, Arizona.

*Brenda Nagore*

Brenda Nagore

Initials

# Exhibit 22

## DECLARATION OF FRANK NAGORE

I, Frank Nagore, declare as follows:

1. I was born on June 25, 1955. I married Brenda Ward on September 18, 1976. Together, we have three children, Colleen, Jennifer, and Jake. We also adopted our granddaughter, Alexis, who is the daughter of our daughter, Jennifer.

2. I first met Joe Andriano at Apache Lake, Arizona in the early 1990s. He was in his early twenties at the time and we hit it off real well. I was quite a bit older than he was, but I can make friends with anyone, and we had a common interest, which was fast boats at the lake. Joe was a real nice guy. He was good and honest. He and his friends liked to drink and hang around. I met Joe and his friends up there once or twice and then we started planning trips to be at the lake on the same weekends. They were a lot younger than me, but I guess I never grew up. In addition to hanging out with Joe and his friends at the lake, they came down to parties in Tucson, and I went up to parties in Casa Grande.

3. When I met Joe, he had a girlfriend named Shelly, but within a couple years, he was no longer dating Shelly and he met Wendi. I remember Joe introducing us to Wendi when he brought her to the lake one time. I absolutely loved her. I just thought she was the absolute nicest, most genuine person in the world. She was young, younger than Joe, and she was naïve. She was just a sweet, sweet, little girl.

4.    Joe and Wendi got married and we went to the wedding. In time, they also had a child together. I remember that they were real good with their son, but it was the typical thing where the mom takes care of the kid and the dad does whatever he wants. I remember that their son was real little, and we all went to the races together. Wendi was a very good mother and she took great care of her son.

5.    Joe and I talked about everything. Our biggest interest, however, was in boats. We talked about boats all the time, and how to make them run better. Joe also helped me work on boats and helped me at the races. I recall that at one point Joe was also starting a glass business, and we talked about that some.

6.    At the lake, Joe and I and the other guys raced around together, drank beer, and went on water skis. He was a good, fun, guy, and, you know, when you're younger, anything goes. He was levelheaded most of the time, but sometimes he got into fights. I remember one time in specific, someone threw a beer at me and missed and it hit my wife. I started fighting the guy, and another guy jumped in so Joe jumped in to help. We were just typical, stupid guys when we were drinking.

7.    I remember Wendi drinking a little bit too, but I never ever saw her drink more than one or two drinks. She was younger than Joe and his friends. She was always levelheaded and reasonable, and she was the sensible person even with a lot of the other stuff that went on. Everyone really, really liked her - she was a real sweet girl. I always thought of Wendi as a daughter and that's the way I treated her. I treated her just like one of my own daughters.

Initials

8.    I also remember that Wendi's little brother, Brandon, came to the races with us. Wendi brought him with her a lot. He seemed to be a typical, good little kid. He helped us wipe down the boats after the races and things like that, and he seemed to be really into it.

9.    In 1998, two years before Joe died, our son, Jake, passed away. I remember that Wendi and Joe called from time to time to make sure that we were okay. They also came down to Tucson to check on us and to support us. They were always good friends like that.

10.   After Joe got sick, we didn't see as much of Joe or Wendi, but occasionally I saw them at the lakes. I don't recall why we lost contact with them, but maybe it was because he was on chemotherapy. I remember that the chemotherapy made him really sick. I really don't remember much else about that time.

11.   I recall that a friend of mine, Bob Dermer, told me that he saw Joe at the lake after he got sick. Bob told me that he could tell that Joe had become a really angry person. He said that the cancer and the chemo had changed him.

12.   After Joe's death, one of Joe's friends called Brenda and I to tell us what happened. I remember that my reaction was one of disbelief. I really couldn't believe what I was hearing. It totally shocked me. Wendi was such a sweet, kind girl. She was so young. In the time that I knew her, I always watched out for her and made sure nothing bad happened to her. She was really like a daughter to me.

Initials

13.     I remember that at Joe's funeral, Joe's friends were pissed off that Wendi's family was there. I didn't really understand that. I said to them, "You're just going to be pissed off your whole life and you're never going to come to terms with Joe's death if you keep thinking that way."

14.     I do believe in the death penalty for the right people, but in this case I don't believe it's appropriate for Wendi. I remember that when I heard that they were seeking the death penalty, it pissed me off. I just don't think that the punishment is justifiable in Wendi's case. It would kill me if Wendi was executed. I still have contact with some of Joe's friends and they know how I feel but they don't agree with me. The way I look at it, if I was told, "We're gonna let her out but you're responsible for her," I would accept that responsibility. I would let her come and stay in my house. I would do it in a second, without hesitation. I would trust her completely in my house, with my kids, and with my grandkids. If she ever does go free, and she needs somewhere to live, she is welcome in my house. She is a genuine, good person, and, though I have no idea what happened between her and Joe that night, I know that Wendi is not an evil person. I think the world of Wendi.

15.     I recall that my wife, Brenda, approached someone who was involved with Wendi's case. I don't remember who it was or what time that was, but Brenda told that person that we were both willing to testify as character witnesses for Wendi. In fact, we wanted to do it. In spite of the fact that we reached out and offered to testify, we were never contacted again. It really surprised us. We would have been really positive

witnesses for Wendi and it didn't seem right to us that we were not given the opportunity to testify on her behalf.

16.     From what I heard about Wendi's trial, it really didn't sound like she got a fair one. Brenda was in contact with Wendi's mom at that time and we heard things that way. I don't remember reading much about it in the paper or seeing anything on television – and I'm the kind of person who knows you can't believe all the things you read in the paper. There are so many times in life where you think you know something, or the way something happened, and you come to find out that you don't. I don't know what happened that night, but I know that Wendi is a wonderful person.

17.     I recall that Wendi had a few different attorneys in the beginning. I don't remember why they couldn't seem to hold onto one, but I remember wishing that we had money to give to her to get a good attorney the first time around. I know that that can make all the difference. I have been in trouble myself a couple times, for things related to drinking, nothing violent or anything like that, and I always represented myself because I didn't want to deal with a public defender. I also have a son-in-law who is a public defender and he tells me that they are loaded down with so much work that they can't possibly adequately represent all their clients.

18.     Since Joe's death and Wendi's arrest, I have sustained two brain injuries in boating accidents. As a result, my memory is not what it once was. If someone had come to talk to me sooner, I would have remembered more things and been able to provide more details.

Initials

19.     Until now, no one has come to talk to me about Wendi, Joe, or our experiences together.  If they had, I would have provided all the information that I have provided in this declaration.  I would have answered whatever questions were asked of me.  If I had been asked to testify on Wendi's behalf and to what I have said in this declaration, I would have done so.  In fact, if someone had come to talk to me sooner, I would have remembered more details.

I have read the foregoing declaration consisting of six (6) pages and nineteen (19) paragraphs and it has been read to me.  I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this ___ day of November 2010 at Pima County, Arizona.

Frank Nagore

Initials

# Exhibit 23

# DECLARATION OF JASPER NEACE

I, Jasper Neace, declare as follows:

1.     My name is Jasper Neace.  I was born on February 10, 1967, in Portsmouth, Ohio.  I am the son of Ronnie Gordon Neace and Glenda Sue Neace.  I have eight siblings.  In birth order they are: Ronnie, me, Sherry, Michael, Holly, Rene, Amanda, Candy and Manuel.  My family moved to Casa Grande, Arizona, from Georgia in about 1979.  Prior to our arrival in Casa Grande, my family had moved back and forth from Georgia to Florida.  I have known Wendi Andriano since shortly after my family arrived in Casa Grande when I was about twelve years old. When I first met Wendi, she was a child and called by her maiden name, "Wendi Ochoa."

2.     I am a former student of the 91st Psalm Christian School and former member of the 91st Psalm Christian Church located in Casa Grande, Arizona.  During the time I was there, the name 91st Psalm Christian Church was changed to Harvest Family Church and the school became Harvest Christian Academy.  This change in name occurred when the church changed hands.  When I first began attending church there, Calvin "Cal" Lorts was the pastor.  When he left, a man named Tom King took over and renamed the church and school.  I became a member of the church and began attending school there at the time my family arrived in Casa Grande in about

Page 1 of 25

Initials

1979. I remained at the school for about six years until the end of 1985 or the beginning of 1986, at which time I was eighteen years old.

3.      I remember Wendi well as I saw her every day for years and years. I remember Wendi as the all-American girl. She was funny and cute. She was talkative, outgoing and smart. She was everything a guy would want. I never took an interest in her because she was too young for me. She was only twelve years old when I was fifteen. Wendi was in and out of all the groups and was accepted by everybody.

4.      Within a couple months of us moving there, my dad was gone. My mother kicked him out because the church convinced her that he was a sinner. The associated scripture was "A house divided against itself shall not stand."

5.      When my dad left, my family could not afford to remain in the house we were living in. At that time, we moved to the projects. At that time, my mother also started collecting welfare. I recall that every month, when she got her welfare check, we went to the grocery store. We had two shopping carts. We filled one cart with cheap food. The other cart was filled with high quality, healthier food. We bought the food from both carts with our welfare money. We kept the cheap food for ourselves, and gave the good food to Tom and Patricia King, the pastor at Harvest and his wife. I remember stopping by their house on the way home from the market and bringing the food up to their house. My mother did this every month. I asked her why she was doing that and she responded, "God will bless us." I still recall how bad that made me

Initials

feel. I guess, in another sense, I felt good about it. They had me okey-doked too, and I believed my mother when she said that God would bless us. But at the same time, I couldn't understand why Tom King accepted my mother's food. Never once did he refuse the food even though he knew we were poor and barely had enough for ourselves.

6.     I remember specifically that my mother would purchase three or four gallons of milk for Tom and Pat, and one for us. She poured half of our gallon of milk into an empty gallon container, and filled the remainder of both gallons with water and powdered milk. I also recall that the meat that she bought for Tom and Pat was of a higher quality than the meat she bought for us. They got rib eye steaks, and we got hamburger meat. Ours probably cost about a dollar a pound, while the meat we bought for them was ten dollars a pound. Still, we managed to get by. My mother was an amazing cook and she could make anything taste good.

7.     The idea behind my mother giving food to Tom King was the Bible instruction on tithing ten percent of what you have. Supposedly, if you do so, the Lord will return it to you one hundred fold. Church members signed a piece of paper stating how much they were committing to give. Regular collections were placed in a basket in the church during services. The contribution was in an envelope filled out with the person's name on it. The church kept a log and record of what each person gave. The church favored those that gave more. One of the biggest contributors was Martha England who donated ten to fifteen thousand dollars at a time. Another

Initials

church member, whose name I cannot recall, purchased a couple of buses for the school to use.

8. Sometime in late 1982 or early 1983, I returned to Georgia with my family. My father had persuaded my mother to take him back. He promised to quit drinking. We remained in Georgia for about four or five months. We left because my father continued to drink, and we returned to Casa Grande. We snuck away while he was at work one day. At that time, my siblings and I returned to school at Harvest.

9. As members of the congregation at Harvest, we were not permitted to associate with anyone who did not attend the church. Harvest was our whole world; we spent our days there, and then went home. The only recreational activities we were permitted were those put on by the church. For example, if I went to hang out with my neighbor buddy, and someone from the church found out, they reported to my mother that I was hanging out with "bad people." A "bad person" was anyone who did not subscribe to Tom King's way of thinking. Kids who did not attend our church and school were branded this way. They were called bad influences, and to spend time hanging out with them was to "tempt the Devil." We were told that they were ungodly and that we would become that way too if we spent our time with them. In this way, the church tried to control every aspect of our lives. It was not just limited to our behavior at the church and school, but any outside activities as well.

10. I feel that I missed out on a lot as a child. I never watched "Mork and Mindy" or "Gilligan's Island." All television was forbidden. They called it the Devil's


Initials

box. We were only allowed to watch Christian movies, such as Ben Hur, and all other movies were also forbidden. I recall that I wanted to see Indiana Jones so bad, but I was not allowed. I was told that it was evil. We didn't watch or hear any news from the world outside, and I knew nothing of politics or world events. We were told that it was too much death and destruction. We were not permitted to eat sugar, and used honey for sweetener. We also were not permitted to eat white bread. I felt isolated and was cut off from how other children played and things they did. I lived in the projects and, though my mother tried, she couldn't always keep us away from all the neighbor kids. On the rare occasion that I was around kids not from the church, I remember hearing them talking about things, movies and television, and I couldn't participate in the conversation. I recall that my brother and I occasionally snuck off to the drive-in theatre. We cut a hole in the fence so we could watch movies that way. On those occasions, we told my mother that we were going to the park.

11.     I attended public schools until the sixth grade. After my family moved to Casa Grande I started attending 91st Psalm School. The church school was very different than the public schools. We were required to memorize and be able to recite fifteen verses from the King James Bible each month. The scripture assignment was given out at the beginning of the month and anytime during the month that a child was ready to recite, they could. If the end of the month came around and students still had not volunteered to recite the scripture assignment, they were called upon to do so. This was very difficult for my brother Michael. He is hearing impaired and as a result,



Initials

had poor pronunciation.  Nevertheless, he was punished for not properly reciting the scripture assignment.  Sometimes he lost recreation as punishment, and sometimes he was whooped.

12.   91st Psalm charged tuition for students to attend.  In order to pay for the tuition for me and my brothers and sisters, I worked at the church and school until seven or eight in the evenings every night and on weekends to pay for our tuition.  I did this for the entire six years I was there.  Alejo Ochoa oversaw the work I did; for all intents and purposes, he was my boss.  I was very dedicated to the church and school. The only sibling of mine who did not attend the school was my youngest brother, Manuel.  We were all ousted from the church and school in 1985 or 1986, before Manuel entered school.

13.   As a result of working there and being around the school and church so much, I saw many things that went on both inside the classrooms, at the church, and after regular school and church hours.  I never received actual payment in money for my work at the school and church.  There was a written accounting that tracked how much I worked against the costs of my siblings to attend church and school.  I know that we were charged for each Accelerated Christian Education ("ACE") booklet we used plus an amount for each semester that may have cost about $150 for each student.

14.   I think that the church and school were not so bad at the beginning when Calvin Lorts and his wife, Barb were there.  Cal Lorts left 91st Psalm to take over


Initials

at a sister church, the 91st Psalm in Phoenix. His brother, Barry, was running the school up there before Cal left. After Cal went up to Phoenix to take over for Barry, Tom King rose to the position of head pastor and things went downhill. Initially, Cal traveled back and forth from Phoenix to Casa Grande and tried to remain at both schools. Tom King went behind his back and took over. Eventually, Cal didn't want to deal with it anymore, and he signed everything over to Tom. At that time, Tom changed the name to Harvest Family Church and the school became Harvest Christian Academy. The congregation dropped in number and the number of students at the school declined.

15.    Tom King's wife, Pat King, was a sweet lady who was devoted to Tom and right or wrong, she always had good things to say. She was jolly, played the piano and sang a lot. I felt sorry for her. Tom was hard on his two sons. One son, Shawn, who wound up dating Wendi, was run over in an automobile accident. The other, Brad, died in a plane crash. Their daughter, Amy, became a police officer. When Brad died, Tom King tried to raise him from the dead.

16.    Pat King was the head lady of the singing in the church and she played the piano during the church services. During the Sunday sermons by Tom, he liked to have attendees speak in tongues and then he interpreted what the person was saying. During these times, Pastor Tom would be preaching that the Lord is asking someone to speak and the piano would be going low in a real dramatic way. When a person


Initials

stood to speak, the piano stopped. When the person stopped speaking in tongues, the piano started up again. Pastor Tom then interpreted what they said as a message from God that he was able to decipher for the rest of us. I ran the recording booth during the services. I operated the lights so that they were dim during dramatic moments like when people came up for healings and I operated the microphones and tape decks to record the sermons.

17.     Pastor Tom also did healing by laying his hands on people. After preaching for a while, Tom would say that Jesus had healing power. I dimmed the lights and Tom asked that if anyone was sick, they should come up. When they did, Tom laid his hands on them and prayed. I never saw him make the blind see or the deaf hear. It was always something inside, not something visible that was healed. Both Tom and Calvin laid their hands on people to heal them. I saw people pass out. I thought they were faking it but Calvin really could make you believe anything. He was charismatic.

18.     There were special sermons given at the church about marriage and for couples. The sermons drew from the Old Testament and talked about how women were to be faithful to their husband and if they were not, they should be stoned because that was the greatest sin a woman could commit. The man is the boss and the woman is his backbone. If a woman is your wife then what the man says goes. It



Initials

seems to me that all of the worst punishment in the adult realm was reserved for the women. The women were also the butt of any jokes that were made.

19.     The Sunday service usually lasted about two or two-and-a-half hours. There were some years when there were more people in the church and for a while there were two Sunday services, one at 7:30 am and another at 10:00 am. After the sermons every day I went in and cleaned. I swept the floor and wiped down the benches and got the place ready for the next service.

20.     During the years that Cal was the pastor, the sermons were shorter and more exciting. Tom's sermons tended to be long and drawn out and boring. Tom was a negative person, he preached damnation, but Cal was more positive and optimistic. Cal could make you feel good.

21.     School was held in one large rectangular room.   There were tables around the perimeter of the room with dividers or partitions between each student to the right and to the left so that we faced the wall and could not see the students to our right or to our left. With the partition on either side, it created individual cubicles for each student. There were adults, "monitors" who we called teachers and from whom we could request assistance. If we needed help, we placed a small American flag in a hole in the wall above our table so that it hung down for the "teacher" to see. The teacher would then come over and help us with whatever we needed. The monitors or teachers were members of the church who volunteered at the school. A few of the


Initials

school monitors were my neighbor, Connie Carlin; Sherry West; Joyce Casey; and Barbara Lorts, Cal Lorts' wife. The monitors had set schedules. Some of the monitors didn't work a normal job because their husbands supported them. Those individuals came in to volunteer "teach" five days a week. Others both worked and volunteered at the school, so they only came in two or three days a week. I recall that Connie Carlin and Sherry West came in two or three days a week, while Joyce Casey and Barbara Lorts came in five days a week.

22.     Because the monitors were not teachers, they were often not able to help with the questions I had. Barbara Lorts was pretty smart and she was able to help sometimes. The only man who I recall being a monitor was Johnny Casey for a period of time. He was a college graduate and so he was also able to help.

23.     The school was very strict. There were no professionally trained teachers with credentials and no formal group instruction except when we were instructed in the Bible, sewing, cooking, welding, physical education ("PE"), or photography. The remainder of our education was self-taught using ACE booklets. A typical school day started at seven thirty or eight in the morning. It varied over the years. We said the pledge of allegiance and then said our prayers for the day. After prayers, we worked at our cubicles for a couple of hours and then had a break for recess. After recess, we returned to our desks until lunch. There was no cafeteria and we brought lunch from home and ate outside. Unlike in the classroom, during recess and lunch we were able to hang out and talk with our schoolmates. After lunch, we


Initials

returned to our desks again. We had another break in the afternoon and then school concluded at three thirty.

24.     Alejo was the children's church pastor and youth pastor. He was the number one man behind the scenes. He was Tom King's right hand man, and also the janitor. Before Alejo, a man named Mikey Long was the children's church pastor for a time. He was a man who lived with Cal and Barbara when they were still in Casa Grande, before they moved to Phoenix.

25.     Formal Bible instruction took place about three times a week, but Bible teachings infiltrated nearly every subject we were taught in school. The Bible instruction took place in the children's church, which was separate from the adult church. Alejo or Johnny taught Bible instruction but usually it was Alejo. It was a lot like turning on a Christian channel on TV. He would start with scripture, read through it, and then give an explanation. There were different themes each week. One week, the class would be about anger, the next week, love, the next week, tithing, etc. It lasted approximately forty-five minutes to an hour. I recall that Alejo put most of his attention on the girls in the class. I remember feeling that he was more interested in them. I remember him licking his finger and touching their ears and acting real flirty. None of the guys liked Alejo; we all talked about it.

26.     During the time I attended school at Harvest, Mark and Nancy Keating came to work at the school. I believe they were actually real teachers. They were both college graduates and real athletic. Mark was into swimming and Nancy was also the



Initials

track coach. They were real nice, but it seemed like they had problems with Tom King. That was the impression I got from being around the office all the time. They were real good with the students and they always acted real professional. I never had one bad experience with either one of them. I recall that at parent conferences they always spoke highly of me to my mother. When they arrived, we began having more activities at school. They started a track team, and some of us ran up to ten miles per day. I think they were still there when I left at the end of 1985.

27.     In the church system how I was raised, just about anything I did or wanted to do in the outside world was a sin so it was very difficult to cope. There were the standard kinds of sins, such as lying, stealing, and cheating. But there were other things that were normal that were also referred to as sins. Thinking negative thoughts was a sin. Gossip was a sin. Engaging in romantic relationships was a sin. Talking badly about people was a sin. I can still hear the words, "Sin is pleasure for a season but the end thereof is death." Upon reflection, it seemed that as long as Pastor Tom was happy, we were all going to heaven. But, if Tom was not happy for some reason or if he did not like you, anything you did was a sin.

28.     There are several main principles and guiding scriptures that were taught at the school and to which the school and church adhered. One that sticks out for me referred to us children, "Beat them when they are young and when they are old, they won't depart from it." Another was "Honor thy mother and thy father and



Initials

with long life will I satisfy thee." Corporal punishment was standard at Harvest. If there was one thing the adults enjoyed, it was beating the hell out of kids. That was the number one thing adults did at the school. Kids at school got whoopings for nearly everything; disobeying, not following orders, being unable or unwilling to memorize the scripture assignment, lying, cheating, and incomplete homework.

29.     Tom King encouraged our parents to spank us. He preached about it in sermons. I recall him saying, "Beat them while they're young and when they're old, they won't depart from it." When students were punished at the school, the monitor took them to an office and the beating was done in private. The students were beaten with paddles that had scriptures inscribed on them. When the kids were swatted, they bent over and touched the desk while they received the swats with the paddle. I think that it was pretty standard for a child to receive between three and five swats on their rear ends. I remember those paddles well and remember dusting them every day. After the kids were swatted, they returned to the main classroom. Everyone knew what happened. There were no opportunities to hide what had happened and we were not permitted to have any secrets. The kid came back in the classroom and you could see it on their face. Sometimes they were just red and embarrassed, sometimes they were crying.

30.     The church recommended that parents keep paddles in the home to hit their children with, and my mother ascribed to the church teachings that children



Initials

should be beaten. She used a paddle that I made out of a two-by-four. It was two feet long and was sanded down with scriptures written on it. When we were hit with it, we had to read both sides of the paddle that had scriptures about discipline and obeying. I never had a whooping until I was twelve years old after my mom began attending the 91st Psalm Church, and then I had one from her nearly every day until I was seventeen. I usually got about ten licks. I believe that my mother thought she was doing the right thing. She was brainwashed by the church's teachings, and she acknowledges that now. Every time I talk to her, she apologizes for what she put us through. I have to be careful not to bring up, because she cries and cries and feels so badly about it.

31.     I remember being in a welding class taught by Tom King. It was a class that we could take to earn extra credits. Tom owned some welding equipment and he taught us how to use it and how to operate heavy equipment. One day during class, I was sitting in the back of a pick up truck. Tom King and I exchanged words. I don't recall what we were arguing about, but I made him mad. He grabbed me out from the back of the pick-up truck, lifted me high above it and let me drop to the ground. He said, "There you go, how does that feel?" I hit the ground hard and it was gravel, so it scraped up my knees and the palms of my hands pretty bad. It caught me off guard and it hurt like hell. When I asked him why he did it, he responded, "You needed it."

32.     I recall another occasion when an adult at the school physically assaulted me. His name was Steve Justus. His wife, Cyndee Justus, was the sister of Patricia

Initials

King.  Steve and Cyndee helped run the teen church, and we were on a teen camping trip.  There was a kid who attended school at Harvest who was also on the trip.  His name was Jordan and I didn't really like him.  He wanted to trade watches with me, and I knew that his was watch was more expensive, so I agreed.  Before we traded, however, Jordan asked me if my watch was waterproof.  It said "water resistant" on it, so I told him it was.  We held our watches under water to make sure, and after a couple minutes, they were both still working, so we traded.  Later on in the day, the watch I gave to him quit working.  He wanted his old watch back, and I told him, "Too bad, a deal's a deal."  Steve heard us and he was angry.  He called me a "Georgia-used-car salesman."  He grabbed me and dragged me across the ground real hateful.  I pushed him and he punched me and beat me up a little.

33.    It seemed like Tom King and the monitors at Harvest singled out certain kids for more frequent and harder beatings.  Some kids really got it bad.  Alejo was particularly abusive to the children and to my brother Michael.  In addition to whooping the children during the school week, Alejo whooped the kids during Sunday school.  I didn't get swatted at school too much.  I think that I was such an asset to the church because I did so much work, that they kind of left me alone.  Maybe they suspected that I wouldn't put up with it.  My sister, Sherry, and my brother, Michael, were some of the hardest hit, both physically and mentally.  They were whooped about three times a week.

Initials

34.     I'm not sure why my sister and brother were abused so frequently.  I know they never really did their homework, and I think that was the catalyst for a lot of the beatings.  They were also easy targets.  Michael was mostly deaf.  He had a very difficult time memorizing and reciting the Bible versus and was punished heavily and beaten hard because of his disability.  Sherry, bless her heart, was kind of an ugly little girl.  I hate to say it, but she had big buckteeth and thin hair and she never really fit in with the other students.

35.     The church destroyed Sherry.  They picked on her, drove her real hard.  When Sherry was about sixteen, she got a ride home from a churchgoer, and he raped her.  My family never would tell me who the man was, because they were afraid what I might do to him.  Later, Sherry turned to hard drugs to cope.  In addition to Sherry, my brother Michael was also raped by a Christian man, and also later did drugs.

36.     Although Wendi Ochoa was younger than me, we were in the same classroom together for years.  All of the students were together in one room for many years and we all saw each other every day.  Sometime before I left the school, the classroom was divided so that junior high and senior high-level students were in one room and the other children in another room.  Wendi and I were always in the same room together, and were around each other a lot.

37.     I was on the school and church grounds until late everyday working.  Wendi was also there late because she had to wait until her father left to get a ride home.  We spent so much time there we practically lived there.  Wendi sometimes



Initials

helped clean up the church, but sometimes she just stayed there doing schoolwork or studying. She spent about 90% of her waking time at the church and school. While I don't recall Wendi getting beaten at the school, I remember her remarking about getting whoopings at home. I think that due to the fact that she lived with Alejo, most of her punishments were delivered after school, in her home.

38.   I always had good feelings about Wendi's mother, Donna. She was a really sweet, kind person; a pretty woman; and generally well-liked. Wendi's father, Alejo was a different story. I frequently saw him flirting with women. I saw him flirt with another church member, Connie Carlin, in the little kitchen area of the school. I remember seeing him lick his finger and touch her ear with it.

39.   Alejo acted very differently around his wife, Donna. I never saw him flirt with her the way he did with the other women or the young girls. Alejo and Donna's relationship appeared to be more professional than romantic.

40.   On numerous occasions I heard many different young girls complain about being alone with Alejo, and another man who was a teacher at the school, Johnny Casey. Girls did not like being alone with either one of them. As I understand it, Alejo and Johnny touched the girls in PE class. It was all under the guise of aiding them in stretching and things like that, but the children were under the impression that it was just an excuse to touch them. I remember specifically that Samantha Nichols talked about not liking being alone with Alejo or with Johnny. Alejo and Johnny spent a lot of time together. It creeped out the girls that Alejo licked his finger and then



Initials

touched their ears with it. I think that it was his way of being able to touch them somehow.

41.    I recall hearing that two members of the church, Connie and George Carlin, confronted Tom King about Alejo's behavior with one of their daughters, either Sara or Rachel. Connie and George confronted Alejo about it but Tom King took Alejo's side and stood up for him. Connie and George left the church and never came back.

42.    I also remember that Wendi told me that Alejo touched her in a sexual way. I was about fourteen or fifteen years old when Wendi told me this, so she was eleven or twelve. She was really upset and she was crying about it. I recall being under the impression that Alejo wanted to have sex with her. She told me things on several occasions that led me to believe that. Often, they were just little remarks. She said that her dad was disgusting. She said that her dad licked her neck. She said that her dad put his tongue on her and rubbed her upper leg. Other times, my impressions were from facial expressions that she made. She often screwed up her face in disgust when Alejo was nearby. I got the impression that she was afraid to be alone with him, that she was scared of what he might do. She was always real quiet when he was around, she didn't joke around like she normally did. She immediately changed when he walked in the room. I recall that she always crossed her legs and kept her dress pulled down as far as it would go. She sat there real quiet, and you could just feel the

Page 18 of 25

Initials

tension. She never wanted to sit too close to him, and when she got in the car with him, I recall that she'd get in the back seat. She never sat next to him in the front. It seemed that no one had the guts to flat out tell on Alejo and what he was up to with her. It was hard being a kid in that situation because the adults had all the power.

43. I recall hearing, long after I was gone from the school and church, that Alejo was no longer a part of the church because of his sexual behavior with girls. I heard that he abused a girl sexually. This does not surprise me.

44. In addition to being a teacher at the school for a time, Johnny Casey worked as the back-up pastor. He did the sermons once in a while if Tom King wasn't around for some reason. He was always okay with me, but the girls didn't like him. He always tried to get the girls alone. I recall that a student, Samantha Nichols, told me that Johnny looked up her dress. He wasn't as obvious about touching or flirting with young girls as Alejo was, but the girls complained about him.

45. I also witnessed what I consider a lot of hypocrisy. For example, when I worked at Kingdom Construction, the owners were two men who were members of the church. However, one of them drank alcohol, which was strictly prohibited by the church. When I cleaned out his truck, I found beer cans under his seat. When I approached the other owner about it, I was told to "keep it to yourself and pray for him."

46. As I got older, I obtained a second job at Basha's grocery, in addition to the job working to pay tuition for myself and my siblings at the school and church. I


Initials

worked an entire summer and part of the school year and saved up enough money to buy a motorcycle.  I also worked odd jobs for church families and for Kingdom Construction.  However, when Tom King saw the motorcycle, he told me that I had to sell it and give the money to my mother for food.  I refused.  I felt that it was none of his business what I did with my money, and I think that it was hypocritical for him to say something like that to me.  He probably knew that if I sold my motorcycle and gave my mother the money, he'd end up with his ten percent.

47.     During the time I was at the church and school, we did outreach to people in impoverished communities in Arizona.  I recall going out on buses and being dropped off in public housing projects.  Areas were mapped out and we each went with two or three people in a group going door to door.  We knocked on doors, telling people where we were from and about any specific event that was going on.  We were given candy to take to the kids in order to try and convince them to go to church.  We had books and fliers to pass out.  At first I was a little uncomfortable doing it, but I got real good at it.  I probably convinced hundreds of people to come to the church.

48.     We also did charity works.  We went to Mexico to towns about an hour or so past the border with busloads of clothing and canned food.  When we went, we spent the day with children handing out clothes.

49.     Another community event was building a Christmas Nativity Scene in town every year.  The scene would be in place for twelve days and church members


Initials

played the parts of Jesus, Mary, Joseph and others. I helped build the nativity each year I was with the church.

50.     My family was ousted from the church in about 1985, all of them except for me. My mother met someone and wanted to get married. The man she wanted to marry was not a member of the church. She asked Tom King's permission to marry him. He said no. Tom King did not like the man my mom wanted to marry because he was not a member of the church. My mom married him anyway. As a result, she was kicked out. At the time, I was living at the house of Barbara Lorts' mother. I was taking care of it for her. I wasn't kicked out of school when the rest of my family was because I wasn't living at home with them. I recall showing up at church and my family wasn't there. I went by my mother's house and asked her why she wasn't in church and she explained to me that she had been kicked out. I had every intention of leaving too, but my mom asked me to stay. She wanted me to finish school there because I was so close to graduating.

51.     I was expelled from school at the age of seventeen or eighteen after Wendi brought the cover of a pornographic magazine to school and told me that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in my locker, and then I told the pastor, Tom King, that I needed to talk to him about something important. My intention was to tell Tom King about the magazine. All the other kids were too afraid to say anything. I wanted Alejo to face the consequences for all the damage he was doing. I was angry about what I saw to be extreme hypocrisy. I was in



Initials

trouble for buying a motorcycle, and my mother got kicked out for getting married, but Alejo faced no consequences for his sexual behavior with children, for whooping on kids, and for looking at dirty magazines. Tom King called me into his office and asked me what I had to say. I told Tom King about the magazine, but Alejo was sitting right there in the office and he flatly denied it. Tom King said, "Are you sure you have the magazine? I'd like to see it." I said "Go to my locker, you'll find it." But when we went back to my locker to retrieve the magazine, it was gone. I still to this day have no idea what happened to it. I thought at the time that it was possible that Wendi took it out of my locker. She may have been afraid of what would happen if I showed it to Tom King. After it was discovered that the magazine was not in my locker, Tom and Alejo brought me back to the office. They looked so smug. I pointed my finger at Tom King, and I said to him, "I've always wanted to tell you this: Fuck you, Tom." I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity. After I cussed at Tom, he told me he was going to call the cops. He started rattling off scriptures and he said that he was rebuking me in the name of Jesus and that he was turning me over to the devil. He said that I was an outcast and a liar and that I was evil just like my father. I tried to leave, but Tom King blocked one door and told Alejo to block the other. Tom King pinned me against the wall. I pulled my fist back to punch him and he said, "In the name of Jesus, you will not hit a man of God." I punched him in the chest as hard as I



Initials

could, and then I turned around and knocked Alejo down. I ran out the door and hopped on my motorcycle.

52.    After that incident, Tom King announced in a sermon that I was a demon and that no one was to talk to me. He told the congregation that they would perish in hell if they had anything to do with me.

53.    Shortly after we were ousted, my mother and siblings moved back to Georgia. I remained in Arizona and completed high school at another 91st Psalm School, the school in Phoenix that was run by Calvin Lorts, the former Pastor of 91st Psalm in Casa Grande. I stayed in Arizona because I was in love with a Christian girl from the school. Her name was Denise Miller. We dated for about two years. I stayed in the home of Calvin and Barbara Lorts and I attended Cal's church in Phoenix.

54.    Thinking back on my experience at 91st Psalm and Harvest, I realize that during the years I was growing up there, I was going through hell. The church made me think a certain way and it went so far it got to the point where it brainwashed me. In order to cope with all of the horrible things I went through at that church and school, I turned to drugs and alcohol, as I was becoming an adult. The teachings of the church had me convinced that I was a sinner and was going to hell; they crammed it down your throat day in and day out. I truly believed that I was going to hell. I turned to drugs to numb the pain and to forget about my impending fate in hell. I turned to drugs to break free. When I was eighteen, I went hog wild because I never



Initials

had a chance to experience anything. My whole life had been about what I could not do, I never heard anything about what I *could* do.

55.    I remember that on my eighteenth birthday, I got stoned and drank beer. A year later, I was doing cocaine and a year and a half after that, I was using methamphetamine. Drugs were my way out. Drugs were my way out of thinking that if I did not put Jesus first that I was going to hell.

56.    The problems and issues that stemmed from my drug abuse probably weren't any better than those I had from being part of the Harvest church and school, but at least I wasn't depressed. They were my release.

57.    My sister Sherry went down the same path I did after we left the school. She started doing drugs, and spent time in prison. She smoked crack and marijuana and did cocaine. I believe that she, like me, turned to drugs in an attempt to cope with her problems. She has been clean now for a year and a half. My brother Michael also got caught up in drugs. He recently signed a ten-year plea deal for possession charges.

58.    In 2001, I shot my first wife in the ~~foot~~ *shoe* ⁱ. I came home and discovered a man crawling out of the window. Knowing my wife cheated on me caused me to become enraged. I became so enraged that I temporarily lost my mind. At some point, I blacked out, and though I don't remember what happened, I was told later that I was quoting bible scriptures and that I was shooting a gun at my wife. I told her that she had committed the gravest of all sins. I believe that the church environment

Page 24 of 25



Initials

in which I was raised led to my losing my mind that way. At school, we had been taught that the punishment for adultery was death. We were taught about accounts of women being stoned to death for committing adultery.

59.     The life I lived there was so strange. Coming out of it was very hard. I remember watching television for five years trying to catch up on all that I missed. I think that overall it all started with good intentions and went bad somehow. It seems to me that Tom King destroyed so many lives with the way he did things and the way he got people to follow him and obey him. In the end he wound up with nothing, just a burnt down building. I have never even told my wife about the life I had there. I have four children and I never considered sending them to a Christian School of any kind. I do not want them in a church environment because I saw what could happen.

60.     Until now, no one has ever contacted me about Wendi or our experiences growing up together. If I had been asked to testify on Wendi's behalf to what I have said in the declaration, I would have done so.

I have read the forgoing declaration consisting of twenty-five (25) pages and sixty (60) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct. Signed this  7  day of June 2010 in Pima County, Arizona.

Jasper Neace

Page 25 of 25

Initials

# Exhibit 24

## DECLARATION OF ALEJO LORENZANA OCHOA

I, Alejo Lorenzana Ochoa, declare as follows:

1.    I am the adoptive father of Wendi Ochoa Andriano.  I have been married to Wendi's mother, Donna Worsham Ochoa, since June 1975, when Wendi was almost five years old.  I was born on August 1, 1952, in Torrance, California to Alejo Molina Ochoa and Natalia "Natalie" Lorenzana.  I have one sibling, a sister, Delia Rose Rascon Alvarez, who is about three years older than I am.  My wife, Donna, was born on September 20, 1949.

2.    Donna and I also legally adopted Donna's half-sister Kathie's son, Brandon, when he was about two-and-a-half years old.  When Brandon came to live with us, the people from foster care dropped him off with us at a café while we were vacationing in the mountains.

3.    My father, Alejo Molina Ochoa, was born in Bisbee, Arizona on May 12, 1927. At the time I was born, he worked at "Standard," a company that manufactured toilets.  My paternal grandparents were Alejo B. Ochoa and Guadalupe Molina Ochoa. My father's siblings who survived infancy are Michael; Cecilia; Maria, "Mary;" Angeline, "Angie;" Guadalupe, "Lupe;" and Lucia, "Lucy."  Michael died when he was in high school after being hurt playing football in Casa Grande.

Page 1 of 58

Initials

4.      My mother, Natalia "Natalie" Lorenzana, was born in Phoenix, Arizona on
June 1, 1925 and died on September 27, 2003 of a massive heart. a fade A.O. Her parents were older
when she was born.  My maternal grandfather was named Ygnacio Lorenzana and as far
as I know, my maternal grandmother was named Maria.  My mother's siblings that I
know of are Elena, "Helen;" Lavaro, Ignacio; "Nacio;" Maria; and Frank, "Baldy."  My
mother's parents had both been orphaned and grew up in the Lorenzana Orphanage in
Mexico City and received the surname of Lorenzana.

5.      My family left Torrance and moved to Casa Grande, Arizona when I was
about three years old.  I grew up in Casa Grande.  While I was growing up, my dad
worked from his panel truck selling dry goods such as canned food and household
supplies to migrant workers living in camps near or around Casa Grande while they
followed work picking cotton or lettuce.  When I was about five years old, he started
taking me with him in the truck when he went around selling his wares.  He also delivered
newspapers and I remember sometimes getting up at two in the morning to go with him
to help deliver newspapers. He also worked as a Meat cutter. A.O.

6.      We lived on 4th and Lincoln on the east side of Casa Grande from my early
years until the end of my sixth grade school year.  We then moved to the house on Park.
The house on Park was in a working-class neighborhood consisting mostly of white
families.

A.O.
Initials