*Andriano v. Ryan, et al.*, CV–16–01159–PHX–SRB

# EXHIBIT A

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
D. Casales, Deputy
8/18/2017 10:41:04 AM
Filing ID 8593445

Jon M. Sands
Federal Public Defender
Jennifer Y. Garcia (Arizona Bar No. 021782)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Jennifer_Garcia@fd.org
Telephone: 602.382.2816
Facsimile: 602.889.3960

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>      Plaintiff/Respondent,<br><br>vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>      Defendant/Petitioner. | No. CR2000-096032<br><br>Joint Motion to Correct the Record<br><br>(Hon. Sam Myers)<br><br>(CAPITAL CASE) |

Petitioner Wendi Elizabeth Andriano is currently in federal habeas proceedings in the United States District Court for the District of Arizona. *See Andriano v. Ryan*, No. CV-16-01159-PHX-SRB (D. Ariz.). Pursuant to that court's general procedures order, the Arizona Attorney General is required to provide the district court with relevant portions of the state-court record.

In compiling this record, counsel for the Attorney General's Office realized that while Ms. Andriano's state post-conviction counsel intended to file public (but redacted) versions of sealed exhibits to the amended petition for post-conviction

relief, for unknown reasons the court's copy did not make it into the court record or docket itself.[1] Accordingly, the exhibits to the petition for post-conviction relief in the court's official record are sealed. (*See State v. Andriano*, No. CR2000-096032 (Maricopa County Super. Ct. order filed Mar. 6, 2012 & minute entry filed May 3, 2012).) For ease of reference by the parties during the federal court proceedings, counsel have conferred and hereby jointly move the Court to correct the record in this case by filing the redacted versions of those exhibits attached here. This will allow counsel for the State to file these redacted versions with the district court, thereby protecting the sealed information while avoiding unnecessary additional sealing of the federal court filings.

Respectfully submitted this 18th day of August, 2017.

| | |
|---|---|
| Mark Brnovich | Jon M. Sands |
| Attorney General | Federal Public Defender |
| Lacey Stover Gard | Jennifer Y. Garcia |
| Assistant Attorney General | Assistant Federal Public Defender |
| | |
| By s/ Lacey Stover Gard | By s/ Jennifer Y. Garcia |
| Counsel for | Counsel for |
| Plaintiff/Respondents | Defendant/Petitioner |

---

[1] Both Ms. Andriano's current counsel and the Arizona Attorney General's Office have these redacted exhibits,

Original and Copies of the foregoing
e-filed this 18th day of August, 2017, to:

Clerk of the Maricopa County Superior Court
Phoenix, Arizona 85003

And Mailed to:

Lacey Stover Gard
Arizona Attorney General's Office
Capital Litigation Section
400 West Congress, Bldg.S-315
Tucson, AZ 85701-1367

s/Robin Stoltze
Assistant Paralegal
Capital Habeas Unit

## EXHIBITS FILED WITH PETITION FOR POST-CONVICTION RELIEF

### *Volume 1*

### EXPERT REPORTS

1.    Expert Declaration of Larry Hammond

2.    Expert Report of Dr. George W. Woods

       2.A.    Appendix A to Woods Report:  List of Documents Reviewed
       2.B.    Appendix B to Woods Report:  Overview of the Biopsychosocial and
               Psychiatric History of Wendi Elizabeth Andriano and Her Family
       2.C.    Appendix C to Woods Report:  Curriculum Vitae
       2.D.    Appendix D to Woods Report:  Qualifications, Background and
               Experience

3.    Expert Report of James Hopper, Ph.D. (Executive Summary)

4.    Appendix to Expert Report of James Hopper, Ph.D. (Full Report)

       4.A.    Exhibit A to Hopper Report:  Curriculum Vitae
       4.B.    Exhibit B to Hopper Report:  List of Documents Reviewed

5.    Expert Report of Myla Young, Ph.D.

       5.A.    Addendum to Expert Report of Myla Young

### *Volume 2*

### DECLARATIONS

#### Declarations of Individuals Associated with Wendi's Trial Representation

6.    Affidavit of Daniel Patterson

       6.A.    Exhibit A to Patterson Affidavit:  Assessment by Dr. Jack Potts
       6.B.    Exhibit B to Patterson Affidavit:  12/20/01 Email to Patrick Linderman
       6.C.    Exhibit C to Patterson Affidavit:  Assessment by Dr. Richard Rosengard
       6.D.    Exhibit D to Patterson Affidavit:  2/14/02 Email from Michelle Arvanitas
       6.E.    Exhibit E to Patterson Affidavit:  Report of Dr. Michael Bayless

7.    Declaration of G. David DeLozier

       7.A.    Exhibit A to DeLozier Declaration:  2/19/01 Letter from Certified
               Professional Counselor Kandy Rohde
       7.B.    Exhibit B to DeLozier Declaration:  3/12/01 Letter from Certified
               Professional Counselor Kandy Rohde

7.C. Exhibit C to DeLozier Declaration:  Notes from Certified Professional Counselor Kandy Rohde

*Note: Exhibits D and E to DeLozier Declaration appear as exhibits A and E, respectively, in the Patterson Affidavit*

7.F. Exhibit F to DeLozier Declaration:  Trial Note from Client

7.G. Exhibit G to DeLozier Declaration:  9/1/04 Letter from Dr. Gerald Perry and Dr. Pamela Drapeau

8. Affidavit of Scott A. Mac Leod

## Declarations of Fact Witnesses

9. Declaration of Wendi Andriano

10. Declaration of Constance Boys

11. Declaration of George Carlin

12. Declaration of Jeri Lynn Cunningham

13. Declaration of Mark Keating

14. Declaration of Nancy Keating

15. Deposition Testimony of Shawn King

16. Declaration of Barry Lorts

17. Declaration of Kelsey Leon McGuffee, Jr.

18. Declaration of Marjorie Micek

19. Declaration of Jeffrey B. Miller

 19.A. Exhibit 1 to Miller Declaration:  10/10/00 Letter to Client

20. Declaration of Sharon Murphy

21. Declaration of Brenda Nagore

22. Declaration of Frank Nagore

23. Declaration of Jasper Neace

24. Declaration of Alejo Ochoa

25. Supplemental Declaration of Alejo Ochoa

26. Declaration of Brandon Ochoa

2

27.   Declaration of Donna Ochoa

28.   Supplemental Declaration of Donna Ochoa

29.   Second Supplemental Declaration of Donna Ochoa

30.   Declaration of Deblen Oke

31.   Declaration of Gia Palicki

32.   Declaration of Shelby "Skip" Robertson

33.   Declaration of Stuart Wade Robertson

34.   Declaration of Cynthia Schaider

35.   Declaration of Stephen Schaider

36.   Declaration of John Shaddle

37.   Declaration of Christopher Weaver

38.   Declaration of Kimberly Wilson

**Declarations of Jurors**

39.   Declaration of Barbara Bauer

40.   Declaration of Martha Colvin

41.   Declaration of Linda Percy

42.   Declaration of Jacqueline Sacamano

*Volume 3*

**DOCUMENTS OBTAINED FROM FILES OF TRIAL COUNSEL**

43.   Authenticating Declaration of Matthew R. Lynch

**Documents Further Indicating Need to Fully Investigate Psychiatric Defenses**

44.   Notice of Defenses, Indicating (1) Intent to Raise Temporary Insanity Defense, and (2) Need for Expert Psychologist (filed 1/16/01)

45.   Counseling Session Notes from Certified Professional Counsel Kandy Rohde (January 2001 to April 2004)

46.   Counseling Session Notes from Casa Grande Valley Counseling Service (2/27/96 to 3/6/96)

47.   Notes from Estrella Jail and Durango Psychiatric Unit Medical Providers (Excerpts) (11/3/00 to 9/30/04)

48.   Special Needs Treatment Plan from Durango Psychiatric Unit Medical Providers

49.   Medication Records During Pre-Sentencing Incarceration (November 2000 to November 2004)

50.   Email from Donna Ochoa to Trial Counsel (12/4/01)

51.   Email from Donna Ochoa to Trial Counsel (9/30/02)

52.   Emails from Sharon Murphy to Trial Counsel (3/25/03 and 3/30/03)

**Documents Further Indicating Failure to Investigate Other Mitigating Evidence**

53.   General Medical and Public Record Release Forms (obtained by Public Defender's Office in January 2002, March 2002, August 2002, April 2003, May 2003, November 2003, and April 2004)

54.   Motion for Court Order to Assist Mitigation Investigation and Proposed Order, seeking "order directing state and local agencies to provide records regarding Ms. Andriano to the defense" (filed 11/19/04)

55.   Article, "Sexual Abuse as Mitigation" (printed 1/17/03)

56.   Email from Donna Ochoa to Trial Counsel (2/12/01)

57.   Email from Donna Ochoa to Trial Counsel (2/26/03)

**Documents Further Indicating Failure to Investigate the Victim's Mental State**

58.   Transcribed Interview and Voice Message of Chris Weaver by Michelle Arvanitas (1/30/04)

59.   Emails Regarding Interview of Chris Weaver (1/30/04 and 2/02/04)

60.   Invoice from Goldman & Kaplan, Ltd. to Joseph Andriano "In Reference To: Estate Planning" (10/3/00)

**Attorney Correspondence**

61.   Letter from G. David DeLozier to Alejo and Donna Ochoa dated (12/14/00)

62.   Letter from Leon Thikoll to Bethanne Klopp-Bryant (11/29/00)

4

63. Emails Between G. David DeLozier and the Public Defender's Office (8/2/02 to 8/5/02)

64. Email Regarding G. David DeLozier Not Receiving Files (10/23/03)

**Investigation Documents**

65. Report of Autopsy (11/28/00) and Amendment (1/5/01)

    65.A. Phoenix Fire Department Incident History Printout for 10/8/00

66. Police Photographs of Defendant's Pre-Arrest Injuries (10/8/00)

## ADDITIONAL DOCUMENTS OBTAINED IN PCR INVESTIGATION

67. Authenticating Declaration of Kristen Powers

68. Summary Chart and Earnings of Alejo and Donna Ochoa, 1975 to 1995

    68A. Social Security Earnings Statements of Alejo Ochoa

    68B. Social Security Earnings Statements of Donna Ochoa

69. Summary Chart and Earnings Statements of Joe and Wendi Andriano, 1983 to 2000

    69A. Social Security Earnings Statements of Joe Andriano

    69B. Social Security Earnings Statements of Wendi Andriano

70. Inmate Record Summary for Shelby Robertson

71. Inmate Record Summary for Tommy Robertson

72. Photograph of Wendi Andriano by Alejo Ochoa

73. Proof Sheet of Photographs of Wendi Andriano by Alejo Ochoa

74. Proof Sheet of Photographs of Wendi Andriano and Others by Alejo Ochoa

75. Card Sent to Wendi Andriano from Alejo Ochoa

## ADDITIONAL PUBLIC DOCUMENTS

76. American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003)

77. Mandate from Court of Appeals to Attorney DeLozier in *In Re the Adoption of Nicholas A. and Ashlee A.* (08/19/04)

5

# Exhibit 1

1
2
3
4
5
6

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7

IN AND FOR THE COUNTY OF MARICOPA

8

STATE OF ARIZONA,
    Plaintiff,

9

10

vs.

11

WENDI ELIZABETH ANDRIANO,
    Defendant.

12

13

No. CR2000-096032-A

**DECLARATION OF**
**LARRY A. HAMMOND**

(Assigned to the Hon. Presiding
Criminal Judge, Douglas Rayes)

14
15

    1.    My name is Larry A. Hammond.  I am a member of the law firm of

16
17

Osborn Maledon, P.A.  I am a member of the Bars of the States of Arizona (1975) and

18

California (1971; inactive).  I am a graduate of the University Of Texas School Of Law

19

(1970).

20

    2.    I was asked to review materials in connection with the post-conviction

21
22

proceeding in *State of Arizona v. Wendi Elizabeth Andriano*, Case No. CR2000-096032-

23

A, and provide this Declaration in connection with Wendi Andriano's ("Petitioner")

24

Petition for Post-Conviction Relief.

25

    3.    I was retained in August, 2009 to serve as an expert on the issues relating

26
27

to the constitutionally ineffective assistance of Petitioner's trial counsel.  This

28

engagement was confirmed in an agreement executed in September, 2009.  I am being

compensated at the rate of $250.00 per hour. My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour. My background is briefly summarized below. A copy of my CV is attached.

4.      After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71. I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973. In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor. In 1974, I began practicing in Arizona.

5.      During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

6.      Both as a Supreme Court law clerk and as a Deputy at OLC I undertook responsibilities with respect to death penalty-related matters.

7.      In 1981, I rejoined my law firm (Osborn Maledon) in Phoenix, Arizona. From 1981 to the present I have been engaged in the practice of law primarily on the criminal defense side. Throughout that time our law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.      I have been a practicing lawyer for 41 years. I have been engaged in civil litigation and criminal defense work continuously for the last 30 years. From 1981 to the present, I have spent at least some portion of my time every year on capital cases. The law firm of Osborn Maledon and its predecessor firm and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction

review, federal habeas corpus and clemency.  The very substantial majority of that work has been in cases involving Arizona defendants and Arizona State prosecutions.

9.     I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection voir dire.  I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one on the District of Southern California.  In each case I was appointed as lead counsel to satisfy 18 U.S.C. §3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

10.     Within the last 15 years, this law firm has served as co-counsel under *Knapp v. Hardy* in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow.*  I served as co-counsel in each case with a member of OLD.

11.     Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart,* Case No. CIV96-116 TUC JCC).  That case has recently returned to Federal Court after a stay and abeyance to allow proceedings on a Petition for Post-Conviction Relief (PCR) in the Pima County Superior Court.

12.     In approximately 1989, I participated in the founding of the Arizona Capital Representation Project and I have served as a Board member and/or officer of

that organization since its inception.   The Capital Representation Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population.   Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the PCR stage.

13.   In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF) and I have continued in that position since that time.   The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally.   The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona.   The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases.   Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

14.   For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage.   The Committee was chaired by the Honorable Justice Michael Ryan.   In the formative months of the work of that Committee, I participated in the

drafting, review and ultimate establishment of the rules governing the appointment of counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure. This Committee was later disbanded and its mission never achieved, although the Committee did review the qualifications and conducted interviews of numerous applicants.

15. I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught along with Professor Robert Bartels a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally. Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

16. For the last 14 years I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. One of the Justice Project's cases, *Martinez v. State*, Case No. 2:08-cv-00785-JAT is pending in the United States Supreme Court and

addresses the question of the entitlement to constitutionally effective counsel at the initial PCR stage.

17.     The law firm of Osborn Maledon has served as co-counsel in cases addressing the funding of indigent defense—both capital and non-capital.  I argued on behalf of Mr. Zarabia in a case styled *Zarabia v. Bradshaw*, 185 Ariz. 1, 912 P.2d 5 (1996) in which the Arizona Supreme Court addressed the standards for indigent defense in criminal cases in Yuma County.  We also represented Richard Rivas in connection with the indigent defense funding issues raised in *State v. Rivas*–a case in Maricopa County presided over by the Honorable Judge Fields, in which court appointed counsel, Mr. Mike Terribile, successfully challenged the contract system for compensation of indigent defense counsel in capital cases in Maricopa County.  In 2007 and 2008, Osborn Maledon represented the Mohave County Public Defender's Office in the successful challenge to the indigent defense funding system in that County.  *Arizona v. Lopez*, No. 2007-1544 (Mohave County Superior Court, filed Dec. 17, 2007).

18.     I testified in October, 2002 as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona*, Case No. CR1995-000713.  In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel.  I have also testified and served as an expert in the post-conviction proceedings in *Arizona v. Kayer*, CR 94-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh*, Case No. CR 1995-006472 in the Superior Court of Maricopa County.  In December, 2010, I testified as an expert witness

in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo*, 53 Conn.App. 747, 731 A.2d 768 (1999).

19.    During the last several years my involvement in matters related to the death penalty has increased.  I will briefly summarize here those activities that helped inform my opinions with respect to Ms. Andriano's case.  Most relevant is my very recent involvement as co-counsel on behalf of an indigent defendant in Yavapai County Superior Court in *State v. DeMocker*, Case No.P1300CR20081339.  In this case, our defense team endeavored to conform our trial preparation to the ABA Guidelines.  My opinions are informed as well by my continued involvement in efforts in Maricopa County, in this State, and elsewhere.  We have assisted  defense counsel in their efforts to comply with the ABA Guidelines in the course of decision making in their capital cases.  Much of this counsel and advice has been undertaken on an informal basis in conjunction with other experienced capital defense counsel who had volunteered their time and services to the State Bar Indigent Defense Task Force.  We have had the opportunity to meet with and to work with members of all three of the Maricopa County public defender offices as well as with lawyers appointed by the Office of Public Defense Services (ODPS).

20.    Finally, my opinions as they relate to this case have been colored by my involvement as a member of the team that represented Timothy Ring in both the United States Supreme Court case, *Ring v. Arizona,* 536 U.S. 584 (2002), and in the subsequent Arizona Supreme Court proceedings that focused on the application of Sixth

Amendment jury fact-finding at the aggravation phase of capital trials. *Arizona v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003).

21.   I have reviewed the following materials in connection with my engagement in Ms. Andriano's post-conviction proceeding:

      (a) Trial transcripts

      (b) Openings/closings statements at the trial and sentencing phases

      (c) Jury instructions

      (d) Declarations:

            i. Dan Patterson

            ii. David DeLozier

            iii. Scott MacLeod

            iv. Donna Ochoa

            v. Alejo Ochoa

            vi. Brandon Ochoa

            vii. Gia Palicki

            viii. Shelby Robinson

            ix. Sharon Murphy

            x. Kyre Martinez (through Alexis Bootby)

            xi. Shawn King

            xii. Kimberly Ethington

      (e) Expert reports:

            i. Kandy Rohde (March 2001)

8

ii. George Woods, Jr./ M.D.

iii. James Hopper, PhD.

iv. Myla Young, PhD.

(f) Jail visitation records

(g) Jail medical records

(h) Initial assessment at jail

22.   In addition to the review of these and other materials, I have also conferred with an experienced expert in mitigation development, Keith Rohman.  For reasons stated below, I have found his observations helpful to the formation of my opinions in this post-conviction proceeding.  I have also met with the Petitioner, Wendi Andriano, and I have read her declaration.

**Opinions**

23.   It is my opinion that Petitioner received constitutionally ineffective assistance of counsel at both the trial and sentencing phases of her case.  Fundamental to the defense of any capital case is the formation of the team that will assume responsibility for the case.  At a minimum, that team should have been composed of two experienced capital defense lawyers, an investigator, a trained mitigation specialist, and such mental health or mental state consultants as the case plainly required.  That team should have met regularly and frequently and the members should have been in communication as the case proceeded toward trial.  This did not occur in this case.  The

1
2
3
4

lack of a properly functioning team, in my opinion, contributed to the ineffectiveness of counsel at both the guilt/innocence stage and the aggravation/mitigation phases of the case.

5

## GUILT/INNOCENCE PHASE

6
7
8
9
10
11
12
13
14
15
16

24.   The declarations provided by Dan Patterson and David DeLozier describe in general terms the relationship between the two attorneys who represented Wendi Andriano at trial of this matter.  Mr. DeLozier had no death penalty trial experience.  He was retained and compensated on what turned out to be a very limited basis by Ms. Andriano's family.  He served as *Knapp* counsel sharing the representation with the Office of Public Defender and Dan Patterson.  Although Mr. Patterson recalls he assigned Mr. DeLozier to the penalty phase of the case, Mr. DeLozier also recalls that he had been given no specific responsibility for any phase of the case.  Yet, he presented the opening statement at the guilt/innocence phase.

17
18
19
20
21
22
23
24
25
26

25.   From the outset of the trial, the defense suffered from the absence of a coordinated explanation for the circumstances surrounding the death of Joe Andriano. Variously, the defense argued that his death was the culmination of an assisted suicide, or that Ms. Andriano acted in self-defense, or that she was the victim of domestic violence who responded to years of abuse. The defense failed to develop evidence that Ms. Andriano suffered from mental impairments that should have been relevant to the jury's decision that she formed the requisite mental state essential to support a conviction in this case.

27
28

26.     The lack of a coordinated defense became more evident at the sentencing stage of the case.  I will address the mitigation case later in this Declaration, but the failure of the defense to present a consistent set of themes throughout the trial is apparent and may have had its greatest impact after the jury had already found Ms. Andriano guilty.

27.     According to Mr. DeLozier, a motivating factor for his acceptance of the representation of Ms. Andriano was the common religious or spiritual bond between himself and Ms. Andriano.  Although Mr. DeLozier saw the defendant frequently before trial, his visitations with her focused primarily on these religious connections rather than on development of the relevant factual background leading up to Joe Andriano's death or on the defendant's life history.  As a consequence, neither the factual record nor the life history of the defendant were properly explored or understood.

28.     The lack of proper trial preparation was compounded by Mr. DeLozier's decision to fast during the trial.  It is reported that he decided to fast as a demonstration of his spiritual solidarity with the defendant.  He may have failed fully to anticipate the length of the trial or that a lengthy death penalty trial would so significantly sap his stamina, but his breakdown in the second month of the trial should have been foreseen. No one attempting to provide competent representation in a lengthy capital trial should have failed to appreciate the disadvantage this set of events presented for the defendant.

29.     It is quite clear from the transcripts of the trial that the defense team had also failed to appreciate and develop evidence with respect to Ms. Andriano's history of abuse or her mental-health history.  Much of that history was known to Ms. Andriano's

11

mother, Donna Ochoa, and to her step-father, Alejo Ochoa, yet neither was interviewed in any meaningful way by Mr. DeLozier. His failure to thoroughly investigate his client's troubled background may have been due in part to a conflict of interest and divided loyalty arising from the fact that he was retained and paid by Ms. Andriano's parents and by his simultaneous representation of the parents in custody proceedings involving Ms. Andriano's children. This failure of investigation infected both the guilt/innocence and the mitigation/sentencing phases of the trial.

30. The prosecution at trial was successful in creating the image of Ms. Andriano as a woman of low moral character and as a person quite capable of planning and carrying out a coldly calculated murder. It is difficult to imagine a more negative portrayal of a capital defendant's self-indulgent motivations. That portrayal went largely unaddressed by the defense at trial.

31. Defense counsel's failure to investigate and develop at trial the full story of Ms. Andriano's mental condition and history may also explain to some extent the failure of the defense to request a jury instruction on lesser included offenses. Even without more evidence than was already in the record at the end of the trial, however, there was ample evidence to support such an instruction. I can conceive of no adequate tactical or strategic ground for failing to seek a lesser included offense instruction. To whatever extent the decision to forego an instruction might have been the result of defense counsel's perception of the client's wishes; this would not be an adequate basis for foregoing an instruction that could have avoided the death penalty.

32.     The prosecutor throughout the trial—from opening statement through the end of the mitigation/sentencing stage—engaged in misconduct.  He mischaracterized the record; he argued inferences that had no support in the record; he sought to inflame the jury with arguments about Ms. Andriano's alleged sexual promiscuity; he attacked the motives and integrity of witnesses called by the defense without any evident basis; and he did so without meaningful objection from the defense.  An important core function of defense counsel in the adversary system is to respond and oppose the excesses of the prosecution.  That function was not performed in this case.

## MITIGATION/SENTENCING PHASE

33.     The jury in this case found unanimously in favor of the death penalty based upon finding a single aggravating circumstance.  Neither the jury nor the Arizona Supreme Court found that any substantial mitigation was presented by the defense. It is apparent that this failure may have been in large part attributable to the absence of a qualified and trained mitigation specialist.  As Scott MacLeod (the defense mitigation team member) explained, he had no particular training or expertise in capital cases.  His background was as a probation officer, and he approached his work in this case in much the same way he did in performing mitigation work on other felony cases.

34.     Mr. MacLeod joined the team less than six months before trial.  By that time—despite the passage of more than three years since the death of Joe Andriano—virtually no mitigation work appears to have been undertaken.  Mr. MacLeod did little in the few months before or during trial to undertake a proper mitigation investigation.  Indeed, it appears from the declaration of MacLeod and from the emails in the file that

MacLeod may have attended his first substantive mitigation training program during the trial. By that time, the damage that flowed from the absence of a competent defense team had already been done. In particular, he was unequipped to explore or develop any mental and psychological disorders or impairments that might have helped the jury better understand the defendant's conduct and state of mind.

35.     Primary responsibility for assuring that the defense team was properly formed and that it had the requisite expertise belonged to lead counsel. Neither defense counsel made up for the absence of training and performance by the mitigation specialist. Mr. DeLozier, according to his declaration, did not perceive his role as involving any particular focus on the development of the mitigation, although Mr. Paterson seems to recall that he assigned the mitigation case to Mr. DeLozier.   As a consequence, no one assumed responsibility for this phase of the case at an early stage.

36.     There is no doubt that even with the very limited knowledge that the defense had accumulated there were ample signs that should have compelled a thorough investigation of the defendant's history, including her psychological and mental state. Very early in the post-indictment stage of this case, the defense was presented with strong indications that the defendant might suffer from serious psychological disorders. The record contains reports and communications from a number of professionals who expressed serious concerns about Ms. Andriano's mental state, including Certified Professional Counselor H. Kandy Rohde, Dr. Jack Potts and Dr. Richard Rosengard. The records from the Maricopa County Jail further reveal the existence of obvious mental state issues that should have been "red flags" to the team members, but it appears that

records were not even requested until well after the guilty verdict and during the penalty phase, and that even then Ms. Andriano's extensive jail medical records were not obtained or considered.

37.     Although Ms. Andriano appears to have been evaluated at an early point during her pretrial incarceration by Dr. Rosengard, there is no indication that he or anyone else undertook a thorough evaluation.   Dr. Sharon Murphy was retained and called as a witness on battered woman's syndrome, and while she did not undertake a thorough evaluation, there are numerous indications in her assessment to suggest the importance of a more thorough investigation of Ms. Andriano's history.   Her declaration reveals that she saw evidence of possible childhood sexual abuse and trauma, but she did not explore these areas.   Therefore, despite these indications and despite the fact that Dr. Murphy's concerns were mentioned to Dan Patterson, no appropriate evaluation was undertaken.

38.     I have seen the neuropsychological evaluation performed by Myla H. Young, PhD, which reveals that Ms. Andriano suffers from a cognitive disorder—a disorder never identified or pursued by the defense team.   I have also reviewed the extensive report prepared by James Hopper, PhD, which traces Ms. Andriano's history of physical and psychologically trauma spread throughout Ms. Andriano's history from childhood through age 18.   This social history reveals a long exposure to sexual, psychological, and emotional abuse at the hands of her adoptive father, coupled with disturbing evidence of possible abuse by her biological father—a man never contacted at any stage of the pretrial mitigation investigation.

39.     I have also reviewed the report of Dr. George Woods and have considered his clinical findings, which include Bipolar Disorder, Post-Traumatic Stress Disorder (PTSD), Dependent Personality Disorder, Cognitive Disorder (as found by the neuropsychological findings), and caregiver burden.  As Dr. Woods points out, neither in the trial nor sentencing phases of this case was the jury provided with anything approaching an accurate picture of Ms. Andriano's mental illnesses, and what was presented was grossly misrepresented.

40.     As the Arizona Supreme Court observed, the scant evidence offered by the defense in mitigation presented only isolated and unconfirmed suggestions of childhood abuse that the Court deemed to be "remote in time to the offense and thus their relevance is minimal." *Arizona v. Andriano,* 215 Ariz. 497, ¶ 72, 161 P.3d 540 (July 9, 2007). Mitigation evidence presented in the fashion revealed by the testimony in this case could easily have not only failed to persuade the jurors, but could have done more harm than good.

41.     It is my opinion that the evaluations conducted by Young, Hopper and Woods (a) were appropriate parts of any proper mitigation investigation, (b) that there is no legitimate reason evident in the record that would explain why this investigation did not occur prior to trial, (c) had this investigation been conducted and considered by the defense team, both the trial and the sentencing phases of this case would have proceeded in markedly different ways, and (d) that the substantial mitigation gleaned from these evaluations would have provided a powerful response to the single aggravating factor found by the jury in this case.

42.     The defense's failure to investigate and develop evidence regarding Ms. Andriano's mental health history affected both the aggravation and mitigation phases of the case. The State successfully persuaded the jury that the evidence supported beyond a reasonable doubt the "cruelty" prong of the (f)(6) aggravator. A central element of this particular aggravating circumstance, however, is that the defendant knew or had reason to know that her conduct would cause the victim to experience extraordinary pain and anguish before death. The evidence now available—all of which could have been known and developed before trial—calls into question whether Ms. Andriano could have formed the mental state necessary to support a jury finding that she acted in an "especially cruel" manner.

43.     I have considered the question whether there is any explanation that would account for the failure of the defense team to properly address and develop the mitigation case. One might suggest that the Andriano case development was hobbled by the change in the law occasioned by *Ring*. The argument might be made that prior to June, 2002 when *Ring* was decided, defense counsel in Arizona capital cases could anticipate that substantial time would be afforded by the sentencing court to conduct a mitigation investigation after the trial and before the sentencing hearing. This would not have been appropriate practice even in the pre-2002 world in Arizona, but it certainly does not explain the absence of a significant mitigation investigation in this case. The death of Joe Andriano occurred in October, 2000, and both Patterson and DeLozier were in place as defense counsel long before trial. The trial did not begin for more than two full years after *Ring*. Most States and the federal system had been accustomed to jury

17

fact-finding and there was no shortage of training programs available to defense lawyers, mitigation specialists and mental health experts. The timing of the *Ring* decision in no way explains or justifies the lack of preparation of the mitigation case.

44. The argument might also be made that the ABA Guidelines were promulgated in 2003—only one year before the Andriano trial. The Guidelines, however, as many courts have since held, constituted a compilation of then existing standards. The Guidelines were an expression of the basic requirements of reasonable practice by defense counsel, and were not new or unknown to competent defense counsel in this State.

45. An additional argument voiced in some post-conviction capital proceedings is that funds were not available to conduct a proper mitigation investigation. I have seen no evidence in the files of this case that money in any way restricted the ability of the defense team to do its job. At some point it appears that Mr. DeLozier was no long being paid, but there is no indication that his decision making prior to trial was affected by this, and the ultimate responsibility for the identification and selection of experts and consultants rested with the Public Defender in any event, and there is no indication that Dan Patterson was prevented from retaining such consultants as he deemed appropriate.

46. Finally, there is no indication here that the defense team lacked sufficient time to conduct a proper pretrial mitigation investigation. Nothing I have seen in the record of this case would suggest that the defense team was hampered by time constraints. I am aware that Mr. Patterson was engaged for a portion of this pretrial time

in defending another substantial capital case, but nothing in the record suggests that his engagement in another trial caused the remainder of the team to cease work. Indeed, it appears that Scott MacLeod was not even assigned to the mitigation role in the case until April, 2004, and that virtually no meaningful mitigation work had been done by the Public Defender's Office before his appointment.

47.    Given all of these considerations, it is my opinion that Wendi Andriano was denied the effective assistance of defense counsel and that the lack of the representation to which she was constitutionally entitled was prejudicial. Even in the absence of specific evidence of the prejudiciality of counsel's failings in this case, I would conclude that the total lack of a coordinated defense established before trial and maintained throughout the guilt/innocence and sentencing/mitigation phases of the case was tantamount to having no counsel at all in the context of this death penalty case.

I declare the foregoing under penalty of perjury under the laws of the State of Arizona and the United States of America that it is true and correct.

DATED this //6th day of February, 2012.

Larry A. Hammond

3904659v1

19



# OSBORN MALEDON

## Larry A. Hammond

Phone: (602) 640-9361 | Email: lhammond@omlaw.com

Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.



2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793

### Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

### Bar Admissions

- Arizona, 1975
- California, 1971

### Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

### Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

### Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

### Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

### Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication
  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List
  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide
  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.



*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America®*, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2011

*Arizona's Finest Lawyers*

## Professional Activities

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present



Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:  Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

## Publications

- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets – Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project:  5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project:  Status Report and Update*, The Defender, July 2002



*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate*, The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy: A True Story of Crime and Punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

# Exhibit 2

**GWW** GEORGE  W.  WOODS, JR., M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Atlanta


Stephan Nickels, Esq.
Foley and Lardner, LLP
Madison, Wisconsin

       Re: Wendi Elizabeth Andriano


Mr. Nickels,

       In accordance with your request to provide the government with a summary and outline of my testimony, I submit the following report. The purpose of this report is to outline my expert opinion regarding whether Ms. Andriano had any mental defects or impairments at the time of the crime and/or throughout her lifetime.

## MATERIALS RELIED UPON

       The data or other information considered by me in forming opinions in this case are listed in **Appendix A**, attached. The substance of my opinions as expressed in this report can be summarized in a PowerPoint should you desire one as an Exhibit for court proceedings.

       In order to complete my neuropsychiatric examination, I interviewed Wendi on 11/23/2010, 1/18/2011, and 4/26/2011.  I also interviewed her mother, Ms. Donna Ochoa, on 4/27/2011. I reviewed Wendi's academic history, employment history, and medical/mental health history.

       In addition, I reviewed Wendi's paternal and maternal family history, including available medical, school, and prison records and declarations from persons who knew Wendi,

including Donna Ochoa, Alejo Ochoa, Shelby Wayne Robertson, family members, church

members, pastors, classmates from Wendi's elementary and high school years, and persons who

knew Wendi as an adult. The social history of Ms. Andriano created as a part of this report is

attached as **Appendix B** and incorporated herein. Much of the comprehensive social history

information is summarized in the report of James Hopper, Ph.D., which supplements this report

as to the matters contained therein.

I reviewed the police investigation, including Wendi's interrogation, trial

transcripts and jail and prison records.

A complete list of records reviewed is included in Appendix A.

### QUALIFICATIONS, EXPERT WITNESS EXPERIENCE, AND COMPENSATION RATE IN THIS CASE

My qualifications, publications, and expert witness experience are fully set forth

in my Statement of Qualifications and C.V., attached as **Appendix C**. My compensation rate in

this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice

focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220

Renaissance Parkway, #1220, Atlanta, Georgia 30308.

My qualifications, background, experience and expert witness experience are set

out in full and attached as **Appendix D** and incorporated herein.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology,

and psychotherapy in Oakland, California.

2

## SUMMARY OF FINDINGS

In combination with a familial history of mental illness and a multi-generational history of trauma and abuse, while growing up, Wendi was subjected to emotional and physical neglect, sexual abuse, beatings, isolation, extreme poverty, cultish indoctrinations, exploitation, extraordinarily traumatic events, and marginalization. As a result, Wendi developed neurocognitive deficits, environmental impairments, and psychiatric illnesses, including: (1) bipolar disorder; (2) complex posttraumatic stress disorder; (3) dependent personality disorder; (4) cognitive disorder not otherwise specified; and (5) caregiver burden.

These illnesses are co-morbid in Wendi, with their effects and symptoms intensified in combination and in aggregate. The amalgam of Wendi's neurological impairments and psychiatric illnesses, combined with her social, religious, familial and cultural upbringing, resulted in significantly impaired judgment, extremely limited ability to recognize, understand, and appreciate context in the world around her, and a limited and circumscribed ability to respond self-protectively. These deficits were and are most pronounced in times of extreme stress and novel circumstances.

Wendi's                    REDACTED                    exhibited symptoms of mental illnesses, addictions, and impairments that were severely damaging to Wendi at every developmental stage from infancy to young adult.[1] Mental illness, alcoholism, drug addiction and cognitive impairments are common in varying presentations and combinations within Wendi's family, extended family, and the insular, isolated communities in which she grew up.[2]

---

[1] School records of REDACTED ; Military Records of REDACTED ; Mental Health Records of REDACTED ; Criminal History and ADOC records of REDACTED ; Mental Health Record of REDACTED ; Tabs 10, 12, 16, 24, 27, 30, 32, 36.

[2] School records of REDACTED ; Military Records of REDACTED ; Mental Health Records of REDACTED ; Criminal History and ADOC records of REDACTED ; Mental Health Record of

3

Family and community members report a range of symptoms and behaviors including psychotic episodes, depression, mania, suicidal tendencies and attempts, delusional disorders, polysubstance abuse, and many others.[3] These symptoms and behaviors impacted the Ochoa family's daily life and basic functioning, compromised caregiving and parenting, continued unchecked due to a lack of education and awareness among their sufferers, and, for Wendi's caregivers, were never ameliorated by medical or psychiatric treatment until after she was incarcerated, and then only to a limited extent, primarily through medication.[4] While Wendi was growing up, these symptoms and behaviors were intensified by long periods of extreme isolation, poverty, and transience.[5]

Wendi's neurological and cognitive impairments that resulted from her multigenerational and transgenerational[6] family history of mental illness, abuse, trauma, and addiction, as well as the psychological, emotional, physical and sexual abuse, and isolation to which Wendi was subjected for her entire childhood. These impairments manifested themselves more severely after Wendi met and married Joe Andriano in a succession of poor choices that ever more deeply embroiled her in a pattern of alternating dependence and self-sacrificing caregiving.

---

REDACTED    ; Medical and Mental Health Records of    REDACTED    ,    REDACTED    REDACTED
, Tabs 10-14, 16, 18, 24, 27, 30, 32-35.

[3] Ibid.

[4] Mental Health Record of    REDACTED    , Tabs 24, 27.

[5] Address History of    REDACTED    , Social Security Earnings Records of    REDACTED    ,
Arizona Social Services Records; Tabs 24, 27, 36, Tab 10 at ¶ 37, Tab 35, at ¶ 6.

[6] As used in this declaration, "multigenerational" means across multiple generations of ancestors and descendants, while "transgenerational" means across multiple individuals of various parentage within the same generation.

4

By reviewing the trial court proceedings,[7] including testimony presented by Wendi and witnesses, I determined that the nature, severity, and ramifications of Wendi's mental illness, of her family's extensive history of mental illness, and the consequences of the extreme trauma, abuse, and neglect that she survived, were not presented to the jury. The evidence, arguments, and inferences that *were* presented to the jury failed to represent Wendi's biopsychosocial history and her mental state prior to and during the time of the offense for which she was sentenced to death. Further, Wendi's mental state after she was arrested and during the time she was incarcerated in the Maricopa County Jail prior to her sentencing was also mischaracterized and misdiagnosed.

This report is divided into two sections: (1) Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano and (2) Forensic Analysis and Formulation of How Wendi Andriano's Mental Disorders Impacted her Behavior in Relation to the Offense, which supports and contributes to my diagnoses.  For a complete social history of Wendi Andriano, please see the full report of James Hopper, Ph.D.

1.   **Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano**

Wendi Elizabeth Andriano suffers from multiple mental disorders that were present before the offense for which she has been charged and convicted.

a.   **Clinical Findings**

*First*, Wendi suffers from Bipolar Disorder, a prevalent disorder within her maternal extended family. Many individuals, including Wendi's                REDACTED
have been diagnosed, treated, or have exhibited symptoms for bipolar disorder.

---

[7] See Appendix A.

5

Wendi manifested symptoms of bipolar disorder during the months prior to her husband's death, including hypersexuality, impaired judgment, depression, irritability, increased alcohol use, impaired contextual understanding, and poor mental flexibility. She was treated with medications used in the treatment of bipolar depression for years after her arrest and incarceration.

*Second*, Wendi suffered from Complex Post-Traumatic Stress Disorder ("PTSD"), resulting from ongoing sexual coercing by her father and neglect by her mother. Symptoms of affective dysregulation, anger, dissociation, affective numbing, avoidance, acquiescence, and hyperreactivity mark much of Wendi's life, particularly during her marriage to Joe Andriano. Wendi also meets the criteria for Type I PTSD. She suffered from irritability, rumination, hypervigilance, and hopelessness.

*Third*, Wendi meets the criteria of Dependent Personality Disorder. She was pathologically subservient in relationships, unable to tolerate the loss of relationships, and became emotionally impaired when unable to discern her role in intimate relationships. Her personality structure was formed by the ongoing sexual coercion and neglect of her father and mother during her formative years.

*Fourth*, Myla Young, PhD, documented cognitive deficits in processing speed and understanding social context, as well as impaired decision making. Dr. Young's neuropsychological findings support the diagnosis of Cognitive Disorder Not Otherwise Specified (Cognitive Disorder NOS).

*Fifth*, Wendi suffered from Caregiver Burden, the tremendous emotional strain imposed upon those who take care of the terminally ill. Wendi was the financial, emotional, psychological, and day-to-day functional caregiver for not only her dying husband, but her

6

children as well, in the years leading up to Joe's death. The clinical literature documents the

destruction of resiliency that caregiver burden can cause, especially in the face of an emotionally

fragile person like Wendi.

Symptoms of each of these disorders include stealing money from her employer,

lying on employment applications, becoming sexually provocative, creating false documents in

the presence of employees and others, drinking to excess, extreme and spontaneous anger. Each

of these symptoms could have been identified at the time of trial by a comprehensive social,

medical, and psychiatric history. Many of these symptoms were identified and treated after she

was incarcerated.

All were in play at the time of the offense, a synergy of trauma, cognitive deficits,

and mood defects, impairing her ability to conform her behavior to the requirements of the law.

Below is a discussion of Wendi Andriano's mental status examination and diagnostic

impressions, followed by a more detailed description of each of the five symptom complexes and

their role in Wendi Andriano's mental state before, during, and after the offense for which she

has been tried, convicted, and sentenced to death.

**b.** **Mental Status Examination and Diagnostic Impressions of Wendi Elizabeth Andriano**

Wendi Andriano is a white female who looked younger than her stated age. She

was regularly dressed in orange prison garb during my evaluations. She was oriented to person,

place, date, and circumstances. Her movements were fluid. She used and gestured with her hands

a great deal.

Wendi denied perceptual disorders such as hallucinations, illusions, and

delusions. She did display occasional thinking which bordered on magical thinking, as well as

7

significant denial. This thinking was specifically around her current adjustment to prison, and is discussed below.

Wendi dissociated on several occasions. Wendi appeared to look away, and did not respond. There were no indications of epileptiform disorder, such as her looking only in one direction or motor involvement. Her dissociation was related to discussions of traumatic events, both in her family, during her marriage, and at the time of the offense.

The first instance was during our first discussion about the sexual coercion by her stepfather, Alejo Ochoa. She dissociated when she was told about sexually provocative photographs taken of her by her father, as reported by Brandon Ochoa and Cynthia Schaider,[8] and when she was shown a picture of herself taken by Alejo ("Lightning Photo"). (*See* Tabs72 – 74.)

When told about the photos described by Cynthia Schaider, Wendi did not recall them having been taken, and did not recall ever having seen them. When I showed her the Lightning Photo, taken when she was a teen, Wendi had no independent recollection of this photo prior to her father giving it to her a couple of years ago. Wendi did remember going to the mountains during a thunderstorm with her father so he could take pictures of her. She also then recalled going to a motel room for the purpose of taking other photographs, but Wendi did not recall the actual taking of these pictures. When questioned further about the photographs, Wendi reported that she did not recall ever seeing them.

Wendi's speech was normal in volume and fluid. She was articulate.

Wendi's insight was impaired. She saw herself currently in the best circumstances of her life, and felt she had learned more on Death Row than she could have experienced in the

---

[8] Tab 34, at ¶7: Tab 26, at ¶ 18.

outside world. There was some insight, however, in that Wendi had some recognition of her

dependency needs and acquiescence prior to her incarceration, and felt that she has overcome

some of these symptoms.

Wendi's judgment remains impaired by her profound trauma and dependency

needs, which continue to guide much of her behavior. This impaired judgment was evident

during her early incarceration, and  her constant desire to please significantly impairs clear

thinking.

Wendi described situations in her early jail experiences when she was very

gullible.  Although she claimed to have become less gullible, her judgment remained impaired

during our conversations. Her insight into herself and her trauma history remained impaired over

the period of my evaluations.  Her understanding of her mental disorders was just beginning to

develop. This is particularly true about her early traumatic experiences such as her family's

traveling and her mother's early neglect. As part of beginning to cope with the history of her

father's sexual coercing and molestation, she has withdrawn from him to an extent.

Neurovegetative signs included sleep disruption, anhedonia (loss of pleasure), and

cognitive confusion. She described periods when she would stay in bed for days. These periods

would be accompanied by heaviness in her limbs, as though it were difficult to move. She also

described periods of not sleeping, without any associated tiredness. Problems with sleep have

occurred since childhood.

Wendi denied changes in appetite. She has decreased activity, consistent with her

mood disorder, as well as her incarceration. There is no agitation, pain, or alterations in

consciousness.

9

She said that aside from the pain of losing her children, coming to prison has been the best thing that had ever happened to her. She said that she has been able to "find herself" while in prison, and had grown in ways that had not been possible for her when she was a child or during her marriage.

Wendi resisted my suggestion that being incarcerated and on Death Row, awaiting her execution, by definition could not be "the best time" in her life. She presented significant denial of her circumstances, consistent with the mood elevation of bipolar disorder.

Her thought processes displayed circumstantiality, the filling in of extraneous details, and flight of ideas, moving from one idea to another without a logical flow, as if the ideas were going from trapeze to trapeze. When under stress, her ability to follow instructions was impaired. This was also captured in Dr. Young's neuropsychological interview.

When she attempted to discuss traumatic events, Wendi's thought processes were often disrupted by dissociative experiences. She would stop talking, often taking a moment or two to respond. She was able to renew the conversation at the point of departure, which is consistent with dissociation, and also consistent with her inability to recall emotionally conflicted circumstances that had nothing in common with the time of the offense, other than the quality of stress Wendi was experiencing.

Wendi's mood was generally apprehensive and anxious. She displayed anticipatory anxiety which persisted throughout my evaluations of her, but which abated somewhat over the course of my time with her. She was always physically tense. Wendi's mood was also labile, ranging from extreme sadness to near euphoria. Wendi's mood was fragile. She described her process for attempting to keep herself together emotionally and not becoming suicidal after discussions of the trauma she experienced in her personal history. Her current

process for keeping herself together after these visits consisted of going to her cell, isolating herself and not talking with anyone, and reading until she fell asleep. This process reminded her of going into the closet when she was a child.

While generally apprehensive, Wendi's affect was often extremely—and inappropriately—bright. Her affective range was extremely wide in spite of her anxiety.

In addition to being inappropriately bright in general, given her position on Death Row, Wendi's affect was often inappropriately bright compared to the specific content of our conversations. She smiled when talking about her father buying her a negligee or taking her into pornography shops when she was a teen.

Wendi exhibited strong dependency needs. It was obviously very, very important to her to be both liked and correct in the responses she provided to any questions. When I did not reassure her that any given response from her was acceptable or any given answer was correct, she became anxious and ruminative, going over the issue again and again.

Wendi's thought content reflected significant denial and thought repression. Her belief that Death Row was the best circumstances she has ever had is both grandiose and reflects pathological denial. However, it is also a barometer for the impact of her previous life, an impact that was not truly understood at the time of trial for its significant pathology. She denied experiencing homicidal and suicidal ideation at the time of my interviews with her.

### c.   Clinical and Diagnostic Conclusions

Wendi was born into a family that suffered from mood disorders, alcohol abuse, sexual abuse, and violence. She suffered for years from sexual coercion and molestation at the hands of her stepfather, causing both trauma and dependency.

Wendi has demonstrated a broad range of co-morbid, interrelated symptoms and clinical disorders, resulting from trauma and abuse, from the familial mental illness as shown in

11

her personal history, and from her multigenerational and transgenerational family history. What follows is a discussion of Wendi's symptoms that are the most relevant contributing factors in Wendi being arrested, charged, convicted and sentenced. These symptoms were not investigated or presented to the jury at any time during her trial, or offered as mitigating factors in her defense or sentencing.

Wendi's clinically identifiable disorders include: (1) Bipolar Disorder, (2) Complex PTSD, (3) Dependent Personality Disorder, and (4) Cognitive Disorder NOS. Additionally, Wendi suffers from the well-documented strain of providing for someone with chronic, in this case terminal, illness. This overwhelming condition is documented in the medical literature as Caregiver Burden.

The Diagnostic and Statistical Manual-Fourth Edition, Text Revised (DSM-IVTR), is the current classification system used in American psychiatry to increase interrater reliability, meaning a set of criteria for each disorder that is felt by treating clinicians to reflect the most common symptoms of a disorder. The DSM-IVTR notes that its use in forensic settings must be taken cautiously. This caveat is especially true, since the DSM-IVTR is over 15 years old, and DSM-V is rapidly approaching, which has shown significant evolution in the diagnoses of Wendi's disorders.

i.    **Wendi Elizabeth Andriano Suffers from Bipolar Disorder**

(1)    **Diagnostic Criteria of Bipolar Disorder**

Bipolar disorder is a disruption of mood. The DSM-IVTR criteria for Bipolar disorder are:

Table 14.6-7. DSM-IVTR Criteria for Manic Episode

- A distinct period of abnormally and persistently elevated, expansive, or irritable mood, lasting at least 1 week (or any duration if hospitalization is necessary).

12

- During the period of mood disturbance, three (or more) of the following symptoms have persisted (four if the mood is only irritable) and have been present to a significant degree:

    o   inflated self-esteem or grandiosity

    o   decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

    o   more talkative than usual or pressure to keep talking

    o   flight of ideas or subjective experience that thoughts are racing

    o   distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

    o   increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

    o   excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments)

- The symptoms do not meet criteria for a mixed episode.

- The mood disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.

- The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, or other treatment) or a general medical condition (e.g., hyperthyroidism).

Note: Manic-like episodes that are clearly caused by somatic antidepressant treatment (e.g., medication, electroconvulsive therapy, light therapy) should not count toward a diagnosis of bipolar I disorder.

### (2)   Evidence of Wendi Elizabeth Andriano Having Bipolar Disorder

Wendi's family is what is known as an "affectively laden family," meaning there are multiple generations of symptoms and diagnoses of mood disorder. Wendi's father, Skip

13

Robertson, was a hypersexual alcoholic.                    REDACTED

                                                                                    9

                REDACTED            , has had bouts of psychotic depression since she

was a child, the latest occurring during Wendi's incarceration. She has a history of

hypersexuality, impaired judgment, and currently displays flight of ideas and inappropriate

affect. She describes both flight of ideas and inappropriate affect as family traits that have been

commented upon over the years.

                REDACTED            , was diagnosed with bipolar disorder and

treated with Lithium and other anti-manic drugs for much of her adult life. She functioned

successfully as a nurse for many years.

                REDACTED            , has also been diagnosed with mood

disorders, and has a long-term history of chemical dependency.

        Wendi manifested symptoms of depression early in life. On one missionary trip to

Mexico while a teenager, Wendi spent several weeks in bed, for no apparent reason.

        Wendi was diagnosed with depressive symptoms by the Casa Grande Counseling

Services. She was treated, ineffectively, with antidepressants that caused her "increased anxiety,"

consistent with the manic switch which may be induced in persons suffering from the depressive

phase of bipolar disorder.[10]

---

        [9] Brady, K. T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The
neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

        [10] Ghaemi, S. N., Rosenquist, K. J., Ko, J. Y., Baldassano, C. F., Kontos, N. J. & Baldessarini, R.
J. (2004). Antidepressant treatment in bipolar versus unipolar depression. *American Journal of
Psychiatry, 161*(1), 163-165.

Wendi has also complained of "panic attacks," episodes of increased anxiety and energy that do not meet the criteria for true panic disorders. Panic-like attacks are found in bipolar disorder.[11]

The clinical literature clearly identifies a strong relationship between traumatic stress and the manifestation of bipolar disorder.[12]

Wendi's behavior prior to her offense reflects ongoing manic behavior. She had significant irritable mood and mood lability. She increased her alcohol intake, in response to her overwhelming mood disruption.

Wendi also manifested hypersexuality and an increase in goal-directed activity. She became involved in two sexual relationships (one at the apartment complex she managed). Both of these relationships were known to her employees. Wendi also created false business licenses on the business computer in plain sight of her employees.

An excessive involvement in activities with a high potential for negative consequences was also seen during this extraordinarily stressful period, coupled with the other symptoms of her mood disorder.

These symptoms—including irritable mood, impaired judgment, chemical dependency, denial, and impaired decision making[13]—continued for an extended period, and did not only occur during her alcohol use, meeting the criteria for bipolar disorder.

---

[11] MacKinnon, D. F., Zandi, P. P., Cooper, J., Potash, J. B., Simpson, S. G., Gershon, E., Nurnberger, J., Reich, T., & DePaulo, J. R. (2002). Comorbid bipolar disorder and panic disorder in families with a high prevalence of bipolar disorder. *American Journal of Psychiatry, 159*(1), 30-35.

[13] Kim, E.Y., D.J. Miklowitz, A. Biuckians, K. Mullen. (2006). Life stress and the course of early onset bipolar disorder. *Journal of Affective Disorders, 99*(1-3), 37-44.

Wendi's acute mood disorder symptoms, although always apparent, became increasingly obvious during the period surrounding the offense, and extended for years after.

### ii.    Wendi Elizabeth Andriano Suffers from Post-Traumatic Stress Disorder (PTSD)

#### (1)    Diagnostic Criteria of PTSD

Wendi suffers from Type II, or complex, post-traumatic stress disorder.  Complex PTSD is characterized by ongoing, chronic exposure to one or more traumatic stressors, as opposed to Type I PTSD, which is characterized by exposure to a singular traumatic incident. Complex PTSD differs in significant ways from the single-incident version. Below are criteria for Complex Trauma:

Alterations in:

- Regulation of affect and impulses

- Attention or consciousness

- Self-perception

- Relations to others

- Body functioning and integrity (somatization)

- Systems of meaning[14]

Complex PTSD is a diagnosis that does not appear in the DSM-IVTR, although it was actively studied and the subsequent body of literature has supported an independent diagnosis. The symptoms noted above "result[] from lasting traumatic experiences in which the

---

[13] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine, 31*(4), 679-693.

[14] Roth, S., Newman, E., Pelcovitz, D., van der Kolk, B., & Mandel, F. S. (1997). Complex PTSD in victims exposed to sexual and physical abuse: Results from the DSM-IV field trial for posttraumatic stress disorder. *Journal of Traumatic Stress, 10*, 539-556.

victim felt-or was-captive and unable to escape."[15] Wendi's experienced two chronic stressors that would create symptoms of complex PTSD. The first is her upbringing, particularly the ongoing sexual coercing of her stepfather and neglect of her mother. The second chronic stressor is her caregiver burden in taking care of her dying husband and just-born children.

### (2)   Evidence of Wendi Elizabeth Andriano Having Complex PTSD

Numbing of affect is common in both Complex Trauma and Type I PTSD. The emotional numbing, the self-protective shell, limits emotional connectedness. Wendi has had both an external shell, her closet as a child, and an internal shell, her overwhelming numbing and dissociation.

Wendi also suffers from many of the motor symptoms of traumatic stress. She constantly scans the environment and the person, looking to pick up cues. She is hyperreactive and easily overwhelmed in stressful situations, even when those situations are artificial testing circumstances.

The core symptoms of Wendi's traumatic presentation are avoidance, affective numbing, acquiescence, and dissociation. She has pathological avoidance and denial, and these symptoms, coupled with her active dissociation, impaired her judgment at the time of the offense and continue to do so.

Wendi displays a number of symptoms that are related to or arise from affective dysregulation, including: generally poor coping skills; an inability to recognize her own needs, emotionally and otherwise; and an inability to effectively weigh, deliberate, and formulate options for choices she might make, particularly in circumstances of high stress. All of these are

---

[15] Tab 3, at p. 22.

expected clinical symptoms resulting from the trauma and abuse Wendi suffered while growing up.

Wendi exhibits patterns of extreme acquiescence, which means a constant, overriding inability to stand up to or overcome the emotional control of others in intimate relationships. The functional result of this in Wendi's life has been that she has given in to the demands, needs, requirements, and control of others from childhood to the present. Her pattern of acquiescence is the clinically expected and logical result of the sexual coercion, abuse, and molestation, and the other complex and compounded abuse and trauma that Wendi suffered beginning in infancy or very early childhood and throughout her childhood and adolescence. This degree of acquiescence requires the unhinging or disconnecting of emotions to actions, which results in the emotional dysregulation of PTSD.

Wendi's acquiescence to her stepfather's sexual coercion over years set the stage for her difficulty making effective judgments in response to events in the world around her, particularly for novel, stressful, and difficult events, and her inability to protect herself in those circumstances. The patterns of acquiescence that Wendi demonstrated as a young adult and adult in her relationship with Joe are also consistent with dependent personality disorder.

Throughout her life, Wendi has displayed a lack of self-identity, meaning acquiescence to the needs of others to such an extent that she reforms herself in the image others wanted for her, rather than maintaining a consistent identity.

Wendi exhibits affective dysregulation, which means an inability to accurately modulate her emotional reactivity, both in failing to register a self-protective emotional response in situations in which a normal person would do so, a result of years of sexual coercion and molestation; and in overreacting emotionally in situations in which a normal person would be

18

able to respond appropriately. During times of stress, Wendi's capacity to rely on the normal emotional processes that are necessary for effective decision-making is limited.

Affective dysregulation generally arises from poor or nonexistent modeling of appropriate coping mechanisms by parents. Wendi's affective dysregulation is the clinically expected and logical result of the traumatic stress and the neglect she suffered from her mother, biological father, and adoptive father. The denial by Alejo and Donna of Alejo's ongoing coercion and sexual molestation of Wendi while she was growing up illustrates the poor insight and coping skills demonstrated by Wendi's parents, and highlights the poor insight and coping skills that were modeled for Wendi.

In addition to failing to model appropriate behaviors and coping mechanisms, Wendi's parents actively modeled inappropriate behavior.

The extensive abuse and trauma that Wendi experienced growing up are seen in the degree to which Wendi has normalized violence and abuse. Wendi describes events which objectively are extreme and traumatic, as being "normal" and "not unusual" compared to the chronic violence she suffered growing up. She states that even though losing her children has been incredibly difficult, coming to prison as an inmate on Death Row is the best thing that has ever happened to her. "Normalization" of violence and trauma is part of the typical numbing seen in cases of chronic traumatic stress, and, in Wendi, contributes to her emotional disconnect and affect.

Finally, because the trauma is ongoing, neglect can be as damaging as direct trauma. We see this in Wendi's case, with the neglect of Donna Ochoa, Wendi's mother, who, due to her own mental illness, could not marshal the emotional responsibility to protect her daughter from ongoing sexual coercion and intimidation by Wendi's step father, Alejo Ochoa.

19

### iii.   Wendi Andriano Suffers from Cognitive Disorder NOS

#### (1)   Diagnostic Criteria for Cognitive Disorder NOS

The DSM-IVTR describes Cognitive Disorder NOS as:

**Cognitive Disorder Not Otherwise Specified**

This category is for disorders that are characterized by cognitive
dysfunction presumed to be due to the direct physiological effect
of a general medical condition that do not meet criteria for any of
the specific deliriums, dementias, or amnestic disorders listed in
this section and that are not better classified as Delirium Not
Otherwise Specified, Dementia Not Otherwise Specified, or
Amnestic Disorder Not Otherwise Specified. For cognitive
dysfunction due to a specific or unknown substance, the specific
Substance-Related Disorder Not Otherwise Specified category
should be used.

Mild neurocognitive disorder: impairment in cognitive functioning
as evidenced by neuropsychological testing or quantified clinical
assessment, accompanied by objective evidence of a systemic
general medical condition or central nervous system dysfunction
(see Appendix B in DSM-IV-TR for suggested research criteria).

#### (2)   Evidence of Wendi Elizabeth Andriano Having Cognitive Disorder NOS

Dr. Young identified areas of cognitive impairment in Wendi's brain functioning.

Wendi did well on much of the neuropsychological testing. However, there were areas of

cognitive dysfunction that relate directly to her mood and trauma symptoms.

Decision making, particularly under stressful circumstances, was tested on the

Iowa Gambling Task. Wendi's ability to develop problem-solving strategies is impaired, when

those problem-solving strategies are made under novel, stressful or new conditions.

Dr. Young also found cognitive deficits in Wendi's processing speed, the speed

with which she is able to understand, synthesize, and respond effectively. Her understanding of

the big picture, as identified by her difficulty with the Reyes Complex Figure instrument, is also impaired.

Wendi's behavior during testing was acquiescent, in the extreme. Dr. Young reported Wendi regularly asked for direction, and became stressed when Dr. Young could not, as part of the testing protocol, provide Wendi feedback on her performance. Her test taking behavior was consistent with the difficulties attending and focusing evident through much of her adult life, especially after her marriage. These problems attending are more consistent with mood disruption than disorders of attention.

Wendi therefore meets the criteria for Cognitive Disorder, Not Otherwise Specified.

### iv.   Wendi Elizabeth Andriano Suffers from Dependent Personality Disorder

#### (1)   Diagnostic Criteria for Dependant Personality Disorder

Dependent personality disorder is characterized by pervasive psychological dependence upon and acquiescence to other people, to the loss of the sufferer's own identity. Diagnostic criteria for 301.6 Dependent Personality Disorder include:

- A pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

  o   has difficulty making everyday decisions without an excessive amount of advice and reassurance from others

  o   needs others to assume responsibility for most major areas of his or her life

  o   has difficulty expressing disagreement with others because of fear of loss of support or approval. Note: Do not include realistic fears of retribution

o    has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)

o    goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant

o    feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself

o    urgently seeks another relationship as a source of care and support when a close relationship ends

o    is unrealistically preoccupied with fears of being left to take care of himself or herself

### (2)    Evidence of Wendi Elizabeth Andriano Having Dependent Personality Disorder

Wendi's presentations for this disorder, beginning in childhood, include abnormal efforts to please others, extreme obedience and acquiescence, impaired self-control within relationships, lack of self-confidence, naiveté, gullibility, and willingness to accept mistreatment. For people suffering from dependent personality disorder, the desire to please others is forefront in their minds and a significant amount of time and of energy is expended trying to achieve this goal. Disagreeing with others may be so unbearable that they will go to great lengths to win people over. The sufferer is prone to being taken advantage of as they consistently place others' needs and desires before their own and will abdicate their own safety and well-being for that of others.

People with dependent personality disorder often experience pathological anger when their dependency needs are thwarted. Malmquist discusses the seemingly paradoxical phenomena:

> Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such

22

destructive relationships, reveals a limited perspective and narrow focus to their existence....[I]t is a prominent awareness of the limitations existing in the degrees of freedom they have in their lives....They have a sense of being caught in the grips of powerful forces with which they cannot deal.[16]

> v.      **Wendi Elizabeth Andriano Suffered From Caregiver Burden**

> (1)      **Manifestations of Caregiver Burden**

Caregiver burden is a well-documented stressor, with a set of severe manifestations that magnify underlying preexisting psychiatric conditions.[17]  Caregiver stress was initially studied in connection with care for those suffering from Alzheimer's disease and severe mental illnesses like schizophrenia. Only in the last two decades has the literature on caregiver stress in chronic medical illnesses and terminal conditions like cancer been extensively reviewed.  As noted in this recent research:

> A cancer diagnosis has a significant impact on the patient and the spouse caregiver. Patients are confronted with a life-threatening diagnosis and a difficult treatment regimen, while their partners are often required to fulfill the demanding role of a spouse caregiver. These difficulties are amplified during the terminal phase of cancer when patients experience more disease-related factors. Individuals with cancer are at an increased risk for persistent depressive symptoms when compared with the general population. Feelings of hopelessness are also common in patients approaching end-stage cancer. A general feeling of hopelessness may reflect end-of-life despair, or in extreme cases, may develop into a desire for hastened death or suicidal ideation, loss of dignity, and intimate dependency. A reported 15–50% of adult cancer patients and their spouses present with clinically significant psychological distress,

---

[16]Malmquist, C. (1996). Dependent Personality Disorders and Killing. In *Homicide: A Psychiatric Perspective (157-159).* Washington, DC: American Psychiatric Press.

[17] Biegel, D. E., Milligan, S. E., Putnam, P. L., &Song, L. Y. (1994). Predictors of burden among lower socioeconomic status caregivers of persons with chronic mental illness. *Community Mental Health Journal, 30*(5), 473-494; Caregiver Burden Assessment, Erie County Department of Senior Services, Caregiver Resource Center, 95 Franklin St., Rm. 1301, Buffalo, NY 14202

including depression and hopelessness, and this increases as death approaches.

The majority of studies report that patients and their spouse caregivers have similar levels of distress over time, consistent with the view that common factors impact both partners, and affect the entire family system.[18]

Sales et al. describe the objective as well as the subjective burdens of caregiving, listed below:

1)   Objective burden

    a)   Direct tasks of care

        i)   Helping patient with ADLs

        ii)   Supervising the patient

    b)   Indirect tasks

        i)   Dealing with emotional needs of patient

        ii)   Encouraging the patient

        iii)   Effects of caregiving on other aspects of life

        iv)   Family interaction

        v)   Family routine

        vi)   Leisure

        vii)   Work/employment

---

[18]McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548 (internal citations omitted).