viii)   Mental health

    ix)   Physical health

    x)   Social network

    xi)   Others outside household

    xii)   Children

    xiii)   Financial consequences

2)   Subjective burden

    a)   Personal reactions to caregiving Distress

    b)   Stigma

    c)   Worrying

    d)   Shame

    e)   Guilt[19]

### (2)   Evidence of Wendi Elizabeth Andriano Having Caregiver Burden

Wendi's symptoms of mental disorder were amplified by the strains of her caregiving. She, almost singlehandedly, was responsible for each of the objective burdens described by Sales.

It was Wendi who was primarily responsible, particularly in the last few months, of taking care of her husband's daily care. As Joe became increasingly despondent and withdrawn, refusing to share his plight with others, it was Wendi who became his main emotional outlet, bearing the brunt of his despair, anger, and fear of death.

Jeffrey B. Miller, Joe and Wendi's malpractice attorney, worked with the couple during the 2000 period. He discusses, in his declaration of August 8, 2011, how a distraught

---

[19] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41 (internal citations omitted).

Wendi called him, concerned about the suicidal urges Joe was having. Mr. Miller talked with

Joe, who acknowledged suicidal ideation.

> In the months prior to Joe's October 2000 death, I received two or three distressed phone calls from Wendi relating to her observations of Joe. In each of these phone calls, Wendi stated that she was feeling very concerned and frightened for Joe. Wendi said that she had perceived Joe becoming more depressed, and that he had recently expressed a desire to die and an intent to take his own life. Wendi told me that she was worried that Joe would hurt himself, and asked me to speak with him regarding his mental state and recommend a counselor for Joe. Wendi also asked me to remind Joe that, from a legal perspective, he would be hurting his family by committing suicide because the malpractice claim would be dismissed.

> I subsequently spoke with Joe regarding these concerns. I told Joe that his family was concerned about his mental state and worried that he was contemplating suicide. Joe acknowledged these concerns and did not deny that they were accurate. Joe said he understood that the malpractice claim would not continue if he died from something other than cancer, and told me not to worry. I recommended a counselor to Joe, but I do not know if Joe ultimately received treatment from that counselor.[20]

Wendi was the primary financial provider, working her full time job and, at times,

being forced to leave her work to change her children's diapers or attend to both her husband's

and her children's needs. Wendi was also responsible for family interaction, which became

increasingly tense as the needs of the children and the needs of her dying husband complicated

her ability to satisfy these often contradictory circumstances.

Wendi's leisure activities reflected the stress of her caregiving and amplified her

mood and trauma symptoms. She drank heavily, became involved in sexual behavior, and

became isolated from her family and any true support system she might have had. Rather than

---

[20] Tab 19, at ¶¶ 4-5.

reflecting a lack of caring, these behaviors, actually symptoms of her acute mental illness, clearly illustrate how impaired Wendi had become, and illustrates what little resiliency she had was undermined by the extraordinarily stressful strain of her attempt to provide care to her husband and children.[21]

Sales describes the effects of caregiver strain on other aspects of the caregiver's life as perhaps the most difficult impact of the illness on the caregiver.[22]

Wendi's psychiatric symptoms from her bipolar disorder, dependent personality disorder, and complex trauma were magnified by the stress and novel circumstances of her role during most of her marriage, that of caregiver. Although Wendi had been placed in the role of soother and pacifier during her childhood and adolescence in her sexual interactions with her stepfather, but it was not until her marriage to Joe and his terminal diagnosis that she found herself as a caregiver.

Within a very short time, Wendi experienced an additional stressor, watching her husband become ill, with repeated failures to correctly diagnose cancer. There is extensive documentation of Wendi's multiple interventions to save her husband's life, as well as to care for her children that were born during this tumultuous period.

The overwhelming emotional burden of Wendi's attempts to live, grow, understand, empathize, support, and resolve were never recognized nor presented at her trial. The

---

[21] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12* (Suppl. 1), 33–41.

[22] "In some ways, the impact of caregiving on other central life roles may be its most pervasive and pernicious consequence. The degree to which caregiving demands truncate or create conflict in other role sectors may vary, but most researchers attempt to measure the broad range of impact commonly felt. These include changes in family interactions, family routines, leisure, work, social network involvement, contacts with others outside the household, as well as the financial consequences of illness. These role ramifications are most commonly viewed as additional objective consequences of caregiving, although Braithwaite places them in the subjective burden category." Sales, *supra*, at 37 (internal citations omitted).

interaction between her re-traumatization through her role as caregiver for her husband and children, and her emerging symptoms of affective dysregulation, impaired judgment, anger, affective numbing, and slowed realization of her circumstances is the foundation for her inability, due to mental disorder and environmental trauma, to conform her behavior to the law. The behaviors seen in the months before her husband's death were fueled by the destruction of all resiliency and support Wendi had known in her life.

      **d.**    **Conclusion of Clinical and Diagnostic Findings and Mental Status Examination**

Wendi suffers from multiple mental disorders. She suffers from bipolar disorder, and clearly comes from an affectively laden family, with her        REDACTED manifesting symptoms of alcoholism, hypersexuality, impaired judgment, mood swings, chemical dependency, psychosis, suicidality, and depression.

Wendi suffers from complex PTSD, with at least two sources of chronic trauma. The first is the ongoing sexual coercing and abuse by her step-father, which led to her acquiescence, anger, affective numbing, hyperreactivity, and emotional dysregulation. She also underwent the extreme, ongoing trauma of her caregiver strain, while attempting to find ways to help her husband, raise her children, and maintain her family.

Wendi has cognitive impairments that slow down her ability to effectively size up and respond to social situations. In spite of the structure of prison, her cognitive deficit continues to this day.

She also suffers from a longstanding dependent personality disorder, created and coerced by the sexual abuse of her stepfather and neglect and abuse of her mother. Dependent personality disorder has been well documented as a source of anger and self destructive behavior.

28

Each of these disorders was acute during the months before her husband's death. Symptoms of each disorder were synergistic, creating a maelstrom of instability and emotional disruption. This was the mental state Wendi was suffering from at the time of her husband's death, and for some time afterwards, as captured in jail and prison medical records.

It is against this emotional and cognitive backdrop that her behavior at the time of the offense must be considered, and her behavior examined forensically.

**2.      Forensic Analysis and Formulation:  How Wendi Andriano's Mental Disorders Impacted Her Behavior in Relation to the Offense**

This section includes my forensic analysis of Wendi's history, specifically from the time she met Joseph Andriano ("Joe") on March 17, 1992 until Joe's death on October 8, 2000, and her incarceration following Joe's death from 2000 to the present. This section analyzes how Wendi's mental disorders impacted her behavior in relation to the offense.

In this formulation and analysis, when I describe statements in the present verb tense, such as "Wendi states" or "Donna describes," this indicates that I received the information directly from the person involved during firsthand evaluations conducted during 2010 and 2011. Other statements come from the trial transcripts, declarations, or other sources identified in Appendix A.

**a.      Adulthood from Meeting Joe to the Night of the Offense**

**i.      The Beginning of Wendi and Joe's Relationship**

Wendi was twenty-one years old when she met Joe on March 17, 1992, at Dell's Pizza in Casa Grande, Arizona.[23]  While Wendi maintained steady, regular employment, Joe was having a hard time earning money as a welder and found himself without a place to live. Within weeks of meeting Joe, Wendi (the caregiver and unable to turn anyone away) offered to let Joe

---

[23] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011.

sleep on the couch in her apartment. As underscored by Dr. Hopper, Wendi was coerced from

her childhood to feel safe and loved when she was taking care of others, especially during times

when they were angry and abusive:

> If someone is angry – whether that anger is caused by her, directed
> at her for no good reason, or directed elsewhere and has nothing to
> do with her – Wendi feels *driven* to make that person feel better,
> because she believes, "then they will like me." If someone likes
> her and is nice to her, Wendi strives to be even nicer to them and to
> take care fo them, because this is the only way she knows to avoid
> them getting angry at her or abandoning her. . . . In short, the very
> ways she attempts to avoid neglect and abuse in adult
> relationships leave her feeling neglected and used.[24]

In the year prior to meeting Joe, Wendi's relationship ended with Shawn King,

her childhood sweetheart. Shawn broke up with Wendi in the fall of 1991 and he punctuated the

breakup by smashing the windows of Wendi's car.[25] In the year prior to Joe moving into

Wendi's apartment, Wendi's paternal cousin, Barbara Mitchell stayed most nights at Wendi's

apartment with her. Barbara was still in high school at the time and largely resided with Wendi

for about ten months. It was just around this time that Wendi met Joe.  One of the defining

symptoms of people suffering from dependent personality disorder is the intolerance of being

alone. When they are alone they feel helpless and uncomfortable. As soon as a relationship has

ended, or even before, they will desperately seek out a new one. Joe Andriano came into

Wendi's life at a time when she was most vulnerable to the discomfort and  helplessness that she

otherwise faced in being alone.

Shortly after Joe began staying with Wendi, he moved in permanently and they

officially became a couple. During 1992, the year that Wendi and Joe met, Wendi earned over

---

[24] Tab 4, at ¶ 548.

[25] Tab 15.

$15,000 and received her apartment at Quail Gardens as part of her compensation package. Joe, on the other hand, had reported income of just over $2,200. The economic disparity in the earnings between Joe and Wendi continued throughout their relationship and into their marriage with Wendi providing the main financial support.[26] Only one time in their history together did Joe earn more than Wendi and that was in the time frame just after their first child, Nicholas, was born. Wendi's parents provided additional financial support so Wendi could stay home with her infant child.

        Joe's inability to provide financial or emotional support for the family reinforced Wendi's self-deprecating behavior and enabled her dependent personality. Wendi's early relationship with Joe was characterized by her acquiescence, the result of both her trauma history and the conditioning she received from the earliest moments of her life to abdicate herself to men in positions of authority while being unprotected by the women in her family.[27] When Wendi first met Joe, he was unlike any of the young men she had previously been acquainted with. He was from a different social group in Casa Grande and compared to Wendi, was much more adept

---

[26] Tab 69 (Social Security Earnings Statements of Wendi and Joe Andriano: 1993 – Wendi - $19,128; Joe - $3,404; 1994 – Wendi - $22,447; Joe - $0; 1995 – Wendi - $24,234; Joe - $0; 1996 – Wendi - $6,648; Joe - $0; 1997 – Wendi - $0; Joe - $5,576; 1998 – Wendi - $17,064; Joe - $11,529; 1999 – Wendi - $31,943; Joe - $0; 2000 – Wendi - $38,682; Joe - $0).

[27] Tab 27, Tab 34 at ¶¶ 8-9, 15, 25 ("Wendi grew up in a male-dominated environment. Tom King frequently preached that a woman's place was in submission to her husband. He often said that women should quit their jobs and stay at home. He was sexist. There were certain roles that men and women were expected to fulfill, and this was embedded in the culture of the church. According to Tom, if a girl wore a bathing suit and a boy got aroused it was the girl's fault. As parents, we were encouraged by the pastor to use corporal punishment on our children. This was presented as the Biblical way to raise children. Wendi had domineering daddy and grew up in a church with a domineering pastor. . . . Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation. . . . Discipline at that school centered around scolding, humiliation, corporal punishment, extreme work punishment, and social isolation.").

at navigating the social circles of young adults in the small town of Casa Grande.[28]   Unlike the

Ochoa family, who lived on the periphery of social acceptance and flew far under the radar in

their desire to remain religiously segregated and isolated,[29] the Andriano family was part of the

landholding farming class in Casa Grande, an influential segment of the population that

possessed social status and clout in the community of Casa Grande.

Given her history of being coerced and acquiescent behavior, her relatively

newfound social freedom beyond the boundaries of the church, and her natural curiosity, Wendi

found Joe's attention desirable. Wendi was "surprised" that Joe "loved me."[30] Although Wendi

reports that she "did not want a rigid, religious man who controlled my life," and that her

decision to date Joe was based, in part, on the fact that he was not part of the church,[31] she

discovered over time that Joe and her stepfather, Alejo were similar in terms of their requirement

for her caregiving.[32]

Wendi allowed Joe to move in without a defined commitment or clear agreement

between them about their status as a romantically partnered couple, or any real understanding of

---

[28] In 1990, Casa Grande had a population of 19,954 residents in an area covering 48.2 square
miles, making it an extremely low-density population.
http://www.census.gov/epcd/www/92profiles/county/04021.TXT

[29] Tab 27, Tab 34, at ¶¶ 3-4 ("Wendi's parents, Donna and Alejo, had nothing, meaning they were
always very poor. They told me that before I knew them, they were part of a street ministry in Northern
California. They followed another strong-willed, 'turn or burn' pastor there. It was a different time; the
Jesus-freak movement was in full swing: It consisted of born again hippies who traveled around spreading
'Jesus power.' This was in the mid-1970s. Donna and Alejo told me that while they were in the ministry,
Wendi panhandled for them. They lived out of a bus and walked the streets preaching and handing out
tracts. . . . When we began going to the church in 1980, Donna and Alejo lived in a rental house on the
south side of the tracks in Casa Grande. It was a low-income area. Later, Donna, Alejo and Wendi moved
to a house in another housing project called 'Hopi Hills,' or 'Indian Hills,' or something like that.")

[30]Interview of Wendi Andriano by George Woods, MD at ASP Perryville on November 23, 2010.

[31] Ibid.

[32] Ibid.

the direction in which the relationship was headed. After Joe moved in, Wendi quickly allowed Joe to take a position of increasing control over her. Initially, Wendi was attracted to Joe because she could take care of him and because he was a connection to life outside of the church.[33] Wendi persevered in acquiescing to Joe, and expressed her pathological dependence by allowing him a progressively greater position of control over her. Joe began to dictate how she dressed, and he required her to wear her hair in a different style and color than she had ever used before, specifically blond and short, much different than her naturally brown and historically long hair.[34] Wendi soon started disengaging with her friends and they felt unwelcome in her apartment. As noted by Barbara Mitchell in her interview with Sharon Murphy prior to trial, "Joe isolated Wendi making it very difficult for her to retain her previous relationships."[35] Wendi's interactions were limited to Joe's crowd, even though many of the women in that group rejected her. Even this early in their relationship, Wendi was unable to stand up to Joe and went along with these changes.[36]

Wendi's behavior in her relationship with Joe mirrored, in many ways, the compliant behavior required of her in her relationship with her father and with the adults at 91st Psalm and Harvest Church and School. In both the home and at school, Wendi was coerced to behave in compliance under the threat of severe punishment. She was also required to dress in certain ways. Photographs of Wendi early in life depict her as a miniature version of Donna, with matching hairstyles and outfits. Donna was dying Wendi's hair to match her own by the time

---

[33] Tab 26, at ¶21.

[34] Interview with Donna Ochoa by Woods, G.; Interview with Barbara Mitchell by Sharon Murphy on May 20, 2003.

[35] Interview with Barbara Mitchell by Murphy S. on May 20, 2003.

[36] Interview by Woods, G. on May 26, 2011.

Wendi was nine to eleven years old.  Alejo preferred Wendi to dress provocatively, and began buying her age-inappropriate attire before she had even reached her teens.[37]

Wendi reports that passion was not a part of her relationship with Joe. She appreciated his laughter and his initial attentiveness to her as opposed to being in love with him. She describes her sexual relationship with Joe during their entire relationship as not satisfying, which is consistent with how she describes all of her sexual encounters throughout her life. She felt that if her partner wanted sex, it was her responsibility to have sex, without considering at all her own feelings, preferences, or concerns about sexuality and having sex with that partner[38]— the automatic behavior created through traumatic sexual coercion and molestation during childhood and adolescence. "Wendi and Joe had a very structured romantic life . . . It was so regimented and controlled. Wendi told me that she wanted her relationship with Joe to be more affectionate and intimate. She told me that Joe refused to kiss her at all."[39]

Despite Wendi's yearning for affection, she was unable to enjoy a fully developed sexual relationship and instead repeated the learned sexual behaviors of submission in her marriage with Joe. Wendi's relationship with her father mirrors this acquiescence without intimacy, the basis of a dependent personality disorder in many cases. Donna describes Wendi and Alejo going into adults-only novelty stores, triple-X pornography stores, and making special family trips to Frederick's of Hollywood, a store with primarily extremely revealing clothing. Even though both Wendi and Donna were conflicted by this behavior, Alejo's intimidation and coercion "normalized" this behavior for Wendi.

---

[37] Tab 27.

[38] Interview by Woods, G. on November 23, 2010; Interview with Barbara Mitchell by Murphy, S. on May 20, 2003.

[39] Tab 31, at ¶11.

### ii.    Wendi and Joe Get Married

Wendi's mother and father, with whom Wendi maintained regular contact and who lived close by, were uncertain enough of her interest in and passion for Joe that, as late as Wendi's wedding day, they asked her if the marriage to Joe was really what she wanted, and assured her that she could say "no" to the marriage. Despite their relationship being emotionally disconnected, Wendi married Joe on January 22, 1994. By the time they were married, Wendi had left her employment at Quail Gardens. In May of 1993, she started working at the Casa Grande Regional Medical Center in the accounting department.[40] Wendi and Joe had each moved into the homes of their respective parents prior to their marriage.[41] In deciding to marry Joe, Wendi manifested symptoms of her dependent personality disorder: her inability to recognize her own needs, her inability to recognize options in making decisions, her lack of coping skills, and lack of self-identity in her relationship with Joe.

Donna Ochoa documented difficulties beginning very early between Joe and Wendi. Donna recalls Joe calling Wendi a "fucking bitch," and other instances when Wendi called her parents after sequestering herself in the bedroom, after Joe had become angry and physically intimidating. Wendi felt that the traumatic events occurring between her and Joe were "normal" and "not unusual" compared to the chronic violence she suffered growing up.[42] Wendi's actions and choices from the time she met Joe in 1992 until his death in 2000 demonstrate affective dysregulation, numbing of her own affect responses, her sense of

---

[40] Tabs 69, 69.B. (Employment and Social Security Earnings Records of Wendi Andriano).

[41] Interview by Woods, G on April 26, 2011.

[42] Interview by Woods, G. on April 26, 2011.

helplessness, and her increasing inability to respond normally or appropriately to stressful, difficult situations.  These are all symptoms of her PTSD.

Wendi states that, "The first part of the marriage was within the bounds of acceptability. I had grown up with an angry father. For the first six months, we lived in a rented townhouse then we moved to Andriano farm property." After that, Joe was "yelling and yelling and yelling and breaking things . . . I did not leave. In the morning, I got up and we did not talk about it." Wendi states that she had and still has no way to determine how to behave or what to do absent demands or requests from others. In characterizing her general behavior, she states, "I need to know what you want from me. If I don't, I don't know how to function or what to do."[43]

The experience of prolonged and severe trauma, particularly trauma that occurs early in the life cycle, as experienced by Wendi, can lead to complex clinical pictures that include disturbances of regulation of affective arousal, an impaired capacity for cognitive integration of experience (as in dissociation), and impairment in the capacity to differentiate relevant from irrelevant information.  Research shows that people who suffer from PTSD are prone to suffer from problems with affect regulation, decision making, difficulty modulating anger, chronic self-destructive and suicidal behaviors, impulsive and risk-taking behaviors, and difficulty modulating sexual involvement.  Like findings are found in child development literature: as many as 80% of abused infants and children develop disorganized/disoriented attachment patterns. These are associated with an inability to utilize caregivers for soothing and with the emergence of pathological self-regulatory behaviors such as, in Wendi's case, hiding in the closet, obsessive caregiving and later, heavy alcohol consumption. A substantial body of

---

[43] Mental Status evaluation of Wendi Andriano by Woods G., M.D., January 18, 2011.

research has shown that early and prolonged trauma in childhood affects the capacity to regulate the intensity of affective responses.[44]

Yet, it was more than Wendi's traumatic environment alone that affected Wendi's responses to stress. Myla Young, PhD's neuropsychological testing documents Wendi's cognitive deficits, specifically her difficulties organizing and processing her thoughts in stressful circumstances.

Dr. Young describes a number of cognitive impairments, including Wendi's inability to effectively attend, and to recall verbal information. The cognitive deficits that most directly impact Wendi's ability to weigh and deliberate, to make good decisions, were her executive functions. Dr. Young describes these executive functions as "an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed

---

[44] Walker, E. A., Katon, W. J., Neraas, K., Jemelka, R. P., & Massoth, D. (1992). Dissociation in women with chronic pelvic pain. *American Journal of Psychiatry, 149*(4), 534-537;

Saxe, G.N., Chinman, G., Berkowtiz, R., Hall, K., Lieberg, G., Schwartz, J., & van der Kolk B. A. (1994). Somatization in patients with dissociative disorders. *American Journal of Psychiatry, 151*(9), 1329-1334;

Cole, P. & Putnam, F. W. (1992). Effect of incest on self and social functioning: A developmental psychopathology perspective. *Journal of Consulting and Clinical Psychology, 60*(2), 174-184;

Adams-Tucker, C. ( 1982). Proximate effects of sexual abuse: A report on 28 children. *American Journal of Psychiatry, 139*(10), 825-837;

Browne, A. & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. *Psychology Bulletin, 99*(1), 66-77;

Green, A. H. (1983). Dimensions of psychological trauma in abused children. *American Journal of Psychiatry, 22*(3), 231-237;

Pynoos, R. S. & Nader, K. (1988). Children who witness the sexual assaults of their mothers. *Journal of the American Academy of Child and Adolescent Psychiatry, 27*(5), 567-572.

actions. Executive functioning also is the ability to problem solve, and include abilities to

initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions."[45]

Wendi did well on some executive functioning tests, reflecting a lack of

malingering as well as illustrating intact areas of brain functioning. But Dr Young also found

that "…her abilities were predominantly impaired."[46] Her cognitive abilities were specifically

impaired in those areas that "…required rapid processing of information, flexible thinking,

decision making, and/or inhibition…the ability to stop responding to the immediate physical

environment…in order to think, consider and plan alternative ways of solving a problem and

respond according to the situation."[47]

### iii.   Joe Gets Sick

Once they were married, Wendi and Joe moved to "the shop," a structure located

on the Andrianos' farm.  It was a small workshop that had been converted for habitation. Joe had

learned windshield repair and hoped to make a go of having his own business, "Joe's Windshield

Repair."  Joe's sister and brother-in-law co-signed for a loan to start the business. Business did

not go well for Joe and the young couple faced ongoing financial difficulties.

Within several months of their marriage, Joe noticed a lump on his neck and his

neck pathology was discovered.  In September 1994 he underwent the first of his surgeries, an

outpatient surgery to remove what the doctor noted to be s a benign tumor. Doctors told Wendi

---

[45] Tab 5, at p. 11.

[46] Tab 5, at p. 12.

[47] Tab 5, at p. 13.

and Joe that his tumors were not malignant. Wendi reports that she and Joe were obviously

relieved to learn that Joe's condition wasn't expected to be serious.[48]

        After marrying Joe, in June of 1994, Wendi returned to Central Arizona College

where she continued to take classes until June of 1995. She also enrolled at the University of

Phoenix in April of 1995 to commence business classes. Even though Joe was minimally ill

during this initial period of medical evaluation, he, nevertheless, was not supportive of Wendi's

efforts to continue her education or secure more stable employment. Wendi reports that Joe

ridiculed her attempts to continue her education and did not see value in it. Wendi acquiesced to

Joe's preferences, and ultimately stopped going to school. The pervasiveness of Wendi's

dependency needs is apparent in how completely she allowed Joe to control her life, from her

appearance to her professional future, from what she ate to whom she befriended.[49]

        Within six months of Joe's first surgery in September of 1994, he experienced

pain in his neck in the area of the surgery as the result of another lump forming. Wendi reports

that, by early 1995, Joe's neck was painful and swollen. Together, Wendi and Joe pursued

further medical treatment for Joe. The second surgery, also an outpatient surgery, was performed

at the University Medical Center in Tucson, Arizona in August 1995. Joe was required to spend a

night in a hotel, but, again, the couple did not yet understand the terminal nature of Joe's illness

and the enormity of the effect it would have on their lives. They were again reassured that the

tumor removed was benign.

---

[48] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011

[49] Ibid.

Despite Wendi's income from the hospital and monetary assistance from Donna, Joe and Wendi were unable to manage the glass business or their finances well enough to stay afloat financially as Joe continued to deteriorate physically and emotionally.

### iv.   Pressure on Wendi Increases as Joe Worsens

With mounting financial pressures, and Wendi desperate to provide the care and support for her young family, she took money from her employer. In January 1996, Wendi's doctor placed her on a medical leave of absence during which time Wendi acknowledged that she took $2,000 from her employer, an uncharacteristic act considering her lack of criminal history prior to her experiencing such extreme stress levels about her family's circumstances. The manifestation of trauma and mood symptoms like impaired judgment, impulsivity, numbing of affect, and depression speaks to the increased pressures of Wendi's caregiver burden as well.[50] Wendi's increasing caregiver pressures exposed her vulnerabilities that result from her history of trauma, dependent personality disorder, and bipolar disorder.

In connection with the theft, Wendi was referred for counseling and psychological treatment and was seen at Casa Grande Valley Counseling Service, Inc. ("CGVCSI"). Treatment notes from CGVCSI indicate that Wendi's day-to-day functioning was impaired. She was not sleeping, was unable to focus, and felt unsupported by her husband. It was recommended that she receive anti-depressant medication to "help her sleep better and cope with the stresses she is

---

[50] McClean, L.M., Walton, T., Matthew, A., & Jones, J. M. *Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress.* 19 SUPPORT CANCER CARE, 1539-1548 (2001) ("The diagnosis of cancer has profound consequences for both patients and their family members, and its progression brings further challenges for couples that include imposed changes in responsibilities and the threat of mortality. Distress, including depression and hopelessness, is very common in both partners when facing a diagnosis of metastatic cancer . . . Spouses who are less satisfied with the marital relationship may experience more caregiving burden. Caregiver burden refers to both objective caregiving, including care-related tasks and time involved in caregiving, as well as subjective caregiving, including the caregiver's experience and feelings about their role as caregiver.") (internal citations omitted).

facing at work and at home."[51] Her therapist notes that, "Wendi appears to be very depressed and

very angry at her husband although she has not reported this to him." Wendi was overwhelmed,

depressed, and becoming increasingly isolated.[52]

      Although Wendi received anti-depressant medication, her therapist noted that

Wendi "has had a bad reaction to [the anti-depressants], so plans to recontact her doctor." The

therapist also advised Wendi to seek credit-counseling services, but by March of 1996, Wendi

reported that she had not followed through with that recommendation because "her husband does

not want them to lose their credit cards."

      There is a note by Wendi's therapist, Beverly Nichols, MFT, from March 6, 1996.

Wendi was taking anti-depressants but reported that "she's having *more* difficulties sleeping."

Antidepressants are well known to induce manic episodes, called the "manic switch," in patients

that are bipolar, rather than unipolar and merely depressed.[53]

      The manic switch is a chemically-induced elevation of mood, most often caused

by antidepressants. Bipolar disorder is a chronic, enduring, severe, and often crippling illness

that, as we see in Wendi's case, exerts a crushing toll on the individual and the family. Women

with bipolar disorder present most commonly with depressive moods, particularly in the early

stages of the disorder. Depression appears most commonly before manic symptoms in bipolar

disorder, and appears more frequently in women.

---

[51] Tab 46 (Medical Records of Wendi Andriano – Casa Grande Valley Counseling Service Inc., March 1, 1996).

[52] *Ibid.*

[53] Boerlin, H.L., Gitlin, M. J., Zoellner, L. A., & Hammen, C. L. (1998). Bipolar Depression and Antidepressants induced mania: A naturalistic study. *Journal of Clinical Psychiatry*, *59*(7), 374-379.

In early 1996, Wendi lost her job at the Medical Center. Joe Wendi tried to keep Joe's Windshield Repair going and Wendi began seeking employment. Meanwhile, Joe began working at a boat shop owned by friends. The money Joe made working there, however, appears to have been used to support his boating hobby and no additional income entered into the family home. Social Security Earnings Reports verify the grave state of financial affairs with Wendi earning just over $6600 in tax year 1996 and Joe with no reported earnings. When Wendi lost her job, she and Joe lost their medical insurance.

By late September 1996, Wendi was pregnant with no way to afford medical care. Her mother, Donna assisted in paying for prenatal care. Joe took out another loan, for $10,000, and purchased another speedboat.

Joe experienced more pain and swelling and had a third surgery with no postoperative care recommended in February 1997. The pathology report again noted "benign pleomorphic adenoma."[54]

In 1997, Wendi continued to scramble to earn enough money to provide for her now growing family. It must be remembered that, in addition to her medically ill husband, Wendi and Joe had a child (and she would soon be pregnant with another) at a time of great emotional and financial insecurity.

Wendi became involved in an at-home marketing program in attempt to earn extra money. In the initial phases of this endeavor, she wrote to Pat Hyduk, a woman associated with the marketing program, "I need to get $5,000 in one week or the bank is repossessing my car, my

---

[54] Medical Records of Joseph Andriano – Mayo Clinic Revised Report of August 18, 1998

phone will be shut off and God knows what else. I am really desperate. Is there something you can do to help me? I [sic] going insane."[55]

  This cry for help, to an almost complete stranger, is more than the desperate cry from someone who is just angry. Wendi was overwhelmed, and unable to function effectively. Her own life was unraveling, her husband was seriously ill, she was having to care for her children, and she was beginning to experience symptoms of mental illness to greater and greater degrees.

  Joe's glass repair business was hampered by local competition and poor financial management skills. After recovering from his surgery in February 1997, he was never able to regain his footing in the business. Wendi considered leaving Joe in early 1997, and asked her parents for money to move. However, after Joe's surgery, because of his clearly failing health, Wendi was emotionally unable to leave him. She borrowed money from her parents for basic items, such as food.

  Nicholas was born on June 20th, 1997. Wendi and Joe were deeply in debt, and Donna and Alejo bought most of Nicholas's clothes, diapers, and furniture.

  When Joe was offered the opportunity to purchase an already established business, Accu-Glass, a successful company that Joe had once worked for, Wendi and Joe thought that might be a good option. Already deeply in debt, Wendi and Joe had no independent financial resources or credit to secure conventional business financing to purchase Accu-Glass.

  Wendi wanted—and needed—Joe to succeed. She sought help from her father, Alejo, which led to Jerry Robles, an old friend. Jerry had cash from his various enterprises. According to Alejo, Donna, and Wendi, Jerry Robles became partners with Wendi and Joe.

---

[55] Letter from Wendi Andriano to Pat Hyduk , c. 1997 .

Jerry put up $85,000 in cash and retained 51% ownership. The remainder of the purchase price

of Accu-Glass—an additional $100,000—was to be paid to the sellers, over a five-year period.

Wendi began working with Joe at Accu-Glass, handling the accounting and office

functions. They were not effective business people, and Joe once again began experiencing pain

and swelling in his neck in September 1997. Jerry Robles was not receiving revenues from Accu-

Glass, and, amid turmoil with him regarding the business's financial condition, Wendi and Joe

signed the business over to Robles. The high hopes Wendi held for Joe and a successful business

venture collapsed. The young couple continued to depend on others for financial support.

In March 1998, Wendi obtained a job at the Courtyard Apartments in Casa

Grande. She noted on her application that she had completed a bachelor's degree, even though

she had not completed her education. She secured a good compensation package, which included

health insurance and a free apartment. Wendi was pregnant again.

In July 1998, with the birth of their second child, Ashlee just two months away,

Joe was diagnosed with cancer and a report from the Armed Forces Institute of Pathology

confirmed that all of the tumors dating back to the first mass removed in September of 1994

were, indeed, malignant cancers.[56]

Joe had his fourth surgery in the summer of 1998. Shortly thereafter, on

September 16, 1998, Ashlee was born. Joe was becoming increasingly depressed, isolated, bitter,

and withdrawn. Wendi was the sole financial provider for the family. Because Joe was sick,

Wendi had no choice but to return to work right after Ashlee was born. Joe was unable to care

for the children so they were in left in the care of a neighbor at the apartment complex. Wendi

---

[56] Medical Records of Joseph Andriano – Armed Forces Institute of Pathology Report dated
August 12, 1998.

returned to the apartment at lunch to feed Joe through a feeding tube that had been inserted after the surgery. Alejo came over three times a day to change his bandage.

Overwhelming financial pressures, the increasing pressures of her marriage, and the continuing illness of her husband began to weigh heavily on Wendi, undermining her resiliency and exposing her fragile homeostasis. Holding on by acquiescing no longer worked to keep the effects of Wendi's mood dysregulation and poor coping skills—coupled with the impaired judgment and impulsivity of her mood disorder—from completely disintegrating her ability to rise above her dependence. She had long since abandoned school and had eliminated all social contacts other than with Joe's friends. Her life became dedicated to Joe, her children, and their support and needs.

As noted by Gia Palicki who provided day care for Nicholas and Ashlee in the year before Joe died:

> Wendi and Joe told me that Joe's job was the kids, and Wendi's job was work, but really Joe spent his time doing whatever he wanted. Wendi was responsible for taking care of all the bills as long as Joe made sure that the children were dropped off for daycare. He loved to go boating, and that's what he spent most of his time doing. Wendi encouraged that hobby, and she was glad to have me care for her children so that Joe was free to go have fun. This arrangement was mutually agreed between Wendi and Joe. This was how their family worked.[57]

Though Wendi may have encouraged Joe to "go have fun" after his diagnosis, her tacit permission for Joe to avoid responsibility further worsened Wendi's emotional state. As noted by one study addressing issues related to caregiver burden, female caregivers' level of

---

[57] Tab 31, at ¶3.

45

marital distress increases as the male patient avoidance subscale score increases, such that the more avoidant the male patients are, the more the female caretakers' marital distress increases.[58]

Wendi became even more committed to helping Joe recover. She researched and found a Christian-based alternative naturopathic facility, Health Quarters Ministries in Colorado Springs, Colorado.[59] Joe's family and friends held a benefit dinner to raise money so Joe could go to Health Quarters. The program was based on nutrition. Upon his return, Wendi attempted to support a radical change in the way the young couple ate. She worked during the day and then cared for her children and Joe in the evenings, attempting to follow a strict vegetarian nutritional program that incorporated the use of vitamins, supplements, and fresh juice extracts. Despite Wendi's good intentions, encouragement and support, Joe was unable to maintain the diet and soon returned to his former eating habits.

### v.    Wendi's Symptoms Worsen as Joe's Physical and Mental Condition Deteriorates

On the heels of Joe's diagnoses, Wendi was informed that she was losing her job at Courtyard. For the Andriano family, not only did this mean the loss of income but the loss of their home and health insurance. Wendi once again scrambled to find employment. She obtained a well-paying job at an upscale apartment complex, the Meridian at the Biltmore, in Scottsdale.

---

[58] McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548.

[59] According to its Web site, "The mission of Health Quarters is to help facilitate both physical and spiritual health in the lives of God's people. We focus on building better health by presenting nutritional choices and the principles of nutrition through body cleansing and the rebuilding of the immune system. We firmly believe that illness and disease are caused by toxicity, stress, an inefficient digestive system, biochemical imbalances, mal-absorption of vital nutrients in the body, etc. We also believe that the human body has been designed by God for self-healing of degenerative conditions, given the right dietary and lifestyle changes."
https://www.healthquarters.org/index.php?option=com_content&view=article&id=43&Itemid=2

However, housing was not provided. Joe and Wendi returned to live at the Andriano farm property. Wendi worked full days, leaving at six-thirty or seven in the morning and returning home to Casa Grande late at about seven or eight in the evening after a long commute. Joe transported the kids to the babysitter and picked them up each day that Wendi worked.

Wendi's emotional leak was gradual, but unrelenting. She was crumbling under the stress of her marriage and Joe's ever growing discontent at living with his parents. When Joe and Wendi learned of a new apartment complex—San Riva—being opened in the Ahwatukee Foothills in south Phoenix, Wendi applied. She went through three interviews and obtained yet another position at an even higher scale. She received not only an excellent salary and benefits, including health insurance, but a three bedroom, two bath apartment. The young family moved to San Riva in November 1999.

When Wendi started working at San Riva, she initially worked double shifts every day to try and catch up on her family's expenses. Once their health insurance took effect, Joe returned to have a CT Scan of his lungs. In the ten months since the last scan, the tumors had doubled and the prognosis was poor. Joe was, literally, suffocating to death.

During the year leading up to Joe's death, the caregiver burden Wendi experienced and the weight Wendi bore crushed her. As noted by Gia Palicki, Wendi and Joe's babysitter:

> When I met Joe, he was a free spirit, but towards the end he was not that way anymore. His attitude completely changed. Joe changed drastically over the year that I knew him. In the beginning, things were so different. He was all about the kids, having fun, and being happy. As the illness progressed, Wendi became the sole caregiver for the children. She also was the only one working. It got so that Joe was always pissed off, and he was hardly ever at home. Eventually he was almost never around at all

47

and I hardly saw him anymore. I even started picking the kids up in the morning instead of Joe dropping them off if Wendi couldn't.[60]

Wendi's dependence, her need to not be alone and maintain a dependent relationship, was turned upside down. She could not get praise. Her financial, emotional, physical, and familial life was deteriorating in front of her eyes.

In addition, symptoms of Wendi's bipolar disorder began to further disrupt her ability to modulate her affect and behavior. She started to drink more.[61] She then became involved in a romantic relationship with Rick Freeland, a resident at San Riva, and spoke openly to her employees and tenants about the affair. An open affair with someone in her apartment complex, while she continues as manager, is a manifestation of both dysregulation and bipolar disorders. In Wendi's case, her condition was compounded by her dependent personality. When Rick met Joe and Rick said he could not continue the relationship, Wendi fell apart, consistent with the symptoms seen in dependent personality disorder. Gia Palicki observed:

> If it is true that Wendi had an affair, I can understand that. She was afraid to be alone. She did not know anyone different than Joe, and towards the end he was not very affectionate with her, which is about all she would have asked for from him. He was dying, and later on he was always angry even though she was doing everything she could to make his remaining time as comfortable and happy as possible. She was young, and her relationship with Joe was cold physically. If she had an affair, it was not because she did not love Joe.[62]

Then what were her affairs? The very symptoms of trauma and dependence, acquiescence, aiming to please, denial, emotional dyscontrol, and numbing of affect that had

---

[60] Tab 31, at ¶18.

[61] Testimony of Wendi Andriano, October 27, 2004

[62] Tab 31, at ¶21.

48

driven and shaped Wendi's life were undermined. She was increasingly unable to maintain the facade of normality, of possible triumph, and she was feeling to blame. Traumatic stress, real life caregiver burden, and mood disorder began to undermine Wendi's identity as the pleaser and fixer she had been coerced to be. Her affairs, her drinking, and her impaired judgment were the products of her emerging bipolar disorder, symptoms augmented by her longstanding trauma and pathological dependency.[63]

The burden of giving care added to the weight of always trying to keep up. As Joe became increasingly sick, the weight of caring not only for her husband, but her two children, eviscerated Wendi's ability to make reasoned choices.

Wendi suffers co-morbid disorders, disorders that occur in combination or at the same time. Among all mental disorders, alcohol and substance use is highest in people suffering from bipolar disorder and PTSD.[64] Alcohol is the most common "self-medication" used by people suffering from bipolar and PTSD disorders and PTSD is highly correlated with substance abuse. In one study, 24% of persons with PTSD also suffered from alcohol abuse.[65]

---

[63] Malmquist (1996), *supra*, p.159 ("A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level as not possible without this other person, no matter what the price . . . .").

[64] Brady, K.T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[65] Mills, K.L., Teesson, M., Ross, J., & Peters, L. *Trauma, PTSD, and Substance Use Disorders: Findings from the Australian National Survey of Mental Health and Well-Being.* 163(4) AMERICAN JOURNAL OF PSYCHIATRY, 652-658 (2006).

When a person with bipolar disorder is subjected to stress, mood symptoms of mania or depression may become increasingly prevalent. Since alcohol is both a stimulant at low levels and a depressant at higher levels, it serves to anesthetize both poles, while also causing impaired cognitive functioning. The combination of trauma and mood symptoms in co-morbid disorders creates atypical and more severe behavior than would be seen in a given disorder alone. Wendi's co-morbid disorders were intensified by the trauma of her husband's terminal illness, and unleashed her mood symptoms. As discussed, Wendi' symptoms were openly displayed and rarely covered.

Wendi's underlying dependency needs, present since childhood and fostered by her father's coercion, kept her teetering toward the pathological anger seen in dependent personality when those needs are thwarted.

Wendi describes conversations with Joe about his unwillingness to continue to live given his terminal condition and his fear of dying via suffocation, as had been predicted due to the proliferation of the cancer in his lungs. In fact, Wendi reports that Joe did not want anyone to know about his desire to end his life, as his minimization to Jeffrey Miller illustrates.

As a result, Wendi investigated, on her *office computer*, lethal drugs, used primarily for suicide. Wendi reports conversations with Shawn King about types of drugs and places to buy these drugs online.[66] Under the best of circumstances, Wendi's investigation into lethal substances reflects impaired judgment. She had little knowledge of these compounds, and her only computer was at her desk at work in an office shared by other people.

Wendi frequently talked with co-workers about the tremendous pressure she was under, and they saw it. Her family recognized the loss of emotional control and attempted to take

---

[66] Interview of Wendi Andriano by George Woods, MD at ASP Perryville, January 26, 2011.

50

care of the children, pay for medical care, or provide Joe with outlets like paying for him to spend time on his boat.

### vi.    Wendi Becomes More Erratic

As Wendi's stress increased, her behavior became more erratic. Her relative openness at work, particularly about her relationship with Joe, her affairs, her use of the office computer, and her investigation into lethal drugs and substances in a location where she could easily be seen doing so reflects Wendi's impaired decision making and ability to understand context as seen in people suffering from bipolar disorder.[67] As a 2001 study noted:

> This is possibly the first study to have directly compared decision-making performance in manic and depressed patients. The results showed manic and depressed patients' to be impaired on a computerized decision-making task. While the most general indicators of performance showed similarities between these two groups, close examination of the individual components of the task revealed distinct patterns of impairment: although both manic and depressed patients demonstrated similarly delayed deliberation times and altered betting strategies, impairments in the quality of decisions were confined to manic patients.[68]

An impaired mental flexibility to effectively understand social context and make good decisions is reflected in Wendi's open research into lethal drugs and substances on her office computer and in the fact that others' open awareness of Joe's condition might lead them to discern the purpose of her research. This decision making impairment is also captured in Dr. Young's testing.

---

[67] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[68] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

Cognitive dysfunction is common in bipolar disorder.[69] Problems with attention and focus, leading to a slower processing of events and circumstances, have been found in persons suffering from bipolar disorder, regardless of mental status and mood state. So, a person with bipolar disorder, even in a euthymic (stable) state, may still manifest symptoms of cognitive impairment.

In the period leading up to Joe's death, Wendi was acutely symptomatic. Symptoms consistent with bipolar disorder began to manifest. The most prominent were her expansive mood, distractibility, increased psychomotor activity, impaired judgment, and willingness to engage in activities with a high risk for problematic endings.

Wendi became inappropriately involved with fellow workers in a way that was historically uncharacteristic for her. Once married to Joe, she limited her social contacts to his friends and activities related to boating and events at the lake. Even though she was responsible for various social events at Quail Gardens and the Courtyard Apartments, she did not become personally involved with the residents and staff. At San Riva, Wendi became a part of the San Riva community. To some degree this may have served as a supportive measure for her, but, in fact, her involvement was inappropriate, showed little ability to judge her role, either as wife or manager, and was much more consistent with mental disease.

Wendi worked at San Riva. She was the boss. Nevertheless, she socialized with co-workers and renters at San Riva. She used her only computer at her office at San Riva, often in plain view of other employees and renters. She had affairs with tenants. She went to parties and barbeques at San Riva, and drank more and more.

---

[69] Martínez-Arán, A., Eduard, V., Reinares, M., Colom, F., Torrent, C., Sánchez-Moreno, J., Benabarre, A...&  Salamero, M. *Cognitive Function Across Manic or Hypomanic, Depressed, and Euthymic States in Bipolar Disorder.* 161(2) AMERICAN JOURNAL OF PSYCHIATRY, 262-270 (2004).

Deficits in understanding social circumstances, and the impaired ability to respond appropriately to social circumstances are hallmarks of children and adults with bipolar disorder.[70]

Dr. Young's findings are consistent with the social history and Wendi's behavior. Dr. Young found Wendi has difficulty with decision-making, particularly with decisions that were novel and stressful. Wendi's Iowa Gambling Task demonstrated poor strategies for decision making.

Dr. Young also found that Wendi's ability to process novel information is slowed. Both Wendi and Donna describe this difficulty with understanding context and responding to it in multiple ways. Wendi described developing relationships early in her prison years that indicate decision-making that was impaired beyond mere naiveté.

We see the correlation between Dr. Young's findings of slow processing speed, and Wendi's own impaired judgment, particularly under tremendous stress, stress that had become much greater than the "normal" stress of violence and anger she had grown up with.

Wendi became involved with two men (one of whom, Rick Freeland, a tenant at the apartment complex she managed). Consistent with the need to be loved, Wendi described herself in her testimony as falling in love with Freeland within months. When they separated, she

---

[70] "Children and adults with bipolar disorder perform differently from comparison subjects and individuals with other disorders on social-cognitive measures, particularly facial expression processing tasks. Symptomatic adults with bipolar disorder also have difficulty using contextual cues to infer others' mental states. Less research has focused on expressive aspects of social cognition; clinical observation of youths with pediatric bipolar disorder, however, suggests that language pragmatics (i.e., appropriate social use of verbal/nonverbal language) may be problematic. This pattern of aberrant social-cognitive skill suggests dysfunction in neural structures thought to mediate social, emotional, and possibly pragmatic linguistic processing. These structures include the ventrolateral and medial prefrontal cortices and the amygdala, which exhibit structural and/or functional anomalies in bipolar disorder." McClure et al. (2005). *Deficits in Social Cognition and Response Flexibility in Pediatric Bipolar Disorder* (internal citations omitted).

was overwhelmed, feeling as though she had lost a close friend, someone she could talk with, an interaction of classic symptoms of bipolar disorder and dependent personality disorder.

Wendi was the manager of the San Riva apartments. She not only lived there, with her husband and children, but San Riva was her place of business. She manifested multiple behaviors that portended increasing mental illness, as she continued to work there. These symptoms of elevated mood, poor judgment, impaired impulse control, increased alcohol intake, and increased sexuality, were temporally and causally related to the onset of her extreme level of traumatic stress and subsequent manifestation of bipolar symptoms. There was a change in Wendi.

The extreme stress rent the fabric of Wendi's fragile mental state, already bombarded by affective dysregulation, self-medication, impaired cognitive tools, and defective judgment. Many of the symptoms that were previously subclinical, meaning less obvious, were amplified by Wendi's loss of control, and the destruction of all that she knew, and as a result of the need to keep herself, her children, and her dying husband going.

It is unclear whether Joe participated in a suicide decision, although he had clearly entertained suicide and talked with his malpractice lawyer about his suicidal ideation. Wendi, however, on her office computer, created a false business license, using the address of her actual business office. She found a company that sold lethal compounds. She brought those compounds to her office.

Wendi's competent facade was just that, a facade that quickly crumbled in the face of coercion by her dad, the vulnerabilities of her own mental illnesses, the neglect of her mother, and, now, the extraordinary burdens of caregiving she faced. From childhood, she was isolated from others, unable to effectively socialize, and subject to peer pressure. The series of

behaviors prior to the night of the offense captures the range and severity of the mental illnesses Wendi was suffering from, especially when under tremendous stress before the current offense, at the time of the offense, and while being treated in jail after the offense.

### vii.    Wendi's Symptoms on the Night of the Offense

Chris Hashisaki's testimony gives some insight into Wendi's mental symptoms and mental state at the time of the offense. When asked, during cross examination, if Wendi was creating fictitious business licenses on the job, in plain view of other employees, Ms. Hashisaki said "Yes."[71] Ms. Hashisaki acknowledged seeing the package in Wendi's office. When asked by Mr. Martinez to describe Wendi's mental state at the time of the offense, Ms. Hashisaki describes Wendi as "confused."[72]

Ms. Hashisaki made it clear that Wendi was overwhelmed by Joe's illness, not just Wendi and Joe's relationship.[73]

When the emergency medical technicians came the first time, Wendi said her husband was dying and did not want any services. They asked her if she had a DNR (Do not

---

[71] Hashisaki testimony, Page 48 ("Q: In the office set up there, she openly was in the process of creating fictitious business license, correct? A: Yes. Q: You observed that? A: Yes. Q: She made no effort to hide that fact from you in doing it, correct? A: To point. Q: Right. And then when you inquired of it, she basically said it's none of your business, leave me alone? A: Correct. Q: But she did it at time during business hours, correct? A: She did yes. Q: When you were witness to it? A: Yes.").

[72] Hashisaki testimony, Page 11 ("Q: How would you describe her demeanor? A: Confused. Q: And did she have telephone in her hand? A: She did.").

[73] Hashisaki testimony, Page 40 ("Q: The marriage had some problems? A. They were having trouble with his illness, yes. Q: Beyond the illness, they were having other problems? A: Such as what? Q: Such as -- don't know how else to describe it. Difficulty between man and wife in husband and wife kind of relationship? A: She expressed difficulty in the relationship, yes. Q: And she attributed those problems to the conduct of Mr. Andriano correct? A: More so towards his illness. Q: Illness was one of the problems, but there were other items that were causing marital discord between these two individuals, correct? A: That don't know of. Q: Are you telling me that she never suggested that she was having problems with Mr. Andriano? A: No I'm not suggesting that. I'm suggesting that it was more so due to the illness. . .").

resuscitate) order.[74] Wendi's executive functioning, her impaired sequencing and understanding of specific social context, had fallen apart. She was suddenly surrounded by people she had called without knowing what to do, the very antithesis of planning, if that were the case.

Again, the emotional disconnect grounded in trauma was documented. Wendi's range of emotions and the quality of the symptoms at play included traumatic dissociation, where she lost and was unable to recollect much of the time during the incident. Wendi's dissociation has a strong foundation in the trauma and neglect of her childhood. As noted above and in the Hopper report, Wendi's father coerced her sexually for many years during her childhood and early adolescence. There are at least two incidents of Wendi being photographed by her father, once in a motel, in sexually-provocative poses and see-through nightgowns. Wendi does not recall either of the photographs, although she does recall going to each place these photographs were taken, and recalls reluctantly agreeing to let Alejo Ochoa, her father, take these pictures.

Wendi's dissociation underlies much of what we know about the actual offense. Studies consistently report a high degree of dissociation in patients who suffer from pathological forms of affective dysregulation as discussed above.[75] Indeed, Wendi was experiencing pronounced symptoms of her mental illness during the period leading up to Joe's death, and the

---

[74] Hashisaki testimony, Page 37 ("A: She walked past the fire department and myself and stood by the front door and explained that she did not want any service, that her husband was dying and this was not the way that he wanted to go, and that she would like us to leave.  Q: And what did the fire department people do?  A: The fire department said that if you're refusing treatment that was something they understood. They asked her if he had a 'DNR'. She asked them what a 'DNR' was and they said 'DNR' was 'do not resuscitate.'").

[75] Lewis, D. O. (1992). From abuse to violence: Psychophysiological consequences of maltreatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 31*(3), 383-391;

van der Kolk, B. A., Perry, J. C., & Herman, J. L. (1991). Childhood origins of self-destructive behavior. *American Journal of Psychiatry, 148*(12), 1665-1671;

Terr, L. (1991). Childhood traumas: An outline and overview. *American Journal of Psychiatry, 148*, 10-20.

56

night of the offense involved the convergence of severe symptoms of each of Wendi's disorders, which, because of their co-morbid nature, would have fed off each other to exponentially worsen their collective severity. The manifestations of her psychiatric disorders, including dissociation, likely played a substantial role in the events that caused Joe's death. A person in Wendi's state would have been unable to control and manage her emotions and responses to the events as they unfolded. Moreover, those disorders in conjunction – and particularly dependent personality disorder when the sufferer's dependency needs are thwarted in the profound manner at issue here – likely would have substantially impaired Wendi's ability to accurately judge how to "help" her terminally ill husband, who was the focus of Wendi's pathological dependence needs. Her ability to judge whether her behavior was right was marred by her multiple mental and cognitive symptoms.

Wendi's post-arrest therapy sessions with private counselor Kandy Rohde provide our best glimpse into her mental state.

> She felt angry and hit him twice with a chair. She believes she
> continued to hit him with the chair but her recollection is that she
> watched herself do that. [A classic description of dissociation.]
> The next memory is of Wendi sitting on the ground next to Joe's
> body. She thinks she had her hand on him and she knew he was
> dead. She said they were in the middle of a pool of blood. She got
> up to wash her face and glasses because they were so bloody she
> could not see. She said that she does not know how much time
> passed or what happened. She did not hear the paramedics. The
> children did not wake up. Chris did not return. She called her
> parents and her father told her to call the police. She did. Her most
> chilling memory is that of Joe asking her to help him as she hit him
> with the chair. In her head she said that she was helping him. She
> said that she felt relief when she found him dead. She was glad her
> old life was over.[76]

---

[76] Tab 45 (Kandy Rohde Notes dated February 23, 2001).

57

Consistent with her multiple, interrelated, co-morbid disorders, Wendi describes dissociative symptoms at the time of here greatest stress. Her loss of time, emotional numbing, hyper-reactivity, and anger are all part and parcel of her traumatic disorder. Augmenting her traumatic response, however, is her Dependent Personality Disorder, created from the long term sexual coercion that led to both acquiescence and the anger that comes from overwhelming stress.

Dr. Carl Malmquist describes how individuals with dependent personality disorders are often led to violence.[77] This was certainly the case with Wendi. Her history with men, starting with her sexual coercion by Alejo Ochoa, her stepfather, to her affair with Rick Freeland and subsequent one-night stand with Travis Black, had always been one of dependence. In the impending death of Joe Andriano, Wendi was suffering from emotional abuse, dissociation, affective numbing, anger, hyper reactivity, and the foreshortened sense of the future one sees in complex trauma. She had already become unhinged, displaying manic symptoms of increased drinking, incredibly poor judgment, and sexual dalliances. The multiplicity and interplay of symptoms eroded what little ability she had shown in the past, to maintain cohesive functioning.

Symptoms of dependent personality disorder, acquiescence, difficulty being alone, and extreme neediness, permeated the early years of Wendi's and Joe's marriage. With the introduction of Joe's terminal illness, Wendi began to show new, acute trauma symptoms like numbing of affect, hyper reactivity, anger, irritability, and avoidance. These symptoms are common in caregivers, particularly those who have few resources for support.

---

[77] Malmquist, C. (1996). Dependent personality disorders and killing, in *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

Pearlin has investigated the role implications of life stressors, including family illness. He suggests that concepts such as role captivity, which is viewed as being placed in a role involuntarily and unwillingly, and role overload, help us to understand many dilemmas of caregiving. He also acknowledges the impact of caregivers' coping and social support resources on their ability to deal with caregiving demands.[78]

Wendi reported many symptoms of traumatic stress when describing the night of the offense to counselor Kandy Rohde. She described affective numbing, dissociation, and the overreaction seen when trauma, both acute and chronic, impairs the ability to modulate feelings and behaviors.

Tragically, the dependent underpinnings of her façade were also crushed, and her ability to conform her behavior was thwarted.[79] Wendi's mental disorders and the role they played in the deterioration of her mental state were never examined before or during her trial. A thorough social history would have pointed out the multigenerational history of mental illness. A social history would have also chronicled the sexual coercion of her stepfather and neglect of her mother which led to a lack of coping skills, acquiescence, and lack of appropriate affective control and response.

---

[78] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41.

[79] "A question arises as to why a DPD (Dependent Personality Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level." Malmquist, C. (1996). Dependent personality disorders and killing. In, *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

In addition, research has consistently demonstrated a connection between affective dysregulation and experiences of early childhood neglect, trauma and attachment failure. Without adequate regulation of the infant's distress states, the nervous system and affect-regulating brain structures fail to respond optimally. Affective dysregulation is a core symptom of post-traumatic stress disorder. Methods to increase self-regulation are crucial to the effectiveness of any treatment for these problems. Traditional therapeutic modalities that address distorted cognitions or focus on emotional expression, attempt to address affect regulation but fail to modify its underlying basis in the nervous system. When Wendi sought and first received psychological treatment in 1996, no historical information was provided to the therapist and there was no treatment recommended to appropriately approach affect dysregulation as a caregiver stress and trauma symptom, and address the underlying causes of Wendi's dysregulation.

The significance of Wendi's affective dysregulation, dissociation, numbing of affect, and other symptoms of PTSD can only be determined by a careful investigation of the total context of a patient's life, and the totality of the patient's functioning. In Wendi's case, the substantiation of many of Wendi's symptoms of bipolar disorder, cognitive dysfunction, dependent personality, and complex trauma rest upon a social history that was not sought nor found by her trial attorneys.

The lack of this social history prevented mental health specialists from understanding the multiple disorders in play as well as the environmental pressures of caregiver burden.

**b.**    **Post Offense Treatment for Mental Illness**

After Wendi was arrested and charged with Joe's murder, jail mental-health practitioners recognized Wendi's mood disorder, trauma, and personality symptoms. She began

to complain of problems sleeping early in her incarceration. Within weeks of her incarceration, she was placed on Prozac, Remeron, and Trazadone; all three antidepressants. Remeron and Trazadone are particularly sedative, and are used to aid in sleep.

On November 3, 2000, Dr. Garcia-Bunel reported that Wendi was extremely depressed, and that she had been depressed for over a year. This year corresponds to Wendi's most illogical, mood-driven acts.

Within months, her medication was changed to Remeron solely. Wendi's attorneys advised her not to talk with Dr. Garcia-Bunel, and those visits were discontinued.

Wendi was first placed on Seroquel, an atypical antipsychotic commonly used in bipolar depression, in April 2002. She was started on 100mg. at night. Seroquel is also highly sedative and an excellent sleep aid in persons that have a psychotic disorder or bipolar disorder.

By November 2002, Wendi was described as still having ongoing insomnia. Dr. Vickie Ayers increased Wendi's Seroquel to 200mg at night. Dr. Ayers also prescribed Ativan, an anti-anxiety agent, and Elavil, a very sedating antidepressant. Over the next months, Wendi was consistently prescribed Seroquel, the atypical antipsychotic, and Elavil, the sedating antidepressant. There is an important clinical question of whether Wendi was actually switched into hypomania by the Elavil. She certainly continued to manifest anxiety and problems sleeping, symptoms that could have been compounded by the very treatment she is receiving.

Vincent Stuart, MD, saw Wendi on October 23, 2003. He felt that she was anxious due to the upcoming trial and, in addition to her Seroquel, he increased her Ativan to a total of 4mg per day.[80]

---

[80] MCCHSD Progress Notes, October 23, 2003.

On November 27, 2003, in spite of treatment with antidepressants and medications for her bipolar depression, Wendi attempted suicide. She cut her left wrist, and was taken to the Durango Psych. Unit. D. Anderson, the evaluating nurse, described Wendi's thoughts as "irrational" and felt she was minimizing her attempt.[81] Wendi was placed in four-point restraints.

By the afternoon of November 28th, Wendi was logical. She had been reduced to two-point restraints. K. Hoffert, MD, made the diagnosis of "Adjustment Disorder with mixed features," and continued her medications.

Wendi's discharge criteria, developed on November 29, 2003, were that she not be a danger to herself or others, and that she develop a 25% increase in coping skills.[82] Wendi's pathological dependency needs appear at her most vulnerable times, as Counselor L. King recognized.

King evaluated Wendi on November 29, 2003. King determined that Wendi should remain on the Psychiatric Unit, where she stayed for two more years, through her trial, an extremely unusual occurrence for someone not grossly psychotic. It speaks to Wendi's mental fragility during this period, the result of multiple, overlapping psychiatric symptoms.

King believed that Wendi's need for stabilization justified her stay on the Durango Psych. Unit. Wendi's instability had, as Wendi said, started long before her incarceration. The treatment she needed came too late.

---

[81] Progress notes, MCCHSD, November 27, 2003.

[82] Progress note, MCCHSD, September 29, 2003.

c.     **Wendi's Trial**

Wendi's trial testimony was fashioned by extremely poor investigation, and a limited understanding of mental health. Mitigation was not effectively presented, since there was such a limited social history, and the attorneys relied upon incomplete data. Consequently, the symptoms of her trauma—the early childhood and adolescent trauma, the trauma of the years of marriage and her husband's impending death, and the events of his death—were not discussed as mental health symptoms. The events were discussed, but not their impact on her life. A comprehensive explanation of the multiple mental-health symptoms affecting Wendi could not be undertaken, since the social history preparation was so limited.

Many of the witnesses, particularly those from San Riva, accurately describe Wendi's symptoms of increased alcohol intake, sexual acting out, depression, and poor judgment. This behavior was not contextualized into a mental health framework to explain that Wendi was in fact suffering from several acute mental disorders, rather than merely a reaction to abusive behavior by Joe.

Due to the absence of an in-depth understanding of Wendi's family dynamic, a remarkably inaccurate and incomplete picture of Alejo and Donna Ochoa was painted. Rather than the complex, abusive, neglectful, sexually charged atmosphere that led to Wendi's dissociative states in her adolescence, Wendi's upbringing was painted as a good Christian home. Without the proper factual foundation, her attorneys were unaware of the depth of her mental disorder. They could not, therefore, discuss the depth and impact of her mental disorders, since that time treated in prison, on her life as well as at the time of the offense.

Since there was no mental health framework for her behaviors, these symptoms of dissociation, affective numbing, emotional dysregulation, and anger that are so much a part of the trauma symptom constellation were not identified as mental illness.

63

Her dependency needs were used to portray Joe in a negative light when, in fact, her dependency contributed to the instability of the relationship, and limited, as L. King reported, Wendi's coping mechanisms. This dependency was a lifelong personality disorder.

Wendi's attorneys could not effectively prepare or confront Wendi because they knew so little about her, her family, and her mental illnesses.

## **CONCLUSION**

It is my professional opinion, which I hold to a reasonable degree of medical certainty, that these symptoms were present at the time of offense, impairing Wendi's capacity to conform her behavior to the law, control and manage her emotions and responses to the events as they unfolded, and judge right from wrong in determining how to "help" her terminally ill husband.

Date:  February 14, 2012

George W. Woods, Jr., M.D.

## APPENDIX A TO THE EXPERT REPORT OF DR. GEORGE W. WOODS

### Materials reviewed by Dr. George W. Woods

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report and Appendix of James W. Hopper, Ph.D.

- The Expert Report of Myla Young, Ph.D.

**APPENDIX B**

**Overview of the Biopsychosocial and Psychiatric History of**
**Wendi Elizabeth Andriano and Her Family**

1.     **Importance of Family Social History and Mental Illness**

          Wendi's immediate and extended family members, including her parents, maternal aunt and cousins, and maternal grandmother, all exhibit a history of mental illness. Particularly notable are symptoms consistent with bipolar disorder, major and psychotic depression, attention deficit disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Medical records describe, and family members report, an array of psychiatric symptoms displayed by various family members, including bipolar episodes, depression, mania, suicidal tendencies, suicide attempts, psychosis, obsessive compulsive disorder, and substance abuse.[1]  These symptoms interfered with the family's day-to-day functioning, seriously compromised their parenting and care giving abilities, and were rarely ameliorated by any medical or psychiatric treatment.

          Wendi's family's multigenerational history is pivotal in determining the genetic and familial components of her mental disorders. Wendi was vulnerable to mood disorders, which were rampant in her family. The incidence of inheriting mood disorders is increased four-fold in the children of persons with bipolar or depressive disorders.[2]

          Wendi's maternal grandfather exhibited symptoms of bipolar disorder, including hypersexuality, chemical dependency, irritability, and impaired functioning. We also see Wendi's aunt, Nadine, diagnosed with bipolar disorder. Her mother, Donna Ochoa, has suffered from psychotic breaks on at least four occasions.

          During Wendi's earliest years, she was exposed to the extreme neglect, drug use and violence of her parents. Skip Robertson, himself an abused, depressed, traumatized man; surrounded his daughters with his family, rife with childhood sexual abuse. Donna, due to her own limitations and demons, did nothing to protect her child. Wendi manifested inappropriate sexual mannerisms as early as four years of age.

          Wendi was sexually traumatized at the hands of her stepfather, Alejo Ochoa. She was also subjected to an authoritarian, cult-like environment for many of her most formative years. These "religious" environments fostered corporal child abuse, and turned a blind eye to child sexual abuse.

---

          [1] *See generally* Tabs 18, 27-28, 32.

          [2] Schulze, T.G., Hedeker, D, Zandi, P., Rietschel, M. & McMahon, F.J. (2006).  What is Familial about Familial Bipolar Disorder.  Archives of General Psychiatry, 63 (Dec.).

This genetic/familial/environmental vulnerability to mental illness resulted in Wendi suffering from the seeds of multiple mental disorders.

## 2.  Maternal Biopsychosocial History: Clinical Symptoms and Diagnoses

### a.  Maternal Family Biosocial History

Maternal family declarations and medical, military, and pharmacological records reveal and support a multigenerational and transgenerational history of bipolar disorder, clinical depression, migraine headaches, cognitive disorders, attention deficit hyperactivity disorder ("ADHD"), and alcoholism. Many occurrences of these conditions went untreated. With few exceptions, in the instances up to and including Wendi's generation when treatment was sought and obtained, this was usually done late in the lives of the family members affected, often in middle age.  As a result, during the parents' years of child-rearing and care giving, children were subjected to abuse and neglect resulting from alcohol and drug abuse, psychosis, outbursts and emotional absence due to mania and mood shifts, anxiety, and the despondency of depression. Children across multiple generations of Wendi's maternal family lacked care giving, nurturing, safety, parental attention and guidance, and appropriate modeling. Situational events resulting from these conditions often derailed successful childhood development and the achievement of normal developmental milestones.

Wendi's maternal great-grandfather (her mother's paternal grandfather), Henry Mason Worsham, Sr., was "a big drinker and an alcoholic" who "drank away" his farm.[3] Wendi's mother's paternal grandmother, Mary Elizabeth Fortner, put up with Henry Worsham, Sr.'s lifelong drinking just as Wendi's maternal grandmother, Laverne Ann Tilley (Ann), put up with Henry Worsham, Jr.'s, lifelong drinking.[4]

Wendi's maternal great-grandparents (her mother's maternal grandparents) were Sanford Tilley and Ina Rebecca Roberts. Family stories reveal the severe bipolar symptoms suffered by Ina, including having migraines her whole life[5] and severe, rapid mood changes.

---

[3] Tab 27, at ¶ 4.

[4] Tab 27, at ¶ 5.

[5] Tab 27, at ¶ 406.

Ina tried to kill herself on at least one occasion. In a separate incident, when Ina was hospitalized for migraines later in life, she died at the hospital in what her husband at the time considered a successful suicide attempt.[6]

Thyroid disorder is frequently seen and co-morbid in people suffering from depression and bipolar disorder and other mental illness. Wendi's maternal grandmother, Ann, had a lifelong history of thyroid disorder,[7] and later in life was regularly prescribed anxiolytics in the form of Librium and Ativan and was also prescribed Haldol, used to treat psychotic disorders.[8]

Wendi's maternal grandfather (Donna's father), Henry Mason Worsham, Jr. ("Hank") was "the black sheep of his family because he stayed in the Navy and never settled down like the rest of his family."[9] Hank was a lifelong alcoholic, so severe in his alcoholism that he spent most of his money on alcohol, drank regularly for the entire time Donna was growing up, and he continued drinking until the end of his life.[10] Hank lost great potential for a successful career and life because of his drinking:

> [Donna and her parents] moved to Tucson around the time
> [Donna] was finishing third grade or during the summer
> before [she] started 4th grade. In Tucson [Hank] worked as a
> recruiter for the Navy. He should have been an officer by
> then, but he often drank and got into fights, which resulted in
> his being demoted all the time. Most of the fights he got into
> were bar fights with other military people while he was
> drunk, like when Army and Navy men were in the same bar.
> He ended up spending time in the brig on a Navy ship more
> than once.

After Donna and her parents moved to Tucson when Donna was about nine years old, Hank prepared Donna to drink alcohol:

> My dad took me around to bars while I was growing up. That
> was how we spent time together after we moved to Tucson. I

---

[6] Tab 27, at ¶ 407.

[7] Health History of LaVerne Ann Worsham; Medical and Pharmacy records of Laverne Ann Worsham.

[8] Medical and Pharmacy records of Laverne Ann Worsham.

[9] Military and Address History of Nadine A. Zens; Address history by LaVerne A. Worsham.

[10] Tab 27, at ¶ 29; Tab 18, at ¶ 14; Medical and Military Records of Nadine A. Zens.