spent a lot of my youth in bars in downtown Tucson. I sat in
the bars and drank Shirley Temples, a nonalcoholic drink
made of 7up, grenadine syrup, and cherries, while my dad
was drinking alcohol. If I was really lucky I got a cherry
coke, but usually drank a Shirley Temple because the name
sounded like a drink for grownups. How pathetic is that:
preparing a child to drink alcohol by taking her around to bars
and giving her an adult-sounding cocktail when she's not
even a teen yet.[11]

Donna started drinking alcohol regularly with her dad when she was fifteen years old.[12]

Hank was unfaithful to Ann and reared a family with another woman,
Virgie, while remaining married to Ann.[13] Hank and Ann were unable to either separate
or resolve their problems. They subjected each other and Donna to years of violence,
vicious fighting, abuse, and neglect. For the first year or two of Hank's affair with Virgie,
Ann "dragged" the twelve-or-thirteen-year-old Donna along with her on Sundays while
she went around to hotels looking for Hank. Sometimes Ann brought a gun with her, and
on one occasion, while Donna waited in the car, Ann entered the hotel room where Hank
and Virgie were staying and fired the gun at Virgie, attempting to kill her, then provided
no explanation of what had occurred to Donna, leaving Donna wondering whether or not
her mom had killed her dad.[14] When Hank came home around midnight after drinking
and carousing with waitresses, there was regularly screaming and fighting between Hank
and Ann and "they fought so hard that they broke windows." The pre-teen and early-teen
Donna became so afraid and anxious that she began keeping a butcher knife by her bed to
protect herself from her parents.[15] The problems between her parents escalated over
time[16] until in 8th or 9th grade Donna had a psychotic depressive break that included
periods of uncontrollable crying and mental absence.[17]

---

[11] Tab 27, at ¶ 30.

[12] Tab 27, at ¶ 83.

[13] Tab 27, at ¶ 49; Tab 18, at ¶ 14.

[14] Tab 27, at ¶ 35.

[15] Tab 27, at ¶¶ 37-38.

[16] Tab 27, at ¶ 38.

[17] Tab 27, at ¶ 48.

Ann "became suddenly furious at times, and had rapid mood swings."[18] Ann abruptly ended conversations on the phone. She "just suddenly had to stop talking and get off the phone." Now Donna does the same thing. She stops family members in the middle of conversations and hangs up because she "reach[es] a point where I'm just done talking and the idea of continuing to talk is intolerable."[19]

Donna is aware of a diagnosed history of bipolar disorder within her family.[20] Medical records for Wendi's mother, Donna Ochoa, reveal a history of depression, and in 2001, she was referred for a psychiatric consultation in which she was diagnosed as suffering from severe depression and anxiety disorder.[21] Donna's history of severe trauma, abuse, and neglect is manifested in an array of severe clinical symptoms and disorders that in some cases have extreme presentations in Donna's history, including bipolar disorder, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. *See* "Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa" and "Donna Elizabeth Ochoa: Clinical Symptoms and Diagnostic Conclusions," below in this appendix, for detailed treatment and discussion of Donna's trauma and mental health history.

Wendi's maternal aunt, Kathie E. Worsham, child of Donna's father, Hank, with his second wife, has a significant mental health history.[22]

Wendi's maternal aunt, Nadine Ann Bednorz nee Zens, first child of Ann, had a significant mental health history. Nadine was diagnosed with both clinical depression and bipolar disorder,[23] and struggled with depression while her children grew up.[24] Nadine suffered from migraines[25] for which she received medical and pharmaceutical treatment for most of her life. She was treated with Phenobarbital from the time she was twelve or thirteen years old until she was seventeen, after which the

---

[18] Tab 27, at ¶ 405.

[19] Tab 27, at ¶ 404.

[20] Tab 27, at ¶ 406.

[21] Donna Ochoa Medical Records.

[22] Criminal History and ADOC Records of Kathie Worsham; Tab 27, at ¶¶ 50-61; Tab 26.

[23] Medical Records of Nadine Bednorz; Tab 18, at ¶ 3; Tab 27, at ¶ 406.

[24] Tab 18, at ¶ 3.

[25] Medical Records of Nadine Bednorz; Tab 27, at ¶ 406; Tab 18, at ¶ 3.

headaches subsided until she was twenty-five years old.  Thereafter she was prescribed Fioronal, to which she became addicted and was admitted for detoxification at the age of about fifty-nine. [26]

Nadine's medical records from 2001 and 2002 report a familial history of headaches, depression and bipolar disorder.  She was hospitalized three times between 2001 and 2005 for treatment for headaches, depression and bipolar disorder.[27]

Wendi's maternal cousins, including the children and grandchildren of Nadine, and Kathie's son, Brandon, who later became Wendi's adoptive brother, also have significant mental health and alcohol/substance histories. Wendi's maternal cousin, Clark Bednorz, Jr., son of Nadine, who is about a year younger than Wendi,[28] received an Individualized Education Plan ("IEP") in elementary school as a result of being diagnosed with attention-deficit disorder (now characterized in the literature as a type of ADHD).[29] He had mental-health issues as a child and received neuropsychiatric treatment for his behavioral and adjustment difficulties. [30]

Clark's condition has not improved over his lifetime.[31]  Nadine was afraid of him because of his "violent rages."[32] He drank and got into trouble for drinking.[33] As an adult and through the present-day, Clark "literally begins living on the street suddenly if he doesn't take his medication regularly."[34]

Nadine's daughter, Margie (Wendi's maternal cousin), suffers from migraines and has been diagnosed with bipolar disorder.[35] Margie has extreme mood swings so extreme that even Nadine was afraid of her:[36]

---

[26] Medical Records of Nadine Bednorz

[27] Medical Records of Nadine Bednorz

[28] Tab 27, at ¶ 414.

[29] Medical and Scholastic records of Clark Bednorz, Jr.

[30] Medical and Scholastic records of Clark Bednorz, Jr.; Tab 27, at ¶ 414.

[31] Tab 18, at ¶¶ 4-10.

[32] Tab 27, at ¶ 414.

[33] Tab 18, at ¶ 6.

[34] Tab 27, at ¶ 415.

[35] Tab 27, at ¶ 406.

> At times [Margie] can be the happiest person you could ever
> expect to meet and at other times, vicious and violent. She
> goes from fits of screaming and cursing to being nice and
> docile. She goes into the screaming fits suddenly, and can
> transition back to being happy and as calm as can be as
> though nothing happened within an hour. When that happens,
> family members are often standing around shocked, and
> Margie doesn't seem to think it's a big deal. She and her
> husband Jeff have been physically abusive toward each other.
> Nadine gave Margie thousands of dollars over the years to
> encourage her to leave him but still she has not left him
> though as far as I know the abuse and violence continues.[37]

Margie has four children: Brett, born 1991; Kayla, born 1993; Tyler, Born 2002; and Logan, born 2010. All of Margie's children except Logan, an infant, have been prescribed psychiatric medications "for mental health and behavioral issues" from the time they were small children, before they started grade school.[38] Margie states:

> My son Brett and my daughter Kayla have both been
> diagnosed with ADHD. My son Tyler is autistic, has a mood
> disorder, and also has ADHD. He has a lot of anger problems.
> Brett was eleven years old when my dad passed away. They
> were very close and Brett was extremely affected by his
> grandfather's death. Even though he was only eleven years
> old, I was unable to get him to go to school. Eventually, I had
> to put him on antidepressant medication, but he didn't take it
> for very long. Kayla is currently taking Concerta, for her
> ADHD. Tyler takes Adderall, Tenex, Risperdal, and
> Depakote.  Because I've had trouble dealing with Tyler's
> problems, and with my mom's passing, I currently take
> Prozac.[39]

Alcoholism is common among individuals in Wendi's extended family, including her maternal grandfather, Henry Worsham, Jr., great-grandfather, Henry Worsham, Sr., and many others:

---

[36] Tab 27, at ¶ 413.

[37] Tab 27, at ¶ 413.

[38] Tab 18, at ¶ 13; Tab 27, at ¶ 416.

[39] Tab 18, at ¶ 13.

Many people in Wendi's extended family, both blood relatives and relatives by marriage, are or have been alcoholics, including Wendi's biological father, Skip, for much of his life; [Wendi's mother, Donna] for a couple of periods from the time [she] was a teenager until [she] was in [her] mid-twenties; Alejo; my dad and my paternal grandfather; all of Skip's brothers; my half-sister, Nadine, when she was younger and while she was in the service; Nadine's son, Clark, and her grandson, Brett; the husband of Nadine's daughter Marjorie, whose name is "Jeff;" my half-brother, Stevie; my half-sister, Kathie; my stepbrother, Adolfo; my mother's brother, Delmar; my mother's first husband, Theodore Zens; my father's second wife, Virginia, when she was younger; many of the men in my dad's extended family; Alejo's father, Alejo, Sr., who was a rowdy drinker until he was about sixty-five years old; Alejo's mother, Natalie; Wendi's paternal cousin, Natalie; and many other members of Alejo's extended family, including his aunts, uncles, and cousins.[40]

Wendi's life must be viewed through the legacy of her family. Prominent symptoms of impaired sexuality, chemical dependency, psychosis, and mood disruption are the foundations of Wendi's affectively laden family. Her mother, Donna, inherited many of these symptoms, and, as we now see, passed them on to Wendi.

    **b.**    Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa Relevant to the Clinical Diagnosis and Forensic Formulation.

I will not reiterate the full biopsychosocial history of Donna Ochoa, due to the extensive documentation provided by Dr. Hopper's report, but will summarize certain particularly relevant portions here.

Early childhood years are critical for developing a person's capacity for developing and maintaining healthy relationships as an adult. The ability to bond and empathize are typically reinforced by parents during these years. During this time Donna moved frequently and was a loner. Her parents' tumultuous and violent marital history shows their limited capacities for bonding and empathy, and her father's absence and mother's neglect show that Donna received little positive parental reinforcement as a child to establish the foundation needed for adult relationship skills. Donna's rheumatic fever and subsequent hospitalizations reinforced her isolationist tendencies. Medical

---

[40] Tab 28, at ¶ 96.

illness in children is a significant cause of traumatic stressors, one that is not often considered when looking at personality and mood disorders in adults that have suffered significant medical afflictions as children.

While growing up and as an adult, Donna was coerced to please her father. Until she was at least six or seven years old, she took showers with her father, and he continued to surprise her while she showered by dumping cold water on her until she was twelve years old and in the 6th grade.[41] This is the earliest incident of self-reported, inappropriate sexual and sex-related behavior by men Donna was close to with underage girls. Inappropriate sex-related behavior and sexual abuse of underage girls by men who were close to Donna and close to Wendi is consistently evident throughout both of their lives.[42]

Donna's childhood friend in Tucson, Alice McGuffee and her sisters were sexually abused by the Robertson brothers, the brothers of Donna's future husband, Wendi's biological father, Skip Robertson.[43]

Donna was "completely oblivious to the sexual abuse going on in [the McGuffee] family" and she "thought that the McGuffees had the perfect happy family" while growing up as Alice's best friend,[44] beginning a life-long pattern of Donna not noticing or comprehending sexual abuse occurring around her or in her household:

> [I, Donna] was an only child, severely neglected by parents who had no affection for each other, and I had no clue and no way to understand or even notice the sexual abuse that was happening in Alice's family, despite the fact that I witnessed things that as an adult in retrospect I recognize as being inappropriate. I actually always thought that the McGuffees had the perfect happy family, the kind of family I always wanted, because it was a big family with siblings, lots of activities and things going on, and everyone involved in each other's lives.
>
> If I had known then what I know now as an adult, and if I had had the adult skills and perceptions that I have today, I would

---

[41] Tab 27, at ¶ 18.

[42] *See generally* Tabs 12, 27-28, 30, 32.

[43] Tab 27, at ¶ 27; Tab 28, at ¶¶ 8, 13; Tab 30; Tab 17; Tab 32, at ¶3.

[44] Tab 28, at ¶ 14.

have recognized things that were going on in Alice's family as being odd, and in retrospect I can see some incidents as definitely being weird, mild things such as inappropriate grasping or touching of the McGuffee girls by the Robertson brothers while I was around and the girls had their clothes on, but at the time I didn't know that any of it was wrong or even unusual. I had nothing healthy in my own family to compare it with, and no context in my own life to recognize that anything was occurring other than the happy, normal family life that I thought the McGuffees had.[45]

Donna's mother, Laverne Ann Tilley ("Ann"), ignored Donna and neglected her severely while Donna was growing up.[46] At times Ann lashed out and slapped or smacked Donna for no reason other than that Donna was nearby and Ann was angry.[47] Donna's food and survival needs were met, but the relationship between Donna and her mom was sterile and distant; there was "no emotional connection with [my mom], no hugging, no cuddling, no warmth, no affection, no bond."[48]

As described in depth above, Donna's father, Hank, drank so much that he spent most of his money on alcohol for the entire time Donna was growing up, and he continued drinking until the end of his life.[49] The primary way Donna spent time with her father, from the time she was about nine years old, in 4th grade, until she was thirteen or fourteen years old, was in bars—where Hank drank alcohol and she drank nonalcoholic drinks.[50] Hank thus prepared Donna to drink alcohol while she was still a child, and she started drinking alcohol regularly with her dad when she was fifteen years old.[51]

As described above, Donna's father had marital affairs with many women while Donna was growing up.[52] Shortly after the affair began between Hank and Virgie,

---

[45] Tab 28, at ¶ 14.

[46] Tab 27, at ¶¶ 44–46, 304; Tab 28, at ¶ 14.

[47] Tab 27, at ¶ 44.

[48] Tab 27, at ¶ 46, Tab 32, at ¶ 31.

[49] Tab 27, at ¶ 29.

[50] Tab 27, at ¶ 30.

[51] Tab 27, at ¶ 83.

[52] Tab 27, at ¶ 33.

while Donna was in 6th or 7th grade, she "didn't want to be Donna anymore, so I decided to change my name to 'Beth,'" and she "went around for a summer telling everyone that I was 'Beth.'"[53] This indicates intense emotional conflict in the pre-teen and early teen Donna.

The stress and fighting between Donna's parents worsened further over time.[54] Ann continued to ignore Donna, and never talked with Donna about anything important, "especially not the difficulties between her and my dad." Ann never admitted to Donna that there was a problem between her and Hank,[55] and despite the intense fighting late at night, Donna and her parents pretended that nothing was wrong. They never talked about the fighting, and during the day acted like things were okay.[56]

Donna "never wanted to do anything to make my dad mad at me."[57] She did things that she knew he would not approve of, but when he found out about them and told her to stop, she stopped: "Whatever my dad told me to do, I did."[58]

A family history of substance abuse, childhood abuse, and isolation are all clearly evident in Donna's childhood, and all strongly support a diagnosis of bipolar disorder in Donna and Wendi.

Two or three years after her parents' severe marital problems began, when Donna was in 8th or 9th grade, she "took it until I couldn't take it anymore," then lost it and "had the breakdown,"[59] the first of at least four psychotic breaks that she has suffered throughout her life. She was unable to stop crying, and then could not respond when people talked to her. She "stayed home from school and everything else" for a week or two.[60]

Donna had a period of hypersexuality beginning in her senior year in high school and continuing after she graduated, while she went to college for a semester, and

---

[53] Tab 27, at ¶ 43.

[54] Tab 27, at ¶ 38.

[55] Tab 27, at ¶ 45.

[56] Tab 27, at ¶ 38.

[57] Tab 27, at ¶ 72.

[58] Tab 27, at ¶¶ 76–77.

[59] Tab 27, at ¶ 48.

[60] Tab 27, at ¶ 48.

then met Wendi's biological father, Skip.[61] She was "fresh meat for the partying crowd and the guys who were older than [she] was,"[62] and she went to bars with "partiers and bad boys" who were in their twenties when she was seventeen.[63] Her first sexual intercourse occurred when she was underage with a man who was twenty-three or twenty-four years old.[64]

Donna's periods of hypersexuality and alcohol abuse in late adolescence and early adulthood are typical prodromal symptoms of bipolar disorder. Donna drank so much while attending college, "during the whole semester," that she almost got kicked out of school.[65]

Donna got together with Wendi's biological father, Skip Robertson, in late 1967, when she returned home for Christmas break after her first semester of college. Skip had just returned from Vietnam.[66] She saw him for the first time since high school at a party at which Skip and his brothers started drinking early and stayed drunk all evening.[67] Donna was eighteen years old at the time.[68] Donna and Skip had sex over Christmas break. Donna thought she was pregnant, so she and Skip got married.[69] Skip and Donna were married in February, 1968.[70]

Donna's history of severe trauma, abuse, and neglect is manifested in an array of clinical symptoms and disorders, including bipolar, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. The clinical literature recognizes the

---

[61] Tab 27, at ¶ 179.

[62] Tab 27, at ¶ 78.

[63] Tab 27, at ¶ 77.

[64] Tab 27, at ¶ 179.

[65] Tab 27, at ¶ 85.

[66] Tab 27, at ¶ 90; Tab 32, at ¶ 17.

[67] Tab 27, at ¶ 90.

[68] Tab 27, at ¶ 92; Tab 32, at ¶ 17.

[69] Tab 27, at ¶ 93.

[70] Tab 27, at ¶ 96; Tab 32, at ¶ 24.

impact trauma can have in the manifestation of mood symptoms, not only depression but mania as well.[71]

When faced with the severe trauma of her childhood, Donna began to dissociate as a survival mechanism.[72] Her parents subjected her to intense fighting, screaming, and even murderous violence[73] and reinforced her dissociation by avoiding all discussion of what occurred, encouraging "pretending" that things were normal and nothing was wrong.[74] As a teen, the only way she was able to enjoy sex was to dissociate from it and pretend it was not happening.[75] Throughout the time she was married to Skip, Donna's response to years of Skip's extreme alcoholism, drug use, affairs with other women, absence, extreme verbal abuse, and other forms of abuse was to "choke it down somehow, look the other way, pretend it isn't a problem, and all will be fine, or at least that's what I tell myself."[76]

When she had the choice, Donna preferred uppers to alcohol.[77] This predilection is consistent with treating the depressed phase of bipolar disorder. Clinical literature supports gender differences in the presentation of bipolar disorder. One gender difference is the greater amount of depression bipolar women typically experience than bipolar men during a lifetime.

Throughout her life, Donna has adopted the lifestyle, ways, clothing, and attitudes of others in order to fit in, "almost like [she] was a chameleon." All her life she has gone along with whatever group or person she has been with, whether with partiers in high school, Skip and his family, with hippies, with church and ministry groups, or around Joe Andriano after he and Wendi were married. She changes her appearance and behavior in order to be liked and accepted. She avoided development of a cohesive identity and throughout her life "never wanted to make a decision" about who and what she was.[78] Donna has had periods of excessive drug and alcohol abuse beginning when

---

[71] Nolen et al. (2004). Correlates of 1-Year Prospective Outcome in Bipolar Disorder: Results From the Stanley Foundation Bipolar Network. *American Journal of Psychiatry.*

[72] Tab 27, at ¶ 46.

[73] Tab 27, at ¶¶ 34–35, 37–38.

[74] Tab 27, at ¶ 38.

[75] Tab 27, at ¶ 73.

[76] Tab 27, at ¶ 121.

[77] Tab 27, at ¶ 107.

[78] Tab 27, at ¶ 98.

she was a teenager, two periods in particular in her late teens and early-to-mid-twenties.[79] These periods of alcohol use coincided with equivalent periods of hypersexuality.[80]

Donna has experienced at least four psychotic depressive breaks during her life: in childhood after the ugliness and fighting between her parents became too much,[81] a few days after Wendi was born when she found that her dog had disappeared while Donna was at the hospital giving birth,[82] late in the marriage with Skip when trying to leave him when Wendi was two or three years old,[83] and after Wendi was arrested in connection with the current matter.[84] When she experiences these breaks, she becomes emotionally labile or cries uncontrollably for a day or two, "usually lasts a day," then shuts down and is completely dissociated for a day or longer, unable to feed herself, recognize when others are around her, or respond to communications.[85] In Donna's words, "My brain completely stops processing . . . I'm completely gone for a couple of days. I don't even have facial expressions. You can't even really talk to me because I'm not there."[86]

Throughout her adulthood, as a result of her trauma history, Donna demonstrated a capacity for extremely poor judgment and poor decision making, as with marrying Skip,[87] her difficulty and inability to leave Skip despite extreme problems,[88] the illogic of becoming pregnant with Wendi to try to solve severe marital problems with Skip despite Skip's alcoholism, absence, affairs, and abuse,[89] and the numerous poor choices Donna made in regard to Wendi's upbringing, as detailed in the report of James

---

[79] Tab 27, at ¶¶ 31, 81–89, 106–107.

[80] Tab 27, at ¶¶ 74, 76–78, 87.

[81] Tab 27, at ¶¶ 48, 143.

[82] Tab 27, at ¶¶ 142–144.

[83] Tab 27, at ¶ 143.

[84] Tab 27, at ¶ 143.

[85] Tab 27, at ¶¶ 48, 143.

[86] Tab 27, at ¶ 143.

[87] Tab 27, at ¶¶ 83, 92-93.

[88] Tab 27, at ¶¶ 103, 109-110, 112-14.

[89] Tab 27, at ¶¶ 115-16, 120, 123.

Hopper, Ph.D.  Over the course of her adulthood, Donna's cumulative bad judgment and decision making provides a remarkable narrative of suffering and mental disorder.

3.      Paternal Biopsychosocial History: Clinical Symptoms and Diagnoses

Wendi's biological father, Shelby Wayne "Skip" Robertson, was born April 11, 1948, to Boyd Gravely "BG" Robertson and Flora Pearl Harrison, in Fort Stockton, Texas.[90] Skip was the youngest of eight siblings.[91]

Skip was sexually abused by his brother, Buck, who was almost sixteen years his senior when Skip was eight or nine years old.[92]

Skip attempted suicide at age fifteen or sixteen by overdosing on pills that his brothers took to stay awake and go to sleep while trucking. Skip served in the Marine Corp in Vietnam beginning in 1966.[93] After five or six months in Vietnam, he "was numb."[94]

It was hard for Skip to return from Vietnam and be called a "baby killer."[95] The first few months after he returned were especially bad.[96] Skip was "[always] mental, meaning crazy," in the time period after he returned to Vietnam and during his marriage to Donna. He had "bad nightmares," four to five nights per week, where he thrashed around and called out to people.[97] On one occasion, when lying in bed with Donna, he threw her out of bed because he believed he was under attack. Another time he woke up to find himself on top of her on the floor after she threw her arm across his chest in bed while they were sleeping and he responded as though he were being attacked. Donna woke him up many times from a nightmare because he was "hollering to get down."[98]

---

[90] Tab 32, at ¶ 4.

[91] Tab 27, at ¶ 67;  Tab 32, at ¶ 4.

[92] Tab 32, at ¶ 15.

[93] Tab 27, at ¶ 91.

[94] Tab 32, at ¶ 20.

[95] Tab 32, at ¶ 20.

[96] Tab 32, at ¶ 21.

[97] Tab 27, at ¶¶ 101, 110; Tab 32, at ¶ 21.

[98] Tab 32, at ¶ 21.

Skip was very jumpy and easily startled. "[A]ny kind of loud noises or sudden surprises set him off." Skip stayed away from 4th of July celebrations and could watch fireworks only from afar because the loud noise was too much for him.[99] There were several incidents when Skip hit the ground in response to a loud noise.[100] To waken Skip safely, Donna had to crouch at the end of the bed and touch his toes, because he came out of his dreams swinging his fists hard enough to hurt her.

Skip drank steadily and was drunk for much of the time while he and Donna were married, both before and after Wendi was born. He did not "just have a couple of beers or go out and get buzzed, he always drank to get really drunk." Skip remained in Wendi's life until he and Donna were divorced.[101] He saw her only a few times after he and Donna were divorced, until Wendi was six years old.[102]

Skip has had "really bad" depression at times throughout his life, and in addition to the attempted suicide as a teenager, he had had other difficult depressive periods and has thought about committing suicide "every once in a while."[103] In 1987 he had another difficult period while driving trucks with his brother, Tommie. Skip did not attempt suicide directly, but "drank a lot to drown [his] sorrows."

In 1990, Skip married his third wife, Crystal Overpeck. Not long after marrying Crystal, Skip became very depressed.

Skip's brother, Tommie, was arrested for taking photos of Julie, Skip's stepdaughter, including a Polaroid with Tommie holding his penis in front of Julie's face. Julie's brother, James, found the pictures in the sleeper compartment of Tommie's truck, and showed them to his mother. When the pictures were discovered, Skip told Tommie he had to leave. Tommie was arrested a few months later in Tucson, in late 1992.[104]

Skip was also arrested in November, 1992, and went to prison in 1993 after pleading guilty to charges of molesting his stepdaughter.[105] Prior to going to prison, and

---

[99] Tab 32, at ¶ 42.

[100] Tab 27, at ¶ 102.

[101] Tab 28, at ¶¶ 35, 37.

[102] Tab 28, at ¶ 39; Tab 32, at ¶¶ 1, 33.

[103] Tab 32, at ¶¶ 11, 13, 63.

[104] Tab 32, at ¶¶ 65, 67; Probation Report – State of Arizona v. Shelby Wayne Robertson.

[105] Tab 32, at ¶ 67.

for three years while he was in prison, Skip went to counseling, which has made it easier for him to talk about difficult things that the rest of his family never discussed.[106] He learned in counseling that he has post-traumatic stress disorder. While in prison, if someone slapped shower shoes together, the sudden noise made him jump.[107]

Skip served out his entire seventeen-year sentence until 2010.  While incarcerated, Skip learned a lot, including how to recognize when he is depressed, and that he has "to do things" to bring himself out of it.[108]

From the time Wendi was five or six years old, Skip had no contact whatsoever with her, and until 2009 he was unaware that she was on death row.[109] When he signed his declaration in June 2011, Skip still experienced PTSD symptoms. If he watches war movies, he has nightmares and wakes up "hollering and screaming." He has to be careful what he watches on TV because PBS documentaries or even an advertisement can set him off.[110]

Based on the above, Skip meets the diagnosis of Post-Traumatic Stress Disorder.

---

[106] Tab 32, at ¶¶ 12, 60.

[107] Tab 32, at ¶ 22.

[108] Tab 32, at ¶ 71.

[109] Tab 32, at ¶¶ 1, 33.

[110] Tab 32, at ¶ 22.

**CURRICULUM VITAE**

**George W. Woods, Jr., M.D.**

**4200 Park Boulevard, #545**
**Oakland, California 94602**

**57 Executive Park South, #360**
**Atlanta, Georgia 30326**
**United States of America**

EDUCATION

1981-1982:  American Psychiatric Association/National Institute of Mental Health
Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981:  Residency- Psychiatric - Pacific Medical Center
 San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978: Internship—Medical/Surgical, Highland Hospital
 Oakland, California

1977:  MD, University of Utah
 Salt Lake City, Utah

1969:  BA, Westminster College
 Salt Lake City, Utah


LICENSES & CERTIFICATIONS


2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004:  Fellow: American Psychiatric Association

1992:  Certified by the American Board of Psychiatry and Neurology

1979:  Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

2011: San Francisco Police Department Crisis Intervention Training (CIT): Suicide Assessment, Mood disorders, thought disorders, and personality disorders.

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

2

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981:  Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California

INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania

ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

3

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

CLINICAL LECTURES

2011: Mood and Thought Disorders in Crisis Intervention: San Francisco County Sheriff's Crisis Intervention Training, San Francisco, California.

2011: Fetal Alcohol Spectrum Disorders and the Criminal Justice System, National Press Club, Washington, DC.

2011: The Epidemiology of Medicalization of Prisoners in the United States, International Academy of Law and Mental Health, Berlin, Germany

2011: Intellectual Disability and Fetal Alcohol Spectrum Disorder: International Academy of Law and Mental Health, Berlin, Germany

4

2011: Neuronal Plasticity: **Cognitive Skills Retraining for students with acquired brain injuries or learning disabilities**. College of Alameda, Alameda, California

2011: "The Neurobiology of Trauma In Children: Lessons About Early Childhood; Families First, Atlanta, Georgia

2010: From the Plantations/Asylums to the Prisons: The Relationship between Humiliation, Stigma, Economics and Correctional Care for the Mentally Ill: 2010 Workshop on Transforming Humiliation and Violent Conflict*□representing the□16th Annual Human DHS Conference□and the Seventh Workshop on Humiliation and Violent Conflict□□ Columbia University, Teachers College, New York

2010: Applying the Institute of Medicine Quality Chasm Framework to Improving Health Care for Mental and Substance Use Conditions; Morehouse School of Medicine, Department of Psychiatry, Journal Club

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009: Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007: Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine,

Atlanta, Georgia

2006: Moderator & Respondent (Representing Morehouse School of Medicine) Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003: Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

6

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

7

American Association for Intellectual and Developmental Disabilities

CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California (Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association, Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy,

8

University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Greenspan, Switzky, Woods: *Intelligence Involves Risk-Awareness and Intellectual Disability Involves Risk-Unawareness: Implications of a Theory of Common Sense*, Journal on Intellectual & Developmental Disability, 2011, in press.

Woods, Greenspan, Agharkar: *Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders:* American Academy of Psychiatry and the Law, 2011, in press.


Bradford, Fresh, Woods: Not all patients are alike: *Ethnopsychopharmacology of Bipolar Disorder in African Americans*. Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.


FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts


FORENSIC PROFESSIONAL LECTURES

2010: The Trial of Hamlet, Morrison and Foerster, LLP, Law College, San Diego, California

2009: Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University

9

of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999: Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist?  Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996: Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995: Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995: Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

11

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention


PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995. (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

Anatomy of a Trial: 1994 (Available for the California State Bar).


PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health


PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2011: Forefront Behavioral Telecare, LLC: Director of Clinical Research

2009-2010:  Forefront Behavioral Telecare, LLC: Chief Medical Officer

2009: AgeServe  Communications, LLC: Director of Research/Director of Government
Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis,
Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the
experiences of racially diverse college students., Narrative Matters, Fredericton, New
Brunswick, Canada


2003:     In Association with the Council on Education in Management, Charlotte, North
Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA,
Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric
Disabilities and California Workplace Requirement, With the Bar Association of San
Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial
Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial
Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II-
Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical
Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher
Education, Seattle Washington

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006).  Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters:  Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College.  (pp. 99-116).  New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000).  Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.

Updated January 8, 2012

**APPENDIX D**

**Qualifications, Expert Witness Experience, and Compensation Rate in this Case**

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as Exhibit B. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

I am a Fellow of the American Psychiatric Association, as well as a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am currently Secretary General of the International Academy of Law and Mental Health.

I am on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York. I teach Clinical Aspects of Forensic Psychiatry and Geriatric Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry.

I was on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento. I was on the faculty of the University of Washington, Bothell campus, where I have taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California Medical Center.

I received a Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992. My fellowship was in Geriatric Psychopharmacology.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm. The neuropsychiatric

assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline.

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders and dysmorphology (the study of structural abnormalities often related to developmental disorders). The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and transcendent of both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology practice in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status is undertaken.

My early medical training focused on internal medicine as well as psychiatry. My internship at Alameda County Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital (Now California Pacific Presbyterian Hospital), in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United Farmworkers of America. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had neurological impairments, significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

2

The focus of my American Psychiatric Association/National Institute of Mental Health (APA/NIMH) Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges.

First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population, yet is directly relevant to non-geriatric populations who may be ill or incapacitated in other ways. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated. Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required. I still conduct home visits with many of my clinical patients, due to their impairments.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, which is a long term psychiatric facility dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations. During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital is one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many psychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these psychiatric drugs are not utilized for their primary psychiatric indication. For example, anti- psychotics, anti-depressants, and anti-

3

seizure medications may be effective in diabetic limb and phantom pain. Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention.

During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California. Sleep disorders, the evaluation of disorders in the architecture of sleep is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Substance abuse is also often related to impairment of normal sleep patterns.

From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic. We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance. From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients with what are called co-occurring disorders. Co-occurring disorders defined persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to

4

neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, neurologists, and hospital pharmacologists on all patients in the Intensive Care Unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological instruments, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI, 2, and RF), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

In the last 10 years, my clinical practice has focused on developmental disorders like Fetal Alcohol Spectrum Disorder and Intellectual Disabilities. I assess and treat patients with psychiatric manifestations of brain impairment, typically congenital, infectious, or acquired brain injury.

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry.  I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse College of Medicine, Department of Psychiatry in Atlanta, Georgia.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

5

I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that, even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

6

Exhibit 3

## EXPERT REPORT OF JAMES HOPPER, Ph.D.

### I.   QUALIFICATIONS

I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts. In 1997, I earned a Doctoral degree (Ph.D.) in clinical psychology from the University of Massachusetts at Boston. Most of my research and clinical work over the past 20 years has focused on the long-term effects of childhood abuse.

From 1997 to 1999, I completed a post-doctoral psychology fellowship at the Trauma Center of HRI Hospital, in Brookline, Massachusetts, an internationally recognized clinic affiliated with Boston University School of Medicine. I was also the Assistant Director of Research at the Trauma Center during the same period. In these capacities, I received training in and provided intensive psychotherapy for severely traumatized clients and co-designed and managed several research projects on traumatic memory characteristics and psychological and biological treatments of Posttraumatic Stress Disorder (PTSD).

I have conducted research at Harvard Medical School, Boston University School of Medicine and the University of Western Ontario on various aspects of psychological trauma and PTSD, including characteristics of traumatic memories, emotional and behavioral effects of child abuse, brain bases of emotion regulation problems in psychological trauma, and psychological and pharmacological treatments for PTSD caused by child abuse trauma. I have conducted assessments and provided therapy to adults suffering from the effects of childhood neglect and abuse in several different outpatient settings, including hospital clinics, college counseling and mental health centers, and private practice. Since 2003 I have also worked as an independent consultant

1

in clinical and forensic psychology, including as an expert witness on psychological trauma and its effects for eight capital cases.

From 1995 to 2000 I was an adjunct instructor with the Department of Psychology at the University of Massachusetts at Boston, where I taught undergraduate courses in personality theory, abnormal psychology, and psychological trauma. From 2000 to the present I have given numerous invited teaching presentations, on topics including the diagnosis, clinical phenomenology and treatment of PTSD; the long-term effects of childhood abuse, including sexual abuse; the biology of trauma and PTSD; and the implications of research on traumatic memory characteristics and the biology of PTSD for various lines of work, including psychotherapy and police crime investigations. In addition, I have given talks at numerous conferences of professional psychological and psychiatric associations, as well as to the United States military.

I have authored or co-authored sixteen papers published in peer reviewed journals, on various aspects of psychological trauma and PTSD, including perpetration outcomes in adults with histories of child abuse, characteristics of traumatic memories, and neurobiological aspects of PTSD and reactions to trauma-related stimuli.

In 2007 I was a founding board member of 1in6, Inc., a non-profit organization serving men with histories of child sexual abuse, and from 2008 through 2011 I was a 1in6 Advisory Board member and paid consultant writing the content for 1in6.org, the most comprehensive website in the world on the issue.

From 2006 to 2011, I was an Instructor of Psychology in the Department of Psychiatry of Harvard Medical School. In July of 2001 my appointment with Harvard Medical School became Clinical Instructor of Psychology and I began my current

2

position as psychological trauma consultant for the Outpatient Addictions Service of the Cambridge Health Alliance.

A copy of my curriculum vitae is attached to this report as Exhibit A.

## II.    SCOPE OF ASSIGNMENT

I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically traumatic aspects of Ms. Andriano's development from birth to age eighteen. Of particular focus were (1) experiences of neglect, abuse and other potentially traumatic mistreatment by her parents and other adults, and (2) harmful effects of such traumatic experiences and relationships on her mental health and ways of relating to others.

## III.   MATERIALS REVIEWED

I conducted numerous interviews and reviewed thousands of pages of documents. My interviews included six visits with Wendi, totaling 52 hours, and one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;

- Wendi's biological father, Shelby Robertson;

- Wendi's adoptive father, Alejo Ochoa;

- Martha England, an adult member of Ms. Andriano's church when Wendi was a child and adolescent; and

- Jeri Lynn Cunningham, a childhood friend    REDACTED

My document review included a copy of Ms. Andriano's videotaped interrogation by detectives shortly after she was arrested, a transcript of that interrogation, hundreds of pages of trial testimony and numerous affidavits obtained by counsel and others throughout the course of Ms. Andriano's post-conviction relief proceedings, including affidavits from Wendi's direct family,

3

several friends and acquaintances, and many extended family members. A complete list of the documents I reviewed is attached as Exhibit B.

## IV.    CONCLUSIONS

Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

## V.    EVIDENCE AND ANALYSIS

The following is a summary of the evidence and analysis which support my conclusions. Given the large volume of information and the complexity of this matter, I am providing this summary to highlight the most significant traumatic experiences and relationships that shaped Wendi's childhood development and adult life. A full presentation of the evidence and my analysis is attached as an appendix to this report, and I will refer to that appendix as I summarize the evidence and analysis below.

### A.    Wendi Andriano's Neglect and Abuse by Her Parents and Other Adults

The most important people in Wendi's life were themselves severely damaged individuals incapable of providing the caring and nurturing necessary for normal human development. Wendi's mother, biological father and adopted father all suffered neglect and abuse in their own childhoods and repeated that pattern with Wendi. When not being

4

neglected or abused by one of her parents, Wendi was turned over to other adults who

likewise subjected Wendi to extremely harmful environments.

The neglect and abuse falls into five categories: (1) neglect by Wendi's mother;

(2) physical abuse, including Wendi being "beaten into submission;" (3) emotional abuse

by Wendi's adoptive father; (4) sexual abuse by her adoptive father and others; and

(5) traumatizing relationship patterns. Each category is addressed below.

### 1.      Neglect by her Mother.

Wendi's mother, Donna Ochoa, emotionally neglected her from birth until she left

home at age 18. Donna often handed Wendi off to others, including emotionally,

physically and sexually abusive men, starting with her first husband, Skip Robertson.

Looking back on various phases and traumatic events of Wendi's childhood, Donna

repeatedly comments on not knowing and not even wanting to know where Wendi was,

who she was with, or whether she was being abused.  And when it came to the most

abusive relationship of Wendi's life, with Donna's second husband Alejo Ochoa, Donna

was *relieved* to have Wendi be the one to deal with Alejo's anger and sexual perversion.

Donna was herself severely neglected by both of her parents. Donna reports that

while her mother made sure she was fed and clothed, "I had no emotional connection

with her, no hugging, no cuddling, no warmth, no affection, no bond." Donna's father

was usually absent – either working, drinking, or with other women and his parallel

family. When he did give her attention, he took her to bars (beginning at age 10) or went

drinking with Donna and her teenage friends. Donna also reports being told that her

father took showers with her until she was six or seven years old,          REDACTED

(Appendix,

Section III.B.)

5

The neglect Donna experienced was particularly devastating, and rendered her unable to cope with the traumatic experiences of her childhood or to effectively parent Wendi. Donna's parents had brutal fights with screaming, breaking glass, and physical assaults. A particular low point occurred when Donna's mother brought her along when searching for her father (with other women) in local hotels, and Donna heard her mother fire a gun at him and believed he may have been killed. Throughout all of this Donna's parents never helped Donna deal with the emotional effects on her or expressed any concern about her wellbeing. Donna responded by pretending not to notice and acting like everything was OK – just as she would when Wendi was in harm's way and being abused.

The following are representative samples of the ways in which Donna neglected Wendi. A full discussion of Donna's neglect can be found throughout the appendix to this report, particularly in sections IV and VIII.

Immediately after Wendi's birth, Donna made no effort to visit her in the hospital nursery, and "did not bond with Wendi at all." Donna was more worried about her dog, which had gone missing while she was in the hospital, and "couldn't attend to Wendi at all," including to breast feed her. After bringing Wendi home, Donna went into depression and "completely shut down," unable to feed herself, get on her feet, or communicate. After that, nursing was the *only* way that Donna cared for her baby. She otherwise avoided her, and was unable to sooth her colicky baby even when she tried. Almost every night for the first several months of her life, infant Wendi was left to cry in her room for hours, with no contact from her parents.

Decades of research have shown that infant brain development depends as much on emotional nurturance as physical care. Maternal neglect is known to exert substantial deleterious effects on developing infants' brains. Experiences like those of Wendi's infancy can have lasting effects on neurotransmitter systems, on circuits involved in attachment to parents, emotion and mood, as well as other brain systems, through a variety of mechanisms including altered gene expression.

Donna did not merely neglect her daughter's emotional needs. She remembers feeling, from the beginning, "I didn't know what to do with Wendi... and I didn't interact with her... My mom had the patience to sit and rock her, but I was like 'No way.'" Donna often handed Wendi over to others, including men likely to abuse her. Her neglect always occurred in the context of triangular relationships, in which Donna's attitude and actions as a mother can be summed up: "I can't handle her. I don't want her. YOU take her."

Until Wendi was four, Donna often handed Wendi over to Wendi's biological father, Skip Robertson. Skip's childhood was also full of neglect and abuse. His family produced at least five sons who sexually abused young girls, with Skip and one brother ultimately serving long sentences for abusing Skip's REDACTED (Appendix, Section III.A.) Skip imposed harsh discipline on Wendi, including potty training her by 10 months of age with punishments and threats. (Appendix, Section IV.) Donna made no attempt to protect her. At Robertson family gatherings, the women cooked, the men got drunk, and Donna had no idea where Wendi was or who she was with, which put Wendi at risk of sexual abuse by Skip's brothers and father, who was notorious among Robertson family women as a "dirty old man." (*Id.*)

7

When Wendi was four years old, day care workers reported that Wendi was initiating unusual and concerning sexual interactions with other children. Donna made no attempt to get Wendi help. Soon thereafter, Donna let Wendi wander the dangerous neighborhood around the drug and alcohol clinic where she worked. She let Wendi spend time alone with the director of the clinic, even after discovering evidence that he had sexually abused girls.

Donna divorced Skip when Wendi was four years old. Donna then became sexually involved with Alejo Ochoa, an extremely limited and disturbed man REDACTED

(Appendix, Section V.) From the start Alejo was more interested in Wendi than Donna, and soon he was sleeping in the same bed with them. (Appendix, Section VI.) Then Wendi began wetting the bed for the first time in her life. Donna did not want to know, or even to think about whether Alejo was sexually abusing Wendi. Within months Donna married Alejo, and he took primary responsibility for parenting Wendi. For the next 13 years, Donna mostly withdrew, looked away and tried not to notice as Wendi was emotionally, physically and sexually abused by Alejo. (Appendix Sections VI-VIII.)

### 2.   Physical Abuse.

Donna's abdication of her parenting duties was not limited to neglect; it included physical abuse as well. Starting when she was a toddler and lasting into her teens, Wendi was regularly subjected to physical beatings by her mother. She was also beaten by her biological and adoptive fathers and authority figures in two religious cults who taught that God wants children beaten into submission. The beatings were not just for bad behavior, but for failure to instantly and automatically obey. The children were even

8

beaten for displaying a "bad attitude," that is, insufficient submissiveness as expressed by facial expression, body language or tone of voice.

Skip proudly reported a time Wendi stopped crying after he beat her. As a toddler Wendi was regularly beaten by Donna and Skip, with their hand or a wooden spoon. Donna recalls beating Wendi for not coming immediately when called. (Appendix, Section IV.) When Alejo assumed the primary parental role, he applied the same "beat into submission" philosophy until Wendi was around 13 years old. (Appendix, Sections VI-VIII.)

Donna and Alejo joined a traveling religious cult when Wendi was 7, in which the leaders gave God's imprimatur to their philosophy of beating children into submission. (Appendix, Section VII.) When Wendi was nine, her family left the traveling cult and joined a stationary one, in which attempts to beat children into total submission were even more extreme. Wendi attended a school controlled by the cult, where children were constantly beaten for any infraction, including having a bad attitude. (Appendix, Section VIII.)  An audio recording captures the cult's leader saying things like, "You beat 'em 'til they cry, and you keep on beatin' 'til they cry softly," because if they cry loudly, "it's rebellion, and you gotta get 'em until their spirit is broken" (emphasis in spoken language). By then Wendi had learned to obey and put on a façade of obedience. Rarely beaten outside of her home, she normalized the violence to which children around her were continually subjected.

A complete discussion of the physical abuse suffered by Wendi is included in Sections IV and VI to VIII of the appendix to this report.

### 3.    Emotional Abuse by her Adoptive Father.

Alejo Ochoa entered Wendi's life when she was four and a half years old. He immediately became Wendi's primary caretaker. Alejo was a damaged, limited and confused man,                          REDACTED

, physical and sexual abuse. He began emotionally abusing Wendi almost immediately. This abuse escalated over the years. By the time Wendi was about 10 years old, Alejo was routinely teasing and attempting to degrade and humiliate her, primarily in sexualized ways.

For example, Alejo proudly recalls forcing Wendi, when she was four years old, to clean crayon from a door for an hour and a half straight – despite her not having known that coloring on the door was forbidden (i.e., she didn't even know she had done anything wrong) and despite her crying the entire time. He told this story as an example of her innocence and his allegedly effective parenting. (Appendix, Section VI.)

Donna reports that Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence. He did so "ruthlessly," despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." He pounced on naïve or "clueless" comments she made by saying she was "another dumb blond." (Appendix, Section VIII.) A parent in the community recalls that Alejo "was real harsh with Wendi and frequently humiliated her in front of everyone, just screamed at her. Wendi reminded me of a whipped pup."

When Wendi was about 10 years old, Alejo's verbal abuse became predominantly sexual in nature. He tried to embarrass and shame her about sexual issues, including commercials for feminine products. If Wendi or Donna protested, Alejo denied their experiences and reality itself, insisting that Wendi *liked* what he was doing.

10

A full discussion of Alejo's emotional abuse of Wendi is included in Sections VI to VIII of the appendix to this report.

### 4.    Sexual Abuse by Her Adoptive Father and Others.

There is evidence that Wendi was sexually abused from infancy through age nine and strong evidence that such abuse occurred from ages 9 to 18.  It was during this latter time that Alejo sexualized Wendi in an incestuous relationship that included buying and dressing her in lingerie, making her look at pornographic and "adult" paraphernalia with him, and making her scratch and rub his legs and head for hours while both Wendi and Alejo were barely dressed and with Alejo doing things like putting his head in Wendi's crotch and exposing his genitals. The following is a summary of the evidence that Wendi was sexually abused; a full discussion is included in Sections IV and VI to VIII of the appendix to this report.

The evidence that Wendi was sexually abused before age nine is indirect but suggestive. Given Donna's well-established and acknowledged neglect and that Skip, his brothers and father are well-known child sexual abusers, it is likely Wendi was sexually abused during numerous Robertson family cookouts, parties and camping trips when she was one to four years old. During these events Donna left Wendi unsupervised with drunken men who were known sexual abusers of young girls. (Appendix, Section IV.) Wendi exhibited typical sexual abuse-reactive behaviors at day care when she was four years old.

Donna let Wendi wander alone in a dangerous neighborhood where she worked at a clinic frequented by drug addicts and criminals, and left Wendi alone with the clinic's boss, despite Donna's knowledge of his prior sexual abuse of girls. Around the same

time, Alejo began sleeping with Donna and Wendi and she started wetting the bed, not an uncommon reaction of a four year old to sexual abuse. (Appendix, Section VI.)

Once the family left the traveling cult when Wendi was nine years old, they settled in Casa Grande and joined another cult, the 91st Psalm/Harvest Family Church. Alejo's sexual abuse became more obvious and extended to Wendi's friends. He routinely made Wendi spend literally hours scratching and rubbing his legs and head. (Appendix, Section VIII.) He bought her lingerie and sexy nightgowns and other clothing, even when she said it was uncomfortable. He had Wendi wear such clothing while engaged in scratching and rubbing, also known as "babying" and "touching on" him, and over time he progressively wore less and less clothing, including no underwear so that his genitals were exposed.

Beginning when Wendi was 9 or 10, Donna witnessed Alejo engage in many sexualizing and sexually abusive behaviors with Wendi. She saw the night-time "touching on" ritual between scantily clad Alejo and Wendi. She saw and heard Alejo routinely subject Wendi to verbal sexual abuse,                          REDACTED

                                                    . Donna was along on outings when Alejo took Wendi shopping for lingerie and other revealing clothing, and saw much more they had purchased on numerous outings without her. She watched Alejo coerce Wendi into joining him in stores devoted to pornography and "adult" paraphernalia.

Adults and children from the cult community also recall that Wendi wore lingerie around the house and said that Alejo had bought it for her and liked her to wear it. Jeri Lynn Cunningham, a close friend of Wendi's from ages 9 to 13, often slept over at her house. She recalls Alejo forcing her and Wendi to get into their nightgowns well before

12

bedtime. Alejo also demanded that both girls engage in the nightly routine of scratching

his legs and head.                                   REDACTED

In the 91st Psalm/Harvest community, several witnesses cited examples of how

Alejo and Wendi did not have a typical father-daughter relationship and acted more like a

"couple." It was commonly known that Alejo routinely subjected other girls and women

to verbal sexual harassment and abuse. He frequently engaged in sexually inappropriate

behavior such as pretending microphones were penises and making gestures of sexual

intercourse in front of the entire congregation, including young children. Alejo was

widely viewed as a "sexual pervert."

The principals of Wendi's school report that when Wendi was 17 years old, she

approached them privately in a room at the school. She did so with great trepidation and

the principals are convinced Wendi intended to disclose Alejo's sexual abuse. Alejo

suddenly appeared, Wendi recoiled in fear, and she never attempted to speak to them

again about whatever she had intended to that day.

One parent reports confronting Alejo about his sexual behavior at the time,

apparently including his sexual abuse of Wendi, and says that Alejo admitted it. It was a

purely personal confrontation; Alejo was not held accountable and continued to act with

impunity. There is no evidence that pastor of the church, Tom King did anything to stop

Alejo from using his "Youth Pastor" role and power within the church to sexually abuse

women and children.

More important than the exact forms of sexual abuse Alejo perpetrated is the nature of the incestuous relationship Alejo had with Wendi, how it occurred within an incestuous family in which Donna's role was critical, and how being abandoned and subjected to such incestuous sexual abuse harmed Wendi.

Donna recalls that by age 11 Wendi "was more partnered with Alejo than I was, almost like she was his spouse." Alejo had no adult friends and little emotional connection with Donna. Donna seldom ate dinner with Alejo and Wendi or spent time with them, either singly or together. Wendi was Alejo's only playmate, and he often imposed himself on her and her friends, especially when they slept over at the house.

Alejo Ochoa exemplifies what is known, in the sex offender literature, as a "regressed pedophile." That is, he is an extremely immature man who, even if married, is incapable of a healthy intimate relationship with an adult, and instead seeks emotional intimacy, partnership and sexual pleasure from children – who he experiences, compared to potential adult partners, as innocent and safe, thus the best match for his own child-like immaturity. Alejo appears to truly believe – while unwilling to admit it to others for obvious reasons – that for him to have a sexual relationship with a child is a good thing, and that, all evidence to the contrary, he is actually helping and even loving the child.

In their classic incestuous family dynamic, Donna played a typical neglectful mother role. Because of her own childhood of neglect and trauma, Donna responded to their troubled family by withdrawing from all non-work relationships and retreating into a private world of reading books or sleeping. The angrier Alejo got over Donna's refusal to have sex with him, the more she retreated, resulting in Wendi being Alejo's intimate partner. In Donna's words, "It was easier for me to let Wendi spend so much time with

Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room to read."

Donna also ignored the sexually inappropriate clothes Alejo bought for Wendi. "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about. ... I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." In typical incestuous family fashion, Donna's relationship with Wendi and Alejo went from "I can't handle her. I don't want her. YOU take her," when Wendi was under 10, to "I can't handle your constant sexualizing and anger. You take HER," and "I can't handle his constant sexualizing and anger. YOU take him." The incestuous relationship between Wendi and Alejo relieved Donna from having to parent Wendi or deal with Alejo. In a perverse way, it was exactly what she wanted.

### 5.    Traumatizing Relationship Patterns.

The neglect and abuse to which Wendi's parents and others subjected her is summarized above; here the focus is on key *relationship patterns* in which their neglect and abuse was embedded. These relationship patterns, involving the most important relationships and most emotionally significant events of her life, are those that shaped how Wendi experienced, thought about, and behaved in the significant relationships of her adulthood.

Wendi's mother neglected her by ignoring her and handing her off to others. Wendi's biological father Skip was usually neglectful (e.g., on the road or out drinking), and when he did focus on Wendi was often coercive and abusive (e.g., demands, threats, beatings, and perhaps sexual abuse). Wendi may have been sexually abused by Skip's father and brothers, by the director of an alcohol and drug treatment clinic where Donna

15

worked, and possibly by drug addicts and criminals who frequented the clinic as well as a traveling cult leader. If Wendi's maternal grandmother and some day care workers were positive influences, those relationships were not reliable or enduring.

These early life relationships established ingrained patterns for Wendi's future relationships – especially with significant people in her life, including her husband – which can be understood as three principal "lessons" she learned. First, do whatever the easily-angered people in her life want and avoid making them unhappy. Second, do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. Third, the only reliable ways to get attention and affection are to *take care of others and do what they want.* Repeatedly engaging in these relationship patterns was another traumatizing characteristic of Wendi's childhood, related to but distinct from the traumas described elsewhere in this report.

The most important and impactful relationship in Wendi's life was with her adoptive father Alejo. It began when she was four and half, and reinforced the relationship "lessons" she had already absorbed. Alejo was a near constant, imposing and intrusive presence in Wendi's life: her emotionally, physically and sexually abusive parent, her "youth pastor," and her primary playmate. For years Wendi repeatedly went through the cycle of Alejo getting angry, screaming and yelling, then requiring hours of "babying" or "touching on." She learned to prevent Alejo from getting angry by habitually and automatically anticipating and responding to his needs and wishes – which included providing him with sexual stimulation.

Section II of the appendix provides an explanation of the relationship patterns Wendi experienced at a young age. Sections IV, VI, VII, and VIII discuss the manner in

16

which these patterns "trained" Wendi and repeated themselves on other relationships, most notably with Alejo.

**B.    Wendi's Childhood of Neglect and Abuse Left Her a Severely Traumatized and Damaged Adult**

The analysis below is based on my experience and knowledge as a researcher and therapist who has for 20 years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

From birth until age 18, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

17

Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day. The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

**1.    Brain-based deficits in cognitive functioning.**

The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at 9)  On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (*Id.*) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural

regions include the prefrontal cortex, reticular activating system, cerebellum and

frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive

abilities. Her disabilities on tasks of attention and concentration, combined with

descriptions of her daily functioning, indicate impairment of these brain regions and

structures." (*Id.* at 10)

Dr. Young also found several impairments on test of learning and memory. For

example, on a test of verbal learning, "Her ability to learn new information was mild-

moderately impaired," and Wendi inaccurately believed that she remembered information

that had never been presented. (Tab 5, at 10)  On a test requiring Wendi to copy a

complex figure, recall it one minute later, recall it again 30 minutes later and then

distinguish between accurate and inaccurate portions, Wendi's 30-minute delayed recall

and her ability to distinguish accurate and inaccurate portions 30 minutes later were

moderately to severely impaired. (*Id.*) Based on these and other findings, Dr. Young

concluded that Wendi has impairment within "all of [the] brain structures and pathways"

involved in memory and learning. (*Id.* at 11)

Finally, a third area of significant brain-based impairment Dr. Young's testing

revealed was "executive functioning." As Dr. Young explains, "Executive functioning is

an umbrella construct that describes processes responsible for guiding, directing, and

managing thinking and emotional regulation. Mature executive functioning provides for

purposeful, considered, goal directed actions. Executive functioning also is the ability to

problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize,

and control thinking and actions." (Tab 5, at 11) Executive functions depend on the

prefrontal cortex and its interactions with various other brain regions, and "adequate

mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (*Id.* at 11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired." (*Id.* at 12) In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (*Id.*) Inhibition is ability "to stop responding to the immediate physical environment... in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (*Id.* at 13.)

In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with*

*caregivers,* and are particularly vulnerable to damage by neglectful and abusive relationships.

### 2.   Psychiatric disorders and symptoms.

As assessed and reported by Dr. Woods, Wendi Andriano suffers from several psychiatric disorders. Specifically, Wendi meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

REDACTED

. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of

having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape. The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main

strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age 18, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and

23

immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her husband's life, contributed to her actions and role in Joe's death. Those pathological relationship patterns are addressed below.

### 3.    Deficits in emotional functioning.

Psychiatric diagnoses and symptoms cannot capture the complexity of unique human beings, or the myriad potential effects of chronic and severe childhood neglect and abuse. For example, while the diagnosis of complex PTSD includes problems with emotion regulation, Wendi's problems with emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has major, long-standing deficits in the following areas: emotional awareness, including awareness of the bodily correlates of emotions; when she is aware of unwanted emotions, tolerating them without becoming immediately overwhelmed; modulating the intensity of her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions into words and sharing them with other people in order to calm herself and connect with others, understand the situations and interactions that give rise to emotions, and come up with constructive solutions. Importantly, emotion regulation problems are based in the dysfunction of multiple interwoven brain circuitries – including the circuitries that underlie Wendi's memory and executive functioning deficits and her bipolar and dissociative symptoms. All of those circuitries are known to be damaged by childhood neglect and abuse, especially when the neglect and abuse are severe and chronic and perpetrated by parents.

### 4.    Trauma-based ways of relating to others.

The neglect and abuse to which Wendi's parents and many other adults subjected her, and some key relationship patterns in which their neglect and abuse was embedded, are summarized above. As a result of those traumatic childhood relationships, Wendi habitually relates to others in specific ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want.* As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid

them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

Date: _____     _____

James Hopper, Ph.D.

27