# Exhibit 5

**MYLA H. YOUNG, Ph.D., ABN**
**Diplomate – American Board of Professional Neuropsychology**
**PSY 11916**

July 11, 2011

CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING

In response to your request, following is a report of neuropsychological and psychological testing for Wendi Andriano. Information includes a description of neuropsychological and psychological tests administered, information about those tests, neuroanatomical descriptions of brain functioning and results of her neuropsychological testing.

Name: Wendi Elizabeth Andriano
Date of Birth: 08/24/70
Dates of Evaluation: 12/06/10; 12/07/10; 2/15/11; and 2/16/11
Education: 14 estimated
Ethnicity: White
Handedness: R
Date of Report: 04/21/11

Wendi Andriano was seen for neuropsychological evaluation on 12/06; 12/07; 12/08/2010 and on 2/15 and 2/16/ 2011 for a total of 25 hours of evaluation. The evaluation was completed in a private contact room at Arizona State Prison, Perryville, Arizona. She was not restrained, there were no interruptions, the room was reasonably quiet, she was provided lunch and frequent breaks with food, and she was not directly viewed by any other individuals, including custody staff. Limitations to her confidentiality were explained, understood and agreed upon. Third party observers were not present.

Information Relied Upon:

Transcripts of testimony by Wendi Andriano – 2004
Consultations with legal and medical professionals associated with her legal defense

Review of records associated with her developmental, educational, work, social, medical, psychiatric, criminal, prison and jail records.

1

Procedures Completed:

The following neuropsychological tests were administered to Wendi Andriano:

Effort on Neuropsychological Testing
    15 Item Test
    Test of Malingering Memory (TOMM)
    Green Word Memory Test
    Structured Inventory of Malingered Symptomatology (SIMS)
    California Verbal Learning Test Forced Choice (CVLT-II)
    Rorschach Bolder Validity Index

Intellectual Functioning
    Wechsler Adult Intelligence Scale-IV

Neuropsychological Functioning
    Sensory and Motor Coordination
        Smell Identification Test (SIT)
        Klove-Reitan Sensory Perception Examination
        Grooved Pegboard
        Finger Tapping Test

    Attention and Concentration
        Conners' Continuous Performance Test (CPT)
        Paced Auditory Serial Attention Test (PASAT)
        Visual Search and Attention Test (VSAT)
        Conners' Adult ADHD Rating Scales (CAARS-Self Report)
        Seashore Rhythm Test
        Sensory Perception Test

    Memory and Learning
        California Verbal Learning Test (CVLT II)
            Trial Learning
            Interference Learning
            Short Delay-Free
            Short Delay-Cued
            Long Delay-Free
            Long Delay-Cued
            Recognition
            Forced Choice

        Wechsler Memory Scale (WMS-IV)
            Auditory Memory Subtests
            Visual Memory Subtests
            Working Memory Subtests
            Immediate Memory
            Delayed Memory

Rey Complex Figure Test (REY)
    Immediate Recall
    Delayed Recall
    Recognition

Tactual Performance Test
    Memory Trial
    Location Trial

Secondary Language
    Wechsler Individual Achievement Test (WIAT II)
        Word Recognition
        Reading Comprehension
        Pseudoword Decoding
        Numerical Operations
        Math Reasoning

Visual Perception
    Rey Complex Figure Test Copy Trial
    WAIS-IV Perceptual Organization Scales
    WAIS-IV Processing Speed Scales

Executive Functioning
    Executive Functioning Test
        Trail Making Tests
        Verbal Fluency Tests
        Design Fluency Tests
        Color-Word Interference Tests
        Sorting Tests
        Twenty Questions
        Tower Test
        Motor Speed

Wisconsin Card Sorting Test
Category Test
Iowa Gambling Test (IGI)
Comprehensive Affect Testing System (CATS)

Behavior Rating Scale – Self Report (BRIEF-A)

Halstead-Reitan Neuropsychological Battery
    Reitan-Klove Sensory-Perceptual Examination
    Finger Tapping Test (FTT)
    Tactile Form Recognition
    Trail Making A and B
    Tactual Performance Test (TPT)
    Seashore Rhythm Test
    Speech Sounds Perception Test

Category Test

Emotional Testing:
     Rorschach Test
     Dissociative Experience Scale (DES)
     Multi-score Depression Inventory (MDI)
     Detailed Assessment of Posttraumatic Stress (DAPS)

Interview – Wendi Andriano:

Accommodations for testing were private, in an environmentally comfortable place, uninterrupted, and not directly observed by other viewers. She was advised, understood, and signed consent to complete this evaluation. Interviews with Wendi Andriano were limited to only that information that was needed to understand her brain and psychiatric functioning. She was not asked to provide information about her early developmental history and possibility of childhood victimization. I am aware that Wendi Andriano has had unusual childhood experiences which included being raised in a Fundamental Christian ministry/church and having minimal interaction with the general community. Most of her education was provided by a school program within the ministry church. The group moved and relocated frequently. She was at times homeless.

Interviews with Wendi were conducted on December 6, 7, and 8 2010 and on 2/15/11 and 2/16, 2011. Although she reported previously being prescribed antidepressants (Seroquel;Zoloft;Elavil) as well as Ativan, she had not been taking any psychotropic medications at this time. She indicated that she had not used alcohol and/drug in close proximity to testing.

She reported that she did not have a prior major medical disability and did not have any medical problem at the time of evaluation. She indicated that she was not currently receiving psychiatric treatment. She reported that she had received some counseling in 1996 and had previously received therapy while in jail.

She reported that she had never used or abused drugs or smoked tobacco. She reported a history of limited adult alcohol use. Her first drink of alcohol was when she was 18 years old. She reported that since 2000 she had used alcohol with friends, with alcohol use characterized as drinking wine coolers. She used alcohol most when was 21 years old, using alcohol at least once a week and overusing alcohol on some limited occasions. She indicated that she was not smoking tobacco at the time of the evaluation and had never smoked.

When she was 13 years old she was involved in a moving vehicle accident (MVA). Documented information describing this MVA was not currently available. She, however, reported repeated head injuries throughout her childhood ("I have a lot of traumas in my life. As a kid life was hard, real hard."). She described also having repeated head injuries throughout her marriage. She was not sure whether or not she experienced loss of consciousness, but indicated that "would see stars" and be "blank." When her head was hit particularly hard, she would "just go to sleep".

Other than the conviction for which she was given the death penalty, to my knowledge she does not have prior criminal offenses. She reported that she had received three disciplinary reports

4

while in prison—two for "using make up" and one for having tobacco on her food tray. She reported that she did not put the tobacco on the food tray because she had never had tobacco while in prison. It is her belief that the tobacco was placed on her food tray by a cafeteria worker or another inmate.

Reports indicate that her childhood was unusual. She reportedly did not have contact with her biological father after she was 5 years old. She was adopted by Alejo Ochoa when she was 5-6 years old. His occupation is described as construction, but primarily as "ministry activities" where he is described as "fundamental Christian." Elements of early childhood abuse are not fully described. Although *details not known to me, it is reported that she was sexually* abused as a "very small child," before three years of age. As indicated, her early childhood was unusual, and would be considered abusive. Although family life as a Christian family is not considered "abusive," elements in her family life would be considered abusive. Her family was described as "fundamentally Christian." Her adoptive father is described as a "street minister" and part of a traveling ministry. They reported lived predominantly in a trailer, moving frequently. Her education was provided exclusively in a Christian school which apparently had somewhat limited typical educational experience, with biblical topics incorporated into educational subjects that were taught.

She was reportedly not allowed to dance or listen to "secular music." Her social activities were strictly limited. Her friends were permitted only to children of other Christian preachers, and her social interactions were permitted to be associated only with other individuals who were known to be Christian. Her first heterosexual date was when she was 18 years old, and that date was chaperoned by her parent(s).

Her discipline at home was described by her parents as atypical. She reportedly was "spanked with a wooden paddle," the severity of which is not known to me. Consequence of discipline was, however, described as being of such severity that she reportedly occasionally ran away from home with friends to avoid punishment. Another incidence is described as her father yelling at her, grabbing her by the shoulders and shaking her and telling her to "get out of sight." No further information about disciplinary procedures is known to me.

Wendi Andriano was married to the victim in this offense, Joe Andriano, in 1994. Her father reportedly disapproved of her relationship with him and at one point had refused to speak to her for at least one year because of the relationship. She and her husband initially lived with his parents. They have two children, Nicolas who was born in 1997 and Ashley who was born in 1998. Their marriage is described as often troublesome, with descriptions of frequent arguments, threats of harm to her, being hit on several occasions, and incidences of retreating to the bathroom and locking the door. On one occasion her husband is described as becoming so angered that he banged on the bathroom door until the door was broken and had to be replaced. She described being hit several times by him and on another occasion being squeezed "until it was hard to breathe."

In 1994 Joe Andriano was diagnosed with a "lump" in his neck which was surgically removed and diagnosed as benign. In 1995 and again in 1997 a lesion was again diagnosed, surgically removed and described as benign. In 1998, when a lesion again appeared and was again surgically removed, the lesion was identified as positive for cancer. He received extensive surgery, followed by radiation and chemotherapy and he sought what is described as "holistic"

5

treatment . While hospitalized he is described as uncooperative and aggressive with nursing staff, with at least one incidence of throwing a medical chart at nursing staff. Following hospitalization he is described as experiencing severe nausea, hair loss, anger and depression. In testimony, Wendi Andriano indicated that "he blamed me for God not healing him."

In 2000 he reportedly talked about suicide, sought cyanide but purchased sodium azide rather than cyanide. She testified that he believed that this method of suicide would be quick and painless. These actions were either quick or painless but resulted in more severe symptoms which left him "sick and scared." She testified that they then participated in "assisted suicide."

## Brain Functioning and Neuropsychological Assessment

Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is currently supported and relied upon by contemporary neuroscientists in understanding brain function (Bear, Connors & Paradiso, 2001).

Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to main ain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and prefrontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a specific and predictable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and prefrontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

Neuroscientists have known for many years that the prefrontal cortex and networks of connections to and from the prefrontal cortex are the last brain region to mature, undergoing

6

profound brain growth and change through adolescence and into young adulthood. It has been well established that the region of the brain that is undergoing the greatest maturation, is also the brain region that is most vulnerable to damage. Development and maturation of the prefrontal cortex is most vulnerable to damage during adolescence. As the prefrontal cortex develops and matures, the individual's abilities for executive functioning also mature. Prenatal neurodevelopmental abnormality and brain insult(s) as a child interfere with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

Neuroscientists *are also now aware of the consequences to brain development of childhood* abuse and/or neglect. It is believed that when a child experiences persistent abuse or lives in a highly anxiety producing environment the brain noradrenic system is over stimulated leaving the child in a state of increased norepinehrine and dopamine production resulting in damage particularly to the prefrontal, temporal, hippocampus, amygdala, cerebellum and neuropathways throughout the brain results. If that abuse continues from childhood into adulthood, the brain damage continues with consequence of attention deficit, executive functioning deficiency, memory impairment, emotional dysfunction and psychiatric disorder, particularly depression and acute anxiety disorders (Teicher, 2002; Van der Kolk, 2003).

Neuroscientists are also aware of the consequences of brain damage associated with persistent fear or anxiety that is initiated during childhood and continues in adulthood but continues into adulthood. Prefrontal, temporal cortex, limbic system, hippocampus, amygdala, cerebellum, and neuropathways among these brain regions as previously described continue. Additionally, diminished right-left hemisphere integration in exchange between the right and left brain hemispheres across the corpus callosum and structured damage to the cerebellum, particularly the cerebellar vermis, and integration of information from the cerebellum to other brain region intensify. Abnormality of neurotransmitters, particularly norepinephrine and dopamine, as well as electrical activity particularly from the cerebellar vermis though pathways through the cortex continue and are demonstrated *in individuals who experience one of several psychiatric* disorders, including depression disorders and acute anxiety disorders.

As a result, degeneration and smaller brain structural size, neuropathway immaturity, abnormal neurotransmitter production, abnormal neural activity particularly electrical stimulation of neuron movement, and impaired postsynaptic receptors have been found in several psychiatric disorders, and particularly in depression and overwhelming anxiety disorders. Prefrontal, temporal, hippocampus, amygdala, cerebellum, neuropathway and abnormal communication of information across the corpus callosum have been shown.

Results of Neuropsychological Evaluation:

Wendi Andriano's performance on neuropsychological testing is summarized in the following sections of this report. A detailed description of her abilities on neuropsychological testing is described in greater detail in an addendum to this report.

   *Attitude Towards and Effort on Testing:* Wendi's attitude towards and effort on neuropsychological testing was evaluated using tests specifically developed to assess her effort on testing and possible attempt to manipulate her testing ability, or to malinger. These tests included 15 Item Test, *Test of Malingering (TOMM), California Verbal Learning Test (CVLT*

II) Forced Choice, Green Word Memory Test, Bolder Index of the Rorschach Test, and Structured Inventory of Malingered Symptoms (SIMS). Wendi Andriano's responses to all these tests of effort and potential manipulation indicate that she was cooperating with testing, was putting forth an appropriate level of effort on testing, and was not attempting to "fake" or "malinger" her test performance.

Wendi's attitude towards and effort on neuropsychological testing was also consistently evaluated through my observations of her abilities throughout the testing, through patterns of her abilities on individual neuropsychological tests. This is achieved through assessment of the consistency both within and across her neuropsychological testing, and through evaluation of patterns of abilities on neuropsychological tests that are known to be associated with specific neurological disorders. All indications are that Wendi Andriano was cooperating with testing, was putting forth substantial effort to complete all neuropsychological tests, and was not attempting to malinger or to manipulate the testing results. Wendi's abilities as described in this evaluation are considered a valid assessment of her functioning.

   *Intellectual Functioning:* Wendi Andriano's general mental ability was evaluated using the Wechsler Adult Intelligence Scale (WAIS-IV). Her abilities on the WAIS-IV place her general mental ability in the Average Range of intellectual functioning (Full Scale =104, 61st %ile; 95% Confidence = 100 - 108). Her verbal abilities that require reasoning, comprehension and conceptualization using verbal information are in the High Average range (VCI =110, 75th %ile Confidence =104 – 115). Her nonverbal reasoning and visual-perceptual organization were in the High Average range *(PRI = 115, 84th %ile Confidence = 108 – 120).* Her simultaneous and sequential processing of information, attention and concentration was substantially lower but within the Average range (WMI = 102, 55th %ile Confidence = 95 - 109 ). Her speed of mental processing and visual-perceptual skills were, however, significantly lower and in the Borderline Range (PSI = 76, 5th %ile  Confidence = 70 – 87).

   *Sensory Perception:* Wendi's sensory perception was evaluated using the Smell Identification Test (SIT) and bilateral primary and secondary sensory perception. On the SIT she had four errors (26th %ile) indicating Normosia to Mild Microsmia.  Although she did not experience impairment on primary tactile, auditory or visual perception, her secondary sensory perception was significantly impaired with impairment in the moderate range. This pattern of impairment implicates reasonable normality of the primary sensory perception strip, but significant impairment when more complex information has to be integrated among the sensory strip and other brain regions. Prefrontal cortex, orbitofrontal pathway and frontal-subcortical pathway impairments are primarily indicated.

   *Motor Coordination:* Wendi's motor coordination was evaluated using the Grooved Pegboard Test and Finger Tapping Test. On the Grooved Pegboard Test she had mild dominant (right) impairment and mild-moderate non-dominant (left) impairment (Grooved Pegboard Right = 56, SS -1; Left = 84 -1.5; Finger Tapping Right =36.7, SS -2; Left 33, SS-2).

      Sustained fine motor ability is primarily mediated by the posterior motor region of the prefrontal cortex, in coordination with other brain regions. Her abilities on these tests of motor coordination indicate overall impairment within the motor strip, prefrontal cortex, orbitofrontal pathway, frontal-subcortical pathways, and corpus callosum.

8

*Attention and Concentration:* Wendi's attention and concentration was evaluated using the Conners' Continuous Performance Test (CPT), Paced Auditory Serial Attention Test (PASAT), Visual Perception Test (VSPT), Seashore Rhythm Test and Sensory Perception Test. With the exception of the quick and simple VSPT and simple Sensory Perception Test, her abilities on all other measures of attention and concentration were significantly impaired.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated.

Her ability on the VSPT and Sensory Perception Test was within the average range (VSP = 95th %ile; Sensory Perception Test = Average Range). Her abilities on the more complex CPT and PSAT, however, were significantly impaired.

On the CPT her performance demonstrated significantly impaired attention and concentration with an equal chance that her attention and concentration is like that of individuals who experience Attention Deficit Hyperactivity Disorder and attention disorder associated with other Neurological Disorder(s). Her reaction times were slowed and inconsistent. Her ability to change her response time as the time of the target stimuli changed was significantly impaired. When the target stimuli slowed, her abilities were most impaired. She also was impaired in her ability to sustain her attention to the test, with her abilities becoming more impaired the longer the test progressed. Poor performance indicates potential attention problems with several significantly elevated and impaired attention measures. Co-existing, poor performance indicates *potential neurological deficit(s) other than attention problems, with several neurological* measures also significantly elevated and like those of individuals who experience a neurological disorder.

The PASAT requires the individual to listen to numbers paired together and remember the last number heard, adding the number last heard to the number previously heard. There are four separate trials. The numbers do not change, but each successive trial presents the information more rapidly. Of all tests of attention, her abilities on the PASAT were the most impaired, with classification of ability persistently in the inferior range. Her impairment ranged from mild to severe. Observing her attempt to complete this test was uncomfortable to observe. She was obviously expending extraordinary effort to be successful on the test. She simply was not able to accomplish the task. She was unable to successfully remember and manipulate simple numbers from the time the test was initiated and until the test was completed. Her abilities throughout this test were severely *impaired, but became more impaired as the test progressed.*

Both the CPT and PASAT are complex tests of attention and the VSAT is a simple test of attention requiring less than one minute to complete. As the tests of attention became more complex, her abilities became more impaired.

In addition to completing tests which were directly administered, she independently responded to the Connors' CAARS. This is a self-report test in which the individual is asked to respond to thirty questions describing behaviors or problems that are experienced by adults. Their responses are then compared to the responses of individuals who have known attention deficit disorders and those who do not experience attention deficits. Each question is ranked on a scale of 0 to 3, with 0 = Not at All and 3 = Very Much, Very Frequently. Wendi's responses to this

self-report measure were significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Attention is process that allows awareness of a part or aspect of the environment and allows selective responsiveness to one class of stimuli while simultaneously being able to filter out or ignore information which is not essential or simply confusing to understanding a situation or environment. Attention is not a single ability, but rather includes multiple aspects including arousal, perception, divided attention, selective attention, sustaining attention and shifting attention. The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning indicate impairment of these brain regions and structures.

*Memory and Learning:* Wendi's memory and learning of verbal and visual information were evaluated using the California Verbal Learning Test (CVLT-II), Rey Complex Figure Test (Rey), Wechsler Memory Scale IV (WMS-IV), Tactual Performance Test Memory and Location trials. Her abilities on the WMS-IV and Rey memory trials were in the average range.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated. Her abilities on the WMS-IV and on the Rey immediate memory were in the average range. Her abilities on all other measures of memory and learning were, however, mild – moderately impaired.

The CVLT-II requires the individual to learn verbal information that is repeated several times, recall that same information both immediately and again after a 30 minute delay, and recognize information when a choice of information is provided. The CVLT-II also has one subtest that was developed specifically to identify individuals who are attempting to manipulate their testing abilities or are not providing sufficient effort to complete neuropsychological testing to the best of their ability. This CVLT-II subtest has been demonstrated to identify with 96% the accuracy those individuals who were not putting forth appropriate effort and/or were attempting to manipulate their abilities (Millis, Putnam, Adams & Ricker, 1995).

On CVLT-II, her ability to learn information after the information had be repeated five items was significantly impaired. Her ability to learn information the first time the information was heard was mild-moderately impaired (Trial 1 = SS-1.5). Her ability to learn new information was mild-moderately impaired. She had a significant error, remembering information that had never been presented (Intrusion = SS -1). There were a significant number of instances when she remembered information that had never been presented (Intrusion Errors = SS -1). On the Wechsler Memory Scale IV (WMS-IV) her abilities were within the average range.

The Rey Complex Figure Test requires the individual to copy a complex figure; recall the figure they had just copied after a one minute delay; recall the figure again after a 30 minute delay; and distinguish between accurate and inaccurate portions of the figure after a 30 minute delay. Her ability to recall the information immediately was in the average range (Immediate Recall = T = 50, 50th %ile ) . Her ability on all other measures was moderately – severely impaired (Total Recognition T = 33, 4th %ile; Recognition True Positive 2-5[th] %ile; Recognition False Negative 2-5[th] %ile). It is noteworthy that memory errors occurred even after requiring significantly

longer to copy the figure, which should have enhanced the probability of recalling the information  (Copy = 7 minutes 3 seconds <1st%ile).

Memory and learning are primarily mediated by the brain's neocortex (thalamo-limbic system, hippocampus, amygdala, basal ganglia), the brain's mesocortex (temporal and prefrontal cortices), and all brain connecting systems (frontal-subcortical, hippocampal, orbitofrontal) connections to and from these brain structures. Memory and learning are also strongly impacted by the brain's ability to transfer information across the corpus callosum to and from the right and left brain hemispheres as well as transfer of information from the cerebellum vertex to the prefrontal cortex. *Her disabilities across these tasks of memory and learning indicate impairment within all of these brain structures and pathways).*

*Language*: Wend's secondary language was evaluated using the Wechsler Individual Achievement Test (WIAT II) Word Reading, Reading Comprehension, Pseudoword Decoding, Numerical Operations and Math Reasoning subtests.  Although her Pseudoword Decoding and Math Reasoning abilities were in the mild range of impairment, her abilities on other WIAT-II subtests were in the average range.   For her, primary parietal and occipital brain structures are strengths for her and within the average range.  Connecting region between these structures, particularly the angular gyrus region is significantly impaired.

*Visual-Perceptual*: Wendi's visual perception was primarily evaluated using the copy trial of the Rey Complex Figure Test (Rey) and the WAIS-IV Perceptual Organization and Processing Speed Indices.  The Rey is a test evaluating the individual's ability to copy a complex design while the figure can be seen.  The WAIS-IV Perceptual Organization Index is a measure of the ability to analyze and synthesize abstract visual stimuli and the WIAS-IV Processing Speed Index is a measure of sort-term visual memory, cognitive flexibility, visual discrimination, psychomotor speed, speed of mental operation, attention and concentration.

The Rey Complex Figure Copy trial *requires the individual to copy a figure while* viewing the stimulus.  Her ability to copy this figure was within the average range.  It is noteworthy, however, that it required significantly more time for her to complete this task. Whereas most individuals required less than five minutes to copy the figure, she required 7 minutes 20 seconds (<1st %ile) to complete this task.  As previously demonstrated on the WIAT II her visual-perception is brain strength.  When required to coordinate information from these brain structures to the prefrontal cortex, *however, her ability is severely impaired.*

*Executive Functioning*: Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions.

Executive functioning is mediated by the brain prefrontal cortex, but also requires interconnection among the prefrontal cortex and other cortical and subcortical regions of the brain, comprising a prefrontal *system*.  As previously described, the developmental course of executive functioning is sequential and prolonged, beginning as a child, continuing through adulthood, and with the greatest maturation occurring during adolescence (12 – 18 years of age). Adequate and mature prefrontal cortex development is required for just about every aspect of

adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions.

The prefrontal cortex is the largest brain structure in the human brain, comprising 20-25% of total brain tissue. The prefrontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these pre-frontal cortex regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration of motor coordination and sensory perception. The mesial region primarily regulates emotion, *motivation, drive, and the ability to monitor actions*. *The dorsolateral region* primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize memory, and—in combination with the mesial region—the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional liability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a primary interactive role with the limbic system, assessing and altering emotion.

Wendi Andriano's executive functioning was evaluated using subtests of the Executive Functioning Test (EFT), Wisconsin Card Sorting Test (WCST), Comprehensive Affect Testing System (CATS) and Iowa Gambling Test (IGT). The Executive Functioning Test is a series of tests which systematically evaluate functioning of each region of the prefrontal cortex as well as connecting systems to and from the prefrontal cortex and all other brain regions. The Wisconsin Card Sorting Test is one of the oldest tests of prefrontal cortex functioning, and requires the individual to develop a rule, consistently apply that rule, and respond to information provided by the test by flexibly changing their thinking and actions as signaled by the test. The Comprehensive Affect Testing System (CATS) is one of the newest tests of executive functioning (2003), and systematically evaluates the prefrontal cortex, temporal cortex (including extended limbic system), and connection between these brain regions. The Iowa Gambling Test (IGT) evaluates the individual's *ability to think ahead, plan, organize, and weight the* consequences making decisions.

Although she he was successfully able to complete some EFT subtests, her abilities were predominantly impaired. On the 25 EFT Primary Measures, her abilities were significantly impaired on 72% of EFT measures. On WCST, her abilities were significantly impaired on 88% of the measures. Her abilities on all CAT Subtests (Affect Recognition; Prosody Recognition; Emotional Recognition) were significantly impaired. On the IGT her ability to think about the task was within the average range. Any IGT measures which required decision making, however, were significantly impaired (Deck A Decision Making = 2-5th %ile; Deck D Decision Making – 11 – 16th %ile).

Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired, within these tests, those executive functioning tests which required rapid processing of information, flexible thinking, decision making, and/or inhibition were the most severely impaired. The ability to rapidly process information allows the individual to face a new or different situation, take in information that is relevant to that situation while ignoring information which is not relevant to that situation, and put that thinking into actions. Flexible thinking is a "hallmark" of executive functioning and is the ability to abandon a previous response to generate a new response when demands of the situation require a change. It is also the ability to move freely from one situation to another, one aspect of a problem to another, make transitions to new

12

thinking and actions, and consequently to effectively solve problems.  Inhibition is the inability to stop responding to the immediate physical environment (what is happening at this moment and not beyond) in order to think, consider and plan alternate ways of solving a problem and responding accordingly to that situation.  Inhibition also is the inability to disengage involvement in the immediate in order to organize, plan, problem solve and act in ways that are appropriate to the situation.  Executive functioning is mediated by the prefrontal cortex.  These particular executive functioning abilities are predominantly mediated by dorsolateral and orbitofrontal prefrontal cortex regions, as well as pathways among the prefrontal cortex and all other brain structures, particularly the hippocampus, temporal, limbic amygdala, and cerebellum.

Wendi had a range of abilities across measures of executive functioning, indicating a pattern of brain normalcy and abnormality.  Her abilities across measures of executive range ranged from within average range to severely impaired, depending on which brain region within the prefrontal cortex was required to complete the specific test.  In the interest of some brevity, Wendi's abilities on all of these measures of executive functioning are described in detail in the addendum to this report.  If further information is needed, please advise me.

Psychological Functioning:
Wendi Andriano's emotional functioning was evaluated using the Rorschach Test, Dissociative Experience Scale (DES), Multi-score Depression Inventory (MDI) and Detailed Assessment of Posttraumatic Stress (DAPS).  Her responses to each of these tests indicate that she was not attempting to exaggerate her feelings and was providing a valid description of her emotional experience.

On the Rorschach Test her responses are like those of individuals who have experienced mild depression for much of their lives.  Her Rorschach responses suggest that she is pervasively introverted.  She would expend much effort looking inside her own feelings and attempting to understand them without the help of others.  Unfortunately for Wendi, when she looks inside herself she experiences much pain and negative feelings about herself.  Her responses are like those of individuals who have limited emotional resources, are extremely emotionally vulnerable and consequently are emotionally dependent.  Her responses are like those of individuals who have experienced themselves as "damaged," and take a passive role in their interactions with others.  They are individuals who attempt to avoid emotion because they have some awareness of their emotional vulnerability.  Overall, her responses are like those of individuals who have been diagnosed with Dysthymia or Mood Disorder.  The possibility of Bipolar Disorder would not be ruled out.

On the Dissociative Association Scale (DAS) Wendi acknowledged several experiences consistent with the experience of dissociation.  Of particular note, she acknowledged some out of ordinary experiences of listening to someone talk and suddenly realizing that she did not hear part or all of what was said; of someone approaching her that she does not know and the individual calls her by name or insists that they have met previously.  She acknowledged having no memory of some important event in her life (for example a wedding or graduation).  Of particular concern she indicated that she had experienced times when she was not sure whether things that she remembered had really happened or whether she just dreamed them; that sometimes when she is alone she talks out loud to herself; and that she had experienced hearing voices inside her head that tell her to do things or comment on things that she is doing.

13

On the Multiscore Depression Inventory (MDI) Wendi acknowledged extreme fatigue, overwhelming feelings of pessimism and hopelessness, extreme feelings of guilt and that she experiences overwhelming feelings of sadness. Overall, her responses to the MDI would satisfy the diagnosis of a Mood Disorder.

On the Detailed Assessment of Posttraumatic Stress (DAPS) she described her life as having experienced multiple situations of fearfulness and overwhelming anxiety dating back to childhood and continuing into adulthood. She described herself as frequently bothered by intrusive recollections of her experiences, as having upsetting memories, dreams and flashbacks of the experiences, and as regularly being bothered by intrusive recollections of these experiences of fear. She indicates that she has a tendency to withdraw or "shut down", particularly when her experience is of recalling her fear. Overall, her responses to the DAPS would satisfy the diagnosis of PTSD or of Acute Anxiety Disorder.

Summary
Wendi Andriano's abilities across neuropsychological tests are like those of individuals who experience serious neurological and psychiatric disorders. From a neuropsychological perspective, early childhood mistreatment and early childhood fear and anxiety are likely brain impairment consequences of Cognitive Disorder. From a psychiatric perspective these same factors of serious early childhood mistreatment, fear and anxiety, as well as continuing experiences of fear and anxiety into adulthood are likely psychiatric consequences of Depression Disorder and/or Anxiety Disorder.

Disabilities in thinking, reasoning, planning, making decisions, anticipating consequences of plans and actions, maintaining impulse control, attending and concentrating, remembering important information, recognizing emotional problem, seeking help for emotional problems, and consistently communicating information in accurate and meaningful ways would need to be considered.

*[signature]*

Myla H. Young, Ph.D., ABN


Clinical Neuropsychology
Office:
1475 North Broadway, Suite 335
Walnut Creek, CA 94596
(925) 952-4350

Mailing:
1630 North Main Street #357
Walnut Creek, CA 94596

**MYLA H. YOUNG, Ph.D., ABN**
Diplomate – American Board of Professional Neuropsychology
PSY 11916

CONFIDENTIAL NEUROPSYCHOLOGICAL EVALAUTION

TEST SCORES

Name:   Wendi Elizabeth Andriano
Date of Birth:   08/26/70
Date of Evaluation:   12/06/10; 12/07/10; 12/08/10;  02/15/11; 02/16/11
Age at Time of Evaluation:  40 years
Education:   14 years estimated
Handedness:   Right
Date of Report:   07/11/11

**Attitude towards Evaluation**

| Test | Score | Qualitative Description |
|------|-------|------------------------|
| 15 Item Test | 15/15 | Valid Protocol |
| Test of Malingering Memory | 49/50 | Valid Protocol |
| CVLT II Forced Choice | 100% | Valid Protocol |
| Green Word Memory Test | 98/98/98/100 | Valid Protocol |
| Bolder Index | 0 | Valid Protocol |
| Structured Inventory of Malingered Symptoms | 5 | Valid Protocol |

**Wechsler Adult Scale of Intelligence (WAIS IV)**

| Scale | Sum of Scaled Scores | Index Score | 95% Confidence | %ile | Qualitative Description |
|-------|----------------------|-------------|----------------|------|------------------------|
| Verbal Comprehension | 36 | 110 | 104-115 | 75 | High Average |
| Perceptual Reasoning | 38 | 115 | 108-120 | 84 | High Average |
| Working Memory | 21 | 102 | 95-109 | 55 | Average |
| Processing Speed | 11 | 76 | 70-87 | 5 | Borderline |
| Full Scale | 106 | 104 | 100-108 | 61 | Average |

| Verbal Comprehension | Raw Score | Scaled Score | %ile |
|----------------------|-----------|--------------|------|
| Similarities | 32 | 14 | 91 |
| Vocabulary | 39 | 10 | 50 |
| Information | 18 | 12 | 75 |
| Comprehension | 34 | 17 | 99 |
| (Con't) | | | |

1

| WAIS IV (Con't) | | | |
| --- | --- | --- | --- |
| Perceptual Reasoning | Raw Score | Scaled Score | %ile |
| Block Design | 62 | 16 | 98 |
| Matrix Reasoning | 18 | 10 | 50 |
| Visual Puzzles | 18 | 12 | 75 |
| Figure Weights | 18 | 12 | 75 |
| Picture Completion | 10 | 7 | 16 |
| Working Memory | Raw Score | Scaled Score | %ile |
| Digit Span | 31 | 11 | 63 |
| Arithmetic | 15 | 10 | 50 |
| Letter-Number Seq | 20 | 10 | 50 |
| Processing Speed | Raw Score | Scaled Score | %ile |
| Symbol Search | 20 | 5 | 5 |
| Coding | 49 | 6 | 9 |
| Cancellation | 26 | 6 | 9 |

**Wechsler Individual Achievement Test (WIAT-II)**

| Subtest | Standard Score | Composite Score | 95% Confid. Index | %ile |
| --- | --- | --- | --- | --- |
| Reading | | | | |
|    Word Reading | 115 | | 109-121 | 84 |
|    Comprehension | 128 | | 122-134 | 97 |
|    Pseudoword Decoding | 109 | | 104-114 | 73 |
|    Composite | 352 | 130 | 126-134 | 98 |
| Mathematics | | | | |
|    Numerical Reasoning | 118 | | 110-126 | 88 |
|    Math Reasoning | 107 | | 100-114 | 68 |
|    Composite | 225 | 112 | 106-118 | 79 |
| | | | | |

**Smell Identification Test**

| Errors | %ile | Qualitative Description |
| --- | --- | --- |
| 4 | 26 | Normosia |

**Grooved Pegboard Test**

| Measure | Raw Score | Mean/SD – Comparison Group | Standard Score | Qualitative Description |
| --- | --- | --- | --- | --- |
| Dominant | 56 | X=63;SD=7.4 | -1 | Mild Impairment |
| Non-Dominant | 84 | X=70.8; SD=8.9 | -1.5 | Mild-Moderate Impairment |

2

**Finger Tapping Test**

|  | Mean Number Taps | Mean/SD-Comparison Group Mean | Standard Score | Qualitative Description |
|---|---|---|---|---|
| Dominant –R | 36.7 | 47.0/5.6 | -2 | Moderate Impairment |
| Non-Dominant | 33 | 43.5/5.2 | -2 | Moderate Impairment |

**Conners' Continuous Performance Test (CPT)**

**Inattention**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Below Average |
| Hit RT Std. Error | 59.05 | Mild Impairment |
| Variability | 59.35 | Mild Impairment |
| Detectability | 16.37 | Average |
| Hit RT ISI Change | 60.74 | Mild Impairment |
| Hit SE ISI Change | 77.24 | Severe Impairment |

**Impulsivity**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Omissions | 42.82 | Average |
| Commissions | 31.63 | Average |
| Hit RT | 62.60 | Average |
| Perseverations | 45.91 | Average |
| Commissions | *31.63* | Average |

**Vigilance**

| Measure | T Score | Qualitative Description |
|---|---|---|
| Hit RT Block Change | 35.50 | Average |
| Hit SE Block Change | 40.26 | Average |

**Paced Auditory Serial Addition Test (PASAT)**

| Pacing | Total Correct | SS | % | Classification |
|---|---|---|---|---|
| 2.4 | 28 | -2 | 46.6 | Inferior |
| 2.0 | 30 | -2 | 50.0 | Inferior |
| 1.6 | 7 | >-3 | >11.6 | Inferior |
| 1.2 | 2 | >-3 | .03 | Inferior |

3

**California Verbal Learning Test (CVLT-II)**

| Subtest | Raw Score | Standard Score | Qualitative Description |
|---|---|---|---|
| Trial 1 | 5 | -1.5 | Mild-Moderate Impairment |
| Trail 5 | 16 | 1 | Average |
| Trial B | 4 | -1.5 | Mild-Moderate Impairment |
| Short Delay-Free | 15.0 | 1 | Average |
| Short Delay-Cued | 15.0 | 1 | Average |
| Long Delay-Free | 15.0 | 1 | Average |
| Long Delay-Cued | 15.0 | .05 | Borderline |
| Recognition | 16.0 | 0 | Average |
| Intrusions | 0 | -1 | Mild Impairment |
| Forced Choice | | 100% | Valid Protocol |

**Wechsler Memory Scale (WMS-IV)**

| Index | Sum of SS | Index Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Auditory Memory | 51 | AMI 117 | 87 | High Average |
| Visual Memory | 42 | VMI 103 | 58 | Average |
| Visual Working Memory | 20 | VWMI 100 | 50 | Average |
| Immediate Memory | 42 | IMI 103 | 58 | Average |
| Delayed Memory | 51 | DMI 119 | 90 | High Average |

**Rey Complex Figure Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Copy | 35 | | >16 | Average |
| Immediate Recall | 21.5 | 50 | 50 | Average |
| Delayed Recall | 21 | 49 | 46 | Mild Impairment |
| Recognition | 18 | 33 | 4 | Moderate Impairment |
| Time to Copy | 7'3" | | <1 | Exceeds Normal Time |
| Recognition True Positive | 6 | | 2-5 | Moderate Impairment |
| Recognition False Positive | 0 | | >16 | Average |
| Recognition True Negative | 12 | | >16 | Average |
| Recognition False Negative | 6 | | 2-5 | Moderate Impairment |

**Executive Functioning Test (EFT)**

| Measure | Raw Score | Scaled Score | Qualitative Description |
|---|---|---|---|
| **Verbal Fluency Tests** | | | |
| Letter Fluency | 27 | 6 | Mild Impairment |
| Category Fluency | 39 | 10 | Average |
| Category Switching | 16 | 12 | Average |
| Category Switching Accuracy | 8 | 6 | Mild Impairment |
| (Con't) | | | |

| **Executive Functioning Test (Con't)**<br><br>Measure | Raw<br>Score | Scaled<br>Score | Qualitative Description |
|---|---|---|---|
| | | | |
| **Trail Making Tests** | | | |
| Visual Scanning | 25 | 9 | Average |
| Number Sequencing | 42 | 8 | Borderline Impairment |
| Letter Sequencing | 41 | 8 | Borderline Impairment |
| Number-Letter Switching | 86 | 9 | Average |
| | | | |
| **Design Fluency** | | | |
| Filled | 10 | 10 | Average |
| Empty | 12 | 11 | Average |
| Switching | 6 | 9 | Average |
| | | | |
| **Color-Word Interference** | | | |
| Color | 41 | 4 | Moderate Impairment |
| Word | 32 | 4 | Moderate Impairment |
| Inhibition | 70 | 7 | Mild Impairment |
| Inhibition-Switching | 74 | 8 | Borderline Impairment |
| | | | |
| **Sorting Test** | | | |
| Confirmed Sorts | 8 | 9 | Average |
| Description | 30 | 9 | Average |
| Recognition | 36 | 10 | Average |
| | | | |
| **Twenty Questions** | | | |
| Abstraction | 25 | 9 | Average |
| Questions Asked | 20 | 13 | Average |
| Achievement | 19 | 15 | Average |
| | | | |
| **Tower Test** | | | |
| Achievement | 18 | 11 | Average |
| Rule Violations | 1 | 44%ile | Average |

**Wisconsin Card Sorting Test**

| Measure | Raw Score | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| | | | | |
| Total Correct | 56 | | | |
| Total Errors | 8 | 53 | 61 | Average |
| Perseverative Responses | 4 | 49 | 45 | Average |
| Persevertive Errors | 4 | 49 | 47 | Average |
| Nonperseverative Errors | 4 | 51 | 53 | Average |
| Conceptual Level | 53 | 51 | 55 | Average |
| Categories Completed | 5 | | >16 | |
| Trials to Complete | 11 | | >16 | |
| Failure to Maintain Set | 0 | | | |
| Learning to Learn | 0.19 | | >16 | |

5

**Short Category Test**

| Test | Raw Error | T Score | %ile | Qualitative Description |
|---|---|---|---|---|
| Total Errors | 48 | 41 | 18 | Low Average |

**Iowa Gambling Test**

| Score | Raw Score | % | Classification |
|---|---|---|---|
| A' | 21 | 2-5 | Moderate Impairment |
| B' | 30 | >16 | Average |
| C' | 26 | >16 | Average |
| D' | 23 | 11-16 | Average |

Exhibit 6

1

2

3

4

5

6

7

8

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

9   State of Arizona,                              )
                                                  )
10                         Respondent,             )   No. CR2000-096032-A
                                                  )
11        vs.                                      )   **AFFIDAVIT OF**
                                                  )   **DANIEL PATTERSON**
12   Wendi Elizabeth Andriano,                     )
                                                  )
13                                                 )   (Assigned to the Hon. Douglas Rayes)
                                                  )
14                         Petitioner.             )
                                                  )
15   _____               )

16

17   STATE OF ARIZONA            )
                                )   SS.
18   COUNTY OF MARICOPA          )

19            DANIEL PATTERSON, being first duly sworn upon oath deposes and states:

20

21        1.      I represented Wendi Andriano during her trial for first-degree murder in connection

22   with the death of her husband, Joseph Andriano.  I have personal knowledge of the facts stated

23   herein.

24

25                                    **OVERVIEW**

26        2.      I commenced employment with the Public Defender's Office on July 23, 2001,

27   after leaving private practice.  Wendi's case was one of eight death penalty cases I assumed on

28

that date from former Deputy Public Defender Gerald Gavin, seven of which (including Wendi's) were pending trial and one of which was awaiting sentencing. Wendi's case was the second-newest of my caseload at that time (determined by date of the offense), and two of the cases were set to go to trial in early 2002.

3.      In addition, I was subsequently assigned a very high-profile case in September 2001 (*State v. Roque*) in which I defended a man accused of committing an ethnically motivated murder immediately following the September 11, 2001 terrorist attacks. The *Roque* case required substantial attention and went to trial in the fall of 2003, before Wendi's trial. As a result, my personal involvement in Wendi's representation was limited until early 2003, just before we had a trial date set in her case. When Wendi's trial was continued to accommodate the *Roque* trial, my involvement in her case was again limited throughout the remainder of 2003.

4.      Prior to my assignment, Ms. Andriano was successively represented by other attorneys in the Public Defender's Office, including Attorneys Bethanne Klopp-Bryant and Gerald Gavin, who represented her in 2000, and Attorney Wesley Peterson, who represented her in early 2001. As reflected in the docket in her case, there was some back-and-forth regarding whether she would be represented by private counsel (initially Attorney Leon Thikoll, then Attorney Thikoll and Attorney David DeLozier, and by March 2001 solely Attorney DeLozier) or the Public Defender's Office, and there was a dispute raised in court between the Public Defender's Office and Attorney DeLozier regarding payments of funds. Ms. Andriano was primarily represented by private counsel for several months between December 2000 and June 2001. By the time the case came to me, it was my understanding that the Public Defender's Office would take the lead role and Attorney DeLozier would serve as co-counsel pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974).

2

MADI_8575620.1

5.     Prior to Wendi's case, I had no experience working with counsel retained pursuant to *Knapp* in any felony case.  Wendi's case is the first and only capital case I have defended with *Knapp* counsel.

6.     From July 2001 until Wendi's sentence, I was the only attorney from the Public Defender's Office assigned to Wendi's case, and the only attorney from that office who worked on the case.  I did not request or receive substantive assistance on the case from any attorney other than Attorney DeLozier.

## RELATIONSHIP WITH CO-COUNSEL

7.     As noted above, I represented Wendi in conjunction with her *Knapp* counsel, Attorney David DeLozier.

8.     I first met with Attorney DeLozier at the Public Defender's Office on September 20, 2001, shortly after I was assigned the case.  From our conversation and outside knowledge, I recognized that Attorney DeLozier had no experience or training in death penalty cases, and that I could not rely upon him for substantial assistance on issues relating to capital jurisprudence.

9.     Attorney DeLozier and I did not have regularly-scheduled meetings to discuss Wendi's case.  My communications with Attorney DeLozier were initially infrequent, but became more common after the conclusion of the *Roque* trial discussed above.

10.     I was responsible for the majority of Wendi's case.  I believed that it was necessary for me to assume responsibility for the majority of the work on Wendi's case because I had the relevant death penalty experience.  I assigned specific tasks to Attorney DeLozier and did most of the pre-trial work on Wendi's case myself.

3

MADI_2575620.1

11.     Among the tasks assumed by Attorney DeLozier was the primary responsibility for meeting with Ms. Andriano to prepare for trial. I was aware that Attorney DeLozier met with her frequently while she was awaiting trial, but I did not discuss the content of those meetings with him.

12.     It was not until I suggested that Attorney DeLozier perform Wendi's direct examination at trial, approximately four months before trial began in August 2004, that Wendi informed me that she and Attorney DeLozier had not discussed the details of her case during their meetings. Rather, Attorney DeLozier and Wendi had mainly discussed faith and religion. In accordance with Wendi's wishes, I performed Wendi's examination at trial.

13.     Several weeks into Wendi's trial, I began to notice that Attorney DeLozier was becoming increasingly thin and weak. I learned from Wendi that Attorney DeLozier was fasting during the trial for spiritual purposes. He told me that he was not consuming any food during this time, although he did drink fruit juice.

14.     An attorney at Attorney DeLozier's law firm was murdered during Wendi's trial on Sunday, October 17, 2000. I contacted the Court and requested two days of recess in light of the effect of this tragedy on Attorney DeLozier. The court reconvened on Wednesday, October 20, and Attorney DeLozier conducted direct examination of a witness that day. During the middle of the prosecutor's cross-examination of that witness, I observed that Attorney DeLozier appeared to be in a daze and not focused on the proceedings; he was not following the questioning or the witness's testimony, and he did not respond to my inquiry at counsel table concerning his condition. I was forced to interrupt the Court to ask to adjourn the trial for the day.

4

MADI_2575620.1

## MY INVESTIGATION

15.     My personal involvement in the pre-trial investigation of Wendi's case consisted primarily of inspecting and assessing the State's evidence and interviewing the individuals on the State's witness list. This was time-consuming because the witness list, with supplements, listed roughly 100 individuals. The interviews were conducted in the presence of counsel from the County Attorney, usually at his office.

16.     I interviewed 10-20 individuals associated with law enforcement or the fire department on six days in May 2002, another dozen or so associated with law enforcement, Wendi's apartment complex, or Wendi's attempts to obtain life insurance on six days in October 2002, and another 25-35 witnesses on various dates from December 2003 through April 2004. I did not conduct any follow-up interviews with any of these witnesses prior to trial.

17.     Prior to trial, I did not personally investigate or conduct interviews of mitigation-related fact witnesses, except for Wendi and her immediate family. I relied on others—including the mitigation specialist assigned to the case, Scott Mac Leod—to locate and interview potential witnesses not identified by the State who could be relevant to Wendi's defense.

## MITIGATION INVESTIGATION AND THE *RING* DECISION

18.     I had defended several death penalty cases prior to Wendi's trial, but I had only tried one death penalty case (*Roque*) since the Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002).

19.     In my opinion, *Ring* made a dramatic difference in how death penalty cases are prepared and tried in Arizona. Before *Ring*, a judge was responsible for deciding whether a defendant found guilty of murder would be sentenced to death. Presenting a mitigation case

5

typically consisted of preparing a presentation about the positive aspects of the defendant's life and about life circumstances that helped to explain the defendant's actions. After *Ring*, the fact-finding necessary to the sentencing decision was made by a jury. Presenting a mitigation case to a jury under the post-*Ring* standards required a much more extensive investigation into the defendant's life history because a jury is less capable of considering proportionality, a factor that I routinely relied upon in making sentencing arguments to judges.

20.     Further, the amount of time between the guilt and sentencing phases was eliminated post-*Ring*. Prior to *Ring*, defense counsel often was allowed more than a year following a guilty verdict to investigate and prepare a mitigation case. It was my practice to wait until after a defendant received a guilty verdict before focusing on the mitigation case. Following *Ring*, the sentencing phase began shortly after the guilt phase, requiring that defense counsel begin to prepare the mitigation case much earlier. If I were to try Wendi's case today, with the experience I now have in death-penalty cases post-*Ring*, I would have been more active in the development of her mitigation case than I was.

21.     I assigned most of the research and preparation of the mitigation case to Scott Mac Leod, a mitigation specialist in our office who took over Wendi's case after a previous mitigation specialist, Patrick Linderman, left the office in early 2004. I gave limited direction to Mr. Linderman and Mr. Mac Leod as to developing themes and theories of mitigation. I do not recall giving Mr. Mac Leod any specific direction and largely left the development of the mitigation case to the discretion of Mr. Mac Leod and Attorney DeLozier, who had the primary relationship with Wendi and her family.

6

MADI_8575620.1

22.   I assigned Attorney DeLozier to take the lead in presenting the mitigation case. The theme of the mitigation case, as I understood it, was that Wendi was a good person, mother, and inmate, and an abused spouse, and therefore did not deserve the death penalty.

**LACK OF MENTAL HEALTH AND SOCIAL HISTORY INVESTIGATION**

23.   Attached as Exhibit A is a true and correct copy of a competency assessment made by Dr. Jack Potts in March 2001, which was available to me once I assumed the role of lead counsel in the case.

24.   Attached as Exhibit B is a true and correct copy of an email I sent to Patrick Linderman, a former employee of the Public Defender's Office, on December 20, 2001.

25.   Attached as Exhibit C is a true and correct copy of an a competency assessment performed by Dr. Richard Rosengard in August 2002, which was made available to me at that time. I understand that Dr. Rosengard's report was obtained in response to my email in Exhibit B.

26.   I was aware that Wendi had been independently meeting with Kandi Rohde, while Wendi was in pre-trial incarceration. Attached as Exhibit D is a true and correct copy of an email I received from Michelle Arvanitas, an investigator with the Public Defender's Office assigned to work on the Andriano matter, on February 14, 2002.

27.   Attached as Exhibit E is a true and correct copy of an August 4, 2004 report by Dr. Michael Bayless, which was provided to me prior to Wendi's trial.

28.   I was aware that Wendi attempted suicide while incarcerated and was placed in a psychiatric facility during her trial.

7

MADI_8575620.1

29.     I was also aware that Wendi was prescribed and took multiple psychoactive medications while incarceration. I was not aware of the specific medications she was taking.

30.     My investigation into Wendi's mental health and her personal and family mental health history was limited to the email attached as Exhibit B and the report prepared by Dr. Rosengard as Exhibit C. There was no strategic reason why I did not investigate further into Wendi's mental health and her personal and family mental health history, or engage an additional psychiatrist or neuropsychologist to evaluate Wendi's mental health. Based on the information then known to me, I did not believe that there was a viable mitigation theme based on Wendi's mental health.

31.     I was aware that Wendi's biological father was in prison for sexual molestation of another child, and I inquired of Wendi and her mother as to whether he had molested Wendi as well. Neither confirmed abuse by Wendi's biological father. Other than this inquiry, I did not investigate whether Wendi had suffered childhood abuse or trauma. There was no strategic reason why I did not do so.

32.     I did not conduct any interviews of individuals that knew Wendi from her childhood school or church that may have had information relevant to Wendi's mitigation case except for speaking with Shawn King in the presence of his lawyer, and I did not direct Scott Mac Leod or Attorney DeLozier to do so. There was no strategic reason why I did not do so.

33.     Scott Mac Leod did not recommend or assist in engaging any experts. The information that Mr. Mac Leod presented to me focused on Wendi's good upbringing and character and her good behavior in jail.

8

MADI_8575620.1

## ADDITIONAL DETAIL

34.     I provided several boxes containing true and correct copies of documents from my file relating to Wendi's case to her post-conviction relief counsel. All materials provided (except for post-trial materials) were available to me at or before the time of Wendi's trial.

DATED this 14th day of June, 2011.

Daniel Patterson

Subscribed and sworn to before me this 14 day of June, 2011.

Notary Public, State of Arizona
My Commission: april 20 2015



OFFICIAL SEAL
ELIA HUBRICH
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires April 20, 2015

MADI_2575620.1

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA
### Forensic Services Unit

March 28, 2001

The Honorable Daniel A. Barker
Maricopa County Superior Court
222 East Javelina Avenue
Mesa, AZ 85210-6201

RE:  **Wendi Elizabeth Andriano**
     **Competency Screening Evaluation**
     **CR# 2000-096032**

Dear Judge Barker:

This is in reference to the above-named individual.  On March 9, 2001 your court ordered the Forensic Services Unit to evaluate the competency of Ms. Andriano.  I had an opportunity of visiting with the defendant for this evaluation on March 21, 2001.  At that time the defendant was housed within the general population of the Estrella Jail Facility, which is under the jurisdiction of the Maricopa County Sheriff.  When I saw the defendant for this evaluation in the Medical Dispensary of that unit, I informed her of the nature of our conversation and the fact it would not be privileged.  I also told the defendant the information she provided could not be used against her in further proceedings unless she were to enter a plea of Guilty Except Insane.  She understood the reason for the evaluation and agreed to continue.  Prior to completing my report I reviewed:

1)  The Court's order;
2)  Defense counsel's Motion;
3)  A copy of a letter from counselor, Ms. Rohde;
4)  A copy of the grand jury transcripts.

I appreciate having received the information I did in a timely fashion.  I also had an opportunity of discussing the case at length with Dr. Leonardo Garcia-Bunuel.  Dr. Garcia-Bunuel is a psychiatrist with Correctional Health Services.

Ms. Andriano is a 30-year-old widowed Caucasian female who is the mother of two preschool children.  When seen, she was dressed in routine jailhouse garb and had

009178

EXHIBIT
A

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 2

good hygiene. She was fully alert and oriented to her name, the date, our location, and
the reason for my evaluation. The defendant's thought processes were goal-directed
and intact throughout our conversation. There was no evidence she was suffering from
perceptual disturbances, such as auditory or visual hallucinations. She adamantly
denied having such experiences. The defendant denied being on any psychiatric
medications at the present time. Her affect was generally appropriate, but at times she
seemed quite depressed and was tearful. She denied any previous history of
psychiatric hospitalizations. She denied any known family history of psychiatric
hospitalizations. Apparently her family history is significantly positive for two paternal
cousins having successfully suicided. The defendant denies abuse of alcohol or other
illicit substances. Apparently Ms. Andriano was reared in Pinal County, where her
parents presently reside. She has worked in Phoenix for a number of years, and was
working in the field of property management when arrested. Her cognitive abilities are
quite likely consistent with that of the general population. She maintains she attended
classes at the University of Phoenix in "business management." I would estimate her
I.Q. as being within the average range. Her abilities to abstract and conceptualize, as
tested by having her interpret relatively common sayings/proverbs, were intact. Her
memory seemed to be grossly intact for both recent and remote events. She did
complain of having some lacunae in her memory. She was able to remember three out
of three unrelated items after a few minutes of intervening conversation. She was
neither suicidal nor homicidal at the time of my evaluation. She maintains that she is
religious and is a non-denominational Christian.

Ms. Andriano is very well aware of being charged with First Degree Murder. She also
understands the adversarial nature of the proceedings she is facing. She realizes that
she has certain Constitutional rights, and that if she is to enter a plea of Guilty, she will
waive those rights. She was able to talk in a coherent fashion about her various rights,
including her right not to testify, as well as her right to call witnesses on her own behalf
and confront the witnesses against her in a court of law. She was able to independently
identify her attorney. She maintains she has a lot of respect and confidence in Mr.
Delozier, Jr. The defendant maintains she has not been offered a plea agreement in
the charges she is facing.

In summary, I do not believe that grounds exist to further question the competency of
Ms. Andriano. It would be my opinion, within a reasonable degree of psychiatric
certainty, that she has a factual, as well as a rational understanding of the proceedings
she is facing. I also would opine that she can effectively assist her attorney in her
defense. Whether or not she has "amnesia" for the time around the alleged offense is
something I cannot determine. Defense counsel may wish to independently retain an
expert to evaluate his client's state of mind around the time of the offense. Certainly

009179

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 3

there is something quite bizarre about what allegedly occurred. If Ms. Rhode is
accurate in her diagnostic assessment, then the criminal culpability of the defendant
and her state of mind at the time of the alleged offense should be evaluated
independently, outside the scope of a Rule 11 evaluation.

If the Court has any further questions regarding my opinions, I will remain available. (I
would also note that apparently previous Defense counsel instructed Ms. Andriano not
to talk to Dr. Garcia-Bunuel. I think this is a mistake, as I believe Dr. Garcia-Bunuel is
trying to treat the defendant for what he believes is a Depressive Disorder. If such
treatment is indicated, I would hope that Defense counsel would be supportive of his
client receiving the necessary treatment from Dr. Garcia-Bunuel, who is a respected,
ethical, and competent psychiatrist.)

Respectfully,

Jack Potts, M.D.
Chief, Forensic Services Unit

009180

**Patrick Linderman - PDX**

| | |
|---|---|
| **From:** | Daniel Patterson - PDX |
| **Sent:** | Thursday, December 20, 2001 12:01 PM |
| **Э:** | Patrick Linderman - PDX |
| **Subject:** | RE: referrals |

Pat- the two clients are  REDACTED   and Wendi Andriano- both are death penalty cases- Patty Moncada has been asked to provide you with complete sets of discovery- both clients should be examined by mental health professionals- not because I believe they suffer from mental illness but as death penalty cases, a mental health exam can provide a source for mitigation- be glad to give you a synopsis of their respective cases at your convenience- just come see me- Thanks- Dan P.

-----Original Message-----
| | |
|---|---|
| **From:** | Patrick Linderman - PDX |
| **Sent:** | Wednesday, December 19, 2001 9:15 AM |
| **To:** | Daniel Patterson - PDX; Patricia Moncada - PDX; Irene Esqueda - PDX |
| **Subject:** | referrals |

Hi Dan,

I received word recently that I am assigned as the Client Services Coordinator to two of your cases.  I am unclear exactly which cases, but I believe that they are  REDA  and someone named Wendy something.  I would love to get together with you to gain some clarification and direction.  I will also probably speak with Patty since it appears that she is the person also assigned to this case.  I am sure that I can get the DRs and other important papers from her. All those legal assistants are always very organized.  (Wish some of that would rub off on me) It is my understanding that our office has had these cases for some time, so I may need to jump right in and see what I can do to help.

Patrick Linderman

1



007684

# Richard J. Rosengard, D.O.

Mailing Address:   5501 N. 7th Ave., PMB # 219          Diplomate, American Board of Psychiatry and Neurology
                   Phoenix, Arizona 85013-1755          Diplomate of the American Board of Forensic Medicine
                   (602) 843-0035 • FAX (602) 843-8963          Diplomate, American Board of Forensic Examiners



August 27, 2002

Dan Patterson, Deputy Public Defender
Office of the Public Defender
Southeast Facility
1750 South Mesa Drive, Suite 150
Mesa, Arizona  85210-6211                          **Fax Number 506-2865**

RE:     State of Arizona v. Wendi Elizabeth Andriano
CR#:  2000-096032
DATE OF EVALUATION: June 23, 2002
DATE OF DICTATION: August 25, 2002
EVALUATION LOCATION: Estrella Jail

**IDENTIFICATION:**  Wendi Andriano was seen on a referral from the Office of the Public Defender and chief trial deputy, Larry Grant and presented as a 31-year-old, Caucasian female who prior to her detention in the Estrella Jail, where she had been since October of 2000, had been employed as a property manager.  She was married and resided with her spouse and two children.

**INFORMANT:**  The Defendant understood the extent and limitation of this evaluation and consented for me to release information herewith obtained, knowing full well that I was not establishing a physician/patient relationship with her.  She also signed a Release of Information indicating that I could review the records in the Estrella Jail Clinic.  Those records indicated that she had been on Seroquel 100 mg h.s. and that previously Remeron, trazodone, and Prozac had been used and discontinued.  A note from November 3, 2000, indicated that the psychiatrist felt that she was labile.

I reviewed a cover letter written by Patricia Moncada, who was a legal assistant to Daniel Patterson, Deputy Public Defender, listing the reports which were reviewed and included a Phoenix Police Department narrative report, transcripts from 911 calls from the Phoenix Fire Department and Phoenix Police Department, medical records regarding the victim from Dr. Kellogg, and the medical examiner's report regarding the victim.  The supplemental Phoenix Police Department Report reviewing the 911 call, showed how the Defendant had apparently admitted that her husband was stabbed, indicating that she possibly had done it and that she and her husband were fighting to the point of him strangling her.  She denied doing the action purposefully and appeared to be upset by the situation.  She indicated that her husband went into rages.  She went on to indicate that she had previously hit her husband over the head, and his rage simmered down and then started once again.  She indicated that she sent away the paramedics because she did not want to get her husband in trouble.  She indicated that her husband had episodes of rage and personality changes, secondary to the chemotherapy that he was going through.  She indicated that her husband had wrapped a cell



EXHIBIT
C

007544

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                              Page 2
RE:     State of Arizona v. Wendi Elizabeth Andriano                             August 27, 2002

phone cord around her throat, and she grabbed a knife in order to cut that cord; thereafter, they
wrestled around.

There was contact between Patricia Moncada and my office, indicating the charge against the
Defendant who indicated that she did not recall what had happened and was not involved with drugs
or alcohol. She reported that she had called the paramedics one to two hours earlier but sent them
away and then called the police thereafter. The victim apparently had a lot of outstanding business
loans. He also had terminal cancer with less than a year survival rate, according to the medical
examiner. She was seen to have superficial scrapes with a fake nail ripped off and redness around
her neck.

**PRESENTING SITUATION ACCORDING TO THE DEFENDANT:** The Defendant indicated
that she had not pleaded as of yet and knew that she was charged with first degree murder. She
indicated that she read the police report accusation synopsis, as well as a newspaper where it was
alleged that she had slit her husband's throat and had given him poison over a period of time. She
indicated, though, that her husband had been on chemotherapy and was no longer working. She
indicates that he took sodium azide and an overdose of pills and wanted to kill himself. She
indicates that her husband got mad when a friend, Chris, was called and vacillated about what he
wanted to do. She indicates that in March of 2000, she had an affair, predominantly for
companionship but did consummate the relationship sexually. She felt that her husband sensed what
was going on and asked her about that, and she answered honestly. He got angry and had a physical
fight with her regarding that on the night that the incident happened. The next thing that the
Defendant recalled was sitting on the living room floor with her husband. Thereafter, she called her
parents and told her father and then called the police. She indicated that she could not recall calling
the paramedics earlier. She also admitted to making calls to buy sodium azide a few weeks prior
to the incident. Her husband wanted that. At first, he apparently wanted cyanide; and then the
Defendant had convinced a friend to assist in getting the sodium azide. She indicated that her
husband had suicidal thoughts in the past and went through therapy but did not want to go through
therapy again. He did have some family therapy in 1997 and 1998. Apparently, therapy was set up
but her husband did not want to go.

**STRESSORS:** The Defendant indicated that her husband's cancer had been getting worse, since
they found out about it in March of 2000. He had had adeno cystic carcinoma since 1994, and was
diagnosed in 1996 or 1997. The Defendant was obviously now going through legal repercussions
of her alleged behavior and going through continued remorse and grief regarding the death of her
husband. Her husband had been going through chemotherapy, and they had two young children.
She worked, as her husband no longer did or could work.

**MOOD DISORDER SYMPTOMS:** The Defendant was depressed for six to seven months prior
to coming into detention. While in detention, she was doing better with the level of depression, as

007545

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 3
RE:     State of Arizona v. Wendi Elizabeth Andriano                    August 27, 2002

there was relief from some of the stressors that existed previously. Nevertheless, the symptoms still included: insomnia and feeling depressed, helpless, and anhedonic. She had lost weight and had a reduced appetite with crying episodes. In the past, she felt particularly helpless, as she could not help her husband, particularly when he got irritable in the last few months of his life.

The Defendant denied symptoms that would be consistent with manic episodes but did admit to panic attacks since childhood. These happened at night on attempts to go to sleep and occurred less than a few times a year. During these episodes, she would have an increase in heart rate, dyspnea, dizziness, lightheadedness, shakes, sweats, and like a lump in her throat. She would have gastrointestinal upset, a fear of dying and losing control, and a sense of impending doom. She indicated that it was like having a heart attack. She also had symptoms of anxiety but would hide these feelings and focus in on somebody else when she had them.

The Defendant denied any history of suicidal attempts or homicidal ideation, intent, or actions. She had thoughts of hurting herself when she first came into detention for a few months but indicated that they were "Not serious."

**OTHER PSYCHIATRIC CONDITIONS:** The Defendant denied symptoms consistent with phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders. She denied having paranoia or hallucinations that were auditory or visual.

The Defendant indicated that her mother and therapist say that her biological grandfather sexually abused her when she under the age of 3; although, she could not recall that and had no dreams or flashbacks. She had difficulties in trusting others sexually but was able to enjoy herself with the exception of intercourse, and she did not like that. She got easily upset in dealing with others who were in abusive relationships; and with the aid of therapy, she felt that she was in an abusive relationship with her husband. She was particularly upset in finding out about and dealing with children that were sexually abused.

**SUBSTANCE ABUSE HISTORY:** The Defendant denied use of cocaine, speed, cannabis, IV drugs, heroin, PCP, LSD, inhalants, or alcohol.

**PAST PSYCHIATRIC HISTORY:** The Defendant had no history of acting out in violence, treatment with psychiatric medications, or placement in a psychiatric facility. She went for three to four appointments in 1996, to an EAP therapist but did not enjoy that therapy, indicating that they had blamed her husband and told her to leave him. In the year 2000, her husband's doctor gave her medication for anxiety and sleep; but she could not recall, the name of the medication and it was used for two to three months. She was out of that medication, I believe, for a week prior to being detained.

007546

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 4
RE:     State of Arizona v. Wendi Elizabeth Andriano                    August 27, 2002

**FAMILY PSYCHIATRIC HISTORY:** The Defendant's father and grandfather abused alcohol and there was no familial history of suicides, psychiatric illnesses, or drug abuse.

**PAST PERSONAL HISTORY:** The Defendant was born in Groom, Texas, and raised in Arizona and California. She indicated that her childhood was "Different," as her mother and stepfather were married when she was 4 years old. They travelled around on bus, being involved in a street ministry. Until the age of 10, she was raised at home; and from 10 and on, she was in a private school. She did well in school but indicated that she did get in trouble as she was "Being really hardheaded," even to the point of getting expelled. She could not recall what she did to merit that expulsion. She always got honors in her grades. She was the only child from her biological father who lived with her for a few years; and thereafter, her stepfather lived with her. She saw her biological father when she was 8 years old and did not really know him. She indicated that she had no involvement with the military or the law, except for some speeding tickets. In the last two years of high school, she did junior college work, as well; and after high school, she went to Mexico, doing missionary work for seven to eight months. Thereafter, she worked for a few months answering phones but apparently had a temper and quit. Then, she worked in property management as a leasing agent for a couple of years and ended that work to be an AP clerk accountant at Casa Grande Regional Hospital. She left that job after less than four years to go into property management. While she had been working at Casa Grande Regional Hospital, she attended college and indicates that she is two classes shy of a BA degree. She met her husband in March of 1992, and they were married in January of 1994. They have two children who are now being cared for by their paternal aunt. She indicated that she had no relationships with other people and that her relationship with her husband was difficult as he yelled at her daily. That is why she sought out the company of another man for moral support. She indicated that, at that time, she got into alcohol, as well; but she ended the relationship with that other man prior to the incident at hand.

**PAST MEDICAL HISTORY:** The Defendant denied any history of allergies to medications, surgeries, seizures, fractures, head traumas, or other major medical problems. She denied any use of tobacco. She used alcohol with peers, approximately four to five drinks at a time, drinking that every other week in the year 2000, and a lot less prior to that time. She had been on Seroquel at the time of the evaluation, 100 mg h.s, and had been on that for a couple of months. That was used to help sleep. She indicated that her bunkmate took that medication. She had tried other medications prior to the use of Seroquel, as I indicated above under informant.

**OBJECTIVE MENTAL STATUS EXAMINATION:** The Defendant appeared clean in jail garb and was well-groomed. She wore glasses and was less than average in her build. She appeared her stated age with a normal degree of alertness, posture, and gait. Her eye contact was good, and her attention span was satisfactory. Her motor level was normal, and she appeared good and cooperative as a historian. Her speech was normal. Her affect was labile, tearful, and sad; although,

007547

Aug-28-02   12:56pm   From-Arizona Community Psychiatric          602-843-7054          T-736   P 006/007   F-401

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                   Page 5
RE:     State of Arizona v. Wendi Elizabeth Andriano               August 27, 2002

she was able to smile a few times. She denied and showed no psychotic thought processes. She denied suicidal or homicidal ideation or intent. She indicated that her mood was "Fine." She was friendly, trustful, and cordial in her interpersonal style and fair in her insight and judgement. She was oriented to her own name, the day of the week, month, and year and knew the street and address of the jail and the city, county, and state where it was located. She knew that the date was somewhere in the twenties but did not know the exact date. Immediately, she was able to repeat three out of three items that I asked her to repeat; and after five minutes, she was able to recall one of them. She knew the name of the current and previous president of the United States and felt that she did not know the one prior to Clinton but indicated that prior to Clinton was possibly Reagan. She was able to do serial sevens accurately to 72 from 100 and accurately multiply six times eight and nine times seven. She was able to spell the word "world" backwards and abstractly interpret a proverb of moderate difficulty. She was thought to have an IQ that was above average.

**DIAGNOSTIC IMPRESSION:**

| | |
|---|---|
| AXIS I: | (a) Major affective disorder, depression. |
| | (b) Probable posttraumatic stress disorder. |
| | (c) Panic disorder. |
| AXIS II: | None. |
| AXIS III: | None. |
| AXIS IV: | Stressors: 1) dealing with her husband's cancer that was getting worse; 2) dealing with the legal repercussions, as well as personal repercussions, of the loss of her husband; 3) currently being a single parent. |
| AXIS V: | Current GAF: 62. Highest GAF in last 12 months: 70. |

**SUMMARY, OPINIONS, AND RECOMMENDATIONS:** The Defendant was going through a considerable amount of stress in dealing with not only the eventual loss of her husband at a very early age and being the sole parent of her two young children but dealing with the slow and painful demise of her husband, while her husband was becoming inappropriately irritable and mistreating her emotionally and physically. She had seen a deterioration in their relationship; and apparently, she had killed him. Perhaps no one will know exactly what occurred in the incident; and several potentials exist, including the potential that she was defending herself to some extent. Questions could arise as to how somebody who had a sound mind prior to and after the event could now have blocked what had occurred, specifically at that juncture; and the issue of amnesia for the subject appears all too convenient. I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it. An individual who goes through a traumatic event

007548

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 6
RE:     State of Arizona v. Wendi Elizabeth Andriano                       August 27, 2002

will often forget that extreme situation, because an individual is unable to deal with the thoughts
on an emotional basis. This occurs in both children and adults who have been physically or sexually
attacked and more than explains the Defendant's response, particularly in light of the fact that she
had a past history, apparently, of being abused and symptoms consistent with posttraumatic stress
disorder. That situation and the emotional responses that she has had from that situation make it
more likely that she would have had such an amnestic response to her apparent actions. That is true
whether her actions were a matter of self-defense or whether they were purposeful attacks in the
heat of a momentary aggressive outburst. The former appears more probable and the latter less
probable, based on the Defendant's statements currently and to the emergency crew that she dealt
with.

The Defendant certainly should receive appropriate therapeutic treatment, which would include
individual therapy and a strong consideration of an antidepressant, which could be beneficial both
for her depression and traits of posttraumatic stress disorder.

Should there be further questions regarding this Defendant or my report, I would be happy to answer
them at your earliest convenience.

Respectfully submitted,

Richard J. Rosengard, D.O.
RJR/mw/TMHT

007549

## Michelle Arvanitas - PDX

**From:** Daniel Patterson - PDX
**Sent:** Thursday, February 14, 2002 3:04 PM
**To:** Michelle Arvanitas - PDX
**Subject:** RE: Andriano

Thank you- Michelle- Dan P.

-----Original Message-----
**From:** Michelle Arvanitas - PDX
**Sent:** Wednesday, February 13, 2002 3:04 PM
**To:** Daniel Patterson - PDX
**Subject:** Andriano

Hey Dan P.

I spoke with Dave Delozier this morning. He heard through Donna's sister in Texas (Nadine Bednorz) that Wendi called someone right after the accident by the name of Easy (probably a nickname). Supposedly she called this person prior to calling her father, Police or cousin. Dave heard that Mathew Ocker is on the state's witness list. Do you have an updated list that might verify this story? Easy worked at SESCO gas. That is the same place that Mathew Ocker worked at the time. Sherry Ocker mentioned to Nadine Bednorz that Mathew Bednorz was subpoenaed. (Hope you are following this explanation). Nadine has not mentioned this to Donna.

I also spoke with Kandy Rohde-Wendi's counselor.
Wendi was diagnosed with Three things according to Kandy.

1) Depersonalization Disorder (300.6) is persistent or recurrent
episodes of depersonalization characterized by a feeling of detachment
or estrangement from one's self.
She does not let the "bad stuff in". She ignores any bad
feeling.

2) Disassociative Amnesia. (300.12) is an inability to recall
important personal information, usually of a traumatic or stressful
nature, that is too extensive to be explained by normal forgetfulness.

3) Physical, Sexual or Neglect of a child. V61.21

Kandy mentioned that Wendi avoided conflict or confrontation by doing everything Joe said. Wendi's biological grandfather may have molested her as a child. Supposedly, her biol. father is in prison for molestation.
After Joe took the pill (poison) and didn't die he begin to panic. She wanted to take him to the hospital and put her purse in her car. He kept changing his mind-wanting to go to the hospital, then not wanting to go. He wanted her to call 911. He was really upset, she was trying to calm him down. He pushed her on the infidelity issue, wanted to know before he died. She felt he deserved to know. She finally admits and is surprised at how enraged he became. This is what escalated the fight . She recalls what made him angry and that Chris came and waited outside. Her standing in the kitchen and him coming after her with the phone cord. She remembers shiny knife on counter. She wakes up-so much blood. Rinses off glasses in order to see. Surprised to see scene-confused. appears to have materialized out of nowhere. Remembers calling parents. She recalls sitting outside waiting-snapshots. Kandy mentions that she appears calm for being in Jail the first time. Remembers thinking what can I do to fix this-she fixed everything for everybody. Heard 1st degree murder still thinking how she can fix-not in tune with severity of what happened. This is Kandy's chat in a nutshell. Looking forward to our meeting with Shawn and atty.

1



EXHIBIT
D

019106



**MICHAEL B. BAYLESS & ASSOCIATES**
**3620 NORTH THIRD STREET**
PHOENIX, ARIZONA 85012
PHONE: 602-230-7373
FAX: 602-230-5105

MICHAEL B. BAYLESS, PH.D.
LETICIA AMICK, PH.D.
CRISTY LOPEZ, PH.D.

August 4, 2004

## PSYCHOLOGICAL REPORT
## RE: WENDY ANDRIANO

**Reason for Referral:**
Wendy Andriano entered a plea of not guilty to first-degree murder. She is currently charged with the murder of her husband, Joe Andriano. According to the police reports Joe Andriano's death occurred on or about October 8, 2000. The purpose of this evaluation is to exam Wendy Andriano's intellect, personality, and overall emotional stability.

**Observations:**
Wendy Andriano is a relatively short, thinly-built 33-year-old female of Caucasian descent. At the time of the interview, Ms. Andriano was wearing jail attire and her hygiene appeared to be good. She was in relatively good mood and was very open and cooperative with this examiner. Her affect was normal to content. She did not exhibit any abnormal motor activity or mannerisms. She denied having any tattoos or identifying physical marks. She was alert, exhibited good eye contact, and maintained satisfactory attention span. Her thoughts and communications were coherent and seemed to follow logical sequence. There were no obvious deficits in her short or long-term memory.

**Consent to Evaluation:**
Wendy Andriano signed Bayless and Associates 's Forensic Consent Form indicating she read and understood the purpose of the evaluation and limits of confidentiality. She was aware that information from this evaluation would be reported to the court and may be disseminated to interested parties. Ms. Andriano consented to the evaluation and voluntarily answered all questions.

**Documents Reviewed:**
1. Photographs of the crime scene
2. Phoenix Police Department departmental Reports
3. Autopsy Report
4. Sharon B. Murphy, Ph.D. Report and Domestic Violence Data



EXHIBIT

E

Andriano
Page 2

**Procedures:**
1. The Shipley Institute of Living Scale.
2. The Williamson Sentence Completion Test.
3. The Minnesota Multiphasic Personality Inventory – II.
4. Clinical interview.

**Background:**
Wendy Andriano was born Groom, Texas and is an only child. Wendy did not know her biological father. Her mother remarried when she was approximately four years of age to Alejo Ochoa. Her stepfather raised her as his own daughter and was basically the only father she has ever known. Her father worked as an assistant pastor and managed a tortilla factory and restaurant. Her mother is a human resource person and both of her parents are described as being workaholics. However, she also states that they were very caring, outgoing, and very loving. Her father was the main disciplinarian in the family. She reports that she has always had a very loving and open relationship with her parents. She was raised as a Christian and states as a young girl she participated in a lot of church activities. When asked whether or not she had ever been physically or sexually abused, she reported that she was sexually abused by her biological father and her grandfather. She believes that she was less than two years of age and can barely remember what happened. She states that she remembers parts but not all of the things that happened. Noteworthy, her biological father is in prison for child molestation. Wendy has a vague memory of the molestation and states she can only remember it when she is dreaming.

Although she states that she was happy as a young girl, she did have a number of anxiety-related problems. During her childhood she was a sleepwalker, experienced night terrors, bed wet, and suffered from separation anxiety from her mother. Noteworthy, she continues to have night terrors to this day.

As a teenager, Wendy enjoyed music, playing the piano, and swimming. She went to a very small high school, such that there were only 15 kids in her high school class. She got along quite well with her peer group. The most significant event that happened to her during her teenage years was her participation in the church social group. She did not date during her high school years.

**Education:**
Wendy graduated from high school with honors and reports that she has always been a very good student and really enjoyed her education. She went to a small Christian school and reports that everyone was best friends. She has also completed approximately three years of college.

**Employment:**
Wendy's last job was working as a property manager for the San Riva apartments. She worked there from September 1999 through October 8, 2000. She earned approximately $32,000 a year. Before she was arrested, her goals were to work in real estate but now she simply wants to have her children back and go back to having a normal life. Noteworthy, after Wendy was arrested for the murder of her husband it was learned that there were some financial irregularities at the apartment complex. It was found that in apartment #229, a man had been allowed to live rent free without documentation in that apartment. There was also a full audit being done due to irregularities which had come to light. On a previous job, Wendy stole approximately $18,000 from her employer. She reported that she stole the money because her husband had created so much debt that she had to do something. She felt overwhelmed by the debt and felt responsible for the family's happiness. Consequently, she was forced to steal $18,000.

Andriano
Page 3

**Relationships:**
Wendy has been married once and has two children. She was married from 1994 to 2000. Wendy's deceased husband had cancer and the last year of her marriage was very hard. She admitted to having an extra-marital affair during her last year of marriage. When asked about her affair, she reported that she had an affair with Rick Freeman. She met Rick at the apartment complex and they became friends. He was aware that her husband had cancer and he had told her that his fiancé had recently died. On one evening she went to Rockin' Rodeo, which is a local bar, with Rick and as they were coming home he kissed her. She stated that after they had kissed their relationship deepened and it became sexual. Noteworthy, Wendy reported to this examiner that she did not enjoy having sex and actually sex was quite painful for her. When asked about this, she stated "you can't just kiss on someone and not have sex with them, that's teasing". He was comforting me and as a trade I had sex with him". She reports she had sex with Rick Freeman five or six times. She claims he was quite gentle and although it wasn't painful for her, it was very uncomfortable. She stated "I don't know why my brain just clicks off. A lot of it is I was scared and thinking what do I do, how do I act. Joe was dying; life was going to be different".

**Psychological History:**
Wendy reports that she was treated by Candy Rhode in May once a week for three years. She denies receiving any other inpatient or outpatient treatment. This examiner did not receive copies of those records to review. Currently, while incarcerated, Wendy is taking Ativan, Zoloft and Seroquel. When asked if she had anyone in her family who had a history of mental illness or substance abuse, she reported her grandfather was an alcoholic and her aunt had a drug problem. She denies having a bad temper and states when she gets angry she would typically cry. She stated "I always see the best in people. Anger is a sin. I practice forgiveness and love".

Wendy denies having a frequent headaches, backaches, stomachaches, dizziness, heart palpitations, and fatigue. When she is under a great deal of stress she sometimes has difficulty sleeping and she used to have frequent nightmares. She reports her appetite is normal and she has not experienced any weight loss or weight gain.

Wendy denies experiencing hallucinations and/or delusions. She admitted that at times she does become depressed and has had suicidal ideations and one suicidal attempt. After being served papers about severing her parental rights she intentionally cut her arm. Further, she reported that she has a lot of fear and basic dislike of sexual intercourse due to it causing her pain.

Wendy is in relatively good physical condition and has not had any major operations or serious illnesses. She denies any neurological injuries.

**Alcohol/Drug Use:**
Wendy reported that she began drinking alcohol when she was 21 years of age. She typically drinks wine coolers and rarely if ever becomes intoxicated. She reports that she has been intoxicated maybe three or four times in her entire life. She denies using any illicit drugs. She does not drink coffee nor does she smoke cigarettes.

**Arrest Record:**
Wendy does not have a juvenile arrest record. She reports that this is the first time she has ever been arrested or charged with a crime. As noted earlier, Wendy is currently charged with first-degree murder. When asked how she is handling incarceration, she reported "I have adjusted. Either you sink or swim".

Andriano
Page 4

**Defendant Statements:**

In 1994 Wendy married Joe Andriano. They were married in Casa Grande, Arizona. Initially, there was some conflict over their church and beliefs but that quickly resolved and their marriage was basically okay. After the marriage, Wendy reported that she and her husband Joe both felt as if they had changed and they did not have to any longer "put on any airs". Through their marriage they learned who they both were and everything was fine. Wendy initially hung out with Joe and his friends and eventually lost touch with her own friends. Joe was working as a welder but quit that and went into his own business, auto glass replacement. They got a loan and started Joe's Windshield Repair. In the process of obtaining a new business, Wendy and Joe moved to her parent's farm and basically renovated the old shack and lived there until March of 1998. She reported she had her first child in the old farmhouse. Approximately seven months into the marriage it was discovered that Joe had a tumor, which supposedly the doctor removed successfully. However, in 1996 it came back, which started to wreck havoc in their lives. They both were upset and under a lot of stress. Joe was not a very good businessman and spent most of his money on pleasurable activities. As a result, Wendy felt as though she had to put money back into the business from her job and eventually became overwhelmed by debt. She stated, "I felt responsible for my family's happiness". As a result, Wendy over a period of four year's, stole approximately $18,000 from her employer. She was fired from her job.

When Wendy first met Joe, he was dating this very wealthy girl and would say to her quite often that if he had stayed with his rich girlfriend his life would not be as miserable as it is today. Wendy reported this really hurt and here she was working full-time, stealing money from her company, attempting to go to school, making dinner, cooking, doing the clothes, and everything else around the house but that was not good enough. She stated, "What could I do, how could I make him happy".

At this point during the marriage, she was only around members of Joe's family. She felt isolated, alone and decided to go back to church. She tried to teach Joe how to love and forgive but was not very successful. Wendy was pregnant with her first child and Joe was not working. At this point, she was taking care of the baby, working and her parents were also helping do almost everything. Then she found out that she was pregnant again and that was just totally overwhelming. In October 1997 she decided that she was going to leave Joe because she did not want her son to grow up like this. She went to Jerry, the man who had loaned them the money for the business, and he gave her $2,000 and told her that if she wanted to leave, for her to leave. Noteworthy, Wendy did not leave Joe and instead reported that she actually gave the $2,000 to Joe. She reported that she wrote Joe a letter telling him that she was going to leave and later that evening he came in, in the middle of the night, and had apparently found the letter. He was angry and was screaming at her "what does this mean". She stated by the time it was all done he was begging her to stay and for some reason he was able to talk her into not leaving. Joe had a way with words and also she was very much afraid of his temper. She stated she remembers the first time she asked Joe about living on the farm, just that she thought they were living there so that they could save money to buy a house. She stated Joe became extremely angry, grabbed her and shook her, which made her very much afraid. Previously Joe told her about catching his ex-girlfriend sleeping with another man and he became so upset that he had to move to California to keep him from hurting the guy with whom his girlfriend was having an affair. She believes one of the reasons Joe told this story was so that she would be afraid of him.

Wendy reported that she really was not angry with Joe and actually always felt bad for him. Joe, in her mind, was angry at the world because of his cancer. Wendy stated, "It was the worse thing you could go through. You expect it when you are old, not when you are young". Wendy also reported that Joe would feel very bad when he had his episodes of anger. The cancer was overwhelming and basically consumed him. She told this examiner it was Joe who asked her to order the poisons because he wanted to take it and end it all.

Andriano
Page 5

**Police Interviews:**
In witness interviews conducted by the Phoenix Police Department, Chris Hashisaki reported that Wendy
had asked both Eric Vallante and James Yost to pose as Joe so she could a life insurance policy on Joe.
She believed that they both were offered $50,000 to do this. Chris is also aware of an incident in which
Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer.
Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time
as having no observable injuries.

Shannon Sweeney was also interviewed by the police and is one of Wendy's friends. Shannon and
Wendy would often go to bars and hang out. Wendy apparently told Shannon that she had been having
problems with Joe for a long time and would have left him if he had not become ill. Shannon believed
that Joe was very possessive of Wendy. On one night, Shannon reported they took Wendy out for her
birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's
cellular phone and a glass bottle across the parking lot.

Shannon was also aware that Wendy had an affair with Rick Freeman. Apparently Wendy did not tell
Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not
want to end and became very persistent. Rick described this to Shannon as Wendy refusing to leave him
alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric
at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to
follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone.
When he would not answer, she began banging on his door and when he would not answer she threatened
to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this. Later, Wendy also
had a one night affair with a young man by the name of Travis whom she met at Rockin' Rodeo Bar.

Noteworthy, Wendy told Shannon about Joe screaming and would often break things. Wendy never told
her about any incident in which Joe touched her. Shannon had never observed any injuries on Wendy.
Apparently, Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost
and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon
that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no
way the insurance company would find out about him posing as Joe. She also told Eric that Joe would
most likely die of a heart attack due to his condition and treatment and that this would not be investigated.
He also told Shannon that Wendy offered him $50,000 to pose at Joe. As to the poison ordered over the
Internet, Wendy used a fictitious business license in order to order the poison. Noteworthy, Wendy gave
an address to a company that she had no connection to. The poison Wendy ordered has the effect of
mimicking a heart attack in its victim. Noteworthy, Wendy ordered poison from the website under the
name of Anne Newton.

Ray Ortega, who was part of the management team that managed San Riva Apartments, found out that a
man was living apartment 229 rent-free. Additionally, on October 10, 2000 Ray found in Wendy's office
while he was cleaning the office, an envelope under Wendy's desk. Ray observed a pieced-together
certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information
on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William
told him that while working on the office computer, he discovered where somebody had looked up a
website containing information on cyanide as well as a point of reference site. Ray contacted Janice Lord
and advised her of what William found. Ray, along with Janice, confronted Wendy about this. Wendy
did not deny looking up this information but stated that she was helping a friend with a college report.

Eric Vaillent is a friend of Rick Freeman who was dating Wendy. He reported that Wendy would often
pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and
kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also

Andriano
Page 6

observed Wendy at nightclubs drinking excessively and would flirt and kiss on guys she knew at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any of the domestic violence or any situation in which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can buy poisons. Wendy told this examiner that it was Joe's idea to buy poison.

Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20,000,000. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated he got upset with Wendy and called her a money hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed Wendy did not really care for Joe any longer and she told him that she no longer had sex with Joe. This is quite interesting considering the fact that Wendy told this examiner that Joe demanded sex with her on a daily basis.

Rick Freeman admitted that he used to date Wendy and when he found out she was married he tried to break off the relationship. Wendy pursued him and often come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Ted Bennett, who is a neighbor at the San Riva Apartments, reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him how much money they expected to be awarded. Ted reported that Joe did not appear to have given up or want to die and in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments Ted had never been aware of any rodent problems that would require poison.

Debra Lewis was employed as a housekeeper for the San Riva Apartment complex. She is aware that Wendy and Joe were having some problems and was aware that Joe was questioning Wendy about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe's continued checking up on her and Wendy also complained to Debra in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Debra was unaware of any allegations of domestic violence between Wendy and Joe. She describes Joe as being a real pussy cat. Debra often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Debra stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore. She described Wendy as acting as if she was not married.

Travis Black is a young man that Wendy met at a night club called the Rockin' Rodeo. She met Travis on September 27, 2000 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations Wendy told Travis that her husband had died of cancer.

On August 28, 2000 Wendy contacted Amica Life Insurance Company in reference to purchasing a life insurance policy on her husband Joe. Wendy talked to Carolyn Statalano and told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes she stated this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Also, on the application for a life insurance policy, the policy asks if Joe had cancer to which Wendy entered "no" on the application.

Andriano
Page 7

Based on the above-mentioned interviews, it appears clear that Wendy in more than one situation had a tendency to be less than truthful. She has the ability to be manipulative and attempted to encourage others to get involved in fraudulent schemes to collect money from an insurance company. Additionally, for a woman who did not enjoy sex, she clearly was sexually aggressive with one of her male boyfriends and on one occasion met a man at a bar one night and took him home and had sex with him. She seemed to become somewhat obsessed with Rick and seemed to have extreme difficulty accepting the fact that he no longer wanted to date her. Additionally, Wendy told this examiner that Joe asked her to buy the poison. Yet in her overall quest to buy the poison, she attempted to hide her identity, have the poison mailed to a business address, and seemed to want to hide her connection to the poison.

**Intellectual Functioning:**
Wendy Andriano's performance on the Shipley Institute of Living Scale yielded a total IQ score of 110 which places her in the above-average range of intellectual functioning. Ms. Andriano was oriented to reality and had a capacity to appreciate the difference between right and wrong. At the time of the testing her memory, judgment, and decision making ability were intact. Although she was mildly anxious during the testing her test scores appear to be an accurate representation of her abilities. She did not report nor did the test data indicate the presence of neurological impairment.

Wendy Andriano's performance on the Minnesota Multiphasic Personality Inventory yielded a valid and interpretable profile. Her scores on the Validity Scales indicate that she tends to be defensive, lack insight, and be slightly more conforming and moralistic than usual. Typically, these individuals have a tendency to repress or deny problems and unfavorable traits. She is prone to minimize and disregard problems with herself. Self-insight and self-understanding are usually lacking. She is very concerned about how she is perceived by others and typically views emotional problems as weaknesses.

Ms. Andriano's performance on the Clinical Scales reveals an individual who has a very mild level of emotional distress that is characterized by a general dissatisfaction with life rather than by any specific mood. She is so unaware of this dissatisfaction that she can say that she is happy most of the time and very seldom has "spells" of the "blues". Yet she frequently worries about something. She will use indirect means of expressing her anger.

Ms. Andriano sees herself as quite capable and able to make decisions easily. Her memory and concentration skills are good. She does not analyze her or others feelings and behavior. She daydreams very little. She believes that it is safe to trust others and that they are willing to help. She is very direct and comfortable in stating her opinions to others.

Although she is concerned about her health, she does not report any specific symptoms other than dizzy spells. Individuals with similar scores report that they do not wake up fresh and rested most mornings. They typically have behavioral problems in school and are likely to have been in trouble with the law. Although she may abuse substances, she is unlikely to have suicidal ideation. Typically individuals with similar profiles have a very poor prognosis. This is due to their problems being more characterological and not readily amenable to change. She is experiencing minimal emotional distress and has little concern about her behavior, limiting her motivation for treatment.

Noteworthy, clients with this profile tend to be defensive, and unwilling to acknowledge psychological problems even when they are readily apparent to others. They report little psychological emotional distress and describe themselves as less depressed and anxious than do most psychiatric patients. Behavioral problems are more likely to occur in this code type than in any other code type that includes Scale 3. Further, clients of this profile are characterized by poorly controlled anger and hostility that it is expressed in cyclic fashion. Often these clients are eventually incarcerated for their violent acts.

Andriano
Page 8

Typically, these clients are quiet, withdrawn individuals, and their sudden outbursts come as a surprise to others. They display poor judgment under stress, but their emotional or violent outbursts may be only minimally related to external stress or provocation. The cyclic pattern of violent outbursts with intermittent periods of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change.

Ms. Andriano's performance on the Williamson Sentence Completion Test substantiates the findings noted above. Again we see an individual who has very little anxiety and who tends to be very superficial in her overall responses. This examiner finds this to be somewhat surprising considering what Ms. Andriano is being charged with and the fact that she is in jail. She tends to have very strict rules in which she expects herself and others to live up to. Further, she has a strong need to be needed and desperately wants to be seen in the eyes of others as being worthy. She has a rather naïve viewpoint of life such as she wants/desires a perfect existence. When she cannot get all her needs met she tends to feel guilty and has a tendency to externalize blame onto others for her own shortcomings. Her primary defense mechanism is denial.

Summary:
Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a fictitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

Andriano
Page 9

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The examiner notes that this is understandable considering Ms. Andriano's behavior and general response toward her husband. During this time period in which Ms. Andriano's husband was very suspicious of her behavior, she was, in fact, having an affair. As a matter of fact, she admits to having actually two affairs. This examiner finds this is quite interesting in light of the fact that Ms. Andriano reports that she did not enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on the night of the offense she and her husband were engaged in a physical fight. She alleged that he had attempted to choke her with a telephone cord and had earlier pushed her into the dresser and onto her bed. He also pushed her into their wedding display case, shattering it, grabbed her in a bear hug and they both were wrestling around in the house. As her husband began to reach for a belt to hit her, she was able to wiggle away from him, grab the barstool and hit him on the back of his head. Apparently Joe was knocked unconscious and was severely injured. She gave him a pillow and blanket. She called Chris and told her Joe was having a heart attack. While she was waiting for Chris to come, she covered the blood on the carpet with a towel. Chris came over and told Wendy to call 911. Wendy told the 911 operator Joe was having a heart attack. The Fire Department came and Wendy sent them away. She also told Chris to go home. When she returned to the apartment and Joe was standing up. At this time he wrapped the charging cord from his cell phone around her neck and as they struggled and moved toward the kitchen she grabbed a knife and cut the cord from around her neck. She reported that the next thing she remembers was struggling with her husband in the living room. She still had the knife in her hand and the next thing she knew she had blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim the she was a victim of domestic violence.

Diagnosis:
Axis I:          Depressive disorder NOS.
Axis II:         Personality disorder NOS with antisocial and borderline traits.
Axis III:        None.
Axis IV:         Marital conflict, financial problems.
Axis V:          GAF = 65.

Michael B. Bayless, Ph.D.
Clinical and Forensic Psychologist

## NOTES
## RE: WENDY ANDRIANO

**Note 1:** In the interview with Leslie Herb Duncan, AKA Herb, Chris reported that Wendy had asked both Eric Vallante and James Yost to pose as Joe so she get a life insurance policy on Joe. She believed that they both would offered $50,000 to do this. Chris was also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

**Note 2:** Interview with Shannon Sweeney. Shannon Sweeney was a friend of Wendy's and would often go to bars and hang out with Wendy. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he not become ill. Shannon believed that Joe was very possessive of Wendy. On one incident, Shannon reported that they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot. Shannon was also worried that Wendy had an affair with Rick Friedman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end it and became very persistent. Rick described this to Shannon as Wendy refusing to leave him alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer, she would threaten to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this.

Later Wendy also began dating a day by the name of Travis whom she met at a rock rodeo bar. Noteworthy is that Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incidents in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose as Joe. As to the poison ordered over the Internet, Wendy had used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to.

**Note 3:** Interview with Ray Ortega. Ray Ortega is part of the management team that managed San Riva Apartments which Wendy Andriano was a manager. It was found out that in Apartment #229 a man had been allowed to live rent-free without documentation in that apartment. Noteworthy, there was a full audit being done due to irregularities which had come to light after Wendy's arrest.

**Note 4:** Interview; Eric Vaillent. Eric was a friend of Rick Friedman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also observed Wendy at nightclubs in which she would often drink excessively and would flirt and kiss on guys she met at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any domestic violence or any situation which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can

Notes
Wendy Andriano
Page 2

buy poisons. Wendy told this examiner that it was Joe's idea to buy poison. Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20 million dollars. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated that he got upset with Wendy and called her a money-hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed that Wendy did not really care for Joe any longer and she had told him that she no longer had sex with Joe. This was quite interesting in the fact that Wendy told this examiner that Joe demanded sex from her on a daily basis.

Note 5: Interview: Rick Friedman. Rick admitted that he used to date Wendy and when he found out she was married, he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Note 6: Witness: Ted Bennett. Ted reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him about how much money they expected to be awarded. Ted reported that Joe did not appear to have given up and wanted to die and, in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments, Ted had never been aware of any rodent problems that would require poison.

Note 7: Interview: Deborah Lewis. Deborah Lewis was employed as a housekeeper for the San Riva Apartment complex. She was aware that Wendy and Joe were having some problems in the fact that Joe was questioning her about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe continually checking up on her and Wendy also complained to Deborah in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Deborah was unaware of any allegations of domestic violence between Wendy and Joe. She described Joe as being a real pussycat. Deborah often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Deborah stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore and that he was not here anymore. She described Wendy as acting as if she was not married.

Note 8: Witness: Travis Black. Travis is a young man that Wendy met at a nightclub called the Rocking Rodeo. She met Travis on 09/27/00 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then they went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations, Wendy told Travis that her husband had died of cancer.

Note 9: Witness: Ray Ortega. Ray on 10/10/00 found in Wendy's office while he was cleaning the office an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janis Lord and advised her of what William found. Ray along with Janis confronted Wendy about this. Wendy did not deny looking up this information but stated she was helping a friend with a college report. Noteworthy, Ray is unaware of the apartment complex having a rodent problem.

Notes
Wendy Andriano
Page 3

Note 10: Witness: Carolyn Catalano at Amica Life Insurance Company. Apparently Wendy contacted Amica Life Insurance Company on 08/28/00 in reference to purchasing a life insurance policy on her husband Joe. On 09/22/00 Carolyn called Wendy on the phone. Wendy told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes, she stated that this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Noteworthy, on the application for life insurance policy, the policy asked if Joseph had cancer to which Wendy entered no on the application. Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

_____

Michael Brad Bayless, Ph.D.
Forensic and Clinical Psychologist

## INTERVIEW FORMAT

NAME & DOE: _Wendi Andriano_

REFERRAL INFORMATION: _1st degree Murder_
_Does not Qualify –_
_Date of Death / 10-8-00 Called 911 – Reported_
_Husband Dead – Intellect, personality, Emotional Stab_.

## BEHAVIORAL OBSERVATIONS

AGE: _33_

DOB: _8/26/70_

HEIGHT: _5'4_

WEIGHT: _110_

RACE: _Cauc._

HYGIENE/ATTIRE: _Yes / Attire / okay_

MOOD: _ok, = one_

AFFECT: _No_

PHYSICAL IDIOSYNCRASIES: _No_

EXAM ATTITUDE....cooperative, pleasant, did not mind personal inquiry, inquisitive, overly anxious, complaining, indifferent, resistant, defensive, too revealing

TEST-TAKING ATTITUDE...needed reassurance, easily frustrated, impulsive, grew tired, worked slowly, gave good effort, perfectionistic, organized, persistent, inconsistent

SENSORIUM....alert, hypervigilant, confused, sleepy, stuporous

EYE CONTACT....good, avoided, appeared distracted

ATTENTION SPAN....poor, satisfactory, distractible

MOTOR LEVEL...normal, hyperactive, hypoactive, psychomotor retardation

POSTURE....normal, relaxed, slumped, rigid, leaning to side

MANNERISMS....none, tics, EPS, tardive dyskinesia, fidgety, rocking, leg shaking

SPEECH...normal, rapid/slow, loud/soft, excessive detail/impoverished, stuttered, mumbled, slurred, pressured, lisp

LANGUAGE ABILITIES....monolingual/bilingual...speaking/reading/writing fluency

THINKING...incoherent, loose, circumstantial, tangential, concrete, logical, linear

MEMORY....grossly intact, confused, superficial/poor historian, contradictions, perseverated

PERSONALITY TRAITS....shy, gregarious, sense of humor, frank, bizarre, suspicious, hostile, manipulative, help-seeking, complaining, immature, narcissistic, argumentative

THOUGHT CONTENT: _____

JUDGMENT/INSIGHT: _____

SUICIDAL/HOMICIDAL IDEATION: _____

## BACKGROUND

PLACE OF BIRTH & RELOCATIONS: *Groom, Texas*

BIRTH ORDER/# OF SIBLINGS: *Only Child -*

BIRTH/DEVELOPMENTAL PROBLEMS: *Step Dad.*

PARENTS' NAMES & AGES: *Alejo, Donna Ochoa*
DIVORCE/DEATH (TIME/CAUSE): *Raised her since age 4*
REMARRIAGES:

PARENTS' OCCUPATIONS: *Asist. Pastor @ Manage a Tortilla*
*factory & Walmart - Mom - Human Resource Person*
PARENTS' PERSONALITIES: *Dad - Public, very conservate*
*Quiet - loving - Mom - Same - less harsh -*
HOME ATMOSPHERE/DISCIPLINE: *Very Detailed - Perfectionist*
*Dad - Spank - Grounded*
RELATIONSHIP WITH PARENTS: *Good - Stressed -*

RELATIONSHIP WITH SIBLINGS/FRIENDS: *N/A*

RELIGION (CHILD/CURRENT): *Christian*

SIGNIFICANT CHILDHOOD EVENTS (ABUSE): *Yes - Met Father*
*@ Grief Father - @ @ uncles - Knows but Not*
*Kids of this -*

EARLY CHILDHOOD... ~~happy~~   poor health,   nail biting,   stuttering,   thumb sucking,
~~sleepwalking~~,  ~~night terrors~~,  ~~bed wetting~~,  ~~separation anxiety~~,  fears,   rituals,   hyperactivity
*2 Age 9.    Still    @ 9-10 yrs.   Mom   @ episodes.*

TEEN HOBBIES/INTERESTS: *(Music), Piano, Swim Team -*

PEER GROUP (GANGS): *Very Small - 15 kids in H.S. Class.*
SIGNIFICANT TEEN EVENTS: *- Church Social Group -*

## EDUCATION

HIGHEST GRADE COMPLETED: *15 yrs -*   GED?:
SPECIAL ED/HELD BACK:
GENERAL ATTITUDE/GRADES: *H.S. @ Honors -*

BEHAVIOR PROBLEMS: *No -            Popular -*

PEER RELATIONS (TEASING↔): *No -*
COLLEGE/TRADE SCHOOL:

*Christian School - Very Small*
*- E.O. was Best Friends -*

*(left margin handwritten notes:)*
*Bio Dad*
*OK.*
*Him*
*@*

*TBA*
*work.*

*Let*
*Her*
*Prison*
*1 child*
*molestation*

*argue*
*during*
*The*
*molestation*
*& analysis*

*new*
*rock?*

## EMPLOYMENT

**FIELD OF WORK:** *Manager - SAP Rehab. Aprt*

**CURRENT/LAST JOB TITLE & DATES:** *Sept 99 to Oct 8, 2000  Property Manag.*

**SATISFIED/REASON FOR LEAVING:** _____

**EARNINGS VS. COSTS:** *$32,000*

**JOB HISTORY (FIRST, LONGEST, DATES & REASONS FOR LEAVING):** _____

**HX OF SSI/SSD/WKMAN'S COMP:** _____

**HX OF GRIEVANCE/HARASSMENT:** _____

**AMBITION/GOALS:** *Rt Now — Want my Children Back.*
*Before — wanted to wk in Real Estate.*

**MILITARY BRANCH :** _____
**DURATION OF SERVICE:** *No*
**TYPE OF DISCHARGE & RANK:** _____
**SPECIAL AWARDS/DISCIPLINARY ACTIONS:** _____

## RELATIONSHIPS

**NUMBER OF MARRIAGES:** *1*

**NAME, AGE, OCCUPATION, PERSONALITY OF CURRENT PARTNER:** *Joe Williams — 94 - 2000*

**HX & STATUS OF CURRENT RELATIONSHIP:** *Deceased — Husband had Cancer - last yr. of marriage was hard*

**OTHER MARRIAGES/SIGNIFICANT RELATIONSHIPS:** *Had a Sexual Rel. — extra Marital Affair*

**DOMESTIC VIOLENCE:** _____

**GENDER/AGES OF CHILDREN:** *2   Ages — Boy 6 - Girl 5 yrs*

**DESCRIPTION OF CHILDREN (SPECIAL PROBLEMS?):** _____

**RELATIONSHIP WITH CHILDREN:** _____

**MISCARRIAGES/ABORTIONS:** _____

## (RELATIONSHIPS CONTINUED)

AGE/CIRCUMSTANCES OF FIRST EXPOSURE TO DATING & SEX: _____

ATTITUDE ABOUT SEX: _____

HX OF SEXUAL FUNCTIONING (OVERALL/CURRENT): _____

## PSYCHOLOGICAL HISTORY

INPATIENT FACILITY & DOCTOR:        DATES/LENGTH:

OUTPATIENT PRACTITIONERS: *Candy Rhode, MA.*    DATES/FREQUENCY: *1X wk for 3yrs -*

HX OF COT?: _____

OUTCOME OF TX (PSYCHOTROPICS/DIAGNOSES): -

TX COMPLIANCE/BENEFIT: _____

CURRENT MEDICATION(RX, NON-RX, HERBS): *Ativan 1mg.*   *Dr. Belogia*
*25.mg. Zoloft (150.mg. seriquet -)*

CURRENT COMPLIANCE (LAST DOSAGE): _____ *Dr. Perry*

FAMILY HISTORY OF ABUSE/MENTAL ILLNESS/SUBSTANCE USE: *Tort*
*G.F. Alcoholic -, Aunt (mom'sister) Drug*

TEMPER/ANGER (DTO: EASILY AGITATED, LOSE CONTROL): _____
*AB - Cry -*

*always See The Best in people*
*Anger is a Sin - Forgive*
*? love*

## PSYCHOSOMATIC SYMPTOMS

HEADACHES: _No_                 DIZZINESS: _No_
BACKACHES: _2_                  PALPITATIONS: _2_
STOMACH/GI SX: _2_              FATIGUE: _2_
ALLERGIES: _2_                  NUMBNESS: _No_

SLEEP DISTURBANCES: _S.T. — Stress / also Nightmares_

CHANGES IN APPETITE: _PL_

## PSYCHOPATHOLOGICAL SYMPTOMS

HALLUCINATIONS: _No_

DELUSIONS: _No_
PARANOIA:
GRANDIOSITY: _No_

DEPRESSION: _Yes — S.T. — / S.A._

DTS: _Cut my arm inside_
MANIA: _Arm — Since being in_

PANIC/AGORAPHOBIA: _Jail. After being_
PHOBIAS:
OBSESSIONS/COMPULSIONS: _Served papers about_
PTSD:
GAD: _Severing parental rt._

SEXUAL DYSFUNCTIONS: _fear a dislike of Intercourse._
PARAPHILIAS:
GENDER ID: _female_

ANOREXIA: _N/O_
BULIMIA/ BINGE:

INTERMITTENT/EXPLOSIVE:
PYRO/KLEPTO/TRICHO/GAMBLING:
DISSOCIATION/UNREALITY:

PERSONALITY D/O (STRENGTHS/WEAKNESSES):

_Started Embell. from Job. Fired_
_Stole $18000 in 4 yrs — from Job._

## MEDICAL AND NEUROLOGICAL

**CURRENT GENERAL HEALTH:** *WNS —*
**HEALTH HX (ILLNESSES, OPERATIONS, ACCIDENTS):**

**HX OF NEUROLOGICAL INJURIES/PROBLEMS:** *NO*

**COGNITIVE FUNCTIONING/MEMORY:**

**OTHER UNTREATED PAIN/COMPLAINTS:** *NO*

## SUBSTANCE USE

**AGE STARTED ALCOHOL:** *21*
**USUAL TYPE OF ALCOHOL:** *Wine Coolers*
**AVERAGE, PEAK, LONGEST WITHOUT:**
*Intox 3 to 4 X's in life —*
**ROUTINE:**
**EFFECTS (INTOX, BLACKOUTS, SOC/OCC FUNCTION, TOL/WITHD):**

**CURRENT USE (LAST 30 DAYS):**

**AGE STARTED DRUGS:** *NO*
**TYPES OF DRUGS:**

**AVERAGE, PEAK, LONGEST WITHOUT:**

**ROUTINE/PARAPHERNALIA:**

**EFFECTS (BLACKOUTS, SOC/OCC FUNCTION, TOL/WITHD):**

**CURRENT USE (LAST 30 DAYS):**

**CAFFEINE INTAKE:** *NO*
**CIGARETTE USE:** *No*
**OVERALL DRUG OF CHOICE:** *Alcohol*
**TREATMENT:** *NO*

## CRIMINAL/LEGAL

**JUVENILE ARRESTS:**   **DATE:**   **DISPOSITION:**

_No_

**ADULT ARRESTS:**   **DATE:**   **DISPOSITION:**

_1st Time_

**WEAPONS (TRAINING, BELIEFS, OWN?):** _No — Andrew s hAd_
_Guns & knives_
**FAMILY HX OF CRIMINAL BEHAVIOR:** _bio Father in prison for_
_molestation_
**FUNCTIONING IN JAIL:** _I Adjusted — Either smile a_
_Swim —_

**LITIGATION HISTORY:**

## CURRENT FUNCTIONING

**LIVING SITUATION/OTHERS IN HOME:** _Jail_

**DAILY ROUTINE:**

**CURRENT INTERESTS (FREE TIME):**

**CURRENT PEER & SUPPORT GROUPS:**

**STRESSES (LEGAL/FINANCIAL PROBLEMS):**

## STATEMENTS

Married Joe (Age 26) Wendi (23) (1994)

Married in Casa Grande —
religious conflict over Church —
actually marriage was ok — marriage
was best both felt we changed —
we didn't have to put on "hits"
pretend like we were — it was fine
for me — use to hang out + his friends
lost touch w/ mine — He had a
Camaro Cha — was welding — then
Auto Rc Placement (6 mos) — got a
loan — started Joe's windshield's repair
tented a House — moved to the farm
to a shack — old shore, was being —
tore + there until March '98 —
that was 1st child in there —
[?] in marriage — He had tumor
was got it fixed — then it came back —    1996
Had a good busi. manager — He spent
1994   the money on pleasure things — then I
had to put money in the business from
my job — gave whatever by Debt —
Felt Responsible for our Happiness, "what
more can I do" — Stole $18,000

**RULE 11/26.5**

UNDERSTANDS CHARGES: *[handwritten]*

UNDERSTANDS PLEAS (G/NG): *[handwritten]*

UNDERSTANDS COURT ROLES: *[handwritten]*

ABILITY TO HELP LAWYER: *[handwritten]*

UNDERSTANDS CONSTITUTIONAL RIGHTS: *[handwritten]*

UNDERSTANDS WAIVER OF RIGHTS WITH GUILTY PLEA: _____

COMPETENCE TO STAND TRIAL: _____

COMPETENCE RELATED TO MEDS?: _____

AMENABILITY TO TREATMENT: _____

DANGER TO COMMUNITY: _____

(IF REQUESTED) MENTAL STATUS AT OFFENSE: _____

Product Number
24005

# MMPI-2™
## Minnesota Multiphasic Personality Inventory-2™

**Profile for Supplementary Scales**

Name _____

Address _____

Occupation _____ Date Tested __ / __ / __

Education _____ Age _____ Marital Status _____

Referred By _____

Scorer's Initials _____

Copyright © 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved. Copyright © 1942, 1943 (renewed 1970), 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved. Distributed exclusively by National Computer Systems, Inc., P.O. Box 1416, Minneapolis, MN 55440. 800-627-7271 www.ncs.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. This NCS logo is a registered trademark of National Computer Systems, Inc.

**LEGEND**
A — Anxiety
R — Repression
Es — Ego Strength
MAC-R — MacAndrew Alc.
AAS — Addiction Admit
APS — Addiction Potent
MDS — Marital Distress
Ho — Hostility
O-H — Overcontrolled Host.
Do — Dominance
Re — Social Responsibility
Mt — College Maladjustment
GM — Gender Role-Masculine
GF — Gender Role-Feminine
PK — Post Traum. Stress
PS — Post Traum. Stress
Si1 — Shyness/Self Consciousness
Si2 — Social Avoidance
Si3 — Alienation – Self and Others
A, R, Es, MAC-R, AAS, APS, MDS, Ho, O-H, Do, Re, Mt, GM, GF, PK, PS, Si1, Si2, Si3

FEMALE

| | A | R | Es | MAC-R | AAS | APS | MDS | Ho | O-H | Do | Re | Mt | GM | GF | PK | PS | Si1 | Si2 | Si3 | VRIN | TRIN | F_b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score | 13 | 21 | 34 | 21 | 4 | 25 | 4 | 15 | 13 | 21 | 34 | 7 | 12 | 34 | 21 | 13 | 1 | 38 | 3 | 2 | 1 | |



# MMPI-2™ Minnesota Multiphasic Personality Inventory-2™

The VRIN scale consists of 49 pairs of specially selected items. The members of each VRIN item pair have either similar or opposite content; each pair is scored for the occurrence of an inconsistency in responses to the two items. The scale score is the total number of times item pairs are answered inconsistently. (Refer to the *MMPI-2 Manual for Administration, Scoring, and Interpretation* for directions on interpreting scores.)

**Directions for scoring:**

1. Transfer responses to the item pairs from the answer sheet to the recording grid on the right by blackening in the appropriate circle:
   Example: If response to item 6 was false   6   Ⓣ ●

2. Place the scoring template VRIN-1 over the grid; in the blank provided in the third column, enter a "+" (plus sign) for each item pair in which both template boxes show a blackened response.
   Example: The response 3 ● Ⓕ   39 ● Ⓕ   would receive a "+" because both boxes of the scoring template show a blackened response.

3. Do the same for scoring template VRIN-2.

4. Total the +'s and record the total score.

| | | | | |
|---|---|---|---|---|
| 3 Ⓣ ● | 39 ● Ⓣ | ___ | | |
| 6 ● Ⓣ | 90 ● Ⓣ | ___ | | |
| 9 Ⓣ ● | 56 Ⓣ ● | ___ | | |
| 28 Ⓣ ● | 59 Ⓣ ● | ___ | | |
| 31 Ⓣ ● | 299 ● Ⓣ | ___ | | |
| 32 Ⓣ ● | 318 Ⓣ ● | ___ | | |
| 40 Ⓣ ● | 176 Ⓣ ● | ___ | | |
| 45 Ⓣ ● | 265 Ⓣ ● | ___ | | |
| 48 Ⓣ ● | 184 ● Ⓣ | ___ | | |
| 49 ● Ⓣ | 280 Ⓣ ● | ___ | | |
| 73 ● Ⓣ | 377 ● Ⓣ | ___ | | |
| 81 ● Ⓣ | 284 Ⓣ ● | + | | |
| 83 ● Ⓣ | 288 Ⓣ ● | ___ | | |
| 84 ● Ⓣ | 105 ● Ⓣ | + | | |
| 86 ● Ⓣ | 359 Ⓣ ● | ___ | | |
| 95 ● Ⓣ | 388 Ⓣ ● | ___ | | |
| 99 Ⓣ ● | 138 Ⓣ ● | ___ | | |
| 103 Ⓣ ● | 344 Ⓣ ● | ___ | | |
| 110 Ⓣ ● | 374 Ⓣ ● | ___ | | |
| 118 Ⓣ ● | 430 Ⓣ ● | ___ | | |
| 125 Ⓣ ● | 195 Ⓣ ● | ⌐ | | |
| 135 Ⓣ ● | 482 Ⓣ ● | ___ | | |
| 136 ● Ⓣ | 507 Ⓣ ● | ___ | | |
| 152 ● Ⓣ | 464 Ⓣ ● | ___ | | |
| 161 Ⓣ ● | 185 Ⓣ ● | ___ | | |
| 165 Ⓣ ● | 565 Ⓣ ● | ___ | | |
| 166 ● Ⓣ | 268 Ⓣ Ⓥ | + | | |
| 157 Ⓣ ● | 243 Ⓣ ● | ___ | | |
| 196 Ⓣ ● | 415 Ⓣ ● | ___ | | |
| 199 Ⓣ ● | 467 Ⓣ ● | ___ | | |
| 226 Ⓣ ● | 257 Ⓣ ● | ___ | | |
| 259 Ⓣ ● | 333 Ⓣ ● | ___ | | |
| 262 ● Ⓣ | 275 Ⓣ ● | ___ | | |
| 290 ● Ⓣ | 556 ● Ⓣ | ___ | | |
| 339 Ⓣ ● | 394 ● Ⓣ | ___ | | |
| 349 Ⓣ ● | 515 Ⓣ ● | ___ | | |
| 360 ● Ⓣ | 521 ● Ⓣ | ___ | | |
| 353 ● Ⓣ | 370 ● Ⓣ | ___ | | |
| 364 Ⓣ ● | 554 Ⓣ ● | ___ | | |
| 369 ● Ⓣ | 421 Ⓣ ● | ___ | | |
| 372 ● Ⓣ | 405 ● Ⓣ | ___ | | |
| 380 ● Ⓣ | 562 Ⓣ ● | ___ | | |
| 395 Ⓣ ● | 435 Ⓣ ● | ___ | | |
| 398 Ⓣ ● | 403 ● Ⓣ | ⌐ | | |
| 411 Ⓣ ● | 485 ● Ⓣ | ⌐ | | |
| 472 Ⓣ ● | 533 Ⓣ ● | ___ | | |
| 491 ● Ⓣ | 509 ● Ⓣ | ___ | | |
| 506 Ⓣ ● | 520 Ⓣ ● | ___ | | |
| 513 Ⓣ ● | 542 Ⓣ ● | ___ | | |

**VRIN Total**  10

Form for use with the MMPI-2 test as published and copyrighted by the Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS Pearson, Inc., P.O. Box 1416, Minneapolis, MN 55440.
800-627-7271   http://assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

Product Number
24007



# MMPI-2

### Minnesota Multiphasic
### Personality Inventory-2™

The TRIN scale consists of 20 pairs of items that are opposite in content. If a subject responds inconsistently by answering True to both items of certain pairs, one point is added to the TRIN score; if the subject re-sponds inconsistently by answering False to certain item pairs, one point is sub-tracted. (Refer to the *MMPI-2 Manual for Administration, Scoring, and Interpretation* for directions on interpreting scores.)

**Directions for scoring:**

1. Transfer responses to the item pairs from the answer sheet to the recording grid on the right by blackening in the appropriate circle:
   Example: If response to item 3 was false    3  Ⓣ●

2. Place the scoring template TRIN-1 over the grid; in the blank provided in the third column, enter a "+" (plus sign) for each item pair in which both template boxes show a blackened response.
   Example: The response  3 ●Ⓕ   39 ●Ⓕ   would receive a "+" because both template boxes show a blackened response.

3. Count the number of "+"s and enter the TRIN-1 total.

4. Place the TRIN-2 scoring template over the grid; in the blank provided in the third column, enter a "-" (minus sign) for each item pair in which both template boxes show a blackened response.

5. Count the number of "-"s and enter the TRIN-2 total.

6. Subtract the TRIN-2 total from the TRIN-1 total and enter the result.

7. Add 9 points to obtain the TRIN total.
   Example: TRIN-1 total     2
   TRIN-2 total     −1
                     1
                    +9
   TRIN Total     10

| | | | | | |
|---|---|---|---|---|---|
| 3 | Ⓣ● | | 39 | ●Ⓣ | — |
| 9 | ●Ⓣ | | 56 | Ⓣ● | — |
| 12 | Ⓣ● | | 166 | ●Ⓣ | — |
| 40 | Ⓣ● | | 176 | Ⓣ● | — |
| 48 | Ⓣ● | | 184 | ●Ⓣ | — |
| 63 | Ⓣ● | | 127 | ●Ⓣ | — |
| 65 | Ⓣ● | | 95 | ●Ⓣ | — |
| 73 | ●Ⓣ | | 239 | Ⓣ● | — |
| 83 | ●Ⓣ | | 266 | Ⓣ● | — |
| 99 | Ⓣ● | | 314 | ●Ⓣ | — |
| 125 | Ⓣ● | | 195 | Ⓣ● | — |
| 140 | Ⓣ● | | 196 | ●Ⓣ | — |
| 152 | ●Ⓣ | | 484 | Ⓣ● | — |
| 165 | ●Ⓣ | | 565 | Ⓣ● | — |
| 209 | Ⓣ● | | 351 | Ⓣ● | — |
| 262 | ●Ⓣ | | 275 | Ⓣ● | — |
| 265 | Ⓣ● | | 360 | Ⓣ● | — |
| 359 | ●Ⓣ | | 367 | Ⓣ● | — |
| 377 | ●Ⓣ | | 534 | Ⓣ● | — |
| 556 | ●Ⓣ | | 560 | ●Ⓣ | + |

TRIN-1     1

− TRIN-2     1

−     0

+9

TRIN TOTAL     9

Form for use with the MMPI-2 test as published and copyrighted by the Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS Pearson, Inc., P. O. Box 1416, Minneapolis, MN 55440.
800-627-7271   http://assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

A B C D  2000



Product Number
24007

MMPI-2™ Minnesota Multiphasic Personality Inventory-2™

Profile for Content Scales

Name: Wendi Andriano
Address:
Occupation:                          Date Tested
Education:               Age        Marital Status
Referred by:
MMPI-2 Code:
Scorer's Initials:

FEMALE

Excerpted from the MMPI-2™ (Minnesota Multiphasic Personality Inventory-2™) Manual for Administration, Scoring, and Interpretation, Revised Edition. Copyright © 2001 The Regents of the University of Minnesota. All rights reserved. Distributed exclusively under license from the University of Minnesota by NCS Pearson, Inc., P.O. Box 1416, Minneapolis, MN 55440. 800-627-7271. http://Assessments.ncspearson.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS Assessments logo is a trademark of NCS Pearson, Inc.

Product Number 24002

| T | ANX | FRS | OBS | DEP | HEA | BIZ | ANG | CYN | ASP | TPA | LSE | SOD | FAM | WRK | TRT | T |
|---|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|---|
| Raw Score | 15 | 7 | 6 | 7 | 4 | 3 | 0 | 7 | 8 | 5 | 9 | 3 | 3 | 10 | 1 | |
| T | 69 | 51 | 50 | 54 | 46 | 56 | 32 | 47 | 54 | 43 | 57 | 41 | 42 | 52 | 55 | |

## Part II

**Instructions:** Complete the following by filling in either a number or a letter for each dash ( _____ ). Do the items in order, but don't spend too much time on any one item.

**EXAMPLE:**  A B C D _E_

(1) 1 2 3 4 5 _6_

(2) white black   short long   down _u p_

(3) AB . BC   CD   D _E_

(4) Z Y X W V U _T_

(5) 1 2 3 2 1   2 3 4 3 2   3 4 5 4 3   4 5 6 _5 2_

(6) NE/SW   SE/NW   E/W   N/ _S_

(7) escape   scape   cape   _a p e_

(8) oh ho   rat tar   mood   ___ _a a_ ___

(9) A Z B Y C X D _W_

(10) tot tot   bard drab   537 _7 3 5_

(11) mist is   wasp as   pint in   tone _o n_

(12) 57326   73265   32657   26573 _6 5 7 3 2_

(13) knit in   spud up   both to   stay _a t_

(14) Scotland   landscape   scapegoat _g o a t_ ee

(15) surgeon 1734567   snore 17635   rogue _1 5 3 7 6_

(16) tam tan   rib rid   rat raw   hip _b i t_

(17) tar pitch throw   saloon bar rod   fee tip end   plank _t a b l e_ meals

(18) 3124   82   73   154   46   13 _12_

(19) lag leg   pen pin   big bog   rob _r u b_

(20) two w   four r   one o   three _t_

_IQ ~ 110_

### Summary Scores

| | | | | | |
|---|---|---|---|---|---|
| V: Raw _32_ | T ___ | A: Raw _30_ | T ___ | Total: Ra _68_ | T ___ |
| CQ: ___ | AQ: ___ | Est. IQ: ___ | | | |

# Exhibit 7

1
2
3
4
5
6
7
8

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

9  State of Arizona,                          )
                                             )
10                          Respondent,       )    No. CR2000-096032-A
                                             )
11          vs.                               )    **DECLARATION OF**
                                             )    **G. DAVID DELOZIER**
12                                            )
     Wendi Elizabeth Andriano,                )
13                                            )    (Assigned to the Hon. Douglas Rayes)
                            Petitioner.       )
14                                            )
                                             )
15                                            )
16

17      1.      I served as counsel to Wendi Andriano during her first degree murder trial in

18   connection with the death of her husband, Joseph Andriano.

19

20      2.      Prior to Wendi's case, I had never tried a death penalty case.  I had some

21   criminal defense experience starting in the mid-1990s, including some felony cases.  I also

22   played a secondary role in a couple second-degree murder cases in the late 1990s, similar

23   to the role I ultimately assumed in Wendi's case.  I had never worked on a criminal matter

24   comparable to the magnitude of Wendi's case.

25

26      3.      The Public Defender's Office initially represented Wendi along with *Knapp*

27   counsel Leon Thikoll.  I assumed representation of Wendi's case on December 2, 2000,

28

MADI_2575622.1

1   after speaking with Pastor Andrew Cunningham, a friend of the Ochoas. For several

2   months in early 2001, I had sole representation of Wendi, taking over for both Attorney

3   Thikoll and the Public Defender's Office. The Public Defender's Office resumed the lead

4   role in the case in mid-2001, when it became clear that the cost and expense of the case

5   would be prohibitive for Wendi and her family to pursue with privately retained counsel.

6

7        4.     Prior to the Public Defender's resumption of representation in mid-2001, I

8

9   sought the appointment of experts and was actively involved in the preparation of the case.

10

11        5.     My active involvement in the case ceased when the Public Defender's Office

12   resumed primary responsibility for the case in mid-2001. Dan Patterson was the attorney

13   assigned to Wendi's case from the Public Defender's Office, and from our first meeting in

14   September 2001 forward, I understand that my role was to be passive—providing

15   assistance on discrete tasks when requested by Attorney Patterson—rather than taking the

16   lead on any aspects of the pre-trial preparation or investigation. From that time forward, I

17

18   did not assume responsibility for any tasks related to Wendi's case unless Attorney

19   Patterson asked for my assistance. Because I viewed my role in the case as limited to

20   tasks that Attorney Patterson assigned me, I did not continue to pursue my own

21

22   investigation of the case after Attorney Patterson's appointment.

23

24        6.     Attorney Patterson rarely requested my assistance in Wendi's case. He only

25   met with me a few times total between our first meeting in 2001 until Wendi's trial in

26   August 2004, and he rarely communicated with me by phone. Attorney Patterson

27   frequently failed to return my calls and correspondence when I attempted to contact him

28

MADI_2575622.1

about Wendi's case. Attorney Patterson did not inform me which witnesses he wanted me to examine until after the trial was underway.

7.     As a result, I worked on very limited, discrete tasks in the months leading up to the trial. My billing records indicate that I spent a total of 36.35 hours working on the case during a seven-month time period (December 2003 through June 2004) prior to trial.

8.     I communicated with Wendi regularly during the time leading up to trial. These meetings were primarily to discuss topics unrelated to her case, such as family and our belief in God. I viewed my role with Wendi as a combination of an attorney and a spiritual counselor. One of the primary goals of my meetings with Wendi was to provide psychological and religious support. Because I was not routinely kept "in the loop" on case strategy and progress by Attorney Patterson, I generally did not communicate with her regarding matters relating to the substance of her case.

9.     I fasted during Wendi's trial to provide spiritual insight. I went 70 days without eating any solid food, although I did consume fruit juices during this time.

10.     An attorney that worked in my law firm, Justin Blair, was murdered during Wendi's trial. I was devastated by this loss and found it very difficult to focus on Wendi's case after this happened. I believe that this loss also greatly affected my concentration and performance during the trial. Additionally, Mr. Blair's death was disruptive because Mr. Blair had assisted me with Wendi's case, both by performing legal research and helping me prepare for direct examination of the defense witnesses.

MADI_2575622.1

11.     On at least one day during the trial (October 20, 2004), I felt weak to the extent that I began trailing off toward the end of my direct examination of William Joe Collier, a witness who testified regarding sodium azide, and realized that I was unable to follow along during the prosecutor's cross-examination of Mr. Collier.  Midway through the cross-examination, Attorney Patterson recognized that I was feeling ill and asked the Court to adjourn early.

12.     Attorney Patterson requested that I be the principal lawyer involved in preparing and presenting Wendi's mitigation case in the spring of 2004.  Attorney Patterson did not participate in preparing or presenting the mitigation case until after the verdict.

13.     I met with some of Wendi's friends and family to research the mitigation case and then narrated a Power Point prepared by Scott Mac Leod with photographs of Wendi during the mitigation case.  I initially requested that Donna Ochoa, Wendi's mother, write the script for the Power Point.  Donna recommended that a family friend, Cindy Schaider, write the script, which I later read during the Power Point.

14.     I only met with Scott Mac Leod, the mitigation specialist from the Public Defender's Office, a few times before Wendi's trial and had minimal contact by phone.  When I did see him, he appeared tired and preoccupied.  Other than Scott's preparing the slides for the Power Point presentation I narrated, we did not coordinate on the mitigation portion of the case.

MADI_2575622.1

15.     I was aware of information while preparing for trial that suggested that Wendi had mental health problems and a history of childhood sexual abuse.  For example, I communicated with Kandi Rohde, a mental-health counselor who treated Wendi during her pre-trial incarceration.  Wendi authorized Ms. Rohde to communicate to me information disclosed during her counseling sessions, and Ms. Rohde frequently contacted me regarding her concerns about Wendi's mental health.  On February 19, 2001, Ms. Rohde sent me a letter urging that I pursue a psychiatric consultation for Wendi.  Ms. Rohde's February 19, 2001 letter is attached as Exhibit A.  Ms. Rohde's letter indicated that Wendi displayed symptoms of a personality disorder and emphasized that Wendi's mother had reported that Wendi was sexually abused by her paternal grandfather. *See* Ms. Rohde's February 19, 2001 letter at p. 1.

16.     Ms. Rohde also sent me a letter on March 12, 2001, which is attached as Exhibit B.  In her letter, Ms. Rohde reported that she believed Wendi had been sexually molested by her paternal grandfather as a child and that Wendi suffered from depersonalization disorder, dissociative amnesia, and a personality disorder and asked that I seek a psychological examination of Wendi. *See* Ms. Rohde's March 12, 2001 letter at p. 1-2.

17.     On several occasions, Ms. Rohde sent me her notes from the counseling sessions, including sessions held on September 29, 2003 and October 2, 2003.  Ms. Rohde's notes from the sessions are attached as Exhibit C.  These sessions occurred shortly after Wendi attempted suicide, requiring emergency medical treatment and

MADI_2575622.1

placement in a psychiatric facility. Ms. Rohde's notes from these counseling sessions detailed Wendi's psychiatric symptoms of anxiety and distress. *Id.*

18.     Dr. Jack Potts conducted a competency evaluation of Wendi in March of 2001. Dr. Potts' competency report, which I received prior to Wendi's trial, is attached as Exhibit D. Dr. Potts' report noted Wendi's depression and memory problems, urging that Wendi's mental health be independently evaluated. *See* Dr. Potts' Report, p. 2-3.

19.     I was not aware that Dr. Richard Rosengard had performed an additional competency evaluation of Wendi in August of 2002.

20.     Dr. Michael Bayless conducted a psychological evaluation of Wendi for the prosecution and issued a report dated August 4, 2004, which I received prior to Wendi's trial. Dr. Bayless's report is attached as Exhibit E. In his report, Dr. Bayless diagnosed Wendi with depressive disorder and personality disorder with antisocial and borderline traits. *See* Dr. Bayless's Report, p. 9. Dr. Bayless also noted that Wendi reported a history of childhood sexual abuse by her paternal grandfather and biological father, and that Wendi's biological father was currently in prison for child molestation of his step-daughter. *Id.* at 2.

21.     I was generally aware that Wendi was taking psychoactive medications prior to and during trial. I did not monitor her medications.

22.     I was also aware of Wendi's grueling schedule during the trial. Each day during her trial, Wendi was required to wake up at 1:00 a.m. to prepare to be transported to

6

Madison Jail, where she was held from 2:20-7:30 a.m. in a holding cell.  At 7:30 a.m., Wendi was transported to Mesa Courthouse.  Wendi reported difficulty getting adequate sleep and exhaustion during her trial.  Wendi was also provided only two meals each day during her trial – one at 3:00 a.m. and one at 6:30 p.m.  Wendi reported hunger during her trial.  A handwritten note by Wendi from during her trial detailing her daily schedule is attached as Exhibit F.  A letter from Wendi's healthcare providers during her incarceration at Durango Jail, expressing concern regarding her lack of adequate meals, is attached as Exhibit G.

23.    I did not investigate Wendi's personal and family history of mental health problems or engage a psychiatrist or neuropsychologist to evaluate Wendi's mental health. I sent copies of some of Kandy Rohde's notes regarding Wendi's mental health to Attorney Patterson, but he did not ask me to follow up.  I know of no strategic reason for not investigating Wendi's personal and family history of mental health problems.

24.    I did not investigate Wendi's history of possible childhood abuse.  I know of no strategic reason for not investigating childhood abuse of Wendi.

25.    I provided several boxes containing true and correct copies of documents from my file relating to Wendi's case to her post-conviction relief counsel.  All materials provided (except for post-trial materials) were available to me at or before the time of Wendi's trial.

26.    I declare under penalty of perjury that the foregoing is true and correct.

7

MADI_2575622.1

1

DATED this 7th day of June, 2011.

2

3                                                    _____
                                                     David DeLozier
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                     8

MADI_2575622.1


FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 21 2001 12:47PM P2

Feb-21-01 07:28A                                          310 836 0695              P.01


H. Kandy Rohde, CPC
5507 East Shea Blvd.
Scottsdale AZ 85254
(480) 443-9313

Law Offices of G.David DeLozier
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

February 19, 2001

Dear Mr. DeLozier,

    I have been meeting with Wendi Andriano, and I recommend that a psychiatrist be called in to examine her. I believe that her willingness to give up her will to others is a symptom of some kind of personality disorder. I also suspect that her defense system includes dissociation. Her mother's reference to possible abuse by Wendi's paternal grandfather could be the origin of that dissociation. The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional.

    It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist. Ideally I would like to have him or her administer personality tests and perhaps interview Wendi under hypnosis. I would also hope she could be evaluated for medication.

    Please let me know if this is possible and if I can confer with the professional she chooses. Thank you.

Sincerely,

H.Kandy Rohde, CPC

EXHIBIT
A