# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

**LARRY GRANT**
Chief Trial Deputy – East Valley

JAMES J. HAAS
Public Defender

PETER C. ROSALES
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: Wendi Elizabeth Andriano          Date of Birth: 08/26/70
SS#: 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   Purpose for disclosure: Criminal defense
Extent of information to be disclosed: Any and all records including but not limited to medical, physical, psychological records or other.

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.     Records of treatment for drug or alcohol abuse or psychiatric illness:
       X Yes ___ No

2.     Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and
       communicable disease related information:
       ___ Yes   X No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing.  Undersigned may revoke authorization by written notice of revocation.  However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____   _____   _____   _____
Patient                    Date       Witness                    Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____   _____        _____
Authorized Representative   Date            Relationship to Patient

_____   _____
Witness                    Date

**LAW FIRM**         019344
Southeast Facility ▪ 222 East Javelina, Suite 1300 ▪ Mesa, Arizona 85210-6201
(602) 506-2200 ▪ (FAX) 506-2865 ▪ (TT) 506-1646

PCR000287

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:  Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: Wendi Elizabeth Andriano          Date of Birth: 08/26/70
SS#: 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     Purpose for disclosure: Criminal defense
Extent of information to be disclosed:   Any and all records including but not limited to medical, physical, psychological records or other.

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entitles listed above to provide a copy of the following records: (please initial)

1.      Records of treatment for drug or alcohol abuse or psychiatric illness:
                        X Yes      No

2.      Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
                        Yes      X No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing.   Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____        _____
Patient                    Date        Witness                    Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____        _____
Authorized Representative      Date        Relationship to Patient

_____
Witness                    Date

**LAW FIRM**
Southeast Facility • 222 East Javelina, Suite 1300 • Mesa, Arizona 85210-6201
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

019345

PCR000288

May 23 03 09:39a

H.Kandy Rohde
Certified Professional Counselor CC-2814
5507 East Shea Blvd.
Scottsdale AZ 85254
480-443-9313

### Authorization for Release of Information

I, _Wendi Andriano_ , hereby authorize H.Kandy Rohde to
release information regarding my treatment to:
_Dan Patterson or Patrick Linderman_
_of the Public Defenders Office_
_Release is for all treatment notes._

I understand that I may revoke this authorization at any time, except to the extent
that action based on this authorization has already been taken. This consent will expire
automatically one year from the date on which it is signed.

_Wendi Andriano_       Date   _5-23-03_

005385

PCR000289

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

**JAMES J. HAAS**
Public Defender

LARRY GRANT
Chief Trial Deputy – East Valley

LANCE C. ANTONSON
Group C Counsel

To:   Hospitals and Medical Facilities      Employers
      Treatment Facilities                   Counselors/Psychologists
      Educational Facilities                 Medical Professionals
      Government Agencies                     Academic

From: _____

RE: _____  DOB: _____ SSN: _____

Date: _____

Please release **all appropriate records** for the above referenced individual for the purpose of criminal defense preparation by the Maricopa County Office of the Public Defender. The approximate date of the requested records is_____.

The undersigned hereby authorizes _____ to provide copies of any and all records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and psychological histories, medical psychiatric information, educational (including individual treatment plans) records, treatment facility documentation (both substance-abuse and mental health and employment verification.

Please initial for treatment of substance abuse and/or psychiatric illness: __✓__ Yes _____ No

This authorization shall be considered invalid after six months (or 60 days with respect to active drug and alcohol abuse records) from the date of signing. The undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease-related information, the recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by application of the law.

_____  5-23-03          _____ 5-23-03
Client signature (or guardian)  Date      Witness signature      Date

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

*Delivering America's Promise of Justice for All*

005386

PCR000290

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

LANCE C. ANTONSON
Group C Counsel

To:    Hospitals and Medical Facilities        Employers
       Treatment Facilities                     Counselors/Psychologists
       Educational Facilities                   Medical Professionals
       Government Agencies                       Academic

From:   Maricopa County Public Defender

RE: Wendi Andriano        DOB:   8-26-70   SSN:   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

Date:     5-23-2003

Please release all appropriate records for the above referenced individual for the purpose of
criminal defense preparation by the Maricopa County Office of the Public Defender. The
approximate date of the requested records is    January 2001 to Present        .

The undersigned hereby authorizes  H. Kandy Rohde      to provide copies of any and all
records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data,
grades, etc.) pertaining to family/social and psychological histories, medical psychiatric
information, educational (including individual treatment plans) records, treatment facility
documentation (both substance-abuse and mental health and employment verification.

Please initial for treatment of substance abuse and/or psychiatric illness:  ✓  Yes _____ No

This authorization shall be considered invalid after six months (or 60 days with respect to active
drug and alcohol abuse records) from the date of signing. The undersigned may revoke
authorization by written notice of revocation. However, undersigned may not revoke
authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality
rules and release pursuant to this authorization, or records regarding communicable disease-
related information, the recipient of this information understands that it is prohibited from
making any further disclosure of this information unless further disclosure is expressly permitted
by written consent of the undersigned or otherwise permitted by application of the law.

_____ 5-23-03        _____ 5-23-03
Client signature (or guardian)   Date          Witness signature           Date

LAW FIRM
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

*Delivering America's Promise of Justice for All*

005384



CORRECTIONAL HEALTH SERVICES FOR MARICOPA COUNTY, ARIZONA
ATTENTION: MEDICAL RECORDS DEPARTMENT (4TH FLOOR)
225 W. MADISON STREET
PHOENIX, ARIZONA 85003
PHONE: 602/256-5524    FAX: 602/256-9417

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

I, __Wendi Andriano__    __A631830__    __8/26/70__, hereby authorize
　　PATIENT NAME　　　　BOOKING No. OR SS No.　　DATE OF BIRTH
　　　　　　　　　　　　　　　　　　　　　　　　to disclose the following specific
　　　　　　　COVERED ENTITY
protected health information from __6/1/03__ to __Present__ at my request to __Maricopa County__
　　　　　　　　　　　　　　(Date)　　　　　(Date)
__Office of the Public Defender__    __1750 S. Mesa Dr., Suite 150,__
　　　　　　　　　　　　　　　　NAME AND ADDRESS
__Mesa, Arizona 85260__    __c/o Patrick Linderman__

Specific description of information to be disclosed and purpose for disclosure: __Legal__

The following information may also be disclosed, as applicable (check all that apply):
_____    CONFIDENTIAL HIV AND AIDS-RELATED INFORMATION.
_____    CONFIDENTIAL COMMUNICABLE DISEASE-RELATED INFORMATION.
_____    CONFIDENTIAL ALCOHOL OR DRUG ABUSE-RELATED INFORMATION.
__X__    CONFIDENTIAL MENTAL HEALTH DIAGNOSIS/TREATMENT INFORMATION.
_____    CONFIDENTIAL GENETIC TESTING INFORMATION.

I hereby release anyone disclosing or receiving the records or information specified above pursuant to this authorization from any and all liability arising from that disclosure. I understand that I may revoke this authorization by writing, to the covered entity, at any time, except to the extent that action has been taken in reliance upon it. With respect to all information other than HIV and AIDS-related information, this authorization will expire on the earlier of three-hundred-sixty-five (365) days after the date of this signature or the following expiration date, _____. With respect to HIV and AIDS-related information, this authorization will expire six months from the date of signing, or the expiration date, whichever is earlier.

I understand that the covered entity may not condition treatment, payment, enrollment or eligibility for benefits on whether I sign this authorization. I understand that information disclosed pursuant to this authorization may be subject to redisclosure by the recipient and may no longer be protected by federal privacy regulations.

Date __11-3-03__    Signature of Patient _____

　　　　　　　　　　　Witness __Patrick Linderman__

If Patient is unable to give consent because of physical condition or age, complete the following:

Patient is a minor ( _____ Year of age), or is unable to give consent because _____

Date _____    Signature of Parent/Guardian/POA _____

Relationship _____    Witness _____

**PROHIBITION OF REDISCLOSURE:** If the information disclosed relates to substance abuse treatment, the confidentiality of these records is protected by federal law. Federal regulations (42 CFR Part 2) prohibit any further disclosure without the specific written consent of the person to whom it pertains, or a otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient to release substance abuse records. The Federal Rule restricts any use of the information to criminally investigate or prosecute any substance abuse patient. State laws may also protect the confidentiality of patient records.

012882

Fees: $10.00/first 10 pages and $0.50/page for additional sheets copied. The fee for the record copied for you is $ _____ for _____ pages. (There is a $25.00 retrieval fee for records in off-site storage). Please send a cashier's check or money order payable to MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES.



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:   Hospitals and Medical Facilities          Employers
      Treatment Facilities                       Counselors/Psychologists
      Educational Facilities                     Medical Professionals
      Government Agencies                         Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN:_____

Date: _____

Please release **all appropriate records** for the above referenced individual for the
purpose of criminal defense preparation by the Maricopa County Office of the Public
Defender. The approximate date of the requested records is _____

The undersigned hereby authorizes _____, to provide Scott A. Mac
Leod,M.Ed. with a copy of any and all records (documents, reports, charts, charting
notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and
psychological histories, medical psychiatric information, educational (including
individual treatment plans) records, treatment facility documentation (both substance
abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness: ___Yes__No

This authorization shall be considered invalid after six months (or 60 days with respect to
active drug and alcohol abuse records) from the date of signing. The undersigned may
revoke authorization by written notice of revocation. However, undersigned may not
revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records regarding
communicable disease-related information. the recipient of this information understands
that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise
permitted by application of the law.

_____  4-22-04      _____  4-22-04
Client signature (or guardian)  Date    Witness signature    Date

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

004247

PCR000293



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:   Hospitals and Medical Facilities          Employers
      Treatment Facilities                       Counselors/Psychologists
      Educational Facilities                     Medical Professionals
      Government Agencies                         Academic


From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____


Please release **all appropriate** records for the above referenced individual for the
purpose of criminal defense preparation by the Maricopa County Office of the Public
Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____ to provide Scott A. Mac
Leod, M.Ed. with a copy of any and all records (documents, reports, charts, charting
notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and
psychological histories, medical psychiatric information, educational (including
individual treatment plans) records, treatment facility documentation (both substance
abuse and mental health and employment verification).

Please initial for treatment of substance abuse and/or psychiatric illness. ___Yes ___No

This authorization shall be considered invalid after six months (or 60 days with respect to
active drug and alcohol abuse records) from the date of signing. The undersigned may
revoke authorization by written notice of revocation. However, undersigned may not
revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records regarding
communicable disease-related information, the recipient of this information understands
that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise
permitted by application of the law.

_____ 4-22-04   _____ 4-22-04
Client signature (or guardian)  Date    Witness signature    Date

007281

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

. To:   Hospitals and Medical Facilities        Employers
        Treatment Facilities                    Counselors/Psychologists
        Educational Facilities                  Medical Professionals
        Government Agencies                     Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release **all appropriate** records for the above referenced individual for the
purpose of criminal defense preparation by the Maricopa County Office of the Public
Defender.  The approximate date of the requested records is _____.

The undersigned hereby authorizes _____ to provide Scott A. Mac
Leod,M.Ed. with a copy of any and all records (documents, reports, charts, charting
notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and
psychological histories, medical psychiatric information, educational (including
individual treatment plans) records, treatment facility documentation (both substance
abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness: X Yes __No

This authorization shall be considered invalid after six months (or 60 days with respect to
active drug and alcohol abuse records) from the date of signing.  The undersigned may
revoke authorization by written notice of revocation.  However, undersigned may not
revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records regarding
communicable disease-related information, the recipient of this information understands
that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise
permitted by application of the law.

_____ 4-22-04 _____ 4-22-04
Client signature (or guardian)   Date        Witness signature        Date

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

007282

PCR000295



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:   Hospitals and Medical Facilities        Employers
      Treatment Facilities                    Counselors/Psychologists
      Educational Facilities                  Medical Professionals
      Government Agencies                      Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release all appropriate records for the above referenced individual for the
purpose of criminal defense preparation by the Maricopa County Office of the Public
Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____, to provide Scott A. Mac
Leod,M.Ed. with a copy of any and all records (documents, reports, charts, charting
notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and
psychological histories, medical psychiatric information, educational (including
individual treatment plans) records, treatment facility documentation (both substance
abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness. _X_Yes __No

This authorization shall be considered invalid after six months (or 60 days with respect to
active drug and alcohol abuse records) from the date of signing. The undersigned may
revoke authorization by written notice of revocation. However, undersigned may not
revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records regarding
communicable disease-related information, the recipient of this information understands
that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise
permitted by application of the law.

_____ 4/22/04        _____ 4/22-04
Client signature (or guardian)   Date        Witness signature        Date

007283

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

PCR000296

# Exhibit 54

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003
(602) 506-6463
FAX: (602) 506-5001
Bar No. 005743
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR 2000-096032 |
| Plaintiff, | |
| vs. | MOTION FOR COURT ORDER TO ASSIST MITIGATION INVESTIGATION AND PROPOSED ORDER |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | (Assigned to the Honorable Brian K. Ishikawa) |

Defendant Wendi Elizabeth Andriano, by and through undersigned counsel, moves the

court for an order directing state and local agencies and entities to provide records regarding

Ms. Andriano and her family to the defense. If any state or local agency or entity possesses

any records relating to Ms. Andriano or her family, the defense needs to obtain them to

conduct an independent and thorough mitigation investigation in this capital case.

1

011810

This motion is supported by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15 and 24 of the Arizona Constitution.

This motion is further supported by the attached Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this ___19th___ day of November, 2004.

Maricopa County Public Defender

By _____
DANIEL B. PATTERSON
Deputy Public Defender

2

011811

PCR000298

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15, and 24 of the Arizona Constitution, Ms. Andriano is entitled to have her defense attorneys conduct an independent and thorough investigation of potential mitigating information to be used at the sentencing proceeding. In order to conduct an independent and thorough investigation, the defense must obtain all records documenting Ms. Andriano's life. This motion seeks the assistance of the court in obtaining such records in the possession of any state or local public agency in the State of Arizona.

A capital defendant has an unqualified right to present any facet of her character, background, or record that might call for a sentence less than death. *See Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982); *Lockett v. Ohio*, 438 U.S. 586, 602-03 (1978) (plurality opinion). The investigation into the existence of any mitigating circumstances must be conducted in accordance with the recently revised guidelines for defense counsel in capital cases. *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (revised 2003) [hereinafter "ABA GUIDELINES"]. The Guidelines "are not aspirational, . . . [but rather] embody the current consensus about what is required to provide effective defense representation in capital cases." *History of* ABA GUIDELINE 1.1. The United States Supreme Court has affirmed that the Guidelines are the established standards for capital defense counsel. *Wiggins v. Smith*, _____ U.S. _____,

3

011812

PCR000299

123 S.Ct. 2527, 2537 (2003) (The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are "well-defined norms."). *See also* Ariz.R.Crim.P. 6.8(b)(1)(iii).

Defense counsel must conduct "thorough and independent" investigations relating to issues of both guilt and penalty. ABA GUIDELINE 10.7. Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. *Commentary to* ABA GUIDELINE 10.7. Mitigation investigations must include "efforts to discover *all reasonably available* mitigating evidence and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." Commentary to ABA GUIDELINE 10.11. Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

4

011813

Any records relating to Ms. Andriano or her family that may be in the possession of state or local agencies are necessary to build his social history. The defense must obtain these records in order to conduct the required independent and thorough investigation into Ms. Andriano's background. The proposed Order will assist the defense in obtaining these records without the need to subpoena each individual agency to produce the records.

The proposed Order will also help to keep Ms. Andriano's privileged records from the prosecution and law enforcement until and unless disclosure of the records is required by Rule 15.2 of the Arizona Rules of Criminal Procedure. Just as the prosecution is entitled to conduct its investigation independently from the defense, so, too, Ms. Andriano's defense team is entitled to collect her records without fear that they will be disclosed to the prosecution regardless of their privileged nature. If the records will be used at any phase of the trial, their disclosure to the prosecution should be the decision of defense counsel, rather than that of an employee of a public agency in possession of the records.

For the foregoing reasons, Ms. Andriano asks the court to sign the proposed Order.

RESPECTFULLY SUBMITTED this _____ day of November, 2004.

Maricopa County Public Defender

By _____

DANIEL B. PATTERSON
Deputy Public Defender

5

011814

PCR000301

Copy of the foregoing mailed/
delivered this ___ day of November, 2004, to:

THE HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
Maricopa County Attorney's Office
301 W. Jefferson, 8th Floor
Phoenix, AZ  85003

G. DAVID DELOZIER
Attorney At Law
4016 East Forest Pleasant Place
Cave Creek, AZ  85331

By: _____
    DANIEL B. PATTERSON
    Deputy Public Defender

6

011815

PCR000302

# Exhibit 55

# SEXUAL ABUSE AS MITIGATION

Recently I had the opportunity to attend a seminar on sexual abuse in Lexington, presented by Carondelet Management Institute. This seminar was directed toward helping professionals in various disciplines who may encounter situations of sexual abuse or sexual abuse survivors. My intent in attending the seminar was to gain a deeper understanding of the signs and symptoms presented by survivors, to better identify individuals and/or families in which sexual abuse is present. This subtopic was thoroughly covered, as well as the dysfunctional dynamics that emerge in families with sexual abuse, unhealthy coping mechanisms of survivors, and treatment techniques with the highest success rates. For the purposes of a professional who is attempting to identify areas of mitigation, identification of the abuse survivor and perpetrator is the most important information to share. The following is a compilation of characteristics of the sexual abuse survivor:

1. Fear of the dark and/or sleeping alone
2. Nightmares
3. Lack of physical self-care
4. Eating disorders and related symptoms of such; distorted body image
5. Alcoholism and drug abuse, or total abstinence
6. Various phobias, such as agoraphobia or claustrophobia
7. Striving for perfection that seems obsessive in nature
8. Self-mutilation and self-destructiveness
9. Depression
10. Hysterical physical symptoms of illness
11. Compulsive behaviors
12. Blocking out memories of early years
13. Mistrust of others
14. "Victim" patterns in lifestyle/relationship choices
15. Rigidity in thought processes
16. Anger issues(rage disorders or total inability to express anger)
17. Discrimination against race/gender of perpetrator
18. Sexual issues in adult relationships
19. Gynecological problems; physical/psychosomatic symptoms such as gastrointestinal concerns, headaches, or arthritis
20. Minimization of childhood problems or complete denial of such problems
21. Dissociative (formerly multiple personality) disorders

The characteristics identifying sexual abuse perpetrators are, unfortunately, much less specific. In fact, it was stressed throughout the seminar to be constantly aware that many unlikely individuals are revealed as perpetrators. With that in mind, the following is a descriptive profile of the sexual abuse perpetrator:

1. Male or female
2. Likely to be a sexual abuse survivor
3. Substance abuser
4. Charming demeanor
5. Possibly a pillar of the community
6. Likely from a sexually dysfunctional family system
7. May be a pedophile
8. May be a sex addict
9. Denial
10. Dissociation
11. Rage issues
12. Shame/guilt issues
13. Exhibits antisocial personality traits/ disorder

000219

PCR000303

Besides identifying characteristics of the survivor and perpetrator, a person actively searching for signs of sexual abuse should carefully seek signs of sexual abuse family dynamics when observing interactions amongst family members. This requires an understanding of **trauma bonds**, attachments and acquired roles of family members which are not present in a healthy family. An example of a traumatic bond that often develops in a sexually abusive household is a "surrogate spouse" bond between the perpetrator and victim; this dynamic presents as an unusually close relationship between the perpetrator and victim, with the child victim practically replacing the role of the other parent or adult in the household.

An individual investigating a possibly sexually abusive situation should look for this type of unhealthy dynamic, as well as other unusual child roles, such as a child with decision-making power or control on a level with that of an adult parent.

The power of sexual abuse mitigation is obvious and apparent. It is one area in which no blame typically is placed upon the victim/survivor for the situation. Sexual abuse most often emerges as an issue in childhood, and most people would agree that children are not able to defend themselves against this type of abuse and manipulation. The variety and severity of problems sexual abuse creates for the adult survivor(and possible future perpetrator) can go a long way in explaining inappropriate, dysfunctional and destructive behavior that our clients often exhibit.

If any readers have a particular interest in this area and would like more information about sexual abuse and successful treatment, I would be happy to share the literature I received at the seminar.

**VALERIE BRYAN**
Capital Post-Conviction Branch
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601
Tel: (502) 564-3948
Fax: (502) 564-3949

The Advocate, Vol. 20, No. 2 (March 1998)

 Return to the Table of Contents

000220

PCR000304

# Exhibit 56

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5994          Feb. 12 2001 09:19AM P1

*Adriano*

| | |
|---|---|
| Subj: | **early years** |
| Date: | 2/12/01 7:32:05 AM US Mountain Standard Time |
| From: | grandmaochoa@hotmail.com (Donna Ochoa) |
| To: | GDDeLozier@aol.com |
| File: | **earlyyea.zip** (11507 bytes) DL Time (28800 bps): < 1 minute |

I've done a short early history on Wendi. If more is needed, please ask
Kandy what sort of details she'd like. I have pictures, too.

I added a little to Joe/Wendi's history re: trip to Vegas this past May.
After he grabbed Wendi, Joe grabbed the luggage and started just throwing it
In the back of the Yukon. Didn't care where or how hard, he was angry.

I've attached other concerns re police. Will be done with rest of interviews
In couple days. We do not have Wendi's interviews on paper, do you? I'm
trying real hard not to be anal and realize these are summaries and not
transcribed notes.

We received your faxes.

Praise God and have a blessed day! We pray for all of you daily.

Alejo & Donna

Get your FREE download of MSN Explorer at http://explorer.msn.com

------------------ Headers ------------------
Return-Path: <grandmaochoa@hotmail.com>
Received: from rly-xb05.mx.aol.com (rly-xb05.mail.aol.com [172.20.105.106]) by air-xb04.mail.aol.com
(v77_r1.21) with ESMTP; Mon, 12 Feb 2001 09:32:05 -0500
Received: from hotmail.com ([289.law11.hotmail.com [64.4.16.164]) by rly-xb05.mx.aol.com (v77_r1.21) with
ESMTP; Mon, 12 Feb 2001 09:29:25 -0500
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
   Mon, 12 Feb 2001 06:29:25 -0800
Received: from 208.165.25.80 by lw11fd.law11.hotmail.msn.com with HTTP;   Mon, 12 Feb 2001 14:29:25
GMT
X-Originating-IP: [208.165.25.80]
From: "Donna Ochoa" <grandmaochoa@hotmail.com>
To: GDDeLozier@aol.com
Subject: early years
Date: Mon, 12 Feb 2001 07:29:25 -0700
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="----=_NextPart_000_6caf_46fc_52f1"
Message-ID: <F289yi87EKRuYDlrjbu00009a87@hotmail.com>
X-OriginalArrivalTime: 12 Feb 2001 14:29:25.0335 (UTC) FILETIME=[32EDAE70:01C09500]

Monday, February 12, 2001     America Online: GDDeLozier          **008349**

*ANDRIANO*

**Wendi's early years:**

I (Donna) was married at 18 years of age. I had lived in Tucson, AZ from age 8.  My dad was in the Navy, he worked as a recruiter then retired and became a restaurant owner.  I was in the Flowing Wells district all my school years.  My father was an alcoholic and my mom was really a good person (though I preferred my dad at the time).  They fought all the time.  I went with a boy through high school, then broke up when I when he went to college (1 year ahead of me). married Skip (Shelby Robertson), in Feb. 1968. N He had returned from Viet Nam on Dec. 24, 1967.  He was my best friend's step uncle.  Her father had died in a mining accident when we were 9 and her mother remarried Buck Robertson, Skip's older brother when we were in Jr. Hi I never dated him in school or even thought much of him (he was the kind that was always getting into trouble, skipped school, had sleeves rolled up with cigs in them).  The fall of 1967, I was in college.  Right before Christmas break I broke up with my boyfriend at school. Christmas eve when Skip returned to Tucson, I was drunk and when he made a pass at me, I caught it.  We dated the whole time he was home on leave.  Seemed to have changed.  By February that year we were married and I moved to San Clemente, CA to be with him.

. We had okay marriage until he got out of service (spring of 1969) and we came back to Arizona. His brothers all drove trucks and he had promised he wouldn't.  He went to trade school, but didn't finish and then started driving long distance trucks, too.  Things got worse, but we had promised each other we wouldn't ever get a divorce because everyone (the families) thought we couldn't make it together.  Being stubborn, we were going to show them.  The fall of 1969, I got fed up with the drinking and never having any money.  He would never have any left after a haul, it all went to expenses.  Being young and naïve I believed it.  I took off and went to Tucson and stayed with a girlfriend. Skip came looking for me and said if I wanted, we could live in Tucson and he'd try to find another job.  We moved, I worked at a Title company and proceeded to get pregnant.  I was so tired of his father, the father was really old (60's) and the brothers all mooched off his other.  (Six brothers, two sisters)  (family was from Austin, Texas - all drunks and partying cowboys)  Wendi was due in August 1970.  In June 1970, Skip came home and said he had a job in Groom, Texas and that we were moving.  I quit my job, packed and we took off.  Six months pregnant in a small mustang was a trip.  Got there and he had a job at a small truck stop (really a gas station) in Groom (pop. 600, maybe) on Route 66, about 40 miles east of Amarillo.  I was miserable and would sit in the car for hours playing the 8 track by Charley Pride about "going back to Phoenix, Arizona."  That is where Wendi was born on August 26, 1970.  I started having contraction in July, my mother came out the end of July to help.  My husband was running around with some older lady and I had no clue, I just knew he didn't come home much, even before mom came out.  We lived in a big farm house and my mom was staying in the attic which had a separate entrance (she was working in a restaurant there)  Wendi was born on a Wednesday and we stayed in hospital till Saturday morning.  She was the only baby in the hospital (in Groom, for surrounding communities) and was spoiled by the nurses.  She was 7 pounds 11 ounces and 21 inches long.  No hair and black eyes.  She was beautiful.  Was an easy delivery, the doctor almost didn't make it back to catch her.

On Labor Day, we had snow and Skip decided we needed to move back to Arizona (later found out that the girl he'd been messing around with was pregnant and he didn't want to be named the father).  Mom, Skip and I moved into a house in Phoenix (mom usually paid the rent) and I started working at another Stewart Title.  We moved houses a couple times and landed in one around 35th Ave. south of McDowell.  Mom was working at Garcia's on 35th and had her own place.  I was working at US Life Title at that time.  Skip was still running around, driving trucks.

Wendi was a really good baby.  She had colic in Texas and mom and I would take turns rocking her.  I nursed her for 4 months then she went on the bottle.  She was a chunk, she started baby cereal at 2 ½ months.  The money that I made went to paying bills and food.  I

008350

never expected any from Skip. But by this time he would come home and *tell me* I was gaining weight, or that I wasn't raising Wendi right, etc. I was afraid of him when he drank because he would start swinging, especially if he was thinking about Nam. The first few years we were married I would have to wake him up by touching his feet, because he would come up swinging. He wanted to go to the cowboy bars whenever he was home (I didn't grow up on that, I had liked rock and roll) and I just wanted to please him. [Sounds like history repeated itself - I have just never really faced it before). I felt like I couldn't leave him because I wouldn't be able to make it on my own. He talked down to me so much that I had no self esteem. (didn't know that expression back then) I had always been an 'A' student in school, took college prep classes, had looked forward to doing great things. Had wanted to be a pharmacist and was sharp enough to have done it. Wendi was taken care of by my mom for a while. Wendi would go to a baby-sitter. Skip was the one that had Wendi potty trained by 11 months. He had babysat for his older brothers and sisters all his life, He was good with her those first two years, I think.

We moved to Tempe early 1972. I transferred to the Tempe office of USLife Title. I worked as an Escrow secretary then as the Assistant Escrow Officer. Down the street was a day care center where I took Wendi. She learned dance, French, etc. A Montessori school believe. Occasionally I would go on a weekend run to LA with Skip and his sister-in-laws would watch Wendi. She was a really loving child, loved to hug and cuddle.

During those first years, Wendi was around my mom and me mostly. Skip was not home very often. He drove what was called 'garbage' trucks. They hauled anything and everything. He and his brothers did lots of pills and booze'.

In May 1971, Skip was arrested in Ohio for robbery. He had parked his rig, went to a bar. Got drunk and pilled up. He walked into a residence and stole money and was going through the house when the owner woke up chased him out with a baseball bat. Skip flagged down a car, which was a police officer and was busted. My mother paid his way out and the fees. ($5000) In 1972 he destroyed government property with his truck and mom paid that one too ($3000). My mom helped support us many times throughout our 6 years fiasco.

This part is hard. Sometime in 1972 rumors were flying through the family that the grandpa (Skip's dad) was touching the granddaughters inappropriately. (All different ages, from 1 to 14.) Of course, the brothers all said they were crazy, their dad wouldn't do that (macho rednecks from Texas) and the kids were lying. To this day I still do not know how much if true and how much wasn't. And I know that I didn't want to believe it as Wendi had been around the grandpa numerous times. And I have thought of it through the years, and have been scared about it. One of Skip's older brothers had been in prison twice and another one once.

One of the girls in my office was dating the director of Terros (drug program in Phoenix). She talked me into going to counseling there because of my marriage. It was definitely on the rocks. Skip hadn't changed and I was starting to get stronger. I started going over there and went through counseling (Gestalt, I'm OK, You're OK type stuff). Started volunteering at the Terros House. Emergency phone lines for druggies, clinic, ambulance service. I started taking classes at Phoenix College to become and psychologist to help other people. I also took EMT classes and received my EMT II certification. At the time you could not be rated any higher that that, only firefighters could go on to be a paramedic. I worked on the Terros ambulance whenever they needed me. Eventually I quit my job at USLife and went to work for CODAC (Community Organization for Drug and Alcohol Corporation) in the accounting department. I kept records and was learning to write grants. CODAC was the umbrella organization for lots of different substance abuse programs. Right next door to the CODAC office was part of Terros. At this location the handled addicts. It was a place for detox and also for handing out methadone. At times I would take Wendi there with me and the ones that had detoxed would talk to her, etc. Lots of the women had children of their own (usually hookers) and they loved seeing her. It was almost therapy for them. They wanted to be able to see their own children when they were straight like they were seeing Wendi. She was *never* alone with any of them.

008351

She was such an outgoing child, I always watched over her very closely. She especially loved old people, we'd go to the parks and she'd head straight for them. She has continued that love for them through out her entire life. She's always been very patient with the elderly and the young children. Young children have always gravitated to her. She treats them like little people.

Towards the end of 1973 I began telling Skip I wanted out, I wanted a divorce. Her would cry and promise to do better, stop drinking, etc. Never happened and I was still a sucker Figured be hard to find another husband as I had a child. Sometimes our thought processes are so screwed. Finally, in March of 1974 I told him no more. I was leaving. He tried to talk me out of it but this time he knew I was serious and would do it. (strange, we were driving from Phoenix to Maricopa where I was taking him to meet his brother with a load of cattle) I still did have a hard time standing up for myself and he finally said, won't you think about getting back together in a year or two? Like a chicken I said okay. Prior to this I had started dating a real estate agent I had met at work several years before. We had dated a few times, and I realized I wasn't such a loser. That there were people out there that thought I was worth something. We had a good relationship. No abuse (Skip would get rough with me, he hit me once but not again. He would try to hurt me when we had sex. Or he would just cut me down verbally.)

After the divorce was final in May 1974, I continued working at CODAC. Wendi would go to a nursery downtown that was attended by other whit collar worker's children. It was a good school, I do not recall the name. That summer my mom and I moved in with each other so we both took care of Wendi. My mother loved Wendi like she was her own. I remember getting jealous a few times when Wendi would call her 'mom.' But mom was a good stable influence on Wendi. At Christmas that year, Wendi and I went with a young man I was seeing (he had just returned from Thailand being in the Peace Corp) to his family's home in Flagstaff. It was great. In January I went to work at Casa Grande for PADAC (Pinal Alcohol and Drug Abuse Corporation). I had met the director that fall at a Convention in Scottsdale and had been doing grant work for him on the side. When he got money available to hire me he did so and I moved to Casa Grande. I met my husband, Alejo prior to moving. Alejo was on the Board of Directors for PADAC and had met me and had to approve my hire.

The facility I worked at was downtown Casa Grande. Around the corner was a used furniture store run by one of the old-timers in town (Stoney-his last name). Very nice man, retired, etc. Wendi would be down there with me sometimes. She would sneak out the door and stand there asking people for money. She was so cute they gave it to her. A couple times she wandered over to Stoney's. He'd be sitting on his rocking chair and he'd keep an eye on her. If she looked like she was going to go anywhere else, he'd walk her back to the center. Normally she was at the day care, this would be on the weekends.

Alejo and I were married 6/6/75. We all moved out of our apartment when the lease ran out and moved into his mom's house. We were having a house built and only stayed there a couple months. We had dogs, which Wendi always loved. She has felt she was missing something if she didn't have a dog. The one she grew up with (Toby), she would sit and hold him and tell him all her problems.

Wendi and Alejo loved each other from the start. When we were dating, he tell her something to do and she'd look at him with her hands on her hips and say, "You can't tell me what to do, you're not MY boss." He'd just laugh and say okay, but wouldn't you like to do this? She'd do it, feeling like she had won the contest.

From the time she was small I wanted her to be independent. Able to ask for things by herself. I didn't want her to be like me. Afraid to confront anyone. In some area she did turn out like that. She's bold enough to go after what she wanted in the area of school. In areas where she wasn't connected personally with someone. But she wouldn't stand up for her rights. She always tried to make other people happy.

008352

PCR000308

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 12 2001 08:22AM P5

She went to kindergarten and first grade in Casa Grande. After that she was home schooled until December 1979. We were in the ministry beginning June 1977 and traveled with an evangelistic group. There were 4 married couples, she was the only child. Her use of the English language really grew at that time with being around adults. She sang with the group and did solos while she played the guitar. When we came back to Casa Grande in November 1979, it took her awhile to get used to kids around all the time.

Even when she was small, if someone wanted something of hers, she gave it to them. She did that all through her childhood. When she got her first credit card, she let her friends use it and didn't complain when they didn't pay it. If you needed her dress, it was yours. She gave total strangers money. She had been taught that "give and it shall be given to you." She was always a giver. She was and is a 'care-taker.' When my mother was in the nursing home in South Dakota in 1988 - 1991, Wendi would go back there and hang out at the home. The elderly loved her and she had no problem being around them. It takes a special person to do that. I personally couldn't.

Wendi was even tempered as a child, she loved animals and was always trying to bring puppies and kittens home. We had our share of goldfish, too. She played well with other kids and she shared well.

She wasn't the kind to let you sleep in late on the weekend. She'd get up early and come in my room and want to talk. I'd turn on the TV and cartoons and tell her to watch them. Five minutes later she was back. She wasn't addicted to the TV.

One of my favorite stories has always been this one: When she was around two years old we were driving over to Mesa on Broadway. She'd ask me a question, I'd answer, she'd say "Why?" I'd answer again, she'd reply, "Why?" Over and over, finally I told her that was enough, no more "Why's?" She looked at me and said, "I thought you wanted me to learn!?" Her vocabulary was very good for her age.

She walked at 10 months, was potty trained by 11 months, her first tooth didn't come in till she was 14 months and she had none to very little hair until she was over two years. She was definitely a 'precocious' child.

008353

PCR000309

Exhibit 57

**Michelle Arvanitas - PDX**

From:       Donna Ochoa [grandmaochoa@hotmail.com]
Sent:       Wednesday, February 26, 2003 5:29 PM
To:         arvanitas@mail.maricopa.gov
Cc:         pattersond@mail.maricopa.gov; GDDeLozier@aol.com
Subject:    Andriano

Michelle,
I don't remember if I gave you al of this information before.  This is
Wendi's biological father and his location:

Shelby Wayne Robertson
dob - 3/11/48
ADC Inmate No. 100374
ASPC - Eyman
State ID # - 09534466

It states the maximum term is 17/00/00

MSN 8 with e-mail virus protection service: 2 months FREE*
http://join.msn.com/?page=features/virus

1

062173

PCR000310

# Exhibit 58

<u>STATE VS. WENDI ANDRIANO</u>
CR 2000-96032

INTERVIEW OF CHRIS WEAVER
TAPE 1, SIDE A & B

DAN PATTERSON, DEPUTY PUBLIC DEFENDER
, DEPUTY COUNTY ATTORNEY

Date of Interview:                    Time:

Present:

|       |                            |
|-------|----------------------------|
| :     | , Deputy Public Defender   |
| :     | , Deputy County Attorney   |
| ??:   | Unknown Female Interviewer |
| CW:   | Chris Weaver, Witness      |

(Telephone interview began before tape was started.)

CW: Yeah, we were, uh, --

??: -- Young boys, or? --

CW: Yeah, we were 16, 17 years old when we met. Let's see, we would have been, uh, uh, sophomore in high school is when we met.

??: Okay. And you said you re, re-met in 83, or is that when you initially met?

CW: Well that's when we initially met. I, I, I was born in Casa Grande, then we moved away and then moved back in 83.

??: Okay.

CW: And, uh, that's when I met Joe. I met him thorough some friends at school that I'd known when I lived down here previously. And, uh, they introduced me to Joe and we had a lot of the same interests. We were both into motorcycles and quads and really anything that was fast, uh, um, we just had a whole lot of the same interests.

??: Okay. What was his personality like?

1

000546

1  CW:  Uh, really outgoing. –

2  ??:  -- Coming from a guy. A guy view.

3  CW:  He was, he was a hard worker. He had, uh, he had his own business for years and
4       years. He farmed a couple of years, um, he farmed for his dad also. Um, he had a
        welding business in, uh, he'd help anybody out that needed help. Uh, we wasn't
        afraid to try different things, different types of jobs and whatnot. Um, he was a
5       really outgoing guy.

6  ??:  So he was really friendly with other people, and?

7  CW:  Oh yeah.

8  ??:  Pretty generous?

9  CW:  Yeah, he, he could talk to anybody and talk to them about whatever and, uh, a lot
        of people that he met I think he just met by going up and start talking to them and
10      stuff like that. But, no he was a, he was a real, real personable guy.

11 ??:  Was his temperament, um, calm? Was he, did he get excited easy? Was he
        assertive? Aggressive? Um, violent? Where, where do you place his, you know –
12
   CW:  -- Um –
13
   ??:  -- through that time period. I know you mature and change but what?
14
   CW:  Right. But through high school, I never, never knew him to get into any fights
15      through school. Um, I really can't even think of him getting into a fight after high
        school either. Uh, he'd get mad at his brother but, you know, that, that's brothers
16      that are like that. But he'd, it, he would never be mad to the point where he would
        like try and hit him or, or hurt him or anything like that. He'd yell at him maybe
17      tell him, "Well, get out of here", or whatever there. And sometimes he'd even
        leave, but, no I never knew Joe to be a, a violent guy.
18
   ??:  Now which brother is that?
19
   CW:  James.
20
   ??:  Oh James. Okay.
21
   CW:  (Unintelligible) Yeah, he's only got one brother.
22

·  000547

2

1   ??:   That's right. His father and his brother.

2   CW:   Right.

3   ??:   And he's a little bit younger wasn't he? James?

4   CW:   Yeah. James, uh, let me, I'm not sure exactly how old he is. I'd have to say he's
          probably maybe seven or eight years younger.
5
    ??:   Okay.
6
    CW:   Maybe a little more. I'm, I'm not real sure.
7
    ??:   Would he? Was he, would you say, a ladies man? Did he date a lot? Was he?
8
    CW:   Joe? No, I wouldn't say a ladies man. Um, let's see in high school, in high school,
9         I think from the time I knew him, he might have had two, maybe three girlfriends,
          um, after high school, after high school I can only think of one girl that he dated
10        and they didn't date very long. She was kindof real wishy-washy. And, uh, --

11  ??:   -- Was that Shelly?

12  CW:   No, uh, I can't think of the girl's name. Rodriguez I think was her last name. But,
          uh, no he dated Shelly for long time. I don't know how many years to be honest
13        with ya, um –

14  ??:   -- So that was like his first serious girlfriend?

15  CW:   Right. Yeah, that's what I would say. And then, uh, after he and Shelly broke up,
          um, I don't think he dated anybody until he met Wendi. Yeah I don't think he met
16        anybod – or dated anybody until he met Wendi.

17  ??:   Why did he and Shelly break up, do you know?

18  CW:   Um, I believe it was Shelly was messing around with another guy, uh, I don't
          know what his, his actual name is. We always referred to him as Bo Diddley, for
19        some reason, but don't ask me why, but, that name just always seemed to come
          about whenever we'd talk about it, but, uh, no I think Shelly had another boyfriend
20        and broke up with Joe and had another boyfriend.

21  ??:   Oh, okay. Now I understand, I don't know –

22  CW:   -- And it was, he's a quite a bit older guy too.

000548

3

1

??:   Oh is that right?

2

CW:   Yeah.

3

??:   I'm not sure if my information's correct but I, I have it written down that Shelly
4        actually got pregnant and had an abortion?

5   CW:   Yes, that's true.

6   ??:   Is that true? And it was Joe's baby?

7   CW:   Yeah, yeah. It --

8   ??:   -- Was that something Joe talked to you about or?

9   CW:   Yeah, we were, um, in fact, let me think here. I think he might have been living
         with me when that had happened.
10
    ??:   So it was in a year or two out of high school?
11
    CW:   Right.
12
    ??:   So did he want the abortion? Did she kindof go against his will? Did he encourage
13        it or what, what was the situation there?

14   CW:   Um, you know I really can't remember. Uh, --

15   ??:   -- I know it's been awhile.

16   CW:   Yeah. It's been, yes a long time. Probably about 89? Um, I really don't remember.
         I remember finding out that Shelly was pregnant but she -- I, I, do believe that it
17        was a mutual agreement that she did have the abortion. Um, and Joe, I know Joe
         was upset about it. He, he felt bad that she'd got pregnant and that she was getting
18        an abortion, but they knew that, that at the time it was probably the best thing
         because neither one of them, I don't think, were really ready to be parents.
19
    ??:   Okay. So they were fairly young?
20
    CW:   Right. I would say Joes was probably 21 at the time, 20, 21.
21
    ??:   Were you, did you say you were around he and Wendi quite a bit? You knew their
22        relationship? Or was that when you didn't see him as often?

4                                    000549

PCR000314

1   CW:  Um, no I knew em, I knew em pretty well. We'd go out, uh, we'd go out to, uh,
2        this bar up in Chandler and we'd go dancing and whatnot. Um, I'd known Wendi
         before she met Joe. She, she dated a friend of mine that I worked with in, uh, I
3       don't know how long they dated. That's how I, that's how I knew Wendi before
         she met Joe was, um, oh what was that guys name, uh? Johnny? Shoot, I'm blank
4       right now. Anyway, it's a short little Hispanic guy, um, they dated for a little while
         and then they broke up. Um, I didn't know Wendi much while she was dating that
5       other guy but after she met Joe and I started knowing her more because she was
         around Joe all the time and visa versa. Joe was around her all the time. But, um,
6       they always seemed to get along good whenever I was around and after Joe had
         found out that he had cancer, uh, he still he tried to work as much as he could. I
7       know he had mentioned to me a lot of times that he just didn't have a whole lot of
         energy when he was going through a lot of his treatments and stuff, and, uh, he'd
8       be tired and whatnot. But he still seemed to be the outgoing type of guy and, uh,
         there'd been a lot of time where, I regret it now but, at the time I wasn't thinking
9       about it, but he'd, he'd say, "Hey, why don't you see if you can get that day off, or
         this day coming up off and we'll go up to the lake?" "Well, I'll see what I can do."
10      And I never, I never did take the time to do it and I wish –

11   ??:    -- Cause you were working? Is that? --

12   CW:  -- Right. I, I wish that I would have taken time out to go do that because I guess I
         was just trying to ignore the fact that yeah, he had cancer, and yeah that he was
13      gonna die that maybe if I didn't do it he would be around longer. And I just, I tried
         to avoid –
14

     ??:    -- So you knew, you knew it was a given that, that he was going to die? Was that
15      pretty much a given?

16   CW:  Yeah, cause –

17   ??:    -- And it was like well he's – will die, it's just when?

18   CW:  Right, um, from what, what I'd heard about the cancer that he had that, that it was
         spreading throughout his body and, uh, that it was (unintelligible) like September.
19      About the middle, the end of August, first part of September. Something like that,
         um, Wendi had called me up and said, "Hey, we're gonna go to Rockin Rodeo
20      tonight with Brandon and Del and supposed to be a bunch of other people there
         and why don't you come up?" I was single at the time, I said, "Oh, okay I'll come
21      up and meet you guys." And she goes, uh, "Have you talked to Joe lately?" I said,
         "Nah, it's been a week or so, why?" She goes, "Well, he had another doctor's
22      appointment." I said, "Oh really. And what'd they say?" She said, "Well the, the

000550

PCR000315

1       cancer has spread throughout his lungs now and up into his chest and they're only
        giving him about a month to live."

2  ??:   Ooh.

3  CW:   Oh, (unintelligible) Jesus. So.

4  ??:   And that was in August?

5  CW:   In Sep – end of September – first part of September, end of August. Somewhere in
6        that area. And, uh, I thought ah, geez, so (inaudible) –

7  ??:   -- How did she take that? Did she seem upset, or what, surprised? –

8  CW:   -- Um –

9  ??:   -- Or what was her?

10 CW:   She didn't, she didn't really seem upset about it, um, I don't know that she was
        surprised about it either cause I think all of us, all of us guys that were all friends
11       with Joe, we all kindof knew that, yeah, we could, we could slowly see him
        getting into like a, I don't know what you want to call it, uh, more like a downhill
12       mode where he didn't have as much energy and stuff and he just – but he always
        kept good spirits so I had to give him credit for that because that night when we
13       were up there and, uh, I'd asked him about it, he just tried to like ignore the fact,
        more or less ignore what I'd said. And, uh, he kept talking about his boat, yeah,
14       well I'm gonna do this and this and I think after the first year I'm going to do this
        to it and that'll make it go a lot faster and he didn't, it was – I had to give him
15       credit for, for ignoring it thinking that, yeah he's, in his own mind, yeah he wasn't
        gonna die that he was gonna be around longer and that he wasn't afraid of it, but
16       he had it whipped. But –

17 ??:   -- So do you think he thought he was going to live or he just wasn't, didn't want to
        talk about dieing?
18
19 CW:   Um, I think he, I think he thought. Hold on just a sec. (He appears to be speaking
        to someone in the background) Um, I think he knew it but he was just trying to
        deny the fact that he knew that it was gonna happen and I think that he was trying,
20       trying to treat it kindof like I was. Ignoring the fact that yeah it was going to
        happen. I've already lost, before Joe had died I had a good friend that, uh, was
21       killed in a car accident and he was practically like my brother.

22 ??:   Oh.

                                                            000551

                                        6

1    CW:   In, uh, in. So when I found out Joe was dieing that it me hard. It's like my God,
2           you know it's happening to another good friend of mine and I really haven't, up
             until here recently, probably about the past five, six months, I really haven't tried
3           to get anybody that is a good friend that we go out and do stuff together all the
             time and whatnot because I just felt that you know it, you get attached to a friend
4           and you guys go out and have fun then something happens and then it hurts you
             for a long time.

5    ??:    Yeah (unintelligible) getting close when they just die on you.

6
   CW:   Right and that's practically the way it was and then I just didn't want to do it
7           anymore. It, it hurt me to see it and then to admit it and know that it was gonna
             happen. And, uh, I just didn't like –

8
   ??:   -- So you both pretty much just overlooked it and talked about boating or ATVs –
9
   CW:   -- Oh yeah, we'd always, we'd always talk about. Cause he had, uh, quads and he,
10         he loved going to the dunes. Um, probably the only thing he like more than going
            to the dunes was going to the lake. And, uh, he loved the lake. He could, he could
11         spend seven days a week at the lake and never have a bad day. But, uh, he loved
            going to the lake.

12
   ??:   So if he was going to the lake and boating and building his boat, how was he – and
13         he wasn't working, right? At this point?

14    CW:   No, he was still, he was still working. He was working, uh, part-time for, um, uh,
             can't think of the name of the boat shop. There's a boat shop in, uh, in East Mesa.
15
   ??:   Oh, okay.
16
   CW:   I can't think of the name. He was, he was, uh, uh, rebuilding jet pumps for em.
17         (Inaudible) –

18    ??:   -- So was he working for parts, or working or money?

19    CW:   No, he was working for money.

20    ??:   Oh, okay. So that, is that how he paid his boat habit so to speak?

21    CW:   Right. That and then, uh, he was also, he would go down and help, uh, Larry's
             Engine and Marine in Tucson. Build motors down there. And, uh, for a while he
22

000552

PCR000317

1 had his own glass business, he was doing, uh, windshields and stuff like that. And making money –

2

??: -- That was, that was before he moved to, uh, Maricopa County isn't it? Before he
3 got as sick? --

4 CW: -- No, uh, I believe he was still doing it after he moved up there too. Um –

5 ??: -- Okay. Right, real close to when he died was he doing that? Or was it? –

6 CW: -- No he wasn't doing it anymore when he got close to dieing, no.

7 ??: Oh, okay. How did he treat, uh, Wendi from what you saw?

8 CW: Um, every time we were around each other, he always treated her real good, uh,
 never badmouthed her. Nev – they never. Everybody has their little arguments but
9 it was never a, like a heated argument where they really got mad at each other.
 Um, they never seemed, never seemed like anything was really that big of a deal.

10

??: Okay.

11

CW: Um, they never did get into any bad arguments around me, um, I never heard em
12 talk about any of em, uh, and Joe and I, we'd talk quite a bit. I know, I know there
 towards the end he, he kept making little comments that he thought Wendi had a
13 boyfriend. And then when he would go to the lake he'd take off and from the time
 he would leave his house to the time he would get on the interstate, like ten
14 minutes and he would call back to the house and the babysitter would be over
 there and she's already up and gone. And, uh –

15

??: -- Is that when she was working full time? When she was running the apartment?

16

CW: The apartments, yeah. But this would be like on a weekend when they, when she
17 wouldn't have to go to the office or anything and, uh, there'd be times where I
 would go up to Rockin Rodeo and I would see Wendi up there. And I'd "Hey
18 where's Joe?" "Oh, he's at home, or he's at the lake this weekend." "Oh, who you
 here with?" "Oh, I'm with my friends over here." She had a couple friends, I can't
19 remember what their names were but a couple of them, they weren't the type that
 you would really want to write home to mom about. They didn't, they didn't
20 appear that way anyways.

21 ??: Yeah.

22

8

000053

PCR000318

1  CW:  And, uh, I never – I'd said anything to Joe about it. I'd, I might mention to him like, "Hey, I saw Wendi up there last weekend and danced with her a couple of

2  times," and whatnot, but I never, I don't know if I should have or what but I never really tried to pay attention to what she was doing because I figure you know,

3  every once in awhile couples need to get out and go out with their friends and have fun. So I didn't really pay attention to if she dance with one guy five or six times

4  or, or where they went after they got off the dance floor or anything like that. I didn't. Cause I had other friends up there too that I would go up and talk to and

5  whatnot. But, um, I know he'd made the comment quite a few times that, uh, that he thought that she had a boyfriend and he just didn't know who it was.

6

7  ??:  Was this, um, within six months of him dieing? A year? A few months? Or what was the time period? –

8  CW:  -- Yeah. Within, within about, within about six months.

9  ??:  He started to suspect something? Is that what it was?

10  CW:  Yeah, yeah.

11  ??:  Okay. What -- did, did he ever mention, "I wish I could find a way to kill myself so I don't have to suffer?" Or, um?

12

13  CW:  No. He, he never did, um, it, it just really kindof struck me that he had so much faith and willpower that he, that he wasn't gonna die or that he always acted like

14  he wasn't gonna die. Um, I couldn't imagine Joe saying that, that he would just kill himself so he wouldn't have to suffer. I know, uh, I saw him right after he had

15  the operation where they removed a lot of the muscle on his jawbone and, uh, he was just in super spirits. It was like, my God, ya know, the guy that's gone through

16  what you're going through, it's awesome.

17  ??:  You mean almost like he didn't fit, or? –

18  CW:  -- I mean I'd, I'd, I'd be a basket case –

19  ??:  -- Yeah, so would I. So it didn't seem like a normal type of up? Was it too positive considering what he was going through, or?

20  CW:  Um, no it just seemed like Joe. He – Joe had got in a car accident. Uh, we were in high school, believe it might have been our junior year.

21

22  ??:  Yeah.

9

000554

PCR000319

| | |
|---|---|
| 1 | CW: He'd wrecked a – he was passing a car and then the car turned in front of him and |
| | hit him and then he went through a, uh, power pole and, uh, the steering wheel hit |
| 2 | him on the chest and it left a big bruise up on his chest where he had hit it. Even |
| | after that he had, he had some sore ribs but Joe was still Mr. Happy-Go-Lucky. |
| 3 | Always laughing. Make a joke out of a bad situation. He was a riot sometimes to |
| | be around. |
| 4 | |
| | ??: Yeah. I heard he was a pretty fun guy. |
| 5 | |
| | CW: He was. He was, he was a lot of fun. |
| 6 | |
| | ??: What about, was he a drinker? A nondrinker? Didn't really party or? |
| 7 | |
| | CW: Um, after he got, after he got the cancer he didn't, he didn't drink anymore. Um, |
| 8 | he'd drink a lot of waters. Um, once in awhile a coke but he didn't, he didn't drink |
| | beers anymore and I'd ask him every once in awhile, hey, when we were up there |
| 9 | at the bar or whatever, "Hey man you want me to buy you a beer or can I buy you |
| | a beer?" "No, I'm, I'm alright." Okay, he'd just drink water. Um, I don't know, his |
| 10 | dad's a, a pretty religious man. So is his mother and, uh, his dad was an alcoholic |
| | and, uh, I don't know if maybe Joe was afraid that if he did drink that would just |
| 11 | hurt him more or I don't know if the doctors told him that or what. But, uh, he |
| | didn't, he stopped drinking after he got the cancer. |
| 12 | |
| | ??: Oh, so you saw a definite, he drank before the cancer and once he found out he |
| 13 | totally stopped, huh? |
| 14 | CW: Right, right. |
| 15 | ??: Did he have a close relationship with his dad that you – or parents, I guess I could |
| | say? |
| 16 | |
| | CW: Um, yeah I'd say it was pretty close. They, they talked quite a bit, um, we used to |
| 17 | always laugh as we always called his dad's office the Waterburger, drink coffee |
| | and eat breakfast. If you wanted to find his dad, you would go to Waterburger and |
| 18 | look for him there first before you went anywhere else. But, uh, we'd always go |
| | down there and his dad would once in awhile come over and hang out with the |
| 19 | guys and his dad would go to the lake when it was just the guys going and stuff. |
| | He was, he was a lot of fun to have around and he could, he was about like Joe, he |
| 20 | could laugh and joke about things that a lot of people wouldn't laugh and joke |
| | about. Like take a bad situation and make a joke into it or whatever. But, uh, Joe's |
| 21 | dad – |
| 22 | ??: -- So the two of them were pretty close? |

000555

PCR000320

CW:   Yeah. And their, their personalities, um, I'd say their personality, personalities were pretty much alike. They had the same humors, um, had a lot of the same thoughts on stuff. I'd say they were pretty close to almost being a, almost a, a split image.

??:   Oh, okay. Was he close to his mother?

CW:   Um, yeah, he, he was always –

??:   -- Or I guess did he appear close to em? –

CW:   -- he'd always check. What's that?

??:   I guess I should say did he appear close to them? I guess it's all relative where.

CW:   Yeah. He, uh, he and mom always got along. I never, I never heard of them having any cross words or anything, but they always got along good. And, uh, most of our time was spent outside horsing around out at the shop or wherever. But, um, I wasn't around a whole lot when he was around with his mother. So.

??:   Oh, okay.

CW:   But like I said, most of our time was outside horsing around in the shop or out fixing something for somebody. There wasn't a whole lot of time that I was at their house when – I would eat dinner with them once in awhile and his mom was always really nice and, but I would say yeah that, just from the way that they appeared, they had a good relationship.

??:   Were they pretty supportive as far as helping him out when he got sick with the cancer and started (inaudible) –

CW:   -- Oh yeah. His dad, his dad was very supportive of him. Um, (inaudible) --

??:   -- So they came out to Ahwatukee –

CW:   -- Oh yeah –

??:   -- and helped him all the time?

CW:   Yeah. He, he'd help him out and, uh, his dad would, uh, help make arrangements for him to get doctor's appointments and whatnot. Yeah they, they were very supportive of it.

000556

PCR000321

1

??:    Okay. Did they help with the kids at all, or?

2

CW:    Yeah, um, they'd help watch the kids and, uh, if they needed a babysitter they'd
3          baby-sit for em.

4    ??:    Okay. I know I'm throwing questions out there. I'm just trying to, you know, get a
           picture her of, of, of your relationship I guess. Um, why did he stay with you
5          instead of at his house for the two years that he lived with you?

6    CW:    Um, he just wanted to get out on his own. We were always together and whatnot,
           um, I'd just bought the house and, uh, the other friend of mine that got killed, he
7          was living there at the same time. It was a three-bedroom house and we all had our
           own rooms and we just kind of thought that it'd be neat that since we were always
8          together and whatnot to just stay in one house. And, uh, he was gonna help split
           the bills, or split the -- he was paying me rent and that would help make the house
9          payment, the electric and gas, water and whatever. And, then we'd just always be
           right there. We wouldn't have to go over there to see him or whatever.

10
      ??:    Okay. So it was more you had bought a house and you were roommates type of
11         thing, huh?

12   CW:    Right, uh, huh.

13   ??:    Okay. Okay, so I just want to clarify there was never a time where, you, you may
           not have seen because it's not common to see but heard that he was abusive to
14         Shelly or any girlfriends or to Wendi or anyone?

15   CW:    No, huh uh. I never --

16   ??:    Or to his sisters, mother?

17   CW:    Uh, one of my girlfriends was a good friend of Shelly's and that's how I met my
           girlfriend and, uh, shoot we dated probably two, two and a half years, something
18         like that. And, uh, we were around quite a bit. We went camping together. We
           went to the lake together, um (inaudible) --

19
      ??:    -- This is in the early days? When they were first --
20
      CW:    -- Yeah, this --
21
      ??:    -- married?
22

000557

PCR000322

1  CW:  -- this was like in, uh, be the 86 to 88 era. And, uh, I never, I don't remember Joe
         and, uh, Shelly having any -- they would, they would argue, but there was never
2        any, uh, violence involved in it. No pushing or shoving or anything like that.

3  ??:   Okay. I'm trying to see -- what, what is Shelly's last name? I'm trying to see if --

4  CW:  -- Well she, ya know she remarried. It used to be Sour. S-O-U-R. And I'm not sure
         what it is now, but I know she remarried it, or got married I should say. And, uh, I
5        don't know what her new name is. (Unintelligible) --

6  ??:   -- Is her real name Michelle?

7  CW:  Yes, Michelle. --

8  ??:   -- Or is it always Shelly?

9  CW:  It's Michelle.

10 ??:   Okay. I'm just looking at my notes here to see. Trying to connect people. There's
         just so many players involved here so I'm --
11

12 CW:  -- Yeah. --

    ??:   -- separating everyone. And you don't know her married name?
13

14 CW:  No, I don't.

    ??:   Okay. Um, did you have a, would you say you had a lot of contact with the two of
15       them in the last year before he died? With Wendi and Joe?

16 CW:  Yeah, I'd say I had a pretty good amount of contact with em.

17 ??:   Okay, would you say once a month, once every six months, or? Cause, what did --
         did you live in Casa Grande --
18

    CW:  Um --
19

    ??:   -- at that time?
20

    CW:  -- yeah I did. But Joe, Joe was down here constantly, uh, that's where he kept his
21       boat most of the time. Um, he still came down here and helped his dad out with
         stuff, uh --
22

13                                                     000558

PCR000323

1  ??:  -- The last year before he died?

2  CW:  Yeah, uh huh.

3  ??:  Okay.

4  CW:  Yeah, I'd say, yeah, I'd say we still kept in pretty good contact.

5  ??:  And did Wendi usually go with him or was he by himself?

6  CW:  Um, no a lot of the times Wendi wouldn't come with him. Uh, a lot of the times it
      was during the day when I would see him.

7
   ??:  And she was a work?
8
   CW:  Right.
9
   ??:  Now would he have the kids with him or?
10
   CW:  Um, yeah there was a couple of times where I remember seeing him with the kids
11      inside the, uh, the Tahoe asleep.

12  ??:  Oh, okay. And he stopped by to say hi to you? That kind of thing?

13  CW:  Yeah, I'd, I'd be out working and he'd drive by and see me and he'd stop and talk
      to me and BS about what's been going on and whatnot.
14
   ??:  Okay. Is there anything that, um, you want to let me know that I haven't asked,
15      that I haven't thought of asking to kind of fit em all together, I guess?

16  CW:  No, not that I can think of.

17  ??:  Okay. Well I sure appreciate you spending time. I know you're at work and I don't
      want to take too much time at, at one time and make you chitchat. But, uh, you
18      have my direct line, don't you? The 2255 number?

19  CW:  Yeah. Uh huh.

20  ??:  If there's something that comes up, feel free to call me.

21  CW:  Okay.

22  ??:  Um, or if you have any questions on, on something.

000559

14

1  CW:  Okay.

2  ??:  And then, uh –

3  CW:  Um, do you want my number if you need to get back with me? Cause I know you
4        called my mother the other day and my mother was scared to death for a minute.
       She thought, "My God what has he done."

5  ??:  Oh, no I told her. I said I just wanted to chat about (unintelligible) Andriano. It's
6        no big deal.

7  CW:  Yeah, well when she, when you first introduced yourself, "This is Michelle from,
       uh, Maricopa County Prosecutor's Office", my mother thought, "Oh my God,
8        what's he done?"

9  ??:  Yeah, actually I'm with the public defender's office.

10 CW:  Or public defenders, that's what it was.

11 ??:  Yeah.

12 CW:  I knew it was something to do with law.

13 ??:  Same exact thing, just different side, right?

14 CW:  That's right, that's right.

15 ??:  Okay, what's your number?

16 CW:  Uh, 520-705-2358.

17 ??:  Okay, and that's your home or your cell or?

18 CW:  That's my cell.

19 ??:  Okay.

20 CW:  It's easier to catch me on my cell than it is at my house so.

21 ??:  Okay, sounds good. Hey thanks so much. I do appreciate it and I'll –

22 CW:  -- Alright.

000560

PCR000325

1

??:      -- probably be calling you another time or two before the trial.

2

CW:     Okay.

3

??:      Okay. Thanks Chris.

4

CW:     Uh huh, bye-bye.

5

??:      Bye.

6

(This is the beginning of a new telephone conversation. I do not know a date or time.)

7

CW:     We talked for probably 20, 30 minutes just BS-ing back and forth about different things.

8

9

??:      Yeah.

10

CW:     And, uh, I could tell that it, he had something he wanted to say and then all of a sudden he said, "Hey, I need to ask you a question." I was like, "Okay." He goes, uh, "When I die would you take care of my family for me?" I was like, whoa it just kind of like blind sided me and I was like, uh --

11

12

??:      Um, that's at a month? --

13

CW:     -- Well --

14

??:      Month before he died? --

15

CW:     -- It's about, it's about two months before. I can't remember the exact time. But I'm, I'm thinking that it was right about two months before. And, uh, I said, "Yeah Joe, if, if that's what you would like, I would be more then happy to do that for ya. I'd be honored to be able to do that for you." I said, "If that's what you want just let me know and I'll do it." He goes, "Yeah because Wendi and I've been talking and, uh, we kind of both decided to have you be the one to help take care of the family."

16

17

18

19

??:      Mmm.

20

CW:     I was like, "Oh, okay."

21

??:      It's like he'd been sitting there talking with Wendi about it huh?

22

16

0u0561

PCR000326

1  CW:  Right.

2  ??:  Did he say I, I'm feeling like I'm gonna go soon or I'm not feeling well or just –

3  CW:  No, he –

4  ??:  -- like it just occurred to him that he needed to put things in place?

5  CW:  Yeah, he never, he never did say anything like that. He just said that when, he, he
      was sitting down to make out a will and, uh, that he thought he'd better make one
6      up so that he would have one when he did die.

7  ??:  Yeah. That is interesting. Well at least that –

8  CW:  -- Yeah. –

9  ??:  -- showed he was starting to think about it, huh?

10 CW:  Right. And it, it, it really caught me off guard cause I wasn't expecting anything
      like that. And, uh, even after he had died, I'd never mentioned anything to the
11     family about the conversation that Joe and I'd had. (End of tape, side A)

12 ??:  I was eating my sandwich.

13 CW:  What are we eating?

14 ??:  It was a yummy turkey sandwich a little late today. Do you know if it was ever put
      in the will? Or did he say I'm, we're making out the will?
15
   CW:  I don't know, I. He, yeah, he said they were making out a will.
16
   ??:  Yeah.
17
   CW:  So, I don't know. Cause his dad's never said anything to me, um, Brad and Janaye
18     have never said anything to me about it and neither has James. So I don't know if
      it ever made it into the will or if –
19
   ??:  -- If they were just talking and didn't carry through with it, huh?
20
   CW:  Right, well he said they were doing it. At the time they were filling one out then.
21     So I don't know if they, if the family never said anything to me about it. I, I, I'm
      not sure. I've never mentioned anything to the family about it because I don't
22

17                                    0uu562

PCR000327

1    want, I don't want them to think that I'm trying to take Joe's kids away from the
     family.
2
     ??:  Do you remember exactly when that was? Can you pinpoint it at all? Was it hot
3         outside? Was it cooler?

4    CW:  Um, I would have to say it would, it would have to still be warm.

·5   ??:  So it could have been –

6    CW:  I, I would think –

7    ??:  -- March, April, May? --

8    CW:  -- it was probably. No, I'm thinking more like, probably July, August.

9    ??:  Okay.

10   CW:  Somewhere in there.

11   ??:  Have you talked to Wendi about that at all?

12   CW:  No, I never did. I never, after, after, uh, (unintelligible) or however you want me
          to put it, I'd never talked to her since. Well, before then. Um probably the last I'd
13        talked to em, to Joe and Wendi was probably maybe two or three weeks before.

14   ??:  Um, okay.

15   CW:  And, I hadn't, I haven't had any contact with Wendi since.

16   ??:  Okay, so she didn't say, "Remember that promise you made?" Or made any –

17   CW:  -- Right. –

18   ??:  -- comment to you because she hasn't had a chance and you as well, huh?

19   CW:  Right.

20   ??:  Hum, okay. Well that is interesting. At least he was trying to take care of his
          family and, uh –
21
     CW:  -- Right. –
22

                                                    0uu563

                                             18

| 1  | ??: | -- Make some, put some plans in, huh? |
|----|-----|---|
| 2  | CW: | Yeah. |
| 3  | ??: | Okay. Do the kids seem to be doing okay with the – |
| 4  | CW: | Um, you know, I, I don't see, I've seen the kids a couple of times but it's just been |
| 5  |     | like in passing. I've seen em on the road like going to, uh, Joe and Jeanette's house. But I've never, never stopped to talk to em or anything like that. Um, I just, uh, I, I kindof feel weird about it because – |
| 6  |     | |
| 7  | ??: | -- Yeah, you're in a weird situation because – |
|    | CW: | -- Right. – |
| 8  | ??: | -- Joe asked you to take care of em. – |
| 9  | CW: | -- Because, because you still, you still got fam – |
| 10 | ??: | -- Yeah. – |
| 11 | CW: | -- (unintelligible) take care of em for em and it, and it just kind of really struck me |
| 12 |     | as -- it, in one way it was a, a very honorable thing for him to ask me to do that for him, but yet it also struck me as being odd, well, why wouldn't you have your |
| 13 |     | sister Janaye take care of em or whatever. It just, it, it caught me as being odd. |
| 14 | ??: | Yeah, that he would choose you? |
| 15 | CW: | Right. Well I – we were good friends and everything and I just thought that it was |
| 16 |     | odd that he chose me over one of his own family members. |
| 17 | ??: | Uh, were you married at the time? |
|    | CW: | Uh, no I wasn't. I was divorced. |
| 18 | ??: | And he still, still called you and asked you knowing that you -- |
| 19 | CW: | -- Right. -- |
| 20 | ??: | -- weren't married? Do you have children? |
| 21 | CW: | Uh, yeah, I've got one son. He's, uh, he'll be, in fact he's eight years old today. |
| 22 |     | |

UU0564

PCR000329

1  ??:   Oh, so he knew you had some experience with kids and.

2  CW:   Right, right.

3  ??:   Yeah, usually you do choose a family member but he specifically pointed that out.
       You don't have anything in writing do you?

4
   CW:   No, I don't.
5
   ??:   Okay. I'm just kind of curious if he actually gave you a copy. –
6
   CW:   -- I didn't. It was, it was at nighttime when he had called me at home. I'd have to
7       say it was probably like, maybe 7:30, 8:00 at night, something like that.

8  ??:   Huh. Okay. Yeah that's kindof interesting that he would just, uh, well I guess that
       makes sense, huh? If you're planning on dieing.
9
   CW:   Yeah.
10
   ??:   Okay. Well thanks for sharing that with me. I appreciate you at least thinking
11      about it and taking me serious when I said, "Hey if there's anything you think
       about, can you call me back."
12
   CW:   Yeah. Well if I think of anything else, I'll give you a ring.
13
   ??:   Great. Thanks Chris.
14
   CW:   Uh huh.
15
   ??:   Okay. Bye.
16
   CW:   Bye-bye.
17
   (This is the beginning of a new telephone conversation. I do not know a date or time.)
18
   CW:   (Unintelligible), um, the deal about his will. That had to be in October because,
19      uh, I remember that was the last year I'd got drawn for elk and I was gone every
       weekend so I wasn't able to meet up with him on the weekends. And, uh, he'd
20      called me, I can't remember what day of the week it was. I'm thinking like on a
       Sunday evening he had called me, I'm guessing around 8:30, 9:00 at night. And,
21      uh, it was, I want to say like maybe two to three weeks before, uh, he ended up
       dieing. Um, any questions, give me a call back. Alrighty, thank you, bye-bye.
22

0uu565

PCR000330

1 | Transcribed by:

2 | Jackie Johnson
Maricopa County Public Defender's Office
3 | 1750 S. Mesa Drive, Suite 150
Mesa, Arizona 85210
4 | (602) 506-2207

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

21

000566

PCR000331

# Exhibit 59

## Michelle Arvanitas - PDX

| | |
|---|---|
| From: | Daniel Patterson - PDX |
| Sent: | Monday, February 02, 2004 8:55 AM |
| To: | Michelle Arvanitas - PDX |
| Subject: | RE: Andriano |

Thanks for the info-please have your secretary transcribe the interview-send me both the tape and the transcript thereafter-good work-see you later- Dan P.

-----Original Message-----
| | |
|---|---|
| From: | Michelle Arvanitas - PDX |
| Sent: | Friday, January 30, 2004 4:08 PM |
| To: | Daniel Patterson - PDX |
| Subject: | Andriano |

Hi Dan P.

I spoke with Chris Weaver today. I taped the conversation. Would you like my secretary to transcribe it or should I send you a copy of the tape?
He basically said He and Joe were very close. He saw no violence or problems between he and Wendi besides the normal argument occasionally. He said Joe had a good relationship with his Dad.
I did asked him if he remembered anything to call me back. People very seldom call, he did. He said that Joe called him one night and asked him to take care of his family when he died. He was a surprised since it was late. Joe told him, he and Wendi were talking and making out a will. He wanted to put him in their will to take care of the kids. He said he would be honored and certainly would. He thought it strange since he didn't ask a family member. I thought the last statement may be important due to Joe and Wendi possibly talking that night about him dying (Sodium Azide)?

It will be helpful to read or listen to the full tape.

I am still attempting to get the Boat registration. Will get back to you soon.

Good weekend to you :)

~M

1

002097

PCR000332

Exhibit 60

GOLDMAN & KAPLAN, LTD.
2930 North 7th Street
Phoenix, AZ 85014
(602) 264-9323

TID# 86-0274398

Joseph Andriano
PO Box 12102
Casa Grande, AZ 85222

October 03, 2000

In Reference To: ESTATE PLANNING

|  | Amount |
|---|---|
| Previous balance | $200.00 |
| Balance due | $200.00 |

006301
000439

PCR000333

Exhibit 61

# Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

| | |
|---|---|
| **G. David DeLozier** SBAZ #05237 | **Legal Assistants:** |
| *(Admitted in AZ, PA, TX & Federal Courts)* | General:           Planning & Zoning: |
| **Kathy M. O'Quian** SBLA #14195 | Ronald Ramirez      Marlene J. Baker |
| *(Admitted in LA & Federal Courts)* | Kimberly Birdsong   Domestic Relations. |
| | Tamera Martin |

December 14, 2000

Mr. Alejo Ochoa
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222

Re: State v. Wendi E. Andriano

Dear Mr. and Mrs. Ochoa:

It was a pleasure to meet with you today, Mr. Ochoa. Thank you for driving that long distance to meet with me and provide the initial funds, $5,400.00, of the retainer.

As you know, your daughter's request came to me through mutual friends and we are willing to assist her for several reasons, including those friends. We have, however, significantly reduced our normal fees for this representation. However, that does not mean that your daughter will not receive all of the best efforts we are able to make on her behalf.

However, the one aspect that I believe that may be significantly beyond our abilities is that of forensic experts in various areas, most notably psychologists. Thus, I am very hopeful that Mr. Thikoll will advise me expeditiously of his intent in assisting with the case and what his plans are in especially this area of expert witnesses. It is my opinion, that without the use of experts, your daughter's defense is going to be extremely difficult. Thus, while attorney's fees are critical, and I am thankful for all you are doing to raise the funds for these fees, I want to be certain you are aware of these critical areas, as well. Of course, if Mr. Thikoll or you know of persons in these fields of expertise that will work with us on a reduced basis, that would also be helpful to know. But, the defense of the case needs immediate attention.

With that in mind, I have revised the representation agreement and have included two copies of it. I have executed both; please have your wife and you sign one of them and return to me. Please feel free to call with your questions and comments at any time. Again, thank you for driving up to meet with me today.

Mr. Alejo Ochoa
Mrs. Donna Ochoa
Re: State v. Wendi E. Andriano
December 14, 2000
Page 2.

Also, I look forward to those chips and tamales.  Best regards.

Very truly yours,

LAW OFFICES OF G. DAVID DELOZIER, P.C.

G. David DeLozier

enclosures

cc:  Wendi E. Andriano

PCR000335

Exhibit 62



**LEON THIKOLL**
ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701

TELEPHONE (520) 884-7897
FAX   (520) 884-1122


November 29, 2000


Bethanne Klopp-Bryant
Maricopa County Public Defender
11 W. Jefferson, Suite 5
Phoenix, AZ 85003

   Re: State of Arizona v. Wendi Elizabeth Andriano
     CR2000-096032

Dear Bethanne:

   As of Monday afternoon, November 27th, your associate has not been out to see Wendi, nor has your office sent her any substantive paperwork concerning her charge.  Please, be humane, and see her as much as possible, keeping her up to date on the case.

         Sincerely,

         Leon Thikoll

LT/llg


001481


PCR000336

Exhibit 63