1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Wendi Elizabeth Andriano,                No. CV-16-01159-PHX-SRB

10            Petitioner,                   <u>DEATH PENALTY CASE</u>

11  v.                                      **ORDER**

12  David Shinn, et al.,

13            Respondents.

14

15        Before the Court is the Petition for Writ of Habeas Corpus filed by Wendi Elizabeth

16  Andriano, an Arizona death row inmate. (Doc. 17.) Respondents filed an answer to the

17  petition and Andriano filed a reply. (Docs. 22, 42.) For the reasons set forth below, and

18  based on the Court's review of the briefings and the entire record herein, the petition is

19  denied.

20                          **I.      BACKGROUND**

21        In 2004, Andriano was convicted of one count of first-degree murder and sentenced

22  to death for killing her husband. The following facts are taken from the opinion of the

23  Arizona Supreme Court affirming the conviction and sentence, *State v. Andriano*, 215 Ariz.

24  497, 161 P.3d 540 (2007), *abrogated by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509

25  (2012), and from the Court's review of the record.

26        At about 2:15 a.m. on October 8, 2000, Andriano called Chris, a coworker who lived

27  at the same apartment complex, and asked her to watch the Andrianos' children while she

28  took her husband, Joe, to the doctor. Joe was terminally ill with metastatic adenoid cystic

carcinoma. Andriano met Chris outside the apartment and told her Joe was dying. She stated she hadn't yet called 911.

Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking 45 minutes for the paramedics to show up.

Chris heard the paramedics arrive and went outside to direct them to the apartment. As the paramedics were unloading their equipment, Andriano exited the apartment screaming at them to leave. She returned inside and slammed the door. Chris and the paramedics knocked on the door but no one answered. Instead of coming out the front door, which opened onto the living room, Andriano went out through the back door, climbed over the patio wall, and walked around the apartment building to the front door. She had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. The paramedics left.

Andriano later called 911 again and the same paramedics responded. When they entered the apartment they found Joe lying dead on the floor in a pool of blood. He had sustained brain hemorrhaging caused by blows to the back of his head. He had also suffered a stab wound to his neck that severed his carotid artery. A broken bar stool covered in blood was found near Joe's body, along with a bloody kitchen knife and a belt.

The medical examiner determined that the brain hemorrhaging was caused by at least 23 blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated that he was conscious for at least part of the attack. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. The cause of death was blunt force trauma and the stab wound.

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack.

The detective further opined, based on the absence of arterial spurting on the belt and the knife, that those items were placed beside Joe's body after he died.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's stepfather told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500–gram bottle of sodium azide, two Tupperware containers containing sodium azide, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the bag in which the cardboard box was shipped. In the Andrianos' apartment, police found capsules filled with sodium azide in a bottle labeled as an herbal supplement. Trace amounts of sodium azide were found in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of the sodium azide were unaccounted for. Trace amounts of sodium azide were found in Joe's blood and gastric contents.

Andriano had ordered the sodium azide, a poison used for pest control, over the internet from a chemical distributor. For the transaction she used a false name and shipping address and a fictitious business license.

In the months leading up to Joe's murder, Andriano had attempted to procure a life insurance policy on him. In doing so she falsely claimed that Joe did not have cancer, and asked male friends to pose as Joe for the required physical examination, offering one of the men as much as $50,000.

At trial Andriano testified that Joe, who had been contemplating suicide and decided to take his life that night, swallowed several sodium azide capsules. The poison failed to kill him, however, and he became verbally and physically abusive. He tried to strangle Andriano with a telephone cord but she was able to cut the cord with a knife. When Joe picked up the knife, she struck him with the bar stool in self-defense. Joe then threatened

1    to kill himself with the knife. Andriano testified that she tried to stop him and his neck was
2    cut during the struggle.

3        Andriano also presented evidence that she was a victim of domestic abuse. She
4    testified that throughout the course of their marriage Joe had been emotionally, physically,
5    and sexually abusive. An expert testified about the psychological effects of domestic abuse.

6        The jury found Andriano guilty of first-degree murder. At sentencing, the jury found
7    one aggravating factor: that the murder had been committed in an "especially cruel
8    manner" under A.R.S. § 13–751(F)(6).[1] The jury then found that the evidence presented in
9    mitigation was not sufficiently substantial to call for leniency and returned a verdict of
10   death. The conviction and sentence were affirmed on direct appeal. *Andriano*, 215 Ariz.
11   497, 161 P.3d 540.

12       Andriano sought post-conviction relief ("PCR") in state court, filing a petition
13   raising claims of ineffective assistance of trial and appellate counsel. (PCR pet., Doc. 28-
14   1, Ex. OOOOO.) The court dismissed the majority of Andriano's claims as precluded or
15   not colorable, but granted a hearing on her penalty-phase ineffectiveness and conflict-of-
16   interest claims.[2] (ME 10/30/12.) After the hearing, the court dismissed both claims. (ME
17   11/1/14.) The Arizona Supreme Court denied review without comment.

18       Andriano filed a petition for writ of habeas corpus in this Court on March 6, 2017.
19   (Doc. 17.) She subsequently filed a motion for evidentiary development, which the Court
20   denied. (Doc. 68.) In doing so the Court denied Claims 6, 10, 11, 15, 18, 19A, 21C, 21D,
21   and 21E as procedurally defaulted and barred from federal review, and Claims 4, 17, 22,
22   31, 35, and 36 as meritless. (*Id.*)

23

24       [1] At the time of Andriano's offense, Arizona's capital sentencing scheme was set
25   forth in A.R.S. §§ 13–703 and 13–703.01 to –703.04. It is presently set forth in A.R.S.
26   §§ 13–751 to –759. The Court refers throughout this order to the statutes in effect at the
     time Andriano committed the murder.

27       [2] Maricopa County Superior Court Judge Brian K. Ishikawa presided over both the
28   trial and the PCR proceedings.

1

## II.     APPLICABLE LAW

2    Federal habeas claims are analyzed under the framework of the Antiterrorism and

3  Effective Death Penalty Act ("AEDPA").[3] Pursuant to the AEDPA, a petitioner is not

4  entitled to habeas relief on any claim adjudicated on the merits in state court unless the

5  state court's adjudication (1) resulted in a decision that was contrary to, or involved an

6  unreasonable application of, clearly established federal law or (2) resulted in a decision

7  that was based on an unreasonable determination of the facts in light of the evidence

8  presented in state court. 28 U.S.C. § 2254(d).

9    A state court decision is "contrary to" clearly established federal law

10 under § 2254(d)(1) if the decision applies a rule that contradicts the governing law set forth

11 in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the

12 Supreme Court on a matter of law, or if it confronts a set of facts that is materially

13 indistinguishable from a decision of the Supreme Court but reaches a different

14 result. *Williams  v. Taylor* (*Terry Williams*), 529 U.S. 362, 405–06 (2000); *see Early v.*

15 *Packer*, 537 U.S. 3, 8 (2002) (per curiam). Under the "unreasonable application" prong

16 of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the

17 correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it

18 to the facts of the particular . . . case" or "unreasonably extends a legal principle from

19 [Supreme Court] precedent to a new context where it should not apply or unreasonably

20 refuses to extend that principle to a new context where it should apply." *Williams (Terry)*,

21 529 U.S. at 407.

22    The Supreme Court has emphasized that under § 2254(d)(1) "an *unreasonable*

23 application of federal law is different from an *incorrect* application of federal law." *Id.*

24 (O'Connor, J., concurring) (emphasis in original); *see Bell v. Cone*, 535 U.S. 685, 694

25
26 [3] Andriano's challenge to the constitutionality of the AEDPA (Doc. 17 at 32–35) is
   meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that the
27 AEDPA violates neither the Suspension Clause nor the separation of powers doctrine).

28

(2002). Under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The burden is on the petitioner to show "there was no reasonable basis for the state court to deny relief." *Id.* at 98.

Under § 2254(d)(2), habeas relief is available if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El I*, 537 U.S. at 340. A state court's "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Murray (Robert) v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). Satisfying § 2254(d)(2) is a "daunting" burden, "one that will be satisfied in relatively few cases." *Id.* at 1000.

For claims not adjudicated on the merits in state court, federal review is generally not available when the claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3).

1    For unexhausted and defaulted claims, "federal habeas review . . . is barred unless
2    the prisoner can demonstrate cause for the default and actual prejudice as a result of the
3    alleged violation of federal law, or demonstrate that failure to consider the claims will result
4    in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *Coleman* further held
5    that ineffective assistance of counsel in PCR proceedings did not establish cause for the
6    procedural default of a claim. *Id.*

7    In *Martinez v. Ryan*, the Court established a "narrow exception" to the rule
8    announced in *Coleman*. 566 U.S. 1, 9 (2012). Under *Martinez* an Arizona petitioner may
9    establish cause and prejudice for the procedural default of an ineffective assistance of trial
10   counsel claim by demonstrating that (1) PCR counsel was ineffective and (2) the
11   underlying ineffective assistance claim has some merit. *See Cook v. Ryan*, 688 F.3d 598,
12   607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *Ramirez v. Ryan*, 937 F.3d 1230,
13   1242 (9th Cir. 2019).

14   To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR
15   counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Ramirez*,
16   937 F.3d at 1241. *Strickland* requires demonstrating that PCR counsel's performance was
17   deficient and there was a reasonable probability that, absent the deficient performance, the
18   result of the PCR proceedings would have been different. *Id.* Determining whether there
19   was a reasonable probability that the result of PCR proceedings would have been different
20   "is necessarily connected to the strength of the argument that trial counsel's assistance was
21   ineffective." *Id.* (quoting *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled*
22   *on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015)). "[I]f the claim
23   of ineffective assistance of trial counsel is implausible, then there could not be a reasonable
24   probability that the result of post-conviction proceedings would have been different."
25   *Clabourne*, 745 F.3d at 377.

26   To establish "prejudice" under *Martinez*, a petitioner must demonstrate that his
27   underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez*, the
28   Supreme Court defined substantial as a claim that "has some merit." *Martinez*, 566 U.S. at

13. The procedural default of an ineffective assistance of trial counsel claim will not be excused if the claim "is insubstantial, *i.e.*, it does not have any merit or . . . is wholly without factual support." *Id.* at 15–16. To determine whether a claim is "substantial" for purposes of establishing prejudice under *Martinez*, the court undertakes a "general assessment" of the merits of the underlying ineffective assistance of trial counsel claim. *Ramirez*, 937 F.3d at 1241 (citing *Cook*, 688 F.3d at 610 n.13).

While "prejudice" for purposes of "cause and prejudice" requires a showing only that the underlying claim is "substantial," a petitioner still must satisfy the second prong of *Strickland* with respect to PCR counsel's performance. *Clabourne*, 745 F.3d at 377.

*Martinez* applies only to claims of ineffective assistance of trial counsel; it has not been expanded to other types of claims. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (denying petitioner's argument that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court can expand the application of *Martinez* to other areas); *see also Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017) (explaining that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## III.  DISCUSSION

Andriano raises 36 claims in her habeas petition, some of which include numerous subclaims. These include both exhausted claims and unexhausted claims. The Court denied a number of the claims in its order on evidentiary development. (Doc. 68.) The Court addresses the remaining claims as follows.

## CLAIM 1

Andriano alleges that the prosecutor "engaged in repeated and pervasive misconduct," violating Andriano's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 17 at 35–59.) Specifically, she alleges that the prosecutor (1) inappropriately focused on irrelevant and salacious information about Andriano's sex life;

1  (2) misstated facts and vouched for his case; and (3) made unfounded attacks on Dr. Sharon

2  Murphy, Andriano's domestic-abuse expert. (*Id.* at 44–54.) Andriano did not raise these

3  claims on direct appeal. *See Andriano*, 215 Ariz. at 503 n.3, 161 P.3d at 546.

4      Andriano also alleges that trial and appellate counsel performed ineffectively by

5  failing to challenge the alleged misconduct. (Doc. 17 at 54–59.) She raised these claims in

6  her PCR petition (PCR pet., Doc. 28-1, Ex. OOOOO at 63–69, 70), and the PCR court

7  denied them on the merits. (ME 10/30/12 at 3, 6.) The Arizona Supreme Court denied

8  review without comment.[4]

9  **A.   Background**

10     On direct appeal, Andriano alleged that the trial court erred by admitting evidence

11  of her extramarital affairs. The Arizona Supreme Court rejected her argument:

12      During the summer of 2000, Andriano had a brief extramarital affair with
    Rick, a resident of the apartment complex where she lived and worked as the
13      property manager. That affair ended in July when Rick learned that Andriano
    was married and had children. Despite his rejection of her advances,
14      Andriano aggressively pursued Rick. . . .

15      During that same summer, Andriano frequented bars on a weekly basis with
16      coworkers and friends. There, she was seen dancing and flirting and even
    groping and kissing men. On September 27, the evening after Joe's fourth
17      chemotherapy treatment, Andriano went to a dance club and began dancing
    provocatively with and kissing a man she met there. They ultimately returned
18      to the Andrianos' apartment and had sex. During a phone conversation the
19      following day, Andriano told the man her husband had died of cancer.

20      . . . The evidence was admissible under Rule 404(b) . . . as evidence of
21      Andriano's motive for killing her husband—to be free to pursue other
    relationships. Supporting this purpose was testimony from Andriano's
22      hairdresser, who testified that Andriano told her in February of 2000 that she
23      would have divorced Joe were he not ill. At a later visit, Andriano disclosed
    that Joe "wanted to keep the marriage together," but she was "emotionally
24      out of it" and "wished he was dead so she could move on with her life."
25      Around August of 2000, Andriano confided to the hairdresser that she was

26

27

28      [4] When the state's highest court denies a claim summarily, the federal
    court looks through to the last reasoned decision, *Ylst v. Nunnemaker*, 501 U.S. 797, 803
    (1991), which in this case is the decision of the PCR court.

1    interested in another man who hesitated to get involved in a relationship
2    because she was married.

3    The evidence was also admissible under Rule 404(b) to rebut the defense
4    theory that Andriano was a domestic violence victim who lived in fear of her
5    abusive husband, whom she bludgeoned to death in self-defense.

6    Andriano maintains, nonetheless, that the evidence was unfairly prejudicial
     because "[t]he prosecutor took every opportunity to infuse the trial with
7    marginally relevant information about Andriano's partying and man-
8    chasing." Nearly all the examples Andriano provides relate to the
     prosecutor's comments in the guilt phase closing arguments. Comments in
9    closing arguments, however, are not evidence, as the jury was instructed, and
10   thus the comments do not render unfairly prejudicial evidence that is
     otherwise properly admitted.

11
12   Another incident about which Andriano complains occurred during the cross-
     examination of defense expert Dr. Sharon Murphy. The prosecutor asked Dr.
13   Murphy whether Andriano used a personal lubricant during sexual
14   intercourse with Rick. The door to this line of questioning had been opened
     by defense counsel's questioning on direct examination, to which Dr.
15   Murphy responded that Andriano and Joe "needed to use a lubricant" during
16   intercourse. Considered in context, the questioning was designed to rebut Dr.
     Murphy's suggestion, elicited by defense counsel's question, that Andriano's
17   need to use a lubricant when she had sex with Joe showed that Joe was an
18   abusive spouse. The evidence elicited was not unfairly prejudicial.

19   The final incident relates to a comment the prosecutor made during
20   aggravation phase closing arguments and therefore is not relevant to whether
     such evidence was admissible in the guilt phase. The probative value of
21   evidence of Andriano's extramarital relationships is not substantially
     outweighed by the danger of unfair prejudice, and thus the trial court did not
22   abuse its discretion in admitting the evidence.

23   *Andriano*, 215 Ariz. at 503–04, 161 P.3d at 546–47 (footnote and citations omitted).

24   Andriano argues that this ruling was an unreasonable application of clearly established law

25   under 28 U.S.C. § 2254(d)(1). (Doc. 17 at 37.)

26           In her PCR petition, Andriano alleged that trial counsel performed ineffectively by

27   failing to object to the prosecutor's "pervasive instances" of misconduct, which included

28   making references to Andriano's "hyper-sexual behavior," implying that "the State

                                          - 10 -

possessed evidence of factual matters that was [sic] never introduced at trial," and "making unfounded accusations that a defense expert was unethical." (PCR pet., Doc. 28-1, Ex. OOOOO at 63–65.) Andriano further alleged that appellate counsel performed ineffectively by failing to challenge the prosecutor's actions on appeal. (*Id.* at 70.)

The PCR court construed this claim as alleging both prosecutorial misconduct and ineffective assistance of counsel. With respect to the former, the court found the claim waived and precluded under Arizona Rule of Criminal Procedure 32.2(a)(3) because it was not raised on direct appeal. (ME 10/30/12 at 3.) The court alternatively addressed the claim's merits and denied relief because the Arizona Supreme Court had found the evidence admissible:

> [T]he defendant alleges that numerous instances of prosecutorial misconduct deprived her of due process and violated her right to effective assistance of counsel. Specifically, she claims that references to her extramarital lifestyle were improper. However, the defendant raised and the Supreme Court rejected the admissibility of other act evidence regarding her extramarital affairs on direct appeal. That Court concluded that this Rule 404(b) evidence served to establish a motive for the murder and to rebut the defendant's domestic violence victim/self-defense theory. *Andriano*, 215 Ariz. at 503, 161 P.3d at 546. Comment upon properly-admitted evidence by a prosecutor is appropriate.
>
> Although noting that the defendant did not allege prosecutorial misconduct on appeal, the Supreme Court nonetheless addressed the prosecutor's statements about defendant's actions and observed that the majority of them occurred during the guilt phase closing arguments. *Id.* at 503 & n.3. The Court noted that "[c]omments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted." *Id.*

(*Id.*) The court further held that, "[r]egarding any alleged prosecutorial misconduct . . . the prosecutor did not commit misconduct." (*Id.* at 6.)

The PCR court also addressed and denied Andriano's claim of ineffective assistance of appellate counsel, finding that because the prosecutor did not commit misconduct, the Arizona Supreme Court "would not have reversed the defendant's conviction on that basis." (ME 10/30/12 at 6.)

1   Andriano alleges that the PCR court's decision was based on an unreasonable
2   application of clearly established federal law and an unreasonable determination of the
3   facts. (Doc. 17 at 38.)

4   **B.   Clearly established federal law: prosecutorial misconduct**

5   The appropriate standard of federal habeas review of a claim of prosecutorial
6   misconduct is "the narrow one of due process, and not the broad exercise of supervisory
7   power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*
8   *DeChristoforo*, 416 U.S. 637, 642 (1974)). A petitioner is not entitled to relief in the
9   absence of a due process violation even if the prosecutor's comments were "undesirable or
10  even universally condemned." *Id.* Therefore, to succeed on a claim of prosecutorial
11  misconduct, a petitioner must prove not only that the prosecutor's remarks and other
12  conduct were improper but that they "so infected the trial with unfairness as to make the
13  resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see Parker v.*
14  *Matthews*, 567 U.S. 37, 45 (2012); *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)
15  (explaining that relief is limited to cases in which the petitioner can establish that
16  prosecutorial misconduct resulted in actual prejudice); *see also Smith v. Phillips*, 455 U.S.
17  209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged
18  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")

19  In determining if a petitioner's due process rights were violated, the court "must
20  consider the probable effect [of] the prosecutor's [remarks] . . . on the jury's ability to judge
21  the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an
22  assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v.*
23  *California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34
24  (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the
25  Court assessed the fairness of the trial by considering whether the prosecutor's comments
26  manipulated or misstated the evidence, whether the trial court gave a curative instruction,
27  and "[t]he weight of the evidence against petitioner." 477 U.S. at 181–82; *see Trillo v.*
28  *Biter*, 769 F.3d 995, 1001 (9th Cir. 2014).

1    In the event a petitioner can establish a due process violation, to be found eligible

2  for relief he must also establish that the violation resulted in a "substantial and injurious"

3  effect on the verdict under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619,

4  637 (1993). *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *see Wood v. Ryan*, 693 F.3d 1104,

5  1113 (9th Cir. 2012).

6    Courts have substantial latitude when considering prosecutorial misconduct claims

7  because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily

8  imprecise." *Donnelly*, 416 U.S. at 645; *Parker*, 567 U.S. at 48 (explaining that the "*Darden*

9  standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in

10  case-by-case determinations'") (quoting *Yarborough*, 541 U.S. at 664).

11  **C.    Clearly established federal law: ineffective assistance of counsel**

12    Claims of ineffective assistance of counsel are governed by the principles set forth

13  in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner

14  must show that counsel's representation fell below an objective standard of reasonableness

15  and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland*

16  is highly deferential. "A fair assessment of attorney performance requires that every effort

17  be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

18  counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

19  the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The

20  "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because

21  "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account

22  of the variety of circumstances faced by defense counsel or the range of legitimate

23  decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at

24  688–89.

25    To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption

26  that, under the circumstances, the challenged action 'might be considered sound trial

27  strategy.'" *Strickland*, 466 U.S. at 689. "The question is whether an attorney's

28  representation amounted to incompetence under 'prevailing professional norms,' not

whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689).

Counsel's strategy with respect to objections is entitled to deference, and reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see, e.g.*, *United States v. Mejia–Mesa*, 153 F.3d 925, 931 (9th Cir. 1998) (explaining that "a few missed objections alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions (or failures to act) were pursuant to his litigation strategy and within the wide range of reasonable performance."). Trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *see United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Dubria v. Smith*, 224 F.3d 995, 1003–04 (9th Cir. 2000) (finding that failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694; *see Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005)  (explaining that the

1  defendant "'bears the highly demanding and heavy burden [of] establishing actual

2  prejudice.'") (quoting *Williams (Terry)*, 529 U.S. at 394)).

3         Claims of ineffective assistance of appellate counsel are also evaluated under the

4  *Strickland* standard. *See Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010)

5  (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). First, the petitioner must show that

6  counsel's performance was objectively unreasonable, which in the appellate context

7  requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover

8  and brief a merit-worthy issue. *Id.* Second, the petitioner must show prejudice, which in

9  this context means that he must demonstrate a reasonable probability that, but for appellate

10  counsel's failure to raise the issue, he would have prevailed in his appeal. *Id.*; *see*

11  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that to prove prejudice, a

12  petitioner must show that there is a reasonable probability the state appellate court would

13  have reversed the trial court's decision).

14         Finally, under the AEDPA, ineffective assistance of counsel claims are subject to

15  two layers of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla*

16  *v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application

17  of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S.

18  at 105. "When § 2254(d) applies, the question is not whether counsel's actions were

19  reasonable. The question is whether there is any reasonable argument that counsel satisfied

20  *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105; *see Knowles v. Mirzayance*,

21  556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a

22  *Strickland* claim under the § 2254(d)(1) standard") (citing *Yarborough v. Gentry*, 540 U.S.

23  1, 5–6 (2003) (per curiam)). Under this standard of review, the court "gives both the state

24  court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15

25  (2013).

26  **D.    Analysis**

27         In support of this claim, Andriano first outlines "the history of ethical complaints

28  and misconduct" against the prosecutor, Juan Martinez. (Doc. 17 at 40–44.) The Court

1    agrees with Respondents that accusations from other cases are not relevant to the issue

2    before it, which is "the fairness of [Andriano's] trial, not the culpability of the prosecutor."

3    *Phillips*, 455 U.S. at 219; *see Trillo*, 769 F.3d at 1001 (explaining that the court's role in

4    reviewing prosecutorial misconduct claims "is not to punish society for the misdeeds of

5    the prosecutor" but "to ensure that the petitioner received a fair trial"). Accordingly, the

6    Court addresses only the prosecutor's actions in Andriano's case.

7        Respondents contend that Andriano's claims of prosecutorial misconduct are both

8    procedurally defaulted and meritless. As noted above, the PCR court found that Andriano's

9    claim of prosecutorial misconduct was precluded under Rule 32.2(a)(3) because it was not

10   raised on direct appeal. (ME 10/30/12 at 3.) Because this is an independent and adequate

11   state procedural bar, *Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam), the

12   prosecutorial misconduct claim is procedurally defaulted. The PCR court's alternative

13   merits ruling does not nullify the default. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

14       Andriano contends that the claim's default can be excused by the ineffective

15   assistance of PCR and appellate counsel. (Doc. 17 at 36.) Under *Martinez*, the ineffective

16   performance of PCR counsel may excuse the default only of claims of ineffective

17   assistance of trial counsel. *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27.

18   However, ineffective assistance of appellate counsel may be used as cause to excuse a

19   procedural default where the particular ineffective assistance allegation was first exhausted

20   in state court as an independent constitutional claim. *See Edwards v. Carpenter*, 529 U.S.

21   446, 453 (2000); *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986). As noted, PCR counsel

22   raised and exhausted a claim alleging that appellate counsel performed ineffectively by

23   failing to raise a claim of prosecutorial misconduct. (PCR pet., Doc. 28-1, Ex. OOOOO at

24   70.)

25       Regardless of their procedural status, however, the Court will consider Andriano's

26   claims of prosecutorial misconduct on the merits.[5] *See* 28 U.S.C. § 2254(b)(2) (allowing

27

28       [5] The PCR court expressly addressed only the prosecutorial misconduct claim
     concerning Andriano's sexual history. (ME 10/03/12 at 3.) The court also stated, however,
     without further discussion, that "[r]egarding any alleged prosecutorial misconduct . . . the

denial of unexhausted claims on the merits); *see also Lambrix v. Singletary*, 520 U.S. 518, 524-525 (1997) (explaining that the court may bypass the procedural default issue in the interest of judicial economy when the merits are clear but the procedural default issues are not). The Court will do so applying AEDPA deference. *See Clabourne*, 745 F.3d at 383 (explaining that AEDPA deference applies to PCR court's alternative ruling on the merits). The Court will also review Andriano's claims of ineffective assistance of trial and appellate counsel, under the "doubly deferential" standard of *Strickland* and the AEDPA. *See Mirzayance*, 556 U.S. at 123.

### 1.   Focus on irrelevant and salacious information

#### a.   *Prosecutorial misconduct*

Andriano alleges that the prosecutor committed misconduct by improperly focusing on the details of her sexual history, including her extramarital affairs. (Doc. 17 at 45–50.)

Andriano cites the following instances of alleged misconduct from the guilt phase of trial. The prosecutor: highlighted Andriano's extramarital affairs during his opening statement and closing argument[6]; cross-examined Andriano about her sexual history and details of her sexual relationships[7]; questioned Rick Freeland and Travis Black about the details of their sexual encounters with Andriano[8]; cross-examined Dr. Murphy about Andriano's sexual history, including whether she used a personal lubricant with Freeland[9]; and cross-examined Andriano's mother, Donna Ochoa, about Andriano's sexual history

---

prosecutor did not commit misconduct." (*Id.* at 6.) Andriano asserts that the PCR court must be presumed to have rejected all of her prosecutorial misconduct claims on the merits. (Doc. 17 at 38.) The Court agrees. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits. . . .") (citing *Richter*, 562 U.S. at 100).

[6] *See* RT 9/7/04 at 25, 29, 31, 55; RT 11/16/04 at 18, 37, 63, 75–76, 84–85, 87–88.

[7] *See* RT 10/28/04 at 75–77, 98–99; RT 11/1/04 at 35–54, 57, 89–92, 106–109; RT 11/2/04 at 35.

[8] *See* RT 9/16/04 at 89–91, 108; RT 9/13/04 at 21,  66.

[9] *See* RT 10/13/04 at 50, 65, 67–69, 73, 77, 104, 123, 148.

1    and whether bruises Donna had attributed to Joe could have been caused by Freeland
2    during intercourse with Andriano.[10] (Doc. 17 at 44–51.)

3         Andriano also challenges the following incidents from the penalty phase of trial: the
4    prosecutor elicited from the State's  rebuttal mental-health expert, Dr. Michael Bayless,
5    evidence that Andriano had behaved flirtatiously during his evaluation of her[11] and cross-
6    examined Gia Palicki, a friend who babysat for Andriano's children, about Andriano's sex
7    life with Joe.[12] (*Id.*)

8         As discussed above, the Arizona Supreme Court rejected Andriano's claim that the
9    trial court erred by admitting this evidence. *Andriano*, 215 Ariz. at 503–04, 161 P.3d at
10   546–47. The court found the evidence of extramarital affairs relevant to Andriano's motive
11   for killing Joe and admissible to rebut her claim that she was a victim of domestic violence.
12   *Id.* at 503, 161 P.3d at 546. As to the details of those affairs, the court specifically rejected
13   Andriano's challenge to the prosecutor's questions to Dr. Murphy about whether Andriano
14   had used a personal lubricant with Freeland, finding that it rebutted Dr. Murphy's
15   suggestion that Andriano used a lubricant for intercourse with Joe because he was abusive.
16   *Id.* at 503–04, 161 P.3d at 546–47.

17        The Arizona Supreme Court also found that the evidence of extramarital affairs was
18   not unfairly prejudicial. *Id*. at 503, 161 P.3d at 546. Finally, the court concluded that any
19   error in the prosecutor's closing argument was not prejudicial because the trial court
20   instructed the jurors that counsel's arguments are not evidence. *Id.*

21        The PCR court in its alternative merits ruling denied relief on the prosecutorial
22   misconduct claim because the Arizona Supreme Court found the evidence admissible. (ME
23   10/30/12 at 3.) That ruling was not based on an unreasonable application of clearly
24   established federal law or an unreasonable determination of the facts.

25

26   _____

27        [10] *See* RT 10/5/04 at 98–99, 154–55.

     [11] *See* R.T 12/15/04 at 14, 21, 38.
28
     [12] *See* RT 12/13/04, at 60–61.

1       As the PCR court found (*id.*), a prosecutor does not engage in misconduct by

2   commenting on evidence that was properly admitted. *See United States v. Reyes*, 660 F.3d

3   454, 463 (9th Cir. 2011) (explaining that because the evidence was "properly admitted,

4   Reyes cannot rely on the admission of that evidence to demonstrate prosecutorial

5   misconduct") (citing *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994)); *see also*

6   *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008) ("A prosecutor may rely in good faith

7   on evidentiary rulings made by the state trial judge and make arguments in reliance on

8   those rulings."); *Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997).

9       In concluding there was no prosecutorial misconduct, the PCR court also cited the

10  Arizona Supreme Court's finding that the prosecutor's comments during closing argument

11  were not unduly prejudicial because the trial court instructed the jury that the lawyers'

12  arguments are not evidence. (ME 10/30/12 at 3.) Again, the PCR court's decision was

13  reasonable. "A jury is presumed to follow" a judge's instructions. *Weeks v. Angelone*, 528

14  U.S. 225, 234 (2000); *see Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir. 2004) ("[W]e note

15  that the jury was instructed that argument of counsel is not evidence. That instruction tends

16  to draw the sting from improper arguments."); *see also Cheney v. Washington*, 614 F.3d

17  987, 997 (9th Cir. 2010) (explaining that arguments of counsel carry less weight with juries

18  than instructions from the court) (citing *Boyde v. California*, 494 U.S. 370, 384 (1990)).

19      Notwithstanding the findings by the Arizona Supreme Court and the PCR court as

20  to its admissibility, Andriano alleges that the prosecutor engaged in misconduct with

21  respect to evidence of her sexual history. She cites, for example, the prosecutor's cross-

22  examination of Dr. Murphy about Andriano's use of a personal lubricant. (Doc. 17 at 49.)

23      As the Arizona Supreme Court noted, Andriano opened the door to this evidence.

24  *Id.* at 504, 161 P.3d at 547. On direct examination by defense counsel, Dr. Murphy testified

25  that Andriano used a lubricant with Joe because she found no pleasure in the act of sexual

26  intercourse with him but felt forced to submit to his wishes. (RT 10/12/04 at 63.) This

27  testimony supported Dr. Murphy's opinion that Andriano was a victim of domestic abuse.

28  On cross-examination, in questioning cited by Andriano as misconduct, the prosecutor

1    asked whether Dr. Murphy was aware that Andriano had told a friend that she used

2    lubricant with Joe because she found him "gross and skinny"—a circumstance which, Dr.

3    Murphy conceded, "had nothing to do with any domestic violence." (RT 10/13/04 at 68.)

4    Dr. Murphy also acknowledged that she did not ask Andriano whether she used a lubricant

5    with Freeland. (*Id.* at 68–69.) This omission impacted the credibility of Dr. Murphy's

6    opinion that use of a lubricant with Joe reflected Andriano's status as domestic violence

7    victim.

8        This line of questioning was not prosecutorial misconduct. "Where the defendant

9    opens the door to an argument, it is fair advocacy for the prosecution to enter." *United*

10   *States v. Garcia-Guizar*, 160 F.3d 511, 522 (9th Cir. 1998) (citations and internal quotation

11   marks omitted); *see United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002)

12   ("The government may introduce otherwise inadmissible evidence when the defendant

13   opens the door by introducing potentially misleading testimony.") (internal quotation

14   marks omitted).

15       Apart from the evidence and comments regarding Andriano's extramarital affairs,

16   Andriano cites as misconduct the prosecutor's questioning of Dr. Bayless, the State's

17   penalty-phase rebuttal witness. (Doc. 17 at 48.) The prosecutor questioned Dr. Bayless

18   about Andriano's demeanor when he interviewed her in jail. (RT 12/15/04 at 24.) Bayless

19   testified that Andriano was "being very flirtatious," and that his colleagues who were

20   present at the interview also commented on that aspect of her demeanor. (*Id.* at 14–15.) He

21   also testified that Andriano did not "tear up" during the evaluation as she had been reported

22   to do frequently in previous interviews. (*Id.* at 26.) Based on these observations, and his

23   review of the jail record, Dr. Bayless concluded that Andriano behaved manipulatively in

24   pursuit of "secondary gain." (*Id.* at 26.) He also opined that Andriano did not meet the

25   criteria for battered woman syndrome and testified that a suicide attempt Andriano had

26   carried out in jail was not serious. (*Id.* at 25, 27.)

27       There was nothing improper about the prosecutor's examination of Dr. Bayless.

28   Bayless's observations about Andriano's flirtatiousness and other aspects of her behavior

1    and demeanor helped form his professional opinions, which were used to rebut the

2    testimony of Andriano's penalty-phase witnesses.

3         Andriano also cites a question the prosecutor asked Donna Ochoa, Andriano's

4    mother, about bruises she had once observed on Andriano. (Doc. 17 at 49.) Donna was

5    testifying about incidents of "inappropriate touching" where Joe had acted aggressively

6    toward Andriano. (RT 10/5/04 at 97–100.) When Donna mentioned the bruises, the

7    prosecutor responded, "But you don't know [Joe] did that. For all you know, somebody

8    named Rick Freeland did that while they were making love." (*Id.* at 98–99.) Defense

9    counsel's objection was sustained, and Donna conceded she did not know who made the

10   bruises. (*Id.* at 99.)

11        Here the prosecutor "did stray beyond proper advocacy." *Sassounian v. Roe*, 230

12   F.3d 1097, 1106 (9th Cir. 2000). His comment was argumentative and improper. However,

13   the court properly sustained the objection, and when viewed in the context of the

14   prosecution's entire case, the comment did not deprive Andriano of a fair trial. *Id.* at 1106–

15   07.

16        Finally, Andriano cites the prosecutor's cross-examination of her friend and

17   babysitter Gia Palicki. (Doc. 17 at 49.) The prosecutor repeatedly asked Palicki whether

18   she knew that Andriano was meeting other men and having extramarital sex. (RT 12/13/04

19   at 60–63.) Palicki had just been asked on direct examination whether she and Andriano had

20   ever discussed Andriano's sex life with Joe and Palicki had testified that Andriano told her

21   she enjoyed kissing but Joe no longer felt comfortable doing it. (*Id.* at 58.) Palicki had also

22   just testified that Andriano never "bad-mouth[ed]" or spoke negatively about Joe. (*Id.* at

23   57.) Again, the prosecutor's questions may have strayed over the line, but taken in context

24   they did not deprive Andriano of a fair trial.

25        Even if Andriano could show a due process violation based on the prosecutor's

26   comments and questions about her sexual history, she would not be entitled to relief

27   because she cannot demonstrate that the misconduct had a "substantial and injurious effect

28   or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Wood*, 693

F.3d at 1113. The weight of the evidence of Andriano's guilt was overwhelming. *See Darden*, 477 U.S. at 182 (rejecting prosecutorial misconduct claim where the "weight of the evidence against petitioner was heavy"); *see also Leavitt*, 383 F.3d at 834–35 (finding alleged prosecutorial misconduct harmless because of the "strength of the evidence"); *Cristini*, 526 F.3d at 900 (faulting the prosecutor's opening and closing argument for violating the trial judge's ruling about other-acts evidence but concluding that the state court "reasonably found that this character argument was harmless in view of the admissible evidence that established the Defendant's guilt"); *United States v. Green*, 435 F.3d 1265, 1269 (10th Cir. 2006) ("The amount of evidence presented against Defendant satisfies us the alleged misconduct had a minuscule effect, if any, on the jury's verdict."); *United States v. Washington*, 417 F.3d 780, 787 (7th Cir. 2005) ("[L]ike most prosecutorial misconduct claims, Washington's claim founders in the face of the strong evidence of his guilt."); *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) ("Given the overwhelming evidence of guilt and the court's cautionary instruction to the jury, we conclude that the prosecution's statement had no substantial and injurious effect or influence in the determination of Cotton's guilt."); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (holding that misconduct was non-prejudicial because "the evidence of Petitioner's guilt of first-degree murder was very strong").

The evidence showed that Andriano purchased poison using a fictitious name and a falsified business license, surreptitiously administered the poison to Joe, and when he did not die from the poison, bludgeoned and stabbed him to death. *See Andriano*, 215 Ariz. at 500–01, 161 P.3d at 543–44. Andriano arranged the crime scene to make it appear as though a struggle had taken place, and she admitted to her stepfather that she had stabbed Joe. *Id.* at 501, 161 P.3d at 544. After being taken into custody, Andriano called a colleague and asked her to hide certain items that were in Andriano's business office. *Id.*

In addition, as the Arizona Supreme Court found, the evidence refuted her claim of self-defense:

1
2
3
4

> The evidence established that Andriano did not kill Joe while defending against a domestic violence attack. Instead, she poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of the attack because he was so weak from the poison and chemotherapy that he could not get up.

5

*Id.* at 512, 161 P.3d at 555.

6

In the face of this evidence, Andriano cannot show that the prosecutor's conduct

7

had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht*, 507 U.S.

8

at 637; *see Darden*, 477 U.S. at 182. Accordingly, the PCR court's denial of this claim was

9

not based on an unreasonable determination of the facts or an unreasonable application of

10

clearly established federal law, and Andriano has not met her burden of showing "there

11

was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see*

12

*Parker*, 567 U.S. at 47–48 (noting that because the *Darden* standard is a general one, courts

13

have more leeway in reaching outcomes on a case-by-case basis).

14

**b.**     *Ineffective assistance of trial counsel*

15

Andriano alleges that counsel performed ineffectively by failing to object to these

16

instances of alleged prosecutorial misconduct. (Doc. 17 at 54–56.) The PCR court's denial

17

of this claim was neither an unreasonable application of *Strickland* nor was it based on an

18

unreasonable determination of the facts.[13]

19

First, because the Arizona Supreme Court found the evidence admissible and the

20

prosecutor's comments nonprejudicial, counsel did not perform ineffectively by failing to

21

object. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a

22

frivolous objection does not cause counsel's performance to fall below an objective level

23

of reasonableness."). "An ineffective assistance claim based on a failure to object is tied to

24

the admissibility of the underlying evidence. If evidence admitted without objection was

25

admissible, then the complained of action fails both prongs of the *Strickland* test." *Hough*

26

27

28

---

[13] To support these allegations of ineffective assistance of counsel, Andriano cites *Taylor v. Maddox*, 366 F.3d at 1001, and 28 U.S.C. § 2254(d)(2), but she does not specify which facts the PCR court unreasonably determined. This is insufficient to overcome the presumption that the court's factual determinations were correct. *See* 28 U.S.C. § 2254(E)(1); *Miller-El I*, 537 U.S. at 340.

1   *v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001); *see United States v. Bosch*, 914 F.2d 1239,

2   1247 (9th Cir. 1990) (explaining that failure to object to admissible evidence is neither

3   unreasonable nor prejudicial under *Strickland*).

4   Next, counsel did in fact take action to prevent the admission of testimony about

5   Andriano's extramarital affairs. They filed a motion in limine to preclude the State from

6   presenting evidence that she was involved in affairs with Freeland and Black (ROA 100),[14]

7   but the court denied the motion (*see* RT 9/7/04 at 13). Counsel thereby preserved the issue

8   for appeal. *See United States v. Mejia-Alarcon*, 995 F.2d 982, 992 (10th Cir. 1993) (finding

9   no ineffective assistance where counsel "preserve[d] the objection" through a motion in

10  limine). Again, counsel did not perform ineffectively by failing to object to evidence the

11  trial court already found admissible. *See Bosch*, 914 F.2d at 1247. Nor was counsel

12  ineffective for failing to object to reasonable inferences drawn from the evidence. *Trillo*,

13  769 F.3d at 1002.

14  In addition, the defense placed Andriano's past sexual behavior, including her sex

15  life with Joe, into evidence through the testimony of Dr. Murphy to support their theory

16  that Andriano was a domestic-violence victim. (*See* RT 10/12/04 at 62–63.) Dr. Murphy

17  testified that Andriano told her that intercourse was painful and she needed to use a

18  lubricant with her husband. (*Id.*) Dr. Murphy testified that sexual intercourse became

19  abusive because Joe wanted it and Andriano did not. (*Id.* at 105.) According to Dr. Murphy,

20  Joe's daily demand for sex amounted to sexual abuse. (RT 10/13/04 at 6.) Dr. Murphy

21  testified that Joe brought sex toys into the relationship, against Andriano's wishes. (*Id.* at

22  6–7.) Dr. Murphy also discussed Andriano's relationship with Rick Freeland, who was

23  more emotionally supportive than Joe. (RT 10/12/04 at 116.) Andriano had sex with

24  Freeland not because she wanted to but because she thought that was what was expected

25  in a relationship. (*Id.* at 117.) Counsels' decision to offer this evidence is presumed to be

26  reasonable, *Strickland*, 466 U.S. at 698, and having offered the evidence counsel might

27
28      [14] "ROA" refers to the trial court record for Andriano's direct appeal (Case No. CR-05-0005-AP). "P-App." refers to the Appendix to Andriano's Petition for Review (CR 2000-096032).

- 24 -

1    reasonably have decided not to object to the prosecutor's questions and comments. *See*
2    *Mejia-Mesa*, 153 F.3d at 931. As discussed below, many of the questions Andriano
3    describes as misconduct arose from Dr. Murphy's testimony and Andriano's self-reporting
4    of her sexual history.

5           Finally, as Respondents note (Doc. 22 at 47), counsel did in fact raise objections to
6    some of the prosecutor's questions about Andriano's sex life, albeit not on misconduct
7    grounds. (*See* RT 10/5/04 at 99; RT 10/13/04 at 54–56, 65.) Along with the motion in
8    limine counsel filed prior to trial, this suggests that counsel's failure to object to other
9    questions and comments was strategic and not a manifestation of inattention or professional
10   incompetence. *See Necoechea*, 986 F.2d at 1281.

11          In support of her allegation that counsel performed ineffectively, Andriano cites
12   *Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015), where the Ninth Circuit found
13   ineffective assistance based on counsel's failure to object to comments made in the
14   prosecutor's rebuttal closing argument. (Doc. 17 at 57.) In *Zapata*, the prosecutor spun a
15   "pure fiction" in which the defendant shouted vile racial epithets at the victim while
16   shooting him. *Id.* at 1112–13. The prosecutor's comments were false, inflammatory, and
17   inappropriately recounted the crime from the victim's perspective. *Id.* at 1114. The Ninth
18   Circuit found that counsel's failure to object constituted ineffective assistance of counsel
19   under *Strickland*.

20          *Zapata* is distinguishable. In finding that counsel's failure to object was prejudicial,
21   the court noted, among other factors, that the prosecutor's comments were not a reasonable
22   inference from the record and that the "evidence of guilt was weak." *Id.* at 1117–23. As
23   already noted, in Andriano's case, the Arizona Supreme Court found that the prosecutor's
24   statements were comments on evidence properly admitted at trial. *Andriano*, 215 Ariz. at
25   503–04, 161 P.3d at 546–47. More significantly, the evidence against Andriano was
26   overwhelming, defeating any showing of prejudice. *See Leavitt*, 383 F.3d at 834–35;
27   *Drayden*, 232 F.3d at 712; *Weygandt v. Ducharme*, 774 F.2d 1491, 1493 (9th Cir. 1985)
28   ("Although Weygandt's attorney should have objected to the prosecutor's improper

1    remarks, his failure to do so, evaluated in light of the overwhelming evidence of guilt

2    presented at trial, did not so prejudice Weygandt as to deprive him of a fair trial."); *Bible*

3    *v. Schriro*, 497 F.Supp.2d 991, 1041–42 (D. Ariz. 2007), *aff'd sub nom. Bible v. Ryan*, 571

4    F.3d 860 (9th Cir. 2009).

5         Andriano has not rebutted the presumption that counsel's performance fell within

6    the "'wide range' of permissible professional legal conduct," *Necoechea,* 986 F.2d at 1281,

7    or demonstrated that she was prejudiced by counsel's failure to object, *see Dubria*, 224

8    F.3d at 1003–04. Applying the doubly deferential standard required by the AEDPA and

9    *Strickland*, the Court finds that Andriano is not entitled to relief on this claim. *See Richter*,

10   562 U.S. at 105; *Mirzayance*, 556 U.S. at 123.

11                       *c.    Ineffective assistance of appellate counsel*

12        During the PCR proceedings, Andriano alleged that appellate counsel performed

13   ineffectively by failing to raise a claim of prosecutorial misconduct. (PCR pet., Doc. 28-1,

14   Ex. OOOOO at 70.) The PCR court rejected the claim on the merits. (ME 10/30/12 at 6.) ,

15   The court found that there was no misconduct, so that even if appellate counsel had raised

16   such a claim it would have been rejected by the Arizona Supreme Court. (*Id.*) The PCR

17   court's decision was not based on an unreasonable application of clearly established federal

18   law or an unreasonable determination of the facts.

19        For the reasons already discussed, primarily the strength of the evidence against

20   Andriano, the underlying prosecutorial misconduct claim lacks merit. Even if, as Andriano

21   argues (Doc. 17 at 57–58), appellate counsel's performance was deficient in failing to brief

22   the issue, Andriano cannot establish that she was prejudiced by omission of the

23   prosecutorial misconduct claim from the appellate brief. *See Wildman v. Johnson*, 261 F.3d

24   832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does

25   not constitute ineffective assistance when appeal would not have provided grounds for

26   reversal."). There was not a reasonable probability of a different result on appeal if counsel

27   had raised a prosecutorial misconduct claim. *See Moorman*, 628 F.3d at 1106;

28   *Kimmelman*, 477 U.S. at 375.

1       Andriano is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105;

2   *Mirzayance*, 556 U.S. at 123.

3           2.      Misstatements of facts and vouching

4       Andriano alleges that the prosecutor misrepresented facts and engaged in vouching

5   by questioning Dr. Murphy about whether Andriano's relationship with a man named

6   Shawn King ended because King had caught her naked with another man[15]; by implying

7   during his guilt-phase closing argument that he had "undisclosed evidence implicating

8   King along with Andriano"[16]; and by vouching for witnesses and using the phrase "we

9   know" during his opening statements and closing arguments.[17] (Doc. 17 at 50–52.)

10  Andriano also contends that trial and appellate counsel were ineffective for not challenging

11  the misconduct. (*Id.* at 56–59.)

12              a.      *Prosecutorial misconduct*

13                  i.      Questioning Dr. Murphy about Shawn King

14      As noted above, Dr. Murphy testified at the guilt phase of trial that Andriano was a

15  domestic-violence victim. (*See* RT 10/13/04 at 44.) Based on the information Andriano

16  provided, Dr. Murphy described Andriano's dating history, testifying that King was the

17  only boyfriend Andriano had before meeting Joe. (RT 10/12/04 at 37, 47–48.) Dr. Murphy

18  testified that King had given Andriano a ring and, according to Andriano, when Andriano

19  ended the relationship King broke her car windows and bit the stone out of the ring while

20  it was still on her finger. (*Id.* at 47–48.) Andriano told Dr. Murphy she did not report the

21  incident to law enforcement. (*Id.*)

22      Dr. Murphy also testified that Andriano had cried the first time she had sexual

23  intercourse with Joe. (*Id.* at 61–62.) Dr. Murphy believed that this was Andriano's first

24

25  _____

26      [15] *See* RT 10/13/04 at 51.

27      [16] *See* RT 10/27/04 at 87–91; RT 11/17/04 at 81.

28      [17] *See* RT 9/23/04 at 59; 11/16/04 at 54, 140; RT 11/20/04 at 23–24; RT 11/30/04 at 23; RT 12/1/04 at 18.

sexual experience. (*Id.*) She opined that Andriano did not enjoy sex but submitted to sex with Joe because she was his wife and wanted to please him. (*Id.*)

On cross-examination, the prosecutor attacked Dr. Murphy's credibility by showing that Andriano's self-reporting, on which Dr. Murphy based her opinions, was inaccurate. (*See* RT 10/13/04 at 45–46.) He established, for example, that Andriano had in fact reported King to the police for breaking her car windows. (*Id.* at 47–50.) He also showed that Dr. Murphy was not aware that Andriano was having sex with other men while dating King. (*Id.* at 50–51.) He then asked Dr. Murphy if she knew that King had terminated the relationship with Andriano after catching her "in a state of undress with another male." (*Id.* at 51.) Under further examination, Dr. Murphy acknowledged that her opinion in Andriano's case depended on the truthfulness of the information she received, and if Andriano's statement were "thrown out" it would have been difficult for Dr. Murphy to have reached a conclusion. (*Id.* at 51–53.)

During this line of questioning, defense counsel objected to the prosecutor's inquiries about whether Andriano had had sex with King and her level of sexual experience, arguing that the prosecutor "needs to be certain he's making a good faith representation of what he believes Mr. King is going to say." (*Id.* at 54–55.) At a bench conference both the prosecutor and defense counsel stated that they had interviewed King, with the prosecutor indicating that he had also spoken with three other men who had had sex with Andriano. (*Id.* at 55.) The court overruled the objection, finding that the prosecutor had a good faith basis for his questions. (*Id.* at 56.)

Respondents argue that Dr. Murphy opened the door to questions about the credibility of her opinions when she testified about Andriano's relationship with Shawn King and, based on Andriano's self-reporting, provided inaccurate details about how the relationship ended. (Doc. 22 at 52.) Respondents contend that the prosecutor had a good faith basis, based on his questioning of King, for challenging Dr. Murphy's methodology with information she omitted in forming her opinion. (*Id.*)

The Court agrees with Respondents that the "prosecutor's questioning . . . did not mislead the jurors or misrepresent the facts." (*Id.*). The prosecutor had a good faith basis for his questions about how King's relationship with Andriano ended.[18] Nothing in his questions suggested an attempt to mislead the jury. *See United States v. Etsitty*, 130 F.3d 420, 424 (9th Cir. 1997) (holding that there was no prosecutorial misconduct where "[n]othing in the questioning or the answers given can be construed to reflect an intention by the prosecutor to mislead the jury"), *amended by* 140 F.3d 1274 (9th Cir. 1998). Nor did the prosecutor seek to introduce evidence that had been ruled inadmissible. *See United States v. Cabrera*, 201 F.3d 1243, 1247 (9th Cir. 2000) ("[T]he prosecutor did not engage in misconduct. He did not seek to introduce evidence that had been ruled inadmissible.").

Even if the prosecutor's questions constituted misconduct, the error was harmless under *Brecht*, 507 U.S. at 637. Evidence of other acts of infidelity was properly admitted, lessening the impact of the prosecutor's question about King catching Andriano with another man. In any event, as already discussed, the evidence overwhelmingly established Andriano's guilt. *See Darden*, 477 U.S. at 182; *Leavitt*, 383 F.3d at 834–35.

The PCR court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Andriano has not met her burden of showing "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Parker*, 567 U.S. at 47–48.

### ii.   Closing argument comments about Shawn King

Andriano alleges that the prosecutor improperly referred to King as an "accomplice" in Joe's death, thereby implying that the State had "undisclosed evidence implicating King along with Andriano." (Doc. 17 at 51.)

During the guilt phase of trial, Andriano testified that Joe told her he wanted to commit suicide and as part of that plan she and Joe began researching poisons. (RT

---

[18] King did not testify at trial. During the PCR proceedings, King confirmed in a deposition that he had, in fact, caught Andriano with another man. She was wearing a nightie; the man was putting on his underwear. (PCR pet., Ex. 15 at 19; P-App. at 2559.)

10/27/04 at 84–86.) When Joe asked her to research cyanide on the internet, she enlisted King's assistance because he was more familiar with computers. (*Id.* at 84–87.) Andriano testified that Joe felt comfortable dealing with King because King had once contemplated suicide after being severely injured in an accident. (*Id.* at 87–89.) According to Andriano, King identified sodium azide as an alternative to cyanide, which could not be purchased legally. (*Id.* at 89–91.) He also found the company from which Andriano ordered the poison. (*Id.* at 92.)

In his closing argument, defense counsel contended that Andriano's conduct, including seeking the aid of a third party, King, was inconsistent with her having a secret scheme to murder Joe and supported the theory that she was working with Joe on an assisted-suicide plan. (RT 11/17/04 at 51.) In his rebuttal argument, the prosecutor responded to defense counsel's focus on Shawn King's role in procuring the poison. (*Id.* at 81–82.) He told the jurors they were not there to determine King's guilt, but stated that if King "were to be judged, he would be judged as an accomplice." (*Id.* at 81.)

A prosecutor may not suggest that information not presented to the jury supports his case. *See Necoechea*, 986 F.2d at 1281. The prosecutor's comment here did not suggest that he had undisclosed evidence implicating King beyond what Andriano herself testified to at trial, nor would it lead a jury to reasonably believe the prosecutor knew of undisclosed evidence of Andriano's guilt. The comment was a response to the defense argument that King's involvement in procuring the poison supported the assisted-suicide theory.

Even if the prosecutor's comment constituted misconduct, the error was harmless. *Brecht*, 507 U.S. at 637. The trial court instructed the jury that counsel's arguments were not evidence. *See Andriano*, 215 Ariz. at 503, 161 P.3d at 546. Again, the evidence of Andriano's guilt was overwhelming. *See Darden*, 477 U.S. at 182; *Leavitt*, 383 F.3d at 834–35. Notwithstanding King's role in assisting Andriano in procuring the sodium azide, the evidence showed it was Andriano who contacted the supplier using a false name, purchased the poison using a fraudulent business license, and administered it to Joe. (RT 9/8/04 at 64–68; RT 9/21/04 at 29–115; 9/22/04 at 73–146.) The evidence also established

that Andriano did not act in self-defense when she killed Joe. *See Andriano*, 215 Ariz. at 500–01, 161 P.3d at 543–44.

The PCR court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Andriano has not met her burden of showing "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Parker*, 567 U.S. at 47–48.

### iii. Vouching for witnesses and use of "we know"

Andriano contends that the prosecutor "vouched for his own witnesses and statements repeatedly throughout the trial" and used the phrase "we know" in his opening statements and closing arguments to bolster "unproven and disputed factual assertions." (Doc. 17 at 51.) Respondents argue that the prosecutor used the phrase "we know" to describe the evidence presented at trial and reasonable inferences therefrom, not to refer to evidence not presented at trial. (Doc. 22 at 59.)

A prosecutor improperly expresses his belief in the credibility of a witness if the prosecutor's statements place the prestige of the government behind a witness through personal assurances of the witness's veracity or by suggesting that information not presented to the jury supports the witness's testimony. *United States v. Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996). Here, the challenged statements do not constitute improper "vouching" for the credibility of the State's witnesses. Instead, the statements made reference to evidence admitted at trial and reasonable inferences from that evidence. The statements do not contain personal assurances of any witness's testimony, nor do they imply that there is some information or evidence that was not presented to the jury that supports their testimony. *See United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999). Accordingly, the prosecutor's repeated use of the term "we know" does not constitute misconduct. *See United States v. Young,* 398 F.3d 1179, 1190 (9th Cir. 2005) ("It is not misconduct for the prosecutor to argue reasonable inferences based on the record.") (quotation omitted).

Andriano's principal argument concerns the prosecutor's comments about the amount of sodium azide Joe ingested. (*Id.* at 52.) In his closing argument at the guilt phase of trial, the prosecutor stated that, "If there's a small amount of sodium azide in your veins that indicates in this case that there was a large amount that was consumed a long time ago." (RT 11/16/04 at 54.) In his opening statement at the aggravation stage of trial, the prosecutor discussed the evidence of sodium azide poisoning, stating that "we know the amount of poison that is unaccounted for is approximately 21 grams. . . . So we know she gave him at least ten times the amount that was necessary to kill him." (RT 11/30/04 at 23.) Andriano contends that these statements are "the exact opposite information" from what was testified to by the State's expert and that there was no evidence of how much poison Joe ingested. (Doc. 17 at 52.) Andriano's argument is not persuasive.

The State's expert, Edward French, a toxicologist, testified that small amounts of sodium azide were found in Joe's gastric contents (3.8 milligrams per liter) and blood (two parts per million). (RT 9/23/04 at 21–22, 35.) French testified that these results indicated that either a large amount of sodium azide was consumed "quite a bit a ways back in time" or a very small amount was consumed more recently. (*Id.* at 26.) Another expert witness for the State, Joseph Richmond, a chemist, testified that, "It's possible there was a large amount [of sodium azide] a long time before [Joe's] death or a small amount immediately before his death." (RT 9/27/04 at 40.) French also testified that a lethal dose of sodium azide for someone of Joe's size would be approximately two grams.[19] (RT 9/23/04 at 55.)

On cross-examination, French testified that he could not draw any conclusions based on tissue samples—which might not have been tested—except that "we have no idea how much was ingested." (*Id.* at 59.) It is this statement Andriano relies on for her argument that there was no evidence of how much sodium azide Joe ingested. That reliance, however, ignores the rest of French's testimony and the fact that 20.8 grams of the sodium azide Andriano purchased could not be accounted for. (*See* RT 9/22/04 at 142, 145.)

---

[19] French testified that a lethal dose of sodium azide is 27 milligrams per kilogram. (RT 9/23/04 at 55.) A lethal dose for a 150 pound man therefore would be 27 milligrams multiplied by 70 kilograms, or 1890 milligrams (1.89 grams). (*Id.*)

The prosecutor's statement that Joe ingested 21 grams of sodium azide is a reasonable inference from the missing 20.8 grams. His statement that the amount of sodium azide found in Joe's blood indicated consumption of a large amount of the poison a long time ago (RT 11/16/04 at 54) is a reasonable inference from the missing sodium azide and the testimony of French and Richmond (*see* RT 9/23/04 at 26; RT 9/27/04 at 40). His statement that Andriano administered ten times the lethal dose of sodium azide is a reasonable inference from by French's testimony that a lethal dose would be approximately two grams. (RT 9/23/04 at 55.)

There was no improper vouching. The prosecutor's "we know" statements referred to evidence admitted at trial and reasonable inferences from that evidence. *Young*, 398 F.3d at 1190.

Even if the prosecutor's comments were improper, the error was harmless. *Brecht*, 507 U.S. at 637. The trial court instructed the jury that counsel's arguments were not evidence, *see Andriano*, 215 Ariz. at 503, 161 P.3d at 546, and the evidence of Andriano's guilt was overwhelming, *see Darden*, 477 U.S. at 182; *Leavitt*, 383 F.3d at 834–35.

The PCR court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Andriano has not met her burden of showing "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Parker*, 567 U.S. at 47–48.

> b.   *Ineffective assistance of trial and appellate counsel*

Andriano alleges that trial counsel performed ineffectively by failing to object to the prosecutor's alleged misstatements of facts and improper vouching, and that appellate counsel performed ineffectively by failing to raise this claim on appeal. (Doc. 17 at 56–59.) The PCR court denied these claims on the merits. (ME 10/30/12 at 3, 6.) That decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Andriano cannot show that she was prejudiced by trial or appellate counsel's performance. First, the underlying allegations of prosecutorial misconduct are without merit, so challenges by trial or appellate counsel would have been fruitless. *See Green*, 160 F.3d at 1035; *Wildman*, 261 F.3d at 840. In addition, the evidence against Andriano was overwhelming, defeating any allegation of prejudice due to counsel's alleged errors. *See, e.g.*, *Leavitt*, 383 F.3d at 834–35. There was not a reasonable probability of a different outcome at trial or on appeal if counsel had raised challenges to the prosecutor's conduct.

Applying the doubly deferential standard required by the AEDPA and *Strickland*, the Court finds that Andriano is not entitled to relief on this claim. *See Richter*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123.

3.   Unfounded attacks on witness

Andriano alleges that the prosecutor "repeatedly attacked defense expert Sharon Murphy through unproven and unfounded arguments regarding her supposed lack of credibility and made wild allegations regarding her lack of ethics." (Doc. 17 at 52–53.) Andriano cites the follow comments: the prosecutor argued that Murphy was "in [Andriano's] pocket"[20]; was a "liar" who could not "keep her story straight"[21]; made "misrepresentations . . . to everyone"[22]; and ignored her "ethical[] . . . duty to consider both sides."[23] (*Id.*)

a.   *Prosecutorial misconduct*

During his guilt-phase closing argument, the prosecutor characterized Andriano as a Don Quixote-like figure living in an elaborate fantasy world where she was the victim of domestic violence. (RT 11/16/04 at 150–57.) He stated that the defense "want[s] you to have faith in the defendant's word." (*Id.* at 152.) He continued:

---

[20] *See* RT 12/16/04 at 6.

[21] *See* RT 12/1/04 at 61.

[22] *See* RT 11/16/04 at 153.

[23] *See* RT 12/16/04 at 7.

1
2
3

> So that's what they want you to have. And these misrepresentations from
> Sharon Murphy to everybody but that's okay, you should believe her. Each
> and every one of you should have faith and believe her. Right? That's what
> they want you to believe.

4
5
6
7

(*Id.*) When read in context, it is clear that the prosecutor is accusing Andriano, not Dr.
Murphy, of making misrepresentations. This is consistent with the prosecutor's argument
that Andriano made misrepresentations to Dr. Murphy, and those misrepresentations
formed the basis of her opinion that Andriano was a victim of domestic violence.

8
9
10
11

In his rebuttal closing argument during the aggravation phase of trial, the prosecutor
addressed comments made by defense counsel asking the jury "not to rely upon conjecture
or scenarios conjured up for you by the gentleman [the prosecutor] not based in fact." (RT
12/1/04 at 43.) The prosecutor responded:

12
13
14
15
16
17

> If there's anybody that is conjuring anything up, if there's anybody here that
> can be labeled a conjurer or liar, it isn't the prosecutor. It certainly isn't. He's
> not the one that's the liar here. It maybe someone else in this courtroom, the
> one who can't keep her story straight, Sharon Murphy. The one who can't,
> when questioned about things and say, yeah, I lied over and over again.
> Perhaps it's somebody who submits false documents in connection with their
> student loan. Perhaps it's somebody who submits false documents to obtain
> poison.

18
19
20
21
22
23
24

(*Id.* at 61.) Again, although the prosecutor names Sharon Murphy, taken in context it
appears he is referring to Andriano, whose often inaccurate self-report formed the basis of
Dr. Murphy's opinion and who obtained the sodium azide using false information. The
prosecutor's comment was also "invited by" or "responsive to" defense counsel's
argument. *Darden*, 477 U.S. at 182 ("[T]he idea of 'invited response' is used not to excuse
improper comments, but to determine their effect on the trial as a whole.") (citing *Young*,
470 U.S. at 13).

25
26
27
28

The final comment cited by Andriano occurred during the prosecutor's penalty-
phase closing argument. (RT 12/16/04 at 6–7.) There he explicitly referenced Dr. Murphy:

> Obviously, the two of them have bonded. And/or you can look at it another
> way, you can say that Sharon Murphy is in her corner. Another way to look
> at it is to say that she is in the defendant's pocket. And, basically, that's what

you have here. A defendant who has manipulated the individual who has come out to speak with her. And I can stand up here and can say that to you because we know that Sharon Murphy, when confronted with all of the lies— they're not inconsistencies, they're not omissions, they're lies—with all of the lies presented by the defendant, she said, "I wouldn't change my opinion at all." Sharon Murphy doesn't care about the truth because she is convinced now that the defendant is a victim of domestic violence.

(*Id.*) The prosecutor then argued that, "Ethically, [Dr. Murphy] has a duty to consider both sides." (*Id.* at 7.)

The prosecutor's attacks on Dr. Murphy all stem from the fact that she based her report on information provided by Andriano, and that the information Andriano supplied was often inaccurate. "It is not misconduct for the prosecutor to argue reasonable inferences based on the record." *Young*, 398 F.3d at 1190. A prosecutor is permitted to go so far as to "label a witness's testimony as lies or fabrication." *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

In *Spector v. Diaz*, 115 F. Supp. 3d 1121 (C.D. Cal. 2015), the district court denied a claim of misconduct based on the prosecutor's comments about a defense expert.[24] The court explained:

Although petitioner believes that the jury understood the prosecutor's comments as accusations that defense counsel or petitioner purchased false

---

[24] In her closing argument, the prosecutor stated:

Ultimately, what the defense science told you was that they are willing to say, when everything adds up to homicide, everything adds up, everything points to homicide, [the defense experts] are willing, for a price, folks, and wait till you get this price, they are willing to come in and say suicide. Can you believe Werner Spitz, when asked last year how much he made . . . The fact of the matter is, he is a professional witness. He knows I'm going to find out how much money [he] made . . . he knows I'm not stupid. I'm going to ask the question, and I'm going to find out one way or the other. Yet, when he is asked the simplest questions, he tries to hide the truth.

*Spector*, 115 F.Supp.3d at 1148.

testimony, the challenged comments reasonably could have been understood as strongly-worded arguments that the defense experts were biased and that they were willing to lie for petitioner in order to secure their hourly fees. Such comments do not result in a due process violation. . . . The prosecutor's suggestions that the defense experts were lying, moreover, were arguably supported by the evidence at trial. . . .

*Id.* at 1149 (internal citation omitted).

The court cited *Duckett v. Mullin*, 306 F.3d 982, 989 (10th Cir. 2002). There the prosecutor's closing arguments criticized the qualifications and impartiality of the defense mental health expert. *Id.* The Tenth Circuit found that the state court's denial of relief was reasonable "particularly given the disputed nature of the expert's testimony at trial." *Id.* The prosecutor's conduct in Andriano's case falls within the range of conduct found permissible in *Turner*, *Spector*, and *Duckett*.

Andriano cites a series of Arizona cases which she claims support a finding of prosecutorial misconduct based on the prosecutor's comments about Dr. Murphy. (Doc. 17 at 53.) She argues that "[n]early identical facts were at issue" in *In re Zawada*, 208 Ariz. 232, 92 P.3d 862 (2004). In that case the Arizona Supreme Court held that the prosecutor had committed misconduct by implying, without evidence, that a defense mental health expert fabricated a diagnosis to coincide with the defendant's theory of the case; suggesting that defense counsel had paid money to the expert to fabricate a diagnosis of insanity for the defendant; and arguing that mental health experts in general create excuses for criminals. *Id.* at 234–35, 92 P.3d at 864–65.

None of these circumstances is present in Andriano's case. The prosecutor's criticism of Dr. Murphy was supported by evidence that her opinion relied on Andriano's unreliable self-reporting. The prosecutor did not imply that Dr. Murphy's opinion was paid for; instead—again based on evidence that Dr. Murphy unquestioningly accepted Andriano's version of events—he argued that she and Andriano had formed a bond and that Andriano was able to manipulate Dr. Murphy into providing a report consistent with the defense theory of domestic abuse. (RT 12/16/04 at 6–7.) Finally, the prosecutor did not accuse the mental health profession as a whole of making excuses for criminals. *Zawada*

- 37 -

1    does not support Andriano's argument that the prosecutor committed misconduct in his

2    comments about Dr. Murphy.

3            Even if the prosecutor's comments were improper, the error was harmless. *Brecht*,

4    507 U.S. at 637. The trial court instructed the jury that counsel's arguments were not

5    evidence, *see Andriano*, 215 Ariz. at 503, 161 P.3d at 546, and the evidence of Andriano's

6    guilt was overwhelming, *see Darden*, 477 U.S. at 182; *Leavitt*, 383 F.3d at 834–35.

7            The PCR court's denial of this claim was not contrary to or an unreasonable

8    application of clearly established federal law, nor was it based on an unreasonable

9    determination of the facts. Andriano has not met her burden of showing "there was no

10   reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Parker*, 567

11   U.S. at 47–48.

12                       *b.      Ineffective assistance of trial and appellate counsel*

13           Andriano alleges that trial counsel performed ineffectively by failing to object to

14   the prosecutor's comments about Dr. Murphy and appellate counsel performed

15   ineffectively by failing to raise this claim on appeal. (Doc. 17 at 56–59.) The PCR court

16   denied these claims on the merits. (ME 10/30/12 at 3, 6.) That decision was neither contrary

17   to nor an unreasonable application of clearly established federal law, nor was it based on

18   an unreasonable determination of the facts.

19           Andriano cannot show that she was prejudiced by trial or appellate counsel's

20   performance. First, the underlying allegations of prosecutorial misconduct are without

21   merit, so challenges by trial or appellate counsel would have been fruitless. *See Green*, 160

22   F.3d at 1035; *Wildman*, 261 F.3d at 840. In addition, the evidence against Andriano was

23   overwhelming, so any allegation of prejudice based on counsel's alleged errors fails. *See,*

24   *e.g.*, *Leavitt*, 383 F.3d at 834–35. There was not a reasonable probability of a different

25   outcome at trial or on appeal if counsel had raised challenges to the prosecutor's comments

26   about Dr. Murphy.

27

28

1    Applying the doubly deferential standard required by the AEDPA and *Strickland*,

2  the Court finds that Andriano is not entitled to relief on this claim. *See Richter*, 562 U.S.

3  at 105; *Mirzayance*, 556 U.S. at 123.

4          4.    Cumulative prejudice

5          Andriano argues that the Court must consider the cumulative effect of the

6  prosecutorial misconduct. (Doc. 17 at 38.) She cites *Berger v. United States*, 295 U.S. 78

7  (1935), in support of this argument.

8          In *Berger*, the Supreme Court reversed a conviction where the prosecutor had made

9  "improper suggestions, insinuations, and . . . assertions of personal knowledge" about

10  evidence not before the jury. *Id.* at 88. The Court found that the prosecutor:

11          was guilty of misstating the facts in his cross-examination of witnesses; of
            putting into the mouths of such witnesses things which they had not said; of
12          suggesting by his questions that statements had been made to him personally
            out of court, in respect of which no proof was offered; of pretending to
13          understand that a witness had said something which he had not said and
            persistently cross-examining the witness upon that basis; of assuming
14          prejudicial facts not in evidence; of bullying and arguing with witnesses; and,
            in general, of conducting himself in a thoroughly indecorous and improper
15          manner.
16

17

18  *Id.* at 84. The Court found that the prosecutor's "pronounced and persistent" misconduct

19  had "a probable cumulative effect upon the jury," and concluded that Berger was entitled

20  to a new trial. *Id.* at 89.

21          *Berger* is distinguishable on two grounds. First, as the Court has described, the

22  prosecutor in Andriano's case did not engage in the level of misconduct of the prosecutor

23  in *Berger*. Second, in *Berger* the evidence supporting the defendant's conviction was

24  "weak." 295 U.S. at 89 ("If the case against Berger had been strong, or, as some courts

25  have said, the evidence of his guilt 'overwhelming,' a different conclusion might be

26  reached.").

27          In Andriano's case, the evidence of guilt was overwhelming and the cumulative

28  effect of the alleged misconduct did not deprive her of a fair trial. *See United States v. Ross*,

- 39 -

149 F. App'x. 670, 674 (9th Cir. 2005) (finding no cumulative prejudice "in light of the overwhelming evidence" of guilt); *Graves v. Ault*, 614 F.3d 501, 507–08 (8th Cir. 2010) (finding defendant was not denied a fair trial where jury was instructed that closing arguments are not evidence and cumulative effect of misconduct was outweighed by the "strength of properly admitted evidence" of guilt); *Duckett*, 306 F.3d at 992–93 (applying cumulative error analysis to prosecutorial misconduct claims and finding petitioner not entitled to relief given the "strong" evidence of his guilt).

In *United States v. Auch*, 187 F.3d 125, 133 (1st Cir. 1999), the court recognized that the "prosecutor's various transgressions and missteps" were "both disturbing and exasperating" but concluded there was no reversible error even when the misconduct was considered cumulatively because the defendant's guilt was "plain in the record." The court also observed that it was "heed[ing] the Supreme Court's admonition against letting the guilty go free to punish prosecutorial misconduct." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 506–507 (1983)).

The cumulative effect of the prosecutor's alleged misconduct was not so severe as to deny Andriano a fair trial. *See Darden*, 477 U.S. at 181–82.

### 5.   Conclusion

The PCR court denied Andriano's claims of prosecutorial misconduct and ineffective assistance of trial and appellate counsel. (ME 10/30/12 at 3, 6.) Andriano bears the burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Parker*, 567 U.S. at 47–48. With respect to her claims of ineffective assistance of counsel, she also bears the burden under *Strickland* of showing both deficient performance and prejudice. *Richter*, 562 U.S. at 105; *see Mirzayance*, 556 U.S. at 123. For the reasons discussed above, Andriano fails to satisfy those burdens. Accordingly, Claim 1 is denied.[25]

---

[25] By reaching this conclusion the Court does not condone Martinez's conduct in Andriano's trial or in other cases. A number of his comments and questions are worthy of condemnation, but that is not enough to entitle Andriano to habeas relief. In *Darden*, the prosecutor suggested that the death penalty would be the only guarantee that the defendant

1    **CLAIM 2**

2         Andriano alleges that attorney David DeLozier, who was responsible for her

3    penalty-phase defense, performed ineffectively due to an actual conflict of interest arising

4    from the fact that he simultaneously represented her in her criminal proceeding and her

5    parents in guardianship and adoption cases involving her children. (Doc. 17 at 59–68.)

6    Andriano argues that "DeLozier clearly had an actual conflict—on one hand to represent

7    Andriano's interests in the criminal case against her, which included telling the jury about

8    her family history of mental illness and abuse, and on the other to represent the Ochoas in

9    their custody battle, which required portraying them as suitable caregivers for two young

10   children." (*Id.* at 61.) According to Andriano, this conflict resulted in DeLozier

11   overlooking key mitigating evidence, including allegations that Andriano was raised in a

12   religious cult and was sexually abused by her stepfather, Alejo Ochoa.[26]

13   **A.    Background**

14        Andriano was represented at trial by lead counsel Daniel Patterson, of the Maricopa

15   County Public Defender's Office, and DeLozier, who was originally retained by

16   Andriano's family.[27]

17        After Joe's murder, his sister and her husband were appointed guardians of

18   Andriano's two children. (RT 2/4/14 at 166; P-App. 967.) Donna and Alejo Ochoa hired

19   DeLozier to represent them in the guardianship matter. (*Id.* at 167; P-App. 968.) DeLozier

---

would not commit another heinous crime in the future, that the defendant was an "animal" and should not be let out of prison without a leash, and that the prosecutor wished the defendant's face had been "blown off" by a shotgun. *See Darden*, 477 U.S. at 179–80, nn. 9–12. Although these statements clearly constituted misconduct, they did not, according to the Supreme Court, so "infect" the trial with unfairness as to violate due process. *Id.* at 181.

[26] In Claim 3, Andriano indicates that she is no longer citing as omitted mitigation evidence the allegations of sexual abuse by Alejo Ochoa. (*Id.* at 36–37). Those allegations, however, were included in her PCR petition, on which she bases her arguments that counsel performed ineffectively at sentencing. (*See* PCR petition, Doc. 28-1, Ex. OOOOO at 46–55).

[27] After Patterson's appointment, DeLozier served as second chair pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974).

1

also initiated an adoption proceeding on the Ochoas' behalf. (*Id.* at 170; P-App. 971.)
DeLozier represented the Ochoas in those matters from July 12, 2001, to July 31, 2002. In
this role he solicited letters from acquaintances of the Ochoas attesting that they were good
parents and grandparents. (*Id.* at 168–69; P-App. 969–70.) The argument he made on the
Ochoas' behalf was that "they were honorable people and that they were [sic] would raise
or help assist in raising these children appropriately." (RT 2/10/14 at 75; P-App. 1539.)

At the PCR evidentiary hearing, Donna Ochoa testified that the defense team never
asked her about childhood abuse or mental health issues involving Andriano. (RT 2/4/14
at 190–91; P-App. 991–92.) DeLozier testified that he did not have Andriano evaluated as
a potential victim of sexual assault, although information in the record was consistent with
what DeLozier understood to be symptoms of sexual abuse. (RT 2/10/14 at 111, 116; P-
App. 1574, 1580.) He never investigated whether Andriano was molested by her
grandfather, biological father, or stepfather, despite hints of such abuse in the records,
including in the reports of Kandy Rhode, a counselor hired by the Ochoas, Dr. Jack Potts,
who performed a Rule 11 competency examination of Andriano, Dr. Richard Rosengard,
a psychiatrist retained by the defense, and Dr. Murphy. (*See id.* at 114–135; P-App. 1578–
1599.) DeLozier likewise never investigated the source of Andriano's reported sleep issues,
dissociation, memory issues, and childhood trauma. (*Id.* at 129–30; P-App. 1593–94.)

DeLozier testified that he did not "investigate any potentially negative material
regarding [Andriano's] upbringing." (*Id.* at 135; P-App. 1599.) He stated that he was "on
the path to develop that part of her case" but couldn't force lead counsel Patterson to act.
(*Id.* at 137; P-App. 1601.)

DeLozier testified that during the guardianship proceedings, Joe's parents raised
allegations of abuse during visitations with the Ochoas. DeLozier dismissed the
accusations as typical of those raised in custody disputes. (*Id.* at 74–76; P-App. 1537–39.)

DeLozier agreed it was "possible" that representation of the Ochoas "may have
affected [his] noninvestigation of these issues." (*Id.* at 138; P-App. 1602.) At the time,
however, he felt the parties' interests aligned. (*Id.* at 148; P-App. 1612.) He explained:

- 42 -

> But based on what I knew about her upbringing with the church she went to, the kinds of things mommy and daddy were trying to provide, . . . I didn't see a real conflict at that time between the two. The kinds of things I felt and believed about her childhood were similar to what was being told about the grandparents and their behavior.

(*Id.*) He testified that Andriano and the Ochoas "had the same desires and they weren't using one against the other" and that Andriano wanted DeLozier to represent the Ochoas in the guardianship and adoption proceedings. (*Id.* at 148–49; P-App. 1612–13.)

**B.   Analysis**

The PCR court rejected this claim. The court, citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980), found that DeLozier's dual representation of Andriano and her parents "presented the <u>potential</u> for a conflict of interest, **to the extent that their interests diverged.**" (ME 11/1/14 at 19) (emphases in original). The court found, however, that the interests of Andriano and her parents did not diverge, explaining that, "rather than being in conflict, the interests of DeLozier's clients, the parents in the guardianship proceedings and the daughter in the criminal action, were aligned at the time of trial" because "[s]he wanted her parents to have guardianship." (*Id.*) The court continued:

> Now, ten years later the defendant's parents have been deprived of having a relationship with children [sic] and the defendant is facing a death sentence. Their interests have again aligned, this time in favor of portraying negative aspects of her growing-up years.
>
> The Court finds that the interests of the defendant and her parents' interests were aligned, rather than conflicting, at the time of trial. Their interests dovetailed, rather than diverged, and no conflict existed.
>
> The Court agrees that, were the "horrific childhood" and other background information true, and not investigated because of the impact on the parents [sic] case, there may have been an actual conflict. However, DeLozier was familiar with sexual abuse victimology; he attributed statements assailing his clients' (the defendant's parents') character to the normal aspersions cast in domestic situations. Further, the defendant denied the existence of abuse.
>
> The Court concludes that . . . the "bad facts" background information may not be true (or may be merely speculative . . . ) and/or may have been hidden

- 43 -

from investigation (the defendant and family may have been involved in failing to disclose or even active concealment for their own reasons) and that the possibility and speculation do not support the Court finding that an "actual conflict" existed at the time of trial.

(*Id.* at 19–20.)

The PCR court's decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

The right to counsel guaranteed by the Sixth Amendment includes the "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). An ineffective assistance of counsel claim based on a conflict of interest requires a petitioner to show "that an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 350. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* In the conflict of interest context, prejudice is presumed if a petitioner shows that his lawyer labored under an actual conflict of interest. *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003) (citing *Sullivan*, 446 U.S. at 347). An "actual conflict of interest" means "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in original).

Andriano contends that there was an "actual conflict," and thus a presumption of prejudice, based on DeLozier's representation of her in the criminal matter and her parents in the custody dispute. The Court disagrees. In *Mickens*, "the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest . . . to cases involving 'concurrent representation'"—that is, simultaneous representation of two or more defendants. *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing *Mickens*, 535 U.S. at 175); *see Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation. . . ."). The Court explained that the presumption of prejudice is needed

1  in cases of concurrent representation because of "the high probability of prejudice arising

2  from multiple concurrent representation, and the difficulty of proving that prejudice."

3  *Mickens*, 535 U.S. at 175; *see Rowland*, 876 F.3d at 1192. However, "[n]ot all attorney

4  conflicts present comparable difficulties," and the *Mickens* Court criticized circuit courts

5  for applying "*Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,'"

6  including cases involving personal or financial interests. *Mickens*, 535 U.S. at 174 (citation

7  omitted); *see Rowland*, 876 F.3d at 1192.

8          The PCR court did not unreasonably apply *Sullivan*. Because this is not a case

9  involving concurrent representation of defendants, *Sullivan* does not apply. Andriano

10  cannot show an actual conflict of interest that would lead to a presumption of prejudice.

11  Accordingly, to be entitled to relief Andriano must demonstrate prejudice under *Strickland*.

12  *See, e.g.*, *Rodrigues*, 347 F.3d at 823; *United States v. Walter-Eze*, 869 F.3d 891, 900 (9th

13  Cir. 2017) (explaining that *Strickland* analysis applies in the absence of an actual conflict

14  under *Sullivan*).

15          The PCR court determined that Andriano was not prejudiced by DeLozier's

16  performance. The court did so in its analysis of Andriano's claim of ineffective assistance

17  of counsel at sentencing. (ME 11/1/14 at 20–31.) This Court has likewise undertaken an

18  analysis of prejudice in the context of Andriano's claim of ineffective assistance of counsel

19  at sentencing (Claim 3), and, as explained next, has found that Andriano has not met her

20  burden under the doubly deferential standard of *Strickland* and § 2254. *See Richter*, 562

21  U.S. at 105; *Mirzayance*, 556 U.S. at 123. Claim 2 is therefore denied.

22  **CLAIM 3**

23          Andriano alleges that counsel performed ineffectively at the penalty phase of her

24  trial in violation of her Sixth, Eighth, and Fourteenth Amendment rights. (Doc. 17 at 68.)

25  In Claim 3(A), she alleges that counsel failed to adequately investigate, develop, and

26  present mitigation evidence. (*Id.* at 72.) The PCR court rejected this claim on the merits.

27  (ME 11/1/14.) In Claim 3(B), Andriano alleges that counsel's failure to object to an

28  instruction that informed the jury that she could be sentenced to life with the possibility of

1  parole constituted ineffective assistance of counsel. (*Id.* at 84.) Andriano did not raise this

2  claim in state court. She contends that its default is excused under *Martinez* by the

3  ineffective assistance of PCR counsel. (*Id.*)

4  **Claim 3(A)**

5  **A.    Background**

6       1.    Sentencing

7       During the guilt phase of trial, counsel presented evidence to support their theory

8  that Andriano was a domestic violence victim who killed her abusive husband in self-

9  defense. *See Andriano*, 215 Ariz. at 504, 161 P.3d at 548. Counsel continued that theme at

10 sentencing, while also presenting evidence to support several other mitigating

11 circumstances. (*See* RT 12/8/04 28–37.)

12       During the penalty phase of sentencing, Andriano presented 11 witnesses over three

13 days. Andriano first offered testimony from three employees of the Maricopa County Jail's

14 psychiatric unit who treated Andriano when she was admitted following a suicide attempt

15 in September 2003: Laura King, a mental health counselor; Dr. Gerald Perry, a

16 psychologist; and Joyce Van Every, the lead psychiatric nurse. King and Dr. Perry

17 described the suicide attempt as "quite significant" and "pretty serious." (RT 12/8/04 at 68,

18 120.) Andriano had stabbed herself in the arm with a pen, cutting an artery and losing a lot

19 of blood. (*Id.* at 120.) Both Dr. Perry and King testified that Andriano was not diagnosed

20 at the time with a serious mental illness, such as a psychotic break, but she was treated for

21 depression and severe anxiety. (*Id.* at 71–72, 92, 111, 121–22, 134.)

22       The witnesses described Andriano as a model inmate in the psychiatric unit. (*Id.* at

23 142.) She served as an intermediary, aiding inmates and bringing their problems to the

24 attention of the staff. (*Id.* at 75, 81–83, 127, 142–43.) She was a positive influence and kept

25 the pod clean. (*Id.* at 75, 77.)

26       The witnesses further described Andriano as smart but naïve, gullible, and easily

27 manipulated by other inmates. (*Id.* at 72–74.) She was a people pleaser with the personality

28

of a caretaker who had difficulty establishing boundaries and avoided confrontation. (*Id.* at 85, 125.)

King and Van Every opined that Andriano's depression and anxiety resulted partly from the charges she faced. (*Id.* at 111, 146.) Dr. Perry opined that the conditions resulted from the stress inherent in the jail environment. (*Id*. at 122.)

Jimmy and Linda Galyon, fellow church members and friends of the Ochoas, testified on Andriano's behalf. (RT 12/9/04 at 24–25.) Andriano frequently babysat for them. She took good care of the children. She was gentle, never violent, and hesitated even to discipline the kids. (*Id.* at 26). According to the Galyons, Andriano was "very calm, timid, very quiet," and "humble"; she never displayed anger. (*Id.* at 27, 43.) She was "very pleasant . . . just a really good girl." (*Id.* at 39.) Andriano was also very helpful with children at church. (*Id.* at 28.)

The Galyons felt that the crime was completely uncharacteristic of the Andriano they knew. (*Id.* at 28, 41.) They testified that it would be a tragedy for the Ochoas to lose Andriano to the death penalty. (*Id.*) The Galyons believed the community would be worse off without Andriano and that she would not pose a threat to other inmates. (*Id.*)

Andriano then recalled Dr. Murphy, the domestic violence expert who testified during the guilt phase of trial in support of Andriano's theory of self-defense.

Murphy again testified that Andriano was a victim of domestic violence by her husband (*Id.* at 48). She testified about the dynamics of abusive relationships. Murphy detailed the "building blocks of trauma" Andriano had experienced. (*Id.* at 59–60.) She noted that Andriano might have been sexually abused as a toddler, a significant event that "set [her] up for difficulties down the road." (*Id.* at 59.) Murphy then testified that a male church member had exposed himself to Andriano when she was six to eight years old— another form of sexual abuse. (*Id.*) Murphy explained that the role of the church in Andriano's life was another traumatizing factor, isolating her and denying her the opportunity to experience the outside world. (*Id.* at 60.) Finally, Murphy described the incident with Shawn King when Andriano broke up with him and he reacted by breaking

1   the window in her vehicle and tearing a ring off her finger. (*Id.*) According to Murphy,

2   these incidents set Andriano up to be involved in a relationship with someone who would

3   become an abuser. (*Id.* at 61.)

4       Murphy described Andriano's relationship with Joe as eight years of ongoing abuse

5   during which she never fought back. (*Id.* at 61–62.) According to Murphy, this is a typical

6   pattern, where battered women do not fight back until a final incident occurs. (*Id.* at 63.)

7   Murphy again noted the early accumulation of trauma Andriano experienced which, when

8   combined with terror and intense fear of Joe, caused the fatal attack. (*Id.* at 64.) According

9   to Murphy, Andriano felt her life was in danger and she was protecting herself. (*Id.*)

10      Finally, Murphy testified that battered women are not a threat to others in the

11  community. (*Id.* at 65.) She opined that Andriano was a viable candidate for rehabilitation

12  because she now understood the cause of her actions. (*Id.* at 66)

13      Donna Ochoa, Andriano's mother, testified that she loved her daughter whom she

14  described as a "good child, sweet child" and a generous and compassionate person. (*Id.* at

15  85–86.) Andriano was musically inclined as a child and taught herself to play guitar and

16  piano at ages five and six. (*Id.* at 86–87.) She was a hard worker who earned her own

17  money to attend musical competitions. (*Id.* at 87.) She also wrote songs and poems for her

18  mother. (*Id.* at 88–90.) Andriano was always there for those who needed her, always on

19  the side of the underdog. (*Id.* at 90.) She would give away money or gifts to those who

20  needed them more. (*Id.* at 91.)

21      Donna testified that Andriano loved kids, whom she tutored and babysat. (*Id.*) She

22  learned Spanish and raised money to fund missionary trips to Mexico, where she built

23  churches and homes and donated food and gifts. (*Id.* at 91–93.) She taught Sunday school

24  until she became involved with Joe. (*Id.* at 94.) She was involved in other charitable

25  projects such as cleaning roads, delivering Thanksgiving meals to the less fortunate, and

26  visiting nursing homes. (*Id.* at 95–96.) She would bring classmates home for dinner and

27  adopt stray puppies. (*Id.* at 96–97.) When Donna underwent surgery, Andriano at age 11

28  or 12 took up the household slack. (*Id.* at 97–98.)

1    Donna testified that it was Andriano who convinced the Ochoas to adopt Brandon,

2    Andriano's younger step-brother, from foster care. (*Id.* at 99.)

3    Donna testified further about Andriano's relationship with her children. Andriano

4    could not bear to hear her children cry when they got their shots. (*Id.* at 105.) The children

5    were clean and properly fed and clothed. (*Id.* at 107.) Andriano read to them. (*Id.* at 108.)

6    She would not spank the children. (*Id.* at 110.) Donna testified that Andriano was a "really

7    good mom." (*Id.* at 109.)

8    Donna testified that her family, including Brandon, would be devastated if Andriano

9    were executed. (*Id.* at 113–14.) She did not believe the community would be better off

10   without Andriano. (*Id.*) Donna testified that Andriano could still contribute, even behind

11   bars, and would not be a threat to the community. (*Id.* at 115.)

12   Lonnie Inskeep, a family friend of the Ochoas through their church, testified on

13   Andriano's behalf. (RT 12/13/04 at 38.) He described Andriano as an active, unique

14   teenager, who was kind and considerate, a listener who never got mad, and a "neat person."

15   (*Id.* at 40–41.) Inskeep testified that Andriano's execution would impact his life as he

16   viewed her as a young lady with a lot of potential. (*Id.* at 42.)

17   Gia Palicki, a friend who babysat Andriano's children, testified that Andriano was

18   a "great mom" who was patient and wonderful with Gia's kids as well. (*Id.* at 50–52.)

19   Andriano's children were always well-clothed, nourished, and clean. (*Id.* at 53.) Andriano

20   never raised her voice to her children. (*Id.*)

21   Barbara Mitchell, another friend of Andriano's, testified that she had observed

22   Andriano holding, cuddling, and feeding her son Nicholas, making him giggle, and bathing

23   him. (*Id.* at 71.) Andriano handled discipline of her children "calmly." (*Id.*)

24   For Mitchell, Andriano's execution would be like "ripping your heart out." (*Id.* at

25   73.) She testified that Andriano was a good candidate for rehabilitation as a caring, giving,

26   helpful person who could make other people smile. (*Id.* at 74.)

27   Alejo Ochoa, Andriano's stepfather, testified that her execution would be

28   "devastating." (*Id.* at 82.) He described Andriano as a very protective mother, a "real good

1    mom" who didn't like to see her children hurt. (*Id.* at 83.) Ochoa never saw Andriano

2    mistreat the children. (*Id.* at 85.) While Joe would spank the children with a spoon,

3    Andriano refused to use corporal punishment. (*Id.*)

4         Ochoa stated that he maintained contact with Andriano in jail through visits and

5    phone calls. (*Id.* at 87.) He testified that he would not be able to handle her execution. (*Id.*

6    at 88.)

7         On direct appeal, the Arizona Supreme Court independently reviewed this

8    mitigating evidence and affirmed that it was not sufficiently substantial to call for leniency.

9    *Andriano*, 215 Ariz. at 511–12, 161 P.3d at 554–55.

10        2.    PCR proceedings

11        During the PCR proceedings, the state court granted an evidentiary hearing on

12   Andriano's claim that trial counsel performed ineffectively in its presentation of mitigating

13   evidence. Andriano offered evidence from three mental health experts: Dr. James Hopper,

14   a clinical psychologist; Dr. George Woods, a neuropsychiatrist; and Dr. Joette James, a

15   clinical neuropsychologist. Andriano's mother and several childhood friends also testified.

16   Members of the defense team testified, including Patterson, DeLozier, and mitigation

17   specialist Scott MacLeod. Also testifying were Larry Hammond, an attorney and standard-

18   of-care expert, and Keith Rohman, a mitigation expert. In contrast to the theme at the

19   sentencing hearing—that Andriano was a good person driven to violence by domestic

20   abuse—during the PCR hearing the emphasis was on Andriano's abusive childhood and

21   mental health issues.

22        Dr. Hopper interviewed Andriano for a total of 52 hours; he also interviewed 6 other

23   witnesses, reviewed 29 declarations and volumes of other documentary information, and

24   prepared a 250-page report. (RT 2/3/14, a.m., at 28–31; P-App. 590–93.) His testimony

25   detailed the trauma Andriano experienced during the various stages of her childhood,

26   including, in her earliest years, severe neglect by her mother, emotional and physical abuse

27   by her mother and biological father, Skip Robertson, and exposure to child molesters on

28   Robertson's side of the family. (*Id.* at 35–59; P-App. 597–621.)

1      Dr. Hopper testified that later, after her mother had divorced Robertson, Andriano

2  experienced the "extremely disruptive force" of Alejo Ochoa entering her life. (*Id.* at 63;

3  P-App. 625.) Her family became involved with an abusive, cult-like religion that practiced

4  corporal punishment for any lack of compliance and taught women to be submissive to

5  their husbands. (*Id.* at 64, 68, 73–78; P-App. 626, 630, 635–40; RT 2/3/14, p.m., at 6–23;

6  P-App. 664–681.) According to Dr. Hopper, "wherever [Andriano] was, she was

7  surrounded by this kind of sick, disturbed, abusive community of people beating children

8  and the [sic] ridiculing them and humiliating them and things like that." (RT 2/3/14, p.m.,

9  at 13; P-App. 671.)

10      As she entered her teenage years, Andriano continued to experience "unrelenting"

11  emotional, physical, and sexual abuse from Alejo. (*Id.* at 6; P-App. 664.) Dr. Hopper

12  described particular incidents of sexually inappropriate behavior and sexual abuse

13  committed by Alejo. (*Id.* at 17–44; P-App. 675–702.)

14      According to Dr. Hopper, the cumulative result of these traumas was that Andriano

15  entered adulthood "severely damaged." (*Id.* at 45; P-App. 703.) The trauma left her unable

16  to regulate her impulses and emotions; she suffered from problems with executive

17  functioning, dissociation, and memory loss. (*Id.* at 45–49; P-App. 703–07.)

18      Dr. Woods, in performing his neurological examination, interviewed Andriano three

19  times, interviewed her mother, reviewed a "comprehensive social history," and analyzed

20  the results of neuropsychological testing carried out by Dr. Myla Young. (RT 2/5/04 at 48–

21  50; P-App. 1094–96.) Dr. Woods diagnosed Andriano with PTSD, complex type; bipolar

22  disorder; dependent personality disorder; caregiver burden; and cognitive deficits. (*Id.* at

23  43; P-App. 1088.) Dr. Woods testified that these "neuropsychiatric disorders and cognitive

24  deficits" affected Andriano's conduct at the time of the murder. (*Id.* at 42–43, 111; P-App.

25  1087–88, 1157.) The conditions undermined her ability to handle emotionally complex and

26  stressful situations and impaired her decision-making ability. (*See id.* at 111; P-App 1157.)

27      Dr. Joette James, a clinical neuropsychologist, also reviewed the data from Dr.

28  Young's examination of Andriano. (RT 2/10/14 at 5; P-App. 1469.) Based on that

information, Dr. James identified deficits in attention, executive functioning, and processing speed. (*Id.*) Dr. James testified that these conditions resulted in impulsivity, difficulty adjusting to changing circumstances, and a lower threshold for becoming overwhelmed and shutting down in stressful situations. (*Id.* at 24–48; P-App. 1488–1512.)

Among the lay witnesses called at the PCR evidentiary hearing, Andriano's mother, Donna, testified that there was a history of bipolar disorder and depression in her family and that she herself had suffered from severe bouts of depression. (RT 2/4/14 at 76–81; P-App. 877–82.) She also testified that she neglected Andriano immediately after she was born and did not want to have anything to do with her, and that she and Andriano's biological father, Skip, spanked Andriano from the time she was in diapers. (*Id.* at 91–96; P-App. 892–97.)

Donna testified that she sometimes left Andriano alone with Skip's father, a known child molester; that Skip himself went to prison for molesting his stepdaughter and was accused of molesting his nieces; and that Skip said his brother Tommy probably molested Andriano. (*Id.* at 94–104; P-App. 895–905.) She also testified that it became Andriano's duty to "minister" to her stepfather, Alejo, by massaging his head and back when he was upset. (*Id.* at 153–55; P-App. 594–96.) Alejo also made inappropriate sexual comments to Andriano and bought sexy lingerie for her when she was just 12 or 13 years old. (*Id.* at 156; P-App. 597.)

Andriano's childhood friends Kyre Lort, Jeri Lynn Cunningham, and Jasper Neace testified that the church-affiliated school they attended with Andriano practiced corporal punishment, which involved striking children with the so-called "Rod of Correction." (*See id.* at 216–17; P-App. 1017–18.) Lort and Cunningham also testified that Alejo sexually abused them when they were children. According to Cunningham, Alejo put his hand down her nightgown at a sleepover when she was 12; took photos of her and Andriano showering; and put his head in her crotch while she massaged him. (*Id.* at 222–29; P-App. 1022–29.) Lort testified that at sleepovers when she was in third grade she and Andriano would play dress-up wearing Donna Ochoa's lingerie. (*Id.* at 47–51; P-App. 848–52.) Alejo would

1    invite Lort and Andriano to his room where he would be sitting in his underwear. He would

2    touch the girls on their legs, breasts, and genitals, and they would touch his genitals. (*Id.* at

3    51–60; P-App. 852–61.)

4        Patterson, DeLozier, and MacLeod all testified at the evidentiary hearing about their

5    performance during the penalty stage of Andriano's trial. Patterson testified that his

6    mitigation strategy was to present Andriano as a good woman—a wonderful mother and

7    daughter, a good Christian, a devoted wife, and a hard worker. (*See, e.g.*, RT 2/7/14 at 48–

8    49, 55; P-App. 1331–32, 1338.)

9        Because this was a post-*Ring*[28] case, with the jury determining Andriano's sentence,

10   Patterson front-loaded the presentation of mitigating information about Andriano's good

11   character along with evidence that she was a domestic violence victim who acted in self-

12   defense. (*Id.* at 105–06; P-App. 1388–89.) The "good woman" defense was the most

13   plausible because Patterson believed there was no credible evidence that Andriano suffered

14   from a serious mental health issue or was sexually abused as a child. (*Id.* at 58–59; P-App.

15   1340–41.) Neither MacLeod, the mitigation specialist, nor DeLozier, who bore primary

16   responsibility for the mitigation phase of trial, presented Patterson with negative

17   information about the Ochoa family. (*Id.* at 37; P-App. 1320.) Patterson testified, however,

18   that he should have started the mitigation investigation sooner and more closely supervised

19   DeLozier and MacLeod. (*Id.* at 20; P-App. 1303.) Patterson believed that DeLozier was

20   actively involved in developing a mitigation case, along with Patrick Linderman, the

21   defense team's first mitigation specialist. (*Id.* at 27–28; P-App. 1310–11.)

22       Patterson retained Dr. Richard Rosengard to conduct a mental health evaluation of

23   Andriano. (*Id.* at 28; P-App. 1311.) The evaluation took place on June 23, 2002. Dr.

24   Rosengard diagnosed Andriano with depression, probable post-traumatic stress disorder

25   (PTSD), and panic disorder. Dr. Rosengard's report also referenced improper touching by

26

27   ─────────────

28       [28] *Ring v. Arizona*, 536 U.S. 584, 588–89 (2002), held that a defendant is entitled to
     a jury determination of "the presence or absence of the aggravating factors required by
     Arizona law for imposition of the death penalty."

Andriano's biological father. (*Id.* at 38; P-App. 1321.) No social history was provided to Dr. Rosengard. (*Id.* at 53; P-App. 1336.)

Three months before trial, Patterson learned that DeLozier was not discussing the case with Andriano in their meetings; instead, he was acting primarily as her spiritual advisor. (*Id.* at 42; P-App. 1325.) At that point, Patterson began meeting with Andriano regularly to go over the guilt-phase facts in preparation for her taking the stand at trial. (*Id.*) Patterson's meetings with Andriano were not focused on mitigation. (*Id.* at 44; P-App. 1327.)

Patterson testified that despite the fact that DeLozier had gone on a fast during trial and was dealing with the death of an associate at his law firm,[29] DeLozier "gave a pretty powerful summation in Phase 3." (*Id.* at 47; P-App 1330.) Patterson "didn't notice any defect in [DeLozier's] performance during his participation in the mitigation presentation." (*Id.*)

Patterson testified that he did not direct the activities of mitigation specialist Linderman. (*Id.* at 54; P-App. 1337.) Linderman provided no mitigating evidence beyond the "good person" theme. (*Id.* at 55; P-App. 1339.)

In 2004, Scott MacLeod took over as mitigation specialist. (*Id.* at 55–56; P-App. 1339–40.) Patterson met with MacLeod "irregularly." (*Id.* at 56; P-App. 1340.) Patterson provided no specific direction for MacLeod. (*Id.* at 57; P-App. 1341.)

Patterson explained his approach to sentencing as follows:

> Nothing was ever presented to me during the course of my representation of Ms. Andriano that she suffered from a significant mental illness. No information was presented to me that she had a significant drug problem, that she had a significant sexual abuse dysfunctional development, except to the extent that we did develop it through Sharon Murphy. She was uncomfortable with certain of the preferences of her husband and that she did

---

[29] During the guilt phase of trial DeLozier went on a fast, depriving himself of solid food for some five weeks, for spiritual reasons and to increase his focus. (RT 2/10/14 at 140; P-App. 1640; *see* RT 2/7/14 at 44–45; P-App. 1327–28.) The associate at his firm was murdered in a road-rage incident; his death made it difficult for DeLozier to "get his bearings." (RT 2/10/14 at 141; P-App. 1642.)

1
2      it anyway because she thought that was what a good wife should do. I had no
       independent information that she had a—had been abused as a child or as a
3      young adult or that any of that kind of stuff was visited upon her by relatives,
       parents, stepparents, anything of that nature. So, by default, the theory of the
4      theme became she's a good woman, she's a good mom, she's a hard worker,
       she provides for the family, those kinds of things.
5

6      (*Id.* at 59; P-App. 1342.)

7            Patterson did not investigate whether Andriano had been sexually abused as a child

8      or suffered other trauma, or direct the mitigation specialists, DeLozier, or any mental health

9      expert to do so. (*Id.* at 62, 64–67; P-App. 1345, 1347–1348.) No such information was

10     derived from meetings with Donna and Alejo. (*Id.* at 63; P-App. 1346.) "Nothing adverse

11     about her background development, rearing . . . was ever disclosed to me during the course

12     of those meetings with any of those people." (*Id.* at 64; P-App. 1347.) Patterson testified

13     that, "Had I been presented with that kind of information, the substance of our meeting

14     would have been different." (*Id.*) Patterson relied on DeLozier and the expertise of the

15     mitigation specialists.

16           When asked why he did not investigate whether Andriano had been sexually abused

17     as a child, Patterson explained:

18           Again, it wasn't something that I believed the standard of care required, as a
             matter of course, to investigate sexual abuse absent some kind of indication
19           that there was a problem. Dr. Rosengard, in his report, said there may have
             been, but it didn't appear to him to be psychologically significant or
20           psychiatrically significantly. So that's why I didn't pursue that any further. I
             had no credible witness who supplied information either that she was
21           sexually abused, nor did the client advise me that there was something there.
             . . .
22

23
             I didn't think it was a significant issue in the development of mitigation or
24           development of the defense for Ms. Andriano.

25

26     (*Id.* at 67–68; P-App. 1350–51.)

27           Patterson acknowledged that, "Sexual abuse history can be a significant mitigator.

28     But I had no—no reporters advising me that it was an issue, nor did the client claim that

- 55 -

1   there was an issue." (*Id.* at 68; P-App. 1351.) "It certainly wasn't a strategic decision," he

2   explained, because "you can't exercise or make a strategic decision absent some evidence."

3   (*Id.*)

4        Patterson testified that he only investigated mental health as it concerned Andriano's

5   relationship with Joe and the issue of domestic abuse. (*Id.* at 69; P-App. 1352.) According

6   to Patterson, "we didn't have any reason to believe that she suffered from a mental illness

7   or disease or defect that either accounted for the incident, nor was compelling mitigation.

8   So we didn't explore it." (*Id.* at 70; P-App. 1353.)

9        Patterson did not direct the mitigation specialists or DeLozier to investigate

10   Andriano's mental health. (*Id.* at 73–74; P-App. 1356–57.) He explained:

11        Based upon Dr. Rosengard's report, I didn't see that to be an issue in her
         case. The facts and circumstances of her conduct and the defense that we had
12        chosen were not wholly consistent with mental disease, defect or illness.
         None of the persons involved in the case brought to my attention any need
13        for further mental health inquiry.

14

15        My experiences person-to-person with Ms. Andriano didn't lead me to
         believe that there was an issue—mental health issue. None of her close
16        relatives or family suggested there was a mental health issue. Her history, her
         performance in high school suggested that if she had mental health issues,
17        she had certainly adapted with them. And to suggest that she had mental
         health problems, see, I can't say what I would have done with that
18        information had it been developed at the time. We didn't develop it. So I
         don't know, beyond what I just told you, whether it would have had
19        application in the trial.

20

21   (*Id.* at 74–75; P-App. 1357–58.)

22        Patterson testified that he had capital case experience at the time of Andriano's case,

23   having taken approximately eight death penalty cases to trial. (*Id.* at 98–99; P-App. 1381–

24   82.)

25        Patterson reiterated that he front-loaded the mitigation evidence, including evidence

26   of self-defense, which carried over from the guilt to the penalty phase of trial. "[T]he fact

27   that she was a good person coupled with her victim status as a domestically abused person,

28

that's a compelling mitigation theme and that was the thrust of our theme." (*Id.* at 108; P-App. 1391.)

Patterson acknowledged that Dr. Murphy's report "touched on" abuse by Andriano's biological father but noted, "Mom does not have any proof this happened . . . but has thought it might be a possibility." (*Id.* at 113; P-App. 1396.) Dr. Murphy, despite her numerous meetings with Andriano, did not discover the alleged abuse by Alejo. (*Id.* at 114; P-App. 1397.) Patterson testified that the defense team made it known to the Ochoas that information about topics like sexual abuse would be relevant at sentencing. (*Id.* at 163; P-App. 1446.)

Patterson testified that he first heard the allegations against Alejo during the PCR proceedings. (*Id.* at 123; P-App. 1406.) He reiterated that during his meetings with the Ochoas, neither Donna, Alejo, nor Brandon disclosed any allegations of abuse. (*Id.* at 125, 149–50; P-App. 1408, 1432–33.)

Patterson described Andriano as a helpful, "candid," "forthcoming" client. (*Id.* at 129; P-App. 1411.) However, she never disclosed any allegations of sexual abuse. (*Id.*) "She never suggested to me that her biological grandfather touched her improperly, that her biological father touched her improperly, or that any other human being, other than Joseph Andriano, touched her in a manner that she didn't wish to be touched sexually." (*Id.* at 132–33; RT 1414–15.)

Patterson again testified about his decision not to pursue mental health as a mitigating circumstance, explaining that "there was nothing in Rosengard's report that screamed this woman had a mental health issue. Nothing in my experience with the woman led me to conclude that she had a mental health issue." (*Id.* at 135; P-App. 1418.) Patterson interpreted Dr. Rosengard's report as suggesting that Andriano's mental health symptoms were situational. (*Id.* at 135–36; P-App. 1418–19.) Patterson relied on Dr. Rosengard as an expert he trusted. (*Id.* at 136; P-App. 1419.)

Patterson further testified that he had a strategic reason for being wary of mental health defenses:

Now, in my experience discussing with my attorneys in the unit, my own personal experience, mental health, unless it's schizophrenia, unless it's the kind of mental health that's palpable, that the average juror can relate to, it is somewhat—and the prosecution dismisses it as the abuse excuse. And, unfortunately, it also, in my estimation, portrays your client as a defective human being, which may give a potential juror license to vote to kill your client. So I'm very, very reserved about the use of mental health information as mitigation.

The downside, once you notice it, then you subject your client to evaluation from the government's expert. And there are a number of local experts who are very adept at portraying your client as an anti-social human being.

(*Id.* at 142–43; P-App. 1425–26.)

Patterson testified that he saw no downside to the good person/domestic abuse survivor mitigation theme. (*Id.* at 146; P-App. 1429.)

As discussed above, DeLozier also testified at the evidentiary hearing. He testified that he did not have Andriano evaluated as a potential victim of sexual assault, although information in the record was consistent with what DeLozier understood to be symptoms of sexual abuse. (RT 2/10/14 at 111, 116; P-App. 1575, 1580.) He never investigated whether Andriano was molested by her grandfather, biological father, or stepfather, and did not investigate Andriano's reported sleep issues, dissociation, memory issues, and childhood trauma. (*See id.* at 129–30; P-App. 1593–94.)

DeLozier did not investigate potentially negative information about the Andriano family. (*Id.* at 135; P-App. 1599.) He testified that it was "possible" his representation of the Ochoas affected his failure to investigate issues regarding Andriano's childhood. (*Id.* at 138; P-App. 1602.)

Finally, Dr. Steven Pitt, a psychiatrist, and Dr. Kirin Amin, a neuropsychologist, testified for the State in rebuttal. Dr. Amin tested Andriano for cognitive deficits, reviewed prior testing, and concluded that she did not suffer from a cognitive disorder. (RT 2/14/14 at 9–17, 25–26; P-App. 1856–64, 1872–73.) Dr. Pitt diagnosed Andriano with personality disorder not otherwise specified with antisocial, borderline, and dependent features, and

adjustment disorder with mixed anxiety and depressed mood. (*Id.* at 77–78; P-App. 1924–25.) He also opined that Andriano understood the wrongfulness of her conduct and could conform it to the law; that she was not under unusual or substantial duress at the time of the offense; and that there was no causal connection between her mental conditions and the murder. (*Id.* at 80–90; P-App. 1927–37.)

The PCR court denied relief. (ME 11/1/14.) In addressing the deficient performance prong under *Strickland*, the court found that "there was a lack of communication and coordination between members of the defense team." (*Id.* at 17.) The court nevertheless concluded that counsel "secured and presented that evidence that was readily available at the time of trial." (*Id.*) The court noted that "the mitigation presentation was not limited to the penalty phase; the presentation of mitigating evidence was 'front-loaded' and began during Patterson's guilt phase presentation." (*Id.*)

With respect to some of the new evidence produced during the PCR proceedings, the court was not convinced of its "credibility" or "its availability at trial." (*Id.*) In particular, the court noted that at trial Andriano "denied experiencing anything other than a strict, religiously-directed childhood" and "testified that she was neither physically nor sexually abused." (*Id.* at 15.) Accordingly, the court found that the new "bad facts" evidence about Andriano's "horrific childhood"—including evidence of sexual abuse— "may not be true," may be "merely speculative," or may have been concealed by Andriano and her family. (*Id.* at 20.)

In considering *Strickland*'s second prong, prejudice, the court "contrast[ed] the trial presentation, which provided a singular, linear view of mitigation, with the post-conviction presentation, which provided a global, cumulative overview of [Andriano's] development over time." (*Id.* at 21.) Here the court focused on the new evidence of Andriano's abusive childhood. The court noted that, at trial, Andriano had presented herself as a "good person raised with a good background who made a bad decision—attributable to her being a victim of domestic violence." (*Id.* at 22.) By contrast, at the PCR hearing, Andriano presented evidence to show that she was "a person shaped by her horrendous childhood—a victim of

sexual abuse [and] mental health issues." (*Id.*) The court concluded that Andriano's childhood "was somewhere between 'good' and 'impoverished,' but was neither 'horrific' nor 'harrowing.'" (*Id.*)

The court viewed much of the omitted mitigating evidence as "cumulative to the evidence presented at trial." (*Id.* at 23.) The court also based its findings on an assessment of the credibility of the witnesses, explaining that "the Court's resolution necessarily relies on an assessment of the *credibility* of evidence presented regarding sexual abuse, harrowing childhood and mental health presented at the PCR hearing." (*Id.* at 13) (emphasis in original). The court found "the defendant's and her witnesses' words [denying abuse], shared before a death sentence was imposed, to be more credible" than the new evidence of physical and sexual abuse. (*Id.* at 15.) In making this determination, the court noted the inconsistencies between the trial and PCR evidence and inconsistencies in the testimony at the PCR hearing. (*Id.* at 12, 15.) The court specifically found that the allegations against Alejo Ochoa were "undermined by the absence of reports to law enforcement; the lack of an outside investigation; and the denial by the defendant at trial." (*Id.* at 12.) The court also noted that the allegations were reported by "interested third parties," including Andriano's close childhood friends and her mother, who knew about the alleged abuse but did not report it until eight years after Andriano's trial. (*Id.* at 12, 15.)

With respect to Andriano's new mental health evidence, the court accepted as true the opinions of Andriano's experts that she "suffer[ed] from depression, PTSD, impulsivity and impairment of executive functioning." (*Id.* at 13.) However, the court found this insufficient to establish that Andriano's "capacity to appreciate the wrongfulness of her conduct was significantly impaired" under the A.R.S. § 13-751(G)(1) mitigating factor.[30] (*Id.*) The court noted that in her allocution at trial Andriano acknowledged that she had made a "horrific choice" to kill Joe. (*Id.*) The court then found that Andriano's argument

---

[30] This factor applies where "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–751(G)(1).

that stress and impulsivity led to the murder would have carried "little weight" in mitigation, particularly because it was killing Joe that "brought on the stress." (*Id.*)

Taking into account the totality of the mitigating evidence, the PCR court concluded:

> The Court acknowledges that the defendant is the sum of her experiences, which cumulatively impacted her development; the Court, however, cannot conclude that the evidence presented is sufficiently substantial to call into question the penalty imposed by the jury. This is particularly so because the attributes attributed to the defendant are frequently characterized as "consistent with" someone who has had certain life experiences or are recounted by those whose recollections have varied, if only in emphasis, over time.
> . . .
> At the time she murdered her husband, the defendant was an intelligent, thirty-year-old young woman who had completed high school, made good grades, received awards in various competitions (swimming; music), attended college, worked for a living, gotten married and had two children. Because the defendant's act of poisoning her husband coupled with the fact that he did not immediately die as anticipated resulted in a stressful situation with which she had to contend, the proffered mitigation testimony would be accorded little weight by any trier of fact.
>
> The Court finds that the mitigation evidence offered at the PCR, if offered at trial, would not be sufficiently substantial to warrant leniency, and that a jury—confronted with this evidence—would not have returned with a different sentence.

(*Id.* at 23–24.) The court then noted that it was "not persuaded that the post-conviction mitigation evidence would be sufficiently substantial to warrant leniency, in light of the (F)(6) aggravating factor ('cruelty' prong)." (*Id.* at 30.)

## B.  Clearly established federal law

As discussed above, claims of ineffective assistance of counsel are governed by *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show both deficient performance and prejudice. *Id.* at 687–88.

To show deficient performance, Andriano must establish that counsel's representation was unreasonable "[i]n light of the 'variety of circumstances faced by

1    defense counsel and the range of legitimate decisions regarding how best to represent a

2    criminal defendant.'" *Wong*, 558 U.S. at 17 (quoting *Strickland*, 466 at 688–89).

3    "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

4    options are virtually unchallengeable." *Strickland*, 466 at 690. The Court's scrutiny of

5    counsel's performance is "highly deferential," *Strickland*, 466 U.S. at 689, and Andriano

6    "bears the heavy burden" of proving that counsel's performance was unreasonable,

7    *Murtishaw*, 255 F.3d at 939.

8           The Court must judge the reasonableness of counsel's conduct based on the facts of

9    this case, viewed at the time of counsel's conduct, applying a strong presumption that

10   counsel's actions fall within the wide range of "reasonable professional assistance."

11   *Strickland*, 466 U.S. at 689.

12          Counsel have substantial leeway in making strategic and tactical decisions about

13   how to present a case at a capital sentencing hearing and are not required to offer every

14   conceivable mitigation defense if, after proper investigation and review, they conclude that

15   it is not in the defendant's best interest to do so. *Darden*, 477 U.S. at 186 (explaining that

16   trial counsel's decision not to introduce mitigating evidence was not deficient because such

17   evidence would have allowed the prosecution to introduce damaging evidence); *Burger v.*

18   *Kemp*, 483 U.S. 776, 793 (1987) (finding no ineffective assistance where counsel declined

19   to present evidence of defendant's violent tendencies that was at odds with trial strategy of

20   portraying defendant's actions as result of co-defendant's strong influence on his will).

21   "An attorney need not pursue an investigation that would be fruitless, much less one that

22   might be harmful to the defense." *Richter*, 562 U.S. at 108. A decision not to investigate

23   mitigation "must be directly assessed for reasonableness in all the circumstances, applying

24   a heavy measure of deference to counsel's judgments.'" *Strickland*, 466 U.S. at 691; *see*

25   *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

26          With respect to *Strickland*'s second prong, Andriano must affirmatively prove

27   prejudice by "show[ing] that there is a reasonable probability that, but for counsel's

28   unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. This showing "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Richter*, 562 U.S. at 112). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Apelt v. Ryan*, 878 F.3d 800, 831 (9th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687).

"[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004). The Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529 U.S. at 397–98). While the Court is "mindful that the state courts are not required to address every jot and tittle of proof suggested to them," or "'make detailed findings addressing all the evidence,'" *Taylor*, 366 F.3d at 1001 (quoting *Miller-El I*, 537 U.S. at 346), "the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id.*

Finally, under the AEDPA, ineffective assistance of counsel claims are subject to two layers of deference. "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105; *see Mirzayance*, 556 U.S. at 123 (discussing "doubly deferential" standard of review); *Titlow*, 571 U.S. at 15.

**C.    Analysis**

Andriano alleges that the PCR court's decision denying this claim is both an unreasonable application of *Strickland*, § 2254(d)(1), and based on an unreasonable determination of the facts, § 2254d)(2), and therefore this Court's review of the claim is de

1    novo. (Doc. 17 at 74–79.) The Court finds that Andriano is not entitled to relief whether

2    the claim is reviewed with AEDPA deference or de novo.

3         At the outset the Court notes that much of Andriano's argument that she received

4    ineffective assistance of counsel at sentencing is premised on the behavior of co-counsel

5    DeLozier, who was responsible for her penalty phase defense. However, her complaints

6    about his conduct—that he acted as her spiritual adviser, that he fasted during trial, and

7    that he was traumatized by the killing of a colleague—are not independent grounds for

8    finding his performance deficient. Because counsel's performance is judged against an

9    "objective standard of reasonableness," *Strickland*, 466 U.S. at 688, the circumstances

10   Andriano cites are relevant only to the extent she can "point to specific acts or omissions

11   that may have resulted from" them. *Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014);

12   *see Bonin v. Calderon*, 59 F.3d 815, 828–29 (9th Cir. 1995); *Cook v. Schriro*, 538 F.3d

13   1000, 1016 (9th Cir. 2008).

14        1.    The PCR court's ruling was not an unreasonable application of *Strickland*

15        Andriano first argues that the PCR court "applied incorrect standards when

16   assessing the credibility of Andriano's evidence." (Doc. 17 at 74.) She asserts that the court

17   evaluated her mental health evidence only as it related to A.R.S. § 13-751(G)(1) and failed

18   to consider it as nonstatutory mitigation. (*Id.* at 75.) She argues that the court "ignored both

19   prevailing professional norms and the case law interpreting *Strickland*" with respect to the

20   proper scope of a mitigation investigation. (*Id.*) Finally, she contends that the court

21   improperly "relied on the evidence presented at trial to decide that the performance of

22   counsel was not deficient." (*Id.* at 76.) These arguments are unpersuasive.

23        The record shows that the PCR court did consider Andriano's mental health

24   evidence as nonstatutory mitigation. This is apparent from the court's discussion,

25   immediately following its finding that the statutory mitigating factor was not proved, that

26   Andriano's evidence of impulsivity and an impaired ability to respond under stress were

27   entitled to little *weight* as mitigating circumstances. (ME 11/01/14 at 13.) If the court did

28

- 64 -

1    not consider the evidence as nonstatutory mitigation, such a determination would not have

2    been necessary after its finding with respect to § 13-751(G)(1).

3          Next, the record does not support Andriano's argument that the PCR court failed to

4    apply prevailing professional norms and the case law interpreting *Strickland*. Nothing in

5    the order suggests such an interpretation. The court discussed the *Strickland* standard and

6    quoted the case for the proposition that reviewing courts "must judge the reasonableness

7    of counsel's challenged conduct on the facts of the particular case, viewed as of the time

8    of counsel's conduct," 466 U.S. at 690. (ME 11/1/14 at 3.) Then, citing *Rompilla v. Beard*,

9    545 U.S. 374 (2005), the court wrote that "counsel may have a duty to investigate 'available

10   mitigating evidence' . . . even where the defendant and family members deny its

11   existence."[31] (*Id.*) The court clearly applied *Strickland* and its progeny in its analysis of

12   deficient performance. Even if the PCR court had not cited *Strickland*, it is presumed that

13   the court applied the correct standard. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

14         Finally, the Court finds nothing problematic about the PCR court's use of trial

15   evidence in assessing the credibility of the evidence presented during the PCR proceedings.

16   Andriano cites the PCR court's opinion, with respect to counsel's handling of Andriano's

17   penalty-phase testimony, that "the shortcomings were neither apparent at trial nor captured

18   in the record." (ME 11/1/14 at 17.) This assessment of counsel's performance, taken in

19   context of the PCR court's ruling as a whole, is not inconsistent with *Strickland*. In fact,

20   contrary to Andriano's argument, the fact that the judge in the PCR proceedings also

21   presided over her trial and sentencing, and therefore was familiar with the record, provides

22   the Court an additional reason to extend deference to his ruling. The Ninth Circuit has held

23   that when the judge who presided at the PCR proceeding was also the trial judge, the

24   reviewing court is considerably less inclined to order relief because doing so "might at least

25   approach 'a looking-glass exercise in folly.'" *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th

26   Cir. 1998) (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)); *see Schurz*

27

28         [31] The PCR court also cited *Wiggins*, 539 U.S. at 534, *Wong*, 558 U.S. at 19–20, and *Richter*, 562 U.S. at 111–12, in its discussion of *Strickland*'s prejudice prong. (ME 11/1/14 at 21.)

*v. Ryan*, 730 F.3d 812, 816 (9th Cir. 2013) ("We are particularly confident in so concluding [that Schurz was not prejudiced by counsel's performance at sentencing] in light of the fact that the judge who sentenced Schurz already reviewed much of the 'new' evidence through the state post-conviction process, and found it insufficient to change the sentence from death."); *but see Kayer v. Ryan*, 923 F.3d 692, 720 (9th Cir. 2019) (rejecting argument that rulings of PCR judge who was also trial judge are entitled to "special deference" because prejudice is assessed "independent of the particular judge or judges"). In any event, this Court's "review of the state habeas court's credibility determinations is highly deferential." *Mann v. Ryan*, 828 F.3d 1143, 1153 (9th Cir. 2016).

Under 28 U.S.C. § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams (Terry)*, 529 U.S. at 410 (O'Conner, J., concurring); *see Bell*, 535 U.S. at 694. Federal habeas relief is precluded when "fairminded jurists" could disagree on the correctness of the PCR court's denial of this claim. *See Richter*, 562 U.S. at 101. For the reasons just discussed, Andriano has not met her burden of showing "there was no reasonable basis for the state court to deny relief." *Id.* at 98; *see Mirzayance*, 556 U.S. at 123 (discussing doubly deferential standard of review under *Strickland* and AEDPA).

The PCR court did not unreasonably apply *Strickland* in denying this claim.

2.      The PCR court's ruling was not based on an unreasonable determination of the facts

Andriano argues that the PCR court "ignored the abundant evidence of prevailing professional norms and duties of a capital lawyer at sentencing. . . ." (Doc. 17 at 76.) She cites the court's "uncertainty" (ME 11/1/14) about the extent of the mitigation investigation and faults the court for making "no actual findings regarding the scope of the investigation. . . ." (Doc. 17 at 76.) According to Andriano, the court "ignored evidence presented by PCR counsel in favor of reminiscing about events at trial and pointing out that nothing seemed wrong." (*Id.* at 77.)

1    The record refutes the allegation that the court ignored evidence presented during

2  the PCR proceedings. Rather, the court considered evidence of the scope of the mitigation

3  investigation but found some of the evidence "not credible" or "speculative." (ME 11/1/14

4  at 17.) This is because the mitigation specialist, MacLeod, "remembered little" of it and

5  the mitigation expert, Rohman, could only "infer" the scope of the investigation based on

6  the evidence presented at trial and during the PCR proceedings. (*Id.*)

7    Andriano next argues that the PCR court erroneously found that the mitigation

8  investigation was "front-loaded." (Doc. 17 at 77.) According to Andriano, this finding was

9  unreasonable because lead counsel Patterson testified that the mitigation investigation did

10  not begin until immediately before trial and the defense team was still gathering records

11  after the guilt phase. (*Id.*) The Court agrees with Respondents that there is no inherent

12  contradiction between the timing of the investigation as described by Patterson and

13  frontloading the presentation of mitigating evidence. Patterson himself testified that the

14  mitigation investigation was front-loaded with guilt-phase testimony showing Andriano

15  was a good person subjected to domestic violence, and the record, including Dr. Murphy's

16  testimony, confirms that. (RT 2/7/14 at 105–06, 108; P-App. 1388–1389, 1391.)

17    Andriano contends that the PCR court erred when it "repeatedly discounted the

18  credibility of evidence based on the fact that this evidence was different from what was

19  presented at trial." (Doc. 17 at 77.) This argument is unconvincing because the PCR court

20  was entitled to make credibility determinations based on inconsistencies in the testimony.

21  The court did not ignore evidence presented during the PCR proceedings, as Andriano

22  maintains, but properly compared that evidence with the mitigating evidence presented at

23  trial as part of its prejudice analysis under *Strickland*. (*See* ME 1/01/14 at 23–24, 30.)

24    Finally, Andriano argues that the PCR court was "unreasonable in its determination

25  that the evidence presented in the post-conviction proceedings was not 'available' at the

26  time of trial based on Andriano's testimony." (Doc. 17 at 78.) Andriano testified at trial

27  that her stepfather had never "touched [her] improperly or harmed [her] physically." (RT

28  10/25/04 at 43.) Much of the PCR proceedings were intended to show the opposite. The

court was not obligated to accept Andriano's argument that her mental health issues, including dissociation, prevented her from accessing her memories of abuse by her stepfather, when neither her family nor her friends had reported such abuse at the time of Andriano's trial and sentencing. *See Crittenden v. Ayers*, 624 F.3d 943, 966–67 (9th Cir. 2010) (finding that counsel did not render ineffective assistance where interviews with family members did not reveal anything that would put counsel on notice of abuse); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("Counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." (quotation omitted).

Under 28 U.S.C. § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El II,* 545 U.S. at 240. A state court's factual determinations are presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El I*, 537 U.S. at 340; *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

Andriano has not met her burden of overcoming the presumption of correctness attached to the PCR court's findings. An appellate panel could reasonably conclude that the PCR court's findings are supported by the record. *Taylor*, 366 F.3d 1000; *see Wood*, 558 U.S. at 301 (explaining that a state court's "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance"). The PCR court's ruling was not based on an unreasonable determination of the facts.

Under the doubly deferential standard established by *Strickland* and the AEDPA, *Mirzayance*, 556 U.S. at 123, Claim 3(A) is meritless and will be denied

### 3.    The claim fails under de novo review

Because both parties address the issue, the Court will evaluate Andriano's claim of ineffective assistance of counsel at sentencing without the deference accorded to the state court's ruling under AEDPA. For the reasons discussed next, the Court finds that Andriano

has not met her burden under *Strickland* of showing deficient performance and prejudice.

Andriano alleges that counsel did not "conduct a thorough investigation of her background in preparation for sentencing." (Doc. 17 at 80.) She argues that counsel's presentation at sentencing omitted "'classic' mitigating factors that affected Andriano's behavior throughout her life, including at the time of the crime." (*Id.* at 83.) She asserts that if this evidence had been presented, there was a "reasonable probability of a different result in the penalty phase." (*Id.*)

In her reply brief, Andriano specifically cites counsel's failure to obtain and present mental health evidence at sentencing despite suggestions by Dr. Potts, Dr. Murphy, and Kandy Rohde that Andriano should be evaluated further. (*Id.* at 39–40.)

Andriano contends that because counsel failed to follow up on these suggestions for additional evaluations, "the jury was left with an incomplete and inadequate explanation for the offense as well as Andriano's behaviors, including her extramarital affairs, that was not sufficient to combat the prosecutor's theory that she coldly committed the offense." (Doc. 42 at 41.) Andriano asserts that as a result of this failure:

> The jury never heard that Andriano's emotional dysregulation caused her to attempt to hide her emotions from herself and others or to "dissociate" and become disconnected from them. Nor did they hear that her lifetime of abuse and neglect, in conjunction with her family's history and adherence to a religious cult, rendered her extremely vulnerable to developing psychiatric disorders such as bipolar disorder marked by abnormal manic and depressive states, complex post-traumatic stress disorder, and dependent personality disorder. Thus, trial counsel willfully ignored and failed to present credible and compelling evidence that Andriano's mental health disorders rendered her incapable of the mens rea required to commit first-degree murder.

(*Id.*) (citations omitted).

Respondents argue that counsel's decision not to present expert testimony at sentencing about Andriano's mental health was reasonable. (Doc. 22 at 86.) The defense expert, Dr. Rosengard, diagnosed Andriano with depression, probable PTSD, and panic disorder. (Dr. Rosengard's report dated August 27, 2002; P-App. 2443.) He did not recommend additional testing or consultation with another expert. (RT 2/7/14 at 74; P-

App. 1357.) Patterson's own interactions with Andriano did not suggest there was a mental health issue, and Andriano's relatives did not report any such issues. (*Id.*) Patterson himself, based on his own experience with juries, was skeptical of pursuing a mental health defense without stronger evidence. (*Id.* at 142–43; P-App. 1425–26.)

The *Strickland* Court held, in a passage cited by the PCR court (ME 11/1/14 at 15–16), that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. The Court explained:

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.*; *see Mickey v. Ayers*, 606 F.3d 1223, 1243 (9th Cir. 2010) ("We refuse to find counsel deficient for not uncovering evidence that Mickey did not tell the original investigators. . . ."). Neither Andriano nor her family offered evidence that she suffered from serious mental health issues, just as they did not report sexual abuse by Alejo. Counsel properly took this information, or lack of information, into account in making their "litigation decisions." *See Strickland*, 466 U.S. at 691.

Based on these factors, counsel decided to pursue another mitigation theory, one that had been front-loaded into the guilt phase of trial: that Andriano was a good person driven to act as she did after suffering years of domestic violence at the hands of her husband. Counsel supported this theory with expert testimony from Dr. Murphy. *See Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 2002) ("The choice of what type of expert to use is one of trial strategy and deserves a heavy measure of deference.").

1    "Because of the difficulties inherent in fairly evaluating counsel's performance,

2    courts must 'indulge a strong presumption that counsel's conduct falls within the wide

3    range of reasonable professional assistance.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 988

4    (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). "This presumption of reasonableness

5    means that not only do we 'give the attorneys the benefit of the doubt,' we must also

6    'affirmatively entertain the range of possible reasons [defense] counsel may have had for

7    proceeding as they did.'" *Id.* (quoting *Pinholster*, 563 U.S. at 196) (additional citations

8    omitted); *see also Leavitt v. Arave*, 646 F.3d 605, 609 (9th Cir. 2011). As the *Strickland*

9    Court explained, "strategic choices made after thorough investigation of law and facts

10   relevant to plausible options are virtually unchallengeable." *Strickland*, 466 at 690.

11       Here, counsel investigated Andriano's mental health before pursuing another course

12   based on their professional judgment. Their expert, Dr. Rosengard, did not advise them to

13   obtain additional testing. *See Wildman*, 261 F.3d at 838 ("Trial counsel could reasonably

14   rely on [the] initial expert investigation and Wildman did not show that the expert retained

15   revealed that further investigation would be productive."); *cf. Earp v. Cullen*, 623 F.3d

16   1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does not

17   constitute ineffective assistance of *counsel*, and [a defendant] has no constitutional

18   guarantee of effective assistance of experts.").

19       Even if counsel's investigation into Andriano's mental health was less than

20   complete, a decision not to investigate mitigation "must be directly assessed for

21   reasonableness in all the circumstances, applying a heavy measure of deference to

22   counsel's judgments.'" *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 521–22. It is

23   "strongly presumed" that counsel "made all significant decisions in the exercise of

24   reasonable professional judgment." *Strickland*, 466 at 690; *see Allen*, 395 F.3d at 998.

25       Under the circumstances of this case, it was reasonable for counsel to pursue the

26   domestic violence theory rather than the relatively weak mental health evidence offered by

27   Dr. Rosengard. In addition, the domestic violence evidence had an exculpatory function,

28   explaining why Andriano acted as she did in attacking Joe. *See Allen,* 395 F.3d at 1005–10

(noting that mitigating evidence may serve both a "humanizing" and an "explanatory" or "exculpatory" purpose, with greater weight generally being ascribed to the latter). Andriano has not overcome the presumption that counsel made a reasonable strategic decision to present the opinion of the domestic violence expert, Dr. Murphy, instead of expert mental health testimony.

Andriano has also failed to prove that she was prejudiced by counsel's performance at sentencing, specifically by the omission of mental health evidence.

First, counsel did present strong mitigating evidence. The lay witnesses testified about Andriano's good character, her non-violent nature, their love for her, and the effect her execution would have on them.

Dr. Murphy testified not only about the domestic violence Andriano suffered, but the sexual abuse she experienced as a toddler and a young girl and the oppressive, cult-like nature of the religion she was raised in. In the absence of allegations of sexual abuse by Alejo Ochoa, an accusation Andriano no longer relies on to support her claims, there is nothing about Andriano's childhood that was not presented at sentencing through Dr. Murphy's testimony.

In addition, the mitigating value of the mental health evidence Andriano claims should have been presented is reduced because such evidence is inconsistent with many of the facts of the crime and Andriano's prior and subsequent behavior. For instance, Andriano carefully planned Joe's murder, researching poisons and obtaining the sodium azide using a false name and business license. (*See* RT 9/8/04 at 65; RT 9/21/04 at 29–115; RT 9/22/04 at 22–146.) She also asked male friends to pose as Joe for a life insurance physical examination, offering to pay one of the men $50,000. *Andriano*, 215 Ariz. at 502, 161 P.3d at 545. After killing Joe, she arranged the crime scene to make it look like a struggle had occurred, *id.* at 501, 161 P.3d at 544, and after being taken into custody she called a colleague and asked her to hide certain items that were in Andriano's office, *id.* This conduct is not consistent with the experts' opinion that Andriano's mental health conditions included impulsivity and an inability to regulate her emotions while under

stress. *See Wong*, 558 U.S. at 24–25 (finding that petitioner was not prejudiced by failure to present evidence of emotional instability and impulsivity where the "cold, calculated nature" of the murder "would have served as a powerful counterpoint"). To the extent that Andriano acted impulsively during the murder, the stressor causing that impulsive behavior was, as the PCR court noted, the fact that her plan to poison Joe failed and he did not die as intended. (ME 11/1/14 at 23.) Expert testimony about an impaired ability to react to stressors would have been of minimal mitigating value.

The mitigating weight of Andriano's mental health diagnoses—bipolar disorder, PTSD, dependent disorder, impulsivity—is also reduced because those conditions are not connected to the circumstances of the crime. *See, e.g.*, *State v. Styers*, 227 Ariz. 186, 189, 254 P.3d 1132, 1135 (2011) ("When assessing the weight and quality of a mitigating factor, we take into account how the mitigating factor relates to the commission of the offense."); *State v. Smith*, 215 Ariz. 221, 235 ¶ 67, 159 P.3d 531, 545 (2007) (giving less weight to mental health mitigating evidence in light of testimony that defendant "could have controlled his impulses and that he likely knew what he was doing and that it was wrong"); *see also Apelt*, 878 F.3d at 834 (finding no prejudice where "none of the proffered mitigating evidence excuses Apelt's callousness, nor does it reduce Apelt's responsibility for planning and carrying out the murder").

As Respondents note, Andriano had a pattern of calculating and deceitful conduct. (Doc. 22 at 88.) For example, she embezzled money from employers—in one case more than $18,000. (RT 2/14/14, a.m., at 72; RT 2/5/14, a.m., at 120.) In addition, while incarcerated, Andriano was implicated in a fraudulent check-cashing scheme. (RT 2/5/14, a.m., at 121; RT 2/14/14, a.m., at 76.) By presenting mental health experts at sentencing, defense counsel may well have opened the door to such damaging rebuttal testimony. *See Atwood v. Ryan*, 870 F.3d 1033, 1063 (9th Cir. 2017) (finding counsel "reasonably concluded that adopting a mental health defense would open the door to rebuttal testimony. . . ." and "reasonably focused his efforts on developing other areas of mitigation, such as Atwood's drug use and his good family background"); *Williams v. Woodford*, 384 F.3d

567, 616–19 (9th Cir. 2004) (finding no ineffective assistance of counsel where mitigating evidence was not especially helpful and would have opened the door to evidence of defendant's gang activities). In fact, Patterson was able to convince the trial court to limit the penalty-phase rebuttal testimony of the State's expert, Dr. Bayless, so that evidence of Andriano's conduct in stealing from an employer was not admitted, nor were opinions Bayless arrived at through his testing of Andriano. (*See* RT 12/14/03 at 5–33.)

In addition, as shown by the testimony of Drs. Pitt and Amin, any expert testimony offered by Andriano would have been subjected to rebuttal testimony by the State's experts. Counsel could reasonably wish to avoid turning sentencing into a "battle of the experts" in which Andriano might wind up on the "losing side." *Bonin*, 59 F.3d at 836; *see Pinholster*, 563 U.S. at 201 ("If Pinholster had called Dr. Woods to testify consistently with his psychiatric report, Pinholster would have opened the door to rebuttal by a state expert."); *Atwood*, 870 F.3d at 1063 ("We have held that counsel's decision not to pursue a mental health defense is a reasonable strategic decision under *Strickland* where it avoided the introduction of 'dueling mental health experts,' evidence of the petitioner's 'past acts of sexual abuse as rebuttal evidence,' and 'details of the crime.'") (quoting *Elmore v. Sinclair*, 799 F.3d 1238, 1246, 1251 (9th Cir. 2015)).

Finally, although counsel did not present a mitigation case based on expert mental health evidence, the testimony from employees of the Maricopa County Jail psychiatric unit informed the jury that Andriano suffered from depression and anxiety and attempted suicide. Those diagnoses went unrebutted.

Weighing the totality of the mitigating evidence against the evidence presented at sentencing, *Wiggins*, 539 U.S. at 534, the Court finds that there was not a reasonable probability of a different outcome if counsel had presented a mitigation case premised on expert opinions that Andriano suffered from bipolar disorder, PTSD, and dependent disorder. The "magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented," *Stankewitz*, 365 F.3d at 716, is not so great as to undermine confidence in the sentencing outcome, *Richter*, 562

U.S. at 104. Even if presentation of the omitted mental health evidence would have resulted in a different sentencing profile, *see Strickland*, 466 U.S. at 695, prejudice is not established. *See Apelt*, 878 F.3d at 833 (finding omission of significant evidence of childhood mental, physical, and sexual abuse was not sufficient to establish prejudice where petitioner's murder of his wife was "premeditated and calculated").

Andriano cites *Porter v. McCollum*, 558 U.S. 30, 40 (2009), *Wiggins*, 539 U.S. at 514, 537–38, and *Williams (Terry)*, 529 U.S. at 398, as cases where prejudice resulted from omitted mitigating evidence. (Doc. 17 at 42–43.) The mental health evidence omitted from Andriano's sentencing does not approach the severity of the mitigating circumstances counsel failed to present in those cases.

In *Porter*, the omitted evidence included the fact that Porter had been abused as a child by his violent father, who once shot at him and who beat his mother in front of Porter; attended classes for "slow learners"; had brain damage and cognitive defects; and was a decorated veteran who served on the front lines in two horrific battles of the Korean War and suffered from PTSD. 558 U.S. at 33–36. In *Wiggins*, counsel failed to present evidence that Wiggins suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and was deemed to have diminished mental capacities. 539 U.S. at 535. In *Williams*, counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood. . . ." 529 U.S. at 395. Counsel thus failed to present evidence that Williams had been committed at age 11, suffered dramatic mistreatment and abuse during his early childhood, was "borderline mentally retarded," had suffered numerous head injuries, and might have organic mental impairments. *Id.* at 370–71.

These cases do not support a finding that Andriano, an educated 30-year-old with no history of mental health treatment who committed a cold and calculated murder, was prejudiced by counsel's failure to present evidence that she suffered from bipolar disorder, PTSD, and dependent disorder, with a tendency to act impulsively in stressful situations.

*See Rhoades v. Henry*, 638 F.3d 1027, 1052 (9th Cir. 2011) (finding no prejudice where evidence did not show petitioner was "abandoned or mistreated, placed within the state's custody, or institutionalized"); *see also Apelt*, 878 F.3d at 834 ("At the age of 25, Apelt concocted and carried out a calculated plan to marry Cindy, to have her pay for her own life insurance, and then, as soon as the insurance premium was paid, to viciously and cruelly murder her"—there was no reasonable likelihood that further mitigating evidence would have affected his sentence).

Under de novo review Andriano has failed to meet her burden with respect to either prong of *Strickland*.

4.    Conclusion

Andriano has not satisfied her "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw*, 255 F.3d at 939. She has likewise failed to bear "the highly demanding and heavy burden [of] establishing actual prejudice," *Allen*, 395 F.3d at 1000, by demonstrating there was a reasonable probability of life sentence if counsel had presented mitigating evidence about her mental health.

Applying either AEDPA deference or under de novo review, Andriano has failed to demonstrate that she is entitled to relief on her claim that counsel performed ineffectively at sentencing. Claim 3(A) is denied.

**Claim 3(B)**

Andriano alleges that trial counsel performed ineffectively by failing to object to the following jury instruction, given during the penalty phase of Andriano's trial:

> If your verdict is that the Defendant should be sentenced to death, the Defendant will be sentenced to death. If your verdict is that the Defendant should be sentenced to life, the Defendant will not be sentenced to death and the Court will sentence the Defendant to either life without parole until 25 calendar years in prison are served; or "natural life," which means the Defendant would never be released from prison.

(ROA 419 at 11.)

1    Relying on *Lynch v. Arizona*, 136 S. Ct. 1818 (2016) (per curiam), Andriano argues
2    that counsel should have objected to the erroneous instruction that she could be sentenced
3    to life with the possibility of parole. (Doc. 17 at 84–87.) Andriano concedes that she failed
4    to raise this ineffectiveness claim in state court. (*Id.* at 84.) Therefore, it is procedurally
5    defaulted. *Martinez* does not provide cause to excuse the procedural default because, as set
6    forth below, the claim is plainly meritless.

7    In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held that
8    when a defendant's future dangerousness is at issue and state law prohibits her release on
9    parole, she has a due-process right to inform the jurors of her parole ineligibility.

10   Until 2012, Arizona law permitted imposition of a parole-eligible life sentence for
11   defendants convicted of first-degree murder. *See* A.R.S. § 13–703(A)(2000), *renumbered*
12   *as* A.R.S. § 13–751(A). In 1994, however, Arizona effectively abolished parole for all
13   inmates convicted of felonies. *See* A.R.S. § 41–1604.09(I). Accordingly, at the time of
14   Andriano's sentencing, defendants facing death sentences were statutorily eligible to
15   receive life-with-parole sentences but, as a practical matter, could not be paroled.

16   At the time of Andriano's trial, the Arizona Supreme Court had not considered
17   *Simmons*' applicability to Arizona's capital jury-sentencing process in light of § 41–
18   1604.09(I). In 2008, however, the court rejected an argument that *Simmons* required a trial
19   court to "presentence" a defendant by deciding before trial whether it would impose a
20   parole-eligible life sentence and instruct the jury accordingly. *State v. Cruz*, 218 Ariz. 149,
21   160,181 P.3d 196, 207 (2008). The court reasoned that *Simmons* did not require reversal
22   because "[n]o state law would have prohibited [the defendant's] release on parole after
23   serving twenty-five years, had he been given a life sentence." *Id.* (citing A.R.S. § 13–
24   703(A) (2004)). Subsequently, the court reaffirmed its holding that *Simmons* did not apply
25   in Arizona because a defendant facing a death sentence was eligible to receive a life
26   sentence with the possibility of parole under A.R.S. § 13–751(A). *See, e.g.*, *State v. Lynch*,
27   238 Ariz. 84, 103–04, 357 P.3d 119, 138–39 (2015), *reversed by Lynch*, 136 S. Ct. at 1818–
28   20.

1      Twelve years after Andriano's trial, the United States Supreme Court overruled the
2  Arizona Supreme Court's precedent, holding that the court had incorrectly interpreted
3  *Simmons*. *Lynch*, 136 S. Ct. at 1818–20. The Court concluded, based on § 41–1604.09(I),
4  that an Arizona capital defendant is ineligible for parole within *Simmons*'s meaning. *Id.*
5  Therefore, when future dangerousness is at issue, Arizona capital-sentencing juries must
6  be instructed that the defendant is not eligible for parole under Arizona law.

7      Andriano has not met her burden of showing that counsel performed deficiently by
8  failing to object to the instruction. At the time of Andriano's trial, the Arizona Supreme
9  Court had not yet ruled on *Simmons*' applicability. However, as noted, A.R.S. § 13–751(A)
10  expressly provided for a parole-eligible life sentence. Because the Arizona Supreme Court
11  had not yet addressed how *Simmons*, § 41–1604.09(I), and § 13–751(A) interacted,
12  reasonable counsel could have concluded, as the Arizona Supreme Court did in *Cruz* and
13  for several years thereafter, that Andriano was in fact parole-eligible and therefore there
14  were no grounds for an objection.[32] *See Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994)
15  (holding that defense attorney is not ineffective for failing to anticipate a decision in a later
16  case); *Brown v. United States*, 311 F.3d 875 (8th Cir. 2002) (finding no ineffective
17  assistance based on counsel's failure to raise an issue that was "unsupported by then-
18  existing precedent. . . . "). For the same reason there is no support for the proposition that
19  the trial court would have granted an objection to the instruction.

20      To support her claim that she was prejudiced by counsel's failure to object to the
21  instruction, Andriano cites juror declarations submitted with her PCR petition. (Doc. 17 at
22  86.) The court will not consider this evidence.

23      As discussed in its order denying evidentiary development (Doc. 68 at 28), juror
24  testimony cannot be used to impeach a verdict unless "extrinsic influence or relationships
25  have tainted the deliberations." *Tanner v. United States*, 483 U.S. 107, 120 (1987). Rule
26  606(b)(1) of the Federal Rules of Evidence prohibits juror testimony "about any statement

28      [32] Andriano acknowledges as much when she argues in Claim 5 that raising a
*Simmons* claim would have been futile prior to *Lynch*. (Doc. 42 at 64.)

made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). "The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Id.* There are limited exceptions to this Rule, Fed. R. Evid. 606(b)(2), but they do not apply here.

Andriano contends that the Court may consider the declarations because they are offered in support of her ineffective assistance of counsel claim. (Doc. 17 at 86.)

Courts have rejected this argument. *See Brown v. United States*, 720 F.3d 1316, 1337 (11th Cir. 2013) (finding that juror's affidavit, swearing that additional mitigation evidence gathered during the postconviction process might have had an impact on the jury's penalty-phase deliberations, was not competent evidence); *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010); *Garza v. Ryan*, No. CV-14-01901-PHX-SRB, 2017 WL 1152814, at *15 (D. Ariz. Mar. 28, 2017) ("Juror affidavits may not be considered under Rule 606(b) in support of ineffective assistance of counsel claims.").

The proffered declarations concern the jurors' deliberative process and the effect of the evidence on their votes. Therefore, they may not be considered under Rule 606(b). *See Jones v. Ryan*, No. CV-01-00384-PHX-SRB, 2016 WL 3269714, at *2 (D. Ariz. June 15, 2016); *Smith v. Schriro*, No. CV-03-1810-PHX-SRB, 2006 WL 726913, at *22–23 (D. Ariz. Mar. 21, 2006).

The court finds plainly meritless the claim that trial counsel performed ineffectively by failing to object to the jury instruction at issue. Therefore, there was not a reasonable probability of a different outcome in the PCR proceedings if PCR counsel had raised the underlying claim. Because PCR counsel did not perform ineffectively, Andriano cannot establish cause for the claim's default. *Ramirez*, 937 F.3d at 1241; *Clabourne*, 745 F.3d at 377. Claim 3(B) is therefore denied as procedurally defaulted and barred from federal review.

**CLAIM 5**

Citing *Lynch*, 136 S. Ct. 1818, Andriano alleges that her due process rights were

violated when the jury was incorrectly instructed that if given a life sentence she could be eligible for parole. (Doc. 17 at 102.) Andriano failed to raise this claim on direct appeal. She argues that its default is excused by the ineffective performance of appellate and PCR counsel. (Doc. 17 at 102.) These arguments fail. Under *Martinez*, the ineffective assistance of PCR counsel excuses only claims of ineffective assistance of trial counsel, not claims of trial error. *See Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27. Appellate counsel's alleged ineffectiveness cannot constitute cause because that claim is itself procedurally defaulted and Andriano has not excused the default. *See Edwards*, 529 U.S. at 452 ("'[A] claim of ineffective assistance' . . . generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'") (quoting *Murray*, 477 U.S. at 489).

Andriano next argues that her failure to exhaust this claim is excused pursuant to 28 U.S.C. § 2254(b)(1)(B). (Doc. 17 at 102.) Under § 2254(b)(1)(B), excuse from exhaustion is available when either "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." In her reply brief, Andriano argues there was no available state corrective process because it would have been futile to raise this claim in Arizona courts before the *Lynch* decision in 2016. (Doc. 42 at 64.)

The Supreme Court has rejected the futility doctrine. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982). "If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." *Id.*; *see Roberts v. Arave*, 847 F.2d 528, 530 (1988) ("[T]he apparent futility of presenting claims to state courts does not constitute cause for procedural default."); *Parker v. Kelchner*, 429 F.3d 58, 63 (3rd Cir. 2005) ("Our sister Circuits that have considered the issue have similarly concluded that the exhaustion requirement is not excused merely because a petitioner's claim will likely be denied on the merits in state court.").

1    The default of this claim is not excused under § 2254(b)(1)(B).

2    In her reply brief, Andriano indicates that she reserves the right to seek a stay and

3    return to state court to exhaust this claim, arguing that she has an available avenue for relief

4    in Rule 32.1(g) of the Arizona Rules of Criminal Procedure. (Doc. 42 at 63.) Respondents

5    contend that *Lynch* does not represent a significant change in the law for purposes of Rule

6    32.1(g). (Doc. 22 at 107.) The Court agrees.

7    Rule 32.1(g) provides that a defendant may file a petition for relief on the grounds

8    that "[t]here has been a significant change in the law that if determined to apply to

9    defendant's case would probably overturn the defendant's conviction or sentence." Arizona

10   courts have characterized a significant change in the law as a "transformative event," *State*

11   *v. Shrum*, 220 Ariz. 115, 118, 203 P.3d 1175, 1178 (2009), and a "clear break" or "sharp

12   break" with the past. *State v. Slemmer,* 170 Ariz. 174, 182, 823 P.2d 41, 49 (1991). "The

13   archetype of such a change occurs when an appellate court overrules previously binding

14   case law." *Shrum*, 220 Ariz. at 118, 203 P.3d at 1178. A statutory or constitutional

15   amendment representing a definite break from prior law can also constitute a significant

16   change in the law. *Id.* at 119, 203 P.3d at 1179.

17   *Lynch* applied *Simmons* to a capital sentencing in Arizona. In *Lynch*, the defendant

18   was convicted of murder and other crimes. 136 S. Ct. at 1818. Before the penalty phase of

19   his trial began, the state successfully moved to prevent his counsel from informing the jury

20   that, if the defendant did not receive a death sentence, he would be sentenced to life in

21   prison without possibility of parole. *Id.* at 1819. The jury sentenced him to death. *Id.* On

22   appeal, Lynch argued that because the state had made his future dangerousness an issue in

23   arguing for the death penalty, the jury should have been given a *Simmons* instruction

24   stating that the only non-capital sentence he could receive under Arizona law was life

25   imprisonment without parole. *Id.* The Arizona Supreme Court affirmed, holding that the

26   failure to give the *Simmons* instruction was not error because Lynch could have received a

27   life sentence that would have made him eligible for release after 25 years—even though

28   any such release would have required executive clemency. *Id.* at 1820.

1       The United States Supreme Court reversed. *Id.* The Court reiterated that under

2   *Simmons* and its progeny, "where a capital defendant's future dangerousness is at issue,

3   and the only sentencing alternative to death available to the jury is life imprisonment

4   without possibility of parole," the Due Process Clause "entitles the defendant to inform the

5   jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel."

6   *Id.* at 1818 (internal quotation marks omitted).

7       *Lynch* does not represent a significant change in the law. It simply applies existing

8   law to an Arizona case. It is not a transformative event of the kind described by Arizona

9   courts in interpreting Rule 32.1(g). In *Shrum*, for example, the Arizona Supreme Court

10  cited *Ring v. Arizona*, 536 U.S. 584 (2002), as a "significant change in the law." 220 Ariz.

11  at 119, 203 P.3d at 1179. *Ring* "expressly overruled" *Walton v. Arizona*, 497 U.S. 639

12  (1990), *overruled by Ring v. Arizona*, 536 U.S. 584 (2002). As the Arizona Supreme Court

13  explained, "before *Ring*, a criminal defendant was foreclosed by *Walton* from arguing that

14  he had a right to trial by jury on capital aggravating factors; *Ring* transformed existing

15  Sixth Amendment law to provide for just such a right." *Shrum*, 220 Ariz. at 119, 203 P.3d

16  at 1179.

17      In contrast to the holding in *Ring*, which expressly overruled precedent and

18  invalidated Arizona's capital sentencing scheme, *Lynch* did not transform Arizona law.

19  The holding does not constitute a significant change in law for purposes of Rule 32.1(g).

20  *See Boggs v. Ryan*, No. CV-14-02165-PHX-GMS, 2017 WL 67522, at *3 (D. Ariz. Jan. 6,

21  2017); *Garza*, No. CV-14-01901-PHX-SRB, 2017 WL 105983, at *3; *Garcia v. Ryan*, No.

22  CV-15-00025-PHX-DGC, 2017 WL 1550419, at *3 (D. Ariz. May 1, 2017).[33]

23      Respondents also argue, correctly, that *Lynch* would not apply retroactively. *Lynch*

24  applies *Simmons* to Arizona capital sentencing. In *O'Dell v. Netherland*, the Supreme Court

25  rejected the argument that *Simmons* represented a "watershed" rule of criminal procedure

26

27

28      [33] On June 2, 2020, the Arizona Supreme Court held oral argument in *State v. Cruz* to consider whether *Lynch* represented a significant change in the law that applies retroactively. *See* Order, *State v. Cruz*, No. CR-17-0567-PC (Ariz. Sup. Ct. Apr. 1, 2020).

1    that applied retroactively.[34] 521 U.S. 151, 167 (1997). Like *Simmons*, *Lynch* is procedural

2    and non-retroactive. *See, e.g.*, *Johnson v. Ryan*, No. CV-18-00889-PHX-DWL, 2019 WL

3    1227179, at *2 (D. Ariz. Mar. 15, 2019) (finding *Lynch* non-retroactive because it "didn't

4    announce a new rule of substantive law and the procedural rule it applied doesn't amount

5    to a 'watershed' rule of criminal procedure" and noting that since 1989 the Supreme Court

6    has not found that any rule falls within the "watershed" exception); *Armstrong v. Ryan*,

7    No. CV-15-00358-TUC-RM, 2017 WL 3970327, at *2. Therefore, Andriano would not be

8    entitled to retroactive application of *Lynch* and her claim fails to meet the exception to

9    preclusion set out in Rule 32.1(g).

10          Accordingly, Claim 5 is denied as procedurally defaulted and barred from federal

11   review.

12   **CLAIM 7**

13          Andriano alleges that her rights under the Sixth and Fourteenth Amendments were

14   violated by the trial court's failure to instruct the jury that it had to find beyond a reasonable

15   doubt that the aggravating factor outweighed the mitigating circumstances. (Doc. 17 at

16   110.)

17          On direct appeal, Andriano alleged that "Arizona's death penalty scheme is

18   unconstitutional because it does not require the sentencer to find beyond a reasonable doubt

19   that the aggravating circumstances outweigh the accumulated mitigating circumstances, in

20   violation of the Fifth, Eighth, and Fourteenth Amendments. . . ." (Opening Brief at 131.)

21   In Claim 7 of her habeas petition, by contrast, Andriano alleges instructional error in

22   violation of the Sixth and Fourteenth Amendments. (Doc. 17 at 110–16.) Andriano

23   therefore did not fairly present her allegation of instructional error in state court. Fair

24   presentation requires a description of the federal legal theory on which a claim is based.

---

26          [34] In determining whether to apply new constitutional legal principles retroactively,
27   Arizona courts apply the federal retroactivity standard announced in *Teague v. Lane*, 489
     U.S. 288 (1989). *See Slemmer*, 170 Ariz. at 182, 823 P.2d at 49. As relevant here, *Teague*
28   holds that a new constitutional principle is to be applied retroactively if it is a "watershed
     rule[ ] of criminal procedure" that "implicate[s] the fundamental fairness of the trial."
     *Teague*, 489 U.S. at 311–12.

1    *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary

2    to support the federal claim were before the state courts or that a somewhat similar state-

3    law claim was made.") (quotations omitted). Because Andriano is precluded from

4    obtaining relief in state court, Ariz. R. Crim. P. 32.1(d)–(h); 32.2(a) & (b), Claim 7 is

5    procedurally defaulted.

6         Andriano argues that the claim's default is excused by the ineffective assistance of

7    PCR and appellate counsel. (Doc. 42 at 77.) These arguments fail. Under *Martinez*, the

8    ineffective assistance of PCR counsel excuses only claims of ineffective assistance of trial

9    counsel, not claims of trial error. *See Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–

10   27. Appellate counsel's alleged ineffectiveness cannot constitute cause because that claim

11   is itself procedurally defaulted and Andriano has not excused the default. *See Edwards*,

12   529 U.S. at 452.

13        In addition, the Arizona Supreme Court's decision rejecting Andriano's challenge

14   to the statute, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an

15   unreasonable application of clearly established federal law. The United States Supreme

16   Court has "never held that a specific method for balancing mitigating and aggravating

17   factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*,

18   548 U.S. 163, 175 (2006) (quotations omitted).

19        Andriano's reliance on *Hurst v. Florida*, 136 S. Ct. 616 (2016), is misplaced.

20   In *Hurst*, 136 S. Ct. 616, the Supreme Court held that Florida's capital sentencing scheme

21   violated *Ring*. Under the Florida scheme, a jury rendered an advisory verdict while the

22   judge made the ultimate factual determinations necessary to sentence a defendant to

23   death. *Id.* at 621–22. The Court held that this procedure was invalid because it "does not

24   require the jury to make the critical findings necessary to impose the death penalty." *Id.* at

25   622. The Supreme Court simply applied *Ring* to Florida's capital sentencing statutes.

26        *Hurst* does not, as Andriano argues, hold that a jury is required to find beyond a

27   reasonable doubt that the aggravating factors outweigh the mitigating circumstances. *Hurst*

28   held only that Florida's scheme, in which the jury rendered an advisory sentence but the

1    judge made the findings regarding aggravating and mitigating factors, violated the Sixth

2    Amendment. *Hurst*, 136 S. Ct. at 620.

3         *Hurst* did not address the process of weighing aggravating and mitigating

4    circumstances. Indeed, the Supreme Court has held that the sentencer may be given

5    "unbridled discretion in determining whether the death penalty should be imposed after it

6    has found that the defendant is a member of the class made eligible for that penalty." *Zant*

7    *v. Stephens*, 462 U.S. 862, 875 (1983); *see Tuilaepa v. California*, 512 U.S. 967, 979–80

8    (1994). In *Zant*, the Court explained that "specific standards for balancing aggravating

9    against mitigating circumstances are not constitutionally required." *Id.* at 875 n.13; *see*

10   *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have never held that a specific

11   method for balancing mitigating and aggravating factors in a capital sentencing proceeding

12   is constitutionally required.").

13        In Arizona, in accordance with *Ring* and *Hurst*, the jury makes factual findings

14   regarding the aggravating factors and mitigating circumstances to determine the

15   appropriate sentence. That is sufficient to satisfy the Constitution. The trial court did not

16   err in failing to instruct the jury that it must find the aggravating factors outweigh the

17   mitigating circumstances by beyond a reasonable doubt.

18        Claim 7 is both meritless and procedurally defaulted and barred from federal review.

19   **CLAIM 8**

20        Andriano alleges that the trial court's failure to instruct the jury on the lesser-

21   included offenses of second-degree murder and manslaughter violated her rights under the

22   Sixth, Eighth, and Fourteenth Amendments. (Doc. 17 at 11.)

23   **A.    Background**

24        Andriano did not request lesser-included instructions at trial. *See Andriano*, 215

25   Ariz. at 504, 161 P.3d at 547. On direct appeal, she alleged that the trial court's failure to

26   give the instructions *sua sponte* denied her right to a fair trial. (Opening Brief at 49–53.)

27   The Arizona Supreme Court rejected this claim. First, citing *Beck v. Alabama*, 447 U.S.

28   625, 627, 638 (1980), the court explained that "[i]n a capital case, it is fundamental error

for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence." *Andriano*, 215 Ariz. at 504, 161 P.3d at 547. The court then addressed Andriano's arguments that she was entitled to lesser-included-offense instructions:

> As to second degree murder, Andriano contends on appeal that because sodium azide poisoning did not cause Joe's death, a reasonable jury could have found that she abandoned her plan to poison Joe. Abandonment is shown, she argues, by her summoning Chris to the apartment and her call to 911. She maintains that a new sequence of events began that led to an intentional or knowing—but not premeditated—death. As to manslaughter, Andriano contends that the evidence supports a conclusion that Joe provoked her when he reached for a knife, and she then killed him during a sudden quarrel or in the heat of passion.
>
> Andriano did not argue either of these theories at trial, however, and the evidence presented does not support either theory. Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help. She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.
>
> Despite Andriano's testimony that Joe had killed himself, in closing argument, defense counsel argued that Andriano was a domestic violence victim who acted in self-defense after an assisted suicide attempt. The jury was instructed on self-defense and told that if it found Andriano to be a domestic violence victim, "the state of mind of a reasonable person . . . shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence."
>
> We held in *State v. Celaya* that "where the sole defense is self-defense so that the evidence requires either conviction or acquittal, any instruction on any other grade would be impermissible." 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983); *see also State v. Wall*, 212 Ariz. 1, 6, ¶ 29, 126 P.3d 148, 153 (2006) (noting that when defendant asserts an "all-or-nothing" defense, the record usually will not support the giving of a lesser-included offense

instruction); *State v. Jones*, 109 Ariz. 80, 81–82, 505 P.2d 251, 252–53 (1973) (holding that lesser-included offense instructions were not required where evidence at trial and defendant's self-defense theory presented an "either-or" situation requiring either first degree murder conviction or acquittal). We conclude that the evidence in this case did not support either a second degree murder or manslaughter instruction and that the trial court therefore did not commit fundamental error in failing to give either instruction.

*Id.* at 504–05, 161 P.3d at 547–48.

**B.    Analysis**

Andriano alleges that the Arizona Supreme Court's decision was contrary to clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), because the United States Supreme Court has held that a self-defense instruction "is not necessarily incompatible" with a lesser-included offense instruction. (Doc. 17 at 117–18.) She also argues that the court unreasonably applied federal law and unreasonably determined the facts by finding that the evidence did not support lesser-included offense instructions. (*Id.*) Neither argument is persuasive.

The Arizona Supreme Court correctly based its decision on *Beck*, 447 U.S. 625. In *Beck*, the Court held that the death penalty may not be imposed if the jury was not permitted to consider a lesser-included, non-capital offense. *Id.* at 627. However, due process requires a lesser-included offense instruction to be given only when the evidence warrants it. *Id.*; *see Hopper v. Evans*, 456 U.S. 605, 611 (1982). The state and federal rule are the same: a lesser included offense instruction should be given if the evidence would permit a jury rationally to find a defendant guilty of the lesser offense and acquit him of the greater. *Murray (Roger) v. Schriro*, 882 F.3d 778, 813 (9th Cir. 2018) (citing *State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995), and *Hopper*, 456 U.S. at 612); *see Clabourne v. Lewis*, 64 F.3d 1373, 1380 (9th Cir. 1995) (noting that it is plain error for the court to fail to give a lesser-included instruction on second-degree murder in a capital case "where the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater").

1    Evidence is deemed "sufficient to require a lesser-included offense instruction if
2    two conditions are met. The jury must be able to find (a) that the State failed to prove an
3    element of the greater offense and (b) that the evidence is sufficient to support a conviction
4    on the lesser offense." *State v. Wall*, 212 Ariz. 1, 4, 126 P.3d 148, 151 (2006). "It is not
5    enough that, as a theoretical matter, 'the jury might simply disbelieve the state's evidence
6    on one element of the crime' because this 'would require instructions on all offenses
7    theoretically included' in every charged offense." *Id.* (quotation omitted). "[T]he evidence
8    must be such that a rational juror could conclude that the defendant committed only the
9    lesser offense." *Id.*

10    To support her argument that there is no categorial bar on instructions for
11    inconsistent defenses, Andriano cites *Stevenson v. United States*, 162 U.S. 313, 322–33
12    (1896), and *Mathews v. United States*, 485 U.S. 58, 63–64 (1988). Those cases stand for
13    the proposition that due process requires instructions on inconsistent defenses where
14    supported by the evidence. In *Mathews*, the Court held that the defendant was entitled to
15    an instruction on entrapment without requiring him to admit all elements of the crime. 485
16    U.S. at 59–60. In *Stevenson*, the Court held that the defendant was entitled to instructions
17    on both self-defense and manslaughter. 162 U.S. at 323.

18    *Stevenson* and *Mathews* do not hold that a defendant is entitled to an instruction that
19    is not supported by the evidence. In *Mathews*, the Court held that "a defendant is entitled
20    to an instruction as to any recognized defense *for which there exists evidence sufficient for*
21    *a reasonable jury to find in his favor.*" 485 U.S. at 63–64 (emphasis added); *Stevenson*,
22    162 U.S. at 315, 323; *see Taylor v. Withrow*, 288 F.3d 846, 853 (6th Cir. 2002) (explaining
23    that a defendant does not have "the right to offer any defense, nor to demand a jury be
24    instructed on any theory").[35] "No due process violation occurs from the failure to give an

---

25
26    [35] Andriano cites another case, *United States v. Scafe*, for the proposition that "self-
defense and voluntary manslaughter are not always inconsistent." 822 F.2d 928, 932 (10th
27    Cir 1987). In that case, however, the court determined that the defendant was not entitled
to a voluntary manslaughter instruction because the record showed there was "no basis"
28    for such a finding despite "some suggestion of rage or fear as a basis for heat of passion."
*Id.* at 932–33.

1   instruction on a defense where there was insufficient evidence as a matter of law to support

2   such a charge." *Lakin v. Stine*, 80 F. App'x. 368, 374 (6th Cir. June 12, 2003).

3          Here, the Arizona Supreme Court found that Andriano presented an all-or-nothing

4   self-defense theory and that there was insufficient evidence to support instructions on the

5   lesser-included offenses of second-degree murder and manslaughter. *Andriano*, 215 Ariz.

6   at 504–05, 161 P.3d at 547–48. These findings are entitled to a presumption of correctness

7   under 28 U.S.C. § 2254(e)(1). *See Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001) (citing

8   § 2254(e)(1) and explaining "*Mathews* does not control if we are given no basis upon which

9   to overcome the state court's factual findings that there was *not* sufficient evidence to

10  support the defendant's theory. . . ."); *Dowthitt v. Johnson*, 230 F.3d 733, 757–58 (5th Cir.

11  2000) (finding petitioner did not present "clear and convincing evidence" showing he was

12  guilty only of the lesser offenses); *Bryson v. Ward*, 187 F.3d 1193, 1207 (10th Cir. 1999)

13  ("The state trial and appellate courts determined that the evidence did not support giving

14  these instructions [on second-degree murder and manslaughter] . . . . We afford this factual

15  determination a presumption of correctness under 28 U.S.C. § 2254(e)(1)."). Andriano

16  fails to rebut that presumption.

17         As she did on direct appeal, Andriano argues that the evidence supported the lesser

18  charges because it showed that she abandoned her plan to poison Joe when she called her

19  friend Chris and then 911. (Doc. 17 at 119–122.) According to Andriano, a jury could find

20  that after this "break in the chain of events" she killed Joe without the premeditation

21  required for first-degree murder. (*Id.*) Specifically, Andriano argues that because Joe was

22  not killed by the poison but died in a fight with her, a jury could reject her theory of self-

23  defense but nevertheless find that premeditation was lacking, and therefore she was entitled

24  to an instruction on second-degree murder.[36] (*Id.* at 120–21.) She also argues that a jury

25         [36] A.R.S. § 13–1104(A) provides, in relevant part, "A person commits second degree
26  murder if without premeditation:
          1. The person intentionally causes the death of another person . . . ; or
27        2. Knowing that the person's conduct will cause death or serious physical injury,
28        the person causes the death of another person . . . ."

1  could have found that she was "provoked" by Joe when he attacked her with the knife, and

2  she killed him in a sudden quarrel or the heat of passion, warranting a manslaughter

3  instruction.[37] (*Id.* at 121–22.)

4      The success of Andriano's arguments depends on whether a rational jury could

5  believe that by calling Chris and then 911, she abandoned her plan to kill Joe and therefore

6  the murder was no longer premeditated. The evidence showed that Andriano never

7  abandoned her plan to kill Joe. Although Andriano did eventually call 911, she did so

8  reluctantly, after being pressured by Chris and after lying to Joe about having already made

9  the call. (RT 9/8/04 at 12–15.) She then lied to the dispatcher about Joe's condition. (RT

10  10/28/04 at 37.) When the paramedics first arrived, she did not allow them into the

11  apartment, lying to them about Joe dying of cancer and having a do not resuscitate order.

12  (RT 9/8/04 at 37.) By that point, she had already killed Joe. This evidence does not support

13  a finding that she ever abandoned her plan to do so.

14      As the Arizona Supreme Court noted, Andriano's trial testimony was not consistent

15  with the theories she now offers. *Andriano*, 215 Ariz. at 594, 161 P.3d at 547. She testified

16  that Joe killed himself with the knife while she tried to stop him, not that she actually killed

17  him or killed him in the heat of passion or a sudden quarrel. (*See* RT 10/28/04 at 62.) She

18  argued, however, in contrast to her testimony, that she killed Joe in self-defense, and the

19  jury was so instructed. (*See* RT 11/17/04 at 25, 73–74, 104–06; ROA 364 at 11–14.) The

20  evidence supported neither theory, as the jury's verdict indicated.

21      Andriano has not met her burden of showing by clear and convincing evidence that

22  the Arizona Supreme Court unreasonably rejected her theory that she abandoned

23  premeditation and was therefore entitled to lesser-included offense instructions. *See* 28

24  U.S.C. § 2254(e)(1); *see also Wood*, 558 U.S. at 301 (explaining that a state court's "factual

25

26      [37] Under A.R.S. § 13–1103(A)(2), "A person commits manslaughter by . . .
[c]ommitting second degree murder as prescribed in § 13–1104, subsection A upon a

27  sudden quarrel or heat of passion resulting from adequate provocation by the victim . . .

28  ."

1   determination is not unreasonable merely because [a] federal habeas court would have

2   reached a different conclusion in the first instance"); *Taylor*, 366 F.3d at 1000.

3          Finally, the Court finds that any error was harmless. *Ghent v. Woodford*, 279 F.3d

4   1121, 1134 (9th Cir. 2002), *as amended* (Mar. 11, 2002) ("If a *Beck* violation has

5   occurred, the court must then determine whether the error had a substantial and injurious

6   effect on the jury's deliberations and verdict.") (citing *Brecht*, 507 U.S. at 637); *see*

7   *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004) ("[E]ven if a manslaughter

8   instruction were required under *Beck*, Beardslee would have to demonstrate that the

9   violation had a substantial and injurious effect. . . ."). The evidence overwhelmingly

10  established, as the jury found beyond a reasonable doubt, that Andriano premeditated

11  Joe's murder. She researched the poison, purchased it using false information, and

12  administered it to Joe. After she killed Joe she staged the scene to make it appear that a

13  struggle had taken place. As the Arizona Supreme Court concluded, the evidence,

14  including Andriano's own testimony about how Joe's death occurred, did not support

15  charges of second-degree murder or manslaughter.

16         The decision of the Arizona Supreme Court was neither contrary to nor an

17  unreasonable application of *Beck*, *see Richter*, 562 U.S. at 98, nor was it based on an

18  unreasonable determination of the facts. Andriano was not entitled to lesser-included

19  offense instructions. Claim 8 is denied.

20  **CLAIM 9**

21         Andriano alleges that the "the trial judge coerced a verdict" at the penalty phase of

22  trial in violation of her Sixth, Eighth, and Fourteenth Amendment Rights. (Doc. 17 at 122.)

23  **A.     Background**

24         During the second day of deliberations following the penalty phase of Andriano's

25  trial, the jury sent the court a note that read: "If we are unable to reach an [sic] unanimous

26  verdict, what is the procedure that will be followed?" (RT 12/20/04 at 4; ROA 423 at 1;

27  ROA 424.) The court responded:

28

It appears from your note that you are at a deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I am merely trying to be responsible [sic] to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement and disagreement and discuss the law and evidence as they relate to the areas of disagreement.

If you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions, law or facts on which we can possibly help. Please give your note to the bailiff. We will then discuss your note and try to help.

(RT 12/20/04 at 4; ROA 423 at 2.) Defense counsel objected to the court's instruction, arguing that it did not accurately describe the sentencing process. (RT 12/20/04 at 5.) The jurors returned their verdict of death two days later. (RT 12/22/04 at 5; ROA 426.)

Several weeks later, counsel moved for a new penalty-phase hearing, arguing, based on a newspaper report, that a single juror had favored life and the trial court's instruction had coerced that juror into returning a death verdict. (RT 2/4/05 at 6–8; ROA 444, 444A.) The trial court denied the motion. (ROA 448.)

On direct appeal, Andriano argued that the instruction incorrectly described the jurors' penalty-phase task and thereby coerced their verdict. (Opening Brief at 115–21.) The Arizona Supreme Court rejected the claim:

In *Lowenfield v. Phelps*, the United States Supreme Court addressed whether an impasse instruction given to a capital sentencing jury coerced the death sentence in that case. 484 U.S. 231, 233, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The Supreme Court held that the instruction did not coerce the jury's death verdict. *Id.* at 241, 108 S.Ct. 546. The Court quoted with approval another capital case in which it had opined that jurors must try to reach a verdict:

The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Id.* at 237, 108 S.Ct. 546 (quoting *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). The Court emphasized that "[t]he continuing validity of this Court's observations in *Allen* are beyond dispute." *Id.*

*Lowenfield* thus makes clear that jurors in capital cases have a duty to deliberate in sentencing proceedings. Arizona's death penalty sentencing scheme does not alter this duty. While jurors individually determine whether a mitigating circumstance exists, A.R.S. § 13–703(C), the jury must still be unanimous in its decision to impose a death sentence or a life sentence, *id.* § 13–703.01(H). Therefore, the jurors may be instructed that they have a duty to deliberate in the penalty phase of a capital case.

In sum, because the impasse instruction correctly stated the law and was given after an affirmative indication from the jury that it was deadlocked, it cannot be said that the verdict was coerced.

*Andriano*, 215 Ariz. at 508–10, 161 P.3d at 551–53 (footnote omitted). This decision was neither contrary to nor an unreasonable application of clearly established federal law.

## B. Analysis

"Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield*, 484 U.S. at 241. Nonetheless, when a jury is deadlocked, "[t]he use of a supplemental charge has long been sanctioned." *Id.* at 237 (citing *Allen v. United States*, 164 U.S. 492 (1896)). Whether the conduct of a trial judge infringed a defendant's due process right to a fair trial and an impartial jury turns on whether the judge's actions would be likely to coerce some jurors into relinquishing their views in favor of reaching a unanimous decision. *Jimenez v. Myers*, 40 F.3d 976, 979

(9th Cir. 1993). The trial court's actions and statements must be evaluated under the totality of the circumstances. *Lowenfield*, 484 U.S. at 237, 250; *see Parker v. Small*, 665 F.3d 1143, 1147 (9th Cir. 2011).

In *Lowenfield*, the Court reviewed a duty-to-deliberate instruction, or "*Allen* charge," given in the penalty phase of a capital case and found that the instruction was not coercive.[38] *Id.* at 237–41. The Court explained that such instructions are appropriate in capital cases, holding that "[t]he State has in a capital sentencing proceeding a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.'" *Id.* at 238 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968)). The Court continued:

> Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity on the first ballot, the court would incontestably have had the authority to insist that they deliberate further. This is true even in capital cases such as this one and *Allen*, even though we are naturally mindful in such cases that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

---

[38] In *Lowenfield*, the trial court gave the following instruction (in part):

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

484 U.S. at 235.

1    *Id.* 238–39.

2           Nonetheless, Andriano argues that because the decision whether to impose death is

3    an individual, moral one, a duty-to-deliberate instruction is never appropriate in the penalty

4    phase of a capital trial. (Doc. 17 at 124–25.) That argument, of course, is foreclosed by

5    *Lowenfield* itself, which permits such instructions in capital cases.

6           Andriano next contends that, even if a penalty-phase duty-to-deliberate instruction

7    is legally permissible, it was coercive under the circumstances of her case. She first argues

8    that there was a coercive element in the instruction because the court did not answer the

9    jury's question. (Doc. 17 at 126.) That argument is unpersuasive. As the Arizona Supreme

10   Court found, it was reasonable for the trial court to interpret the question as suggesting that

11   the jury had reached an impasse. *Andriano*, 215 Ariz. at 509, 161 P.3d at 552. In the context

12   of the instruction as a whole, the fact that the court did not indicate what the outcome would

13   be if unanimity could not be reached did not, as Andriano argues, suggest "that a

14   unanimous verdict was required and the only acceptable result." (Doc. 17 at 126.)

15          In further support of her argument, Andriano cites *Smalls v. Batista*, 191 F.3d 272

16   (2d Cir. 1999), and *Tucker v. Catoe*, 221 F.3d 600 (4th Cir. 2000). These cases do not

17   support her position.

18          In *Smalls*, the trial court gave an *Allen* charge after learning there was an eleven to

19   one split in the jury. 191 F.3d at 281. The Second Circuit found that the judge's instructions

20   were coercive because on three occasions during the course of deliberations he had

21   reminded the jurors that they had a duty and responsibility to convince other jurors that

22   their views were correct and because he failed to balance this charge with cautionary

23   language that would remind the minority jurors not to surrender their conscientiously held

24   beliefs merely for the purpose of obtaining a unanimous verdict. *Id.* at 282.

25          In *Tucker*, the Fourth Circuit, citing *Lowenfield*, noted the following factors as

26   relevant in reviewing an *Allen* charge for coerciveness:

27              the charge in its entirety and in context; suggestions or threats that the jury
                would be kept until unanimity is reached; suggestions or commands that the
28              jury must agree; indications that the trial court knew the numerical division

of the jury; indications that the charge was directed at the minority; the length of deliberations following the charge; the total length of deliberations; whether the jury requested additional instruction; and other indications of coercion.

*Tucker*, 221 F.3d at 611.

Applying these factors, the Fourth Circuit found that the instruction in *Tucker* was coercive because the judge knew how the jury was divided, first ten to two and ultimately eleven to one in favor of a death sentence. *Id.* Knowing there was a single holdout, the court instructed the jury that, "It was never intended that the verdict of the jury should be the view of any one person." *Id.* The trial court further stated that "the verdict of the jury is the collective reasoning of all of the men and women serving on the panel." *Id.* In finding the instruction coercive, the Fourth Circuit explained that:

> The charge singled out the minority juror and emphasized the need for unanimity, without instructing that one, lone holdout was permitted under the law. . . . This emphasis on the collective, at the expense of the individual determination, was, in the context in which this charge was given, unduly coercive.

*Id.*

The trial court qualified its charge with the instruction that "no juror is expected to give up an opinion based on reasoning satisfactory to himself or herself merely for the purpose of being in agreement with others," but the Fourth Circuit found that "this line did not sufficiently balance the charge." *Id.* at 612. Instead, the "instruction merely gave one reason why a juror may decline to change his vote, and in the circumstances in which it was administered, the overall charge sought to eliminate the possibility of a single holdout juror preventing a unanimous verdict." *Id.*

The Fourth Circuit also noted that "the jury deliberated for a little more than one-and-a-half hours following the *Allen* charge (out of ten and one half hours of total deliberations), before unanimously recommending death." *Id.* Up to that point the jury was "hopelessly deadlocked at 11–1," according to the note it sent the court. *Id.* The Fourth

Circuit found this dynamic "telling because (1) the expression of deadlock was emphatic and unequivocal; and (2) the note did not request further instruction." *Id.*

The Fourth Circuit concluded that "even with the 20–20 hindsight of appellate review, we must concede that this is a close issue." *Id.* Nonetheless, the court found that under the totality of the circumstances the *Allen* charge was coercive. *Id.* "Put simply, the import of the charge was that the single juror (whom every member of the jury knew was holding out) should not prevent the majority from imposing the death penalty." *Id.*

Applying the reasoning in *Lowenfield*, *Smalls*, and *Tucker*, the Court concludes that the duty-to-deliberate charge in Andriano's case was not coercive. Although Andriano asserts that there was only "one juror in the minority" (Doc. 17 at 128), there is no evidence in the record that the court was aware of the numerical split until a juror disclosed it after the verdict, and the court did not enquire into the jury's numerical division.

Even if the court had been aware of the split, there was nothing in the instruction suggesting that the "single juror . . . should not prevent the majority from imposing the death penalty." *Tucker*, 221 F.3d at 612. In contrast to *Tucker*, there was no language focusing on the minority juror or jurors, requiring them to listen to the majority jurors, or emphasizing the need for a collective decision. *See id.* at 611.

Nor did the court in Andriano's case provide an "unbalanced" instruction or suggest that the jury was required to reach a verdict. To the contrary, the court included cautionary language reminding minority jurors not to surrender their conscientiously held beliefs for the purpose of obtaining a unanimous verdict. *See Smalls*, 191 F.3d at 282. Thus the court informed the jurors that its instruction was not intended "to force you to reach a verdict" and reminded jurors that each of them "has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment." (RT 12/20/04 at 4; ROA 423 at 2.) The court cautioned that, "No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict." (*Id.*) Also in contrast to the note in *Tucker*, the jurors' note in Andriano's case was not an "emphatic

1    and unequivocal" expression of deadlock. *Tucker*, 221 F.3d at 612. This factor also

2    suggests the instruction was not coercive. *Id.*; *see Lowenfield*, 484 U.S. at 239.

3         Finally, the length of the deliberation supports a finding that the duty-to-deliberate

4    charge was not coercive. The jury did not reach its verdict until two days after the court

5    responded to the jurors' note. *Andriano*, 215 Ariz. at 508, 161 P.3d at 551. This contrasts

6    with the brief time period between the *Allen* charge and the verdict in *Tucker*.

7         The totality of the factors demonstrates that the duty-to-deliberate instruction

8    offered by the court in Andriano's case was not coercive.

9         The Arizona Supreme Court's rejection of this claim was neither contrary to nor an

10   unreasonable application of clearly established federal law. Andriano has not met her

11   burden of showing "there was no reasonable basis for the state court to deny relief."

12   *Richter*, 562 U.S. at 98. Claim 9 is denied.

13   **CLAIM 12**

14        Andriano alleges that the State failed to present sufficient evidence supporting a

15   finding of cruelty under the (F)(6) aggravating circumstance. (Doc. 17 at 137.) The Arizona

16   Supreme Court denied this claim on direct appeal:

17        The evidence showed that Andriano poisoned Joe with sodium azide and left
18        him to suffer for what felt to Joe like a "long time." During that period, Joe
          vomited at least twice, was too weak to sit or stand, and was having difficulty
19        breathing. After pretending to call 911, Andriano stood by for approximately
          forty-five minutes as Joe suffered from the effects of sodium azide poisoning.
20        Andriano's Internet research on sodium azide and the warnings
          accompanying the shipped chemical demonstrate that she knew or should
21        have known that poisoning her husband with sodium azide would cause him
          physical pain and mental anguish. Joe, who was conscious during this time,
22        as evidenced by his interaction with Chris, undoubtedly "experienced
          significant uncertainty as to [his] ultimate fate." *See Ellison*, 213 Ariz. at
23        142, ¶ 120, 140 P.3d at 925 (quoting *State v. Van Adams*, 194 Ariz. 408, 421,
24        ¶ 44, 984 P.2d 16, 29 (1999)) (mental anguish, and hence cruelty, established
          upon this showing).
25

26

27        Moreover, Andriano struck her terminally ill husband at least twenty-three
          times in the back of the head with a bar stool. Defensive wounds on Joe's
28        hands and wrists indicate that he was conscious for at least some of the attack

and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish.[10]

> FN 10 The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.

Andriano asks us to require that the physical or mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at 18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.

*Andriano*, 215 Ariz. at 511, 161 P.3d at 554. The court then rejected Andriano's argument that Joe could not have experienced mental anguish because he did not know he had been poisoned:

> While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.

*Id.* Andriano alleges that this decision was contrary to or an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 17 at 137–38.) The Court does not agree.

Whether a state court misapplied an aggravating factor to the facts of a case is a question of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Federal habeas review of a state court's application of an aggravating factor is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Id.* In *Jeffers*, the Supreme Court held that the appropriate standard of federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" test: "whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements" of the aggravating factor. *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see McDaniel v. Brown*, 558 U.S. 120, 133 (2010).

"The 'especially cruel' prong of the (F)(6) aggravator focuses on the victim's state of mind." *State v. Tucker*, 215 Ariz. 298, 321,160 P.3d 177, 200 (2007). "To establish this prong, the state must prove beyond a reasonable doubt that the defendant knew or should have known that the victim would experience mental anguish or physical pain and that the victim was conscious during some part of the violence." *Id.* Mental anguish alone can support a finding of cruelty and "is established if the victim experienced significant uncertainty as to her ultimate fate." *State v. Ellison*, 213 Ariz. 116, 142, 140 P.3d 899, 925 (2006) (quotations omitted). When assessing the cruelty factor, the court "examines the entire murder transaction and not simply the final act that killed the victim." *Id.* (quotations omitted).

Andriano has not demonstrated that no rational trier of fact could have found the especially cruel aggravating factor to exist. *Jeffers*, 497 U.S. at 780. As the Arizona Supreme Court concluded, the record contains sufficient evidence that Joe consciously suffered both mental anguish and physical pain and that Andriano knew or should have known that he would suffer. *See Tucker*, 215 Ariz. at 321, 60 P.3d at 200; *Ellison*, 213 Ariz. at 142, 140 P.3d at 925.

First, Andriano watched Joe experience the effects of the poison—dizziness, nausea, weakness, and difficulty breathing—for some 45 minutes while leading him to believe that she had called 911 and that paramedics were on their way. *Andriano*, 215 Ariz. at 511, 161 P.3d at 554. From her research on the drug and the warnings that accompanied the shipment of the poison, Andriano knew or should have known that ingesting sodium azide would cause Joe to suffer physically and mentally as he experienced uncertainty about his fate. *Id.*

Andriano then struck Joe at least 23 times in the back of the head with a bar stool. Defensive wounds indicated that he was conscious for at least some of the attack. *Id.*

1   Andriano knew or should have known that beating her poisoned and terminally ill husband
2   with a bar stool while he lay on the floor would cause him physical pain and mental
3   anguish. *Id.*

4   Andriano argues that Joe might not have known he was being poisoned because the
5   effects he experienced from the sodium azide were similar to those of chemotherapy and
6   the cancer itself. (Doc. 17 at 138–39.) As noted, the Arizona Supreme Court rejected this
7   argument on state law grounds, finding that knowledge of the source of the suffering is not
8   required under (F)(6). *Andriano*, 215 Ariz. at 511, 161 P.3d at 554. "[I]t is not the province
9   of a federal habeas court to reexamine state-court determinations on state-law questions."
10  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see Babbitt*, 151 F.3d at 1178–79.

11  Andriano also challenges the Arizona Supreme Court's finding that Joe was
12  conscious during the beating. (Doc. 17 at 141.) She bases this argument on the medical
13  examiner's testimony that he could not be certain at what point Joe lost consciousness
14  while being attacked with the barstool. (*Id.*) However, for purposes of analysis under
15  *Jackson* and the AEDPA, a presumption of correctness attaches to the state court's factual
16  findings. *See Brown*, 558 U.S. at 133. Andriano has not rebutted that presumption. Viewed
17  in the light most favorable to the prosecution, Joe's defensive wounds and the medical
18  examiner's testimony that Joe "was certainly conscious" during some part of the attack
19  (RT 11/30/04 at 56–57), support the Arizona Supreme Court's conclusion that Joe was
20  conscious and experienced mental and physical suffering.

21  Finally, Andriano argues that the period of her husband's suffering was too brief to
22  result in a finding of extreme cruelty. Under Arizona law, however, "[n]o set period of
23  suffering is required" for cruelty to exist. *State v. Cropper*, 223 Ariz. 522, 526, 225 P.3d
24  579, 583 (2010). Moreover, the circumstances here, encompassing the entire murder
25  transaction, *see Ellison*, 213 Ariz. at 142, 140 P.3d at 925, demonstrate that Joe suffered
26  for a prolonged period—at least 45 minutes before Andriano eventually rendered him
27  unconscious with blows from the barstool.

28

A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that Joe suffered both physical and mental cruelty in satisfaction of the (F)(6) aggravating factor. Claim 12 is denied as meritless.

**CLAIM 13**

Andriano alleges that the trial court prevented the jury from considering mercy and residual doubt as mitigating circumstances in violation of her rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 17 at 143.) The Arizona Supreme Court rejected these arguments on direct appeal. *Andriano*, 215 Ariz. at 506–07, 161 P.3d at 549–50.

**A.    Mercy**

Andriano asked the trial court to include a list of 27 proposed mitigating factors in the preliminary penalty-phase jury instructions. (ROA Item 396.) She identified "mercy" as one of the factors. (*Id.* at 2.) The State objected, arguing that the proposed factor inappropriately appealed to "sympathy or bias." (RT 12/7/04 at 6.) Defense counsel countered that "mercy is synonymous with leniency." (*Id.*) The trial court issued the following ruling:

> With regard to the issue of mercy and witness statements pertaining [to] the appropriate sentence, with regard to this issue, it is ordered that no witness, whether called by the defense or by the State shall be asked about nor are they to offer any opinion regarding the appropriate sentence to be imposed in this case or make any request for a specific sentence in this case.
>
> Defense witnesses, however, may testify as to the loss or impact that will result from the defendant's execution.

(RT 12/8/04 at 6.) The court thereby did not include "mercy" on the mitigation list submitted to the jurors. (ROA 399 at 5–6; ROA 19 at 6–7.)

In its jury instructions, the court defined mitigation as circumstances "which, in fairness or mercy, may extenuate or reduce the degree of blame or moral culpability." (ROA 419 at 6.) The court further instructed jurors that they were not limited to the enumerated mitigating factors; that the weighing of aggravation and mitigation was not a "mere mechanical counting of factors"; that they were required to reach "a reasoned, moral

judgment about which penalty is justified and appropriate"; and that they were not to be influenced by "mere sentiment, passion or prejudice." (*Id.* at 8–9.)

On direct appeal, Andriano alleged that the trial court's refusal to allow her to present evidence of mercy violated her constitutional rights. The Arizona Supreme Court rejected the argument:

> Arizona Revised Statutes § 13–703(G) (Supp.2004) provides that mitigating circumstances are "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." The defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence. *Id.* § 13–703(C). The defendant cannot, however, prove "mercy" by any standard, nor does it relate to the character or propensities of the defendant or the circumstances of the crime. Therefore, mercy is not a mitigating circumstance.
>
> Mercy is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case. In this sense, "mercy" is simply another word for "compassion" or "leniency." A capital defendant is free to argue to the jury, as the defense did here, that mercy or leniency is appropriate based on the mitigation evidence presented.
>
> The instructions given in this case correctly conveyed the role of mercy in determining the appropriate sentence. The trial court did not err in refusing Andriano's request to include mercy among the enumerated mitigating circumstances for the jury's consideration.

*Andriano*, 215 Ariz. at 506–07, 161 P.3d at 549–50.

This decision was neither contrary to nor an unreasonable application of clearly established federal law.

The Arizona Supreme Court reasonably determined that the exclusion of "mercy" from Andriano's enumerated list of mitigating circumstances did not prevent her from arguing, and the jury from considering, the concept of mercy in determining her sentence. As noted, the jurors here were specifically instructed that mitigating circumstances are those that operate "in fairness or mercy" to warrant lenience. (ROA 419 at 6.) Because the jury was not precluded from considering mercy as a mitigating circumstance, there was no

1   violation under clearly established federal law of Andriano's right "to introduce any

2   relevant mitigating evidence regarding [her] character or record and any of the

3   circumstances of the offense." *California v. Brown*, 479 U.S. 538, 541 (1987).

4         Finally, any error in precluding this evidence was harmless under *Brecht*. The trial

5   court did not prohibit Andriano from arguing for mercy, but simply denied her request to

6   list it as a distinct mitigating circumstance. As the Arizona Supreme Court found, defense

7   counsel did in fact argue for mercy. *Andriano*, 215 Ariz. at 507, 161 P.3d at 550. In

8   addition, Andriano fails to indicate what evidence she would have presented to "prove"

9   mercy, a concept which the Arizona Supreme Court characterized as unprovable. *Id.* The

10  trial court's ruling with respect to mercy as a mitigating circumstance did not have "a

11  substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

12  U.S. at 637.

13  **B.    Residual doubt**

14        Before trial, the State moved to preclude Andriano from offering residual doubt as

15  mitigating circumstance. (ROA 144.) In response, Andriano notified the court that she did

16  not intend to present residual doubt as mitigation. (ROA 165.) The trial court granted the

17  State's motion, precluding Andriano "from presenting evidence or arguing residual doubt

18  in the penalty phase of the sentencing." (RT 7/30/04 at 5.)

19        Andriano subsequently asked the trial court to include residual doubt in a list of

20  mitigating circumstances submitted to the jury. (ROA 396 at 2.) Defense counsel asked the

21  court to include residual doubt on her mitigation list because it was "that space between

22  beyond a reasonable doubt and beyond all doubt" and was "an area we can go into in terms

23  of mitigation." (RT 12/7/04 at 5.) The court affirmed its previous ruling precluding

24  residual-doubt evidence and argument (RT 12/8/04 at 5–6) and omitted residual doubt from

25  the list of proposed mitigating circumstances given to the jury. (ROA 399 at 5–6; ROA 419

26  at 6–7.)

27        Andriano challenged the trial court's ruling on appeal, arguing that it restricted the

28  jurors' consideration of mitigation. The Arizona Supreme Court rejected the claim:

1
2
3
4
5
6
7
8
9
10
11

> Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation. In *Oregon v. Guzek*, the defendant argued that the Eighth and Fourteenth Amendments granted him a constitutional right to present new alibi evidence at his sentencing proceeding. 546 U.S. 517, ——, 126 S.Ct. 1226, 1230, 163 L.Ed.2d 1112 (2006). The Supreme Court, although not deciding whether such a right exists, held that its previous cases do not grant capital defendants a constitutional right to present evidence of residual doubt at sentencing. *Id.* at ——, 126 S.Ct. at 1231–32. We thus noted in *State v. Ellison* that "there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of 'residual doubt.'" 213 Ariz. 116, 136, ¶ 82, 140 P.3d 899, 919 (citing *Guzek*, 546 U.S. at ——, 126 S.Ct. at 1230–32), *cert. denied,* —— U.S. ——, 127 S.Ct. 506, 166 L.Ed.2d 377 (2006). The trial court did not err in denying Andriano's request to present residual doubt evidence in mitigation.

12    *Andriano*, 215 Ariz. at 506–07, 161 P.3d at 549–50.

13
14    This decision was neither contrary to nor an unreasonable application of clearly established federal law.

15
16    "[T]he United States Supreme Court has expressly rejected the assertion that a capital defendant has a federal constitutional right to produce evidence of residual doubt at

17    sentencing." *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1021 (D. Ariz. 2007) (citing *Guzek*,

18    546 U.S. at 523–25); *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 250–51 (2007) ("[W]e

19    have never held that capital defendants have an Eighth Amendment right to present

20    'residual doubt' evidence at sentencing."); *Franklin*, 487 U.S. at 174 (suggesting there is

21    no constitutional right to present evidence of "residual doubt" because "[s]uch lingering

22    doubts are not over any aspect of petitioner's 'character,' 'record,' or a 'circumstance of

23    the offense'"); *see also Holland v. Anderson*, 583 F.3d 267, 283 (5th Cir. 2009) (explaining

24    that the Supreme Court "has not recognized a constitutional right to argue 'residual doubt'

25    at sentencing," so the state court's decision precluding such evidence was neither contrary

26    to nor an unreasonable application of clearly established federal law).

27    The reasoning in *Guzek* applies to Andriano's residual-doubt argument. In *Guzek*,

28    the Supreme Court noted that "sentencing traditionally concerns how, not whether, a

defendant committed the crime." 546 U.S. at 526. In *Guzek*, the defendant had been found guilty and sentenced to death. *Id.* at 519. The Oregon Supreme Court reversed the death sentence. *Id.* at 519–20. At the penalty-phase retrial, the defendant sought to introduce alibi evidence that he had not presented during the guilt phase. *Id.* at 520. The Supreme Court held that the defendant did not have a constitutional right to introduce evidence at the new penalty phase because, in part, "that evidence [wa]s inconsistent with Guzek's prior conviction. It shed[ ] no light on the manner in which he committed the crime for which he has been convicted." *Id.* at 523. The Court noted that "the parties previously litigated the issue to which the evidence is relevant—whether the defendant committed the basic crime. The evidence thereby attacks a previously determined matter in a proceeding at which, in principle, that matter is not at issue. The law typically discourages collateral attacks of this kind." *Id.* at 526.

Andriano's residual-doubt argument did not concern how she killed Joe but whether she killed him in a manner that constituted first-degree murder, an issue that had already been decided by the jury's guilty verdict. *Id.* Again, this type of evidence is irrelevant to the sentencing determination. *See United States v. Gabrion*, 719 F.3d 511, 525 (6th Cir. 2013) ("We are . . . doubtful that a (by-definition) unreasonable doubt regarding an issue litigated during the guilt phase of the trial can be part of 'a reasoned moral response to the defendant's background, character, and crime.'") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Finally, the Court finds that any error in excluding Andriano's residual-doubt evidence was harmless under *Brecht*. Andriano offers no indication of what evidence she was prevented from offering that would have supported a residual-doubt mitigating circumstance. Andriano testified at trial. The jury rejected her version of events and found her guilty of premeditated first-degree murder. The exclusion of unspecified residual-doubt evidence at sentencing did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

**C.     Conclusion**

The Arizona Supreme Court's denial of these claims was neither contrary to nor an unreasonable application of clearly established federal law. *See Richter*, 562 U.S. at 98. Claim 13 is denied as meritless.

**CLAIM 14**

Andriano alleges that the trial court improperly instructed the jury at the penalty phase that it could only consider mitigating circumstances that were found to exist unanimously, in violation of her Sixth, Eighth, and Fourteenth Amendment rights. (Doc. 17 at 147.)

**A.   Background**

At issue is the following instruction, provided by the court in the penalty phase of trial:

> Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death. If you unanimously find that mitigation exists and it is sufficiently substantial to call for leniency, you must return a verdict of life. If, after considering all of the aggravating and mitigating evidence, you have a doubt whether a death sentence should be imposed, then you should resolve that doubt in favor of a life sentence.

(ROA 419 at 10; RT 2/16/04 at 49.)

On direct appeal, the Arizona Supreme Court rejected Andriano's claim that that "this instruction improperly required the jury to unanimously find particular mitigating circumstances before each juror could individually consider whether that mitigation was sufficiently substantial to call for leniency." *Andriano*, 215 Ariz. at 507, 161 P.3d at 550. The court explained:

> Each juror in a death penalty case must individually determine whether any mitigating circumstances exist. A.R.S. § 13-703(C); *see Baldwin*, 211 Ariz. at 472, ¶ 13, 123 P.3d at 666; *see also Ellison*, 213 Ariz. at 139, ¶ 102, 140 P.3d at 922 (discussing Supreme Court cases holding that capital sentencing statutes may not require unanimity as to mitigating circumstances). Then, in

- 107 -

light of the aggravating circumstances the jury has already found to exist, each juror must individually determine whether the mitigation that juror has found to exist is sufficiently substantial to call for leniency. *See* A.R.S. § 13-703(C), (E); *Baldwin*, 211 Ariz. at 473, ¶ 18, 123 P.3d at 667.

Read as a whole, the instructions given here correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency. The court repeatedly advised them during the penalty phase that each juror was required to "individually" determine the existence of mitigating circumstances. [] We therefore conclude that the trial court's instruction, considered in light of the other instructions, adequately informed the jury and does not require reversal.

*Id.* at 507–08, 161 P.3d at 550–51 (footnote omitted). The court noted that additional instructions provided by the trial court supported its determination that the instruction at issue did not contain an improper unanimity requirement. For example, before being given the instruction to which Andriano objects, the jurors had been instructed as follows:

Although a final decision on a penalty of death or life imprisonment must be unanimous, *the determination of what circumstances are mitigation is for each one of you to resolve, individually*, based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.

(ROA 419 at 6; RT 12/16/04 at 45) (emphasis added). The jurors were also instructed:

You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase. To do this, *you must individually determine the nature and extent of mitigating circumstances*. Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.

(ROA 419 at 8–9; RT 12/16/04 at 47) (emphasis added).

In addition, at the outset of the penalty phase, the jury was advised that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may consider any mitigating circumstance found by that juror in determining

the appropriate penalty." (RT 12/8/04 at 27.) The jury was further instructed to "individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death." (*Id.*)

Finally, defense counsel in their penalty-phase closing argument "correctly advised the jurors regarding their responsibilities." *Andriano*, 215 Ariz. at 508 n.6, 161 P.3d at 551. They informed the jury: "[t]o clarify once again, individually determine the nature and extent of the mitigating circumstances. Not as a group, individually. What is it to me, as one juror. What is my moral position on that circumstance." (RT 12/16/04 at 40.)

**B.    Analysis**

The clearly established federal law governing this claim includes *Mills v. Maryland*, 486 U.S. 367 (1988). The Court in *Mills* found a state court's jury instructions and verdict forms unconstitutional because they suggested that the jurors could not find a circumstance mitigating unless they found it proven unanimously. *Id.* at 380–81; *see also McKoy v. North Carolina*, 494 U.S. 433, 435 (1990) (applying *Mills* to invalidate state law preventing jury from considering any mitigating factor not found unanimously).

In *Smith v. Spisak*, 558 U.S. 139, 144 (2010), the Court explained that the rule set out in *Mills* "is based on two well-established principles." First, the death penalty cannot be imposed if the sentencer is "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* (quoting *Mills*, 486 U.S. at 374 (additional quotation marks omitted). Second, the sentencer "may not refuse to consider or be precluded from considering any relevant mitigating evidence." (*Id.*) (quoting *Mills*, 486 U.S. at 374–375) (additional quotation marks omitted).

Andriano alleges that the Arizona Supreme Court's decision unreasonably determined the facts and was contrary to, or an unreasonable application of, *Mills* and *McKoy*. (Doc. 17 at 147–51.) The Court disagrees.

The Arizona Supreme Court reasonably determined that the instructions provided by the trial court, when viewed in their entirety, did not impose a unanimity requirement

in violation of *Mills* and *McKoy*. First, the instruction itself did not explicitly impose such a requirement as to each mitigating circumstance. Moreover, as the Arizona Supreme Court correctly noted, the trial court "repeatedly advised [jurors] during the penalty phase that each juror was required to 'individually' determine the existence of mitigating circumstances." *Andriano*, 215 Ariz. at 508, 161 P.3d at 551. In addition, the jury was preliminarily instructed that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist." *Id.* at 508 n.6, 161 P.3d at 551 n.6. These circumstances contrast sharply with the instructions offered in *Mills* and *McKoy*.

In *Mills*, the Supreme Court overturned a Maryland death sentence where the jury had received a verdict form which contained a list of possible mitigating circumstances, accompanied by spaces in which the jury could check "yes" or "no" and preceded by a statement that the jury "unanimously find[s] that each of the following mitigating circumstances which is marked 'yes' has been proven to exist." 486 U.S. at 384–89. The verdict form in *Mills* further asked the jury to affirm or deny that it unanimously found that the mitigating circumstances marked "yes" outweighed the aggravating circumstances, and the trial court's instruction to the jury in that case emphasized the unanimity requirement. *Id.* The Supreme Court determined that these instructions and the verdict form violated the constitution because the jury could have interpreted them as precluding, through the requirement of unanimity with respect to a particular circumstance, the consideration of all possible mitigating evidence. *Id.* at 380.

In *McKoy*, the Court applied *Mills* to overturn a North Carolina death sentence where the sentencing jury received an instruction that expressly prevented the jury from considering any mitigating factor that it did not "unanimously" find to exist. The Court held that the instruction violated the Eighth Amendment because it impermissibly limited the jurors' consideration of mitigating evidence. *McKoy*, 494 U.S. at 442–44.

Andriano argues that a reasonable juror could have read the instructions in her case as demanding unanimity with respect to the finding of a mitigating circumstance. (Doc. 17 at 149–50.) She offers several scenarios under which the jurors could have been confused

by the instructions, including uncertainty about when unanimity was required with respect to mitigation and when it was not. (*See* Doc. 17 at 149–51.) These scenarios are unpersuasive given the totality of the penalty-phase instructions provided by the trial court, which repeatedly emphasized that it was up to the individual juror to determine whether a particular mitigating circumstance existed and that unanimity was not required. The instruction that followed—"If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist"—is plainly read as requiring unanimity only insofar as each juror in his or her individual determination found that any mitigating circumstance existed.

Taken as a whole, the instructions provided in Andriano's case did not, by demanding juror unanimity with respect to the finding of a mitigating circumstance, prohibit the jury from "considering any relevant mitigating evidence." *Spisak*, 558 U.S. at 144; *id.* at 148 (finding no violation of *Mills* and *McKoy* where "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously").

Andriano has not met her burden of showing "there was no reasonable basis" for the Arizona Supreme Court to deny this claim. *Richter*, 562 U.S. at 98. Accordingly, Claim 14 is denied.

**CLAIM 16**

Andriano alleges that the instructions defining cruelty were vague and overbroad, in violation of her rights under the Sixth, Eighth, and Fourteenth Amendments. (Doc. 17 at 155.) She argues that the instructions did not inform the jury about what qualified as the "norm of first degree murders" and did not define "mental anguish" by including the phase "uncertainty about his ultimate fate." (*Id.* at 156, 158.)

**A.    Background**

The trial court provided the following instruction with respect to the (F)(6) cruelty aggravating factor:

1
2
3
4

> All first degree murders are to some extent heinous, cruel or depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders.
>
> . . . .

5
6
7
8
9

> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

10

(RT 12/1/04 at 91–92; ROA 383 at 10.) [39]

11
12
13
14

On direct appeal, the Arizona Supreme Court rejected Andriano's argument that the "instruction was insufficient to guide the jury and channel its discretion in applying the aggravator." *Andriano*, 215 Ariz. at 505, 161 P.3d at 548. The court reviewed the instruction for fundamental error. In denying the claim, the court explained:

15
16
17
18
19
20
21
22

> The instruction given paraphrases this Court's statement in *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997), that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." (Internal citation omitted.) We recently reaffirmed that the *Trostle* definition of "cruelty" sufficiently narrows and gives substance to the (F)(6) "especially cruel" aggravating factor to save it from constitutional infirmity. *Anderson II*, 210 Ariz. at 352 & n. 18, ¶109, 111 P.3d at 394 & n. 18. We similarly conclude here that the trial court's instruction gave sufficient substance and specificity to the term "cruelty" to channel the jury's discretion and correct any unconstitutional vagueness.
>
> . . . .

23
24
25
26

> The trial court instructed the jury that the (F)(6) aggravating circumstance "cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders." Andriano claims that this instruction required the jury to engage in proportionality review, which was improper in

27
28

---

[39] The jury found the cruelty prong of (F)(6) was proved but not the heinous or depraved prongs.

light of *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992), and *State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991). . . .

We have held that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" *State v. Carlson*, 202 Ariz. 570, 582, ¶45, 48 P.3d 1180, 1192 (2002) (quoting *State v. Hoskins*, 199 Ariz. 127, 163, ¶169, 14 P.3d 997, 1033 (2000)). Such an instruction does not require the jury to engage in proportionality review. Instead, the jurors must assess whether the murder was so cruel that it rose above the norm of first degree murders. To assist them in this inquiry, the judge instructed the jurors on the definition of "cruelty," explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders." Considering the instructions as a whole, the jury was properly instructed to apply the definition of "cruelty," rather than to engage in proportionality review. The trial court did not err, fundamentally or otherwise, in giving the instruction.

*Id.* at 505–06, 161 P.3d at 548–49 (footnote omitted).

**B.    Analysis**

This decision was neither contrary to nor an unreasonable application of clearly established federal law. First, rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the (F)(6) factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 652–56. In *Walton*, the Supreme Court held that the "especially heinous, cruel or depraved" aggravating circumstance was facially vague but the vagueness was remedied by the Arizona Supreme Court's clarification of the factor's meaning. 497 U.S. at 654; *see also Smith v. Ryan*, 823 F.3d 1270, 1294–95 (9th Cir. 2016); *Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016 WL 1045355, at *45 (D. Ariz. Mar. 16, 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019) ("There is no clearly established federal law holding that jury instructions based on the Arizona Supreme Court's narrowing construction are inadequate.").

Andriano cites no authority for the proposition that additional jury instructions on the definitions of "norm of first degree murders" and "mental anguish" are necessary to

1    narrow the cruelty factor. The instruction provided in Andriano's case contained the two

2    "essential narrowing factors" of cruelty: that the victim consciously experienced mental or

3    physical pain and that the defendant knew or should have known the victim would suffer.

4    *Tucker*, 215 Ariz. at 310, 160 P.3d at 189–90.

5         The Arizona Supreme Court reasonably determined that the phrase "above the norm

6    of first degree murders" was appropriately narrowed by the definition of "especially cruel,"

7    which directly followed it in the instructions. *Andriano*, 215 Ariz. at 596, 161 P.3d at 549.

8         Andriano argues that the term "mental anguish" is properly narrowed under *Walton*,

9    497 U.S. at 654, only when it is further defined to include the "victim's uncertainty about

10   his ultimate fate." (Doc. 17 at 158.) This argument is unconvincing.

11        Under *Walton*, "mental anguish" itself is the phrase that properly narrows the (F)(6)

12   factor. *See Kennedy v. Louisiana*, 554 U.S. 407, 440 (2008) (noting that the Court has

13   upheld the constitutionality of aggravating factors including Arizona's "'the perpetrator

14   inflict[ed] mental anguish or physical abuse before the victim's death.'") (quoting *Walton*,

15   497 U.S. at 654) (alteration in original). The Arizona Supreme Court has approved

16   instructions that did not include the "uncertainty about his fate" language. *See Tucker*, 215

17   Ariz. at 310–11, 160 P.3d at 189–90 ("We have approved 'especially cruel'

18   narrowing instructions that required the jury to find that the victim was conscious during

19   the mental anguish or physical pain and also that the defendant knew or should have known

20   that the victim would suffer. . . .  Tucker's instructions contained these essential narrowing

21   factors.") (citations omitted); *see State v. Champagne*, 247 Ariz. 116, 140, 447 P.3d 297,

22   321 (2019) (noting the "two essential narrowing factors" of cruelty under (F)(6): "the

23   victim was conscious during the mental anguish or physical pain" and "the defendant knew

24   or should have known that the victim would suffer"). The trial court's instruction was not

25   erroneous.[40]

26   _____

27   [40] As use of the word "including" suggests, the phrase "including a victim's uncertainty as to his ultimate fate" does not narrow "mental anguish," nor is it a requirement for mental anguish to be proved. The phrase does not define "mental anguish,"

28   but simply gives one example of it. *See State v. Djerf*, 191 Ariz. 583, 595, 959 P.2d 1274, 1286 (1998) ("Mental anguish includes uncertainty as to one's ultimate fate. . . .  It may

Finally, as Respondents argue, even if the trial court's instruction did not appropriately narrow "mental anguish," any error was cured by the Arizona Supreme Court's independent review of the cruelty aggravating factor. The court found that mental anguish in the form of Joe's significant uncertainty about his ultimate fate was proved. *Andriano*, 215 Ariz. at 510–11, 161 P.3d at 553–54.

In any event, the (F)(6) factor was satisfied by the physical pain Joe suffered, irrespective of whether mental anguish was also proved. *See Andriano*, 215 Ariz. at 511, 161 P.3d at 554 ("We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.").

Claim 16 is denied.

**CLAIM 19**

Andriano alleges that she received ineffective assistance of counsel during the guilt phase of her trial in violation of her rights under the Sixth and Fourteenth Amendments. (Doc. 17 at 167.) The claim consists of subclaims (A) through (F). The Court previously dismissed Claim 19(A) as procedurally defaulted and barred from federal review. (Doc. 68 at 30.) The Court addresses Claims 19(B) through 19(F) as follows.

**A.   Mental health evidence**

In Claim 19(B), Andriano alleges that counsel performed ineffectively by failing to investigate and present expert testimony regarding her mental-health history during the guilt phase of her trial. (Doc. 17 at 175.) According to Andriano, "counsel failed to coordinate an explanation for the circumstances surrounding the offense and consequently missed a critical opportunity to present the jury with evidence that Andriano lacked the requisite mental state to support a first degree murder conviction." (*Id.* at 177.)

Andriano raised a similar claim in her PCR petition, alleging that trial counsel were ineffective for failing to retain an expert "to evaluate [Andriano's] mental state at the time

---

also include knowledge that a loved one has been killed.") (citations omitted). Fear and a victim's *certainty* about his fate are also forms of "mental anguish." *State v. Walton*, 159 Ariz. 571, 587, 769 P.2d 1017, 1033 (1989). Because mental anguish encompasses more than just a victim's uncertainty about his fate, including that phrase is not necessary to narrow the cruelty factor.

of the crime" and present "expert testimony [that] would have called into question whether Andriano had the requisite mental state for premeditated murder." (PCR pet., Doc. 28-1, Ex. OOOOO at 59–60.) The PCR court rejected the claim:

> Concerning the mental illness evidence, the defendant argues that this evidence would have established "whether she formulated the mental state necessary to be convicted of first-degree murder." However, because she did not raise an insanity defense, evidence of mental illness was inadmissible to negate the *mens rea* element of the charge. *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997). Thus, counsel was not ineffective for failing to seek admission of evidence precluded by Arizona law.

(ME 10/30/12 at 5.) (citation omitted).

The PCR court's decision does not entitle Andriano to relief. As that court correctly found, under Arizona law evidence of mental illness short of insanity is inadmissible to negate the mens rea of an offense. *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997) ("Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the mens rea element of a crime."); *see also Clark v. Arizona*, 548 U.S. 735, 756 (2006). Because the proposed evidence would not have been admissible, counsel's failure to offer it did not constitute deficient performance, nor was it prejudicial. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining that failing to take a futile action cannot constitute deficient performance); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).

Andriano now asserts that the evidence counsel should have presented would have been admissible under *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981). (Doc. 17 at 180.) *Christensen* permits expert testimony regarding "a character trait of acting reflexively in response to stress" for the sole purpose of rebutting the premeditation element of first-degree murder. *Mott*, 187 Ariz. at 543, 931 P.2d at 1054 (citing *Christensen*, 129 Ariz. at 34–36, 628 P.2d at 582–84).

As Respondents note, Andriano did not claim in her PCR petition that counsel should have presented expert testimony of the type that would have been admissible under *Christensen.* (Doc. 22 at 18.) Therefore, they argue, this aspect of Claim 19(B) is

1    procedurally defaulted. (*Id.*) Andriano does not attempt to excuse its default. (*See* Doc. 42

2    at 129–30.) Regardless of its procedural status, however, the Court finds this aspect of the

3    claim is meritless.

4            Under *Christensen*, an expert cannot testify as to whether the defendant was acting

5    impulsively at the time of the offense. *Christensen*, 129 Ariz. at 35–36, 628 P.2d at 583–

6    84. *Christensen* also does not permit evidence of a mental disease or defect as a foundation

7    for demonstrating an impulsive character trait. *Mott*, 187 Ariz. at 541, 931 P.2d at 1051.

8    Given these limitations and the facts of the case, testimony that Andriano had a character

9    trait of impulsivity would have been of little benefit. The evidence of premeditation was

10   strong. Rebutting premeditation with evidence of a reflexive personality trait would have

11   been a daunting task given the evidence of Andriano's calculating behavior in planning

12   Joe's murder, obtaining the sodium azide, altering the crime scene after she had killed Joe,

13   and asking a coworker to hide incriminating evidence. *See Wong*, 558 U.S. at 24–25

14   (explaining that the "cold, calculated nature" of the murder would have been "powerful

15   counterpoint" to evidence of petitioner's "instability" and "impulsivity"). Other evidence

16   would have shown Andriano behaving with calculation and deception, as opposed to

17   impulsivity, including her embezzlement of funds from an employer and the fraudulent

18   check scheme she participated in while incarcerated. Under these circumstances, Andriano

19   was not prejudiced by counsel's failure to present expert testimony pursuant to

20   *Christensen*.

21           Andriano has not met her burden under *Strickland* of showing that trial counsel

22   performed ineffectively by failing to present expert testimony about her state of mind at

23   the time of the murder or about a character trait of impulsivity. Claim 19(B) is denied.

24   **B.    Evidence of Joe's depression**

25           In Claim 19(C), Andriano alleges that trial counsel performed ineffectively by

26   failing to introduce evidence that Joe was severely depressed in the period leading up to

27   his death. (Doc. 17 at 181.) Specifically, Andriano claims that trial counsel failed to present

28   testimony from two witnesses who could have corroborated her testimony that Joe was

1    suicidal: Jeffrey Miller, the attorney who represented the Andrianos in a medical

2    malpractice lawsuit against Joe's doctors, and Joe's friend Chris Weaver. (Doc. 17 at 181–

3    85.)

4          Miller testified for the State in the guilt phase of trial. During cross-examination,

5    defense counsel attempted to establish that Miller knew Joe was suicidal. The trial court

6    sustained the State's hearsay objection. (RT 9/29/04 at 89–91.)

7          Miller later submitted a declaration in support of Andriano's PCR petition, attesting

8    that in the months prior to Joe's death, Andriano contacted him to report that Joe was

9    becoming more depressed and had recently expressed a desire to end his life. (PCR pet.,

10   Ex. 19, ¶ 4; P-App. 2601.) Miller stated that he contacted Joe about these concerns. Joe

11   "acknowledged" them and "did not deny" their accuracy, but informed Miller that he

12   understood that his non-cancer-related death would terminate the malpractice lawsuit and

13   told Miller "not to worry." (*Id.* at ¶ 5; P-App. 2601.)

14         Weaver did not testify at trial, but in an interview with trial counsel he stated that

15   Joe never discussed suicide but instead "always acted like he wasn't gonna die" and

16   remained "in super spirits." (PCR pet., Ex. 58 at 9; P-App. 3361.) Weaver also claimed

17   that approximately two months before the murder, Joe had called him, informed him that

18   he and Andriano were composing a will, and asked Weaver to take care of his family after

19   he died. (*Id.* at 16–18; P-App. 3368–69.) Joe thought "he'd better make [a will] so that he

20   would have one when he did die." (*Id.*) As Respondents note, Weaver also recalled some

21   damaging information: that he had frequently seen Andriano out at bars, that Joe believed

22   she had a boyfriend, and that Andriano had called him in late August or early September

23   2000 and told him that Joe's cancer was spreading and that he had approximately one

24   month to live. (*Id.* at 5–6, 8–9; P-App. 3358–58, 3360–61.) Andriano "didn't really seem

25   upset about" that news. (*Id.* at 6; P-App. 3358.)

26         In addition, in a declaration prepared for the PCR proceedings, Weaver stated that

27   Joe, in the last several months of his life, "had accepted the fact that he was dying" and

28   gave the impression that he "knew he was dying and it didn't really matter to him

anymore." (PCR pet., Ex. 37, ¶ 4; P-App. 3019.) Weaver also noted that in the year before his death Joe became aware that Andriano was having an affair with a man at their apartment complex. (*Id.*, ¶ 3; P-App. 3019.)

The PCR court rejected Andriano's claims challenging counsel's performance with respect to the Miller and Weaver testimony. (ME 10/30/12.) The court found that "Jeffrey Miller's testimony about Joe's depression was excluded because it was inadmissible hearsay" and that "Chris Weaver's purported testimony does not establish that Joe was depressed." (*Id.* at 5.)

The court then explained:

> Decisions concerning trial strategy and tactics, including what witnesses to call, motions to file, and objections to make, are entrusted to trial counsel. *State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984). The court finds that the defendant has failed to show a colorable claim of deficient performance or prejudice regarding these trial strategies.

(*Id.*)

The PCR court's rulings were neither contrary to nor an unreasonable application of clearly established federal law. First, the court reasonably concluded that the testimony Andriano sought to elicit from Miller was inadmissible hearsay. That determination is a matter of state law which does not implicate Andriano's federal habeas rights. *See Estelle*, 502 U.S. at 67–68. Moreover, counsel did in fact attempt to introduce the testimony, but the trial court ruled it inadmissible. (RT 9/29/04 at 89–91.) Because the testimony was inadmissible under Arizona law, and because counsel nonetheless attempted to admit it, Andriano cannot show deficient performance or prejudice. *See Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27.

Next, with respect to Weaver's proposed testimony, the PCR court reasonably found that Weaver's account of Joe's statements did not establish that Joe was depressed or suicidal, but rather that he was in good spirits or had accepted his diagnosis. Moreover, as Respondents note, reasonable counsel could have elected not to call Weaver because he would have been cross-examined about Andriano's extramarital affairs and other

1   prejudicial information. Finally, as with Miller's testimony, Weaver's account does not

2   negate Andriano's actions in procuring sodium azide, attempting to obtain a life insurance

3   policy, and bludgeoning and stabbing Joe. There is no reasonable probability that the

4   omitted testimony would have affected the verdict. Counsel was not ineffective for failing

5   to present Weaver's testimony at trial.

6        Andriano has not met her burden of showing "there was no reasonable basis for the

7   state court to deny relief." *Richter*, 562 U.S. at 98; *see Mirzayance*, 556 U.S. at 123. Claim

8   19(C) is denied.

9   **C.**    **Life insurance evidence**

10        In Claim 19(D), Andriano alleges that trial counsel performed ineffectively by

11   failing to identify corroborating evidence that Joe knew Andriano was trying to obtain a

12   life insurance policy. (Doc. 17 at 185.)

13        At trial, Andriano testified that Joe was aware of her efforts to obtain a life insurance

14   policy on him, and that she had stopped seeking a policy when Alejo Ochoa advised her it

15   was illegal. (RT 10/27/04 at 32–46.) In her PCR petition, Andriano alleged that counsel

16   should have presented testimony from Gia Palicki, the Andriano children's babysitter, to

17   corroborate this information. (PCR pet., Doc. 28-1, Ex. OOOOO at 37.) In a declaration in

18   support of the petition, Palicki described the Andrianos' desire to obtain life insurance:

19       I know that Joe was trying to obtain a life insurance policy. Both [Andriano]

20       and Joe talked to me about it. That was really soon after we met, because
        they told me about looking for life insurance and about a malpractice lawsuit

21       when they first told me that Joe was sick with cancer. One of Joe's biggest
        concerns was that he might die before he obtained life insurance or the

22       malpractice suit went through. He wanted all of that taken care of before he

23       passed. Joe and [Andriano] were trying to get a life insurance policy and they
        told me they were running into difficulties because of Joe's cancer. . . .

24

25   (PCR pet., Ex. 31, ¶ 8; P-App. 2946.)

26        The PCR court found that Andriano failed to state a colorable claim of ineffective

27   assistance. (ME 10/30/12 at 5.) The court explained that "Gia Palicki's purported testimony

28   relates to a conversation she had with [Andriano] and Joe in the summer or fall of 1999

1    and therefore was remote in time to the murder and would not have rebutted the defendant's
2    later attempts to obtain life insurance for Joe without his knowledge." (*Id.*)

3         This decision was neither contrary to nor an unreasonable application of clearly
4    established federal law, nor was it based on an unreasonable determination of the facts.

5         Palicki's conversation with Joe about life insurance occurred shortly after she met
6    Joe, in the summer or fall of 1999. By contrast, Andriano made her clandestine attempts to
7    obtain life insurance approximately a year later, "during August and September of 2000."
8    *Andriano*, 215 Ariz. at 502, 161 P.3d at 545. During this process she claimed that Joe did
9    not have cancer. *Id.* When an insurance agent contacted Joe in September 2000 in response
10   to one of Andriano's inquiries, Joe stated he was not interested in applying. *Id.* Three days
11   later, Andriano emailed the agent asking him to reinstate Joe's application and to contact
12   her with all future inquiries. *Id.* She also asked two friends to pose as Joe and take the
13   requisite physical exam in order to conceal Joe's illness. *Id.*

14        Based on these circumstances, there is not a reasonable probability that Palicki's
15   testimony would have changed the verdict. Andriano therefore cannot show prejudice from
16   counsel's failure to present such evidence. The PCR court reasonably concluded that
17   Andriano failed to carry her burden under *Strickland*.

18        Andriano has not met her burden of showing "there was no reasonable basis for the
19   state court to deny relief." *Richter*, 562 U.S. at 98; *see Mirzayance*, 556 U.S. at 123. Claim
20   19(D) is denied.

21   **D.    Limiting instruction**

22        In Claim 19(E), Andriano alleges that trial counsel performed ineffectively by
23   failing to request a limiting instruction on the proper use of evidence of Andriano's
24   extramarital relationships and attempts to obtain life insurance. (Doc. 17 at 190.) Andriano
25   did not raise this claim in state court. She contends that its default is excused under
26   *Martinez*, 566 U.S. 1, by the ineffective assistance of PCR counsel. (*Id.*) The Court
27   disagrees.

28

To excuse the claim's default, Andriano must first show cause, which requires her to demonstrate that PCR counsel's performance in failing to raise the underlying claim was ineffective under *Strickland*—a showing that "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Ramirez*, 937 F.3d at 1241. Andriano cannot show that she was prejudiced by PCR counsel's failure to raise the underlying ineffectiveness claim, and therefore cannot demonstrate cause, because the argument that trial counsel performed ineffectively here is weak. Assuming trial counsel had moved for a limiting instruction and it had been granted, there was no reasonable probability of a different verdict given the strength of the evidence against Andriano. Because the underlying ineffective assistance of trial counsel claim was weak, there was no probability of a different result during the PCR proceedings if PCR counsel had raised it. *See Clabourne*, 745 F.3d at 377.

Andriano cannot show cause for the default of Claim 19(E). The claim remains procedurally defaulted and barred from federal review. Alternatively, the Court finds the claim meritless because Andriano cannot show she was prejudiced by trial counsel's failure to request a limiting instruction. *See Musladin v. Lamarque*, 555 F.3d 830, 847–48 (9th Cir. 2009) (counsel's failure to request a limiting instruction was deficient but not prejudicial given the strong evidence of premeditation).

Claim 19(E) is denied.

## E.     Lesser-included offense jury instructions

In Claim 19(F), Andriano alleges that trial counsel performed ineffectively by failing to seek a jury instruction on the lesser included offenses of second-degree murder and manslaughter. (Doc. 17 at 193.)

Counsel did not request lesser-included-offense instructions. As already noted, the Arizona Supreme Court held on direct appeal that the evidence did not support such instructions. *Andriano*, 215 Ariz. at 504, 161 P.3d at 547. Nonetheless, in her PCR petition, Andriano claimed that counsel performed ineffectively by failing to request the instructions.

1    The PCR court rejected the claim:

2    As to the alleged failure to seek a jury instruction on lesser-included offenses,
3    the defendant raised this issue on appeal and the Supreme Court held that the
     evidence did not support any lesser-included offenses. Therefore, defense
4    counsel was not ineffective for failing to request such instructions.

5    (ME 10/30/12 at 5) (citation omitted).

6    This decision was neither contrary to nor an unreasonable application of clearly

7    established federal law. Because the Arizona Supreme Court determined that Andriano was

8    not entitled to lesser-included-offense instructions, counsel's failure to request the

9    instructions was neither deficient nor prejudicial. *See Rupe*, 93 F.3d at 1445. Claim 19(F)

10   is denied.

11   **F.    Conclusion**

12   For the reasons set forth above, Claims 19(B) through 19(F) are denied. The PCR

13   court did not unreasonably apply *Strickland* in denying the claims. Even assuming that

14   counsel's performance was deficient, given the overwhelming evidence of her guilt

15   Andriano cannot show there was a reasonable probability of a different verdict if counsel

16   had performed competently.

17

18   **CLAIM 20**

19   Andriano alleges that counsel performed ineffectively during the aggravation phase

20   of her trial in violation of her Sixth and Fourteenth Amendment rights. (Doc. 17 at 197.)

21   This claim consists of four subclaims, two of which Andriano raised in state court, Claims

22   20(A) and (C). She did not raise Claims 20(B) and 20(D). She argues that their default is

23   excused under *Martinez*, 566 U.S. 1, by the ineffective assistance of PCR counsel.

24   **A.    Sodium azide evidence**

25   In Claim 20(A), Andriano alleges that counsel's failure to object to the jury's

26   consideration of evidence related to the sodium azide poisoning constituted ineffective

27   assistance of counsel. (Doc. 17 at 198.) She argues that the sodium azide evidence was not

28   relevant because Joe died of blunt force injuries and stabbing wounds, not poisoning. (*Id.*

at 199.) She also argues that the evidence showed that she did not believe the sodium azide would cause Joe to suffer and that Joe would have thought that any symptoms he experienced were the result of his chemotherapy or cancer. (*Id.*)

At the aggravation stage of trial, the State presented evidence from a police detective and the medical examiner. (RT 11/30/04 at 40–74.) The testimony was offered in support of the especially cruel aggravating factor under § 13–751(F)(6). As discussed above, to support a finding of cruelty, the prosecution must establish beyond a reasonable doubt that the victim consciously suffered physical pain or mental anguish and that the defendant knew or should have known that the victim would suffer. The testimony offered by the State was intended to establish that Joe was conscious for a period of time while Andriano struck him with the bar stool, as evidenced by defensive wounds on his hands. (*Id.* at 53– 58.) The State otherwise relied on the evidence presented at trial and argued that the jurors should find the murder especially cruel based on the following circumstances: Andriano administered the sodium azide to Joe, leaving him weak and sick; she gave Joe "false hope" by pretending to call the paramedics, while preventing Chris and the paramedics from entering the apartment; and she bludgeoned Joe repeatedly while he was still conscious. (*Id.* at 18–31.)

The jurors unanimously found that the (F)(6) cruelty factor was proven. (ROA 393.) On direct appeal, the Arizona Supreme Court independently found that cruelty was proven beyond a reasonable doubt, relying on evidence that Joe suffered physically and mentally from the effects of sodium azide and the blows from the bar stool. *Andriano*, 215 Ariz. at 511, 161 P.3d at 554.

In her PCR petition, Andriano alleged that counsel should have moved to preclude the jurors from considering the effects of sodium azide in determining whether the especially cruel aggravating factor was established. (PCR pet., Doc. 28-1, Ex. OOOOO at 56–59.) She asserted that the State had failed to prove conclusively how Joe came to ingest the sodium azide and failed to rebut her argument that he had voluntarily consumed the poisoned capsules. (*Id.*) The PCR court rejected this claim:

1
2
3
4
5
6

> [T]rial counsel was not ineffective for failing to seek an order precluding the jury from considering Joe's ingestion of sodium azide in determining whether cruelty was established. The defendant did not contest the admissibility of this evidence in the guilt phase because it played a key role in her self-defense theory. Pursuant to A.R.S. § 13–752(I), any evidence admitted in the guilt phase is deemed admitted as evidence in the aggravation phase. Thus, counsel could not allow evidence to be admitted in the guilt phase without objection and subsequently seek its preclusion in the aggravation phase.

7

(ME 10/30/12 at 4–5.)

8
9

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

10
11
12
13
14
15

As the PCR court explained, under Arizona law any evidence admitted in the guilt phase is deemed admitted in the aggravation phase. A.R.S. § 13–752(I). Therefore, it would have been futile for counsel to move to preclude the sodium azide evidence introduced at the guilt phase of trial from consideration during the aggravation phase.[41] Failure to raise a meritless motion does not constitute ineffective assistance of counsel. *See Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27.

16
17
18
19
20

In addition, cruelty was established apart from Joe's ingestion of sodium azide and therefore Andriano cannot show that she was prejudiced by counsel's performance on this issue. Joe's defensive wounds showed that he was conscious, but in a debilitated condition, while Andriano bludgeoned him with the barstool. As the Arizona Supreme Court found on independent review:

21
22
23
24

> . . . Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish.

25
26

*Andriano*, 215 Ariz. at 511, 161 P.3d at 554.

27
28

---

[41] The parties agree that the sodium azide evidence was integral to both the prosecution and the defense theories of the case during the guilt phase of trial. (Doc. 17 at 199; Doc. 18 at 190.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The court also rejected Andriano's argument that mental anguish could not be proved because "Joe did not know he was being poisoned." *Id.* The court held that "a victim's knowledge of the source of physical pain . . . is not a requisite for a finding of mental anguish," and concluded that "on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned." *Id.*

Under the "doubly deferential" deferential standard of review that applies to a *Strickland* claim under the AEDPA, *Mirzayance*, 556 U.S. at 123, Claim 20(A) fails and will be denied. *See Richter*, 562 U.S. at 98.

**B.    Juror misconduct**

In Claim 20(B), Andriano alleges that counsel performed ineffectively by failing to investigate and present evidence of juror misconduct. (Doc. 17 at 201–03.) Andriano asserts that the jurors improperly considered her possible sentences when determining whether the State had proven the (F)(6) aggravating factor. (*Id.*) Andriano did not raise this claim in state court. The claim is therefore unexhausted and defaulted. *See Coleman*, 501 U.S. at 735 n.1; Ariz. R. Crim. P. 32.1(d)–(h); 32.2(a), (b). Andriano argues that the claim's default is excused under *Martinez* by the ineffective assistance of PCR counsel. (Doc. 17 at 201.)

The Court finds that Andriano has failed to establish that PCR counsel performed ineffectively in failing to raise this claim; therefore, she has not shown cause for its default under *Martinez. Ramirez*, 937 F.3d at 1241; *Clabourne*, 745 F.3d at 377.

After Andriano's trial, the *Arizona Republic* newspaper published an article for which a numbers of her jurors had been interviewed. (ROA 444A at 3.) According to the article, one juror stated that "[w]hile jurors were discussing whether to execute Andriano, they considered that they would have no control over whether the trial judge . . . would give her life in prison with or without parole. . . . Jurors did not want to see a 25 years to life sentence." (*Id.* at 5.) The juror also told the reporter that "[w]e also knew with the death penalty that she has an automatic appeal." (*Id.*)

1    Citing the article, defense counsel filed a motion for a new penalty-phase hearing.

2  They argued that the article showed the coercive effect of the court's impasse instruction

3  during deliberations, which caused the lone holdout juror to agree to a verdict of death.

4  (RT 2/4/05 at 6–8; ROA 444; ROA 444A.) In support of the motion, counsel cited the fact

5  that in reaching their penalty-phase verdict the jury had impermissibly considered

6  Andriano's parole eligibility and her right to an automatic appeal. (RT 2/4/05 at 7–8.) The

7  trial court denied the motion. (ROA 448.)

8    PCR counsel interviewed the juror quoted in the article. She stated that "when we

9  decided on the aggravator, we talked about what might happen if we didn't find an

10 aggravating circumstance." (PCR Pet., Ex. 41, ¶ 6; P-App. 3038) The jurors "discussed

11 how [Andriano's] sentencing would go back to the judge and agreed that none of us wanted

12 that. We talked about how we didn't want to see Wendi get out of prison, and that was a

13 key reason why we decided on the cruelty aggravator." (*Id.*)

14    Another juror recalled that "[d]uring deliberations at both the aggravation and

15 mitigation phases of the trial, we discussed what the possible outcome would be if the

16 aggravation outweighed the mitigation and vice versa. We considered what her punishment

17 would be." (*Id.*, Ex. 39, ¶ 8; P-App. 3029)

18    In her PCR petition, Andriano raised a claim alleging that the jurors had committed

19 misconduct by considering possible sentencing outcomes at the aggravation phase of her

20 trial. (PCR pet., Doc. 28-1, Ex. OOOOO at 69–70.) The court denied the claim on

21 procedural grounds, finding that the claim could have been raised earlier, including in a

22 motion for a new trial or in a motion to vacate the judgment. (ME 10/31/12 at 3.)

23    Andriano alleges that "trial counsel rendered ineffective assistance by failing to

24 investigate and challenge, in a post-trial motion, juror misconduct at the aggravation

25 phase." (Doc. 17 at 202.) According to Andriano, "trial counsel was alerted to the fact that

26 Andriano's possible parole eligibility had been considered at the penalty phase because the

27 newspaper article counsel relied on in the motion for a new penalty phase said as much."

28 (*Id.*)

1    Respondents argue that because "this claim rests entirely on inadmissible statements

2  from jurors disclosing their deliberative process. . . , Andriano cannot show *Strickland*

3  prejudice." (Doc. 22 at 193.) The Court agrees.

4    As discussed above and in the Court's order on evidentiary development (Doc. 68

5  at 28), the information Andriano relies on to support this claim is barred from the Court's

6  consideration under Rule 606(b)(1) of the Federal Rules of Evidence and *Tanner*, 483 U.S.

7  at 120.

8    Juror testimony cannot be used to impeach a verdict unless "extrinsic influence or

9  relationships have tainted the deliberations." *Tanner*, 483 U.S. at 120. Rule 606(b)(1)

10  prohibits juror testimony "about any statement made or incident that occurred during the

11  jury's deliberations; the effect of anything on that juror's or another juror's vote; or any

12  juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1).

13  The Rule further states that "[t]he court may not receive a juror's affidavit or evidence of

14  a juror's statement on these matters." *Id.* As relevant here, the only exceptions are

15  questions of whether "extraneous prejudicial information was improperly brought to the

16  jury's attention" or "outside influence was improperly brought to bear upon any juror."

17  Fed. R. Evid. 606(b)(2). These exceptions are inapplicable to the information Andriano

18  relies on.

19    The jurors' alleged discussion of sentencing outcomes did not involve extrinsic

20  evidence. *See Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) ("The fact that Petitioner did

21  not testify in his own defense is not extrinsic evidence. Although the jury's discussion of

22  this issue clearly violated the trial court's instructions, what happened (or did not happen)

23  in the courtroom was a part of the trial, not extrinsic to it.") (citation omitted); *Belmontes*

24  *v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005), *rev'd on other grounds, Ayers v.*

25  *Belmontes,* 549 U.S. 7 (2006) (explaining that jurors' discussion of whether defendant

26  would be paroled was an "intrinsic jury process"). The jury did not learn information about

27  Andriano's possible sentences "through outside contact, communication, or publicity," and

28

1   the information "did not enter the jury room through an external, prohibited route." *United*
2   *States v. Rodriquez*, 116 F.3d 1225, 1227 (8th Cir. 1997).

3       Because the information was part of the trial and not extrinsic, juror testimony about
4   their deliberations is prohibited under Rule 606(b).

5       Andriano contends that Rule 606(b) is "inapposite because Arizona Rule [of
6   Criminal Procedure] 24.1 governed state counsel's actions and is less restrictive." (Doc. 42
7   at 142.) This argument fails.

8       First, Rule 24.1(c) lists the grounds for a new trial based on juror misconduct. Not
9   included in that list is a jury's consideration of possible punishments. Ariz. R. Crim. P.
10  24.1(c); *see State v. Olague*, 240 Ariz. 475, 481 n.4, 381 P.3d 269, 275 (App. 2016)
11  ("Although these comments ran afoul of the trial court's clear instructions not to consider
12  possible punishments when deciding the case, a violation of jury instructions is not
13  included in the list of juror misconduct under Rule 24.1(c)(3) and consequently cannot
14  support a motion for new trial.") (citing *State v. Chaney*, 141 Ariz. 295, 311, 686 P.2d
15  1265, 1281 (1984)).

16      In addition, at the time of Andriano's trial, under Rule 24.1(d), "No testimony or
17  affidavit shall be received which inquires into the subjective motives or mental processes
18  which led a juror to assent or dissent from the verdict." Ariz. R. Crim. P. 24.1(d).[42] Again,
19  the information Andriano relies on concerns the jurors' motives and mental processes. *See,*
20  *e.g.*, *State v. Spears*, 184 Ariz. 277, 908 P.2d 1062 (1996) (finding that inquiry into
21  allegation that the jury discussed the defendant's failure to testify "may have required an
22  improper inquiry into the mental processes of the jurors"); *State v. Mauro*, 159 Ariz. 186,
23  206, 766 P.2d 59, 79 (1988) (holding that a juror's misunderstanding of the burden of proof
24  "relates to the juror's mental processes").

25      The juror information on which this claim of ineffective assistance of counsel is
26  based is inadmissible in state and federal court. In addition, there was no juror misconduct

27
28      [42] Rule 24.1(d) now reads, "But the court may not receive testimony or an affidavit that relates to the subjective motives or mental processes leading a juror to agree or disagree with the verdict." Ariz. R. Crim. P. 24.1(d).

under Arizona law. *See* Ariz. R. Crim. P. 24.1(c); *Olague*, 240 Ariz. at 481 n.4, 381 P.3d at 275. Raising such a claim would have been futile. *See Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27. Accordingly, trial counsel did not perform ineffectively.

PCR counsel in turn did not perform ineffectively by failing to raise the underlying claim of ineffective assistance of trial counsel. There is not a reasonable probability that the result of the PCR proceedings would have been different if PCR counsel had raised the claim. *Ramirez*, 937 F.3d at 1241; *Clabourne*, 745 F.3d at 377. Claim 20(B) therefore remains procedurally defaulted and barred from federal review.[43]

## C.    Mental illness evidence

In Claim 20(C), Andriano alleges that trial counsel's failure to investigate and present expert testimony regarding Andriano's mental illness constituted ineffective assistance of counsel. (Doc. 17 at 204.)

With respect to the (F)(6) aggravating factor, the trial court instructed the jury that in order to prove cruelty, the State had to show that Andriano "knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death." (RT 12/1/04 at 91–92.) The court further instructed the jury that the "heinous" or "depraved" aggravators "focus on a defendant's state of mind at the time of the offense." (*Id*. at 92.) Andriano alleges that counsel performed ineffectively by failing to present mental health evidence to rebut the state-of mind elements of the aggravating factor. (Doc. 17 at 206.)

In her PCR petition, Andriano argued that counsel was ineffective for failing to present evidence of her alleged mental illness to show that she "did not know or have the capacity to know that her actions would cause Joe to suffer (rather than alleviate) further physical pain or mental illness." (PCR pet., Doc. 28-1, Ex. OOOOO at 55.) She relied on

---

[43] In Claim 11, Andriano alleged that the jurors engaged in misconduct by considering sentencing outcomes during their aggravation-phase deliberations. (Doc. 17 at 134–37.) The Court previously found the claim procedurally defaulted and barred from federal review. (Doc. 68 at 13.)

expert reports opining that, due to her "dependence needs" and other factors, she believed she was helping Joe by killing him. (*Id.*) The PCR court rejected the claim on the merits:

> [T]he defendant alleges that her trial counsel was ineffective in the aggravation phase by failing to investigate and present expert testimony regarding her mental illness and by failing to object to the jury's consideration of evidence related to sodium azide poisoning. The Court finds these claims are not colorable. As noted, the sole aggravator was "especially cruel." This aggravator focuses on the physical and mental suffering of the victim rather than on the actions or mental state of the defendant. It is determined by reference to an objective standard, and whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a reasonable person in the defendant's position. *State v. Carlson*, 202 Ariz. 570, ¶ 44, 58 P.3d 1180 (2002) ("Foreseeability in connection with the cruelty factor has been based on an objective rather than subjective standard. We have held that the physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, regardless of whether the defendant actually foresaw it. *State v. Djerf*, 191 Ariz. 583, 595 ¶ 45, 959 P.2d 1274, 1286 ¶ 45 (1998); *State v. Adamson*, 136 Ariz. 250, 255, 665 P.2d 972, 988 (1983)."). Thus, the defendant's mental health evidence would not have been relevant or admissible in the aggravation phase and trial counsel was not ineffective for failing to present it.

(ME 10/30/12 at 4.)

This decision was neither contrary to nor an unreasonable application of clearly established federal law. The PCR court found, under Arizona law, that mental health evidence would have been irrelevant and inadmissible in the aggravation phase. *See Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Specifically, the court explained that Arizona law defines cruelty by an objective standard. The question of whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a reasonable person in the defendant's position. *See State v. Allen*, 248 Ariz. 352, 460 P.3d 1236, 1246 (2020) ("Whether Allen should have known [the victim] would suffer based on the information at hand is an objective inquiry."); *Carlson*, 202 Ariz. at 582, 48 P.3d at 1192.

1     Because Arizona law precludes the omitted evidence at the aggravation phase,

2     counsel did not perform deficiently by failing to offer it. *See Rupe*, 93 F.3d at 1445;

3     *James*, 24 F.3d at 27.

4     Even if admissible, the mental health evidence does not establish that Andriano

5     could not reasonably have known that Joe would suffer physical pain or mental anguish

6     while being beaten repeatedly with a barstool after being poisoned.

7     Andriano contends that her mental health evidence was admissible to challenge the

8     state of mind elements of the heinous and depraved aggravators, which the prosecution

9     also alleged along with cruelty. (Doc. 17 at 207.) The jury, however, did not find that the

10    heinous or depraved factors had been proved. This defeats Andriano's claim that she was

11    prejudiced by counsel's failure to challenge the aggravators with mental health evidence.

12    Accordingly, under the "doubly deferential" standard of review that applies to a

13    *Strickland* claim under the § 2254(d)(1), *Mirzayance*, 556 U.S. at 123, Claim 20(C) fails

14    and will be denied. *See Richter*, 562 U.S. at 98.

15    **D.     Pecuniary gain aggravating factor**

16    Andriano alleges that counsel performed ineffectively by failing to properly move

17    for the dismissal of the pecuniary gain aggravating circumstance. (*Id.* at 207.) Andriano

18    did not raise this claim in state court. The claim is therefore unexhausted and defaulted.

19    *See Coleman*, 501 U.S. at 735 n.1; Ariz. R. Crim. P. 32.1(d)–(h); 32.2(a), (b). Andriano

20    argues that the claim's default is excused under *Martinez* by the ineffective assistance of

21    PCR counsel. (Doc. 17 at 207.) The Court finds that Andriano has failed to establish that

22    PCR counsel performed ineffectively in failing to raise this claim; therefore, she has not

23    shown cause for its default under *Martinez*.

24    During the aggravation phase of trial, the prosecutor relied on the guilt-phase

25    evidence, including evidence of Andriano's attempt to obtain a life insurance policy on

26    Joe, to argue that the pecuniary gain factor was established. At the close of evidence,

27    defense counsel moved for judgment of acquittal on the pecuniary gain factor. (RT

28

1    11/30/04 at 77–97.) The trial court denied the motion. (*Id.* at 99.) The jury, however, found

2    that the factor was not proven. (ROA 393.)

3         Andriano argues that counsel should have moved to dismiss the pecuniary gain

4    allegation before the aggravation phase of trial. (Doc. 17 at 207–10.) She contends that

5    counsel's failure to do so enabled the prosecutor to "emphasize Andriano's greed and

6    dishonesty," which "tainted" the jurors' consideration of the cruelty factor. (*Id.* at 209–10.)

7         There is not a reasonable probability that the result of the PCR proceedings would

8    have been different if PCR counsel had raised this claim of ineffective assistance of trial

9    counsel. *Ramirez*, 937 F.3d at 1241; *Clabourne*, 745 F.3d at 377. First, the jurors rejected

10   the pecuniary gain factor. (ROA 393.) Andriano therefore cannot show prejudice from the

11   factor's submission to the jury. If, as Andriano contends, the prosecutor's characterization

12   of her as greedy and dishonest tainted the jury's deliberations during the aggravation phase,

13   the jury presumably would have found the other aggravators had been proved. It did not.

14        In addition, the State did not introduce any evidence supporting the pecuniary gain

15   factor that had not already been presented during the guilt phase of trial. Therefore,

16   submitting the pecuniary gain factor at the aggravation stage did not enable the jury to

17   consider any evidence that was not previously admitted.

18        Finally, the jurors were instructed that the prosecutor's arguments are not evidence.

19   (ROA 383 at 4.) Jurors are presumed to follow the court's instructions. *See Weeks*, 528

20   U.S. at 234; *Leavitt*, 383 F.3d at 834.

21        PCR counsel did not perform ineffectively by failing to raise this claim. *Ramirez*,

22   937 F.3d at 1241; *Clabourne*, 745 F.3d at 377. Accordingly, Claim 20(D) remains

23   defaulted and barred from federal review.

24   **E.    Conclusion**

25        For the reasons just discussed, Andriano's allegation of ineffective assistance of

26   counsel at the aggravation phase of trial are either meritless or procedurally defaulted and

27   barred from federal review. Claim 20 is denied.

28   **CLAIM 21**

Andriano alleges that her Sixth Amendment right to the effective assistance of appellate counsel was violated by counsel's failure to raise meritorious claims on direct appeal. (Doc. 17 at 210.) She cites 10 instances of ineffective assistance of appellate counsel. (*Id.* at 212–20.)

The Court previously dismissed three of these claims: 21(C), (D), and (E). (Doc. 68 at 29.) Of the remaining claims, Claims 21(F) through 21(J) were not raised in state court.[44] *Martinez* does not apply to excuse the procedural default of claims of ineffective assistance of appellate counsel. *Davila*, 137 S. Ct. at 2062–63. Therefore, the claims remain defaulted and barred from federal review.

The Court addresses the remaining claims, Claims 21(A) and (B), as follows.

Claims of ineffective assistance of appellate counsel are evaluated under the *Strickland* standard. *See Moormann*, 628 F.3d at 1106. A petitioner must show that counsel acted unreasonably in failing to discover and brief a merit-worthy issue and demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, she would have prevailed in her appeal. *Id.*

In Claim 21(A), Andriano alleges that appellate counsel performed ineffectively by failing to raise the issue of DeLozier's "actual conflict of interest." (Doc. 17 at 212.) The PCR court rejected the claim on the merits, finding that appellate counsel did not perform ineffectively because he could not have raised the conflict-of-interest claim on appeal because it had not been raised at trial and depended on extra-record facts. (ME 10/30/12 at 6.)

Andriano does not challenge the PCR court's ruling (s*ee* Doc. 17 at 212) and therefore has not demonstrated that the rejection of the claim was contrary to or an

---

[44] Andriano alleged that appellate counsel performed ineffectively by failing to challenge the admission of unreliable scientific evidence, Claim 21(F); failing to challenge the trial court's improper limitations on voir dire and rehabilitation of jurors, 21(G); failing to correct the Arizona Supreme Court's reliance on facts not in evidence, 21(H); failing to argue that execution of Andriano after years spent on death row would be cruel and unusual punishment, 21(I); and failing to challenge Arizona's jury selection process as unconstitutional, 21(J). (Doc. 17 at 218–20.)

1   unreasonable application of clearly established federal law, or based on an unreasonable

2   determination of the facts. Moreover, as described above, the conflict of interest claim fails

3   on the merits, so appellate counsel did not perform ineffectively by failing to raise it. *See*

4   *Wildman*, 261 F.3d at 840. Claim 21(A) is denied.

5       In Claim 21(B), Andriano alleges that appellate counsel failed to challenge the trial

6   court's improper exclusion of relevant, admissible testimony of Joe Andriano's mental

7   state. (Doc. 17 at 213.) The PCR court denied this claim on the merits, finding that the

8   proposed "testimony would have elicited inadmissible hearsay" and, therefore, "the

9   [Arizona] Supreme Court would have found no error in this Court's ruling." (ME 10/30/12

10  at 6.)

11      This decision was neither contrary to nor an unreasonable application of clearly

12  established federal law, nor was it based on an unreasonable determination of the facts.

13  The evidence at issue—Joe's statements to Miller about his, Joe's, state of mind—was

14  inadmissible hearsay under state law. *Estelle*, 502 U.S. at 67–68. As the PCR court found,

15  appellate counsel did not perform ineffectively by failing to raise this claim. *See Wildman*,

16  261 F.3d at 840. Claim 21(B) is denied.

17  **CLAIM 23**

18      Andriano alleges that the death penalty violates her rights under the Eighth and

19  Fourteenth Amendments because it is irrationally and arbitrarily imposed and serves no

20  purpose that is not adequately addressed by life in prison. (Doc. 17 at 223.) The Arizona

21  Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was

22  neither contrary to nor an unreasonable application of clearly established federal law.[45]

23      Andriano cites no clearly established federal law in support of her argument, and

24  the cases are to the contrary. *See Walton*, 497 U.S. at 655–56; *Smith*, 140 F.3d at 1272;

25

26      [45] Andriano contends that the Arizona Supreme Court did not address the claim on
the merits and therefore its decision is not entitled to deference under the AEDPA. (Doc.
17 at 223–24.) She is incorrect. In the appendix to its opinion, the court denied Andriano's
various challenges to the constitutionality of Arizona's death penalty scheme, *Andriano*,
27  215 Ariz. at 513, 161 P.3d at 556, including the claims raised as Claims 23 through 33 in
her habeas petition. *See Richter*, 562 U.S. at 99–100 (explaining that AEDPA deference
28  applies even where state court provided no reason for its decision).

*Roseberry v. Ryan*, No. 15-CV-1507-PHX-NVW, 2019 WL 3556932 at *37 (D.AZ. August 5, 2019). Claim 23 is denied.

**CLAIM 24**

Andriano alleges that application of the death penalty on the facts of her case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. (Doc. 17 at 225.) She asserts that her death sentence is unconstitutional because the Arizona Supreme Court "failed to conduct a comparative proportionality review of Andriano's death sentence." (*Id.* at 226.) The Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application of clearly established federal law.

Proportionality review of death sentences is not constitutionally required. *See McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *Allen*, 395 F.3d at 1018. Moreover, while "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in an arbitrary or irrational fashion, *Pulley*, 465 U.S. at 54 (Stevens, J., concurring); *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated. *See also Walton*, 497 U.S. at 655–56. The Constitution requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). Claim 24 is not supported by clearly established federal law and is denied.

**CLAIM 25**

Andriano alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the death penalty. (Doc. 17 at 227.) The Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application of clearly established federal law.

1    The Supreme Court has held that prosecutors have wide discretion in making the

2    decision whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296–97; *Gregg v.*

3    *Georgia*, 428 U.S. 153, 199 (1976) (holding that pre-sentencing decisions by actors in the

4    criminal justice system that may remove an accused from consideration for the death

5    penalty are not unconstitutional). In *Smith*, the Ninth Circuit rejected the argument that

6    Arizona's death penalty statute is constitutionally infirm because "the prosecutor can

7    decide whether to seek the death penalty." 140 F.3d at 1272. Claim 25 is denied.

8    **CLAIM 26**

9    Andriano alleges that her rights under the Fifth, Sixth, Eighth, and Fourteenth

10   Amendments were violated because the aggravating factors alleged by the State were not

11   supported by findings of probable cause at the indictment stage. (Doc. 17 at 228.) The

12   Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556,

13   was neither contrary to nor an unreasonable application of clearly established federal law.

14   The Supreme Court has held that facts constituting the elements of an offense rather than

15   just a sentencing enhancement must be charged in a *federal* indictment. *See Jones v. United*

16   *States*, 526 U.S. 227, 251–52 (1999). However, the Fifth Amendment Due Process Clause

17   does not incorporate the same requirements into state criminal prosecutions by virtue of

18   the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *see also*

19   *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Because states are not required by the

20   Constitution to empanel grand juries for purposes of indictment, they are not required to

21   specify aggravating factors in an indictment. *See, e.g.*, *Moeller v. Weber*, 635 F. Supp. 2d

22   1036, 1063 (D.S.D. 2009), *order amended on denial of reconsideration*, No. CIV. 04-

23   4200, 2010 WL 9519011 (D.S.D. Apr. 9, 2010), *aff'd*, 649 F.3d 839 (8th Cir. 2011). Claim

24   26 is denied.

25   **CLAIM 27**

26   Andriano alleges that the application of Arizona's newly-enacted death penalty

27   statute, promulgated after *Ring*, violated the *ex post facto* doctrine. (Doc. 17 at 229.) The

28   Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556,

1  was neither contrary to nor an unreasonable application of clearly established federal law.

2        Andriano committed the murder on October 8, 2000. On June 24, 2002, the United

3  States Supreme Court invalidated Arizona's death penalty scheme under which judges

4  rather than juries found the facts making a defendant eligible for the death penalty. *Ring v.*

5  *Arizona* (*Ring I*), 536 U.S. 584 (2002).

6        In denying this claim, the Arizona Supreme Court cited its opinion in *State v. Ring*

7  (*Ring II*), 204 Ariz. 534, 545–47, 65 P.3d 915, 926–28 (2003), holding that the *Ex Post*

8  *Facto* Clause did not prohibit the resentencing of capital defendants after *Ring I* because

9  the new statute provided for only procedural changes and did not place defendants in

10  jeopardy of a greater punishment. *Andriano*, 215 Ariz. at 513, 161 P.3d at 556

11        The *ex post facto* doctrine prohibits a state from "retroactively alter[ing] the

12  definitions of crimes or increas[ing] the punishment for criminal acts." *Collins v.*

13  *Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which punishes as a crime an act

14  previously committed, which was innocent when done; which makes more burdensome the

15  punishment for a crime, after its commission, or which deprives one charged with crime of

16  any defense available according to law at the time when the act was committed, is

17  prohibited as *ex post facto*." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell*

18  *v. Ohio*, 269 U.S. 167, 169–70 (1925)).

19        In *Dobbert*, the defendant was sentenced to death in Florida under a capital

20  sentencing system that was subsequently declared unconstitutional. 432 U.S. at 288.

21  Dobbert argued that he could not be sentenced to death under the amended Florida

22  procedures because at the time of his original sentencing the death penalty was not an

23  available punishment. *Id.* at 297. The Supreme Court rejected the argument and held that

24  there was no *ex post facto* violation because the changes in Florida's statute were "clearly

25  procedural." *Id.* at 293. "The new statute simply altered the methods employed in

26  determining whether the death penalty was to be imposed; there was no change in the

27  quantum of punishment attached to the crime." *Id.* at 293–94.

28

Under *Dobbert*, the post-*Ring* procedural changes in Arizona's death penalty are not *ex post facto* laws. *See Schriro v. Summerlin*, 542 U.S. 348, 353–54 (2004) ("*Ring*'s holding is properly classified as procedural.").

Andriano's argument is not distinguishable from the claim rejected in *Dobbert*, where the defendant contended there was "no death penalty 'in effect' in Florida" when he committed the murders. 432 U.S. at 297. The Court responded that "this sophistic argument mocks the substance of the Ex Post Facto Clause." *Id.* Similarly, the statute in place at the time Andriano committed the murder and the statute enacted after *Ring I* provided for the same quantum of punishment. While *Ring I* invalidated the procedure by which the death penalty was imposed in Arizona, it did not eliminate the death penalty as a possible sentence for first-degree murder. Claim 27 is denied.

**CLAIM 28**

Andriano alleges that Arizona's capital-sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies capital defendants the benefit of proportionality review of their sentences. (Doc. 17 at 232.) The Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application of clearly established federal law.

As noted above, there is no federal constitutional right to proportionality review of a death sentence. *McCleskey*, 481 U.S. at 306 (citing *Pulley*, 465 U.S. at 43). The Arizona Supreme Court discontinued the practice in 1992. *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the "substantive right to be free from a disproportionate sentence" is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 28 is denied.

**CLAIM 29**

Andriano alleges that Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove that the death penalty is appropriate by imposing a beyond-a reasonable-doubt standard of proof at the penalty phase of trial. (Doc.

17 at 233, 234.) The Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application of clearly established federal law.

The Constitution does not require that a death penalty statute set forth specific standards for a capital sentencer to follow in its consideration of aggravating and mitigating circumstances. *See Zant*, 462 U.S. at 875 n.13 (explaining that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"); *see also Tuilaepa*, 512 U.S. at 979–80 ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."). In *Marsh*, the Court explained:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (2006) (quoting *Franklin*, 487 U.S. at 179).

Accordingly, the Constitution does not require the capital sentencer to find that the aggravating circumstances outweigh mitigation beyond a reasonable doubt. *See Smith*, 140 F.3d at 1272 (summarily rejecting claim based on failure to apply beyond a reasonable doubt standard at sentencing); *Williams v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995) ("[T]he failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional."). Claim 29 is denied.

**CLAIM 30**

Andriano alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not provide objective standards to guide the sentencer in weighing the aggravating factors against the mitigating circumstances. (Doc. 17 at 235.) The Arizona Supreme Court's denial of this claim, *Andriano*, 215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application of clearly

1    established federal law. The Supreme Court has held that in a capital case "the sentencer
2    may be given 'unbridled discretion in determining whether the death penalty should
3    be imposed after it has found that the defendant is a member of the class made eligible for
4    that penalty.'" *Tuilaepa*, 512 U.S. at 979–80 (quoting *Zant*, 462 U.S. at 875); *see Franklin*,
5    487 U.S. at 179 ("[W]e have never held that a specific method for balancing mitigating and
6    aggravating factors in a capital sentencing proceeding is constitutionally required."). Claim
7    30 is denied.

8    **CLAIM 32**

9         Andriano alleges that execution by lethal injection is cruel and unusual punishment.
10   (Doc. 17 at 239.)  Andriano does not indicate how the Arizona Supreme Court's denial of
11   this claim, 215 Ariz. at 513, 161 P.3d at 556, conflicts with or unreasonably applies
12   controlling Supreme Court law. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008). Moreover, the
13   Ninth Circuit has concluded that Arizona's lethal injection protocol does not violate the
14   Eighth Amendment. *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

15        In addition, prior to execution, Andriano may present this claim in a separate civil
16   rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573, 579–80,
17   (2006) (recognizing that a challenge to the State's execution method may be brought in a
18   § 1983 action). Claim 32 is denied.

19   **CLAIM 33**

20        Andriano alleges that Arizona's capital-sentencing scheme violates the Eighth and
21   Fourteenth Amendments because it requires a death sentence whenever one aggravating
22   circumstance and no mitigating circumstances are found with respect to an eligible
23   defendant. (Doc. 17 at 246.) The Arizona Supreme Court's denial of this claim, *Andriano*,
24   215 Ariz. at 513, 161 P.3d at 556, was neither contrary to nor an unreasonable application
25   of clearly established federal law.

26        Arizona's death penalty scheme allows certain, statutorily-defined aggravating
27   factors to be considered in determining eligibility for the death penalty. For death to be an
28   appropriate sentence, at least one aggravating factor must be found and the court must

1    determine that the mitigating circumstances do not warrant a lesser sentence. Again, this

2    scheme has been found constitutionally sufficient. *See Jeffers*, 497 U.S. at 774–77; *Walton*,

3    497 U.S. at 649–56; *Woratzeck v. Stewart*, 97 F.3d 329, 334–35 (9th Cir. 1996); *see also*

4    *Smith*, 140 F.3d at 1272. Claim 33 is denied.

5    **CLAIM 34**

6    Andriano alleges that she will be denied a fair clemency process in violation of the

7    Eighth and Fourteenth Amendments. (Doc. 17 at 247.)

8    This claim is not cognizable on federal habeas review. Habeas relief may only be

9    granted on claims that a prisoner "is in custody in violation of the Constitution or laws or

10   treaties of the United States." 28 U.S.C. § 2254(a). Andriano's challenge to state clemency

11   procedures and proceedings does not represent an attack on her detention and thus does not

12   constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir.

13   1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (1997). Claim 34 is

14   denied.

15   **IV.  CERTIFICATE OF APPEALABILITY**

16   Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

17   cannot take an appeal unless a certificate of appealability has been issued by an appropriate

18   judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

19   district judge must either issue or deny a certificate of appealability when it enters a final

20   order adverse to the applicant. If a certificate is issued, the court must state the specific

21   issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

22   Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner

23   "has made a substantial showing of the denial of a constitutional right." This showing can

24   be established by demonstrating that "reasonable jurists could debate whether (or, for that

25   matter, agree that) the petition should have been resolved in a different manner" or that the

26   issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*,

27   529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue

28   only if reasonable jurists could debate whether the petition states a valid claim of the denial

1    of a constitutional right and whether the court's procedural ruling was correct. *Id.*

2    The Court finds that reasonable jurists could debate its resolution of Claim 1,

3    alleging prosecutorial misconduct; Claim 2, alleging a conflict of interest; and Claim 3(A),

4    alleging ineffective assistance of counsel at sentencing.

5    **V.  CONCLUSION**

6    The Court has considered Andriano's claims and determined that none establish

7    entitlement to habeas relief.

8    Based on the foregoing,

9    **IT IS HEREBY ORDERED** that Andriano's Petition for Writ of Habeas Corpus

10    (Doc. 17) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

11    **IT IS FURTHER ORDERED** granting a certificate of appealability with respect

12    to Claims 1, 2, and 3(A).

13    **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

14    this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

15    85007-3329.

17    Dated this 19th day of January, 2021.

21    _____

     Susan R. Bolton

     United States District Judge